# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

NATIONAL PUBLIC RADIO, INC.,
1111 North Capitol Street NE,
Washington, DC 20002;

ROARING FORK PUBLIC RADIO, INC. D/B/A
ASPEN PUBLIC RADIO,
110 E. Hallam Street, Suite 134,
Aspen, CO 81611;

COLORADO PUBLIC RADIO,
7409 S. Alton Court,
Centennial, CO 80112;

KUTE INC. D/B/A KSUT PUBLIC RADIO,
15150 CO-172,
Ignacio, CO 81137,

                  *Plaintiffs*,

        v.

DONALD J. TRUMP, in his official capacity as
President of the United States,
1600 Pennsylvania Avenue NW
Washington, D.C. 20500;

RUSSELL T. VOUGHT, in his official capacity
as Director of the Office of Management and
Budget, 725 17th Street NW,
Washington, D.C. 20503;

SCOTT BESSENT, in his official capacity as
Secretary of the Treasury, 1500 Pennsylvania
Avenue NW
Washington, D.C. 20220;

MARIA ROSARIO JACKSON, in her official
capacity as Chair of the National Endowment
for the Arts, 400 7th Street SW
Washington, D.C. 20506;

OFFICE OF MANAGEMENT AND BUDGET, 725
17th Street NW,
Washington, D.C. 20503;

UNITED STATES DEPARTMENT OF THE
TREASURY, 1500 Pennsylvania Avenue NW
Washington, D.C. 20220;

**Civil Case No. _____**


**COMPLAINT FOR DECLARATORY
AND INJUNCTIVE RELIEF**

NATIONAL ENDOWMENT FOR THE ARTS, 400
7th Street SW
Washington, D.C. 20506;

THE CORPORATION FOR PUBLIC
BROADCASTING, 401 9th Street NW
Washington, D.C. 20004,

*Defendants*.

**INTRODUCTION**

1.      Plaintiff National Public Radio, Inc. (NPR) and Plaintiffs Roaring Fork Public Radio, Inc. d/b/a Aspen Public Radio (Aspen Public Radio), Colorado Public Radio (CPR), and KUTE, Inc. d/b/a KSUT Public Radio (KSUT) (together, the Local Member Stations) bring this action to challenge an Executive Order that violates the expressed will of Congress and the First Amendment's bedrock guarantees of freedom of speech, freedom of the press, and freedom of association, and also threatens the existence of a public radio system that millions of Americans across the country rely on for vital news and information.

2.      "If there is any fixed star in our constitutional constellation, it is that no official, high or petty, can prescribe what shall be orthodox" in matters of politics or opinion.  *West Va. State Bd. of Educ. v. Barnette*, 319 U.S. 624, 642 (1943).  As the Supreme Court reiterated just last year, "it is no job for government to decide what counts as the right balance of private expression— to 'un-bias' what it thinks biased, rather than to leave such judgments to speakers and their audiences."  *Moody v. NetChoice, LLC*, 603 U.S. 707, 719 (2024).  These fundamental First Amendment principles apply in full force in the context of public media and doom Executive Order 14290, which expressly aims to punish and control Plaintiffs' news coverage and other speech the Administration deems "biased."  The Order also violates due process, the Separation of Powers and the Spending Clause of the Constitution.  *See* U.S. Const. Art. I, § 8, cl. 1.  It cannot stand.

3.      By statute and longstanding public policy, Congress has for decades promoted, supported and protected from governmental interference the speech of private entities in the public broadcasting system, including NPR and non-commercial radio stations like the Local Member Stations.  In so doing, Congress recognized not only that promoting and supporting public broadcasting serves the public interest, but also that such speech remains private—and thus fully

1

protected from censorship, retaliation or other forms of governmental interference, consistent with the Constitution and our country's democratic traditions. Yet the President—criticizing what he perceives as "bias" in the award-winning journalism and cultural programming produced by NPR—has issued an Executive Order that thwarts Congress's intent and the First Amendment rights of Plaintiffs to be free from the government's attempts to control their private speech, and their rights to be free from retaliation aimed at punishing and chilling protected speech, journalistic activities, and expressive association.

4.    Congress enacted the Public Broadcasting Act of 1967 (the Act) because it determined that broad access to free, high-quality, independent public radio and television programming produced and aired by private entities for the benefit of all Americans was a public good. The Act created the infrastructure for a public radio system that, today, reaches approximately 99 percent of the U.S. population over the airwaves and, in doing so, serves the same fundamental purpose—to foster an engaged and informed citizenry—as the First Amendment. *See Citizens United v. Federal Election Comm'n*, 558 U.S. 310, 339 (2010) ("The right of citizens to inquire, to hear, to speak, and to use information to reach consensus is a precondition to enlightened self-government and a necessary means to protect it.")

5.    Two pillars of the Act have been central to its success. First, Congress appropriated federal funding to support independent public broadcasting—funding that it has continued to appropriate, year after year, with bipartisan support. Second, to achieve Congress's "cardinal objective" that public broadcasting be shielded from "extraneous interference and control," the Act creates an "elaborate structure . . . to insulate [broadcasters] from government interference," *FCC v. League of Women Voters of Cal.*, 468 U.S. 364, 386-89 (1984)—including by interposing

a private entity, the Corporation for Public Broadcasting (the Corporation or CPB), between the government and the ultimate recipients of appropriated funds.

6.    For more than 50 years, NPR has been a vital source for news and cultural programming, ranging from *Morning Edition* and *All Things Considered* to *Planet Money* and *Tiny Desk Radio*.  NPR serves an audience of more than 43 million Americans each week, including through a network of local public radio stations like the Local Member Stations that are dedicated to serving their communities.  And as the entity selected by the nation's public radio stations to manage and operate the Public Radio Satellite System (PRSS)—the nation's public radio interconnection system—NPR for decades has provided critical infrastructure services for an even larger group of radio stations, ensuring, among other things, that federal emergency alerts reach those residing in the most remote corners of the country.

7.    NPR and the Local Member Stations benefit from, and participate in, the structure for public radio created by Congress in the Act, including its funding mechanisms, and the statutory and constitutional protections that insulate them from governmental interference with their editorial decisions.

8.    On May 1, 2025, President Trump issued Executive Order 14290, entitled "Ending Taxpayer Subsidization of Biased Media" (the Order), 90 Fed. Reg. 19415, which contradicts these statutory precepts and violates the Constitution.  Contrary to Congress's intent to support an independent public radio and television system, and statutory requirements that expressly shield the Corporation and entities like Plaintiffs from governmental interference, the Order directs federal agencies as well as the Corporation to withhold all federal funding from NPR and the Public Broadcasting Service (PBS).  The Order further directs the Corporation to "cease indirect funding to NPR and PBS" by mandating that local radio and television stations that receive grants

3

from CPB, like the Local Member Stations, not use those federal funds to acquire NPR or PBS programming, and by revising existing grant agreements to prohibit grantees "from funding NPR or PBS." Order § 2(b).

9.      It is not always obvious when the government has acted with a retaliatory purpose in violation of the First Amendment. "But this wolf comes as a wolf." *Morrison v. Olson*, 487 U.S. 654, 699 (1988) (Scalia, J., dissenting). The Order targets NPR and PBS expressly because, in the President's view, their news and other content is not "fair, accurate, or unbiased." Order § 1. And the "Fact Sheet" and press release accompanying the Order, which echo prior statements by President Trump and members of his Administration, only drive home the Order's overt retaliatory purpose. They deride NPR's content as "left-wing propaganda," and underline the President's antipathy toward NPR's news coverage and its editorial choices. *See* "Fact Sheet: President Donald J. Trump Ends Taxpayer Subsidization of Biased Media" (May 1, 2025) (asserting that NPR published articles "insist[ing] COVID-19 did not originate in a lab" and "refused to cover the Hunter Biden laptop story");[1] Press Release, "President Trump Finally Ends the Madness of NPR, PBS" (May 2, 2025) (asserting that NPR "apologized for calling illegal immigrants 'illegal'").[2]

10.      The Order is unlawful in multiple ways. It flatly contravenes statutes duly enacted by Congress and violates the Separation of Powers and the Spending Clause by disregarding Congress's express commands. It also violates the First Amendment's guarantees of freedom of speech and of the press. The Order's objectives could not be clearer: the Order aims to punish

---

[1] Available at https://www.whitehouse.gov/fact-sheets/2025/05/fact-sheet-president-donald-j-trump-ends-the-taxpayer-subsidization-of-biased-media/.

[2] Available at https://www.whitehouse.gov/articles/2025/05/president-trump-finally-ends-the-madness-of-npr-pbs/.

NPR for the content of news and other programming the President dislikes and chill the free exercise of First Amendment rights by NPR and individual public radio stations across the country. The Order is textbook retaliation and viewpoint-based discrimination in violation of the First Amendment, and it interferes with NPR's and the Local Member Stations' freedom of expressive association and editorial discretion. This is an "egregious form of content discrimination," an assault on the First Amendment that is "all the more blatant." *Rosenberger v. Rector & Visitors of Univ. of Va.*, 515 U.S. 819, 829 (1995). In the words of the D.C. Circuit, such "viewpoint discrimination is poison." *Frederick Douglass Found., Inc. v. District of Columbia*, 82 F.4th 1122, 1141 (D.C. Cir. 2023) ((internal quotations omitted)). Lastly, by seeking to deny NPR critical funding with no notice or meaningful process, the Order violates the Constitution's Due Process Clause.

## PARTIES

11.    Plaintiff National Public Radio, Inc. (NPR) is a private nonprofit corporation. It is headquartered in, and incorporated under the laws of, the District of Columbia.

12.    Plaintiff Roaring Fork Public Radio, Inc. d/b/a Aspen Public Radio (Aspen Public Radio) is a public radio station based in Aspen, Colorado. It has been an NPR Member station since 1990.

13.    Plaintiff Colorado Public Radio (CPR) is a public radio network based in Centennial, Colorado, with offices in Denver, Grand Junction, and Colorado Springs. It has been an NPR Member station since 1973.

14.    Founded by the Southern Ute Indian Tribe in 1976, Plaintiff KUTE Inc., d/b/a KSUT Public Radio (KSUT), is a public radio network based in Ignacio, Colorado. It has been an NPR Member station since 1984.

15.     Defendant Donald J. Trump is the President of the United States. He is sued in his official capacity.

16.     Defendant Russell T. Vought is Director of the Office of Management and Budget. He is sued in his official capacity.

17.     Defendant Scott Bessent is Secretary the United States Department of the Treasury. He is sued in his official capacity.

18.     Defendant Maria Rosario Jackson is Chair of the National Endowment for the Arts. She is sued in her official capacity.

19.     Defendant Office of Management and Budget is a federal agency established within the Executive Office of the President headquartered in Washington, D.C.

20.     Defendant United States Department of the Treasury is a federal agency headquartered in Washington, D.C.

21.     Defendant National Endowment for the Arts is an independent federal agency headquartered in Washington, D.C.

22.     Defendant Corporation for Public Broadcasting is a nonprofit corporation headquartered in Washington, D.C. The Corporation is named as a defendant solely for the purpose of obtaining complete relief.

## JURISDICTION AND VENUE

23.     This Court has subject-matter jurisdiction because this action arises under the Constitution of the United States and federal statutes, 28 U.S.C. § 1331, and because the individual Defendants are United States officials, 28 U.S.C. § 1346(a)(2).

24.     The Court is authorized to award the requested relief under 28 U.S.C. §§ 2201 and 2202 and pursuant to its inherent equitable powers.

6

25.     Venue is proper in this District under 28 U.S.C. § 1391(b) because a substantial part of the events giving rise to the claims occurred in the District of Columbia; and under 28 U.S.C. § 1391(e)(1) because the federal agency defendants reside in the District of Columbia.

## BACKGROUND

### The Public Broadcasting Act and the Corporation for Public Broadcasting

26.     Congress, determining that "it is in the public interest to encourage the growth and development of public radio and television broadcasting," established the Corporation for Public Broadcasting (the Corporation or CPB) in the Public Broadcasting Act of 1967 (the Act).  47 U.S.C. § 396(a)(1), (b).

27.     The Corporation was established as a private "nonprofit corporation" and is not "an agency or establishment of the United States Government."  *Id.* § 396(b).

28.     The Corporation is overseen by a Board of Directors appointed by the President and confirmed by the Senate.  *Id.* § 396(c)(2).

29.     The Corporation's primary purposes include to "facilitate the full development of public telecommunications in which programs of high quality" and "creativity" will be "obtained from diverse sources" and "made available to public telecommunications entities"; to "assist in the establishment and development of one or more interconnection systems to be used for the distribution of public telecommunications services"; and to "assist in the establishment and development of one or more systems of public telecommunications entities."  *Id.* § 396(g)(1).

30.     The Public Broadcasting Act details how the Corporation must allocate its general appropriation from Congress.  After administrative and system support expenses, the Corporation must spend 25 percent of that appropriation to support public radio and 75 percent to support public television.  47 U.S.C. § 396(k)(3)(A).

31.     Of the amount designated for public radio funding, the Corporation must make 70 percent available to public radio stations that meet certain criteria.  A further 23 percent must be made available to those public radio stations exclusively for "acquiring or producing programming that is to be distributed nationally and is designed to serve the needs of a national audience."  *Id.* § 396(k)(3)(A)(iii).  The remaining 7 percent must be made available for the production of public radio programming.  *Id.*

32.     The Corporation distributes the vast majority of public radio funding to local public radio stations.  In general, stations may apply for two types of grants from the Corporation, consistent with the provision of the Public Broadcasting Act.  The first, called "unrestricted" Community Service Grants (CSGs), can be used to fund programming and production, educational outreach, broadcasting, transmission, distribution, and other operational expenses.  *See id.* § 396(k)(3)(A)(iii)(I).  The second, called "restricted" CSGs, must be used to acquire or produce programming that is distributed nationally and serves the needs of national audiences.  *See id* § 396(k)(3)(A)(iii)(III).  Member stations may use restricted grant funds to acquire NPR content or content from other national producers.  Public radio stations may also use these funds to produce programming locally and distribute it regionally or nationally.  For some local public radio stations in rural or remote areas, CPB grants constitute 50 percent or more of their operating budgets.

33.     The Public Broadcasting Act separately establishes a Satellite Interconnection Fund to fund interconnection systems used for the distribution of public telecommunications services.  *Id.* §§ 396(g)(1)(B), (k)(10).  Subject to other statutory requirements, all funds appropriated to the Satellite Interconnection Fund "shall be distributed by the Corporation" to public education television stations or the entity they designate for interconnection purposes, and "to those public telecommunications entities participating in the public radio satellite interconnection system or the

national entity they designate for satellite interconnection purposes." *Id.* § 396(k)(10)(D)(i). Those funds must be used "exclusively for the capital costs of the replacement, refurbishment, or upgrading of their national satellite interconnection systems and associated maintenance of such systems." *Id.* The Public Radio Satellite System (PRSS) is the nation's public radio interconnection system.

34.    Congress has appropriated $535 million in general funding for the Corporation for Fiscal Years 2025, 2026, and 2027. *See* Pub. L. No. 117-328, Div. H, tit. IV (for Fiscal Year 2025); Pub. L. No. 118-47, Div. D, tit. IV (for Fiscal Year 2026); Pub. L. No. 119-4, Div. A, tit. I, § 1112 (extending prior appropriations "in the same amount" for Fiscal Year 2027). Additionally, Congress has appropriated $60 million for interconnection services for Fiscal Year 2025. *See* Pub. L. No. 118-47, Div. D, tit. IV ($60 million for interconnection services for Fiscal Year 2024); Pub. L. No. 119-4, Div. A, tit. I, § 1101(a)(8) (extending appropriations at the same levels as Fiscal Year 2024).

35.    In enacting the Public Broadcasting Act, one of Congress's overriding goals was to guarantee the Corporation, and the public broadcasting entities that receive federal funds from the Corporation, "maximum protection from extraneous inference and control." 47 U.S.C. § 396(a)(1).

36.    The Act expressly denies "authoriz[ation to] any department, agency, officer, or employee of the United States to exercise any direction, supervision, or control over public telecommunications, or over the Corporation or any of its grantees or contractors, or over the charter or bylaws of the Corporation, or over the curriculum, program of instruction, or personnel of any . . . public telecommunications entity." *Id.* § 398(a). This provision has only one exception, concerning the enforcement of antidiscrimination laws. *Id.* § 398(b).

37.    The Act further clarifies that "[n]othing in this section shall be construed to authorize any department, agency, officer, or employee of the United States to exercise any direction, supervision, or control over the content or distribution of public telecommunications programs and services." *Id.* § 398(c).  Still another provision in the Act makes clear that the Corporation is to "carry out its purposes and functions . . . in ways that will most effectively assure the maximum freedom of the public telecommunications entities and systems from interference with, or control of, program content or other activities." *Id.* § 396(g)(1)(D).

38.    In addition to making clear that the Corporation is "not . . . an agency or establishment of the United States Government," *id.* § 396(b), the Act also makes clear that the CPB's Board members "shall not, by reason of such membership, be deemed to be officers or employees of the United States," *id.* § 396(d)(2).  The Board is fully empowered to choose CPB's President and other officers, who are not government employees, and who "shall serve at the pleasure of the Board." *Id.* § 396(e)(1).  The Board is expressly prohibited from using any "political test or qualification" in selecting officers or taking other personnel actions. *Id.* § 396(e)(2).

39.    In order to further ensure that the Corporation allocates funding in a manner that is free from political influence and aligned with Congress's goals, the Act directs the Corporation to distribute funds to public radio stations "in accordance with eligibility criteria . . . that promote the public interest in public broadcasting, and on the basis of a formula designed to" provide for the financial needs of those stations in relation to their audiences; provide incentives for non-federal financial support; and "assure that each eligible licensee and permittee of a public radio station

receives a basic grant." *Id.* § 396(k)(6)(B). Accordingly, each year CPB publishes its "Radio Community Services Grants General Provisions and Eligibility Criteria" (Eligibility Criteria).[3]

40.    The Eligibility Criteria for local public radio stations require that stations comply with the Public Broadcasting Act's requirements. Those requirements include, among other things, that recipients must conduct open meetings; maintain open financial records; establish a community advisory board; and produce employment statistical reports. *See* Eligibility Criteria at 4-6; 47 U.S.C. §§ 396(k)(4), (5), (8), (11), (12). Recipients must also meet various technical requirements with respect to recordkeeping, operations, staffing, audience service, and training. Eligibility Criteria at 6-13. The Eligibility Criteria do not take into account the content or viewpoint of a local public radio station's programming.

41.    If a public radio station meets the Eligibility Criteria, it is entitled to receive funding in accordance with a specific formula promulgated by the Corporation. *See* Corporation for Public Broadcasting, "Fiscal Year 2025 Radio Station Grant Calculations."[4] That formula reflects the Public Broadcasting Act's requirement that a fixed portion of grant funds must be spent on programming designed to serve a national audience. *Id.*; *see* 47 U.S.C. § 396(k)(3)(A)(iii)(III).

**The National Endowment for the Arts**

42.    The National Endowment for the Arts (NEA) is an independent federal agency that supports the arts through grant programs. As relevant here, it is authorized to award grants to nonprofit organizations for purposes such as "enabling cultural organizations and institutions to

---

[3] Available at
https://cpb.org/sites/default/files/FY%202025%20Radio%20CSG%20General%20Provisions%20and%20Eligibility%20Criteria.pdf.

[4] Available at
https://cpb.org/sites/default/files/Radio%20Community%20Service%20Grant%20Calculations%20-%20FY%202025.pdf.

increase the levels of continuing support and to increase the range of contributors to the programs of such organizations or institutions"; "providing administrative and management improvements for cultural organizations and institutions"; "enabling cultural organizations and institutions to increase audience participation in, and appreciation of, programs sponsored by such organizations and institutions"; and "stimulating artistic activity and awareness which are in keeping with the varied cultural traditions of this Nation."  20 U.S.C. § 954(p).

43.    When considering grant applications, NEA is required to ensure that "applications are consistent with the purposes of this section" and that "artistic excellence and artistic merit are the criteria by which applications are judged, taking into consideration general standards of decency and respect for the diverse beliefs and values of the American public."  *Id.* § 954(d).

## National Public Radio

44.    NPR is an independent, nonprofit media organization that serves millions of Americans each day.  NPR is not a public radio station, nor does it operate one.  Instead, NPR produces, acquires, and distributes programming, including national news programming, that is made available to independent locally owned and operated public radio stations around the country.  NPR's mission is to work with those local public radio stations to cultivate an informed public, fostering a deeper understanding and appreciation of events, ideas, and cultures.

45.    A local public radio station may choose to become an NPR Member station.  NPR's commitment to its Member stations is to provide benefits that help them deliver on their mission to the American people, grow audiences across platforms, and build sustainable business models.

46.    NPR Member stations pay a membership "core fee" to license certain NPR content, which may include *Morning Edition*, *All Things Considered*, and *Weekend Edition*, and receive other benefits, including NPR-led advocacy on behalf of the public radio system, digital services,

and music licensing support, among other things. Member stations may also choose to license additional content from NPR such as specific news, talk, entertainment, or music programs. NPR Member stations participate in NPR's governance, including voting for and serving on NPR's Board of Directors. A Member station's "core fee" is calculated on an individualized basis based on a variety of factors designed to ensure alignment with the station's revenue size and reflect NPR's contribution to the station's ability to generate revenue from its local audience. A Member station's "core fee" is not based on the amount of federal support that it may receive from the Corporation. NPR currently has 246 Member stations across the country, including in the District of Columbia, U.S. Virgin Islands, and Guam, collectively operating more than 1,000 public radio signals and hundreds of digital platforms.

47.     *All Things Considered*, NPR's flagship news program, is the most listened-to afternoon drive-time, news radio program in the country. Since its debut in 1971, *All Things Considered* has provided listeners with the biggest stories of the day, thoughtful commentaries, and insightful features on arts and life, music and entertainment. *All Things Considered* and NPR's weekday morning radio news program, *Morning Edition*, draw on reporting from correspondents based around the world, and producers and reporters in locations throughout the United States, including reporters at local Member stations across the country.

48.     NPR upholds the highest standards of public service in journalism. NPR's excellence in journalism has repeatedly been recognized. In recent years, for example, NPR has won a Pulitzer Prize, eight Edward R. Murrow awards, two National Press Club awards, and an Alfred I. duPont-Columbia award for its exceptional journalism.

49.     NPR ensures the integrity and high standards of its journalism through multiple, rigorous safeguards. It maintains an editorial firewall that protects against interference in editorial

decision-making by its management or external actors, and it requires all editorial staff to adhere to stringent ethics policies set out in the NPR Ethics Handbook. Among other things, the NPR Ethics Handbook prohibits staff connected with news coverage from making contributions to political campaigns or referendums.

50. NPR also manages and operates the Public Radio Satellite System (PRSS), the nation's public radio interconnection system. The PRSS is the satellite and terrestrial content distribution system that serves as the nationwide infrastructure backbone of the public radio system. The PRSS, which has been managed and operated by NPR for decades, delivers thousands of hours of news, music, and other programming from a wide range of producers each year to public radio stations across the country.

51. The PRSS plays a vital role in ensuring that essential information reaches all Americans during times of emergency. It serves 379 public radio stations, including NPR's 246 Member stations, and more than 1,200 radio signals, enabling essential information to reach approximately 99 percent of Americans over the airwaves, including those living in rural or remote communities. In the event of a nationwide crisis, the PRSS receives Presidential alerts from the Federal Emergency Management Agency (FEMA), which it transmits to public radio stations throughout the country. The PRSS has been named as a resource in at least 20 states' emergency plans, and public radio stations are included in more than 35 states' emergency plans.

52. Each of the public radio stations participating in the PRSS (collectively, the Interconnected Stations) is a stakeholder in its collective assets and a customer of the services it provides. Interconnected Stations own their own downlink and uplink equipment. For purposes of the Public Broadcasting Act, the Interconnected Stations have "designate[d]" NPR as the "national entity" responsible for managing and operating the PRSS. 47 U.S.C. § 396(k)(10)(D)(i).

53.    NPR is funded primarily through sponsorships, donations from individuals and private entities, membership and licensing fees from local public radio stations, direct funding from the Corporation, and direct funding from other government grants, including grants awarded by the NEA.

54.    In total, NPR receives approximately $100 million, or approximately 31 percent of its annual operating revenue through membership fees and the licensing of content to its 246 Member stations and other public radio stations.

55.    Member stations choose to acquire content from NPR for a variety of reasons, including audience interest, the needs of their local communities, the relative cost of acquiring such programming, especially in comparison to its value to the station, and their own journalistic and editorial judgments about the quality of NPR's programming.  In many rural areas, NPR Member stations are the only free providers of local and national news, and reliable emergency information.

56.    NPR also receives direct funds through grants from CPB.  For Fiscal Year 2024, it spent approximately $11.1 million, in total, in grants from the Corporation for programming and to support the PRSS.  NPR must apply for such grants and comply with the terms of any applicable grant agreements, including, for example, by producing reports.

57.    Approximately $6.8 million of that funding came from a grant specifically designated to support the PRSS.

58.    Approximately $4.3 million of that funding came from competitive grants used, among other things, to provide safety and security for journalists working in war zones, produce content regarding the war in Ukraine, and provide support for local news stations in rural areas.

59.    For the past several years, NPR also has received grants from the NEA.  In 2024, NPR was awarded approximately $65,000 in NEA grant funding.

**The Local Member Stations**

60.    Aspen Public Radio, Colorado Public Radio, and KSUT are three NPR Member stations serving communities in the state of Colorado.  Each of the Local Member Stations provides free, high-quality local news programming for the communities they serve.

61.    Aspen Public Radio is a nonprofit, member-supported, non-commercial community service of Roaring Fork Public Radio, Inc., serving communities in the Roaring Fork, Crystal, Colorado, Fryingpan, and Eagle River valleys.  Its mission is to support, nourish, and enrich its community by providing informative, entertaining, and educational radio and digital programming in a reliable and professional manner.

62.    Founded in 1980 as Roaring Fork Public Radio Translator, Aspen Public Radio has grown from broadcasting daily hog prices from the University of Wyoming into one of the most relied upon news institutions in the Roaring Fork Valley.  Aspen Public Radio broadcasts award-winning reporting by a team of local journalists, as well as over two dozen national public radio programs, including from NPR, and international news from the BBC.

63.    Aspen Public Radio has been an NPR Member station since 1990.  For nearly its entire existence, NPR programming has been part of the station's broadcast offerings.  The station's tag line is "NPR News for Aspen and the Valley," and the high-quality journalism the NPR network provides is core to Aspen Public Radio's identity as a public radio broadcaster. Aspen Public Radio chooses to air NPR programming because it is a trusted brand.  Aspen Public Radio's audience has repeatedly asked for NPR programming, which provides access to a broader network of journalists and perspectives of communities all across the country.  As an NPR Member

station, Aspen Public Radio is also provided the opportunity to distribute its local reporting through national NPR programming, which is a critical way for Aspen Public Radio to execute its mission. NPR's programming accounts for approximately 92 hours of content aired weekly, including between 12-15 hours per day on weekdays.

64.     Colorado Public Radio (CPR) is a nonprofit, member-supported, non-commercial community service of Public Broadcasting of Colorado.  It is home to CPR News, CPR Classical, and Indie 102.3.  CPR News includes a locally produced program called "Colorado Matters," local newscasts throughout the day, and national and international news, including from NPR.  CPR also operates KRCC, a public radio station in Colorado Springs that broadcasts non-commercial News/Talk programming, including from NPR.  KRCC is a member-supported, non-commercial community service of Colorado College.

65.     CPR's programming airs on 19 full-power stations, augmented by 20 translators. Their combined signal reaches approximately 90 percent of Colorado.

66.     CPR's mission is to deliver meaningful news, music, and cultural experiences to Coloradans.  Over the years, CPR's newsroom has received a number of journalism awards, including RTNDA Edward R. Murrow Awards, Public Radio News Directors Incorporated (PRNDI) Awards, and Colorado Broadcasters Association (CBA) Awards.

67.     CPR has been an NPR Member station since 1973.  It chooses to air NPR's programming because it offers an efficient and trusted way to deliver national and international news directly from communities across the country and around the globe.  NPR programs go beyond daily headlines, sharing stories that inspire, spark curiosity, and highlight our shared human experience.  As part of the NPR Network, CPR's reporting reaches a national audience,

helping to elevate the voice and visibility of Colorado on the national stage. CPR News broadcasts approximately ten hours per day of NPR programming.

68.    KSUT was founded by the Southern Ute Indian Tribe in 1976 as one of only eight Tribal radio stations in the country. It has been an independent, non-profit corporation since 1986. Since 1998, KSUT has broadcast two complementary and comprehensive programming services—Four Corners Public Radio and Tribal Radio—from its studios in Ignacio, Colorado. KSUT serves 14 communities in the Four Corners region, including Durango, Silverton, Cortez, Mancos, and Pagosa Springs, Colorado; Aztec, Bloomfield and Farmington, New Mexico; and four distinct Federally Recognized Tribes including the Southern Ute Indian Tribe, Ute Mountain Ute Tribe, and portions of the Navajo Nation and Jicarilla Apache Nation. KSUT airs news, eclectic music, entertainment, storytelling, and documentary programming.

69.    KSUT's coverage area encompasses approximately 27,000 square miles of mostly rural land. For most of its coverage area, KSUT is the only public radio station available and the only available source of free, reliable local and regional news and information.

70.    KSUT has been an NPR Member station since 1984. It chooses to air NPR's programming because it is high-quality, affordable, and resonates with KSUT's listeners. On weekdays, NPR's programming accounts for seven hours of daily content aired on Four Corners Public Radio and four hours of daily content on Tribal Radio.

71.    Each of the Local Member Stations receives federal funding from the Corporation in the form of Community Service Grants (CSGs). For Fiscal Year 2025, approximately $210,000 of Aspen Public Radio's operating revenue comes from CSG funds, comprising approximately 10.8 percent of its budget. Approximately $1.4 million of CPR's operating revenue comes from

CSG funds, comprising approximately six percent of its budget.  $333,000 of KSUT's operating revenue comes from CSG funds, comprising approximately 19 percent of its budget.

72.    Each of the Local Member Stations pays programming and membership fees to NPR in part with restricted CSG funds they receive from the Corporation—that is, with funds that must be used to acquire or produce programming that is distributed nationally and serves the needs of national audiences.  *See* 47 U.S.C. § 396(k)(3)(A)(iii)(III).

73.    Each of the Local Member Stations is also a stakeholder in the nation's public radio interconnection system and relies on the PRSS to distribute content from public radio producers. The Local Member Stations also rely on the PRSS infrastructure to distribute critical emergency alerts.  Like all Interconnected Stations, the Local Member Stations pay fees to NPR for its management and operation of the PRSS.

**President Trump and his Administration Attack NPR and Threaten Retaliation**

74.    Since his first term in office, President Trump has repeatedly expressed his disagreement with the editorial decisions reflected in the speech and viewpoints of programming offered by NPR and PBS.  For example, on January 26, 2020, President Trump promoted a social-media post claiming that NPR was a "big-government, Democrat Party propaganda operation," and questioning "Why does NPR still exist?"[5]

75.    On March 25, 2025, President Trump announced in a press conference that he would "love to" defund NPR and PBS because of his belief that they are "biased."[6]

---

[5] @realDonaldTrump, Twitter (Jan. 26, 2020),
https://x.com/realdonaldtrump/status/1221436736594681856.

[6] Ali Bianco & John Hendel, *DOGE's next target: NPR and PBS*, Politico (Mar. 26, 2025),
https://www.politico.com/news/2025/03/26/doge-npr-pbs-hearing-00004556.

76.     On March 27, 2025, President Trump wrote on social media: "NPR and PBS, two horrible and completely biased platforms (Networks!), should be DEFUNDED by Congress, IMMEDIATELY. Republicans, don't miss this opportunity to rid our Country of this giant SCAM, both being arms of the Radical Left Democrat Party. JUST SAY NO AND, MAKE AMERICA GREAT AGAIN!!!"[7]

77.     On April 1, 2025, President Trump wrote on social media: "REPUBLICANS MUST DEFUND AND TOTALLY DISASSOCIATE THEMSELVES FROM NPR & PBS, THE RADICAL LEFT 'MONSTERS' THAT SO BADLY HURT OUR COUNTRY!"[8]

78.     On April 10, 2025, President Trump wrote on social media: "NO MORE FUNDING FOR NPR, A TOTAL SCAM! … THEY ARE A LIBERAL DISINFORMATION MACHINE. NOT ONE DOLLAR!!!"[9]

79.     On April 14, 2025, the White House issued a press release entitled "The NPR, PBS Grift Has Ripped Us Off for Too Long."[10]  In it, the White House accused NPR and PBS of "spread[ing] radical, woke propaganda disguised as 'news,'" and provided a list of purported "examples of the trash that passes for 'news' at NPR and PBS."

---

[7] @readlDonaldTrump, Truth Social (Mar. 27, 2025), https://truthsocial.com/@realDonaldTrump/posts/114232752130631453.

[8] @readlDonaldTrump, Truth Social (Apr. 1, 2025), https://truthsocial.com/@realDonaldTrump/posts/114264549657133828.

[9] @readlDonaldTrump, Truth Social (Apr. 10, 2025), https://truthsocial.com/@realDonaldTrump/posts/112248653824267212.

[10] Available at https://www.whitehouse.gov/articles/2025/04/the-npr-pbs-grift-has-ripped-us-off-for-too-long/.

80.    On April 15, 2025, Director Vought stated during an interview that NPR and PBS's journalism "is not just left-wing indoctrination" but "is worse than that," and accused NPR and PBS of "dividing on the basis of wokeism."[11]

### The Administration Purports to Fire Three CPB Board Members and Assert Control over CPB

81.    On the evening of April 28, 2025, the White House's Deputy Director of Presidential Personnel, Trent Morse, emailed three of the Corporation's Board members the following message:

> On behalf of President Donald J. Trump, I am writing to inform you that your position on the Corporation for Public Broadcasting is terminated effective immediately.
>
> Thank you for your service.

Complaint ¶¶ 34-35, *Corporation for Public Broadcasting v. Trump*, No. 25-cv-1305, Dkt. 1 (D.D.C. Apr. 29, 2025).

82.    The following day, the Corporation, its unanimous Board, and the three purportedly terminated Board members sued to challenge the attempted removal. *Id.*; *see also* Plaintiffs' Motion for a Temporary Restraining Order, *Corporation for Public Broadcasting v. Trump*, Dkt. 2 (D.D.C. Apr. 29, 2025).  That suit remains pending.

83.    Also on April 29, 2025, Department of Government Efficiency (DOGE) officials emailed the remaining two Board members requesting a meeting to "discuss getting a DOGE team assigned to the organization."  Reply at 24, *Corporation for Public Broadcasting v. Trump*, Dkt. 12 (D.D.C. May 9, 2025); *see also* Reply Ex. A, Supplemental Declaration of Evan Slavitt ¶ 12, Dkt. 12-1.

---

[11] Frances Vinall, et al., *Trump administration will ask Congress to cut funding for NPR and PBS*, Washington Post (Apr. 15, 2025), https://www.washingtonpost.com/style/2025/04/15/npr-pbs-funding-trump-administration/.

84.    The Corporation has averred that, at the time of the Administration's purported termination of three of its Board members, the Corporation "was negotiating the extension" of its current "PRSS Interconnection grant [with NPR]"— which "expires on September 30, 2025"— "for an additional $35,962,000 using funds that Congress has already appropriated for that specific purpose."  Reply at 20, *Corporation for Public Broadcasting v. Trump*, Dkt. 12; *see also* Reply Ex. A, Supplemental Declaration of Evan Slavitt ¶¶ 35-36, Dkt. 12-1.  According to the Corporation, "[i]f the PRSS Interconnection Grant is not extended, the PRSS system will cease operations and the resulting effects will be catastrophic."  *Id*.

### President Trump Issues the Executive Order Purporting to Terminate All Funding to NPR and PBS Based on the Content and Perceived Viewpoint of Their Speech

85.    On May 1, 2025, President Trump issued Executive Order 14290, titled "Ending Taxpayer Subsidization of Biased Media" (the Order), which purports to direct federal agencies as well as the Corporation to stop NPR and PBS from receiving any federal funding.

86.    Section 1 of the Order announces that its purpose is to terminate federal funding to NPR and PBS based on the perceived viewpoint of some their programming:  It alleges that "neither entity presents a fair, accurate, or unbiased portrayal of current events."  Order § 1; *see also id.* § 2(a) (funding termination is necessary to "ensure that Federal funding does not support biased and partisan news coverage").

87.    Section 1 admits that the Order is motivated by a desire to abrogate the Public Broadcasting Act and appropriations legislation by executive fiat: "[T]oday the media landscape is filled with abundant, diverse, and innovative news options.  Government funding of news media in this environment is not only outdated and unnecessary but corrosive to the appearance of journalistic independence."  *Id.* § 1.

88.    Section 1 states that the President "therefore" instructs the Corporation "and all executive departments and agencies" to "cease Federal funding for NPR and PBS." *Id.*

89.    Section 2 of the Order purports to direct the Corporation to terminate funding streams that benefit NPR and PBS.  First, it states that the "CPB Board shall cease direct funding to NPR and PBS, consistent with my Administration's policy to ensure that Federal funding does not support biased and partisan news coverage.  The CPB Board shall cancel existing direct funding to the maximum extent allowed by law and shall decline to provide future funding." *Id.* § 2(a).  Second, it states that the CPB Board "shall [cease to] provide indirect funding to NPR and PBS, including by ensuring that [local public stations] do not use Federal funds for NPR and PBS." *Id.* § 2(b).  The CPB Board shall do this, the Order states, by revising its 2025 Eligibility Criteria "to prohibit direct or indirect funding of NPR and PBS" by June 30, 2025.  *Id.*  The Order further states that "the CPB Board shall take all other necessary steps to minimize or eliminate its indirect funding of NPR and PBS." *Id.*

90.    Section 2 of the Order also appears to dictate that no CPB money shall go to any public broadcasting station that acquires NPR or PBS content even with *non-CPB* money.  It provides that, "[t]o the extent permitted" by the 2024 Eligibility Criteria "and applicable law," the CPB Board shall "prohibit parties subject to [those criteria] from funding NPR or PBS after the date of this order." *Id.*

91.    Section 3 of the Order concerns sources of funding other than the Corporation.  It directs "[t]he heads of all agencies" to "identify and terminate, to the maximum extent consistent with applicable law, any direct or indirect funding of NPR and PBS." Order § 3(a).  The heads of agencies shall then review any remaining funding for compliance with the terms of the grant, contract, or other funding instrument under which the funding is received.  *Id.* § 3(b).

92.     A "Fact Sheet" and press release, which the White House published accompanying the Order, confirm that the Order is motivated by a hostility toward the perceived viewpoints expressed by NPR and PBS.  The "Fact Sheet," headlined "President Donald J. Trump Ends the Taxpayer Subsidization of Biased Media," alleges that "NPR and PBS have fueled partisanship and left-wing propaganda with taxpayer dollars."  Fact Sheet.  It then lists specific news coverage and editorial choices with which the President disagrees, ranging from coverage of the Covid-19 pandemic to content featured on Valentine's Day.  *Id.*

93.     The press release, entitled "President Trump Finally Ends the Madness of NPR, PBS," accuses NPR and PBS of "spread[ing] radical, woke propaganda disguised as 'news.'" Expanding on the "Fact Sheet," the press release contains nineteen bullets and sub-bullets cataloguing (and mischaracterizing) news and other content by NPR and PBS exemplifying the types of editorial decisions that prompted the issuance of the Order.

94.     As evidenced by the President's statements leading up to the Order, the documents accompanying it, and the text of the Order itself, the sole, express basis of the Order is the President's disapproval of the content of the speech and news reporting of NPR and PBS.

**The Order's Immediate Consequences for NPR and the Local Member Stations**

95.     The Order purports to direct the Corporation "and all executive departments and agencies" to cease providing any direct or indirect funding to NPR or PBS.

96.     Just one day after President Trump issued the Executive Order, the NEA terminated a grant award to NPR.

97.     This termination confirms that NEA is complying with the Order and has rendered NPR ineligible to apply for grants going forward.

98.     The Order purports to require the Corporation to revoke grants already awarded to NPR and to preclude NPR from receiving such grants in the future, jeopardizing a critical source of funding used (among other things) to protect journalists working in war zones and maintain resiliency of the PRSS, the nation's public radio distribution system.

99.     By basing its directives on the content and perceived viewpoints expressed in NPR's programming, the Order puts NPR on notice that, if it is ever to receive federal funding again, it must adapt its journalistic and editorial choices to suit the government's preferences.

100.    The Order further purports to require the Corporation to prohibit local stations from using CPB grants to acquire NPR's programming, notwithstanding a statutory requirement that stations must use "restricted" funds to acquire or produce programming that is distributed nationally and serves the needs of national audiences. *See* 47 U.S.C. § 396(k)(3)(A)(iii)(III).

101.    The Order would therefore force local stations to redirect those funds to acquire different national programming—in contravention of their own editorial choices—and to take additional, non-federal funds out of their budgets to continue acquiring NPR's programming.

102.    As noted above, each of the Local Member Stations receives significant grant funds from the Corporation, ranging between $210,000 and $1.4 million for Fiscal Year 2025.  Some of that funding must be used by the Local Member Stations to acquire or produce national programming.  All of the Local Member Stations use some portion of that funding to acquire NPR programming.  By prohibiting the Local Member Stations from using those funds in that manner, the Order directly interferes with their journalistic and expressive independence and their editorial choices—requiring them to use grant funds received from the Corporation to acquire different national programming rather than NPR programming.  If Local Member Stations wish to continue airing NPR's programming, they would have to use funds obtained from other sources.

103.    More broadly, the Order puts the Local Member Stations and other public radio stations that air NPR programming on notice that the government disapproves of their editorial choices and will seize any available opportunities to retaliate if they continue to air NPR programming.

104.    The loss of all direct funding from CPB and the loss (or significant decline) of revenue from local stations would be catastrophic for NPR.  As described above, NPR's direct grants from CPB are used to support vital journalistic endeavors and to support the Public Radio Satellite System—which serves as an essential public safety mechanism.  NPR also receives approximately $100 million annually from local public radio stations in fees, including the Local Member Stations, constituting nearly a third of NPR's operating budget.

105.    After the Order was issued, the Corporation released a statement explaining that "CPB is not a federal executive agency subject to the President's authority" and that "Congress directly authorized and funded CPB to be a private nonprofit corporation wholly independent of the federal government."  Corporation for Public Broadcasting, "Statement Regarding Executive Order on Public Media" (May 2, 2025).[12]  The Corporation noted that, in creating CPB, "Congress expressly forbade 'any department, agency, officer, or employee of the United States to exercise any direction, supervision, or control over educational television or radio broadcasting, or over [CPB] or any of its grantees or contractors.'"  *Id.* (quoting 47 U.S.C. § 398(c)).

106.    However, the President has already purported to remove three of the Corporation's five Board members, and the Executive Branch under his direction has unequivocally taken the position that the President can remove any Board member at any time and for any reason.  *See*

---

[12] Available at https://cpb.org/pressroom/Corporation-Public-Broadcasting-Statement-Regarding-Executive-Order-Public-Media.

*generally* Defendant's Opposition to Plaintiffs' Motion for Temporary Restraining Order, *Corporation for Public Broadcasting v. Trump*, Dkt. 11 (D.D.C. May 6, 2025). Indeed, during hearings regarding the Corporation's motions for a temporary restraining order and for a preliminary injunction, counsel for the government has repeatedly left open the possibility that the President could attempt to install new Board members without the required advice and consent of the Senate. 4/29/25 Tr. at 11-12 and 5/14/25 Tr. at 47-49, *Corporation for Public Broadcasting v. Trump*. *See also* Emergency Motion for Stay Pending Appeal at 7-19, *Aviel v. Gor*, No. 25-5105 (D.C. Cir. Apr. 7, 2025) (asserting that the President's Article II authority empowers him to unilaterally appoint "acting" Board members to the Inter-American Foundation after firing all existing Board members, notwithstanding a statutory requirement that Board members must be confirmed by the Senate); *id.* at 19-20 (arguing in the alternative that if the President cannot appoint acting Board members, he must be permitted to fire the Foundation's president directly). The Administration's efforts to "assign[]" DOGE officials to the Corporation further demonstrate its intent to exert control over the Corporation's functions.

107.    To the extent CPB does not comply with the Order's directives, the Order appears to direct the Treasury Department (or any agency or instrumentality that may need to act in any capacity or to any extent to fulfill the mandates of the Act) to withhold appropriated funds from CPB because to disburse them would constitute "indirect funding of NPR and PBS" in violation of Section 3(a) of the Order.

**CLAIMS**

**COUNT 1**

**Lack of Constitutional and Statutory Authority**

**(APA and Equitable Causes of Action—*Ultra Vires*)**

108.    Plaintiffs incorporate by reference the allegations of the preceding paragraphs.

109.    The President's power to issue the Order, and any executive official's power to implement it, "must stem either from an act of Congress or from the Constitution itself." *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 585 (1952).  But Congress, through the Public Broadcasting Act, has expressly prohibited the actions directed by the Order—and no provision of the Constitution allows the President to override Congress's will.

110.    The Act prohibits any "department, agency, officer, or employee of the United States" from "exercis[ing] any direction, supervision, or control over public telecommunications, or over the Corporation or any of its grantees or contractors, or over the charter of bylaws of the Corporation, or over the curriculum, program of instruction, or personnel of any . . . public telecommunications entity." 47 U.S.C. § 398(a).  The Act further makes clear that the Corporation is "not . . . an agency or establishment of the United States Government" and that its Board members are not "officers or employees of the United States.  *Id.* §§ 396(b), (d)(2).

111.    The Order nevertheless purports to issue commands to the Corporation—including that it cease all direct funding of NPR and PBS; prohibit local public radio and television stations from acquiring NPR or PBS programming; and amend its Eligibility Criteria to effectuate the Order's directives.

112.    The Order further violates provisions of the Act that require the Corporation to fund local public stations in accordance with eligibility criteria that serve specific statutory objectives. *See* 47 U.S.C. § 396(k)(6)(B).

113.    Moreover, the Order violates the Act by prohibiting the Corporation from funding NPR's management and operation of the PRSS, notwithstanding the Act's requirement that the Corporation "shall" distribute designated Satellite Interconnection Funds to "the national entity" that public radio stations "designate for satellite interconnection purposes." *Id.* § 396(k)(10)(D)(i).

28

114. The Order also violates statutes governing the NEA's grant-making functions. In particular, the NEA is required to ensure that "artistic excellence and artistic merit are the criteria by which applications are judged, taking into consideration general standards of decency and respect for the diverse beliefs and values of the American public." 20 U.S.C. § 954(d)(1). By unilaterally dictating that NPR cannot be eligible to receive any federal grants, the Order precludes NPR from competing for grants from NEA based on its "artistic excellence and merit," in violation of the statute.

115. The President has no authority under the Constitution to take such actions. On the contrary, the power of the purse is reserved to Congress, and the President has no inherent authority to override Congress's will on domestic spending decisions. By unilaterally imposing restrictions and conditions on funds in contravention of Congress, the Order violates the Separation of Powers and the Spending Clause of the Constitution. *See* U.S. Const. Art. I, § 8, cl. 1.

116. Plaintiffs have an equitable cause of action to enjoin "violations of federal law by federal officials," including to enjoin "unconstitutional actions." *Armstrong v. Exceptional Child Ctr.*, 575 U.S. 320, 327-28 (2015); *see Am. School of Magnetic Healing v. McAnnulty*, 187 U.S. 94, 110 (1902). Judicial "[r]eview for ultra vires acts rests on the longstanding principle that if an agency action is unauthorized by the statute under which [the agency] assumes to act, the agency has violate[d] the law and the courts generally have jurisdiction to grant relief." *Nat'l Ass'n of Postal Supervisors v. U.S. Postal Serv.*, 26 F.4th 960, 970 (D.C. Cir. 2022) (alterations in original; internal quotations omitted). When a "statutory provision plainly delineates the outer limits of agency authority and Congress has not expressly precluded judicial review," plaintiffs have a cause of action to enjoin *ultra vires* acts. *Id.* at 971. Moreover, with respect to the individual federal-official Defendants, "suits for specific relief against officers of the sovereign allegedly acting

beyond statutory authority or unconstitutionally are not barred by sovereign immunity." *Pollack v. Hogan*, 703 F.3d 117, 119-20 (D.C. Cir. 2012) (per curiam) (quotation marks omitted).

117.    To the extent that the Executive Order is implemented via final agency action, including through the NEA's termination of NPR's grants, those actions also are reviewable under the Administrative Procedure Act (APA), 5 U.S.C. § 706, for lack of statutory authority and violations of the Constitution.

118.    The Court should therefore declare that the Order is *ultra vires*, enjoin Defendants from implementing it, and vacate any agency action implementing the Order.

## COUNT 2
### Violation of the First Amendment—Retaliation
### (APA and Equitable Causes of Action—*Ultra Vires*)

119.    Plaintiffs incorporate by reference the allegations of the preceding paragraphs.

120.    "The Framers designed the Free Speech Clause of the First Amendment to protect the 'freedom to think as you will and to speak as you think.'" *303 Creative LLC v. Elenis*, 600 U.S. 570, 584 (2023) (quoting *Boy Scouts of America v. Dale*, 530 U.S. 640, 660-61 (2000)). "The Constitution specifically selected the press . . . to play an important role in the discussion of public affairs." *Mills v. Alabama*, 384 U.S. 214, 219 (1966). "Suppression" of the press therefore "muzzles one of the very agencies the Framers of our Constitution thoughtfully and deliberately selected to improve our society and keep it free." *Id.*

121.    While government officials have their own right to speak and to "do so forcefully," they cannot "use the power of the State to punish or suppress disfavored expression." *Nat'l Rifle Ass'n v. Vullo*, 602 U.S. 175, 188 (2024). In particular, "the First Amendment prohibits government officials from retaliating against individuals for engaging in protected speech." *Lozman v. City of Riviera Beach*, 585 U.S. 87, 90 (2018).

122.    Yet retaliation is the Order's plain purpose.  The Order's text and the materials that accompanied it make unmistakably clear that the Order is intended to—and does—retaliate against NPR because of its protected speech.

123.    To demonstrate that unlawful retaliation has occurred, a plaintiff must show that "(1) [it] engaged in conduct protected under the First Amendment; (2) the defendant took some retaliatory action sufficient to deter a person of ordinary firmness in plaintiff's position from speaking again; and (3) a causal link between the exercise of a constitutional right and the adverse action taken against him." *Aref v. Lynch*, 833 F.3d 242, 258 (D.C. Cir. 2016) (internal quotations omitted).

124.    NPR and the Local Member Stations have engaged in protected speech by airing content produced or distributed by NPR, including the specific content listed in the Fact Sheet and press release.

125.    There can be no doubt the Order—which seeks to halt all direct and indirect funding from CPB to NPR, precludes NPR from applying for any federal grants from any federal agency in the future, and threatens CPB funding to the Local Member Stations—is an adverse action that would chill an ordinary speaker.  The Order also poses a threat to local public radio stations, including the Local Member Stations, that they will incur official sanctions for airing NPR content. In so doing, the Order will doubtless result in broader "'self-censorship' of speech that could not be proscribed," particularly by organizations that receive government funds, and will thereby "discourage the 'uninhibited, robust, and wide-open debate that the First Amendment is intended to protect.'" *Counterman v. Colorado*, 600 U.S. 66, 75, 78 (2023) (quoting *New York Times v. Sullivan*, 376 U.S. 254, 270 (1964)); *see also, e.g.*, *Hustler Mag., Inc. v. Falwell*, 485 U.S. 46, 50

(1988) ("At the heart of the First Amendment is the recognition of the fundamental importance of the free flow of ideas and opinions on matters of public interest and concern.").

126.    The "causal link" between NPR's and the Local Member Stations' protected speech and the Order's punitive actions is spelled out by the Order itself and the materials that accompanied it.  The Order seeks to sanction NPR because it is purportedly "biased" and because the President dislikes the content of certain of its programming.

127.    Plaintiffs have an equitable cause of action to enjoin "unconstitutional actions" by federal officials.  *Armstrong*, 575 U.S. at 327.

128.    To the extent that the Executive Order is implemented via final agency action, those actions also are reviewable under the APA, 5 U.S.C. § 706, for violations of the Constitution.

129.    The Court should therefore declare that the Order is *ultra vires*, enjoin Defendants from implementing it, and vacate any agency action implementing the Order.

## COUNT 3

### Violation of the First Amendment—Viewpoint-Based Discrimination

### (APA and Equitable Causes of Action—*Ultra Vires*)

130.    Plaintiffs incorporate by reference the allegations of the preceding paragraphs.

131.    "At the heart of the First Amendment's Free Speech Clause is the recognition that viewpoint discrimination is uniquely harmful to a free and democratic society."  *Vullo*, 602 U.S. at 187.  *See also Reed v. Town of Gilbert, Ariz.*, 576 U.S. 155, 156 (2015) (viewpoint discrimination is a "'more blatant' and 'egregious form of content discrimination'" (quoting *Rosenberger*, 515 U.S. at 829.  Because the Order imposes a viewpoint-based burden on NPR's and the Local Member Stations' exercise of their First Amendment rights, it is *per se* unconstitutional.  *See Reed*, 576 U.S. at 156.

132.    Congress is not obligated to support independent public radio with federal funds. But the government cannot "'deny a benefit to a person on a basis that infringes his constitutionally protected . . . freedom of speech'. . . ." *United States v. Am. Libr. Ass'n, Inc.*, 539 U.S. 194, 210 (2003) (citation omitted).    To put it another way, government funding decisions cannot constitutionally "be aimed at the suppression of ideas thought inimical to the Government's own interest." *Legal Servs. Corp. v. Velazquez*, 531 U.S. 533, 549 (2001).  The Order does just that.  It aims to silence NPR's speech because the President dislikes the balance of viewpoints expressed in NPR's programming.

133.    By effectuating its retaliatory and viewpoint discriminatory aims through the Corporation and local public radio stations, the Order also engages in precisely the kind of third-party coercion that the Supreme Court recently affirmed is unlawful.  "[T]he government violate[s] the First Amendment through coercion of a third party" when its conduct, "viewed in context, could be reasonably understood to convey a threat of adverse government action in order to punish or suppress the plaintiff's speech."  *Vullo*, 602 U.S. at 191.  Here, the Order purports to issue a direct command to the Corporation that it cease all direct and indirect funding of NPR.  It further seeks to coerce local public radio stations, including the Local Member Stations, by threatening them with the loss of funds if they continue to exercise their editorial discretion in ways disfavored by the Administration.

134.    The Order likewise subjects the Local Member Stations to viewpoint-based discrimination by dictating that federal funds cannot be used to acquire NPR's programming.  At the outset, the Order would impose significant burdens on the Local Member Stations by requiring them to segregate funds and prove to the government's satisfaction that no CPB grants are being used to acquire NPR's programming.  But the Order goes further: by decreeing that CPB funds

designated for acquiring national programming *cannot* be used to acquire NPR's programming, the Order would force the Local Member Stations to alter their own editorial choices and acquire national programming from elsewhere to align with the government's preferred viewpoints. But the First Amendment prohibits "restrictions distinguishing among different speakers, allowing speech by some but not others." *Citizens United*, 558 U.S. at 340. Moreover, as the Supreme Court has repeatedly held, the "'exercise of editorial control and judgment'" is protected by the First Amendment, and "'governmental regulation'" cannot supplant "the 'crucial process' of editorial choice." *Moody*, 603 U.S. at 728-29 (quoting *Miami Herald Publ'g Co. v. Tornillo*, 418 U.S. 241, 258 (1974)). It is hard to conceive of a more blatant scheme to regulate the exercise of editorial discretion by Executive fiat.

135.    The Order's insistence that it is only intended to eliminate supposed "bias" in NPR's programming does not salvage it. On the contrary, it proves the Order serves no legitimate government interest. "The government may not, in supposed pursuit of better expressive balance, alter a private speaker's own editorial choices about the mix of speech it wants to convey." *Moody*, 603 U.S. at 734. "In case after case, the Court has barred the government from forcing a private speaker to present views it wished to spurn in order to rejigger the expressive realm." *Id.* at 733.

136.    Plaintiffs have an equitable cause of action to enjoin "unconstitutional actions" by federal officials. *Armstrong*, 575 U.S. at 327.

137.    To the extent that the Executive Order is implemented via final agency action, those actions also are reviewable under the APA, 5 U.S.C. § 706, for violations of the Constitution.

138.    The Court should therefore declare that the Order is *ultra vires*, enjoin Defendants from implementing it, and vacate any agency action implementing the Order.

34

## COUNT 4

### Violation of First Amendment—Freedom of Association
### (APA and Equitable Causes of Action—*Ultra Vires*)

139.    Plaintiffs incorporate by reference the allegations of the preceding paragraphs.

140.    By purporting to direct the Corporation to restrict funds for local public radio stations that choose to affiliate with NPR, the Order further infringes on NPR's and those stations' freedom of association.

141.    The Supreme Court has "long understood as implicit in the right to engage in activities protected by the First Amendment a corresponding right to associate with others in pursuit of a wide variety of political, social, economic, educational, religious, and cultural ends." *Roberts v. United States Jaycees*, 468 U.S. 609, 622 (1984). Government action that "may have the effect of curtailing the freedom to associate is subject to the closest scrutiny" under the First Amendment. *NAACP v. Alabama ex rel. Patterson*, 357 U.S. 449, 460-61 (1958). *See also, e.g.*, *303 Creative*, 600 U.S. at 586 (the First Amendment protects the right to speak, and, "[e]qually, the First Amendment protects acts of expressive association").

142.    By directing the Corporation to prohibit local public radio stations that receive federal funding from expending funds to become an NPR Member Station or to otherwise acquire NPR's programming, the Order cuts at the heart of NPR's and those public radio stations' freedom to associate with one another for expressive purposes.

143.    Further, the Interconnected Stations, which include but are not limited to NPR Member Stations, have designated NPR to manage and operate the PRSS on their behalf. The Order, including by directing the Corporation to cease federal funding to NPR, interferes with the right of NPR and the Interconnected Stations to associate with one another.

35

144.    The Order seeks to force local public radio stations to cut existing ties with NPR to remain eligible to receive federal funding, including Corporation grants.  And local public radio stations may have to incur significant burdens to ensure they segregate non-federal funds to acquire NPR's programing or undertake other burdensome measures to demonstrate compliance with the Order's directives.  *Cf. Citizens United*, 558 U.S. at 337, 339 (government restriction that "necessarily reduce[d] the quantity of expression" was "a ban on speech," and potential alternative means of expression through a political action committee did "not alleviate the First Amendment problems" because of the associated burdens).

145.    The Order's interference with freedom of association *among news media entities* only compounds its fundamental incompatibility with the First Amendment.  NPR and its Member stations are partners in newsgathering and reporting, and NPR regularly airs reporting from its Member stations.  The Order constitutes a governmental veto over the programming choices of public radio stations—threatening those stations with the loss of funds if they choose to air programming from a speaker that the government has decreed is off-limits.

146.    Plaintiffs have an equitable cause of action to enjoin "unconstitutional actions" by federal officials.  *Armstrong*, 575 U.S. at 327.

147.    To the extent that the Executive Order is implemented via final agency action, those actions are also reviewable under the APA, 5 U.S.C. § 706, for violations of the Constitution.

148.    The Court should therefore declare that the Order is *ultra vires*, enjoin Defendants from implementing it, and vacate any agency action implementing the Order.

**COUNT 5**
**Violation of the Due Process Clause**
**(APA Equitable Causes of Action—*Ultra Vires*)**

149.    Plaintiffs incorporate by reference the allegations of the preceding paragraphs.

150.    The Due Process Clause of the Fifth Amendment provides that "No person shall be . . . deprived of life, liberty, or property, without due process of law."  U.S. Const. amend. V.

151.    The Order violates the Due Process Clause because it purports to order the Corporation to terminate all direct and indirect funding to NPR, in disregard of NPR's substantial reliance interests in its continued eligibility for such funding.  Furthermore, by directing the Corporation to terminate funding needed by NPR to operate the PRSS, the Order impedes NPR's ability to perform its contractual obligations and agreements with Interconnected Stations.  In so doing, the Order deprives NPR of property rights with no pre-deprivation notice or meaningful opportunity to be heard.

152.    NPR has a protected property interest in its continued eligibility to receive federal funding from the Corporation and from local public radio stations that receive grants from the Corporation.  A "statutory entitlement" is a property right under the Due Process Clause, *see Goldberg v. Kelly*, 397 U.S. 254, 262 (1970), as is "[l]egitimate and reasonable reliance on a promise from the state," *Forgue v. City of Chicago*, 873 F.3d 962, 970 (7th Cir. 2017) (internal quotations omitted).  Property rights "protect those claims upon which people rely in their daily lives"; that reliance "must not be arbitrarily undermined."  *Bd. of Regents of State Colleges v. Roth*, 408 U.S. 564, 577 (1972).

153.    The degree of pre-deprivation process to which someone is entitled under the Due Process Clause "depends upon whether the recipient's interest in avoiding that loss outweighs the governmental interest in summary adjudication."  *Goldberg*, 397 U.S. at 263; *see Nat'l Council of Resistance of Iran v. Dep't of State*, 251 F.3d 192, 205-08 (D.C. Cir. 2001) (affording due process prior to government action depriving organization of "protected property right").

154.    The sudden loss of all federal funding, including PRSS funding, as well as fees from local public radio stations that otherwise would acquire programming from NPR would be catastrophic to NPR.  As described above, NPR receives about 31 percent of its total operating revenue through fees from local public radio stations, including its Member stations, and additional millions of dollars from CPB to support NPR's coverage of particular issue areas, such as the ongoing war in Ukraine.  NPR relies on CPB grants to support essential functions, and without federal funding, NPR would need to shutter or downsize collaborative newsrooms and rural reporting initiatives and, at the same time, also eliminate or scale back critical national and international coverage that serves the entire public radio system and is not replicable at scale on the local level.  Loss of all revenue from local public radio stations would dramatically harm NPR's ability to execute its journalistic mission.

155.    Conversely, the government has no legitimate interest in summary termination of NPR's ability to receive federal funding and funding from public broadcasters.  Year after year, Congress has reauthorized funding for the Corporation knowing that a portion of that funding was destined for NPR.  If NPR continues to receive Congressionally appropriated funds while the Government's accusations are orderly adjudicated, the government will not seriously suffer harm.

156.    Given NPR's weighty interest in avoiding the loss of its property rights relative to the government's non-existent interest in abrogating those rights, NPR was entitled to meaningful pre-deprivation process, including notice and a meaningful opportunity to be heard.  *See Goldberg*, 397 U.S. at 267-68.  NPR indisputably did not receive such process.

157.    Moreover, the Order independently violates the Due Process Clause because it is void for vagueness.  "A law is unconstitutionally vague if it fails to provide a person of ordinary intelligence fair notice of what is prohibited, or is so standardless that it authorizes or encourages

seriously discriminatory enforcement." *Woodhull Freedom Found. v. United States*, 72 F.4th 1286, 1303 (D.C. Cir. 2023) (internal quotations omitted). The vagueness doctrine serves to ensure that "regulated parties should know what is required of them so they may act accordingly," and to require "precision and guidance . . . so that those enforcing the law do not act in an arbitrary or discriminatory way." *FCC v. Fox Television Stations*, 567 U.S. 239, 253 (2012). "When speech is involved, rigorous adherence to those requirements is necessary to ensure that ambiguity does not chill protected speech." *Id.* at 253-54; *see also Karem v. Trump*, 960 F.3d 656, 665 (D.C. Cir. 2020) (courts will apply a "particularly stringent vagueness and fair-notice test" where an adverse action "implicates important First Amendment rights" (brackets and internal quotations omitted)).

158. The Order punishes NPR because, in the government's view, NPR does not "present[] a fair, accurate, or unbiased portrayal of current events." Order § 1. NPR did not have adequate notice that its journalistic activities would subject it to such punishment. Nor does the Order—which carries the implicit threat of additional adverse consequences for NPR and its Local Member Stations if their programming deviates from the government's view of what is "fair" or "unbiased" in the future—provide any semblance of sufficient notice. Whether reporting is "fair" or "unbiased" inevitably will depend on the eye of the beholder, making the Order "so standardless that it . . . encourages seriously discriminatory enforcement." *Woodhull*, 72 F.4th at 1303.

159. Plaintiffs have an equitable cause of action to enjoin "unconstitutional actions" by federal officials. *Armstrong*, 575 U.S. at 327.

160. To the extent that the Executive Order is implemented via final agency action, those actions also are reviewable under the APA, 5 U.S.C. § 706, for violations of the Constitution.

161. The Court should therefore declare that the Order is *ultra vires*, enjoin Defendants from implementing it, and vacate any agency action implementing the Order.

## PRAYER FOR RELIEF

For these reasons, Plaintiffs respectfully request an order:

162.   Declaring that Executive Order 14290 and all actions implementing it are unlawful and unconstitutional;

163.   Preliminarily and permanently enjoining the Defendants from implementing or seeking to enforce Executive Order 14290;

164.   Declaring that the National Endowment for the Arts may not withhold funding from NPR on the basis of Executive Order 14290;

165.   Declaring that the Corporation may not withhold funding from NPR on the basis of Executive Order 14290;

166.   Declaring that the Corporation may not withhold funding from the Local Member Stations or condition their receipt of funding on the basis of Executive Order 14290;

167.   Vacating any final agency action implementing Executive Order 14290;

168.   Entering judgment in favor of Plaintiffs;

169.   Awarding Plaintiffs their reasonable costs and attorney's fees in accordance with law; and

170.   Issuing any other relief that the Court deems just and proper.

Dated: May 27, 2025

Respectfully submitted,

*/s/Miguel A. Estrada*
Miguel A. Estrada (D.D.C. Bar No. 456289)
GIBSON, DUNN & CRUTCHER LLP
1700 M Street, N.W.
Washington, D.C. 20036-4504
(202) 955-8500
MEstrada@gibsondunn.com

Theodore J. Boutrous, Jr. (D.D.C. Bar No. 420440)
Katie Townsend (D.D.C. Bar No. 1026115)
GIBSON, DUNN & CRUTCHER LLP
333 South Grand Avenue
Los Angeles, CA 90071-3197
(213) 229-7000
TBoutrous@gibsondunn.com
KTownsend@gibsondunn.com

Elizabeth A. Allen (*Pro Hac Vice Application Pending*)
NATIONAL PUBLIC RADIO, INC.
1111 North Capitol Street, NE
Washington, D.C. 20002
(202) 513-2000
EAAllen@npr.org

*Counsel for Plaintiff*
*National Public Radio, Inc.*

Steven D. Zansberg (*Pro Hac Vice Application Pending*)
Zansberg Beylkin LLC
100 Fillmore Street, Suite 500
Denver, CO 80206
(303) 564-3669
steve@zblegal.com

*Counsel for Plaintiffs Roaring Fork Public Radio, Inc. d/b/a Aspen Public Radio, Colorado Public Radio, and KUTE, Inc. d/b/a KSUT Public Radio*