**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| NATIONAL PUBLIC RADIO, INC., *et al.* <br><br> *Plaintiffs,* <br><br> *v.* <br><br> DONALD J. TRUMP, *et al.*, <br><br> *Defendants*. | Case No. 25-cv-1674 |

**MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFFS' MOTION FOR
SUMMARY JUDGMENT**

Steven D. Zansberg (*Admitted Pro Hac Vice*)
Zansberg Beylkin LLC
100 Fillmore Street, Suite 500
Denver, CO 80206

*Counsel for Plaintiffs Roaring Fork Public Radio, Inc. d/b/a Aspen Public Radio, Colorado Public Radio, and KUTE, Inc. d/b/a KSUT Public Radio*

Miguel A. Estrada (D.D.C. Bar No. 456289)
GIBSON, DUNN & CRUTCHER LLP
1700 M Street, N.W.
Washington, D.C. 20036-4504

Theodore J. Boutrous, Jr. (D.D.C. Bar No. 420440)
Katie Townsend (D.C. Bar No. 1026115)
GIBSON, DUNN & CRUTCHER LLP
333 South Grand Avenue
Los Angeles, CA 90071-3197

Elizabeth A. Allen (*Admitted Pro Hac Vice*)
NATIONAL PUBLIC RADIO, INC.
1111 North Capitol Street, NE
Washington, D.C. 20002

*Counsel for Plaintiff
National Public Radio, Inc.*

# TABLE OF CONTENTS

**Page**

INTRODUCTION ................................................................................................................. 1

BACKGROUND ................................................................................................................. 3

    A.    The Public Broadcasting Act and the Corporation for Public
Broadcasting ......................................................................................... 3

    B.    National Public Radio ........................................................................... 7

    C.    The Local Member Stations ................................................................. 9

    D.    The Executive Branch Targets Public Media ..................................... 10

    E.    The Executive Order ........................................................................... 12

    F.    The Effects of the Executive Order on Plaintiffs ............................... 13

LEGAL STANDARD ....................................................................................................... 16

ARGUMENT .................................................................................................................... 17

    I.    The Executive Branch Has No Power to Issue or Enforce the Order ................. 18

        A.    Section 2 of the Order Has No Legal Basis and May Not Be
Enforced. ............................................................................................. 18

        B.    The Department of the Treasury and the National Endowment for
the Arts Lack Authority to Implement or Enforce the Order .............. 23

    II.    The Order Violates the First Amendment ......................................................... 25

        A.    The Order Is Unlawful Retaliation in Violation of the First
Amendment. ........................................................................................ 25

        B.    The Order Imposes Viewpoint-Based Burdens on Speech. ................ 29

        C.    The Order Infringes Plaintiffs' Associational Rights. ....................... 35

        D.    The Order Cannot Survive Any Measure of Constitutional
Scrutiny. .............................................................................................. 36

    III.    The Order Violates Due Process .................................................................... 38

    IV.    The Court Should Declare the Order Unlawful and Enjoin its Enforcement ....... 40

        A.    The Order Inflicts Irreparable Constitutional Harms. ....................... 41

        B.    The Order Inflicts Multiple Additional Irreparable Harms. ............... 42

        C.    The Balance of the Equities and the Public Interest Favor
Injunctive Relief. ................................................................................ 44

CONCLUSION ................................................................................................................. 45

# TABLE OF AUTHORITIES

**Page(s)**

## Cases

*303 Creative LLC v. Elenis*,
  600 U.S. 570 (2023)............................................................................................25

*Agency for Int'l Dev. v. All. for Open Soc'y Int'l, Inc.*,
  570 U.S. 205 (2013)............................................................................................32

*In re Aiken Cnty.*,
  725 F.3d 255 (D.C. Cir. 2013)........................................................................23, 24

*Am. Civil Liberties Union v. Mineta*,
  319 F. Supp. 2d 69 (D.D.C. 2004)......................................................................32

*Am. Commc'ns Ass'n v. Douds*,
  339 U.S. 382 (1950)............................................................................................32

*Am. Sch. of Magnetic Healing v. McAnnulty*,
  187 U.S. 94 (1902)..............................................................................................17

*Ams. For Prosperity Found. v. Bonta*,
  594 U.S. 595 (2021)............................................................................................37

*Anatol Zuckerman & Charles Krause Reporting, LLC v. United States Postal
  Serv.*,
  64 F.4th 1354 (D.C. Cir. 2023)......................................................................40, 44

*Anderson v. Liberty Lobby, Inc.*,
  477 U.S. 242 (1986)............................................................................................16

*Aref v. Lynch*,
  833 F.3d 242 (D.C. Cir. 2016)......................................................................26, 28

*Armour & Co. v. Freeman*,
  304 F.2d 404 (D.C. Cir. 1962)............................................................................43

*Armstrong v. Exceptional Child Ctr., Inc.*,
  575 U.S. 320 (2015)............................................................................................17

*Aviel v. Gor*,
  No. 25-5105, 2025 WL 160556 (D.C. Cir. June 5, 2025) ..............................14, 15

*\*Bd. of Cnty. Comm'rs v. Umbehr*,
  518 U.S. 668 (1996)................................................................................28, 29, 32, 34

*Bd. of Regents of State Colleges v. Roth*,
  408 U.S. 564 (1972)............................................................................................38

*Bostock v. Clayton Cnty.*,
   590 U.S. 644 (2020) ................................................................................ 35

*Buckley v. Valeo*,
   424 U.S. 1 (1976) (*per curiam*) .............................................................. 31

*California v. Azar*,
   911 F.3d 558 (9th Cir. 2018) .................................................................... 42

*Cate v. Oldham*,
   707 F.2d 1176 (11th Cir. 1983) ................................................................ 42

*Chamber of Com. v. Edmondson*,
   594 F.3d 742 (10th Cir. 2010) .................................................................. 42

*Chamber of Com. v. Reich*,
   74 F.3d 1322 (D.C. Cir. 1996) ................................................................. 17

*Chaplaincy of Full Gospel Churches v. England*,
   454 F.3d 290 (D.C. Cir. 2006) ................................................................. 43

*Citizens United v. Federal Election Comm'n*,
   558 U.S. 310 (2010) ........................................................................... 18, 35

*Coates v. City of Cincinnati*,
   402 U.S. 611 (1971) ................................................................................ 40

*\*Corp. for Pub. Broad. v. Trump*,
   No. 25-cv-1305, 2025 WL 1617191 (D.D.C. June 8, 2025)
   ............................................................ 6, 11, 12, 14, 15, 18, 19

*Counterman v. Colorado*,
   600 U.S. 66 (2023) .................................................................................. 44

*Davis v. District of Columbia*,
   158 F.3d 1342 (D.C. Cir. 1998) ............................................................... 41

*eBay Inc. v. MercExchange, LLC*,
   547 U.S. 388 (2006) ................................................................................ 41

*Elrod v. Burns*,
   427 U.S. 347 (1976) ................................................................................ 41

*FCC v. League of Women Voters of Cal.*,
   468 U.S. 364 (1984) .................................................................................. 4

*Forgue v. City of Chicago*,
   873 F.3d 962 (7th Cir. 2017) .................................................................... 38

*Fox Television Stations*,
   567 U.S. at 253 ........................................................................................ 40

*Franklin v. Massachusetts*,
   505 U.S. 788 (1992) ................................................................................ 17

*Frederick Douglass Found., Inc. v. District of Columbia*,
  82 F.4th 1122 (D.C. Cir. 2023) ............................................................................... 30

*Goldberg v. Kelly*,
  397 U.S. 254 (1970) ...................................................................................... 38, 39

*Gordon v. Holder*,
  721 F.3d 638 (D.C. Cir. 2013) ............................................................................... 44

*Hartman v. Moore*,
  547 U.S. 250 (2006) ........................................................................................ 26

*Hurley v. Irish-Am. Gay, Lesbian & Bisexual Grp. of Bos.*,
  515 U.S. 557 (1995) ........................................................................................ 26

*Iowa Utilities Bd. v. FCC*,
  109 F.3d 418 (8th Cir. 1996) ............................................................................... 42

*\*Jenner & Block LLP v. U.S. Dep't of Justice*,
  -- F. Supp. 3d --, 2025 WL 1482021 (D.D.C. May 23, 2025) ........................... 17, 29, 32, 34

*Jones v. District of Columbia*,
  177 F. Supp. 3d 542 (D.D.C. 2016) ....................................................................... 43

*Karem v. Trump*,
  960 F.3d 656 (D.C. Cir. 2020) ........................................................................ 41, 42, 44

*Lamar v. United States*,
  241 U.S. 103 (1916) ........................................................................................ 20

*Lamb's Chapel v. Ctr. Moriches Union Free Sch. Dist.*,
  508 U.S. 384 (1993) ........................................................................................ 33

*League of Women Voters of U.S. v. Newby*,
  838 F.3d 1 (D.C. Cir. 2016) ................................................................................ 44

*Legal Servs. Corp. v. Velazquez*,
  531 U.S. 533 (2001) ........................................................................................ 33

*Louisiana v. Biden*,
  55 F.4th 1017 (5th Cir. 2022) .............................................................................. 43

*Lozman v. City of Riviera Beach*,
  585 U.S. 87 (2018) ......................................................................................... 25

*McConnell v. Federal Election Com'n*,
  540 U.S. 93 (2003), *overruled on other grounds by Citizens United v. Federal
  Election Com'n*, 558 U.S. 310 (2010) .................................................................... 37

*McCray v. Biden*,
  574 F. Supp. 3d 1 (D.D.C. 2021) .......................................................................... 40

*\*Media Matters for America v. Paxton*,
  -- F.4th --, 2025 WL 1536459 (D.C. Cir. May 30, 2025) .......................................... 25, 26, 41

*MedImmune, Inc. v. Genentech, Inc.*,
  549 U.S. 118 (2007)..................................................................................17, 45

*\*Miami Herlad Pub. Co. v. Tornillo*,
  418 U.S. 241 (1974)...................................................................26, 30, 31, 32

*Mills v. District of Columbia*,
  571 F.3d 1304 (D.C. Cir. 2009) ..........................................................................41

*Minn. Voters All. v. Mansky*,
  585 U.S. 1 (2018).............................................................................................30, 36

*\*Moody v. NetChoice, LLC*,
  603 U.S. 707 (2024)...............................................................2, 26, 31, 36, 45

*Morrison v. Olson*,
  487 U.S. 654 (1988) ...........................................................................................27

*Morse v. Frederick*,
  551 U.S. 393 (2007) ...........................................................................................26

*Motions Sys. Corp. v. Bush*,
  437 F.3d 1356 (Fed. Cir. 2006)..........................................................................21

*NAACP v. Alabama ex rel. Patterson*,
  357 U.S. 449 (1958) ...........................................................................................35

*Nalco Co. v. EPA*,
  786 F. Supp. 2d 177 (D.D.C. 2011) ...................................................................42

*Nat'l Ass'n of Postal Supervisors v. U.S. Postal Serv.*,
  26 F.4th 960 (D.C. Cir. 2022) ............................................................................17

*Nat'l Council of Resistance of Iran v. Dep't of State*,
  251 F.3d 192 (D.C. Cir. 2001)......................................................................38, 39

*Nat'l Inst. of Fam. & Life Advocs. v. Becerra*,
  585 U.S. 755 (2018)..........................................................................................36

*\*Nat'l Rifle Ass'n of Am. v. Vullo*,
  602 U.S. 175 (2024).....................................................................................34, 36

*Nat'l Treasury Employees' Union v. Nixon*,
  492 F.2d 587 (D.C. Cir. 1974) ...........................................................................40

*Nat'l Wildlife Federation v. United States*,
  626 F.2d 917 (D.C. Cir. 1980) ...........................................................................20

*Nieves v. Bartlett*,
  587 U.S. 391 (2019)..........................................................................................26

*Nixon v. Fitzgerald*,
  457 U.S. 731 (1982) ...........................................................................................21

*Nken v. Holder,*
   556 U.S. 418 (2009) ......................................................................................................44

*Patriot, Inc. v. U.S. Dep't of Hous. & Urban Dev.,*
   963 F. Supp. 1 (D.D.C. 1997) .......................................................................................43

*Perry v. Sinderman,*
   408 U.S. 593 (1972) ...............................................................................................29, 33

*Reed v. Town of Gilbert, Ariz.,*
   576 U.S. 155 (2015) ...............................................................................................30, 36

*Rhode Island Latino Arts v. Nat'l Endowment for the Arts,*
   -- F. Supp. 3d --, No. 25-cv-79, 2025 WL 1009026 (D.R.I. Apr. 3, 2025) ...........24

*Roberts v. United States Jaycees,*
   468 U.S. 609 (1984) ......................................................................................................35

*Roman Cath. Diocese of Brooklyn v. Cuomo,*
   592 U.S. 14 (2020) ........................................................................................................41

*\*Rosenberger v. Rectors & Visitors of the Univ. of Va.,*
   515 U.S. 819 (1995) ...............................................................................30, 32, 33, 34

*Ross-Simons of Warwick, Inc. v. Baccarat, Inc.,*
   217 F.3d 8 (1st Cir. 2000) ............................................................................................18

*Rutan v. Republican Party of Ill.,*
   497 U.S. 62 (1990) ........................................................................................................28

*Savignac v. Jones Day,*
   754 F. Supp. 3d 135 (D.D.C. 2024) .............................................................................17

*Sorrell v. IMS Health, Inc.,*
   564 U.S. 552 (2011) ...............................................................................................30, 31

*Tao v. Freeh,*
   27 F.3d 635 (D.C. Cir. 1994) .......................................................................................28

*Turner v. U.S. Agency for Glob. Media,*
   502 F. Supp. 3d 333 (D.D.C. 2020) .......................................................................36, 44

*U.S. Dep't of Navy v. Fed. Lab. Rels. Auth.,*
   665 F.3d 1339 (D.C. Cir. 2012) ...................................................................................23

*United States v. Playboy Ent. Grp., Inc.,*
   529 U.S. 803 (2000) ......................................................................................................29

*Widakuswara v. Lake,*
   -- F. Supp. 3d --, 2025 WL 1166400 (D.D.C. Apr. 22, 2025), *appeal pending,*
   No. 25-5144 (D.C. Cir.) .........................................................................................23, 24

*Woodhull Freedom Found. v. United States,*
   72 F. 4th 1286 (D.C. Cir. 2023) ..............................................................................39, 40

*Yorktown Sys. Grp., Inc. v. Threat Tec LLC,*
    108 F.4th 1287 (11th Cir. 2024) ............................................................43

*Youngstown Sheet & Tube Co. v. Sawyer,*
    343 U.S. 579 (1952)..............................................................................18

## Statutes

5 U.S.C. § 706(2) .......................................................................................17

20 U.S.C. § 954(d)(1) .................................................................................24

28 U.S.C. § 2201(a) ...................................................................................18

28 U.S.C. § 13618 .....................................................................................20

47 U.S.C. § 396(a)(1) ..........................................................................3, 22, 45

47 U.S.C. § 396(a)(10)......................................................................1, 6, 7, 18, 20

47 U.S.C. § 396(b) ......................................................................1, 7, 12, 20, 22

47 U.S.C. § 396(d)(2) ..................................................................7, 20, 23

47 U.S.C. § 396(f)(3) ..................................................................37, 38

47 U.S.C. § 396(g) .......................................................................................4

47 U.S.C. § 396(k) .......................................................................................4

47 U.S.C. § 396(k)(3)(A).................................................................4, 5, 8, 10, 21, 22

47 U.S.C. § 396(k)(6)(B).................................................................5, 21

47 U.S.C. § 396(k)(7) ..................................................................................22

47 U.S.C. § 396(k)(10)(D)(i)..........................................................5, 6, 9, 22

47 U.S.C. § 398(a) ......................................................................1, 7, 19, 20

47 U.S.C. § 398(b) .......................................................................................7

52 U.S.C. § 30101(9)(B)(i) ..........................................................................37

D.C. Code § 29.406.08(e) .......................................................................20

Pub. L. No. 117-328, Div. H, tit. IV (2022)..............................................7, 24

Pub. L. No. 118-47, Div. D, tit. IV (2024) ...............................................7, 24

Pub. L. No. 119-4, Div. A, tit. I, § 1101(a)(8) (2025) ..............................7, 24

Pub. L. No. 119-4, Div. A, tit. I, § 1112 (2025) .......................................7, 24

## Other Authorities

2 Op. O.L.C. 39 (1978) ..................................................................................................22

2 Op. O.L.C. 41 (1978) ..................................................................................................23

3 Op. O.L.C. 31, 35 (1979) ............................................................................................19

33 Op. O.L.C. 370 (2009) ..............................................................................................21

11A Charles Alan Wright *et al.*, Federal Practice and Procedure § 2948.1 (3d ed.
    2013 & 2015 Supp.) ...............................................................................................43

*Corp. for Pub. Broad. v. Trump*,
    No. 25-cv-1305, Pls.' Mot. for Temporary Restraining Order, Dkt. 2 ..............12, 14

*Corp. for Pub. Broad. v. Trump*,
    No. 25-cv-1305, Reply, Dkt. 12 ........................................................................15, 16

*Corp. for Pub. Broad. v. Trump*,
    No. 25-cv-1305, Reply Ex. A, Dkt. 12-1 ...............................................................16

Corporation for Public Broadcasting, "2025 Radio Community Services Grants
    Provisions and Eligibility Criteria" (2025 Eligibility Criteria), available at
    https://cpb.org/sites/default/files/FY%202025%20Radio%20CSG%20General
    %20Provisions%20and%20Eligibility%20Criteria.pdf ............................................5

"Fact Sheet: President Donald J. Trump Ends Taxpayer Subsidization of Biased
    Media" (May 1, 2025), available at https://www.whitehouse.gov/fact-
    sheets/2025/05/fact-sheet-president-donald-j-trump-ends-the-taxpayer-
    subsidization-of-biased-media/ .................................................13, 14, 26, 27, 30, 36

Frances Vinall, et al., *Trump administration will ask Congress to cut funding for
    NPR and PBS*, Wash. Post (Apr. 15, 2025), available at
    https://www.washingtonpost.com/style/2025/04/15/nprpbs-funding-trump-
    administration/ .......................................................................................................11

H.R. Rep. No. 572, 90th Cong., 1st Sess. (1967) ............................................................4

Katherine Trully-McManus & Jennifer Scholtes, "House clears $9.4B in funding
    clawbacks requested by White House," Politico.com (June 12, 2025),
    available at https://www.politico.com/news/2025/06/12/house-clears-9-4b-in-
    funding-clawbacks-requested-by-white-house-00403305 .......................................28

Press Release, "President Trump Finally Ends the Madness of NPR, PBS" (May
    2, 2025), available at https://www.whitehouse.gov/articles/2025/05/president-
    trump-finally-ends-the-madness-of-npr-pbs/ .....................................................14, 30

Rescission Proposal No. R25-21, "Report Pursuant to Section 1012 of the
    Congressional Budget and Impoundment Control Act of 1974 (2 U.S.C. 683)"
    (May 28, 2025), available at https://www.whitehouse.gov/wp-
    content/uploads/2025/03/Proposed-Rescissions-of-Budgetary-Resources.pdf ......27

S. Rep. No. 222, 90th Cong., 1st Sess. (1967) ..........................................................6, 19

**Rules**

Fed. R. Civ. P. 56(c) ................................................................................................16

**Regulations**

90 Fed. Reg. 19415 ..................................................................................................12

**Constitutional Provisions**

U.S. Const. amend. V..............................................................................................38

U.S. Const. art. I, § 9, cl. 8......................................................................................21

U.S. Const. art. II, § 1 .............................................................................................21

# INTRODUCTION

Plaintiff National Public Radio, Inc. (NPR) and Plaintiffs Roaring Fork Public Radio, Inc. d/b/a Aspen Public Radio (Aspen Public Radio), Colorado Public Radio (CPR), and KUTE Inc. d/b/a KSUT Public Radio (KSUT) (together, the Local Member Stations) seek to bar the implementation and enforcement of an Executive Order that defies the express commands of Congress and infringes Plaintiffs' constitutional rights. The Court should declare the Order null and void and permanently enjoin its enforcement.

The Executive Order, titled "Ending Taxpayer Subsidization of Biased Media" (the Order), purports to instruct federal agencies as well as the private Corporation for Public Broadcasting (CPB or the Corporation) to stop all direct and indirect funding of NPR, including by prohibiting local stations from using federal funds to license NPR's programming. But the President has no authority to issue that directive. When Congress enacted the Public Broadcasting Act of 1967 (the PBA or Act), it envisioned a vibrant, independent public media system, and it authorized the establishment of the Corporation as a private non-profit entity explicitly and deliberately to provide public media "maximum protection from extraneous interference." 47 U.S.C. § 396(a)(10); *see id.* § 396(b) (CPB "will not be an agency or establishment of the United States Government"). To that end, Congress expressly denied "authoriz[ation to] any department, agency, officer, or employee of the United States to exercise any direction, supervision, or control over . . . the Corporation or any of its grantees or contractors." *Id.* § 398(a). And for more than half a century, the Corporation and its grantees, including NPR and the Local Member Stations, have operated free of government control, as Congress mandated and intended. By seeking to end that independence through restricting the use of funding duly appropriated by Congress, the Order defies Congress's expressed will and attempts to assume Congress's power of the purse, violating

the Separation of Powers and the Spending Clause of the Constitution.  The Order is unlawful for those reasons alone.

Even if the Order did not so clearly contravene the Act, it would be unconstitutional.  The Order is obvious in its viewpoint-discriminatory purpose and its retaliatory motive.  Expressly predicated on the President's belief that NPR is "biased," the Order aims to punish NPR for exercising its First Amendment rights and to stop public radio stations across the country, including the Local Member Stations, from airing NPR news and other NPR programming.  But as the Supreme Court has repeatedly made clear, "it is no job for government to decide what counts as the right balance of private expression—to 'un-bias' what it thinks biased, rather than to leave such judgments to speakers and their audiences."  *Moody v. NetChoice, LLC*, 603 U.S. 707, 719 (2024).  The First Amendment protects the editorial choices of NPR and the Local Member Stations, shields NPR from targeted retribution for its reporting, and will not countenance the blatant viewpoint discrimination effected by the Order.  The Order further violates the First Amendment by infringing NPR's and the Local Member Stations' freedom of association, and it violates NPR's Due Process rights by purporting to strip it of vital funding without notice or meaningful process.

There is no disputed issue of material fact.  Plaintiffs are entitled to a declaration that the Order is unlawful.  In addition to succeeding on the merits of their claims, Plaintiffs satisfy the remaining requirements for a permanent injunction.  If not enjoined, the Order will inflict permanent, irreparable harm on NPR, its Local Member Stations, and the tens of millions of Americans across the country who rely on public radio for fact-based news, cultural programming, and vital emergency information.  The Order's egregious violation of Plaintiffs' constitutional rights is, alone, irreparable harm.  And the financial and practical harms Plaintiffs would suffer if

the Order were to be implemented and enforced would be devastating and irremediable. NPR relies on funding from the Corporation, including to maintain the Public Radio Satellite System (PRSS)—the infrastructure that supports public radio distribution nationwide and ensures that life-saving emergency alerts reach even the most remote corners of the country in times of crisis. The Corporation's grants also provide necessary financial support for local public radio stations, including the Local Member Stations, that associate with and air NPR programming for the benefit of their listeners and supporters. The Order threatens the financial stability of those stations and, in turn, threatens to deprive the communities they serve of free news and information that is not available from any other source. Preventing these harms unquestionably serves the public interest.

Because the Order lacks any basis in law and violates the Constitution in multiple ways, the Court should grant Plaintiffs' Motion for Summary Judgment, issue a declaration that the Order is unlawful, and permanently enjoin Defendants from implementing or enforcing it.

## BACKGROUND

### A.    The Public Broadcasting Act and the Corporation for Public Broadcasting

"[I]t is in the public interest to encourage the growth and development of public radio." 47 U.S.C. § 396(a)(1). So said Congress in 1967, when it passed the watershed PBA. With the goal of ensuring that high-quality news and educational programming would reach even the most remote areas of the country, the Act laid the groundwork for a public radio system that today reaches approximately 99 percent of the U.S. population and serves the same fundamental purpose—to foster an engaged and informed citizenry—as the First Amendment.

To that end, Congress organized the PBA around two central pillars. First, recognizing that public media is a public good, Congress appropriated funds to support it—funding it has continually reauthorized with bipartisan support. Second, to achieve Congress's "cardinal objective" to shield public broadcasters from "extraneous interference and control," the Act

created an "elaborate structure" to "insulate [them] from government interference." *FCC v. League of Women Voters of Cal.*, 468 U.S. 364, 386–87 (1984).  In particular, Congress interposed a private entity, the Corporation, between any possible source of government influence and the ultimate recipients of appropriated funds.  *See* H.R. Rep. No. 572, 90th Cong., 1st Sess., at 15 (1967) ("It was generally agreed that a nonprofit Corporation, directed by a Board of Directors, none of whom will be Government employees, will provide the most effective insulation from Government control or influence over the expenditure of funds.").

The Corporation receives congressionally appropriated money each year and must distribute it to public media entities in accordance with a statutorily prescribed formula.  *See* 47 U.S.C. § 396(g), (k).  After administrative and system-support expenses, the Corporation must spend 75 percent of its appropriation to support public television and 25 percent to support public radio.  *Id.* § 396(k)(3)(A).  Funding for radio is further subdivided:  70 percent is allocated for local public radio stations for general purposes, and 23 percent goes to local stations exclusively for "acquiring or producing programming that is to be distributed nationally and is designed to serve the needs of a national audience."  *Id.* § 396(k)(3)(A)(iii)(I), (III).  The Corporation distributes both categories of funding to local radio stations through "Community Service Grants" (CSGs).  The remaining 7 percent is allocated to fund public radio programming directly.  *Id.* § 396(k)(3)(A)(iii)(II).

Local public radio stations may apply for two types of CSGs from the Corporation: "unrestricted" and "restricted."  Unrestricted CSG funds come from the 70 percent of public radio funds that can be used for a variety of purposes, including programming and production, educational outreach, broadcasting, transmission, distribution, and other operational expenses.  *Id.* § 396(k)(3)(A)(iii)(I).  Restricted CSG funds come from the 23 percent of public radio funds that

must be used to acquire or produce programming that is distributed nationally and serves the needs of national audiences.  *See id*. § 396(k)(3)(A)(iii)(III).  Local stations may use restricted CSG funds to acquire content from NPR or from other producers of nationally distributed programming.

CSG funds must be distributed by the Corporation "in accordance with eligibility criteria" that are content-neutral.  *Id.* § 396(k)(6)(B).  Specifically, CPB's eligibility criteria must "promote the public interest in public broadcasting" and must ensure funds are spent "on the basis of a formula designed to" provide for the financial needs of local stations in relation to their audiences; provide incentives for non-federal financial support; and "assure that each eligible licensee and permittee of a public radio station receives a basic grant."  *Id.*; *see also* Corporation for Public Broadcasting, "2025 Radio Community Services Grants Provisions and Eligibility Criteria" (2025 Eligibility Criteria) (describing various statutory and technical requirements).[1]

In addition, the PBA separately provides support for the Public Radio Satellite System (PRSS)—the national infrastructure for all public radio.  *Id.* § 396(k)(10)(D)(i) (providing for a "public radio satellite interconnection system").  The PRSS is the satellite and terrestrial content-distribution system that is the backbone of the public radio system.  Statement of Undisputed Material Facts (SUMF) at 3 (¶ 19).  The PRSS, which has been managed and operated by NPR for decades at the behest of public radio stations, delivers thousands of hours of news, music, and other programming from a wide range of producers each year to public radio stations across the country.  *Id.* at 5 (¶ 36).  The PRSS also serves a critical public safety function:  in times of national emergency, it receives alerts from the Federal Emergency Management Agency (FEMA) and provides them to local radio stations around the country.  *Id.* (¶ 32).  To support the PRSS,

---

[1] Available at
https://cpb.org/sites/default/files/FY%202025%20Radio%20CSG%20General%20Provisions%20and%20Eligibility%20Criteria.pdf.

Congress appropriates funds to the Corporation which "shall be distributed" to the "public telecommunications entities participating in the" system "or the national entity they designate for satellite interconnection purposes." 47 U.S.C. § 396(k)(10)(D)(i). NPR is that designated national entity. SUMF at 7 (¶ 44). Federal funds allocated to the Corporation for this purpose must be used "exclusively for the capital costs of the replacement, refurbishment, or upgrading of [the] national satellite interconnection systems" and related maintenance. 47 U.S.C. § 396(k)(10)(D)(i).

When it enacted the PBA, Congress sought to ensure that "[n]oncommercial television and radio in America, even though supported by Federal funds," would "be absolutely free from any Federal Government interference over programming." S. Rep. No. 222, 90th Cong., 1st Sess., at 11 (1967) (hereinafter Senate Report); *see also id.* ("stat[ing] in the strongest possible terms" that it was Congress's "intention that local stations be absolutely free to determine for themselves what they should or should not broadcast"); *id.* at 4 ("Federal financial assistance . . . should in no way involve the Government in programming or program judgments."). Accordingly, "[t]hroughout the legislative process, and in the legislation itself, Congress made clear that it intended that the [Corporation's] Board of Directors perform its duties outside the government and without government or political influence." *Corp. for Pub. Broad. v. Trump*, No. 25-1305, 2025 WL 1617191, at *2 (D.D.C. June 8, 2025) (hereinafter *CPB v. Trump*).

Congress protected public radio and television from any attempted governmental influence in multiple ways. First, the Act expressly grants the Corporation "maximum protection from extraneous interference and control." 47 U.S.C. § 396(a)(10). Second, it establishes CPB as "a private corporation" that is "not . . . an agency or establishment of the United States Government." *Id.* § 396(a)(10), (b). The Act further specifies that CPB's Board members "shall not . . . be deemed to be officers or employees of the United States." *Id.* § 396(d)(2). Third, to leave no

doubt about the intended independence of the Corporation and its grantees, the Act expressly denies "authoriz[ation to] any department, agency, officer, or employee of the United States to exercise any direction, supervision, or control over public telecommunications, or over the Corporation or any of its grantees or contractors, or over the charter of bylaws of the Corporation, or over the curriculum, program of instruction, or personnel of any . . . public telecommunications entity," save for an exception regarding enforcement of antidiscrimination laws.  *Id.* § 398(a), (b).

In addition, Congress has safeguarded the independence of the public broadcasting system by appropriating funds to the Corporation in two-year advancements.  Currently, CPB is funded through Fiscal Year 2027.  Congress has appropriated $535 million in general funding for CPB for Fiscal Years 2025, 2026, and 2027.[2]  Additionally, Congress has appropriated $60 million for interconnection services, including the PRSS, for Fiscal Year 2025.[3]

### B.    National Public Radio

Founded in 1970, NPR is an independent, nonprofit media organization that serves millions of Americans each day.  SUMF at 1 (¶ 1).  NPR is not a public radio station, nor does it operate one.  *Id.* (¶ 2).  Rather, NPR produces and acquires radio programming and distributes it to local public radio stations throughout the country.  *Id.* (¶ 3).

NPR funds its programming and operations from several sources.  It receives some funds directly from CPB (a portion of the 7 percent of CPB's radio budget earmarked for programming content).  *Id.* at 6 (¶ 42).  In Fiscal Year 2024, NPR spent approximately $4.3 million in grants

---

[2] *See* Pub. L. No. 117-328, Div. H, tit. IV (for Fiscal Year 2025); Pub. L. No. 118-47, Div. D, tit. IV (for Fiscal Year 2026); Pub. L. No. 119-4, Div. A, tit. I, § 1112 (extending prior appropriations "in the same amount" for Fiscal Year 2027).

[3] See Pub. L. No. 118-47, Div. D, tit. IV ($60 million for interconnection services for Fiscal Year 2024); Pub. L. No. 119-4, Div. A, tit. I, § 1101(a)(8) (extending appropriations at the same levels for Fiscal Year 2025).

from CPB to, among other things, acquire safety equipment for journalists in warzones and support local news coverage for rural communities. *Id.* at 7 (¶ 47). NPR also receives grants from the National Endowment for the Arts (NEA). For the past several years, NPR has received grants from NEA to support music programming and literary content. *Id.* (¶ 48). For Fiscal Year 2024, NPR was awarded approximately $65,000 in NEA grant funding. *Id.*

A significant source of NPR funding comes from membership and licensing fees paid by local public radio stations, like the Local Member Stations, that choose to become NPR Members. Member stations pay a "core fee" to air NPR's flagship newsmagazines (*Morning Edition*, *All Things Considered*, and *Weekend Edition*). *Id.* at 2 (¶ 12). Member stations may also choose to license additional content from NPR such as specific news, talk, entertainment, or music programs.

Member stations may pay for NPR content using grant funding from CPB. *Id.* at 8 (¶51). In particular, because 23 percent of the Corporation's funds must be awarded to local radio stations to spend on "programming that is to be distributed nationally and is designed to serve the needs of a national audience," 47 U.S.C. § 396(k)(3)(A)(iii)(III), recipients often use those CSG funds to license NPR news and other programming. They also may spend unrestricted CSG funds for that purpose. NPR receives approximately $100 million, or approximately 31 percent of its annual operating revenue, from its 246 Member stations. SUMF at 6 (¶ 41). NPR in turn supports its Member stations in additional ways, including by providing digital services, music licensing support, data on audience insights and analytics, and fundraising materials. *Id.* at 3 (¶ 14).

NPR also serves as the "national entity" that local public radio stations have "designate[d] for satellite interconnection purposes." 47 U.S.C. § 396(k)(10)(D)(i). Each station participating in the PRSS (collectively, the Interconnected Stations) is a stakeholder in the PRSS's collective assets and a customer of the services it provides. As the entity responsible for managing and

operating the PRSS, NPR receives CPB funds designated specifically for that purpose. In Fiscal Year 2024, NPR received approximately $6.8 million in such funds from CPB. SUMF at 7 (¶ 45).

### C.    The Local Member Stations

Aspen Public Radio, Colorado Public Radio, and KSUT (the Local Member Stations) are three NPR Member stations serving communities in the state of Colorado. Each of the Local Member Stations provides free, high-quality local news programming for the communities they serve—ranging from rural and remote communities in the Four Corners region to mountain communities in the Roaring Fork Valley and urban and suburban audiences in and around Denver.

Each of the Local Member Stations has been an NPR Member station for decades. Each station has consistently exercised its own editorial judgment regarding what programming they choose to produce, acquire, and broadcast, just as Congress intended. *See* Senate Report at 7-8 ("local autonomy of stations and diversity of program sources will provide operation safeguards to assure the democratic functioning of the system"). The Local Member Stations choose to air NPR's programming because, in their editorial judgment, NPR provides high-quality journalism, cultural content, and other programming that serves their communities. SUMF at 3 (¶ 17). The Local Member Stations' audiences value the national and international news coverage that NPR provides. *See id.* The Local Member Stations air dozens of hours of NPR content weekly, ranging from approximately seven to fifteen hours daily on weekdays. *Id.* at 9 (¶ 63), 12 (¶ 92), 17 (¶ 125). NPR is also deeply entwined with the Local Member Stations' branding; Aspen Public Radio's tag line, for example, is "NPR News for Aspen and the Valley." *Id.* at 9 (¶ 61).

Each of the Local Member Stations receives federal funding from the Corporation in the form of CSGs. As described above, the amount that each receives is determined by a content-neutral formula that takes into account the size and nature of the station's audience and its other sources of revenue, among other factors. For smaller stations, CSG funds can make up a

significant portion of their budgets.  For Fiscal Year 2025, CSG funds constitute approximately

20 percent of KSUT's operating revenue and approximately 10.8 percent of Aspen Public Radio's

operating revenue.  *Id.* at 18 (¶ 141), 10 (¶ 76).  CSG funds account for approximately six percent

of CPR's operating revenue.  *Id.* at 14 (¶ 101).

Each of the Local Member Stations pays membership and programming fees to NPR in

part with restricted CSG funds they receive from CPB—that is, with funds that must be used to

acquire or produce programming that is distributed nationally and serves the needs of national

audiences.  *See* 47 U.S.C. § 396(k)(3)(A)(iii)(III); SUMF at 7-8 (¶ 50).  The Local Member

Stations have each determined that NPR programming is a cost-effective way to provide high-

quality news and other content to their audiences, particularly as compared to other programming

options.  SUMF at 3 (¶ 17).

In addition, each of the Local Member Stations is a stakeholder in the PRSS and is

dependent on that distribution system for its content.  The PRSS is also critical in delivering

national emergency alerts and supporting technology that Interconnected Stations use to transmit

alerts concerning local and regional emergencies.  *Id.* at 5 (¶¶ 30, 32).  These emergency alert

services can be especially critical in rural and remote areas.  For example, in KSUT's broadcast

coverage area of more than 27,000 square miles, public radio is often the only way to obtain timely

information about natural disasters such as flash floods or wildfires.  SUMF at 18 (¶¶ 133-35).

Like all Interconnected Stations, the Local Member Stations pay modest fees to NPR for its

management and operation of the PRSS.

### D.    The Executive Branch Targets Public Media

Since at least 2020, President Trump and members of his Administration have expressed

their disagreement with NPR's and PBS's programming choices and demanded they be defunded:

- On January 26, 2020, President Trump promoted a social media post claiming that NPR was a "big-government, Democrat Party propaganda operation," and questioning NPR's existence. *Id.* at 19 (¶ 146).

- On April 10, 2024, President Trump wrote on social media: "NO MORE FUNDING FOR NPR, A TOTAL SCAM! … THEY ARE A LIBERAL DISINFORMATION MACHINE. NOT ONE DOLLAR!!!" *Id.* at 20 (¶ 149).

- On March 27, 2025, President Trump again wrote on social media: "NPR and PBS, two horrible and completely biased platforms (Networks!), should be DEFUNDED by Congress, IMMEDIATELY. Republicans, don't miss this opportunity to rid our Country of this giant SCAM, both being arms of the Radical Left Democrat Party. JUST SAY NO AND, MAKE AMERICA GREAT AGAIN!!!" *Id.* at 19 (¶ 147).

- Five days later, President Trump yet again wrote on social media: "REPUBLICANS MUST DEFUND AND TOTALLY DISASSOCIATE THEMSELVES FROM NPR & PBS, THE RADICAL LEFT 'MONSTERS' THAT SO BADLY HURT OUR COUNTRY!" *Id.* (¶ 148).

- On April 15, 2025, OMB Director Russell Vought told an interviewer that NPR's journalism "is worse than" "left-wing indoctrination," and accused it of "dividing on the basis of wokeism." Frances Vinall, et al., *Trump administration will ask Congress to cut funding for NPR and PBS*, Wash. Post (Apr. 15, 2025), available at https://www.washingtonpost.com/style/2025/04/15/nprpbs-funding-trump-administration/.

In April 2025, this rhetoric ripened into executive action. The first strike was aimed at the Corporation. On April 28, 2025, the White House's Deputy Director of Presidential Personnel emailed three of CPB's Board members purporting to inform them of their immediate termination. *See CPB v. Trump*, 2025 WL 1617191, at *4. The next day, the Corporation, its unanimous Board, and the three purportedly terminated Board members sued to challenge the attempted removal, contending that the President lacks the authority to remove CPB Board members. *See* Pls.' Mot. for Temporary Restraining Order, *CPB v. Trump*, Dkt. 2. Also on April 29, 2025, Department of Government Efficiency (DOGE) officials emailed the remaining two Board members requesting a meeting to "discuss getting a DOGE team assigned to the organization." *CPB v. Trump*, 2025 WL 1617191, at *4-5.

On June 8, 2025, this Court denied CPB's motion for a preliminary injunction, concluding as a statutory matter that it had not established a likelihood of success on their claim that the President lacked any authority to remove Board members.  *Id.* at \*6-10; *see id.* at \*7 (concluding that the D.C. Nonprofit Corporation Act—which applies to the Corporation to the extent it is "consistent with" the Public Broadcasting Act, 47 U.S.C. § 396(b)—may have authorized the President to remove directors).  The Court also concluded that the plaintiffs had failed to demonstrate that CPB was irreparably harmed, including because CPB could continue to function despite the Board members' removal.  *CPB v. Trump*, 2025 WL 1617191, at \*10-11.  As part of its analysis, the Court observed that CPB had recently amended its bylaws to require the Board's concurrence to remove either of its two remaining Board members.  *Id.* at \*7, 11.

### E.    The Executive Order

The next strike came on May 1, 2025, when President Trump issued Executive Order 14290, titled "Ending Taxpayer Subsidization of Biased Media."  90 Fed. Reg. 19415.  The Order purports to direct all federal agencies as well as the independent Corporation to cease any direct or indirect funding of NPR and PBS.  The Order asserts that NPR and PBS do not "present[] a fair, accurate, or unbiased portrayal of current events" and that the Order is necessary to "ensure that Federal funding does not support biased and partisan news coverage."  Order §§1, 2(a).

Section 2 of the Order purports to direct CPB to terminate multiple sources of funding for NPR and PBS.  First, it commands CPB's Board to "cease [providing] direct funding to NPR and PBS," including both "existing direct funding" and "future funding."  *Id.* § 2(a).  The Order also directs the CPB Board to "cease [providing] indirect funding to NPR and PBS, including by ensuring that [local public stations] do not use Federal funds for NPR and PBS."  *Id.* § 2(b).  To effectuate this directive, the Order instructs the CPB Board, by "June 30, 2025," to revise its 2025 Eligibility Criteria "to prohibit direct or indirect funding of NPR and PBS."  *Id.*  Section 2(b) also

purports to instruct CPB's Board to "prohibit [local stations that receive CSGs] from funding NPR or PBS after the date of this order." *Id*. "In addition," it directs CPB's Board to "take all other necessary steps to minimize or eliminate its indirect funding of NPR and PBS." *Id.*

Section 3 of the Order is addressed to federal agencies. It directs "[t]he heads of all agencies" to "identify and terminate, to the maximum extent consistent with applicable law, any direct or indirect funding of NPR and PBS." *Id.* § 3(a). It then instructs agency heads to identify any funding not terminated and "determine whether NPR and PBS are in compliance with the terms of th[e funding] instruments." *Id.* § 3(b). "In the event of a finding of noncompliance," the Order directs agency heads to "take appropriate steps under the terms of the instrument." *Id.*

The Order was accompanied by a "Fact Sheet" and Press Release further explaining the Order's basis and purpose. The "Fact Sheet" states that "NPR and PBS have fueled partisanship and left-wing propaganda with taxpayer dollars, which is highly inappropriate." "Fact Sheet: President Donald J. Trump Ends Taxpayer Subsidization of Biased Media" (May 1, 2025).[4] It lists various articles and editorial decisions as examples, such as NPR's coverage of the Covid-19 pandemic. *Id.* The Press Release accuses NPR of spreading "radical, woke propaganda," labels NPR's reporting as "trash," and contains nineteen bullets and sub-bullets cataloguing specific NPR articles, statements, and editorial decisions with which the President disagrees. Press Release, "President Trump Finally Ends the Madness of NPR, PBS" (May 2, 2025).[5]

## F.    The Effects of the Executive Order on Plaintiffs

---

[4]  Available at https://www.whitehouse.gov/fact-sheets/2025/05/fact-sheet-president-donald-j-trump-ends-the-taxpayer-subsidization-of-biased-media/.

[5]  Available at https://www.whitehouse.gov/articles/2025/05/president-trump-finally-ends-the-madness-of-npr-pbs/.

As detailed above, the Order purports to direct the Corporation "and all executive departments and agencies" to cease providing any direct or indirect funding to NPR.  Order § 1. Agencies have already begun to comply.  On May 2, 2025—the day after the Order was issued— the NEA informed NPR that it had terminated a grant.  SUMF at 23 (¶ 173).

Although the current leadership of CPB has indicated it does not intend to follow the Order, *see* Compl. ¶ 105, the Administration is actively working to dismantle that leadership.  In support of the President's purported firing of three of the CPB Board's five members, the Administration has taken the position that the President can remove any Board member at any time for any reason, *see generally CPB v. Trump*, 2025 WL 1617191, and repeatedly left open the possibility that the President could attempt to install new Board members without the advice and consent of the Senate that the Act requires.  4/29/25 Tr. at 11-12 and 5/14/25 Tr. at 47-49, *CPB v. Trump*.  *See also* Emergency Mot. for Stay Pending Appeal at 7-19, *Aviel v. Gor*, No. 25-5105 (D.C. Cir. Apr. 7, 2025) (asserting that the President's Article II authority empowers him to unilaterally appoint "acting" Board members to the Inter-American Foundation after firing all existing Board members, notwithstanding a statutory requirement that Board members must be confirmed by the Senate); *id.* at 19-20 (arguing in the alternative that if the President cannot appoint acting Board members, he must be permitted to fire the Foundation's president directly).[6]  But whether the President seeks to appoint new CPB Board members with or without the advice and consent of the Senate, it is clear CPB faces an ongoing attempt by the Administration to control its leadership—and an effort

---

[6] A panel of the D.C. Circuit found the President was unlikely to succeed in these arguments.  *See Aviel v. Gor*, No. 25-5105, 2025 WL 160556, at *1-2 (D.C. Cir. June 5, 2025).  This Court also found it "unlikely . . . that the President can shortcut" the PBA's advice-and-consent requirement "by filling vacancies on an interim basis."  *CPB v. Trump*, 2025 WL 1617191, at *8.  However, there is no indication that the Executive Branch has changed its position.

to pave the way for full implementation of the Order.[7]  It is equally clear that the President's near complete control over the Executive Branch, including all federal agencies and departments that routinely disburse funds appropriated by Congress, provide the Executive Branch multiple potential means to execute the Order's retaliatory designs even if it cannot secure the cooperation or obedience of CPB.

If the Order is fully implemented, the loss of direct funding from CPB combined with the loss or significant decline in revenue from Member stations would have severe consequences for NPR.  NPR would have to take immediate cost-saving measures, including but not limited to eliminating or scaling back critical emergent coverage areas like the war in Ukraine.  SUMF at 23 (¶ 174).  Further, the loss of federal funding would jeopardize NPR's ability to produce and distribute programs like *Morning Edition* and *Tiny Desk Radio* to local public radio stations around the country.  *Id.* at 24 (¶ 177).  If forced to cut back or eliminate programming, NPR would lose the confidence of millions of listeners and supporters, thereby suffering lasting institutional damage.  *Id.* (¶¶ 179-80).

Further, a loss of funding needed to maintain and operate the PRSS could be devastating.  As the Corporation has attested in its ongoing litigation, when the President purported to terminate three of its Board members, CPB was in the process of "negotiating the extension" of its current "PRSS Interconnection grant [with NPR]"—which "expires on September 30, 2025"—"for an additional $35,962,000 using funds that Congress has already appropriated for that specific purpose."  Reply at 20, *CPB v. Trump*, Dkt. 12.  As CPB explained, "[i]f the PRSS Interconnection

---

[7] As noted above, on June 8, this Court concluded that CPB and its Board had failed to demonstrate irreparable harm from the President's purported termination of three of its Board members.  *CPB v. Trump*, 2025 WL 1617191, at *10-11.  The Court's opinion did not address the legality of the Order (which the Corporation's suit did not challenge).

Grant is not extended, the PRSS system will cease operations and the resulting effects will be catastrophic." *Id.*; *see also* Reply Ex. A, Supplemental Declaration of Evan Slavitt ¶¶ 35-36, Dkt. 12-1. The PRSS is the product of decades of engineering and cannot readily be replaced by federal or state-level systems or commercial entities. Without the PRSS and the Interconnected Stations, entire populations—especially those in rural and remote areas—would be left vulnerable during natural disasters, blackouts, and other emergencies. *Id.* at 25 (¶ 186)

Member stations like the Local Member Stations, many of which serve small and rural communities with limited resources, would also face severe consequences, not the least of which is the violation of their First Amendment rights. At base, the Order seeks to impose a government veto over those stations' editorial choices, and it does so in a context where Member stations are statutorily required to use certain CSG funds to acquire or produce national programming.

If the Order is fully implemented, Member stations that wish to continue to air NPR programming may have to license it using funds from other parts of their budgets, forcing them to reduce spending on, for example, local news coverage. If the Local Member Stations are no longer able to air NPR news and other programming, they would almost certainly lose listeners and private contributors which, in turn, would lead to significant revenue losses. *Id.* at 27 (¶¶ 198, 200), 29 (¶¶ 214-15), 30-31 (¶¶ 225-27). And those Member stations that continue to air NPR programming would also do so at the risk of further government retaliation. *See id.* at 26 (¶ 192), 28 (¶ 203), 29 (¶ 218).

## LEGAL STANDARD

Summary judgment is appropriate if "there is no genuine issue as to any material fact" and either movant "is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c); *see Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986). When parties submit cross-motions for summary judgment, each part "must carry its own burden under the applicable legal standard,"

*Savignac v. Jones Day*, 754 F. Supp. 3d 135, 163 (D.D.C. 2024), and "each party receives the benefit of favorable factual inferences for purposes of the other party's motion," *Jenner & Block LLP v. U.S. Dep't of Justice*, -- F. Supp. 3d --, 2025 WL 1482021, at *6 (D.D.C. May 23, 2025).

## ARGUMENT

Plaintiffs have an equitable cause of action for declaratory and injunctive relief "with respect to violations of federal law by federal officials," including the "ability to sue to enjoin unconstitutional actions by . . . federal officers." *Armstrong v. Exceptional Child Ctr., Inc.*, 575 U.S. 320, 326–27 (2015); *see Am. Sch. of Magnetic Healing v. McAnnulty*, 187 U.S. 94 (1902). It is "well established that '[r]eview of the legality of Presidential action can ordinarily be obtained in a suit seeking to enjoin the officers who attempt to enforce the President's directive,'" even if "a cause of action under the [Administrative Procedure Act] is not available." *Chamber of Com. v. Reich*, 74 F.3d 1322, 1327, 1328 (D.C. Cir. 1996) (quoting *Franklin v. Massachusetts*, 505 U.S. 788, 828 (1992) (Scalia, J., concurring in part and concurring in judgment)); *see also Nat'l Ass'n of Postal Supervisors v. U.S. Postal Serv.*, 26 F.4th 960, 970-71 (D.C. Cir. 2022). Plaintiffs also have a cause of action under the Administrative Procedure Act (APA) to seek vacatur of any and all final agency actions implementing the unlawful Order on the grounds that those actions violate statutory commands and the Constitution. *See* 5 U.S.C. § 706(2).

Because, as detailed below, the undisputed material facts establish that the Order violates federal statutes and the Constitution in multiple ways, the Court should enter summary judgment in favor of Plaintiffs. Specifically, the Court should declare the Order unlawful because "the facts alleged, under all the circumstances, show that there is a substantial controversy, between parties having adverse legal interests, of sufficient immediacy and reality to warrant the issuance of a declaratory judgment." *MedImmune, Inc. v. Genentech, Inc.*, 549 U.S. 118, 127 (2007) (quotation marks omitted); *see* 28 U.S.C. § 2201(a). And because the Order also inflicts "substantial injury

that is not accurately measurable or adequately compensable by money damages," *Ross-Simons of Warwick, Inc. v. Baccarat, Inc.*, 217 F.3d 8, 13 (1st Cir. 2000), and contravenes the public interest, this Court should also permanently enjoin its implementation and enforcement.

## I.     The Executive Branch Has No Power to Issue or Enforce the Order

The Order is invalid from the start because the President had no authority to issue it.  That authority, and any executive branch official's power to implement or enforce the Order, "must stem either from an act of Congress or from the Constitution itself."  *Youngstown Sheet & Tube Co. v. Sawyer,* 343 U.S. 579, 585 (1952).  But not only does the Order lack any statutory basis, the Public Broadcasting Act expressly forbids it.  The NEA's foundational statute too prohibits the Order's "instructions" to the NEA.  And the Constitution supplies no basis for it as an exercise of the President's inherent authority.  To the contrary, Congress holds the power of the purse, and domestic spending is far afield of the rare domains where the President may override Congress's will based on authority the Constitution confers solely to him.

### A.     Section 2 of the Order Has No Legal Basis and May Not Be Enforced.

Congress enacted the PBA to promote First Amendment values.  By supporting public broadcasting with federal funds, the Act fosters the engaged and informed citizenry that "is a precondition to enlightened self-government and a necessary means to protect it."  *Citizens United v. Federal Election Comm'n*, 558 U.S. 310, 339 (2010).  The Act also furthers First Amendment values by affording public broadcasting "maximum protection from extraneous interference."  47 U.S.C. § 396(a)(10).  Congress's intent to safeguard the independence of public broadcasters— and thereby to safeguard their First Amendment rights—could not be clearer.  *See CPB v. Trump*, 2025 WL 1617191, at *7 ("Congress was clearly concerned about preventing 'any department, agency, officer, or employee of the United States' from directing, supervising, or controlling the Corporation." (quoting 47 U.S.C. § 398(a))); *see also, e.g.*, Senate Report at 11 (1967)

18

("Noncommercial television and radio in America, even though supported by Federal funds, must be absolutely free from any Federal Government interference over programming.").

The Order flouts those unambiguous statutory safeguards in multiple ways. First and foremost, it violates 47 U.S.C. § 398(a), which expressly denies "authoriz[ation to] any department, agency, officer, or employee of the United States to exercise any direction, supervision, or control over . . . the Corporation or any of its grantees or contractors." Section 2 of the Order—which purports to "instruct[] the CPB Board [to] cease direct funding to NPR" and to "cease indirect funding to NPR . . . including by ensuring" that local stations "do not use federal funds for NPR"—constitutes exactly the type of attempt to "control" the Corporation and its grantees that Congress unmistakably prohibited. The Order should be invalidated on this clear statutory basis alone.

The Executive Branch is currently of the view that § 398(a) does not bind the President. *See CPB v. Trump*, 2025 WL 1617191, at *10. It is wrong. Although the President is not an "officer" for purposes of the Constitution's Appointments Clause—because he is elected and not appointed—he is most certainly an "officer" in this statutory context. Indeed, the Executive Branch itself previously explained the distinction between "the word 'officers' [as] used in the narrow constitutional sense to denominate persons appointed by the President" and "elected officers such as the President," concluding that the President may be considered an "officer" for statutory purposes. *The President—Interpretation of 18 U.S.C. § 603 as Applicable to Activities in the White House*, 3 Op. O.L.C. 31, 35 (1979). As that opinion explains, "the critical consideration in determining the meaning of the word 'officer' is . . . the intent of Congress." *Id.*; *see also CPB v. Trump*, 2025 WL 1617191, at *10 (finding it "likely" that Congress "intended to preclude the President (or any subordinate officials acting at his direction) from directing,

supervising, or controlling the Corporation").  Here, it would make no sense to conclude that Congress built an elaborate structure to insulate CPB from political or other editorial interference—including by creating the Corporation as a private entity, 47 U.S.C. § 396(b); disclaiming agency status, *id.*; stating that its Board members and officers are not government employees, *id.* § 396(d)(2); making a determination that the Corporation should be "afford[ed] *maximum* protection from extraneous interference and control," *id.* § 396(a)(10) (emphasis added); and enacting § 398(a) to expressly prohibit interference by government officers and employees— while leaving the door open for the President himself to leverage the Corporation's funding decisions to control the content of CPB grantees' programming.  Such a gaping loophole would be wholly inconsistent with Congress's clear provision to the Corporation of "maximum" protection from government interference.[8]

More generally, as decisions from this Circuit and others confirm, the President fits within the plain meaning of the word "officer" for statutory purposes.  *See, e.g.*, *Nat'l Wildlife Federation v. United States*, 626 F.2d 917, 923 (D.C. Cir. 1980) (concluding that a mandamus action under 28 U.S.C. § 13618, which authorizes suits against "an officer or employee of the United States," is "not precluded because the federal official at issue is the President"); *see also Lamar v. United States*, 241 U.S. 103, 112 (1916) (concluding that members of Congress are "officers" for statutory

---

[8] This Court's holding in *CPB v. Trump* is not to the contrary.  In concluding that the President likely had authority to remove three of CPB's Board members, the Court relied on the absence of any text in the PBA specifically addressing Board members' removal; the Act's provision that the Corporation is subject to the D.C. Nonprofit Corporation Act "to the extent consistent with [the PBA]," 47 U.S.C. § 396(b); and a particular provision in the D.C. Nonprofit Corporation Act pertaining to the removal of board members, D.C. Code § 29.406.08(e).  *See CPB v. Trump*, 2025 WL 1617191, at *6-8.  But while the PBA is silent on the President's authority to remove CPB Board members, it expressly and unequivocally forbids the type of interference embodied by the Order.  As the Government itself conceded during a hearing before this Court, "there is . . . a distinction between direction of the Corporation's activities and control over who is on the board." 5/14/25 Tr. at 32, *CPB v. Trump*.

purposes); *Motions Sys. Corp. v. Bush*, 437 F.3d 1356, 1365 (Fed. Cir. 2006) (Gajarsa, J.,

concurring) (the Court's holding in *Lamar* means that the President, too, is "an officer of the United

States for statutory purposes").  Indeed, the President may be considered an "officer" for other

constitutional purposes as well.  *See Nixon v. Fitzgerald*, 457 U.S. 731, 750 (1982) (the Vesting

Clause of the Constitution, U.S. Const. art. II, § 1, "establishes the President as the chief

constitutional officer of the Executive Branch"); *President's Receipt of the Nobel Peace Prize*, 33

Op. O.L.C. 370, 374 (2009) ("The President surely 'hold[s] an[] Office of Profit or Trust'" for

purposes of the Foreign Emoluments Clause (quoting U.S. Const. art. I, § 9, cl. 8)).

Moreover, the President can only potentially enforce the Order through actions of agencies

and of Executive Branch officials and employees who indubitably are covered by § 398(a).  Thus,

at a minimum, any attempt by any other federal Defendant to implement or enforce the Order,

including by attempting to control CPB's funding decisions or the use of CPB funds by the Local

Member Stations, would violate the Act.

The Order violates the Act in multiple other ways as well.  By requiring CPB to prohibit

local public radio stations from using CSG funds for NPR membership and programming fees, the

Order directs the Corporation to engage in precisely the kind of content-based and viewpoint-based

discrimination that the Act expressly prohibits.  The Act requires CPB to distribute funds to local

stations "on the basis of" three content-neutral factors:  "each eligible [station] receives a basic

grant"; the funds must be allocated based on the "financial needs and requirements of [each]

station[]"; and they must be awarded under a formula that "provid[es] incentives" to "stimulate

new[] sources of non-Federal financial support for stations." 47 U.S.C. § 396(k)(3)(A)(iii)(I),

(k)(6)(B).  These provisions leave the Corporation no discretion to award or deny funding based

on the content of a station's programming.  And to leave no doubt on that score, the Act adds that

"[t]he funds distributed pursuant [to this provision] may be used at the discretion of the recipient." *Id.* § 396(k)(7).  The remaining portion of CPB's appropriation that must be distributed to local radio stations (23 percent) is subject to only one additional viewpoint-neutral restriction:  the funds must be spent on "acquiring or producing programming that is to be distributed nationally and serves the needs of national audiences." *Id.* § 396(k)(3)(A)(iii)(III).  Simply put, the Act affords CPB no leeway to deny funding to local public radio stations to prevent those funds from being spent on disfavored content or programming from a disfavored speaker.

The Order further violates the Act's requirement that CPB allocate funds appropriated to the Satellite Interconnection Fund to "the national entity" that public radio stations "designate for satellite interconnection purposes." *Id.* § 396(k)(10)(D)(i).  That entity is NPR, which the Interconnected Stations have designated for decades to manage and operate the PRSS.  SUMF at 5 (¶ 36).  Accordingly, there can be no debate that CPB "shall" distribute interconnection funds to NPR for "capital costs" and "associated maintenance." 47 U.S.C. § 396(k)(10)(D)(i).

Finally, even if Congress had not included any of these restrictions or requirements, the Order still would have no legal basis because CPB is a private corporation, and no law bestows on the President the power to issue it commands.  As the Executive Branch itself has recognized, Congress "carefully preserved [CPB's] nongovernmental status." *Corporation for Public Broadcasting:  Grants—Monitoring Administration Of*, 2 Op. O.L.C. 39, 40 (1978).  The Act announces that "a *private* corporation should be created . . . to afford maximum protection from extraneous interference." 47 U.S.C. § 396(a)(1) (emphasis added).  It then states that the Corporation "will not be an agency or establishment of the United States Government." *Id.* § 396(b).  And it declares that "[t]he members of [CPB's] Board shall not … be deemed to be officers or employees of the United States." *Id.* § 396(d)(2).  CPB's status as a private entity,

22

alone, dooms the Order.  "The President can ordinarily regulate the affairs of private persons by Executive order only on the basis of some express or implicit statutory authority."  2 Op. O.L.C. 41, 45 (1978).  And no provision of the Act allows the President to issue the Order; to the contrary, from top to bottom the Act bars government interference in CPB's affairs.

Finally, the Administration cannot paper over its lack of statutory authority with Article II of the Constitution.  Congress has "exclusive power over the federal purse."  *U.S. Dep't of Navy v. Fed. Lab. Rels. Auth.*, 665 F.3d 1339, 1346 (D.C. Cir. 2012).  This power is "a bulwark of the Constitution's separation of powers" and "particularly important as a restraint on Executive Branch officers."  *Id.* at 1347.  Directing how federal funds are expended to support domestic welfare is as far from an inherently executive function as there is.  Put simply, the President lacks any authority to overrule Congress's decision about how funds appropriated to CPB are spent.

### B.    The Department of the Treasury and the National Endowment for the Arts Lack Authority to Implement or Enforce the Order.

The Order directs "all agencies" to "terminate" "any direct or indirect funding of NPR and PBS."  The Order thus appears to direct the Treasury Department to withhold funding from the Corporation to the extent that the Corporation does not voluntarily comply with the Order.  But the Treasury Department has no authority to withhold funds appropriated to the Corporation.

Treasury must disburse appropriated funds as directed by Congress.  "Congress possesses the 'power of the purse,' which is the ultimate check on the power of the Executive."  *Widakuswara v. Lake*, -- F. Supp. 3d --, 2025 WL 1166400, at *15 (D.D.C. Apr. 22, 2025) (quotation and alteration marks omitted), *appeal pending*, No. 25-5144 (D.C. Cir.).  The President's apparent "unwillingness to expend funds in accordance with the congressional appropriations laws is a direct affront to the power of the legislative branch," and illegal.  *Id.*; *see In re Aiken County*, 725 F.3d 255, 260-61 & n.1 (D.C. Cir. 2013) (explaining that "the President does not have unilateral

authority to refuse to spend the funds" appropriated by Congress based on "policy reasons").  The Consolidated Appropriations Act of 2023 provides that $535 million "*shall* be available" "[f]or payment to [CPB]" for fiscal year 2025, and the Further Consolidated Appropriations Act of 2024 likewise provides that $535 million "*shall* be available" "[f]or payment to [CPB]" for Fiscal Year 2026.[9]  The Continuing Appropriations and Extensions Act of 2025 extends those appropriations into Fiscal Year 2027, and additionally appropriates $60 million for interconnection services for Fiscal Year 2025.[10]  Withholding funding appropriated by Congress to CPB would violate the express terms of these laws.  It is Congress, not the Executive, that has the sole power to determine how much funding CPB should receive.  The Treasury Department should be enjoined from withholding that funding.

The Executive Order also is incompatible with the NEA's governing statute.  Under the National Foundation on the Arts and Humanities Act, "[n]o payment shall be made [by the NEA] except … in accordance with regulations … [which] shall ensure that … artistic excellence and artistic merit are the criteria by which applications are judged."  20 U.S.C. § 954(d)(1).  The President is seeking to introduce another criterion:  whether the President approves of the applicant.  In other words, no matter how artistically excellent and meritorious an NPR submission is, it cannot be funded.  This directly violates Section 954(d)(1), which "makes clear that each application is to be reviewed on an individual basis" and forbids the government from adopting a categorical "eligibility bar."  *Rhode Island Latino Arts v. Nat'l Endowment for the Arts*, -- F. Supp. 3d --, No. 25-cv-79, 2025 WL 1009026, at *10 (D.R.I. Apr. 3, 2025).  And the Constitution no

---

[9] Pub. L. No. 117-328, Div. H, tit. IV (Fiscal Year 2025); Pub. L. No. 118-47, Div. D, tit. IV (Fiscal Year 2026).

[10] Pub. L. No. 119-4, Div. A, tit. I, §§ 1101(a)(8), 1112.

more authorizes the President to countermand the National Foundation on the Arts and Humanities Act than it does the PBA.

In short, the Order has no basis in law. On that ground alone, the Court should declare it unlawful and enjoin Defendants from implementing or enforcing it.

## II.    The Order Violates the First Amendment

The Executive Order is a textbook First Amendment violation in multiple respects: It unconstitutionally retaliates against NPR for its journalism and protected speech, imposes viewpoint-based burdens on NPR and the Local Member Stations, and infringes on NPR's and the Local Member Stations' freedom of association. The illegitimate reason for the Order's punitive measures—the President's dislike of NPR's journalism and other speech—is unmistakably clear from the plain text and title of the Order: NPR is, in the President's view, "biased." Order §§ 1, 2. And, if that were not enough, the "Fact Sheet" and Press Release accompanying the Order list specific NPR news coverage and other content of which the President disapproves. The fact that the President issued it after months of criticizing NPR's journalism only reinforces the Order's obvious unconstitutionality and underlines the necessity of permanent injunctive relief.

### A.    The Order Is Unlawful Retaliation in Violation of the First Amendment.

The First Amendment was designed "to protect the freedom to think as you will and to speak as you think." *303 Creative LLC v. Elenis*, 600 U.S. 570, 584 (2023) (quotation marks omitted). To that end, it "prohibits government officials from retaliating against individuals for engaging in protected speech." *Lozman v. City of Riviera Beach*, 585 U.S. 87, 90 (2018); *see also Media Matters for America v. Paxton*, -- F.4th --, 2025 WL 1536459, at *11 (D.C. Cir. May 30, 2025). To demonstrate that unlawful retaliation has occurred, a plaintiff must show that "(1) [it] engaged in conduct protected under the First Amendment; (2) the defendant took some retaliatory action sufficient to deter a person of ordinary firmness in plaintiff's position from speaking again;

and (3) a causal link between the exercise of a constitutional right and the adverse action taken against him." *Aref v. Lynch*, 833 F.3d 242, 258 (D.C. Cir. 2016); *see also Nieves v. Bartlett*, 587 U.S. 391, 398 (2019) ("a plaintiff must establish a 'causal connection' between the government defendant's 'retaliatory animus' and the plaintiff's 'subsequent injury'" (quoting *Hartman v. Moore*, 547 U.S. 250, 259 (2006))).  Each of these elements is satisfied here.

The Order targets NPR, a news organization, for its journalism in violation of the First Amendment's protections for free speech and a free press.  Indeed, NPR's journalism is "at the core of what the First Amendment is designed to protect." *Morse v. Frederick*, 551 U.S. 393, 399 (2007) (internal quotations omitted); *see also Media Matters*, 2025 WL 1536459, at *15 ("reporting on public issues are quintessential First Amendment activities").  The "Fact Sheet" and Press Release provide examples of NPR's protected journalism, including specific news articles, that precipitated the Order's issuance.  The "Fact Sheet" complains of stories run by NPR as "one-sided[ly]" "address[ing] racism," "defending looting"; "insist[ing] COVID-19 did not originate in a lab"; and featuring "queer animals" on Valentine's Day.  "Fact Sheet" at 2.  And the Press Release contains nineteen bullets and sub-bullets linking to specific content published by NPR, all of which the Press Release categorizes as "trash" and "radical, woke propaganda."  Press Release at 1.  Both the Press Release and "Fact Sheet" also criticize NPR for its editorial choices about what *not* to cover.  *See* "Fact Sheet" at 2 (accusing NPR of "refus[ing] to cover the Hunter Biden laptop story"); Press Release at 3 (similar).  NPR's "editorial function"—its decisions about what stories to cover and how—is protected by the First Amendment.  *NetChoice*, 603 U.S. at 731 (internal quotations omitted); *Tornillo*, 418 U.S. at 258, *see also Hurley v. Irish-Am. Gay, Lesbian & Bisexual Grp. of Bos.*, 515 U.S. 557, 575 (1995) ("the choice of a speaker not to propound a particular point of view . . . is presumed to lie beyond the government's power to control").

The "causal link" between NPR's exercise of its First Amendment rights and the Order's issuance cannot be reasonably disputed. Indeed, it is not always obvious when the government has acted with a retaliatory purpose. "But this wolf comes as a wolf." *Morrison v. Olson*, 487 U.S. 654, 699 (1988) (Scalia, J., dissenting). The Order itself decries NPR as "biased" and "partisan"—which is just another way of saying that the views expressed by NPR do not align with the President's. And the accompanying "Fact Sheet" and Press Release make unmistakably clear that the content of NPR's news and other programming prompted the President to issue the Order. There can be no doubt that the President issued the Order to punish NPR and to stop the Local Member Stations from disseminating what the President views as "left-wing propaganda." "Fact Sheet" at 1. Indeed, the "Fact Sheet" even cites as justification for the Order a claim that "Democrats outnumbered Republicans" among NPR's newsroom editorial staff. *Id*.

The Order's blatantly retaliatory nature is further confirmed by the campaign of attacks that led up to its issuance. The President has repeatedly called for defunding NPR because of his hostility to what he perceives as the viewpoint of its news and other programming. *See supra* at 11-13. Those attacks have only escalated since Plaintiffs filed this lawsuit to challenge to the Order. On May 28, 2025, President Trump formally requested that Congress rescind the entirety of the $1.1 billion appropriated to CPB for Fiscal Years 2026 and 2027 on the grounds that the public media system "is politically biased and an unnecessary expense to the taxpayer."[11] On June 12, 2025, the House of Representatives narrowly approved that request by a vote of 214-212.[12]

---

[11] *See* Rescission Proposal No. R25-21, "Report Pursuant to Section 1012 of the Congressional Budget and Impoundment Control Act of 1974 (2 U.S.C. 683)" (May 28, 2025), available at https://www.whitehouse.gov/wp-content/uploads/2025/03/Proposed-Rescissions-of-Budgetary-Resources.pdf.

[12] Katherine Trully-McManus & Jennifer Scholtes, "House clears $9.4B in funding clawbacks requested by White House," Politico.com (June 12, 2025), available at

Just prior to the vote, President Trump took to social media to proclaim, in support of his rescission proposal, that "[f]or decades, Republicans have promised to cut NPR, but have never done it, until now," and to urge "every single Republican in Congress" to "vote 'YES.'"  SUMF at 26 (¶ 190).

The Order would unquestionably deter an entity of "ordinary firmness" from producing and airing content that might displease the President.  *Aref*, 833 F.3d at 258.  A media organization of ordinary firmness would be chilled in exercising its First Amendment rights if threatened with an executive order that commands the organization's funding sources and partners to stop supporting it, based expressly on the President's criticism of its content as "biased."  And of course, the implementation of the Order would constitute further retaliatory action.  NPR receives millions of dollars annually directly from CPB, including to support the PRSS, and fees paid by Member stations accounts for nearly one third of its budget.  An overall reduction of a substantial portion of its budget would prove a powerful deterrent against the exercise of constitutionally protected editorial independence.  Accordingly, the Order and the funding freeze it threatens easily count as sufficiently adverse actions for purposes of First Amendment retaliation.  *Cf. Tao v. Freeh*, 27 F.3d 635, 639 (D.C. Cir. 1994) ("[A]s the Supreme Court has noted, the First Amendment protects government employees from 'even an act of retaliation as trivial as failing to hold a birthday party for a public employee . . . when intended to punish her for exercising her free speech rights.'" (quoting *Rutan v. Republican Party of Ill.*, 497 U.S. 62, 76 n.8 (1990)).

Finally, a denial of funding clearly constitutes an adverse, retaliatory action.  While Congress has discretion in how it uses its spending power, *see infra* at 33, neither it nor the President can halt funding "in retaliation for protected First Amendment activity."  *Bd. of Cnty.*

---

https://www.politico.com/news/2025/06/12/house-clears-9-4b-in-funding-clawbacks-requested-by-white-house-00403305.

*Comm'rs v. Umbehr*, 518 U.S. 668, 677 (1996) (the First Amendment protects "the right of independent government contractors not to be terminated for exercising their First Amendment rights"); *see, e.g.*, *Jenner*, 2025 WL 1482021, at *15 (the government cannot threaten to cancel contracts with law firm's clients in retaliation for the law firm's speech). The Order therefore amounts to unconstitutional retaliation.

### B.    The Order Imposes Viewpoint-Based Burdens on Speech.

The Order unquestionably imposes unconstitutional viewpoint-based burdens on NPR's and the Local Member Stations' protected speech. "When the Government restricts speech, the Government bears the burden of proving the constitutionality of its actions." *United States v. Playboy Ent. Grp., Inc.*, 529 U.S. 803, 816 (2000). Government actions "burdening" speech face "the same rigorous scrutiny" as actions "banning speech." *Id.* at 812. Here, it is beyond dispute that NPR's programming and editorial choices are protected speech. The Order, by purporting to terminate NPR's federal funding and prevent local public stations from airing NPR's content, has burdened NPR's speech through the denial of funding based on the perceived viewpoint of that speech. *See Perry v. Sinderman*, 408 U.S. 593, 593 (1972) (the government "may not deny a benefit to a person on a basis that infringes his constitutionally protected interests").

The Order even more blatantly imposes viewpoint-based burdens on the Local Member Stations' speech by prohibiting them from using federal funds to license NPR's programming. The Order would insert the government directly into their editorial processes, dictating that NPR is off-limits when the Local Member Stations choose among national programming options—because the President dislikes NPR's news coverage. The Order would thus override Member stations' editorial judgment and their expressive choices. *See Miami Herald Pub. Co. v. Tornillo*, 418 U.S. 241, 258 (1974) ("The choice of material to go into a newspaper . . . constitute[s] the exercise of editorial control and judgment."). Stations wishing to continue airing NPR's content

would, at minimum, have to draw from other parts of their budgets and undertake burdensome methods to segregate those funds.

The burden imposed on Plaintiffs' protected speech is *per se* unconstitutional because it is based on the viewpoints expressed by NPR and the editorial choices of the Local Member Stations. "Government discrimination among viewpoints is a 'more blatant' and 'egregious form of content discrimination,'" *Reed v. Town of Gilbert, Ariz.*, 576 U.S. 155, 156 (2015) (quoting *Rosenberger v. Rectors & Visitors of the Univ. of Va.*, 515 U.S. 819, 829 (1995)), and a finding of viewpoint-based discrimination is typically "all but dispositive" in a First Amendment challenge, *Sorrell v. IMS Health, Inc.*, 564 U.S. 552, 571 (2011). While content-based burdens on speech "must satisfy strict scrutiny," "those based on viewpoint *are prohibited*." *Minn. Voters All. v. Mansky*, 585 U.S. 1, 11 (2018) (emphasis added); *see, e.g.*, *Frederick Douglass Found., Inc. v. District of Columbia*, 82 F.4th 1122, 1141 (D.C. Cir. 2023) ("viewpoint discrimination is 'poison'").

As discussed above, the Order and its accompanying materials leave no doubt that the Order punishes NPR because (in the President's view) its news and other programming are too "left-wing." "Fact Sheet" at 1; Press Release at 1. The specific content cited by the "Fact Sheet" and Press Release further demonstrate that the Order is premised on the President's disagreement with the viewpoints expressed in NPR's news coverage and editorial content. *See, e.g.*, "Fact Sheet" at 2 (criticizing NPR's "one-sided narrative to 'address racism'" and "celebrat[ion of] a transgender teen's transition"); Press Release at 1 (calling NPR's journalism "trash").

The Order insists that "[w]hich viewpoints NPR and PBS promote does not matter. What does matter is that neither entity presents a fair, accurate, or unbiased portrayal of current events to taxpaying citizens." Order § 1. But the Order's stated purpose of removing "bias" only lays bare its incompatibility with the First Amendment. The Supreme Court has "many times held, in

many contexts, that it is no job for government to decide what counts as the right balance of private expression—to 'un-bias' what it thinks biased, rather than to leave such judgments to speakers and their audiences." *NetChoice*, 603 U.S. at 719; *see, e.g.*, *Tornillo*, 418 U.S. at 258 ("government regulation" of a newspaper's "treatment of public issues and public officials—whether fair or unfair" cannot be "exercised consistent with [the] First Amendment"); *Buckley v. Valeo*, 424 U.S. 1, 48 (1976) (*per curiam*) (government may not "restrict the speech of some elements of our society in order to enhance the relative voice of others"); *Sorrell v. IMS Health Inc.*, 564 U.S. 552, 578-79 (2011) (government may not "tilt public debate in a preferred direction").

Just last year, the Court reaffirmed that "[t]he government may not, in supposed pursuit of better expressive balance, alter a private speaker's own editorial choices about the mix of speech it wants to convey." *NetChoice*, 603 U.S. at 734. In *NetChoice*, the Court addressed the constitutionality of two state laws that restricted social-media platforms' ability to engage in content moderation. The Court flatly rejected the argument that the laws were necessary to solve for supposed bias on the platforms, explaining that the government "may not interfere with private actors' speech to advance its own vision of ideological balance" because "[o]n the spectrum of dangers to free expression, there are few greater than allowing the government to change the speech of private actors in order to achieve its own conception of speech nirvana." *Id.* at 741-42. So too here: the President cannot substitute his own editorial judgment—*his viewpoints*—for NPR's and the Local Member Stations and decide that NPR produces the "wrong" balance of news coverage. Indeed, what was true in *NetChoice* with respect to social-media platforms applies with even more force to NPR and the Local Member Stations—media organizations exercising paradigmatic editorial control over their content. *See Tornillo*, 418 U.S. at 258 (the "First Amendment guarantees of a free press" protect "editorial control and judgment"). When the

government attempts to "un-bias" viewpoints expressed by a private speaker, it engages in unconstitutional viewpoint discrimination.

The fact that the Order engages in viewpoint-based discrimination by restricting government funding rather than by regulating speech directly is of no moment. "[I]deologically driven attempts to suppress a particular point of view are presumptively unconstitutional in funding, as in other contexts." *Rosenberger*, 515 U.S. at 831 (internal quotations omitted). That is because "the First Amendment does not concern itself only with 'direct restraint or punishment'"; it also forbids "indirect 'discouragements'" that "'undoubtedly have the same coercive effect upon the exercise of First Amendment rights.'" *Jenner*, 2025 WL 1482021, at *15 (quoting *Am. Commc'ns Ass'n v. Douds*, 339 U.S. 382, 402 (1950)). Thus, the government cannot "deny a benefit to a person on a basis that infringes his constitutionally protected . . . freedom of speech *even if he has no entitlement to that benefit*." *Umbehr*, 518 U.S. at 674 (1996) (quotation marks omitted; emphasis added); *see also, e.g.*, *Am. Civil Liberties Union v. Mineta*, 319 F. Supp. 2d 69, 86 (D.D.C. 2004) (invalidating statute that prohibited federal grantees from permitting advertising advocating for the legalization of marijuana and observing that "[w]hile Congress may be under no obligation to fund mass transit . . . , once it chooses to do so, it must act in a way that does not engage in viewpoint discrimination in violation of the First Amendment."). To deny funding based on the viewpoint expressed by a private speaker, as the Administration attempts to do here, would "penaliz[e]" and "inhibit[]" the exercise of First Amendment rights to "produce a result"—the suppression of disfavored views—"which [the government] could not command directly." *Perry*, 408 U.S. at 597; *see also Agency for Int'l Dev. v. All. for Open Soc'y Int'l, Inc.*, 570 U.S. 205, 214 (2013).

To be sure, "[w]hen the government disburses public funds to private entities to convey a *governmental* message, it may take legitimate and appropriate steps to ensure that its message is neither garbled nor distorted by the grantee." *Rosenberger*, 515 U.S. at 833 (emphasis added). When the government is speaking, "it is entitled to say what it wishes"—even if it employs private actors to convey that message. *Id.* But when the government "expends funds to encourage . . . *private* speech," it "may not discriminate based on the viewpoint of private persons whose speech it facilitates." *Id.* at 833-34 (emphasis added). In other words, "[v]iewpoint-based restrictions" are not "proper when the [government] does not itself speak or subsidize transmittal of a message it favors but instead expends funds to encourage a diversity of views from private speakers." *Id.* at 834. In *Rosenberger*, for example, a public university made funds generally available to student groups to communicate messages to the community. *Id.* at 824–25. Having done that, the school could not "discriminate based on the viewpoint of [the] private persons whose speech it facilitates" by refusing to fund religious student groups. *Id.* at 834. Likewise, when the government provides school property for after-hours use by private groups, it cannot then gatekeep those facilities based on viewpoint. *Lamb's Chapel v. Ctr. Moriches Union Free Sch. Dist.*, 508 U.S. 384, 392 (1993). In short, "[w]here private speech is involved, even Congress' antecedent funding decision cannot be aimed at the suppression of ideas thought inimical to the Government's own interest." *Legal Servs. Corp. v. Velazquez*, 531 U.S. 533, 548–49 (2001). That is no less true where, as here, the President aims to suppress speech *in contravention* of funding decisions made by Congress.

NPR's and the Local Member Stations' news and other programming is private speech facilitated by public funding; it is not government speech. Indeed, Congress expressly insulated CPB grantees like NPR and the Local Member Stations from government control. *See supra* at 3-4, 6-7. Because NPR and the Local Member Stations are private speakers rather than "government

mouthpiece[s]," "the government has no legitimate interest in repressing" their viewpoints. *Jenner*, 2025 WL 1482021, at *18 (quoting *Umbehr*, 518 U.S. at 680). Accordingly, the "provision of financial benefits" to CPB grantees like NPR and the Local Member Stations must be "viewpoint neutral[]." *Rosenberger*, 515 U.S. at 834.

Finally, the Administration's attempt to impose viewpoint-based burdens on NPR is made worse, not better, because it operates through threats and directives to CPB, the Local Member Stations, and other local public radio stations. "[T]he First Amendment prohibits government officials from wielding their power selectively to punish or suppress speech, directly or . . . through private intermediaries." *Nat'l Rifle Ass'n of Am. v. Vullo*, 602 U.S. 175, 198 (2024). "To state a claim that the government violated the First Amendment through coercion of a third party, a plaintiff must plausibly allege conduct that, viewed in context, could reasonably be understood to convey a threat of adverse government action in order to punish or suppress the plaintiff's speech." *Id.* at 191. The Order clearly constitutes such a threat: issued by the President with the full force of the Executive Branch, it purports to command CPB to cease all direct and indirect funding of NPR and threatens local public radio stations with funding terminations should they continue to exercise their constitutionally protected editorial discretion to license and air NPR programming.

Indeed, the Administration's attempt to discriminate based on viewpoint through the coercion of third parties is even more obvious and pernicious than it was in *Vullo.* "The power that a government official wields . . . is relevant to the objective inquiry of whether a reasonable person would perceive the official's communication as coercive"—and here, no government official wields greater coercive power than the President. *Vullo*, 602 U.S. at 191. Moreover, unlike the *Vullo* defendant's threats in the guise of "encourage[ment]" and "[g]uidance," *id.* at 184, the Order purports to issue direct *commands* to CPB, ordering it to cease all funding of NPR. By

effecting retaliation and viewpoint-based discrimination against NPR through coercion of third parties like the Local Member Stations—in contravention of the Local Member Stations' own First Amendment rights—the government has not avoided liability, but "double[d] it." *Bostock v. Clayton Cnty.*, 590 U.S. 644, 659 (2020).

### C.    The Order Infringes Plaintiffs' Associational Rights.

By purporting to direct CPB to restrict funds for local public radio stations that choose to associate with NPR, the Order also violates NPR's and the Local Member Stations' right to freely associate with one another.  The Supreme Court has "long understood as implicit in the right to engage in activities protected by the First Amendment a corresponding right to associate with others in pursuit of a wide variety of political, social, economic, educational, religious, and cultural ends." *Roberts v. U.S. Jaycees*, 468 U.S. 609, 622 (1984).  Government action that "may have the effect of curtailing the freedom to associate is subject to the closest scrutiny" under the First Amendment.  *NAACP v. Alabama ex rel. Patterson*, 357 U.S. 449, 460-61 (1958).

By directing the Corporation to prohibit the Local Member Stations and other Member stations from expending federal funds on acquiring NPR's programming, the Order cuts at the heart of NPR's and its Member stations' freedom to associate for expressive purposes.  The Order seeks to force the Local Member Stations and others to cut existing ties with NPR to remain eligible to receive CPB grants.  And Member stations may have to incur significant burdens to ensure that they segregate non-federal funds to license NPR's programming, or to undertake other measures to demonstrate compliance with the Order's directives.  *Cf. Citizens United*, 558 U.S. at 337, 339 (government restriction that "necessarily reduce[d] the quantity of expression" was "a ban on speech," and potential alternative means of expression did "not alleviate the First Amendment problems" because of the associated burdens).  The Order's interference with freedom of association *among media entities* only compounds its fundamental incompatibility with the First

Amendment. The Order amounts to a governmental veto of the Local Member Stations' programming choices—threatening those stations with the loss of funds if they choose to choose to air content from a speaker the government has decreed is off-limits.

### D. The Order Cannot Survive Any Measure of Constitutional Scrutiny.

As retaliation for NPR's exercise of its First Amendment rights and as a viewpoint-based denial of federal funds to NPR, the Order is per se unconstitutional. *See Vullo*, 602 U.S. at 180; *Mansky*, 585 U.S. at 11; *AID*, 570 U.S. at 221; *Turner v. U.S. Agency for Glob. Media*, 502 F. Supp. 3d 333, 381 (D.D.C. 2020). At minimum, the Order warrants strict scrutiny because it imposes content-based burdens on NPR and the Local Member Stations: Terminating funding based on concerns about, *inter alia*, so-called "left-wing propaganda," "Fact Sheet" at 1, and "biased and partisan news coverage," Order § 2, burdens NPR's and its Member stations' constitutionally protected editorial discretion and speech based on "particular subject matter" and "cannot be justified without reference to the content of the regulated speech." *Reed v. Town of Gilbert*, 576 U.S. 155, 164 (2015) (quotation marks omitted). Content-based restrictions "are presumptively unconstitutional and may be justified only if the government proves that they are narrowly tailored to serve compelling state interests." *Nat'l Inst. of Fam. & Life Advocs. v. Becerra*, 585 U.S. 755, 766 (2018) (quotation marks omitted). It cannot do so here.

The Administration has *no* legitimate interest—much less a compelling one—in forcibly rebalancing private speech, or what it calls combatting "biased and partisan news coverage." Order § 2. As noted above, the government may not, "consistent with the First Amendment," "tilt[] the public debate in a preferred direction" to "improve or better balance the speech market" or "restrict the speech of some elements of our society in order to enhance the relative voice of others." *NetChoice*, 603 U.S. at 741-42 (internal quotations omitted). The "unadorned interest" in tilting the scales of speech to strike the government's "own vision of ideological balance" is "not

unrelated to the suppression of free expression and the government may not pursue it."  *Id.* Because the Executive Branch's attempt to suppress disfavored views and "advance its own" can serve no legitimate interest, the Order fails any level of constitutional scrutiny.  *Id.* at 741-42.

Moreover, even if the government were able to invoke some interest in cultivating an informed public (rather than just rebalancing speech), it is inconceivable that terminating funding to NPR would serve the purpose of cultivating an informed public—much less constitute the "least restrictive means" of doing so.  *Ams. For Prosperity Found. v. Bonta*, 594 U.S. 595, 607 (2021) (quotation marks omitted).  Nor, of course, could cutting off funding for the PRSS—infrastructure relied on by all public radio stations—possibly serve that end.

Finally, the Administration cannot justify the Order as the least restrictive means of enforcing the PBA's prohibition against CPB supporting political parties.  The Order cites 47 U.S.C. § 396(f)(3), which provides that CPB "may not contribute to or otherwise support any political party or candidate for elective public office."  But NPR is not a political party or candidate, and the government cannot declare it to be one by executive fiat.  Nor would NPR's allegedly "biased" coverage constitute contributions to or support for a political party or candidate: Federal election law makes clear that news media organizations do not impermissibly contribute to or support political parties or candidates through their reporting and editorial activities.  *See, e.g.*, 52 U.S.C. § 30101(9)(B)(i) (exempting news stories, commentaries, and editorials from Federal Election Campaign Act's definition of "expenditure"); *McConnell v. Federal Election Com'n*, 540 U.S. 93, 208-09 (2003), *overruled on other grounds by Citizens United*, 558 U.S. 310 ("Numerous federal statutes" have distinguished the "media industry" to "ensure that the law does not hinder or prevent the institutional press from reporting on, and publishing editorials about, newsworthy events." (internal quotations omitted)).  Thus, terminating funding to NPR is not the

least restrictive means (or any means) to achieve any governmental interest in ensuring compliance with 47 U.S.C. § 396(f)(3).

## III.    The Order Violates Due Process

The Fifth Amendment's Due Process Clause provides that no person "shall . . . be deprived of life, liberty, or property, without due process of law." U.S. Const. amend. V.  The Order violates this basic guarantee because it did not afford NPR adequate process before depriving it of a protected property interest, and because its reasons for doing so afford no meaningful standard.

The "fundamental norm" of due process is that "before the government can constitutionally deprive a person of [a] protected liberty or property interest, it must afford him notice and hearing." *Nat'l Council of Resistance of Iran v. Dep't of State*, 251 F.3d 192, 205 (D.C. Cir. 2001).  NPR has a protected property interest in its continued eligibility to receive funding from CPB and from local stations that receive federal funds.  A "statutory entitlement" is a property right under the Due Process Clause, *see Goldberg v. Kelly*, 397 U.S. 254, 262 (1970), as is "[l]egitimate and reasonable reliance on a promise from the state," *Forgue v. City of Chicago*, 873 F.3d 962, 970 (7th Cir. 2017).  Such rights "protect those claims upon which people rely in their daily lives"; that reliance "must not be arbitrarily undermined."  *Bd. of Regents of State Colleges v. Roth*, 408 U.S. 564, 577 (1972).

The degree of pre-deprivation process to which one is entitled under the Due Process Clause "depends upon whether the recipient's interest in avoiding that loss outweighs the governmental interest in summary adjudication."  *Goldberg*, 397 U.S. at 263; *see Nat'l Council of Resistance of Iran*, 251 F.3d at 205-08 (D.C. Cir. 2001) (affording due process prior to government action depriving organization of "protected property right").  The sudden loss of all federal funding, including PRSS funding, as well as fees from local public radio stations that otherwise would license NPR programming, would be devastating to NPR.  As described above, NPR

receives about 31 percent of its total operating revenue through membership and programming fees from local stations, and additional millions of dollars from CPB to support NPR's operations and coverage of particular issue areas. Without this funding, NPR would need to eliminate or scale back its news coverage in critical areas, including international coverage like the war in Ukraine that would be cost-prohibitive for local stations to cover. Conversely, the government has no legitimate interest in summary termination of NPR's ability to receive funding from CPB and local public stations. Year after year, Congress has reauthorized funding for the Corporation knowing that a portion of that funding was destined for NPR. If NPR continues to receive appropriated funds while the Administration's accusations are orderly adjudicated, the government will not seriously suffer harm. Given NPR's weighty interest in avoiding the loss of its property rights relative to the government's non-existent interest in abrogating those rights, NPR was entitled to meaningful pre-deprivation process, including notice and a meaningful opportunity to be heard. *See Goldberg*, 397 U.S. at 267-68. NPR indisputably did not receive such process.

Moreover, the Order independently violates the Due Process Clause because it is void for vagueness. "A law is unconstitutionally vague if it fails to provide a person of ordinary intelligence fair notice of what is prohibited, or is so standardless that it authorizes or encourages seriously discriminatory enforcement." *Woodhull Freedom Found. v. United States*, 72 F. 4th 1286, 1303 (D.C. Cir. 2023). The vagueness doctrine serves to ensure that "regulated parties should know what is required of them so they may act accordingly," and to require "precision and guidance . . . so that those enforcing the law do not act in an arbitrary or discriminatory way." *Fox Television Stations*, 567 U.S. at 253. "When speech is involved, rigorous adherence to those requirements is necessary to ensure that ambiguity does not chill protected speech." *Id.* at 253-54.

The Order punishes NPR because, in the Administration's view, NPR does not "present[] a fair, accurate, or unbiased portrayal of current events." Order § 1. NPR did not have adequate notice that its journalistic activities would subject it to such punishment. Nor does the Order— which carries the implicit threat of additional adverse consequences for NPR and the Local Member Stations if their programming deviates from the Administration's view of what is "fair" or "unbiased" in the future—provide any reasonable standards to apply. Whether reporting is "fair" or "unbiased" inevitably will depend on the eye of the beholder, so the Order "is so standardless that it . . . encourages seriously discriminatory enforcement." *Woodhull*, 72 F.4th at 1303; *see also Coates v. City of Cincinnati*, 402 U.S. 611, 614 (1971) (ordinance was void for vagueness where "men of common intelligence must necessarily guess at its meaning" (internal quotations omitted)). The Order thus violates the Due Process Clause for two independent reasons.

## IV. The Court Should Declare the Order Unlawful and Enjoin its Enforcement

This Court should declare the Order unlawful and permanently enjoin Defendants from enforcing it.[13] To obtain permanent injunctive relief, a movant must demonstrate "'(1) that it has suffered an irreparable injury; (2) that remedies available at law, such as monetary damages, are inadequate to compensate for that injury; (3) that, considering the balance of hardships between the plaintiff and defendant, a remedy in equity is warranted; and (4) that the public interest would not be disserved by a permanent injunction.'" *Anatol Zuckerman & Charles Krause Reporting, LLC v. United States Postal Serv.*, 64 F.4th 1354, 1364 (D.C. Cir. 2023) (quoting *eBay Inc. v.*

---

[13] Because existing precedent "cast[s] doubt on the availability of injunctive relief as a remedy" against the President, *McCray v. Biden*, 574 F. Supp. 3d 1, 8-10 (D.D.C. 2021) (discussing cases), and to avoid unnecessary briefing on the issue, Plaintiffs do not seek to enjoin the President directly. Plaintiffs seek to enjoin "other executive officials who are tasked with enforcing the President's orders," *id.* at 10, as well as CPB. Plaintiffs also seek declaratory relief with respect to all Defendants. *Cf. Nat'l Treasury Employees' Union v. Nixon*, 492 F.2d 587, 616 (D.C. Cir. 1974) (providing declaratory relief with respect to President Nixon).

*MercExchange, LLC*, 547 U.S. 388, 391 (2006)).  Because the Order has inflicted and continues to inflict irreparable harm on Plaintiffs that cannot be remediated by money damages, the balance of equities tips overwhelmingly in Plaintiffs' favor, and the public interest would be served by a permanent injunction, the Court should enjoin the Order's enforcement.

### A.    The Order Inflicts Irreparable Constitutional Harms.

"It has long been established that the loss of constitutional freedoms, 'for even minimal periods of time, unquestionably constitutes irreparable injury.'" *Mills v. District of Columbia*, 571 F.3d 1304, 1312 (D.C. Cir. 2009) (quoting *Elrod v. Burns*, 427 U.S. 347, 373 (1976)); *see also Roman Cath. Diocese of Brooklyn v. Cuomo*, 592 U.S. 14, 19 (2020) (holding that the loss of First Amendment freedoms is irreparable injury); *Karem v. Trump*, 960 F.3d 656, 668 (D.C. Cir. 2020) ("[A] violation of Fifth Amendment due process rights . . . support[s] injunctive relief.").  And "there is a presumed availability of federal equitable relief against threatened invasions of constitutional interests."  *Davis v. District of Columbia*, 158 F.3d 1342, 1346 (D.C. Cir. 1998) (cleaned up); *see also Karem*, 960 F.3d at 667 ("[A] prospective violation of a constitutional right constitutes irreparable injury for . . . purposes" of injunctive relief).

Here, the Order infringes and will continue to infringe Plaintiffs' constitutional rights in multiple ways.  First, as detailed above, Plaintiffs are "suffering from a campaign of retaliation against" NPR "in response to [NPR's] exercise of [its] First Amendment rights"; that is "an irreparable injury."  *Media Matters*, 2025 WL 1536459, at *15; *see also id.* at *11 (harm from retaliatory government investigation targeting media outlet was "distinct from any resulting chilling effects"); *Cate v. Oldham*, 707 F.2d 1176, 1188-89 (11th Cir. 1983) (government retaliation for the exercise of First Amendment rights is an irreparable injury).  Further, by imposing viewpoint-based burdens on the speech and associational rights of NPR and the Local Member Stations—including by directly interfering with the Local Member Stations' rights to

determine which programming they choose to broadcast—the Order effects an additional, present First Amendment injury on Plaintiffs.  Plaintiffs are suffering the chilling effects of the Order's viewpoint-based discrimination *today*, regardless of which funding has or has not yet been terminated.  Moreover, the Administration has purported to deny NPR valuable property rights without due process and to subject it to punishment based on unconstitutionally vague standards, in violation of the Due Process Clause.  *See Karem*, 960 F.3d at 668 (denial of a "procedural" right in "violation of Fifth Amendment due process rights . . . support[s] injunctive relief").  Because the Order violates Plaintiffs' First Amendment rights and NPR's due process rights, it is causing *per se* irreparable constitutional injuries.

> ### B.    The Order Inflicts Multiple Additional Irreparable Harms.

In addition to the constitutional injuries it inflicts, the Order irremediably harms Plaintiffs in at least four additional ways.  First, the economic harm Plaintiffs will suffer if the Order is not enjoined is "irreparable *per se*" because sovereign immunity limits Plaintiffs to nonmonetary equitable relief as to the federal Defendants.  *Nalco Co. v. EPA*, 786 F. Supp. 2d 177, 188 (D.D.C. 2011); *see also California v. Azar*, 911 F.3d 558, 581 (9th Cir. 2018) (economic harm caused by federal agencies protected by sovereign immunity "is irreparable . . . because the [plaintiffs] will not be able to recover monetary damages"); *Chamber of Com. v. Edmondson*, 594 F.3d 742, 770-71 (10th Cir. 2010); *Iowa Utilities Bd. v. FCC*, 109 F.3d 418, 426 (8th Cir. 1996) (similar).

Second, a loss of funding creates a grave risk that NPR will be forced reduce the size of its staff and thus lose irreplaceable expertise.  Such a loss constitutes irreparable harm to an organization; a court's "'compensatory or other corrective relief'" cannot restore its lost human capital.  *Chaplaincy of Full Gospel Churches v. England*, 454 F.3d 290, 297 (D.C. Cir. 2006); *see also, e.g.*, *Louisiana v. Biden*, 55 F.4th 1017, 1034 (5th Cir. 2022) (the "loss of an employee and the associated costs—monetary and otherwise—are nonrecoverable costs"); *Yorktown Sys. Grp.,*

*Inc. v. Threat Tec LLC*, 108 F.4th 1287, 1296 (11th Cir. 2024) (similar). This makes sense because an organization's capabilities and expertise are diminished when it is forced to lay off experienced employees, even if it eventually replaces them.

Third, by preventing Member stations from utilizing CPB grant funds to license NPR programming, and by threatening to terminate funding if they air NPR's content, the Order irreparably harms NPR's relationships and goodwill with those local stations as well as with its listeners and supporters. And if Member stations are no longer able to air NPR's programming, they face the imminent likelihood of losing listeners themselves. Because "'[i]njury to reputation and goodwill is not easily measured in monetary terms,' it is 'often viewed as irreparable.'" *Jones v. District of Columbia*, 177 F. Supp. 3d 542, 547 (D.D.C. 2016) (quoting 11A Charles Alan Wright *et al.*, Federal Practice and Procedure § 2948.1 (3d ed. 2013 & 2015 Supp.)); *see also Armour & Co. v. Freeman*, 304 F.2d 404, 406 (D.C. Cir. 1962) (irreparable injury where government action "could not fail to damage [the plaintiff's] good name"); *Patriot, Inc. v. U.S. Dep't of Hous. & Urban Dev.*, 963 F. Supp. 1, 5 (D.D.C. 1997) ("irreparable harm in damage to [plaintiffs'] business reputation").

Finally, an organization is irreparably harmed if: (1) the actions taken by the defendant "perceptibly impair[] the organization's programs," and (2) the defendant's actions "directly conflict with the organization's mission." *League of Women Voters of U.S. v. Newby*, 838 F.3d 1, 8 (D.C. Cir. 2016) (quotation marks and alterations omitted). The termination of all direct federal funding to NPR, and a prohibition on Member stations using federal funds to associate with NPR and license its content, would harm Plaintiffs' programs and journalistic missions. NPR relies on federal funds as well as fees from Member stations to develop its content and pay its staff, and it would be unable to produce anywhere close to the same amount of valuable content if that funding

were cut off. For the Local Member Stations, CPB funds are a significant portion of their budgets and are used pay staff, produce programming, and license content that is core to their brands and their mission to serve their communities.

The magnitude of harm is even greater with respect to PRSS funding. NPR relies on CPB grants specifically designated to support the maintenance and operation of the PRSS, and its ability to maintain and operate the system without those funds would be seriously compromised. SUMF at 25 (¶ 183). A degradation of the PRSS would in turn irreparably harm the public interest, including by compromising the ability to deliver radio content nationwide and jeopardizing the infrastructure used to disseminate national emergency information in times of crisis.

### C.    The Balance of the Equities and the Public Interest Favor Injunctive Relief.

The "balance of hardships" and "public interest" factors "merge" when the defendant is the government. *Anatol Zuckerman*, 64 F.4th at 1364 (citing *Nken v. Holder*, 556 U.S. 418, 435 (2009)). Here, the merged factors favor the issuance of a permanent injunction because "enforcement of an unconstitutional law is always contrary to the public interest." *Karem*, 960 F.3d at 668 (quoting *Gordon v. Holder*, 721 F.3d 638, 653 (D.C. Cir. 2013)). Indeed, that the merged factors favor Plaintiffs "is self-evident." *Turner*, 502 F. Supp. 3d at 386. "The Constitution is the ultimate expression of the public interest, and consequently, government actions in contravention of the Constitution are always contrary to the public interest." *Id.* (cleaned up). And the First Amendment harms here are particularly pernicious because they are aimed at causing broader "'self-censorship' of speech" by organizations that receive government funds, and will "discourage the 'uninhibited, robust, and wide-open debate that the First Amendment is intended to protect.'" *Counterman v. Colorado*, 600 U.S. 66, 75, 78 (2023).

Moreover, Congress has determined that the "public interest" lies in the "growth and development of public radio and television broadcasting," and that interest is best served by

providing public radio the "maximum protection from extraneous interference and control."  47 U.S.C. § 396(a)(1).  For these reasons, Congress prohibited "any department, agency, officer, or employee of the United States" from exercising "any direction, supervision, or control over public telecommunications."  *Id.* § 398(a).  For decades, Congress and prior Presidents have appropriated funds to support public broadcasting within the framework of Act.  And Congress's reasoned judgment comports with how the Supreme Court has interpreted the values of the First Amendment:  A "fundamental aim of the First Amendment" is to allow for "an expressive realm in which the public has access to a wide range of views," but "the way the First Amendment achieves that goal is by preventing *the government* from tilting public debate in a preferred direction."  *NetChoice*, 603 U.S. at 741.  Thus, Congress and the Constitution authoritatively locate where the public interest lies in this case:  with the editorial and operational independence of the public broadcasting system and entities like NPR and the Local Member Stations.  The Executive Branch is not entitled unilaterally to abrogate the judgment of Congress and the Framers.

## CONCLUSION

Plaintiffs are entitled to summary judgment in their favor.  Because the Order violates the PBA and the Constitution, and because there is a "substantial controversy" between Plaintiffs and the government, this Court should declare the Order unlawful.  *MedImmune*, 549 U.S. at 127 (quotation marks omitted).  Further, because the Order is causing Plaintiffs irreparable harm for which there is no adequate remedy at law, and because the public interest favors relief, this Court should permanently enjoin Defendants from taking any action to enforce or implement the Order.

June 13, 2025

Respectfully submitted,

*/s/ Miguel A. Estrada*

Miguel A. Estrada (D.D.C. Bar No. 456289)
GIBSON, DUNN & CRUTCHER LLP
1700 M Street, N.W.
Washington, D.C. 20036-4504
(202) 955-8500
MEstrada@gibsondunn.com

Theodore J. Boutrous, Jr. (D.D.C. Bar No. 420440)
Katie Townsend (D.C. Bar No. 1026115)
GIBSON, DUNN & CRUTCHER LLP
333 South Grand Avenue
Los Angeles, CA 90071-3197
(213) 229-7000
T Boutrous@gibsondunn.com
KTownsend@gibsondunn.com

Elizabeth A. Allen (*Admitted Pro Hac Vice*)
NATIONAL PUBLIC RADIO, INC.
1111 North Capitol Street, NE
Washington, D.C. 20002
(202) 513-2000
EAAllen@npr.org

*Counsel for Plaintiff*
*National Public Radio, Inc.*

Steven D. Zansberg (*Admitted Pro Hac Vice*)
Zansberg Beylkin LLC
100 Fillmore Street, Suite 500
Denver, CO 80206
(303) 564-3669
steve@zblegal.com

*Counsel for Plaintiffs Roaring Fork Public*
*Radio, Inc. d/b/a Aspen Public Radio,*
*Colorado Public Radio, and KUTE, Inc. d/b/a*
*KSUT Public Radio*