# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| NATIONAL PUBLIC RADIO, INC., et al.,<br><br>      Plaintiffs,<br><br>   v.<br><br>DONALD J. TRUMP, in his official capacity<br>as President of the United States, et al.,<br><br>      Defendants. | Case No. 1:25-cv-01674 |
| PUBLIC BROADCASTING SERVICE, et al.,<br><br>      Plaintiffs,<br><br>   v.<br><br>DONALD J. TRUMP, in his official capacity as<br>President of the United States, et al.,<br><br>      Defendants. | Case No. 1:25-cv-01722 |

### AMICUS CURIAE BRIEF OF DIGITAL CONTENT NEXT, THE INTERCEPT MEDIA, INC., PRO PUBLICA, INC., AND THE RADIO TELEVISION DIGITAL NEWS ASSOCIATION IN SUPPORT OF PLAINTIFFS' MOTIONS FOR SUMMARY JUDGMENT

Charles D. Tobin (#455593)
Maxwell S. Mishkin (#1031356)
Sasha Dudding (#1735532)
BALLARD SPAHR LLP
1909 K Street NW, 12th Floor
Washington, DC 20006
Tel: (202) 661-2200
Fax: (202) 661-2299
tobinc@ballardspahr.com
mishkinm@ballardspahr.com
duddings@ballardspahr.com

*Counsel for Amici Curiae*

# <u>TABLE OF CONTENTS</u>

<b><u>Page</u></b>

TABLE OF AUTHORITIES ................................................................................. ii

CORPORATE DISCLOSURE STATEMENTS .................................................... v

RULE 29(a)(4)(E) CERTIFICATION............................................................... vi

INTERESTS OF AMICI CURIAE..................................................................... vii

INTRODUCTION ...............................................................................................1

ARGUMENT ......................................................................................................2

I.    THIS UNCONSTITUTIONAL ORDER WILL HARM THE PRESS AND PUBLIC ..........................................................................................................2

II.   THE ORDER VIOLATES THE FIRST AMENDMENT'S PROHIBITION ON VIEWPOINT DISCRIMINATION ...........................................................5

     A.    Viewpoint Discrimination Strikes at the Core of the First Amendment................5

     B.    The Order Constitutes Unlawful Viewpoint Discrimination ..................................6

III.  THE ORDER ALSO VIOLATES THE FIFTH AMENDMENT'S DUE PROCESS CLAUSE....................................................................................9

     A.    The Order Implicates Plaintiffs' Property and Liberty Interests ...........................9

          i.    The Order Implicates Plaintiffs' Property Interests ...................................9

          ii.   The Order Implicates Plaintiffs' Liberty Interests ....................................10

          iii.  Plaintiffs' Protected Interests Prevent Defendants from Eliminating their Continued Funding Without Due Process ...................12

     B.    Defendants Failed to Provide Plaintiffs with Due Process ...................................13

CONCLUSION...................................................................................................14

# <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*303 Creative LLC v. Elenis*,
  600 U.S. 570 (2023)..................................................................................................5

*American Bar Association v. U.S. Department of Justice*,
  2025 WL 1388891 (D.D.C. May 14, 2025).............................................................4

*Associated Press v. Budowich*,
  2025 WL 1039572 (D.D.C. Apr. 8, 2025) ..............................................................4

*Bailey v. Federal Bureau of Prisons*,
  2024 WL 3219207 (D.D.C. June 28, 2024)...........................................................12

*\*Board of Regents of State Colleges v. Roth*,
  408 U.S. 564 (1972)......................................................................................9, 10, 11

*BMW of North America, Inc. v. Gore*,
  517 U.S. 559 (1996)................................................................................................13

*Brandon v. D.C. Board of Parole*,
  823 F.2d 644 (D.C. Cir. 1987)..................................................................................9

*Cafeteria & Restaurant Workers Union, Local 473, AFL-CIO v. McElroy*,
  367 U.S. 886 (1961)................................................................................................10

*CNN, Inc. v. Trump*,
  2018 WL 9436958 (D.D.C. Nov. 16, 2018) ...........................................................13

*Counterman v. Colorado*,
  600 U.S. 66 (2023)....................................................................................................3

*FCC v. Fox Television Stations, Inc.*,
  567 U.S. 239 (2012)................................................................................................13

*FCC v. League of Women Voters of California*,
  468 U.S. 364 (1984)..................................................................................................9

*Frederick Douglass Foundation, Inc. v. D.C.*,
  82 F.4th 1122 (D.C. Cir. 2023)................................................................................1

*Goldberg v. Kelly*,
  397 U.S. 254 (1970)..................................................................................................9

*Heffernan v. City of Paterson, N.J.*,
  578 U.S. 266 (2016)..................................................................................................8

*Homer v. Richmond*,
  292 F.2d 719 (D.C. Cir. 1961) .................................................................11

*\*Jenner & Block LLP v. U.S. Department of Justice*,
  2025 WL 1482021 (D.D.C. May 23, 2025) ...................................3, 4, 14

*Joseph Burstyn, Inc. v. Wilson*,
  343 U.S. 495 (1952) ................................................................................11

*\*Karem v. Trump*,
  960 F.3d 656 (D.C. Cir. 2020) ...........................................................11, 13

*Mathews v. Eldridge*,
  424 U.S. 319 (1976) ..................................................................................9

*Mills v. Alabama*,
  384 U.S. 214 (1966) ..................................................................................3

*\*Moody v. NetChoice, LLC*,
  603 U.S. 707 (2024) ..................................................................................5

*N.Y. Times Co. v. Sullivan*,
  376 U.S. 254 (1964) ..................................................................................2

*N.Y. Times Co. v. United States*,
  403 U.S. 713 (1971) ..................................................................................3

*National Association of Diversity Officers in Higher Education v. Trump*,
  2025 WL 573764 (D. Md. Feb. 21, 2025) .................................................4

*\*NRA of America v. Vullo*,
  602 U.S. 175 (2024) ...............................................................................5, 7

*NB ex rel. Peacock v. D.C.*,
  794 F.3d 31 (D.C. Cir. 2015) ...................................................................10

*Perkins Coie LLP v. U.S. Department of Justice*,
  2025 WL 1276857 (D.D.C. May 2, 2025) .................................................4

*Perry v. Sindermann*,
  408 U.S. 593 (1972) ................................................................................14

*Police Department of City of Chicago v. Mosley*,
  408 U.S. 92 (1972) ....................................................................................6

*President & Fellows of Harvard College v. Department of Homeland Security*,
  2025 WL 1588636 (D. Mass. June 5, 2025) .............................................4

*Procunier v. Martinez*,
   416 U.S. 396 (1974) .................................................................................11

*Rankin v. McPherson*,
   483 U.S. 378 (1987) .................................................................................12

*Ridley v. MBTA*,
   390 F.3d 65 (1st Cir. 2004) ........................................................................6

*Rosenberger v. Rector & Visitors of University of Va.*,
   515 U.S. 819 (1995) ...................................................................................5

*San Francisco A.I.D.S. Foundation v. Trump*,
   2025 WL 1621636 (N.D. Cal. June 9, 2025) ...............................................4

*Sherbert v. Verner*,
   374 U.S. 398 (1963) .................................................................................10

*Sherrill v. Knight*,
   569 F.2d 124 (D.C. Cir. 1977) ...................................................11, 13, 14

*Smith v. California*,
   361 U.S. 147 (1959) ...................................................................................2

*Susman Godfrey LLP v. Executive Office of President*,
   2025 WL 1113408 (D.D.C. Apr. 15, 2025) .................................................4

*Village of Hoffman Estates v. Flipside, Hoffman Estates, Inc.*,
   455 U.S. 489 (1982) .................................................................................11

*W. Va. State Board of Education v. Barnette*,
   319 U.S. 624 (1943) ...................................................................................6

*Widakuswara v. Lake*,
   2025 WL 1166400 (D.D.C. Apr. 22, 2025) .................................................4

*Wilkinson v. Austin*,
   545 U.S. 209 (2005) .................................................................................10

*Wilmer Cutler Pickering Hale & Dorr LLP v. Executive Office of President*,
   2025 WL 1502329 (D.D.C. May 27, 2025) .................................................4

**Other Authorities**

*Exec. Order No. 14,290, Ending Taxpayer Subsidization of Biased Media, 90
   Fed. Reg. 19,415 (May 1, 2025) ........................................................ *passim*

## CORPORATE DISCLOSURE STATEMENTS

**Digital Content Next** has no parent corporation, corporate affiliates, or subsidiaries, and issues no stock.

**The Intercept Media, Inc.** is a non-profit, non-stock Delaware corporation.  No entity owns any stock in the corporation, and it has no corporate affiliates, subsidiaries, or parent corporations.

**Pro Publica, Inc. ("ProPublica")** is a Delaware nonprofit corporation that is tax-exempt under section 501(c)(3) of the Internal Revenue Code.  It has no corporate affiliates, subsidiaries, or parent corporations, and has no stock.

**Radio Television Digital News Association** is a nonprofit organization that has no parent company, corporate affiliates, or subsidiaries, and issues no stock.

## <u>RULE 29(a)(4)(E) CERTIFICATION</u>

Pursuant to Local Rule 7(o)(5) and Federal Rule of Appellate Procedure 29(a)(4)(E), amici certify that their counsel authored this brief in whole or in part; no party or party's counsel contributed money that was intended to fund preparing or submitting this brief; and no person — other than amici, their members, or counsel — contributed money that was intended to fund preparing or submitting the brief.

## INTERESTS OF AMICI CURIAE

Amici are a coalition of news organizations and associations representing the interests of the news media. As members of the news media, amici have a vital interest in ensuring that the First Amendment's prohibition on viewpoint discrimination, as well as the procedural protections afforded under the Fifth Amendment's Due Process Clause, are safeguarded and upheld. Because President Trump's Executive Order purporting to end federal funding for National Public Radio, the Public Broadcasting Service, and their member stations violates both the First and Fifth Amendments, amici have a strong interest in ensuring that the Executive Order is permanently enjoined and declared unconstitutional. Additionally, amici are uniquely positioned to address the grave threats that this executive order poses to a free press and an informed democracy.

Amici and their interests are as follows:

**Digital Content Next ("DCN")**, founded in 2001, is the only trade organization dedicated to serving the unique and diverse needs of high-quality digital content companies that enjoy trusted, direct relationships with consumers and advertisers. DCN's members include many of the most trusted and well-respected publishing brands in the United States. Together, DCN's members have an unduplicated audience of 259 million unique visitors and reach 95 percent of the U.S. online population. DCN's member list is a "who's who" of the American media and publishing industry.

**The Intercept Media, Inc.** is a nonprofit news organization that publishes The Intercept, an award-winning, nationally recognized news organization with a reputation for in-depth investigations that focus on politics, national security, crime and justice, surveillance, corruption, the environment, science, technology, and the media. One of its projects is the Press Freedom

Defense Fund that provides support, training and financial assistance to news organizations, individual journalists, and documentarians when confronted with security and legal threats.

**Pro Publica, Inc. ("ProPublica")** is an independent, nonprofit newsroom that produces investigative journalism in the public interest. It has won eight Pulitzer Prizes, most recently 2024 and 2025 prizes for public service, a 2020 prize for national reporting, and the 2019 prize for feature writing. ProPublica is supported almost entirely by philanthropy and offers its articles for republication, both through its website, propublica.org, and directly to leading news organizations selected for maximum impact. ProPublica has extensive regional and local operations and a series of Local Reporting Network partnerships.

**Radio Television Digital News Association ("RTDNA")** is the world's largest and only professional organization devoted exclusively to electronic journalism. RTDNA is made up of news directors, news associates, educators and students in radio, television, cable and electronic media. RTDNA is committed to encouraging excellence in the electronic journalism industry and upholding First Amendment freedoms.

## INTRODUCTION

In an unprecedented attack on the First Amendment, last month President Trump issued an Executive Order purporting to end federal funding for National Public Radio, Inc. ("NPR"), the Public Broadcasting Service ("PBS"), and their member stations (together, "Plaintiffs"). *See* Exec. Order No. 14,290, Ending Taxpayer Subsidization of Biased Media, 90 Fed. Reg. 19,415 (May 1, 2025) (the "Order"). As the Order itself and the President's related statements make clear, the motivation for this attack is a desire to suppress speech the President dislikes—speech he has called "trash," "biased," and a "Radical Left Disaster," published by "MONSTERS" who are "1000% against the Republican Party!" Such official targeting of disfavored speech and speakers violates the First Amendment's bedrock prohibition on viewpoint discrimination. "Government favoritism in public debate is so pernicious to liberty and democratic decisionmaking that viewpoint discrimination will almost always be rendered unconstitutional." *Frederick Douglass Found., Inc. v. D.C.*, 82 F.4th 1122, 1141 (D.C. Cir. 2023) (cleaned up). In other words, "[v]iewpoint discrimination is 'poison.'" *Id.* (quoting *Iancu v. Brunetti*, 588 U.S. 388, 399 (2019) (Alito, J., concurring)). Judicial review is the antidote.

Amici write to underscore the grave threats this unconstitutional Order poses to a free press. NPR, PBS, and their member stations play a vital role in the nation's media landscape, from providing fact-based reporting on national news to educational early-childhood programming to lifesaving emergency alerts. Some member stations are the only radio or television broadcasters in their areas, with thousands of Americans dependent on them for coverage. And the Order's devastating impact is not limited to Plaintiffs. Allowing the Order to stand would set a dangerous, speech-chilling precedent with ripple effects felt throughout the press and public. If the President can target NPR, PBS, and their member stations with impunity,

other media organizations may well be next.  While the courts have played a vital role in restraining the Administration's viewpoint-discriminatory acts to date, many news media organizations cannot afford such a fight.  Newsrooms are increasingly facing a Hobson's choice: hew their coverage to the White House's liking, or face official retribution.  Such "self-censorship, compelled by the State, would be a censorship affecting the whole public, hardly less virulent for being privately administered."  *Smith v. California*, 361 U.S. 147, 154 (1959).  Thus, given the vital role of a free press in our democracy, it is the public that ultimately suffers when the press is targeted.

The Court should grant Plaintiffs' motions for summary judgment, declare that the Order is unlawful, and permanently enjoin Defendants from implementing or enforcing it.

## ARGUMENT

## I.    THIS UNCONSTITUTIONAL ORDER WILL HARM THE PRESS AND PUBLIC

The Order, if left unchecked, would harm not only Plaintiffs and their audiences, but also the press and public nationwide.  If the President can single out disfavored news organizations for punishment, without procedural protections, others will fear their journalism will be next to draw the President's ire.  Without warning, they may find themselves facing severe penalties to their newsgathering and finances.  Even for those who escape such targeting, the looming threat of it may chill vital journalism.  And for members of the press who do face government retribution and prevail in court, the resulting legal battle will inevitably drain organizational resources—both time and money—that would otherwise go toward gathering and reporting the news.  As the Supreme Court recognized, "would-be critics of official conduct may be deterred from voicing their criticism, even though it is believed to be true and even though it is in fact true, because of doubt whether [they can prevail] in court or fear of the expense of having to do so."  *N.Y. Times Co. v. Sullivan*, 376 U.S. 254, 279 (1964).

When journalism is chilled, so is public discourse.  At the root of the First Amendment is the recognition that the free press plays an "essential role in our democracy."  *N.Y. Times Co. v. United States*, 403 U.S. 713, 717 (1971) (Black, J., concurring); *see Mills v. Alabama*, 384 U.S. 214, 219 (1966) ("The Constitution specifically selected the press . . . to play an important role in the discussion of public affairs.").  A system in which the President may target news organizations for summary retribution based on his dislike of their speech is one in which the "'uninhibited, robust, and wide-open' debate that the First Amendment is intended to protect" cannot long survive.  *Counterman v. Colorado*, 600 U.S. 66, 78 (2023) (quoting *Sullivan*, 376 U.S. at 270).

Underscoring the severity of these risks, the Administration has engaged in a series of official acts, including many executive orders, targeting "speaker[s] they don't like," "all while evading the due process that would normally accompany such a step."  *Jenner & Block LLP v. U.S. Dep't of Just.*, 2025 WL 1482021, at *16 (D.D.C. May 23, 2025).  This Court and others across the country have enjoined many of these speech-chilling efforts, in cases involving

entities from news organizations[1] to law firms[2] to universities[3] to nonprofits[4] and more.  In doing

so, courts have upheld the maxim that "[t]he First Amendment envisions the United States as a

---

[1] *See Associated Press v. Budowich*, 2025 WL 1039572, at *9-15 (D.D.C. Apr. 8, 2025), *appeal filed*, No. 25-5109 (D.C. Cir. Apr. 10, 2025) (enjoining President's viewpoint-discriminatory ban on Associated Press from White House press pool and press corps events due to its use of the name "Gulf of Mexico"); *see also Widakuswara v. Lake*, 2025 WL 1166400, at *14 (D.D.C. Apr. 22, 2025) (granting preliminary injunction based on Administrative Procedure Act claims in case challenging President's executive order dismantling Voice of America, but noting as to viewpoint discrimination claim that "it cannot be the case that by shutting down all content at an agency, which current leadership has deemed 'radical' and 'so far to the left,' the defendants have avoided any First Amendment transgressions").

[2] *See Wilmer Cutler Pickering Hale & Dorr LLP v. Exec. Off. of President*, 2025 WL 1502329, at *16, *26 (D.D.C. May 27, 2025) (granting summary judgment for WilmerHale based on finding that executive order which "suppresses [] disfavored speech by imposing severe sanctions on WilmerHale both directly and indirectly" "is 'an egregious' violation of the First Amendment!" and "violates procedural due process"); *Jenner & Block*, 2025 WL 1482021, at *6, *16 (enjoining executive order targeting Jenner & Block on due process and First Amendment grounds, and citing a "feature[] of this order magnify[ing] its offensiveness to the freedoms the First Amendment guarantees: its viewpoint discrimination"); *Perkins Coie LLP v. U.S. Dep't of Just.*, 2025 WL 1276857, at *32, *44 (D.D.C. May 2, 2025) (executive order targeting Perkins Coie "express[ed] President Trump's disapproval of plaintiff's First Amendment activity" amounting to "viewpoint discrimination, plain and simple," and violated due process); *Susman Godfrey LLP v. Exec. Off. of President*, 2025 WL 1113408, at *1 (D.D.C. Apr. 15, 2025) (entering temporary restraining order in case bringing due process and viewpoint-discrimination challenges to executive order targeting Susman Godfrey); *see also Am. Bar Ass'n v. U.S. Dep't of Just.*, 2025 WL 1388891, at *8 (D.D.C. May 14, 2025) (holding American Bar Association "has made a strong showing that Defendants terminated its grants to retaliate against it for engaging in protected speech," violating First Amendment).

[3] *See President & Fellows of Harvard Coll. v. Dep't of Homeland Sec.*, 2025 WL 1588636, at *1 (D. Mass. June 5, 2025) (entering temporary restraining order in case bringing viewpoint-discrimination and other challenges to executive order preventing Harvard from enrolling international students); *see also Nat'l Ass'n of Diversity Officers in Higher Educ. v. Trump*, 2025 WL 573764, at *24 (D. Md. Feb. 21, 2025) (entering preliminary injunction to prevent "textbook viewpoint-based discrimination" in executive order requiring termination of "equity-related" grants), *appeal filed*, No. 25-1189 (4th Cir. Feb. 27, 2025).

[4] *See San Francisco A.I.D.S. Found. v. Trump*, 2025 WL 1621636, at *18 (N.D. Cal. June 9, 2025) (executive order directing agencies to terminate funding for diversity and gender-related initiatives "violate[s] the First Amendment by withholding subsidies for a censorious purpose—aiming to suppress the dangerous ideas of 'equity,' 'DEI,' and 'gender ideology'").

rich and complex place where all persons are free to think and speak as they wish, not as the

government demands." *303 Creative LLC v. Elenis*, 600 U.S. 570, 603 (2023).  Here, too, amici

urge the Court to reject yet another blatant attempt at suppressing disfavored speech, one which

threatens the press and public nationwide, from rural audiences reliant on public media for fact-

based news coverage and emergency alerts, to news organizations fearing retribution for their

truthful reporting on matters of public concern.

## II.    THE ORDER VIOLATES THE FIRST AMENDMENT'S PROHIBITION ON VIEWPOINT DISCRIMINATION

The Order is unconstitutional because it amounts to viewpoint-based speech

discrimination that the First Amendment flatly forbids.  *See* NPR Compl. ¶¶ 130-38; PBS

Compl. ¶¶ 91-103.  Allowing the Order to stand risks subjecting not only NPR and PBS, but also

the broader press, to government punishment based on the contents of protected speech.

### A.    Viewpoint Discrimination Strikes at the Core of the First Amendment

The Supreme Court has repeatedly made clear, including in a unanimous decision last

term, that "viewpoint discrimination is uniquely harmful to a free and democratic society."  *NRA*

*of Am. v. Vullo*, 602 U.S. 175, 187 (2024).  In another unanimous decision that term, the Court

further explained:

> [A] State may not interfere with private actors' speech to advance
> its own vision of ideological balance.  States (and their citizens) are
> of course right to want an expressive realm in which the public has
> access to a wide range of views.  That is, indeed, a fundamental aim
> of the First Amendment.  But the way the First Amendment achieves
> that goal is by preventing *the government* from "tilt[ing] public
> debate in a preferred direction."

*Moody v. NetChoice, LLC*, 603 U.S. 707, 741 (2024) (quoting *Sorrell v. IMS Health Inc*., 564

U.S. 552, 578-79 (2011)); *see also Rosenberger v. Rector & Visitors of Univ. of Va.*, 515 U.S.

819, 829 (1995) ("When the government targets not subject matter, but particular views taken by

speakers on a subject, the violation of the First Amendment is all the more blatant."); *Police Dep't of City of Chicago v. Mosley*, 408 U.S. 92, 95 (1972) ("[A]bove all else, the First Amendment means that government has no power to restrict expression because of its message, its ideas, its subject matter, or its content"). Even during World War II, in an opinion that referenced and distinguished the United States from "our present totalitarian enemies," the Supreme Court declared that "[i]f there is any fixed star in our constitutional constellation, it is that no official, high or petty, can prescribe what shall be orthodox in politics, nationalism, religion, or other matters of opinion or force citizens to confess by word or act their faith therein." *W. Va. State Bd. of Educ. v. Barnette*, 319 U.S. 624, 642 (1943).

### B.    The Order Constitutes Unlawful Viewpoint Discrimination

The Order openly violates this foundational rule. Though "the government rarely flatly admits it is engaging in viewpoint discrimination," *Ridley v. MBTA*, 390 F.3d 65, 86 (1st Cir. 2004), it has done so repeatedly in this case. The President does not want NPR, PBS, and their member stations to broadcast the content of their choosing – he wants them to broadcast content *he* prefers. And he is so insistent that, in an effort to punish Plaintiffs for the content of their programming, he purports to end their federal funding entirely.

The Order makes its target clear from the start: what it perceives as "Biased Media." *See* Order § 1 (claiming "that neither entity presents a fair, accurate, or unbiased portrayal of current events"), § 2 (citing "my Administration's policy to ensure that Federal funding does not support biased and partisan news coverage"). The White House's "Fact Sheet" underscores the Order's viewpoint-discriminatory aims, claiming falsely that "NPR and PBS have fueled partisanship and

left-wing propaganda."[5]  The "Fact Sheet" lists examples of disfavored reporting, complaining

that "NPR refused to cover the Hunter Biden laptop story," that "NPR ran a Valentine's Day

feature around 'queer animals,'" that "PBS produced a movie titled 'Real Boy' which celebrates

a transgender teen's transition," and more.  *See* Fact Sheet.  The White House's accompanying

press release doubles down again on the Order's discriminatory purpose, claiming that NPR and

PBS "spread radical, woke propaganda disguised as 'news,'" and listing more "examples of the

trash that has passed for 'news' at NPR and PBS."[6]

The President has further amplified this message on social media, where he has

repeatedly attacked NPR and PBS with posts stating, *inter alia*, that "REPUBLICANS MUST

DEFUND AND TOTALLY DISASSOCIATE THEMSELVES FROM NPR & PBS, THE

RADICAL LEFT 'MONSTERS' THAT SO BADLY HURT OUR COUNTRY!" and that "NPR

and PBS are a Radical Left Disaster, and 1000% against the Republican Party!"[7]

There is no question that the President may voice his own anti-NPR and anti-PBS "views

freely and criticize particular beliefs," but there is also no question that "what [he] cannot do . . .

is use the power of the State to punish or suppress disfavored expression."  *Vullo*, 602 U.S. at

188.  Yet as the Order and surrounding statements make clear, he is engaged in precisely that

---

[5] *See Fact Sheet: President Donald J. Trump Ends the Taxpayer Subsidization of Biased Media*,
White House (May 1, 2025), https://www.whitehouse.gov/fact-sheets/2025/05/fact-sheet-
president-donald-j-trump-ends-the-taxpayer-subsidization-of-biased-media ("Fact Sheet").

[6] *See* Press Release, "President Trump Finally Ends the Madness of NPR, PBS," White House
(May 2, 2025), https://www.whitehouse.gov/articles/2025/05/president-trump-finally-ends-the-
madness-of-npr-pbs ("Press Release").

[7] @RealDonaldTrump, Truth Social,
https://truthsocial.com/@realDonaldTrump/posts/114671982391481893 (June 12, 2025);
@RealDonaldTrump, Truth Social,
https://truthsocial.com/@realDonaldTrump/posts/114264549657133828 (Apr. 1, 2025).

sort of viewpoint-based discrimination against Plaintiffs, in violation of the First Amendment.

That the Order targets Plaintiffs based on the President's "factual mistake" of characterizing Plaintiffs as "radical, woke propagand[ists]," *see* Fact Sheet—when in fact they are fact-based, nonpartisan broadcasters—does not change the result. *Heffernan v. City of Paterson, N.J.*, 578 U.S. 266, 274 (2016). Discrimination based on the speaker's *perceived* viewpoint, even when the speaker does not in fact espouse that viewpoint, remains unconstitutional. *Id.* Official targeting of protected speech "can cause the same kind, and degree, of constitutional harm whether that belief does or does not rest upon a factual mistake." *Id*. The targeting "of one tells the others that they engage in protected activity at their peril," whether or not the speakers actually hold the views for which they are being targeted. *Id.* at 273.

Nor does Plaintiffs' status as public media change the result. Viewpoint discrimination is anathema to a free society, however that viewpoint is funded. For one, "NPR is an independent, nonprofit media organization" and "is not a public radio station, nor does it operate one," but it provides programming to "independent locally owned and operated public radio stations around the country." NPR Statement of Undisputed Material Facts ("SUMF") ¶¶ 1-3 (Dkt. 21-2). Likewise, PBS is a "a private non-profit corporation." PBS Compl. ¶ 4. The Corporation for Public Broadcasting, through which Plaintiffs receive funding, is a "non-federal, non-profit, and nonpartisan entity," structured that way by Congress "'to afford maximum protection from extraneous interference and control.'" *Id*. ¶¶ 2, 34 (quoting 47 U.S.C. § 396(a)(10)). The First Amendment's prohibition on viewpoint-based speech restrictions applies just as forcefully in this case. Whether aimed at public broadcasters or any other speakers, "[a] regulation of speech that," as here, "is motivated by nothing more than a desire to curtail expression of a particular point of view on controversial issues of general interest is the purest example of a 'law . . .

abridging the freedom of speech, or of the press'" and cannot stand.  *FCC v. League of Women Voters of Cal.*, 468 U.S. 364, 383-84 (1984) (citation omitted).

## III.    THE ORDER ALSO VIOLATES THE FIFTH AMENDMENT'S DUE PROCESS CLAUSE

The Order is unconstitutional for the additional and independent reason that it violates the Due Process Clause.  *See* NPR Compl. ¶¶ 149-61.  Plaintiffs have a protected property interest in their continued eligibility for federal funding and a protected liberty interest in the exercise of their First Amendment rights.  Their funding eligibility and speech thus cannot be curtailed without due process of law.  Yet Plaintiffs received no procedural protections, and the Order rested on arbitrary and viewpoint-discriminatory reasons.

### A.    The Order Implicates Plaintiffs' Property and Liberty Interests

The Due Process Clause "imposes constraints on governmental decisions which deprive individuals of 'liberty' or 'property' interests."  *Mathews v. Eldridge*, 424 U.S. 319, 332 (1976).  When faced with a due process claim, therefore, courts "first inquire whether the nature of the interest is within the contemplation of the Constitution's 'liberty or property' language."  *Brandon v. D.C. Bd. of Parole*, 823 F.2d 644, 647 (D.C. Cir. 1987) (citation omitted).  Here, the Order implicates both property and liberty interests.

#### i.    The Order Implicates Plaintiffs' Property Interests

Plaintiffs have a protected property interest in their continued eligibility for federal funding, which the Order implicates.  Protected property rights include "statutory entitlements."  *Goldberg v. Kelly*, 397 U.S. 254, 262 (1970).  A property interest also arises from "existing rules or understandings that stem from an independent source such as state law."  *Bd. of Regents of State Colls. v. Roth*, 408 U.S. 564, 577 (1972); *see also Mathews*, 424 U.S. at 332 ("[T]he interest of an individual in continued receipt of these benefits is a statutorily created 'property'

interest protected by the Fifth Amendment"); *NB ex rel. Peacock v. D.C.*, 794 F.3d 31, 41 (D.C. Cir. 2015) ("It is well established that certain government benefits give rise to property interests protected by the Due Process Clause.").  Property rights "protect those claims upon which people rely in their daily lives, reliance that must not be arbitrarily undermined." *Roth*, 408 U.S. at 577. Here, Plaintiffs' statutory entitlement to, and legitimate reliance on, continued eligibility for federal funding is a property interest protected by the Due Process Clause. *See* NPR Compl. ¶ 152.

> ### ii.    The Order Implicates Plaintiffs' Liberty Interests

Plaintiffs also have a protected liberty interest in the exercise of their First Amendment rights, which the Order implicates as well.  "A liberty interest may arise from the Constitution itself, by reason of guarantees implicit in the word 'liberty,' or it may arise from an expectation or interest created by state laws or policies." *Wilkinson v. Austin*, 545 U.S. 209, 221 (2005) (internal citation omitted).  "In a Constitution for a free people, there can be no doubt that the meaning of 'liberty' must be broad indeed." *Roth*, 408 U.S. at 571-72.

In a bygone era, the Supreme Court extended due process protections only to interests it counted as "rights," not "mere privilege[s]." *Cafeteria & Rest. Workers Union, Loc. 473, AFL-CIO v. McElroy*, 367 U.S. 886, 895 (1961).  The Court repudiated this doctrine over 60 years ago, however, reasoning that "[i]t is too late in the day to doubt that [] liberties" such as free "expression may be infringed by the denial of or placing of conditions upon a benefit or privilege." *Sherbert v. Verner*, 374 U.S. 398, 404 (1963).  "For that reason," the Supreme Court "fully and finally rejected the wooden distinction between 'rights' and 'privileges' that once seemed to govern the applicability of procedural due process rights." *Roth*, 408 U.S. at 571. Instead, courts have long recognized that "[o]ne may not have a constitutional right to go to

Baghdad, but the Government may not prohibit one from going there unless by means consonant with due process of law." *Homer v. Richmond*, 292 F.2d 719, 722 (D.C. Cir. 1961).

Americans indisputably enjoy a liberty interest in the exercise of First Amendment rights. *See, e.g.*, *Vill. of Hoffman Ests. v. Flipside, Hoffman Ests., Inc.*, 455 U.S. 489, 499 (1982) (due process attaches to "the exercise of constitutionally protected rights," including "the right of free speech"); *Joseph Burstyn, Inc. v. Wilson*, 343 U.S. 495, 500 (1952) ("[T]he liberty of speech and of the press . . . is within the liberty safeguarded by the Due Process Clause[.]").  The liberty interest is broad—including the right to speak freely, publish freely, and gather the news—and applies across a wide variety of contexts.  Procedural protections are therefore required "[w]hen a State would directly impinge upon interests in free speech or free press . . . whether or not the speech or press interest is clearly protected under substantive First Amendment standards." *Roth*, 408 U.S. at 575 n.14.

For example, even though "the public has no right of access to the White House," once the White House opens its doors to journalists, "the protection afforded newsgathering under the first amendment guarantee of freedom of the press, requires that this access not be denied arbitrarily or for less than compelling reasons." *Sherrill v. Knight*, 569 F.2d 124, 129 (D.C. Cir. 1977).   Journalists therefore have a protected liberty interest in obtaining, and keeping, White House press passes. *Id.* at 130-31; *Karem v. Trump*, 960 F.3d 656, 665 (D.C. Cir. 2020).

Courts have also recognized that "[t]he interest of prisoners and their correspondents in uncensored communication by letter, grounded as it is in the First Amendment, is plainly a 'liberty' interest" protected by due process, "even though qualified of necessity by the circumstance of imprisonment." *Procunier v. Martinez*, 416 U.S. 396, 418 (1974), *overruled on other grounds by Thornburgh v. Abbott*, 490 U.S. 401 (1989).  A recent decision in this District

11

found that this liberty interest extends even to the use of prison email, rejecting the government's antiquated claim that a prisoner "has no protected liberty interest because the" use of the email system is "a 'privilege'" not a right. *Bailey v. Fed. Bureau of Prisons*, 2024 WL 3219207, at \*11 (D.D.C. June 28, 2024).

Government employees likewise have a liberty interest in not being fired "on a basis that infringes that employee's constitutionally protected interest in freedom of speech." *Rankin v. McPherson*, 483 U.S. 378, 383–84 (1987).  Indeed, even if the employee "was merely a probationary employee, and even if she could have been discharged for any reason or for no reason at all, she may nonetheless be entitled to reinstatement if she was discharged for exercising her constitutional right to freedom of expression." *Id.*

In revoking Plaintiffs' eligibility for federal funding, the Order here squarely implicates Plaintiffs' protected liberty interests in exercising their First Amendment rights by "produc[ing], acquir[ing], and distribut[ing] programming, including national news programming."  NPR SUMF ¶ 3.  While the government is not obligated to fund public broadcasters in the first instance, once it does so, there is a protected interest in continued funding.  Any deprivation of that protected interest must come after affording Plaintiffs due process.

### iii.    *Plaintiffs' Protected Interests Prevent Defendants from Eliminating their Continued Funding Without Due Process*

The Founders wove Fifth Amendment due process into the Constitution out of respect for the need to safeguard this type of property and liberty interest.  This means that, before the President can deprive PBS, NPR, and their member stations of this interest, he must follow procedural safeguards with a viewpoint-neutral, reasonable basis for doing so.

### B.    Defendants Failed to Provide Plaintiffs with Due Process

Due process requires the government to follow constitutionally "adequate procedures" before denying a protected property or liberty interest. *Sherrill*, 569 F.2d at 131 n.24. Because the Order "implicates important first amendment rights," the requirements of due process must be applied in a "particularly stringent" manner. *Karem*, 960 F.3d at 665 (cleaned up). More specifically, Defendants were required to provide Plaintiffs, before reaching a final decision, with (1) "notice of the factual bases for denial," (2) "an opportunity for the applicant to respond to these," and (3) "a final written statement of the reasons for denial" of access, (4) which reasons may not be "arbitrar[y]" or "less than compelling." *Sherrill*, 569 F.2d at 130.

Defendants cannot dispute that they failed to provide Plaintiffs with due process in all of these respects. *See* NPR Compl. ¶ 156. Plaintiffs were entitled to "receive fair notice not only of the conduct that would subject it to punishment, but also of the magnitude of the sanction that the White House might impose," which under this Order is severe if not existential. *Karem*, 960 F.3d at 665 (cleaned up). And, to be "constitutionally sufficient," notice must be provided "*prior* to being sanctioned*," which it was not. *FCC v. Fox Television Stations, Inc.*, 567 U.S. 239, 257 (2012) (emphasis added); *see also CNN, Inc. v. Trump*, 2018 WL 9436958 (D.D.C. Nov. 16, 2018) (noting, as to the revocation of CNN reporter's White House press pass, that "when an important interest is at stake and when the government is able to provide this process before deprivation, it generally must do so"). There was *no* process here, let alone timely process.

The Order was also issued "arbitrarily [and] for less than compelling reasons." *Sherrill*, 569 F.2d at 129; *see also BMW of N. Am., Inc. v. Gore*, 517 U.S. 559, 587 (1996) (Breyer, J., concurring) ("This constitutional concern, itself harkening back to the Magna Carta, arises out of the basic unfairness of depriving citizens of life, liberty, or property, through the application, not of law and legal processes, but of arbitrary coercion."). As discussed above, the Order flows

13

Case 1:25-cv-01674-RDM    Document 27    Filed 06/24/25    Page 23 of 24


from the President's desire to restrict the speech and editorial discretion of NPR, PBS, and their member stations based on their perceived viewpoints. *See Sherrill*, 569 F.2d at 129 (official targeting is "violative of the first amendment" when "based upon the content of the journalist's speech"); *Perry v. Sindermann*, 408 U.S. 593, 597 (1972) (cleaned up) (government "may not deny a benefit to a person on a basis that infringes his constitutionally protected interests— especially, his interest in freedom of speech," which "would allow the government to produce a result which it could not command directly"). This Court should "not allow the defendants to evade the procedural protections that would normally attend" such an action "by instituting a scheme of state censorship effectuated by extralegal sanctions." *Jenner & Block*, 2025 WL 1482021, at *17 (internal marks omitted).

Defendants have not met a single one of the constitutionally mandated requirements of due process. Their revocation of Plaintiffs' funding eligibility was arbitrary and unlawful, and the Order should be enjoined for this additional reason.

## CONCLUSION

For the foregoing reasons, the Court should enter summary judgment in favor of Plaintiffs, issue a declaration that the Order is unlawful, and permanently enjoin Defendants from implementing or enforcing it, and grant any other relief that the Court deems appropriate.

Dated:  June 20, 2025

Respectfully submitted,

BALLARD SPAHR LLP

*/s/ Charles D. Tobin*
Charles D. Tobin (#455593)
Maxwell S. Mishkin (#1031356)
Sasha Dudding (#1735532)
1909 K Street NW, 12th Floor
Washington, DC 20006
Tel: (202) 661-2200
Fax: (202) 661-2299
tobinc@ballardspahr.com
mishkinm@ballardspahr.com
duddings@ballardspahr.com

*Counsel for Amici Curiae*