## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

NATIONAL PUBLIC RADIO, INC.,
1111 North Capitol Street NE,
Washington, DC 20002;

ROARING FORK PUBLIC RADIO, INC.
D/B/A ASPEN PUBLIC RADIO,
110 E. Hallam Street, Suite 134,
Aspen, CO 81611;

COLORADO PUBLIC RADIO,
7409 S. Alton Court,
Centennial, CO 80112;

KUTE INC. D/B/A KSUT PUBLIC RADIO,
15150 CO-172,
Ignacio, CO 81137,

       *Plaintiffs*,

  v.

DONALD J. TRUMP, in his official capacity
as President of the United States, 1600
Pennsylvania Avenue NW, Washington, D.C.
20500;

RUSSELL T. VOUGHT, in his official
capacity as Director of the Office of
Management and Budget, 725 17th Street
NW, Washington, D.C. 20503;

SCOTT BESSENT, in his official capacity as
Secretary of the Treasury, 1500 Pennsylvania
Avenue NW, Washington, D.C. 20220;

MARIA ROSARIO JACKSON, in her official
capacity as Chair of the National Endowment

Case No. 1:25-cv-01674

for the Arts, 400 7th Street SW, Washington,
D.C. 20506;

OFFICE OF MANAGEMENT AND
BUDGET, 725 17th Street NW, Washington,
D.C. 20503;

UNITED STATES DEPARTMENT OF THE
TREASURY, 1500 Pennsylvania Avenue NW,
Washington, D.C. 20220;

NATIONAL ENDOWMENT FOR THE
ARTS, 400 7th Street SW, Washington, D.C.
20506;

THE CORPORATION FOR PUBLIC
BROADCASTING, 401 9th Street NW,
Washington, D.C. 20004,

*Defendants*.

**BRIEF OF PROPOSED AMICI CURIAE THE REPORTERS COMMITTEE
FOR FREEDOM OF THE PRESS AND INDEPENDENT NPR MEMBER STATIONS
IN SUPPORT OF PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT**

## CORPORATE DISCLOSURE STATEMENTS

Blue Ridge Public Radio is a community licensee.  It has no corporate owner and issues no stock.

Chicago Public Media is a not for profit corporation. It has no parent entity and issues no stock.  It owns and operates WBEZ in Chicago, one of the founding NPR member stations, as well as simulcast stations in Northern Illinois, WBEQ and WBEK, and W219CD in Elgin, Illinois.

Community Communications, Inc., d/b/a Central Florida Public Media, is an independent 501(c)(3) non-profit corporation that has no parent company and issues no stock.

Illinois Public Broadcasters (IPB) is an independent 501c3 and does not issue stock.

KCRW is a non-profit membership organization and a community service arm of Santa Monica College. It has no corporate parent and issues no stock.

KQED Inc. is a privately-supported, California public benefit corporation with no parent company, and does not issue stock.

Mid-Shore Community Radio is a non-profit community radio station, has no parent, and does not issue stock.

Minnesota Public Radio is owned by American Public Media Group (APMG), a tax-exempt, nonprofit parent support organization that provides administrative,

i

financial, and human resources services to its supported nonprofit organizations in the field of public media. APMG is the parent organization for Minnesota Public Radio, American Public Media, and Southern California Public Radio. Neither APMG nor its subsidiaries issue stock. The mission of APMG is to provide significant long-term financial strength to its supported organizations.

The Nathan B. Stubblefield Foundation d/b/a WMNF-Tampa, Florida is a privately supported, not-for-profit organization that has no parent company and issues no stock.

New Hampshire Public Radio is an independent, community-owned and operated 501(c)3 organization with no parent company.

New York Public Radio is a 501(c)(3) not-for-profit organization governed by an independent Board of Trustees.

Oregon Public Broadcasting is an independent nonprofit organization with no parent company and does not issue stock.

Pacific Public Media (KNKX-88.5fm and Jazz 24) is a non-for-profit member supported community broadcaster.  It has no parent corporation and issues no stock.

Pittsburgh Community Broadcasting Corporation is a privately-supported, 501c3 organization that operates WESA-FM and WYEP-FM as a noncommercial community licensee.  It is an independent organization with no parent company and does not issue stock.

The Reporters Committee for Freedom of the Press is an unincorporated association of reporters and editors with no parent corporation and no stock.

Rocky Mountain Public Media is a privately supported, not-for-profit membership organization that has no parent company and issues no stock.

Southern California Public Radio is owned by American Public Media Group (APMG), a tax-exempt, nonprofit parent support organization that provides administrative, financial, and human resources services to its supported nonprofit organizations in the field of public media. APMG is the parent organization for Southern California Public Radio, Minnesota Public Radio, and American Public Media. Neither APMG nor its subsidiaries issue stock. The mission of APMG is to provide significant long-term financial strength to its supported organizations. Spokane Public Radio, Inc. is a Washington nonprofit corporation with no parent and issues no stock.

Spokane Public Radio, Inc., is a Washington state nonprofit corporation with no parent corporation and which issues no stock.

Vermont Public – Is an independent nonprofit organization with no parent company and issues no stock.

WABE is a privately supported, not-for-profit membership organization. It is not owned by any parent company, does not issue stock, and maintains complete editorial independence.

WAMC is a not-for-profit educational corporation chartered by the New York State Education Department.

WAMU American University, a 501c3 academic institution in Washington, DC, holds the broadcast license for WAMU.

WBUR is owned by Trustees of Boston University, which is a non-profit organization which has no parent corporation and does not issue stock.

WDIY 88.1 FM - Lehigh Valley Community Broadcasters Association, Inc. (licensee of WDIY 88.1 FM) is a nonprofit 501(c)(3) organization. It has no parent corporation and no publicly held corporation owns 10% or more of its stock.

WFAE - WFAE is an independent, not-for-profit, listener-supported public radio station It is an independent organization with no parent company and does not issue stock.

WGLT – Bloomington-Normal's Public Media – is an NPR member public radio station owned and operated by and licensed to Illinois State University, a public research university in Illinois.

WJCT Public Media is a 501(c)3 not-for-profit corporation and has no parent company and issues no stock.

WLIW is owned by the WNET Group.

WSHU is wholly owned by Sacred Heart University, a private, nonprofit Catholic university.

WXXI Public Broadcasting Council, Inc. (WXXI) is a private, independent, community-owned not-for-profit corporation which has no parent company and issues no stock.

# TABLE OF CONTENTS

**Page:**

CORPORATE DISCLOSURE STATEMENTS ........................................................................ i

TABLE OF AUTHORITIES ................................................................................................ vii

INTEREST OF AMICI CURIAE ........................................................................................ 1

INTRODUCTION ............................................................................................................. 3

ARGUMENT .................................................................................................................... 6

    I.    NPR Member Stations exist thanks to a carefully considered statutory framework, which protects locally accountable public broadcasters with editorial independence. ............................................................................................ 6

    II.    Communities around the country are uniquely served by locally controlled NPR Member Stations, yet the Order wrests away that control by imposing editorial conditions on funding and interfering with programming independence. .................................................................................... 11

    III.    Defunding NPR and making Member Station funding contingent on the station toeing the Administration's preferred editorial line is unconstitutional. ....................................................................................................... 21

        A.    The Order violates the First Amendment ........................................................ 21

        B.    The Order violates the separation of powers in a manner that is particularly dangerous for freedom of the press ............................................ 24

CONCLUSION ................................................................................................................. 25

CERTIFICATE OF COMPLIANCE ..................................................................................... 27

# TABLE OF AUTHORITIES

**Page(s):**

**Cases**

*Aids Vaccine Advoc. Coal. v. U.S. Dep't of State,*
  770 F. Supp. 3d 121 (D.D.C. 2025) ................................................................... 26

*City & Cnty. of San Francisco v. Trump,*
  897 F.3d 1225 (9th Cir. 2018) ........................................................................... 26

*FCC v. League of Women Voters of Cal.,*
  468 U.S. 364 (1984) ............................................................................... 4, 7, 22

*Frederick Douglass Found., Inc. v. District of Columbia,*
  82 F.4th 1122 (D.C. Cir. 2023) ............................................................................ 5

*Iancu v. Brunetti,*
  588 U.S. 388 (2019) .............................................................................................. 5

*In re Aiken Cnty.,*
  725 F.3d 255 (D.C. Cir. 2013) ........................................................................... 26

*Miami Herald Publ'g Co. v. Tornillo,*
  418 U.S. 241 (1974) ............................................................................... 5, 24, 25

*Moody v. NetChoice, LLC,*
  603 U.S. 707 (2024) ........................................................................................... 24

*Newspaper Guild of Greater Phila., Loc. 10 v. NLRB,*
  636 F.2d 550 (D.C. Cir. 1980) ............................................................... 4, 21, 24

*Passaic Daily News v. NLRB,*
  736 F.2d 1543 (D.C. Cir. 1984) ........................................................................ 24

*Rosenberger v. Rector & Visitors of Univ. of Va.,*
  515 U.S. 819 (1995) ........................................................................................... 23

*Ward v. Rock Against Racism,*
  491 U.S. 781 (1989) ........................................................................................... 23

## Statutes

47 U.S.C. § 396 ............................................................................................................ *passim*

Pub. L. No. 117-328, Div. H, tit. IV, 136 Stat. 4459, 4901 (2023) ............................................ 9

Pub. L. No. 118-47, Div. D, tit. IV, 138 Stat. 460, 696 (2024) .................................................. 9

Pub. L. No. 119-4, Div. A, tit. I, § 1112, 139 Stat. 9, 14 (2025) .............................................. 9

## Other Authorities

Ally Jarmanning, *Former N.H. Addiction Treatment Center CEO Faces Conspiracy,
Vandalism Charges in Court*, WBUR (June 2, 2025),
https://www.wbur.org/news/2025/06/02/eric-spofford-new-hampshire-radio-
vandalism ........................................................................................................................ 15

Annie Rosenthal & Chad Bradley, *What Defunding Public Media Would Mean for
the West*, High Country News (June 6, 2025),
https://www.hcn.org/articles/what-defunding-public-media-would-mean-for-
the-west/ ...................................................................................................................... 9, 16

*Blindspot: The Plague in the Shadows*, Peabody Awards (last visited June 18, 2025),
https://peabodyawards.com/award-profile/blindspot-the-plague-in-the-
shadows/ .......................................................................................................................... 13

*Blindspot: Tulsa Burning*, duPont-Columbia Awards (last visited June 18, 2025),
https://dupont.org/blindspot-credits ................................................................................ 13

Cara Tabachnick, *Feds Arrest New Hampshire CEO for Allegedly Devising Conspiracy
to Stalk, Intimidate Journalists*, CBS News (May 31, 2025),
https://www.cbsnews.com/news/feds-arrest-eric-spofford-new-hampshire-
public-radio/ .................................................................................................................... 15

Catherine C. Pactol, *Aboard a Small Plane, This Maui Pilot Takes Animal Rescues to
New Heights*, Haw. Pub. Radio (Nov. 29, 2023),
https://www.hawaiipublicradio.org/local-news/2023-11-29/aboard-a-small-
plane-this-maui-pilot-takes-animal-rescues-to-new-heights .......................................... 17

Compl.,
*Corp. for Pub. Broad. v. Trump*, No. 25-cv-1305 (D.D.C. Apr. 29, 2025) .............................. 8

David Enrich, *Businessman Accused of Orchestrating Attacks on Journalists*, N.Y. Times (May 30, 2025), https://www.nytimes.com/2025/05/30/business/eric-spofford-new-hampshire-vandalism.html ........................................................................................................ 15

*Dirt Track Racing is a Family Affair*, NCPR (May 23, 2025), https://www.northcountrypublicradio.org/news/story/51776/20250523/5-23-25-dirt-track-racing-is-a-family-affair ................................................................. 17

*Ending Taxpayer Subsidization of Biased Media*, 90 Fed. Reg. 19415 (May 1, 2025) ........................................................................ 5

*Fact Sheet: President Donald J. Trump Ends the Taxpayer Subsidization of Biased Media*, The White House (May 1, 2025), https://perma.cc/RJ28-7F57 ................................................................................. 5, 23

*Former Treatment Center CEO Charged with Orchestrating Vandalism at NHPR Journalists' Homes*, NHPR (May 30, 2025), https://www.nhpr.org/nh-news/2025-05-30/ex-treatment-center-ceo-charged-with-orchestrating-vandalism-at-nhpr-journalists-homes .............................................. 15

H.R. Rep. No. 90-572 (1967), *reprinted in* 1967 U.S.C.C.A.N. 1799 ............................... 4, 6, 7

*History of the Peabody Award*, Am. Archive of Pub. Broad. (last visited June 18, 2025), https://americanarchive.org/exhibits/peabody/history-peabody ................................... 13

John J. O'Connor, *All About How 'We' Are Against 'Them'*, N.Y. Times (Apr. 22, 1973), https://www.nytimes.com/1973/04/22/archives/all-about-how-we-are-against-them-television-we-vs-them.html ................................................................. 11

Jonathan Stempel, *Corporation for Public Broadcasting Can Keep Board Members Despite Judge's Ruling*, Reuters (June 9, 2025), https://www.reuters.com/business/media-telecom/corporation-public-broadcasting-can-keep-board-members-despite-judges-ruling-2025-06-09/ .................. 8

Julie Rogers, *A Timeline of NPR's First 50 Years*, NPR (Apr. 28, 2021), https://perma.cc/MA5E-F7AX ................................................................................. 8

Karen Brown, *New Plea and Sentencing in Federal Case Against Men who Harassed New Hampshire Journalists*, WGBH (Sept. 10, 2024), https://www.wgbh.org/news/local/2024-09-10/new-plea-and-sentencing-in-federal-case-against-men-who-harassed-new-hampshire-journalists ........................... 15

Kaylee Tornay, *New Oregon Program Pays Parents to Care for Kids with Intensive Medical, Behavioral Needs — But Few Can Access It*, OPB (Oct. 2, 2024), https://www.opb.org/article/2024/10/02/investigate-west-oregon-program-intensive-medical-behavioral-waitlists-medicaid-extrodinary-needs/ ......................... 19

Lauren Chooljian, *He built New Hampshire's largest addiction treatment network. Now, he faces accusations of sexual misconduct*, NHPR (Mar. 22, 2022), https://www.nhpr.org/2022-03-22/eric-spofford-granite-recovery-center-nh-sexual-misconduct ................................................................................................. 14

Les Brown, *Files of Nixon White House Show Bid to Control Public Broadcasting*, N.Y. Times (Feb. 24, 1979), https://www.nytimes.com/1979/02/24/archives/files-of-nixon-white-house-show-bid-to-control-public-broadcasting.html .................................................................. 10

Lucas A. Powe, Jr., *American Broadcasting and the First Amendment* (1987) .................. 10, 11

Lucas A. Powe, Jr., *The Fourth Estate and the Constitution* (1992) ......................................... 25

Mary S. Hodgin, *What happens when a rural hospital shuts its doors? Look to Pickens County*, WBHM (Mar. 26, 2024), https://wbhm.org/2024/what-happens-when-a-rural-hospital-shuts-its-doors-look-to-pickens-county/ ........................................................................................................... 18

Medill Loc. News Initiative, The State of Local News (2024), https://localnewsinitiative.northwestern.edu/projects/state-of-local-news/2024/ ........ 20

Mitch Borden, *Toyah Residents Struggle to Access Clean Water as Boil Water Notice Stretches on for Years*, Marfa Pub. Radio (Apr. 14, 2023), https://www.marfapublicradio.org/2023-04-14/toyah-residents-struggle-to-access-clean-water-as-boil-water-notice-stretches-on-for-years ..................................... 18

Neda Ulaby, *It's A First! NPR And Member Stations KCUR and WABE Win a Pulitzer Prize*, NPR (June 11, 2021), https://www.npr.org/2021/06/11/1005612695/nprs-gun-culture-podcast-wins-a-pulitzer-and-the-newsroom-celebrates ............................................................................... 14

*NHPR's 13th Step Honored as a Pulitzer Prize Finalist*, NHPR (May 6, 2024),
    https://www.nhpr.org/nh-news/2024-05-06/nhpr-the-13th-step-honored-as-a-
    pulitzer-prize-finalist ............................................................................................... 14

Nika Bartoo-Smith, *Oregon Governor Outlines Commitments to Native Nations*, OPB
    (Aug. 28, 2024),
    https://www.opb.org/article/2024/08/28/oregon-governor-interview-tribal-
    policy/ ........................................................................................................................ 19

*NPR Ethics Handbook – Independence*, NPR (last visited May 30, 2025),
    https://perma.cc/Q3XN-UUQH ................................................................................ 22

*NPR Stations and Public Media*, NPR (last visited June 18, 2025),
    https://www.npr.org/about-npr/178640915/npr-stations-and-public-media .................. 1

*NPR Wins 8 Edward R. Murrow Awards*, NPR (Aug. 15, 2024),
    https://perma.cc/5EJG-MT6D ................................................................................... 13

Oregon Public Broadcasting, *Salmon People: A Native Fishing Family's Fight to
    Preserve a Way of Life*, YouTube (Dec. 21, 2022),
    https://www.youtube.com/watch?v=xFQvL6a9mQQ .................................................. 16

*Our Story*, Alliance of Rural Pub. Media (last visited June 18, 2025),
    https://ruralpublic.org/about/our-story/ .................................................................... 12

Penelope Muse Abernathy, Ctr. for Innovation & Sustainability in Loc. Media,
    The Expanding News Desert (2018),
    https://www.cislm.org/wpcontent/uploads/2018/10/The-Expanding-News-
    Desert-10_14-Web.pdf ............................................................................................. 20

Peter Hirschfeld, *FEMA's Plodding Bureaucracy Exacts Financial Toll on Vermont
    Towns*, Vt. Pub. (Sept. 23, 2024),
    https://www.vermontpublic.org/local-news/2024-09-23/fema-plodding-
    bureaucracy-puts-small-rural-vermont-towns-debt ...................................................... 17

Peter Hirschfeld, *For Some Vermont Flood Survivors, FEMA Was the Second Major
    Disaster Last Year*, Vt. Pub. (July 1, 2024),
    https://www.vermontpublic.org/local-news/2024-07-01/vermont-flood-july-
    2023-fema-costs-administrative-fees-assistance-buyouts-hurdles ................................. 17

Press Release, "Sold a Story" Wins Prestigious duPont-Columbia Award, Minn.
     Pub. Radio (Jan. 31, 2024),
     https://www.mpr.org/stories/2024/01/31/sold-a-story-wins-prestigious-
     dupontcolumbia-award ................................................................................. 13

Press Release, MPR News Podcast, "74 Seconds," Wins a Peabody Award, Minn.
     Pub. Radio (Apr. 24, 2018),
     https://www.mpr.org/stories/2018/04/24/mpr-news-podcast-74-seconds-wins-
     a-peabody-award ........................................................................................ 13

*Public Radio Finances*, NPR (last visited May 30, 2025),
     https://perma.cc/K6BG-FTRX ...................................................................... 9

Rick Edmonds, *The News Desert Problem Continues to Worsen With Little Relief in
     Sight*, Poynter (Oct. 23, 2024),
     https://www.poynter.org/business-work/2024/news-deserts-growing-medill-
     state-local-news-report/ .............................................................................. 21

*River Watch*, KYUK (last visited June 18, 2025),
     https://www.kyuk.org/podcast/river-watch.................................................. 16

*Salmon Wars*, OPB (last visited June 18, 2025),
     https://www.opb.org/salmonwars/ .............................................................. 16

Sommer Hill, *Congratulations NPR and Member Stations for Winning Multiple
     Edward R. Murrow Awards*, NPR (Aug. 17, 2023),
     https://www.npr.org/sections/npr-
     extra/2023/08/17/1194367122/congratulations-npr-and-member-stations-for-
     winning-multiple-edward-r-murrow-awa..................................................... 13

*The Collaborative Journalism Network: How NPR and Member Stations Are Working
     Together*, NPR (last visited June 18, 2025),
     https://www.npr.org/collaborative-journalism-regional-newsroom-topic-team......... 18

U.S. Const. art. I, § 8, cl. 1................................................................................. 25

*Who We Are*, NPR (last visited May 30, 2025),
     https://perma.cc/M23H-W3ZU ............................................................... 3, 8

**INTEREST OF AMICI CURIAE**

Proposed amici curiae are the Reporters Committee for Freedom of the Press (the "Reporters Committee") and 29 NPR Member Stations (together, "amici"), who under the Executive Order challenged in this litigation are barred from using federal funds to purchase and air NPR programming that their local audience relies on—forcing them to drop the programming or find a way to pay for it with other funding sources.  By discriminating against NPR based on its content (and what the Administration perceives to be its viewpoint), the Executive Order also conveys to NPR Member Stations that continued association with NPR puts at risk the federal funding on which many stations depend to broadcast in their communities.

NPR Member Stations "are independent, locally owned and operated broadcasters" that pay membership and licensing fees to NPR in exchange for benefits including "a set of rights to NPR programming, content, digital distribution streaming and inclusion in mobile products," along with NPR branding and participation in NPR governance.  *See NPR Stations and Public Media*, NPR (last visited June 18, 2025), https://www.npr.org/about-npr/178640915/npr-stations-and-public-media.  The following stations, broadcasting to millions of Americans, join this brief as amici:

1. Blue Ridge Public Radio (North Carolina)
2. Chicago Public Media, including WBEZ, WBEQ, WBEK, and W219CD
3. Community Communications, Inc., d/b/a Central Florida Public Media
4. Illinois Public Broadcasters
5. KCRW (California)
6. KQED (California)

1

7.   Mid-Shore Community Radio, WHCP-FM (Maryland)
8.   Minnesota Public Radio
9.   The Nathan B. Stubblefield Foundation, d/b/a WMNF-Tampa (Florida)
10. New Hampshire Public Radio
11. New York Public Radio
12. Oregon Public Broadcasting
13. Pacific Public Media, d/b/a KNKX-88.5fm (Washington state)
14. Pittsburgh Community Broadcasting Corporation
15. Rocky Mountain Public Media (Colorado)
16. Southern California Public Radio
17. Spokane Public Radio (Washington state)
18. Vermont Public
19. WABE (Georgia)
20. WAMC, Northeast Public Radio (New York)
21. WAMU (Washington, DC)
22. WBUR (Massachusetts)
23. WDIY 88.1 FM (Pennsylvania)
24. WFAE (North and South Carolina)
25. WGLT – Bloomington-Normal's Public Media (Illinois)
26. WJCT Public Media (Florida)
27. WLIW (New York)
28. WSHU (Connecticut)
29. WXXI Public Broadcasting Council, Inc. (New York)

These stations join with lead amicus Reporters Committee, an unincorporated

nonprofit association of reporters and editors dedicated to defending the First

Amendment and newsgathering rights of the news media and whose attorneys

provide pro bono legal representation, amicus curiae support, and other legal resources

to protect journalists. [1]

---

[1]     Individual statements of interest are set forth in the accompanying motion for leave to file this amici brief.  No party or party counsel authored this brief in whole or in part.  No person other than amici, including any party or party counsel, made a monetary contribution intended to fund the preparation or submission of this brief.

**INTRODUCTION**

For decades, National Public Radio, Inc. (NPR) and the independent, locally

owned and operated radio stations that choose to be NPR Member Stations have

delivered vital news and information to millions of Americans across the country.

Collectively, NPR Member Stations' signals reach approximately 99% of the United

States population, providing a broad range of communities across the country with on-

the-ground reporting.  *See* Compl. ¶¶ 4, 46; *Who We Are*, NPR (last visited May 30,

2025), https://perma.cc/M23H-W3ZU.  These broadcasters pay a fee to become Member

Stations with the option to air a variety of NPR programs and to partner with NPR on

newsgathering.  The communities in which NPR Member Stations operate are distinct

from one another, geographically, economically, politically, and culturally.  It is not

surprising therefore that the individual choices of what NPR content they choose to

air—whether music programming, general interest talk shows, or any of NPR's many

news and information programs—reflect the preferences of a Member Station's own

unique local audience.  What is true across all Member Stations, however, is that

through this structure, listeners, including many in underserved areas, have free access

to high-quality programming.

This extraordinary network of programming is made possible by NPR's unique

combination of public funding and editorial independence.  That combination is no

accident.  Congress built the foundation for it through the Public Broadcasting Act of

1967, 47 U.S.C. § 396, setting up mechanisms for federal grants alongside "measures

designed both to ensure the autonomy of the Corporation [for Public Broadcasting] and

to protect the local stations from governmental interference and control," *FCC v. League*

*of Women Voters of Cal.*, 468 U.S. 364, 369 (1984).  In doing so, Congress expressly

recognized that the success of public broadcasting "depend[s] on freedom, imagination,

and initiative on both local and national levels," and sought to ensure stations had

"maximum protection from extraneous interference and control."  47 U.S.C. § 396(a)(3),

(a)(10); *see also* H.R. Rep. No. 90-572, at 19–20 (1967), *reprinted in* 1967 U.S.C.C.A.N. 1799,

1810 ("The educational stations must not be permitted to become vehicles for the

promotion of one or another political cause, party, or candidate.").  As with many news

organizations that stake their reputation on the quality, seriousness, and real-life value

of their reporting, NPR's "credibility is central to . . . the enterprise."  *Newspaper Guild of*

*Greater Phila., Loc. 10 v. NLRB*, 636 F.2d 550, 560 (D.C. Cir. 1980).

This statutorily protected editorial freedom is bolstered and backstopped by the

First Amendment, which "erects a virtually insurmountable barrier" to insulate a

publisher's exercise of editorial judgment from government interference.  *Miami Herald*

*Publ'g Co. v. Tornillo*, 418 U.S. 241, 259 (1974) (White, J., concurring).  The government

cannot control the content of NPR's work, nor can it punish stations for broadcasting

stories it does not like.  Such "viewpoint discrimination is poison."  *Frederick Douglass*

*Found., Inc. v. District of Columbia*, 82 F.4th 1122, 1141 (D.C. Cir. 2023) (citation omitted);

*see also Iancu v. Brunetti*, 588 U.S. 388, 399 (2019) (Alito, J., concurring) (describing "[v]iewpoint discrimination" as "poison to a free society"). These guarantees are fundamentally important to NPR and its Member Stations, and to each American relying on their local station, in all corners of the country.

The Executive Order at issue in this case, E.O. 14290, "Ending Taxpayer Subsidization of Biased Media," 90 Fed. Reg. 19415 (May 1, 2025) (the "Order"), casts aside these protections and seeks to cancel both "direct" and "indirect" federal funding to NPR and the Public Broadcasting Service (PBS). The Order does so specifically because of the Administration's stated disagreement with their reporting. *See, e.g.*, *Fact Sheet: President Donald J. Trump Ends the Taxpayer Subsidization of Biased Media*, The White House (May 1, 2025), https://perma.cc/RJ28-7F57 (claiming NPR is "biased" and "left-wing propaganda" and criticizing coverage decisions); Compl. ¶¶ 74–80. The Order thus engages in viewpoint discrimination that violates the First Amendment. It also contravenes Congress's instructions to afford NPR "maximum protection from extraneous interference and control," 47 U.S.C. § 396(a)(10), and keep it from becoming a "vehicle[] for the promotion of one or another political cause, party, or [President]," H.R. Rep. No. 90-572, at 19–20 (1967), *reprinted in* 1967 U.S.C.C.A.N. 1799, 1810.

These constitutional and statutory protections are not merely academic. They have real-world impacts for the Member Stations and the millions of listeners who depend on them for locally selected content—whether that content is regional and

community news, music and arts programming, or, with respect to stations that choose to air NPR's news and public affairs programming, information from throughout the United States and the world.

The issues raised in this litigation are of deep importance not only to the NPR Member Stations that joined the lawsuit as plaintiffs, but also to those around the country that represent and serve their communities.  For the reasons set forth herein, amici urge the Court to grant Plaintiffs' motion for summary judgment and safeguard the funding and independence of NPR and the local Member Stations.

## ARGUMENT

I.    **NPR Member Stations exist thanks to a carefully considered statutory framework, which protects locally accountable public broadcasters with editorial independence.**

For the better part of a century, Congress has provided some direct financial support for NPR, which is primarily distributed through the independent non-profit Corporation for Public Broadcasting (CPB) in the form of grants.  Most of the grant money is designated specifically for NPR's maintenance of the Public Radio Satellite System, with a relatively small amount of grant dollars available for other uses, including news coverage and programming, security for journalists, and support for local newsrooms.  Compl. ¶¶ 56–59.  The Public Broadcasting Act of 1967 codified the concept of domestic broadcasters receiving federal funds, finding it was "in the public interest to encourage the growth and development of public radio and television

broadcasting."  47 U.S.C. § 396(a)(1).  Through that law, Congress created CPB to

distribute federal funds to noncommercial TV and radio stations across the U.S.  The

statute included "measures designed both to ensure the autonomy of the [CPB] and to

protect the local stations from governmental interference and control."  *FCC*, 468 U.S. at

369.  The House Committee in charge of the bill recognized that partisan influence or

the appearance thereof would doom efforts at serious journalism by federally funded

broadcasters.  *See* H.R. Rep. No. 90-572, at 19–20 (1967), *reprinted in* 1967 U.S.C.C.A.N.

1799, 1810.  Lawmakers thus included safeguards separating editorial activity from the

funding grants that the CPB would then direct.[2]  *See* 47 U.S.C. § 396(a)(10) (directing

creation of private CPB "to afford maximum protection from extraneous interference

and control"); *id.* § 396(c)(1) ("No more than 5 members of the Board appointed by the

President may be members of the same political party."); *id.* § 396(d)(2) ("The members

of the Board shall not, by reason of such membership, be deemed to be officers or

employees of the United States."); *id.* § 396(g)(1)(D) (directing CPB to "effectively assure

the maximum freedom of the public telecommunications entities and systems from

interference with, or control of, program content or other activities").

---

[2]      CPB currently awards grants to more than 1,500 stations serving communities
around the country, many of which use the funds to license NPR and PBS content to
distribute locally alongside local news, music shows and other programming.

In 1970, following passage of the Public Broadcasting Act, NPR was founded with 88 original Member Stations.  Julie Rogers, *A Timeline of NPR's First 50 Years*, NPR (Apr. 28, 2021), https://perma.cc/MA5E-F7AX.  It has since grown to encompass 246 Member Stations that together provide boots-on-the-ground news coverage to nearly all of the United States population.  *See* Compl. ¶ 46; *Who We Are*, NPR (last visited May 30, 2025), https://perma.cc/M23H-W3ZU.  While CPB funds make up a small percentage of NPR's own budget, many NPR Member Stations substantially rely on CPB grants for their operations.[3]  *See Public Radio Finances*, NPR (last visited May 30, 2025), https://perma.cc/K6BG-FTRX.  Some stations, for example, receive up to 70% of their funding from CPB.  *See* Annie Rosenthal & Chad Bradley, *What Defunding Public Media Would Mean for the West*, High Country News (June 6, 2025), https://www.hcn.org/articles/what-defunding-public-media-would-mean-for-the-west/. Stations in rural and indigenous communities would be hardest hit should CPB funding be eliminated.  *Id.* ("Data show that rural, tribal and Western stations would be most impacted by Trump's attempt to cut CPB funding.").  One Member Station has described the threat of the Order as "catastrophic."  *Id.*

---

[3]    Congress has appropriated $535 million in general funding to CPB for each Fiscal Year, 2025 through 2027.  *See* Pub. L. No. 117-328, Div. H, tit. IV, 136 Stat. 4459, 4901 (2023); Pub. L. No. 118-47, Div. D, tit. IV, 138 Stat. 460, 696 (2024); Pub. L. No. 119-4, Div. A, tit. I, § 1112, 139 Stat. 9, 14 (2025).  Budgets and funding sources can vary significantly across individual NPR Member Stations.

From 1970 to now, NPR and its Member Stations have operated with editorial independence—sometimes to the displeasure of political leaders, but without many concerted attempts to control their content through punitive government action.  The exceptions are few and infamous.  For example, President Richard Nixon sought to wrest control of CPB and control public broadcasting "so it might serve the Administration's aims" in the earliest years of NPR.  *See* Les Brown, *Files of Nixon White House Show Bid to Control Public Broadcasting*, N.Y. Times (Feb. 24, 1979), [https://www.nytimes.com/1979/02/24/archives/files-of-nixon-white-house-show-bid-to-control-public-broadcasting.html](https://www.nytimes.com/1979/02/24/archives/files-of-nixon-white-house-show-bid-to-control-public-broadcasting.html).  In efforts resembling those of the current Administration, President Nixon and members of his Administration sought to prevent public broadcasting from airing content it deemed to be "liberal," or "ke[ep] [it] away from public-affairs programming" altogether, by "applying financial pressure."  Lucas A. Powe, Jr., *American Broadcasting and the First Amendment* 129 (1987).  The Nixon White House exerted pressure on managers of local member stations to in turn pressure the CPB to "put balance in their programming."  Brown, *supra.*  As a later-released White House memo revealed, the Administration saw the government's financial support for those local stations as leverage in this effort.  *Id.* (quoting 1971 internal strategy memo to White House chief of staff stating that "[o]ur credibility on funding with the local stations is essential to this effort").  In addition to public criticisms and pressure by White House officials, Patrick Buchanan, then a member of President Nixon's staff,

reportedly warned a public broadcasting executive privately that "[i]f you don't do the kind of programming we want, you won't get a f---- dime."  Powe, Jr., *supra*, at 129.  In 1972, Nixon vetoed a bill to significantly increase public broadcasting funding that had passed in the Senate by a margin of 82-1.  *See id.*; John J. O'Connor, *All About How 'We' Are Against 'Them'*, N.Y. Times (Apr. 22, 1973),

https://www.nytimes.com/1973/04/22/archives/all-about-how-we-are-against-them-television-we-vs-them.html.  But the people wanted local broadcasting, and even Nixon's efforts could not stop its growth.  *See* Powe, Jr., *supra*, at 130–31.

Various politicians over the years have complained of bias or unfair treatment by public broadcasters but have been unsuccessful in efforts to leverage funding to influence content.  Accusations of bias are not of course limited to public media, but rather a standard refrain against many news organizations that report on the activities of public officials and discuss public affairs.  But were it not for statutory protections, public broadcasting (and particularly local Member Stations reliant on CPB funding, *see supra* pp. 8–9) would be vulnerable to political influence and intimidation in a way that other media is not.  Congress did not want that.  Viewing independent public radio as "in the public interest," 47 U.S.C. § 396(a), its legislation gave rise to the locally owned and operated Member Stations whose signals today reach 99% of American households.

II.   **Communities around the country are uniquely served by locally controlled NPR Member Stations, yet the Order wrests away that control by imposing editorial conditions on funding and interfering with programming independence.**

What is at stake in this litigation is both the ability of Member Stations to control their own programming decisions—including their ability to report and present the news—as well as the public's ability to receive information from their local stations.  To appreciate the stakes, it is vital to understand how NPR Member Stations like amici operate and serve their communities.  Far from a monolith, the Member Stations are as varied as the regions they serve.  While collectively public radio's geographic reach is vast, because individual Member Stations are independently owned and operated, each can select its own programming (whether locally produced, licensed from NPR, or distributed by other third parties) based on the specific interests and needs of its listeners.  *See* Compl. ¶ 55 (identifying reasons Member Stations cite for selecting their particular mix of content and stating that "[i]n many rural areas, NPR Member stations are the only free providers of local and national news, and reliable emergency information"); *see also Our Story*, Alliance of Rural Pub. Media (last visited June 18, 2025), https://ruralpublic.org/about/our-story/ ("The rural radio network serves all 50 states, Guam, Puerto Rico, and the U.S. Virgin Islands, as well as Native American and Island communities" and collectively, "public radio stations broadcast to 98.5 percent of the U.S. population, providing local news and information to urban, rural, and underserved areas of the country, often where other broadcasters do not reach.").

11

American communities benefit significantly from the independent and often award-winning journalism produced by NPR Member Stations across the country over the past 55 years.  Many stories by station journalists—frequently stories that had otherwise gone unreported—have garnered recognition for their quality and impact. For example, in the prior two years alone, 49 stories reported by NPR Member Stations were awarded the prestigious national Edward R. Murrow award for outstanding achievements in broadcast and digital journalism, separate and apart from awards received by NPR itself.  *See NPR Wins 8 Edward R. Murrow Awards*, NPR (Aug. 15, 2024), https://perma.cc/5EJG-MT6D (awarding 22 Member Station stories in 2024); Sommer Hill, *Congratulations NPR and Member Stations for Winning Multiple Edward R. Murrow Awards*, NPR (Aug. 17, 2023), https://www.npr.org/sections/npr-extra/2023/08/17/1194367122/congratulations-npr-and-member-stations-for-winning-multiple-edward-r-murrow-awa (27 awards in 2023).[4]

---

[4]    NPR Member Stations have been recognized with other prestigious journalism honors, such the George Foster Peabody Awards and the Alfred I. duPont-Columbia Awards.  *See, e.g.*, Press Release, MPR News Podcast, "74 Seconds," Wins a Peabody Award, Minn. Pub. Radio (Apr. 24, 2018), https://www.mpr.org/stories/2018/04/24/mpr-news-podcast-74-seconds-wins-a-peabody-award (podcast series on policing and race); *Blindspot: Tulsa Burning*, duPont-Columbia Awards (last visited June 18, 2025), https://dupont.org/blindspot-credits (podcast series on 1921 Tulsa massacre); Press Release, "Sold a Story" Wins Prestigious duPont-Columbia Award, Minn. Pub. Radio (Jan. 31, 2024), https://www.mpr.org/stories/2024/01/31/sold-a-story-wins-prestigious-dupontcolumbia-award (podcast series on failures of literacy curriculum); *Blindspot: The*

In a ground-breaking and award-winning news investigation published in
March 2022, New Hampshire Public Radio reported that the founder and then-CEO of
an addiction treatment network had preyed on and sexually harassed and assaulted a
patient and employees.  Lauren Chooljian, *He built New Hampshire's largest addiction
treatment network. Now, he faces accusations of sexual misconduct*, NHPR (Mar. 22, 2022),
https://www.nhpr.org/2022-03-22/eric-spofford-granite-recovery-center-nh-sexual-
misconduct.  NHPR journalists stayed on the story, gathering additional information,
which they reported via a podcast entitled *The 13th Step* (13thsteppodcast.org).  *The 13th
Step* received both a duPont and a Murrow award and was honored as a finalist for a
Pulitzer Prize in local reporting and as a nominee for a Peabody Award.  *NHPR's 13th
Step Honored as a Pulitzer Prize Finalist*, NHPR (May 6, 2024), https://www.nhpr.org/nh-
news/2024-05-06/nhpr-the-13th-step-honored-as-a-pulitzer-prize-finalist.  But the
reporting also touched off legal actions and acts of harassment against the reporters:

---

*Plague in the Shadows*, Peabody Awards (last visited June 18, 2025),
https://peabodyawards.com/award-profile/blindspot-the-plague-in-the-shadows/
(podcast series on the early years of the AIDS epidemic); *see also History of the Peabody
Award*, Am. Archive of Pub. Broad. (last visited June 18, 2025),
https://americanarchive.org/exhibits/peabody/history-peabody.  And in 2020,
journalists at several Member Stations, WABE in Atlanta, KCUR out of Kansas City,
Missouri, and WAMU in Washington, DC, produced long-form reporting that resulted
in NPR's first Pulitzer Prize for journalism, one year after the Pulitzer body began
accepting audio entries.  Neda Ulaby, *It's A First! NPR And Member Stations KCUR and
WABE Win a Pulitzer Prize*, NPR (June 11, 2021),
https://www.npr.org/2021/06/11/1005612695/nprs-gun-culture-podcast-wins-a-pulitzer-
and-the-newsroom-celebrates.

Following publication, NHPR endured attacks from the CEO, both legal and extra-legal,

for its journalism.  First, he unsuccessfully sued NHPR for defamation in New

Hampshire state court, where the judge found no basis for his claims and dismissed the

case.  Karen Brown, *New Plea and Sentencing in Federal Case Against Men who Harassed*

*New Hampshire Journalists*, WGBH (Sept. 10, 2024),

https://www.wgbh.org/news/local/2024-09-10/new-plea-and-sentencing-in-federal-case-

against-men-who-harassed-new-hampshire-journalists.  The CEO and his associates

were subsequently indicted for stalking and harassing the journalists who reported the

story.  *See* Cara Tabachnick, *Feds Arrest New Hampshire CEO for Allegedly Devising*

*Conspiracy to Stalk, Intimidate Journalists*, CBS News (May 31, 2025),

https://www.cbsnews.com/news/feds-arrest-eric-spofford-new-hampshire-public-

radio/; David Enrich, *Businessman Accused of Orchestrating Attacks on Journalists*, N.Y.

Times (May 30, 2025), https://www.nytimes.com/2025/05/30/business/eric-spofford-

new-hampshire-vandalism.html.

NHPR's reporting is laudable, and additionally notable because of what occurred

after it aired, but it is by no means the sole testament to the important local reporting

that NPR Member Stations do, alone and in collaboration with other Member Stations

or with NPR news teams.  In rural Alaska, Member Station KYUK produces and airs a

program called River Watch that monitors and reports in depth on the area around the

Kuskokwim for residents of the Yukon-Kuskokwim Delta.  *River Watch*, KYUK (last

14

visited June 18, 2025), https://www.kyuk.org/podcast/river-watch.  As the Western

news magazine High Country News has reported, "[i]n dozens of Southwest Alaska

villages — including many Yup'ik, Athabaskan and Cup'ik [indigenous] communities

— residents who live far from the U.S. highway system rely on boats and snow

machines to get around.  'The Kuskokwim River in this region is like [its] highway.'"

Rosenthal & Bradley, *supra* (quoting KYUK news director).  Crucially, in this remote

region, roughly the size of Oregon, "KYUK is the only daily news source . . . and *River*

*Watch* is a staple of its programming."  *Id.*[5]

Vermont Public, a public broadcaster serving a statewide audience in a primarily

rural area of the country, published an investigation in July 2024 about the systemic

failures in FEMA's individual assistance program for flood survivors.  Peter Hirschfeld,

*For Some Vermont Flood Survivors, FEMA Was the Second Major Disaster Last Year*, Vt. Pub.

(July 1, 2024), https://www.vermontpublic.org/local-news/2024-07-01/vermont-flood-

july-2023-fema-costs-administrative-fees-assistance-buyouts-hurdles.  A year before,

"floods [had] wreaked havoc in nearly every corner of Vermont."  *Id.*  Yet this NPR

---

[5]     NPR Member Stations do vital reporting within indigenous communities.  For example, Oregon Public Broadcasting (OPB), in partnership with a nonprofit newsroom, investigated how dam creation and other federal government policies were destroying salmon in the Pacific Northwest and harming indigenous people, for a podcast and a documentary film.  *See Salmon Wars*, OPB, https://www.opb.org/salmonwars/;  OPB, *Salmon People: A Native Fishing Family's Fight to Preserve a Way of Life*, YouTube (Dec. 21, 2022), https://www.youtube.com/watch?v=xFQvL6a9mQQ.

Member Station found that, since then, residents trying to obtain FEMA funds had faced a morass of bureaucratic obstacles, including contradictory assessments on the degree of damage and their eligibility for assistance and nonresponsive staff at FEMA centers purportedly established to support applicants. Vermont Public's reporting also revealed structural problems in FEMA's public assistance program (for impacted states and localities). Peter Hirschfeld, *FEMA's Plodding Bureaucracy Exacts Financial Toll on Vermont Towns*, Vt. Pub. (Sept. 23, 2024), https://www.vermontpublic.org/local-news/2024-09-23/fema-plodding-bureaucracy-puts-small-rural-vermont-towns-debt. This work by Vermont Public has been cited by federal legislators in the call for reform at FEMA.[6]

---

[6]    Space constraints preclude amici from citing more than just a few of the many examples of high-quality public radio reporting that connects listeners to their communities and their stations, and whose programming reflects the community's interests and values back to itself. *See, e.g.*, Catherine C. Pactol, *Aboard a Small Plane, This Maui Pilot Takes Animal Rescues to New Heights*, Haw. Pub. Radio (Nov. 29, 2023), https://www.hawaiipublicradio.org/local-news/2023-11-29/aboard-a-small-plane-this-maui-pilot-takes-animal-rescues-to-new-heights (award-winning feature about a Maui pilot handling animal rescues); *Dirt Track Racing is a Family Affair*, NCPR (May 23, 2025), https://www.northcountrypublicradio.org/news/story/51776/20250523/5-23-25-dirt-track-racing-is-a-family-affair (award-winning deep dive into dirt track racing in a town along the U.S.-Canadian border); Mitch Borden, *Toyah Residents Struggle to Access Clean Water as Boil Water Notice Stretches on for Years*, Marfa Pub. Radio (Apr. 14, 2023), https://www.marfapublicradio.org/2023-04-14/toyah-residents-struggle-to-access-clean-water-as-boil-water-notice-stretches-on-for-years (award-winning series on water access for Texas residents living under a years-long boil water notice); Mary S. Hodgin, *What happens when a rural hospital shuts its doors? Look to*

To further aid this kind of newsgathering, NPR launched regional newsrooms. *See The Collaborative Journalism Network: How NPR and Member Stations Are Working Together*, NPR (last visited June 18, 2025), https://www.npr.org/collaborative-journalism-regional-newsroom-topic-team (explaining, "NPR and Member organizations . . . launched The Appalachia + Mid-South Newsroom"—composed of seven stations in Kentucky, Tennessee and West Virginia, with NPR as a partner—and listing additional regions, including Midwest states and Gulf states, where regional newsrooms had been established).  These newsrooms increase the likelihood that more stories, including ones from less populated areas, will be discovered and told; listeners will receive more information on the places they live, and people in other parts of the country will see more reporting on, and hopefully better understand, these regions as well.  *Id.* (explaining that regional newsrooms are intended "to strengthen local news coverage and bring more stories from [the particular] region to the rest of the country").

---

*Pickens County*, WBHM (Mar. 26, 2024), https://wbhm.org/2024/what-happens-when-a-rural-hospital-shuts-its-doors-look-to-pickens-county/ (award-winning report on how rural areas handle the loss of their only hospital).

And for many of the same reasons that NPR formed regional newsrooms, some

Member Stations have participated in news partnerships in their own states to expand

the breadth and depth of their coverage and the audiences they are serving.[7]

And when there is breaking news in their communities, NPR Member Stations

deploy their reporters to ensure listeners know and understand what is happening.

Maine Public Radio, for example, provided vital and award-winning breaking news

coverage of the Lewiston mass shooting; WESA offered incisive first-person reporting

in July, 2024 of the assassination attempt on then-candidate Donald Trump in Butler

County Pennsylvania, for which it received a Murrow Award; and Central Florida

Public Media has been a go-to and award-winning source for storm coverage, including

over 50 hours of special coverage during the last three hurricanes to impact its region.

Following the outbreak of the 2024 California wildfires, KCRW ensured its reporting

---

[7]     For example, OPB contributes journalism content through a partnership with a
coalition of small newspapers and digital outlets across Oregon and Washington and
thereby serves as a regional wire service, particularly on state government, education,
and environmental issues.  OPB will also consider for publication stellar journalism
from its local partners, so the audience has access to stories it might not otherwise see.
*See* Kaylee Tornay, *New Oregon Program Pays Parents to Care for Kids with Intensive
Medical, Behavioral Needs — But Few Can Access It*, OPB (Oct. 2, 2024),
https://www.opb.org/article/2024/10/02/investigate-west-oregon-program-intensive-
medical-behavioral-waitlists-medicaid-extrodinary-needs/ (republishing article by non-
profit news partner, examining much-touted but hard-to-access behavioral health
programs for children); Nika Bartoo-Smith, *Oregon Governor Outlines Commitments to
Native Nations*, OPB (Aug. 28, 2024), https://www.opb.org/article/
2024/08/28/oregon-governor-interview-tribal-policy/ (republishing reporting by
Indigenous-centered non-profit investigative newsroom).

and information-gathering reached its millions of social media users, many of whom were displaced, and hosted Zoom panels on the safety of living in or near the burn zone that drew 6,000 attendees.  Additionally, four public media entities in California joined to share information and reporting with one another and distribute it in email form, reaching 750,000 people each month.  This collaboration, resulting in tangible information and focused outreach, was supported by CPB special funding.

Ceasing the flow of CPB funds to NPR would complicate—or in some cases, may fully cut off—Member Stations' ability to use grants for essential programming.  And some of those stations serve the most remote places in the nation, which need and deserve access to local news.  Penelope Muse Abernathy, Ctr. for Innovation & Sustainability in Loc. Media, The Expanding News Desert (2018), https://www.cislm.org/wp-content/uploads/2018/10/The-Expanding-News-Desert-10_14-Web.pdf (explaining that "news deserts"—meaning no local newspaper in a community—are growing but local digital news outlets are attempting to fill void); Medill Loc. News Initiative, The State of Local News (2024), https://localnewsinitiative.northwestern.edu/projects/state-of-local-news/2024/.  Those who stand to lose the most under the Executive Order are the people living in the communities—particularly small towns and rural areas—where access to news and other programming has been made possible through federal grants and membership in NPR.  Rick Edmonds, *The News Desert Problem Continues to Worsen With Little Relief in*

*Sight*, Poynter (Oct. 23, 2024), https://www.poynter.org/business-work/2024/news-deserts-growing-medill-state-local-news-report/ (one of the few "positive developments" in the face of newspapers' continuing decline is the "robust public media local news efforts").[8]

For NPR Member Stations, the quality and independence of their reporting is central to their credibility, and like "most news publications, credibility is central to the[] ultimate product and to the conduct of the enterprise." *Newspaper Guild*, 636 F.2d at 560. As community broadcasters without out-of-state corporate owners, they are uniquely tied to their local listeners, which is also central to their credibility and public trust. As NPR explains it:

> To secure the public's trust, we must make it clear that our primary allegiance is to the public. Any personal or professional interests that conflict with that allegiance, whether in appearance or in reality, risk compromising our credibility. . . . Under no circumstances do we skew our reports for personal gain, to help NPR's bottom line or to please those who fund us.

---

[8]    In some places, public radio is not only a source of news, but also a community hub. For example, Rocky Mountain Public Media (RMPM) employs journalists who live in and report from Colorado's rural areas; and in addition to its locations in Denver and Colorado Springs, it has physical space in two rural communities. These bureaus act as a community gathering place for events. In 2024 alone, RMPM convened over 100,000 people through in-person music events, panel and forums, cultural celebrations, and more. Similarly, WJCT in Jacksonville, Florida, holds approximately 100 in-person community events each year, most of them free to the public.

*NPR Ethics Handbook – Independence*, NPR (last visited May 30, 2025),

https://perma.cc/Q3XN-UUQH.  By design, these NPR Member Stations are

community-based stations whose programming reflects the needs and interests of the

public, and their independence allows them to understand and serve their audience.

III.    **Defunding NPR and making Member Station funding contingent on the station toeing the Administration's preferred editorial line is unconstitutional.**

A.      **The Order violates the First Amendment.**

The Order seeks to end funding to NPR and restricts CPB's continued support

for NPR Member Stations based on their willingness to conform their programming to

the Administration's preferences.  Specifically, it places restrictions on how the local

stations can choose to utilize their funding, exerting editorial control by prohibiting

them from using federal funds to license and broadcast NPR programs.  The Order

thereby disregards Congress's intent to "protect the local stations from governmental

interference and control."  *FCC*, 468 U.S. at 369.  It also violates the First Amendment

rights of these public broadcasters and the concomitant right of their listeners to receive

information that local stations choose to air.

First, amici agree with Plaintiffs that the Order violates the First Amendment

because it aims to harm NPR specifically because of the content of NPR's prior

reporting and what the Administration perceives to be NPR's viewpoint.  *See* Summ. J.

Br. at 29–35.  Simply put, the First Amendment does not allow the government to target

a particular press outlet for punishment "because of disagreement with the message it

21

conveys." *Ward v. Rock Against Racism*, 491 U.S. 781, 791 (1989).  A government's decision to "target[] . . .particular views taken by speakers on a subject" is a "blatant" violation of the First Amendment.  *Rosenberger v. Rector & Visitors of Univ. of Va.*, 515 U.S. 819, 829 (1995).  Yet the revocation of NPR's funding is based on the current Administration's perception that NPR is "biased" and possesses a "left-wing" viewpoint.  *See, e.g., Fact Sheet: President Donald J. Trump Ends the Taxpayer Subsidization of Biased Media, supra* (calling NPR and PBS "left-wing propaganda" and criticizing specific stories); Summ. J. Br. at 10–11.  This discriminatory animus strikes at the heart of free speech and a free press, undermining the central purpose of the First Amendment.  "The government must abstain from regulating speech when the specific motivating ideology or the opinion or perspective of the speaker is the rationale for the restriction."  *Rosenberger*, 515 U.S. at 829.

A news organization's freedom to articulate its views "lies at the core of publishing control," a reflection of a news organization's "untrammeled authority to set standards of workmanship that determine its intrinsic excellence and its quality and public character."  *Newspaper Guild*, 636 F.2d at 560–62, 567 (MacKinnon, J., concurring).

Moreover, the government cannot constitutionally tell NPR, or its Member Stations, what to publish or not publish.  The Supreme Court "has many times held, in many contexts, that it is no job for government to decide what counts as the right balance of private expression—to 'un-bias' what it thinks biased."  *Moody v. NetChoice,*

*LLC*, 603 U.S. 707, 719 (2024).  Rather, a foundational precept of the First Amendment is that government must "leave such judgments to speakers and their audiences."  *Id.* While this requires that society "take the risk that occasionally debate on vital matters will not be comprehensive and that all viewpoints may not be expressed," government censorship is a far graver risk.  *Tornillo*, 418 U.S. at 260 (White, J., concurring).  In *Tornillo*, the Supreme Court unanimously affirmed that the First Amendment forbids governmental interference in the editorial decision-making of the press, striking down a Florida law that attempted to "[c]ompel[] editors or publishers to publish that which reason tells them should not be published."  *Id.* at 256 (citation and internal quotation marks omitted).  The First Amendment requires that news organizations have autonomy in determining what they publish.

In sum, the First Amendment is a "virtually insurmountable barrier" shielding editorial independence.  *Id.* at 259 (White, J., concurring); *see also Passaic Daily News v. NLRB*, 736 F.2d 1543, 1557 (D.C. Cir. 1984); Lucas A. Powe, Jr., *The Fourth Estate and the Constitution* 277 (1992) ("Because editorial autonomy is indivisible, it must be absolute.").  And when it comes to protecting the strength of that barrier, the stakes are high.  Without it, public discourse "would be blunted or reduced" if reporters take "the safe course . . . to avoid controversy."  *Tornillo*, 418 U.S. at 257.  This effect is not difficult to imagine in the context of the Order here.  Were NPR and its Member Stations to find operations unsustainable absent the federal funding that the Order

23

freezes, they would be incentivized to cease dissemination of reporting and content that the President dislikes, or at a minimum slash the funds that can be used to pay for NPR material.  In the worst case, a Member Station would be forced to choose between editorial independence and free speech on the one hand, and continued access to lawfully appropriated federal funds and controlled speech on the other.  It is unconstitutional to impose that choice upon them, particularly because the Order was motivated by prior reporting of topics and views that the President disfavored.

**B.    The Order violates the separation of powers in a manner that is particularly dangerous for freedom of the press.**

The Order's instruction that CPB cease funding to NPR and PBS violates the Constitution's separation of powers, *see* U.S. Const. art. I, § 8, cl. 1, because it seeks to override the Public Broadcasting Act's protections for editorial independence at stations receiving federal funds and invalidate lawful congressional appropriations.  And such interference in Congress's prerogatives poses a particular risk for the editorial freedom of publicly funded media.  "[I]f [Congress's] authority to make law and control spending is to mean anything, it means the President may not disregard a statutory mandate to spend funds 'simply because of policy objections.'"  *Aids Vaccine Advoc. Coal. v. U.S. Dep't of State*, 770 F. Supp. 3d 121, 145 (D.D.C. 2025) (quoting *In re Aiken Cnty.*, 725 F.3d 255, 259 (D.C. Cir. 2013)); *see also City & Cnty. of San Francisco v. Trump*, 897 F.3d 1225, 1235 (9th Cir. 2018) ("[T]he Administration may not redistribute or withhold properly appropriated funds in order to effectuate its own policy goals.").

24

Congress has, through clear and consistent statutory language, insisted that public broadcasters remain outlets for independent journalism, the content of which cannot be dictated by the government.  The Order subverts this goal in two distinct ways:  It targets NPR directly, and it makes NPR Member Stations both a weapon and collateral damage in its effort to suppress speech it does not like.  Because of the freedom Congress has codified, NPR and its Member Stations have earned trust and built reputations that allow their journalists to gather and disseminate news to audiences across the country.  But if any President has the power to revoke funds both to NPR and any local stations that air NPR programs because of stories he does not like—a tactic that forces stations to choose between journalistic independence and financial support—the foundation for that kind of independent journalism is eroded and may be hard to regain.  For many of the NPR Member Stations around the country, that could be a death knell for their local broadcasts.

## CONCLUSION

For the foregoing reasons, amici respectfully urge the Court to grant Plaintiffs' motion for summary judgment.

Dated: June 20, 2025                              Respectfully submitted,

                                                 /s/ Bruce D. Brown
                                                 Bruce D. Brown (D.C. Bar No. 457317)
                                                   *Counsel of Record for Amici Curiae*
                                                 Lisa Zycherman (D.C. Bar No. 495277)
                                                 Gabriel Rottman (D.C. Bar No. 992728)
                                                 Mara Gassmann (D.C. Bar No. 1014532)

Renee M. Griffin (D.C. Bar No. 1766634)
REPORTERS COMMITTEE FOR
 FREEDOM OF THE PRESS
1156 15th Street NW, Ste. 1020
Washington, DC 20005
Telephone: 202.795.9300
bbrown@rcfp.org

*Counsel for Proposed Amici Curiae
Reporters Committee for Freedom of the
Press and 29 NPR Member Stations*

**CERTIFICATE OF COMPLIANCE**

This amici curiae brief complies with the type-volume limit of LCvR 7(o)(4) because it is 25 or fewer pages.

This amici curiae brief complies with the typeface and type-style requirements of LCvR 5.1(d) because it has been prepared in a proportionally spaced typeface using Microsoft Word with Palatino Linotype in size 12 font.

Dated: June 20, 2025                                Respectfully submitted,

                                /s/ Bruce D. Brown
                                Bruce D. Brown
                                (D.C. Bar No. 457317)
                                  *Counsel of Record for Amici Curiae*