**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

NATIONAL PUBLIC RADIO, INC., *et al*.,

                            *Plaintiffs*,

            v.

DONALD J. TRUMP, *et al.*,
                            *Defendants*.

Civil Case No. 25-cv-1674

**FEDERAL DEFENDANTS' RESPONSES TO PLAINTIFFS' STATEMENT**
**OF UNDISPUTED MATERIAL FACTS IN SUPPORT OF**
**PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT**

Pursuant to Local Civil Rule 7 and this Court's Standing Order, Defendants respectfully submit the following responses to Plaintiffs' statements of material facts that are not in genuine dispute.

**I.      National Public Radio**

1.      Founded in 1970, National Public Radio (NPR) is an independent, nonprofit media organization.  Declaration of Daphne Kwon (Kwon Decl.) at 2 (¶ 3).

**Response:  Undisputed.**

2.      NPR is not a public radio station, nor does it operate one.  *Id.*

**Response:  Undisputed.**

3.      NPR produces, acquires, and distributes programming, including national news programming, that is made available to independent locally owned and operated public radio stations around the country. *Id*.

**Response:  Undisputed.**

4.      *All Things Considered*, NPR's flagship news program, is the most listened to

1

afternoon drive-time, news radio program in the country. *Id.* (¶ 4).

**Response:  Undisputed.**

5.      *All Things Considered* and NPR's weekday morning radio news program, *Morning Edition*, draw on reporting from correspondents based around the world, and producers and reporters in locations throughout the United States. *Id.*

**Response:  Undisputed.**

6.      Since 2021, NPR has won a Pulitzer Prize, eight Edward R. Murrow awards, two National Press Club awards, and an Alfred I. duPont-Columbia award for its journalism. *Id.* (¶ 5).

**Response:  Undisputed.**

7.      NPR maintains an editorial firewall intended to protect NPR's newsroom from political and other interference in its editorial decisions. *Id.* at 3 (¶ 6).

**Response:  Undisputed.**

8.      NPR requires all editorial staff—defined as staff members who play a role in shaping the journalistic or creative direction of NPR's content—to adhere to ethics policies set out in the NPR Ethics Handbook, which instructs editorial staff to pursue the core journalistic values of accuracy, fairness, completeness, honesty, independence, impartiality, transparency, accountability, respect, and excellence. *Id.* (¶ 7).

**Response:  Undisputed.**

9.      Among other things, the NPR Ethics Handbook prohibits staff connected with news coverage from making contributions to political campaigns or referendums. *Id.*

**Response:  Undisputed.**

10.      A local public radio station may choose to become an NPR Member station. *Id.* (¶ 10).

2

**Response:  Undisputed.**

11.    NPR currently has 246 Member stations across the country, including in the District of Columbia, U.S. Virgin Islands, and Guam, collectively operating more than 1,000 public radio signals and hundreds of digital platforms. *Id.* at 3-4 (¶ 10).

**Response:  Undisputed.**

12.    NPR Member stations pay a membership "core fee" to license certain NPR content, which may include *Morning Edition*, *All Things Considered*, and *Weekend Edition*. *Id.* at 4 (¶ 11).

**Response:  Undisputed.**

13.    Member stations may also choose to license additional content from NPR such as specific news, talk, entertainment, or music programs.   *Id.*

**Response:  Undisputed.**

14.    Member stations receive other benefits as well, including NPR-led advocacy on behalf of the public radio system, digital services, and music licensing support, among other things. *Id.*

**Response:  Undisputed.**

15.    A Member station's "core fee" is calculated on an individualized basis based on a variety of factors to ensure alignment with the station's revenue. *Id.* (¶ 12).

**Response:  Undisputed.**

16.    A Member station's "core fee" is not based on the amount of federal support that a Member station receives from the Corporation for Public Broadcasting (the Corporation or CPB). *Id.*

**Response:  Undisputed.**

17.     Member stations choose to acquire content from NPR for a variety of reasons, including audience interest, the needs of their local communities, the relative cost of acquiring such programming, especially in comparison to its value to the station and its listeners, and their own journalistic and editorial judgments about the quality of NPR's programming.  *Id.* (¶ 13); Declaration of Tami Graham (Graham Decl.) at 3 (¶ 13); Declaration of Breeze Richardson (Richardson Decl.) at 4 (¶ 16); Declaration of Stewart Vanderwilt (Vanderwilt Decl.) at 3 (¶ 12).

**Response:  Undisputed.**

18.     In many rural areas, NPR Member stations are the only source for reliable emergency information and for free local as well as national news.  Kwon Decl. at 4 (¶ 13).

**Response:  Undisputed.**

A.     **NPR's Management and Operation of the Public Radio Satellite System**

19.     NPR manages and operates the Public Radio Satellite System (PRSS), the satellite and terrestrial content distribution system that serves as the nationwide infrastructure backbone of the public radio system.  Declaration of Badri Munipalla (Munipalla Decl.) at 2 (¶ 5).

**Response:  Undisputed.**

20.     Each year, the PRSS distributes approximately 400,000 hours of news, music, and specialized audience programming to more than 1,200 public radio stations and signals throughout the United States.  *Id.*

**Response:  Undisputed.**

21.     The PRSS's centralized network operations comprise one of the largest and most reliable media distribution systems in the United States.  *Id.* (¶ 6).

**Response:  Undisputed.**

22.    The PRSS's Network Operations Center in Washington, D.C. serves stations and signals throughout the United States that reach about 99 percent of the U.S. population. *Id.*

**Response:  Undisputed.**

23.    The PRSS's synchronized backup network operations center in St. Paul, Minnesota, provides failover capabilities on a different power grid in case of emergencies, enabling up-to-the-moment, live content coverage. *Id.*

**Response:  Undisputed.**

24.    The PRSS relies on a distribution system, ContentDepot®, which uses satellite technology as its primary distribution platform because satellite is currently the most cost-effective and reliable means of delivering high-quality audio programming to a diverse national network of radio stations. *Id.* at 4 (¶ 16).

**Response:  Undisputed.**

25.    Satellite capability enables stations in remote areas without reliable Internet service to provide content to listeners. In some areas, it is the only form of media available. *Id.* at 5 (¶ 16).

**Response:  Undisputed.**

26.    The PRSS is available to all public telecommunications entities including independent producers; program syndicators and distributors; national, state, and local organizations; and public radio stations. *Id.* at 4–5 (¶ 16).

**Response:  Undisputed.**

27.    Stations that receive programming distributed by the PRSS include stations located in remote villages in northern Alaska, in Tribal communities in the Southwest, Guam and the U.S. Virgin Islands, and in major media markets including New York and Los Angeles. *Id.* at 2 (¶ 7).

**Response:  Undisputed.**

28.     PRSS also provides 24/7 technical support for local public radio stations. *Id.* at 5 (¶ 17).

**Response:  Undisputed.**

29.     Many local radio stations have only a few staff members, and do not have anyone on site to troubleshoot problems if the station is having difficulty accessing programming.  When these stations run into problems, they rely on PRSS technical staff to help solve them. *Id.*

**Response:  Undisputed.**

30.     The PRSS plays a vital role in ensuring that essential information reaches all Americans during times of national emergency. *Id.* at 2 (¶ 8).

**Response:  Undisputed.**

31.     It serves 379 public radio stations, including NPR's 246 Member stations, and more than 1,200 radio signals, enabling essential information to reach approximately 99 percent of Americans over the airwaves, including those living in rural or remote communities. *Id.* at 2–3 (¶ 8).

**Response:  Undisputed.**

32.     In the event of a nationwide crisis, the PRSS provides Presidential alerts from the Federal Emergency Management Agency (FEMA) to public radio stations throughout the country. *Id.* at 3 (¶ 8).

**Response:  Undisputed.**

33.     The PRSS has been named as a resource in at least 20 states' emergency plans, and public radio stations are included in more than 35 states' emergency plans. *Id.*

**Response:  Undisputed.**

34.     Each of the public radio stations participating in the PRSS (collectively, the

Interconnected Stations) is a stakeholder in the PRSS's collective assets and a customer of the services the PRSS provides. *Id.* (¶ 9).

**Response: Undisputed.**

35.    Interconnected Stations own their own downlink and uplink equipment. *Id.*

**Response: Undisputed.**

36.    For decades, the Interconnected Stations have designated NPR as the sole entity responsible for managing and operating the PRSS. *Id.* (¶ 10).

**Response: Undisputed.**

37.    CPB has recognized NPR as the system manager responsible for maintaining and developing the PRSS and has provided funding specifically for that purpose. *Id.*

**Response: Undisputed.**

38.    The PRSS is overseen by the Distribution/Interconnection Committee of the NPR Board, which includes both NPR Board members and other representatives of public radio entities. *Id.* (¶ 11).

**Response: Undisputed.**

39.    Because the transmission of radio signals is not dependent upon electricity, radio communication is an important source of emergency information during a natural disaster, severe weather incident, or other emergency. Richardson Decl. at 7 (¶ 30); Graham Decl. at 9 (¶ 37); Vanderwilt Decl. at 8 (¶ 33).

**Response: Undisputed.**

**B.    NPR's Funding Sources**

40.    NPR is funded primarily through sponsorships, donations from individuals and private entities, membership and licensing fees from local public radio stations, direct funding

from the Corporation, and direct funding from other government grants, including grants awarded by the National Endowment for the Arts ("NEA").  Kwon Decl. at 5-6 (¶ 19).

**Response:  Undisputed.**

41.    NPR received approximately $100 million, or approximately 31 percent of its annual operating revenue, through membership fees and the licensing of content to its 246 Member stations and other public radio stations, in Fiscal Year 2024. *Id.* at 6 (¶ 20).

**Response:  Undisputed.**

42.    NPR also receives direct funds through grants from CPB.  For Fiscal Year 2024, it spent approximately $11.1 million in grants from the Corporation for programming and to support the PRSS. *Id.* (¶ 21).

**Response:  Undisputed.**

43.    NPR must apply for such grants from the Corporation and comply with the terms of any applicable grant agreements, including, for example, by producing reports. *Id.*

**Response:  Undisputed.**

44.    As the entity designated by the Interconnected Stations to manage and operate the PRSS, NPR receives funds from the Corporation from a designated fund—the Public Broadcasting Satellite Interconnection Fund—for maintaining and operating the PRSS. *Id.*; Munipalla Decl. at 4 (¶ 12).

**Response:  Undisputed.**

45.    For Fiscal Year 2024, NPR received approximately $6.8 million in grant funding from the Corporation to support the PRSS.  Kwon Decl. 6 (¶ 21).

**Response:  Undisputed.**

46.    NPR's current grant agreement with the Corporation for PRSS funding expires on September 30, 2025.  Munipalla Decl. at 4 (¶ 12).

**Response:  Undisputed.**

47.    Approximately $4.3 million of CPB funding came from competitive grants used, among other things, to provide safety and security for journalists working in war zones, produce content regarding the war in Ukraine, and provide support for local news stations in rural areas. Kwon Decl. at 6 (¶ 21).

**Response:  Undisputed.**

48.    For the past several years, NPR also has received grants from the NEA.  In 2024, NPR was awarded approximately $65,000 in NEA grant funding.  *Id.* (¶ 22).

**Response:  Undisputed.**

## II.    Public Radio Funding

49.    Congress has appropriated $535 million in general funding for the Corporation for Fiscal Years 2025, 2026, and 2027.  *See* Pub. L. No. 117-328, Div. H, tit. IV (for Fiscal Year 2025); Pub. L. No. 118-47, Div. D, tit. IV (for Fiscal Year 2026); Pub. L. No. 119-4, Div. A, tit. I, § 1112 (extending prior appropriations "in the same amount" for Fiscal Year 2027).

**Response:  Undisputed.**

50.    In general, public radio stations may apply for two types of grants from the Corporation.  The first, called "unrestricted" Community Service Grants (CSGs), can be used to fund programming and production, educational outreach, broadcasting, transmission, distribution, and other operational expenses.  The second, called "restricted" CSGs, must be used to acquire or produce programming that is distributed nationally and serves the needs of national audiences. Kwon Decl. at 5 (¶ 16); Graham Decl. at 6 (¶¶ 23–25); Richardson Decl. at 5 (¶¶ 19–22); Vanderwilt Decl. at 4 (¶¶ 17–20).

**Response:  Undisputed.**

51.    NPR Member stations may use restricted CSG funds to acquire NPR content or content from other national producers.  Kwon Decl. at 5 (¶ 17); Graham Decl. at 6 (¶ 25); Richardson Decl. at 5 (¶ 19); Vanderwilt Decl. at 4 (¶ 19).

**Response:  Undisputed.**

52.    Public radio stations may also use restricted CSG funds to produce programming locally and distribute it regionally or nationally.  Kwon Decl. at 5 (¶ 17); Graham Decl. at 6 (¶ 25); Richardson Decl. at 5 (¶ 19); Vanderwilt Decl. at 4 (¶ 19).

**Response:  Undisputed.**

53.    For some local public radio stations in rural or remote areas, CPB grants constitute 50 percent or more of their operating budgets.  Kwon Decl. at 5 (¶ 17).

**Response:  Undisputed.**

54.    In Fiscal Year 2023, 79 radio stations relied on CPB grants for 30 percent or more of their funding.  Grahm Decl. at 6 (¶ 26).

**Response:  Undisputed.**

## III.    The Local Member Stations

### A.    Aspen Public Radio

#### 1.    Background

55.    Aspen Public Radio is an independent, nonprofit corporation that operates a public radio station in Colorado.  Richardson Decl. at 2 (¶ 4).

**Response:  Undisputed.**

56.    Aspen Public Radio is a community licensee, meaning that it is an independent, locally owned and operated broadcaster.  *Id.* at 3 (¶ 10).

**Response:  Undisputed.**

57.     Aspen Public Radio serves rural communities in the Roaring Fork, Crystal, Colorado, Fryingpan, and Eagle River Valleys.  Its coverage area includes Pitkin, Eagle, Garfield, and Pitkin Counties.  *Id.* at 2 (¶ 6).

**Response:  Undisputed.**

58.     On average, Aspen Public Radio serves 18,000 listeners and 30,000 digital users each week, and its weekly newsletter is distributed to more than 5,000 unique email addresses.  *Id.* at 3 (¶ 10).

**Response:  Undisputed.**

59.     Aspen Public Radio broadcasts local news reported by a team of local journalists, as well as over two dozen national public radio programs, including NPR and other distributors of national and international news.  *Id.* at 2 (¶ 5).

**Response:  Undisputed.**

60.     Aspen Public Radio has been an NPR Member station since 1990 and, for most of its existence, NPR programming has been part of the station's broadcast offerings.  *Id.* at 3 (¶ 13).

**Response:  Undisputed.**

61.     Aspen Public Radio's tagline is "NPR News for Aspen and the Valley."  *Id.*

**Response:  Undisputed.**

62.     Aspen Public Radio airs NPR programming because it believes NPR to be a trusted brand and because its audience has repeatedly asked for this programming.  *Id.* at 3–4 (¶ 13).

**Response:  Undisputed.**

63.     Aspen Public Radio broadcasts a total of 92 hours of NPR programming per week, including 12–15 hours per day on weekdays.  *Id.* at 4 (¶ 14).

**Response:  Undisputed.**

64.      Aspen Public Radio pays an individualized "core fee" to NPR that accounts for, among other things, the station's rural audience.  That "core fee" entitles Aspen Public Radio to air certain NPR programming, including NPR's flagship newsmagazines: *Morning Edition*, *All Things Considered*, and *Weekend Edition*. *Id.* (¶ 15).

**Response:  Undisputed.**

65.      In addition, Aspen Public Radio pays programming fees to license additional NPR programming, including *Fresh Air* and *Here & Now*. *Id.*

**Response:  Undisputed.**

66.      Aspen Public Radio chooses which NPR programs to license and broadcast based on it what it believes best fits the needs and interests of the communities it serves. *Id.*

**Response:  Undisputed.**

67.      As an NPR Member station, Aspen Public Radio also has the opportunity to distribute its local reporting through national NPR programming. *Id.* (¶ 13).

**Response:  Undisputed.**

68.      Of Aspen Public Radio's listeners, 82 percent tune in to NPR's *All Things Considered*, 78 percent tune in to NPR's *Morning Edition*, and 60 percent tune in to NPR's *Fresh Air*. *Id.* (¶ 16).

**Response:  Undisputed.**

69.      In addition to the ability to broadcast NPR programming, as an NPR Member station, Aspen Public Radio also receives services from NPR, including fundraising materials and assets, representation in blanket music license negotiations, and data regarding audience insights and analytics. *Id.* (¶ 17).

**Response:  Undisputed.**

12

70. Because Aspen Public Radio covers a rural location, where many residents experience long commute times and where mountain terrain creates frequent cellular dead zones, residents rely on FM radio infrastructure for communicating life-saving information including road closures, mud slides, wildfire threats, and other emergency information. *Id.* at 2 (¶ 7).

**Response: Undisputed.**

71. Aspen Public Radio's fall 2024 listener survey revealed that 86 percent of survey respondents knew to turn to Aspen Public Radio during times of emergency. *Id.* at 7 (¶ 30).

**Response: Undisputed.**

72. Aspen Public Radio distributes approximately 25 emergency signals each year. *Id.*

**Response: Undisputed.**

73. Aspen Public Radio transmits alerts concerning local and regional emergencies using technology supported by the PRSS. *Id.* at 7 (¶ 29).

**Response: Undisputed.**

### 2. Funding

74. Aspen Public Radio's total operating revenue for Fiscal Year 2025 is approximately $1.94 million. *Id.* at 5 (¶ 18).

**Response: Undisputed.**

75. That operating revenue includes approximately $210,000 in CSG funds from the Corporation. *Id.*

**Response: Undisputed.**

76. Funding from the Corporation accounts for approximately 10.8 percent of its most recent budget. *Id.*

**Response: Undisputed.**

77.    Each year, Aspen Public Radio uses restricted CSG funds it receives from the Corporation to help pay the station's "core fee" and programming fees to NPR. *Id.* (¶ 22).

**Response:  Undisputed.**

78.    As an Interconnected station—*i.e.*, a station that uses the PRSS—Aspen Public Radio also receives funds from the Corporation specifically for Interconnection purposes. *Id.* at 7 (¶ 28).

**Response:  Undisputed.**

79.    Aspen Public Radio pays an Interconnected fee to NPR for its management and operation of the PRSS. *Id.*

**Response:  Undisputed.**

### B.    Colorado Public Radio

#### 1.    Background

80.    Colorado Public Radio (CPR) began broadcasting in 1970, originally licensed to the University of Denver. Since 1984, it has operated as an independent, non-profit corporation. Vanderwilt Decl. at 1 (¶ 3).

**Response:  Undisputed.**

81.    CPR is a community licensee, meaning that it is an independent, locally owned and operated broadcaster. *Id.* (¶ 4).

**Response:  Undisputed.**

82.    CPR reaches 90 percent of the Colorado population over the airwaves, including in many rural areas. *Id.* at 1–2 (¶ 4).

**Response:  Undisputed.**

83.    CPR has 142 employees across the state, in Denver, Grand Junction, and Colorado

14

Springs. Its programming—heard on 19 stations and another 20 translators serving small communities—includes 24/7 news, music, and cultural programming. *Id.* at 2 (¶ 4).

**Response: Undisputed.**

84. CPR serves communities in areas including Denver, Vail, Pueblo, Grand Junction, Montrose, Boulder, Glenwood Springs, Fort Collins, Carbondale, and more. Some of the communities it serves, including Rangely and Craig, Colorado, do not have access to other local radio news. *Id.* (¶ 5).

**Response: Undisputed.**

85. On average, CPR serves 499,000 listeners each week. *Id.* (¶ 6).

**Response: Undisputed.**

86. Since 1970, CPR has provided coverage of critical events in Colorado, including the 1999 shooting at Columbine High School, the 2008 Democratic National Convention in Denver, and the Aurora theater shooting in 2012; and launched podcasts covering topics including music, Colorado politics, transportation, music appreciation, and solutions to preserving the resources of the Colorado River. *Id.* (¶ 9).

**Response: Undisputed.**

87. CPR is the only media organization in the State with a full-time journalist in Washington, D.C. devoted to reporting on the work of the Colorado congressional delegation. *Id.* at 2–3 (¶ 9).

**Response: Undisputed.**

88. CPR is also part of a collaboration funded by CPB that has the largest contingent of reporters covering the Colorado Capitol. *Id.* at 3 (¶ 9).

**Response: Undisputed.**

89.     CPR began carrying programming from NPR in 1973 and has been an NPR Member station since 1973. *Id.* (¶ 12).

**Response: Undisputed.**

90.     CPR chooses to include NPR programming because it believes that NPR offers an efficient and trusted way to deliver national and international news directly from communities across the country and around the globe. In CPR's view, NPR programs go beyond daily headlines, sharing stories that inspire, spark curiosity, and highlight the shared human experience. *Id.*

**Response: Undisputed.**

91.     As part of NPR's network of Member stations, CPR's reporting reaches a national audience, helping to inform the American public about Colorado events. *Id.*

**Response: Undisputed.**

92.     CPR News broadcasts 24/7, with 65 hours per week of NPR programming, including on weekends. *Id.* (¶ 13).

**Response: Undisputed.**

93.     NPR news is a significant part of the complete package of programming CPR provides to listeners, which also includes local and regional news coverage. *Id.*

**Response: Undisputed.**

94.     As an NPR Member station, CPR receives services from NPR including fundraising materials and assets, representation in blanket music license negotiations, and data regarding audience insights and analytics. *Id.* (¶ 14).

**Response: Undisputed.**

95.     CPR pays an individualized "core fee" to NPR. That "core fee" entitles CPR to air certain NPR programming, including NPR's flagship newsmagazines *Morning Edition*, *All Things*

*Considered*, and *Weekend Edition*. *Id.* at 4 (¶ 15).

**Response:  Undisputed.**

96.    CPR also pays programming fees to license additional programming, including *Here & Now*, *Fresh Air*, and *Wait Wait . . . Don't Tell Me!*, which are distributed but not produced by NPR. *Id.*

**Response:  Undisputed.**

97.    CPR also regularly broadcasts classical music.  It has the most extensive library of classical music in the state.  It also has a dedicated program called "Colorado Spotlight," through which it interviews and airs performances by local musicians and visiting artists, and it maintains a Performance Studio that hosts artists for on-air performances and interviews.  In addition to classical music, CPR has a channel devoted to new music discovery with a focus on Colorado-based musicians and groups. *Id.* at 3 (¶ 10).

**Response:  Undisputed.**

98.    The PRSS provides the technology through which CPR shares programming with other public radio stations for statewide broadcasts, including political debates, candidate forums, and the Colorado State of the State address. *Id.* at 7 (¶ 32).

**Response:  Undisputed.**

99.    Because radio transmission is not dependent on electricity, CPR is an essential, reliable source of information in the event of a natural disaster, severe weather, or other emergency situation. *Id.* at 8 (¶ 33).

**Response:  Undisputed.**

### 2.    Funding

100.    CPR's total operating revenue for Fiscal Year 2025 is approximately $25 million.

Approximately $1.4 million of that operating revenue comes from CSG funds from the Corporation. Funding from the CPB thus constitutes approximately six percent of CPR's budget for 2025. *Id.* at 4 (¶ 16).

**Response: Undisputed.**

101.    Each year, CPR uses restricted CSG funds it receives from the Corporation to help pay the station's "core fee" and programming fees to NPR. *Id.* (¶ 20).

**Response: Undisputed.**

102.    As an Interconnected station, CPR receives funds from the Corporation specifically for Interconnection purposes. *Id.* at 7 (¶ 30).

**Response: Undisputed.**

103.    CPR pays an Interconnected fee to NPR for its management and operation of the PRSS. *Id.*

**Response: Undisputed.**

    **C.    KSUT Public Radio**

        **1.    Background**

104.    KSUT Public Radio was founded by the Southern Ute Indian Tribe in 1976, and has been an independent, non-profit corporation since 1986. Graham Decl. at 1 (¶ 3).

**Response: Undisputed.**

105.    Since 1998, KSUT has broadcast two programming services tailored for Tribal and non-Tribal listeners—Tribal Radio and Four Corners Public Radio—from studios in Ignacio, Colorado. *Id.*

**Response: Undisputed.**

106.    KSUT serves 14 communities in the Four Corners, including Durango, Silverton,

Cortez, Mancos, and Pagosa Springs, Colorado; Aztec, Bloomfield and Farmington, New Mexico; and four distinct Federally Recognized Tribes: the Southern Ute Indian Tribe, Ute Mountain Ute Tribe, and portions of the Navajo Nation and Jicarilla Apache Nation. *Id.* at 2 (¶ 14).

**Response:  Undisputed.**

107.    For 11 years in a row, KSUT has been voted best radio station (commercial or noncommercial) by *Durango Herald* readers. *Id.* at 8 (¶ 34).

**Response:  Undisputed.**

108.    KSUT has eleven full-time staff members and six part-time staff members. *Id.* at 2 (¶ 5).

**Response:  Undisputed.**

109.    KSUT is both a rural and a minority-owned community licensee, *i.e.*, an independent, locally owned and operated broadcaster. *Id.* (¶ 7).

**Response:  Undisputed.**

110.    KSUT serves a large and diverse area of the country.  It operates nine tower sites and its signals cover, over the airwaves, approximately 27,000 square miles, giving it a potential listening audience of approximately 250,000. *Id.* (¶ 8).

**Response:  Undisputed.**

111.    KSUT's broadcast coverage area is mostly rural.  Large portions of that coverage area, including those portions of the Ute Mountain Ute Tribe, Navajo Nation, and Jicarilla Apache Nation, have very limited access to broadband service. *Id.* (¶ 9).

**Response:  Undisputed.**

112.    KSUT's service is particularly critical for those communities, especially when it

comes to access to emergency information. *Id.*

**Response:  Undisputed.**

113.    For most of its broadcast coverage area, KSUT is the only public radio station available. *Id.* (¶ 10).

**Response:  Undisputed.**

114.    KSUT is one of only a handful of sources of local and regional news and information, including local newspapers, within its coverage area.  For some portions of its coverage area, KSUT is the only source of local and regional news. *Id.* at 2–3 (¶ 10).

**Response:  Undisputed.**

115.    KSUT broadcasts 24 hours a day, seven days a week, through its two complementary programming services. *Id.* at 3 (¶ 12).

**Response:  Undisputed.**

116.    KSUT airs news, music, and other programming, including original programming and national programming produced by NPR, American Public Media (APM), Public Radio International (PRX), and Native Voice 1 (NV-1). *Id.*

**Response:  Undisputed.**

117.    KSUT has been an NPR Member station since 1984. *Id.* (¶ 13).

**Response:  Undisputed.**

118.    KSUT chooses to include NPR programming among the slate of programs it broadcasts because it believes that NPR programming is affordable and of high quality, and it resonates with its listeners. *Id.*

**Response:  Undisputed.**

119.    As an independent public radio station, KSUT exercises editorial judgment to

20

choose what to put on air, and it chooses to air NPR programming based on its assessment of the value it brings to listeners and KSUT. *Id.*

**Response: Undisputed.**

120.    KSUT pays an individualized "core fee" to NPR that accounts for, among other things, its rural audience. That "core fee" entitles KSUT to air certain NPR programming, including NPR's flagship newsmagazines: *Morning Edition*, *All Things Considered*, and *Weekend Edition. Id.* at 4 (¶ 15).

**Response: Undisputed.**

121.    In addition, KSUT pays programming fees to license additional NPR programming, including *Fresh Air*, *Here & Now, Jazz Night in America,* and *Wait Wait . . . Don't Tell Me!. Id.*

**Response: Undisputed.**

122.    KSUT chooses which NPR programs to license and broadcast based on what it believes best fits the needs and interests of the communities it serves. *Id.*

**Response: Undisputed.**

123.    In addition to the ability to broadcast NPR programming, as an NPR Member station, KSUT also receives services from NPR, including fundraising materials and assets, representation in blanket music license negotiations, and data regarding audience insights and analytics. *Id.* (¶ 16).

**Response: Undisputed.**

124.    On weekdays, NPR programming accounts for seven hours of the content aired daily on Four Corners Public Radio. On weekends, Four Corners Public Radio broadcasts three to four hours of NPR programming. *Id.* (¶ 17).

**Response: Undisputed.**

125.    Tribal Radio offers 46 hours of original programming each week, including news, public affairs programs, cultural information, Native American traditional and contemporary music, special Tribal meetings, interviews with elected Tribal officials, and Ignacio High School Sports, and simulcasts Four Corners Public Radio the remainder of the time. *Id.*

**Response:  Undisputed.**

126.    Tribal Radio broadcasts NPR's newsmagazines *Morning Edition* and *All Things Considered*, among other content simulcast on Four Corners Public Radio. *Id.*

**Response:  Undisputed.**

127.    KSUT has heard from listeners that they appreciate being able to listen to NPR news on KSUT. *Id.* at 5 (¶ 18).

**Response:  Undisputed.**

128.    In addition to providing listeners with local news from the Four Corners region, KSUT is also part of Rocky Mountain Community Radio, the Capitol News Alliance, and the Mountain West News Bureau. *Id.* (¶ 20).

**Response:  Undisputed.**

129.    Rocky Mountain Community Radio is a coalition of 21 stations, mostly in Colorado, that share news content and editorial and reporting resources, including a full-time climate reporter for the region. *Id.*

**Response:  Undisputed.**

130.    As a small public radio station with limited staff and resources, collaborations like Rocky Mountain Community Radio are critical to enabling KSUT to provide its listeners with free access to local and regional news. *Id.*

**Response:  Undisputed.**

131.    NPR's national reporting draws from the local and regional journalism of NPR Member stations like KSUT and collaborations like Rocky Mountain Community Radio.  This relationship brings stories about KSUT's communities to a national audience.  *Id.* (¶ 21).

**Response:  Undisputed.**

132.    KSUT distributes approximately 75 emergency signals each year.  *Id.* at 9 (¶ 37).

**Response:  Undisputed.**

133.    Because KSUT serves such a vast, and mostly rural, area of the country, its broadcasting of emergency alerts and information can be indispensable.  *Id.* (¶ 38).

**Response:  Undisputed.**

134.    If there is dangerous flash flooding in a remote portion of the Navajo Nation, KSUT is likely the only place to learn about it in a timely fashion.  *Id.*

**Response:  Undisputed.**

135.    Wildfires are a common emergency in the Four Corners.  KSUT work closely with regional emergency services to provide listeners with timely, accurate information in the event of a wildfire or other emergency.  *Id.* at 9–10 (¶ 39).

**Response:  Undisputed.**

136.    During the devastating Missionary Ridge Fire in 2002, which burned for more than a month, KSUT was a source for road closures and evacuation information.  *Id.* at 10 (¶ 39).

**Response:  Undisputed.**

137.    KSUT transmits alerts concerning local and regional emergencies using technology supported by the PRSS.  *Id.* at 9 (¶ 37).

**Response:  Undisputed.**

## 2.    Funding

138.    KSUT's operating revenue for Fiscal Year 2025 is approximately $1.67 million. *Id.* at 5 (¶ 22).

**Response:  Undisputed.**

139.    The majority of KSUT's revenue comes from private support, with donations from listeners accounting for approximately 27 percent of its annual budget. *Id.* at 5-6 (¶ 22).

**Response:  Undisputed.**

140.    Federal funding, in the form of CSGs from the Corporation, is approximately 20 percent of KSUT's annual budget. *Id.* at 6 (¶ 22).

**Response:  Undisputed.**

141.    In 2025, KSUT received $333,000 in grant funds from the Corporation. *Id.*

**Response:  Undisputed.**

142.    Each year, KSUT uses restricted CSG funds it receives from the Corporation to help pay the station's "core fee" and programming fees to NPR. *Id.* (¶ 25).

**Response:  Undisputed.**

143.    As an Interconnected station, KSUT receives funds from the Corporation specifically for Interconnection purposes. *Id.* at 8 (¶ 36).

**Response:  Undisputed.**

144.    KSUT pays an Interconnected fee to NPR for its management and operation of the PRSS. *Id.*

**Response:  Undisputed.**

## IV.    Executive Order 14290

### A.    Background

145.    On January 26, 2020, President Trump re-tweeted and labeled "[a] very good

24

question!" a social media post asking: "Why does NPR still exist? We have thousands of radio stations in the U.S. Plus Satellite radio. Podcasts. Why are we paying for this big-government, Democrat Party propaganda operation." Declaration of Katie Townsend (Townsend Decl.) at 1-2 (¶ 4).

**Response: Undisputed.**

146. On March 25, 2025, President Trump announced in a press conference that he would "love to" defund NPR and PBS because of his belief that they are "biased."[1]

**Response: Undisputed.**

147. On March 27, 2025, President Trump wrote on social media: "NPR and PBS, two horrible and completely biased platforms (Networks!), should be DEFUNDED by Congress, IMMEDIATELY. Republicans, don't miss this opportunity to rid our Country of this giant SCAM, both being arms of the Radical Left Democrat Party. JUST SAY NO AND, MAKE AMERICA GREAT AGAIN!!!" Townsend Decl. at 2-3 (¶ 6).

**Response: Undisputed.**

148. On April 1, President Trump wrote on social media: "REPUBLICANS MUST DEFUND AND TOTALLY DISASSOCIATE THEMSELVES FROM NPR & PBS, THE RADICAL LEFT 'MONSTERS' THAT SO BADLY HURT OUR COUNTRY!" *Id.* at 3 (¶ 7).

**Response: Undisputed.**

149. On April 10, 2024, President Trump wrote on social media: "NO MORE FUNDING FOR NPR, A TOTAL SCAM! … THEY ARE A LIBERAL DISINFORMATION MACHINE. NOT ONE DOLLAR!!!" *Id.* at 2 (¶ 5).

---

[1] Ali Bianco & John Hendel, DOGE's next target: NPR and PBS, Politico (Mar. 26, 2025), https://www.politico.com/news/2025/03/26/doge-npr-pbs-hearing-00004556.

**Response:  Undisputed.**

150.    On April 15, 2025, OMB Director Russell Vought stated during an interview that NPR's journalism "is worse than" "left-wing indoctrination," and accused NPR of "dividing on the basis of wokeism."[2]

**Response:  Undisputed.**

151.    On April 28, 2025, the White House's Deputy Director of Presidential Personnel sent an email to three CPB Board members stating that they were immediately terminated.[3]

**Response:  Undisputed.**

152.    In response, the Board filed suit.[4]  On June 8, 2025, the Court denied the Board's motion for a preliminary injunction.[5]

**Response:  Undisputed.**

153.    In support of the President's purported firing of three of CPB Board's five members, the Executive Branch has taken the position that the President has the power to remove CPB Board members.[6]

**Response:  Undisputed.**

154.    In the CPB litigation, counsel for the government did not concede that the President lacked the power to install new Board members without the advice and consent of the Senate, as is required by the Act.[7]

---

[2] Frances Vinall, et al., Trump administration will ask Congress to cut funding for NPR and PBS, Washington Post (Apr. 15, 2025), https://www.washingtonpost.com/style/2025/04/15/nprpbs-funding-trump-administration/.
[3] *See* Complaint ¶ 35, *CPB v. Trump*, Dkt. 1.
[4] *Id.*
[5] *CPB v. Trump*, Dkt.   .
[6] *See generally* Opp. to Mot. for Temporary Restraining Order, *CPB v. Trump*, Dkt. 11.
[7] Transcripts, *CPB v. Trump*, Dkt. _ at 11–12; Dkt. _ at 47–49.

**Response:** This statement characterizes colloquies between the Court and Government counsel in *CPB v. Trump*. Defendants respectfully refer the Court to the transcripts of the two hearings in that case, and dispute this statement to the extent it or any portions of it are inconsistent with those transcripts. *See CPB v. Trump*, Tr. 11-12 (Apr. 29, 2025); *CPB v. Trump*, Tr. 47-49 (May 14, 2025).

### B.    The Executive Order and Accompanying Materials

155.    On May 1, 2025, President Trump issued Executive Order 14290, titled "Ending Taxpayer Subsidization of Biased Media" (the Order).[8]

**Response:  Undisputed.**

156.    The Order states that NPR and PBS do not "present[] a fair, accurate, or unbiased portrayal of current events" and that the Order will "ensure that Federal funding does not support biased and partisan news coverage." Order §§ 1, 2(a).

**Response:  Undisputed.**

157.    Section 1 states that "[w]hich viewpoints NPR and PBS promote does not matter. What does matter is that neither entity presents a fair, accurate, or unbiased portrayal of current events to taxpaying citizens." *Id.* §1.

**Response:  Undisputed.**

158.    Section 2 states that "The CPB Board shall cease direct funding to NPR and PBS," including both "existing direct funding" and "future funding." *Id.* §2(a).

**Response:  Undisputed.**

159.    Section 2 states that "The CPB Board shall cease indirect funding to NPR and PBS, including by ensuring that [local public stations] do not use Federal funds for NPR and PBS." *Id.*

---

[8] 90 Fed. Reg. 19415.

§2(b).

**Response:  Undisputed.**

160.    Section 2 instructs the CPB Board, by "June 30, 2025," to revise its 2025 Eligibility Criteria "to prohibit direct or indirect funding of NPR and PBS." *Id.*

**Response:  Undisputed.**

161.    Section 2 instructs CPB's Board to "prohibit [local stations that receive CSGs] from funding NPR or PBS after the date of this order." *Id.*

 **Response:  Undisputed.**

162.    Section 2 directs CPB's Board to "take all other necessary steps to minimize or eliminate its indirect funding of NPR and PBS." *Id.*

**Response:  Undisputed.**

163.     Section 3 directs "[t]he heads of all agencies" to "identify and terminate, to the maximum extent consistent with applicable law, any direct or indirect funding of NPR and PBS." *Id.* §3(a).

**Response:  Undisputed.**

164.    Section 3 instructs agency heads to identify any funding not terminated and "determine whether NPR and PBS are in compliance with the terms of th[e funding] instruments." *Id.* §3(b).

**Response:  Undisputed.**

165.    Section 3 states that "[i]n the event of a finding of noncompliance, the head of the relevant agency shall take appropriate steps under the terms of the instrument." *Id.*

**Response:  Undisputed.**

166.    The Order was accompanied by a "Fact Sheet" and Press Release further explaining

the Order's basis and purpose.[9]

**Response:  Undisputed.**

167.    The "Fact Sheet" states that "NPR and PBS have fueled partisanship and left-wing propaganda with taxpayer dollars, which is highly inappropriate."  It lists several articles and editorial decisions as examples, such as NPR's coverage of the Covid-19 pandemic.[10]

**Response: Undisputed.**

168.    The "Fact Sheet" states that stories run by NPR "one-sided[ly]" "address racism"; "defend[] looting"; "insist[] COVID-19 did not originate in a lab"; and feature "queer animals" on Valentine's Day.[11]

**Response:**  Defendants cannot respond as the sentence after the word "NPR" appear to be missing either a verb or adverb or both.

169.    The Fact Sheet criticizes NPR for stories it "refused to cover."[12]

**Response:**  This statement characterizes all or part of the Fact Sheet.  Defendants respectfully refer the Court to the content of the Fact Sheet, and dispute this statement to the extent it or any portions of it are inconsistent with those in that Sheet.

170.    The "Fact Sheet" states that "Democrats out-numbered Republicans" among NPR's newsroom editorial staff.

**Response:**  Defendants cannot respond as the sentence after the word "Republicans" appear to be missing either a verb or adverb or both.

---

[9] "Fact Sheet: President Donald J. Trump Ends Taxpayer Subsidization of Biased Media" (May 1, 2025), https://www.whitehouse.gov/fact-sheets/2025/05/fact-sheet-president-donald-j-trump- ends-the-taxpayer-subsidization-of-biased-media/.
[10] *Id.*
[11] *Id.*
[12] *Id.*

171.    The Press Release states that NPR spreads "radical, woke propaganda," describes NPR's reporting as "trash," and contains, as "examples of the trash," nineteen bullets and sub-bullets listing specific NPR articles, statements, and editorial decisions.[13]

**Response:  Disputed**.  The bullets are more than nineteen.

172.    Some of these examples are about stories that, according to the document, "NPR refused to cover."[14]

**Response:  Undisputed.**

## V.    Effects of the Executive Order on NPR

173.    One day after President Trump issued the Order, NPR received via email a notice that NEA was terminating a grant awarded to NPR.  Kwon Decl. at 7 (¶ 25); *see* Ex. A, Kwon Decl.

**Response:   Undisputed.**   And for additional material facts, *see* Defendants' Statement of Undisputed Material Facts filed with their cross-motion for summary judgment.

174.    Without federal funding, including funding provided directly by the Corporation and funding provided indirectly through Member stations, NPR would have to take significant measures to cut its expenditures.  These measures could include eliminating or scaling back certain coverage areas, such as the war in Ukraine, and laying off staff or terminating existing positions. *Id.* (¶ 28).

**Response:  Disputed.**  Plaintiffs admit that its operating budget consists of other sources thereby challenging the notion NPR would have to eliminate certain coverage areas.    Pls. Mem., ECF. 21-1 at p. 17 of 56.

---

[13] Press Release, "President Trump Finally Ends the Madness of NPR, PBS" (May 2, 2025), available at https://www.whitehouse.gov/articles/2025/05/president-trump-finally-ends-the- madness-of-npr-pbs/.
[14] *Id.*

175.    The loss of federal funding would affect the quality, depth, and breadth of news coverage and the amount of content provided to Member stations by NPR. *Id.*

**Response:  Undisputed.**

176.    If the quality of NPR's news coverage and other programming declines because of a loss of federal funding, this would put downward pressure on all of NPR's other revenue streams, including by jeopardizing our relationships with Member stations, listeners and supporters. *Id.* at 7-8 (¶¶ 29, 31).

**Response:  Undisputed.**

177.    A loss of federal funding would jeopardize NPR's ability to produce and distribute programs like *Morning Edition* and *Tiny Desk Radio* to local public radio stations around the country. *Id.* at 8 (¶ 31).

**Response:  Undisputed.**

178.    NPR news and other programming is the product of decades of credibility-building, editorial rigor, and community trust. *Id.*; Graham Decl. at 5 (¶ 18); Richardson Decl. at 3–4 (¶ 13); Vanderwilt Decl. at 3 (¶ 12).

**Response:  Undisputed.**

179.    If NPR were forced to reduce or eliminate news coverage, it would lose the confidence of its Member stations, other public radio stations that air NPR programming, listeners, and supporters.  Kwon Decl. at 8 (¶ 31).

**Response:  Undisputed.**

180.    If forced to reduce or eliminate news coverage and other programming, NPR expects to lose millions of listeners and supporters—suffering irremediable institutional damage. *Id.*

31

**Response:  Undisputed.**

181.    Kwon understands that the Order, by basing its directives on the content and perceived viewpoints expressed in NPR's news and other programming, puts NPR on notice that it must adapt its journalistic and editorial choices to suit the government's preferences if it is ever to receive federal funding again. *Id.* at 9 (¶ 35).

**Response:  Undisputed.**

182.    NPR relies on CPB grant funding specifically designated to support the maintenance and operation of the PRSS.  Kwon Decl. at 6 (¶ 21); Munipalla Decl. at 4 (¶ 15).

**Response:  Undisputed.**

183.    If NPR is unable to receive that funding, NPR's ability to maintain and operate the PRSS will be seriously compromised.  The loss of all direct funding for the PRSS would be crippling for the PRSS.  Kwon Decl. at 9 (¶ 33); Munipalla Decl. at 4 (¶ 15).

**Response:  Undisputed.**

184.    The Corporation agrees that if the PRSS Interconnection Grant is not extended, the impact could be "catastrophic."  Reply at 20, *CPB v. Trump*, Dkt. 12.

**Response:  Undisputed.**

185.    The PRSS cannot be easily or inexpensively replaced by federal government or state-level systems or commercial entities.  Munipalla Decl. at 5 (¶ 18).

**Response:  Undisputed.**

186.    Without PRSS and its interconnected stations, entire communities across the country would be vulnerable during national disasters, blackouts, and other emergencies. *Id.* (¶ 19).

**Response:  Undisputed.**

187.    The PRSS provides Presidential-level alerts to stations in the event of a national

emergency. *Id.*

**Response:  Undisputed.**

188.    The PRSS also equipped some stations with the technology to provide local and regional text alerts on smart devices—including phones, car radios and tablets—that can be synchronized with local and regional broadcast alerts.  Local stations have used that capability to, for example, provide updates related to tornadoes, hurricanes, and wildfires.  Many local stations rely on PRSS to maintain and update this technology.  If PRSS lost its funding, these systems would degrade. *Id.*

**Response:  Undisputed.**

189.    On May 28, 2025, President Trump formally requested that Congress rescind the entirety of the $1.1 billion that it has allocated to CPB for Fiscal Years 2026 and 2027.[15]

**Response:  Undisputed.**

190.    On June 12, 2025, the House of Representatives narrowly approved that request by a vote of 214-212.  Just prior to the vote, President Trump posted on social media that "[f]or decades, Republicans have promised to cut NPR, but have never done it, until now," and urged "every single Republican in Congress" to "vote 'YES.' MAKE AMERICA GREAT AGAIN!" Townsend Decl. at 3 (¶ 8).

**Response:  Undisputed.**

**VI.    Effects of the Order on the Local Member Stations**

  **A.    Aspen Public Radio**

---

[15] *See* Rescission Proposal No. R25-21, "Report Pursuant to Section 1012 of the Congressional Budget and Impoundment Control Act of 1974 (2 U.S.C. 683)" (May 28, 2025), available at https://www.whitehouse.gov/wp-content/uploads/2025/03/Proposed-Rescissions-of-Budgetary-Resources.pdf.

191.    Aspen Public Radio's Executive Director, Breeze Richardson, understands the Order to be sending a message that the government disapproves of NPR and will seek to retaliate against NPR as well as Member stations like Aspen Public Radio that choose to air NPR's programming.  Richardson Decl. at 5 (¶ 23).

**Response:  Undisputed.**

192.    The threat of further retaliation has already affected Aspen Public Radio's operations.  Among other things, it has occupied the time of the Board and legal counsel, and Richardson has had to address concerns about the possibility of further retaliation voiced by listeners and supporters of Aspen Public Radio.  *Id.* at 5–6 (¶ 23).

**Response:  Undisputed.**

193.    If barred from using CSG funds for NPR programming, Aspen Public Radio could potentially use its restricted CSG funds to pay for other national programming, but its ability to shift all those funds toward that purpose would depend from year to year on the fees set by NPR and by other national content producers and on the mix of programming the station chooses to air. *Id.* at 6 (¶ 24).

**Response:  Undisputed.**

194.    The Order's restriction on the use of CSG funds would constrain the station's editorial choices if, for example, it chooses to license a greater proportion of NPR programming as compared to other national programming, or if NPR's price structure were to shift.  *Id.*

**Response:  Undisputed.**

195.    If the Order's restriction on the use of CSG funds is applied to all Member stations, that will likely impact NPR's ability to offer the same high-quality news and other programming for the same amount that Aspen Public Radio currently pays. *Id.*

**Response:  Undisputed.**

196.    A change in fee structure for the NPR programming the station currently airs would significantly disrupt Aspen Public Radio's budget and could require it to use revenue for national programming that is currently being used to support the employment of local reporters, the production of special events, and the acquisition of professional services.  *Id.*

**Response:  Undisputed.**

197.    If Aspen Public Radio were no longer able to air NPR programming, it would lose listeners.  *Id.* (¶ 26).

**Response:  Undisputed.**

198.    Aspen Public Radio listeners place a high value on receiving content from NPR specifically, and its brand is deeply connected with NPR.  *Id.* (¶ 25).

**Response:  Undisputed.**

199.    Losing listeners would harm Aspen Public Radio's ability to fundraise—leaving it with even fewer resources to dedicate to local news, community information, and staff salaries. *Id.*

**Response:  Undisputed.**

200.    Aspen Public Radio airs a significant number of hours of NPR programming during the week.  As a small public radio station, it lacks the resources to produce content that would fill that airtime on its own.  *Id.* at 7 (¶ 27).

**Response:  Undisputed.**

201.    Because Aspen Public Radio serves rural and mountainous areas of the country, radio broadcasts are sometimes the only way for first responders to communicate life-saving information to impacted residents during a time of disaster.  *Id.* (¶ 31).

**Response:  Undisputed.**

**B.    Colorado Public Radio**

202.    Stewart Vanderwilt, CPR's CEO, understands the Order to be sending a clear, unmistakable message that the government disapproves of NPR and will seek to use all available levers to retaliate against NPR and its member stations.  Vanderwilt Decl. at 5 (¶ 22).

**Response:  Undisputed.**

203.    Vanderwilt understands the Order to send the message that if CPR associates with or airs programming from NPR or any other organization of which the Administration disapproves, CPR could be retaliated against, including through a loss of funding. *Id.*

**Response:  Undisputed.**

204.    In Fiscal Year 2025, CPR received approximately $400,000 in restricted CSG funds to be spent on national programming. *Id.* (¶ 24).

**Response:  Undisputed.**

205.    CPR has a tight budget and relies on restricted CSG funds to cover a significant portion of its national programming. *Id.*

**Response:  Undisputed.**

206.    Currently, almost all the money CPR spends on national programming is spent on NPR content. *Id.*

**Response:  Undisputed.**

207.    In FY 2025, CPR budgeted approximately $2.24 million on national programming, and only around $340,000 for non-NPR programming. *Id.*

**Response:  Undisputed.**

208.    If CPR cannot use restricted CSG funds for NPR membership and programming fees, it will have less money for NPR programming and would need to substitute other national

programming that it would otherwise not have chosen to air. *Id.*

**Response:  Undisputed.**

209.    CPR has not identified a robust source of national and international news with the scale and scope offered by NPR. *Id.* at 6 (¶ 25).

**Response:  Undisputed.**

210.    Other national programming is significantly more expensive to license than NPR programming. *Id.*

**Response:  Undisputed.**

211.    If the Order is enforced, then to economize, CPR may need to purchase fewer NPR or other national programs and repeat them more often, creating a less comprehensive experience for audiences. *Id.*

**Response:  Undisputed.**

212.    Even if CPR could segregate funds to use other sources of funding for NPR programs, this would place administrative burdens on CPR staff and could lead to eliminating non-NPR programs, which would reduce access to a wider variety of programs and voices. *Id.* (¶ 26).

**Response:  Undisputed.**

213.    If CPR were no longer able to air NPR programming or had to reduce the amount of NPR programming it airs it would likely lose listeners. *Id*. (¶ 27).

**Response:  Undisputed.**

214.    A loss of listeners could significantly harm CPR's ability to fundraise, including to support local programming. *Id.*

**Response:  Undisputed.**

215.    If CPR were ultimately to lose its federal funding, it would likely lose employees

and its ability to provide real-time news and local cultural coverage would be reduced. This would impact CPR's local service in communities across the state. *Id.* (¶ 28).

**Response:  Undisputed.**

216.    A loss of federal funding would also have significant negative impacts on CPR's ability to support its infrastructure and air its music programming.  *Id.* at 7 (¶ 29).

**Response:  Undisputed.**

### C.    KSUT

217.    KSUT Executive Director Tami Graham understands the order to be sending a clear message that the government officially disapproves of NPR's programming and that it will take steps to retaliate not only against NPR, but against Member stations like KSUT that choose to associate with NPR and to air NPR's content.  Graham Decl. at 7 (¶ 27).

**Response:  Undisputed.**

218.    While KSUT does not wish to disassociate itself from NPR, the threat of further retaliation from the government has caused it to seek legal advice and to question whether it should continue to air NPR programming.  *Id*.

**Response:  Undisputed.**

219.    If KSUT were no longer able to use CSG funds it receives from the Corporation to help pay the station's "core fee" and programming fees to NPR, KSUT may not be able to continue to acquire and air NPR programming. *Id.* (¶ 28).

**Response:  Undisputed.**

220.    For Fiscal Year 2025, CSG funds are approximately 20 percent of KSUT's annual budget.  In Fiscal Year 2025, KSUT received $80,678 in restricted CSG funds to be spent on national programming.  It relies on these restricted funds to cover most of the national

programming it airs. Currently, most of those funds are spent on NPR programming; it has budgeted to spend only approximately $29,000, total, on non-NPR nationally distributed radio programming this year. *Id*. (¶¶ 22, 29).

**Response: Undisputed.**

221.    If KSUT cannot use restricted CSG funds for NPR membership and programming fees, it will have far less money for NPR programming and would need to substitute other national programing that it would have otherwise not chosen to air. *Id.* (¶ 29).

**Response: Undisputed.**

222.    KSUT airs a significant number of hours of NPR programming during the week. As a small public radio station, it lacks the resources to produce content that would fill that airtime on its own. *Id.* (¶ 30).

**Response: Undisputed.**

223.    If KSUT cannot use restricted CSG funds for NPR membership and licensing fees, even if KSUT could still afford to continue to be an NPR Member station, it would very likely need to reduce the amount of NPR programming it airs. *Id.* at 8 (¶ 30).

**Response: Undisputed.**

224.    While KSUT would attempt to fundraise in order to remain an NPR Member station and to license NPR programming, it would be challenging to raise those funds. *Id*. (¶ 31).

**Response: Undisputed.**

225.    If KSUT were no longer able to air NPR programming, Graham expects that it would lose listeners. *Id*. (¶ 34).

**Response: Undisputed.**

226.    A loss of listeners would have a significant, negative impact on KSUT's ability to

fundraise. That, in turn, would leave KSUT with fewer resources to dedicate to local news and community information. *Id.*

**Response: Undisputed.**

227.   Even if KSUT were able to raise enough non-federal funds to continue to acquire and air NPR programming, it would incur administrative burdens and costs associated with segregating those funds from the CSG funds it receives from the Corporation. *Id.* (¶ 32).

**Response: Undisputed.**

228.   From KSUT's perspective, there is no equivalent to NPR programming on a national scale. *Id.* (¶ 33).

**Response: Undisputed.**

229.   If KSUT were forced to obtain national programming from other sources, it would cost the station considerably more. *Id.*

**Response: Undisputed.**

230.   If KSUT were no longer able to be an NPR Member station, it would also lose other benefits it depends on, including NPR's representation of Member stations in blanket music license negotiations. There is little possibility that KSUT, on its own, could afford the music licensing fees required for its current music programming. *Id.* at 8–9 (¶ 35).

**Response: Undisputed.**


Pursuant to this Court's Standing Order, 10.d.vi., Defendants add this information to their responses to statements numbered 145 through 154 and 156 through 165:

- The Executive Order's statements directed to CPB accompany the qualifier "to the extent permitted by … applicable law. *See* 90 Fed. Reg. 19415, § 2(b).

- The Executive Order's statements directed to the heads of all agencies accompany the qualifying clause "to the maximum extent consistent with applicable law."  *See* 90 Fed. Reg. 19415, § 3(a).

- The Executive Orders section called "General Provisions" contains this provision:  "This order shall be implemented consistent with applicable law and subject to the availability of appropriations."  *See* 90 Fed. Reg. 19415, § 3.


July 11, 2025

                                                    Respectfully submitted,


                                                    BRETT A. SHUMATE
                                                    Assistant Attorney General

                                                    YAAKOV M. ROTH
                                                    Principal Assistant Attorney General
                                                    Civil Division

                                                    ERIC HAMILTON
                                                    Deputy Assistant Attorney General

                                                    SEAN SKEDZIELEWSKI
                                                    Counsel to the Assistant Attorney General

                                                    JOSEPH E. BORSON
                                                    Assistant Branch Director


                                                    */s/ Carmen M. Banerjee*
                                                    CARMEN M. BANERJEE
                                                    (D.C. Bar #497678)
                                                    Trial Attorney
                                                    United States Department of Justice
                                                    Civil Division, Federal Programs Branch
                                                    1100 L Street NW
                                                    Washington, DC 20530
                                                    Tel: (202) 514-3183
                                                    Fax: (202) 616-8460
                                                    Email: carmen.m.banerjee2@usdoj.gov

                                                    *Counsel for the Federal Defendants*