**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

|  |  |
|---|---|
| NATIONAL PUBLIC RADIO, INC., *et al.*,<br><br>    *Plaintiffs,*<br><br>    v.<br><br>DONALD J. TRUMP, in his official capacity as President of the United States *et al.*,<br><br>    *Defendants.* | Case No. 1:25-cv-01674-RDM |

## FEDERAL DEFENDANTS' MEMORANDUM OF LAW IN SUPPORT OF THEIR MOTION FOR SUMMARY JUDGMENT AND IN OPPOSITION TO PLAINTIFFS' MOTION

# TABLE OF CONTENTS

INTRODUCTION ............................................................................................................1

BACKGROUND ...........................................................................................................3

I.      STATUTORY BACKGROUND..........................................................................3

        A.      CPB and the Public Broadcasting Act .......................................................3

        B.      The National Foundation on the Arts and Humanities Act of 1965 ...........5

        C.      The Appropriations Acts.............................................................................5

II.     Factual Background ...........................................................................................5

III.    Procedural Background.......................................................................................7

LEGAL STANDARD.....................................................................................................7

ARGUMENT .................................................................................................................7

I.      PLAINTIFFS' CLAIMS ARE NOT RIPE FOR REVIEW....................................7

II.     PLAINTIFFS' CONSTITUTIONAL CLAIMS FAIL. ...........................................9

        A.      Plaintiffs' First Amendment Claims Fail Because the Government
                Has Broad Powers to Choose How to Distribute Funding. ......................10

        B.      Plaintiffs' Due Process Claim (Count 5) Fails Because Government |
                Grants Are Not Constitutionally Protected Property Interests..................16

III.    PLAINTIFFS' STATUTORY CLAIMS ALSO FAIL..........................................19

        A.      Plaintiffs Cannot Invoke the APA or *Ultra Vires* Review........................20

CONCLUSION..............................................................................................27

i

# TABLE OF AUTHORITIES

## CASES

*Abbott Lab'ys v. Gardner*,
387 U.S. 136 (1967) ..............................................................................................7

*Advoc. Christ Med. Ctr. v. Azar*,
Civ. A. No. 17-cv-1519, 2022 WL 2064830 (D.D.C. June 8, 2022),
*aff'd*, 80 F.4th 346 (D.C. Cir. 2023) ....................................................................7

*Agency for Int'l Dev. v. All. for Open Soc'y Int'l, Inc.*,
570 U.S. 205 (2013) ...........................................................................10, 11, 12, 13

*Appalachian Energy Grp. v. EPA*,
33 F.3d 319 (4th Cir. 1994) ................................................................................21

*Aref v. Lynch*,
833 F.3d 242 (D.C. Cir. 2016) ............................................................................15

*Bd. of Regents of State Colls. v. Roth*,
408 U.S. 564 (1972) ............................................................................................17

*Bennett v. Spear*,
520 U.S. 154 (1997) ............................................................................................20

*Buckley v. Valeo*,
424 U.S. 1 (1976) ................................................................................................13

*Building & Const. Trades Dep't, AFL-CIO v. Allbaugh*,
295 F.3d 28 (D.C. Cir. 2002) .........................................................................24, 25

*Chi. & S. Air Lines, Inc. v. Waterman S.S. Corp.*,
333 U.S. 103 (1948) ............................................................................................21

*Chlorine Inst., Inc. v. Fed. R.R. Admin.*,
718 F.3d 922 (D.C. Cir. 2013) .............................................................................8

*City of N.Y. v. U.S. Dep't of Def.*,
913 F.3d 423 (4th Cir. 2019) ..............................................................................21

*Comm'n v. Texas*,
605 U.S.---, 145 S. Ct. 1762 (2025) ...............................................................19, 22

*Corp. for Pub. Broad. v. Trump*,
---F. Supp. 3d---, 2025 WL 1617191 (D.D.C. June 8, 2025) ...........................6, 25

*Dep't of Educ. v. California,*
   604 U.S.---, 145 S. Ct. 966 (2025) ........................................................21

*English v. District of Columbia,*
   717 F.3d 968 (D.C. Cir. 2013) ............................................................17

*EPA v. Brown,*
   431 U.S. 99 (1977) ..............................................................................21

*FCC v. Fox Television Stations, Inc.,*
   567 U.S. 239 (2012) ............................................................................18

*Fed. Express Corp. v. U.S. Dep't of Com.,*
   39 F.4th 756 (D.C. Cir. 2022) ............................................................22

*Franklin v. Massachusetts,*
   505 U.S. 788 (1992) ............................................................................19

*FTC v. Standard Oil Co. of Cal.,*
   449 U.S. 232 (1980) ............................................................................21

*Gizzo v. Ben-Habib,*
   44 F. Supp. 3d 374 (S.D.N.Y. 2014) .................................................17

*Goldberg v. Kelly,*
   397 U.S. 254 (1970) ............................................................................17

*Grayned v. City of Rockford,*
   408 U.S. 104 (1972) ............................................................................18

*Indep. Equip. Dealers Ass'n v. EPA,*
   372 F.3d 420 (D.C. Cir. 2004) ..........................................................21

*Leathers v. Medlock,*
   499 U.S. 439 (1991) ............................................................................12

*Lincoln v. Vigil,*
   508 U.S. 182 (1993) ............................................................................26

*Miller v. Brown,*
   462 F.3d 312 (4th Cir. 2006) ...............................................................8

*Moody v. NetChoice, LLC,*
   603 U.S. 707 (2024) ............................................................................13

*National Rife Ass'n of America v. Vullo,*
   602 U.S. 175 (2024) ............................................................................14

\*  *Nat'l Endowment for the Arts v. Finley*,
   524 U.S. 569 (1998) ................................................................................ *passim*

*Nat'l Park Hosp. Ass'n v. Dep't of Interior*,
   538 U.S. 803 (2003) .................................................................................... 7

*Nat'l Urban League v. Trump*,
   ---F. Supp. 3d---, 2025 WL 1275613 (D.D.C. May 2, 2025) ..................... 14

*Nevada v. Dep't of Energy*,
   457 F.3d 78 (D.C. Cir. 2006) ...................................................................... 8

*New Vision Photography Program, Inc. v. District of Columbia*,
   54 F. Supp. 3d 12 (D.D.C. 2014) .............................................................. 17

*Nyunt v. Chairman, Broad. Bd. of Governors*,
   589 F.3d 445 (D.C. Cir. 2009) .................................................................. 19

*Perry v. Sindermann*,
   408 U.S. 593 (1972) .................................................................................. 17

*Racing Enthusiasts & Suppliers Coal. v. EPA*,
   45 F.4th 353 (D.C. Cir. 2022) ................................................................... 21

*Reed v. Goertz*,
   598 U.S. 230 (2023) .................................................................................. 16

*Regan v. Taxation With Representation of Wash.*,
   461 U.S. 540 (1983) ............................................................................. 15, 16

*Reno v. Cath. Soc. Servs., Inc.*,
   509 U.S. 43 (1993) ...................................................................................... 8

*Rosenberger v. Rector & Visitors of the University of Virginia*,
   515 U.S. 819 (1995) .................................................................................. 13

\*  *Rust v. Sullivan*,
   500 U.S. 173 (1991) ................................................................. 10, 11, 12, 15

*S & D Maintenance Co. v. Goldin*,
   844 F.2d 962 (2d Cir. 1988) ..................................................................... 17

*Scoggins v. Lee's Crossing Homeowners Ass'n*,
   718 F.3d 262 (4th Cir. 2013) ...................................................................... 8

*Select Specialty Hosp.-Akron, LLC v. Sebelius*,
   820 F. Supp. 2d 13 (D.D.C. 2011) .............................................................. 7

*Sessions v. Dimaya*,
    584 U.S. 148 (2018)................................................................................................18

*Texas v. United States*,
    523 U.S. 296 (1998)..................................................................................................7

*Town of Castle Rock v. Gonzales*,
    545 U.S. 748 (2005)................................................................................................17

*Trump v. American Federation of Government Employees,*
    606 U.S.---, 2025 WL 1873449 (U.S. July 8, 2025)..............................................23

*Trump v. New York*,
    592 U.S. 125 (2020)...............................................................................................8, 9

*United States v. Am. Libr. Ass'n*,
    539 U.S. 194 (2003)................................................................................................12

*Vera Institute of Justice v. U.S. Department of Justice*,
    2025 WL 1865160 (D.D.C. July 7, 2025)..................................................18, 22, 23

*Ysursa v. Pocatello Educ. Ass'n*,
    555 U.S. 353 (2009)................................................................................................12

**STATUTES**

20 U.S.C. § 954................................................................................................5, 19, 25, 26

47 U.S.C. § 396....................................................................................................3, 4, 18, 25

47 U.S.C. § 398..............................................................................................................4, 24

Public Broadcasting Act of 1967,
    Pub. L. No. 90-129, 81 Stat. 365 (*codified at* 47 U.S.C. § 390 *et seq*).......................3

Consolidated Appropriations Act, 2023,
    Pub. L. No. 117-328, 136 Stat. 4459 (2022)..............................................................5

Further Consolidated Appropriations Act, 2024,
    Pub. L. No. 118-47, 138 Stat. 460 ............................................................................3

Full-Year Continuing Appropriations And Extensions Act, 2025,
    Pub. L. No. 119-4, 139 Stat. 9 ..................................................................................5

**RULES**

Fed. R. Civ. P. 56............................................................................................................7

**REGULATIONS**

*Ending Taxpayer Subsidization of Biased Media*,
  Exec. Order No. 14,290, 90 Fed. Reg. 19,415 (May 1, 2025)........................................... *passim*

**OTHER AUTHORITIES**

Brian E. Humphreys, Cong. Rsch. Serv., R48545, Public Broadcasting: Background
  Information and Current Issues for Congress (2025),
  https://www.congress.gov/crs-product/R48545..........................................................................4

## INTRODUCTION

In Executive Order No. 14,290, *Ending Taxpayer Subsidization of Biased Media* ("the EO"), the President directed the Corporation for Public Broadcasting ("CPB") to terminate direct and indirect funding to National Public Radio ("NPR") and the Public Broadcasting Service ("PBS") and instructed federal agencies to identify and terminate any direct or indirect funding to these two organizations. 90 Fed. Reg. 19,415 (May 1, 2025) ("Exec. Order No. 14,290"). Both directives were qualified by an instruction to proceed only as consistent with applicable law. *Id.* As the EO explained, those directives reflected the President's determination that NPR and PBS do not "present[] a fair, accurate, or unbiased portrayal of current events to taxpaying citizens." *Id.* § 1. Plaintiffs—NPR and certain local member stations—have now sued to challenge the EO. This Court should deny their motion for summary judgment, and instead grant Federal Defendants' motion for summary judgment and dismiss this case.

At the outset, Plaintiffs' claims are not ripe for judicial review; there is no genuine case or controversy that warrants judicial intervention at this time. As Plaintiffs acknowledge, CPB disputes the President's authority to direct its funding decisions, and that relationship is the subject of separate litigation before this Court. For now, however, CPB has not acted to terminate funding for Plaintiffs; indeed, Plaintiffs' motion includes no factual material suggesting that they have suffered any loss of funding by virtue of the EO. Nor have the other agency Defendants—the Department of the Treasury and the National Endowment for the Arts ("NEA")—caused Plaintiffs any ripe injury. Plaintiffs apparently included Treasury in the suit for fear it will not disburse funds to CPB, yet Treasury has not refused to disburse any such funds. As to NEA, that agency had only two grants with NPR, both of which were already fully paid (two and a half months before the EO) out and set to expire anyway  on the day the

termination was to be in effect.  The bottom line is that Plaintiffs may object to the EO in principle, but there is no ripe, concrete dispute in practice.  On that basis alone, the Court should dismiss this action without prejudice.

If the Court reaches the merits, it should reject Plaintiffs' claims.  Starting with constitutional claims, Plaintiffs argue that the EO violates the First and Fifth Amendments by ceasing their federal subsidization.  That misapprehends both constitutional provisions.  As to the First Amendment, it is well established that when the government acts as a *patron*—rather than as a *regulator*—it may consider the content and viewpoint of the work it is subsidizing.  That is all that happened here: the challenged EO does not purport to substantively regulate NPR or anyone else, much less to dictate its content.  The EO merely chooses not to fund Plaintiffs with taxpayer dollars.  It thus neither impermissibly discriminates based on Plaintiffs' viewpoint nor retaliates against them based on protected speech.  Nor does the challenged EO violate Plaintiffs' associational rights—it does not limit such rights at all; again, it merely declines to subsidize them, which has long been constitutionally permitted.  As for the Fifth Amendment, Plaintiffs do not articulate a cognizable property interest to which the Due Process Clause attaches.  Federal grants and subsidies are not, and have never been, treated as property interests that trigger constitutional protection before they can be terminated or ceased.

Turning to Plaintiffs' statutory claims, they fail too.  At the outset, the President himself (and thus the EO itself) is not subject to injunctive relief, either under the Administrative Procedure Act ("APA") or generally.  The only way Plaintiffs could challenge the EO on statutory grounds would be to seek to vacate implementation acts by federal agencies as contrary to law under the APA.  But Plaintiffs cannot do that here, because no agency Defendant has yet taken any final agency action against Plaintiffs.  Nor does that absence of final agency action

somehow mean the "Hail Mary" remedy of an *ultra vires* claim available. Finally, even if there

had been final agency action—and there is not—the scattershot collection of statutory violations

Plaintiffs allege are not persuasive on the merits.

For all of these reasons, Plaintiffs are not entitled to summary judgment. Instead, the

Court should dismiss the action.

## BACKGROUND

### I.    Statutory Background

#### A.  CPB and the Public Broadcasting Act

CPB was created by Congress in the Public Broadcasting Act of 1967 (the "PBA"). Pub.

L. No. 90-129, 81 Stat. 365, *codified at* 47 U.S.C. § 390 *et seq.* Congress designed CPB to

advance various governmental purposes, including serving the "public interest" by

"encourag[ing] the growth and development of public radio and television broadcasting" and

"nonbroadcast telecommunications technologies for the delivery of public telecommunications

services." 47 U.S.C. § 396(a)(1), (2). CPB does so primarily by using appropriated taxpayer

funds, drawn from a Public Broadcasting Fund administered by the Secretary of the Treasury, to

issue grants supporting public broadcasting, in a manner prescribed by statute. *See id.* § 396(k);

*see also, e.g.*, Further Consolidated Appropriations Act, 2024, Pub. L. No. 118-47, § 407, 138

Stat. 460, 696. CPB is required to promote specific types of programming—*e.g.*, "instructional,

educational, and cultural" programming. 47 U.S.C. § 396(a)(1). But Congress "prohibited" CPB

from owning or operating broadcast stations or producing its own programming. *Id.* § 396(g)(3).

CPB is overseen by a board consisting solely of Presidential appointees who are

confirmed by the Senate. The PBA provides that nothing in the statute "shall be deemed . . .

except to the extent authorized in subsection (b), to authorize any department, agency, officer, or

employee of the United States to exercise any direction, supervision, or control over public telecommunications, or over the Corporation or any of its grantees or contractors, or over the charter or bylaws of the Corporation, or over the curriculum, program of instruction, or personnel of any educational institution, school system, or public telecommunications entity." *Id.* § 398(a).

CPB provides funds, directly and indirectly, to NPR and PBS. *See* Brian E. Humphreys, Cong. Rsch. Serv., R48545, Public Broadcasting: Background Information and Current Issues for Congress 10 (2025), https://www.congress.gov/crs-product/R48545. NPR "was created by the CPB in 1970 as a news-gathering, production, and program-distribution company governed by its member public radio stations." *Id.* NPR produces radio programs for its members, although member stations retain control over programming decisions. *Id.* By contrast, PBS "operate[s] and manage[s] a nationwide program distribution system interconnecting public television stations." *Id.* PBS does not produce programming directly, but "aggregates funding for the creation and acquisition of programs by and for the stations and distributes programs through its satellite distribution system" to local public television stations. *Id.* NPR and PBS are distinct from the member stations that actually distribute content directly (*e.g.*, WAMU in Washington, D.C.). Public broadcasters may use CPB funds to "pay membership dues and program acquisition fees" to PBS and NPR, but "there are no authoritative estimates of indirect federal funding levels of the PBS and NPR nonprofit organizations through dues and fees." *Id.* NPR and PBS also "receive some direct federal funding from the CPB." *Id.*

NPR currently has 246 member stations across the country who pay a membership "core fee" to license certain NPR content. ECF No. 21-3 at 3-4 (Decl. of Daphne Kwon ¶¶ 10-11). Member stations may also choose to license additional content from NPR. *Id.*

### B.    The National Foundation on the Arts and Humanities Act of 1965

The NEA is an independent federal government entity created by Congress that deploys appropriated taxpayer dollars to advance governmental purposes in accordance with its enabling statute. *See* 20 U.S.C. § 954.  The NEA chairperson is authorized to "establish and carry out a program of contracts with, or grants-in-aid or loans" to individuals or groups "of exceptional talent engaged in or concerned with the arts" to advance various governmental purposes described in the National Foundation on the Arts and Humanities Act. . *Id.* § 954(c).

### C.    The Appropriations Acts

The Consolidated Appropriations Act, 2023 ("2023 Act") appropriated $535,000,000 for CPB for fiscal year 2025. Pub. L. No. 117-328, Div. H, Tit. IV, 136 Stat. 4459, 4901 (2022). Pursuant to the 2023 Act, payment to CPB is "as authorized by the Communications Act of 1934, an amount which shall be available within limitations specified by that Act." *Id.*  With the exception of certain restrictions not at issue here, *id.*, the Act is a lump-sum appropriations that imposes no specific requirements on further distributions (i.e., line-items).  The Further Consolidated Appropriations Act, 2024 and the Full-Year Continuing Appropriations and Extensions Act, 2025 similarly provide lump-sum appropriations for the succeeding fiscal years. *See* 138 Stat. at 696 and Pub. L. No. 119-4, Tit. I, 139 Stat. 9.

## II.    Factual Background

On May 1, 2025, President Trump issued Executive Order No. 14,290, titled *Ending Taxpayer Subsidization of Biased Media*, 90 Fed. Reg. 19,415 (May 1, 2025). Section 1 of the EO contains the President's findings, including that "Americans have the right to expect that if their tax dollars fund public broadcasting at all, they fund only fair, accurate, unbiased, and nonpartisan news coverage," and "[n]o media outlet has a constitutional right to taxpayer

subsidies, and the Government is entitled to determine which categories of activities to subsidize."  Exec. Order No. 14,290 § 1.

Sections 2 and 3 of the EO, respectively, call for CPB to terminate direct and indirect funding to NPR and PBS "to the maximum extent allowed by law," *id.* § 2, and for federal agencies to identify and terminate any direct or indirect support for PBS or NPR "consistent with applicable law." *Id.* § 3.

CPB has expressed that it will not comply with the EO.  ECF No. 21-1 at 24 (Mem. of Law in Supp. of Pls.' Mot. for Summ. J.).  The scope of the President's control over CPB is the subject of separate litigation.  *See Corp. for Pub. Broad. v. Trump*,  ---F. Supp. 3d.---, 2025 WL 1617191 (D.D.C. June 8, 2025) (Moss, J).

Treasury has not taken any action to reduce funding to CPB.  Decl. of Lisa Moore ¶ 7 ("Moore Decl.").  The NEA issued two grants to NPR in 2024. Decl. of Brenna Berger ¶¶ 4-8 ("Berger Decl.").  The first, in the amount of $25,000, was to support literary content on NPR platforms (the "Literary Arts Grant"). *Id.* ¶¶ 5, 8.  The second, in the amount of $40,000, was to support the production and distribution of NPR's music programming (the "Media Arts Grant"). *Id*.  Both the Literary Arts Grant and the Media Arts Grant were fully paid as of February 2025, and set to expire on May 31, 2025.  *Id.* ¶¶ 6, 8.  Earlier in May, the NEA issued terminations for a broad range of grant awards that did not align with the agency's current priorities, including the Literary Arts Grant and the Media Arts Grant.  Both grants were terminated effective on May 31, 2025 (the day when they were originally set to expire).  *Id.* ¶ 9.  NEA's Chief Financial Officer has verified that the Government fully disbursed the payments for both grants to NPR in February 2025.  Decl. of William Wiggins ¶ 7, Exs. D and E ("Wiggins Decl.").

## III.    Procedural Background

NPR, Roaring Fork Public Radio, Inc. d/b/a Aspen Public Radio, Colorado Public Radio, and KUTE Inc. d/b/a KSUT Public Radio (collectively, "Plaintiffs," comprising NPR and the "Local Members") sued the President, the Office of Management and Budget, the NEA, CPB, the Department of the Treasury ("Treasury"), and officials from some of these agencies.  ECF No. 1 (Compl.,).  Plaintiffs allege that the Defendants violated certain statutes and the First and Fifth Amendments in issuing and implementing the EO.  Plaintiffs have moved for summary judgment.  ECF No. 21 (Mot. for Summ. J.).

## LEGAL STANDARD

In an APA case, the Federal Rule of Civil Procedure 56(a) summary judgment standard, requiring the court to determine if there is a genuine dispute of material fact, does not apply. Rather, the district court sits as an appellate tribunal, reviewing the administrative record. "[S]ummary judgment 'serves as a mechanism for deciding, as a matter of law, whether the agency action is supported by the administrative record and is otherwise consistent with the APA standard of review.'"  *Advoc. Christ Med. Ctr. v. Azar*, Civ. A. No. 17-cv-1519, 2022 WL 2064830, at *5 (D.D.C. June 8, 2022) (quoting *Select Specialty Hosp.-Akron, LLC v. Sebelius*, 820 F. Supp. 2d 13, 21 (D.D.C. 2011)), *aff'd*, 80 F.4th 346 (D.C. Cir. 2023).

## ARGUMENT

## I.    PLAINTIFFS' CLAIMS ARE NOT RIPE FOR REVIEW.

Article III only permits the Court to adjudicate those claims that are ripe for review. *Texas v. United States*, 523 U.S. 296, 300–01 (1998) (ripeness "requir[es] us to evaluate both the fitness of the issues for judicial decision and the hardship to the parties of withholding court consideration." (quoting *Abbott Lab'ys v. Gardner*, 387 U.S. 136, 149 (1967)); *see also Nat'l Park Hosp. Ass'n v. Dep't of Interior*, 538 U.S. 803, 808 (2003) ("The ripeness doctrine is

'drawn both from Article III limitations on judicial power and from prudential reasons for refusing to exercise jurisdiction.'" (quoting *Reno v. Cath. Soc. Servs., Inc.*, 509 U.S. 43, 57 n.18 (1993))).  Ripeness requires that an alleged injury be "certainly impending."  *Chlorine Inst., Inc. v. Fed. R.R. Admin.*, 718 F.3d 922, 927 (D.C. Cir. 2013).  Meanwhile, a claim is not ripe if it is "dependent on 'contingent future events that may not occur as anticipated, or indeed may not occur at all.'"  *Trump v. New York*, 592 U.S. 125, 131 (2020).  With respect to APA claims, "[a] case is fit for adjudication 'when the action in controversy is final and not dependent on future uncertainties.'"  *Scoggins v. Lee's Crossing Homeowners Ass'n*, 718 F.3d 262, 270 (4th Cir. 2013) (quoting *Miller v. Brown*, 462 F.3d 312, 319 (4th Cir. 2006)).  Finality is a prerequisite for ripeness—agency action that is not final is not ripe for review.  *Nevada v. Dep't of Energy*, 457 F.3d 78, 85 (D.C. Cir. 2006).

Because Plaintiffs' claims are "dependent on contingent future events that may not occur as anticipated, or indeed may not occur at all," *Trump*, 592 U.S. at 131, they are nonjusticiable. As explained, Plaintiffs seek relief from this Court from the mere prospect that CPB or the Defendant agencies will cut off their funding as a result of the EO.  ECF No. 21-1 at 11, 22-24. Yet CPB's relationship with the federal government, and the degree of control that the government may exercise over it, are currently hotly disputed questions in separate litigation before this Court.  *See Corp. for Pub. Broad. v. Trump*, No. 25-1305 (RDM) (D.D.C.).  For now, CPB has not taken action to terminate funding for NPR or PBS, as their failure to allege otherwise amply demonstrates.  Any dispute over potential CPB terminations of funding is therefore not ripe.

As for the agency Defendants, none has taken concrete, cognizable action against Plaintiffs.  While Plaintiffs apparently interpret the EO as directing the Treasury to withhold

funding from CPB if CPB fails to comply with the EO, ECF No. 21-1 at  . 33-34, the EO does not include such a direction and Treasury has not withheld funding. To the contrary, Treasury has continued to make payments to CPB since the EO was issued.  Moore Decl. ¶¶ 7-8.  Any dispute with Treasury is therefore also premature, hypothetical, and unripe.

Defendants acknowledge that NEA terminated two grants to NPR in May 2025, *see* Berger Decl. ¶¶ 8-9, but only after those grants had been fully paid in February 2025. Wiggins Decl. ¶¶ 6-7, Exs. A-D.  The effective date of termination for both awards was May 31, 2025— the same day that the grants were originally intended to expire.  Berger Decl. ¶ 9.  Accordingly, the terminations did not alter the period of performance for either grant; nor did the terminations withhold or reduce money that had otherwise been due to the Plaintiffs.  *Id.*  And Plaintiffs offer no evidence that they expect (or expected) to receive any other grants or any money associated with open grants from NEA in the future.  NEA's Director of Grants Management has verified that there are currently no open NEA grant awards issued to NPR.  Berger Decl. ¶ 12. There is no Article III injury with respect to NEA, let alone a ripe dispute.

In short, this lawsuit is an academic exercise right now.  Plaintiffs may feel offended by the EO, but they offer no evidence that it has given rise to any concrete or imminent injury imposed by any Defendant.  There is therefore simply no need for any judicial intervention at this juncture.  The Court should instead dismiss the case without prejudice.

## II.    PLAINTIFFS' CONSTITUTIONAL CLAIMS FAIL.

If this Court does nonetheless reach the merits, it should reject Plaintiffs' claims, starting with the constitutional claims.  The EO does not violate the First Amendment, because the First Amendment does not require the Government to *subsidize* speech on equal terms, and the EO relates solely to such subsidization.  And the EO does not violate the Fifth Amendment, because

it is black-letter law that government grants are not cognizable property interests for constitutional purposes.

### A.  Plaintiffs' First Amendment Claims Fail Because the Government Has Broad Powers to Choose How to Distribute Funding.

In the EO, the President determined that it was inappropriate to provide taxpayer subsidies to entities that he determined fail to "present[] a fair, accurate, or unbiased portrayal of current events to taxpaying citizens."  Exec. Order No. 14,290 § 1.  Plaintiffs assert that the issuance and implementation of the EO violates the First Amendment.  They contend that the President acted because of disagreements with Plaintiffs' journalistic content—more specifically, that those actions (1) were based upon Plaintiffs' viewpoint; (2) retaliated against Plaintiffs because of the content of their journalism; and (3) infringed on Plaintiffs' freedom to freely associate.

All three flavors of the First Amendment claim fail, because the Supreme Court has long been clear that when the Government acts as patron to subsidize speech—as opposed to when it acts as sovereign to regulate it—First Amendment concerns are substantially diminished. *See Rust v. Sullivan*, 500 U.S. 173 (1991); *Agency for Int'l Dev. v. All. for Open Soc'y Int'l, Inc.*, 570 U.S. 205 (2013) ("*AID*").  That principle does not change just because the Government is subsidizing journalism as opposed to a different type of speech.  Were it otherwise, the Government would be unable to consider the quality or value of the speech it uses taxpayer dollars to fund—including whether that speech is "fair, accurate, or unbiased."  That is not the law.  Indeed, the very premise of the PBA is otherwise.  This Court should not adopt Plaintiffs' novel and far-reaching position.

### 1.  Viewpoint Discrimination (Count 3)

Plaintiffs argue that the EO imposes unconstitutional viewpoint-based burdens on the local public stations and NPR. ECF No. 21-1 at pp. 39-40. But this argument fails because principles of viewpoint discrimination do not constrain the Government's discretion to subsidize speech where, as here, the Government's limitations relate solely to what the grantees may do with federal funds. Simply put, the Government is permitted to have policy priorities, and it does not violate the First Amendment to affirmatively fund only programs that align with those policies.

It is well established that government spending is not subject to traditional First Amendment scrutiny. As the Supreme Court explained in *Rust*, "[t]he Government can, without violating the Constitution, selectively fund a program to encourage certain activities it believes to be in the public interest . . . . In so doing, the Government has not discriminated on the basis of viewpoint; it has merely chosen to fund one activity to the exclusion of the other." 500 U.S. at 193. Thus, "[a]s a general matter, if a party objects to a condition on the receipt of federal funding, its recourse is to decline the funds. This remains true when the objection is that a condition may affect the recipient's exercise of its First Amendment rights." *AID*, 570 U.S. at 214; *see also id.* (collecting cases).

In this context, the Government violates the First Amendment only if it attempts to "leverage funding to regulate speech *outside* the contours of the program[s] itself." *Id.* at 214-15 (emphasis added). For example, the Government cannot condition federal funds on a pledge to adopt a policy "explicitly opposing prostitution and sex trafficking," *id.* at 210; that impermissibly regulates speech even on the recipients' "own time and dime." *Id.* at 218-19. But the Government remains free to "specify the activities [it] wants to subsidize," and thus could

(for example) prohibit using federal funds to "promote or advocate [for] the legalization or practice of prostitution or sex trafficking." *Id.* at 217-18.

Under these principles, the EO is constitutional.  It does not impose an unconstitutional condition on Plaintiffs' speech; rather, as permitted under *Rust* and *AID*, the EO merely aligns the Government's sponsorship of activities with its policy priorities.  None of its provisions seek to regulate a grantee/contractor's speech "outside the contours of " any such policy initiatives— *i.e.*, they do not prohibit entities from supporting any position they choose on their "own time and dime." *Id.* at 215, 218.  The EO merely declines to extend federal funding for Plaintiffs' programs.  The Supreme Court has repeatedly held that the Government does not penalize, prohibit, restrict, or otherwise infringe on speech simply because it chooses not to pay for it. *See, e.g., Ysursa v. Pocatello Educ. Ass'n*, 555 U.S. 353, 358 (2009) (explaining that Government "is not required to assist others in funding the expression of particular ideas"); *United States v. Am. Libr. Ass'n*, 539 U.S. 194, 212 (2003) (plurality) (a "decision not to subsidize the exercise of a fundamental right does not infringe the right" (quoting *Rust*, 500 U.S. at 193)); *Leathers v. Medlock*, 499 U.S. 439, 450 (1991) (Government "is not required to subsidize First Amendment rights").

These Supreme Court doctrines establish that there is no First Amendment violation here. Start with funding to NPR itself.  Plaintiffs claim the EO, "by purporting to terminate NPR's federal funding and prevent local public stations from airing NPR's content, has burdened NPR's speech through the denial of funding based on the perceived viewpoint of that speech."  ECF No. 21-1 at p. 39. But, as to the termination of NPR's funding, this is simply restating the activity that *Rust* itself permitted—the Government can choose what to subsidize using taxpayer funds without running afoul of the restrictions on viewpoint discrimination that would otherwise apply

12

when the Government is acting as regulator. *Rust*, 500 U.S. at 193. And Government's decision

not to subsidize First Amendment activities does not itself violate the First Amendment. *Ysursa*,

555 U.S. at 358.

Nor has the Government unconstitutionally burdened local member stations or prevented

them from airing NPR content. Again, the EO merely prohibits *using federal funds* to license

NPR's programming. *Accord*, ECF No. 21-1 at p. 39 (emphasis added). The EO does not

prohibit those stations from licensing NPR programming with their *own* funds; to the contrary,

Plaintiffs remain free to license such programming on their "own time and dime." *AID*, 570 U.S.

at 218. The EO merely restricts what federal funds can be used for, and that funding

determination is not subject to viewpoint restrictions. *Nat'l Endowment for the Arts v. Finley*,

524 U.S. 569, 588 (1998). Plaintiffs analogize this activity to "overrid[ing] Member stations'

editorial judgment and their expressive choices," akin to the Government selecting content for a

newspaper. ECF No. 21-1 at p. 39. But that is not right—local member stations are free to

choose whatever programs they like as a matter of their independent editorial judgment; they

simply cannot pay for NPR's programming with federal funds.

The distinction between government funding and government regulation renders much of

Plaintiffs' brief in support of their motion irrelevant. Plaintiffs cite cases holding that the

Government cannot take sides in ideological contests; but those cases did not emerge from, and

do not apply to, the funding context. *Moody v. NetChoice, LLC*, 603 U.S. 707, 719, 731 (2024);

*Buckley v. Valeo*, 424 U.S. 1, 48 (1976). Plaintiffs rely heavily on *Rosenberger v. Rector &*

*Visitors of the University of Virginia*, 515 U.S. 819 (1995), for the proposition that "when the

government 'expends funds to encourage . . . *private* speech,' it 'may not discriminate based on

the viewpoint of private persons whose speech it facilitates." ECF No. 21-1 at p. 43 (quoting

*Rosenberger*, 515 U.S. at 833-34).  But as the Supreme Court explained just a few years later,
"*Rosenberger* . . . found the viewpoint discrimination unconstitutional not because funding of
'private' speech was involved, but because the government had established a limited public
forum." *Finley*, 524 U.S. at 598-99 (Scalia, J., concurring); *see also id.* at 586.  CPB is not a
limited public forum—and Plaintiffs do not claim that it is.

Finally, Plaintiffs claim that this case resembles the "coercive" condition in *National Rife
Ass'n of America v. Vullo*, 602 U.S. 175, 198 (2024). ECF No. 21-1 at p. 44.  A decision to
decline to fund certain activities is not comparable to the threat of inducing sanctions, as in
*Vullo*.  As Judge Kelly noted recently: "[b]ecause the government is not constitutionally
obligated to fund Plaintiffs' preferred speech or to contract with them for certain purposes, the
decision to stop funding that speech or contracting for those ends is not an example of the
government doing 'indirectly what' it 'is barred from doing directly.'"  *Nat'l Urban League v.
Trump*, ---F. Supp. 3d---, 2025 WL 1275613, at *22 (D.D.C. May 2, 2025) (quoting *Vullo*, 602
U.S. at 190).

Accordingly, Plaintiffs' efforts to invoke strict scrutiny fail, and their viewpoint
discrimination claim must be rejected.

### 2.        First Amendment Retaliation (Count 2)

Next, Plaintiffs repeat their First Amendment claim using the language of retaliation.
ECF No. 21-1 at p. 44.  To be clear, they do not claim that the President issued the EO to punish
them for specific content; rather, their theory is that the President acted because he disliked their
content.  ECF No. 21-1 at pp. 35, 40.  This is not a proper First Amendment retaliation claim; it
is the same viewpoint discrimination claim clothed in a different dress, and fails for the same
reasons stated above.

14

For a claim of First Amendment retaliation, Plaintiffs must establish that (1) they engaged in conduct protected under the First Amendment; (2) the defendant took some retaliatory action sufficient to deter a person of ordinary firmness in plaintiff's position from speaking again; <u>and</u> (3) a causal link between the exercise of a constitutional right and the adverse action taken against plaintiffs exists. *Aref v. Lynch*, 833 F.3d 242, 258 (D.C. Cir. 2016). While Defendants do not dispute that Plaintiffs engaged in First Amendment protected conduct (*i.e.*, journalism), Plaintiffs' retaliation claim fails because termination of funding based on a viewpoint the government does not want to subsidize is not a cognizable adverse action under the First Amendment.

Defendants do not dispute that the President considered NPR's conduct and the content of its material in issuing the EO; the EO is explicit on that point.  *See* Exec. Order No.14,290 § 1.  But that is not unconstitutional retaliation.  The First Amendment allows the President to consider content when the Government is subsidizing (rather than regulating) speech.  Indeed, were the law otherwise, the Government would be required to subsidize journalistic content (or, for that matter, any activity that expresses a viewpoint or a perspective) that it disagrees with, simply because the subsidized activity expresses *a* viewpoint.  That notion cannot be reconciled with *Rust* and its progeny.

### 3.    Freedom of Association (Count 4)

Recharacterizing the First Amendment claim as a burden on freedom of association does not advance the ball any further.  Plaintiffs' associational claim fails because there is no evidence that the EO infringes the freedom to associate.  Once again, Plaintiffs are conflating failure to subsidize with affirmative regulation.

The Supreme Court has consistently affirmed its reasoning that the Government may

define the contours of its funding programs without violating associational rights, provided it does not directly either prohibit or penalize protected association outside the funded programs. *See Regan v. Taxation With Representation of Wash.*, 461 U.S. 540, 545 (1983); *see also Rust,* 500 U.S. at 193.  In *Regan*, the Court upheld an Internal Revenue Code provision that denied tax-exempt status to organizations substantially engaged in lobbying, finding that the organization remained free to associate. It simply could not use government funds to exercise that  associational right—but that restriction on the use of government funds did not violate the First Amendment.  *See Regan*, 461 U.S. at 545 ("The [Internal Revenue] Code does not deny [plaintiff] the right to receive deductible contributions to support its non-lobbying activity, nor does it deny [plaintiff] any independent benefit on account of its intention to lobby.  Congress has merely refused to pay for the lobbying out of public monies.").

That reasoning controls here.  Plaintiffs argue that the EO violates their freedom of association by directing CPB to restrict funds to the local member stations associated with NPR. And they contend the EO also prevents NPR and local member stations from associating with one another. Pls. Mem. ECF No. 21-1 at 45-46.  But this misstates the EO.  The EO does not limit NPR and local member stations' ability to associate with each other; it simply limits the provision of federal funds to subsidize such activities.  Consistent with the reasoning in *Regan* and *Rust*, the Government is not obligated to subsidize any of Plaintiffs' constitutionally protected rights they raise, including their right to freely associate.

### B.    Plaintiffs' Due Process Claim (Count 5) Fails Because Government Grants Are Not Constitutionally Protected Property Interests.

Plaintiffs also claim the Defendants violated the Fifth Amendment because the EO sought to deny NPR funding without notice or meaningful process. ECF No. 21-1 at 12, pp. 48-49; *see also* ECF No. 1  at 6-7(Compl. ¶ 10).  That claim is plainly meritless because courts have

reaffirmed over and over (and over) that government grants of this sort do not give rise to cognizable property interests.

A procedural due process claim consists of two elements: (i) a protected interest in life, liberty, or property, and (ii) inadequate state process. *Reed v. Goertz*, 598 U.S. 230, 236 (2023); *see also English v. District of Columbia*, 717 F.3d 968, 972 (D.C. Cir. 2013) ("The procedural due process protections under the Fifth and Fourteenth Amendments are the same.").

Plaintiffs' claim fails at the outset because Plaintiffs have not identified a constitutionally protected property right.  "The procedural component of the Due Process Clause does not protect everything that might be described as a 'benefit': 'To have a property interest in a benefit, a person clearly must have more than an abstract need or desire'" and "more than a unilateral expectation of it.  He must, instead, have a legitimate claim of entitlement to it." *Town of Castle Rock v. Gonzales*, 545 U.S. 748, 756 (2005).  Applying these principles, the Supreme Court has identified a narrow set of government benefits, so-called "new property," that are protected under the Due Process Clause. *See Perry v. Sindermann,* 408 U.S. 593 (1972) (tenured teaching position); *Goldberg v. Kelly,* 397 U.S. 254 (1970) (welfare benefits); *see also Bd. of Regents of State Colls. v. Roth*, 408 U.S. 564 (1972) (collected cases). The Due Process protections afforded to this set of entitlement-like benefits, however, have not been extended to other legal obligations, such as "'ordinary' or 'routine' government contracts." *Gizzo v. Ben-Habib*, 44 F. Supp. 3d 374, 385 (S.D.N.Y. 2014); *New Vision Photography Program, Inc. v. District of Columbia*, 54 F. Supp. 3d 12, 29 (D.D.C. 2014) ("The Supreme Court has never held that government contracts for goods and services create property interests protected by due process."); *see also S & D Maintenance Co. v. Goldin*, 844 F.2d 962, 966-67 (2d Cir. 1988) (explaining that due process protection does not extend to "contractual interests that are not

associated with any cognizable status of the claimant beyond its temporary role as a governmental contractor").

Just days ago, Judge Mehta reaffirmed in *Vera Institute of Justice v. U.S. Department of Justice*, that the Due Process Clause does not grant plaintiffs a property right in federal grants. Case No. 25-cv-1643 (APM), 2025 WL 1865160, at *15 (D.D.C. July 7, 2025) (explaining that "the D.C. Circuit has … never held that a contractor has a property interest in expected payments").  So too here.

Plaintiffs try to evade this established law by claiming they have a statutory entitlement to funds, which in turn gives rise to constitutionally protectable property interests.  ECF No. 21-1 at pp. 48-49; *see also*  ECF No. 1 at pp. 6-7 (Compl. ¶ 10). But the premise is false. The statute does not directly entitle NPR or the local member stations to any funds; those are intermediated through separate *agreements* via CPB. The relevant statutes are silent about the distribution of funds to Plaintiffs specifically; rather, they speak to the distribution of funding to CPB.  *See e.g.*, 47 U.S.C. § 396(g).  Any entitlement Plaintiffs have to fund is a matter of contract—and contracts do not create cognizable property rights protectable under the Due Process Clause.

Plaintiffs also argue that the EO violates the Due Process Clause because it is void for vagueness.  ECF No. 21-1 at p. 49.  But void-for-vagueness principles have no application here. That doctrine applies to regulations of primary conduct, so that regulated parties have fair notice of what conduct may subject them to criminal or civil enforcement.  *See Sessions v. Dimaya*, 584 U.S. 148, 155-56 (2018) (plurality); *FCC v. Fox Television Stations, Inc*., 567 U.S. 239, 253 (2012); *Grayned v. City of Rockford*, 408 U.S. 104, 108 (1972).  It functions to prohibit uneven enforcement, and ensures notice of requirements with which the public must comply. *See*

*Grayned v. City of Rockford*, 408 U.S. 104, 108 (1972). But the doctrine does not apply in the context of funding determinations.

In *Finley*, for example, the Supreme Court rejected the application of the demanding vagueness standard applicable in the criminal context to government funding decisions. 524 U.S. 569. There, plaintiffs brought vagueness challenges under the First and Fifth Amendments to a funding provision that required the National Endowment for the Arts to "take[] into consideration general standards of decency and respect for the diverse beliefs and values of the American public." *Id.* at 572 (quoting 20 U.S.C. § 954(d)(1)). The Supreme Court acknowledged that "[t]he terms of the provision are undeniably opaque, and if they appeared in a criminal statute or regulatory scheme, they could raise substantial vagueness concerns." *Id.* at 588. But, the Court reasoned, "when the Government is acting as patron rather than as sovereign, the consequences of imprecision are not constitutionally severe." *Id.* at 589; *see also id.* (cautioning that "[t]o accept [plaintiffs'] vagueness argument would be to call into question the constitutionality of . . . valuable Government programs and countless others like them" that "award[] scholarships and grants on the basis of subjective criteria such as 'excellence.'"). This Court should similarly reject Plaintiffs' invitation to impose a demanding vagueness standard on the government even when it "is acting as patron rather than as sovereign." *Id.*

## III.    PLAINTIFFS' STATUTORY CLAIMS ALSO FAIL.

Plaintiffs also raise a host of statutory claims against the President and agency Defendants, alleging violations of the PBA and other statutes. ECF No. 1 at 29-32 (Compl. ¶¶ 108-18). At the threshold, Plaintiffs seek relief against the President, but the APA does not apply to the President, nor is injunctive relief against the President proper. *Franklin v. Massachusetts*, 505 U.S. 788, 801-03 (1992). As for the agency Defendants, Plaintiffs cannot succeed on an

19

APA claim because no agency has taken final agency action. Neither CPB nor any other agency has withheld grant funding from Plaintiffs. In the absence of any implementing actions by CPB or other agencies, Plaintiffs cannot invoke the APA. Nor can Plaintiffs satisfy the "Hail Mary" standard required for an *ultra vires* claim. *See Nuclear Regul. Comm'n v. Texas*, 605 U.S.---, 145 S. Ct. 1762, 1776 (2025) ("*NRC*") (quoting *Nyunt v. Chairman, Broad. Bd. of Governors*, 589 F.3d 445, 449 (D.C. Cir. 2009)). For all of these reasons, the Court has no occasion at this juncture to consider how the EO interacts with the array of statutes that Plaintiffs cite. In all events, however, Plaintiffs' claims fail because the EO comports with the applicable statutory requirements.

### A.    Plaintiffs Cannot Invoke the APA or *Ultra Vires* Review.

Plaintiffs' statutory challenges take the form of APA claims against the agency Defendants. The problem, however, is that none of the agency Defendants has taken final agency action subject to APA review. Nor can Plaintiffs pursue a non-statutory *ultra vires* claim to circumvent that defect.

#### 1.    Final Agency Action

Review under the APA is limited to "final agency action." *Bennett v. Spear*, 520 U.S. 154, 178 (1997). To constitute final agency action: (1) "the action must mark the consummation of the agency's decisionmaking process" and (2) it "must be one by which rights or obligations have been determined, or from which legal consequences will flow." *Id.* at 177–78 (citation omitted). Plaintiffs cannot meet either prong of the test.

Plaintiffs seek judicial review of "any and all final agency actions implementing the unlawful [EO]," ECF No. 21-1 at p. 27, but fail to specifically identify any final agency action with respect to the Treasury. *See* ECF No. 21-1 at pp. 23-25. They do cite one agency action

that has, in their mistaken view, affected them: "the NEA's termination of NPR's grants." ECF No. 1 at p. 32 (Compl. ¶ 117). As discussed above, though, NEA has not withheld any funds from NPR. Berger Decl. ¶ 9; Wiggins Decl. ¶ 7. Rather, NEA paid those grants in full, months before the EO was issued. NEA's termination was effective the same date the grants were previously due to expire. NEA did not impose any additional consequences on NPR – indeed, as part of the termination two of the final reports were waived. Berger Decl. ¶ 11There is therefore no Article III controversy over the termination of those two grants (and if there were, it would be properly brought in the Court of Federal Claims, *see Dep't of Educ. v. California*, 604 U.S.---, 145 S. Ct. 966, 968 (2025)).

Under *Bennett*'s first prong, the EO merely tasks agencies with taking future action consistent with the law; it does not mark the consummation of the agencies' decision-making process. And Plaintiffs cannot point even to "a step" taken by an agency to implement the EO. *Chi. & S. Air Lines, Inc. v. Waterman S.S. Corp.*, 333 U.S. 103, 112 (1948).; *see also EPA v. Brown*, 431 U.S. 99, 104 (1977) ("For [courts] to review [agency actions] not yet promulgated, the final form of which has only been hinted at, would be wholly novel."); *Appalachian Energy Grp. v. EPA*, 33 F.3d 319, 322 (4th Cir. 1994) (no final agency action where agency "has not taken any action at this point triggering [the court's] power to review its position"). Indeed, NEA has already paid out all funds due to Plaintiffs months before the EO was issued, and Treasury has not withheld any funds. Wiggins Decl. ¶¶ 6, 7, Exs. D and E; Moore Decl. ¶¶ 7-8.

Nor do the agency Defendants' potential future attempts to implement the EO satisfy the second *Bennett* prong. Prong two's language includes terms of art reflecting "a 'pragmatic' inquiry that requires courts to examine the 'concrete consequences' of an agency action." *Racing Enthusiasts & Suppliers Coal. v. EPA*, 45 F.4th 353, 358 (D.C. Cir. 2022). The Court must

consider the "concrete impact the [agency action] had on [the Plaintiffs]." *Indep. Equip. Dealers Ass'n v. EPA*, 372 F.3d 420, 427 (D.C. Cir. 2004); *see also FTC v. Standard Oil Co. of Cal.*, 449 U.S. 232, 239 (1980) (considering whether agency action had a "'direct and immediate . . . effect on the day-to-day business' of the complaining parties"); *City of N.Y. v. U.S. Dep't of Def.*, 913 F.3d 423, 431 (4th Cir. 2019) ("This limitation ensures that judicial review does not reach into the internal workings of the government, and is instead properly directed at the effect that agency conduct has on private parties").  Plaintiffs cannot point to any impact stemming from any purported actions of the Defendant agencies implementing the Order.  That is because there are none.

### 2. *Ultra vires* review.

As an alternative to the APA, Plaintiffs ask the Court to conduct non-statutory *ultra vires* review.  But they cannot remotely satisfy its demanding requirements. As the Supreme Court emphasized only weeks ago, such review applies only (1) "when an agency has taken action entirely 'in excess of its delegated powers and contrary to a '*specific prohibition*' in a statute" and (2) "a statutory review scheme forecloses all other forms of judicial review." *NRC*, 145 S. Ct. at 1776.  That is why a nonstatutory *ultra vires* claim "is essentially a Hail Mary pass—and in court as in football, the attempt rarely succeeds." *Id.*; *see also Fed. Express Corp. v. U.S. Dep't of Com.* 39 F.4th 756, 764 (D.C. Cir. 2022) (such claims "confined to extreme agency error where the agency has stepped so plainly beyond the bounds of its statutory authority, or acted so clearly in defiance of it, as to warrant the immediate intervention of an equity court" (cleaned up)).

Plaintiffs cannot meet this standard where there has been no action in the first place. There are no allegations that CPB has terminated funding.  In terminating the grants to NPR,

NEA acted pursuant to its authority under the statute and the terms of the grant—and, in any event, NEA's terminations did not result in withholding any funds from Plaintiffs. Berger Decl. ¶ 9; Wiggins Decl. ¶ 7. And Plaintiffs neither alleged nor established that Treasury has ceased funding to CPB.

Moreover, an *ultra vires* claim necessarily fails where there is an "alternative path to judicial review." *NRC*, 145 S. Ct. at 1776. Here, the APA would apply if there had been final agency action. The fact that there has not been one does not create a back door to reviewability; it illustrates that this case is not amenable to review at all at this juncture. *Accord Vera Inst.*, 2025 WL 1865160 at *1 ("The court cannot grant Plaintiffs relief because it lacks the power to hear their claims under the Administrative Procedure Act.").

**B. The EO Does Not Violate Any Statute.**

For the reasons above, there is no need for this Court to address whether the EO comports with all of the statutes that Plaintiffs have invoked. As explained, there is no justiciable controversy here, and certainly not a viable statutory claim under the APA to any final agency action. But if the Court does go further, it should reject Plaintiffs' arguments. The EO does not run afoul of any statute.

Most fundamentally, the EO does not ask CPB or any other government agency to violate the law. The EO is clear: "The CPB Board shall cancel existing direct funding *to the maximum extent allowed by law* and shall decline to provide future funding." Exec. Order No. 14,290 § 2(a) (emphasis added). And again, in the context of indirect funding: "*to the extent permitted* by the 2024 Television Community Service Grants General Provisions and Eligibility Criteria, the 2024 Radio Community Service Grants General Provisions and Eligibility Criteria, *and applicable law*, the CPB Board shall also prohibit parties subject to these provisions from

funding NPR or PBS after the date of this order." *Id.* § 2(b). The EO on its face thus does not

conflict with any applicable law; it is meant to be applied and implemented consistent with that

law.  And given that the Order has not been implemented yet as to Plaintiffs, this Court cannot

possibly evaluate whether the Order will be implemented in such a way as to violate any statute.

The Supreme Court's recent stay decision in *Trump v.  American Federation of*

*Government Employees* ("*AFGE*"), accords with the conclusion that the EO is not itself a

reviewable final agency action. 606 U.S.---, 2025 WL 1873449 (U.S. July 8, 2025).  In *AFGE*,

the Court reviewed an Executive Order (and implementing OMB/OPM joint memorandum) that

provided a framework for "agencies to plan reorganizations and reductions in force 'consistent

with applicable law.'"  *Id.* at *1 (citation omitted) (Sotomayor, J., concurring in the grant of

stay).  In doing so, the Court distinguished between review of the Presidential direction to

agencies to take action consistent with the law and the agency actions themselves.  *See id*.; *see*

*also id.* ("The District Court enjoined further implementation or approval of the plans based on

its view about the illegality of the Executive Order and Memorandum, not on any assessment of

the plans themselves."). As Justice Sotomayor noted in concurrence, because "[t]he [agency]

plans themselves are not before this Court, at this stage, . . . we thus have no occasion to consider

whether they can and will be carried out consistent with the constraints of law."  *Id.* (Sotomayor,

J., concurring in the grant of stay).

So too here: the challenged EO requires that it "shall be implemented consistent with

applicable law," Exec. Order No. 14,290 § 5(b), and, under *AFGE*, the EO itself is thus not itself

susceptible to APA challenge on the ground that it is contrary to law.  *See also, e.g.*, *Building &*

*Const. Trades Dep't, AFL-CIO v. Allbaugh*, 295 F.3d 28, 32-33 (D.C. Cir. 2002) (noting an EO

directed agencies to take action "to the extent allowed by law," and "[t]hus, if an executive

agency . . . may lawfully implement the Executive Order, then it must do so; if the agency is prohibited, by statute or other law, from implementing the Executive Order, then the Executive Order itself instructs the agency to follow the law").

Even beyond that, none of Plaintiffs' specific objections has merit. *First*, nothing in the PBA precludes the EO. Plaintiffs' primary statutory argument is that the PBA prevents the President, or those acting at his direction from "directing, supervising, or controlling the Corporation." 47 U.S.C. § 398(a); ECF No. 21-1 at p. 18. But, as the Court noted last month, "Congress did provide the President with appointment power and that authority carries with it at least *some* ability to influence the affairs of the Corporation." *Corp. for Pub. Broad.*, 2025 WL 1617191, at *10. Section 398(a)'s otherwise concededly broad language must be understood—at least with respect to the President—with that understanding and limitation. And because there has been no exercised control over CPB to date, Plaintiffs cannot establish a violation of that provision.

*Second*, Plaintiffs assert that the EO violates a provision of the PBA that governs the disbursement of certain satellite interconnection funds ("SIF"). While the EO does not directly address that provision, it does make clear that its terms should be implemented "to the maximum extent allowed by law." Exec. Order No. 14,290. So, if SIF funds are required by law to be disbursed to the local member stations, then the EO instructs those funds to be disbursed (and Plaintiffs do not allege that they have been withheld). *See Building & Const. Trades Dep't*, 295 F.3d at 33. But a plain reading of the statute does not directly require that SIF funds be disbursed to NPR. The relevant provision simply states that funds appropriated to the SIF shall be distributed "to those public telecommunications entities participating in the public radio satellite interconnection system *or* [to] the national entity they designate for satellite

interconnection purposes." 47 U.S.C. § 396(k)(10)(D)(i) (emphasis added). Distribution to the participating entities themselves would satisfy the statute; the designated national entity (assuming it is NPR) is not statutorily required to be funded under this provision.

*Third*, Plaintiffs' argument regarding the NEA falls flat. The NFAH requires that the NEA Chair ensure that "artistic excellence and artistic merit are the criteria by which applications are judged, taking into consideration general standards of decency and respect for the diverse beliefs and values of the American public." 20 U.S.C. § 954(d)(1). The EO does not conflict with these broad statutory standards. Contrary to Plaintiffs' claims, the Order does not introduce a new criterion for NEA to consider in awarding grants. If anything, it simply provides policy direction from the President to the NEA Chair which the NEA Chair may consider in determining areas where "general standards of decency and respect" may be implicated.

*Finally*, Plaintiffs' cursory references to the various Appropriations Acts funding CPB do not advance their arguments. The Appropriations Acts merely provide lump-sum appropriations to CPB; they do not require specific funding to NPR (or any other specific entity). They therefore impose no judicially enforceable restrictions on funding allocations. "For this reason, a fundamental principle of appropriations law is that where 'Congress merely appropriates lump-sum amounts without statutorily restricting what can be done with those funds, a clear inference arises that it does not intend to impose legally binding restrictions." *Lincoln v. Vigil*, 508 U.S. 182, 192 (1993) (citation omitted). In other words, the only applicable function of the Appropriations Acts is to specify an amount of appropriated funds—but the EO does not purport to require CBP to spend *less* than that amount.

## CONCLUSION

For all the reasons stated, the Court should deny Plaintiffs' motion for summary judgment; grant Defendants' cross-motion; and dismiss this action.


Dated:  July 11, 2025                          Respectfully submitted,


BRETT A. SHUMATE
Assistant Attorney General

YAAKOV M. ROTH
Principal Assistant Attorney General
Civil Division

ERIC J. HAMILTON
Deputy Assistant Attorney General

SEAN SKEDZIELEWSKI
Counsel to the Assistant Attorney General

JOSEPH E. BORSON
Assistant Branch Director


*/s/ Carmen M. Banerjee*
CARMEN M. BANERJEE
(D.C. Bar #497678)
Trial Attorney
United States Department of Justice
Civil Division, Federal Programs Branch
1100 L Street NW
Washington, DC 20530
Tel: (202) 514-3183
Fax: (202) 616-8460
Email: carmen.m.banerjee2@usdoj.gov

*Counsel for the Federal Defendants*