# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| NATIONAL PUBLIC RADIO, INC., *et al.*<br><br>*Plaintiffs*,<br><br>*v.*<br><br>DONALD J. TRUMP, *et al.*,<br><br>*Defendants*. | Case No. 25-cv-1674 |

## COMBINED OPPOSITION TO FEDERAL DEFENDANTS' CROSS-MOTION FOR SUMMARY JUDGMENT AND REPLY IN SUPPORT OF PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT

Steven D. Zansberg (*Admitted Pro Hac Vice*)
Zansberg Beylkin LLC
100 Fillmore Street, Suite 500
Denver, CO 80206


*Counsel for Plaintiffs Roaring Fork Public Radio, Inc. d/b/a Aspen Public Radio, Colorado Public Radio, and KUTE, Inc. d/b/a KSUT Public Radio*

Miguel A. Estrada (D.D.C. Bar No. 456289)
GIBSON, DUNN & CRUTCHER LLP
1700 M Street, N.W.
Washington, D.C. 20036-4504

Theodore J. Boutrous, Jr. (D.D.C. Bar No. 420440)
Katie Townsend (D.C. Bar No. 1026115)
GIBSON, DUNN & CRUTCHER LLP
333 South Grand Avenue
Los Angeles, CA 90071-3197

Elizabeth A. Allen (*Admitted Pro Hac Vice*)
NATIONAL PUBLIC RADIO, INC.
1111 North Capitol Street, NE
Washington, D.C. 20002

*Counsel for Plaintiff
National Public Radio, Inc.*

# TABLE OF CONTENTS

Page

INTRODUCTION ............................................................................................................. 1

ARGUMENT .................................................................................................................... 2

I.    Plaintiffs Have a Cause of Action That This Court Has Jurisdiction to Review ........................................................................................................ 2

    A.    Plaintiffs Have an Equitable Cause of Action to Challenge Unconstitutional Acts by Federal Officials ................................... 2

    B.    Federal Defendants' Violations of Clear and Specific Statutory Commands are Subject to *Ultra Vires* Review. ........................... 6

    C.    Plaintiffs' Claims Are Ripe ................................................................ 9

    D.    Plaintiffs' Suit Is Not Moot ............................................................. 13

II.    The Order Violates the Public Broadcasting Act and Other Federal Statutes .................................................................................................... 15

    A.    The Order Violates the Public Broadcasting Act. .......................... 15

    B.    The Order Violates Other Federal Statutes. ................................... 17

    C.    The Order's Boilerplate Disclaimer Does Not Save It. ................. 19

III.    The Order Violates the First Amendment ............................................... 20

    A.    Viewpoint-Based Discrimination Is Unlawful Where, As Here, the Government Funds Private Speech. ............................................ 21

    B.    The Order Effects Unconstitutional Retaliation Through Funding Revocations. .................................................................................... 26

    C.    The Order Violates Plaintiffs' Associational Rights. ..................... 29

IV.    The Order Violates Due Process ............................................................. 31

V.    The Court Should Declare the Order Unlawful and Enjoin its Enforcement ....... 33

CONCLUSION .............................................................................................................. 33

# TABLE OF AUTHORITIES

Page(s)

## Cases

*Agency for Int'l Development v. Alliance for Open Soc'y Int'l, Inc.*,
   570 U.S. 205 (2013)............................................................................................23, 24

*Am. Sch. of Magnetic Healing v. McAnnulty*,
   187 U.S. 94 (1902)...............................................................................................2

*Aref v. Lynch*,
   833 F.3d 242 (D.C. Cir. 2016).............................................................................27

*Armstrong v. Exceptional Child Ctr., Inc.*,
   575 U.S. 320 (2015).............................................................................................2

*Associated Press v. Budowich*,
   2025 WL 1039572 (D.D.C. Apr. 8, 2025).............................................................26

*Axon Enter., Inc. v. Fed. Trade Comm'n*,
   598 U.S. 175 (2023).............................................................................................5

*Bd. of Cnty. Comm'rs v. Umbehr*,
   518 U.S. 668 (1996)...............................................................................23, 27, 28

*Bell v. Hood*,
   327 U.S. 678 (1946).............................................................................................3

*Blanchette v. Connecticut Gen. Ins. Corps.*,
   419 U.S. 102 (1974).............................................................................................12

*Bldg. & Constr. Trades Dept. v. Allbaugh*,
   295 F.3d 28 (D.C. Cir. 2002)...............................................................................20

*Cammarano v. United States*,
   358 U.S. 498 (1959).............................................................................................29

*Chamber of Commerce v. Reich*,
   74 F.3d 1322 (D.C. Cir. 1996).............................................................................4

*Cnty. of San Miguel v. Kempthorne*,
   587 F. Supp. 2d 64 (D.D.C. 2008).......................................................................8

*CPB v. Trump*,
   2025 WL 1617191 (D.D.C. June 8, 2025).............................................11, 15, 16

*Delaware Riverkeeper Network v. FERC*,
   895 F.3d 102 (D.C. Cir. 2018).............................................................................3

*Dombrowski v. Pfister*,
   380 U.S. 479 (1965).............................................................................................10

**TABLE OF AUTHORITIES**

(*continued*)

Page(s)

*FCC v. League of Women Voters of California*,
    468 U.S. 364 (1984)................................................................................23

*Fed. Defs. of New York, Inc. v. Fed. Bureau of Prisons*,
    954 F.3d 118 (2d Cir. 2020)......................................................................3

*Fed. Express Corp. v. U.S. Dep't of Com.*,
    39 F.4th 756 (D.C. Cir. 2022).............................................................5, 6, 7

*Free Enter. Fund v. Pub. Co. Accounting Oversight Bd.*,
    2007 WL 891675 (D.D.C. Mar. 21, 2007)................................................5

*Free Enter. Fund v. Pub. Co. Accounting Oversight Bd.,*
    561 U.S. 477 (2019)...........................................................................2, 3, 5

*Goldberg v. Kelly*,
    397 U.S. 254 (1970)................................................................................31

*Graffius v. Shinseki*,
    672 F. Supp. 2d 119 (D.D.C. 2009).....................................................16, 17

*Hannegan v. Esquire, Inc.*,
    327 U.S. 146 (1946)................................................................................29

*Hou. Cmty. Coll. Sys. v. Wilson*,
    595 U.S. 468 (2022)................................................................................27

*Jenner & Block LLP v. U.S. Dep't of Justice*,
    2025 WL 1482021 (D.D.C. May 23, 2025)......................................4, 9, 10

*Johnston Broad. Co. v. FCC*,
    175 F.2d 351 (D.C. Cir. 1949)...............................................................29

*Juliana v. United States*,
    947 F.3d 1159 (9th Cir. 2020) ...................................................................4

*Lamb's Chapel v. Ctr. Moriches Union Free Sch. Dist.*,
    508 U.S. 384 (1993)................................................................................21

*Leathers v. Medlock*,
    499 U.S. 439 (1991)................................................................................25

*Leedom v. Kyne*,
    358 U.S. 184 (1958)..................................................................................6

*Legal Services Corp. v. Velazquez*,
    531 U.S. 533 (2001)...............................................................21, 22, 24, 25

*Loma Linda-Inland Consortium for Healthcare Educ. v. NLRB*,
    2023 WL 7294839 (D.C. Cir. May 25, 2023)...........................................5

# TABLE OF AUTHORITIES
### (*continued*)

Page(s)

*Lujan v. Defs. of Wildlife,*
   504 U.S. 555 (1992).................................................................................8

*LULAC v. Executive Office of the President,*
   -- F. Supp. 3d --, 2025 WL 1187730 (D.D.C. Apr. 24, 2025) .............................4, 20

*Martin Tractor Co. v. FEC,*
   627 F.2d 375 (D.C. Cir. 1980).........................................................................9

*McCray v. Biden,*
   574 F. Supp. 3d 1 (D.D.C. 2021)....................................................................10

*Media Matters for Am. v. Paxton,*
   138 F.4th 563 (D.C. Cir. 2025).........................................................................9

*Moody v. Netchoice, LLC,*
   603 U.S. 707 (2024)...............................................................................21, 26

*Myers & Myers, Inc. v. U. S. Postal Serv.,*
   527 F.2d 1252 (2d Cir. 1975).........................................................................32

*NAACP v. Alabama ex rel. Patterson,*
   357 U.S. 449 (1958)....................................................................................30

*Nat'l Endowment for the Arts v. Finley,*
   524 U.S. 569 (1998).............................................................19, 23, 26, 32, 33

*Nat'l Park Hospitality Ass'n v. Dep't of Interior,*
   538 U.S. 803 (2003).....................................................................................9

*Nat'l Urban League v. Trump,*
   --- F. Supp. 3d ---, 2025 WL 1275613 (D.D.C. May 2, 2025) .........................10, 11

*Nat'l Assoc. of Postal Supervisors v. U.S. Postal Serv.,*
   26 F.4th 960 (D.C. Cir. 2022)...................................................................6, 7, 8

*Nieves v. Bartlett,*
   587 U.S. 391 (2019)....................................................................................26

*Nuclear Regulatory Comm'n. v. Texas,*
   145 S. Ct. 1762 (2025)............................................................................5, 6, 8

*Pac. Ranger, LLC v. Pritzker,*
   211 F. Supp. 3d 196 (D.D.C. 2016)..................................................................19

*Pearson v. McCaffrey,*
   139 F. Supp. 2d 113 (D.D.C. 2001).................................................................10

*Perkins Coie LLP v. Dep't of Justice,*
   -- F. Supp. 3d --, 2025 WL 1276857 (D.D.C. May 2, 2025) ..................................19

# TABLE OF AUTHORITIES
*(continued)*

Page(s)

*Perry v. Sindermann,*
    408 U.S. 593 (1972)............................................................................................23, 27, 28

*PFLAG, Inc. v. Trump,*
    766 F. Supp. 3d 535 (D. Md. 2025)......................................................................................4

*Regan v. Taxation with Representation of Wash.,*
    461 U.S. 540 (1983)............................................................................................23, 29, 30

*Rhode Island Latino Arts v. Nat'l Endowment for the Arts,*
    -- F. Supp. 3d. --, 2025 WL 1009026 (D.R.I. Apr. 3, 2025)...............................................18

*Roman Catholic Diocese of Brooklyn v. Cuomo,*
    592 U.S. 14 (2020)..................................................................................................................5

*Rosenberger v. Rector & Visitors of Univ. of Va.,*
    515 U.S. 819 (1995)............................................................................................21, 22, 24, 25

*Rust v. Sullivan,*
    500 U.S. 173 (1991)............................................................................................................21

*Sierra Club v. Trump,*
    929 F.3d 670 (9th Cir. 2019) ...............................................................................................3

*Sorrell v. IMS Health Inc.,*
    564 U.S. 552 (2011)............................................................................................................26

*Speiser v. Randall,*
    357 U.S. 513 (1958)............................................................................................................29

*Sullivan v. City of Augusta,*
    511 F.3d 16 (1st Cir. 2007)..................................................................................................10

*Texas v. United States,*
    523 U.S. 296 (1998)..............................................................................................................9

*Trump v. Am. Fed. of Gov't Employees,*
    2025 WL 1873449 (U.S. July 8, 2025)..............................................................................20

*Trump v. Hawaii,*
    585 U.S. 667 (2018)..............................................................................................................3

*Turner v. U.S. Agency for Glob. Media,*
    502 F. Supp. 3d 333 (D.D.C. 2020)......................................................................................4

*United States v. Am. Library Ass'n,*
    539 U.S. 194 (2003)............................................................................................................25

*Webster v. Doe,*
    486 U.S. 592 (1988)..............................................................................................................5

# TABLE OF AUTHORITIES
### (*continued*)

Page(s)

*Wilmer Cutler Pickering Hale & Dorr LLP v. Exec. Off. of the President*,
    2025 WL 1502329 (D.D.C. May 27, 2025)...................................................................11

*Woodhull Freedom Found. v. United States*,
    72 F. 4th 1286 (D.C. Cir. 2023)...........................................................................32

*Youngstown Sheet & Tube Co. v. Sawyer*,
    343 U.S. 579 (1952)................................................................................................3

*Ysursa v. Pocatello Education Ass'n*,
    555 U.S. 353 (2009)..............................................................................................25

## Statutes

5 U.S.C. § 704 ..........................................................................................................4

20 U.S.C. § 954(d)(1) ..............................................................................................18

47 U.S.C. § 396(a)(3) ..............................................................................................25

47 U.S.C. § 396(a)(10) .............................................................................................15

47 U.S.C. § 396(k)(3)(A)(iii)(III) .......................................................................16, 31

47 U.S.C. § 396(k)(6)(B) .......................................................................................7, 32

47 U.S.C. § 396(k)(10)(D)(i) .............................................................................7, 16, 17

47 U.S.C. § 398(a) ...............................................................................................7, 15

## Other Authorities

1 Annals of Cong. 919 (1789)...................................................................................26

2 Op. O.L.C. 41 (1978)............................................................................................17

Corp. for Public Broadcasting, "Request for Proposals for Entity to Manage and
    Govern Public Radio Content Distribution".....................................................11, 12

Donald Trump (@realDonaldTrump), Truth Social (July 10, 2025),
    https://truthsocial.com/@realDonaldTrump/posts/114831435031070955.............................14

L. Manheim & K. Watts, *Reviewing Presidential Orders*, 86 U. Chi. L. Rev. 1743
    (2019)........................................................................................................3

Rescission Proposal No. R25-21, "Report Pursuant to Section 1012 of the
    Congressional Budget and Impoundment Control Act of 1974 (2 U.S.C. 683)"
    (May 28, 2025)..............................................................................................13

**TABLE OF AUTHORITIES**
(*continued*)

Page(s)

**Regulations**

Exec. Order 14290, 90 Fed. Reg. 19415 (2025) ............................................................................7

## INTRODUCTION

Executive Order 14290, "Ending Taxpayer Subsidization of Biased Media," blatantly violates the First Amendment, the Public Broadcasting Act (PBA), and multiple other federal statutes. Notwithstanding an express statutory prohibition against Executive Branch interference in the affairs of the Corporation for Public Broadcasting (CPB), the Order commands CPB to withhold funding from speakers disfavored by the Administration and to prohibit others that wish to associate with those speakers and air their programming from doing so. The Order is textbook retaliation and viewpoint discrimination forbidden not only by the First Amendment but also, here, by statute.

The Administration admits that the Order seeks to deprive National Public Radio (NPR) of funds because of the content and perceived viewpoints of its news and other programming. And the Administration does not seriously contest that the Order violates the PBA. Instead, it relies on a mix of imagined procedural hurdles and a patently erroneous understanding of the First Amendment's application in the context of government funding. But no procedural obstacle bars the Court from deciding this case: Plaintiffs have a cause of action and their claims are ripe for adjudication; indeed, Plaintiffs' need for relief has only become more urgent in recent weeks, with the Administration filing a lawsuit to take over CPB and repeating its content-based attacks on NPR. Indeed, Congress's recent enactment of legislation rescinding CPB's funding for Fiscal Years 2026 and 2027 at President Trump's request, based on his stated antipathy towards NPR's content, only confirms that the Order is singularly motivated by retaliatory animus.

On the merits, the Administration struggles mightily to ignore the PBA—contending that Plaintiffs cannot challenge the Order's violations of federal statutes and relegating its statutory arguments to the last few pages of its brief. But the PBA is fundamental to the structure that Congress established in furtherance of its spending authority. The Order's indisputable violation

of the PBA not only renders it invalid on statutory grounds but also underscores the Order's in-compatibility with the First Amendment.  In enacting the PBA, Congress chose to fund private speech to encourage a diversity of viewpoints in furtherance of the public good.  The President, in contravention of that purpose and of the law, has unilaterally sought to punish NPR and its Member stations based on his own disagreement with—and in retaliation for—their protected speech.  That cannot be tolerated under the Constitution.  Plaintiffs are entitled to summary judgment.[1]

## ARGUMENT

I.    **Plaintiffs Have a Cause of Action That This Court Has Jurisdiction to Review**

A.    **Plaintiffs Have an Equitable Cause of Action to Challenge Unconstitutional Acts by Federal Officials.**

Plaintiffs have stated an equitable cause of action for declaratory and injunctive relief.  As an initial matter, the Federal Defendants do not dispute that Plaintiffs may seek equitable relief with respect to the Order on constitutional grounds.  That is for good reason.  The Supreme Court has explained that the "ability to sue to enjoin unconstitutional actions by . . . federal officers is the creation of courts of equity, and reflects a long history of judicial review of illegal executive action, tracing back to England."  *Armstrong v. Exceptional Child Ctr., Inc.*, 575 U.S. 320, 326-27 (2015); *see also Am. Sch. of Magnetic Healing v. McAnnulty*, 187 U.S. 94 (1902).

In line with this principle, the Supreme Court repeatedly has permitted constitutional chal-lenges to prospectively block official action even when plaintiffs lacked a statutory cause of action under the Administrative Procedure Act (APA) or any specific review provision.  For example, in *Free Enterprise Fund v. Public Company Accounting Oversight Board*, the Court rejected the gov-ernment's assertion that the plaintiffs lacked a "private right of action" to press their constitutional

---

[1] CPB has not submitted any filing in response to Plaintiffs' motion for summary judgment and has therefore waived any arguments in opposition.

claims—recognizing instead that plaintiffs may pursue "Appointments Clause or separation-of-powers claim[s]" against federal officials in the same way as "every other constitutional claim": by invoking courts' "equitable" power to "'issue injunctions to protect rights safeguarded by the Constitution.'"  561 U.S. 477, 491 n.2 (2019) (quoting *Bell v. Hood*, 327 U.S. 678, 684 (1946)).

Similarly, in *Youngstown Sheet & Tube Co. v. Sawyer*, the Court affirmed an injunction restraining the Secretary of Commerce's seizure, pursuant to an executive order, of a steel mill as exceeding the constitutional authority of the Executive.  343 U.S. 579, 582, 588-89 (1952).  The plaintiff did not bring a statutory cause of action; the Court upheld the injunction as an exercise of "equity[]" power.  *Id.* at 584; *see* L. Manheim & K. Watts, *Reviewing Presidential Orders*, 86 U. Chi. L. Rev. 1743, 1807 & n.329 (2019) (explaining that "the *Youngstown* plaintiffs declined to rely on the APA," and that *Youngstown* is "'perhaps the most notable nonstatutory review case ever").  More recently, in *Trump v. Hawaii*, 585 U.S. 667 (2018), the Court "reached the merits of the plaintiffs' Establishment Clause claim" regarding an executive order "[w]ithout discussing whether a cause of action existed to challenge the alleged constitutional violation." *Sierra Club v. Trump*, 929 F.3d 670, 695 (9th Cir. 2019).

In light of *Armstrong*, *Free Enterprise Fund*, *Youngstown*, and *Hawaii*, the D.C. Circuit, other courts of appeals, and district courts, including in this district, all have concluded that the "Supreme Court has recognized an implied action for prospective relief against allegedly unconstitutional actions by federal officials." *Delaware Riverkeeper Network v. FERC*, 895 F.3d 102, 107 (D.C. Cir. 2018), *overruled on other grounds by Allegheny Defense Project v. FERC*, 964 F.3d 1 (D.C. Cir. 2020); *see also, e.g.*, *Sierra Club*, 929 F.3d at 694-95 (citing *Armstrong*, *Youngstown*, and *Hawaii* for the proposition that "Plaintiffs may seek equitable relief to remedy an alleged constitutional violation"); *Fed. Defs. of New York, Inc. v. Fed. Bureau of Prisons*, 954 F.3d 118,

133–34 (2d Cir. 2020) (*Armstrong* and *Free Enterprise Fund* show that "a plaintiff may invoke the court's equitable powers to enjoin a defendant from violating constitutional provisions that do not, themselves, grant any legal rights to private plaintiffs"); *Turner v. U.S. Agency for Glob. Media*, 502 F. Supp. 3d 333, 372–73 (D.D.C. 2020) (plaintiffs have an "equitable cause of action" to bring their "constitutional claims").  The Federal Defendants cite no cases to the contrary.

Further, as the D.C. Circuit explained in *Chamber of Commerce v. Reich*, plaintiffs may "bring a non-statutory cause of action questioning the legality of [an] Executive Order" even when "a cause of action under the APA is not available."  74 F.3d 1322, 1327-28 (D.C. Cir. 1996). Courts "have continuously reviewed, construed, and revised executive orders from the Civil War . . . through the Second World War and beyond" by "invoking the courts' equitable powers" to issue declaratory relief and enjoin the President's "subordinate officers and agencies." *LULAC v. Executive Office of the President*, --- F. Supp. 3d ---, 2025 WL 1187730, at *16 (D.D.C. Apr. 24, 2025) (internal citations omitted); *see also, e.g.*, *Jenner & Block LLP v. U.S. Dep't of Justice*, 2025 WL 1482021, at *5, *26 (D.D.C. May 23, 2025) (granting declaratory and injunctive relief on plaintiffs' constitutional challenge to an executive order).

The Federal Defendants therefore miss the point when they insist that review under the APA is unavailable because there has been no final agency action.  Dkt. 30-9 at 27-29.  Final agency action is a requirement of the APA, *see* 5 U.S.C. § 704, but Plaintiffs *do not depend on the APA for their cause of action*.  Plaintiffs need not wait for final agency action before bringing an equitable cause of action seeking declaratory and injunctive relief to prevent ongoing or imminent constitutional violations.  *See Juliana v. United States*, 947 F.3d 1159, 1167-68 (9th Cir. 2020) (holding that plaintiffs' constitutional claims "may proceed independently of the review procedures mandated by the APA"); *PFLAG, Inc. v. Trump*, 766 F. Supp. 3d 535, 554 n.19 (D. Md.

2025) ("Plaintiffs are not required to wait for a final agency action before bringing a suit for equitable relief."). That is why the plaintiffs in *Free Enterprise Fund* were able to bring a constitutional challenge against the Public Company Accounting Oversight Board to halt the Board's *ongoing* investigation—even though there was no final agency action and they did not bring an APA claim. *Free Enter. Fund*, 561 U.S. at 487; *see Free Enter. Fund v. Pub. Co. Accounting Oversight Bd.*, 2007 WL 891675, at *2-3 (D.D.C. Mar. 21, 2007), *aff'd*, 537 F.3d 667 (D.C. Cir. 2008); *see also, e.g.*, *Axon Enter., Inc. v. Fed. Trade Comm'n*, 598 U.S. 175, 182-84 (2023) (finding district court had jurisdiction over constitutional challenges to ongoing, non-final agency proceedings).

Further, channeling Plaintiffs' constitutional claims through the APA (and requiring final agency action before allowing suit) would be particularly inappropriate and harmful to Plaintiffs here because the chilling effects from the Order's viewpoint discrimination and retaliation are inflicting ongoing, irreparable First Amendment injury. *See infra* at 8-9; Dkt. 21-1 at 51-52; *Roman Catholic Diocese of Brooklyn v. Cuomo*, 592 U.S. 14, 19 (2020). Requiring final agency action here would effectively deny "any judicial forum for a colorable constitutional claim" because the Administration could subject Plaintiffs to unconstitutional retaliation by threatening their funding without taking final action. *Webster v. Doe*, 486 U.S. 592, 603 (1988).

Thus, Plaintiffs have an equitable cause of action to bring their constitutional claims that does not require final agency action.[2] Those claims may proceed.

---

[2] The Administration also contests Plaintiffs' non-statutory *ultra vires* cause of action, Dkt. 30-9 at 29, but the cases it cites as purported support for its "demanding requirements" all discuss *ultra vires* review of *statutory* violations. *See Nuclear Regulatory Comm'n v. Texas ("NRC")*, 145 S. Ct. 1762, 1776 (2025) (*ultra vires* review is available when an agency acts "contrary to a *specific prohibition* in a statute" (quotation marks omitted)); *Fed. Express Corp. v. U.S. Dep't of Com.*, 39 F.4th 756, 763-64 (D.C. Cir. 2022) (similar). The Administration cites no authority for the proposition that bringing an equitable cause of action for a *constitutional* violation is tantamount to a "Hail Mary pass," Dkt. 30-9 at 29, and the cases cited above make clear courts do not apply any heightened standard to such constitutional claims. *Cf. Loma Linda-Inland Consortium for*

**B.**     **Federal Defendants' Violations of Clear and Specific Statutory Commands are Subject to *Ultra Vires* Review.**

Plaintiffs also have an equitable, *ultra vires* cause of action—separate from any cause of action under the APA—to seek an order declaring unlawful and enjoining an "attempted exercise of power" that violates a "specific prohibition" in a statute.   *NRC*, 145 S. Ct. at 1775 (quoting *Leedom v. Kyne*, 358 U.S. 184, 188-89 (1958)); *see Fed. Express Corp. v. U.S. Dep't of Com.*, 39 F.4th 756, 763 (D.C. Cir. 2022) ("This nonstatutory form of judicial review survived the enactment of the APA.").   The Supreme Court in *NRC* framed the substantive standard for *ultra vires* claims in line with how the D.C. Circuit described it in *National Association of Postal Supervisors v. U.S. Postal Service*, 26 F.4th 960 (D.C. Cir. 2022).   In that case, the Postal Service was "expressly exempt from review under the . . . APA." *Id.* at 970 (quotation marks omitted).   But as the D.C. Circuit held, "the case law in this circuit is clear that judicial review is available when an agency acts ultra vires, or outside of the authority Congress granted." *Id.* (quotation marks omitted).   That standard is satisfied when the challenged action contravenes a "clear and specific statutory mandate," and *ultra vires* review "subsumes review of claims involving positive statutory commands" and "questions of statutory interpretation." *Id.* at 971 (quotation marks omitted); *see Fed. Express*, 39 F.4th at 764 (*ultra vires* review lies when an agency "patently . . . misconstru[es]" a statute, "disregard[s] a specific and unambiguous statutory directive" or "violates a specific command of a statute" (cleaned up)).   In short, "[s]o long as a statutory provision plainly delineates the outer limits of agency authority and Congress has not expressly precluded judicial review, the provision

---

*Healthcare Educ. v. NLRB*, 2023 WL 7294839, at *15-16 (D.C. Cir. May 25, 2023) (Rao, J., dissenting) (arguing that for purposes of establishing district court jurisdiction notwithstanding a special statutory review scheme, constitutional claims do not require the "strong and clear" showing that statutory violations do).

may be susceptible to review for *ultra vires* acts that clearly violate its terms." 26 F.4th at 971. *NRC* did not disturb this circuit precedent.

If the standard to bring an *ultra vires* claim is satisfied anywhere, it is satisfied here. Indeed, it is difficult, if not impossible, to conceive of an *ultra vires* claim more clearly meritorious than this one. Most obviously, the Public Broadcasting Act expressly denies "authoriz[ation to] any department, agency, officer, or employee of the United States to exercise any direction, supervision, or control over . . . the Corporation or any of its grantees or contractors." 47 U.S.C. § 398(a). Yet despite this unambiguous prohibition, Section 2 of the Order purports to "[i]nstruct[] . . . [t]he CPB Board [to] cease direct funding to NPR" and to "cease indirect funding to NPR . . . including by ensuring" that local public radio stations, like the Local Member Stations here, "do not use federal funds for NPR" because the President objects to NPR's content. Exec. Order 14290 § 2, 90 Fed. Reg. 19415; *see* Dkt. 21-1 at 36-37. The Order (and any actions that federal officials might take to enforce it) "disregard[s]" Section 398(a)'s "specific and unambiguous statutory directive." *Fed. Express*, 39 F.4th at 764. By commanding CPB to prohibit local stations from using federal funds for NPR content and other offerings, the Order also clearly contravenes the Act's requirement that CPB distribute funds "on the basis of" four neutral factors. 47 U.S.C. § 396(k)(6)(B). And the Order purports to override the Act's "specific command," *Fed. Express*, 39 F.4th at 764, that CPB allocate funds appropriated to the Satellite Interconnection Fund to support the Public Radio Satellite System (PRSS) to "the national entity" that the participating public radio stations "designate for satellite interconnection purposes," 47 U.S.C. § 396(k)(10)(D)(i).

Rather than engage seriously on the merits, the Administration contends that the *ultra vires* standard cannot be satisfied "where there has been no action in the first place." Dkt. 30-9 at 29.

But it cites no authority for the proposition that an *ultra vires* claim is unavailable to enjoin immi-

nent, threatened official action that has not yet occurred in response to an official, express com-

mand from the President.  While *NRC* discussed *ultra vires* action in the past tense because the

agency action in question had already occurred, the Court said nothing about the proper timeframe

for review.  And *Postal Supervisors* held that *ultra vires* review is available for "acts that clearly

violate [a statute's] terms"—without specifying whether those acts need be completed or only

threatened.  26 F.4th at 971.  There is no reason to believe that *ultra vires* claims uniquely are

unavailable when plaintiffs seek declaratory and injunctive relief to prevent an imminent, harmful

official act.  *See Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992) (Article III injury exists for

"actual *or imminent*" harms (emphasis added)).  And here, there *was* an unlawful official action—

issuance of the Executive Order—*and* there is threatened, imminent enforcement of that order.

*See infra* at 11 (efforts to remove noncompliant CPB board members).

Finally, the Federal Defendants' contention that Plaintiffs' *ultra vires* claims fail because

there is an "alternative path to judicial review" fares no better.  Dkt. 30-9 at 30 (quotation marks

omitted).  *NRC* held that *ultra vires* review is precluded when there is a "*meaningful and adequate*

opportunity for judicial review, or if a statutory review scheme forecloses all other forms of judi-

cial review."  145 S. Ct. at 1776 (quotation marks omitted; emphasis added).  The Administration

claims that review under the APA (once there is final agency action) provides an alternative path

to review, but they do not argue that such review would be meaningful and adequate.  It would not

be.  Plaintiffs are suffering irreparable harm *now* as a result of the unlawful Order:  the content-

and viewpoint-based Executive Order is chilling NPR's and the Local Member Stations' speech.

*See* Statement of Undisputed Material Facts (SUMF) at 24 (¶ 181), 26 (¶¶ 191-92), 28 (¶¶ 202-

03), 29 (¶¶ 217-18).  Local Member stations, including Plaintiffs, are uncertain as to the

permissibility and consequences of spending federal funds to license NPR programming or other-wise associate with NPR, *see, e.g.*, SUMF at 26 (¶¶ 191-92), and any significant decline in funding that NPR receives from Member stations would cause dramatic harm to NPR's mission, *see id.* at 23-24 (¶¶ 174-80). Plaintiffs therefore may maintain their *ultra vires* claim before there is final agency action notwithstanding the possibility of future APA review.

### C.    Plaintiffs' Claims Are Ripe.

The Administration's assertion that this case is not ripe for review is meritless. "Ripeness is a justiciability doctrine designed to … avoid[] premature adjudication." *Nat'l Park Hospitality Ass'n v. Dep't of Interior*, 538 U.S. 803, 807 (2003) (quotation marks omitted). A claim is not ripe when it alleges a harm that "may not occur" or is "contingent [on] future events that may not occur as anticipated." *Texas v. United States*, 523 U.S. 296, 300 (1998) (quotation marks omitted). The Administration argues that Plaintiffs' harms are uncertain, Dkt. 30-9 at 14-17, but this is wrong on both the law and the facts. Plaintiffs are already suffering injuries, and more are impending.

As Plaintiffs have explained, the Order is inflicting ongoing First Amendment harms. Plaintiffs have described, and the Administration does not dispute, that the Order's retaliation and viewpoint discrimination is chilling Plaintiffs' speech and affecting their ongoing operations. *See* SUMF at 24 (¶ 181), 26 (¶¶ 191-92), 28 (¶¶ 202-03), 29 (¶¶ 217-18); Gov't Response to SUMF at 32 (¶ 181), 34 (¶¶ 191-92), 36 (¶¶ 202-03), 38 (¶¶ 217-18). As the D.C. Circuit recently made clear, a claim of retaliation is a "claim regarding concrete harm." *Media Matters for Am. v. Paxton*, 138 F.4th 563, 580 (D.C. Cir. 2025); *see also id.* at 585 (a "campaign of retaliation . . . in response to [the] exercise of [] First Amendment rights" is "an irreparable injury"); *Jenner*, 2025 WL 1482021, at *14 ("the injury to Jenner's constitutional right to express itself without fear of gov-ernment reprisal itself confers standing").

9

Further, courts have consistently held that "the chill upon first amendment freedoms" is enough to ripen a First Amendment challenge. *Martin Tractor Co. v. FEC*, 627 F.2d 375, 380 (D.C. Cir. 1980); *see*, *e.g.*, *Pearson v. McCaffrey*, 139 F. Supp. 2d 113, 119 (D.D.C. 2001) (First Amendment claim was ripe where plaintiffs had "provided affidavits from physicians that describe the chilling effect that … [a] federal policy has had on their speech"); *Sullivan v. City of Augusta*, 511 F.3d 16, 31 (1st Cir. 2007) ("when free speech is at issue, concerns over chilling effect call for a relaxation of ripeness requirements"). Plaintiffs have explained why their First Amendment harms are irreparable and justify injunctive relief. Dkt. 21-1 at 51-52. And the irreparable nature of those harms demonstrates that Plaintiffs' claims are ripe. *Cf. McCray v. Biden*, 574 F. Supp. 3d 1, 13 n.4 (D.D.C. 2021) ("there is substantial overlap between the constitutional aspect of the ripeness doctrine and the 'irreparable injury' element of the TRO factors"); *Dombrowski v. Pfister,* 380 U.S. 479*,* 486-87 (1965) (holding that those who face prospective violation of their First Amendment rights need not wait until such violation has occurred before seeking judicial relief to *avoid* that violation).

Rather than dispute Plaintiffs' arguments, the Administration contends, in essence, that Plaintiffs' claims are nevertheless unripe because CPB may simply ignore the Order. Dkt. 30-9 at 15. That "argument is peculiar in its self-deprecation. It requires the defendants to disclaim the [O]rder's potency at accomplishing its stated aim." *Jenner*, 2025 WL 1482021, at *14. But where, as here, "*Defendants* are the ones speculating by suggesting that the agencies will disregard" the Order's "clear mandates," their "assertion that the agencies might implement the [Order's] provisions in uncertain ways does not create a ripeness problem." *Nat'l Urban League v. Trump*, --- F. Supp. 3d ---, 2025 WL 1275613, at *12 (D.D.C. May 2, 2025) (italics in original). The Administration's own legal position is that CPB must follow the Order's "straightforward directive[s],"

*id.*; the Order presumably would not have been issued otherwise. And the Administration is clearly not content to sit idly by and allow its Order to go unimplemented. As Plaintiffs have explained and as the Administration does not contest, the Administration has been taking active steps to dismantle CPB's leadership—presumably to effectuate compliance with the Order. Dkt. 21-1 at 24-25. That action has only intensified: on July 15, the government filed a *quo warranto* action against the three CPB board members whom the President purported to fire in April, seeking to "oust them from that office." Complaint ¶ 1, *United States v. Ross*, Dkt. 1, No. 25-2261 (D.D.C.).[3]

But that is not all. For NPR and the Local Member Stations alike, the Order has given rise to tremendous uncertainty that has disrupted their planning and operations. SUMF at 23-24 (¶¶ 174-77), 26 (¶ 192), 28 (¶¶ 208-10), 30 (¶ 221-22); *see Wilmer Cutler Pickering Hale & Dorr LLP v. Exec. Off. of the President*, 2025 WL 1502329, at *10 (D.D.C. May 27, 2025) (rejecting argument that challenge to executive order was not ripe where the order "create[d] significant uncertainty"). Indeed, the Order has put to the Local Member Stations and other public radio stations a "forced choice" to "change their programming" or face further retaliation. *Nat'l Urban League*, 2025 WL 1275613, at *11; *see* SUMF at 26 (¶¶ 191-92), 28 (¶¶ 202-03), 29 (¶¶ 217-18). And with more than $8 million in membership and programming fees still due to NPR from local public radio stations for Fiscal Year 2025 alone, the Order's threat to local public radio stations has financial repercussions not only for them but also for NPR. Statement of Additional Undisputed Material Facts ("SAUMF") at 12 (¶ 237).

---

[3] The Administration also misleadingly suggests that questions regarding "CPB's relationship with the federal government, and the degree of control that the government may exercise over it" will be resolved in *CPB v. Trump*, No. 25-1305 (D.D.C.). Dkt. 30-9 at 15. But that case concerns the discrete question of whether the President has authority to remove CPB's board members; it is *this* case that presents the question of whether the President may dictate CPB's actions.

Further, on July 14, CPB issued a Request for Proposals (RFP) seeking a new "entity to manage and govern Radio Broadcast and Digital Content Distribution services."[4]  SAUMF at 12 (¶ 232).  That is, CPB is seeking to replace NPR as the manager and operator of the PRSS.  This jarring request for a new entity to administer content distribution—after decades of successful operation and management of the PRSS by NPR, as the entity designated by the interconnected stations to fulfill that role, *see* SUMF at 5 (¶ 36)—can hardly be coincidental.  Indeed, in a nod to the Order, the RFP even states that eligible applicants must be "legally and functionally able to receive CPB funding by September 30, 2025."  RFP at 4.  Thus, even apart from the ongoing, irreparable constitutional harms to Plaintiffs inflicted by the Order, the economic harms from the Order have already crystallized.  *Cf. Blanchette v. Connecticut Gen. Ins. Corps.*, 419 U.S. 102, 139-40 (1974) ("[S]ince ripeness is peculiarly a question of timing, it is the situation now . . . that must govern.").

Moreover, Plaintiffs' challenge to the Order is ripe with respect to federal agencies.  Although the National Endowment for the Arts (NEA) terminated NPR's grant after it had been already paid, *see* Dkt. 30-9 at 13, the Order makes clear that NPR is no longer eligible to receive any NEA grants in the future; there is no contingent agency action that might change this fact.  Indeed, although NPR has applied for and won grants from NEA, without fail, for decades, it was informed just days ago that its most recent grant application was denied.  SAUMF at 13 (¶¶ 235-36).  While the Order remains in effect, there is no doubt that any future NPR grant applications—which have become all the more important to NPR's functioning now that the President's

---

[4] Corp. for Public Broadcasting, "Request for Proposals for Entity to Manage and Govern Public Radio Content Distribution," ("RFP") at 1, available at https://cpb.org/sites/default/files/rfp/2ecfcc9a/Request%20for%20Proposals%20CPB%20-%20RFP%20Content%20Distribution%20Services%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.pdf.  CPB's notification of the RFP is available at https://cpb.org/grants/Entity-Manage-and-Govern-Public-Radio-Content-Distribution.

viewpoint- and content-based rescission request to Congress has succeeded—will be denied too, as the Administration does not contest.  NPR thus has a ripe dispute against the NEA.

Additionally, although Treasury has not so far withheld funding to CPB, there is no legal development, short of Treasury ignoring the Order, that would forestall this injury.  As detailed below, the best interpretation of the Order is that it restricts Treasury from disbursing funds to CPB for as long as CPB funds NPR.  *See infra* at 17.  Although the Administration asserts that "Treasury has continued to make payments to CPB since the [Order] was issued," Dkt. 30-9 at 16, that is not what its accompanying declaration says.  The declaration says only that Treasury has not "taken any actions to reduce funding for CPB, to deny CPB funding, or withhold any funding from CPB pursuant to any Executive Orders."  Dkt. 30-6 ¶ 7.  Absent a clear, unequivocal commitment from Treasury that it will not comply with the Order, the Court must assume it will abide by it.

### D.    Plaintiffs' Suit Is Not Moot.

Lastly, Congress's recent enactment of the President's rescission request does not moot this case; rather, it amplifies the need for injunctive and declaratory relief.  As Plaintiffs previously noted, the President requested that funding for CPB be rescinded for Fiscal Years 2026 and 2027 on the grounds that the public media system "is politically biased and an unnecessary expense to the taxpayer."[5]  Throughout the legislative process, the President repeated his exhortations that Congress should revoke public media funding based on the content produced by, and the perceived viewpoints of, NPR and PBS.  For example, on July 10, 2025, President Trump posted on social media, "It is very important that all Republicans adhere to my Recissions Bill and, in particular,

---

[5] *See* Rescission Proposal No. R25-21, "Report Pursuant to Section 1012 of the Congressional Budget and Impoundment Control Act of 1974 (2 U.S.C. 683)" (May 28, 2025), *available at* https://www.whitehouse.gov/wp-content/uploads/2025/03/Proposed-Rescissions-of-Budgetary-Resources.pdf.

DEFUND THE CORPORATION FOR PUBLIC BROADCASTING (PBS and NPR), which is worse than CNN & MSDNC put together."[6]

While this action by Congress raises its own First Amendment concerns, the rescission does not have any impact on the justiciability of this case.  First and foremost, CPB still retains previously appropriated and non-rescinded funds for satellite interconnection purposes.  *See* Dkt. 21-1 at 25 (describing CPB's ongoing negotiations for the extension of its PRSS Interconnection grant with NPR for over $35 million).  Indeed, it is that pool of funds that CPB may now steer to another entity because of the Order.  *See supra* at 12.  Additionally, certain grant funds that were awarded by CPB to support the development of NPR's editorial operations that have not yet been paid to NPR; payment of those funds is governed by an existing grant agreement between CPB and NPR.  SAUMF at 12 (¶ 234).

Second, as noted above, although CPB has released much of its Fiscal Year 2025 public broadcasting funds to NPR and to the Local Member Stations, the Order creates uncertainty as to whether Local Member Stations may use those funds for NPR programming—or whether doing so could trigger adverse action by CPB or the Administration (*e.g.*, an effort to claw back funds). *See* SAUMF at 12 (¶ 237) (noting that more than $8 million in membership and programming fees due to NPR from local stations for Fiscal Year 2025 remain unpaid).  Third, the PBA remains fully in effect, and if or when Congress appropriates any public broadcasting funds for CPB as part of its larger Fiscal Year 2026 funding legislation—or as part of any other legislation—the Order would still operate to impose its unconstitutional restrictions.  Lastly, the rescission legislation has no effect on federal agencies such as the NEA, and the Order continues to bar NEA from issuing

---

[6]  Donald Trump (@realDonaldTrump), Truth Social (July 10, 2025), https://truth-social.com/@realDonaldTrump/posts/114831435031070955.

grants to NPR.

## II.     The Order Violates the Public Broadcasting Act and Other Federal Statutes

With the Administration's procedural arguments cleared away, the Court can easily resolve the merits.  The Administration scarcely contests that the Order violates the PBA and multiple other statutes.  Plaintiffs identified six ways in which the Order was illegal; the government forfeits two and, on the rest, offers but a few sentences.  Rather than grapple with the merits of each statutory issue, the Administration stakes nearly all its defense of the Order on boilerplate language that the Order should be implemented "consistent with applicable law."  Dkt. 30-9 at 30-31.  But when the Order cannot meaningfully be applied *without* violating the law, that disclaimer is meaningless.

### A.     The Order Violates the Public Broadcasting Act.

*Violation of 47 U.S.C. § 398(a):*  The PBA's foundational principle is that public media funding should have "maximum protection from extraneous [influence]."  47 U.S.C. § 396(a)(10).  To that end, the Act tasks a private corporation, CPB, with disbursing federal funding for public media and denies "authoriz[ation to] any department, agency, officer, or employee of the United States to exercise any direction, supervision, or control over . . . the Corporation."  *Id.* § 398(a).

The Order openly defies that unambiguous prohibition.  The President and any federal actors who might implement the Order are "department[s], agenc[ies], officer[s], or employee[s] of the United States."  And the Order, which "[i]nstruct[s] . . . [t]he [Corporation's] Board" not to fund NPR, undoubtedly "direct[s]" CPB to take certain actions.  Order § 2; *see* Dkt. 21-1 at 28-31.  The Administration contests neither point.  *See* Dkt. 30-9 at 32.  Its entire response is that "Congress did provide the President with appointment power[,] and that authority carries with it at least *some* ability to influence the affairs of the Corporation."  *Id.* (quoting *CPB v. Trump*, 2025 WL 1617191, at *10 (D.D.C. June 8, 2025)).  But as that excerpt demonstrates, the only "influence"

the PBA grants the President is "*through the selection of directors*."  *CPB v. Trump*, 2025 WL 1617191, at *7 (emphasis added).  Once those directors have been selected, the Act explicitly forbids the President from exercising any control—a point to which the Administration has no answer.

   *Violation of 47 U.S.C. § 396(k):*  Even if the President or his subordinates had some power to direct the Corporation (they do not), they still could not give it directions that are illegal under other provisions of the PBA—which the Order does.  The President instructed CPB to defund NPR based on his disapproval of NPR's speech.  But the PBA requires CPB to award its Community Service Grants (which comprise 93% of its public radio funding) to local public radio stations based exclusively on four neutral criteria like an applicant's "financial needs" and whether the funded content "serve[s] the needs of national audiences."  47 U.S.C. § 396(k)(3)(A)(iii)(III); *see* Dkt. 21-1 at 31-32.   CPB has no leeway under the PBA to condition funding for local stations based on the President's dislike of a speaker's viewpoints.  The Administration ignores this argument too and therefore concedes it.  *See Graffius v. Shinseki*, 672 F. Supp. 2d 119, 127 (D.D.C. 2009).

   *Violation of 47 U.S.C. § 396(k)(10)(D)(i):*  The Order next violates the Act's command that CPB "shall" disburse a separate pool of money, the Satellite Interconnection Fund, to "the national entity" that public radio stations "designate for satellite interconnection purposes."  47 U.S.C. § 396(k)(10)(D)(i).  America's public radio stations have designated NPR for that role.  SUMF at 5 (¶ 36).  Accordingly, CPB must fund NPR's operation of the system—specifically, the "capital costs of the replacement, refurbishment, or upgrading of the[] national satellite interconnection system [PRSS] and associated maintenance."  47 U.S.C. § 396(k)(10)(D)(i); Dkt. 21-1 at 32.

The Administration's response misreads the statute. It is true, as the Administration argues, that the statute contemplates a choice: PRSS funds must be allocated to the "broadcast stations" "*or*" to "the national entity they designate." Dkt. 30-9 at 32-33 (quoting 47 U.S.C. § 396(k)(10)(d)(i)). But that choice is not the President's to make—nor is it CPB's. The Act specifies that the *radio stations* get to decide whether to designate a national entity to manage the PRSS, and if so, who. It then requires CPB to honor that designation. The Administration's contrary suggestion that CPB can just give the PRSS funds to local radio stations is absurd. Each station cannot establish and operate its own dedicated satellite system; nor can over 300 interconnected public radio stations simultaneously operate a single satellite system. Public radio stations rely on a single manager to provide the benefits of this essential shared infrastructure.

*Lack of Authority to Direct CPB:* Even if the Order did not violate any specific statute, it would be *ultra vires* because under the Public Broadcasting Act, CPB is "a private corporation," and the President has no inherent authority to direct the affairs of private persons. *See* 2 Op. O.L.C. 41, 45 (1978). Thus, even if the law were silent on the President's power to direct CPB, the Government would still have the burden of identifying a source of statutory or constitutional authority for regulating it. Dkt. 21-1 at 32-33. Far from citing any authority, the Administration ignores this argument, so "the [C]ourt may treat [it] as conceded." *See Graffius*, 672 F. Supp. 2d at 126-27 n.9.

## B.   The Order Violates Other Federal Statutes.

*Violation of Appropriations Statutes:* The Order appears to direct the Treasury Department to withhold funds from CPB if CPB does not defund NPR. The Administration passingly contests this point, saying that the Order "does not include such a direction." Dkt. 30-9 at 16. It is not clear whether counsel for the Federal Defendants is formally adopting, on behalf of the Executive Branch, the view that Treasury may not withhold funds appropriated to CPB. To the extent that

17

the Court is inclined to deny relief against Treasury based on this concession, it should at minimum ascertain that this is the Administration's position, such that the Administration would be judicially estopped later from arguing that Treasury may withhold funds from CPB. *See Cnty. of San Miguel v. Kempthorne*, 587 F. Supp. 2d 64, 73 (D.D.C. 2008). But to the extent the Administration is merely pointing out that the Order lacks an explicit direction to Treasury, that is not persuasive. The Order directs "all agencies" (including Treasury) to "terminate" "any direct or indirect funding of NPR" (which would include funding to CPB). The most natural reading of the Order is that Treasury must withhold any appropriations to CPB that would eventually go to NPR. The Court should assume this is what the Order commands, at least until the Administration unequivocally disclaims it.

Yet withholding any funding appropriated to CPB would be illegal, because appropriations laws are binding acts of Congress. Dkt. 21-1 at 33-34. The Administration does not contest this; nor could it. Its only response is that no appropriations law "require[s] specific funding to NPR." Dkt. 30-9 at 34. This response simply misses the point: Treasury cannot lawfully cut off all funding appropriated to CPB, as the Order appears to require it to do.

*Violation of 20 U.S.C. § 954(d)(1):* The National Foundation on the Arts and Humanities Act directs that all grants awarded under the Act "shall be made" using two "criteria"—"artistic excellence and artistic merit"—while "taking into consideration general standards and decency and respect for the diverse beliefs and values of the American public." 20 U.S.C. § 954(d)(1). These criteria "make[] clear that each application is to be reviewed on an individual basis" and leave no room for the NEA to adopt a categorical "eligibility bar." *Rhode Island Latino Arts v. Nat'l Endowment for the Arts*, -- F. Supp. 3d. --, 2025 WL 1009026, at *10 (D.R.I. Apr. 3, 2025).

Even so, the Order directs NEA to consider a third criterion: whether the recipient is NPR. There is no legal basis for this categorical bar. Dkt. 21-1 at 34.

The Administration's only response is to read Section 954(d)(1) exactly how the Supreme Court said not to. The Administration suggests that the Order is merely a gloss on when "'general standards of decency and respect' may be implicated." Dkt. 30-9 at 33. But the Supreme Court has explained that the "decency and respect" clause is a "procedur[al]" safeguard that "admonishes the NEA merely to take 'decency and respect' into consideration" and "do[es] not silence speakers" or "introduce considerations that, in practice, would effectively preclude or punish the expression of particular views." *Nat'l Endowment for the Arts v. Finley*, 524 U.S. 569, 582-83 (1998). It is only on that reading of the statute that the Court found it to be constitutional. *Id. Finley* leaves no doubt: the NEA may not deny funding to an applicant based on its identity or on the viewpoints it has elsewhere expressed. The Order does just that.

### C.    The Order's Boilerplate Disclaimer Does Not Save It.

With no serious explanation of how the Order complies with any of the laws discussed above, the Administration retreats to arguing that the Order is saved by a disclaimer that it "shall be implemented consistent with applicable law." Order § 5(b); Dkt. 30-9 at 30-32. But the Administration has not pointed to any meaningful application of the Order that would avoid violating the law. The PBA categorically forbids the Administration from directing CPB's funding decisions. And there is no basis for the NEA or any other agency to categorically bar NPR from funding. So to take the disclaimer seriously would be to nullify the Order. Because the disclaimer irreconcilably conflicts with the Order's substance, the Order's "specific" prohibitions must "govern[]" over its "general" boilerplate. *Pac. Ranger, LLC v. Pritzker*, 211 F. Supp. 3d 196, 217 (D.D.C. 2016); *see also Perkins Coie LLP v. Dep't of Justice*, -- F. Supp. 3d --, 2025 WL 1276857, at *47 (D.D.C. May 2, 2025) (executive order "cannot be 'implemented consistent with applicable

law,' as required by the embedded terms of the Order, which is thus [] null and void") (internal citations omitted); *see also LULAC*, 2025 WL 1187730, at *20 ("Courts have affirmed th[e] principle repeatedly" that "[i]f an executive order cannot possibly be implemented consistent with applicable law, a command to do so in a saving clause is meaningless."). The Order must mean something; and what it means is illegal.

The Administration argues otherwise, but its two citations each involved an order with a plainly valid sweep. In *Building and Construction Trades Department v. Allbaugh*, 295 F.3d 28 (D.C. Cir. 2002), the court rejected a challenge to an executive order partly because the order applied only "to the extent permitted by law." *Id.* at 33. The court found that the order, which forbade agencies from imposing certain labor conditions on federal contractors, was "above suspicion in the ordinary course of administration" and should not be condemned merely based on the chance that "a particular agency may try to give effect to [it]" in a way "inconsistent with the relevant funding statute." *Id.* That is nothing like the Order here, which is illegal in every application. The Administration also cites a Supreme Court stay order, *Trump v. American Federation of Government Employees*, 2025 WL 1873449 (U.S. July 8, 2025), in which the Court held that an executive order containing a clause like the one here was "likely" lawful, but it did not mention the clause as the basis of its decision. Only Justice Sotomayor cited that provision in her concurrence. She reasoned that the challenged order, which concerned the restructuring of certain federal agencies, had not been implemented and so it was unclear "whether [it could] and will be carried out consistent with the constraints of law." *Id.* at *1. Here, by contrast, there is no conceivable way that the Order could be implemented "consistent with the constraints of law."

## III.    The Order Violates the First Amendment

As a content- and viewpoint-based attempt to retaliate against NPR for its protected speech and exercise of editorial discretion, the Order violates the First Amendment multiple times over.

The Administration admits that the Order discriminates based on viewpoint, and that it was issued because of the content of NPR's First-Amendment-protected activity. The Administration does not deny that the Order would fail strict scrutiny. Dkt. 30-9 at 17-22. Instead, it argues only that viewpoint discrimination is permissible in the context of government funding and that the termination of government funding cannot constitute adverse action for purposes of retaliation. *Id.* Clear Supreme Court precedent proves it wrong on both counts.

> ### A. Viewpoint-Based Discrimination Is Unlawful Where, As Here, the Government Funds Private Speech.

As the Supreme Court has many times held, "it is no job for government to decide what counts as the right balance of private expression—to 'un-bias' what it thinks biased, rather than to leave such judgments to speakers and their audiences." *Moody v. Netchoice, LLC*, 603 U.S. 707, 719 (2024). And when the government provides resources or support to "facilitate private speech" rather than "promote a governmental message," the First Amendment bars the government from discriminating based on "viewpoint." *Legal Services Corp. v. Velazquez*, 531 U.S. 533, 542 (2001). That is true whether the government provides physical facilities for private speech, *see, e.g.*, *Lamb's Chapel v. Ctr. Moriches Union Free Sch. Dist.*, 508 U.S. 384, 393–94 (1993), or "a subsidy," *Velazquez*, 531 U.S. at 544. Put another way, "viewpoint-based restrictions" are unconstitutional when the government "does not itself speak or subsidize transmittal of a message it favors but instead expends funds to encourage a diversity of views from private speakers." *Rosenberger v. Rector & Visitors of Univ. of Va.*, 515 U.S. 819, 834 (1995). While Defendants attempt to cabin *Rosenberger* to limited-public-forum cases, Dkt. 30-9 at 21, the Supreme Court has explained that "limited forum cases such as . . . *Lamb's Chapel*[] and *Rosenberger*" are "instructive" in government subsidy cases: In both situations, "[w]here private speech is involved," the

government's "funding decision cannot be aimed at the suppression of ideas thought inimical to the Government's own interest." *Velazquez*, 531 U.S. at 544, 548-49.

The Administration relies on *Rust v. Sullivan* for the proposition that the government can selectively choose to fund "certain activities it believes to be in the public interest" without discriminating "on the basis of viewpoint." Dkt. 30-9 at 18 (quoting 500 U.S. 173, 193 (1991)). The Administration reads *Rust*—which involved a challenge to regulations prohibiting the use of federal funds to promote abortion—to allow the government freely to discriminate based on viewpoint so long as the government is "subsidiz[ing] speech" and any limitations imposed "relate solely to what the grantees may do with federal funds." Dkt. 30-9 at 18. But that interpretation directly contradicts *the Supreme Court's* later interpretation—and cabining—of *Rust*. As the Court explained in *Velazquez*, "viewpoint-based funding decisions can be sustained in instances in which *the government is itself the speaker*, or instances, like *Rust,* in which the government *used private speakers to transmit specific information pertaining to its own program*." 531 U.S. at 541 (emphasis added; citations and quotation marks omitted). But this "latitude for government speech" does *not* apply "to subsidies for private speech" when the government expends funds "to facilitate private speech, not to promote a governmental message," *id.* at 542, which is precisely what the PBA does.

Defendants' interpretation of *Rust* cannot be squared with the Supreme Court's repeated statements that the viewpoint-based denial of government funding or resources to private speakers is unconstitutional. *See, e.g.*, *Rosenberger*, 515 U.S. at 830 ("[I]deologically driven attempts to suppress a particular point of view are presumptively unconstitutional in funding, as in other contexts."); *Velazquez*, 531 U.S. at 547 ("Congress cannot recast a condition on funding as a mere definition of its program in every case, lest the First Amendment be reduced to a simple semantic

exercise."); *id.* at 543 (citing *FCC v. League of Women Voters of California*, 468 U.S. 364 (1984), for the proposition that "prohibitions against editorializing by public radio networks were an impermissible restriction, even though the Government enacted the restriction to control the use of public funds"); *Bd. of Cnty. Comm'rs v. Umbehr*, 518 U.S. 668, 674 (1996) (government "'may not deny a benefit to a person on a basis that infringes his constitutionally protected . . . freedom of speech' even if he has no entitlement to that benefit" (quoting *Perry v. Sindermann*, 408 U.S. 593, 597 (1972)).

The Administration also cites *Finley*, purportedly in support of its assertion that funding determinations "are not subject to viewpoint restrictions."  Dkt. 30-9 at 20.  But *Finley* said the opposite.  Although the Court upheld a provision requiring the NEA to take account of "standards of decency and respect for the diverse beliefs and values of the American public" when awarding funds, *see* 524 U.S. at 572, it did so based on its conclusion that this condition did *not* discriminate on the basis of viewpoint, *see id.* at 583.  Indeed, the Court explained that the situation would be different if the "denial of a grant" were "shown to be the product of invidious viewpoint discrimination"—because "even in the provision of subsidies, the Government may not 'ai[m] at the suppression of dangerous ideas.'"  *Id.* at 587 (quoting *Regan v. Taxation with Representation of Wash.*, 461 U.S. 540, 550 (1983)); *see also id.* ("the First Amendment certainly has application in the subsidy context").

Nor does the Administration's interpretation of *Agency for International Development v. Alliance for Open Society International, Inc.* ("*AID*"), 570 U.S. 205 (2013), help its cause.  The Administration claims that *AID* stands for the proposition that the government "violates the First Amendment only if it attempts to 'leverage funding to regulate speech *outside* the contours of the program itself.'"  Dkt. 30-9 at 18 (quoting *AID*, 570 U.S. at 214–15 (alteration omitted)).  The

Administration thus reads *AID* to give it carte blanche to prohibit the use of federal funds to promote particular viewpoints. *Id.* at 18-19. That is wrong. *AID* concerned a challenge to a statute that required, as a condition of receiving federal funding, that organizations have a "policy explicitly opposing prostitution and sex trafficking." 570 U.S. at 208. The Court held that the statute was unconstitutional because it "leveraged funding to regulate speech outside the contours of the federal program itself," *id.* at 214-15, but it nowhere suggested that this is the *only* way in which a funding program can violate the First Amendment.

Rather, the Supreme Court explained that some of its cases (like *Rust*) upheld viewpoint-based conditions "that define the limits of the government spending program—those that specify the activities Congress wants to subsidize." 570 U.S. at 214. But, contrary to the Administration's suggestion, the Court did *not* hold that every instance of government funding creates a "program" that enables the government to impose viewpoint-based restrictions on uses of that funding. In *AID*, the government "enlisted the assistance of nongovernmental organizations to help achieve the many goals of" the federal government's "program" to "combat the spread of HIV/AIDS around the world." *Id.* at 208-09. The program thus funded private actors *to achieve governmental objectives by conveying government messages*—for example, "promot[ing] abstinence, encourag[ing] monogamy," and "promot[ing] voluntary counseling and treatment for drug users"—so it was undisputed that the government could prohibit the use of these funds "to promote or advocate the legalization or practice of prostitution or sex trafficking." *Id.* at 209-10. *AID* therefore left undisturbed the Supreme Court's longstanding rule that viewpoint-based restrictions on the private use of government funds are permissible only when the government "disburses public funds to private entities to convey a governmental message"—*not* when the funding program at

24

issue "encourage[s] a diversity of views from private speakers," *Rosenberger*, 515 U.S. at 833-34,

or otherwise is "designed to facilitate private speech," *Velazquez*, 531 U.S. at 542.[7]

Here, it is beyond dispute that Congress's appropriation to CPB falls into the latter category. The Administration does not (and cannot) argue that congressional funding to CPB enables the "government . . . itself" to speak, *Velazquez*, 531 U.S. at 541, or "disburses public funds to private entities to convey a governmental message" such that viewpoint-based restrictions are "legitimate . . . to ensure that [the government's] message is neither garbled nor distorted," *Rosenberger*, 515 U.S. at 833. The PBA unambiguously proves otherwise by designating CPB as a *private* entity and expressly *insulating* CPB and its grantees from governmental control. *See* Dkt. 21-1 at 13-14, 16-17. The PBA provides funding to "facilitate private speech," *Velazquez*, 531 U.S. at 542, and to "encourage a diversity of views from private speakers," *Rosenberger*, 515 U.S. at 834; *see* 47 U.S.C. § 396(a)(3) (declaring policy to encourage a "diversity" of "programming" based on "freedom, imagination, and initiative on both local and national levels"). Yet the Administration openly admits that it has purported to terminate funding based on the viewpoints NPR has expressed in its journalism. *See* Dkt. 30-9 at 22; Dkt. 21-1 at 35-42. That admission decides this case.

The Supreme Court's rule—that viewpoint-based restrictions are unconstitutional when the government provides resources to facilitate private speech—is consistent with historical tradition and foundational understandings of the First Amendment. The First Amendment aims to prevent

---

[7] The Administration also relies (Dkt. 30-9 at 19) on *Ysursa v. Pocatello Education Ass'n*, 555 U.S. 353 (2009), *United States v. American Library Ass'n*, 539 U.S. 194 (2003) (plurality op.), and *Leathers v. Medlock*, 499 U.S. 439 (1991), for the proposition that the government is not obligated to subsidize speech or the exercise of a fundamental right. That is beside the point. None of these cases addressed a situation where Congress appropriated funds to facilitate private speech and the Executive sought to revoke or condition that funding based on a private speaker's viewpoint.

the government from using its power to "tilt public debate in a preferred direction," *Sorrell v. IMS Health Inc.*, 564 U.S. 552, 578-79 (2011), and "[o]n the spectrum of dangers to free expression, there are few greater than allowing the government to change the speech of private actors in order to achieve its own conception of speech nirvana," *Moody*, 603 U.S. at 741-42; *accord Finley*, 524 U.S. at 587 (government may not "leverage its power to award subsidies" to penalize "disfavored viewpoints"). In line with these principles, the First Congress, which supported private journalists by giving them special access to the floors of Congress, rejected a proposal to bar certain journalists based on the content of their reporting. *See Associated Press v. Budowich*, 2025 WL 1039572, at *7 (D.D.C. Apr. 8, 2025). Doing so, as one representative put it, would constitute "an attack upon the liberty of the press." *Id.* (quoting 1 Annals of Cong. 919 (1789)). The context was different, but the principle the same: The First Amendment prohibits the government from denying benefits to private speakers based on their viewpoints.

**B.    The Order Effects Unconstitutional Retaliation Through Funding Revocations.**

The Administration has also all but conceded that the Order effectuates unconstitutional retaliation. It "do[es] not dispute that Plaintiffs engaged in First Amendment protected conduct (*i.e.*, journalism)," nor does it "dispute that the President considered NPR's conduct and the content of its material in issuing the [Order]." Dkt. 30-9 at 22. Indeed, the Administration concedes that the Order "is explicit on that point." *Id.* In other words, the Administration admits that the Order was issued because of NPR's exercise of its First Amendment rights. Those concessions— which acknowledge "a causal connection between the government defendant's retaliatory animus and the plaintiff's subsequent injury," *Nieves v. Bartlett*, 587 U.S. 391, 398 (2019) (internal quotations omitted)—effectively decide this case.

Put another way, NPR has clearly satisfied each element of a retaliation claim as articulated in this Circuit. *See Aref v. Lynch*, 833 F.3d 242, 258 (D.C. Cir. 2016). NPR has shown, and the Administration concedes, that NPR "engaged in conduct protected under the First Amendment." *Id.* NPR has also shown, and the Administration has also conceded, "a causal link between the exercise of a constitutional right and the adverse action taken against [it]." *Id.* Finally, NPR has shown that the Administration took a retaliatory action "sufficient to deter a person of ordinary firmness in plaintiff's position from speaking again." *Id.* The Administration does not contest that the revocation of public funding significantly harms NPR, nor does it contest that the revocation of funds would chill a media organization of ordinary firmness in the exercise of its First Amendment rights. *See* Dkt. 21-1 at 38.

The Administration's only answer is to argue that a prohibition on any funding to NPR based on the content and viewpoint of its speech is not retaliation because "[t]he First Amendment allows the President to consider content when the Government is subsidizing (rather than regulating) speech." Dkt. 30-9 at 22. But for all the reasons just explained, *see supra* at 21-26, that is not the law with respect to viewpoint discrimination.

Even more plainly, the government cannot punish private parties based on past speech that it dislikes. That is quintessential retaliation.[8] The Supreme Court's decisions in *Perry v. Sindermann*, 408 U.S. 593 (1972), and *Board of County Commissioners v. Umbehr*, 518 U.S. 668 (1996)—which, tellingly, the Administration does not even address—make clear that the

---

[8] The Administration argues that NPR's retaliation claim "is the same viewpoint discrimination claim clothed in a different dress," Br. 14, but that is not so. The government engages in unconstitutional retaliation when it takes an adverse action "*after the fact*" against a person or entity "for having engaged in protected speech," *Hou. Cmty. Coll. Sys. v. Wilson*, 595 U.S. 468, 474 (2022) (emphasis added), while viewpoint discrimination regulates or imposes burdens on speakers' future speech. Here, it is clear the Order is retaliatory: it seeks to stop all federal funding of NPR as punishment for its prior speech.

government engages in retaliation in violation of the First Amendment when it "den[ies] a benefit to a person on a basis that infringes his constitutionally protected interests," *Perry*, 408 U.S. at 597, *even if the injured party "has no entitlement to that benefit*," *Umbehr*, 518 U.S. at 674 (emphasis added). In both cases, the plaintiffs alleged that government entities stopped providing valuable benefits (employment at a university in *Perry*, and a commercial contract in *Umbehr*) because of disagreement with the plaintiffs' speech. As the Court explained in *Perry*, "if the government could deny a benefit to a person because of his constitutionally protected speech or associations, his exercise of those freedoms would in effect be penalized and inhibited. . . . Such interference with constitutional rights is impermissible." 408 U.S. at 597. The same reasoning applies here.

The Administration suggests that application of established anti-retaliation doctrine in the context of subsidies would require it "to subsidize journalistic content (or, for that matter, any activity that expresses a viewpoint or a perspective) that it disagrees with, simply because the subsidized activity express *a* viewpoint." Dkt. 30-9 at 22 (emphasis in original). Not so. The government—more specifically, Congress—can choose whether to fund a category of private speech. *See supra* at 21. But what the government cannot do is declare a particular speaker ineligible to receive federal funds in retaliation for its past speech. That is all the more so here, where the President has disrupted the statutory scheme established by Congress and unilaterally prohibited funding based on his own desire to silence a speaker he dislikes.

Indeed, the implications of the Administration's contrary arguments are alarming. Under its view, the Executive Branch could unilaterally revoke all manner of benefits or subsidies based on the President's or other Executive Branch officials' disagreement with the recipients' past speech. The Internal Revenue Service could revoke an organization's tax-exempt status because

it (or the President) does not like the organization's political viewpoints; the Postal Service could revoke mailing privileges for disfavored periodicals; and the Federal Communications Commission (FCC) could revoke broadcasting licenses based on its (or the President's) disagreement with the broadcaster's speech. That is not the law. *See, e.g.*, *Speiser v. Randall*, 357 U.S. 513, 518 (1958) (invalidating a "discriminatory denial of a tax exemption for engaging in speech"); *Hannegan v. Esquire, Inc.*, 327 U.S. 146 (1946) (Postmaster General cannot deny mailing privileges based on a subjective assessment of the periodical's public value); *Johnston Broad. Co. v. FCC*, 175 F.2d 351, 359 (D.C. Cir. 1949) (the FCC cannot make licensing decisions "on the basis of political, economic or social views of an applicant").

### C. The Order Violates Plaintiffs' Associational Rights.

The Order likewise violates NPR's and the Local Member Stations' freedom of association. As Plaintiffs have explained, the Order fundamentally disrupts their ability to associate with one another for expressive purposes by prohibiting Local Member Stations from using any federal funds for NPR membership or to acquire NPR programming. Dkt. 21-1 at 45-46.

The Administration's response relies entirely on *Regan v. Taxation with Representation of Washington*, 461 U.S. 540 (1983)—a case that did not involve and did not even mention freedom of association. Dkt. 30-9 at 23. In *Regan*, a nonprofit organization challenged Section 501(c)(3) of the Internal Revenue Code based on its denial of tax-exempt status for organizations engaged in lobbying, alleging that this provision "imposes an unconstitutional condition on the receipt of tax-deductible contributions." *See* 461 U.S. at 545 (citing *Speiser*, 357 U.S. 513). In rejecting this argument, the Court simply affirmed that Congress has authority to choose not to subsidize a particular type of activity—*i.e.*, lobbying. *See id.* Indeed, the Court emphasized that "[t]he case would be different if Congress were to discriminate invidiously in its subsidies in such a way as to 'aim at the suppression of dangerous ideas.'" *Id.* at 548 (quoting *Cammarano v. United States*,

358 U.S. 498, 513 (1959) (internal quotations omitted)).  So *Regan* not only has nothing to say about freedom of association; but it also further disproves the Administration's claim that it can lawfully withhold funds based on its disagreement with a speaker's viewpoint.

It is clear the Order impermissibly burdens NPR's and the Local Member Stations' freedom to associate with one another.  The Administration asserts that the Order does not limit Local Member Stations' ability to associate with NPR because the Order simply bars them from using federal funds to do so.  Dkt. 30-9 at 23.  In the Administration's view, in other words, the Executive Branch can decree which sources of content are or are not suitable for local radio stations' use of federal funds based on the President's approval or disapproval of the speaker producing the programming.  But the presence of federal subsidies no more allows the government to impose associational blacklists than it allows the government to restrict funds from being used to express a particular viewpoint.  *See supra* at 21-29.

Moreover, even if Local Member Stations are able to identify other funds they could use to acquire NPR programming, the Order still has the impermissible effect of "curtailing the freedom to associate."  *NAACP v. Alabama ex rel. Patterson*, 357 U.S. 449, 460-61 (1958).  *NAACP* is instructive: there, the Court invalidated a state order that would have required the NAACP to disclose the names of its members.  Even though the order did purport to restrict the ability of the NAACP and its members to associate with one another, the Court held that it violated the NAACP's and its members' First Amendment rights because it was "likely to affect adversely the ability of petitioner and its members to pursue their collective effort[s]."  *Id.* at 462-63.  So too here: the Order would require the Local Member Stations to take onerous measures to identify alternative sources of funds to license NPR programming and to segregate those funds in order to prove their compliance with the Order to the Administration's satisfaction.  *See* Dkt. 21-1 at 45.

Lastly, the Administration does not address the PBA's requirement that a fixed percentage of Community Service Grant funds must be used for "acquiring or producing programming that is to be distributed nationally and is designed to serve the needs of a national audience," 47 U.S.C. § 396(k)(3)(A)(iii)(III)—and the Order's resulting effect of dictating that NPR is off-limits when local stations expend those funds. Before the Order, when a local station chose how to expend funds that must be used to acquire or produce national programming, it could choose from a number of content providers, including NPR and others, like American Public Media (APM). But the Order dictates that NPR is off-limits; instead, funds must be spent to acquire national programming from anyone other than NPR.[9] That restriction plainly curtails the Local Member Stations' and NPR's freedom of association.

## IV.    The Order Violates Due Process

The Order violates the Due Process Clause in two ways.

First, it deprives NPR of a protected property right without sufficient procedure. This is so because: (1) the Due Process Clause protects "statutory entitlement[s]" as a form of property right, *see Goldberg v. Kelly*, 397 U.S. 254, 262 (1970); (2) NPR has a statutory entitlement to continued eligibility for CPB funding; and (3) NPR received no process prior to being deprived of that entitlement. Dkt. 21-1 at 48-49.

The Administration concedes that the Due Process Clause protects statutory entitlements, and it does not dispute that NPR received no process. Dkt. 30-9 at 24-25. The Administration contests only whether NPR has a statutory entitlement, pointing out that NPR lacks a statutory entitlement to any *particular* CPB grant. *Id.* at 25. This is false, as NPR does have a statutory

---

[9] As the Local Member Stations have explained, it is not practicable for them to self-produce such content. *See* SUMF at 27 (¶ 200), 30 (¶ 222).

entitlement to PRSS funding as "the national entity" that public radio stations "designate for satellite interconnection purposes." 47 U.S.C. § 396(k)(10)(D)(i); *see supra* at 16-17. It is also irrelevant. NPR—like any other content producer that meets the PBA's requirements pertaining to funding—has statutory right to be *eligible* for CPB funding and to receive funding from Member stations who wish to associate with NPR and air its content. *See* 47 U.S.C. § 396(k)(6)(B). Courts have recognized that such eligibility is a property interest protected by the Due Process Clause. *Myers & Myers, Inc. v. U. S. Postal Serv.*, 527 F.2d 1252, 1258-59 (2d Cir. 1975) (explaining that "disqualification from bidding or a contracting . . . directs the power and prestige of government at a particular person and . . . may have serious economic impact on that person" and, thus, is a power that "must be exercised in accordance with accepted basic legal norms""). And the Administration does not attempt to explain why NPR's statutory entitlement to continued eligibility to receive federal funding does not create a due process interest.

Second, the Order deprives NPR of fair notice and is unconstitutionally vague. Parties regulated by the government have a right to "fair notice of what is prohibited." *Woodhull Freedom Found. v. United States*, 72 F. 4th 1286, 1303 (D.C. Cir. 2023). But when NPR produced the journalism that precipitated the Order, it lacked notice that its conduct would lead to a punishment resulting in the loss of federal funds. And NPR is no better informed about the consequences of its actions going forward. This vagueness is especially improper because the Order regulates NPR's speech, a domain where "rigorous adherence to [due process] is necessary to . . . [avoid] chill." *Woodhull*, 72 F. 4th at 1303; Dkt. 21-1 at 49-50.

The Administration, without disputing that the Order is vague, responds that the vagueness doctrine applies only "to regulations of primary conduct." Dkt. 30-9 at 25. For this point, it relies on *Finley*, which held that the NEA's funding criteria were not constitutionally vague because

when "the Government is acting as a patron," it has more leeway to be "imprecis[e]." *Id.* at 26 (quoting *Finley*, 524 U.S. at 589). But the Order here *does* regulate NPR's "primary conduct." The criteria at issue in *Finley* were *internal* to the grants program; they determined which NEA applicants would be funded, but did not purport to regulate an applicant's conduct outside its performance of the grant. 524 U.S.at 580-85. The Order here is far different. It does not deny NPR funding because of an artistic judgment about NPR's intended use of any particular funds. The Order makes NPR ineligible to receive any federal funding because the Administration disapproves of its *previous* speech, which may have no relation to the funding NPR seeks today. The Order is thus exactly the sort of regulation of "primary conduct" that the Administration admits must pass a heightened vagueness test.

## V.    The Court Should Declare the Order Unlawful and Enjoin its Enforcement

The Administration does not contest that, if Plaintiffs are correct on the merits, they are entitled to a permanent injunction against the Order's implementation and enforcement. Plaintiffs have clearly demonstrated that the harms caused by the Order are irreparable, that they have no adequate alternative remedies at law, and that the balance of hardships and the public interest favors an injunction. *See* Dkt. 21-1 at 50-55.

## CONCLUSION

For the foregoing reasons, Plaintiffs are entitled to summary judgment as a matter of law. The Court should declare the Order unlawful and permanently enjoin Defendants from taking any action to implement or enforce it.

July 25, 2025

Respectfully submitted,

*/s/ Miguel A. Estrada*

Miguel A. Estrada (D.D.C. Bar No. 456289)
GIBSON, DUNN & CRUTCHER LLP
1700 M Street, N.W.
Washington, D.C. 20036-4504
(202) 955-8500
MEstrada@gibsondunn.com

Theodore J. Boutrous, Jr. (D.D.C. Bar No. 420440)
Katie Townsend (D.C. Bar No. 1026115)
GIBSON, DUNN & CRUTCHER LLP
333 South Grand Avenue
Los Angeles, CA 90071-3197
(213) 229-7000
T Boutrous@gibsondunn.com
KTownsend@gibsondunn.com

Elizabeth A. Allen (*Admitted Pro Hac Vice*)
NATIONAL PUBLIC RADIO, INC.
1111 North Capitol Street, NE
Washington, D.C. 20002
(202) 513-2000
EAAllen@npr.org

*Counsel for Plaintiff*
*National Public Radio, Inc.*

Steven D. Zansberg (*Admitted Pro Hac Vice*)
Zansberg Beylkin LLC
100 Fillmore Street, Suite 500
Denver, CO 80206
(303) 564-3669
steve@zblegal.com

*Counsel for Plaintiffs Roaring Fork Public*
*Radio, Inc. d/b/a Aspen Public Radio, Colo-*
*rado Public Radio, and KUTE, Inc. d/b/a*
*KSUT Public Radio*