**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

---

NATIONAL PUBLIC RADIO, INC., *et al.*,

    *Plaintiffs,*

    v.

DONALD J. TRUMP, in his official capacity
as President of the United States *et al.*,

    *Defendants.*

Case No. 1:25-cv-01674-RDM

---

## FEDERAL DEFENDANTS' REPLY MEMORANDUM OF LAW IN SUPPORT OF THEIR CROSS-MOTION FOR SUMMARY JUDGMENT

## <u>TABLE OF CONTENTS</u>

INTRODUCTION ............................................................................................................... 1

ARGUMENT ...................................................................................................................... 2

    I.    PLAINTIFFS' CLAIMS ARE UNRIPE. ............................................................ 2

    II.    PLAINTIFFS' FIRST AMENDMENT CLAIMS FAIL. .................................... 8

        A.    The Executive Order does not constitute improper viewpoint
              discrimination. ........................................................................................ 8

        B.    The Executive Order does not constitute improper First Amendment
              retaliation. ............................................................................................. 12

        C.    The Executive Order does not violate Plaintiffs' associational rights. ...... 13

    III.    PLAINTIFFS' DUE PROCESS CLAIMS FAIL. ................................................ 13

    IV.    PLAINTIFFS' STATUTORY CLAIMS FAIL. .................................................. 15

        A.    *Ultra Vires* Review Is Unavailable. ......................................................... 16

        B.    Plaintiffs' *Ultra Vires* Claims Fail on the Merits. .................................... 17

CONCLUSION ................................................................................................................. 19

# TABLE OF AUTHORITIES

**CASES**

*Agency for Int'l Dev. v. Alliance for Open Soc'y Int'l, Inc.*,
    570 U.S. 205 (2013) ................................................................................ *passim*

*Am. Foreign Serv. Ass'n v. Garfinkel*,
    490 U.S. 153 (1989) .............................................................................. 4

*Amica Ctr. for Immigrant Rts. v. DOJ*,
    No. 25-cv-00298-RDM, 2025 WL 1852762 (D.D.C. July 6, 2025) ......................... 6

*Ashwander v. Tenn. Valley Auth.*,
    297 U.S. 288 (1936) .............................................................................. 3

*Bd. of County Comm'rs v. Umbehr*,
    518 U.S. 668 (1996) .............................................................................. 12

*Bd. of Governors, Fed. Rsrv. Sys. v. MCorp Fin., Inc.*,
    502 U.S. 32 (1991) ............................................................................... 16

*Bd. of Regents of State Colls. v. Roth*,
    408 U.S. 564 (1972) .............................................................................. 14

*Bldg. & Constr. Trades Dep't, AFL-CIO v. Allbaugh*,
    295 F.3d 28  (D.C. Cir. 2002) ................................................................ 17

*Chlorine Inst. v. Fed. R.R. Admin.*,
    718 F.3d 922 (D.C. Cir. 2013) ................................................................ 8

*Clapper v. Amnesty Int'l USA*,
    568 U.S. 398 (2013) .............................................................................. 4

*Corp. for Pub. Broad. v. FEMA*,
    ---- F. Supp. 3d ----, 2025 WL 1938198 (D.D.C. July 15, 2025) ...................... 5

*Corp. for Pub. Broad. v. Trump*,
    No. 25-cv-1305 (RDM), 2025 WL 1617191 (D.D.C. June 8, 2025) .................... 18

*Decker v. Nw. Envtl. Def. Ctr.*,
    568 U.S. 597 (2013) .............................................................................. 4

*FCC v. League of Women Voters of Cal.*,
    468 U.S. 364 (1984) .............................................................................. 11

*Hannegan v. Esquire, Inc.*,
  327 U.S. 146 (1946) ............................................................................................. 10

*Laird v. Tatum*,
  408 U.S. 1 (1972) ............................................................................................. 6, 7

*Lamb's Chapel v. Ctr. Moriches Union Free School Dist.*,
  508 U.S. 384 (1993) ............................................................................................. 10

*Leedom v. Kyne*,
  358 U.S. 184 (1958) ............................................................................................. 16

*Legal Services Corp. v. Velazquez*,
  531 U.S. 533 (2001) .................................................................................... *passim*

*Lewis v. Cont'l Bank Corp.*,
  494 U.S. 472 (1990) ............................................................................................. 4

*Lujan v. Defs. of Wildlife*,
  504 U.S. 555 (1992) ............................................................................................. 7

*Megapulse Inc. v. Lewis*,
  672 F.2d 959 (D.C. Cir. 1982) ............................................................................. 6

*Myers & Myers, Inc. v. U.S. Postal Serv.*,
  527 F.2d 1252 (2d Cir. 1975) ............................................................................. 14

*National Ass'n for Advancement of Colored People v. State of Ala. ex rel. Patterson*,
  357 U.S. 449 (1958) ............................................................................................. 13

*\*Nat'l Endowment for the Arts v. Finley*,
  524 U.S. 569 (1998) ................................................................................. 2, 10, 15

*Nat'l Park Hosp. Ass'n v. Dep't of Interior*,
  538 U.S. 803 (2003) ............................................................................................. 3

*Nuclear Regul. Comm'n v. Texas*,
  605 U.S. 665 (2025) ............................................................................................. 16

*Nyunt v. Chairman, Broad. Bd. of Governors*,
  589 F.3d 445 (D.C. Cir. 2009) ............................................................................. 16

*Perry v. Sindermann*,
  408 U.S. 593 (1972) ..................................................................................... 12, 13

*Regan v. Tax'n With Representation of Wash.*,
  461 U.S. 540 (1983) ..................................................................................... 11, 13

*Rosenberger v. Rector & Visitors of Univ. of Va.*,
  515 U.S. 819 (1995) ....................................................................................... 9, 10

*Rust v. Sullivan*,
  500 U.S. 173 (1991) ................................................................................ 2, 8, 13

*Southeastern Promotions, Ltd. v. Conrad*,
  420 U.S. 546 (1975) .............................................................................................. 10

*Texas v. United States*,
  523 U.S. 296 (1998) ................................................................................................ 3

*Trump v. Am. Fed'n of Gov't Emps.*,
  606 U.S. ----, 2025 WL 1873449 (U.S. July 8, 2025) ........................................ 6, 17

*Trump v. New York*,
  592 U.S. 125 (2020) .......................................................................................... 2, 3

**STATUTES**

20 U.S.C. § 954 ..................................................................................................... 10, 18

47 U.S.C. § 396 .......................................................................................... 9, 10, 14, 18

47 U.S.C. § 398 ............................................................................................................ 17

National Defense Authorization Act for Fiscal Year 2024,
  Pub. L. No. 118-31, 137 Stat. 136 ......................................................................... 15

Rescissions Act of 2025,
  Pub. L. No. 119-28, 139 Stat. 467 ........................................................................... 4

**REGULATIONS**

Exec. Order No. 14,290, *Ending Taxpayer Subsidization of Biased Media*,
  90 Fed. Reg. 19415 (May 1, 2025) ................................................................... 1, 5, 6

**OTHER AUTHORITIES**

CPB, *Corporation for Public Broadcasting Addresses Operations Following Loss of Federal
  Funding* (Aug. 1, 2025),
  https://cpb.org/pressroom/Corporation-Public-Broadcasting-Addresses-Operations-Following-
  Loss-Federal-Funding ........................................................................................... 1, 4

CPB, *Request for Proposals for Entity to Manage and Govern Public Radio Content Distribution*,
   https://perma.cc/4CMN-RL8M ...................................................................................................... 3

## INTRODUCTION

Plaintiffs brought this case largely to challenge an Executive Order ("the EO")[1] that directs the Corporation for Public Broadcasting ("CPB") to cease indirect and direct funding to the Public Broadcasting Service ("PBS") and National Public Radio ("NPR").  Since the Complaint was filed—indeed, since Plaintiffs' most recent brief was filed—this case has fundamentally changed, because CPB itself will imminently cease to exist.  Plaintiffs' challenges were already unripe, but this latest development eliminates any doubt about that.

On July 24, the President signed a bill rescinding funds originally made available to CPB for FY 2026 and FY 2027.  A few days later, the Senate Appropriations Committee proposed providing no funds to CPB for FY 2026.  And on August 1, CPB announced that it is winding down its operations starting this year; it "informed its employees . . .  that the majority of staff positions will conclude with the close of the fiscal year on September 30, 2025."[2]  Plaintiffs' theory that CPB will ultimately decide to terminate funding to NPR based on the EO was speculative when this suit began; CPB's imminent dissolution shows that this suit will never ripen into a live challenge vis-à-vis that portion of the EO.

Even if this Court did have jurisdiction over the claims against the portions of the EO related to CPB, those claims fail on the merits.  With respect to their First Amendment challenge, Plaintiffs largely rely on the claim that CPB funding amounts to a limited public forum; they say CPB is  about "encouraging a diversity of views from private speakers" and is thus protected under *Legal Servs. Corp. v. Velazquez*, 531 U.S. 533, 542 (2001) (citation omitted).  But that analogy

---

[1] Exec. Order No. 14,290, *Ending Taxpayer Subsidization of Biased Media*, 90 Fed. Reg. 19415 (May 1, 2025).

[2] CPB, *Corporation for Public Broadcasting Addresses Operations Following Loss of Federal Funding* (Aug. 1, 2025), https://cpb.org/pressroom/Corporation-Public-Broadcasting-Addresses-Operations-Following-Loss-Federal-Funding ("CPB Press Release").

fails, because CPB never provided funding to all comers on an equal basis. Rather, Congress recognized that CPB must make judgments about the type of content and perspectives to be funded with taxpayer dollars. *Rust v. Sullivan*, 500 U.S. 173 (1991), *Nat'l Endowment for the Arts v. Finley*, 524 U.S. 569 (1998), and *Agency for Int'l Dev. v. Alliance for Open Soc'y Int'l, Inc. ("AID")*, 570 U.S. 205 (2013), all affirmed the government's right to determine which speech to subsidize using taxpayer funds. Plaintiffs' remaining First and Fifth Amendment challenges similarly fail.

Plaintiffs' statutory claims fail as well because they disclaim reliance on the Administrative Procedure Act ("APA") and rely exclusively on *ultra vires* review. But *ultra vires* review is not available, since either the APA or Tucker Act would provide an adequate remedy. Nor has there been a clear statutory violation that could justify relief.

For these reasons, this Court should grant Defendants' cross-motion for summary judgment, deny Plaintiffs' motion for summary judgment in its entirety, and dismiss this suit.

## ARGUMENT

## I.    PLAINTIFFS' CLAIMS ARE UNRIPE.

A claim is not ripe if it is "dependent on 'contingent future events that may not occur as anticipated, or indeed may not occur at all.'" *Trump v. New York*, 592 U.S. 125, 131 (2020) (citation omitted). Plaintiffs' claims are not ripe, both with respect to Section 2 of the EO (as to CPB), and Section 3 of the EO (as to other federal agencies).

*First*, Plaintiffs' claims as to CPB are not ripe—indeed, because of multiple independent intervening events, those claims are less ripe now than when this lawsuit began. As Defendants previously explained, and as Plaintiffs do not dispute—to date, CPB has stated it will not comply with the EO and disputes that it is subject to the President's direction. Nor has the government, via the Department of the Treasury, tried to indirectly enforce the directive by taking any action to

reduce funding to CPB.  ECF No. 30-9, at 28.  The proposition that—notwithstanding its refusal to cut funding—CPB would nonetheless imminently cut funding to Plaintiffs was thus speculative at the outset of this litigation and is insufficient for this Court to exercise jurisdiction.  *See Texas v. United States*, 523 U.S. 296, 300–01 (1998); *Nat'l Park Hosp. Ass'n v. Dep't of Interior*, 538 U.S. 803, 808 (2003); *Trump*, 592 U.S. at 131.

The only indication of CPB's intentions Plaintiffs point to is a Request for Proposal ("RFP") CPB issued in mid-July for an Entity to Manage and Govern Public Radio Content Distribution.[3]  *See* ECF No. 34, at 20.  Plaintiffs must squint to find any evidence that the RFP was issued because of the Executive Order—the RFP itself does not mention any such justification.  Rather, the stated rationale is, among other things, the need to better incorporate different types of broadcasting mechanisms into the distribution system because of a shifting media landscape.  *See* RFP at 2.  Plaintiffs point to a single line, ECF No. 34, at 20, which, in full, states that the successful applicant must "[b]e incorporated and legally and functionally able to receive CPB funding by September 30, 2025."  RFP at 4.  But this simply reflects the requirement that CPB, in seeking an entity to receive funding, must be able to receive such funding.  There is no evidence it was designed to respond to the EO—especially because the EO has been in place for months.

The uncontroverted evidence to date is that CPB does not intend to comply with this EO.  And while future developments may alter that landscape, this Court need not—indeed, should not—rush into a ruling here before such possibilities become realities, assuming they ever do.  *Ashwander v. Tenn. Valley Auth.*, 297 U.S. 288, 341 (1936) (Brandeis, J., concurring); *see also*

---

[3]CPB, *Request for Proposals for Entity to Manage and Govern Public Radio Content Distribution* ("RFP"), available at https://perma.cc/4CMN-RL8M.

*Am. Foreign Serv. Ass'n v. Garfinkel*, 490 U.S. 153, 161 (1989) (reaffirming that courts should avoid unnecessary constitutional rulings).

Since this lawsuit began, the proposition that CPB would act against NPR is even less likely, and the need for judicial resolution is thus even more remote and speculative. In late July, Congress rescinded FY 2026 and FY 2027 funding for CPB, *see* Rescissions Act of 2025, Pub. L. No. 119-28, 139 Stat. 467. In response, CPB announced it is winding-down its operations as of September 30, 2025, *see* CPB Press Release. Under Plaintiffs' theory, then, for their claims to be ripe, CPB would have to—during its last weeks of being fully operational, as it is winding down its affairs, and after refusing for months to comply with the EO—suddenly decide to cut funding for NPR. That imagined, abrupt about-face is implausible and cannot serve as a potential injury, much less a "certainly impending" one. *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 401 (2013). The claims related to CPB are likely to become moot in October, once CPB winds-itself down. There is no authority for this court to rush a decision when this case's lack of ripeness may well soon become mootness. *See, e.g.*, *Decker v. Nw. Envtl. Def. Ctr.*, 568 U.S. 597, 609 (2013) (courts must ensure a justiciable controversy exists at all stages of review—not just at filing); *Lewis v. Cont'l Bank Corp.*, 494 U.S. 472, 477–78 (1990) (dispute must remain live throughout the litigation; courts need not decide cases that are about to become moot).

*Second*, Plaintiffs' claims against the agency defendants for prospective relief are also unripe because they depend on the specifics of as yet unknown and merely potential future actions of individual agencies. Plaintiffs point to an NEA grant application that they assert was denied in July 2025, and imply that the grant was denied because of the EO. *See* ECF No. 34, at 20. But the process of rejecting that grant began much earlier—before the issuance of the EO. The NEA National Council voted in a public session on May 1, 2025 to reject NEA's application for a Grants

for Arts Project (after receiving materials in support of that vote earlier, strongly indicating that the vote was for reasons other than the EO).  Decl. of Sunil Iyengar ¶¶ 7-9.  Nor, in any event, are Plaintiffs challenging this rejection itself.  Their broader claim appears to be that future grant applications will inevitably be denied.  *See* ECF No. 34, at 20.  But whether that is true—and, importantly, whether those grants would be denied *because* of the EO (as opposed to other, independent factors)—is dependent on events that have not yet occurred.

Plaintiffs' speculation that NEA is inevitably bound to either reject NPR grant applications or terminate NPR's funding is unwarranted.  The EO directs agencies to decrease funding only to the extent permitted by law, *see* Exec. Order No. 14,290 § 3, which means that agencies must consider the relevant factual and legal contexts before making a decision.  A decision in this district just three weeks ago in *Corp. for Public Broad. v. FEMA* affirms that point.  FEMA awarded the Next Generation Warning System ("NGWS") grant program to CPB.  Earlier this year, FEMA temporarily shut down the online portal by which CPB submitted requests for reimbursements. That portal was later restored, and CPB's attempt to seek emergency relief to keep the portal open prospectively was denied.  *See Corp. for Pub. Broad. v. FEMA*, --- F. Supp. 3d ---, 2025 WL 1938198 (D.D.C. July 15, 2025).  During that litigation, a FEMA declarant indicated that access to funding via the portal was temporarily shut off to allow a review of grants to ensure compliance with the EO.  *See id.* at *4 n.3.  It was then turned back on.  This case illustrates that agencies' implementation of the EO will vary, and that any challenge must be grappled with the facts surrounding a particular agency's action.

With respect to Treasury, Plaintiffs admit that Treasury has "not so far withheld funding to CPB."  ECF No. 34, at 21.  They speculate that it might in the future, *id.*, but again, whether it will do so at all and before CPB shuts down is mere speculation.

Ultimately, instead of challenging a discrete agency act implementing the EO, Plaintiffs brought this facial challenge, effectively disclaiming any specific challenge to discrete agency action, seeking to preclude *any* future terminations or grant denials. ECF No. 34, at 12. Plaintiffs want this Court to issue a guarantee against *any* future terminations, regardless of the nature of the agency, the nature of the grant program, or the individual context of any such agency action. Such speculative, inchoate actions are unripe—particularly given that the EO cautions that any grant terminations should only be to the extent permitted by law. *See* Exec. Order No. 14,290 §§ 2, 3, 5. The Supreme Court recently cautioned against allowing such facial challenges to qualified Executive Orders (i.e., those that merely direct future agency actions consistent with the law) outside the context of those individual agency actions. *See, e.g.*, *Trump v. Am. Fed'n of Gov't Emps.* ("*AFGE*"), 606 U.S.---, 2025 WL 1873449 (U.S. July 8, 2025); *see also id.* (Sotomayor, J., concurring). In response, Plaintiffs say that there is no possible way the EO can be interpreted constitutionally, so any subsequent grant terminations will necessarily be unlawful. ECF No. 34, at 27-28. That is an assertion they do not establish, as the remainder of this brief will address. Accordingly, Plaintiffs' claims against the agency defendants must wait until there is a concrete action to constitutionally challenge.[4]

*Third*, Plaintiffs assert that the EO is currently harming them and thus that their dispute is ripe. ECF No. 34, at 5, 17. They identify an alleged subjective "chill" on their programming and journalistic activities. *See id.* at 17-18. But the EO imposes no restrictions on which content can be aired at all, by anyone—Plaintiffs' subjective fears cannot justify relief here. *See Laird v.*

---

[4] Whether Plaintiffs could proceed on such a claim here, or in in the Court of Federal Claims, depends on the specifics and contours of that claim and is not an issue the Court need resolve at this time. *See, e.g.*, *Amica Ctr. for Immigrant Rts. v. DOJ*, No. 25-cv-00298-RDM, 2025 WL 1852762, at *12-19 (D.D.C. July 6, 2025), *appeal filed,* No. 25-5254 (D.C. Cir. July 16, 2025); *see also, Megapulse Inc. v. Lewis*, 672 F.2d 959, 967 (D.C. Cir. 1982).

*Tatum*, 408 U.S. 1, 13-14 (1972) ("Allegations of a subjective chill are not an adequate substitute for a claim of a specific present objective harm or a threat of specific future harm").

Plaintiffs also identify asserted financial harm and business uncertainties. *See* ECF No. 34, at 19-20. But these assertions cannot be tied to the EO. Plaintiffs put forward conclusory and speculative declarations asserting potential harm, including financial harm, if they do not receive CPB funding moving forward. For example, NPR's CFO and Treasurer states that the EO stops local stations from using CPB funds to pay membership fees to NPR and that stopping that flow of funds from member stations to NPR "*would* destabilize NPR's funding model." ECF No. 21-3, at 7 (Initial Kwon Decl. ¶ 26) (emphasis added). And NPR further states, "[w]ithout federal funding, NPR *would* be forced to take immediate cost-saving measures, including but not limited to, eliminating or scaling back critical emergent coverage areas, like the war in Ukraine. NPR also *may be* required to lay off staff and/or terminate existing positions, which *would* affect the quality, depth, and breadth of news coverage…." *Id.*, (Initial Kwon Decl. ¶ 28) (emphasis added) and "The loss of federal funding *would* have an immediate as well as a long-term negative impact on all sources of revenue generated by NPR." *Id.*, (Initial Kwon Decl. ¶ 29) (emphasis added).

But even assuming that a reduction in funding would cause Plaintiffs harm, they cannot tie such harm to the EO, as opposed to Congress's recission bill, which cut funding moving forward, or the CPB itself imminently winding itself down. A lack of causation defeats any potential injury. *See, e.g.*, *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 562 (1992) (noting difficulty of establishing Article III jurisdiction based on injury caused by "unfettered choices made by independent actors not before the courts"). And their allegations about injury potentially caused by future actions of defendant agencies are conclusory. *See* ECF No. 21-3, at 6 (Initial Kwon Decl. ¶¶ 22, 25) (stating NEA historically awarded grants to NPR, including one in 2024 in the amount of $65,000, and

then asserting "I understand that if the NEA is not prohibited from implementing the Order that NPR will be ineligible for NEA grants moving forward.") Those allegations are insufficient to establish future injury. *See, e.g.*, *Chlorine Inst. v. Fed. R.R. Admin.*, 718 F.3d 922, 927 (D.C. Cir. 2013) (ripeness requires an injury to be certainly impending).

## II.    PLAINTIFFS' FIRST AMENDMENT CLAIMS FAIL.

### A.  The Executive Order does not constitute improper viewpoint discrimination.

As Defendants explained in their opening brief, when the government is acting as patron, not regulator (as here) and where it is not restricting the conduct of speech outside the conduct of the federal funds at play (as here), First Amendment concerns are substantially diminished. *See* ECF No. 30-9, at 17 (citing *Rust*, 500 U.S. 173; *AID,* 570 U.S. 205). There is therefore no sound basis to claim that the EO or its implementation violates the First Amendment.

In response, Plaintiffs rely almost exclusively on the Supreme Court's decision in *Velazquez*, 531 U.S. 533 to claim that viewpoint discrimination is not permitted when a program is facilitating private speech, and that the funds at issue relate to private speech. But *Velazquez* is inapplicable here. Even if it does apply—and it does not—Plaintiffs' arguments are premised on the CPB and its activities (which implicates Section 2), they do not discuss other agency defendants and the purpose of any funding those entities provide. Plaintiffs thus cannot show that Section 3 of the EO constitutes impermissible viewpoint discrimination.

In *Velazquez*, the Supreme Court considered a funding condition applicable to the Legal Services Corporation ("LSC"), which provided financial support for non-criminal legal assistance. *Id.* at 536. The funding condition prohibited recipients of LSC money from attempting to amend or challenge existing welfare law. *Id*. The Court concluded that such a condition was unconstitutional, because the government funding was "designed to facilitate private speech, not

to promote a governmental message." *Id.* at 542. The Court noted that "Congress funded LSC grantees to provide attorneys to represent the interests of indigent clients," and that the "LSC lawyer . . . speaks on the behalf of his or her private, indigent client." *Id.* The Court was further concerned that this restriction would severely impair the judicial function, because the restriction was "inconsistent with the proposition that attorneys should present all reasonable and well-grounded arguments necessary for proper resolution of the case." *Id.* at 545; *see also id.* at 548 ("We must be vigilant when Congress imposes rules and conditions which in effect insulate its own laws from legitimate judicial challenge.").

This case does not involve private speech akin to that of a lawyer challenging a government agency on behalf of their client—it involves direct government subsidization of noncommercial broadcasting. Plaintiffs reiterate that the purpose of CPB is to "encourage a diversity of views from private speakers." ECF No. 34, at 29 (citing *Rosenberger v. Rector & Visitors of Univ. of Va.*, 515 U.S. 819, 834 (1995)). They cite 47 U.S.C. § 396(a)(3), which states—in full—that "expansion and development of public telecommunications and of diversity of its programming depend on freedom, imagination, and initiative on both local and national levels[.]" *Id.* Yet, in highlighting this provision, Plaintiffs ignore the very next Congressional finding: that "the encouragement and support of public telecommunications, while matters of importance for private and local development, *are also of appropriate and important concern to the Federal Government*[.]" *Id.* § 396(a)(4) (emphasis added). Plaintiffs further overlook the finding that "it furthers the general welfare to encourage public telecommunications services which will be responsive to the interests of people both in particular localities and through the United States." *Id.* § 396(a)(5). And they disregard the finding that "it is necessary and appropriate for the Federal Government *to complement, assist, and support* a national policy that will most effectively make

public telecommunications services available to all citizens of the United States." *Id.* § 396(a)(7) (emphasis added).  CPB must balance various criteria—determining that it is supporting "programs of high quality, diversity, creativity, excellence and innovation, which are obtained from diverse sources" while also ensuring "strict adherence to objectivity and balance." *Id.* § 396(g)(1)(A). Plaintiffs' repeated incantation of only one of these criteria does not save their claims.

Section 396 is thus *not* a statutory scheme where government funding is simply encouraging private speakers, with no distinct federal interest in what they say.  This case is instead akin to *Finley*, where the Supreme Court upheld, under the First Amendment, criteria for allocating funding for works of "artistic excellence and artistic merit . . . taking into consideration general standards of decency and respect for the diverse beliefs and values of the American public[.]"  20 U.S.C. § 954(d)(1).  As the Supreme Court noted,

> In the context of arts funding, in contrast to many other subsidies, the Government does not indiscriminately 'encourage a diversity of views from private speakers.' . . . The NEA's mandate is to make esthetic judgments, and the inherently content-based 'excellence' threshold for NEA support sets it apart from the subsidy at issue in *Rosenberger*—which was available to all student organizations that were 'related to the educational purpose of the University,' *id.*, at 824 —and from comparably objective decisions on allocating public benefits, such as access to a school auditorium or a municipal theater, *see Lamb's Chapel v. Center Moriches Union Free School Dist.,* 508 U.S. 384, 386 (1993*); Southeastern Promotions, Ltd. v. Conrad*, 420 U.S. 546, 555 (1975), or the second class mailing privileges available to 'all newspapers and other periodical publications,' *see Hannegan v. Esquire, Inc.*, 327 U.S. 146, 148, n.1 (1946).

*Finley*, 524 U.S. at 586.  Plaintiffs do not claim that CPB funds are available to anyone who comes asking.  They do not dispute that CPB must make judgments about quality and worth.  They do not dispute that the government has involved itself in this process and recognizes a role for itself in such subsidization. Those facts readily distinguish this case from *Velazquez* and *Rosenberger* and make them more akin to *Finley* and *AID*.

Indeed, Plaintiffs read the relevant case law too narrowly. They assert that *AID* is simply a case about "conveying government messages," ECF No. 34, at 32 (emphasis omitted). That is not *AID*'s holding. Rather, in *AID*, the case turned not on the message conveyed, but on the scope of the program. The Court specified that "the relevant distinction that has emerged from our cases is between conditions that define the limits of the government spending program—those that specify the activities Congress wants to subsidize—and conditions that seek to leverage funding to regulate speech outside the contours of the program itself." *AID*, 570 U.S. at 214-15. As the *AID* Court explained, in *Regan v. Taxation With Representation of Washington*, 461 U.S. 540 (1983), for example, "the Court upheld a requirement that nonprofit organizations seeking tax-exempt status . . . not engage in substantial efforts to influence legislation." *AID*, 570 U.S. at 215. The parties did not claim that lobbying the government is about conveying a government message, and yet the funding restriction was affirmed. Indeed, in *Rust*, the funding restriction was explicitly viewpoint based. *See id.* at 216. Focusing on activities supported by federal funds rather than an amorphous "government message" makes sense—because what the government supports with its funds itself conveys a message, the distinction between "message" and "no-message" is too fuzzy a line to be helpful.

Ultimately, this case involves only restrictions on the use of federal funds themselves, unlike *FCC v. League of Women Voters of Cal*., 468 U.S. 364 (1984), which involved a prohibition on any noncommercial educational broadcasting station which receives a grant from CPB from "engag[ing] in  editorializing."  The *League of Women* Court struck the condition because it prohibited *all* editorializing, including with private funds. (*Velazquez* similarly applied a prohibition to all activities by recipients of federal funding, even if they used private funds for those activities. 531 U.S. at 538 ("The prohibitions apply to all of the activities of an LSC grantee,

including those paid for by non-LSC funds. §§ 504(d)(1) and (2).")). Here, by contrast, the challenged EO does not purport to impose any restrictions on the use of private funds.

Finally, it is worth noting that Plaintiffs press *only* First Amendment arguments related to their claim that CPB is designed to encourage a "diversity of views" and thus *Rust* is inapplicable. This argument applies only to their challenge to Section 2 of the EO, based on their (mistaken) impression of the CPB's purported limited public forum status. They do not address any statutory authorities for other agencies subject to Section 3 of the EO. They offer no arguments about the purpose of any such funding programs where future grants to NPR may be terminated, much less the First Amendment applicability to such provisions. (That is why, after all, such claims are not ripe—they remain inchoate.) Thus, were this Court to find that Section 2 violates the First Amendment, it should not apply the same reasoning to Section 3 on a facial basis.

### B. The Executive Order does not constitute improper First Amendment retaliation.

Plaintiffs have not established that the EO effectuates unconstitutional retaliation—and Defendants have not conceded that. *Contra* ECF No. 34, at 34-35. At the outset, both parties largely appear to recognize that this issue turns generally on whether the EO itself is improper viewpoint discrimination.[5] *See id.* at 35. It is not, for the reasons stated above.

In their response, Plaintiffs rely on *Perry v. Sindermann*, 408 U.S. 593 (1972) and *Board of County Comm'rs. v. Umbehr*, 518 U.S. 668 (1996), *see* ECF No. 34, at 35-36, which are "unconstitutional conditions" cases. But those cases "involve situations" where the government has "effectively prohibit[ed] the recipient from engaging in the protected conduct outside the scope

---

[5] In a footnote, Plaintiffs state that the order is retaliatory, not viewpoint discrimination, because it "seeks to stop all federal funding of NPR as punishment for its prior speech." ECF No. 34, at 35 n.8. But the order is forward-looking—it restricts the use of funds moving forward. That is, by Plaintiffs' own definition, *id.*, alleged viewpoint discrimination.

12

of the federally funded program." *AID*, 570 U.S. at 219 (citing *Rust*, 500 U.S., at 197). As discussed above, the EO imposes a restriction only on what federal funds may be spent on, it does not limit conduct outside the scope of the government program itself. *See also Rust*, 500 U.S. at 196 (distinguishing *Perry*, 408 U.S. at 597).

### C. The Executive Order does not violate Plaintiffs' associational rights.

Plaintiffs' associational argument also fails. Indeed, Plaintiffs offer no case law in their response supporting the proposition that the government's removal of taxpayer subsidies for private entities violates those entities' associational rights. That is not, in any event, the law. *Regan* noted that a governmental "decision not to subsidize the exercise of a fundamental right does not infringe the right." 461 U.S. at 549; *see also Rust*, 500 U.S. at 175. That principle controls here.

In their response, Plaintiffs point to *National Ass'n for Advancement of Colored People v. State of Ala. ex rel. Patterson ("NAACP")*, 357 U.S. 449 (1958). *See* ECF No. 34, at 39. This was not a funding case—this was a case about whether the State of Alabama's act of publicizing the NAACP's membership list in the mid-1950s might chill their members' rights to associate. *See NAACP*, 357 U.S. at 462 ("Petitioner has made an uncontroverted showing that on past occasions revelation of the identity of its rank-and-file members has exposed these members to economic reprisal, loss of employment, threat of physical coercion, and other manifestations of public hostility."). This is not that case.

### III.    PLAINTIFFS' DUE PROCESS CLAIMS FAIL.

Plaintiffs' Due Process Claim cannot succeed because they have no constitutionally protected interest in the benefits they seek.

Plaintiffs disclaim any property interest in grant payments and rather rest their entitlement on a claim that they have a constitutionally protectable statutory entitlement to "continued eligibility for CPB funding." ECF No. 34, at 39. At the outset, the only specific statutory entitlement they claim is an entitlement to certain Satellite Interconnection Fund funding under 47 U.S.C. § 396(k)(10)(D)(i). *Id.* at 40. But this provision is simply a routine funding statute, it is not the type of "new property" right protected under the Due Process Clause. *See, e.g.*, *Bd. of Regents of State Colls. v. Roth*, 408 U.S. 564 (1972). Plaintiffs offer no authority for the proposition that every funding statute constitutes a protectable property interest. Indeed, Plaintiffs do not contest that there are no due property rights in government contracts, even though those, too, are legal obligations of the government. *See* ECF No. 30-9, at 24 (collecting cases).

In response, Plaintiffs claim they have a "statutory right to be *eligible* for CPB funding and to receive funding from Member stations who wish to associate with NPR and air its content." ECF No. 34, at 40 (citing 47 U.S.C. § 396(k)(6)(B)). But the cited provision—which, again, relates only to CPB—is about radio stations' right to receive funding under certain circumstances. It does not entitle them to funding for NPR specifically. And even if there was a right to be eligible for funding for NPR, the only case they cite for this purported right, *Myers & Myers, Inc. v. U.S. Postal Serv.*, 527 F.2d 1252, 1258-59 (2d Cir. 1975), does not justify relief. *Myers* recognized that certain categorical debarment from government contract bidding might trigger the protections of the Due Process clause. But this principle does not apply here. The member stations are not prohibited from seeking any funding, they are just restricted in spending such funds on one entity, NPR. *They* have no protectable liberty interest that would be compromised here. Rather, this liberty interest doctrine applies only when a party is debarred generally from dealing with a government agency. *See id.* at 1259. Indeed, federal law routinely bars federal funds from being

used to procure products or services from particular entities. *See, e.g.*, National Defense Authorization Act for Fiscal Year 2024, Pub. L. No. 118-31, 137 Stat. 136, § 1821 *et seq.* (prohibiting federal funds from buying certain unmanned aircraft systems from covered foreign entities). And even NPR's claim, on its face, applies only to CPB (and thus only implicates Section 2 of the EO). And ultimately, as discussed above, the question of whether CPB will actually impose anything akin to debarment on NPR in the few weeks before it winds itself down is speculative, and cannot justify relief.

The EO itself is not unconstitutionally vague. Plaintiffs acknowledge *Finley* recognized that "when 'the Government is acting as a patron,' it has more leeway to be 'imprecise.'" ECF No. 34, at 40-41 (quoting *Finley*, 524 U.S. at 589). Plaintiffs further note that "[t]he criteria at issue in *Finley* were *internal* to the grants program; they determined which NEA applicants would be funded, but did not purport to regulate an applicant's conduct outside its performance of the grant." *Id.* at 41 (citation omitted). But the EO does not regulate Plaintiffs' conduct outside the use of federal funds, just like *Finley*.

## IV.    PLAINTIFFS' STATUTORY CLAIMS FAIL.

Plaintiffs' statutory claims fail, both as they relate to Section 2 of the EO (related to CPB) and to Section 3 of the EO (related to other federal agencies). First, *ultra vires* review is unavailable in all respects, because Plaintiffs—who do not rely on their APA claim—cannot satisfy the stringent standards the Supreme Court recently expounded for such review. Second, Plaintiffs' claims fail on the merits. Most of Plaintiffs' claims are about CPB, but they cannot establish a clear violation of applicable statutes. And they raise only a limited statutory claim against NEA, which similarly fails.

### A. *Ultra Vires* Review Is Unavailable.

Plaintiffs cannot successfully seek *ultra vires* review with respect to statutory claims. At the outset, Plaintiffs have stated they "do not depend on the APA for their cause of action." *Id.* at 12. But they cannot side-step the APA in this manner.

With respect to their statutory claims, Plaintiffs cannot avoid the requirements of final agency action imposed by the APA simply by seeking to bring an *ultra vires* claim. In *Nuclear Regul. Comm'n v. Texas ("NRC")*, the Supreme Court confirmed the framework for considering nonstatutory, *ultra vires* review. 605 U.S. 665, 680-81 (2025). As the Court explained, "[b]ecause *ultra vires* review could become an easy end-run around the limitations of . . . judicial-review statutes, this Court's subsequent cases have strictly limited nonstatutory *ultra vires* review to the 'painstakingly delineated procedural boundaries of' *Leedom v. Kyne*, 358 U.S. 184 (1958), the "leading case on post-APA *ultra vires* review.'" 605 U.S. at 681. *Ultra vires* review applies, if at all, only "when an agency has taken action entirely in excess of its delegated powers," *id.* (cleaned up), and "contrary to a *specific prohibition* in a statute," *id.* (citation omitted). And even then, nonstatutory review is "unavailable if, as is usually the case, a statutory review scheme provides aggrieved persons 'with a meaningful and adequate opportunity for judicial review[.]'" *Id.* (quoting *Bd. of Governors, Fed. Rsrv. Sys. v. MCorp Fin., Inc.*, 502 U.S. 32, 43 (1991)). Ultimately, a nonstatutory *ultra vires* claim "is essentially a Hail Mary pass—and in court as in football, the attempt rarely succeeds." *Id.* at 681-82 (quoting *Nyunt v. Chairman, Broad. Bd. of Governors*, 589 F.3d 445, 449 (D.C. Cir. 2009)).

Plaintiffs' attempt to bring *ultra vires* claims against the Defendants here cannot satisfy these requirements. First, there is no unequivocal statutory prohibition; rather, the EO instructs federal agencies to end direct and indirect funding to NPR and local stations only to the maximum

extent that applicable law permits. *See, e.g.*, *AFGE*, 2025 WL 1873449 at *1 (Sotomayor, J., concurring); *Bldg. & Constr. Trades Dep't, AFL-CIO v. Allbaugh*, 295 F.3d 28 28, 33 (D.C. Cir. 2002). Nor has there been a clear statutory violation, as discussed below.

Second, there is an adequate alternative opportunity for relief against the defendant agencies: the APA or the Tucker Act, depending on the nature of the challenged agency action. Plaintiffs, arguing otherwise, assert that they are "suffering irreparable harm *now* as a result of the unlawful Order." ECF No. 34, at 16. In support, they argue that their speech is chilled—but this goes to their constitutional claims, not their statutory ones. *See id.* They are left, then, with being "uncertain" about future funding. *Id.* at 16-17. But the reason they are uncertain is because funding has not been curtailed—if that later becomes the case, they can bring a suit at that time. If uncertainty about future government action could itself justify *ultra vires* review, such review would not be a "Hail Mary," but rather a routine point-after-touchdown. And finally, they note that a "significant decline in funding" will cause harm to NPR's mission. *Id.* at 17. But, even if ultimately true, Plaintiffs can bring suit at that time, when any injury ripens.

**B. Plaintiffs' *Ultra Vires* Claims Fail on the Merits.**

In any event, Plaintiffs' statutory claims cannot satisfy the stringent standard for *ultra vires* review with respect to their statutory claims (the vast majority of which apply only to Section 2 of the EO, as it relates to CPB).

1. **47 U.S.C. § 398(a)**: Plaintiffs' primary statutory argument is that the PBA prevents the President, or those acting at his direction, from "exercis[ing] any direction, supervision, or control" over CPB. *See id.* at 23 (quoting 47 U.S.C. § 398(a)). But the PBA cannot justify relief for two reasons. First, CPB has not taken any action—and given its pending wind-down, may never do so. Second, as this Court noted, the President has "at least *some* ability to influence the

affairs of the Corporation." *Corp. for Pub. Broad. v. Trump*, No. 25-cv-1305 (RDM), 2025 WL 1617191, at *10 (D.D.C. June 8, 2025) (emphasis in original). Nor has CPB taken any action in response to the EO. Given the imminent end of CPB, this Court need not decide whether Section 2—if implemented—would violate the PBA, or whether Presidential direction would constitute appropriate influencing of the Corporation.

  **2.**   **47 U.S.C. § 396(k)(10)(D)(i)**: This provision requires certain satellite interconnection funds to be disbursed to participating public radio stations or the entity they designate. 47 U.S.C. § 396(k)(10)(D)(i). Even assuming that Plaintiffs are correct that the relevant stations determine distribution, *see* ECF No. 34, at 25, those stations are not required to distribute that funding to NPR specifically. And because the EO is to be interpreted as allowed by law, whether the statute would be violated would depend on a future instance where NPR claimed it was entitled to such funding and the funding was not provided. That has not occurred.

  **3.**   **Appropriations Statutes**: Plaintiffs state that the EO "appears to direct" Treasury to withhold funds in violation of Appropriations provisions. *Id.* But it is undisputed that there has been no such withholding, and thus there cannot be any statutory violation.

  **4.**   **20 U.S.C. § 954(d)(1)**: Plaintiffs claim that the EO "directs NEA to consider a third criterion: whether the recipient is NPR." *Id.* at 27. It does not. Rather, it provides policy direction from the President to the NEA Chair, which the NEA Chair may consider in determining areas where "general standards of decency and respect" may be implicated. 20 U.S.C. § 954(d)(1). Defendants do not dispute that this provision allows for "decency and respect" to be considered, ECF No. 34, at 27, but the way it will be considered in any particular example matters, and should be evaluated in the context of any future, concrete action that may or may not occur.

  **5.**

**CONCLUSION**

For all the reasons stated, the Court should grant Defendants' cross-motion and deny

Plaintiffs' motion for summary judgment in its entirety, and dismiss this action.


Dated:  August 8, 2025                                Respectfully submitted,


                                                     BRETT A. SHUMATE
                                                     Assistant Attorney General

                                                     YAAKOV M. ROTH
                                                     Principal Assistant Attorney General
                                                     Civil Division

                                                     ERIC HAMILTON
                                                     Deputy Assistant Attorney General

                                                     SEAN SKEDZIELEWSKI
                                                     Counsel to the Assistant Attorney General

                                                     JOSEPH E. BORSON
                                                     Assistant Branch Director


                                                     */s/ Carmen M. Banerjee*
                                                     CARMEN M. BANERJEE
                                                     (D.C. Bar #497678)
                                                     Trial Attorney
                                                     United States Department of Justice
                                                     Civil Division, Federal Programs Branch
                                                     1100 L Street NW
                                                     Washington, DC 20530
                                                     Tel: (202) 514-3183
                                                     Fax: (202) 616-8460
                                                     Email: carmen.m.banerjee2@usdoj.gov

                                                     Counsel for the Federal Defendants


19