## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| NATIONAL PUBLIC RADIO, INC., *et al.* <br><br> *Plaintiffs*, <br><br> *v.* <br><br> DONALD J. TRUMP, *et al.*, <br><br> *Defendants*. | Case No. 25-cv-1674-RDM |

## MEMORANDUM OF LAW IN SUPPORT OF NATIONAL PUBLIC RADIO, INC.'S MOTION FOR A TEMPORARY RESTRAINING ORDER

Miguel A. Estrada (D.D.C. Bar No. 456289)
GIBSON, DUNN & CRUTCHER LLP
1700 M Street, N.W.
Washington, D.C. 20036-4504

Theodore J. Boutrous, Jr. (D.D.C. Bar No. 420440)
Katie Townsend (D.C. Bar No. 1026115)
GIBSON, DUNN & CRUTCHER LLP
333 South Grand Avenue
Los Angeles, CA 90071-3197

Elizabeth A. Allen (*Admitted Pro Hac Vice*)
NATIONAL PUBLIC RADIO, INC.
1111 North Capitol Street, NE
Washington, D.C. 20002

*Counsel for Plaintiff*
*National Public Radio, Inc.*

# TABLE OF CONTENTS

**Page**

INTRODUCTION ..................................................................................................1

BACKGROUND ...................................................................................................3

    A.    The Public Radio Satellite System ............................................................3

    B.    The Executive Order and this Lawsuit ......................................................5

    C.    President Trump's Efforts to Seize Control of CPB ..................................6

    D.    CPB's Refusal to Distribute Remaining PRSS Funds to NPR, the National Entity Designated to Receive that Funding ................................7

LEGAL STANDARD.............................................................................................9

ARGUMENT ......................................................................................................10

    I.    CPB's Refusal to Distribute PRSS Funding to NPR Is Unlawful .......................10

        A.    Discontinuing NPR's PRSS Funding Violates the First Amendment .................................................................................10

        B.    Discontinuing NPR's PRSS Funding Violates the Public Broadcasting Act .................................................................16

    II.    NPR Will Suffer Irreparable Injury Absent a Temporary Restraining Order .......19

    III.    The Balance of Hardships and Public Interest Favor a Temporary Restraining Order ................................................................20

    IV.    The Court Should Waive Any Bond Requirement ...............................................21

CONCLUSION....................................................................................................22

# TABLE OF AUTHORITIES

**Page(s)**

## Cases

*Adickes v. S. H. Kress & Co.*,
398 U.S. 144 (1970) ................................................................................................ 15, 16

*Am. Fed'n of Gov't Emps., AFL-CIO v. U.S. Off. of Pers. Mgmt.*,
777 F. Supp. 3d 253 (S.D.N.Y. 2025) ......................................................................17

*Anatol Zukerman & Charles Krause Reporting, LLC v. United States Postal Serv.*,
64 F.4th 1354 (D.C. Cir. 2023) .................................................................................20

*Associated Press v. Budowich*,
780 F. Supp. 3d 32 (D.D.C. 2025) ............................................................................21

*Blum v. Yaretsky*,
457 U.S. 991 (1982) ..................................................................................................16

*Cate v. Oldham*,
707 F.2d 1176 (11th Cir. 1983) ................................................................................19

*CPB v. Trump*,
2025 WL 1617191 (D.D.C. 2025) .........................................................................5, 6

*Davis v. District of Columbia*,
158 F.3d 1342 (D.C. Cir. 1998) ................................................................................19

*Elrod v. Burns*,
427 U.S. 347 (1976) ..................................................................................................19

*FCC v. League of Women Voters of Cal.*,
468 U.S. 364 (1984) ....................................................................................................3

*Fed. Express Corp. v. United States Dep't of Com.*,
39 F.4th 756 (D.C. Cir. 2022) ...................................................................................17

*Fed. Prescription Sev., Inc. v. Am. Pharm Ass'n*,
636 F.2d 755 (D.C. Cir. 1980) ..................................................................................21

*Free Enterprise Fund v. Public Company Accounting Oversight Board*,
561 U.S. 477 (2010) ..................................................................................................17

*Global Health Council v. Trump*,
2025 WL 2480618 (D.C. Cir. Aug. 28, 2025) .....................................................18, 19

*Jenner & Block LLP v. U.S. Dep't of Just.*,
2025 WL 1482021 (D.D.C. May 23, 2025) ..............................................................14

*Karem v. Trump*,
960 F.3d 656 (D.C. Cir. 2020) ..................................................................................21

*League of Women Voters of U.S. v. Newby,*
   838 F.3d 1 (D.C. Cir. 2016) ...................................................................................20

*Lebron v. Nat'l R.R. Passenger Corp.,*
   513 U.S. 374 (1995) .............................................................13, 14, 15, 17, 18

*Lugar v. Edmondson Oil Co.,*
   457 U.S. 922 (1982) ...........................................................................................15

*Mills v. District of Columbia,*
   571 F.3d 1304 (D.C. Cir. 2009) .........................................................................19

*Morgan Stanley DW Inc. v. Rothe,*
   150 F. Supp. 2d 67 (D.D.C. 2001) .......................................................................9

*Nat'l Rifle Ass'n of Am. v. Vullo,*
   602 U.S. 175 (2024) .....................................................................................15, 16

*Nken v. Holder,*
   556 U.S. 418 (2009) ...........................................................................................20

*Nuclear Regul. Comm'n v. Texas,*
   145 S. Ct. 1762 (2025) .......................................................................................18

*Roman Cath. Diocese of Brooklyn v. Cuomo,*
   592 U.S. 14 (2020) .............................................................................................19

*Rosenberger v. Rectors & Visitors of the Univ. of Va.,*
   515 U.S. 819 (1995) ...........................................................................................10

*Turner v. U.S. Agency for Global Media,*
   502 F. Supp. 3d 333 (D.D.C. 2020) ...................................................................19

*United States v. Ross,*
   25-cv-2261 (D.D.C. 2025) ...................................................................................6

*Wilmer Cutler Pickering Hale & Dorr LLP v. Exec. Off. of President,*
   2025 WL 1502329 (D.D.C. May 27, 2025) .......................................................14

*Winter v. Nat. Res. Def. Council,*
   555 U.S. 7 (2008) .................................................................................................9

*Youngstown Sheet & Tube Co. v. Sawyer,*
   343 U.S. 579 (1952) ...........................................................................................15

## Statutes

15 U.S.C. § 7211 ....................................................................................................17

47 U.S.C. §§ 396-398 .....................................................................................3, 17, 18

47 U.S.C. § 396(b) .................................................................................................13

47 U.S.C. § 396(g) ...................................................................................................3

47 U.S.C. § 396(g)(1)(B) ........................................................................................... 12

47 U.S.C. § 396(k) ........................................................................................................ 3

47 U.S.C. § 396(k)(10)(D)(i) ................................................................... 1, 3, 12, 13, 15

47 U.S.C § 398 ........................................................................................................... 18

Pub. L. No. 118-47, Div. D, tit. IV ............................................................................. 7

Pub. L. No. 119-4, Div. A, tit. I, § 1101(a)(8) ............................................................ 7

Pub. L. No. 119-28 § 2(b)(20), 139 Stat. 469 (July 24, 2025) .................................... 7

## Other Authorities

Corporation for Public Broadcasting, August 28, 2025 Board Meeting Public
    Session Transcript at 15:30-18:09,
    https://cpb.org/aboutcpb/leadership/board/meetings/2025-08-28/Board-
    Meeting ...................................................................................................... 13

Corporation for Public Broadcasting, "Statement Regarding Executive Order on
    Public Media" (May 2, 2025), available at
    https://cpb.org/pressroom/Corporation-Public-Broadcasting-Statement-
    Regarding-Executive-Order-Public-Media ............................................... 11

Executive Order 14290, "Ending Taxpayer Subsidization of Biased Media."  90
    Fed. Reg. 19415 .......................................................................................... 5

Jennifer Scholtes & Megan Messerly, *White House to send Congress a formal
    request to nix $9.3B for PBS, NPR, State Department*, Politico (Apr. 14,
    2025), available at https://www.politico.com/news/2025/04/14/white-house-
    to-send-congress-a-formal-request-to-nix-9-3b-for-pbs-state-department-
    00289543 ...................................................................................................... 8

Rescission Proposal No. R25-21, Report Pursuant to Section 1012 of the
    Congressional Budget and Impoundment Control Act of 1974 (2 U.S.C. 683)
    (May 28, 2025), at 21-22, *available at* https://www.whitehouse.gov/wp-
    content/uploads/2025/03/Proposed-Rescissions-of-Budgetary-Resources.pdf ....................... 7

## INTRODUCTION

On May 1, 2025, President Trump issued an Executive Order seeking to punish National Public Radio, Inc. (NPR) on the basis of its speech, including by pressing the Corporation for Public Broadcasting (CPB or the Corporation) to carry out that violation of the Constitution. CPB is now poised to do the Order's bidding, in contravention of both the First Amendment and the express mandates of the Public Broadcasting Act of 1967 (the Act). If not immediately restrained from diverting federal funds that must, by statute, be allocated to NPR, CPB will cause irreparable damage to NPR.

For four decades, public radio stations, including non-NPR Member stations, have designated NPR as the sole entity responsible for managing and operating the Public Radio Satellite System (PRSS)—critical infrastructure that public radio stations (known as the Interconnected Stations) depend on for content distribution and emergency alerts. Federal law *requires* CPB to fund the "national entity" that "public telecommunications entities participating in the public radio satellite interconnection system" have "designate[d] for satellite interconnection purposes." 47 U.S.C. § 396(k)(10)(D)(i). Consistent with that statute and the public radio stations' designation, NPR and the Corporation for decades have entered into grant agreements pursuant to which CPB has distributed congressionally appropriated funds to NPR to support the management and operation of the PRSS. NPR's current PRSS grant agreement with CPB ends on September 30, 2025.

Yet, over the past six months, CPB has engaged in a marked about-face with respect to its statutory obligations to provide those funds to NPR that can be explained only as an attempt to comply with the Executive Order. CPB agreed to renew NPR's PRSS grant agreement in April— even telling NPR that its Board had approved the renewal. But after increasing pressure from the Administration, CPB reneged on that promise. In compliance with the Administration's wishes,

and to oust NPR as manager and operator of the PRSS, CPB issued a Request for Proposals (RFP) for an "independent entity" to manage radio and content distribution services on July 14, 2025. On September 23, 2025, NPR was informed by CPB that its Board of Directors had voted to award a five-year "public media infrastructure" grant to a coalition of entities (the PMI Coalition) in response to the RFP.  *See* Declaration of Ryan Merkley at 3–4 (¶ 16).  That five-year grant will include funding in the hands of CPB that was previously appropriated by Congress for public radio satellite interconnection—in other words, funding that CPB is statutorily required to distribute to NPR.  The only plausible explanation for CPB's unlawful turnabout is its desire to comply with the Order.  Simply put, despite CPB's public defense of its own independence and its pronouncements that it is not bound to follow the Order, it determined in private to do just that—cutting off the largest source of funds that flow directly from CPB to NPR.  CPB's actions are patently unlawful and detrimental to the public radio stations it purports to serve. It is poised not only to implement an Executive Order that openly defies the First Amendment, but also to violate the express terms of the Act.

Interim relief is necessary to stop immediate and irreparable harms to NPR and the public radio system.  NPR is likely to succeed on the merits of its claims against CPB and obtain a permanent injunction barring its implementation of the Order.  And because NPR's current PRSS grant agreement with CPB ends on September 30, 2025, NPR requires emergency relief to, at minimum, maintain the status quo while the Court considers the merits in order to prevent CPB from unlawfully distributing funds that may never be recovered.  Absent such relief, NPR will need to continue to manage and operate the PRSS to fulfill its contractual obligations to the Interconnected Stations but will lose any realistic prospect of recovering the funding that Congress specifically intended for that purpose.  And the public interest and balance of equities weigh

heavily in favor of an order temporarily restraining CPB from violating the Act and implementing

the President's unconstitutional Executive Order.

## BACKGROUND

NPR's summary judgment motion canvases the background of this case in detail. Dkt.

21-1 at 13–26. The background relevant to the present motion follows:

### A.    The Public Radio Satellite System

As has been briefed to this Court in detail, *see* Dkt. 21-1 at 28–29; Dkt. 34 at 23–25,

Congress enacted the Public Broadcasting Act, 47 U.S.C. §§ 396–398, to ensure that the nation's

public radio system benefitted from government support without being stifled by political

interference. *See FCC v. League of Women Voters of Cal.*, 468 U.S. 364, 386–87 (1984). To that

end, Congress established the Corporation and provided that it should be insulated from political

control. Congress also provided that CPB may receive appropriated funds that it must then

distribute to public media entities based on specific, statutory criteria. *See* 47 U.S.C. § 396(g), (k).

CPB distributes these funds in several forms, including Community Service Grants (CSGs) to local

public radio stations and, as relevant here, grants to support satellite interconnection among

stations through what is known as the Public Radio Satellite System or PRSS. 47 U.S.C.

§ 396(k)(10)(D)(i). Specifically, the Act provides that satellite interconnection funds "shall be

distributed" to the "public telecommunications entities participating in the public radio satellite

interconnection system or *the national entity they designate for satellite interconnection*

*purposes*." 47 U.S.C. § 396(k)(10)(D)(i) (emphasis added). These funds must be used

"exclusively for the capital costs of the replacement, refurbishment, or upgrading of [the] national

satellite interconnection systems" and related maintenance. 47 U.S.C. § 396(k)(10)(D)(i).

For decades, public radio entities have "designated" NPR as the "sole entity" entrusted

with managing and operating the PRSS. Dkt. 21-2, Statement of Undisputed Material Facts

3

(SUMF) at 5 (¶ 36). That remains true today. Every one of the more than 300 public radio stations participating in the PRSS has an active contract with NPR and has approved the designation of NPR as manager and operator of the PRSS. Second Declaration of Badri Munipalla at 2 (¶¶ 4–5), Ex. A (current form contract "approv[ing]" in writing "the designation of NPR as manager and operator of the [PRSS]"); Exs. B–D (Member Station co-plaintiff contracts). In turn, NPR has agreed in these contracts to manage and operate the PRSS on the stations' behalf. *See*, *e.g.*, *id.* Exs. A–D. Consistent with NPR's designation, and in accordance with the Act, for decades CPB has awarded congressionally appropriated satellite interconnection funding to NPR under a series of agreements between CPB and NPR. 2nd Munipalla Decl. at 2 (¶ 6). Their current grant agreement expressly acknowledges that "the Interconnected [public telecommunications entities] have designated [NPR] as their national entity for interconnection purposes." *Id.* at 2 (¶ 7). Under that agreement, which expires on September 30, 2025, NPR was awarded $4,450,000 in satellite interconnection funding for Fiscal Year 2025. *Id.* at 2–3 (¶ 8).

The PRSS is the backbone of the public radio system in the United States. Each year, the PRSS delivers approximately 400,000 hours of news, music, and specialized audience programming to more than 1,200 public radio stations and signals throughout the United States covering 99% of the U.S. population. SUMF at 3–4 (¶¶ 20–22). And in times of national emergency, the PRSS receives Presidential-level alerts from the Federal Emergency Management Agency (FEMA) and transmits them to local radio stations around the country. *Id.* (¶ 32). The PRSS also supplies technology that local public radio stations use to transmit alerts concerning local and regional emergencies. *Id.* at 5 (¶¶ 73, 137, 188). These emergency alert services can be especially critical in rural and remote areas. For example, in Plaintiff KSUT's broadcast coverage area of more than 27,000 square miles, public radio is often the only way to obtain timely

information about natural disasters such as flash floods or wildfires. *Id.* at 18 (¶¶ 133–36). The PRSS, as managed and operated by NPR, also provides 24/7 technical support for local public radio stations, which often do not have anyone on site to troubleshoot problems. *Id.* at 4–5 (¶¶ 28–29). As CPB's Executive Vice President and General Counsel explained in a declaration filed with this Court, the "PRSS provides essential and secure delivery of content, including news, music, and other programming to public radio stations across the United States" and "also plays a crucial role in delivering emergency alerts to local radio stations." Supp. Slavitt Decl. at 13 (¶ 35), Dkt. 12-1, *Corp. for Pub. Broad. v. Trump* ("*CPB v. Trump*"), No. 25-cv-1305. If the PRSS stopped working, over 1,200 public radio stations and signals in the United States would be unable to access national content or receive emergency alerts and would have to go silent for parts of the day until a replacement system could be built. 2nd Munipalla Decl. at 5 (¶ 22).

## B. The Executive Order and this Lawsuit

On May 1, 2025, the President issued an Executive Order with the avowed purpose of punishing NPR for engaging in journalism he disfavors. *See* Dkt. 21-1 at 20–23; Executive Order 14290, "Ending Taxpayer Subsidization of Biased Media." 90 Fed. Reg. 19415. The Order purports to direct all federal agencies, as well as CPB, to cease any direct or indirect funding of NPR. One provision directs CPB to "cease [providing] direct funding to NPR," including both "existing direct funding" and "future funding." *Id.* § 2(a). The materials accompanying the Executive Order listed specific examples of NPR's constitutionally protected journalism that, in the President's view, merited this punishment. *See* Dkt. 21-1 at 23.

Soon after the Order was issued, NPR and three of its Member Stations filed this lawsuit. The lawsuit names as defendants the President and certain federal agencies within the Order's scope (collectively the Federal Defendants), as well as CPB. Dkt. 1. NPR and its co-plaintiffs assert that the Order violates the Public Broadcasting Act, which forbids Executive Branch

officials from directing CPB's affairs and provides specific instructions to CPB as to how its funds must be distributed. *See* Dkt. 1 at 29–32. Plaintiffs further detail the many ways in which the Order flagrantly violates the First Amendment, including through illegal retaliation and viewpoint discrimination. *Id.* at 32–36. Finally, Plaintiffs allege that the Order deprives NPR of due process. Dkt. 1 at 38–41. Plaintiffs seek an order permanently restraining Defendants, including CPB, "from implementing or enforcing it." Dkt. 21 at 2. Plaintiffs and the Federal Defendants have cross-moved for summary judgment, Dkt. 21, 30, and those motions are fully briefed before this Court. CPB did not respond to Plaintiffs' motion, nor has it moved for summary judgment. CPB filed an Answer in which it admitted to every allegation in the Complaint related to the First Amendment and Public Broadcasting Act, including the claim that the Act requires CPB to distribute satellite interconnection funding "to the national entity that public radio stations designate for satellite interconnection purposes." Dkt. 1 at 30 (¶ 113) (internal quotations omitted); Dkt. 36 at 8 (¶ 113); *see* Dkt. 1 at 29–36 (¶¶ 108–138); Dkt. 36 at 8–9 (¶¶ 108–138).

### C.    President Trump's Efforts to Seize Control of CPB

The Executive Order is not the only way in which President Trump has tried to assert control over CPB and, ultimately, defund NPR.

First, as this Court is aware, President Trump sought to oust three of CPB's five directors. *See CPB v. Trump*, 2025 WL 1617191, at *4 (D.D.C. 2025). CPB and its directors then sued to challenge that attempted removal. When the three directors attempted to remain in their roles, the Department of Justice sued them in an effort to remove them. *United States v. Ross*, 25-cv-2261 (D.D.C. 2025). Summary-judgment motions in both cases are pending (with only one director remaining at issue).

President Trump also took another step to defund NPR: Invoking the Congressional Budget and Impoundment Control Act. On May 28, 2025, the President asked Congress to rescind the

money it had previously appropriated to CPB for the 2026 and 2027 fiscal years.[1]  On July 17, Congress voted to approve the rescission, and it was signed into law by President Trump on July 25.  *See* Pub. L. No. 119-28 § 2(b)(20), 139 Stat. 469 (July 24, 2025).  As a result, CPB will not receive any further funding from the U.S. Treasury unless a new appropriations bill is passed.

Because Congress had not yet appropriated advance funding for satellite interconnection purposes for fiscal years 2026 or 2027, the rescission legislation had no effect on that funding.  *See* Pub. L. No. 118-47, Div. D, tit. IV (appropriating $60 million for interconnection purposes for fiscal year 2024); Pub. L. No. 119-4, Div. A, tit. I, § 1101(a)(8) (extending appropriations at the same levels for fiscal year 2025).

### D.    CPB's Refusal to Distribute Remaining PRSS Funds to NPR, the National Entity Designated to Receive that Funding

Although no further PRSS funding has been appropriated, CPB currently holds millions of dollars in unspent appropriations for satellite interconnection.  *See* Dkt. 34 at 22; Dkt. 21-1 at 25 (describing CPB's then-ongoing negotiations for the extension of its PRSS grant agreement with NPR); 2nd Munipalla Decl. at 3 (¶ 9).  That money is statutorily required to be used to fund the PRSS's operations after the current grant agreement between NPR and CPB expires on September 30, 2025.

Before the Executive Order was issued, CPB was poised to distribute more than $30 million in PRSS funding to NPR.  On March 21, 2025, at CPB's invitation, NPR submitted a proposal seeking approximately $26 million in PRSS funding for the next three years.  2nd Munipalla Decl. at 3 (¶ 10).  On April 2, Kathy Merritt, a CPB executive, called NPR's Vice President responsible

---

[1] *See* Rescission Proposal No. R25-21, Report Pursuant to Section 1012 of the Congressional Budget and Impoundment Control Act of 1974 (2 U.S.C. 683) (May 28, 2025), at 21–22, *available at*        https://www.whitehouse.gov/wp-content/uploads/2025/03/Proposed-Rescissions-of-Budgetary-Resources.pdf.

for the PRSS to advise him that CPB's Board had approved NPR's proposal and would be distributing the full amount of NPR's proposed budget as well as the remaining balance from NPR's existing grant agreement.  This would have resulted in a transfer more than $30 million to NPR for the PRSS.  *Id.* (¶ 10).  Over the next week, the parties continued to work out the operational details of the transfer.  Merkley Decl. 2 (¶ 9).  There was no suggestion that there would be any impediments to finalizing the agreement.  *Id.*

Indeed, CPB itself has represented to this Court that "at the time of the President's purported termination of CPB's board members and the [Executive Order], CPB was negotiating the extension of [the current PRSS] grant to NPR for an additional $35,962,000 using funds that Congress already appropriated for that specific purpose."  Dkt. 12-1 at 25, *CPB v. Trump*; *see also* Dkt. 34 at 22.  And CPB represented to this Court in early May that if that grant to NPR is "not extended, the PRSS system will cease operations and the resulting effects will be catastrophic. … because PRSS Interconnection is the very system that creates a national connected public media system whereby stations across the country can share information, programming and communications."  Dkt. 12-1 at 14, *CPB v. Trump*.

But in the face of ramped-up threats from the Administration, CPB began to waver; and, ultimately, it folded.  On April 14—the same day it was reported that President Trump intended to formally ask Congress to rescind CPB's funding[2]—Ms. Merritt called NPR's Chief Operating Officer to inform him that CPB now wanted to provide PRSS funding to a separate entity, with the principal criterion for eligibility being that the entity lack any ties to NPR.  Merkley Decl. at 2

---

[2] Jennifer Scholtes & Megan Messerly, *White House to send Congress a formal request to nix $9.3B for PBS, NPR, State Department*, Politico (Apr. 14, 2025), available at https://www.politico.com/news/2025/04/14/white-house-to-send-congress-a-formal-request-to-nix-9-3b-for-pbs-state-department-00289543.

(¶ 8).  NPR declined to abandon its designated role as manager and operator of the PRSS.  *Id.*
(¶ 13).  And, following the issuance of the Order on May 1, rather than finalize the extension of
its grant agreement with NPR that it had already approved, CPB instead issued a Request for
Proposals (RFP) seeking a new "entity to manage and govern Radio Broadcast and Content
Distribution services"—one that the Order did not purport to prohibit it from funding.  Dkt. 34-1,
Statement of Additional Undisputed Material Facts ("SAUMF") at 12 (¶ 237).  The RFP seemingly
was drafted specifically to give CPB a purported basis to exclude NPR from consideration by
requiring a bidder to have "no single represented organization holding majority control."  Dkt. 34-
3 at 5.  And in an even more pointed nod to the Order, the RFP stated that CPB sought a manager
of the PRSS who would be "legally and functionally able to receive CPB funding by September
30, 2025."  SAUMF at 12 (¶ 232).

On September 23, 2025, CPB informed NPR that CPB's Board had voted to award a five-
year grant to the PMI Coalition, which would include a substantial amount of funding in CPB's
control that had been appropriated by Congress for satellite interconnection purposes.  Merkley
Decl. at 3–4 (¶ 16).

## LEGAL STANDARD

A plaintiff seeking a temporary restraining order must demonstrate: (1) a likelihood of
success on the merits; (2) that the plaintiff is likely to suffer irreparable injury in the absence of
such relief; and (3) that the balance of the equities and (4) the public interest favor an injunction.
*See Winter v. Nat. Res. Def. Council*, 555 U.S. 7, 20 (2008); *see also Morgan Stanley DW Inc. v.
Rothe*, 150 F. Supp. 2d 67, 72 (D.D.C. 2001) ("The court considers the same factors in ruling on
a motion for a temporary restraining order and a motion for a preliminary injunction.").  Here, all
four elements are readily satisfied:  CPB's conduct is plainly unlawful; NPR will suffer irreparable
injury both through the loss of its First Amendment freedoms and the immediate loss of non-

recoverable funding that is statutorily mandated to support its management and operation of the PRSS; the balance of equities overwhelmingly favors NPR; and the public interest in a functional public radio system demands a temporary restraining order.

## ARGUMENT

### I.    CPB's Refusal to Distribute PRSS Funding to NPR Is Unlawful

The Corporation's decision to award PRSS funding to a recipient other than NPR is an unlawful implementation of the President's unlawful Executive Order. NPR is likely to obtain an order permanently enjoining all actions by CPB to implement the Order, including its refusal to distribute PRSS funding to NPR as mandated by the Act.

### A.    Discontinuing NPR's PRSS Funding Violates the First Amendment

Plaintiffs' summary judgment briefing explains the many ways in which the Executive Order violates the First Amendment. Dkt. 21-1, at 35–48. The Order and its accompanying materials openly admit that the President issued the Order to punish NPR for protected speech, even listing the specific news articles and other content the President disliked most. *Supra* 5. This is textbook First Amendment retaliation. And it is retaliation based on viewpoint, which is "presumptively unconstitutional in funding, as in other contexts." *Rosenberger v. Rectors & Visitors of the Univ. of Va.*, 515 U.S. 819, 831 (1995). Although the Federal Defendants have disputed Plaintiffs' argument that the Order is unconstitutional, CPB did not. Instead, it *admitted every relevant allegation in its Answer.*

Because CPB is now implementing the very Executive Order that it admits is unconstitutional, CPB is violating NPR's First Amendment rights.

1.  <u>CPB Is Implementing the Executive Order</u>

CPB has argued the Order is "not binding on CPB," but has described it as "articulating the policy of the United States."[3]  CPB is now implementing that policy.

The timing of CPB's decision to discontinue NPR's funding allows no other inference. CPB continuously funded the PRSS for decades through grant agreements with NPR.  In early 2025, CPB left no doubt that it meant to continue this funding, soliciting a budget proposal from NPR, the entity designated by the Interconnected Stations to serve as manager and operator of the PRSS.  *Supra* 7.  On April 2, 2025, just weeks before the Executive Order was issued, CPB communicated that its Board had accepted NPR's proposal.  *Supra* 7–8.  But as NPR and CPB were implementing the extension's operational details, political pressure on CPB rapidly mounted. On April 14, the same day the President publicly made known he would be seeking to rescind CPB's funding, CPB informed NPR that it wanted to distribute PRSS funding to a different entity—any entity but NPR.  *Supra* 8.  Soon after, on May 1, the President made his precise demands clear by issuing the Executive Order directing CPB not to fund NPR.  *Supra* 5.

PRSS funding constitutes the largest portion of direct funding from CPB to NPR.  *See* Dkt. 21-2, SUMF at 6–7 (¶¶ 42–47) (of the approximately $11.1 million in grants from CPB that NPR received for Fiscal Year 2024, $6.8 million was for the PRSS).  But after the Order was signed, CPB never again considered giving that funding to NPR.  Even when NPR submitted a proposal in response to the RFP, CPB declined NPR's offer to discuss that proposal despite the fact that NPR had managed and operated the PRSS for decades.  2nd Munipalla Decl. at 3–4 (¶¶ 16–17).

---

[3] Supp. Slavitt Decl. at 9 (¶ 22). *See also* Corporation for Public Broadcasting, "Statement Regarding Executive Order on Public Media" (May 2, 2025), available at https://cpb.org/pressroom/Corporation-Public-Broadcasting-Statement-Regarding-Executive-Order-Public-Media.

After the political pressure on CPB mounted even further, including through rescission and the Administration's lawsuit to remove CPB directors, CPB formally capitulated and determined to distribute PRSS funding to another entity. It is inconceivable that, but for the President's interference, NPR and CPB would not have finalized an extension of their current PRSS grant agreement months ago.

There is no other plausible reason for CPB's actions, nor has CPB has offered one. The Interconnected Stations never requested this change; to the contrary, they have consistently and recently praised NPR's management and operation of the PRSS. 2d Munipalla Decl. at 4 (¶ 14); Merkley Decl. at 3 (¶ 12). And the haphazard way in which CPB has attempted to discontinue NPR's PRSS funding only further confirms its motive. Despite acknowledging to this Court that the PRSS is a critical piece of public radio infrastructure, *supra* 5, CPB informed NPR of its decision to discontinue funding only seven days before NPR's current grant agreement was set to end. Merkley Decl. at 3–4 (¶ 16). CPB's sudden upending of a complex, critical, and well-functioning content distribution system is explicable only as a rushed attempt to cease funding NPR in compliance with the President's command.

To be clear, even if CPB did somehow suddenly decide that, in its view, NPR simply was not suitable to continue to manage and operate the PRSS, that still would not explain CPB's actions because, as CPB knows, that is not its judgment to make. Under the Act, CPB's role is merely to "*assist* in the establishment and development of one or more interconnection systems," including by providing "grant" or "contract" assistance "for interconnection facilities." 47 U.S.C. § 396(g)(1)(B) (emphasis added). It is the Interconnected Stations that "designate" which "national entity" shall manage and operate the public radio satellite system on their behalf. 47 U.S.C. § 396(k)(10)(D)(i). And they have designated NPR. *Supra* 3–4. Nothing in the Act gives

CPB discretion to override that designation.  To the contrary, the Act mandates that the funds Congress has provided for satellite interconnection "shall be distributed by CPB" to "those public telecommunications entities participating in the public radio satellite interconnection system or the national entity *they designate* for satellite interconnection purposes."  47 U.S.C. § 396(k)(10)(D)(i) (emphasis added).  By distributing those PRSS funds to an entity (or entities) not so designated, CPB is openly flouting the Act.  And the only plausible reason why it would do so is to comply with the Order.  In short, CPB's decision should be seen for what it is: a move on the part of CPB, which despite rescission continues to lobby Congress for funds, to comply with the Administration's demands.[4]

2.  CPB's Implementation of the Order Violates the First Amendment

In implementing the President's unconstitutional Order, CPB is violating the First Amendment.  First, while CPB is a private entity for most purposes, Supreme Court precedent makes clear that CPB is bound by the First Amendment.  Second, even if that were not the case, the First Amendment still would prohibit CPB from violating NPR's rights at the government's behest.

CPB is not a federal agency nor is it a government actor for the vast majority of purposes.  CPB is, however, bound by the First Amendment.  The Public Broadcasting Act states that CPB "will not be an agency or establishment of the United States Government."  47 U.S.C. § 396(b).  And that provision is "dispositive" for "matters that are within Congress's control."  *Lebron v. Nat'l R.R. Passenger Corp.*, 513 U.S. 374, 392 (1995).  Thus, CPB is a private entity for nearly

---

[4] Corporation for Public Broadcasting, August 28, 2025 Board Meeting Public Session Transcript at 15:30–18:09, https://cpb.org/aboutcpb/leadership/board/meetings/2025-08-28/Board-Meeting (CPB President stating that CPB would "take every possible step" to "work[] with Congress" to restore funding, and was "communicating with Congress to explore opportunities for continued funding").

every purpose, from contract law to corporations law.  At the same time, the Supreme Court has made clear that when "the Government creates a corporation by special law, for the furtherance of governmental objectives, and retains for itself permanent authority to appoint a majority of the directors of that corporation, the corporation is part of the Government for purposes of the First Amendment." *Lebron*, 513 U.S. at 399.

In *Lebron*, the Supreme Court held that Amtrak was a government actor for purposes of the First Amendment because, among other things, it was created by federal statute for the furtherance of government objectives, and the President (subject to the advice and consent of the Senate) had the authority to appoint the majority of its directors. *Id.* at 392, 397–98.  CPB shares those features.  It was created by the Act to serve a government purpose, and the President appoints its directors.  The Court in *Lebron* even remarked that the "Corporation for Public Broadcasting" and Amtrak are "variation[s] upon the [same] theme." *Id.* at 391.

Of course, CPB's status as a government actor solely for First Amendment purposes in no way suggests the President is free to disregard the Act—a statute enacted by Congress to govern CPB's operations.  Nor does CPB's status for First Amendment purposes mean that the President may remove CPB's directors at will, because the removability of CPB's leadership is "within Congress's control." *Lebron*, 513 U.S. at 392.  But for the limited purpose of the First Amendment, CPB is a state actor; it is prohibited from violating NPR's First Amendment rights.

When the President has issued an Executive Order that violates the First Amendment, actions by state actors to implement that Order also violate the First Amendment and so "the Court can properly enjoin" them. *Wilmer Cutler Pickering Hale & Dorr LLP v. Exec. Off. of President*, 2025 WL 1502329, at *31 (D.D.C. May 27, 2025); *accord Jenner & Block LLP v. U.S. Dep't of Just.*, 2025 WL 1482021, at *24 (D.D.C. May 23, 2025) (similarly enjoining enforcement of

unconstitutional executive order); *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 582, 588–89 (1952) (affirming injunction restraining seizure of steel mill pursuant to an executive order that exceeded the President's constitutional authority).  Because CPB, which for First Amendment purposes is a government actor, is implementing an unconstitutional Order, NPR is likely to prevail on the merits of its First Amendment claim against CPB and obtain an order permanently enjoining CPB from discontinuing PRSS funding to NPR.

Alternatively, even if CPB were not generally a government actor for First Amendment purposes under *Lebron*, 513 U.S. at 392, CPB's discontinuation of PRSS funding to NPR is "fairly attributable" to the government because (1) the deprivation results from the "exercise of some right or privilege created by" the government, and (2) CPB "acted together with" the government. *Lugar v. Edmondson Oil Co.*, 457 U.S. 922, 937 (1982) (describing "state-action requirement" governing constitutional rights protected "'against infringement by governments'").  The government "cannot do indirectly"—through an entity like CPB—"what it is barred from doing directly."  *Nat'l Rifle Ass'n of Am. v. Vullo*, 602 U.S. 175, 190 (2024).

CPB exercised a government-created right or privilege when it denied PRSS funding to NPR.  *Lugar*, 457 U.S. at 937.  CPB can receive and distribute PRSS funding only because the Public Broadcasting Act authorizes CPB to distribute satellite interconnection funds appropriated by Congress for that purpose.  *See* 47 U.S.C. § 396(k)(10)(D)(i).  And CPB acted in concert with the government because its decision to discontinue funding was the result of government compulsion or, at least, significant encouragement.  "[A]cts by private parties done under the compulsion" of the government violate the Constitution, and the target of such acts has a claim directly against the private actor.  *Adickes v. S. H. Kress & Co.*, 398 U.S. 144, 146, 170 (1970) (holding that a plaintiff "would show an abridgement of her equal protection right, if she proves

that [a private restaurant] refused her service because of a state-enforced custom of segregating the races in public restaurants"). The government also can be held "responsible for a private [actor's] decision" when it has "provided such significant encouragement, either overt or covert, that the choice must in law be deemed to be that of the [government]." *Blum v. Yaretsky*, 457 U.S. 991, 1004 (1982). Here, the President ordered CPB to stop funding NPR and tried to bend CPB to his will by, among other things, attempting to remove its directors. CPB's refusal to distribute PRSS funds to NPR is being "done under the compulsion" of the government, *Adickes*, 398 U.S. at 170, or at a minimum is the result of "such significant encouragement" that the choice to deny PRSS funds "must in law be deemed to be" the government's, *Blum*, 457 U.S. at 1004. As the Supreme Court reiterated just last year, "[a] government official cannot coerce a private party to punish or suppress disfavored speech on her behalf. *Vullo*, 602 U.S. at 190. Here, the government so coerced or encouraged CPB's actions to implement the unlawful Order that the action counts as the government's violation of NPR's First Amendment rights.

### B. Discontinuing NPR's PRSS Funding Violates the Public Broadcasting Act

NPR is also likely to prevail on the ground that CPB's refusal to distribute PRSS funding to NPR violates the Public Broadcasting Act. As just explained, the Act expressly requires CPB to distribute such funding to the national entity "designated" by interconnected stations to manage and operate the PRSS. *Supra* 12–13. CPB has instead stated it will distribute those funds to a coalition of other entities that have not been so designated. *Id.* That unambiguously violates the Act.

NPR has an *ultra vires* cause of action to challenge this statutory violation. An *ultra vires* claim is a "suit in equity seeking injunctive relief" that is available when three conditions are present: (1) "there is no express statutory preclusion of all judicial review," (2) "there is no alternative procedure for review of a statutory claim," and (3) the defendant "plainly acts in excess

16

of its delegated powers and contrary to a prohibition in the statute that is clear and mandatory." *Fed. Express Corp. v. United States Dep't of Com.*, 39 F.4th 756, 763 (D.C. Cir. 2022); *see generally* Dkt. 34 at 14–17.  These conditions straightforwardly apply here.  No provision of the Public Broadcasting Act forecloses judicial review.  47 U.S.C. §§ 396–398.  Nor does the Act set forth an alternative procedure for challenging CPB's violation of it.  *Id.*  And it is clear that CPB is violating a statutory mandate: NPR is the designated entity to which PRSS funds must be paid.

Although plaintiffs have typically invoked the *ultra vires* cause of action against entities denominated by Congress as "agencies," and the D.C. Circuit has often stated the elements of an *ultra vires* claim in reference to "agency" action, *see*, *e.g.*, *FedEx*, 39 F.4th at 764, the Supreme Court has confirmed that a private party may bring an equitable cause of action against a government-created corporation.  Consider *Free Enterprise Fund v. Public Company Accounting Oversight Board*, 561 U.S. 477 (2010).  The Oversight Board, just like CPB, is by statute "not … an establishment of the United State Government" but rather "a nonprofit corporation" organized under D.C. law.  15 U.S.C. § 7211.  Even so, the Supreme Court held that plaintiffs may seek "equitable relief" against the Oversight Board.  561 U.S. at 492 n.2.  *Lebron* explains why.  Congress's designation of CPB or the Oversight Board is "dispositive" only for matters "within Congress's control."  *Lebron*, 513 U.S. at 392.  Yet *ultra vires* review "derives" not from Congress, but "from the inherent equitable powers of courts."  *Am. Fed'n of Gov't Emps., AFL-CIO v. U.S. Off. of Pers. Mgmt.*, 777 F. Supp. 3d 253, 282 (S.D.N.Y. 2025) (citing *FedEx*, 39 F.4th at 765).[5]

---

[5] *Free Enterprise Fund* involved a constitutional claim.  But although the standard for equitable relief differs between statutory and constitutional claims, with statutory claims requiring a showing that the violation is "clear and mandatory," 39 F.4th at 763, there is no apparent reason why these claims would differ in who may be subjected to them.  And NPR is aware of no case drawing such a distinction.  *Free Enterprise Fund* confirms that courts have the equitable power to hear claims against entities denominated by Congress as "private."

The Supreme Court recognized the availability of an equitable cause of action against congressionally created public corporations for good reason. Congressionally created corporations are a "device of government … explicitly for the furtherance of federal government goals," *Lebron*, 513 U.S. at 395, and are subject to statutory schemes far more detailed than those governing other private persons. *See*, *e.g.*, 47 U.S.C. §§ 396–398. If these corporations could escape even *ultra vires* review, they could violate their organic statutes and evade their statutory duties with impunity. Judicial review is particularly critical in a case like this one, because it ensures that a corporation cannot wrest from Congress the power of the purse. Absent an *ultra vires* cause of action, CPB will be able to spend what was originally taxpayer money in a way that Congress forbade. Judicial power checks this, while still maintaining the strict insulation from the executive branch that Congress insisted upon. *See* 47 U.S.C § 398 (forbidding "any department, agency, officer, or employee of the United States to exercise any direction, supervision, or control over public telecommunications," while conspicuously not exempting judicial oversight).

Recent D.C. Circuit decisions underline that a party may not "'dress up a typical statutory-authority argument as an *ultra vires* claim.'" *Global Health Council v. Trump*, 2025 WL 2480618, at *12 (D.C. Cir. Aug. 28, 2025) (quoting *Nuclear Regul. Comm'n v. Texas*, 145 S. Ct. 1762, 1776 (2025). But this case is far from typical. The Corporation's decision to distribute PRSS funding to entities other than NPR in violation of a clear statutory directive not only violates NPR's rights and the rights of the Interconnected Stations that designated NPR as manager and operator of the PRSS, but also is part and parcel of a broader effort by the Executive Branch to punish NPR for the exercise of constitutional liberties and to silence perceived opponents of the Administration. Indeed, if CPB's actions were not the direct result of that unconstitutional coercion, its decision to defy the clear statutory directives that govern allocation of PRSS funds under the Act would be

well-nigh inexplicable, but no less unlawful. NPR is entitled to equitable relief to address CPB's extreme violation of the Act's clear statutory commands. *Id.* If *ultra vires* review of CPB's actions is ever available, it must be available here.

## II.    NPR Will Suffer Irreparable Injury Absent a Temporary Restraining Order

Unless CPB is restrained from distributing PRSS funding to the PMI Coalition, NPR will be irreparably harmed in multiple ways.

To start, discontinuing NPR's funding perpetrates a First Amendment injury that inherently inflicts irreparable harm. "It has long been established that the loss of constitutional freedoms, 'for even minimal periods of time, unquestionably constitutes irreparable injury.'" *Mills v. District of Columbia*, 571 F.3d 1304, 1312 (D.C. Cir. 2009) (quoting *Elrod v. Burns*, 427 U.S. 347, 373 (1976)); *see also Roman Cath. Diocese of Brooklyn v. Cuomo*, 592 U.S. 14, 19 (2020) (holding that the loss of First Amendment freedoms is irreparable injury). Accordingly, "there is a presumed availability of federal equitable relief against threatened invasions of constitutional interests." *Davis v. District of Columbia*, 158 F.3d 1342, 1346 (D.C. Cir. 1998) (cleaned up). *See* Dkt. 21-1 at 51–52. The irreparable injury is particularly acute given the First Amendment violation here. Denying NPR funding in retaliation for the views NPR has expressed produces ongoing, prospective chilling effects on the expressive choices of NPR as well as all other private speakers who use public funding—and those chilling effects cannot be undone even if money is eventually recovered at the conclusion of litigation. The "chilling of First Amendment expression" is "irreparable harm." *Turner v. U.S. Agency for Global Media*, 502 F. Supp. 3d 333, 385 (D.D.C. 2020); *accord Cate v. Oldham*, 707 F.2d 1176, 1188–89 (11th Cir. 1983).

Moreover, absent relief, NPR will be harmed in its ability to carry out its mission. An organization is irreparably harmed if (1) the actions taken by the defendant "perceptibly impair[] the organization's programs," and (2) the defendant's actions "directly conflict with the

organization's mission." *League of Women Voters of U.S. v. Newby*, 838 F.3d 1, 8 (D.C. Cir. 2016) (quotation marks and alterations omitted).  A critical part of NPR's mission is to operate the PRSS in service to and for the benefit of all public radio stations.  Contrary to CPB's apparent belief, its decision to discontinue PRSS funding to NPR does not change NPR's role; NPR remains the entity designated to manage and operate the PRSS.  *Supra* 3–4.  The termination of PRSS funding to NPR would unquestionably harm NPR by depriving it of needed funds to fulfill that role.  Moreover, it threatens NPR's contractual relationships with the Interconnected Stations and undermines the hard-earned trust that NPR has built with those stations over decades of service. 2d Munipalla Decl. at 5 (¶ 23).

This injury is imminent and, absent relief from this Court, likely irreparable.  With NPR's current grant agreement with CPB ending in mere days, CPB is likely to distribute PRSS funds to the PMI Coalition quickly.  If CPB is not immediately enjoined from carrying out that transfer of funds to the PMI Coalition, NPR's injuries will be irreparable.  CPB has represented that it is in the process of winding down its operations.  And once PRSS funds have been distributed, it is unlikely that money could be clawed back; the PMI Coalition may well begin to expend the funds immediately and it is unlikely NPR's injuries could be fully redressed in, for example, a subsequent damages action.  Absent injunctive relief, NPR will likely never receive the PRSS funds to which it is entitled by law as the designated manager and operator of the PRSS.

## III.    The Balance of Hardships and Public Interest Favor a Temporary Restraining Order

In a constitutional and *ultra vires* lawsuit like this one, the "balance of hardships" and "public interest" factors "merge."  *Anatol Zukerman & Charles Krause Reporting, LLC v. United States Postal Serv.*, 64 F.4th 1354, 1364 (D.C. Cir. 2023) (citing *Nken v. Holder*, 556 U.S. 418, 435 (2009)).  Here, these factors weigh heavily in favor of a temporary restraining order.

The Constitution and Congress have already determined where the balance of equities and

public interest lie. CPB's decision to discontinue NPR's funding violates the First Amendment and is therefore *per se* against the public interest. *See Karem v. Trump*, 960 F.3d 656, 668 (D.C. Cir. 2020) ("enforcement of an unconstitutional law is always contrary to the public interest" (citation and quotation marks omitted)). Likewise, when enacting the Public Broadcasting Act, Congress determined that it was in the public interest to direct CPB's satellite interconnection funding to the national entity designated by public radio stations. *Supra* 12–13. CPB is not permitted to flout the First Amendment and abrogate the judgment of Congress. The fact that CPB's action is both unconstitutional and unlawful as a statutory matter weighs heavily toward enjoining it.

Moreover, although NPR will suffer substantial irreparable harm absent relief, *supra* 19–20, neither CPB nor the public will suffer if the Court enjoins CPB from distributing funds to the PMI Coalition pending the resolution of this lawsuit. CPB has no personal or proprietary interest in the PRSS funds, which it is statutorily required to distribute. And if it is enjoined from distributing these funds in violation of the Act, CPB will not suffer any harm. Nor will the public be injured. To the contrary, the public benefits tremendously from NPR's effective management and operation of the PRSS, which ensures that public media content and Presidential-level emergency alerts are distributed to public radio stations and the communities that rely on them around the country.

## IV.    The Court Should Waive Any Bond Requirement

The Court should exercise its discretion "to dispense with any security requirement whatsoever." *Associated Press v. Budowich*, 780 F. Supp. 3d 32, 60 (D.D.C. 2025) (quoting *Fed. Prescription Sev., Inc. v. Am. Pharm Ass'n*, 636 F.2d 755, 759 (D.C. Cir. 1980)). No security requirement is necessary because there is no risk that a temporary restraining order will cause CPB to incur "any material damage." *Id.* NPR merely seeks an order temporarily restraining CPB from

distributing PRSS funding to any other entity than NPR.  As just discussed, CPB cannot suffer any material harm from being required to not distribute money in a certain way.  And because NPR will continue to operate the PRSS even if it does not receive additional funding from CPB, 2nd Munipalla Decl. at 6 (¶ 24), the PRSS will not suffer while the TRO is in place (nor would CPB have standing to recover for such damage to the PRSS in any event).

## CONCLUSION

This Court should issue a temporary order restraining the Corporation from distributing PRSS funding to any entity or entities other than NPR or from taking any other steps to implement the unlawful Order pending a resolution of this case on the merits.

September 26, 2025

Respectfully submitted,

*/s/ Miguel A. Estrada*

Miguel A. Estrada (D.D.C. Bar No. 456289)
GIBSON, DUNN & CRUTCHER LLP
1700 M Street, N.W.
Washington, D.C. 20036-4504
(202) 955-8500
MEstrada@gibsondunn.com

Theodore J. Boutrous, Jr. (D.D.C. Bar No. 420440)
Katie Townsend (D.C. Bar No. 1026115)
GIBSON, DUNN & CRUTCHER LLP
333 South Grand Avenue
Los Angeles, CA 90071-3197
(213) 229-7000
T Boutrous@gibsondunn.com
KTownsend@gibsondunn.com

Elizabeth A. Allen (*Admitted Pro Hac Vice*)
NATIONAL PUBLIC RADIO, INC.
1111 North Capitol Street, NE
Washington, D.C. 20002
(202) 513-2000
EAAllen@npr.org

*Counsel for Plaintiff*
*National Public Radio, Inc.*