IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| NATIONAL PUBLIC RADIO, INC., *et al.*, <br><br>    *Plaintiffs*, <br><br> v. <br><br> DONALD J. TRUMP, *et al.*, <br><br>    *Defendants*. | Civil Case No. 25-cv-1674-RDM <br><br> **SECOND DECLARATION OF BADRI MUNIPALLA** |

## SECOND DECLARATION OF BADRI MUNIPALLA

I, Badri Munipalla, hereby declare as follows:

1. I am the Vice President, Distribution at National Public Radio, Inc. (NPR), a position I have held since April 2024.

2. I am over the age of 18, am competent, and make this declaration based upon my own personal knowledge. I make this declaration in support of Plaintiff NPR's Motion for a Temporary Restraining Order in the above-captioned case. If called to do so, I could and would competently testify to these matters under oath.

3. I joined NPR in January 2008 as a software developer with NPR Distribution. In 2020, I became NPR Distribution's Senior Director of Technology, where I was responsible for the overall operation and development of the technical functions of the Public Radio Satellite System (PRSS). In my current role, I oversee NPR Distribution, which manages and operates the PRSS, the nation's public radio interconnection system. I am responsible for all activities associated with the planning and management of this mission-critical division, including engineering, software development, station and producer relations, and business strategy and

1

operations. A more detailed description of the PRSS and the services it provides is provided in my first Declaration, *see* Dkt. 21-4.

4. Beginning in 1985, public radio stations (collectively, the Interconnected Stations) designated NPR as the sole entity responsible for managing and operating the PRSS. The Interconnected Stations have continuously approved that designation every year since.

5. To effectuate this designation, each Interconnection Station has signed a contract with NPR, which is renewed annually. True and correct copies of the contracts that NPR has entered into with co-plaintiffs Roaring Fork Public Radio, Inc. d/b/a Aspen Public Radio, Colorado Public Radio, and KUTE Inc. d/b/a KSUT Public Radio are attached hereto as Exhibits A, B, and C, respectively. A true and correct copy of the current version of the form agreement used for this purpose is attached hereto as Exhibit D.

6. Consistent with this designation, the Corporation for Public Broadcasting (CPB) has recognized NPR as the system manager responsible for maintaining and developing the PRSS and has provided funding to NPR for decades specifically for that purpose.

7. In 2023, CPB and NPR entered into a grant agreement entitled "Public Radio Satellite System Interconnection Funding FY23-24" (the 2023–2024 Grant Agreement) through which NPR was awarded $11,866,755 to "plan, design, procure, construct, replace, upgrade and manage the PRSS Interconnection System on behalf of, for the benefit of, and made available to all of those public telecommunications entities participating in the public radio interconnection system." The 2023–2024 Grant Agreement expressly acknowledges that "the Interconnected [public telecommunications entities] have designated [NPR] as their national entity for interconnection purposes."

8. In September 2024, by written "Amendment #1 to Agreement: Public Radio Satellite System Interconnection Funding FY23-24," (the Extension Amendment), NPR and CPB extended the term of the 2023–2024 Grant Agreement, which was set to expire on September 30, 2024, to September 30, 2025. The Extension Amendment added $4,450,000 to the budget for the grant, bringing the total to $16,317,755. *Id.*

9. On March 21, 2025, NPR submitted a proposal to CPB for a three-year extension of its PRSS grant in the amount of $26,236,211. This proposal was solicited by CPB, which had expressed an intent to fast-track its consideration.

10. On April 2, 2025, I received a call from Kathy Merritt, who was then serving as CPB's Chief for Station and System Strategies. Ms. Merritt informed me that CPB's Board of Directors had approved NPR's proposal. She further informed me that CPB planned to transfer the entire budget amount of $26,236,211 as well as the remaining balance from the existing grant agreement to NPR over the next few days, which Ms. Merritt indicated would result in a transfer of more than $30 million to NPR.

11. During that call, Ms. Merritt told me that CPB anticipated that an executive order would be issued by President Trump related to CPB, but she did not know what the executive order would say.

12. However, I understand that on April 14, 2025, Ms. Merritt contacted Ryan Merkley, NPR's Chief Operating Officer, and informed Mr. Merkley that CPB would not fund the PRSS unless it became a separate entity with no ties to NPR. *See* Merkley Decl. at 2, ¶ 8. I was considerably surprised by this development given CPB's prior indication that it had approved NPR's proposal and sought to transfer funds imminently.

13. Following President Trump's issuance of Executive Order 14290 on May 1, 2025, CPB stopped engaging in meaningful discussions or negotiations with NPR regarding its prior approval of the PRSS grant.

14. CPB has never provided any practical or logical reason for its sudden demand that NPR relinquish its role as the designated operator and manager of the PRSS after decades of successful service. Nor did the Interconnected Stations request this change. Based on my years of experience managing the PRSS and working with CPB, as well as my prior conversations with Ms. Merritt, I have no reason to believe that CPB or the Interconnected Stations are dissatisfied with NPR's management and operation of the PRSS. To the contrary, they have repeatedly praised the high quality of our service in surveys and in meetings that I have attended.

15. On July 14, 2025, CPB published a Request for Proposals (RFP) seeking "an independent entity [] to manage and govern Radio Broadcast and Digital Content Distribution services [] for the public radio system." RFP at 1. A true and correct copy of the RFP is attached hereto as Exhibit E. The RFP states that the recipient entity must, among other things, be "legally and functionally able to receive CPB funding by September 30, 2025." *Id.* at 4.

16. Seeking to preserve its rights and engage with CPB in good faith, NPR submitted a timely, detailed proposal in response to the RFP on August 15, 2025 before the 3:00pm submission deadline.

17. After that response was submitted, I contacted Ms. Merritt on August 25, 2025 to ensure that CPB had received NPR's proposal and offered to provide any additional information that CPB might require. CPB did not seek any further information and did not invite NPR to give a presentation or meet with CPB staff to discuss our proposal, as contemplated by the RFP. *See* Ex. E at 13.

18. It is my understanding that CPB received only one other response to the RFP, which was submitted by a coalition of public media organizations, service providers, and associations. It is my understanding that CPB followed up with that coalition after receiving its response with questions and held a meeting with representatives of that coalition to discuss its proposal.

19. I understand that on September 23, 2025, Ms. Merritt informed Mr. Merkley of CPB's decision to award a five-year grant to that coalition that will include all PRSS funds previously appropriated to CPB. *See* Merkley Decl. at 4, ¶ 16.

20. NPR's current PRSS grant agreement with CPB will expire on September 30, 2025.

21. I understand that there is unlikely to be a new agreement in place for the management and operation of the PRSS by that date.

22. If the PRSS ceased operating, the consequences would be devastating. The PRSS distributes content that is replayed or repeated across more than 1,200 public radio stations and signals throughout the United States. Without it, stations would not be able to access national programming or receive national emergency alerts; unless stations find a suitable replacement for national programming and make the necessary operational adjustments, local public radio stations would go silent during the times when they would have been airing national programming, and entire communities would be vulnerable during emergencies.

23. NPR has contractual obligations to the Interconnected Stations to manage and operate the PRSS, and NPR has spent decades building trust among the Interconnected Stations through its reliable, best-in-class service in the management and operation of the PRSS. If NPR were unable to fulfill its obligations as the designated manager and operator of the PRSS due to a lack of funds moving forward, it would jeopardize that trust and undermine NPR's relationships with the Interconnected Stations.

24. Even in the absence of PRSS funding, NPR will make every effort to honor its obligations to the Interconnected Stations, preserve the functionality of the PRSS for the good of the public radio system, and avoid outages.

25. However, by informing NPR one week before its current grant agreement ends that it will not be distributing PRSS funding to NPR, CPB has created substantial disruption to NPR's operations and uncertainty across the system. And if CPB is permitted to dispense millions of dollars in PRSS funds elsewhere, NPR would need to carry on its management and operation of the PRSS with little or no expectation of recouping the funds it will spend to do so.

26. To the extent NPR needs to increase costs to Interconnected Stations to continue to operate and manage the PRSS as a result of CPB's actions, this burden would be particularly difficult for stations facing severe budget cutbacks due to Congress's recent rescission of public broadcasting funds.

I declare under the penalty of perjury that the foregoing is true and correct.

Dated: Washington, D.C.
September 26, 2025

*Badri Munipalla*

_____

Badri Munipalla