# EXHIBIT E



**Request for Proposals for Entity to Manage and Govern
Public Radio Content Distribution**

**Proposal Due: August 15, 2025 at 3pm ET**

## I. INTRODUCTION

### Overview

The Corporation for Public Broadcasting (CPB) is seeking an independent entity ("Entity") to manage and govern Radio Broadcast and Digital Content Distribution services ("Services") for the public radio system ("System"), defined as the 386 independent recipients of radio Community Service Grants (CSGs) from CPB ("Service Recipients"), which operate more than 1300 stations reaching 99 percent of the U.S. population, and the 200+ content producers and distributors throughout the United States.

The Entity will be responsible for distribution services that allow Service Recipients to provide individual, and in some cases multiple, 24/7 broadcast schedules, digital streaming and on-demand content to their audiences. The Services are essential for enabling the System's success by addressing the varied needs of stations and content producers and fostering collaboration across the System. The Entity will either deliver the Services directly or act as a Managed Service Provider (MSP) by contracting with third parties to deliver, support, maintain and monitor such Services. Specifically, the Services include:

- Primary Entry Point (PEP) feed designation for the delivery of emergency alerting, and the infrastructure to act as such for the entire System.
- Ingest and delivery of public radio real-time and file-based content at scale (for both radio broadcast and streaming) between content providers and stations.
- Facilitation and management of station-to-station content and metadata exchange in a variety of formats, including but not limited to radio programs and podcasts.
- Support for digital audio and on demand audio content publishing, distribution and monetization via spot insertion, delivery and targeting of underwriting, fundraising and promotion opportunities.
- Support and training for Service Recipients to effectuate maximum, timely integration, use and utility of the Services provided.

## Background

CPB is a private, non-profit corporation authorized by Congress in 1967 to receive federal government appropriations and to use those funds to promote the growth and development of public broadcasting and public telecommunications services. CPB is not a government agency.

CPB remains focused on facilitating a public media system that is valued by all Americans and reflects a wide range of ideas and content. CPB's mission is to ensure universal access to non-commercial, high-quality content and telecommunications services.

CPB does not own, operate, or manage any public media stations, or centralized or distributed broadcasting or digital infrastructures. CPB invests in more than 1,500 local radio and television stations – their programs, services, and other initiatives to serve and engage the public. CPB funds multifaceted and innovative programming and other media content that is educational and informative. CPB also provides support for centralized broadcast content distribution infrastructure for public radio and television stations, as well as a centrally developed and delivered third-party Customer Identity Management platform to enable Single Sign-On service for public media stations that opt to utilize it.

## Industry Context

### The Shifting US Media Landscape

Digital media platforms have driven an evolution in how Americans discover and consume content. Today, consumption of news, podcasts, video, and more is mobile-first and always on, with audiences expecting to access content where they want, when they want, and be able to pick up where they left off across devices. The breadth of available content has become overwhelming, giving greater importance to making it easy for people to find what they are looking for across a wide variety of devices and platforms. With new technologies available to distribute content, companies are modernizing and utilizing new distribution methods to deliver content to the increasing number of distribution endpoints; companies are delivering content through radio frequency, satellite, cable, fiber, internet, and MVPDs. While there is a technical standard for broadcast distribution, there is no agreed upon technical standard for digital distribution and that increases the number of formats and configurations required to deliver to those endpoints.

### Implications for Public Media and Distribution

To ensure universal access to non-commercial, high-quality content and telecommunications services, content distribution must keep pace in an ever-evolving media landscape with a proliferation of distribution endpoints. It is critical to be able to adapt content distribution systems with agility to meet changing audience needs and scale.

Audience for public media through radio broadcast distribution is declining and is not being offset by digital distribution methods. Current content distribution systems were designed for a broadcast-first reality and grew organically to deliver to the growing number of distribution endpoints. Yet, content distribution systems have evolved in a sub-optimal way to keep pace with today's market standards and remain fragmented across broadcast delivery and digital systems. Broadcast will continue to be foundational to CPB's ability to meet its mission for universal access, with the additional need to optimize for the digital-first media landscape of today.

There is growing urgency for CPB to consider a holistic approach to the future of content distribution to ensure the most cost-effective approach as the steward of federal funds for public media.  The approach should aim to streamline broadcast distribution, while optimizing for an expanding and evolving network of digital platform options and technical compatibility requirements to best serve the needs of the American public.

## Guiding Principles

CPB expects the Entity to adopt and build on the guiding principles below:

- Future content distribution systems should strive to support maintaining universal access to public media, including populations in rural America, Native communities, older Americans, lower-income families, and individuals with disabilities.
- Future systems should maintain or expand support of emergency alerting products and systems accessible for free to the American public.
- No producer, distributor or Service Recipient should be excluded from content distribution access because of cost barriers, technology accessibility, or fees.
- The governance structure of the content distribution services provider must sufficiently represent the varied circumstances and needs of the breadth of public radio stations with no single represented organization holding majority control or undue influence.  The structure must minimize the potential for conflicts of interest, and established policies and processes must be sufficient to address those that may appear.
- The content distribution system should be based on the evolving business needs of public radio stations and be maximally adaptable through short- and long-term product roadmaps that reflect changing business and audience needs.
- The needs to be addressed should not be limited to broadcast but rather be inclusive of meeting audiences' non-broadcast platform/medium preferences, with consideration given to opportunities to support Service Recipients' data needs that can realistically and sustainably be addressed within the scope of Services.
- No expectation exists that one technological solution exists to meet all

business needs.
- As determined by business requirements, future content distribution systems should be designed and/or built utilizing standard technologies, services, interfaces, and equipment to ensure compatibility with other technologies supporting public media, taking advantage of AI and other emergent technologies where advantageous and advisable.
- Future content distribution systems should be designed, built, and maintained for maximum efficiency and cost effectiveness, taking advantage of opportunities to limit redundancies.
- The content distribution system should provide a secure environment for content and for users.
- The content distribution system should seek adoption of flexible and scalable software and cloud technology where such services provide the best, most efficient solution without degradation of reliability and quality and within acceptable risk tolerance.

## II.    SCOPE and PARAMETERS

### Scope of Entity

The Entity is wholly responsible for serving as the governing body, funding steward, and responsible party for the management and delivery of the Services.

The Entity will either deliver the Services directly or contract with third parties acting as a Managed Service Provider to deliver such Services.

In either case, the Entity must be able to demonstrate:

1. Structured approach to governance, with no single represented organization holding majority control or undue influence.
2. Comprehensive expertise in radio broadcast operations, technology, and digital content distribution platforms, or a history of managing similar services.
3. A plan to independently govern and manage the funding from CPB and other sources.

### Entity Parameters

Additionally, the Entity is required to satisfy the following requirements:

- Exist as an independent 501(c)3 that can qualify as a Public Telecommunications Entity (PTE).
- Have a clearly articulated charter that reflects the Guiding Principles
- Be incorporated and legally and functionally able to receive CPB funding by September 30, 2025.

- Have a Board of Directors that reflects the breadth of the current public radio System, taking into consideration station staffing and budget size, governance structure, and the types of communities they serve.
- Be a functional, legal entity with a chief executive and staff; have the ability to enter into and manage contracts with third parties.
- Be able to provide or contract for public radio content distribution services and operate at a minimum as a managed service provider.
- Be able to provide or contract for Services support and training for Service Recipients.
- Be able to establish and maintain a relationship with the *Public Radio Satellite Interconnection Charitable Trust*[1].
- Operate with transparency, including communicating short- and long-term strategic plans and decision making; have open governance meetings, with clear articulation of limited circumstances when such meetings may be closed.
- Have established, consistent strategic planning and communications structures/mechanisms and processes in place for soliciting, capturing, and responding to broad System input.

### Scope of Services

The Services to be provided by the Entity – either directly or indirectly – include:

**Audience Measurement**

Collect, analyze, and report on audience data, as available, across broadcast and digital streaming and on-demand platforms to understand audience size, demographics, and engagement, where feasible.

**Content Distribution**

Facilitate the delivery of thousands of hours of live and/or file-based audio programming content between and to stations and content partners through a combination of encoding, decoding, and transmission technologies. This includes leveraging satellite, terrestrial, or hybrid distribution paths. Robust connectivity is required to reach stations even in remote or rural areas. Service should be able to support concurrent streams of audio for acquisition and distribution.

**Content Management**

Manage the ingest of audio content and associated metadata from various sources; enable the discoverability and accessibility of content and metadata for interested stations.

---

[1] The Trust holds title to the satellite transponder capacity lease and the national operating system equipment of the Public Radio Satellite System (PRSS) managed by NPR.

**Content Lifecycle & Storage**

Securely store audio content and associated metadata using a tiered storage approach and in accordance with defined storage policies that balance accessibility and cost.

**Data and Analytics**

Aggregate data from multiple sources, including using third party platforms where available, broadly applicable and sustainable, to generate actionable insights. Enable data-driven decision-making across the System. Develop and manage a set of Service Recipient-informed data policies.

**Emergency Alerting**

Fulfill the PEP feed designation role within the Emergency Alert System (EAS) on behalf of the public radio System. Rapidly and reliably disseminate critical information to the public during emergencies – such as natural disasters, national security threats, or other urgent situations – and ensure messages reach the intended Service Recipients.

**Monitoring and Control**

Continuously oversee and manage Services to ensure end-to-end reliability, performance, and compliance. Utilize real-time monitoring, dashboards, and alerting to detect issues, maintain quality standards, and support rapid response to disruptions.

**Operational Support**

Ensure smooth day-to-day operations across broadcast and digital platforms by enabling efficient workflows and minimizing downtime.

**Sponsorship Technology**

Manage tools for delivering, targeting, and tracking sponsorship opportunities for digital audio and on-demand platforms. Enable dynamic ad insertion, audience segmentation, and performance analytics to optimize revenue generation, ensure compliance with sponsorship guidelines, and enhance the listener experience.

**Technology Support**

Provide responsive technology support for stations and other stakeholders across the System. Maintain reliable operations through prompt identification, resolution, and documentation of issues. Perform regular software updates, bug fixes, and feature enhancements, as outlined in roadmaps to optimize system performance, and hardware maintenance.

## III.    PROPOSAL CONTENTS

Instructions: Please format and label your responses to align with the numbered sections below, thoroughly addressing each of the questions.

## 1.0 Entity Structure Response

List of required materials for Entity Structure Response submission:

### 1.1 Overview of the Entity

1. Please describe the nature of the proposed Entity. Does the Entity exist today, or will it need to be established to deliver the Services (e.g., joint venture)?
    a. If the Entity currently exists:
        i. When was the current Entity established, and how long has it been operating?
        ii. What is the legal and organizational structure?
        iii. What is the current purpose and mission? Please provide a complete and clearly articulated organization charter.
    b. If the Entity does not currently exist:
        i. What is the approach and timeline to establish and operationalize the Entity before September 30, 2025? If that deadline cannot be met, please provide an approach and timeline that includes a PTE fiscal agent that can receive the funds no later than September 30, 2025, and steward such funds until the Entity is fully functional by no later than December 31, 2025. Please include key activities, milestones, and target dates for the completion of these milestones.
        ii. What risks are there towards the successful establishment of the proposed Entity?
        iii. What will the legal and organizational structure be?
        iv. What will the purpose and mission be? Please provide a complete and clearly articulated organization charter.
        v. If the Entity will be the controlling party of a collaboration
            a. What are the existing organization(s) that the proposed Entity will be comprised of?
            b. How is the collaboration of the existing organization(s) beneficial to delivering the Services?
            c. Please describe any existing relationship(s) and history between these organizations, as well as the current purpose and mission of each of the individual organizations.
            d. Please describe the relationship expected between the Entity and collaborating organizations and provide any formal agreement(s) enumerating the relationship(s)
            e. Please describe how the collaborative will operate (financials, operations, decision-

making/oversight/management including oversight on Services, etc.)?
2. Does the Entity plan to deliver Services directly, indirectly, or through a hybrid approach?
   a. What experience, direct or indirect, does the Entity (or organizations forming the proposed Entity) have assessing and addressing business requirements of a large stakeholder group on an ongoing basis?
   b. What Services, direct or indirect, does the Entity (or organizations forming the proposed Entity) have experience delivering?
   c. What Services, direct or indirect, does the Entity (or organizations forming the proposed Entity) have experience governing and managing?
3. What is the Entity's strategy and approach to balancing resources for the existing Services and innovating for future requirements?

**1.2 Governance Approach**

1. What is the existing or proposed governance structure for the Entity? How does the purported governance structure sufficiently represent the varied circumstances and needs of the breadth of public radio stations with no single represented organization holding majority control or undue influence? How does the structure minimize the potential for conflicts of interest, and how are established policies and processes sufficient to address those that may arise? Please describe:
   a. Leadership structure and composition, including key groups, forums, or committees
   b. Names and qualifications of key leaders
   c. Terms and processes for appointing or replacing leaders and filling vacancies
   d. Decision-making processes, including priority setting, risk mitigation, and conflict resolution strategies
   e. Meeting cadences, formats, and typical agenda topics
2. How does the Entity plan to select and manage the service provider(s) necessary to deliver the full scope of Services?
   a. What is the process for the evaluation and selection of service provider(s)?
   b. What is the process for the onboarding of service provider(s)?
   c. What is the proposed approach and methodology to govern Service delivery and hold service provider(s) accountable for ongoing maintenance and support, including industry standard performance requirements and measurements and SLAs?
   d. What happens if and when a service provider does not adequately deliver any of the Services promised?

      e. How will the Entity work with service providers to support short- and long-term product lifecycle roadmaps for the service(s), including but not limited to service enhancements and improvements and ongoing resolution process of service issues to address the changing needs of the System over time?
3. How does the Entity plan to work with the stations and content providers in the System during the term in which they are providing the Services?
    a. How does the governance structure represent the varied circumstances and needs of the breadth of public radio stations?
    b. What are the planned communication channels, touchpoints, and boundaries between the Entity and the System?
    c. What is the proposed research and communications approach to engage the System to capture and understand business and Service needs both initially, and on an ongoing basis?
    d. What is the proposed research approach to identify and address the System's changing requirements over time, and assess the impact of implementing such changes?
    e. How will the Entity remain agile and adaptable to future needs?
    f. What is the unique value proposition of the Entity or proposed Entity to the System as a whole, and its individual stations?
4. Please describe how performance of the Services will be communicated to CPB during the term of any contractual agreement, with a frequency of no less than quarterly. Performance communications will include current operational status, ability of the Entity to capture the evolving needs of the Service Recipients, ability of the Entity to address and respond to the needs of the Service Recipients, and status of funding needed to support current operations and addressing future needs.

**1.3 Transition Approach**

1. Given the Entity will be accountable for governance and management of Services immediately upon receipt of funding, how will the Entity demonstrate accountability for those Services?
2. What are the Entity's immediate priorities as defined in the first six (6) months of managing the Servies, and what actions are planned in support of those priorities? Respondents should provide a detailed plan and timeline for when Services will be available and deployed to the Service Recipients (see Section 2.2 Onboarding and Deployment).

## 2.0 Entity Services Response

List of required materials for Entity Services Response submission for each of the Services:

**2.1 Service Approach**

1. Describe your approach for the delivery and/or management of the Service, including how the Service will be provided and what value the Service will deliver.

**2.2 Technical Architecture**

1. Please provide a diagram and/or describe the high-level technical architecture to support the Service(s).
    a. Which parts of the Service(s) will be delivered directly by Entity, and which parts will be delivered indirectly?
    b. Indicate any known potential services provider(s)
2. What is the plan to support connectivity between content providers and Service Recipients?
3. How does the technical architecture address reliability and redundancy?
4. To what extent is the solution based on cloud technologies?
5. How does the proposed architecture support future scalability?
6. How does the proposed architecture support interoperability between and among content providers and Service Recipients?
7. What industry-standard technologies, protocols, and interfaces does the Entity and/or service provider(s) plan to leverage?
8. What security measures, certificates and best practices will be established to protect the System's content assets, brand, and reputation?
9. What data security and cyber security plans, measures, protocols and best practices will be established to protect the Entity's assets, infrastructure and resources?
10. For any areas without direct experience, what is the Entity's plan to support or address these areas?

**2.2 Onboarding and Deployment**

1. What is the high-level approach and timeline for the transition of any existing portion(s) of the Services to new service provider(s), where applicable?
2. What is the onboarding process and timeline for an individual station for each Service? And what would a rollout across the full System look like? Please indicate Services to be contracted from existing providers and the level/number of Service Recipients currently being serviced by such providers and any plans for expanding participation once contracted for.
3. What is the implementation and onboarding process for a new content provider for Services?
4. What is the approach and plan for training and change management, including identifying impacts with any operational changes and addressing those impacts?
5. What is the approach and process for QA testing prior to deployment, for

both individual components and end-to-end Services?
6. How will risks be identified, monitored, and mitigated? What is the process?

**2.3 Operational Support**

1. How will day-to-day operations be managed?
2. What is the approach and plan for business continuity following an event that disrupts the daily operations of the Services?
3. What support channels will be available to stations and other stakeholders within the System (e.g., phone, email, portal, ticket system)?
4. What training and documentation will be provided to stations and stakeholders?
5. What is the process for reporting, resolving, and tracking support incidents?
6. How will issues be escalated and communicated to stakeholders?
7. What type of performance metrics and measurements will be available for the Services and with what method and how often will they be measured?
8. What is your approach to providing support services, such as: Tier 1 (triage, troubleshooting, and routing activities), Tier 2 (addressing of more complex issues), and Tier 3 (expert-level troubleshooting and solutioning)?
9. What is the approach for hardware and software release management (i.e. updates, new releases, bug fixes, etc.), including the approvals of any ongoing hardware of software changes that impact the technical architecture, operation and/or System stakeholders?
10. What SLAs will the Services be able to uphold? Please respond with SLAs delivered for each Service for the following metrics:
    a. Uptime
    b. Latency
    c. Performance
    d. Response and resolution time

**2.4 Examples**

Please provide up to three (3) relevant references or examples that demonstrate the Entity's expertise in radio broadcast operations, technology, content distribution, and digital audio and on-demand platforms; or Entity's history of managing and governing similar Services.

### 3.0 Entity Financial Response

List of required materials for Entity Financial Response submission:

**3.1 Cost Proposal**

1. Please provide a detailed breakdown of estimated costs for the first three (3) years of providing Services, including annual capital and operating costs for the Entity's management, governance, and delivery of Services, by Service.
2. Include initial transition costs and any assumptions and/or sources.

**3.2 Business Model**

1. How does Entity plan to generate revenue based on the delivery of Services?
2. Does the Entity have any innovative approaches to monetization?
3. What potential funding sources will the Entity leverage, other than CPB, and what is the anticipated contribution to the overall funding mix?
4. How does the Entity expect to maintain its revenue sustainability?
5. Please provide high-level financial projections for the first three (3) years.

**3.3 Investment Approach**

1. What are the proposed bodies and mechanisms that will be used to monitor and ensure responsible management and expenditure of funds?
2. What is the proposed decision-making approach, aligned with the governance structure and Guiding Principles, to manage and allocate funds to service provider(s)?
3. Please describe how investment decisions and fund usage will be communicated to CPB during the term of any contractual agreement, with the frequency of no less than quarterly. (Please see Grant Management Conditions section below).

## IV. PROPOSAL PROCESS

### RFP Scoring Criteria (by %)

Proposals will be evaluated and scored on a 0-10 scale, based on the following factors, with the weight of each factor expressed as a percentage of the total score:

1. **Governance (25%)** – The quality of the Entity's proposed governance plan, methodologies, and approach to address the vision and scope.
2. **Technical and Operational Readiness (35%)** – The suitability of the proposed approach towards delivering the full scope and serving the needs of the System; as well as the demonstration of prior experience.
3. **Sustainability (20%)** – The quality of the Entity's proposed approach for revenue generation, funding sources, and management of funds.
4. **Cost (20%)** – The reasonableness of the proposed cost.

### RFP to Contracting Timeline

Below is the anticipated timetable, including all milestones from the release of the RFP document through acceptance of CPB funding by the September 30, 2025, deadline:

| Activity | Due Date |
|---|---|
| Deadline to submit questions to CPB | July 23, 2025 |
| Responses to Questions posted by CPB | August 4, 2025 |
| Deadline to request access to CPB's Grants Management System | August 11, 2025 |

| Electronic Proposal Submissions Due | August 15, 2025, at 3pm ET |
|---|---|
| Presentations (by Invitation Only) | September 2025 |
| Anticipated Final Selection | September 2025 |
| Contract Drafting and Execution | by September 30, 2025 |

**Submission Process**

Entities must submit their proposals and their cost proposals separately through CPB's electronic grants management system.

All questions concerning this RFP must be submitted in writing to **PublicRadioDistribution_RFP@cpb.org** no later than **July 23, 2025**. The questions and CPB's responses will be posted on CPB's Website without attribution. CPB is not responsible for responding to any inquiry, substantive or otherwise, received after the inquiry deadline.

To gain access to the electronic grants management system, please email **PublicRadioDistribution_RFP@cpb.org** no later than **August 7, 2025, by 5:00 PM ET**.

CPB will provide access to interested entities within two business days. If your organization already has an account within CPB's electronic grants system, you must still request access to this specific RFP.

If a proposal represents more than one organization working in collaboration, please note that only one entity can upload the submission through the electronic grants system.

Once access is granted, Entities must upload the technical proposal in Microsoft Word or PDF format and the cost proposal in Excel format separately in the appropriate fields no later than **Wednesday, August 13, 2025, by 3:00 PM ET**.

CPB may request Entities with the top scores to present their proposals to CPB. If so, CPB will notify each of the time and date.

**Assumptions**

- Proposals submitted in response to this RFP by an Entity shall be valid for at least 90 days following the closing date of the RFP.
- Proposals shall be prepared simply and economically, providing a straightforward, concise description of Entity's proposals to meet the requirements of this RFP.
- Neither multiple nor alternate proposals will be accepted. Entity must clearly identify any information in their proposals that they consider confidential because of proprietary commercial information, trade secrets or otherwise.

- The selected Entity shall be responsible for all products and services required by this RFP. Subcontractors must be identified and a complete description of their role, relative to the proposals, must be included in the Entity's proposals.
- By submitting an offer in response to this RFP, an Entity, if selected for award, shall be deemed to have accepted the terms of this RFP. Any exceptions to this RFP must be clearly identified in the proposal. A proposal that takes exception to these terms may be rejected.
- CPB is not responsible for loss or damage to material submitted with or in support of this RFP. Any submission to CPB shall become the property of CPB (not including any intellectual property rights contained in such submission), and CPB is not required to return any submitted materials to any Entity. CPB is not responsible for any violation of copyright, trademark, patent, trade secret, or other rights that may result from disclosure made by response to this RFP.
- Solicitation by CPB of proposals does not constitute an agreement by CPB to extend funding to any party for the project under consideration. CPB may, in its sole discretion, elect not to pursue this project in any manner.
- By submitting a proposal, each Entity grants to CPB the right to duplicate, use, disclose, and distribute all the materials submitted for purposes of evaluation, review, and research. In addition, each Entity guarantees that Entity has final and complete rights to all the information and materials included in the proposal. Each Entity also guarantees that all such materials are not defamatory and do not infringe upon or violate the privacy rights, copyrights, or other proprietary rights of any third party.
CPB will not be responsible for any costs incurred by a Entity in preparing and submitting a proposal, or in performing any other activities relative to this solicitation.
- The proposed Entity must follow GAAP.

## V.    CONDITIONS and GUIDELINES

### Entity Conditions

If a proposal in response to this RFP is selected for funding, the successful Entity (or Entities) will be required to sign a binding agreement. Until both parties have signed an agreement, no express or implied commitment has been made to provide financial support. Entities are not authorized to commence work until the agreement is fully executed. If Entities opt to commence work, they do so at their own risk. No oral or written statement other than the signed, written agreement will govern or modify the relationship.

As a condition of agreement, the successful Entity (or Entities) must guarantee that, among other things, any work they undertake on behalf of CPB is not defamatory and

will not violate or infringe upon the privacy rights, copyrights, or other proprietary rights of any third party. Entities must also agree to indemnify CPB against any loss resulting from breach of any of the guarantees contained in the agreement.

Those receiving funds from CPB must be able to comply with a number of requirements that will be included in the operative agreement. These requirements include, but are not limited to:

1. Entity will demonstrate adequate financial support to complete the work that has been contracted and to deliver reports and/or other intellectual property created pursuant to the Agreement;
2. Entity will maintain, for four (4) years following receipt of relevant funds, all financial records to the project, which shall be accessible to CPB and to the U.S. Comptroller General or other representatives for examination and audit purposes. (Entities must also ensure that its subcontractors likewise maintain such records for the period specified and under the same terms);
3. Entity will maintain, for four (4) years after approval of a final financial report, a complete file of all subcontracts and other agreements, licenses, clearances, and other documents related to the work undertaken, copies of which shall be made available to CPB on request;
4. Entity will comply with equal employment opportunity and nondiscrimination laws and policies;
5. Entity will be required to provide documentation as to actual costs, and provide supporting detail demonstrating that all costs are reasonable, necessary, and allocable to the requirements and objectives of the work undertaken;
6. All research and materials created, developed, compiled, or produced pursuant to or as a result of this project (including but not limited to all reports) will be considered ordered and commissioned by CPB as works made for hire under the copyright laws, and made in the course of services rendered. If, for any reason, the proposed research and materials to be provided are not considered works made for hire under the copyright laws, then Entity will be required to assign all right, title, and interest in and to such research and materials to CPB. Entities further agree that neither they, nor any of their subcontractors, will have any copyrights or other intellectual property rights whatsoever in any research and/or materials created, developed, compiled, or produced by them or by any subcontractor, or by any third party participating in the preparation of research or materials for this project;
7. The agreement will be governed as construed in accordance with the laws of the District of Columbia without regard to its conflict of law provisions;
8. No funds provided by CPB will be used: (i) for any activity designed to influence legislation or appropriations pending before the United States

      Congress or any state legislature, or (ii) to conduct any reception or provide any other entertainment for any officer or employee of the Federal Government or any state or local government;

9. Entity will be required to indemnify and hold CPB harmless from and against all claims, damages, liabilities, costs and expenses (including legal fees) arising out of or related to: (i) any alleged or actual breach of any representation or warranty in the operative agreement; (ii) any other default by such Entity of any term or provision of the operative agreement, or (iii) Entity's performance under the project; and

10. The principal source of CPB funds is appropriations made by the U.S. Congress to CPB. In the event reductions occur in the amount of such appropriations that materially affect the ability of CPB to meet its obligations, then CPB and Entity, at the option of CPB, agree to enter into good faith negotiations to modify the agreement. If CPB and Entity are unable to negotiate modifications acceptable to CPB, then CPB, in its sole discretion, may terminate the agreement.

Other material terms and provisions will be set forth in the documents provided to the Entity that successfully completes the selection process.

**Grant Management Conditions**

If a proposal in response to this RFP is selected for funding, and the successful Entity (or Entities) sign a binding agreement, the Entity (or Entities) must adhere to the following grant management conditions:

1. Entity agrees to track all disbursed funds, separately within its general accounting system;
2. Entity agrees to use prudent and reasonable business judgment to manage all grant funds, by either holding as cash, or interest bearing financial vehicles limited to U.S. Treasury bills, notes and other obligations issued or guaranteed as to principal and interest by the U.S. Government, its agencies or instrumentalities, and repurchase agreements secured by such obligations or cash, with durations not to exceed one year;
3. Entity shall apply all interest earned on all grant funds to the project costs. Entity shall also be required to track any interest earned on the disbursed funds and shall be required to report to CPB on no less than a quarterly basis on said interest, including but not limited to the amount earned and how such interest has been or will be used; and
4. Entity further agrees and acknowledges Funding (including any earned interest) shall be for the benefit of all radio CSG (Community Service Grant) recipients, as designated in the most recent year of CSG distribution, the list of which may vary at CPB's sole discretion during the term of the Agreement, regardless of NPR membership or any other affiliation and may only be used

in support of the public media System.

## Expense Rules

### Non-Employee Travel Expense Guidelines

Travel expenses incurred by non-CPB staff (including Entity and Service Provider employees) must be itemized in the Non-Employee Expense Form. Each expense of $25.00 or more must be supported by an original receipt. Expenses requiring CPB approval must evidence such approval. Reimbursement of travel expenses is subject to the following limitations:

### Transportation

Only coach or economy class airfare, rail fare or bus fare will be reimbursed towards travel expenses. Travelers must make every effort to plan travel and book transportation sufficiently in advance to realize cost savings, and travelers are required to accept the lowest fare available for the required itinerary.

Private automobile use will be reimbursed at the prevailing IRS rate, but not in excess of the lowest available airfare. Taxicab fare will be reimbursed to the extent reasonable and necessary. Rental car expenses will be reimbursed only when the daily taxi fare would exceed the per-day car rental rate, or when no other convenient and less expensive form of ground transportation is available.

Travelers may rent intermediate-size vehicles.

### Lodging

CPB will reimburse only for reasonable, standard rate, single room accommodations and appropriate incidental charges. Incidental expenses incurred for comfort, grooming or personal enjoyment, such as airline and room movies, haircuts, shaving equipment, shoeshines, etc., are not eligible for reimbursement.

### Meals

CPB will reimburse meals up to a total of $75.00 per day for domestic travel and $85.00 per day for foreign travel if meals are not furnished or included in connection with an activity.

***