## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| NATIONAL PUBLIC RADIO, INC., *et al.* | |
| *Plaintiffs*, | |
| *v.* | Case No. 25-cv-1674-RDM |
| DONALD J. TRUMP, *et al.*, | |
| *Defendants*. | |

## SUPPLEMENTAL MEMORANDUM OF LAW IN SUPPORT OF NATIONAL PUBLIC RADIO, INC.'S MOTION FOR PRELIMINARY INJUNCTION AND FOR SUMMARY JUDGMENT AS TO DEFENDANT THE CORPORATION FOR PUBLIC BROADCASTING

Miguel A. Estrada (D.D.C. Bar No. 456289)
GIBSON, DUNN & CRUTCHER LLP
1700 M Street, N.W.
Washington, D.C. 20036-4504

Theodore J. Boutrous, Jr. (D.D.C. Bar No. 420440)
Katie Townsend (D.C. Bar No. 1026115)
GIBSON, DUNN & CRUTCHER LLP
333 South Grand Avenue
Los Angeles, CA 90071-3197

Elizabeth A. Allen (*Admitted Pro Hac Vice*)
NATIONAL PUBLIC RADIO, INC.
1111 North Capitol Street, NE
Washington, D.C. 20002

*Counsel for Plaintiff*
*National Public Radio, Inc.*

# TABLE OF CONTENTS

**Page**

INTRODUCTION ................................................................................................................ 1

MATERIAL FACTS ........................................................................................................... 3

    I.     NPR's Management and Operation of the PRSS................................................ 3

    II.    CPB's Board Votes to Extend NPR's PRSS Grant Agreement for Three More Years.................................................................................................... 4

    III.   CPB Meets with OMB and Reverses Course ................................................ 7

    IV.   CPB Creates a "Working Group" and Runs a Sham RFP Process as Government Pressure Mounts .......................................................................... 15

    V.    CPB Awards Interconnection Funding to "PMI" ............................................ 19

ARGUMENT ....................................................................................................................... 22

    I.     CPB Acted to Implement Unconstitutional, Viewpoint-Based Retaliation and Discrimination Against NPR.......................................................... 22

    II.    CPB's Attempt to Distribute Satellite Interconnection Funds to an Entity Other than NPR or the Interconnected Stations Violates the Public Broadcasting Act.......................................................................................... 30

    III.   CPB Has Tortiously Interfered With NPR's Business Relations ........................ 35

    IV.   NPR Is Entitled to a Preliminary Injunction and Summary Judgment as to CPB............................................................................................................. 39

CONCLUSION.................................................................................................................... 42

# TABLE OF AUTHORITIES

**Page(s)**

### Cases

*Adickes v. S. H. Kress & Co.*,
  398 U.S. 144 (1970) .................................................................................................26

*Agency for Int'l Dev. v. All. For Open Soc'y Int'l, Inc.*,
  570 U.S. 205 (2013) .................................................................................................27

*Armstrong v. Thompson*,
  80 A.3d 177 (D.C. 2013) ..........................................................................................44

*Babb v. Wilkie*,
  589 U.S. 399 (2020) .................................................................................................46

*Blum v. Yaretsky*,
  457 U.S. 991 (1982) .................................................................................................26

*Corp. for Pub. Broad. v. Trump*,
  No. 25-cv-1305 ...................................................................................................39, 48

*Davis v. District of Columbia*,
  158 F.3d 1342 (D.C. Cir. 1998) ...............................................................................46

*Fox Television Stations, Inc. v. FilmOn X LLC*,
  966 F. Supp. 2d 30 (D.D.C. 2013) ...........................................................................43

*Franks v. Bowman Transp. Co.*,
  424 U.S. 747 (1976) .................................................................................................46

*Karem v. Trump*,
  960 F.3d 656 (D.C. Cir. 2020) .................................................................................44

*League of Women Voters of U.S. v. Newby*,
  838 F.3d 1 (D.C. Cir. 2016) ...............................................................................43, 44

*Lebron v. Nat'l R.R. Passenger Corp.*,
  513 U.S. 374 (1995) .................................................................................................27

*Lugar v. Edmondson Oil Co.*,
  457 U.S. 922 (1982) .................................................................................................25

*Nat'l Rifle Ass'n of Am. v. Vullo*,
  602 U.S. 175 (2024) .................................................................................................26

*NCRIC, Inc. v. Columbia Hosp. for Women Med. Ctr., Inc.*,
  957 A.2d 890 (D.C.2008) .........................................................................................40

*New Hampshire v. Maine*,
    532 U.S. 742 (2001)................................................................................48

*In re NTE Connecticut, LLC*,
    26 F.4th 980 (D.C. Cir. 2022)..............................................................45

*Onyeoziri v. Spivok*,
    44 A.3d 279 (D.C. 2012) ......................................................................43

*Parker Drilling Mgmt. Servs., Ltd. v. Newton*,
    587 U.S. 601 (2019)..............................................................................38

*Peyton v. DiMario*,
    297 F.3d 1121 (D.C. Cir. 2002) ..........................................................46

*Roman Cath. Diocese of Brooklyn v. Cuomo*,
    592 U.S. 14 (2020)................................................................................44

*Rosenberger v. Rectors & Visitors of the Univ. of Va.*,
    515 U.S. 819 (1995)........................................................................25, 27

*Turner v. U.S. Agency for Global Media*,
    502 F. Supp. 3d 333 (D.D.C. 2020) ....................................................44

*United States v. United Continental Tuna Corp.*,
    425 U.S. 164 (1976)..............................................................................38

## Statutes

47 U.S.C. § 396.........................................................................34, 35, 36, 45, 47

Pub. L. No. 90–129 .................................................................................37

Pub. L. No. 100–626 ...............................................................................36

Pub. L. No. 117–328, Div. H, tit. IV.......................................................38

Pub. L. No. 118-47, 138 Stat. at 696 (Mar. 23, 2024) ....................4, 35, 44, 45

Pub. L. No. 118–47, Div. D, tit. IV....................................................37, 38

Pub. L. No. 119-4, 139 Stat. 10–12 ........................................................45

Pub. L. No. 119–4, Div. A, tit. I, § 1108(a)(8) ..................................35, 37

Pub. L. No. 119–4, Div. A, tit. I, § 1112 .................................................37

Pub. L. No. 119-28, 139 Stat. at 469-70 .................................................45

## Other Authorities

A. Scalia, *A Matter of Interpretation* 24 (1997) ...........................................35

NPR, *Our Mission and Vision*, https://www.npr.org/about-npr/178659563/our-mission-and-vision ............................................................................................43

Public Broadcasting, *Articles of Incorporation*, art. VII(2) (Nov. 3, 1969) ..................................46

Rescission Proposal No. R25-21, "Report Pursuant to Section 1012 of the Congressional Budget and Impoundment Control Act of 1974 (2 U.S.C. 683)" (May 28, 2025), *available at* https://www.whitehouse.gov/wp-content/uploads/2025/03/Proposed-Rescissions-of-Budgetary-Resources.pdf. .....................20

**Treatises**

18 Moore's Federal Practice § 134.30 (3d ed. 2000)....................................................................48

Restatement (Second) of Torts § 767 (1979) ...............................................................................44

## INTRODUCTION

On April 3, 2025, days after President Donald J. Trump began publicly calling for NPR to be "DEFUND[ED]" for its journalism, a member of his Administration told the Corporation for Public Broadcasting (CPB) that it would be a shame to "throw the baby out with the bath water" when it came to federal funding for public media. As the uncontroverted evidence shows, CPB heard that message loud and clear. Within 24 hours of meeting with an official from the Office of Management and Budget (OMB), CPB began dutifully complying with the Administration's demand to cut off federal funding to NPR in an attempt to save itself from being thrown out with the NPR "bath water." Indeed, on April 2, just one day before that meeting, CPB's Board had voted to approve a three-year, approximately $36 million extension of a grant agreement with NPR as the "designated manager and operator" of the Public Radio Satellite System (PRSS)—the "interconnection" system for public radio. But, after meeting with an OMB Associate Director who expressed her "intense dislike" for NPR, CPB's Board went into "crisis mode" and abruptly reversed course; it determined that the best way—indeed, the *only* way—forward for CPB was to "spin off" the PRSS into an entity "independent" from NPR, regardless whether NPR or the local radio stations participating in the PRSS (the Interconnected Stations) agreed.

Over the ensuing weeks, the Administration would ramp up its pressure on CPB—purporting to remove CPB Board members and crystallizing its demands in Executive Order 14290—all while continuing to publicly lambast NPR for the perceived viewpoints of its journalism. At the same time, CPB's leadership spoke candidly in internal discussions about the need to take "AGGRESSIVE ACTION" to stop funding NPR given the "obvious political challenges." CPB has sought to acquiesce to the Administration's demands and punish NPR for the content of its journalism by redirecting federal interconnection funds away from NPR by any means necessary, including, first, by demanding that NPR voluntarily "spin off" the PRSS, then

1

by engineering a Request for Proposals (RFP) process designed from the start to exclude NPR in order to give its pre-ordained outcome the veneer of "collabor[ation]," and, finally, by hastily "awarding" nearly $58 million in federal public radio interconnection funding that CPB had previously told Congress would go to NPR to support the PRSS to an entity that does not exist.

For months, CPB publicly has insisted that its abrupt determination to sever interconnection funding from NPR had nothing to do with political pressure or the perceived viewpoints of NPR's journalism.  It has alluded to vague concerns about the PRSS's governance structure, its perceived lack of "independence," and unfounded complaints about a supposed failure to innovate—nebulous "concerns" that CPB claims have been longstanding but did not prompt CPB to act until after April 3, 2025.  The undisputed evidence squarely refutes CPB's unsupported, post-hoc attempts to invent a lawful explanation for its actions; its motive is clear: As CPB's President and CEO told the CPB's Board of Directors on September 15, 2025:

> We currently have an EO prohibiting us from funding PBS and NPR. . . .  We are all in serious jeopardy because Congress has abdicated its role, the DOJ and the White House are in charge, and they have shown they will weaponize the executive, judicial and appropriation processes to harass and intimidate.

Supplemental Statement of Undisputed Material Facts (SSUMF) ¶ 205.

The uncontroverted evidence that the Administration compelled or significantly encouraged CPB to deny NPR congressionally appropriated interconnection funding for the PRSS, and that CPB acted because of  government pressure and in response to NPR's perceived viewpoints is overwhelming; it amounts to a veritable arsenal of smoking guns.  CPB has violated the First Amendment, flouted the Public Broadcasting Act's requirements for how public radio interconnection funding must be spent, and tortiously interfered with NPR's business relationships to boot.  For the reasons herein, this Court should preliminarily enjoin CPB from distributing federal funds intended for the PRSS to any entity other than NPR or all the Interconnected Stations,

grant NPR's motion for summary judgment as to CPB, and enter an order requiring CPB to distribute public radio interconnection funds to a statutorily intended recipient.

## MATERIAL FACTS

### I.    NPR's Management and Operation of the PRSS

The Public Radio Satellite System (PRSS) is the satellite and terrestrial content distribution system that serves as the nationwide infrastructure backbone of the public radio system. First Statement of Undisputed Material Facts (SUMF) ¶ 19. Put another way, the PRSS is the nation's public radio interconnection system. SSUMF ¶¶ 1–20. Since 1985, NPR has been the national entity designated by the public broadcasting entities participating in the PRSS (the Interconnected Stations) to manage and operate that system. *Id*. For decades, the Interconnected Stations have continuously approved that designation by annually renewing their interconnection agreements with NPR. SSUMF ¶¶ 13–18. And, currently, each of the more than 350 public radio stations participating in the PRSS has an active agreement with NPR for interconnection. SSUMF ¶ 20. NPR's management and operation of the PRSS is overwhelmingly effective—it is consistently praised by the Interconnected Stations and has an approximately 90% satisfaction rating. SSUMF ¶¶ 23–24.

To support its management and operation of the PRSS, NPR receives funds appropriated by Congress for public radio interconnection. Congress appropriates funding for interconnection to CPB, *see, e.g.*, Pub. L. No. 118-47, 138 Stat. at 696 (Mar. 23, 2024). CPB receives those appropriations and disburses interconnection funds to NPR, as the manager and operator of the PRSS, *see* SUMF ¶ 44, and to PBS, as the manager and operator of the television interconnection system. Interconnection funding is a separate appropriation and interconnection funds cannot be used for content. *See* 138 Stat. at 696. When seeking appropriated funds for interconnection, CPB provides Congress with detailed requests specifically outlining how this funding will be spent.

For decades, CPB has recognized NPR as the national entity designated by the Interconnected Stations to manage and operate the PRSS, and CPB has entered into grant agreements to disburse interconnection funding appropriated by Congress to NPR for that specific purpose. SSUMF ¶ 21. In 2023, for example, CPB and NPR entered into a grant agreement entitled "Public Radio Satellite System Interconnection Funding FY23-24" (the 2023–2024 Grant Agreement) through which NPR received $11,866,755 in federal funds to "plan, design, procure, construct, replace, upgrade and manage the PRSS Interconnection System on behalf of, for the benefit of, and made available to all of those public telecommunications entities participating in the public radio interconnection system." SSUMF ¶ 25. The 2023–2024 Grant Agreement expressly acknowledges that the Interconnect Stations "have designated [NPR] as their national entity for interconnection purposes." SSUMF ¶ 26.[1]

In March 2024, CPB submitted to Congress its Fiscal Year 2025/2027 congressional appropriation request, in which it requested $60 million for Fiscal Year 2025 for "all interconnection costs," explaining that it would work "with NPR" and "extend the current interconnection contracts with PRSS and PBS beyond September 30, 2024." SSUMF ¶ 27. In September 2024, NPR and CPB extended the 2023–2024 Grant Agreement, which was set to expire on September 30, 2024, to September 30, 2025, adding $4,450,000 to the budget for the grant and bringing the total amount of interconnection funding to $16,317,755. SSUMF ¶ 29.

## II. CPB's Board Votes to Extend NPR's PRSS Grant Agreement for Three More Years

Given NPR's longstanding successful operation and management of the PRSS, CPB was on track in early 2025 to continue its unbroken history of distributing public radio interconnection

---

[1] Unless otherwise indicated, all direct quotations to NPR's Statements of Undisputed Material Fact are quotations from the underlying record evidence described in those Statements.

funds appropriated by Congress to NPR for the PRSS. Because NPR's most recent interconnection agreement with CPB was set to expire on September 30, 2025—and because the process of obtaining funding from CPB is time-consuming and inefficient—NPR sent CPB a "concept" note describing its plans for interconnection for the next three years and the associated budget. SSUMF ¶¶ 33. After reviewing that concept document, Kathy Merritt, who was then serving as CPB's Chief for Station and System Strategies, emailed Badri Munipalla, NPR's Vice President of Distribution, and Maryfran Tyler, NPR's Executive Director of Strategy, on March 12, 2025. SSUMF ¶¶ 36–41. Ms. Merritt asked NPR to "proceed with giving us a full proposal . . . as soon as possible" based on that "concept note." SSUMF ¶ 41. On March 20, Ms. Merritt attended a meeting of NPR's Distribution/Interconnection Committee (D/I Committee), which oversees the PRSS, where she "reported that the CPB Board will consider approving a funding amount sufficient to move [NPR's] Proposal forward" and "expressed that CPB management desires to secure the CPB Board's approval of the proposed PRSS funding extension in April 2025." SSUMF ¶ 43.

On March 21, NPR submitted its proposal for a three-year extension of its PRSS grant agreement with a corresponding budget of $26,236,211, including a detailed explanation as to what the money would be used for. SSUMF ¶¶ 45–46. CPB's leadership, including Ms. Merritt, thereafter prepared a formal memorandum recommending to CPB's Board that it direct CPB management to negotiate an extension agreement with NPR reflecting the proposal—explaining that NPR's proposal "aligned with our expectations" and would "ensure continuity of service as well as future facing strategies." SSUMF ¶¶ 48–50. The memorandum concluded that "due to consideration for the importance of continuity of interconnection service to all [Community Service Grant] qualified radio stations," the Board should extend NPR's PRSS grant agreement

"for five years, to September 30, 2030, and increase[e] the funding for the public radio interconnection system." SSUMF ¶ 50. CPB's memorandum to the Board also recommended it approve a proposal by PBS for television interconnection funding; while noting that certain aspects of PBS's proposal required "further evaluation," the memorandum identified no such concerns with NPR's proposal. SSUMF ¶¶ 52–53.

CPB's Board of Directors met on April 1 and 2, convening a closed executive session to discuss interconnection. SSUMF ¶ 53. Consistent with the recommendation made by CPB's leadership, on April 2, CPB's Board voted unanimously to adopt a resolution authorizing "CPB Management to negotiate an amendment to the existing agreement with NPR for the design and implementation of the updated public radio interconnection system to extend the term by five years and increase funding by up to $36 million, as appropriated in FY 2024 and prior." SSUMF ¶ 54. When the CPB Board authorizes management to "negotiate" an agreement, that authorization is generally the final formal action that the CPB Board takes with respect to that contract. SSUMF ¶ 55. For example, on the same day the Board authorized the negotiation of an extension of NPR's grant agreement for radio interconnection, the Board also authorized CPB management to negotiate an extension of PBS's grant agreement for television interconnection. *Id.* CPB management later executed that extension agreement with PBS; no additional CPB Board approvals or resolutions were required. *Id*.

Following the April 2 Board meeting, Ms. Merritt called Mr. Munipalla and informed him that CPB's Board had approved NPR's proposal for a three-year extension of PRSS funding. SSUMF ¶ 58. During that call, Ms. Merritt told Mr. Munipalla that CPB planned to transfer the entire budget amount of $26,236,211 as well as the remaining balance from the existing grant agreement to NPR over the next few days, which Ms. Merritt indicated would result in a transfer

6

of more than $30 million to NPR Distribution for the PRSS.  SSUMF ¶ 59.  Ms. Merritt also told

Mr. Munipalla that CPB anticipated that President Trump would issue an executive order related

to CPB, but she did not know what it would say.  SSUMF ¶ 60.  Given the impending issuance of

an executive order, Ms. Merritt told Mr. Munipalla that CPB wanted to act with "urgency."

SSUMF ¶ 61.  In a later email exchange with CPB Senior Vice President of Operations Deborah

Carr, Ms. Merritt recounted that she had "call[ed] [NPR] and offer[ed] all the funding."  SSUMF

¶ 62.  Following the Board's April 2 resolution, CPB staff, including its in-house attorneys, began

preparing the extension agreement.  *See* SSUMF ¶ 78.

### III.    CPB Meets with OMB and then Reverses Course

Shortly before the CPB Board approved the extension of NPR's grant agreement for the

PRSS, the Trump Administration began attacking NPR for the perceived viewpoints of its

journalism.  On March 25, 2025, the President announced at a press conference that he would

"love to" defund NPR and PBS because, in his view, they are "biased," SUMF ¶ 146.  On March

26, he wrote on social media:  "NPR and PBS, two horrible and completely biased platforms

(Networks!), should be DEFUNDED by Congress, IMMEDIATELY. Republicans, don't miss this

opportunity to rid our Country of this giant SCAM, both being arms of the Radical Left Democrat

Party. JUST SAY NO AND, MAKE AMERICA GREAT AGAIN!!!"  SUMF ¶ 147.

Four days later, on March 31, the White House's Office of Management and Budget

(OMB) contacted CPB with a request to meet with CPB leadership.  SSUMF ¶ 65.  The next day,

April 1, President Trump posted on social media that "REPUBLICANS MUST DEFUND AND

TOTALLY DISASSOCIATE THEMSELVES FROM NPR & PBS, THE RADICAL LEFT

"MONSTERS" THAT SO BADLY HURT OUR COUNTRY!"—and CPB "began to hear rumors

that an executive order would be issued shuttering CPB imminently."  SSUMF ¶¶ 66–67.

The morning of April 3—one day after CPB's Board voted to approve extending NPR's

grant agreement for the PRSS—Ruby Calvert (Chair of CPB's Board of Directors), Clayton Barsoum (CPB's Vice President, Government and External Affairs), and Evan Slavitt (CPB's Executive Vice President and General Counsel) met with Katharine Sullivan, the politically appointed Associate Director of OMB. SSUMF ¶ 74. As Patricia Harrison, CPB's President and CEO, later told the Board, Ms. Sullivan expressed "her intense dislike for NPR" but noted—in an apparent reference to CPB—that "it would be a shame to throw the baby out with the bath water." SSUMF ¶ 75. This characterization of Ms. Sullivan's comments—in particular, her reference to not throwing "the baby out with the bath water"—was repeated in several CPB communications, including by Ms. Harrison in an email to NPR President Katherine Maher, SSUMF ¶ 89, and in talking points that Mr. Barsoum sent to Ms. Harrison on July 12 in preparation for a meeting with Senator Shelley Capito (R-WV), SSUMF ¶ 167.

The OMB meeting kicked off a frantic scramble within CPB. The CPB Board met at 1:00pm that afternoon to "debrief the meeting with OMB." SSUMF ¶ 76. And, at 4:47pm, Donna Joe (CPB Vice President and Assistant General Counsel) emailed Harry Kelly (NPR Deputy General Counsel) that "the CPB Board has been meeting all day today, and they are in a bit of crisis mode." SSUMF ¶ 77. Ms. Joe stated that she had "been instructed to wait to send [Mr. Kelly] the draft of the amendment [to extend NPR's interconnection grant agreement] until after the Board's next meeting," which would occur at 11:00 am on April 4. SSUMF ¶ 78.

On April 4 at 9:19am, Elizabeth Allen (NPR's General Counsel) emailed Mr. Slavitt; noting that NPR still had not "received the contract you envisioned us getting earlier this week," Ms. Allen asked if he would let her know "how early today we'll be able to see the contract" if "we are still aiming to close today." SSUMF ¶ 79.

Unbeknownst to NPR, the CPB Board was meeting that morning in an executive session

that was neither publicly noticed nor recorded in minutes. SSUMF ¶¶ 83–85. During that executive session CPB's Board adopted a new resolution regarding interconnection funding to NPR. *Id.* That April 4 resolution amended the Board's April 2 resolution to direct CPB management to require "the contract with NPR for interconnection to include a contingency that NPR provide a plan within 60 days of amendment execution to establish PRSS as an entity independent of NPR." *Id.* Following that meeting, Mr. Slavitt responded to Ms. Allen at 3:52 pm ""apologiz[ing] for the delays" and stating that he had been "swamped with Board meetings." SSUMF ¶ 81. When Ms. Allen asked about a revised timeline for "the closing wire," Mr. Slavitt responded, "realistically it will have to be Monday/Tuesday at best." SSUMF ¶ 82. That night, Ms. Harrison (CPB's President and CEO) emailed Laura Ross (a member of CPB's Board of Directors) speculating that "DOGE is coming tonight" to PBS. SSUMF ¶ 86. Ms. Ross then asked Ms. Harrison whether she should "call Ruby" Calvert, CPB's Board Chair "now and convene a meeting tomorrow to get the money out and reverse today's decision[.]" *Id.*

The next day, April 5, Ms. Harrison emailed Katherine Maher (NPR's President and CEO) and Paula Kerger (PBS's President and CEO) to express her anxiety about impending actions by the Executive Branch. SSUMF ¶ 87. She began by stating: "These rumors have potential to turn into boy who cried wolf. *Except the wolf is really coming.*" *Id.* (emphasis added). Ms. Harrison noted that "OMB ha[d] requested list of all grants in past two quarters and future"; that Ms. Sullivan at OMB had "expressed her thoughts re pub media—never watch it"; and that Ms. Sullivan thought CPB's "*board was more 'balanced' than most*" and did "*not want to throw out the baby with the bath water.*" SSUMF 88–89 (emphasis added). Ms. Harrison offered potential scenarios, with the first being that "[t]hey keep board, fire ceo, and replace. Shrink power of CPB to follow money tree re distribution, *no fund directly to npr* and perhaps pbs. Reward certain

states/stations." SSUMF ¶ 90 (emphasis added).

CPB's Board met again in executive session on Monday, April 7, the next business day. SSUMF ¶ 91. Draft minutes of that meeting state that Ms. Calvert "noted that she had spoken to board members about her meeting with OMB Associate Director Katherine Sullivan" and explained that "Ms. Sullivan was negative toward public media." SSUMF ¶ 91. And Ms. Harrison told the Board that CPB "needed to be prepared for" the "eventuality" that DOGE would visit CPB. SSUMF ¶ 92.

The Board concluded its April 7 executive session by passing a resolution "amend[ing] its resolution of April 2 and 4 regarding interconnection funding" to add teeth to its requirement that NPR "spin off" the PRSS: The Board directed CPB management to include in the NPR interconnection agreement a contingency that "one third of the [PRSS] funds will be withheld should NPR not comply with the spin off obligatoins [sic]" to "establish PRSS as an entity independent of NPR." SSUMF ¶ 95. The purpose of this provision was, according to Ms. Merritt, to "compel [NPR] to move forward with the spin off." SSUMF ¶ 95.

On April 8, Ms. Merritt emailed Ms. Harrison proposed talking points for an anticipated conversation with NPR's Chief Operating Officer, Ryan Merkley, to discuss CPB's decision to require NPR to "spin off" the PRSS into an independent entity. SSUMF ¶¶ 97–97. Those talking points underline CPB's motive for changing course:

- "The interconnection dollars we have now *may be the last ones we receive*. Our board wants us to fulfill our statutory responsibility to support interconnection and to ensure that interconnection services will be available for the next 3–5 years (especially if CPB might not still exist).

- *At the same time*, *we're in an environment where NPR is the target of the Administration and Congress*. *It's challenging for CPB to disperse millions of dollars to an organization that's under fire and heavily scrutinized.*

- Our board has determined an approach that allows CPB to disperse funds to NPR for

radio interconnection *while also decoupling interconnection from NPR's editorial efforts.*"

SSUMF ¶ 96 (emphasis added).  The talking points then describe CPB's new requirement that NPR "give CPB a plan to spin off ownership and control of PRSS," such that federal "funds would follow to the new entity" and not directly to NPR.  SSUMF ¶ 97.

CPB's Board completed its about-face on April 9.  It met yet again and adopted yet another resolution; this time the Board "rescind[ed] its resolutions of April 2, 4 and 7 regarding interconnection funding for NPR."  SSUMF ¶ 99.

The next day, April 10, CPB continued to discuss how to convey its abrupt reversal to NPR.  Ms. Merritt emailed additional "talking points to NPR" to other members of the CPB leadership team, which she planned to use for a discussion with Mr. Merkley.  SSUMF ¶ 101. Those talking points began: "Things have changed since last week when our board approved giving interconnection funds to NPR." *Id.*  They explained that CPB's "board wants the funds to go [to] the new entity" and proposed the following as an explanation to Mr. Merkley for why the Board "change[d] its mind so quickly": the "circumstances changed, and they had more time to consider the future."  SSUMF ¶ 102.

The same day, Debra Sanchez (CPB's Chief of Staff and Corporate Secretary) met with Carl Forti, a conservative political operative and consultant, to discuss a "plan forward" for CPB to survive the current political climate—specifically, what CPB would be "willing to stop/give up."  SSUMF ¶ 106.  Between April 10 and October 9 of this year, CPB paid Mr. Forti $150,000 for his services as a "Strategic Communications Consultant."  SSUMF ¶ 107.  Mr. Forti followed up on the meeting with a memorandum listing the chief "problem[]" for CPB as "BIAS: Belief both in Administration and among general public that the media is biased against conservatives and more specifically against Trump.  NPR is high on those lists."  SSUMF ¶ 108.  That afternoon,

President Trump wrote on social media: "NO MORE FUNDING FOR NPR, A TOTAL SCAM! EDITOR SAID THEY HAVE NO REPUBLICANS, AND IS ONLY USED TO "DAMAGE TRUMP." THEY ARE A LIBERAL DISINFORMATION MACHINE. NOT ONE DOLLAR!!!" SSUMF ¶ 100.

CPB informed NPR of its reversal on April 11, when Ms. Merritt (who by then was serving as CPB's Chief Operating Officer) called Mr. Merkley to inform him that CPB's Board would not provide any funding for the PRSS unless it became a separate entity with no ties to NPR. SSUMF ¶ 110. She did not describe any complaints about NPR's management or operation of the PRSS or provide any explanation for the decision, apart from vague statements about a perceived need to enhance digital innovation. That same day, Ms. Calvert sent a letter to OMB emphasizing her "deeply conservative and Republican" background and values. SSUMF ¶ 109.

Ms. Merritt spoke to Mr. Munipalla from NPR the next day, Saturday, April 12. Among other things, Mr. Munipalla told Ms. Merritt during that telephone call how "challenging" it would be to separate the PRSS from NPR and that "any change would have to be approved by the interconnected stations." SSUMF ¶ 113.

Internally at CPB, over the next several days its leadership continued to discuss the need to cut off funding to NPR given government pressure, and how best to accomplish that. On April 12, Ms. Merritt reported to Ms. Harrison and Ms. Sanchez that she "spoke with Ruby" Calvert, who was "*adamant that she doesn't want funding to go to NPR*." SSUMF ¶ 114 (emphasis added). And April 13 brought a new flurry of internal discussion that explain CPB's actions:

- Michael Levy (CPB's COO who had resigned a few days earlier) emailed Ms. Harrison a frank account of CPB's decisionmaking with respect to interconnection funding. SSUMF ¶ 123. He said that "[f]unding for public media, *including its interconnection*

*service, is under assault by a newly elected Administration*," and that "*concerns about political and cultural bias—most notably at NPR and with its content, have been cited by the President,* members of his administration (DOGE, OMB?), [and] members of Congress . . . *in support of calls to end funding for public media entirely or to separately defund NPR, or NPR and PBS.*" *Id.* (emphasis added).  Mr. Levy continued: "*Concerned about the risk to funding for the public media system and its attending consequences*, the CPB Board, in early April, resolved to provide funding for public radio interconnection o*nly on condition that it went to a successor entity to PRSS, separated from NPR*, and enabled to operate autonomously with its own assets, employees and a new governance structure."  SSUMF ¶ 125 (emphasis added).  Mr. Levy explained that CPB would cut off interconnection funding to NPR but not PBS because PBS "presents a vastly different degree of threat to funding than NPR."  SSUMF ¶ 126.

- Ms. Sanchez wrote to Ms. Carr reacting to CPB's demand that PRSS be spun off, stating: "Something has been fundamentally missing for me … and it's the 'because' statement. In particular, the 'local stations would be better served by having PRSS as an independent entity' which begs the question … because?"  SSUMF ¶ 116.

- In an email discussion among CPB leadership about the decision to demand that NPR spin off the PRSS, Ms. Harrison wrote, "WE NEED CARL [FORTI] TO MOVE NOW." SSUMF ¶ 118–19.

- Ms. Sanchez dutifully wrote to Mr. Forti:  "We are moving ahead with almost $100 million to PBS for their distribution (interconnection) and not to NPR, why? *There are obvious political challenges, but we can't 'own that' outright.* So we are in a tight spot sort of. What are the strongest messages we can make about the 'why' or the 'because?'"

13

SSUMF ¶ 115 (emphasis added).

- Mr. Barsoum (CPB's Vice President, Government and External Affairs) emailed Ms. Harrison a "government affairs plan for interconnection." That plan proposed a "targeted engagement strategy" "for engaging key Congressional members to ensure they are thoroughly briefed on proposed changes to public media interconnection." SSUMF ¶ 120. First on the list of targets was Senator John Barrasso (R-WY), who was described in Mr. Barsoum's plan as someone Ms. Calvert was connected to and a "*close ally of President Trump*" who "*can facilitate crucial backchannel discussions within his caucus and the Administration*." SSUMF ¶ 121 (emphasis added). The plan proposed messaging to him—and to Senator Shelley Moore Capito (R-WV)—that the plan to spin off PRSS "*will allow CPB to reduce direct investments in NPR*." SSUMF ¶¶ 121–22 (emphasis added).

The Trump Administration kept the pressure on the next day. On April 14, it announced that it planned to request that Congress rescind all funding to CPB. SSUMF ¶ 129. Following that announcement, the White House issued a press release expressing its disdain for NPR's viewpoints and content, entitled "The NPR, PBS Grift Has Ripped Us Off for Too Long." SSUMF ¶ 130. The press release called NPR and PBS news "trash" and listed more than a dozen examples of NPR's reporting that the Administration disliked. *Id.*

After the Trump Administration's latest threats, Mr. Forti provided recommendations to CPB for how to interact with the Administration to preserve its funding  SSUMF ¶ 133. He recommended that CPB emphasize that it has "*already* taken steps *to address the administration's concerns*"—including "[w]ithholding interconnection funds from NPR." *Id.*

Consistent with Mr. Forti's recommendations and the ongoing Executive Branch pressure,

on April 18, CPB sent OMB a response to inquiries OMB had made  about "the amount of funding disbursed directly to NPR in the first two quarters of FY 2025, and planned disbursements for the remainder of the year."  SSUMF ¶ 139.  CPB responded that the "vast majority of CPB's direct funding to NPR, is paid from the federal appropriation for public broadcasting interconnection." *Id*.  CPB emphasized that "CPB is exploring options for the next phase of public radio interconnection funding," including "directing funding to an entity separate from NPR, to manage public radio's interconnection service."  *Id.*

On April 21, Mr. Slavitt sent Ms. Allen (NPR's General Counsel) a letter reiterating that CPB "has requested that NPR, as the grantee of interconnection funds and manager and operator of PRSS, submit to CPB by May 9, a plan to make PRSS an entity that is separate from NPR," and that the new entity managing PRSS "must be legally independent of NPR."  SSUMF ¶ 140. Because the Interconnected Stations have continuously designated NPR to manage and operate the PRSS, and have never rescinded that designation, and given NPR's contractual agreements with the Interconnected Stations, NPR did not submit a plan to separate PRSS from NPR.  SSUMF ¶ 141.

## IV.    CPB Creates a "Working Group" and Orchestrates a Sham RFP Process as Government Pressure Mounts

The Executive Branch's pressure on CPB continued to build in late April and early May. On April 28, the White House's Deputy Director of Presidential Personnel sent an email to three CPB Board members stating that they were immediately terminated.  SUMF ¶ 143.  And on May 1, President Trump issued Executive Order 14290, "Ending Taxpayer Subsidization of Biased Media," which crystallized the Executive Branch's demands of CPB and purported to order CPB to cease all direct funding to NPR, based on the President's disdain for the viewpoints he perceived to be expressed in NPR's journalism.  SUMF ¶¶ 155–72.

During this period, CPB continued its internal discussions about how to appease the Trump Administration.  On April 25, Mr. Levy wrote to Ms. Harrison that "CPB needs to decide on next steps re disbursement of public radio interconnection funds" but that "giv[ing it] to NPR" would "[r]aise[] GOP ire and compromise[] efforts in the Se[n]ate."  SSUMF ¶ 142.  On April 30, Ms. Sanchez and Mr. Forti corresponded again about how CPB should respond to the Administration, with Mr. Forti explaining CPB's "main argument" to the Administration as follows:

> What you [CPB] have that people in this fight and similar fights haven't had is a recent track record of sticking up for the Admins viewpoint. . . . And there's two fights Trump has the full support of his voters on—the fight against DEI and the fight against the biased media. Therefore, you have to "give" the Admin something so that they can claim a win and then be more willing to comprise (give you some money back). *Your win is that you're already cutting off NPR and taking steps to stop biased media coverage.* The Admin gets their win and maybe you can get some money back in recission b/c of the importance of what you provide in certain districts.

SSUMF ¶ 144 (emphasis added).  Ms. Sanchez responded: "Thanks for this analysis. I don't think we are comfortable with the approach to *publicly* state we cut funding to NPR."  SSUMF ¶ 145 (emphasis added).  Mr. Forti replied: "if you're not willing to talk about what you have done, I think it's you at least need to acknowledge why you're being cut."  *Id.*  On April 30, Ms. Sanchez "looped in" Danica Petroshius, a political consultant at Penn Hill Group, to "get her take" on Mr. Forti's analysis.  SSUMF ¶ 146.  Ms. Petroshius responded:

> I th[i]nk what [Forti] says below is good—I'm just not clear on the when. . . . You can say you align and compliy [sic] - but have to leave room for them to negotiate so maybe if we are forced they ONLY trim NPR. If you trim NPR now on your own then they take the next thing.  We have to show "pain" if we negotiate even if its [sic] not that big of a pain[.]

SSUMF ¶ 147.  Ms. Sanchez forwarded this email chain to Ms. Merritt and Mr. Barsoum.  SSUMF ¶ 148.   And on May 7, Mr. Levy wrote to Ms. Harrison objecting to a proposal to give interconnection funds to the Public Radio Satellite System Trust (PRSS Trust) by explaining that "giving money to the trust even for a short period of time is giving money to NPR."  SSUMF ¶ 150.

CPB's next concrete step to stop public radio interconnection funding directly to NPR was to convene, beginning on May 9, a "working group," the stated purpose of which was to "establish shared goals and create a vision for forming a new content distribution entity, funded by CPB" in furtherance of CPB's goal "to transition PRSS into an independent entity." SSUMF ¶ 153. The working group was intended to culminate in the development of a Request for Proposal (RFP) for a "new entity to deliver content distribution services." SSUMF ¶ 154.

In reality, CPBs intention all along was to stop direct federal funding to NPR for the PRSS under any circumstances. As early as April 14, Ms. Merritt was in discussions with Kerri Hoffman, CEO of PRX, about the possibility of using Public Radio International (PRI), a shell nonprofit subsidiary of PRX, as a vehicle for CPB to distribute public radio interconnection funding while avoiding "financial entanglements with NPR." SSUMF ¶ 132. When CPB convened the working group, it knew that PRX "would submit to the RFP" and "would be the obvious organization to do so." SSUMF ¶ 156. On May 7, two days before announcing the working group, Ms. Merritt emailed Ms. Harrison that "we could . . . convene a working group as a way to move the idea of an independent PRSS forward. . . . *We would look like we are collaborating to address the issue and not acting unilaterally*. This would also take focus away from any push NPR makes to have stations attack CPB for not giving NPR interconnection funds." SSUMF ¶ 155 (emphasis added).

CPB controlled the working group's composition. On May 30, Ms. Merritt told Ms. Harrison that "NPR wants Badri Munipalla, head of PRSS, to be part of the working group on radio content distribution." SSUMF ¶ 161. Ms. Merritt noted that Mr. Munipalla would "certainly bring a lot to the table in terms of technical knowledge, but the working group will address building something that NPR has expressly said that don't want to see happen." *Id.* In a follow-up email, Ms. Merritt explained that she was "torn about including Badri" because "he'll be there

17

representing NPR management."  Ms. Harrison responded: "I agree . . . He might be a buzz kill." SSUMF ¶¶ 164–65.  At the same time CPB was excluding the NPR executive who runs the PRSS from the working group, CPB included in its working group executives from the same entities that would eventually form the PMI coalition.  SSUMF ¶ 166.

In the meantime, on May 28, 2025, President Trump formally requested that Congress rescind CPB's funding for Fiscal Years 2026 and 2027.[2]  The House of Representatives voted to approve the rescission request on June 10, 2025.  SSUMF ¶ 180.  On July 12, Mr. Barsoum sent Ms. Harrison talking points for Senator Capito—five of which explicitly referred to NPR.  SSUMF ¶ 167.  Under the bullet point "Avoiding Unintended Harm," for example, Mr. Barsoum wrote:

> As the White House said in conversation with CPB, "we don't want to throw the baby out with the bathwater." Reforms or restrictions can address NPR-specific concerns. But full elimination of CPB or public broadcasting funding would irreparably damage a positive legacy that includes Mister Rogers' Neighborhood, Mountain Stage, and local service from West Virginia Public Broadcasting and Allegheny Public Radio.

*Id.*  The Senate, after protracted discussion and debate, voted to rescind CPB's funding on July 17, 2025.  SSUMF ¶ 181.

CPB issued its "Request for Proposals for Entity to Manage and Govern Public Radio Content Distribution" (the RFP) on July 14.  SSUMF ¶ 173.  The RFP—consistent with CPB's goal to spin off the PRSS from NPR—required a bidder to have "no single represented organization holding majority control[,]" a requirement tailor-made to exclude NPR and favor a coalition.  Doc. 34-3 (RFP) at 5.  The RFP also stated that CPB sought a manager of the PRSS who would be "legally and functionally able to receive CPB funding by September 30, 2025."  *Id.* The day before CPB posted the RFP, Ms. Harrison indicated to Ms. Merritt that issuing the RFP

---

[2] *See* Rescission Proposal No. R25-21, "Report Pursuant to Section 1012 of the Congressional Budget and Impoundment Control Act of 1974 (2 U.S.C. 683)" (May 28, 2025), *available at* https://www.whitehouse.gov/wp-content/uploads/2025/03/Proposed-Rescissions-of-Budgetary-Resources.pdf.

might "help" CPB "combat the idea that we are catering to NPR" among members of Congress, adding "[w]e are not funding npr . . . Making changes to comply with Congress directive." SSUMF ¶¶ 169–72.  By the time the RFP issued, CPB had already distributed television interconnection funding to PBS.  SSUMF ¶ 177.

After the RFP was issued, Ms. Harrison sent herself an email on July 24 stating:  "Currently we are not allowed to give FUNDING TO NPR OR PBS. . . . HOW DO WE GET THE BYLAWS CHANGED—PROTECT CPB."  SSUMF ¶ 182.  And on August 29, Ms. Harrison emailed Ms. Calvert noting that President Trump "CALLED CPB 'A MONSTROSITY,'" and "THE POINT IS NOT TO LOBBY BUT TO GET THEIR INPUT REGARDING ANY STEPS WE COULD TAKE TO KEEP CPB ALIVE.  SUCH AS….AGGRESSIVE ACTION RE NPR—NO FUNDING ANYTHING."  SSUMF ¶ 184.

Despite CPB's preordained conclusion that NPR could not under any circumstances receive direct funding from CPB, NPR—seeking to preserve its rights and engage with CPB in good faith—submitted a detailed response to the RFP by the August 15 deadline.  SSUMF ¶ 183.

## V.    CPB "Awards" Interconnection Funding to "PMI"

Besides NPR, the only response to the RFP came from a coalition of five organizations—American Public Media Group (APMG), the National Federation of Community Broadcasters (NFCB), New York Public Radio (NYPR), PRX (Public Radio Exchange), and Station Resource Group (SRG)—that referred to itself as "Public Media Infrastructure" (PMI).  SSUMF ¶ 185.  At the time it submitted its response (and now), "PMI" did not exist as a legal entity.  It proposed that it would be created "by repurposing the nonprofit entity formerly known as Public Radio International (PRI)."  SSUMF ¶¶ 186–87.  In late August, CPB had extensive discussions with PMI representatives about PMI's response to the RFP, including a meeting on August 27 in which CPB and Deloitte Consulting met with PMI representatives to discuss the more than 20 questions

CPB had about the proposal.  SSUMF ¶¶ 189–93.  Over the next several weeks, the CPB team and

the Deloitte consultants (who would also be tasked with evaluating RFP responses) continued to

communicate questions, feedback, and suggestions to PMI, and collaborated closely with PMI's

representatives on various documents to help them refine PMI's proposal.  SSUMF ¶ 196.  On

September 5, 2025, after extensive discussions with and input from CPB and Deloitte, PMI

delivered a 200-day plan and an 18-month timeline.  SSUMF ¶ 197.  Even still, there remained

"many open questions" about PMI's approach.  SSUMF ¶ 175.  CPB never reached out to NPR to

discuss its RFP response.  SSUMF ¶ 198.

Deloitte delivered its analysis of the two responses to the RFP on September 12, 2025.

SSUMF ¶ 199.  Deloitte's report rated PMI more favorably than NPR on the criteria that CPB had

set forth in its RFP.  SSUMF ¶¶ 200–201.  The very first criterion was "Governance."  SSUMF ¶

200.  Deloitte gave PMI higher marks because NPR's response was inconsistent with "CPB's

requirement for governance without a single organization holding majority control or undue

influence."  *Id.*  Deloitte also rated PMI more favorably than NPR on the factors of audience

measurement, data and analytics, and sponsorship technology because NPR's "current service"

did not include these factors; PMI has no "current service" at all but, per Deloitte, had "plan[s]"

to.  SSUMF ¶ 201.  Deloitte rated NPR's and PMI's responses equally on the factor of cost, despite

PMI's proposal costing $9 million more than NPR's.  SSUMF ¶ 202.  Deloitte ultimately

concluded that PMI was a "better match to the requirements defined by CPB in the RFP."  SSUMF

¶ 203.

Around this same time, Ms. Harrison delivered remarks during a September 15 executive

session of CPB's Board of Directors regarding CPB's "options for survival."  SSUMF ¶ 204.  She

said that "NPR funding must be addressed but CPB will be criticized whether we award it to NPR

or return it to the Treasury." *Id.* She added: "We currently have an EO prohibiting us from funding PBS and NPR" and added: "We are all in serious jeopardy because Congress has abdicated its role, the DOJ and the White House are in charge, and they have shown they will weaponize the executive, judicial, and appropriation processes to harass and intimidate." SSUMF ¶ 205. A draft document that formed the basis for those remarks said that the theory that Executive Order 14290 "does not apply to the Board, only to management in terms of content, etc., may be technically correct but [is] politically naïve." SSUMF ¶ 206.

On September 23, Ms. Merritt told Mr. Merkley that CPB's Board had approved a decision to "award" the RFP to a "public media infrastructure" coalition made up of other public media organizations, service providers, and associations. SSUMF ¶ 212. She told Mr. Merkley that the PMI coalition "had a better response to what we were asking for in the RFP," but she did not identify any deficiencies in NPR's proposal or in its performance as a manager and operator of the PRSS. SSUMF ¶ 213.

After CPB's Board voted to "authorize[] CPB management to negotiate an agreement" with the coalition known as "Public Media Infrastructure," CPB's President and CEO, Ms. Harrison, publicly announced the next day, before any contract was signed, that CPB was "awarding [a] grant to PMI." SSUMF ¶ 214. Even after the "award" was announced, CPB leadership internally expressed significant uncertainty and confusion regarding the legal status of PMI, when and how it would become an independent legal entity, and who or what would have authority to authorize various agreements in the interim. *See, e.g.*, SSUMF ¶ 216 (noting CPB comments on PMI's 200-day plan such as, "Who will be authorized to sign agreements/make employment offers in interim period?"; "When is this happening? How is this happening?"; "WHAT DOES THIS MEAN?"; and "WHEN???????"). As of October 23, PMI still does not

exist as a legal entity or have a board, executive director, or chief technology officer—in stark

contrast to NPR's forty-year track record managing and operating the PRSS.  SSUMF ¶ 217.

## ARGUMENT

I.    **CPB Violated the First Amendment by Implementing Unconstitutional, Viewpoint-Based Retaliation and Discrimination Against NPR.**

CPB has flagrantly violated NPR's First Amendment rights.  The undisputed evidence

leaves no doubt—and certainly establishes by a preponderance of the evidence—that the perceived

viewpoints of NPR's journalism and the Administration's disapproval of those viewpoints caused

CPB to abruptly change course and move to cut off federal interconnection funding to NPR.  CPB's

actions were not driven by concerns about the PRSS's governance; they were not an effort to

"converge" radio and television distribution; and they were not undertaken to promote

"innovation."  Rather, CPB cut off NPR's interconnection funding to give a political "win" to the

Trump Administration and the President's congressional allies.  In doing so, it effectuated the

Administration's patent desire to punish NPR for the content of its journalism in violation of the

First Amendment.  CPB's refusal to distribute interconnection funding directly to NPR, and its

attempt to redirect that funding to a new, as-yet-to-be formed entity, is unconstitutional for two

separate, independent reasons:

*First*, CPB has violated the First Amendment because it has "acted together with" the

government to infringe NPR's speech rights.  *Lugar v. Edmondson Oil Co.*, 457 U.S. 922, 937

(1982).  It is beyond reasonable dispute that if government itself denied funding to NPR based on

the viewpoint and content of NPR's speech—as the Executive Order purports to do—then the

government would violate NPR's First Amendment rights by engaging in unlawful retaliation and

viewpoint discrimination.  Doc. 21-1 at 25–34; *see, e.g.*, *Rosenberger v. Rectors & Visitors of the

Univ. of Va.*, 515 U.S. 819, 830 (1995) ("[I]deologically driven attempts to suppress a particular

point of view are presumptively unconstitutional in funding, as in other contexts." (internal quotation marks omitted)).  Indeed, CPB admits that the Executive Order is unconstitutional.  Doc. 36 at 9 (¶ 122) (admitting that the Order retaliates against NPR because of NPR's protected speech).

Just as clearly, the government "cannot do indirectly" through CPB "what it is barred from doing directly."  *Nat'l Rifle Ass'n of Am. v. Vullo*, 602 U.S. 175, 190 (2024).  Here, CPB must be treated as a government actor for First Amendment purposes because the government "provided such significant encouragement" for CPB's actions "that the choice in law must be deemed to be that of the [government]," *Blum v. Yaretsky*, 457 U.S. 991, 1004 (1982), and because CPB's actions were compelled by the government, *Adickes v. S. H. Kress & Co.*, 398 U.S. 144, 170 (1970).

*Second*, CPB is in any event itself a government actor for purposes of the First Amendment, *see* Doc. 38-1 at 13–15, and therefore cannot constitutionally deny NPR interconnection funding on the basis of the viewpoint or content of NPR's journalism.  In *Lebron v. Nat'l R.R. Passenger Corp.*, the Supreme Court likened CPB to Amtrak, which it held was a government actor for First Amendment purposes because it was created by a federal statute to further federal objectives and the President appoints its board of directors.  513 U.S. 374, 391–92, 397 (1995).  Because CPB is a government actor for First Amendment purposes, it cannot retaliate against NPR by denying federal funding based on NPR's constitutionally protected conduct.  Nor can it constitutionally deprive NPR of interconnection funding—a valuable government benefit—"based on the viewpoint of" NPR's speech.  *Rosenberger*, 515 U.S. at 833–34; *see* Doc. 31-1 at 42–44.  Moreover, CPB (*i.e.*, the government for First Amendment purposes) cannot seek to hold hostage NPR's interconnection funding—funds which support critical public radio infrastructure and are wholly unrelated to content—based on its disagreement with the content or viewpoing of NPR's

news and other programming.  *See Agency for Int'l Dev. v. All. For Open Soc'y Int'l, Inc.*, 570 U.S. 205, 214–17 (2013) (government cannot seek to leverage funding to regulate conduct "outside the scope of [a] program").

The voluminous evidence described above proves that CPB is liable under both theories. CPB's actions to revoke NPR's interconnection funding were caused by continually escalating government pressure and demands to cut off all federal funding to NPR based on the content and perceived viewpoints of its speech, as the Executive Branch strongly encouraged in April and formally commanded in the May 1 Executive Order.  There is overwhelming uncontroverted evidence that CPB folded under the Administration's months-long pressure campaign; indeed, no other explanation is plausible.  At minimum, even if CPB's actions were not the direct result of Executive Branch coercion or encouragement, CPB decided to take "AGGRESSIVE ACTION" to stop all direct interconnection funding to NPR, SSUMF ¶ 184, because of NPR's perceived viewpoints—namely, "concerns about political and cultural bias . . . at NPR," SSUMF ¶ 123.

To begin, the evidence shows that CPB's Board, on the recommendation of CPB's management, initially voted to extend NPR's grant agreement for the PRSS for an additional five years.  SSUMF ¶¶ 49–54.  Indeed, CPB asked for an extension proposal from NPR (and NPR alone) "as soon as possible" in March—with not a word about establishing a new entity.  SSUMF ¶¶ 37–41.  CPB management emphasized (in striking contrast with its later, rushed decision to choose an inchoate, untested entity to manage radio interconnection) "the importance of continuity of interconnection service," when it recommended an extension of NPR's PRSS grant agreement and corresponding $36 million increase in funding.  And when it made that recommendation it noted that NPR's proposal "aligned with our expectations" and would "ensure continuity of service as well as future facing strategies."  SSUMF ¶¶ 50.  The Board conclusively approved on April 2

an extension of NPR's grant agreement to support the PRSS.  SSUMF ¶¶ 54–55.  But just two days later, on April 4, the Board reversed course and voted to adopt a resolution that would require NPR to "spin off" the PRSS.  SSUMF ¶ 83.  "Things ha[d] changed."  SSUMF ¶ 101.

What changed between April 2 and April 4?  The answer is obvious.  While rumors about an executive order had swirled and President Trump had already begun expressing criticism of NPR's speech beforehand, the Executive Branch's pressure on CPB ramped up on April 3 at 10:00am, when CPB leaders, including its Board Chair, met with the politically appointed Associate Director of OMB, Katharine Sullivan.  As CPB leaders recounted in multiple internal communications, Ms. Sullivan expressed her "intense dislike" for NPR but noted that she thought CPB's "board was more 'balanced' than most" and that she did "not want to throw out the baby with the bath water."  SSUMF ¶¶ 75, 89.  The threat was not subtle, particularly given the context of the President's recent posts excoriating NPR for its supposed bias:  If CPB did not want to be "throw[n] out" with the NPR "bath water," it would need to cut off NPR.

The evidence leaves no doubt that CPB immediately comprehended the government's demand and acted accordingly—even before the government attempted to fire CPB's board members or formally issued an executive order.  The CPB Board entered "crisis mode" in the afternoon following the OMB meeting, SSUMF ¶ 77, and, in a desperate scramble to appease the Administration, reversed course from its earlier approval of NPR's grant extension in a series of three resolutions enacted in rapid succession between April 4 and April 9—ultimately completely withdrawing the April 2 extension.  CPB's communications in April speak for themselves in conclusively establishing that CPB's decision to stop funding NPR was caused by government pressure.  *See supra* at 9–19.  Some of the clearest examples are as follows.

- CPB's President, Ms. Harrison, explained that "the wolf really is coming" and that the

government wanted to "[s]hrink the power of CPB" with "no fund[ing] directly to npr." SSUMF ¶¶ 87, 90.

- Ms. Merritt (CPB's Chief for Station and System Strategies) wrote that although CPB wanted to support interconnection services, "NPR is a target of the Administration and Congress.  It's challenging for CPB to disperse millions of dollars to an organization that's under fire and heavily scrutinized."  SSUMF ¶ 96.

- Mr. Forti, CPB's political consultant, advised Ms. Sanchez (CBP's Chief of Staff and Corporate Secretary) that CPB's chief "problem[]" was "BIAS: Belief both in Administration and among general public that the media is biased against conservatives and more specifically against Trump.  NPR is high on those lists."  SSUMF ¶ 108.

- Ms. Sanchez responded that the reason CPB was giving almost $100 million to PBS but "not to NPR" was the "obvious political challenges" but that CPB could not "'own that' outright."  SSUMF ¶ 115.

- Mr. Barsoum (CPB's Vice President for Government and External Affairs) drafted a "government affairs plan for interconnection" that proposed messaging to key allies of President Trump in Congress that the plan to spin off PRSS "will allow CPB to reduce direct investment in NPR."  SSUMF ¶¶ 120–22.

- Mr. Levy (CPB's COO) explained that the reason that CPB's Board "resolved to provide" interconnection funding "only on condition that it went to a successor entity to PRSS, separated from NPR," was that it was "[c]oncerned about the risk to funding for the public media system."  SSUMF ¶ 125.

After CPB voted to rescind its prior approval of NPR's grant extension, the Trump Administration kept up the pressure.  The President posted on April 10 "NO MORE FUNDING

26

FOR NPR, A TOTAL SCAM!" because NPR, in his view, is a "LIBERAL DISINFORMATION MACHINE." SSUMF ¶ 100. The Administration announced its request to rescind all funding to CPB four days later, on April 14, while issuing a press release that foreshadowed the eventual Executive Order by critiquing specific examples of the "trash" reporting at NPR and PBS. SSUMF ¶¶ 129–30. On April 28, the White House purported to remove three CPB Board members. SSUMF ¶ 143. And on May 1, the White House formalized its pressure campaign with Executive Order 14290, which purported to command CPB to stop funding NPR, and its accompanying "Fact Sheet" listing the Administration's grievances with NPR's speech. If there were any doubt the government wanted CPB to stop federal funding to NPR, those doubts were gone by early May.

The government's continued pressure had its intended effect. CPB responded to OMB, following the advice of its political consultant Mr. Forti, by indicating that it planned to stop providing interconnection funding to NPR. SSUMF ¶ 139. Internally, CPB leaders continued to discuss how distributing interconnection funds to NPR would "[r]aise[] GOP ire," SSUMF ¶ 142, and that "giving money to NPR" even for a "short period of time" was therefore unacceptable, SSUMF ¶ 150. And they strategized how to convey their acquiescence with the Trump Administration's demands—for example, developing talking points for a conversation with Senator Capito explaining that "the White House said in conversation with CPB, 'we don't want to throw the baby out with the bathwater,'" but "[r]eforms or restrictions can address NPR-specific concerns" without the "full elimination of CPB or public broadcasting funding." SSUMF ¶ 167 (email from Mr. Barsoum to Ms. Harrison); *see also* SSUMF ¶ 172 (Ms. Harrison stating that "we are not funding npr . . . . Making changes to comply with Congress directive . . . How would we communicate to the Hill/key Senators that we are pushing out the RFP?").

Externally, CPB moved forward with its new goal of giving the appropriated public radio

interconnection funding to anyone but NPR by designing a sham RFP process that was preordained to reach CPB's (and the government's) preferred outcome of cutting off direct federal funding to NPR.  CPB's self-professed goal with the working group was to "transition PRSS into an independent entity," and it strategically managed the group's composition to accomplish that end. SSUMF ¶ 153.  And the RFP's central requirement—that no single entity could hold "majority control"—was written to exclude NPR.  SSUMF ¶ 174.  Even as CPB purported to run an open RFP process, its President, Ms. Harrison, was writing internally that CPB was "not allowed to give FUNDING TO NPR" and that in order "TO KEEP CPB ALIVE," CPB needed to take "AGGRESSIVE ACTION RE NPR—NO FUNDING ANYTHING."  SSUMF ¶¶ 182, 184.  And, as planned, CPB's chosen consultant rated the response of "PMI" more favorably than NPR's given "the requirements defined by CPB in the RFP."  SSUMF ¶ 203.

Just days before CPB announced it had "awarded" the RFP to PMI, Ms. Harrison explained to CPB's Board of Directors in stark terms that CPB's only "option[] for survival" was to comply with the Administration's demands:  "*NPR funding must be addressed* but CPB will be criticized whether we award it to NPR or return it to the Treasury. . . . *We currently have an EO prohibiting us from funding PBS and NPR. . . . We are all in serious jeopardy* because Congress has abdicated its role, *the DOJ and the White House are in charge, and they have shown they will weaponize the executive, judicial and appropriation processes to harass and intimidate*."  SSUMF ¶¶ 204–05 (emphasis added).  Ms. Harrison believed it would be "politically naïve" to ignore Executive Order 14290.  SSUMF ¶ 206.  CPB's Board got the message and voted to approve radio interconnection funding to PMI.  SSUMF ¶ 208.

In short, what NPR strongly suspected is now confirmed by direct evidence in the form of numerous statements from CPB's most senior leaders, all saying the same thing:  CPB has refused

to directly distribute interconnection funding to NPR because of NPR's viewpoints, how they are perceived by the Trump Administration and its allies in Congress, and the President's demand that CPB stop funding NPR.

CPB's alternative explanations for its actions defy both the evidence and common sense. To begin, it strains credulity to suggest that CPB "awarded" the funding to "PMI" because that non-existent entity would do a better job than NPR. NPR successfully managed the PRSS for four decades and achieved a 90% satisfaction rating from the Interconnected Stations; PMI does not exist as a legal entity and has no board, executive director, or chief technology officer—and CPB's own leadership continued to express significant skepticism and confusion about PMI even after declaring it the winner of the RFP. *See* SSUMF ¶¶ 23–24, 216–17.

The RFP and Deloitte's analysis of the responses to it reveal that PMI scored higher based on the "governance" criterion that CBP built into the RFP precisely to exclude NPR—a criterion that was weighted most heavily, at 25% of the total rubric. SSUMF ¶ 200. In a similar vein, CPB's defense that it had already began attempting to oust NPR as the manager and operator of the PRSS before the Order was issued, *see* Doc. 40 at 34–38, is irrelevant. The uncontroverted evidence makes clear that the Executive Branch's pressure campaign began at least as early as the April 3 OMB meeting; the May 1 Executive Order simply formalized the Administration's demand.

Because there is no evidence that plausibly supports any alternative explanation for CPB's actions, there is no genuine dispute of material fact. Instead of crediting CPB's post hoc, self-serving explanations, this Court should credit the reasons CPB's leaders themselves repeatedly and consistently gave for their actions at the time: CPB, under tremendous pressure from the Trump Administration, assiduously and urgently tried to save itself by throwing out the NPR

"bathwater."

## II. CPB's Attempt to Distribute Satellite Interconnection Funds to an Entity Other than NPR or the Interconnected Stations Violates the Public Broadcasting Act.

The Public Broadcasting Act unambiguously requires CPB to distribute satellite interconnection funding to "those public telecommunications entities participating in the public radio satellite interconnection system or the national entity they designate for satellite interconnection purposes," 47 U.S.C. § 396(k)(10)(D)(i), which is indisputably NPR. *See, e.g.*, Doc. 41 at 7–11; SSUMF ¶ 26 (quoting grant agreement between CPB and NPR recognizing that the public telecommunications entities have designated NPR "as their national entity for interconnection purposes"); SSUMF ¶ 127 (email from Kathy Merritt to Patricia Harrison explaining that in order to spin off PRSS, "the stations will have to vote on making a switch for PRSS"). CPB's argument that it is permitted to distribute interconnection funding to PMI because that coalition includes some public telecommunications entities is unavailing; the statute requires such funding to be distributed to "*those* public telecommunications entities participating in the public radio satellite interconnection system"—*all of them*—or the "national entity they designate." 47 U.S.C. § 396(k)(10)(D)(i) (emphasis added).

CPB now advances a new argument: that it "currently holds no funds appropriated to, or received from, the 'Satellite Interconnection Fund' as that term is defined in the Public Broadcasting Act (47 U.S.C. § 396(k)(10)(A))." Townsend Decl., Ex. 101. CPB therefore suggests that the requirements of § 396(k)(10)(D) do not apply to the interconnection funding that Congress has appropriated because that subsection governs the use of "funds appropriated to the Satellite Interconnection Fund and interest thereon," *id.*, which is a specific fund "established in the Treasury," *id.* § 396(k)(10)(A), and the most recent appropriations statutes providing interconnection funding to CPB did not use the term "Satellite Interconnection Fund" but instead

appropriated funds for "replacing and upgrading the public broadcasting interconnection system and other technologies and services that create infrastructure and efficiencies within the public media system."  Pub. L. No. 118-47, 138 Stat. at 696 (Mar. 23, 2024); Pub. L. No. 119–4, Div. A, tit. I, § 1101(a)(8) (extending the same levels of interconnection funding for Fiscal Year 2025).

CPB's blinkered interpretation of the Public Broadcasting Act makes no sense.  *See, e.g.*, A. Scalia, *A Matter of Interpretation* 24 (1997) (a "good textualist is not a literalist").  In enacting the PBA, Congress included among CPB's objectives the authority to "assist in the establishment and development of one or more interconnection systems to be used for the distribution of public telecommunications services" and to "arrange, by grant to or contract with appropriate public or private agencies, organizations, or institutions, for interconnection facilities suitable for distribution and transmission of public telecommunications services."  47 U.S.C. § 396(g)(1)(B), (g)(2)(E).  Congress subsequently amended the PBA through the Public Telecommunications Act of 1988, Pub. L. No. 100–626, in which it established the Satellite Interconnection Fund, *see id.* § 4.  The law's purpose is clear; all funding appropriated to the Satellite Interconnection Fund:

> (i) shall be distributed by the Corporation to the licensees and permittees of noncommercial educational television broadcast stations providing public telecommunications services or the national entity they designate for satellite interconnection purposes and to those public telecommunications entities participating in the public radio satellite interconnection system or the national entity they designate for satellite interconnection purposes, exclusively for the capital costs of the replacement, refurbishment, or upgrading of their national satellite interconnection systems and associated maintenance of such systems; and

> (ii) shall not be used for the administrative costs of the Corporation, the salaries or related expenses of Corporation personnel and members of the Board, or for expenses of consultants and advisers to the Corporation.

§ 396(k)(10)(D).  *See also* H.R. Rpt. 100–825, at 21 (explaining that "[t]he Fund will service those expenses associated with the replacement, refurbishment, upgrading and maintenance of the public broadcasting systems' national satellite systems" and "will also be used to ensure the continued

provision of the high quality interconnection services presently offered by public broadcasting, facilitate the growth of public broadcasting's interconnection systems, and encourage innovative uses of such systems").

In recent years, Congress has made two separate appropriations when it authorizes funding for CPB. The first appropriation funds CPB's general programming and operations and is made for two fiscal years ahead of time. The Further Consolidated Appropriations Act for 2024, for example, authorized $535 million in funding "[f]or payment to the Corporation for Public Broadcasting . . . as authorized by the Communications Act of 1934[3] . . . for the fiscal year 2026." Pub. L. No. 118–47, Div. D, tit. IV. The second appropriation, which is not forward-funded, is specifically for interconnection purposes: the Further Consolidated Appropriations Act for 2024 authorized $60 million "for the costs associated with *replacing and upgrading the public broadcasting interconnection system and other technologies and services that create infrastructure and efficiencies within the public media system*." *Id.* (emphasis added). In the Full-Year Continuing Appropriations and Extensions Act of 2025, Congress carried both provisions forward through Fiscal Years 2027 and 2025, respectively. *See* Pub. L. No. 119–4, Div. A, tit. I, §§ 1112 (extending forward funding amounts for Fiscal Year 2027), 1108(a)(8) (extending funding amounts provided in "division D of Public Law 118–47" for Fiscal Year 2025).

Although Congress did not specify that the $60 million it appropriated for interconnection purposes had to be held specifically in the Treasury's Satellite Interconnection Fund, its language mirrored that of § 396(k)(10)(D), which requires that requires that money appropriated to the Satellite Interconnection Fund must be used for "the *replacement*, refurbishment, or *upgrading* of

---

[3] The Public Broadcasting Act was enacted as an amendment to the Communications Act of 1934 and constitutes a part of the Communications Act. *See generally* Pub. L. No. 90–129.

[] national satellite *interconnection systems*" (emphasis added).  Thus, despite the appropriations statutes not using the term "Satellite Interconnection Fund," read in the context of the Public Broadcasting Act, this funding remains governed by § 396(k)(10)(D)'s requirements.  CPB's contrary position—that because Congress did not use the magic words "Satellite Interconnection Fund," Congress effectively allowed CPB to ignore § 396(k)(10)(D)'s requirements—would render that subsection's reticulated scheme a dead letter.

Indeed, CPB's position would mean that CPB would have been free to ignore *all* of the funding requirements in § 396(k) when spending hundreds of millions of dollars in recent appropriations.  Section 396(k)(1)(A) establishes a Treasury fund called "the Public Broadcasting Fund" (referred to as the "Fund" in other parts of the subsection).  Section 396(k)(3)(A) contains numerous requirements for CPB's annual budget "for use in allocating amounts *from the Fund*"—including percentages of funding allocated to television and radio and, within those allocations, percentages of funding to be distributed to local stations or for national programming.  *See id.* § 396(k)(3)(A)(i)-(v); *see also id.* § 396(k)(3)(B)-(9) (further regulating uses of funds allocated under § 396(k)(3)(A) or funds "distributed pursuant to this subsection").  But recent appropriations statutes have not specified that Congress has appropriated funds to "the Public Broadcasting Fund."   Rather, the Fiscal Year 2024 appropriations statute—carried forward in the 2025 appropriations statute—appropriated $535 million "[f]or payment to the Corporation for Public Broadcasting, as authorized by the Communications Act of 1934."  Pub. L. No. 118–47, Div. D, tit. IV; *see also* Pub. L. No. 117–328, Div. H, tit. IV (same, for Fiscal Year 2023 in providing CPB funding for Fiscal Year 2025).  Because these appropriations did not assign funds specifically to "the Public Broadcasting Fund," CPB's position would mean that it was free to spend this federally appropriated money in any way it chose—constrained only by its statutorily authorized purposes

and any express limits on expenditures.

In other words, CPB's position would erase *all* of the detailed requirements Congress set out in §396(k) simply because the relevant appropriations statutes did not call out specific Treasury funds by name. But it is a "cardinal principal of statutory construction that repeals by implication are not favored," *United States v. United Continental Tuna Corp.*, 425 U.S. 164, 168 (1976), and "courts must give effect, if possible, to every clause and word of a statute," *Parker Drilling Mgmt. Servs., Ltd. v. Newton*, 587 U.S. 601, 611 (2019) (quotation marks omitted). Here, the only plausible reading of the appropriations statutes is that Congress has placed CPB funds, year after year, into two baskets: one for CPB's general purposes, to be spent in accordance with § 396(k)(1)-(9), and one for interconnection, to be spent in accordance with § 396(k)(10). The Court should reject CPB's implausible interpretation and give effect to Congress's choices in the Public Broadcasting Act with respect to how interconnection funding shall be spent.

Finally, CPB's own Fiscal Year 2025/2027 congressional appropriation request and justification confirms that Congress intended its interconnection appropriation to fund NPR's operation of the PRSS, in line with the Public Broadcasting Act's requirements. CPB requested $60 million (the amount Congress eventually appropriated) to cover "all interconnection costs," working "with PBS, NPR, and system leaders . . . . to extend the current interconnection contracts with PRSS and PBS beyond September 30, 2024." SSUMF ¶ 27. CPB then detailed the "public radio interconnection" infrastructure managed by "NPR Distribution and PRSS" and explained the "PRSS budget" (i.e., the budget for NPR to manage and operate the PRSS). Townsend Decl., Ex. 8 at 61–63. Nowhere in CPB's appropriation request did CPB suggest that it might provide tens of millions in radio interconnection funding to an entity besides NPR, let alone an entity that does not exist. When Congress proceeded to appropriate the exact funding that CPB requested, it relied

on CPB's explanation for how that funding would be spent.  And CPB's general counsel, Mr. Slavitt, previously represented to this Court that at least $35,962,000 of its congressional appropriation was appropriated "for that specific purpose" of extending the "current PRSS Interconnection grant with NPR."  Dkt. 12-1 at 14 (¶ 36) (Decl. of Evan Slavitt), *Corp. for Pub. Broad. v. Trump*, No. 25-cv-1305.  Thus, CPB's appropriated interconnection funding must be distributed, in line with § 396(k)(10)(D)(i)'s requirements, to NPR as the national entity designated by the public telecommunications entities for satellite interconnection purposes, or to all of the Interconnected Stations themselves.[4]

## III.    CPB Has Tortiously Interfered With NPR's Business Relations

The uncontroverted evidence also establishes that CPB has tortiously interfered with NPR's existing business relationships with the Interconnected Stations by unlawfully withholding interconnection funding from NPR and seeking to force Interconnected Stations to terminate their existing contractual arrangements with NPR for satellite interconnection.  CPB did so by unilaterally declaring that it would refuse to fund the PRSS so long as it remained connected to NPR.  It then convened a working group and issued an RFP aimed at displacing NPR as the manager and operator of the PRSS, and publicly announced that it had "awarded" the funding appropriated for public radio interconnection to PMI instead of NPR.  CPB's actions constitute the tortious interference with business or contractual relationships under District of Columbia law.

Under D.C. law, the elements of tortious interference are "(1) existence of a valid

---

[4] In its responses to NPR's interrogatories, CPB stated that it had nearly $92 million in interconnection funds on-hand as of September 30, 2025—an amount that includes appropriated funds from Fiscal Years 2024 and 2025, as well as accrued interest on funds beginning from Fiscal Year 2016.  *See* Townsend Decl., Ex. 101.  Because CPB has already disbursed more than $114 million in television interconnection funds to PBS, NPR understands all remaining interconnection funds to be for radio interconnection.  *See id.*

contractual or other business relationship; (2) the defendant's knowledge of the relationship; (3) intentional interference with that relationship by the defendant; and (4) resulting damages." *NCRIC, Inc. v. Columbia Hosp. for Women Med. Ctr., Inc.*, 957 A.2d 890, 900 (D.C.2008) (footnote omitted).  All these elements are satisfied here.

*First*, it is indisputable that NPR has valid contractual and business relationships with the Interconnected Stations:  Every one of the more than 350 public radio stations participating in the PRSS has an active contract with NPR.  SSUMF ¶ 20.  NPR in turn has agreed in these contracts to manage and operate the PRSS on the stations' behalf.  SSUMF ¶ 19–20.

*Second*, CPB has long known and recognized the relationship between NPR and the Interconnected Stations.   CPB and NPR's 2023–2024 grant agreement, for example, acknowledged that "the Interconnected [Stations] have designated [NPR] as their national entity for interconnection purposes."  SSUMF ¶ 21.

*Third*, CPB has intentionally interfered with the relationship between NPR and the Interconnected Stations in several ways.  Under pressure from the Trump Administration, it decided to refuse to fund the PRSS so long as it was legally a part of NPR—in violation of both the First Amendment and the Public Broadcasting Act.  CPB then worked backward to attempt to convince Interconnection Stations to designate a new manager of the system, using its own refusal to fund NPR as leverage to pressure the stations.

As early as April 13, CPB recognized that in order to pursue its objective of separating the PRSS from NPR while abiding by the Public Broadcasting Act, "the stations will have to vote on making a switch for PRSS."  SSUMF ¶ 127.  The Interconnected Stations had for decades designated NPR as the national entity to manage and operate the PRSS on their behalf, so CPB would need to induce the stations to abandon NPR notwithstanding that long-term relationship and

the Interconnected Stations' contractual agreements with NPR.  CPB therefore convened a working group consisting of, by its own admission, "radio stations that were members and non-members of NPR" in order to "develop a plan to transition PRSS into an independent entity."  Doc. 40-1 (Slavitt Decl.) at 17 ¶ 43.  CPB's intention was to use that working group to provide the appearance of "collaborat[ion]" and push Interconnected Stations to abandon NPR as the manager and operator of the PRSS.  SSUMF ¶ 155.  Ms. Merritt emailed Ms. Harrison that the working group would make it "look like we are collaborating to address the issue and not acting unilaterally" and "take focus away from any push NPR makes to have stations attack CPB for not giving NPR interconnection funds."  *Id.*  Ms. Merritt and Ms. Harrison's emails show that they sought to exclude Badri Munipalla, the head of PRSS, from the working group because "he'll be there representing NPR management" and therefore "might be a buzz kill."  SSUMF ¶ 165.  And CPB knew when it convened the working group and selected its members that one of those members, PRX, "would be the obvious organization" to "submit to the RFP" and take over NPR's role.  SSUMF ¶ 156.

CPB's actions caused panic and uncertainty among the Interconnected Stations.  As the Chair of the D/I Committee wrote to Ms. Merritt on May 9: "CPB Board's decision to rescind its commitment to fund the PRSS for three years—and then withhold interconnection funding unless CPB's demand to relocate the PRSS is met—is hurtful and damaging to the 380 public radio stations that count on the PRSS for their live and prerecorded broadcast content."  SSUMF ¶ 159.

CPB then issued an RFP tailor-made to undo NPR's status as manager and operator of the PRSS (and its existing business relationships with the Interconnected Stations) by setting forth, as primary criteria, that there be "no single represented organization holding majority control" and that the manager of the PRSS be "legally and functionally able to receive CPB funding by

September 30, 2025." Doc. 34-3 (RFP) at 5. Finally, CPB purported to award appropriated public radio interconnection funding to a nascent coalition instead of NPR. SSUMF ¶ 214. By withholding this funding from NPR, CPB has substantially burdened NPR's ability to continue its relationships with the Interconnected Stations as manager and operator of the PRSS.

*Fourth*, if CPB's interference with NPR's business relationships succeeds, it will cause substantial, irreparable injury, including the loss of unrecoverable funding, as well as harm to NPR's mission and its goodwill and reputation with the Interconnected Stations. If CPB succeeds in convincing stations to abandon their relationship with NPR and turn to a new entity for interconnection services, those stations will be less likely to use NPR for interconnection services in the future. *See Fox Television Stations, Inc. v. FilmOn X LLC*, 966 F. Supp. 2d 30, 50 (D.D.C. 2013) (explaining 0that "damage to [a plaintiff's] contractual relationships and ability to negotiate" constitutes irreparable harm). That means that NPR will suffer harm to its mission to foster a "more informed public" by providing "satellite interconnection for the entire public radio system." NPR, *Our Mission and Vision*, https://www.npr.org/about-npr/178659563/our-mission-and-vision; *see League of Women Voters of U.S. v. Newby*, 838 F.3d 1, 8 (D.C. Cir. 2016) (an organization is irreparably harmed if the defendant "perceptibly impair[s] the organization's programs" in "direct[] conflict with the organization's mission" (quotation marks and alterations omitted)).

Because NPR has satisfied the elements of the prima facie case for tortious interference, the burden is on CPB to establish that its "conduct was legally justified or privileged." *Onyeoziri v. Spivok*, 44 A.3d 279, 286–87 (D.C. 2012). "In determining whether conduct that allegedly rose to intentional interference was improper or legally justified, finders of fact must weigh seven factors, including "(a) the nature of the actor's conduct, (b) the actor's motive, (c) the interests of

the other with which the actor's conduct interferes, (d) the interests sought to be advanced by the actor, (e) the social interests in protecting the freedom of action of the actor and the contractual interests of the other, (f) the proximity or remoteness of the actor's conduct to the interference and (g) the relations between the parties."  *Armstrong v. Thompson*, 80 A.3d 177, 191 (D.C. 2013). "Conduct specifically in violation of statutory provisions or contrary to established public policy . . . make an interference improper."  Restatement (Second) of Torts § 767 (A.L.I. 1979).  Here, for the reasons explained above, CPB's actions violate both the First Amendment and the Public Broadcasting Act.  They therefore interfere with paramount interests of both NPR and the American public; they cannot be considered legally justified.  This Court should stop CPB's unlawful interference with NPR's business relations.

## IV.    NPR Is Entitled to a Preliminary Injunction and Summary Judgment as to CPB

As NPR has explained, it is suffering and will suffer irreparable harm as a result of CPB's unlawful actions.  *See* Doc. 38-1 at 24–25; Doc 41 at 11–12.  Chief among those harms is the *per se* irreparable First Amendment injury that NPR suffers from CPB's viewpoint-based retaliation. *See, e.g.*, *Roman Cath. Diocese of Brooklyn v. Cuomo*, 592 U.S. 14, 19 (2020); *Turner v. U.S. Agency for Global Media*, 502 F. Supp. 3d 333, 385 (D.D.C. 2020).  NPR is further threatened with irreparable harm to its ability to carry out its mission to manage and operate the PRSS for the benefit of all Interconnected Stations.  *See Newby*, 838 F.3d at 8.  And the fact that CPB's actions violate both the First Amendment and the Public Broadcasting Act establish that the balance of hardships and public interest heavily favor injunctive relief.  *See Karem v. Trump*, 960 F.3d 656, 667–68 (D.C. Cir. 2020).

The Court should enter a preliminary injunction prohibiting CPB from disbursing the approximately $58 million in funds it has "awarded" to PMI, *see* SSUMF ¶ 208—funds that were appropriated by Congress for public radio interconnection and other related technologies and

services—to any entity or entities other than NPR or all the Interconnected Stations.  *See* Pub. L. No. 118-47, 138 Stat. at 696; Pub. L. No. 119-4, 139 Stat. 10–12.  Alternatively, and at minimum, the Court should preliminarily enjoin CPB from disbursing the $35,962,000 that CPB's General Counsel declared was appropriated by Congress "for th[e] specific purpose" of funding the PRSS to any entity or entities other than NPR or all the Interconnected Stations.  Dkt. 12-1 at 14 (¶ 36) (Decl. of Evan Slavitt).  If CPB were to disburse these funds, they would be difficult if not impossible for NPR to recover.  *See, e.g.*, *In re NTE Connecticut, LLC*, 26 F.4th 980, 990 (D.C. Cir. 2022) (explaining that "financial injury can be irreparable where no adequate compensatory or other corrective relief will be available at a later date, in the ordinary course of litigation" (citation, alterations, and quotation marks omitted)).

Further, to preserve the status quo pending resolution of this litigation, including any appeals, this Court should also preliminarily enjoin CPB from returning any of the aforementioned appropriated funds to the Treasury and require CPB to place those funds in escrow.  Although CPB has suggested that it believes it must return undistributed funds to the Treasury by the end of 2025, there is no legal basis for this proposition.  Rather, the Public Broadcasting Act provides that "[f]unds appropriated under this subsection shall remain available until expended."  47 U.S.C. § 396(k)(1)(E).  Nor do the relevant appropriations statutes require the return of unexpended funds.  *See* Pub. L. No. 118-47, 138 Stat. at 696; Pub. L. No. 119-4, 139 Stat. 10–12.  And the recent rescission act only rescinds amounts "made available . . . for fiscal year 2026" and "fiscal year 2027"—*not* amounts previously appropriated and disbursed to CPB.  Pub. L. No. 119-28, 139 Stat. at 469–70.  In fact, CPB's Articles of Incorporation provide that in "the event of dissolution or final liquidation of the Corporation, the Board of Directors shall . . . dispose of all assets of the Corporation" to "organizations organized and operated exclusively for charitable, educational,

literary, or scientific purposes" (i.e., Section 501(c)(3) organizations).  Corporation for Public Broadcasting, *Articles of Incorporation*, art. VII(2) (Nov. 3, 1969) (Doc. 12-1, *Corporation for Public Broadcasting v. Trump*, No. 1:2025-cv-1305 (D.D.C. 2025)).  Accordingly, to maintain the status quo and to prevent CPB from voluntarily returning public radio interconnection funding to the Treasury, the Court should order CPB to place those funds in escrow.

NPR's is entitled to summary judgment on its First Amendment claim, and the appropriate remedy is to enjoin CPB's violation of the First Amendment while restoring NPR (as much as possible) to the position it would be in had CPB not effectuated the government's unconstitutional content- and viewpoint-based retaliation and discrimination.  Accordingly, the Court should enjoin CPB from distributing any radio interconnection funds that would have been awarded to NPR but for CPB's unconstitutional actions.  *See Davis v. District of Columbia*, 158 F.3d 1342, 1346 (D.C. Cir. 1998) ("There is a presumed availability of federal equitable relief against threatened invasions of constitutional interests." (quotation marks omitted)); *Peyton v. DiMario*, 287 F.3d 1121, 1126 (D.C. Cir. 2002) (the Court "has wide discretion to award equitable relief") (quotation marks omitted); *see Franks v. Bowman Transp. Co.*, 424 U.S. 747, 770 (1976) ("The fashioning of appropriate remedies invokes the sound equitable discretion of the district courts.").  Further, because "[r]emedies generally seek to place the victim of a legal wrong in the position that person would have occupied if the wrong had not occurred[,]" *Babb v. Wilkie*, 589 U.S. 399, 413–14 (2020) (quotation marks and alterations omitted), the Court also should order CPB to immediately disburse to NPR the $36 million that CPB's Board authorized for the extension of NPR's PRSS grant agreement—funding that NPR would have received months ago had CPB carried through with signing the extension agreement its Board approved.  Alternatively, and at a minimum, this Court should order CPB to do what it resolved to do before it succumbed to government pressure:

in good faith "negotiate an amendment to the existing agreement with NPR for the design and implementation of the updated public radio interconnection system to extend the term by five years and increase the funding by up to $36 million, as appropriated in FY 2024 and prior."  SSUMF ¶ 54 (quoting April 2 CPB Board of Directors Resolution).

NPR is also entitled to summary judgment on its claim that CPB is violating the Public Broadcasting Act, and NPR respectfully submits that the appropriate remedy for that cause of action is to permanently enjoin CPB from distributing interconnection funding for public radio to any entity besides "those public telecommunications entities participating in the public radio satellite interconnection system or the national entity they designate for satellite interconnection purposes."  47 U.S.C. § 396(k)(10)(D)(i).  Such an order would require CPB to disburse at least $35,962,000 either to all the Interconnected Stations or to NPR as their designated national entity. As Mr. Slavitt previously declared to this Court under penalty of perjury, CPB possesses $35,962,000 in funds that were appropriated for this specific purpose, Dkt. 12-1 at 14 (¶ 36) (Decl. of Evan Slavitt), *Corp. for Pub. Broad. v. Trump*, No. 25-cv-1305 (stating that CPB was in the process of extending the "current PRSS Interconnection grant with NPR . . . for an additional $35,962,000 *using funds that Congress already appropriated for that specific purpose*" (emphasis added))—and the "doctrine of judicial estoppel prevents a party from asserting a claim in a legal proceeding that is inconsistent with a claim taken by that party in a previous proceeding," *New Hampshire v. Maine*, 532 U.S. 742, 749 (2001) (quoting 18 Moore's Federal Practice § 134.30, p. 134–62 (3d ed. 2000)).

## CONCLUSION

This Court should issue a preliminary injunction restraining CPB from distributing appropriated interconnection funding for public radio to any entity or entities other than NPR or

all the Interconnected Stations, including by returning those funds to the Treasury, or from taking any other steps to implement the unlawful Order pending a resolution of this case on the merits.

This Court also (or in the alternative) should enter summary judgment for NPR and direct CPB to restore NPR to the position it would be in had CPB not violated NPR's First Amendment rights and it should permanently enjoin CPB from disbursing funds appropriated for public radio interconnection to any entity that is not statutorily authorized to receive it and require CPB to disburse those funds (a minimum of $35,962,000) to NPR, or directly to all Interconnected Stations.

October 24, 2025

Respectfully submitted,

*/s/ Miguel A. Estrada*

Miguel A. Estrada (D.D.C. Bar No. 456289)
GIBSON, DUNN & CRUTCHER LLP
1700 M Street, N.W.
Washington, D.C. 20036-4504
(202) 955-8500
MEstrada@gibsondunn.com

Theodore J. Boutrous, Jr. (D.D.C. Bar No.
420440)
Katie Townsend (D.C. Bar No. 1026115)
GIBSON, DUNN & CRUTCHER LLP
333 South Grand Avenue
Los Angeles, CA 90071-3197
(213) 229-7000
TBoutrous@gibsondunn.com
KTownsend@gibsondunn.com

Elizabeth A. Allen (*Admitted Pro Hac Vice*)
NATIONAL PUBLIC RADIO, INC.
1111 North Capitol Street, NE
Washington, D.C. 20002
(202) 513-2000
EAAllen@npr.org

*Counsel for Plaintiff*
*National Public Radio, Inc.*