**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| NATIONAL PUBLIC RADIO, INC., *et al.* | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | Case No. 25-cv-1674 |
| | ) | |
| DONALD J. TRUMP, *et al.* | ) | |
| | ) | |
| Defendants. | ) | |

**DEFENDANT CORPORATION FOR PUBLIC BROADCASTING'S**
**MEMORANDUM IN SUPPORT OF ITS**
**MOTION FOR SUMMARY JUDGMENT**

## <u>INTRODUCTION</u>

National Public Radio Inc. ("NPR") brought this action to block the Corporation for Public Broadcasting ("CPB") from awarding a competing coalition of radio stations generally appropriated interconnection funds, to which NPR claims to be "entitled" in perpetuity. Far from an attempt to vindicate First Amendment rights, this lawsuit is an anti-competitive gambit aimed at entrenching a monopoly over taxpayer dollars that the law simply does not grant NPR. It is undisputed that CPB never disburses federally appropriated funds to anyone, much less interconnection funds, without a fully negotiated, written, signed grant agreement. In fact, NPR has **never** received any interconnection funds without first having a signed written grant agreement, which NPR admits that it never had concerning the very funds it seeks.

If successful, NPR's lawsuit would prevent CPB from serving its Congressionally-mandated role to serve as the steward of public dollars for public media, but it would achieve NPR's actual goal: keeping a qualified coalition of radio stations, whose competing bid was deemed, both by Deloitte and by CPB, to be superior to that of NPR, from obtaining public funds for interconnection. NPR's goal was articulated by an internal NPR email written on April 23, 2025 by the manager of NPR's interconnection satellite system, the Public Radio Satellite System ("PRSS"), when NPR learned that it might actually have to accede to reforms in the governance of that system: the elimination of CPB so that NPR could be free to receive these funds without any strings; it described this as its "dream scenario – we get the money and CPB goes away by the action of Congress." CPB's Statement of Facts Not In Genuine Dispute ("SOF") at ¶ 160.

Eleven (11) months after knowing that CPB was strongly considering requiring that the management of the PRSS be reformed to improve governance and over five (5) months after being offered the exclusive right to enter into negotiations to win a new grant agreement, if it

submitted a plan to achieve that revised governance, NPR, which rejected those negotiations, filed this lawsuit.  NPR now claims that, by selecting a competitor over it in a competitive bidding process, CPB violated its Constitutional rights or, alternatively, violated an inapplicable Congressional provision which, according to NPR, requires that no one other than it can win a grant to receive funds for interconnection. NPR is wrong on both counts, as a matter of law and indisputable fact, and, accordingly, CPB moves for summary judgment on all counts.

NPR claims that by rejecting its bid, CPB is somehow implementing President Trump's May 1, 2025 Executive Order and, as such, CPB is violating its Constitutional rights. This argument requires cognitive dissonance. CPB – which NPR has long agreed is a private corporation not part of the executive branch of government and not subject to that Executive Order – is not a state actor. CPB has itself sued President Trump and his administration in this very Court for unlawfully purporting to remove its Directors and thereby assert control over CPB. CPB has publicly and repeatedly stated that it regards the President's Executive Order as having no effect on it. Rather than "implementing" the President's Executive Order, which purported to direct CPB to cease funding NPR and the Public Broadcasting System ("PBS"), CPB disregarded it by continuing to fund NPR and PBS by providing millions of dollars of appropriated funds. And as for CPB's determination that the interconnection system should be managed by an entity with reformed governance, as NPR well knows, CPB had been advised by consultants before Donald Trump returned to office, that this was a public policy imperative. Indeed, NPR knew this full well in 2024, before Trump was even elected president, let alone before he took office or issued the Executive Order.

Even after Trump took office and even after the Executive Order was anticipated, far from "doing Trump's bidding", CPB offered NPR the opportunity to have exclusive negotiations

with CPB to discuss a potential agreement for interconnection funds, subject to its submitting a plan that would allow for the transition to a new entity managing PRSS in which NPR would have a role. NPR refused to do so. CPB then created a working group in which NPR actively participated that recommended that there be a Request For Proposals ("RFP") issued for the interconnection grant at issue. CPB issued the RFP. NPR bid. A broad coalition of radio stations and others submitted a competing bid. CPB's independent consultant, Deloitte, reviewed the competing bids, and concluded that NPR's bid was inferior to the competing bid in numerous crucial respects. CPB selected the competing bid. And that is what NPR's claim in this Court – masked as one grounded in "the First Amendment" – is really all about.

Equally risible is NPR's claim that it is somehow entitled to a Court Order requiring CPB to transfer millions in federally appropriated funds that CPB has selected a competitor to receive – to NPR, which does not and never had a grant agreement as to those funds. The Court would have no authority to do so, of course, but that is the least of NPR's problems in that regard.

First, the statute that NPR relies on does not even apply to the funding at issue. 47 U.S.C. Section 396(k)(10)(D)(i) governs funds appropriated specifically to the Satellite Interconnection Fund – but the funds at issue were not appropriated to that Fund and, indeed, no funds appropriated to that Fund have been appropriated for over a decade. Consequently, CPB has no such funds in its possession. The entire premise of NPR's case, therefore, is false and empty.

Second, even if the statute on which they relied were applicable, NPR is not the "designated entity" to receive  interconnection funds under that statute, any statute, or under anything else. The Public Broadcasting Act ("PBA") does not refer to NPR. NPR itself cannot identify any vote or document establishing it as the entity "designated" to receive generally appropriated interconnection funds in perpetuity, and no such vote or document appears to exist.

On the contrary, when the issue came up of holding a potential vote by radio stations earlier this year, NPR actively discouraged it from taking place. The only agreement between NPR and CPB that could be construed as a general agreement making NPR the general "designee" for such funds, which is the one NPR witnesses have identified as somehow giving them this designation, was signed in 1986, expressly ***expired by its terms in 1988***, and expressly and repeatedly contemplated entities other than NPR serving in that capacity.  SOF at ¶¶ 88, 92.

Third, as NPR admits, any agreement between CPB and NPR by which CPB would grant NPR funds for interconnection would have to be in a signed written agreement covering a particular period, is subject to negotiation, with there being no requirement that CPB (or NPR, for that matter) would ever have to reach such agreement on material terms. Here, CPB authorized its management to commence negotiations with NPR on April 2, 2025 and NPR was expressly invited to do so. It refused. Therefore, because NPR refused to enter into such negotiations, despite repeated requests that it do so, no negotiations took place. There was no agreement; not even a draft grant agreement that was ever provided to NPR by CPB. The notion that the Court could order CPB to transfer millions of taxpayer dollars to NPR, or require CPB to enter into an agreement with NPR, therefore, is obviously meritless.

Fourth, NPR will not be harmed if it does not receive the funds it seeks in this action – a fact admitted by NPR both before and after it brought this lawsuit.  On July 18, 2025, "NPR leadership assured the GMs [of public radio stations] that PRSS serves will continue – no matter what CPB does with the RFP, and with or without CPB funding." Exhibit BB.  Further, since filing its Motion for Temporary Restraining Order ("TRO Motion"), NPR has since issued a public statement that, regardless of the outcome of this suit: NPR will support the PRSS; "NPR's board has passed a stable FY26 budget that will fund PRSS"; "No matter what happens in the

suit, the money in question will be put toward supporting the public radio system"; and "***No money goes away***."  Exhibit E (emphasis added).  CPB has done nothing to affect NPR's ability to gather, report, and publish information or transmit that content through its PRSS interconnection system.  Nothing precludes NPR from continuing to operate the PRSS except its own ability to fund it; CPB has just decided not write NPR a blank check to do so.  NPR's Distribution division, which manages the PRSS, has "healthy reserves" of approximately $25 million that arises from NPR's "very successful commercial business selling excess satellite capacity" – in other words, selling access to the system over which it seeks to maintain monopolistic control through this suit.

Last, the relief sought by NPR has no basis in law.  NPR has made no claim for breach of contract or for damages in this action.  The only remedies it seeks is (a) blocking the grant award to its competitor, and (b) awarding the grant to itself.  Two bases exist for such relief: either a statute or a contract requires the award go to NPR.  Neither exist here, because, even if the statute relied upon by NPR applied, it admits it would still need a grant contract, ***and there is no contract***.  NPR is, essentially, seeking specific performance on a contract that does not exist.  It cannot do so.

For these reasons, as well as the simple fact that CPB is private entity, and, as such, NPR's Administrative Procedure Act, *ultra vires*, and First Amendment claims cannot be brought against CPB, all of NPR's claims against CPB fail.  CPB cannot have acted *ultra vires* because NPR was never statutorily entitled to the funds it seeks.  CPB cannot have retaliated against NPR in service of the Trump Administration because CPB began the steps to pursue its priority of have an independent entity manage interconnection before the Trump Administration even began and before the May 1st EO was ever issued.  CPB also cannot have retaliated against NPR in

service of the Trump Administration when it has defied the May 1st EO by continuing to give significant funds to NPR since the May 1st EO was issued.  CPB cannot have tortiously interfered with NPR's contracts because NPR's contracts did not entitle NPR to the funding it seeks, CPB did not engage in any egregious, wrongful, or improper conduct, and, as the entity authorized to steward the interconnection system, CPB's actions were legally justified.  This Court should enter summary judgment in favor of CPB on all counts.

## FACTUAL BACKGROUND

Filed herewith is a separate Statement of Material Facts Not Subject to Genuine Dispute ("SOF").  CPB incorporates that SOF as if fully set forth herein.

## ARGUMENT

**I.    The Court Should Enter Judgment in Favor of CPB on Counts 1-5 Because the APA Does Not Apply to CPB Because, Under the Express Terms of the PBA, it is Not an Agency of the United States**

The first five counts of Plaintiff's Amended Complaint are brought under the Administrative Procedure Act ("APA"), which applies only to agencies of the federal government. Am. Compl. ¶¶ 108 through 161; 5 U.S.C. § § 702, 704. The APA applies only to agencies (*see, e.g.,* 5 U.S.C. § § 702, 704), and defines "agency" as "each authority of the Government of the United States. . . ."  5 U.S.C. 551(1). Congress, of course, has the ability to create and define agencies of the United States. *See, generally,* U.S. Const., Art. I. Congress made clear, however, that CPB is an independent nonprofit corporation, and "***not***…an agency or establishment of the United States Government." 47 U.S.C. § 396(b) (emphasis added). Congress further expressly prohibited "any department, agency, officer, or employee of the United States [from] exercis[ing] any direction, supervision, or control …over [CPB]…" *Id*. at § 398. And not only is CPB not an agency, its directors are not officers or employees of the United States (47 U.S.C. § 396(d)(2)), and it is not subject to the jurisdiction or whims of any agency of the United States. *See Accuracy*

*in Media, Inc. v. F.C.C.*, 521 F.2d 288, 293 (D.C. Cir. 1975) (finding the FCC had no jurisdiction over the CPB); 47 U.S.C. § 396(d)(2).

The D.C. Circuit has explicitly recognized that CPB is not an agency in affirming a District Court Opinion which found that 28 U.S.C. § 1361 (the Mandamus Act) does not apply to CPB:

> CPB and PBS ***are not agencies*** of the United States and the members of the CPB Board of Directors are not Officers of the United States. [47 USC 396(b)] specifically provides that CPB 'will not be an agency or establishment of the United States Government.'

*Network Project v. Corp. for Pub. Broad.*, 398 F. Supp. 1332, 1339 (D.D.C. 1975), *aff'd in relevant part*, 561 F.2d 963, 976 (D.C. Cir. 1977) (emphasis added).

NPR itself has also conceded that CPB is not subject to the APA because it is not an agency. Am. Compl. ¶¶ 37-39, 140. Reply in Support of NPR's Motion for a TRO ("Reply") at 9 (Dkt. No. 41) ("NPR agrees that it cannot seek relief against CPB under the APA because CPB is not an agency.") The APA, therefore, does not apply to CPB and the Court should grant CPB's Motion for Summary Judgment on Counts 1-5 of the Amended Complaint.

## II.    The Court Should Enter Judgment in Favor of CPB on Counts 1-7 because NPR's *Ultra Vires* Claims Are Not Viable Against CPB

NPR's ultra vires claims fail against CPB for the same reason its APA claims fail: *ultra vires* claims apply only to agencies, and CPB is not an agency. The Supreme Court has described *ultra vires* claims as a "hail mary" pass; that characterization is particularly applicable here. *See Nuclear Regulatory Comm'n v. Texas,* 605 U.S. 665, 681-82 (2025) (quoting *Nyunt v. Chairman, Broadcasting Board of Governors,* 589 F.3d 445, 449 (D.C. Cir. 2009)) (noting that an *ultra vires* claim "is essentially a Hail Mary pass—and in court, as in football, the attempt rarely succeeds." Even if such a claim could be extended to CPB, NPR has no statutory right at issue. The PBA allows CPB to distribute interconnection funds in multiple ways, including establishing and developing interconnection systems; and the statute upon which NPR relies, does not even apply

here because the funds at issue were not "appropriated to the *S*atellite *I*nterconnection *F*und." NPR's claim is nothing more than an attempt to "dress up a typical statutory-authority argument as an *ultra vires* claim." *Nuclear Regulatory Comm'n,* 605 U.S. at 682.

### A.  *Ultra Vires* Review Applies Only to Agency Action

*Ultra vires* claims may be brought only with respect to actions taken by agencies of the government, not by private corporations. *Ultra vires* review derives from actions where "courts recognized a right to equitable relief ***where an agency's action*** was *ultra vires*—that is, 'unauthorized by any law and . . . *in violation of the rights of the individual*." *Nuclear Regulatory Comm'n*, 605 U.S. at 680 (emphasis added). Such actions are found only where "absence of jurisdiction of the federal courts would mean a sacrifice or obliteration of a ***right which Congress has given*** . . . ." *Leedom v. Kyne,* 358 U.S. 184, 185 (1958) (emphasis added). An ultra vires claim "is a narrow one, and it does not apply simply because ***an agency*** has reached a conclusion that does not comport with the law." *Nuclear Regulatory Comm'n,* 605 U.S. at 681 (citations and quotations omitted) (emphasis added). "It applies only when ***an agency*** has taken action entirely in excess of its delegated powers and contrary to a specific prohibition in a statute." *Id*. Courts require agency action to "go beyond mere legal or factual error and amount to a clear departure by the [agency] from its statutory mandate or be blatantly lawless agency action." *Federal Express Corp. v. U.S. Dep't of Commerce*, 39 F.4th 756, 764 (D.C. Cir. 2022) (brackets in original, quotation and citations omitted) (emphasis added). "To prevail on an ultra vires claim, the plaintiff must establish … that ***the agency*** plainly acts in excess of its delegated powers and contrary to a specific prohibition in the statute that is clear and mandatory." *Changji Esquel Textile Co. Ltd. v. Raimondo*, 40 F.4th 716, 722 (D.C. Cir. 2022) (emphasis added). *Ultra vires* review, therefore, can only be applied to agencies.

But CPB is expressly "not…an agency or establishment of the United States Government." 47 U.S.C. § 396(b). *See also Network Project v. Corp. for Pub. Broad*., 398 F. Supp. 1332, 1339 (D.D.C. 1975), *aff'd in relevant part*, 561 F.2d 963, 976 (D.C. Cir. 1977) (affirming district court opinion finding CPB is not an agency). Because CPB is not "an agency or establishment of the United States Government," an *ultra vires* claim is not available against it, and the Court should grant Summary Judgment in CPB's favor.

### B. *Lebron* Cannot be Extended to an *Ultra Vires* Action

To date, NPR has not argued that the holding in *Lebron v. Nat'l R.R. Passenger Corp.*, 513 U.S. 374, 115 S. Ct. 961, 974 (1995) and its later cousin, *Dep't of Transp. v. Ass'n of Am. R.Rs.*, 575 U.S. 43, 53-54 (2015) should be applied to CPB to construe it as a government entity for purposes of its *ultra vires* claims. It must be stated, however, that under *Lebron* and *Dep't of Transp.*, CPB should not be treated as a government entity. In those cases, the Supreme Court determined that Amtrak "is an agency or instrumentality of the United States *for the purpose of individual rights guaranteed against the Government by the Constitution*." *Lebron*, 513 U.S. at 394; *Dep't of Transp.*, 575 U.S. at 54-55. NPR's *ultra vires* claims allege a lack of statutory authority, rather than infringement of constitutional rights. *Lebron*, therefore, do not apply.

Further, "just because an entity is considered a federal instrumentality for one purpose does not mean that the same entity is a federal instrumentality for another purpose." *U.S. ex rel. Adams v. Aurora Loan Servs., Inc.*, 813 F.3d 1259 (9th Cir. 2016) (citations omitted). In *U.S. ex rel. Totten v. Bombardier Corp.*, 380 F.3d 488, 492 (D.C. Cir. 2004), the D.C. Circuit recognized this distinction with respect to Amtrak, the "federal entity" at issue in *Lebron*, ruling that Amtrak was not a governmental entity for purposes of the False Claims Act. Then D.C. Circuit Judge Roberts relied on Congress's statement that Amtrak was not the government, noting that Congress's

determinations of the matter were "assuredly dispositive of Amtrak's status as a Government entity for purposes of matters that are within Congress's control." *Id*. at 492.

Here, for purposes of NPR's *ultra vires* claims, *Lebron* does not apply to CPB for the same reason that *Lebron* did not apply to Amtrak for purposes of the False Claims Act – because Congress has the power to say so and Congress could not have been more clear: CPB is not "an agency or establishment of the United States Government." 47 U.S.C. § 396(b).

### C. The PBA Does Not Create a Private Right of Action.

The D.C. Circuit has affirmed, on multiple occasions: "We hold that private rights of action are **not part of the machinery devised by Congress for control of CPB's activities**." *Network Project*, 561 F.2d at 976; *Schnapper v. Foley*, 667 F.2d 102, 116 (D.C. Cir. 1981) ("Appellants' request for relief under the Public Broadcasting Act fails because that statute provide no private right of action that is available to appellants.") (emphasis added). "Through [the PBA's] statutory requirements and control over the 'purse-strings,' Congress reserved for itself the oversight responsibility for the Corporation [for Public Broadcasting]." *Accuracy in Media*, 521 F.2d at 294. "By that statement we clearly implied that the statutory mandates are to be enforced exclusively by Congress." *Network Project,* 561 F.2d at 975.[1]  Because NPR has no private right of action under the PBA, their claim to enforce the statutory terms of the PBA necessarily fails.

### D. The Statutory Provision Under the PBA Upon Which NPR Bases its Claims Does Not Apply to the Generally Appropriated Funds at Issue

NPR's *ultra vires* theory rests entirely on 47 U.S.C. § 396(k)(10)(D)(i), *see* Am. Compl. ¶¶ 34, 54, 143, which applies **only** to "funds **appropriated** to the **Satellite Interconnection Fund** and interest thereon . . . ." 47 U.S.C. § 396(k)(10)(D)(i) (emphasis added). The "Satellite

---

[1] Congress has indeed now done so, as it has rescinded all funding for CPB beyond 2025. *See* Pub. L. 119-28, 139 Stat. 467.

Interconnection Fund" is a defined term in the Public Broadcasting Act: "There is hereby established in the Treasury a fund which shall be known as the Public Broadcasting Satellite Interconnection Fund (hereinafter in this subsection referred to as the 'Satellite Interconnection Fund'), to be administered by the Secretary of the Treasury." 47 U.S.C. § 396(k)(10)(A). NPR's argument fails at the very first threshold because *the funds at issue here were not appropriated to the Satellite Interconnection Fund, nor do any such funds currently exist*.

When Congress intends to appropriate funds specifically to the Satellite Interconnection Fund, it knows *exactly* how to do that, and it does so explicitly. *See* Pub. L 100–626, Nov. 7, 1988, 102 Stat 3207 ("There is authorized to be *appropriated* to the *Satellite Interconnection Fund*, for fiscal year 1991, the amount of $200,000,000."); Pub. L. 111-117, December 16, 2009, 123 Stat 3034, 3275 (Congress appropriated $25 million "*pursuant to section 396(k)(10)* of the Communications Act of 1934 . . . .") (emphasis added); Pub. L. 111-8, March 11, 2009, 123 Stat 524, 797 (Congress appropriated $26.642 million "*pursuant to section 396(k)(10)* of the Communications Act of 1934 . . . .") (emphasis added); Pub. L. 110–161, December 26, 2007, 121 Stat 1844 (Congress appropriated $26.750 million "*pursuant to section 396(k)(10)* of the Communications Act of 1934.") (emphasis added).

Since 2009, however, Congress has not made a single appropriation to the Satellite Interconnection Fund, whether by reference to the defined term or the statutory citation. Instead, for the 2024 and 2025 fiscal year appropriations, the bills state:

> In addition, for the costs associated with replacing and upgrading the public broadcasting interconnection system and other technologies and services that create infrastructure and efficiencies within the public media system, $60,000,000.

Pub. L. 118-47, March 23, 2024, 138 Stat 460, 696; Pub. L. No. 119-4, Div. A, tit. I, § 1101(a)(8) (extending appropriations at the same levels as Fiscal Year 2024). This same language was used in

2023. Pub. L. 117-328, December 29, 2022, 136 Stat 4459, 4901-02; Pub. L. 117-103, March 15, 2022, 136 Stat 49, 489. Congress used nearly identical language, with differing dollar amounts, for the fiscal years dating back to 2016. Pub. L. 116-260, December 27, 2020, 134 Stat 1182, 1615; Pub. L. 116-94, December 20, 2019, 133 Stat 2534, 2600; Pub. L. 115-245, September 28, 2018, 132 Stat 2981. 3111; Pub. L. 115-141, March 23, 2018 , 132 Stat 348, 757; Pub. L. 115-31, May 5, 2017, 131 Stat 135, 556; PL 114-113, December 18, 2015 , 129 Stat 2242, 2643.

NPR's claim seeks to compel CPB to distribute funds "appropriated pursuant to § 396(k)(10)," but given that Congress has not appropriated any funds to the Satellite Interconnection Fund since 2010, no such funds exist. SOF at ¶¶ 108-109, 113. CPB, of course, cannot remit funds that do not exist, and, as such, has not violated a right possessed by NPR. On that basis alone, NPR's *ultra vires* claims against CPB fail.

The funds held by CPB are for "interconnection" broadly. *See* Pub. L. 118-47, March 23, 2024, 138 Stat 460, 696. The PBA defines "interconnection" as "the use of microwave equipment, boosters, translators, repeaters, communication space satellites, or other apparatus or equipment for the transmission and distribution of television or radio programs to public telecommunications entities." 47 U.S.C. § 397(3). It defines "interconnection system" as "any system of interconnection facilities used for the distribution of programs to public telecommunications entities." *Id.* at § 397(4). The Satellite Interconnection Fund is not mentioned in either definition and the technology mentioned does even not require the use of satellites. *Id.*; SOF at ¶ 24.

Further, CPB's RFP specifically included expansion of terrestrial interconnection capabilities. SOF at ¶ 178. NPR's Proposal in response to that RFP included aspects of terrestrial interconnection and, in fact, included a transition away from satellite interconnection. SOF at ¶ 182. Had NPR won the bid for CPB's RFP it would have used those funds, at least in part, to

12

expand terrestrial interconnection. SOF at ¶ 184. If NPR prevails in this action and receives the funds that it seeks, part of those funds would be used for terrestrial interconnection. SOF at ¶ 185.

Not only does CPB have no funds appropriated to the Satellite Interconnection Fund, but neither CPB nor NPR even intends the funds at issue to be used exclusively for *satellite* interconnection, as both entities intend those funds to be used for *terrestrial* interconnection. Therefore, even if NPR had a claim to *satellite* interconnection funds under 47 U.S.C. § 396(k)(10)(D)(i) – which it does not – its claim would still fail because the funds at issue would not exclusively be used for satellite interconnection.

## E. NPR is Not Otherwise Entitled to Funds Appropriated for General Interconnection Purposes

To the extent that NPR seeks funds that are ***not*** appropriated to the Satellite Interconnection Fund pursuant to 47 U.S.C. § 396(k)(10), NPR has failed to, and cannot, identify any basis for entitlement to such funds and has admitted that no such entitlement exists. NPR has deliberately muddled the terminology of "interconnection" to create the illusion that it is a single concept and system. It is not.

Section 396(k)(10)(D) does not entitle NPR to any funds other than from the Satellite Interconnection Fund. The appropriations for the funds at issue refer to the "interconnection system."  Pub. L. 118-47, March 23, 2024, 138 Stat 460, 696. NPR has failed to identify any section of the PBA that entitles it to such generally appropriated funds. NPR has failed to do so because it cannot. NPR does not receive appropriations directly from Congress, SOF at ¶ 20; and no section of the PBA directly entitles NPR to general interconnection funding, SOF at ¶ 73.

Instead, the PBA gives CPB broad authority to "assist in the ***establishment and development*** of one or more interconnection systems to be used for the distribution of public telecommunications services so that all public telecommunications entities may disseminate such

services at times chosen by the entities." 47 U.S.C. § 396(g)(1)(B) (emphasis added). Further, Congress provided CPB the power to "arrange, by grant to or contract with appropriate public or private agencies, organizations, or institutions, for interconnection facilities suitable for distribution and transmission of public telecommunications services to public telecommunications entities." 47 U.S.C. § 396(g)(2). No such authority was given to NPR.

CPB's selection of PMI for interconnection funding is consistent with CPB's authority under the PBA. PMI's bid not only sets up an additional entity to provide interconnection capabilities, and it does so by relying on existing PRSS capability for satellite interconnection specifically, as well as introducing new methods of interconnection that are just as reliable and more easily accessible to a majority of public broadcasting entities. SOF at ¶ 191-196. In that manner, PMI's bid was more responsive to CPB's plan. *Id.*

NPR is simply not entitled to the funds it seeks. CPB determined that NPR was not the best entity to receive the interconnection funds at issue – a decision that was within its authority to make. NPR, therefore, has failed to identify a right that CPB has allegedly violated.

## F. Even if 47 U.S.C. § 396(k)(10)(D)(i) Applies to the Funds at Issue, NPR is Not Entitled to Receipt of Those Funds

NPR knows that it must have a written and signed agreement from CPB to be entitled to interconnection funds; it has never received interconnection grant funds without first entering into a written signed grant agreement. SOF at ¶ 74. CPB has never issued federally appropriated funds for an interconnection or production grant to anyone without a written, signed agreement. SOF at ¶ 75. CPB never provided a draft agreement, statement of work, or a schedule of deliverables to NPR for the funds at issue. SOF at ¶ 168. CPB never entered an agreement with NPR for the funds at issue. SOF at ¶ 172. NPR, therefore, has no basis for its claim even under the statute.

Moreover, the language of the PBA relied upon by NPR states:

> … all funds appropriated to the Satellite Interconnection Fund and interest thereon … shall be distributed by the Corporation to the licensees and permittees of noncommercial educational television broadcast stations providing public telecommunications services or the national entity they designate for satellite interconnection purposes and to those public telecommunications entities participating in the public radio satellite interconnection system or the national entity they designate for satellite interconnection purposes.

47 U.S.C. § 396(k)(10)(D)(i). Notably, as a default, the rights to the funding rest with the individual licensees and permittees; *not* with any designated entity.

At the hearing on NPR's Motion for TRO, it argued that the first part of Section 396(k)(10)(D)(i), which refers to "the licensees and permittees" means ***all*** licensees and permittees. The second part of this section refers to a national entity that "they" designate to for satellite interconnection purposes. The term "they" refers back to "the licensees and permittees," identified in the first section, which, as NPR has argued, means ***all*** licensees and permittees. Therefore, for NPR to be entitled to the funds that it seeks, ***all*** licensees and permittees must have designated NPR as the national entity to receive satellite interconnection funds.

NPR cannot show that all licensees and permittees have designated them as such.  The PRSS currently serves 375 public radio stations, 129 of which are not NPR member stations. Am. Compl. at ¶ 51. Stations disconnect from the PRSS every year because they believe the fees that NPR charges are too high. SOF at ¶ 95. Moreover, there are 859 ***other*** public broadcast stations that are not even part of PRSS and with whom NPR does not have a contract, SOF at ¶ 45, that NPR has not even attempted to claim have designated it to receive anything, *see* Am. Compl. at *passim*. Per NPR's own construction, therefore, its statutory argument fails.

Further, even the contracts that NPR has produced for the PRSS-connected stations do not guarantee NPR the right to interconnection funds. The standard contract that NPR claims reflects the various stations' designation of NPR to receive interconnection funding contemplates the event

that "NPR no longer manages the PRSS" and gives the stations the right to **_unilaterally_** terminate the agreement **_without cause_**. Dkt No. 38-4 at § 8.

Tellingly, NPR does not want to even hold a vote to confirm its designation as the designee of the public stations' funding. Shortly after NPR filed its TRO Motion in this matter, NPR published its "Q&A on NPR's September 26, 2025 filing" ("Post-Motion Q&A"). Exhibit E. In it, NPR rhetorically asks the public stations: "Won't voting on the PRSS right now just fix all this?" and responds: "No. If we vote on who should run the PRSS (while the EO litigation pending), the May 1st EO still puts the system at great risk, because all future federal funding could still be subject to the EO." Exhibit E. Here, when NPR refers to "future federal funding" being subject to the May 1st EO, it means the directive against funding NPR – **_not_** the individual public stations. According to NPR, the system is at great risk – but only because NPR would not be controlling it.

Therefore, even if 47 U.S.C. § 396(k)(10)(D)(i) applies to the funds at issue, NPR has failed to demonstrate, and cannot demonstrate, that it is entitled to the funds at issue as the designated national entity for all licensees and permittees, or that it entered any contract with CPB as that designated entity. On that basis, NPR's *ultra vires* claims against CPB fail.

### G. NPR Lacks Standing to Assert its Claims Against CPB

"Standing to sue is a doctrine rooted in the traditional understanding of a case or controversy." *Spokeo, Inc. v. Robins*, 578 U.S. 330, 338, 136 S. Ct. 1540, 1547 (2016), as revised (May 24, 2016). "[T]he 'irreducible constitutional minimum' of standing consists of three elements[:] the plaintiff must have (1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision." *Id.* (internal citations omitted). "The plaintiff, as the party invoking federal jurisdiction, bears the burden of establishing these elements." *Id.* "To establish injury in fact, a plaintiff must

show that he or she suffered 'an invasion of a legally protected interest' that is 'concrete and particularized' and 'actual or imminent, not conjectural or hypothetical.'" *Id*. at 339.

Here, NPR lacks standing because it has not suffered "'an invasion of a legally protected interest' that is 'concrete and particularized' and 'actual or imminent, not conjectural or hypothetical.'" *See Spokeo,* 578 U.S. at 338-340. First, because NPR has no right to the funds it seeks, *see* Sections II(D)-(F) *supra*, NPR has failed to identify a "legally protected interest" that CPB has invaded. Second, the Court will recall that, even under NPR's construction of 47 U.S.C. § 396(k)(10)(D), the beneficiaries of the funding at issue – *i.e.* those *actually* entitled to the funding – are the various public broadcast licensees and permittees; ***not*** NPR. Demonstrating NPR's true grievance in this matter, NPR has also stated that: "No matter what happens in the suit, the money in question will be put toward supporting the public radio system" and "[e]ven if NPR succeeds in this motion, some RFP grant money would go to PMI and some would go to PRSS. If NPR does not succeed, the money will go to PMI. No money goes away." Exhibit E. With the money going to public radio interconnection anyway, as NPR admits, the beneficiaries of the funding still receive it; it just does not go through NPR first. In other words, with CPB selecting PMI's proposal, NPR does not actually lose any money, it just loses control over other entities' money. NPR lacks standing to assert a claim for those other entities' money.

Third, NPR has failed to demonstrate a concrete or particularized injury that is actual or imminent. NPR's Post-Motion Q&A belies any injury:

- "If NPR doesn't get the money they want, will they stop supporting PRSS? *No.* NPR plans to support PRSS at the same level of quality, reliability and service as it has for the past 40 years."

- "NPR's board has passed a stable FY26 budget that will fund PRSS and not increase PRSS station fees, despite the loss of federal funding."

Exhibit E (emphasis added). The Vice President of NPR Distribution, the division of NPR that directly manages the PRSS testified: "If NPR were to just maintain the current state and do nothing else, the limiter would not be money as much as it would be the satellite system going away, at which point you wouldn't have anything else and the system would stop operating." SOF at ¶ 189. Moreover, under the bid selected by CPB, approximately $6.5 million will be paid directly to NPR for the PRSS. SOF at ¶ 196. Even if the Court interprets 47 USC 396(k)(10)(D)(i) to apply to appropriations for satellite interconnection, generally, NPR still gets the money.

### III.    The Court Should Enter Judgment in Favor of CPB on Count 7 Because the Evidence Does Not Support NPR's First Amendment Claims

NPR has alleged retaliation and viewpoint discrimination under the First Amendment. NPR's claims fail because: (1) CPB is not a government agency or state actor and, therefore, is not subject to First Amendment claims, nor should it be treated as such given its defiance of the Trump Administration; (2) given CPB's efforts over years to revise the interconnection system and continued distribution of funds to NPR, NPR cannot prove the necessary causal link between its speech or the President's actions and CPB's actions, nor can it prove the necessary retaliatory motive by CPB; (3) given the continued funding of NPR by CPB, the vast resources available to NPR, and NPR's continued speech against the President, it cannot credibly claim to have been deterred from speaking in the future; (4) given that the interconnection system is merely a conduit for communication and CPB has done nothing to affect the content of NPR's speech, NPR cannot prove viewpoint discrimination.

### A.    NPR's First Amendment Claims Fail Because The First Amendment Does Not Apply to Private Actors

"The text and original meaning of [the First Amendment], as well as this Court's longstanding precedents, establish that the Free Speech Clause prohibits only *governmental*

abridgment of speech. The Free Speech Clause does not prohibit *private* abridgment of speech." *Manhattan Cmty. Access Corp. v. Halleck*, 587 U.S. 802, 808, 139 S. Ct. 1921 (2019) (emphasis in original). "The First Amendment has never been read to require private parties to guarantee freedom of speech to other private parties." *The Pen v. DC Radio Assets, LLC*, 181 F. Supp. 3d 49, 53 (D.D.C. 2014). Because CPB is a private, non-profit corporation, 47 U.S.C. § 396; Am. Compl. at ¶¶ 22, 27, NPR's First Amendment claims fail from the outset.

To try to evade this well-established precedent, NPR attempts two arguments: (1) relying on *Lebron*, that CPB, like Amtrak, should be treated as government entity subject to First Amendment claims, and (2) relying on *Lugar v. Edmondson Oil Co.*, 457 U.S. 922, 937 (1982), that CPB's actions "constitute state action because those actions were undertaken at the compulsion (or at least significant encouragement) of the government." Am. Compl. at ¶¶ 198-199. Neither argument is supported by the facts.

### 1.    CPB is Not Governmental Instrumentality Under *Lebron*

In *Lebron* and *Dep't of Transp.*, the Supreme Court concluded that Amtrak "is an agency or instrumentality of the United States for the purpose of individual rights guaranteed against the Government by the Constitution." Amtrak, however, is materially different than CPB. Unlike Amtrak, which was ***created*** by Congress, Rail Passenger Service Act of 1970, § 301, 84 Stat. 1328, 1330; *Lebron*, 513 U.S at 383, CPB was not created by Congress; rather, it was ***authorized*** by Congress, and created by the original board of directors. 47 U.S.C. § 396. This distinction is not without a difference, as Congress has used the "creation" language in various other instances. *See, e.g.*, 15 U.S.C. § 714 ("there is created a body corporate to be known as Commodity Credit Corporation . . . ."); 42 U.S.C. § 2296b(a) ("There is established in the District of Columbia a private nonmembership nonprofit corporation, which shall be known as the Legal Services

Corporation . . . .") (emphasis added); 42 U.S.C. § 8102 ("There is established a Neighborhood Reinvestment Corporation . . . .") (emphasis added); 12 U.S.C. 1717 ("There is created a body corporate to be known as the "Federal National Mortgage Association"") (emphasis added).

Further, the government's involvement in CPB is significantly less than Amtrak. CPB's Board members "shall be selected from among citizens of the United States (***not regular full-time employees of the United States***)." *See* 47 U.S.C. § 396(c)(2) (emphasis added). By contrast, the Secretary of Transportation has always held a seat on Amtrak's Board of Directors. *See* Pub. L. 91-518, §303(a) ("At all times the Secretary [of Transportation] shall be one of the members of the board of directors . . . ."). The Secretary of Transportation's deep involvement does not end there, though, as the Secretary, "acting in cooperation with other interested Federal agencies and departments[,]" was responsible for initially identifying the routes Amtrak trains were to take. *Id.* at § 201. Beyond the involvement of the Secretary of Transportation, Amtrak's statute also generally allows for its directors to be employees of the federal government. *See id.* at § 303(a).

In addition, unlike the PBA, which states that no officer or employee of the United States may exercise any supervision, direction, or control over it, Amtrak's organic statute required ***Presidential approval*** of all actions of its incorporators before they took them. *Id.* at §302 ("The incorporators shall take whatever actions are necessary to establish [Amtrak], including the filing of articles of incorporation, as approved by the President."). Amtrak was required to "transmit to the President and Congress" annual reports. *Id.* at § 308(a).

If Amtrak were unable to come to agreement with private railroads on terms to use their rails and routes, the Interstate Commerce Commission was authorized to use the coercive power of the Federal Government to "order the provision" of those services on Amtrak's behalf. *Id.* at § 402(a). Congress created an advisory panel, "appointed by the President" to "advise the directors

of [Amtrak] on ways and means of increasing capitalization for [Amtrak]." *Id*. at § 502. Two members of this "advisory panel" were to be "representative[s] of the Secretary of the Treasury. . . ." *Id*. at § 501. And Congress explicitly defined Amtrak to be a "mixed-ownership Government corporation" under the Government Corporation Control Act. *Id*. at §804. The Broadcasting Act lacks such provisions, and instead consistently states both that CPB is a private entity and that no federal governmental person or entity may exercise any control over it.

CPB simply is not comparable to Amtrak. *See*, *e.g.*, Slavitt Dec. at ¶13 (Dkt. No. 40-1) (highlighting factual differences). Indeed, numerous Executive agencies have recognized that CPB is ***not*** a governmental entity. This includes the National Archives and Records Administration which has published the Government Manual for over 80 years and tellingly failed to identify CPB anywhere among its listing of governmental and quasi-governmental agencies covering over 2,000 pages. *See, e.g.*, SOF, ¶¶ 20-23. It also includes the Federal Emergency Management Agency ("FEMA"), which, as recently as June 2025 in related litigation pending in this District, submitted a sworn declaration to the Court by FEMA's Acting Associate Administrator for the Office of National Continuity Programs, Thomas Breslin, confirming that CPB's federal funds were frozen under a January 28, 2025 directive issued by the Secretary of Homeland Security concerning grants *to* non-governmental organizations. *See* Slavitt Dec. ¶¶ 14-16; *Corporation for Public Broadcasting v. FEMA*, No. 1:25-cv-00740, Dkt. No. 33-1 at ¶¶ 5-6 (D. D.C. June 24, 2025). Consequently, this Court should not conclude that CPB is an agency or instrumentality of the United States for the purposes of NPR's First Amendment claims.

### 2.  CPB Is Not a State Actor

As relevant to NPR's claims, a private entity can qualify as a state actor in a few limited circumstances: "when the government compels the private entity to take a particular

action; or (iii) when the government acts jointly with the private entity." *Manhattan Cmty. Access*, 587 U.S. at 809 (*Blum v. Yaretsky*, 457 U.S. 991, 1004–1005, 102 S.Ct. 2777 (1982) and *Lugar v. Edmondson Oil Co.*, 457 U.S. 922, 941–942, 102 S.Ct. 2744 (1982), respectively) (internal citations omitted); *see* Am. Compl. at ¶ 199 (citing *Lugar* and alleging that CPB's actions "constitute state action because those actions were undertaken at the **compulsion** (or at least significant **encouragement**) of the government"). The facts and evidence do not support either circumstance.

As a threshold matter, neither President Trump, his Administration, or any government actor has ever directed, suggested, or demanded that CPB ask NPR to spin-off PRSS as a separate independent entity with broad-based governance that NPR could participate in, but not dominate. SOF at ¶ 162. That was CPB's decision based on its long-standing efforts and advice from consultants. *Id*.

Moreover, CPB was defunded on July 24, 2025, before both: (a) it received the competing funding proposals in August 15, 2025 and (b) it decided between those proposals in September 2025. SOF at ¶¶ 13, 176, 179, 195. NPR asks this Court to believe the absurd notion that **after CPB was defunded**, it was still trying to curry favor with the Trump Administration by operating jointly with it.

In stark contrast to being an agent of President Trump or taking direction from him, CPB is suing the President, asserting that he has no authority over CPB.[2]  Indeed, in this very lawsuit,

---

[2] CPB is an independent, nonprofit corporation that is not part of the federal government. SOF at ¶¶ 1-7. Congress expressly excluded CPB from the government, noting it is "not an agency or establishment of the United States," noted that none of its board members are officers or employees of the United States, and prohibited any agency, department, officer, or employee of the federal government from exercising any direction, control or supervision over CPB. 47 U.S.C. § 396(b) (CPB "will not be an agency or establishment of the United States Government."); *id.* at  396(d)(2) ("The members of the Board shall not, by reason of such membership, be deemed to be officers or

CPB has admitted NPR's allegation that CPB has stated publicly that it would not follow the May 1st EO and has continued to carry out its statutory mission as the steward of federal funds. Moreover, CPB's conduct in April and May and made it clear that CPB would not permit President Trump to dictate how it conducts its affairs:

- Immediately suing the President in this very Court on April 29, 2025 when he purported to remove three of its directors, *see Corporation for Public Broadcasting, et al. v. Trump, et al.,* No. 1:25-cv-01305 (D.D.C. Apr. 28, 2025);

- On April 29, 2025, when DOGE attempted to involve itself in CPB's affairs, CPB told DOGE bluntly: "CPB is a private entity incorporated under the laws of the District of Columbia…. Accordingly, neither DOGE, the GSA, nor any other component of the executive branch has any role supervising or having any activity relating to CPB. Thus, DOGE's resources might best be focused elsewhere on some aspect of the government within its jurisdiction," SOF at ¶¶ 201-202;

- issuing a press release publicly stating that the May 1st EO did not apply to it, SOF at ¶ 207;

- continuing to issue funds to PBS and NPR (the entities subject to the May 1st EO), totaling over $92 million, *see* SOF at ¶¶ 209;

- inviting NPR to be part of the Working Group, SOF at ¶¶ 164; and

- allowing NPR to submit a bid on the Radio Content Distribution Grant RFP, SOF at ¶¶ 174-179.

Indeed, from April through September – after CPB made it clear to NPR that the interconnection funds that it sought would be subject to an RFP process – NPR publicly acknowledged that CPB was ignoring the May 1st EO and was maintaining its independence. By way of limited example:

- On May 2, 2025, NPR published an article entitled "Trump says he's ending federal funding for NPR and PBS. They say he can't," in which NPR publicly states: "***CPB is already suing the Trump administration over his executive order*** seeking to fire

---

employees of the United States."); *id.* at § 398(a) ("Nothing in this part shall be deemed . . . to authorize any department, agency, officer, or employee of the United States to exercise any direction, supervision, or control over . . . the Corporation . . . .").. CPB has never taken direction from the President or any executive agency, and has not taken any actions to implement the May1st EO. SOF at ¶ 5.

three of its five board members; on Friday, ***it dismissed the validity of the president's new order."***

- On May 2, 2025, NPR published an article entitled, "President Trump has issued an executive order to pull federal funds from NPR and PBS," stating: "The Corporation for Public Broadcasting itself seems to have essentially ignored this [May 1st EO]. ***It doesn't seem to be granting it the standing as being legitimate, and it's already suing the president and the White House over his efforts to remove three of their board members***."

- On May 27, 2025, NPR published an article entitled, "NPR and Colorado public radio stations sue Trump White House," stating: ***Harrison and CPB have effectively ignored Trump's orders*** — retaining, for now, its board members, as the case works through the federal courts — and ***taking no actions to withhold money from NPR and PBS or the hundreds of stations that send funds to the two national broadcasters***."

- On August 1, 2025, in the wake of Congress rescinding funding for CPB, NPR's president issued a public statement, stating:

  ***CPB upheld the core values of the Public Broadcasting Act, including support for diverse voices, promotion of excellence and creative risk, and advancing service for the unserved and underserved***. It empowered countless journalists, producers, and educators to create programming that has enriched lives, fostered understanding, and ***held power accountable***. The closure of CPB represents the loss of a major institution and decades of knowledge and expertise; an immediate consequence of the passage of H.R. 4, the Rescissions Act of 2025. ***We're grateful to CPB staff for their many years of service to public media.***

SOF at ¶ 12.

Further, CPB has continuously defied the primary instruction of the May 1st EO, which formalized various statements by Trump. The May 1st EO specifically instructed CPB to cease all direct and indirect funding to NPR and PBS, specifically directed CPB to revise the Television and Radio Community Service Grants, and "to minimize or eliminate its indirect funding of NPR and PBS." SOF at ¶¶ 203-205. Since the May 1st EO, CPB has given NPR over $2.15 million. SOF at ¶ 209. CPB has not revised the Community Service Grants and has continued to distribute funds to local stations that they could use to pay NPR or PBS. SOF at ¶ 210. Additionally, CPB would

give NPR $6.5 million despite its selection of NPR's competitor, PMI, to operate the interconnection system. SOF at ¶ 196. Regardless of whether NPR manages the interconnection system or PMI does, NPR still gets millions of dollars. Joint action by CPB and the Trump Administration to effectuate the May 1st EO would require NPR to get ***nothing***. That has not happened. CPB, therefore, was not compelled by the Trump Administration to do anything. CPB openly defined the Trump Administration every step of the way.   NPR cannot demonstrate that CPB should be considered a state actor, and NPR's First Amendment claims fail. *See Manhattan Cmty. Access*, 587 U.S. at 809.

> **B.   NPR's Retaliation Claim Also Fails Because NPR Has Failed To Establish That Any Retaliatory Motive Was The "But-For" Cause Of CPB Not Awarding the Interconnection Funds To NPR.**

"To state a claim for First Amendment retaliation, a plaintiff must allege that: "(1) he [or she] engaged in conduct protected under the First Amendment; (2) the defendant took some retaliatory action sufficient to deter a person of ordinary firmness in plaintiff's position from speaking again; and (3) a causal link between the exercise of a constitutional right and the adverse action taken against him or her." *Aref v. Lynch*, 833 F.3d 242, 258 (D.C. Cir. 2016) (quotation marks omitted). To prove causation, it "is not enough to show that an official acted with a retaliatory motive and that the plaintiff was injured—***the motive must cause the injury***. Specifically, it must be a '***but-for***' cause, meaning that the adverse action against the plaintiff would not have been taken absent the retaliatory motive." *Nieves v. Bartlett*, 587 U.S. 391, 398–99 (2019) (explaining that retaliatory motive requires the defendant's "subjective animus") (emphasis added).

Here, NPR has specifically alleged that CPB's failure to award interconnection funding to NPR was the result of May 1st EO. Am. Compl. at ¶ 197.[3] NPR has also seems to vaguely gesture at social media posts made by the President and a White House press release. *Id.* at ¶¶ 77-80. NPR's First Amendment retaliation causation argument can be boiled down to: the President did not like what NPR said; then the President said NPR should be defunded, and after he said that, CPB decided not to award NPR the interconnection funding. NPR's argument is nothing more than the *post hoc ergo propter hoc* logical fallacy. NPR cannot prove but-for causation or retaliatory animus because: CPB had started the process of revising the interconnection system and awarding management of that system to an independent entity long before any action by Trump or the Trump Administration, and would have taken such action regardless of any social media post or Order by Trump; CPB included NPR in the planning of the revised interconnection system and even offered them, essentially, a right of first refusal; and CPB has continued to provide funds to NPR despite the Trump Administrations directives otherwise.

### 1. NPR Cannot Prove But-For Causation Because CPB's Priority for an Independent Entity to Manage Interconnection Arose Long Before the Trump Administration's Action.

CPB decided well before the May 1st EO, or any social media posts, that it wanted the public radio interconnection system to be run by an independent entity. Beginning in 2015, CPB engaged consultants to evaluate the existing public radio interconnection system. SOF at ¶¶ 133-137.

Approximately one-third of the public satellite radio system stations are not NPR member stations. SOF at ¶ 137. NPR controls the governance, management, fee structure, and strategic

---

[3] In other contexts, NPR has referred to a preceding social media post by the President, but the allegations in this case focus on the May 1st EO.

direction of PRSS, which creates the concern that the needs of tribal and non-NPR stations from the interconnection system will not be met. SOF at ¶¶ 82, 138. As a result of those concerns, CPB began discussing and evaluating the governance of the interconnection system. SOF at ¶¶ 138.

In April 2024, CPB engaged Deloitte Consulting LLP ("Deloitte") to provide advice on the future of interconnection. SOF at ¶ 141. NPR was well aware of CPB's engagement of Deloitte, noting in June 2024 internal emails that: "Given CPB's advocacy for changes in governance and the definition of Interconnection, could NPR Distribution become more dependent on CPB funding in the coming years?", SOF at ¶ 140 and "[a]s we speak CPB is advocating for a change in governance and the definition of interconnection," SOF at ¶ 143.

NPR noted in a September 2024 internal email to NPR's CEO that:

> Deloitte is currently under contract with CPB to develop a strategy and a recommendation for the future of interconnection. Based on recent conversations, it is becoming clear Deloitte is planning to recommend the creation of a "shared services entity," that would potentially handle *all* broadcast infrastructure, *all* digital infrastructure, and potentially back-office infrastructure for NPR and other  national organizations.

SOF at ¶ 144.

> In October 2024, Deloitte recommended that for the next iteration of interconnection, CPB:
>
> Create a new distribution entity (referred to as 'NewCo') that operates shared services for distribution independently from existing public media organizations as a non-profit. Establishing a new entity governed by a Board, with representation from across public media (e.g., CPB, NPR, PBS, station groups), helps serve the needs of the entire system, while consolidating capabilities, governance, and spend over time. The transition of existing distribution services into the new entity introduces risk, but enables public media to realize the greatest technical, operational, and financial upside of a model that unifies services.

SOF at ¶ 145. After discussions with various public media leaders, Deloitte concluded that "there is **widespread agreement on the need for change**" and the its recommended design "envisions an **independent entity to run the distribution services** with a mission and governance structure that meets the needs of all parties."  SOF at ¶ 146 (emphasis added). NPR understood that "NewCo"

27

meant a "new company."  SOF at ¶¶ 147-148. NPR was aware of this recommendation as well, noting in an October 2024 internal email that it asked CPB "if the newco idea is a finalized decision."  SOF at ¶ 149. In November 2024, CPB's Board discussed "a joint meeting of CPB, NPR, and PBS's Interconnection teams" and a "propos[al] that CPB post a Request for Proposals for *new content distribution to increase competition*."  SOF at ¶ 150 (emphasis added).

On April 4, 2025, CPB's board voted to "direct CPB Management to proceed with amending the contract with NPR for interconnection to include a contingency that NPR provide a plan within 60 days of amendment execution to establish PRSS as an entity independent of NPR." As demonstrated above, this change in direction had been in the works since before the second Trump Administration even began, precluding any action or statements by the Trump from being the "but-for" cause of CPB's actions. *See Nieves*, 587 U.S. at 398. NPR, therefore, cannot prove the third element of its retaliation claim, which fails as a matter of law. *See Aref*, 833 F.3d at 258.

### 2.  NPR Cannot Prove Retaliatory Motive

#### a.  CPB Offered NPR a Right of First Refusal and Included NPR in the Process of Revising the Management of the Interconnection System

In April 2025, CPB informed, and have conversations with, NPR about CPB's conclusion that after decades of studies by outside consultants, it was pursuing a strategy of having an independent entity that was more inclusive of  the broad range of public media entities across the country, including rural, tribal, and community stations that rely heavily on interconnection, manage the system, and how NPR could be part of that new vision. SOF at ¶ 152. On April 21, 2025, CPB's General Counsel sent a letter to NPR's General Counsel under the re line of: "*New Structure of Radio Interconnection*," requesting that NPR deliver a only a *plan* – not even to enact it – to transform its PRSS entity into an independent entity by May 9, 2025:

CPB has requested that NPR, as the grantee of interconnection funds and manager and operator of PRSS, submit to CPB by May 9, *a plan to make PRSS an entity that is separate from NPR.* Specifically, goal is as follows: The entity that manages and operates radio interconnection *must be legally independent of NPR and must not be controlled or managed by NPR*. The entity must be managed and operated on behalf of all public radio stations. *Its board must be, and be perceived to be, representative of all stakeholders in interconnection and content distribution for public radio. This should include representation from a variety of interconnected stations, both NPR and non-NPR members*, and may include representation from NPR, other content producers and distributors, CPB, and persons outside of public media who can provide technical or other expertise. *No one public media organization should have majority control over the board and how its representatives are selected*.

SOF at ¶ 157. On April 30, 2025, CPB sent a letter to NPR's Board of Directors stating:

In a changing media and content distribution environment, we believe PRSS would better serve the public radio system *as an independent entity* with a governance structure that more broadly represents the needs and interests of the entire public radio system.

SOF at ¶ 160. NPR did not provide even a *plan* to make PRSS into an independent entity. SOF at ¶ 161.

CPB's request that NPR negotiate around a plan to spin out PRSS into a separate independent entity that NPR could participate in, but that neither it nor any one public media entity would be allowed to dominate, had nothing to do with NPR's editorial content or political views. SOF at ¶ 162. CPB did not receive any direction, suggestion, or pressure from the Executive Office of the President, the Department of Government Efficiency, or any other governmental entity that NPR do so. *Id.* This was CPB's decision, as the steward of federally appropriated funds, to improve the interconnection system for all stations and position it for future success. *Id.*

On May 9, 2025, CPB issued a letter to NPR and stakeholders across the public media system (including radio stations that were members and non-members of NPR) about its desire to shift the management of the interconnection system to an independent entity and *inviting NPR's board members* and public media stations to participate in a Working Group to establish shared

goals and create a vision for forming a new content distribution entity. SOF at ¶ 164  NPR designated two of its board members to participate in the Working Group, as well as its Vice President of NPR Distribution. SOF at ¶ 165

During the month of June 2025, the Working Group met to create a set of guiding principles, parameters, and needs by the stakeholders for the new independent entity. SOF at ¶ 166. The culmination of the Working Group's efforts the formulation of an RFP that would meet the needs of the system. SOF at ¶ 167. On July 9, 2025, CPB informed NPR's Chief Operating Officer that CPB was moving forward with its competitive bid process for the interconnection system. SOF at ¶ 168. Rather than argue that CPB was somehow not authorized to engage in this process, NPR asked to see an advance copy of the Request for Proposal that CPB would be posting that Monday, and CPB appropriately declined this request. SOF at ¶ 171.

On July 14, 2025, CPB publicly issued its Request for Proposals for Entity to Manage and Govern Public Radio Content Distribution, to obtain a grant to manage public radio content distribution, including, but not exclusively through, an interconnection system, with responses due by August 15, 2025. (CPB's "RFP"). SOF at ¶ 176. On August 15, 2025, NPR submitted its response to the RFP, but nowhere in the NPR Submission did it claim that it was somehow automatically entitled to an award from CPB, or that it was providing its submission "under a reservation of rights," or contending in any way that CPB's competitive bid process was somehow "retaliatory." SOF at ¶ 179. Instead, NPR's cover letter to its submission stated that it was "***pleased to submit our proposal in response to CPB's Request for Proposals*** to manage and govern public radio content distribution services."  SOF at ¶ 180. NPR's proposal, however, did not address CPB's specific request for an independent entity to manage the interconnection system. SOF at ¶ 181.

CPB gave NPR every opportunity to receive the interconnection funds it seeks in this suit: to create the independent entity to whom CPB would eventually award the funds; to develop what the independent entity would look like; and to bid on the funds on behalf of an independent entity that it would create. CPB's overtures are inconsistent with subjective animus or retaliatory motive against NPR. *See Nieves*, 587 U.S. at 398. In fact, those overtures prove the exact opposite. NPR, therefore, cannot prove the third element of its retaliation claim, which fails as a matter of law. *See Aref*, 833 F.3d at 258.

### b. CPB has Paid Millions of Dollars to NPR in Disregard of Trump's May 1st EO and his Social Media Posts.

NPR has alleged that Trump's social media posts and May 1st EO caused CPB to not award NPR the interconnection funding at issue. In the social media posts relied upon by NPR, Trump stated: on March 27, 2025, "NPR and PBS, two horrible and completely biased platforms (Networks!), should be DEFUNDED by Congress, IMMEDIATELY"; on April 1, 2025, "REPUBLICANS MUST DEFUND AND TOTALLY DISASSOCIATE THEMSELVES FROM NPR"; and, on April 10, 2025 "NO MORE FUNDING FOR NPR." Am. Compl. at ¶¶ 77-79. The May 1st EO specifically instructed: "The CPB Board shall cease direct funding to NPR and PBS"; "The CPB Board shall cease indirect funding to NPR and PBS"; and "the CPB Board shall take all other necessary steps to minimize or eliminate its indirect funding of NPR and PBS." https://www.whitehouse.gov/presidential-actions/2025/05/ending-taxpayer-subsidization-of-biased-media/. If CPB was acting because of these statements, it should have given NPR ***nothing***.

Yet, CPB has given NPR millions of dollars. Since March 27, 2025, the date of the first social media post, CPB has given NPR a total of approximately $3.1 million. Exhibit Z at 27. Of that amount, $2.1 million came ***after the President issued the May 1st EO***. *Id.* Additionally, in PMI's proposal selected by CPB to manage the interconnection system, CPB would give NPR an

additional $6.5 million for interconnection. SOF at ¶ 196. As noted above, regardless of whether NPR manages the interconnection system or PMI does, NPR still gets millions of dollars.

NPR's receipt of millions of dollars after President Trump instructed CPB to give NPR nothing demonstrates that the President's instructions did not cause CPB to do (or not do) anything. Further, giving NPR nearly $10 million demonstrates that CPB had no retaliatory motive or subjective animus toward NPR or NPR's speech. *See Nieves*, 587 U.S. at 398–99.  If CPB wanted to retaliate against NPR for its speech, CPB certainly would not have given NPR that money. NPR's argument that those millions it has received from CPB reflects an anti-NPR motive or animus makes sense only from the false perspective that NPR is entitled to a monopoly of the interconnection system. It is not. And NPR's receipt of those funds show that CPB's actions were not caused by NPR's speech or the President's instructions. NPR's First Amendment retaliation claim fails.

### C. NPR's First Amendment Retaliation Claim also Fails Because There Was No Retaliatory Action Sufficient To Deter A Person of Ordinary Firmness in NPR's Position From Speaking Again.

As noted above, the second element of a First Amendment retaliation claim is that "the defendant took some retaliatory action sufficient to deter a person of ***ordinary firmness in plaintiff's position from speaking again***."  *Aref*, 833 F.3d at 258 (emphasis added). "Not every [government] restriction," however, "is sufficient to chill the exercise of First Amendment rights, nor is every restriction actionable, even if retaliatory." *DiMeglio v. Haines*, 45 F.3d 790, 806 (4th Cir.1995). "The determination of whether government conduct or speech has a chilling effect or an adverse impact is an objective one—we determine whether a similarly situated person of 'ordinary firmness' reasonably would be chilled by the government conduct in light of the circumstances presented in the particular case." *The Baltimore Sun Co. v. Ehrlich*, 437 F.3d 410,

416 (4th Cir. 2006) (citing *Constantine v. Rectors and Visitors of George Mason Univ.*, 411 F.3d 474, 500 (4th Cir.2005); *Thaddeus–X v. Blatter*, 175 F.3d 378, 398 (6th Cir.1999)). "[T]he question is not whether the plaintiff himself was deterred, though how plaintiff acted might be evidence of what a reasonable person would have done." *Scheffler v. Molin*, 743 F.3d 619, 621 (8th Cir. 2014).

Various cases demonstrate what actions create the necessary "chill." Most applicable to this matter is *Baltimore Sun Co. v. Ehrlich*, in which the governor of Maryland instructed his executive department and agencies to cease speaking with a particular reporter and columnist of the Baltimore Sun because the governor believed that they were not engaged in objective reporting. *Baltimore Sun*, 437 F.3d at 413. The Fourth Circuit found that the Baltimore Sun is "Maryland's largest newspaper with more than one million readers each week," *id.*; the reporter and columnist "have not been chilled from expressing themselves" because "they continue[d] to write as frequently as before the issuance of the Governor's directive," *id.* at 419, and "they have continued to write stories for *The Sun*, to comment, to criticize, and otherwise to speak with the full protection of the First Amendment," *id.*; and that while the reporter and columnist "might now be disfavored, they are no more disfavored than the many reporters without access to the Governor," *id.* The Fourth Circuit concluded: "We cannot accept that the Governor's directive—which, to be sure, has increased the public's awareness of the ***competition for access***—created a chilling effect any different from or greater than that experienced by *The Sun* and by all reporters in their everyday journalistic activities." *Id.* at 420.[4]

---

[4] Similarly, in *Smith v. Plati*, 258 F.3d 1167 (10th Cir. 2001), the plaintiff, who operated a website covering athletics at the University of Colorado, claimed that the assistant athletic director denied him access to resources routinely given to other media, denied him treatment as "media" or "press," prevented him from speaking with coaches, and excluded him from football practices. *Id.* at 1172. The Tenth Circuit held that the assistant athletic director's conduct would not have deterred a person of ordinary firmness because while the conduct made it more difficult to gather

Here, NPR, with its audience of 43 million people and its financial resources, is the Baltimore Sun on steroids. SOF at ¶ 21  NPR has over $800 million in assets, over $325 million in revenue, and an endowment of approximately $370 million. SOF at ¶¶ 15-17.  The underlying "retaliatory action" of NPR's claim is that CPB ultimately did not select NPR's bid in response to CPB's RFP. Am. Compl. at ¶ 197. NPR glosses over, and asks this Court to ignore, the facts that, prior to that: (1) CPB gave NPR a right of first refusal to create an independent entity to receive interconnection funds SOF at ¶¶ 157-160; (2) CPB invited NPR to participate in the Working Group to chart the course for interconnection moving forward, SOF at ¶¶ 164-166; and (3) CPB allowed NPR to participate in the open RFP process SOF at ¶¶ 169-179. NPR also asks this Court to ignore the fact that, even upon awarding the interconnection funding to PMI, ***NPR will still get $6.5 million of those funds,*** assuming a written grant can be finalized before those funds must be returned to Congress.

Not only was this process more than fair to NPR, objectively these actions would not deter an organization such as NPR of ordinary firmness from speaking. NPR has not been disadvantaged more than any other entity. *See Baltimore Sun*, 437 F.3d at 419. NPR has not alleged that its ability gather and report on information or publish content has been affected in any way. *See* Am. Compl. at *passim*; *Plati*, 258 F.3d at 1177. Further, with its vast resources including a $370 million endowment, reserves of $25 million ***specifically for interconnection***, and the fact that less than one percent of its annual budget comes from CPB, NPR has stated that it plans to continue to support and fund the PRSS. Exhibit E. CPB did not take away NPR's transmission conduit, it has

---

some information, the plaintiff had other avenues to obtain information and was not prevented from operating his website. *Id*. at 1177.

just decreased the amount that it will pay for it. Nothing precludes NPR from continuing to operate the PRSS except its own ability to fund it.

Further, NPR has admitted that interconnection funds: cannot be used for programming, Exhibit E; have never been used by NPR for its programming, SOF at ¶¶ 32-33; and have no effect on its speech or the content of its programming. *Id.* NPR has also admitted that CPB has never discussed content in its negotiations with NPR and that CPB has no role in NPR's creation of content. SOF at ¶ 57. Consequently, CPB's award of interconnection funds to PMI cannot have had an impact on, or chilled NPR's speech.

Moreover, NPR has ***not alleged any facts*** to suggest that is speech has been chilled in any way. Comp. at *passim*. Nor could NPR make any such allegation or present any such evidence because NPR's own actions demonstrate that it has not been chilled. Since the May 1st EO:

- NPR's CEO has stated: ***[NPR] will vigorously defend our right*** to provide essential news, information and life-saving services to the American public. We will challenge this Executive Order ***using all means available***," SOF at ¶ 217

- NPR's CEO has denounced the May 1st EO as: "a clear violation of the Constitution and the First Amendment's protections for freedom of speech and association, and freedom of the press" and "an affront to the First Amendment rights of NPR." SOF at ¶ 220

- NPR's CEO has stated: "We will strongly defend our work and our editorial independence and will continue to tell the stories of our country and the world with accuracy, objectivity, and fairness." SOF at ¶ 217

- NPR has sued the President and the Trump Administration in this action;

- NPR's CEO has stated: "NPR will never agree to this infringement of our constitutional rights, or the constitutional rights of our Member stations, and NPR will not compromise our commitment to an independent free press and journalistic integrity," SOF at ¶ 220

- NPR has published an article criticizing CBS, Disney, the Washington Post, the Los Angeles Times for "bow[ing]" to Trump's "power" and echoing criticisms of President Trump's lawsuit against CBS, SOF at ¶ 222;

- PR has published a recorded conversation between two of its reporters criticizing the Trump Administration for "openly, directly pressuring news organizations through lawsuits," "exercise[ing] political pressure and presidential power to seek to control the flow of independent information from the press," and "go[ing] after every single major broadcast network for formal review or investigation, except for Fox," SOF at ¶ 223;

- NPR has published a recorded conversation between two of its reporters stating that the Trump Administration is "using their official roles to threaten investigations, court cases and other forms of retribution for comments that people make in public and online" and "using its power to crack down on or otherwise punish organizations, institutions that it disagrees with," SOF at ¶ 224;

- NPR has published a recorded conversation between two of its reporters stating that the Trump Administration is "at [Trump's] direction … going after major institutions where you find critics or people challenging the administration and its policies," SOF at ¶ 225.

NPR has not been chilled by the Trump Administration's actions; NPR has not deviated from its standard journalistic practices and policies. SOF at ¶ 227. It makes little sense, then, that NPR would be chilled by CPB, which has no role regarding NPR's content, allegedly acting on behalf of that same Administration.

Both objectively, and subjectively, therefore, NPR has failed to demonstrate that CPB's allegedly retaliatory action was sufficient to deter someone of ordinary firmness, in NPR's position, from speaking freely. *See Baltimore Sun*, 437 F.3d at 419-20; *Scheffler*, 743 F.3d at 621. Consequently, NPR has failed to demonstrate the second element of its relation claim and that claim fails as a matter of law. *See Aref*, 833 F.3d at 258.

**D. NPR's First Amendment Viewpoint Discrimination Claim Fails Because the Interconnection System is a Conduit for Communications that has no Influence on Content and CPB has Done Nothing to Affect the Content of NPR's Speech.**

NPR has brought Count 7 on the basis of "Retaliation and Viewpoint Discrimination." Am. Compl. at 47. NPR has alleged that "CPB has carried out government retaliation based on viewpoint discrimination." Retaliation and viewpoint discrimination, however, are two separate claims that NPR appears to be muddling. As demonstrated above, NPR's retaliation claim fails for

multiple reasons. To the extent that NPR has alleged a separate viewpoint discrimination claim, however, that claim also fails.

To prove viewpoint discrimination, a plaintiff must show that burdens were imposed on their speech, or their speech was treated less favorably than other speech because of the viewpoint expressed. *See Rosenberger v. Rector & Visitors of Univ. of Virginia,* 515 U.S. 819, 829, 115 S. Ct. 2510, 2516 (1995); *Frederick Douglass Foundation, Inc. v. District of Columbia*, 82 F.4th 1122, 1141 (2023). Here, CPB has taken no action to impose burdens upon NPR's speech, or treated that speech less favorably.

As noted above, CPB took no action based on NPR's viewpoint.  Moreover, NPR has admitted that CPB has plays no role in reviewing or approving the programming content that NPR creates and provides to radio stations and has never discussed content with NPR in the context of interconnection. SOF at ¶¶ 50-57. NPR has also admitted that interconnection funds: cannot be used for programming,  Exhibit E; have never been used by NPR for its programming, SOF at ¶¶ 50-57; and have no effect on its speech or the content of its programming, *id.* NPR has also stated that it has the funds, and will continue, to support and maintain its PRSS interconnection system. The PRSS will still exist. Exhibit E. NPR will still be able to broadcast its programming through the PRSS. Exhibit E. CPB's selection of PMI for the grant award does not place any restrictions, or impose any burdens, on NPR's speech or the content thereof.  The First Amendment does not entitle NPR to government funding of its communications conduit. Consequently, NPR's viewpoint discrimination claim fails as a matter of law. *See,* 515 U.S. at 829; *Frederick Douglass Foundation*, 82 F.4th at 1141.

**IV.    The Court Should Enter Judgment in Favor of CPB on Count 8 Because NPR Cannot Demonstrate the Elements of the Claim and CPB's Actions Were Legally Justified**

In Count 8 of NPR's Amended Complaint, it has alleged a claim of "Intentional Interference with Business Relations" against CPB. Am. Compl. at 48-49. Here, NPR's claim fails because: (1) the Court lacks jurisdiction to hear that claim; (2) NPR has not, and cannot, establish the elements of the claim; and (3) CPB was legally justified in its actions.

### A.    The Court Lacks Jurisdiction to Hear NPR's Tortious Interference Claim

NPR has asserted that this Court has jurisdiction to hear its claim of tortious interference under the supplemental jurisdiction established by 28 U.S.C. § 1367(a). Am. Compl. at ¶ 24. As this Court is aware, under this section, it has jurisdiction over claims that are related to other claims in the same action that establish federal jurisdiction under Sections 1331 and 1332 for federal question and diversity jurisdiction, respectively. 28 U.S.C. § 1367(a). NPR has asserted federal question jurisdiction as the basis of those other claims which provide the underlying jurisdiction of this Court. Am. Compl. at ¶ 24. In other words, NPR agrees that this Court has no independent jurisdiction over its tortious interference claim; the Court's jurisdiction over that claim is dependent on whether the Court has federal question jurisdiction over NPR's other claims against CPB.

The Court lacks supplemental jurisdiction over NPR's tortious interference claim because, as demonstrated above, NPR's claims that set forth its underlying federal question jurisdiction all fail as a matter of law. The federal question jurisdiction, to which supplemental jurisdiction to hear NPR's tortious interference claim must attach, does not exist. Consequently, this Court lacks supplemental jurisdiction to hear NPR's tortious inference claim.

Although NPR has not asserted diversity jurisdiction, the Court also lacks such jurisdiction. Both NPR and CPB are private corporations headquartered in the District of Columbia. Am. Compl. at ¶¶ 12, 23; CPB's Answer at ¶ 23 (Dkt. No. 47). The requisite diversity of citizenship for diversity jurisdiction, therefore, does not exist. *See* 28 U.S.C. § 1332. Consequently, diversity jurisdiction also cannot be the underlying jurisdiction to which supplemental jurisdiction for NPR's tortious interference claim may attach.

Further, NPR has not alleged, or sought relief for, damages in this action. Am. Compl. at *passim*. NPR, therefore, has failed to establish standing to pursue its tortious interference claim, depriving this Court jurisdiction to hear that claim. *See Spokeo*, 578 U.S. at 338.

### B.  NPR Cannot Demonstrate the Elements of a Claim for Tortious Interference

Under District of Columbia law, proving a claim for tortious interference with contractual or business relations requires the following elements: "(1) existence of a valid contractual or other business relationship; (2) [the defendant's] knowledge of the relationship; (3) intentional interference with that relationship by [the defendant]; and (4) resulting damages." *Whitt v. Am. Prop. Constr., P.C.*, 157 A.3d 196, 202 (D.C. 2017) (citation omitted). NPR has failed to, and cannot, demonstrate: (1) that a valid contract or business relationship existed; (2) that CPB engaged in conduct constituting "interference;" and (3) that NPR has suffered damages.

#### 1.  No Valid Contract or Business Relationship Existed

NPR's tortious interference claim is based upon the contracts that it has entered with various broadcast stations, which NPR claims designate it as the national entity to receive PRSS funding. Exhibit Z at 22-23; Am. Compl. at ¶¶ 203-205. As a result of that designation, NPR claims, CPB is obligated under 47 U.S.C. § 396(k)(10)(D)(i), to distribute interconnection funding

to NPR. Am. Compl. at ¶¶ 203-206. NPR has failed to demonstrate a valid contract or business relationship for two reasons.

First, the contracts relied upon by NPR are irrelevant to the funds at issue; therefore, CPB's actions with respect to the funds at issue did not, and cannot have, interfered, with those contracts. As discussed above, the funds at issue were not appropriated to the Satellite Interconnection Fund; they were appropriated more broadly for interconnection generally. As a result, 47 U.S.C. § 396(k)(10)(D)(i) does not apply to the funds sought by NPR. Consequently, any contractual right arising under 47 U.S.C. § 396(k)(10)(D) are irrelevant to the funds at issue and CPB's actions with respect to the funds at issue did not, and cannot have, interfered with those contracts. NPR has not identified, nor could it, any other contractual right to the funds at issue. Therefore, NPR has not identified any valid contract or business relationship with which CPB allegedly interfered.

Second, even if the contract rights arising under 47 U.S.C. § 396(k)(10)(D)(i) *do* apply to the funds at issue, NPR has failed to demonstrate that it has been designated to receive the funds as contemplated by 47 U.S.C. § 396(k)(10)(D)(i). NPR has failed to show that all permittees and licensees designated it as the national entity to receive satellite interconnection funding. In fact, NPR's own contracts contemplate its cessation as manager of its own interconnection system, the PRSS. *Id.* NPR's own contract with CPB expired on September 30, 2025. SOF at ¶ 81. NPR's tortious interference claim cannot stand on such a foundation.

NPR, therefore, has failed to prove a valid contractual basis on which its tortious interference claim is based. In doing so, NPR has failed to prove the first element of a claim for tortious interference with contractual or business relations. Accordingly, NPR has failed to prove its claim and judgment should be entered in favor of CPB.

### 2. CPB Did not Engage in Egregious, Wrongful, or Improper Conduct

To prove the third element of a claim for tortious interference with business relations, "intentional interference," "the plaintiff must demonstrate that the defendant engaged in conduct that is 'egregious; for example, it must involve libel, slander, physical coercion, fraud, misrepresentation, or disparagement.'" *Modis, Inc. v. InfoTran Sys., Inc.*, 893 F. Supp. 2d 237, 241 (D.D.C. 2012) (quoting *Sheppard v. Dickstein, Shapiro, Morin & Oshinsky*, 59 F.Supp.2d 27, 34 (D.D.C. 1999) (dismissing plaintiff's tortious interference claim where the plaintiff's complaint was "silent" as to any statements made by the defendants that constituted slander, libel, or knowing misrepresentations) (internal quotation omitted)). "Competitive activity does not by itself constitute intentional interference…." *International City Mgt. Ass'n Ret. Corp. v. Watkins*, 726 F.Supp. 1, 6 (D.D.C.1989). The competitive activity that forms the basis of an improper interference claim must be "accomplished by wrongful or improper means, such as fraud, violence, or civil suits." *Id.*; *Mercer Mgmt. Consulting v. Wilde*, 920 F.Supp. 219, 239 (D.D.C. 1996); Restatement (Second) of Torts § 768.

Here, NPR has not even alleged any such "egregious" conduct or "wrongful or improper means," much less proved it. *See Modis*, 893 F. Supp. 2d at 241; *Sheppard*, 59 F.Supp.2d at 34; *Watkins*, 726 F.Supp. at 6; *Mercer Mgmt.,* 920 F.Supp. at 239; Restatement (Second) of Torts § 768. NPR has not alleged or demonstrated any violence by CPB. NPR has not alleged or demonstrated fraud or misrepresentation by CPB. NPR has not alleged or demonstrated any physical coercion by CPB. NPR has not alleged or demonstrated any libel or slander by CPB. NPR has not alleged or demonstrated any disparagement by CPB. And, NPR has not alleged or demonstrated any anti-competitive civil suits by CPB; such action has only been taken by NPR in this suit.

The only conduct that NPR has alleged or demonstrated by CPB, to form the basis of its tortious interference claim, is that CPB solicited proposals to manage interconnection – and invited NPR to participate and submit a proposal, conduct expressly authorized by the PBA. 47 U.S.C. § 396(g)(2). Soliciting a proposal does not, and cannot, rise to the level of "egregious" conduct or "wrongful or improper means" to constitute and form the basis of a tortious interference claim. *See Modis*, 893 F. Supp. 2d at 241; *Sheppard*, 59 F.Supp.2d at 34; *Watkins*, 726 F.Supp. at 6; *Mercer Mgmt.,* 920 F.Supp. at 239; Restatement (Second) of Torts § 768. On this basis alone, NPR has failed to prove the third element of a claim for tortious interference with contractual or business relations and judgment should be entered in favor of CPB.

Indeed, NPR submitted a proposal. SOF at ¶ 179. Nevertheless, NPR argues that the solicitation was structured in a way to require that no single organization held majority control or undue influence over the PRSS – which NPR argues was to ensure that it was not selected. Am. Compl. at ¶ 127; Merkley Decl. at ¶ 14-15. It was NPR's choice to structure their bid as it did in direct contradiction to the terms of the RFP. SOF at ¶ 181. NPR participated in the Working Group that created the guiding principles and parameters that would ultimately inform CPB's request for proposals for the creation of an independent entity to manage interconnection. SOF at ¶¶ 166-167. CPB gave NPR the chance to spin-off its PRSS department into an independent entity, *even before the CPB issued its request for proposals*, which NPR rebuffed. Am. Compl. at ¶ 128; Merkley Decl. at ¶ 8.

Perhaps NPR believes that it tortiously interfered with itself. NPR's arguments demonstrate NPR's true grievance in this lawsuit – that, because of competition, NPR no longer gets to operate the PRSS with majority control and undue influence. As noted above, though, "[c]ompetitive activity does not … constitute intentional interference…." *Watkins*, 726 F.Supp. at 6.

CPB's issuance of a request for proposals, in which it invited NPR to participate, and in which NPR did, in fact, participate, does not, and cannot rise to the level of "egregious" conduct or "wrongful or improper means" that constitutes tortious interference. *See Modis*, 893 F. Supp. 2d at 241; *Sheppard*, 59 F.Supp.2d at 34; *Watkins*, 726 F.Supp. at 6; *Mercer Mgmt.,* 920 F.Supp. at 239; Restatement (Second) of Torts § 768. NPR has not identified or demonstrated any violent, fraudulent, coercive, defamatory, or disparaging conduct by CPB – either in the context of its request for proposals or otherwise. Accordingly, NPR has failed to prove the third element of a claim for tortious interference with contractual or business relations and judgment should be entered in favor of CPB.

### 3.  NPR has Not Suffered Damages

The fourth element of a claim for tortious interference is damages. *Whitt*, 157 A.3d at 202. Here, as detailed above demonstrating NPR's lack of standing NPR has no damages. Accordingly, NPR has failed to prove the fourth element of a claim for tortious interference with contractual or business relations and judgment should be entered in favor of CPB.

### C.  CPB's Actions were Legally Justified

As demonstrated above, NPR has failed to prove the various elements of its tortious interference claim. Even if it had proven all elements,"[a] defendant, however, may avoid liability 'if he can establish that his conduct was legally justified or privileged.'"  *Murray v. Wells Fargo Home Mortg*., 953 A.2d 308, 326 (D.C. 2008) (quoting *Raskauskas v. Temple Realty Co.*, 589 A.2d 17, 27 (D.C.1991)). "A defendant is 'privileged if he acts in order to protect a present, existing economic interest.' "  *Id*.

Here, CPB's actions were legally justified. Congress authorized CPB to "assist in the establishment and development of one or more interconnection systems. . . ." and issue grants for

interconnection. 47 U.S.C. §§ 396(g)(1)(B), 396(g)(2)(E). That is exactly what CPB has done – no more, no less. CPB's actions furthered the interest of the public radio system as a whole, to award interconnection funding to an independent entity that is responsive to everyone, rather than just NPR and its member stations. In doing so, CPB acted to protect the present and existing economic interested of every public radio station. *See Murray*, 953 A.2d at 326. Under 47 U.S.C. § 396(g)(1)(B), CPB was legally authorized and justified in its actions. Therefore, even if this Court has jurisdiction to hear NPR's tortious interference claim, NPR had proven the elements of that claim, that claim still fails as a matter of law. *See Murray*, 953 A.2d at 326.

## V.    NPR's Request that the Court Order CPB to Pay NPR the Interconnection Funds has No Basis in Law

NPR has not requested monetary damages as a remedy in its Complaint. Am. Compl. at 49-50. Beyond declaratory relief, it seeks only (a) injunctive relief barring CPB from awarding the interconnection funds to its competitor, PMI, and (b) an order instructing CPB to award the interconnection funds to NPR. *Id.* NPR admits that no statute directly entitles it to interconnection funds, that it has no contract for the funds it seeks, and even if the statute it relies upon does apply, it must still have a contract with CPB to receive the funds. SOF at ¶ 172. In asking the Court to order CPB to turn over millions of Congressionally appropriated funds to NPR – with no grant agreement, NPR is seeking specific performance of a contract that does not exist. "[T]o prevail on a specific performance theory," the first element that a "plaintiff must show [is] the existence of a valid contract." *Wurtzel v. Richmond*, 717 F. Supp. 1, 2 (D.D.C. 1989) (citing Restatement (Second) of Contracts § 357 (1981)). NPR cannot show this first element; nor has NPR asserted a contract claim. In fact, NPR admits that it had no contract with CPB for the funds it seeks. NPR seeks specific performance as relief for a claim they have not brought for a contract that does not exist. Therefore, NPR's request for an Order requiring CPB to pay NPR the funds at issue fails.

## CONCLUSION

For the foregoing reasons, Defendant the Corporation for Public Broadcasting respectfully requests that this Court GRANT its Motion for Summary Judgment.


Dated: October 24, 2025

By: */s/ Peter C. Nanov*
Jason W. McElroy (D.C. Bar No. 502733)
Peter C. Nanov (D.C. Bar No. 230021)
SAUL EWING LLP
1919 Pennsylvania Avenue NW, Suite 550
Washington, D.C. 20006
Tel: (202) 295-6605
Email: jason.mcelroy@saul.com
          peter.nanov@saul.com

Jeffrey S. Robbins (*Admitted Pro Hac Vice*)
Joseph D. Lipchitz (*Admitted Pro Hac Vice*)
SAUL EWING LLP
131 Dartmouth St., Suite 501
Boston, MA 02116
Tel: (617) 912-0941
Email: jeffrey.robbins@saul.com
          joseph.lipchitz@saul.com

**Counsel for Defendant Corporation for
    Public Broadcasting**