# EXHIBIT 6

Page 1

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF COLUMBIA

--------------------------------X

NATIONAL PUBLIC RADIO, INC.,          :

ET AL.,                               :

               Plaintiffs,          :

                      Case No.:

  v.                                  :

                      1:25-cv-1674-RDM

DONALD J. TRUMP, ET AL.,              :

             Defendants.          :

--------------------------------X


Deposition of BADRI MUNIPALLA

Washington, D.C.

Monday, October 20, 2025

9:01 a.m.


Job No.: 172445


Reported by: Matthew Goldstein, RMR, CRR

## Page 2

```
1        Deposition of BADRI MUNIPALLA, held at:
2
3
4        Saul Ewing LLP
5        1919 Pennsylvania Avenue, NW
6        Suite 550
7        Washington, D.C. 20006
8        202.333.8800
9
10
11
12
13    Pursuant to Notice, before Matthew Goldstein,
14 RMR, CRR, Notary Public in and for the District of
15 Columbia.
16
17
18
19
20
21
22
```

## Page 3

```
1              A P P E A R A N C E S
2    ON BEHALF OF THE PLAINTIFFS, NATIONAL PUBLIC
3    RADIO, INC., ET AL.:
4    ERIC BROOKS, ESQUIRE
5    GIBSON DUNN & CRUTCHER, LLP
6    1700 M Street, NW
7    Washington, D.C. 20036
8    202.777.9302
9
10   and
11
12   KATIE TOWNSEND, ESQUIRE
13   GIBSON DUNN & CRUTCHER, LLP
14   333 South Grand Avenue
15   Los Angeles, California 90071
16   213.229.7000
17
18
19
20
21
22
```

## Page 4

```
1    A P P E A R A N C E S  C O N T I N U E D
2    ON BEHALF OF THE DEFENDANTS, DONALD J. TRUMP,
3    ET AL.:
4    JASON W. MCELROY, ESQUIRE
5    PETER C. NANOV, ESQUIRE
6    SAUL EWING LLP
7    1919 Pennsylvania Avenue, NW
8    Suite 550
9    Washington, D.C. 20006
10   202.295.6605
11
12   ALSO PRESENT:
13   ELIZABETH A. ALLEN, ESQ. - NPR
14   DESHAWN WHITE - VIDEOGRAPHER
15
16
17
18
19
20
21
22
```

## Page 5

```
1              C O N T E N T S
2  EXAMINATION OF BADRI MUNIPALLA              PAGE
3
4  By MR. MCELROY                    12
5  By MR. BROOKS                     298
6  By MR. MCELROY                    302
7          E X H I B I T S
8          (Attached)
9  MUNIPALLA    DEPOSITION EXHIBIT          PAGE
10
   Exhibit 1    NPR0004959 through NPR0004960,   43
11            June 10, 2024, E-mail
             Correspondence
12
   Exhibit 2    47 U.S.C.A. 397, Definitions    53
13
   Exhibit 3    NPR0000256 through NPR0000257,   63
14            ContentDepot Overview of the
             Public Radio Satellite System
15            (PRSS)
16 Exhibit 4    NPR0000254 through NPR0000255,   63
             August 29, 2025, E-mail
17            Correspondence
18 Exhibit 5    NPR0000294, September 5, 2025,   69
             E-mail Correspondence
19
20
21
22
```

10/20/2025          National Public Radio, Inc., et al. v. Donald J. Trump, et al.          Badri Munipalla

Page 6

1  (Continued)
2          E X H I B I T S
3  Exhibit 6   CPB_0063000 through          85
            CPB_0063016, Amendment #1 to
4           Agreement "Public Radio
            Satellite System
5           Interconnection Funding
            FY23-FY24"
6
7  Exhibit 7   NPR0000314 through NPR0000325,   122
            NPR Distribution & PRSS Slide
            Deck
8
9  Exhibit 8   CPB_0198626 through          126
            CPB_0198642, Request for
            Proposals for Entity to Manage
10          and Govern Public Radio Content
            Distribution Proposal Date:
11          August 15, 2025, at 3 pm ET
12 Exhibit 9   CPB_0078348 through          149
            CPB_0078396, RFP Response
13
14 Exhibit 10  CPB_0078397 through          168
            CPB_0078435, Entity to Manage
            and Govern Public Radio Content
15          Distribution CPB Requests for
            Proposals Response
16
17 Exhibit 11  Q&A on NPR's September 26,   180
            2025, Filing
18 Exhibit 12  NPR0000164 through NPR0000165,   194
            Letter Re: Distribution and
19          Interconnection Committee
20 Exhibit 13  NPR0000007 through NPR0000008,   199
            August 22, 2025, E-mail
21          Correspondence
22

Page 7

1  (Continued)
2          E X H I B I T S
3  Exhibit 14  NPR0000201 through NPR0000202,   202
            August 20, 2025, E-mail
4           Correspondence
5  Exhibit 15  NPR0000225, August 21, 2025,   209
            E-mail Correspondence
6
7  Exhibit 16  NPR0000238 through NPR0000239,   209
            August 25, 2025, E-mail
            Correspondence
8
9  Exhibit 17  NPR0000299 through NPR0000300,   209
            September 5, 2025, E-mail
            Correspondence
10
11 Exhibit 18  Exhibit A, Public Radio       212
            Satellite Interconnection
            Agreement
12
13 Exhibit 19  NPR0000410 through NPR0000412,   215
            September 19, 2025, E-mail
            Correspondence
14
15 Exhibit 20  NPR0000432 through NPR0000433,   215
            September 19, 2025, E-mail
            Correspondence
16
17 Exhibit 21  NPR0000451 through NPR0000452,   215
            September 19, 2025, E-mail
            Correspondence
18
19 Exhibit 22  NPR0000460 September 19, 2025,   215
            E-mail Correspondence
20 Exhibit 23  NPR0000241 through NPR0000244,   215
            August 28, 2025, E-mail
21          Correspondence
22

Page 8

1  (Continued)
2          E X H I B I T S
3  Exhibit 24  NPR0000471 through NPR0000472,   221
            September 23, 2025, E-mail
4           Correspondence
5  Exhibit 25  NPR0004993 through NPR0004996,   231
            July 1, 2024, E-mail
6           Correspondence
7  Exhibit 26  NPR0004941 through NPR0004942,   243
            June 3, 2024, E-mail
8           Correspondence
9  Exhibit 27  NPR0018114 through NPR0018115,   247
            June 3, 2025, E-mail
10          Correspondence
11 Exhibit 28  NPR0005094, October 23, 2024,   252
            E-mail Correspondence
12
13 Exhibit 29  NPR0006421 through NPR0006423,   257
            February 1, 2024, E-mail
14          Correspondence
15 Exhibit 30  CPB_0304041 through          268
            CPB_0304042, May 9, 2025,
16          E-mail Correspondence
17 Exhibit 31  NPR0000013 through NPR0000014,   272
            September 25, 2025, E-mail
18          Correspondence
19 Exhibit 32  NPR0000015 through NPR0000027,   272
            Memo Subject: Next-Generation
20          Public Radio Infrastructure,
            Sponsorship, and Support
21          (PRISS) Network - Informal
22          Introduction

Page 9

1  (Continued)
2          E X H I B I T S
3  Exhibit 33  NPR0000028, Public Radio       273
            Infrastructure, Sponsorship, &
4           Support Network
5  Exhibit 34  NPR0000401, PRSS Competition    278
            Slide
6
7  Exhibit 35  NPR0000400, September 18, 2025,   285
            E-mail Correspondence
8  Exhibit 36  NPR0000036, July 31, 2025,     288
            E-mail Correspondence
9
10 Exhibit 37  NPR0000045 through NPR0000046,   288
            August 1, 2025, E-mail
            Correspondence
11
12 Exhibit 38  NPR0002804, April 23, 2025,    294
            E-mail Correspondence
13
14
15
16
17
18
19
20
21
22

www.DigitalEvidenceGroup.com          Digital Evidence Group C'rt 2025          202-232-0646

Page 10

1          THE VIDEOGRAPHER:  This is Video No. 1
2  of the video-recorded deposition of Badri
3  Munipalla, taken in the matter of National Public
4  Radio, Inc., et al., versus Donald J. Trump,
5  et al., in the United States District Court for
6  the District of Columbia, Case No. 1:25-cv-1674.
7          This deposition is being held at
8  Saul Ewing, LLP, 1919 Pennsylvania Avenue
9  Northwest, Washington, D.C., on October 20th,
10  2025.
11          The time on the video screen is
12  9:01 a.m.
13          My name is DeShawn White.  I am the
14  legal videographer from Digital Evidence Group.
15          The court reporter is Matthew Goldstein,
16  in association with Digital Evidence Group.
17          Will counsel please introduce themselves
18  for the record, followed by the court reporter
19  administering the oath.
20          MR. MCELROY:  Jason McElroy on behalf of
21  defendant, Corporation for Public Broadcasting.
22          MR. BROOKS:  Eric Brooks on behalf of

Page 11

1  National Public Radio.
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22

Page 12

1          P R O C E E D I N G S
2  Whereupon,
3          BADRI MUNIPALLA,
4  being first duly sworn or affirmed to testify to the
5  truth, the whole truth, and nothing but the truth,
6  was examined and testified as follows:
7       EXAMINATION BY COUNSEL FOR THE DEFENDANT
8  BY MR. MCELROY:
9      Q.  Thank you.
10          Good morning, Mr. Munipalla.
11      A.  Good morning.
12      Q.  Am I pronouncing that correctly?
13      A.  (No verbal response.)
14      Q.  Great.
15          So before we get started, I just want to
16  go over general ground rules of depositions.
17  Obviously, we're taking a stenographic transcript
18  of what's being said.
19          So to the extent that we can try to
20  allow me to finish a question before you answer,
21  and I will do the same thing for you, let you
22  finish your answer before I start a question.

Page 13

1          Does that make sense?
2      A.  It does.
3      Q.  Secondly, when answering or responding
4  to questions, if you could use full words instead
5  of head nods or "uh-huh" or "huh-uhs," things like
6  that, because those are difficult to determine on
7  a transcript.  I may ask you to restate your
8  answer if that happens.
9      A.  Understood.
10      Q.  If there's ever a time where you don't
11  understand a question that I ask you, please let
12  me know that.  I'm happy to restate.  But if you
13  answer my question, I will assume that you
14  understood it.
15          If you ever need a break at any time,
16  let me know.  The only thing I will ask of you is
17  that if there's a question pending, I'll ask you
18  to answer the question.  But generally, I will try
19  to take regular breaks every hour to hour and a
20  half.
21      A.  Sounds good.
22      Q.  Mr. Munipalla, what is your current

4 (Pages 10 to 13)

Page 14

1  employment?
2      A.  I work for National Public Radio.  I am
3  the vice president of NPR Distribution.
4      **Q.  What is NPR Distribution?**
5      A.  NPR Distribution is responsible for
6  distributing national content to all stations.
7      **Q.  What does that mean, distributing**
8  **national content to all stations?**
9      A.  We operate the public radio satellite
10  infrastructure.  That is the conduit to distribute
11  content to all stations.
12      **Q.  Okay.  I want to follow up on a few of**
13  **those things.**
14          **When you say it's a conduit to**
15  **distribute content, does that mean that the public**
16  **radio satellite infrastructure doesn't engage with**
17  **content or doesn't create content, I should say?**
18      A.  That is correct.
19      **Q.  Okay.  And you said distributing**
20  **national content to all stations.  What is**
21  **national content?**
22      A.  Sorry, if I may, the previous question

Page 15

1  was NPR does not engage in creating content.  I
2  just want to clarify.  NPR creates content.
3  NPR Distribution does not create content, just for
4  clarification.
5      **Q.  Thank you for that clarification.**
6          **So what is the difference between NPR**
7  **and NPR Distribution?**
8      A.  NPR is a producer of content.  NPR is
9  also a membership organization that has NPR
10  members.
11          NPR Distribution is an interconnection
12  system.  It is the backbone to distribute national
13  broadcast content.
14      **Q.  So when you say "national broadcast**
15  **content," what does that mean?**
16      A.  It is the main content that most people
17  listen to when they turn on their radio, for
18  example, NPR's morning edition are, all things
19  considered, in the evenings.  That's what I call
20  national content.
21          Regional content, for example, if you're
22  listening to WAMU, which is our local public radio

Page 16

1  station, on Saturdays you would hear a program
2  called Big Broadcast.  That is a very local
3  production that WAMU airs to its listeners.  It's
4  not the same content that is aired across all
5  stations at the same time.
6      **Q.  So when you say the NPR national**
7  **content, you mean the programming that NPR creates**
8  **for a national audience?**
9      A.  That is correct.  It is programming that
10  goes to all stations.  And when that gets aired,
11  it's the same content, by and large, that gets
12  aired by all of the stations.
13      **Q.  And to be clear, NPR Distribution has**
14  **nothing to do with that content; is that correct?**
15      A.  That is correct.
16      **Q.  So you mentioned that you are the vice**
17  **president of distribution; is that right?**
18      A.  That's correct.
19      **Q.  How long have you been in that role,**
20  **Mr. Munipalla?**
21      A.  Two and a half years.
22      **Q.  How long have you been an employee at**

Page 17

1  NPR?
2      A.  I started as a contractor for one year,
3  and then I became a full-time employee.  So I
4  think 17 years, approximately.
5      **Q.  So somewhere on the order of 2008?**
6      A.  Yeah.
7      **Q.  And when I say "NPR," can we agree that**
8  **I'm referencing National Public Radio?  Do you**
9  **understand that I mean that when I say "NPR"?**
10      A.  Yes, I do.
11      **Q.  And if I use the term "CPB," can we**
12  **agree that I'm referring to Corporation for Public**
13  **Broadcasting?**
14      A.  Yep.  Correct.
15      **Q.  And if I mess up and say "CFPB"**
16  **occasionally, will you tell me?  It's a joke.**
17          **All right.  So beginning in**
18  **approximately 2008, as your contractor role, can**
19  **you tell me what your roles, responsibilities, and**
20  **duties were at NPR?**
21          MR. BROOKS:  Objection; form.
22          You can answer.

5 (Pages 14 to 17)

10/20/2025        National Public Radio, Inc., et al. v. Donald J. Trump, et al.        Badri Munipalla

Page 18

1    THE WITNESS:  In 2008, I was brought on
2  to work on a project called ContentDepot.  This
3  was essentially the software that a third-party
4  consultant had developed, and they had deployed
5  within the PRSS, the Public Radio Satellite
6  System.
7        So it's a first software control that
8  was installed within NPR Distribution.  I was
9  brought in as a Java developer to work on run time
10  issues, and that's what I did for the first three
11  or four years.
12 BY MR. MCELROY:
13    **Q.  So what is your educational background,**
14 **Mr. Munipalla?**
15    A.  I have an undergrad in computer science
16  and a master's in computer science.
17    **Q.  Would you consider yourself a software**
18 **engineer?**
19    A.  Correct.
20    **Q.  Is that what your general role was when**
21 **you first began at NPR in 2008 as a software**
22 **engineer?**

Page 19

1    A.  That was my title.
2    **Q.  And you stated when you first started at**
3 **NPR that you were a contractor; is that right?**
4    A.  (No verbal response.)
5    **Q.  How long were you a contractor with NPR?**
6    A.  For one year.
7    **Q.  And then what happened after that one**
8 **year?**
9    A.  A decision was made within
10  NPR Distribution that this ContentDepot software
11  was going to be critical to operations going
12  forward.  So they made the decision to grow the
13  in-house software development team.
14        And I was one of the first people
15  brought in because I was already working as a
16  contractor, it was a natural transition.
17    **Q.  So when you started with NPR, did you**
18 **start in NPR Distribution?**
19    A.  That is correct.
20    **Q.  Is NPR Distribution a separate entity**
21 **from NPR?**
22    A.  Yes, that's correct.

Page 20

1    **Q.  And when I say "a separate entity," you**
2 **understand that I mean a separate legal entity,**
3 **they're not the same company?**
4    MR. BROOKS:  Objection; form.
5    THE WITNESS:  I'll explain it the best I
6  understand it.  The -- NPR is a separate profit
7  and loss -- NPR Distribution is a separate P & L
8  than NPR, but my paycheck says NPR.  We do share
9  resources with NPR, like legal, HR, some software
10  that we use, like Salesforce, to manage customers.
11        So we get the benefit of some shared
12  resources, but otherwise we are sort of an
13  independent organization that takes care of all of
14  the interconnected stations, which is separate
15  from the NPR membership.
16 BY MR. MCELROY:
17    **Q.  But you're not aware of whether or not**
18 **NPR Distribution is a separate legal entity from**
19 **NPR?**
20    A.  I believe it is, but I cannot say that
21  for sure.
22    **Q.  Okay.  Are you familiar with the acronym**

Page 21

1 PRSS?
2    A.  Yes.
3    **Q.  What does that mean?**
4    A.  The Public Radio Satellite System.
5    **Q.  Is that different from NPR Distribution?**
6    A.  NPR Distribution is the team that
7  operates the PRSS.
8    **Q.  I'm afraid I may not understand the**
9 **finer points of this distinction.  So can you**
10 **explain to me, are NPR Distribution and PRSS**
11 **separate entities?**
12    A.  You should think of the PRSS as the
13  primary product -- I'm simplifying here, as the
14  primary product that the employees of NPR
15  Distribution support.  And the primary product
16  here is the system, which is called the Public
17  Radio Satellite System.  And that serves the
18  interconnected stations.
19    **Q.  Does NPR Distribution own the Public**
20 **Radio Satellite System?**
21    A.  It does not own it.
22    **Q.  Who does?**

6  (Pages 18 to 21)

10/20/2025        National Public Radio, Inc., et al. v. Donald J. Trump, et al.        Badri Munipalla

Page 22

1    A.  The trust does, the PRS -- the Public
2  Radio Satellite Trust.
3        Q.  And is the Public Radio Satellite Trust
4  a separate entity from NPR?
5        A.  Yes, it is.
6        Q.  Are they related at all?
7        A.  No, they're not.
8        Q.  Now, you used a term in there that I
9  want to talk about for a second, "interconnected
10  stations."
11        What does that mean, Mr. Munipalla?
12        A.  So I think it is a term that has been
13  used to define all of the stations that
14  participate in this network that I described
15  earlier, the network that sends national content.
16        So it is the set of stations that are
17  intertwined and are capable of receiving all of
18  the content that is pushed out by the Public Radio
19  Satellite System.
20        If you are an interconnected station,
21  you will receive the content.  If you're not an
22  interconnected station, you don't have the pipe

Page 23

1  that delivers the content.
2        Q.  And the pipe that delivers the content
3  is interconnection?  Is that the term that we use
4  or that you use?
5        A.  The pipe that delivers the content is --
6  it could be called interconnection.
7        Q.  Okay.  But when you said "the pipe,"
8  you're specifically referring to the Public Radio
9  Satellite System?
10        A.  Correct, which is the interconnection
11  for radio.
12        Q.  Okay.  What -- do you understand what
13  the term "interconnection" means?
14        A.  I don't understand the question.
15        Q.  Can you describe to me what
16  "interconnection" means?  Is there a difference
17  between the term "interconnection" and "PRSS"?
18        A.  Interconnection, in general in this
19  context, just means it is the infrastructure that
20  is -- it is the name for the infrastructure that
21  is distributing content.  Specifically, the system
22  that is making it happen is the PRSS.

Page 24

1        Q.  The PRSS is a specific type of
2  interconnection; right?  It's not interconnection,
3  more broadly?
4        MR. BROOKS:  Objection to form.
5        THE WITNESS:  I think PRSS is the system
6  that delivers interconnected content.  So these
7  terms are used interchangeably and sometimes
8  confusingly.
9  BY MR. MCELROY:
10        Q.  Okay.  But there could be other types of
11  interconnection other than PRSS; correct?
12        MR. BROOKS:  Objection; form.
13        THE WITNESS:  Sure.
14  BY MR. MCELROY:
15        Q.  So PRSS is a satellite system; correct?
16        A.  That's correct.
17        Q.  And so would it be fair to refer to PRSS
18  as satellite interconnection?
19        A.  Yes.
20        Q.  All right.  I got a little off topic
21  there.  I'm going to come back to interconnection
22  in a minute, I promise, but let's get back to your

Page 25

1  time at NPR.
2        Now, you said you started out as a
3  contractor, and then was hired on full-time as a
4  software engineer; is that right?
5        A.  That's correct.
6        Q.  What did you do next after being a
7  software engineer for NPR Distribution?
8        A.  I went on to become the manager of the
9  software team.  And then I developed their
10  back-end database infrastructure.  And we slowly
11  were rebuilding the original ContentDepot from
12  2008 and modernizing it.
13        After my time as a manager, I became a
14  director of software development, and then a
15  senior director of, I think it was called,
16  operations software development.  So it was not
17  just software development anymore.  It was also
18  looking -- overlooking the data center and the
19  engineering functions.
20        And after my time as a senior director,
21  I became the vice president of the entire
22  division.

7 (Pages 22 to 25)

Case 1:25-cv-01674-RDM    Document 59-6    Filed 10/24/25    Page 9 of 79

10/20/2025          National Public Radio, Inc., et al. v. Donald J. Trump, et al.          Badri Munipalla

Page 26

1    Q.  And that was roughly two and a half
2  years ago when you became the vice president; is
3  that right?
4    A.  That's correct.
5    Q.  What is ContentDepot?
6    A.  ContentDepot is the software that powers
7  the PRSS.  It is the broadcast distribution
8  platform for the interconnection and public radio.
9    Q.  How does ContentDepot work?
10    A.  ContentDepot is a collection of software
11  programs, and it also interacts with the hardware.
12  It is one of the most complicated systems that
13  I've worked on just because of the number of
14  hardware, the amount of hardware that it has to
15  interact with.
16       So it's not purely software.  It has a
17  lot of tentacles into the hardware, as well.
18  ContentDepot essentially controls all of the
19  content that is entering the distribution data
20  center and ensures that it is delivered to every
21  end point, which is usually the station receivers.
22    Q.  So ContentDepot is not necessarily the

Page 27

1  same thing as PRSS?
2    A.  It is the software that powers the PRSS.
3  PRSS is a very old name.  Back in the '70s it was
4  purely hardware, and there were people who were
5  operating the hardware.
6       And then in 2000 -- mid-2000, they
7  decided that it's time to evolve the system, we
8  need to have more software controls.  So then it
9  became a much more software oriented system.
10       So, you know, without the software,
11  there is no PRSS.
12    Q.  Are you familiar with a term called
13  "terrestrial interconnection"?
14    A.  Yes, I am.
15    Q.  What does that mean?
16    A.  So satellite, essentially, has three
17  points.  You have the uplink, which is right now
18  located in our D.C. office that pushes the signal
19  to a satellite.  And the satellite pushes it to
20  all of the downlinks that are located at stations.
21  So it is the satellite.
22       Terrestrial, in general, refers to

Page 28

1  anything that doesn't have to go up to the
2  satellite.  It is -- it uses a network of either
3  fiber, broadband, 5G, a combination of any of
4  those connections in order to deliver content,
5  with the exception of Starlink, which is also a
6  satellite-based terrestrial distribution system.
7       It can get confusing, but I wanted to
8  add that for thoroughness.
9    Q.  So I want to come back to some of this,
10  but, first, what is Starlink?
11    A.  Starlink is a network of satellites that
12  essentially work like a satellite, for all intents
13  and purposes, but the difference is when the
14  signal is received back at all of the
15  destinations, instead of giving you like a radio
16  frequency signal, they'll just give you a cable, a
17  CAT5 cable, which is your general Ethernet cable.
18       So even though it is using satellite
19  technologies in the back end, the end point to all
20  of the users is just a terrestrial Ethernet jack.
21  So because of that, it is considered much more of
22  a terrestrial technology rather than a satellite

Page 29

1  technology.
2    Q.  Starlink is a private company; correct?
3    A.  That's correct.
4    Q.  Is that an Elon Musk company?
5    A.  That's correct.
6    Q.  So Starlink and NPR are separate
7  entities?
8    A.  Yes.
9    Q.  So for the layman, like myself,
10  terrestrial interconnection is any type of
11  interconnection that doesn't require a satellite,
12  or is it specific to Internet connections?
13    A.  I think it is safe to go with that
14  definition, anything that doesn't --
15    Q.  Which one, the first or second, sorry?
16    A.  Anything that doesn't require satellite.
17    Q.  All right.  So when we were talking
18  about interconnected stations earlier, you said
19  that not all stations are interconnected through
20  NPR Distribution; is that correct?
21    A.  That is correct.
22    Q.  Explain to me why or how a station comes

8 (Pages 26 to 29)

Page 30

1  to be interconnected with NPR Distribution.
2      MR. BROOKS:  Objection; form.
3      THE WITNESS:  NPR interconnection --
4  excuse me, NPR Distribution has a legal contract
5  with all of the interconnected stations.  Stations
6  are expected to sign that contract.  They are
7  expected to pay an interconnection fee that is set
8  up by the D/I committee.  And that's how they
9  become an interconnected station.
10  BY MR. MCELROY:
11      Q.  What is the D/I committee?
12      A.  Yeah, forgive me, it's a
13  distribution/interconnection committee.  We
14  haven't talked about it, but D/I stands for
15  distribution/interconnection committee.
16      Q.  Where is the D/I committee?
17      MR. BROOKS:  Objection; form.
18      THE WITNESS:  The D/I committee is part
19  of the NPR board that governs the PRSS.  So they
20  are like my boss.
21  BY MR. MCELROY:
22      Q.  Do you sit on the D/I committee?

Page 31

1      A.  I do not sit on the D/I committee.  I
2  report to the D/I committee.
3      Q.  Do you -- does the D/I committee conduct
4  regular meetings?
5      A.  Correct, we do.
6      Q.  Do you attend those meetings of the D/I
7  committee?
8      A.  Yes, I do.
9      Q.  Do you attend those meetings as the head
10  of NPR Distribution?  Is that why you go?
11      A.  That is correct.
12      Q.  Now, when we talk about an
13  interconnected station, specifically with respect
14  to NPR Distribution, what type of stations are we
15  talking about?
16      A.  They are public radio entities.  So any
17  public radio station can become an interconnected
18  station.
19      Q.  You said specifically public radio
20  entity, what does that mean?  What is a public
21  radio entity?
22      A.  I don't know what exactly makes a public

Page 32

1  radio entity.  I don't know what the definition
2  that needs to be satisfied, but I just know that
3  as you got to be a public radio station.
4      Q.  Do they have to be nonprofit
5  corporations?
6      MR. BROOKS:  Objection; form.
7      THE WITNESS:  I do believe they're
8  mostly nonprofit.
9  BY MR. MCELROY:
10      Q.  Okay.  Is the distinction you're making
11  between commercial radio entities and public radio
12  entities?  Is that a distinction that exists?
13      A.  That is absolutely a distinction that
14  exists, and we serve public radio stations as part
15  of the interconnection.
16      Q.  You don't serve commercial radio
17  entities then?
18      A.  We -- this is a little nuanced.  NPR
19  Distribution has always had the ability to resell
20  excess satellite capacity, and the revenue
21  generated from that is used to keep our rates and
22  fees low as part of our mission.  So in that

Page 33

1  capacity, we do serve some commercial entities.
2      Q.  Okay.  Explain that to me.  Explain to
3  me how you resell excess satellite capacity.
4      A.  So this is part of the foundation of the
5  PRSS.  It goes back before my time.  The idea was
6  when satellite was the primary distribution pipe
7  back in the '70s and '80s, we were allowed to sell
8  satellite capacity that is not used by public
9  radio, excess satellite capacity to, let's say, a
10  broadcasting video network.
11      So you would sell them a segment, and
12  they would buy that segment from us instead of
13  going to, let's say, Intelsat.  And they would pay
14  us a fee for that, for the usage of that segment.
15      Q.  And are you still doing that today; that
16  is, is NPR Distribution still selling excess
17  satellite capacity today in 2025?
18      A.  Yes.
19      Q.  And the revenue that is generated based
20  upon selling excess satellite capacity, that goes
21  directly to NPR Distribution?
22      A.  That is correct.

Page 34

1    **Q.  Do you know how much annually NPR**
2    **Distribution -- how much revenue annually NPR**
3    **Distribution generates based upon the sale of**
4    **excess satellite capacity?**
5        A.  That number has been changing over the
6    years.  As of right now, that portion of the
7    business generates about 1.5 million per year.
8        **Q.  You said it's been changing over the**
9    **years, how has it been changing?**
10       A.  It is a technology shift.  More and more
11   people are choosing terrestrial distribution over
12   satellite.  Over the last couple of years, we've
13   had the FCC go after the C-band spectrum, which is
14   also precipitated as a quicker transition.
15       **Q.  What does that mean, the FCC has gone**
16   **after the C-band spectrum?**
17       A.  I don't mean to say going after with any
18   negative connotation.  I just mean they have been
19   reselling -- excuse me, they have been selling off
20   C-band bandwidth, which is where the Public Radio
21   Satellite System operates.  It's that frequency.
22           So remember I was telling you the

Page 35

1    satellite distribution is made up of an uplink and
2    then goes to the satellite and then there's a
3    downlink.  All of those transmissions happen over
4    a certain frequency, and when that frequency is
5    not available, satellite is not an option anymore.
6           And what the FCC is doing is the
7    frequency spectrum, which is known as the C-band
8    spectrum, they've been auctioning that away in
9    chunks.  I hope that makes sense.
10       **Q.  I think so.**
11          **How does that affect NPR Distribution's**
12   **business model?**
13       A.  It is a pretty significant impact.
14   Because if we don't have an alternative
15   distribution methodology, you wouldn't be able to
16   serve the interconnected stations, and that would
17   be problematic.
18       **Q.  Is that because NPR Distribution's**
19   **satellite capacity is being diminished by the**
20   **FCC's actions?**
21       A.  That is a good way to put it.
22       **Q.  And you said if you don't have an**

Page 36

1    alternative distribution methodology, you wouldn't
2    be able to serve the interconnected stations.
3           **Has NPR Distribution been working on**
4    **alternative distribution methodologies?**
5        A.  Yes.
6        **Q.  How so?**
7        A.  We have been building our own
8    terrestrial receiver.  The stations right now are
9    equipped with a satellite receiver in order to
10   receive the content.  Our ambition is to replace
11   all of those satellite receivers with a
12   terrestrial receiver so that there's no longer a
13   dependency on satellite.
14       **Q.  Do you have a timeline on which you're**
15   **trying to accomplish that objective?**
16       A.  Yes, it is June of 2028.
17       **Q.  How realistic is that timeline?**
18       A.  It is -- it's aggressive.
19       **Q.  Why is it aggressive?**
20       A.  Because it requires funding to meet
21   those goals and make sure that every station
22   smoothly transitions from satellite to

Page 37

1    terrestrial.  It's part of our mission to leave no
2    station behind.  And without funding, it becomes
3    difficult to accomplish that.
4        **Q.  When did NPR Distribution start**
5    **considering this alternative terrestrial**
6    **methodology?**
7           MR. BROOKS:  Objection; form.
8           THE WITNESS:  I want to say in 2020.
9    That's my recollection.
10   BY MR. MCELROY:
11       **Q.  Have any steps been made by NPR**
12   **Distribution since 2020 to the current day to**
13   **implement this alternative methodology?**
14       A.  Yes.
15       **Q.  What steps?**
16       A.  We have started to build the very first
17   version -- in fact, we have built the very first
18   version of the terrestrial receiver.  It is a
19   single-channel receiver, which means stations can
20   receive programming through just one port.
21          Our ultimate goal is to scale that to a
22   four-channel receiver, at which point it would

10/20/2025          National Public Radio, Inc., et al. v. Donald J. Trump, et al.          Badri Munipalla

Page 38

1  achieve parity with our existing satellite
2  receivers.
3      **Q.  And that's what you are hoping to**
4  **accomplish by 2028, to achieve parity with your**
5  **current receivers?**
6      A.  That's correct.
7      **Q.  Does NPR Distribution currently offer a**
8  **terrestrial distribution methodology for public**
9  **radio stations?**
10      MR. BROOKS:  Objection to form.
11      THE WITNESS:  The satellite receivers
12  have what's called a terrestrial backup option.
13  In that sense, we do offer terrestrial.  The
14  challenge with that backup option is delay.
15      It uses a technology called HLS, and
16  there's an inherent 30-second delay between the
17  live transmission which happens over satellite and
18  what arrives over the terrestrial conduit.  So
19  it's not optimum, but there is an option for
20  stations.
21  BY MR. MCELROY:
22      **Q.  Do you have any stations that currently**

Page 39

1  **utilize only the terrestrial distribution**
2  **methodology?**
3      A.  Yes.
4      **Q.  Do you know how many?**
5      A.  I would like to say around 40.
6      **Q.  And those 40 stations are not using**
7  **satellite interconnection; right?**
8      A.  That's correct.  They're terrestrial
9  only.
10      **Q.  Are there -- you mentioned earlier,**
11  **Mr. Munipalla, that -- or at least it sounded like**
12  **there may be stations, public radio stations, that**
13  **are not interconnected through NPR Distribution;**
14  **is that correct?**
15      A.  That is correct.
16      **Q.  Do you know how many public radio**
17  **entities or stations there are that are not**
18  **interconnected through NPR?**
19      A.  I do not.
20      **Q.  Do you have an approximation of how many**
21  **public radio stations exist that are not**
22  **interconnected through NPR?**

Page 40

1      A.  I would be speculating.
2      **Q.  Do you know how many public radio**
3  **stations NPR Distribution does currently serve for**
4  **interconnection purposes?**
5      A.  I believe it is a little over 370 --
6  350, excuse me.
7      **Q.  So we'll say approximately 350; is that**
8  **fair?**
9      A.  That is fair.
10      **Q.  Of those -- is that approximate**
11  **350 number including those 40 terrestrial-only**
12  **interconnection stations?**
13      A.  That is correct.
14      **Q.  For public radio stations that do not**
15  **utilize NPR Distribution for interconnection, are**
16  **you aware of how those stations obtain content?**
17      MR. BROOKS:  Objection; form.
18      THE WITNESS:  I don't know.
19  BY MR. MCELROY:
20      **Q.  But they don't obtain NPR content?**
21      A.  That is correct.
22      **Q.  And all those approximately 350**

Page 41

1  **interconnected public radio stations, do all of**
2  **those stations receive NPR content?**
3      A.  They have the ability to receive NPR
4  content.  It doesn't mean that they're taking NPR
5  content, because the interconnection serves
6  national content -- excuse me, it carries national
7  content that is beyond NPR.
8      For example, American Public Media
9  carries BBC, and that is available on the PRSS.
10  So there could be stations, for instance, choosing
11  to take the BBC and not any NPR content.
12      **Q.  So NPR Distribution does not serve only**
13  **NPR content?**
14      A.  As far as we're concerned, NPR is one of
15  our customers, just like other producers are our
16  customers.
17      **Q.  So when you say "producers," what does**
18  **that mean?**
19      A.  An entity that produces content.
20      **Q.  So NPR is just one of multiple producers**
21  **that create content?**
22      A.  That is correct.

11 (Pages 38 to 41)

10/20/2025      National Public Radio, Inc., et al. v. Donald J. Trump, et al.      Badri Munipalla

Page 42

1    Q.  And there are multiple producers who
2  provide content through NPR Distribution; is that
3  correct?
4    A.  That's correct.
5    Q.  Does NPR Distribution charge a different
6  fee to interconnected public radio stations
7  depending on whether or not they use NPR content?
8    A.  They -- we charge the exact same amount.
9  Just like any business, if that radio is pulling
10  down NPR content, they pay the producer.  We are
11  not in the loop.
12    Q.  So if a public radio -- if an
13  interconnected public radio station is utilizing
14  NPR content, they're not paying NPR Distribution
15  for that content?
16    A.  That is correct.  They're only paying us
17  for the connectivity, the ability to receive the
18  programming.
19    Q.  All right.  So we mentioned earlier, and
20  I think that you used the word "conduit" for NPR
21  Distribution; is that right?
22    A.  I believe I did.

Page 43

1    Q.  So it's effectively just a pipeline;
2  right?
3    A.  That's correct.
4    Q.  Bear with me for just a moment.  I think
5  I'm going to have to take this off to get my
6  exhibits.
7      MR. MCELROY:  All right.  I'm going to
8  hand to the court reporter what I'd like to be
9  marked as Munipalla Exhibit 1.
10      MS. TOWNSEND:  Do you want to do
11  continuing exhibits?  I don't care either way if
12  you prefer --
13      MR. MCELROY:  I don't think we can
14  because we have depositions going on at the same
15  time.
16      MS. TOWNSEND:  Yeah, you're right.  I'm
17  sorry.
18      (Munipalla Deposition Exhibit 1 was
19  marked for identification and attached to the
20  transcript.)
21  BY MR. MCELROY:
22    Q.  Take a moment to review Exhibit 1,

Page 44

1  Mr. Munipalla, and let me know when you're
2  finished.
3      (Witness peruses the exhibit.)
4      THE WITNESS:  Okay.
5  BY MR. MCELROY:
6    Q.  Do you recognize Exhibit 1,
7  Mr. Munipalla?
8    A.  I do.
9    Q.  It's an e-mail from you to Marta
10  McClellan Ross; correct?
11    A.  That's what it says, yes.
12    Q.  And it's dated June 10th, 2024?
13    A.  Correct.
14    Q.  Now, if you look, it's -- I'm not sure
15  whether you call these actually paragraphs or not,
16  but they're kind of separated here.  So it's the
17  third sentence there starting, "Because teasing
18  out the answers."
19      Do you see that sentence?
20    A.  Yes, I do.
21    Q.  And at the end of it, you say, Since --
22      MR. BROOKS:  Hold on one minute.  Where

Page 45

1  is this?
2      MR. MCELROY:  It's the third sentence.
3      MR. BROOKS:  Got it.  Thank you.
4  BY MR. MCELROY:
5    Q.  And at the end of that sentence, it
6  says, "Since distribution serves as the
7  distribution infrastructure, the bottle, not the
8  wine."
9      Did I read that correctly?
10    A.  That is correct.
11    Q.  And so what you're saying here is the
12  same thing you just told me about NPR
13  Distribution being a conduit.  It carries the
14  content, but the content is -- doesn't matter what
15  it is for NPR Distribution's purposes; right?
16      MR. BROOKS:  Objection; form.
17      THE WITNESS:  That is correct.
18  BY MR. MCELROY:
19    Q.  Now, at this time in June of 2024,
20  you're discussing with Ms. McClellan Ross the
21  implications of potentially losing federal funding
22  in that first sentence; right?

10/20/2025          National Public Radio, Inc., et al. v. Donald J. Trump, et al.          Badri Munipalla

Page 46

1    A.  That's correct.
2    Q.  Why are you discussing with
3    Ms. McClellan Ross the implications of losing
4    federal funding?
5    A.  I don't recall the exact reason, but
6    based on what I've read here, it is probably
7    because the D/I committee was asking us to model
8    the impact of the loss of federal funding, and I
9    was trying to understand the level of analysis
10   they were seeking and get a second opinion from
11   Marta because she understands this topic very well
12   as it pertains to funding.
13   Q.  Sure.
14   Would it be fair to say that NPR
15   Distribution was concerned at this point in time
16   that there was a possibility it would lose federal
17   funding?
18   MR. BROOKS:  Objection; form.
19   THE WITNESS:  Project 2025 was -- this
20   is the report that people refer to as project 2025
21   by Ross Vought that was available, and people had
22   studied that.  There was very specific stuff about

Page 47

1    public radio that would have likely perpetuated
2    this.
3    BY MR. MCELROY:
4    Q.  Now, if you go down toward the bottom of
5    this e-mail, you see a big, bold subsection that
6    says, Specific questions PRSS should consider
7    deeply.
8    A.  Yes.
9    Q.  And the third bullet point under that
10   says, Should we maintain satellite distribution or
11   switch entirely to terrestrial?
12   Did I read that correctly?
13   A.  That is correct.
14   Q.  So at this point in time, you were
15   considering whether or not satellite distribution
16   was still the right route for NPR Distribution to
17   use?
18   A.  I would say at this point we were
19   considering the cost implications of maintaining a
20   satellite lease, not if it was the right
21   technology or not.  It's a cost-base question.
22   Q.  Isn't it the cost basis part of the

Page 48

1    determination of whether or not it's the right
2    technology?
3    A.  The analysis here is about losing
4    federal funding, and CPB pays for the satellite
5    leases.  If CPB goes away, that was the assumption
6    here, loss of federal funding is CPB unable to pay
7    for the satellite.
8    So in that context, we were thinking if
9    it would still make sense to continue to
10   distribute through satellite, or should we switch
11   away from satellite and move to terrestrial.  The
12   implications being, as I pointed out earlier, we
13   do have the hub revenue or the commercial revenue,
14   which was 1.5 million.
15   The analysis is do we keep that because
16   it pays for some level of satellite, not wholly
17   but just partially, or do we just switch to
18   terrestrial.  That is sort of the question.
19   Q.  When you reference the hub revenue,
20   that's the sale of the excess satellite capacity
21   we discussed earlier?
22   A.  That's correct.

Page 49

1    Q.  Just to be clear, the driver of whether
2    or not you wanted to move -- or not the driver,
3    but a consideration was how much the satellite
4    cost; correct?
5    A.  It was a consideration.  And if you look
6    at specifically the first portion of this, that is
7    the key consideration because we are a
8    mission-driven organization first, and it's
9    through the funding that we get from CPB that
10   we're allowed to carry our mission.
11   So it says that, do we compromise on
12   that commitment?  And then that's why we have
13   Question 3, saying if there is no other choice,
14   what other options exist?  So it has to be taken
15   in context.
16   Q.  If you look on page 2, the top bullet
17   point there, it says, "Given CPB's advocacy for
18   changes in governance, and the definition of
19   interconnection, could NPR Distribution become
20   more dependent on CPB funding in the coming
21   years?"
22   Did I read that correctly?

Page 50

1     A.  Yes.
2        Q.  What was CPB's advocacy for changes in
3  governance?
4        A.  At that specific point, I don't think
5  there was clarity.  I think there was just this
6  talk about, Hey, we need to look at the governance
7  structure.  But it was never properly explained.
8  So I can't answer that question because I don't
9  know what exactly it entailed.
10       Q.  But at this point in time in June of
11  2024, CPB was advocating for changes in the
12  governance of the satellite interconnection,
13  weren't they?
14       MR. BROOKS:  Objection; form.
15       THE WITNESS:  I think there was some
16  conversation about it.  I don't know how strong.
17  I don't know if I would say they were advocating
18  vigorously.  There was chatter about it.
19  BY MR. MCELROY:
20       Q.  Sure.  I didn't say "vigorously," but
21  they were advocating.
22       I mean, these are your words here,

Page 51

1  right, Mr. Munipalla?
2     A.  They are.
3        Q.  So CPB at this point in June of 2024
4  advocating in some way for changes in
5  governance with PRSS; is that correct?
6        MR. BROOKS:  Objection; form.
7        THE WITNESS:  I think that is accurate.
8  BY MR. MCELROY:
9        Q.  And then the second part of that first
10  half of the sentence, you say, "the definition of
11  interconnection."
12       What do you mean by that?  What does
13  that mean?
14    A.  I don't know what I mean by it.  I think
15  all I heard was, you know, there's governance, and
16  if we're changing the governance, then what does
17  the interconnection become?  These were difficult
18  questions to understand.
19       So I don't exactly recall what I meant
20  by "the definition of interconnection," but I was
21  just saying that these are things that we'll have
22  to figure out.

Page 52

1        Q.  Are you aware of whether or not Congress
2  defined the term "interconnection" in the Public
3  Broadcasting Act?
4        MR. BROOKS:  Objection.
5        You can answer the question if you know
6  the answer.
7        THE WITNESS:  I'm not familiar with the
8  statute intimately.
9  BY MR. MCELROY:
10       Q.  Would it surprise you to learn that
11  Congress had a specific definition for the term
12  "interconnection" in the Public Broadcasting Act?
13       MR. BROOKS:  Objection; form.
14       THE WITNESS:  I don't have any
15  particular feelings about it.
16  BY MR. MCELROY:
17       Q.  Bear with me for just a moment.
18    A.  Do I return this?  What do I do with
19  this?
20       Q.  You can give it back to the court
21  reporter.
22       MR. MCELROY:  I'm going to hand to the

Page 53

1  court reporter what I'd like to be marked as
2  Munipalla Exhibit 2.
3        (Munipalla Deposition Exhibit 2 was
4  marked for identification and attached to the
5  transcript.)
6        MR. BROOKS:  This appears to be a
7  printout from the United States Code.
8  Mr. Munipalla is not a lawyer.
9        MR. MCELROY:  Is there an objection that
10  you would like to make instead of doing a speaking
11  objection on the record, Mr. Brooks?
12       MR. BROOKS:  I'm just stating for the
13  record what the exhibit is.
14       MR. MCELROY:  All right.  It's my
15  examination.  I will walk Mr. Munipalla through
16  the exhibit.  Thank you.
17  BY MR. MCELROY:
18       Q.  You can take a moment to review
19  Exhibit 2.  Let me know when you're finished.
20       (Witness peruses the exhibit.)
21       THE WITNESS:  I'm sorry, do you want me
22  to read the entire document?

Page 54

1  BY MR. MCELROY:
2      Q.  You can read the entire document if you
3  wish.  You don't need to.  I'm only going to point
4  you to definitions 3 and 4, if that helps you.
5      A.  Thank you for that.  Give me a minute,
6  please.
7          (Witness peruses the exhibit.)
8          THE WITNESS:  Okay.
9  BY MR. MCELROY:
10      Q.  All right.  So, Mr. Munipalla, I'll
11  represent to you that this is a copy of 47 United
12  States Code Section 397.
13          Have you ever reviewed this section of
14  the U.S. Code before?
15      A.  No, never.
16      Q.  So this is part of the Public
17  Broadcasting Act, and I just want to take a look
18  at definition No. 3 here.  And it says, the term
19  "interconnection" means the use of microwave
20  equipment, boosters, translators, repeaters,
21  communication space satellites, or other apparatus
22  or equipment for the transmission and distribution

Page 55

1  of television or radio programs to public
2  telecommunications entities.
3          Did I read that correctly?
4      A.  You did.
5      Q.  Would you agree with Congress'
6  definition here?
7          MR. BROOKS:  Objection; form.
8          THE WITNESS:  I really don't understand
9  the question.
10  BY MR. MCELROY:
11      Q.  Do you agree that this is a reasonable
12  definition of the term "interconnection"?
13          MR. BROOKS:  Objection; form.
14          THE WITNESS:  Sure.
15  BY MR. MCELROY:
16      Q.  So consistent with our discussion
17  earlier, you have in here communication space
18  satellites.  That would be satellite
19  interconnection; correct?
20          MR. BROOKS:  Objection; form.
21          THE WITNESS:  Communication space
22  satellites, sure, yes.

Page 56

1  BY MR. MCELROY:
2      Q.  Okay.  And then you have some other
3  things; microwave equipment, boosters,
4  translators.
5          Do you know what any of those things
6  are?
7          MR. BROOKS:  Objection; form.
8          THE WITNESS:  I think it is trying to
9  encapsulate anything that can move bits around,
10  bits meaning bits of content in this case.
11  BY MR. MCELROY:
12      Q.  Would you consider that to be
13  terrestrial transmission?
14          MR. BROOKS:  Objection; form.
15          THE WITNESS:  Not the way it is written
16  right now.
17  BY MR. MCELROY:
18      Q.  Why not?
19          MR. BROOKS:  Objection; form.
20          THE WITNESS:  Well, I mean, it says "and
21  other apparatus."  So I guess you could say
22  terrestrial would qualify.

Page 57

1  BY MR. MCELROY:
2      Q.  Okay.  But perhaps I'm asking the
3  question the wrong way.  I'm not trying to -- I'm
4  trying not to confuse the issue, and I'm afraid
5  that I am.
6          So when we talked about terrestrial
7  interconnection earlier, is that specific to
8  Internet interconnection?
9      A.  Can you say that again, please?
10      Q.  When we discussed terrestrial
11  interconnection earlier, we talked about using the
12  Internet as an interconnection method; correct?
13      A.  We talked about using terrestrial
14  connectivity.  We could call it the Internet,
15  sure.
16      Q.  Is the Internet the only type of
17  terrestrial interconnection?
18      A.  When it was specifically talking about
19  connectivity, I think you would say whether it's
20  broadband, 5G, those would be the connectivity
21  pieces.  The Internet is just a collection of
22  data.

Page 58

1    Q.  Fair enough.
2        My technical expertise is nowhere near
3    yours, Mr. Munipalla.  So forgive me for using
4    layman's terms.
5        Is it fair to say terrestrial
6    distribution is any type of distribution that does
7    not leave the earth's atmosphere?
8        MR. BROOKS:  Objection; form.
9        THE WITNESS:  Sure.
10   BY MR. MCELROY:
11   Q.  Are you aware of whether using microwave
12   equipment, boosters, translators, or repeaters
13   would require leaving the earth's atmosphere to a
14   space satellite?
15   A.  No.
16   Q.  You're not aware, or it would not
17   require it?
18   A.  It would not require it.
19   Q.  Thank you.
20       You can give that to the court reporter
21   if you want.  You can keep it if you want, not
22   long term.

Page 59

1        MR. MCELROY:  All right.  We've been
2    going for about an hour.  Do you want to take a
3    short break, or we can go for another half an hour
4    before a break?
5        THE WITNESS:  I'd like to take a break.
6        MR. MCELROY:  All right.  Let's go off
7    the record for a break.
8        THE VIDEOGRAPHER:  The time is
9    10:02 a.m.  We are now off the record.
10       (Recess from the record.)
11       THE VIDEOGRAPHER:  The time is
12   10:16 a.m.  We are now on the record.
13   BY MR. MCELROY:
14   Q.  All right.  Welcome back, Mr. Munipalla.
15       I just want to follow up on one thing
16   before we left.  We were talking about terrestrial
17   distribution of radio content; right?
18       And we had spoken previously about NPR
19   Distribution's goal of phasing out satellite by
20   2028; is that correct?
21       MR. BROOKS:  Objection; form.
22       THE WITNESS:  I don't think we

Page 60

1    necessarily said "phasing out," but we were
2    thinking about an alternative strategy.
3    BY MR. MCELROY:
4    Q.  So we were talking about alternative
5    methodologies, and you wanted to implement an
6    alternative methodology to satellite by 2028?
7    A.  Or alongside it.
8    Q.  So that alternative methodology was a
9    terrestrial methodology; correct?
10       MR. BROOKS:  Objection; form.
11       THE WITNESS:  That's correct.
12   BY MR. MCELROY:
13   Q.  Now, you're aware that NPR has brought
14   the lawsuit that we're sitting here for; right?
15   A.  (No verbal response.)
16   Q.  And as part of that lawsuit -- sorry, is
17   that a "yes" or a "no"?  You shook your head,
18   but --
19   A.  I'm aware.  I don't know every detail,
20   but I'm aware, yes.
21   Q.  I understand.
22       And are you aware that as part of this,

Page 61

1    NPR is trying to prevent CPB from providing
2    funding to -- for interconnection to entities
3    other than NPR?
4        MR. BROOKS:  Objection to form.
5        THE WITNESS:  Can you phrase that a
6    different way?
7    BY MR. MCELROY:
8    Q.  Sure, I can rephrase that.
9        So as part of this lawsuit, do you
10   understand that one thing NPR wants is to prevent
11   CPB from granting interconnection funds to the
12   Public Media Infrastructure?
13       MR. BROOKS:  Objection; form.
14       THE WITNESS:  To the Public Media
15   Infrastructure?
16   BY MR. MCELROY:
17   Q.  Yeah.  Are you aware of --
18   A.  The PMI.
19   Q.  -- the Public Media Infrastructure
20   coalition?
21       MR. BROOKS:  Objection; form.
22       THE WITNESS:  I've heard of this PMI

16  (Pages 58 to 61)

Page 62

1  concept, yes.
2  BY MR. MCELROY:
3      Q.  And so when I say "PMI," you know that
4  I'm referring to Public Media Infrastructure
5  coalition?
6      A.  That's correct.
7      Q.  So as part of this lawsuit, one of the
8  things NPR is seeking is to stop CPB from awarding
9  funds, interconnection funds to PMI; is that
10  correct?
11         MR. BROOKS:  Objection; form.
12         THE WITNESS:  It may be one of the
13  goals, sure.
14  BY MR. MCELROY:
15      Q.  And if NPR were to get this funding
16  instead of PMI, would NPR use it to advance this
17  alternative methodology we talked about with
18  terrestrial interconnection?
19         MR. BROOKS:  Objection; form.
20         THE WITNESS:  Yes.
21  BY MR. MCELROY:
22      Q.  All right.  I want to talk a little bit

Page 63

1  about PRSS.  Again, I need to get an exhibit.  I
2  probably should have thought a little more
3  intently about where I placed my exhibits.
4         MR. MCELROY:  I believe we're on
5  Exhibit 3, correct?
6         THE COURT REPORTER:  Uh-huh.
7         MR. MCELROY:  I'm handing to the court
8  reporter what I'd like to be marked as Munipalla
9  Exhibit 3.
10         (Munipalla Deposition Exhibit 3 was
11  marked for identification and attached to the
12  transcript.)
13  BY MR. MCELROY:
14      Q.  Go ahead and take a moment to review
15  that.  I'm going to go grab something else, as
16  well.
17         (Witness peruses the exhibit.)
18         MR. MCELROY:  I'm also handing to the
19  court reporter what I'd like to be marked as
20  Munipalla Exhibit 4.
21         (Munipalla Deposition Exhibit 4 was
22  marked for identification and attached to the

Page 64

1  transcript.)
2         THE WITNESS:  Do I look over that, too?
3  BY MR. MCELROY:
4      Q.  Please go ahead and look at Exhibit 4,
5  as well.  I'm going to ask you about both of them.
6         (Witness peruses the exhibit.)
7         THE WITNESS:  Okay.
8  BY MR. MCELROY:
9      Q.  Do you recognize these documents,
10  Exhibit 3 and Exhibit 4, Mr. Munipalla?
11      A.  Yes, I do.
12      Q.  And what are they?
13      A.  Exhibit 3 is an e-mail talking about
14  preparing for a visit by the Senate Press
15  Secretaries Association and Senate staffers.
16         Exhibit 4 is an overview of the Public
17  Radio Satellite System.
18      Q.  So is Exhibit 4 the document that is
19  referenced as an attachment in Exhibit 3?
20      A.  I don't know for sure because I wasn't
21  at that meeting, but I could say yes because it's
22  got most of the content about PRSS.

Page 65

1      Q.  Well, the attachment there says, PRSS
2  overview 8-2025.PDF; right?
3      A.  Yeah.  And this doesn't necessarily say
4  that.  So that's why I'm assuming.
5      Q.  But at the bottom of this -- Exhibit 4
6  is an overview of PRSS; correct?
7      A.  Yes.
8      Q.  And on the bottom right hand, it says,
9  August 2025?
10      A.  Yes.
11      Q.  So is it fair to --
12      A.  Yes, it does.
13      Q.  -- believe that these two documents are
14  related?
15         MR. BROOKS:  Objection; form.
16         THE WITNESS:  I'm sorry.  This is 29.
17  This is 25.  I think we can say they're closely
18  related.  I just don't know if this is exactly the
19  document.
20  BY MR. MCELROY:
21      Q.  Okay.  I understand.
22         So Exhibit No. 3 is an e-mail you

17 (Pages 62 to 65)

Case 1:25-cv-01674-RDM    Document 59-6    Filed 10/24/25    Page 19 of 79

10/20/2025          National Public Radio, Inc., et al. v. Donald J. Trump, et al.          Badri Munipalla

Page 66

1 received as a cc, correct, Mr. Munipalla?
2     A. Yes.
3     Q. Now, why was the Senate Press
4 Secretaries -- or Senate Press Secretaries
5 Association receiving an overview of PRSS?
6         MR. BROOKS: Objection; form.
7         THE WITNESS: I do not know the answer
8 to that. That's a Marta question.
9 BY MR. MCELROY:
10    Q. Why were you cc'd on the e-mail?
11    A. Because all of the folks who were doing
12 the tour were my staff.
13    Q. Okay.
14    A. And we were just a small portion of the
15 overall program.
16    Q. So Exhibit 4, would this have been
17 created by you or your staff?
18    A. Yes.
19    Q. And is this an accurate representation
20 of the Public Radio Satellite System?
21    A. Yes.
22    Q. Does this overview mention the

Page 67

1 Corporation for Public Broadcasting at all?
2     A. It does at the top.
3     Q. So where it says, The distribution
4 division of NPR manages the PRS, which was
5 originally built in 1979 with funds provided by
6 Congress through the Corporation for Public
7 Broadcasting?
8     A. Yes.
9     Q. If you look on page 2 in the Finances
10 section, that section doesn't reference any
11 funding from CPB; does it?
12    A. The annual operating budget, the
13 13 million, it doesn't explicitly say that in this
14 document, but that's -- that includes the money
15 from CPB.
16    Q. But it wasn't -- the money from CPB
17 isn't important enough to note to the Senate Press
18 Secretaries Association?
19        MR. BROOKS: Objection to form.
20        THE WITNESS: I think that's an
21 inference that you're drawing. I don't know what
22 the nature of the presentation was. I don't know

Page 68

1 if it was about finances. To me, it seems like
2 this was about what does the PRSS do. It was less
3 about the finances. So had it been about
4 finances, I'm sure it would have been broken out.
5 BY MR. MCELROY:
6     Q. But there is a section about finances on
7 this, isn't there, Mr. Munipalla?
8     A. I think it is just a brief summary of
9 here's the budget, and here's -- here's how we get
10 payments from the interconnected stations. It's
11 more about the service that we're providing, less
12 about the budget, even though it's titled
13 Finances.
14    Q. Okay. But that Finances section does
15 not reference the Corporation for Public
16 Broadcasting; does it?
17        MR. BROOKS: Objection; form.
18        THE WITNESS: It does not as written.
19 BY MR. MCELROY:
20    Q. All right.
21        MR. MCELROY: I'm handing the court
22 reporter what I'd like to be marked as Munipalla

Page 69

1 Exhibit 5.
2         (Munipalla Deposition Exhibit 5 was
3 marked for identification and attached to the
4 transcript.)
5 BY MR. MCELROY:
6     Q. Take a moment to look at Exhibit 5, and
7 let me know when you've finished reading it.
8         (Witness peruses the exhibit.)
9         THE WITNESS: Yes.
10 BY MR. MCELROY:
11    Q. Do you recognize this document,
12 Mr. Munipalla?
13    A. I do.
14    Q. And what is it?
15    A. So this is a conversation between me and
16 my boss talking about a potential customer.
17    Q. And who is the potential customer?
18    A. It says that on the subject, WXPN.
19    Q. Who is WXPN?
20    A. XPoNential Radio.
21    Q. Do you know where they're located?
22    A. I believe they're in Pennsylvania, maybe

18 (Pages 66 to 69)

Page 70

1 Philadelphia.
2     **Q.  Do you know whether they're a -- strike**
3 **that.**
4       **Is WXPN a public radio station.**
5     A.  Yes, they are.
6     **Q.  And is WXPN a large public radio**
7 **station?**
8       MR. BROOKS:  Objection; form.
9       THE WITNESS:  I think it is important in
10 this context to think about them as a producer.
11 BY MR. MCELROY:
12     **Q.  As a producer?**
13     A.  Because we're talking about moving their
14 content around.  So they -- within our system, we
15 have stations who are also producing stations.  So
16 in this context, we're talking about WXPN as the
17 producer, less about them as a station.
18     **Q.  So would other public radio stations be**
19 **purchasing WXPN's content?**
20     A.  That is the gist of this e-mail.  They
21 already have a business where they're distributing
22 their music.  It's primarily an alternative music

Page 71

1 station -- I should say alternative music
2 producer, and they distribute it to about 13
3 stations.  That's their network.
4     **Q.  And so the conversation is whether or**
5 **not WXPN will distribute its content through**
6 **NPR Distribution?**
7     A.  That's correct.
8     **Q.  Do you know whether or not WXPN ended up**
9 **signing a deal with NPR Distribution to distribute**
10 **its content through NPR Distribution?**
11     A.  This is ongoing.
12     **Q.  It's ongoing?**
13     A.  Yeah.
14     **Q.  Now, if you look at the bottom section**
15 **of this e-mail, that's an e-mail from you to Chris**
16 **Nelson; correct?**
17     A.  That's correct.
18     **Q.  And you said Chris Nelson is your**
19 **supervisor?**
20     A.  That's correct.
21     **Q.  What is Mr. Nelson's title?**
22     A.  I know he's an SVP, but I don't -- I

Page 72

1 think he's SVP of technology operations.
2     **Q.  For NPR Distribution or NPR?**
3     A.  That would be for NPR.
4     **Q.  Now, in the first line of your e-mail to**
5 **Mr. Nelson, you say, "Our current satellite**
6 **distribution rates will kill this deal before it**
7 **starts."**
8       **Did I read that correctly?**
9     A.  That's correct.
10     **Q.  What do you mean by that?**
11     A.  Yeah, I think what is missing in this
12 e-mail is the conversation that we had, Chris and
13 I had, and I was just reiterating his concern.
14 The PRSS right now is set up to be a national
15 distributor over satellite.
16     And this terrestrial business is -- I
17 shouldn't say terrestrial business.  This
18 terrestrial technology is still in its infancy,
19 and we haven't quite figured out the exact pricing
20 structure because we're still building the
21 technology.
22     So I think what I was trying to point

Page 73

1 out to him was for a small network his size, they
2 wouldn't be able to afford our existing rates and
3 fees for satellite distribution.
4     **Q.  Because the satellite distribution rates**
5 **are higher than the terrestrial distribution**
6 **rates?**
7     A.  And they are fundamentally set up to
8 actually go to every single interconnected
9 station.  So it's a scale thing, but what they
10 were looking for was just to get to 13 stations.
11     So, you know, we're set up for something
12 else, but they were asking for something else, but
13 the flexibility that our terrestrial technology
14 gives us is to be able to address these kind of
15 new markets.
16     **Q.  So the terrestrial technology allows you**
17 **to be more specific about who the content is going**
18 **to?**
19     MR. BROOKS:  Objection; form.
20     THE WITNESS:  No, the terrestrial
21 technology -- the interconnection is set up to be
22 a one to many.  And the scale that you get for

Page 74

1  cost efficiency is pushing it once and getting it
2  to as many locations as possible.  That is the
3  appeal of satellite.
4         But what we have with terrestrial is you
5  could receive content, they could push the content
6  to NPR, NPR Distribution, and we could go to
7  specific nodes.  That's what terrestrial
8  technology enables without getting more and more
9  expensive as you add more sites.  It's just a
10  technology difference.
11  BY MR. MCELROY:
12     Q.  So I just want to make sure that I
13  understand the difference here.  For satellite
14  technology, it goes to everyone who's
15  interconnected regardless of whether they want it?
16        MR. BROOKS:  Objection; form.
17        THE WITNESS:  It goes to -- it's
18  available to everybody who's interconnected, and
19  then if they choose to take that programming, that
20  is the choice of the stations.
21  BY MR. MCELROY:
22     Q.  And that's part of what drives the

Page 75

1  higher cost of satellite interconnection?
2     A.  It is the upfront purchase of the
3  satellite capacity.  That's what drives the cost,
4  because you're buying for the -- you're paying for
5  the bandwidth no matter what.  I mean, that's sort
6  of the PRSS model, right.
7         The CPB pays for satellite capacity, and
8  that gives us the capability of going to all of
9  the public radio stations, if necessary, assuming
10  that they choose to be interconnected.
11        So there is that upfront cost that is
12  associated with satellite, which is also called
13  the CapEx expenditure.  And that's what makes it
14  expensive.  But with terrestrial, that barrier is
15  gone because it's almost a pay-as-you-go.
16     Q.  So to be clear, satellite
17  interconnection is more expensive than Internet
18  interconnection?
19        MR. BROOKS:  Objection; form.
20        THE WITNESS:  The satellite
21  interconnection rates are set up by the D/I
22  committee, as I've shared with you before.  And

Page 76

1  those are, in general, more expensive than what
2  you could do with terrestrial.
3         And that is what we are discussing here,
4  that for this particular -- for this particular
5  deal, it would be better that they use the
6  terrestrial distribution technology, given their
7  size, given what they're trying to accomplish.
8  BY MR. MCELROY:
9     Q.  So two sentences later, still first
10  paragraph, you say, "Plus this producer is already
11  set up with terrestrial distribution.  They are
12  not going to switch to satellite."
13        Did I read that correctly?
14     A.  That is correct.
15     Q.  Does that mean that this producer, WXPN,
16  is already set up with terrestrial distribution
17  with NPR Distribution?
18     A.  No.  What this means is this producer is
19  already set up with terrestrial distribution.
20  They're not going to switch, meaning they already
21  have their own technology set up.  They use --
22  just for -- I mean, you see the word "Barix"

Page 77

1  coming up in the next paragraph.  That is their
2  current technology.
3         So that's why I say, these are basically
4  equivalent to their current Barix setup.  So Barix
5  is a specific kind of receiver.  And they've got
6  Barix boxes at their 13 stations that are
7  receiving the music content.  And that's their
8  current setup.
9     Q.  And Barix is a terrestrial distribution
10  technology?
11     A.  Correct.
12     Q.  Is Barix a competitor of
13  NPR Distribution?
14     A.  Our Edge device, I believe, is superior
15  to their technology.  So since our device is not
16  yet launched, it's hard to call it a competitor.
17  But we're aware of Barix and we're aware of its
18  capabilities and we wanted to make sure that we
19  build a box that at least addresses the existing
20  market capability.
21     Q.  Does NPR Distribution currently not
22  offer terrestrial interconnection?

20  (Pages 74 to 77)

Case 1:25-cv-01674-RDM    Document 59-6    Filed 10/24/25    Page 22 of 79

10/20/2025          National Public Radio, Inc., et al. v. Donald J. Trump, et al.          Badri Munipalla

Page 78

1     MR. BROOKS:  Objection; form.
2     THE WITNESS:  I think we discussed this
3  before.  The terrestrial distribution that we
4  offer right now is as a backup to the existing
5  satellite receivers.  And the terrestrial content
6  arrives on that same satellite receiver unit, and
7  that is the key difference.
8     The Barix box is capable of receiving
9  content on its own Barix unit.
10  BY MR. MCELROY:
11     **Q.  So for the 40 or so public radio**
12  **entities that are with terrestrial distribution**
13  **with NPR, does their -- does the content they**
14  **receive go to the satellite and down to their**
15  **receiver?**
16     A.  Not for terrestrial.  But it goes to the
17  same satellite receiver.
18     **Q.  The same hardware on the ground, but**
19  **it's not using the hardware in space?**
20     A.  That's correct.  Think of the hardware
21  as a box.  There is two ways it can get content,
22  one over the satellite or a delayed terrestrial

Page 79

1  feed.  The stations that decide to use the
2  terrestrial option, they just get the delayed
3  terrestrial feed.  So it's not going over the air.
4     **Q.  And going back to the first paragraph in**
5  **your e-mail to Mr. Nelson, you state, "The water**
6  **won't flow uphill."**
7     **Did I read that correct?**
8     A.  That's correct.
9     **Q.  What do you mean by that?**
10     A.  I think what I was referring to is once
11  people have switched to terrestrial, they like the
12  convenience of terrestrial.  The fundamental
13  difference being it's bidirectional versus
14  satellite, it's unidirectional.
15     And once you get used to that, it's very
16  hard -- because now you have data gathering
17  capabilities.  So they don't like to give that up.
18  So I was trying to suggest -- I mean, I was not
19  trying.  I was trying to tell him that once people
20  have gone to terrestrial, they're not going to
21  want to go back to satellite.
22     **Q.  Do public radio stations generally**

Page 80

1  **prefer terrestrial?**
2     MR. BROOKS:  Objection; form.
3     THE WITNESS:  It's really -- it's a
4  mixed bag with public radio.  Because the benefit
5  of terrestrial is the bidirectionality, but the
6  benefit of satellite is the availability of the
7  ubiquity.  So if you're located up the hill and
8  around the bend, it may be very difficult for you
9  to have a terrestrial connection.
10     So when you talk about public radio, I
11  can't say every single radio station would prefer
12  terrestrial over satellite.
13  BY MR. MCELROY:
14     **Q.  So there are some public radio stations**
15  **that it would be easier for them to use**
16  **terrestrial versus satellite?**
17     MR. BROOKS:  Objection; form.
18     THE WITNESS:  If you are in a major city
19  and if that's where your facility is located and
20  you already have good broadband access, then a
21  case could be made that they would prefer
22  terrestrial.

Page 81

1  BY MR. MCELROY:
2     **Q.  So you said once stations -- once people**
3  **have gone to terrestrial, they're not going to**
4  **want to go back to satellite.**
5     **Why do you feel that way?**
6     A.  If you've gone back to terrestrial --
7  excuse me, if you have completely transitioned to
8  terrestrial, there is a good chance that you've
9  retired all of the satellite equipment.  And the
10  satellite equipment, the downlink, and the RF
11  engineering that goes into receiving satellite
12  content is expensive to set up.
13     So if you've transitioned away from it,
14  it's going to be really hard for you to go back to
15  satellite because it requires all of that
16  equipment, and you have to get an FCC license.
17  There's a lot that goes into being able to be
18  equipped with all of that equipment, the satellite
19  downlink equipment.
20     **Q.  You also said that the terrestrial**
21  **distribution stations receive additional data?**
22     A.  Not with our current setup.  They just

21 (Pages 78 to 81)

Page 82

1  receive delayed content.
2      **Q.  Sorry, I'm not talking about the**
3  **content.  And, again, I'm just trying to follow up**
4  **on a point you made.**
5          **You said there was bidirectional ability**
6  **that allowed them to do something with the data;**
7  **is that correct?**
8      A.  Yes, that's correct.  Forgive me, I was
9  misunderstanding your question.
10     **Q.  What does that mean?  What can they do**
11 **with that data?**
12         MR. BROOKS:  Objection; form.
13         THE WITNESS:  They cannot do anything
14 with the data, but the bidirectionality in a
15 terrestrial service is the ability to get back
16 information about the hardware device, whether
17 it's running, is there a failure.  You know, you
18 get all of that content back easily.
19         But with satellite receivers, sometimes
20 it's only unidirectional.  And you don't get that
21 information back unless stations have IT
22 capabilities and they've opened up firewalls and

Page 83

1  they've allowed that data to come back
2  terrestrially.
3          So it's -- in general, with satellite
4  you can think of it as a unidirectional pipe.  But
5  with terrestrial, it's a bidirectional pipe.
6  BY MR. MCELROY:
7      **Q.  So the data that they're able to obtain**
8  **as a result of the bidirectionality, it's about**
9  **the performance of the equipment; is that correct?**
10         MR. BROOKS:  Objection; form.
11         THE WITNESS:  It could be anything.
12 It's just the capability that they have, exactly
13 what information they get back is very specific,
14 case-by-case basis.
15 BY MR. MCELROY:
16     **Q.  Are they able to better analyze their**
17 **end user data as a result of terrestrial**
18 **distribution?**
19     A.  I think a key point to make here is PRSS
20 is a B2B shop.  We send content to stations.  We
21 don't get content directly to end listeners of
22 those stations.  That is the responsibility of the

Page 84

1  stations.
2          But in theory, generally speaking, it is
3  no different from Apple collecting information
4  about your listenership of podcast listening
5  habits.  That's an example of getting
6  bidirectional data because of terrestrial
7  connection.
8          Now, we are not going straight to the
9  end listener.  We're only going to the businesses
10 or the stations.
11     **Q.  Okay.  But that data -- and I'm really**
12 **just trying to understand this bidirectional**
13 **benefit.**
14         **That data collection that you mentioned**
15 **with the terrestrial distribution, that's not**
16 **possible with the unidirectional satellite**
17 **connection?**
18     A.  In general, yes, unless you carefully
19 engineer it.
20     **Q.  Does NPR Distribution have their**
21 **satellite currently carefully engineered in order**
22 **to get bidirectional data in that manner?**

Page 85

1      A.  We use a system for the satellite
2  distribution piece.  The satellite receiver that
3  we're talking about is provided by a vendor called
4  ATX.  And they have the capability to get some
5  information back, but it is dependent on the
6  station allowing that to come back.
7      **Q.  Okay.**
8      A.  Because it depends on security issues at
9  every station site, and some data centers do not
10 want that.
11     **Q.  But the terrestrial distribution doesn't**
12 **have the same limitation?**
13     A.  That is correct.
14         MR. MCELROY:  I'm handing the court
15 reporter what I would like to be marked as
16 Exhibit 6, Munipalla Exhibit 6.
17         (Munipalla Deposition Exhibit 6 was
18 marked for identification and attached to the
19 transcript.)
20 BY MR. MCELROY:
21     **Q.  And take a moment to review Exhibit 6.**
22 **Let me know when you've finished.**

22  (Pages 82 to 85)

Page 86

1    A. Yeah.
2    Q. Do you recognize Exhibit 6,
3  Mr. Munipalla?
4    A. I do.
5    Q. What is it?
6    A. This is the slide deck that we typically
7  use to orient new D/I committee members or NPR
8  board members.
9    Q. To orient them about NPR Distribution?
10    A. That's correct.
11    Q. And this appears to be an orientation
12  that occurred on September 10th, 2025; right?
13    A. That's right.
14    Q. Would you have participated in this
15  orientation, Mr. Munipalla?
16    A. Yes.
17    Q. I should ask that better. Did you
18  participate in this September 10th, 2025,
19  orientation?
20    A. Yes.
21    Q. Did you create this presentation that
22  we're looking at?

Page 87

1    A. My staff did.
2    Q. Your staff did.
3       Is this a presentation that you
4  personally provided at the orientation?
5    A. Yes, this is the material we went over.
6    Q. If you look at the bottom of the
7  exhibit, you'll see there are numbers and letters
8  down there. We call those Bates numbers. If you
9  look at the one that ends in 316. It's the third
10  page of the exhibit.
11       Do you see that there's a chart here;
12  correct?
13    A. Sorry, yes, I do.
14    Q. What does this chart represent?
15    A. This is the footprint of the
16  interconnection. The blue dots are the
17  ContentDepot downlinks, and the red dots are the
18  repeaters, if you will.
19    Q. What's the difference between the two?
20    A. So the blue dots get the direct signal,
21  and then it's relayed to the regional networks,
22  perhaps, by that blue dot recipient.

Page 88

1    Q. So how is it relayed to the red dot from
2  the blue dot?
3    A. It could vary. I don't know if there's
4  a uniform way of doing it. A lot of it could be
5  just the station infrastructure. I don't know.
6  That's the station business.
7    Q. Would it be another satellite that
8  they're using?
9    A. In some cases, it could.
10    Q. In some cases it could be a terrestrial
11  technology that they're using to relay that
12  information?
13    A. That's correct. I'm speculating, but
14  yes.
15    Q. If you look at the next page with the
16  Bates No. 317 on the bottom.
17       The middle box here is discussing PRSS
18  interconnected stations; right?
19    A. That's correct.
20    Q. And PRSS interconnected stations are
21  those public radio stations that use
22  NPR Distribution for their interconnection; is

Page 89

1  that correct?
2    A. That's correct.
3    Q. All right. And there it says there are
4  379 total; is that right?
5    A. Yes.
6    Q. Now, underneath the -- there's like a --
7  almost sort of a Venn diagram -- not really a Venn
8  diagram. It's a circle chart; right?
9    A. It is a Venn diagram. Yeah, sure.
10    Q. Underneath that there's a chart where it
11  says, PRSS interconnected stations 379. And under
12  that it says, Additional license stations; right?
13    A. Yes.
14    Q. And there it says 859.
15       Do you know what that 859 -- what those
16  859 licensed stations are?
17    A. I think that refers to the affiliates
18  and the red dots in addition to the blue dots in
19  the previous map.
20    Q. So would all of these be public radio
21  stations, Mr. Munipalla?
22    A. Yes, I believe so.

23 (Pages 86 to 89)

10/20/2025          National Public Radio, Inc., et al. v. Donald J. Trump, et al.          Badri Munipalla

Page 90

1    Q.  But these would not be -- these 859,
2  would they be considered interconnected through
3  NPR Distribution?
4    A.  Indirectly.
5    Q.  Because they're receiving content from
6  an interconnected station?
7    A.  That's -- so, I mean, I don't know
8  specifically what content they're receiving, but
9  the fact that they are served in some capacity
10  directly or indirectly is what this reflects.
11    Q.  These 859 additional licensed stations,
12  NPR doesn't -- or NPR Distribution doesn't
13  consider them as interconnected stations for their
14  numbers; right?
15    A.  That is correct, which is why when you
16  asked the question earlier, how many
17  interconnected stations we serve, I said it's
18  about 350, which here it's 379.
19    Q.  So these 859 other stations, are those
20  public radio stations?
21    MR. BROOKS:  Objection; form.
22    THE WITNESS:  I believe they are.

Page 91

1  BY MR. MCELROY:
2    Q.  And those 859 additional licensed
3  stations do not have a contract with
4  NPR Distribution; correct?
5    MR. BROOKS:  Objection; form.
6    THE WITNESS:  That's correct.
7  BY MR. MCELROY:
8    Q.  And before we go off this page, I think
9  we may have addressed this before, but just
10  following up on this, that total number of
11  stations, 1,238 there, are you aware of -- is
12  that -- are there more public radio stations than
13  those 1,238 that are referenced on this slide?
14    A.  I honestly don't know.  As you pointed
15  out earlier, just to be very clear, I mean, we do
16  business with the 379, and what they do afterwards
17  is -- I'm less familiar with that.
18    Q.  Okay.  Fair enough.
19      So you don't do business with the other
20  859.  So you just are unfamiliar with what they
21  do?
22    A.  That's right.

Page 92

1    Q.  All right.  If you go to Slide No. 321,
2  Mr. Munipalla.
3      This is a slide discussing the different
4  funding sources for NPR Distribution; correct?
5    A.  That's correct.
6    Q.  And so there are --
7    MR. BROOKS:  Sorry, one second.  What
8  number are we on now?
9    MR. MCELROY:  321.
10    MR. BROOKS:  Thank you.
11  BY MR. MCELROY:
12    Q.  And so here there are five separate
13  sources of revenue that you've identified on this
14  slide; correct?
15    A.  That's correct.
16    Q.  And the stations, that is the fees that
17  the individual stations who are signed up for
18  interconnection through NPR Distribution pay to
19  NPR; correct?
20    A.  That is correct.
21    Q.  And then the producers, distributors, do
22  those individuals pay NPR interconnection a

Page 93

1  separate fee to provide their content on the
2  interconnection network?
3    A.  Correct.
4    Q.  And then public radio networks and
5  commercial customers, what does that refer to?
6    A.  That's the 1.5 million business I was
7  talking about earlier.
8    Q.  So that's the sale of the excess
9  satellite capacity that we discussed earlier?
10    A.  That's correct.  Just to be clear,
11  there's a little bit more to it, but it's a good
12  general way to think about it.
13    Q.  And then this other box here, it says,
14  charitable trust.  What does that mean?
15    A.  This is what we discussed earlier.  This
16  is the separate entity, the trust, the Public
17  Radio Satellite Trust that owns the equipment, the
18  satellite, and the satellite lease and all of the
19  equipment.
20      And as per our arrangement with them,
21  the trust represents all of the stations.  And
22  since the stations elected NPR to be the operator

24 (Pages 90 to 93)

10/20/2025        National Public Radio, Inc., et al. v. Donald J. Trump, et al.        Badri Munipalla

Page 94

1  of the PRSS, there is an equipment lease agreement
2  that allows us to get up to $400,000 in
3  reimbursement for very specific types of expenses.
4  So that's the charitable trust.
5      **Q.  You said that the stations elected NPR**
6  **to be the operator of the PRSS.  How did that**
7  **occur?**
8          MR. BROOKS:  Objection; form.
9          THE WITNESS:  That was before my time.
10  It was in the 1980s.
11  BY MR. MCELROY:
12      **Q.  Are you aware of whether a vote or**
13  **election occurred amongst the public radio**
14  **stations?**
15         MR. BROOKS:  Objection; form.
16         THE WITNESS:  You would have to check
17  with legal.
18  BY MR. MCELROY:
19      **Q.  Since you have been the VP of**
20  **distribution, are you aware of an election in**
21  **which public radio stations have elected NPR to be**
22  **the entity that runs PRSS?**

Page 95

1      A.  No.
2      **Q.  Since you've -- since 2008 is when you**
3  **started at NPR; right?**
4      A.  (No verbal response.)
5      **Q.  Are you aware of any election that has**
6  **been held of the public radio stations to elect**
7  **NPR as that entity that runs PRSS?**
8      A.  No.
9      **Q.  And back on 317, we talked about those**
10  **859 stations.  Those stations, just to be clear,**
11  **do not have contracts currently with NPR**
12  **Distribution; is that right?**
13         MR. BROOKS:  Objection; form.
14         THE WITNESS:  I'm sorry, can you say
15  that again?
16  BY MR. MCELROY:
17      **Q.  Yeah, sorry.**
18         **So back on page 317, we were talking**
19  **about those 859 additional licensed stations.  Do**
20  **you recall that?**
21      A.  Yes.
22      **Q.  Those 859 additional licensed stations**

Page 96

1  **do not currently have a contractual agreement with**
2  **NPR Distribution; is that correct?**
3          MR. BROOKS:  Objection; form.
4          THE WITNESS:  That's correct.
5  BY MR. MCELROY:
6      **Q.  Oh, we're still on 321.  If we go back**
7  **to 321, there's one box left I didn't ask you**
8  **about.**
9      A.  Okay.
10      **Q.  And that box shows -- it says, federal**
11  **funding.  And it appears to show a picture of the**
12  **Capitol building down the street here and the logo**
13  **for CPB; is that right?**
14      A.  Yes.
15      **Q.  So explain to me the federal funding**
16  **portion of NPR Distribution's funding sources.  Do**
17  **you get money from both Capitol Hill and CPB?**
18         MR. BROOKS:  Objection; form.
19         THE WITNESS:  Can you say that again?
20  BY MR. MCELROY:
21      **Q.  Do you get money directly from Capitol**
22  **Hill for NPR Distribution funding?**

Page 97

1          MR. BROOKS:  Objection to form.
2          THE WITNESS:  Through CPB, not directly.
3  BY MR. MCELROY:
4      **Q.  So Congress does not appropriate funds**
5  **directly to NPR Distribution for interconnection?**
6          MR. BROOKS:  Objection; form.
7          THE WITNESS:  That's a statute question.
8  BY MR. MCELROY:
9      **Q.  I'm just trying to figure out where your**
10  **funding comes from.  Does NPR Distribution receive**
11  **funds directly from the United States Congress?**
12         MR. BROOKS:  Objection; form.
13         THE WITNESS:  By "direct" you mean is
14  there a wire transfer between the United States,
15  Congress, and NPR?
16  BY MR. MCELROY:
17      **Q.  Or the United States Treasury on behalf**
18  **of Congress, yes.  I'm really not trying to be**
19  **difficult here.  You have a picture of the Capitol**
20  **building here.**
21      A.  I think the intention of this picture is
22  perhaps generally to show that we get federal

25  (Pages 94 to 97)

10/20/2025          National Public Radio, Inc., et al. v. Donald J. Trump, et al.          Badri Munipalla

Page 98

1  dollars. I don't think it is indicating that
2  we're getting direct money from Capitol Hill.
3      Q.  Right. Those funds do not come directly
4  from the federal government; correct?
5          MR. BROOKS: Objection; form.
6          THE WITNESS: That is correct.
7  BY MR. MCELROY:
8      Q.  They go through a conduit; right?
9      A.  That's correct.
10     Q.  And in this case, that conduit is CPB?
11     A.  That is correct.
12     Q.  If you go to page 322, this is a pie
13  chart of the various revenue sources for
14  NPR Distribution; correct?
15     A.  Correct, for FY '25.
16     Q.  For fiscal year '25.
17         So on this, again, there are five
18  separate funding sources that correspond to those
19  five funding sources we just discussed; right?
20         MR. BROOKS: Objection; form.
21         THE WITNESS: Yes, it doesn't reflect
22  the trust.

Page 99

1  BY MR. MCELROY:
2      Q.  Why not?
3      A.  Because that is a reimbursement, and
4  it's not a direct revenue source. It just depends
5  at the end of the year how much equipment has gone
6  bad and if the trust is willing to reimburse it.
7      Q.  So for the purposes of these two slides,
8  you're making a distinction between funding and
9  revenue?
10     A.  Correct.
11     Q.  So here you have, instead of the
12  charitable trust box, there's a new revenue source
13  that says, investment income; correct?
14     A.  That's correct.
15     Q.  And that number was 2.13 million for
16  fiscal year '25?
17     A.  That's correct.
18     Q.  What investments does NPR Distribution
19  have that this revenue is generated from?
20     A.  I'll have to think about that for a
21  minute. Sorry, I'm starting to wonder if this is
22  mislabeled, because we really don't have an

Page 100

1  investment income of 2.13 million. That's why I'm
2  taking a minute to understand this. I think
3  you're pointing out something that I haven't
4  caught.
5      Q.  NPR Distribution has financial reserves;
6  doesn't it?
7      A.  It does. And this -- that's why I'm
8  surprised at this number, because the only thing
9  we get from our financial reserves is what's
10  called as a distribution. It is an annual
11  distribution that we take, and it is not
12  2.13 million. It is to the tune of 700,000.
13     Q.  Does NPR Distribution make -- generate
14  interest revenue on its financial reserves?
15         MR. BROOKS: Objection to form.
16         THE WITNESS: It does.
17  BY MR. MCELROY:
18     Q.  Is it possible that this investment
19  income number represents interest gained on NPR
20  Distribution's financial reserves?
21         MR. BROOKS: Objection; form.
22         THE WITNESS: You'll have to ask the

Page 101

1  finance people, but the number looks really high.
2  I don't believe this number is that.
3  BY MR. MCELROY:
4      Q.  Do you know sitting here today how much
5  NPR Distribution has in financial reserves?
6      A.  I believe -- I believe it is around
7  25 million, yeah.
8      Q.  And so looking at the other pieces of
9  this pie chart, CPB's project funding is
10  29 percent of fiscal year '25 revenue; correct?
11     A.  Correct.
12     Q.  So the other two-thirds, approximately,
13  a little more than two-thirds, of
14  NPR Distribution's revenue for fiscal year
15  '25 came from non-CPB sources; right?
16     A.  That's correct.
17     Q.  Now, let's talk for a few minutes about
18  the funds that NPR Distribution receives from CPB.
19         NPR Distribution cannot use any
20  interconnection funds received from CPB to create
21  content; right?
22         MR. BROOKS: Objection; form.

26 (Pages 98 to 101)

Page 102

1    THE WITNESS: We do not create content.
2  NPR Distribution does not create content.
3  BY MR. MCELROY:
4    **Q. But the question I asked is slightly**
5  **different.**
6    **NPR Distribution cannot use the**
7  **interconnection funds received from CPB to create**
8  **content; is that right?**
9    MR. BROOKS: Objection; form.
10    THE WITNESS: I don't know if we can,
11  but we don't create content is what I'm trying to
12  communicate. We're not in the business of
13  creating content.
14  BY MR. MCELROY:
15    **Q. Fair enough. So let me restate the**
16  **question slightly.**
17    **NPR Distribution does not use CPB**
18  **interconnection funds to create content --**
19    MR. BROOKS: Objection; form.
20  BY MR. MCELROY:
21    **Q. -- is that right?**
22    A. That is accurate.

Page 103

1    **Q. So NPR's actual content that it creates**
2  **is unaffected by the amount of interconnection**
3  **funds NPR Distribution receives from CPB; right?**
4    MR. BROOKS: Objection; form.
5    THE WITNESS: NPR's content creation
6  budget is completely separate from our budget, as
7  you can see from this pie chart. So the answer is
8  yes.
9  BY MR. MCELROY:
10    **Q. And in your experience at NPR, does the**
11  **Corporation for Public Broadcasting take a role in**
12  **reviewing or approving programming content at NPR?**
13    MR. BROOKS: Objection; form.
14    THE WITNESS: That is a question you
15  would have to ask -- you'll have to ask an NPR
16  person, not an NPR Distribution person. I don't
17  know what happens there.
18  BY MR. MCELROY:
19    **Q. You're not aware of any time that CPB**
20  **has attempted to review or approve or alter NPR**
21  **programming content?**
22    A. Again, that is generally a question that

Page 104

1  the content team would have to answer. Edith
2  Chapman works with CPB, as well. So that would be
3  something for her. She's not with NPR anymore,
4  but you get my point.
5    **Q. Yeah, I understand. But I'm just -- you**
6  **yourself, you're not aware of any time that CPB**
7  **has attempted to affect NPR's actual content; are**
8  **you?**
9    MR. BROOKS: Objection; form.
10    THE WITNESS: It is not under my
11  purview. I don't have any insight into that.
12  BY MR. MCELROY:
13    **Q. So you don't have any knowledge of any**
14  **time that CPB did that?**
15    MR. BROOKS: Objection; form.
16    THE WITNESS: I just don't have any
17  insight.
18  BY MR. MCELROY:
19    **Q. I understand you don't have any insight,**
20  **but insight and knowledge are different, right.**
21    **Are you aware of -- are you aware of a**
22  **single instance in which CPB attempted to alter or**

Page 105

1  affect NPR's actual programming content?
2    MR. BROOKS: Objection; form.
3    THE WITNESS: I have no personal
4  connections with that team and I have -- I really
5  don't know. I just have no knowledge of it if
6  that's what you're asking.
7  BY MR. MCELROY:
8    **Q. So you have no knowledge of it; right?**
9    A. That's right.
10    MR. BROOKS: Objection. I think he's
11  answered the question numerous times.
12    MR. MCELROY: I disagree, but he now
13  has.
14  BY MR. MCELROY:
15    **Q. Are you aware of any time that CPB has**
16  **ever conditioned NPR's receipt of interconnection**
17  **funding based upon any content that NPR has**
18  **created?**
19    MR. BROOKS: Objection; form.
20    THE WITNESS: I have nothing to do with
21  content creation. These are not conversations I
22  engage with with anybody at NPR. I just do the

27 (Pages 102 to 105)

Page 106

1  distribution side.
2  BY MR. MCELROY:
3      Q.  Sure.  But your communications with CPB
4  about -- you do have communications with CPB about
5  interconnection funding; correct?
6      A.  That's correct.
7      Q.  Has CPB ever told you that
8  interconnection funding is dependent upon the
9  content of NPR's programming?
10     A.  We are the bottle, not the wine, which
11  is really, I mean, we're the conduit, we maintain
12  the infrastructure, we don't have conversations
13  about the content.  It doesn't even come up in
14  discussions with me, in my communications with
15  CPB.
16     Q.  So to be clear, NPR's programming
17  content has never come up in your communications
18  with CPB about interconnection funding?
19         MR. BROOKS:  Objection; form.
20         THE WITNESS:  It has not come up in my
21  communications with CPB.
22

Page 107

1  BY MR. MCELROY:
2      Q.  So the funding that NPR Distribution
3  receives from CPB, CPB requires NPR to sign a
4  written grant agreement for that funding; doesn't
5  it?
6         MR. BROOKS:  Objection; form.
7  BY MR. MCELROY:
8      Q.  Let me restate the question.
9      A.  Thank you.
10     Q.  So NPR Distribution receives funding
11  from CPB as we just discussed for interconnection;
12  correct?
13         Is that a "yes"?
14     A.  That is a yes.
15     Q.  Sorry.
16         When NPR Distribution receives
17  interconnection funding from CPB, does NPR sign a
18  written agreement with CPB related to that
19  funding?
20     A.  Yes.
21     Q.  And does CPB require NPR to sign written
22  agreements regarding interconnection funding?

Page 108

1         MR. BROOKS:  Objection; form.
2         THE WITNESS:  I don't know what CPB
3  requires from NPR.  That's where the lawyers come
4  in.  This is something that they handle with the
5  CPB lawyers.
6  BY MR. MCELROY:
7      Q.  Do you think that NPR would receive the
8  funding if it didn't sign an agreement with CPB?
9         MR. BROOKS:  Objection; form.
10        THE WITNESS:  I don't think -- I don't
11  know for sure, but I've never seen that happen.  I
12  mean, there's always a final paperwork for me to
13  sign which ratifies the contract and the
14  arrangement.
15  BY MR. MCELROY:
16     Q.  So to be clear, in your time as VP of
17  distribution at NPR, there has never been a time
18  where NPR received interconnection funds from CPB
19  where it didn't sign an agreement?
20     A.  That is correct.
21        MR. MCELROY:  We've been going for about
22  another hour.  Do you need to take a break, or we

Page 109

1  can kind of go through to lunch and take a longer
2  break for lunch?  It's up to you, guys.
3         MS. TOWNSEND:  What time are we doing --
4  what time do you want to break for lunch is the
5  question?
6         MR. MCELROY:  I would say around 12 or
7  12:30.
8         THE WITNESS:  I think we'll take a
9  break.
10        MR. MCELROY:  Okay.
11        THE WITNESS:  Yeah, come back before
12  lunch.
13        MR. MCELROY:  Take a quick break.
14        THE WITNESS:  If that's okay.  Yeah.
15        THE VIDEOGRAPHER:  The time is
16  11:15 a.m.  We are now off the record.
17        (Recess from the record.)
18        THE VIDEOGRAPHER:  The time is
19  11:27 a.m.  We are now on the record.
20  BY MR. MCELROY:
21     Q.  Mr. Munipalla, I believe you should
22  still have Exhibit 6 in front of you.  We were

Page 110

1  talking about page 322, Bates No. 322, of
2  Exhibit 6, specifically with respect to the
3  $2.13 million identified as an investment income
4  before we took a break.
5        Do you recall that?
6     A.  Yeah, thank you for the opportunity to
7  clarify that.  I just wanted to tell you I do
8  remember what that 2.13 million is.  I believe the
9  investment income label is a little confusing.
10  It's not what it should say.
11        For FCC '25, this 2.13 includes three
12  numbers, approximately.  There was $700,000 of
13  reserves that we did not use in the previous year.
14  We rolled that over to cover the deficit.
15        And then there was a special one-time
16  distribution of $9,000 that the D/I committee
17  approved.  That's in addition to the 700,000 that
18  was rolled over.
19        And then there was the 400,000
20  approximately that we were talking about in terms
21  of the trust reimbursements.  I think that's
22  lumped together in that number, as well.

Page 111

1        So if you tally that up, that's
2  approximately 2 million.  I don't exactly recall
3  what the 1.3 is, but that gets us close.
4     Q.  So when you said a one-time distribution
5  of 900,000, is that a one-time distribution from
6  reserves?
7     A.  That is correct.
8     Q.  And how is it that you came to recall
9  this information during our break, Mr. Munipalla?
10     A.  It was really bothering me that I
11  couldn't figure out what the 2.13 million was.  So
12  I just sat there and thought about it.  I think it
13  just helped to step away from the chair.  I'm
14  sorry, I couldn't recall it in the moment.
15     Q.  Did you have a communication with anyone
16  where this information was refreshed in your
17  recollection during the break?
18        MR. BROOKS:  Objection.  I think this is
19  privileged.
20        MR. MCELROY:  I don't think it's
21  privileged, but if you're -- I'm just asking if he
22  had the conversation, but if you're instructing

Page 112

1  him not to answer, you may instruct him not to
2  answer and we'll deal with it later.
3        THE WITNESS:  There was no conversation.
4  I just sat in the conference room.  And I was,
5  like, I got to know what this 2.1 is.  And then I
6  was reminded that FY '25 was an odd year in a
7  sense because we don't typically have the rollover
8  of unused reserves, and it was peculiar in that
9  sense.  And I was disappointed with the labeling
10  of it, which threw me off.  It's as simple as
11  that.
12  BY MR. MCELROY:
13     Q.  How were you reminded?
14     A.  Because I thought about it deeply.
15     Q.  You didn't speak to anyone about it?
16     A.  I did not speak to anybody about it.
17     Q.  You didn't send an e-mail to anyone or
18  make a phone call to follow up on the information?
19     A.  Absolutely not.
20     Q.  But you did remember the specific
21  numbers of $700,000 in reserves that had rolled
22  over from fiscal year '24?

Page 113

1     A.  Yeah, the reason -- it's always 700,000,
2  approximately.  So that was easy.  And I
3  remembered that there was a one-time distribution,
4  which was slightly larger, because we had to
5  account for the funding gap left by CPB.
6        So it was a little larger, and those two
7  things added up to most of it.  And then the $400,
8  which I thought was not included here, was
9  definitely lumped into it.
10     Q.  So the 700,000 rolled over from fiscal
11  year '24; right?  So that means you didn't use the
12  700,000 in fiscal year '24; right?
13     A.  That is correct.
14     Q.  Why not?
15     A.  Because I think it was a combination
16  of -- when we prepare the budget, we're
17  forecasting what's to come, like any typical
18  budget.  And sometimes we're forecasting for the
19  worst.
20        We were anticipating a lot more
21  commercial revenue decline than we actually saw.
22  So I think it was ultimately more positive than we

29 (Pages 110 to 113)

Page 114

1  had anticipated.
2      Q.  Did you end up realizing that commercial
3  revenue decline in fiscal year '25?
4      A.  It has been fairly stable '24 and '25.
5  So, yeah, I mean, I think we are anticipating that
6  we would lose more customers to terrestrial
7  distribution.  So we always forecast it that way,
8  but much to our surprise, it's been fairly stable
9  the last couple of years.
10     Q.  Why are you anticipating -- or why were
11  you anticipating that you would lose more
12  customers to terrestrial distribution
13  methodologies?
14     A.  I think this is something that we've
15  discussed before.  It is -- if given the choice,
16  people would prefer to have terrestrial
17  distribution over satellite, given the capital
18  expenses, the maintenance expenses, and the added
19  capability that you get from terrestrial
20  distribution.
21         And since a lot of this is the
22  commercial side of the business, they're

Page 115

1  constantly optimizing for costs.
2      Q.  Well, thank you for the clarification on
3  Exhibit 6, Mr. Munipalla.  I appreciate it.
4      A.  You're welcome.
5      Q.  So before we left, Mr. Munipalla, we
6  were talking about interconnection funding
7  agreements between CPB and NPR.
8         Do you recall that?
9      A.  I do.
10     Q.  I'd like to talk a little bit more about
11  that.
12         Does NPR typically negotiate with CPB
13  regarding the terms of interconnection funding
14  agreements?
15         MR. BROOKS:  Objection; form.
16         THE WITNESS:  The terms and conditions
17  negotiation itself is fairly straightforward, and
18  that is like -- let me rephrase that -- I think is
19  fairly straightforward and it is handled by our
20  lawyers, but they do negotiate the deliverables in
21  terms of like what is going to be delivered and by
22  what date.  That's my understanding.

Page 116

1  BY MR. MCELROY:
2      Q.  And would you agree with me,
3  Mr. Munipalla, that as -- in CPB's role as the
4  steward of federal funds for interconnection here,
5  that CPB can make requests of NPR in those
6  agreements?
7         MR. BROOKS:  Objection; form.
8         THE WITNESS:  I don't think I understand
9  the question.
10  BY MR. MCELROY:
11     Q.  Fair enough.  It was probably a bad
12  question.  It happens.
13         So would you agree with me,
14  Mr. Munipalla, that CPB, in negotiations with NPR
15  for these interconnection funding agreements, can
16  make requests of NPR regarding the terms of the
17  agreement?
18         MR. BROOKS:  Objection; form.
19         THE WITNESS:  If they -- if they make
20  requests, that would go to Harry Kelly, who is our
21  lawyer.  And he would be working with the CPB
22  lawyer, his counterpart, Donna Joe.  That would be

Page 117

1  between them.  And I don't have -- I don't sit in
2  those conversations.
3  BY MR. MCELROY:
4      Q.  Okay.  Fair enough.
5         Are you aware, during your time as VP of
6  distribution, you have sat through at least one
7  negotiation of the CPB funding agreement; correct?
8         MR. BROOKS:  Objection; form.
9         THE WITNESS:  Yes.
10  BY MR. MCELROY:
11     Q.  Have you sat through two -- or have you
12  participated in two negotiations for CPB
13  interconnection funding agreements?
14         MR. BROOKS:  Objection; form.
15         THE WITNESS:  Yes.  If we're defining
16  the negotiations as whatever happens before the
17  lawyers start talking, yes.
18  BY MR. MCELROY:
19     Q.  Sure.  I would define it to include what
20  the lawyers talk about, too, but -- so you have
21  participated in the negotiations of agreements,
22  though?

Page 118

1    A.  Up to the point where it's handed off to
2  the lawyers.
3    Q.  About how many times do you recall that
4  you have participated in these negotiations with
5  CPB for interconnection funding?
6        MR. BROOKS:  Objection; form.
7        THE WITNESS:  About three agreements.
8  BY MR. MCELROY:
9    Q.  And what role do you play in those
10  negotiations, Mr. Munipalla?
11    A.  When I first started participating, it
12  was as a senior director.  And I was explaining to
13  them some of the technology that was involved to
14  their consultants.
15        But then as I transitioned into my new
16  role, it was about the scope, it was about what we
17  were trying to accomplish together, and less about
18  specific technologies.
19    Q.  So what is it that you were trying to
20  accomplish together?
21    A.  So the biggest thing we were trying to
22  accomplish together -- by "we" I mean myself and

Page 119

1  Kathy Merritt -- was to make sure that these
2  negotiations go as quickly and as smoothly as
3  possible.
4        There was a consultant -- I'm sure we'll
5  get to this later, but as it pertains to this
6  question, there was a consultant report that said
7  it takes 2 million to negotiate a contract with
8  CPB in terms of time and people tax.
9        So it was my objective to reduce that
10  and keep it as expeditious as possible, just to
11  save everybody a lot of time and keep it moving
12  along.
13    Q.  Are you aware of any time that CPB
14  provided NPR with interconnection funding without
15  a written agreement?
16        MR. BROOKS:  Objection; form.
17        THE WITNESS:  No.  NPR Distribution,
18  just to be specific.  You said NPR, just
19  clarifying.
20  BY MR. MCELROY:
21    Q.  So are you aware of any time that CPB
22  provided NPR Distribution with interconnection

Page 120

1  funding without a written agreement?
2    A.  No.
3        MR. BROOKS:  Objection; form.
4        THE WITNESS:  Sorry.
5  BY MR. MCELROY:
6    Q.  So it's your experience that before NPR
7  receives -- before NPR Distribution receives
8  interconnection funding from CPB, that there are
9  negotiations of a written agreement; right?
10        MR. BROOKS:  Objection; form.
11        THE WITNESS:  Can you clarify what do
12  you mean by there are negotiations of the written
13  agreement?
14  BY MR. MCELROY:
15    Q.  Let me rephrase.
16    A.  Thank you.
17    Q.  In your experience, before NPR
18  Distribution receives interconnection funding from
19  CPB, there is a written agreement in place between
20  the two parties; right?
21        MR. BROOKS:  Objection; form.
22        THE WITNESS:  Yes.

Page 121

1  BY MR. MCELROY:
2    Q.  And before that written agreement is in
3  place, there are negotiations that occur between
4  the two parties, between CPB and NPR; correct?
5        MR. BROOKS:  Objection; form.
6        THE WITNESS:  I would call them
7  conversations about what is it that we want to
8  accomplish, and then we would discuss the scope of
9  work.  And a lot of that is encapsulated in our
10  proposal.
11  BY MR. MCELROY:
12    Q.  Do you recall when the last funding
13  agreement between CPB and NPR Distribution was
14  signed?
15    A.  It was for FY '25, and it happened
16  before October 1st of that year.
17    Q.  Before October 21st of '25 or '24?
18    A.  October 1st of '24, because it was FY
19  '25.
20    Q.  So that contract for fiscal year '25,
21  did it have a termination date, Mr. Munipalla?
22        MR. BROOKS:  Objection to form.

31 (Pages 118 to 121)

Page 122

1    THE WITNESS: I honestly don't know.  I
2  don't remember.
3  BY MR. MCELROY:
4    Q.  Are you aware of whether that contract
5  for fiscal year '25 funding is still in place?
6    MR. BROOKS:  Objection; form.
7    THE WITNESS:  You would have to ask the
8  lawyers.
9    MR. MCELROY:  I'm going to hand to the
10  court reporter what I'd like to be marked as
11  Munipalla Exhibit 7.
12    (Munipalla Deposition Exhibit 7 was
13  marked for identification and attached to the
14  transcript.)
15    MR. MCELROY:  You actually have an extra
16  copy of this if you want.
17    MS. TOWNSEND:  Thanks.
18  BY MR. MCELROY:
19    Q.  Let me know when you've finished
20  reviewing it.
21    A.  Yes, I'm ready.
22    Q.  Do you recognize Exhibit 7,

Page 123

1  Mr. Munipalla?
2    A.  Yes, I do.
3    Q.  What is that?
4    A.  This is an amendment to our
5  FY '23-FY '24 agreement with the CPB.
6    Q.  Is this the contract we were just
7  talking about that NPR Distribution-CPB entered
8  into in October 2024?
9    A.  I believe it is.  And now I'm also
10  remembering that I actually don't sign this.  But
11  yes, I believe this is.
12    Q.  Do you know who does sign it for the
13  company?
14    A.  It's on page 3.
15    Q.  So Daphne Kwon signed this on behalf of
16  NPR; is that correct?
17    A.  That's correct.
18    Q.  Who's Daphne Kwon?
19    A.  As it says, the title here is a CFO of
20  NPR.
21    Q.  If you look on page 4 of Exhibit 7, do
22  you see at the top there it says, The extension of

Page 124

1  the grant period from October 1st, 2024, to
2  September 30th, 2025, Mr. Munipalla?
3    A.  Yes, I do.
4    Q.  Does that mean that this extension
5  agreement expires on September 30th, 2025?
6    MR. BROOKS:  Objection; form.
7    THE WITNESS:  I think this is contract
8  language.  So if that's the implication, I'm
9  assuming that's what it is, but I'm not an expert
10  in that language.
11  BY MR. MCELROY:
12    Q.  But in your role as VP of distribution,
13  in charge of NPR's interconnection efforts, you're
14  not aware of whether or not this contract ended on
15  September 30th, 2025?
16    MR. BROOKS:  Objection; form.
17    THE WITNESS:  I mean, I think I
18  definitely know that September 30th is the end of
19  the fiscal year, and that's when we need to have
20  the next contract in place.  So in that sense, I
21  guess I do know that there is a time before which
22  we got to start negotiating next contract.

Page 125

1    But, frankly, the confusion for me is
2  when we do these amendments, it's not entirely
3  clear to me what exactly happens at the nuts and
4  bolts level.  So I'm not trying to be evasive.
5  I'm just trying to say sometimes it's not crystal
6  clear to me.  But in principle, I do know that by
7  September 30th, we got to start thinking about the
8  next year.
9  BY MR. MCELROY:
10    Q.  You would agree with me as the VP of
11  distribution, you should be aware of when your
12  funding agreement with the CPB ends; right?
13    MR. BROOKS:  Objection; form.
14    THE WITNESS:  Yes, I would say -- I
15  would say ideally, yes.
16  BY MR. MCELROY:
17    Q.  CPB issued a request for proposal
18  earlier this year for interconnection funding,
19  right, Mr. Munipalla?
20    A.  That's correct.
21    Q.  And you were involved in NPR's response
22  to that RFP; right?

Page 126

1    A.  That's correct.
2    **Q.  And that RFP actually came out of a**
3  **working group that CPB put together; didn't it?**
4    A.  That's my understanding, correct.
5       MR. BROOKS:  Objection.
6  BY MR. MCELROY:
7    **Q.  Did you sit on that working group?**
8    A.  I did not sit on the working group.
9       MR. MCELROY:  I'm handing the court
10 reporter what I would like to be marked Exhibit 8.
11      (Munipalla Deposition Exhibit 8 was
12 marked for identification and attached to the
13 transcript.)
14 BY MR. MCELROY:
15   **Q.  Take a moment to review Exhibit 8.  Let**
16 **me know when you finished, Mr. Munipalla.**
17      **(Witness peruses the exhibit.)**
18      THE WITNESS:  I'm good.
19 BY MR. MCELROY:
20   **Q.  Do you recognize Exhibit 8?**
21   A.  Yes, I do.
22   **Q.  What is it?**

Page 127

1    A.  This is the request for proposals that
2  CPB published on their website.
3    **Q.  And this was issued on July 14th, '25;**
4  **right?**
5    A.  I'll take your word for it.
6    **Q.  On the front page here, it says that the**
7  **proposals are due on August 15th; right?**
8    A.  Yes.
9    **Q.  Do you remember CPB informing you before**
10 **the issuance of this RFP that they were going to**
11 **issue this RFP?**
12   A.  I don't -- I don't remember if it was
13 via an e-mail that was sent out to other people,
14 as well, but I believe I did have knowledge of the
15 fact that there was an RFP coming out.
16   **Q.  When you received the RFP, did you have**
17 **conversations with anyone at CPB about the RFP?**
18   A.  I don't think I specifically had any
19 conversations about the RFP, nothing specific.
20   **Q.  Who was responsible at NPR for**
21 **responding to this RFP?**
22   A.  NPR Distribution.  That would be my

Page 128

1  team.
2    **Q.  So it was you and your team that was**
3  **responsible for responding to the RFP?**
4    A.  That's right.  We responded to the RFP.
5    **Q.  Mr. Munipalla, did you ever tell anyone**
6  **at CPB that you didn't have to respond to the RFP?**
7    A.  I don't recall, but it depends on the
8  context.  If there was an RFP published, I don't
9  think there was a requirement that you have to
10 respond to it.  So, yeah, I don't know.
11   **Q.  Do you ever recall any conversations**
12 **with anyone at CPB that NPR shouldn't have to**
13 **respond to the RFP, yet still should receive the**
14 **interconnection funds?**
15      MR. BROOKS:  Objection to form.
16      THE WITNESS:  I don't specifically
17 remember.
18 BY MR. MCELROY:
19   **Q.  When you were formulating the response**
20 **to this RFP, was it your position as the VP of**
21 **distribution that NPR was entitled to these**
22 **interconnection funds?**

Page 129

1       MR. BROOKS:  Objection; form.
2       THE WITNESS:  You're asking me if NPR
3  was entitled to these interconnection funds.
4  That's a question for NPR lawyers.  I think in
5  terms of NPR Distribution, I don't think I would
6  use the word "entitled," but I think there is a
7  portion for the satellite and the satellite
8  intersection and associated upgrade costs that we
9  have consistently received from CPB.
10      So my belief was for the core
11 interconnection services that we're providing,
12 that should be money that we should be receiving.
13 BY MR. MCELROY:
14   **Q.  Just the portion for the satellite?**
15      MR. BROOKS:  Objection; form.
16      THE WITNESS:  There's no clear-cut
17 demarcation of what that is because it is for the
18 improvement and upgrade of the satellite system
19 that has come to mean satellite, satellite
20 insurance, associated hardware, software, and
21 other expenses.
22

**33 (Pages 126 to 129)**

Page 130

1  BY MR. MCELROY:
2      Q.  And do you believe NPR, including NPR
3  Distribution, was entitled to receive funds to
4  maintain the satellite, the satellite insurance,
5  the associated hardware, et cetera, that you just
6  referenced?
7          MR. BROOKS:  Objection; form.
8          THE WITNESS:  I think I have difficulty
9  with the word "entitled."  I think it's more
10  contractual, in my opinion, or that's my
11  understanding.  So I think when you say
12  "entitled," I don't exactly know what that
13  encompasses, but I would like to -- but I believe
14  that based on our existing contract with CPB,
15  going back to the 1980s, they're responsible for
16  paying for satellite, satellite insurance, and
17  upgrades of the system, which has come to mean the
18  ContentDepot upgrades, as well.
19  BY MR. MCELROY:
20      Q.  So in your opinion, it's based upon the
21  contracts between NPR -- or NPR Distribution and
22  CPB?

Page 131

1          MR. BROOKS:  Objection; form.
2          THE WITNESS:  That's my understanding,
3  it's contractual.
4  BY MR. MCELROY:
5      Q.  Did you ever ask anyone at CPB to see an
6  advanced copy of the RFP?
7      A.  An advanced copy of the RFP.  I don't
8  think I did.
9      Q.  So we talked a minute ago about the
10  working committee that CPB set up to formulate
11  this RFP.
12          Do you remember that?
13      A.  The working group, yes.
14      Q.  You said you weren't on the working
15  group; right?
16      A.  That's correct.
17      Q.  Was anyone from NPR on this working
18  group?
19      A.  Yes.
20      Q.  Who?
21      A.  I think I remember -- I think there were
22  at least two people, Debbie Hiott and Rachel

Page 132

1  Hubbard.
2      Q.  And who are they?
3      A.  They are public radio station general
4  managers.
5      Q.  What is their affiliation with NPR then?
6      A.  Oh, I see what you mean.  They are on
7  the NPR board.
8      Q.  Was there ever a point in time where you
9  were going to be a member of the working group for
10  the RFP that is Exhibit 8?
11          MR. BROOKS:  Objection; form.
12          THE WITNESS:  There was another member
13  who was going to sit on the working group.  His
14  name is Mike Savage, who is the chair of the D/I
15  committee.  And I don't know the exact reasons,
16  but Mike Savage suggested that I sit instead of
17  him on the working group.
18          I believe we sent an e-mail -- I don't
19  know if it was an e-mail or a letter, I cannot
20  remember, but we discussed putting me on the
21  working group instead of Mr. Savage.  And I
22  believe the response to that was, This is not a

Page 133

1  technical group, it has technical elements, and
2  when we need that technical expertise, we will
3  invite Badri.
4  BY MR. MCELROY:
5      Q.  Who did that response come from?
6      A.  Somebody from CPB.
7      Q.  But you don't remember the identity?
8      A.  I don't remember.
9      Q.  Did you ever have any conversations with
10  Debbie Hiott or Rachel Hubbard -- is that right,
11  Hubbard?
12          Did you ever have any conversations with
13  Debbie Hiott or Rachel Hubbard about the working
14  group and its dealings?
15      A.  Not directly.
16      Q.  Were you aware of what the working
17  group's purpose was?
18      A.  Only vaguely.
19      Q.  What was your vague understanding of the
20  working group's purpose?
21      A.  That they were coming together to figure
22  out -- yeah, let me think about that.  I knew that

34  (Pages 130 to 133)

Page 134

1 they were going to form a working group, and they
2 were inviting people. I don't think the agenda of
3 what that working group was was ever published.
4        So I think that's all I actually knew.
5 So it was less than vague, perhaps. I just knew
6 that they were going to form the working group.
7     **Q. So the RFP, Exhibit 8, it has some**
8 **pretty specific requirements about what CPB was**
9 **requesting for the next round of interconnection**
10 **funding; right?**
11    A. That's correct.
12    **Q. And what was your understanding of the**
13 **requirements that CPB was seeking from this RFP?**
14       MR. BROOKS: Objection; form.
15       THE WITNESS: Can you elaborate on the
16 requirements that they were seeking? You mean
17 like what --
18 BY MR. MCELROY:
19    **Q. So we just said that there were some**
20 **specific requirements related to this RFP; right?**
21    A. Yeah.
22    **Q. What was your understanding of those**

Page 135

1 **requirements?**
2       MR. BROOKS: Objection; form.
3       THE WITNESS: I think there was a
4 rubric. I'm trying to find it here, which
5 basically said how are they going to rate every
6 response. I think that is the answer to the
7 question. I'm just trying to find -- okay, it's
8 here.
9        It's on CPB, the last three digits are
10 637. And this is No. 4, where it says, The RFP
11 scoring criteria.
12 BY MR. MCELROY:
13    **Q. Okay. And so on the scoring criteria**
14 **here, it says, Governance, 25 percent.**
15       **Do you know what CPB was seeking with**
16 **respect to governance in this RFP?**
17       MR. BROOKS: Objection; form.
18       THE WITNESS: I believe it's spelled out
19 in the earlier sections.
20 BY MR. MCELROY:
21    **Q. They were seeking independent**
22 **governance; weren't they?**

Page 136

1       MR. BROOKS: Objection; form.
2       THE WITNESS: I don't know -- I don't
3 know how CPB is -- I mean, yes, sorry. That's the
4 answer.
5 BY MR. MCELROY:
6    **Q. They were seeking independent**
7 **governance?**
8    A. They were seeking a governance that was
9 different from the D/I committee is how I
10 understand it.
11    **Q. And how -- what do you understand the**
12 **difference was that they wanted?**
13       MR. BROOKS: Objection; form.
14       THE WITNESS: Just give me one second to
15 just read this, and then I can tell you. I think
16 the key point here is no single -- with no single
17 represented organization holding majority control
18 or undue influence. This is 1.2, No. 1, right in
19 the middle of that paragraph. Page number, last
20 three digits are 633.
21 BY MR. MCELROY:
22    **Q. So when formulating NPR's response to**

Page 137

1 **this RFP, Mr. Munipalla, did NPR address -- how**
2 **did NPR address this requirement of the RFP?**
3    A. I think we addressed it to the best of
4 our abilities by saying we could add an extra D/I
5 committee member that would be a non-NPR board
6 member to satisfy this request. But we were
7 limited in terms of what we could actually do.
8    **Q. But at that point, even if you included**
9 **an additional non-NPR board member on the EO**
10 **committee, would NPR still have held a majority of**
11 **the D/I committee members?**
12       MR. BROOKS: Objection; form.
13       THE WITNESS: If you -- there was an
14 exhibit earlier, which was a presentation that
15 I've given to new board members that lists all of
16 the current D/I committee members.
17 BY MR. MCELROY:
18    **Q. Do you want to get Exhibit 6 --**
19    A. Sure.
20    **Q. -- and point me to it.**
21    A. So this is number, last three digits,
22 318. So as you can see, that's the breakup right

Page 138

1 now. If we would have added another non-board
2 member, that would have made it an even split of
3 five and five.
4 **Q. So that was how NPR responded to the**
5 **request to not have a single organization dominate**
6 **the governance of interconnection?**
7 MR. BROOKS: Objection; form.
8 THE WITNESS: Well, I mean, I do
9 appreciate you asking this question because it is
10 important to point out that there is -- there is
11 an existing D/I committee structure, and there is
12 an existing -- there's a reason for it.
13 The way this is written up would
14 essentially mean that we would have to completely
15 redo the entire D/I committee structure, and that
16 is -- that is not something that we could do, as
17 per the arrangements with the trust and as per our
18 role as the operator of the interconnection.
19 So there's a little bit of circular
20 logic here. Because what this is asking us to
21 undo the very thing that was agreed upon back in
22 the 1980s agreement.

Page 139

1 BY MR. MCELROY:
2 **Q. An agreement between NPR and the**
3 **satellite trust?**
4 MR. BROOKS: Objection; form.
5 THE WITNESS: The NPR -- the NPR and the
6 CPB and perhaps there is also the equipment lease
7 agreement between NPR and the trust. So I think
8 it's multiple contracts or multiple agreements.
9 BY MR. MCELROY:
10 **Q. Okay. Have you seen a copy of this**
11 **contract between NPR and CPB that sets forth the**
12 **D/I committee structure as you just stated?**
13 A. I have seen it. I have not completely
14 read it. This is from before my time. I've just
15 glanced at it.
16 **Q. So it's your position that the D/I**
17 **committee had to be formulated in the way that it**
18 **says here on Exhibit 6, Bates No. 318, due to an**
19 **agreement between CPB and NPR?**
20 MR. BROOKS: Objection; form.
21 THE WITNESS: It is my understanding
22 that NPR is the elected operator of the

Page 140

1 interconnection. And, therefore, the D/I
2 committee, which is a committee of the NPR board,
3 is set up the way it is set up.
4 So asking us to change that without
5 needing stations or just changing that in response
6 to the RFP, I don't think NPR could have done
7 that, which is why we did the best that we could,
8 which is add another member to the D/I committee,
9 to even it out and bring in some expertise that
10 this RFP was asking for, which was around digital
11 distribution.
12 BY MR. MCELROY:
13 **Q. Did you reach out to the interconnected**
14 **stations to ask their opinion on this?**
15 A. No.
16 **Q. So you stated that NPR is limited with**
17 **respect to what it could do in governance. Why?**
18 MR. BROOKS: Objection; form.
19 THE WITNESS: I think I just explained
20 that. NPR is the designated operator of the
21 interconnection, and the structure falls out of
22 that. So NPR cannot just change things out of its

Page 141

1 own volition is the point here.
2 BY MR. MCELROY:
3 **Q. But NPR never asked any of the stations**
4 **whether they wanted to make any changes.**
5 MR. BROOKS: Objection; form.
6 THE WITNESS: NPR consulted the trust
7 and the trustees, and the trustees said they have
8 no problem with NPR as the operator. And NPR does
9 not reach out to the interconnected stations
10 directly almost ever. NPR Distribution maintains
11 that relationship, and we take counsel from the
12 trustees and their attorney.
13 BY MR. MCELROY:
14 **Q. Okay. So NPR Distribution never reached**
15 **out to the interconnected stations and asked them**
16 **whether they would --**
17 A. That's correct.
18 **Q. -- whether they would agree to a change**
19 **in governance?**
20 A. But we did talk to the trustees, which
21 the beneficiaries of this trust are the stations.
22 So they speak for the stations.

36 (Pages 138 to 141)

Page 142

1    Q.  Don't you think the beneficiaries should
2  be consulted about this?
3        MR. BROOKS:  Objection; form.
4        THE WITNESS:  It doesn't matter what I
5  think.  That's the job of the trustees.
6  BY MR. MCELROY:
7    Q.  So if you come back to Exhibit 8.
8    A.  Yes.
9    Q.  So on page 2, it's the -- it's Bates
10  labeled CPB 198527.
11        Do you see the paragraph that says, The
12  shifting U.S. media landscape?
13    A.  You said 527?  627 is what you meant?
14    Q.  198627, sorry.
15    A.  Yeah, got it.
16    Q.  Do you see the paragraph that has the
17  header, The shifting U.S. media landscape?
18    A.  I do.
19    Q.  And this paragraph is generally talking
20  about a change in technology and the way that
21  consumers view and consume radio content; correct?
22        MR. BROOKS:  You can take a second to

Page 143

1  read the paragraph, if you'd like.
2        THE WITNESS:  I'd like to do that if you
3  don't mind.
4  BY MR. MCELROY:
5    Q.  Please do.
6        (Witness peruses the exhibit.)
7        THE WITNESS:  Yes, sorry.
8  BY MR. MCELROY:
9    Q.  So this paragraph is generally
10  discussing that there are changing consumer habits
11  in the way that they view and consume radio
12  content; correct?
13    A.  That's correct.
14    Q.  And as part of that, this RFP -- or as
15  part of that change in consumer habits, this RFP
16  is seeking to modernize distribution technology;
17  right?
18        MR. BROOKS:  Objection; form.
19        THE WITNESS:  I would say it is seeking
20  to expand.
21  BY MR. MCELROY:
22    Q.  Expand.  What's the difference between

Page 144

1  "expand" and "modernize"?
2    A.  At least in my world, in the technology
3  world, when you modernize, you're basically adding
4  capabilities or your improving a certain thing.
5  But expand essentially means taking on new
6  requirements.
7    Q.  Okay.  Fair enough.
8        So it's seeking to expand distribution
9  technology to include things that we talked about
10  earlier, the terrestrial distribution
11  technologies; right?
12        MR. BROOKS:  Objection; form.
13        THE WITNESS:  This particular paragraph
14  is really talking about, as you pointed out
15  earlier, sort of the consumption habit.  And I
16  think it's talking less about -- I think it's
17  talking less about how that happens or how content
18  is delivered, whether it's terrestrial or
19  satellite, is less important.  It's talking about
20  how, you know, consumers are consuming the
21  content.
22

Page 145

1  BY MR. MCELROY:
2    Q.  And so if you go to the next page, 628,
3  do you see under Guiding Principles, there's --
4  one, two, three, four -- it looks like the fifth
5  bullet point down.
6        It says, "The content distribution
7  system should be based on the evolving business
8  needs of public radio stations and be maximally
9  adaptable through short and long-term road maps
10  that reflect changing business and audience
11  needs"; correct?
12    A.  Correct.
13    Q.  Now, as part of this RFP, CPB wanted to
14  expand public radio interconnection to include
15  more terrestrial technologies; right?
16        MR. BROOKS:  Objection; form.
17        THE WITNESS:  This particular paragraph
18  is really just talking about the content
19  distribution system should be based on the
20  evolving business needs of public radio stations,
21  not listeners.  And maximally adaptable through
22  short-term and long-term product road maps that

37 (Pages 142 to 145)

Page 146

1  reflect changing business and audience needs.
2       This is where they're talking about the
3  audience needs.  But it's both what's needed for
4  the station in terms of capability, and then it's
5  also alluding to the fact that audiences, the way
6  they consume that, is changing.
7  BY MR. MCELROY:
8       Q.  I understand.
9       So forget the paragraph for a second.
10 Let's talk about the RFP at large.  Because you're
11 familiar with the RFP; right?
12      A.  Yes.
13      Q.  You engineered NPR's response to it;
14 right?
15      MR. BROOKS:  Objection; form.
16      THE WITNESS:  I --
17 BY MR. MCELROY:
18      Q.  You led NPR's response to it.
19      A.  That's correct.
20      Q.  So CPB was seeking in this RFP to
21 include more terrestrial technologies in
22 interconnection for the public radio system;

Page 147

1  right?
2       MR. BROOKS:  Objection; form.
3       THE WITNESS:  I think we can agree that
4  in terms of expanding the terrestrial -- I mean,
5  the interconnection, we already have satellite,
6  the next natural extension is terrestrial, which
7  is what PRSS has also been doing and which is what
8  CPB is also seeking.
9       But the terrestrial, all I'm trying to
10 say is there is a B2B component, which is what we
11 do.  We deliver content from our data center to
12 our stations.  And then there's also a B2C
13 component, which happens separately from the PRSS.
14      So in this particular RFP, I think
15 they're trying to tackle multiple things.  That's
16 sort of the confusion here.  So I'm not trying to
17 be difficult.  All I'm trying to say is in certain
18 paragraphs, they're talking about expanding the
19 technology capability.  In certain paragraphs,
20 they're talking about the end user consumer
21 behavior changing.
22

Page 148

1  BY MR. MCELROY:
2       Q.  I understand.
3       And as part of those multiple things
4  that CPB is seeking includes expansion of
5  terrestrial interconnection capabilities; correct?
6       MR. BROOKS:  Objection; form.
7       THE WITNESS:  Correct.
8  BY MR. MCELROY:
9       Q.  Now, did NPR respond to this RFP?
10      A.  The answer is yes.
11      Q.  And did NPR ultimately win the bid on
12 this RFP?
13      A.  The answer is no.
14      MS. TOWNSEND:  Are we going to break for
15 lunch soon?  It's 12:20.
16      MR. MCELROY:  Would you like to break
17 for lunch now?
18      MS. TOWNSEND:  I was just bringing it up
19 because -- if you want to go to another exhibit,
20 I'm not going to stop you, but you're in between
21 exhibits is the only reason I was bringing it up.
22      MR. MCELROY:  Let's leave it to

Page 149

1  Mr. Munipalla.
2       Would you like to break for lunch now,
3  or would you like to go for about 20 more minutes?
4       THE WITNESS:  I think I'd like to break
5  for lunch.
6       MR. MCELROY:  Great.  Let's break for
7  lunch.
8       THE WITNESS:  Thank you.
9       THE VIDEOGRAPHER:  The time is
10 12:22 p.m.  We are now off the record.
11      (Recess from the record.)
12      THE VIDEOGRAPHER:  The time is 1:24 p.m.
13 We are now on the record.
14 BY MR. MCELROY:
15      Q.  Welcome back, Mr. Munipalla.  I hope you
16 had a nice lunch.
17      THE VIDEOGRAPHER:  Counsel, your mic.
18      MR. MCELROY:  My microphone is not on.
19 Better?
20      I'm handing the court reporter what I'd
21 like to be marked as Munipalla Exhibit 9.
22      (Munipalla Deposition Exhibit 9 was

38 (Pages 146 to 149)

Page 150

1  marked for identification and attached to the
2  transcript.)
3  BY MR. MCELROY:
4      Q.  Take a moment to review Exhibit 9, and
5  let me know when you've finished, Mr. Munipalla.
6      A.  Okay.
7      Q.  Exhibit 9 -- well, before the break, we
8  were talking about the RFP that CPB issued with
9  respect to interconnection funding in the summer
10  of 2025; right?
11      A.  That's correct.
12      Q.  And we were talking about the fact that
13  NPR had submitted a response to that RFP; right?
14      A.  That's correct.
15      Q.  Exhibit 9 is NPR's response to the RFP;
16  isn't it?
17      A.  It is.
18      Q.  And you see the cover letter on this.
19  That's signed by you, right, Mr. Munipalla?
20      A.  Yes, it is.
21      Q.  So in responding to CPB's RFP, NPR did
22  not write in this response anywhere that it was

Page 151

1  entitled to the interconnection funds; did it?
2      A.  I mean, there are a lot of words on this
3  document, but I believe that word would not have
4  been used.
5      Q.  And it doesn't state anywhere in the RFP
6  response that CPB has a statutory obligation to
7  provide interconnection funds to NPR; does it?
8      A.  The RFP responses were responsive to the
9  RFP, and there was nothing about the public
10  broad -- excuse me, Public Broadcasting Act there.
11      Q.  There was nothing in the Public
12  Broadcasting Act in the RFP, or nothing about the
13  Public Broadcasting Act in NPR's response to it or
14  both?
15      A.  Both.
16      Q.  Now, this was submitted in August 15th,
17  2025, by NPR; right?
18      A.  That's correct.
19      Q.  Now, at this point in time in August of
20  2025, NPR didn't seek to obtain injunctive relief
21  against CPB as a result of this RFP; did they?
22          MR. BROOKS:  Objection; form.

Page 152

1          THE WITNESS:  I don't remember the
2  timeline to answer that question.
3  BY MR. MCELROY:
4      Q.  So do you recall in July when the RFP
5  was issued whether or not NPR filed a motion for
6  injunctive relief against CPB related to the RFP?
7          MR. BROOKS:  Objection; form.
8          THE WITNESS:  I think it was -- I think
9  the complaint was already filed.
10  BY MR. MCELROY:
11      Q.  Understood.  But I'm asking something
12  slightly different, and I understand these are
13  legal terms.
14          But are you aware of whether in July of
15  2025, in response to CPB's issuance of the RFP for
16  interconnection funds, did NPR file a motion for
17  injunctive relief at that point in time?
18          MR. BROOKS:  Objection; form.
19          THE WITNESS:  I don't -- I don't believe
20  we did.
21  BY MR. MCELROY:
22      Q.  And then in August of 2025 when you were

Page 153

1  submitting this response to CPB to the RFP, are
2  you aware -- excuse me, are you aware of whether
3  or not NPR filed a motion for injunctive relief
4  against CPB in August of 2025?
5          MR. BROOKS:  Objection; form.
6          THE WITNESS:  I don't remember.
7  BY MR. MCELROY:
8      Q.  But by this point in time, by the time
9  you were submitting your response on August 15th,
10  you were aware that CPB was requesting changes in
11  governance of PRSS; right?
12          MR. BROOKS:  Objection; form.
13          THE WITNESS:  Based on the RFP, yes.
14  BY MR. MCELROY:
15      Q.  But you were aware before the RFP that
16  CPB wanted changes to the governance of PRSS, too;
17  weren't you?
18          MR. BROOKS:  Objection; form.
19          THE WITNESS:  I think we discussed this
20  earlier and I believe there was talk about it, but
21  like I've said before, this is the first time that
22  it was actually put on paper.

Page 154

1  BY MR. MCELROY:
2      Q.  So looking at page 1 of this, or Bates
3  No. 78348, of Exhibit 9.  The first sentence --
4      A.  Sorry, could you please say the page
5  number again?
6      Q.  It's just first page.
7      A.  Oh, the very first page.  Got it.
8      Q.  The very first page.
9      A.  Yes, got it.
10     Q.  Sorry, Bates No. 78348.
11         The very first sentence of this, you
12  state that NPR is pleased to submit this proposal
13  and response; don't you?
14     A.  Yes.
15     Q.  Not that NPR believes that CPB is
16  retaliating against it for its exercise of
17  First Amendment rights by issuing this RFP?
18     A.  Based on what's written here, I was just
19  expressing -- I was just expressing my pleasure at
20  having this opportunity to respond to this RFP.
21     Q.  And as part of this RFP response that
22  NPR submitted to CPB, you include terrestrial

Page 155

1  distribution as part of the response; correct?
2      MR. BROOKS:  Objection; form.
3      THE WITNESS:  Correct.
4  BY MR. MCELROY:
5      Q.  If you can go to page 32, it's -- the
6  actual page 32 of the document.  I'll give you the
7  Bates number in just a second.  The Bates number
8  is 78384.
9      A.  Yes.
10     Q.  And this is a chart that shows the
11  terrestrial capabilities that you're proposing to
12  implement; correct?
13     A.  That's correct.
14     Q.  And including the service expansion that
15  would result as a result of the terrestrial
16  platform?
17     A.  That's correct.
18     Q.  So NPR intended to use these grant funds
19  if it had been -- if it had won the bid, at least
20  in part, to expand terrestrial interconnection;
21  correct?
22     A.  That's correct.

Page 156

1      Q.  Now, at this point in time -- or as part
2  of this proposal, did NPR plan for a phasing out
3  or diminishment of settling interconnection?
4      MS. TOWNSEND:  Objection to form.
5      THE WITNESS:  No, I think what we've
6  always attempted -- what we've always proposed is
7  adding distribution capabilities as long as we can
8  provide them.  Our mission is to provide
9  distribution capabilities to leave no station
10  behind.
11         Unless, of course -- we discussed the
12  whole FCC issue -- if that were to happen, we
13  wouldn't be able to use satellite, but it is
14  generally our intention to leave no station
15  behind.
16  BY MR. MCELROY:
17     Q.  But the -- excuse me, the FCC issue was
18  with respect to FCC's regulation of satellite
19  bandwidth; right?
20     A.  That's correct.
21     Q.  And that has nothing to do with CPB;
22  correct?

Page 157

1      MR. BROOKS:  Objection to form.
2      THE WITNESS:  FCC is a separate thing
3  altogether.
4  BY MR. MCELROY:
5      Q.  If you go to page 35, it's Bates
6  No. 7387 in this exhibit.
7      A.  I'm sorry.
8      Q.  You see on the top here it appears that
9  the RFP response is talking about NPR's approach
10  to business continuity; is that right?
11     A.  That's correct.
12     Q.  And the fourth bullet point down is
13  about what NPR would do in the instance of a
14  satellite failure; correct?
15     A.  Correct.
16     Q.  And that first sentence there, the first
17  clause in that sentence says, "While satellite
18  connectivity remains in use."
19         Did I read that right?
20     A.  That's right.
21     Q.  Why are you caveating this statement
22  with the phrase, "While satellite connectivity

Case 1:25-cv-01674-RDM    Document 59-6    Filed 10/24/25    Page 42 of 79

10/20/2025    National Public Radio, Inc., et al. v. Donald J. Trump, et al.    Badri Munipalla

Page 158

1  remains in use"?
2      A. I think this is our commitment to the
3  whole leave-no-station-behind idea. As long as
4  stations need satellite connectivity, it is our
5  goal to provide it to them. And I think -- I
6  think the risks to satellite were constantly
7  increasing. So I think we were trying to just be
8  careful and candid that as long as it's needed, we
9  will provide it.
10     Q. So by this you're recognizing that
11  there's a realistic possibility that satellite
12  connectivity may end at some point in the future?
13         MR. BROOKS: Objection; form.
14         THE WITNESS: Yes.
15  BY MR. MCELROY:
16     Q. If you'd go to the page immediately
17  prior to that. It's page 34 and Bates No. 78386.
18         In Section 2.3.6, you see there are two
19  paragraphs there. If you look down about nine
20  lines down, there's a sentence that begins in the
21  middle. And it says, "The terrestrial system."
22         Do you see where I'm starting?

Page 159

1      A. Yes.
2      Q. I'm going to read that.
3         The terrestrial system will become the
4  primary system once an overwhelming majority of
5  systems -- or stations, excuse me, have
6  transitioned to the new system; is that right?
7      A. That's correct.
8      Q. So was it NPR's goal that the
9  terrestrial system will become the primary system?
10     A. NPR Distribution's goal, yes.
11     Q. So prior to the issuance of the 2025
12  RFP, was there a point in time where CPB and NPR
13  were discussing a possible extension of the fiscal
14  year '25 interconnection funding agreement?
15         MR. BROOKS: Objection; form.
16         THE WITNESS: When you say "extension,"
17  I don't think we discussed if it was going to be
18  an extension or if it was going to be a new
19  agreement. And I'd like to make that distinction
20  because this has happened in the past where we've
21  discussed entering a new agreement, but it ended
22  up being an extension.

Page 160

1          My understanding is there's a difference
2  between the two. So I just want to clarify that
3  it was never explicitly discussed if it was going
4  to be an extension or a new agreement.
5  BY MR. MCELROY:
6      Q. That's fair. I appreciate the
7  distinction.
8          Do you recall when those conversations
9  were occurring?
10     A. So this is -- it's an ongoing
11  discussion. We are constantly talking to CPB,
12  especially in the last couple of years where it's
13  become an annual extension. Because of the CPB
14  board meetings and when they occur -- they usually
15  have a board meeting in April. The dates change
16  every year, but there is a board meeting in April.
17         And Kathy Merritt and my effort to kind
18  of speed up the process and keep it as efficient
19  as possible, we both recognized that that April
20  board meeting is an important board meeting to
21  socialize the proposal.
22         So in the past, we've made sure that a

Page 161

1  full grant proposal and, even before that grant
2  proposal, a concept paper is put in front of them,
3  "them" being the CPB board, so we have a
4  fundamental understanding of what we are talking
5  about with the hope of getting an approval from
6  their board in that April meeting.
7      Q. So in your experience, these
8  conversations generally happen in the April time
9  period?
10         MR. BROOKS: Objection; form.
11         THE WITNESS: They -- "these
12  conversations," you would have to be specific what
13  you mean by "these conversations," but I can
14  say --
15  BY MR. MCELROY:
16     Q. Fair enough.
17     A. Yeah.
18     Q. I'm just trying to make sure I
19  understood what you said.
20         So you said that in the past you tried
21  to have conversations about funding agreements
22  with CPB in the April time frame of a given year;

10/20/2025          National Public Radio, Inc., et al. v. Donald J. Trump, et al.          Badri Munipalla

Page 162

1  right?
2      MR. BROOKS:  Objection; form.
3      THE WITNESS:  So if you go -- I think
4  we've looked at a sample agreement.  If you look
5  at that, there's two pages, the one that Daphne
6  signs, those are the terms and conditions,
7  everything else that you see stapled to it is the
8  scope of work.
9      We have negotiated -- typically, we
10 negotiate the scope of work and what is it that we
11 intend to do as a part of that package of work
12 ahead of time.  The only thing that is negotiated
13 are those two pages.  Whether it's a new agreement
14 or whether it's an amendment, that's where the
15 lawyers come in.
16     What I'm trying to clarify here is in
17 terms of the intention of what we want to do,
18 those conversations are happening well before
19 April, typically, because April is too late to
20 start having those discussions, especially when
21 there's a board meeting early in April that the
22 CPB has to be prepared for.  So these usually

Page 163

1  start, you know, as soon as the new year comes
2  around.
3  BY MR. MCELROY:
4      Q.  So you're trying to have the
5  conversations to prime the CPB board for that
6  April meeting?
7      A.  Well put.
8      Q.  All right.  So did similar conversations
9  occur this year, that is in the year 2025?
10     A.  Yes.
11     Q.  And did -- are you aware of whether or
12 not NPR ever received an actual written agreement,
13 a proposed written agreement from CPB for funding
14 in the year 2025?
15     MR. BROOKS:  Objection; form.
16     THE WITNESS:  No written agreement for
17 '25.
18 BY MR. MCELROY:
19     Q.  And just to be clear, because I think
20 that my question may have been slightly unclear on
21 this, when you say no agreement, no written
22 agreement for 2025, you mean that NPR didn't

Page 164

1  receive a written agreement for 2025?
2      A.  We did not receive a written -- in the
3  spirit of clarifying it, we did not receive any
4  written agreement for FY '26 and beyond.
5      Q.  Which occurs in the year, the calendar
6  year 2025?
7      A.  April of 2025.
8      Q.  Thank you for that.  The difference
9  between fiscal years and calendar years can get
10 confusing in here.  So I want to make sure that we
11 get that clear.  I appreciate that.
12     After the -- switching back to the RFP
13 quickly, are you aware of who won the RFP?
14     A.  It was this concept called a PMI.
15     Q.  And that's the Public Media
16 Infrastructure coalition we discussed earlier;
17 right?
18     A.  That's correct.
19     Q.  Are you aware of whether or not the PMI
20 winning bid contained any money going to PRSS?
21     MR. BROOKS:  Objection; form.
22     THE WITNESS:  I have no idea.

Page 165

1  BY MR. MCELROY:
2      Q.  Would it surprise you to learn that the
3  PMI bid included funding for PRSS in it?
4      MR. BROOKS:  Objection; form.
5      THE WITNESS:  It would not surprise me
6  because the RFP explicitly says whatever entity
7  responds to this RFP should have the ability to
8  work with the PRSS Trust.
9  BY MR. MCELROY:
10     Q.  Now, in advance of CPB's determination
11 on the RFP that it issued in July of '25, did NPR
12 make any contingency plans for if it did not
13 prevail on the bid?
14     A.  So coinciding with that April time frame
15 is also when NPR Distribution starts talking about
16 the FY '26 budget.  And for FY '25 funding, I
17 think we were able to accomplish, in principle,
18 what that amount was going to be so there was a
19 little bit of less guesswork.
20     But in this particular budget cycle, we
21 had no idea how much money we would ever get, if
22 any.  So we just assumed zero dollars.  And your

42 (Pages 162 to 165)

10/20/2025          National Public Radio, Inc., et al. v. Donald J. Trump, et al.          Badri Munipalla

Page 166

1  question was about contingency.  And I was just
2  saying all of this to say the contingency was
3  using our reserves.
4      Q.  So when you say you assumed that you
5  would get zero dollars, you mean you assume you
6  would get zero dollars from CPB?
7      A.  That's correct.
8      Q.  And the contingency was to use
9  NPR Distribution's reserves to cover the shortfall
10 or any shortfall that may exist?
11     MR. BROOKS:  Objection; form.
12     THE WITNESS:  That is correct.
13 BY MR. MCELROY:
14     Q.  And you testified earlier that there's
15 approximately $25 million in NPR Distribution's
16 reserves right now; correct?
17     A.  That's correct.  I mean, just to be
18 clear, we view the reserves as a rainy day fund,
19 and we've also used it in the past when CPB and
20 NPR Distribution haven't been able to come to a
21 contract agreement.  So we've used the reserves
22 funds to tie us over and pay our bills until the

Page 167

1  money arrives.
2      Q.  Would you consider CPB losing federal
3  funding from Congress to be a rainy day?
4      MR. BROOKS:  Objection; form.
5      THE WITNESS:  I don't think I'm
6  qualified to answer that question.
7  BY MR. MCELROY:
8      Q.  Okay.  What is your definition of "rainy
9  day fund"?
10     A.  In the context of our reserves, I think
11 I already gave you one example.  Like if we don't
12 receive money, it's a stopgap.  If we also have to
13 pay for severances because of layoffs, again,
14 because of CPB underfunding, we dip into the
15 reserves.  That's how we pay for it.
16         Sometimes, just as a natural process of
17 during the course of business, because CPB uses a
18 reimbursement model to reimburse us for the work
19 that we do, the risk is really on us because what
20 happens is we have to get the work done, but let's
21 say somebody goes on maternity or maternity leave,
22 it's going to take us a while to find a backfill

Page 168

1  or hire a contractor.  And so we either risk not
2  getting the work done or having to pay more to
3  make sure that the work is done.  That comes out
4  of the reserves distribution, as well.
5          And then I think in general the rainy
6  day fund, the way the D/I committee views it, is
7  if there's -- for whatever reason there's no
8  funding in sight because we're committed to our
9  commission, that's when the D/I committee would
10 approve the use of those funds, in other words,
11 metaphorically when it's raining.
12     Q.  Bear with me just a moment.
13     MR. MCELROY:  I'm going to hand the
14 court reporter what I would like to be marked as
15 Munipalla Exhibit 10, please.
16     (Munipalla Deposition Exhibit 10 was
17 marked for identification and attached to the
18 transcript.)
19 BY MR. MCELROY:
20     Q.  This is a large document, Mr. Munipalla.
21 I'm happy for you to take as much time as you need
22 to take a look over it, but I'm only going to be

Page 169

1  asking you about a small portion of it.
2      A.  Yeah, I've never seen this document
3  before.  So if you can tell me what I should focus
4  on, that would be a lot easier.
5      Q.  Sure.  So this is the PMI bid that they
6  submitted.  And if you can look at -- it's
7  probably about two-thirds of the way through.  The
8  Bates number on the bottom is 78430.
9      A.  Yes.
10     Q.  And if you look down here, Service 2.2,
11 content distribution.
12         Do you see that section?
13     A.  Yes, I do.
14     Q.  And here it shows as part of PMI's bid
15 that it's providing 6 and a half million dollars
16 to PRSS; right?
17     MR. BROOKS:  Objection; form.
18     THE WITNESS:  For '25 through '28, so
19 over three years.  I'm sorry, I'm reading this and
20 asking a question at the same time, I apologize.
21 I'm assuming that this is for three years, based
22 on the header above.

10/20/2025          National Public Radio, Inc., et al. v. Donald J. Trump, et al.          Badri Munipalla

Page 170

1  BY MR. MCELROY:
2      Q.  Right.  I mean, it says Q4 2025 to 2028;
3  right?
4      A.  Yeah.
5      Q.  But it allocates 6 and a half million
6  dollars to PRSS; correct?
7          MR. BROOKS:  Objection; form.
8          THE WITNESS:  The first line item
9  explicitly says PRSS.  So I would assume that's
10  us.
11  BY MR. MCELROY:
12     Q.  Would -- even a spread over three years,
13  would 6 and a half million dollars help PRSS
14  offset the loss of interconnection funding?
15         MR. BROOKS:  Objection; form.
16         THE WITNESS:  Offset the loss of
17  interconnection funding.
18  BY MR. MCELROY:
19     Q.  Yeah, that was a bad question.
20         So if -- NPR didn't win the
21  interconnection RFP issued in July 2025; right?
22     A.  That's correct.

Page 171

1      Q.  So that means that the interconnection
2  funds that were at stake in that RFP are not
3  coming to NPR; right?
4          MR. BROOKS:  Objection; form.
5          THE WITNESS:  That's correct.
6  BY MR. MCELROY:
7      Q.  So as part of the winning bid, if the
8  winning bidder were to provide 6 and a half
9  million dollars to PRSS and NPR Distribution,
10  would that help NPR Distribution?
11         MR. BROOKS:  Objection; form.
12         THE WITNESS:  If the definition of
13  "help" here is offset expenses, I would say the 2
14  and a half million would cover satellite,
15  satellite insurance, and some associated costs.
16  BY MR. MCELROY:
17     Q.  So when you say "cover satellite," do
18  you mean the satellite lease?
19     A.  Sorry, that's right.  That's what I
20  meant.
21     Q.  And then the next one -- the next bullet
22  point down there says, National Operations Center

Page 172

1  backup.
2      Q.  And do you know what the National
3  Operations Center is, Mr. Munipalla?
4      A.  I've never heard of a National
5  Operations Center backup.
6      Q.  So NPR Distribution doesn't have a
7  National Operations Center here in Washington,
8  D.C.?
9      A.  I think we might be confusing Network
10  Operations Center, which is what we have, with
11  National Operations Center, which I don't know
12  what it is.
13     Q.  So explain to me what the Network
14  Operations Center is.
15     A.  The Network Operations Center is what we
16  call as the NOC, and the BNOC is the Backup
17  Network Operating Center.  This is where content
18  arrives, if you can imagine that, I mean, although
19  it doesn't look like a bunch of pipes, it's really
20  a bunch of computer screens that's monitoring
21  incoming content, and it's making sure that it's
22  getting out to all of the destinations.

Page 173

1      Q.  So I want to go back to something that
2  you testified to a few minutes ago.  I want to
3  make sure I understand it.
4          You stated that there have been other
5  instances in the past where NPR Distribution has
6  used its reserves as a stopgap to cover CPB
7  funding shortfalls; is that correct?
8      A.  That is correct.
9      Q.  Can you describe to me what instances
10  you can recall where that was -- where that
11  happened?
12     A.  There was the FY '22 negotiations that
13  dragged on until calendar year -- until February
14  of the calendar year.  That means --
15     Q.  So the negotiations were happening in
16  calendar year '21, and they dragged on to calendar
17  of '22?
18     A.  Yeah, until the Feb of '22.
19     Q.  When normally you would have had an
20  agreement for fiscal year 2022 during calendar
21  year 2021?
22     A.  That is correct.

44 (Pages 170 to 173)

Page 174

1      **Q.  Can you recall any other instances?**
2      A.  I believe there were -- the previous
3   year, which I was not a part of, the exact same
4   thing happened.
5      **Q.  So you were a part of the fiscal year**
6   **'22 negotiations, though?**
7      A.  Yes.
8      **Q.  Can you describe to me your recollection**
9   **of why those negotiations went wrong or were**
10  **delayed?**
11     MR. BROOKS:  Objection; form.
12     THE WITNESS:  I can only explain it from
13  a technical perspective because I was not in every
14  one of those conversations.  I think the
15  fundamental argument was about NPR Distribution
16  not using sufficient terrestrial technologies to
17  distribute content, and there was this general
18  perception that we were not forwarding that notion
19  of adopting terrestrial distribution.
20     And I think the NPR Distribution
21  counterpoint was we already are doing to a certain
22  degree terrestrial distribution but what you are

Page 175

1   asking for is a lot more complicated and we need
2   to sit down and talk about it, but we don't have
3   that technology ready yet.
4   BY MR. MCELROY:
5      **Q.  And why didn't you have that technology**
6   **ready?**
7      A.  So bear with me.  It's a little
8   complicated because I think what was happening is
9   we were coming off a long funding cycle, and we
10  simply did not have the cadence to engage with CPB
11  on a regular basis, the flow just wasn't there.
12  So genuinely, I think there was just not enough
13  communication to understand each other.
14     **Q.  Okay.  But it wasn't a technological**
15  **shortcoming.  The technology existed to do it at**
16  **that time?**
17     A.  Yes.  Yeah, yes.  It's complicated when
18  you ask a technology question, but if you want, I
19  can elaborate.
20     **Q.  No, I just want to make sure that the**
21  **technology -- the availability of the technology**
22  **was not the barrier; is that correct?**

Page 176

1      A.  The availability of -- see, when you see
2   availability of terrestrial technology, it could
3   mean a lot of things.  And in general, if you
4   wanted to distribute terrestrially, you could do
5   it, but it was extremely expensive.
6      You would have had to do it using what's
7   called a codex, and each unit costs, like, $3,000.
8   And you would need one on both sides.  But what we
9   ultimately wanted to do is what we're doing today,
10  is to reduce the cost for the interconnection by
11  coming up with something better than what's
12  available in the market.
13     So what we're doing today, obviously we
14  hadn't gotten started on that back then.  So
15  coming back one full circle, when you say did the
16  technology exist, yes.  If somebody said, I'm
17  going to write you a big, fat check and go ahead
18  and buy codex, we could have done that at that
19  very moment.
20     **Q.  Did you ask CPB for funds to do that?**
21     A.  Like I said, that's a business question
22  that I was not a part of.

Page 177

1      **Q.  So NPR Distribution today, as we sit**
2   **here today on, what, October 20th, 2025, is no**
3   **longer receiving interconnection funds from CPB;**
4   **correct?**
5      A.  I would say as where we are today, we
6   haven't received any funding from CPB, and I don't
7   know if we're going to be receiving, I don't know,
8   but as of right now we haven't received anything.
9      **Q.  And NPR Distribution is still able to**
10  **provide interconnection services to public radio**
11  **stations today, though; isn't it?**
12     A.  We are making sure that there's
13  continuity of service and, yes, as of right now
14  we're able to provide that.
15     **Q.  Assuming you receive no further funding**
16  **from CPB for interconnection, do you have a**
17  **timetable for how long NPR Distribution can**
18  **continue providing interconnection services for**
19  **public radio stations?**
20     A.  I think I need to ask a clarifying
21  question.  Are you saying without improving
22  services or maintaining the current state?

45 (Pages 174 to 177)

Case 1:25-cv-01674-RDM    Document 59-6    Filed 10/24/25    Page 47 of 79

10/20/2025            National Public Radio, Inc., et al. v. Donald J. Trump, et al.          Badri Munipalla

Page 178

1      Q.  Let's say maintaining the current state
2  as it exists right now.
3      A.  If we were to just maintain the current
4  state and do nothing else, the limiter would not
5  be money as much as it would be the satellite
6  system going away, at which point you wouldn't
7  have anything else and the system would stop
8  operating.
9      Q.  Why would the satellite system go away?
10     A.  Because my understanding is part of the
11  big, beautiful bill, there was explicit stuff
12  about the FCC claiming the C-band available
13  spectrum, and that chatter has really picked up.
14         We are learning that they're planning on
15  issuing whatever is the initial procedural stuff
16  to begin the auction, and they want to auction off
17  the entire 200 megahertz of C-band.  And that
18  could happen as early as FY '20 -- calendar year
19  '27, perhaps.
20         So by '28 you're either looking at a
21  situation where there's no C-band, or it's very
22  clear when it's going to not be available.

Page 179

1      Q.  So that includes the satellite capacity
2  that PRSS currently uses?
3      A.  That is correct.
4      Q.  How would CPB funding affect that?
5         MR. BROOKS:  Objection; form.
6         THE WITNESS:  Our grand proposal to CPB
7  exactly lays out that case, because what we're
8  telling them is by 2028.  And as you saw also in
9  our RFP proposal, we were talking about how can we
10  transition away from satellite because these risks
11  have been known, and we've tried to actively
12  mitigate them.
13         So our 27 million, which was our
14  three-year -- I know we haven't talked about it,
15  but the three-year grand proposal that we put in
16  front of CPB on March 25th-ish exactly speaks to
17  that.
18  BY MR. MCELROY:
19     Q.  It speaks to the NPR Distribution's
20  ability to transition away from satellite.
21     A.  And a plan.
22     Q.  And a plan.  So the CPB funding wouldn't

Page 180

1  affect the C-band satellite capacity going away?
2      A.  I'm sorry, I don't understand that.
3      Q.  The CPB funding -- strike that.
4         CPB has no authority over the C-band
5  satellite capacity; right?
6         MR. BROOKS:  Objection; form.
7         THE WITNESS:  CPB, as an organization,
8  has absolutely no control over when C-band will go
9  away.
10         MR. MCELROY:  I'm handing the court
11  reporter what I would like to be marked as
12  Munipalla Exhibit 11.
13         (Munipalla Deposition Exhibit 11 was
14  marked for identification and attached to the
15  transcript.)
16  BY MR. MCELROY:
17     Q.  Take a moment to review Exhibit 11.  Let
18  me know when you've finished, Mr. Munipalla.
19     A.  Yes, sir.
20     Q.  Do you recognize Exhibit 11,
21  Mr. Munipalla?
22     A.  Yes, I do.  I believe this is a Q&A on

Page 181

1  this -- I might use the wrong term, but on this
2  court case.
3      Q.  And were you involved in creating this
4  document?
5      A.  Not at all.
6      Q.  Have you seen this document before
7  today?
8      A.  Yeah.
9         MR. BROOKS:  Objection; form.
10         THE WITNESS:  I'm sorry, yes.
11  BY MR. MCELROY:
12     Q.  And how did you see this?
13     A.  Because we have a practice where NPR,
14  excuse me, they send their communications to the
15  NPR member stations.  And when anything needs to
16  be -- excuse me, when anything needs to be sent to
17  the broader system, and by "broader system" I mean
18  the interconnected stations, it goes through me or
19  my staff.  So I saw this document, and I asked my
20  staff to send it to the interconnection stations,
21  as well.
22     Q.  So this document was sent to the

46  (Pages 178 to 181)

10/20/2025        National Public Radio, Inc., et al. v. Donald J. Trump, et al.        Badri Munipalla

Page 182

1  interconnected stations by your department?
2     A. Yes.
3     Q. Do you know the date when it was sent to
4  the interconnected stations?
5     A. No, I don't.
6     Q. We can probably say a date after which
7  is probably after September 26th, 2025; is that
8  fair?
9     A. Oh, yeah, it was definitely in October.
10    Q. Okay. Yeah.
11       Do you know who at NPR was responsible
12 for drafting this document?
13    A. I don't.
14    Q. Do you recall who sent it to you to send
15 out to the interconnected stations?
16    A. So we do have -- I mean, it's weird.
17 There is a shared Google doc where when
18 communications are going out through the system,
19 it's got a couple of -- I mean, send it to the
20 staff, send it to member stations, send it to
21 interconnected stations. And I think typically
22 they just go down that order.

Page 183

1        And then when this had to get sent to
2  the interconnected stations, I don't remember who
3  exactly it was. It could have been somebody
4  sending me a Slack message. Maybe our chief
5  communication officer or somebody from her staff
6  saying, Go grab this document and send it out.
7     Q. So if CPB were to give the
8  interconnection funds from the July 2025 RFP to
9  PMI, that wouldn't preclude NPR Distribution from
10 continuing to provide interconnection services;
11 right?
12    A. Can you say that differently? That
13 wouldn't pre- -- please.
14    Q. Sure. Sure, I can rephrase it.
15       So even if CPB were to give PMI the
16 money from the July 2025 RFP --
17    A. Okay.
18    Q. -- NPR Distribution would still be able
19 to provide interconnection services to public
20 radio stations; right?
21    A. I'm sorry, I -- please say that again,
22 I'm so sorry.

Page 184

1     Q. Sure.
2        So even if NPR Distribution does not
3  receive the funds from the July 2025 RFP, NPR
4  Distribution will still be able to provide
5  interconnection services to public radio stations;
6  right?
7     A. Okay. Thank you. I understand the
8  question.
9        I think we've discussed this a couple of
10 times from a different -- a couple of different
11 angles. Because we're a mission-driven
12 organization, I think we would do our best to
13 provide the service as long as we can.
14    Q. And you just testified to me a few
15 minutes ago that money wouldn't be the thing that
16 would prevent you from being able to continue
17 providing the services; right?
18    A. Oh, well, I think you were asking
19 specifically about the case of satellite -- your
20 question was, How long can you provide the
21 service? And my question to you was, Are you
22 talking about in the current state?

Page 185

1        And I think I was clarifying that the
2  limitation there is the satellite termination
3  which is outside our control. But I think what
4  you're saying now might be slightly different. So
5  if you could please clarify, I'm happy to answer.
6     Q. I understand.
7        All I'm trying to say is that your
8  testimony earlier was that the satellite capacity
9  and its potential availability is a bigger
10 impediment to NPR Distribution continuing to
11 provide satellite interconnection than money on
12 hand; correct?
13       MR. BROOKS: Objection; form.
14       THE WITNESS: I think there are two
15 pieces to that. I can build on the answer that I
16 previously provided because I think it would also
17 answer your question.
18       Ideally, what we would like to do is
19 recognize that satellite is going away, as we
20 have, and ideally receive money to go ahead with
21 our terrestrial rollout so that we could safely do
22 what's called as a dual operation period where

Page 186

1 stations are also receiving content using
2 satellite and then transition them over to the
3 terrestrial services. That requires investment in
4 order to make sure that the system doesn't stop
5 working.
6 BY MR. MCELROY:
7     **Q. Investment in the terrestrial**
8 **distribution system; right?**
9     A. That's correct. But I think -- may I?
10 I think one thing to remember here is remember at
11 the very beginning of our conversation we were
12 talking about the definition of ContentDepot.
13     And in some ways the way you think about
14 ContentDepot is the software that runs the
15 broadcast distribution platform was my definition.
16 So it is not simply about just the hardware or
17 just improving this and that.
18     It is also collectively in tandem
19 improving the control mechanisms that live within
20 the ContentDepot broadcasting platform in order to
21 provide the service that we're providing today.
22     **Q. Thank you for that.**

Page 187

1     **If PMI were to set up an alternative**
2 **interconnection facility, NPR Distribution would**
3 **still be able to provide its interconnection**
4 **services; correct?**
5     MR. BROOKS: Objection; form.
6     THE WITNESS: If PMI were building an
7 alternative distribution platform, depending on
8 when that alternative distribution platform would
9 be truly ready and available, and if the
10 expectation is that we are going to be doing what
11 we're doing today, with absolutely no improvements
12 to the system, then I suppose we could keep the
13 lights on, as the phrase goes, and wait for the
14 other system to form, build, roll out, test, and
15 certify that the system is ready.
16     How long that's going to take, I don't
17 know. But if that's what we're forced to do
18 because there's no funding, then ultimately the
19 stations will suffer.
20 BY MR. MCELROY:
21     **Q. Why will the stations suffer?**
22     A. Because they've got an extremely

Page 188

1 reliable platform with 90 percent customer
2 satisfaction ratings, as you've seen in my board
3 member presentation, the very last slide.
4     You have a system that is functioning
5 really well. Customers are extremely pleased with
6 it. It is what is known in our public radio as an
7 essential service. You could talk to anybody, and
8 they'll tell you that.
9     Because we provide the national content,
10 and that makes up a bigger portion of the
11 broadcast listening pie chart, if you will, right.
12 I mean, 24 hours of programming starting from
13 6 a.m. in the morning all the way to rush-hour
14 traffic in the evening, that's peak listening
15 time.
16     And a lot of the national content is
17 what gets played during those times, interwoven
18 with regional and local content. And we make all
19 of those things happen.
20     We provide the national content. We
21 also provide signals within our national content
22 to cut over to regional programming or local

Page 189

1 programming and come back to the national content.
2 So that's what the ContentDepot platform does.
3     **Q. And I understand all that.**
4     **I guess what I'm asking is slightly**
5 **different, and that is the pure existence of PMI**
6 **providing interconnection services does not affect**
7 **NPR Distribution's ability to provide**
8 **interconnection services at all; does it?**
9     MR. BROOKS: Objection; form.
10     THE WITNESS: I mean, I think the
11 premise is we have enough money to continue to
12 operate the system. And as we get new requests,
13 we're able to respond to those new requests and
14 keep the system up to date -- up to snuff, if you
15 will.
16     If the assumption -- if that is the
17 assumption, then I think we would continue to dip
18 into our reserves and do that to the best of our
19 ability, but it would be difficult because you're
20 going to have a parallel system. And stations
21 will have to figure out all of the transitions,
22 and they would have to work all of this out on

48 (Pages 186 to 189)

Page 190

1  their own.
2  BY MR. MCELROY:
3      Q.  But if the stations go to a parallel
4  system, then that means NPR Distribution is not
5  receiving revenue from them?
6      A.  The only revenue we get, it's the
7  interconnection station fees.  That's what we
8  don't receive if they get off our system
9  altogether.  It also means they don't want NPR
10 programming, which a lot of these stations are not
11 saying they do want NPR programming, and we are
12 the only ones who carry NPR programming.
13         Now the stations are left holding the
14 bag because they've got to pay for two platforms,
15 one for interconnection to receive our NPR
16 programming and another platform to receive other
17 content.  So the burden shifts to the stations.
18     Q.  Not quite what I'm asking, I guess.
19 Just the pure existence of a competitor to
20 NPR Distribution does not affect
21 NPR Distribution's ability to do its job; right?
22         MR. BROOKS:  Objection; form.

Page 191

1          THE WITNESS:  I mean, we do have
2  competition today.  I mean, PRX distributes
3  content.  They distribute not national content,
4  but they distribute file-based content.
5          So the competition there today, and we
6  are doing the best we can to serve the
7  interconnection.  And we're doing that with
8  support from CPB, because we've got satellite
9  expenses and the broadcast back end is expensive
10 to maintain.
11 BY MR. MCELROY:
12     Q.  I understand.  What I'm asking is just
13 slightly different.
14     A.  Sorry.
15     Q.  And I really -- just the basic concept
16 that the existence of another company providing
17 the same services or similar services to
18 NPR Distribution does not actually physically
19 affect NPR Distribution's ability to perform its
20 services; right?
21         MR. BROOKS:  Objection; form.
22         THE WITNESS:  I don't think just the

Page 192

1  fact that there's another system that is working
2  is going to somehow impact the technical
3  capabilities of the system that we run.
4  BY MR. MCELROY:
5      Q.  Right.  But it possibly affects the
6  financial capabilities of what you can do; right?
7      A.  There's an assumption there.
8      Q.  What's the assumption?
9      A.  The assumption is the stations don't
10 want to be part of the interconnected PRSS system.
11     Q.  So that would be -- that assumption
12 relies on stations moving to an alternative
13 provider; right?
14         MR. BROOKS:  Objection; form.
15         THE WITNESS:  Correct.  If they abandon
16 the PRSS platform, at that point we do not get the
17 interconnection fees, and then they move to
18 another platform of their choice.
19         That is a risk that exists today.  They
20 can disconnect interconnection services.  And we
21 see the numbers go up and down year after year,
22 depending on what's happening at a station level.

Page 193

1  BY MR. MCELROY:
2      Q.  And stations do disconnect every year;
3  right?
4      A.  Yeah, they do.  A small portion of them.
5      Q.  And some of them disconnect because they
6  think the fees are too high; right?
7      A.  Yes, that's correct.
8          MS. TOWNSEND:  Do you need a break or
9  are you --
10         THE WITNESS:  Sure.
11         MS. TOWNSEND:  Do you want a break?  You
12 don't have to take one.
13         THE WITNESS:  I can go a little longer.
14         MS. TOWNSEND:  Okay.
15         THE WITNESS:  Actually, I'm sorry, let's
16 take a break.  I'll just quickly use the restroom.
17         MR. MCELROY:  All right.
18         THE WITNESS:  I apologize.
19         MR. MCELROY:  I'm happy to take a break.
20         THE VIDEOGRAPHER:  The time is 2:24 p.m.
21 We are now off the record.
22         (Recess from the record.)

49 (Pages 190 to 193)

Page 194

1          THE VIDEOGRAPHER:  The time is 2:39 p.m.
2     We are now on the record.
3          MR. MCELROY:  I'm going to hand the
4     court reporter what I'd like to be marked as
5     Exhibit 12.
6          (Munipalla Deposition Exhibit 12 was
7     marked for identification and attached to the
8     transcript.)
9     BY MR. MCELROY:
10         **Q.  Take a moment to review Exhibit 12,**
11    **Mr. Munipalla, and let me know when you've**
12    **finished.**
13         **(Witness peruses the exhibit.)**
14         THE WITNESS:  Yes.
15    BY MR. MCELROY:
16         **Q.  Do you recognize Exhibit 12,**
17    **Mr. Munipalla?**
18         A.  Yes, I do.
19         **Q.  And what is it?**
20         A.  This is a letter from Loris Taylor, the
21    president and CEO of Native Public Media, NPM, to
22    Katherine Maher, NPR president and CEO.

Page 195

1          **Q.  Who is Native Public Media, or what is**
2     **Native Public Media?**
3          A.  Native Public Media is a consortium of
4     native stations, and Loris Taylor is the CEO of
5     that consortium.
6          **Q.  And when you say "native stations," what**
7     **does that mean?**
8          A.  Native American stations.
9          **Q.  And the letter is specifically regarding**
10    **to PRSS services and interconnection fees; right?**
11         A.  I'm sorry, say that again.  There was
12    somebody coughing.
13         **Q.  No worries.**
14         **The letter is specifically related to**
15    **interconnection fees charged by NPR Distribution;**
16    **correct?**
17         A.  I don't think that is the right
18    characterization of this request.
19         **Q.  All right.  Why don't you characterize**
20    **it for me, Mr. Munipalla?**
21         A.  I think this is a request from Loris
22    Taylor asking that we provide two years of

Page 196

1     pro bono services to 58 tribal stations that form
2     NPM.
3          **Q.  And those services are interconnection**
4     **services; right?**
5          A.  Yes.
6          **Q.  And by "pro bono" she means free; right?**
7          A.  That's correct.
8          **Q.  Do you know why Ms. Taylor was**
9     **requesting these pro bono services?**
10         MR. BROOKS:  Objection; form.
11         THE WITNESS:  I think she puts that here
12    in terms of what she thinks it's going to
13    accomplish, in the middle of the first page.
14    BY MR. MCELROY:
15         **Q.  Perhaps you could direct me there, and**
16    **read me the section that you're referencing.**
17         A.  So this is paragraph No. 4.
18         **Q.  Okay.**
19         A.  It says, "It would stabilize operations
20    immediately, and it will make sure that tribal
21    stations can keep broadcasting trusted programming
22    to their listeners without new costs.  And it will

Page 197

1     provide them an opportunity to try out the
2     ContentDepot terrestrial solutions that we are
3     working on and make the transition smooth."
4          **Q.  Do you know if NPR Distribution granted**
5     **this request?**
6          A.  I think what might not be obvious here
7     is -- this goes back to the very first question
8     that you asked, is it about costs.  When she says
9     two years for 58 tribal stations, right now we
10    don't provide stations to all of those 58 tribal
11    stations.  There are, I think, three or four of
12    those stations that are interconnected.
13         So her request here is:  Can you extend
14    the interconnection to all of our stations?  And I
15    don't think -- I don't think we were able to
16    entertain this request, but we did offer in return
17    if they would give us a few more sites, we were
18    willing to give them our terrestrial solution and
19    pilot with those stations.
20         Because a lot of these native stations
21    have very tricky, spotty Internet connection.  So
22    we welcome the opportunity to work with them to

10/20/2025          National Public Radio, Inc., et al. v. Donald J. Trump, et al.          Badri Munipalla

---

Page 198

1  ensure that they have continuation of services if
2  they choose to use our terrestrial offering.
3         So we extended the option to choose to
4  do piloting with us, but we denied the request to
5  extend the pro bono service to stations that are
6  not currently interconnected.  And sorry, I just
7  want to say two more things there, if that's okay
8  with you.
9      **Q.  Sure.**
10     A.  What is also not mentioned in this
11  document is right now we do provide the
12  distribution of NPM's programming for free as part
13  of our in-kind services.  So that's the producer
14  side of NPM, not the stations.
15        And when I said "I," I actually meant
16  the D/I committee reviewed this request and made
17  that decision.
18     **Q.  What do you mean when you say in-kind**
19  **services?**
20     A.  So a big chunk of what we do, and this
21  is also spelled out in our response to the RFP, is
22  we provide underserved populations like the

---

Page 199

1  African-American Consortium, Native Public Media
2  pro bono distribution services.  So they send us
3  the content, and we send it free of cost to all of
4  the subscribed sites.
5      **Q.  Free of cost to the producers?**
6      A.  Free of cost to the producers.
7         MR. MCELROY:  I'm handing the court
8  reporter what I would like to be marked as
9  Munipalla Exhibit 13.
10        (Munipalla Deposition Exhibit 13 was
11  marked for identification and attached to the
12  transcript.)
13  BY MR. MCELROY:
14     **Q.  Take a moment to review Exhibit 13,**
15  **Mr. Munipalla.  And let me know when you've**
16  **finished.**
17     A.  Yes.
18     **Q.  Do you recognize Exhibit 13,**
19  **Mr. Munipalla?**
20     A.  Yes, I do.
21     **Q.  What is it?**
22     A.  I think this was a chain from Katherine

---

Page 200

1  Maher who was the original recipient of that
2  e-mail circulating it to us so that we could take
3  it to the D/I committee and have a resolution.
4      **Q.  And she's sending it to -- that is**
5  **Ms. Maher is sending it to Daphne Kwon -- or**
6  **excuse me -- yeah, Daphne Kwon, Maryfran**
7  **Taylor [sic], Ryan Merkley, you; right?**
8      A.  Yes.
9      **Q.  And Daphne Kwon, we spoke earlier, is --**
10  **she's the chief financial officer; is that**
11  **correct?**
12     A.  Yes.
13     **Q.  And who is Ryan Merkley?**
14     A.  He is the COO.
15     **Q.  The chief operating officer?**
16     A.  Correct.
17     **Q.  And who is Maryfran Tyler?**
18     A.  She's part of my staff.
19     **Q.  She works at NPR Distribution?**
20     A.  Correct.
21     **Q.  So after Ms. Maher sends her response to**
22  **Ms. Taylor, Daphne Kwon asks someone to forward**

---

Page 201

1  **her the letter, and you forward it to her; right?**
2      A.  That's correct.
3      **Q.  And then Ms. Kwon says, "It's**
4  **interesting that it's all one way benefit, one way**
5  **detriment, no quid pro quo."**
6         **Did I read that right?**
7      A.  Yep.  Those were her words, yeah.
8      **Q.  Do you know what she means by "one way**
9  **benefit, one way detriment"?**
10     A.  I don't know.  That's her reading of the
11  letter that Loris Taylor sent us, is my
12  understanding.
13     **Q.  What quid pro quo would NPR Distribution**
14  **have expected from Native Public Media?**
15     A.  I do not know.  And you can see my
16  response at the top, which is gives her context in
17  terms of like how we do business with Native
18  American One, which is what I explained to you
19  before you gave me this exhibit.  And I did not
20  see clarification.
21        MR. MCELROY:  I'm handing the court
22  reporter what I would like to be marked as

---

51 (Pages 198 to 201)

Page 202

1   Exhibit 14.
2       (Munipalla Deposition Exhibit 14 was
3   marked for identification and attached to the
4   transcript.)
5   BY MR. MCELROY:
6       **Q.  Take a moment to look at this, as well,**
7   **Mr. Munipalla, and let me know when you're**
8   **finished.**
9       A.  Yeah, thank you.
10      **Q.  Do you recognize this document,**
11  **Exhibit 14, Mr. Munipalla?**
12      A.  Yes, I do.
13      **Q.  What is it?**
14      A.  So this is, I think, my staff talking
15  about -- so in a previous e-mail we talked about
16  trying to pull together information, and this was
17  us doing the research in terms of like what
18  exactly, who are the NPM stations that are
19  currently a part of interconnection, and just
20  trying to understand what the request really
21  entailed.
22      **Q.  And so if you look to the second-to-last**

Page 203

1   **e-mail in the chain, it's an e-mail from Sophya**
2   **Chapson to you; right?**
3       A.  Yes.
4       **Q.  Who is Sophya Chapson?**
5       A.  Sophya works for me.  She is the
6   business affairs.  She's the one who handles the
7   contracts and accounting.
8       **Q.  And she says here that there are 31**
9   **stations that are interconnected; is that right?**
10  **It says, 31 NPM stations?**
11      A.  That's right.  So sorry, I think in the
12  past I said it was a smaller number.  So clearly
13  it's 31, yeah.
14      **Q.  And the total D/I fee for fiscal year**
15  **'26 is $252,526?**
16      A.  From those 31 stations, yes.
17      **Q.  So if NPR interconnection -- or excuse**
18  **me, NPR Distribution were to provide these**
19  **pro bono services to NPM, they would lose that**
20  **FY '26 revenue; right?**
21      A.  That's correct.  And if we did that to
22  38 stations, that would essentially be even more

Page 204

1   in potential lost revenue.
2       **Q.  But those other stations aren't**
3   **currently --**
4       A.  But her requested --
5       **Q.  -- signed up with interconnection?**
6       A.  That's correct.  But her request was, We
7   want you to provide services to all of them, which
8   means we would have to set up downlinks, satellite
9   downlink equipment.  We would have to provide
10  receivers.  All of that is extremely expensive.
11      **Q.  So you would have more expenses**
12  **associated with it, but it wouldn't be a loss of**
13  **revenue; right?**
14      A.  It wouldn't be a loss of revenue in the
15  sense that it's not currently booked, but it would
16  be a loss of revenue in the sense it would become
17  an in-kind service of sorts at that point.  Plus,
18  it would take the initial capital investment of
19  setting up all of the satellite downlink
20  equipment.
21      **Q.  But those are really expenses --**
22      MR. BROOKS:  Objection to form.

Page 205

1   BY MR. MCELROY:
2       **Q.  -- that's not revenue; right?**
3       A.  Sure.
4       **Q.  I just want to make sure I'm**
5   **understanding it correctly.  Because the 38**
6   **stations, I think you said, that aren't**
7   **interconnected, or however many there are, you're**
8   **not currently receiving interconnection fees from**
9   **them; right?**
10      A.  That's correct.  You're right.
11      **Q.  So if you were to give them pro bono**
12  **services, you wouldn't be losing revenue from**
13  **those currently uninterconnected stations; right?**
14      A.  That is correct.  So her statement here
15  is the more accurate reflection of the situation.
16      **Q.  So if you look back on page 1 of**
17  **Exhibit 14, the second e-mail down.**
18      **This is an e-mail from you to your team;**
19  **right?**
20      A.  That's correct.
21      **Q.  So you wrote that.  And at the end there**
22  **you say, I feel this is a one way detriment?**

Page 206

1    A.  Yes.
2    **Q.  What does that mean?**
3    A.  So I think this is the new information
4  that came to light here, which was about the
5  36 million that was available for stations through
6  bridge funding that her stations would have had
7  access to.
8        I think what I was trying to capture
9  there, perhaps not very eloquently, is this would
10  require us to install -- if we were to fulfill
11  Loris Taylor's full request of expanding our
12  service to all of her Native Public Media
13  stations, it would require us to make -- as you
14  point out, incur expenses to set up all of the
15  downlink equipment, and we would be losing the
16  revenue that Sophya points out.
17        So it felt like it was all one way, when
18  those stations actually have access to some relief
19  and PRSS has absolutely nothing.
20    **Q.  NPR Distribution has a process for**
21  **public stations that are experiencing hardship;**
22  **correct?**

Page 207

1    A.  Yes.
2    **Q.  Can you explain to me what that process**
3  **is?**
4    A.  There's a hardship waiver form that
5  stations are required to fill out.  And they're
6  supposed to provide some documentation that
7  justifies their hardship.  And we compile all of
8  the hardship waivers, and we make sure that it is
9  complete.
10        And we put it in front of the
11  D/I committee to make the determination if the
12  hardship waiver should be extended or not.  And I
13  think what the hardship waiver does, in essence,
14  is 50 percent fee waiver, up to 50 percent I
15  should say.
16    **Q.  Has NPR Distribution received more**
17  **hardship waiver requests this year than normal?**
18    A.  Unfortunately, yes.
19    **Q.  Do you know how many of those hardship**
20  **waivers that NPR Distribution has granted?**
21    A.  We will be having that discussion with
22  the D/I committee in our next meeting in November.

Page 208

1    **Q.  Are you aware of what's driving the**
2  **increase in hardship waivers this year?**
3        MR. BROOKS:  Objection; form.
4  BY MR. MCELROY:
5    **Q.  Or hardship waiver requests this year?**
6    A.  It is the loss of public radio funding.
7    **Q.  So the individual public radio entities**
8  **rely on public funding, as well as NPR**
9  **Distribution?**
10        MR. BROOKS:  Objection; form.
11  BY MR. MCELROY:
12    **Q.  Sorry, that was a poor question.**
13        **So the individual radio stations rely on**
14  **public funding.  Is that what you're saying?**
15    A.  Individual radio stations rely on
16  funding from the federal government in addition to
17  whatever other funding sources they have.
18        MR. MCELROY:  I'm going to hand to the
19  court reporter three exhibits that I would like to
20  be marked 15, 16, and 17.
21        (Munipalla Deposition Exhibit 15 was
22  marked for identification and attached to the

Page 209

1  transcript.)
2        (Munipalla Deposition Exhibit 16 was
3  marked for identification and attached to the
4  transcript.)
5        (Munipalla Deposition Exhibit 17 was
6  marked for identification and attached to the
7  transcript.)
8  BY MR. MCELROY:
9    **Q.  Just take a moment to review**
10  **Exhibits 15, 16, and 17.  They're really short.**
11  **Let me know when you've finished.**
12    A.  Yes.
13    **Q.  Do you recognize Exhibit 15?**
14    A.  I do.
15    **Q.  And what is it?**
16    A.  It is an example of how a hardship
17  waiver starts.
18    **Q.  And this one in particular is from a**
19  **station in Alaska; right?**
20    A.  That's correct.
21    **Q.  And then Exhibit 16 is a follow-on to**
22  **that same communication; right?**

Page 210

1    A.  Yes.
2    Q.  So it's showing 12 stations in total
3  from Alaska will be asking for a hardship waiver?
4    A.  It's the same concept of NPM, they have
5  a set of stations, similarly Alaska public media
6  has a set of stations.
7    Q.  So they're all asking for it together.
8    A.  Correct, when the parent represents it,
9  you know, they're asking for everybody.
10    Q.  And Exhibit 17 is a similar request but
11  from a station in Kentucky; right?
12    A.  Correct.
13    Q.  And this one, in fact, is from a station
14  run by a man named Mike Savage?
15    A.  Yes.
16    Q.  And Mike Savage is a board member of
17  NPR, isn't he?
18    A.  He is.
19    Q.  So even board member institutions are
20  not immune from the difficulties in the public
21  funding space right now; right?
22        MR. BROOKS:  Objection; form.

Page 211

1        THE WITNESS:  I don't think if you're an
2  NPR board member you're shielded from the
3  financial realities.  I think it's really a
4  function of where the station is located, the size
5  of the station.  That's what drives it.
6  BY MR. MCELROY:
7    Q.  Mr. Munipalla, you've signed two
8  separate declarations in the course of this
9  litigation; right?
10    A.  That's correct.
11    Q.  And one of them was in support of NPR's
12  motion for temporary restraining order; right?
13    A.  I would say yes.
14    Q.  And in that declaration, you talked or
15  you declared sort of the process that an
16  interconnected station signs up to be
17  interconnected; right?
18        MR. BROOKS:  Objection; form.
19        THE WITNESS:  I don't explicitly
20  remember, but I'll take your word for it.
21  BY MR. MCELROY:
22    Q.  Okay.  Let me ask you about it now then,

Page 212

1  what is the process by which a public radio
2  station signs up with NPR Distribution for
3  interconnection services?
4    A.  I think they would have to sign a legal
5  agreement and there is -- I think that's all there
6  is to it.
7    Q.  I'm going to hand the court reporter
8  what I would like to be marked as Exhibit 18.
9        (Munipalla Deposition Exhibit 18 was
10  marked for identification and attached to the
11  transcript.)
12  BY MR. MCELROY:
13    Q.  Take a moment to review Exhibit 18 and
14  let me know when you've finished.
15    A.  Yes.
16    Q.  And this -- do you recognize this
17  document, Mr. Munipalla?
18    A.  Yes, I do.
19    Q.  What is it?
20    A.  I believe this is a sample of public
21  radio satellite interconnection agreement.
22    Q.  So is this the template agreement that a

Page 213

1  radio would sign when signing up for
2  interconnection services with NPR Distribution?
3    A.  That's correct.
4    Q.  And is it these agreements,
5  Mr. Munipalla, that NPR contends are the mechanism
6  by which public radio stations have designated NPR
7  as the entity to receive interconnection funds on
8  their behalf?
9        MR. BROOKS:  Objection; form.
10        THE WITNESS:  That was a lot.  I don't
11  know if this is -- can you say that again, there
12  were at least two questions in there.
13  BY MR. MCELROY:
14    Q.  Sure.  Are these agreements the
15  documents that NPR contends designate NPR as the
16  entity to receive interconnection funds?
17        MR. BROOKS:  Objection; form.
18        THE WITNESS:  I would say no.  This is
19  very specific to the service that the PRSS or NPR
20  Distribution provides to each station.
21  BY MR. MCELROY:
22    Q.  Let's just look quickly at Section 8 of

Case 1:25-cv-01674-RDM    Document 59-6    Filed 10/24/25    Page 56 of 79

10/20/2025        National Public Radio, Inc., et al. v. Donald J. Trump, et al.        Badri Munipalla

Page 214

1 Exhibit 18. Section 8A allows NPR Distribution to
2 determine the contract with the radio station --
3        MR. BROOKS: Objection, sorry.
4 BY MR. MCELROY:
5        Q. -- under conditions stated therein;
6 right?
7        MR. BROOKS: Objection; form.
8        THE WITNESS: It certainly appears that
9 way, yes.
10 BY MR. MCELROY:
11        Q. And then Section B allows the station to
12 terminate the agreement under certain conditions
13 stated therein, as well; right?
14        MR. BROOKS: Objection; form.
15        THE WITNESS: Yes.
16 BY MR. MCELROY:
17        Q. And, in fact, you have had stations
18 terminating their agreement recently with NPR
19 Distribution; haven't you?
20        A. I think I've only mentioned that every
21 year there is some attrition. I don't know if
22 we've had any recently, but during the course of

Page 215

1 business, it does happen.
2        Q. Bear with me for just a moment here.
3        MR. MCELROY: All right. I'm going to
4 hand the court reporter five documents I'd like to
5 be marked Exhibits 19 through 23.
6        (Munipalla Deposition Exhibit 19 was
7 marked for identification and attached to the
8 transcript.)
9        (Munipalla Deposition Exhibit 20 was
10 marked for identification and attached to the
11 transcript.)
12        (Munipalla Deposition Exhibit 21 was
13 marked for identification and attached to the
14 transcript.)
15        (Munipalla Deposition Exhibit 22 was
16 marked for identification and attached to the
17 transcript.)
18        (Munipalla Deposition Exhibit 23 was
19 marked for identification and attached to the
20 transcript.)
21 BY MR. MCELROY:
22        Q. Realizing that I just handed you a lot

Page 216

1 of paper, Mr. Munipalla, let's start with
2 Exhibit 19.
3        Have you had a chance to review
4 Exhibit 19 yet?
5        MR. BROOKS: Take your time if you need.
6        THE WITNESS: Yeah, thank you.
7        Yes.
8 BY MR. MCELROY:
9        Q. And do you recognize Exhibit 19?
10        A. I do.
11        Q. What is it?
12        A. I think this is a conversation or an
13 e-mail initiated by WORT about disconnecting from
14 the PRSS.
15        Q. And this was in September of 2025;
16 right?
17        A. That's correct.
18        Q. And then if you can look at Exhibit 20.
19        A. Uh-huh. Yes.
20        Q. And this is a disconnection notice from
21 a radio with a call signal WBJB; is that correct?
22        A. That's correct.

Page 217

1        Q. Or is that WBIB, instead of BJB?
2        A. It's BJB.
3        Q. And then Exhibit 21 is a disconnection
4 notice from a radio station with the call signal
5 WMSB; correct?
6        A. Correct.
7        Q. And then Exhibit 22 is a disconnection
8 notice from a radio station with the call signal
9 KWMR; right?
10        A. Almost the same with the exception that
11 in this case that particular station decided to
12 stay interconnected but switch to terrestrial
13 only.
14        Q. Okay. Is -- does that come with a
15 decrease in cost or an increase in cost?
16        A. A decrease by 50 percent.
17        Q. Now, for KWMR, Exhibit 22, I just want
18 to make sure we're talking about the right one.
19        How do you know that KWMR stayed on with
20 the 50 percent discount in terrestrial connection?
21        A. It -- I think if you look at the e-mail
22 that Renee exchanged with Dennis, she says, "This

55 (Pages 214 to 217)

Case 1:25-cv-01674-RDM    Document 59-6    Filed 10/24/25    Page 57 of 79

10/20/2025          National Public Radio, Inc., et al. v. Donald J. Trump, et al.          Badri Munipalla

Page 218

1  is good news. Basically what will happen is we
2  will terminate the satellite agreement and
3  reconnect you as an Internet station."
4      Q.  I see what's going on. You're on
5  Exhibit 23.
6      A.  Oh, I'm so sorry. 22?
7      Q.  Exhibit 22, yes.
8      A.  I was talking about --
9      Q.  No worries.
10     A.  I'm sorry.
11     Q.  So Exhibit 22 is a disconnect form for
12 the station with a call signal KWMR; right?
13     A.  Correct.
14     Q.  And then Exhibit 23 is the station you
15 were discussing that switched to Internet?
16     A.  Correct. Sorry for the confusion.
17     Q.  No worries. I'm glad we could clear it
18 up.
19         And that station is -- can you -- oh,
20 KCCK; correct? It looks like it's on Bates
21 No. 243 of Exhibit 23.
22     A.  243, correct.

Page 219

1      Q.  And all of these were in August or
2  September of 2025; right?
3      A.  Correct. I remember this, and
4  previously I said I don't remember any recent
5  stuff. So thank you for putting this in front of
6  me. All of this was put in front of me by Sophya
7  all on the same day. So that's why they're all
8  dated 9/19.
9          I think it came in on a Friday fast and
10 furious. She was just summarizing a whole bunch
11 of requests that came in recently.
12     Q.  Was there some sort of timing
13 requirement that sort of precipitated all these
14 coming in on the same day?
15     A.  No, I think the general workflow is a
16 station will reach out with their intention to
17 disconnect. And then we usually talk to them and,
18 you know, tell them what the options are, if they
19 want to stay on. Usually, the primary alternative
20 being, do you want to stay on as an Internet-only
21 station, and explain to them what that means. As
22 we've talked about it, the Internet-only service

Page 220

1  has a lag.
2          So if they're okay with it, especially
3  in the case where they're not taking any live
4  programming, if they're only taking files, it
5  might be okay for them. So it's a decision that
6  they can make, but we at least want to make sure
7  that we have that conversation with every customer
8  that intends to disconnect. And then it's a
9  matter of the paperwork coming through and
10 finalizing the disconnection.
11     Q.  So I can't help my curiosity here.
12 Maybe you know the answer to this, maybe you
13 don't. Bur you're talking about the lag between
14 Internet and satellite.
15         Is that the reason why if I'm watching
16 the same football game on the TV feed and then the
17 YouTube feed, that the YouTube feed is slightly
18 behind?
19     A.  That's correct. And it is also --
20 actually, that's a very good point. And in the
21 case of broadcast, you can't have that lag because
22 the stations are relying on time-based cues.

Page 221

1  That's how you know it's one minute after the top
2  of the hour, and the NPR news kicks in.
3          So when you have a latency or delay like
4  that, and especially when it's not fixed at every
5  point -- this happens a lot during football games.
6  You'll hear one house that starts cheer, and then
7  two seconds later there's another house that
8  starts cheering. So there is this variability to
9  it which would not work in the world of broadcast.
10     Q.  I was ahead of myself. I actually
11 already have it.
12     A.  Okay.
13         MR. MCELROY:  All right. I'm going to
14 hand to the court reporter what I would like to be
15 marked as Exhibit 24.
16         (Munipalla Deposition Exhibit 24 was
17 marked for identification and attached to the
18 transcript.)
19 BY MR. MCELROY:
20     Q.  And take a moment to review Exhibit 24.
21 And let me know when you're finished,
22 Mr. Munipalla.

56 (Pages 218 to 221)

10/20/2025          National Public Radio, Inc., et al. v. Donald J. Trump, et al.          Badri Munipalla

Page 222

1    A.  Yes.
2    Q.  Do you recognize this document?
3    A.  I do.
4    Q.  What is it?
5    A.  I think this is an interconnected
6  station, KMFA.  That's talking about, you know,
7  using PRSS and how they want to look for ways to
8  lower their costs.
9    Q.  And what are the ways they're looking at
10 lowering the cost here?
11   A.  So in this particular case, I mean,
12 they're actually taking live programming.  So we
13 can't just offer them like the transfer option.
14 Because, as we just discussed, the delay makes it
15 unworkable with station automations.
16        And this is sort of the challenge that
17 we face, because we've got a fixed D/I committee
18 fee and we don't have the ability to negotiate
19 those fees with individual stations.  It's a fee
20 that the D/I committee decides, and we have to
21 hold true to it.  So in some cases like this, we
22 really don't have alternatives.

Page 223

1    Q.  And here it appears the station is call
2  letters KMFA; right?
3    A.  Yes.
4    Q.  Do you happen to know where that station
5  is located?  It looks like Austin, Texas.
6    A.  Based on the address below, yes.
7    Q.  So in his communication, he's talking
8  about the fact that he only uses a few live
9  broadcasts through interconnect; right?  And he
10 seems to have gotten ways to get live broadcast of
11 the Met from the Met and, similarly, holiday
12 programming from APM; right?
13       MR. BROOKS:  Objection; form.
14 BY MR. MCELROY:
15   Q.  Do you know what APM is?
16   A.  American Public Media.
17   Q.  And then he says he uses NPR's From the
18 Top.
19       Do you know what NPR's From the Top is?
20   A.  It's a show.
21   Q.  Is it a live show?
22   A.  I don't know.  I can't remember.

Page 224

1    Q.  Okay.  So are you familiar with the way
2  that say the Met Opera provides its live
3  programming to people without a satellite?
4    A.  So the value of the interconnection is,
5  ideally, if we carried all of the programming, we
6  would be able to manage the complications of all
7  of the programming, do all of the quality control,
8  and make sure that it is serviced through one
9  service window to all of the recipients or all the
10 subscribers of the program.
11        But it doesn't stop the producers from
12 opening up, for the lack of a better word, a
13 stream that stations can then just grab.  But that
14 becomes an individual relationship between the
15 producer and the station.  When you do that at
16 scale, it becomes terribly inefficient.
17        So I'm not aware of the kind of
18 relationships stations might have with individual
19 producers to get the content that they want
20 because that's between them, but I'm aware that
21 that's a possibility.  But it can be onerous at
22 times, depending on the technical skills available

Page 225

1  at the station.
2    Q.  When you say, "when you do that at
3  scale, it becomes terribly inefficient," what do
4  you mean by that?
5    A.  It doesn't work great for the producer,
6  and it doesn't work great for the station either.
7  Because if there's a problem, you actually don't
8  know where exactly the problem is.  You don't have
9  24/7 operational NOC.  You do not have all the
10 services to ensure and debug where the problems
11 could be and work on fixing them.
12        So you can imagine a situation where,
13 let's say, APM decides to go to every individual
14 statement -- excuse me, every individual's station
15 by passing the interconnection, let's say.  You
16 can imagine the number of service tickets that
17 they'll have to deal with.
18        So they'll have to scale up in order to
19 respond to the problems, and stations will have
20 unique issues that APM will have to solve for
21 them.  But when we -- as an interconnection
22 service, when we provide that, we're set up to

57 (Pages 222 to 225)

10/20/2025          National Public Radio, Inc., et al. v. Donald J. Trump, et al.          Badri Munipalla

Page 226

1 handle all of that.
2        So we solve the problem once, and it
3 benefits all the stations versus every station
4 solving it individually.
5    **Q.  Solving it individually every time it**
6 **occurs?**
7    A.  That's correct.
8    **Q.  Would that be the case for**
9 **NPR Distribution's terrestrial distribution, as**
10 **well?**
11   A.  Correct.  The -- maybe this is a good
12 time to explain that we've always viewed ourselves
13 as adding another way to receive content.  Within
14 our ContentDepot broadcast platform, we have this
15 notion of what's called as an end point.
16       So if you're a station, you could say, I
17 want the following end points.  And that could be
18 a satellite end point or a terrestrial end point.
19       So the software stays the same.  The
20 interface stays the same.  It's just a matter of
21 how they choose to receive the service.  It
22 becomes extremely easy for them.  So there's no

Page 227

1 difference if it's terrestrial or satellite from
2 the user perspective.
3    **Q.  Except for the potential lag?**
4    A.  But that's what we're solving with our
5 terrestrial solution.  That is the exact problem
6 we're solving with terrestrial.
7        Remember we talked about the parity with
8 existing satellites, both in terms of the hardware
9 capability, the awesome -- the difficult computer
10 science problem that we're solving is what
11 satellite offers, no lag and uniform predictable
12 delay across all of the receivers.
13   **Q.  Are there any providers that you feel**
14 **have solved that problem today?**
15   A.  There is one service called Zixi and
16 they do that for video, but they haven't solved it
17 for radio.  They've done it for video but not
18 radio.  Zixi also has this massive disadvantage as
19 a service.  It is extremely expensive because it's
20 mostly catered to video.
21       So they don't have a way to scale it
22 down for radio because the infrastructure that

Page 228

1 they have to spin up is as if it is a video
2 servicing platform.  So they don't have a way to
3 kind of really reduce the rates for radio.
4        And the second piece of information is
5 they have no hardware solution.  So what we are
6 attempting to do is -- essentially, what Zixi has
7 done for video, we want to do that for radio,
8 solve the lag problems that we previously
9 discussed and provide it in a convenient package
10 so that stations can literally drop it in place of
11 the existing satellite receivers.  So it would be
12 a simple drop and replacement.
13   **Q.  So in the top e-mail in Exhibit 24, this**
14 **is John Cyphers to you; right?**
15   A.  Yes.
16   **Q.  Who's John Cyphers?**
17   A.  He works on my team.  He's the product
18 and product support head.
19   **Q.  In the last line here of his message to**
20 **you, he says, "We don't want NPR programs getting**
21 **out around us.  In my opinion, that is a slippery**
22 **slope"; right?**

Page 229

1    A.  That's correct.
2    **Q.  Do you know what he meant by that?**
3        MR. BROOKS:  Objection; speculation.
4        THE WITNESS:  In this particular case,
5 he was reacting to -- on last digits 472, he's
6 talking about how Met is going directly to the
7 customer.  He's talking about if NPR starts going
8 directly to the customer.
9        And as I pointed out to you earlier,
10 that is the -- that is one of the reasons the
11 interconnection is as popular because it carries
12 NPR programming.  I think he's saying if NPR goes
13 around us and if they choose to go directly to the
14 station, it would be a slippery slope.
15 BY MR. MCELROY:
16   **Q.  Where do you think the slippery slope**
17 **leads?**
18       MR. BROOKS:  Objection; speculation.
19       THE WITNESS:  The slippery slope here
20 is, I mean, less and less people would be using
21 the interconnection.
22

58 (Pages 226 to 229)

Page 230

1    BY MR. MCELROY:
2        Q.  We've been going for about another hour.
3    Would you like to take another break, or do you
4    want to keep going?
5        A.  I think we could keep going.
6        Q.  All right.  So you mentioned earlier
7    that the terrestrial distribution option that you
8    provide is about 50 percent of the cost of
9    satellite; right?
10       A.  The rate that we charge today is
11   50 percent that of satellite.
12       Q.  Why is it 50 -- why do you charge
13   50 percent of the satellite for that service?
14       A.  I don't know why we came up with a
15   50 percent discount and not another number.
16   That's not a decision I made.
17       Q.  It's presumably less expensive for you
18   to provide; correct?
19       A.  Satellite costs are fixed.  So if a
20   station that already has a satellite receiver is
21   switching to terrestrial, weirdly it actually adds
22   to costs, right.  I mean, you already have a

Page 231

1    primary conduit, and now you've got to also
2    support a secondary conduit.
3            So it's not necessarily a cost thing,
4    but I don't know why they came up with the
5    50 percent discount.  I'm not saying it's wrong.
6    I just don't know the logic.
7            MR. MCELROY:  I'm going to hand the
8    court reporter what I would like to be marked
9    Exhibit 25.
10           (Munipalla Deposition Exhibit 25 was
11   marked for identification and attached to the
12   transcript.)
13   BY MR. MCELROY:
14       Q.  Take a moment to review Exhibit 25,
15   Mr. Munipalla.  Let me know when you're finished.
16           (Witness peruses the exhibit.)
17           THE WITNESS:  Yes.
18   BY MR. MCELROY:
19       Q.  Do you recognize Exhibit 25,
20   Mr. Munipalla?
21       A.  Yes, I believe I do.
22       Q.  And what is it?

Page 232

1        A.  Just working backwards, there was a
2    meeting that Chris Nelson, my boss, and I had with
3    CPB, where they were explaining to us, very
4    apologetically, why they could not approve the
5    entire amount that we asked last year.
6            And then remember, I think I mentioned
7    this earlier, the last year was one of those years
8    where we knew exactly the amount we were receiving
9    from CPB before October 1st.
10           So this is me explaining to Daphne what
11   the budget shortfall is going to be because of the
12   CPB underfunding, and the specific steps that I
13   would have to take to manage that budget
14   shortfall.
15           And also stapled together to that was a
16   readout of the meeting that Chris Nelson and I had
17   with CPB.
18       Q.  So are these your notes of that meeting?
19       A.  Correct.
20       Q.  And this meeting -- this e-mail is dated
21   July 1st, 2024; right?
22       A.  Correct.

Page 233

1        Q.  So this meeting presumably happened
2    either on that day or at some point before that;
3    right?
4        A.  Correct.
5        Q.  Do you recall the day that this
6    happened?
7        A.  The meeting happened?
8        Q.  The meeting, yeah.
9        A.  I do not.
10       Q.  I want to ask you about a few of the
11   different things that are in these notes here.  So
12   we'll start on page 1.
13           And the top three bullet points have
14   three different bolded words in them.  We've
15   talked about interconnection quite a lot.  We've
16   talked about ContentDepot quite a lot.
17           But what is shared services?  What does
18   that term mean?
19       A.  Recall the budget picture, and you had
20   commercial services, shared services, same thing.
21       Q.  So that's the excess satellite capacity?
22       A.  That's correct.

Page 234

1    Q.  So if you look down about three more
2  bullet points, the sixth bullet point down here.
3  There's another conversation about shared
4  services, where your note is, Shared services
5  business is down 18 percent year over year.
6  Unfortunately, this has been the trend for the
7  past few years; right?
8    A.  Yes.
9    Q.  So in 2024, your -- that means your
10  excess satellite capacity business was down
11  18 percent year over year?
12    A.  Yes.
13    Q.  And then the next part of that says,
14  Cost is the primary driver.  Customers are
15  migrating to terrestrial platforms which happen to
16  be cheaper than what PRSS currently offers.
17      Can you explain to me what that means?
18    A.  Sorry, this might be a little redundant
19  because we sort of talked about this earlier.
20  This is what I was explaining to you about when we
21  were forecasting the budget for the year, we were
22  expecting the worst-case scenarios.

Page 235

1        So this was me explaining to Daphne
2  that, Look, I mean, this business has been
3  trending downwards, and we expect it to continue
4  to decline.
5        So in our forecasts we're assuming that
6  we're going to be losing more customers in our
7  commercial business because terrestrial is eating
8  our lunch.
9    Q.  And, in fact, you say, terrestrial is
10  eating our lunch in the second-to-last line here;
11  right?
12    A.  Yes.
13    Q.  And is that just in the commercial side
14  of it, or did you also think terrestrial was
15  eating your lunch on the public radio
16  interconnection side of it?
17    A.  I think in this context I was talking
18  about overall revenue, and I think I was perhaps
19  leaning more towards the terrestrial -- excuse me,
20  so the commercial business.
21    Q.  On page 2 of this document, there's a
22  heavy black line and then a header that says, CPB

Page 236

1  Nelson meeting readout, Levy on the reason for
2  underfunding.
3        Does that refer to Michael Levy, CPB's
4  former CFO?
5    A.  That's correct.
6    Q.  And if you look at bullet No. 2 here,
7  that is titled, Board's frustration; right?
8        Is that talking about CPB's board?
9    A.  That's correct.
10    Q.  And it says that the board was
11  frustrated by the lack of progress toward
12  convergence and reliance on consensus building.
13        What is convergence?
14    A.  It's a very good question.  It was -- at
15  the time of this meeting, it was never defined and
16  the CPB board was expecting convergence without
17  ever defining what convergence ever was.
18        But in general, it was this idea that
19  television and radio should become one.  And the
20  general frustration with that idea was even though
21  we might both be interconnections, a converged
22  system would not really result in automatic

Page 237

1  savings, which is what the CPB board was
2  automatically assuming.
3        So it was pretty contentious in terms of
4  what convergence meant and how would we perhaps
5  show some progress towards it.
6    Q.  So convergence would require alterations
7  to radio and television interconnection?
8    A.  Yes, depending on -- of course, you'll
9  have to spell out exactly what those alterations
10  are, but in a simple way that is true.  I mean,
11  you would have to change the way in which these
12  two businesses operated in order to have some sort
13  of a unified platform.
14    Q.  Well, even today they operate as
15  separate businesses; right?
16    A.  Correct.
17    Q.  So even taking the basic definition of
18  "convergence," would you expect that convergence
19  would include some combination of the two of them?
20    A.  In fact -- so this is a conversation --
21  if you would just permit me a minute.  The very
22  first thing here, sympathy and appreciation, this

Page 238

1 is the CPB board and Michael Levy, the CEO at the
2 time, saying, We are entirely sympathetic and
3 appreciative of what you've put into the proposal
4 and the change in the direction it marked.
5        There he's talking about a very
6 forward-looking proposal that was moving us from
7 satellite to terrestrial. That is what our
8 previous proposal was.
9        And then he talks about the board
10 saying, We're not going to give you the money
11 because you haven't made process on convergence.
12 And our point was, But you've not defined what it
13 is.
14        Now, the specific question that you're
15 asking is what we addressed in our subsequent
16 conversations with the CPB, which led to a meeting
17 with the CPB board, our CEO, Katherine Maher, and
18 PBS's CEO, talking about what the convergence
19 opportunities are.
20        And to your point about altering the
21 system, the thing that we specifically proposed in
22 our three-year proposal was to take on the PBS

Page 239

1 satellite contract. And since we already have the
2 NOC and we have the BNOC and we have the
3 monitoring capabilities and we have the commercial
4 business that allows us to sell satellite
5 capacity, we could merge the satellite contracts,
6 and we could sell the capacity to PBS. So that
7 would be a low hanging fruit in order to make some
8 progress towards convergence.
9    **Q. And that's how at this time in July '24,**
10 **you were proposing to address the CPB board's**
11 **convergence concerns?**
12    A. No, like I said before, at that point we
13 hadn't really worked out what steps we could make
14 towards convergence. So what Michael Levy was
15 conveying to us is, you guys are not getting your
16 money because you haven't made progress on
17 convergence.
18        And we were, like, But we were never
19 asked to properly consider the question because we
20 don't even know what "convergence" means.
21        So we were, like, All right, we will
22 accept the 4.45 million because we don't have a

Page 240

1 choice. That is what your board is asking you to
2 do. And we will commit to working with you on
3 what convergence could be, and put something in
4 front of your board that would feel reasonable
5 towards that aspiration.
6    **Q. So this meeting that you referenced with**
7 **Ms. Maher and the CPB board, when did that occur?**
8    A. That happened -- so this was in -- did
9 we say July?
10    **Q. Yeah, this is July 1st, right.**
11    A. So you need to fast-forward to Feb of
12 this year. August, September, October, November,
13 December, Jan, Feb -- seven months later.
14    **Q. So if you go down to the next bullet**
15 **point, 3, historical context, your note says that**
16 **board members reflected on longstanding issues and**
17 **past commitments to create an integrated system**
18 **that saves resources.**
19        **And then you quote them as saying, The**
20 **board has been talking about this for years and**
21 **wanting to see this happen. It never happened; is**
22 **that right?**

Page 241

1    A. That's right.
2    **Q. So do you agree with the statement that**
3 **the board had raised these concerns with NPR**
4 **previously to the date of this e-mail?**
5    A. I was obviously aware of it. And I
6 think every single time we were underfunded, the
7 answer was, You're not doing enough towards
8 convergence.
9        And I was grappling with the definition
10 of "convergence," and I asked people, What does
11 this even mean? And nobody could answer it
12 because it was never adequately articulated.
13        So I was aware that there were these
14 convergence chatter all along. We just didn't
15 know what it exactly meant. And this was before
16 my time. This is, like, ten years before. I was
17 not part of any of those conversations back then.
18    **Q. So the next bullet point down, still in**
19 **3, it looks like you're quoting another statement**
20 **here.**
21        **There was a conversation and**
22 **representations made on the Hill about being able**

Case 1:25-cv-01674-RDM    Document 59-6    Filed 10/24/25    Page 63 of 79

10/20/2025          National Public Radio, Inc., et al. v. Donald J. Trump, et al.          Badri Munipalla

Page 242

1  to have an integrated system that would save
2  resources, and there's an ellipses, 20-some-odd
3  years ago.
4        A. So everything that I'm saying there are
5  quotes by Michael Levy. I was just jotting it
6  down and summarizing it. So this is all Michael
7  Levy. When you're saying I'm saying it, I'm not
8  saying it, I'm just quoting Michael Levy.
9        Q. I didn't mean to say that you were
10 saying it.
11       A. Just to be clear.
12       Q. So are you aware of what that reference
13 is to representations made on the Hill about being
14 able to have an integrated system?
15       A. No, it was -- I don't know.
16       Q. It was before your time?
17       A. Yes.
18       Q. So you're not aware of when the
19 discussions about convergence began? It was just
20 sometime before you took on the VP distribution
21 role?
22       A. Yeah, I mean, I think I've -- I've

Page 243

1  shared with you what I understood about
2  convergence at that point in time. It was always
3  this pressure on convergence from the Hill. Okay.
4  I don't know what that means, but this is the kind
5  of verbiage that I have picked up for all of these
6  years, but it was never properly articulated what
7  exactly it means.
8        MR. BROOKS: Are you still doing okay?
9        THE WITNESS: I think can we take a
10 quick break, sorry.
11       MR. MCELROY: Yeah, let's take a quick
12 break.
13       THE VIDEOGRAPHER: The time is 3:47 p.m.
14 We are now off the record.
15       (Recess from the record.)
16       THE VIDEOGRAPHER: The time is 3:59 p.m.
17 We are now on the record.
18       MR. MCELROY: I'm going to hand to the
19 court reporter what I would like to be marked
20 Exhibit 26.
21       (Munipalla Deposition Exhibit 26 was
22 marked for identification and attached to the

Page 244

1  transcript.)
2  BY MR. MCELROY:
3        Q. Take a moment to review this document,
4  Mr. Munipalla. Let me know when you're finished.
5        A. Yes.
6        Q. Do you recognize Exhibit 26,
7  Mr. Munipalla?
8        A. Yes, I do.
9        Q. What is it?
10       A. This was similar -- this is related to
11 the e-mail that we saw earlier where -- the one
12 that I flagged Marta asking about, Can you give us
13 some parameters so that we could actually do some
14 sensible analysis on the doomsday scenario? The
15 doomsday scenario here being losing federal
16 funding.
17       And this is -- this is an e-mail
18 starting off with my staff kind of taking what was
19 done previously, not when I was a VP, and just
20 updating it and saying this is what it could look
21 like.
22       And then this is me responding to Chris

Page 245

1  saying that this is not really a reasonable
2  analysis, and it's hard for us to do a reasonable
3  analysis unless we learn more.
4        Q. Okay. So if you look in the -- so the
5  top e-mail here is you responding to Mr. Nelson or
6  sending this to Mr. Nelson with your comments;
7  right?
8        A. Yes.
9        Q. And one of your comments here, if you
10 look, the second bullet point from the bottom, you
11 state, As we speak, CPB is advocating for a change
12 in governance in the definition of
13 "interconnection"; right?
14       A. Yes.
15       Q. And this e-mail was written June 3rd,
16 2024; right?
17       A. Yes.
18       Q. So as of June 3rd, 2024, you were aware
19 that CPB was interested in a change in governance
20 to PRSS; weren't you?
21       MR. BROOKS: Objection; form.
22       THE WITNESS: Correct. As I've stated

Case 1:25-cv-01674-RDM    Document 59-6    Filed 10/24/25    Page 64 of 79

10/20/2025        National Public Radio, Inc., et al. v. Donald J. Trump, et al.        Badri Munipalla

Page 246

1  before, I mean, these terms have been floating
2  around without definition.  So yes.
3  BY MR. MCELROY:
4      Q.  What type of advocacy or advocating for
5  change in governance had CPB been doing?
6      MR. BROOKS:  Objection to form.
7      THE WITNESS:  To be honest with you,
8  now -- again, as I've said, I mean, you saw the
9  e-mail from the readout that I put in front --
10 that we just looked at before the break.  It's
11 just those sort of comments that we had heard from
12 CPB, nothing specific.
13 BY MR. MCELROY:
14     Q.  So the convergence was included in their
15 advocating for a change in governance.
16     MR. BROOKS:  Objection; form.
17     THE WITNESS:  I think -- when CPB
18 thought about governance, I think it subsumed
19 convergence, too, in some ways because I think
20 these were concepts that were interrelated.  There
21 would be no reason to change governance if we were
22 not trying to achieve convergence, whatever those

Page 247

1  things may mean.
2  BY MR. MCELROY:
3      Q.  Okay.  And if you look two bullets up
4  above that, you have a question there that says,
5  What will the draw on the reserves be to support
6  the system during the first three years?
7          Is that -- you're talking about NPR
8  Distribution's financial reserves?
9      A.  Yes.
10     Q.  And that's to support the system in the
11 scenario that NPR Distribution loses federal
12 funding; right?
13     A.  Yes.
14     MR. MCELROY:  I'm going to hand the
15 court reporter what I would like marked as
16 Exhibit 27.
17     (Munipalla Deposition Exhibit 27 was
18 marked for identification and attached to the
19 transcript.)
20 BY MR. MCELROY:
21     Q.  Take a moment to review Exhibit 27.  Let
22 me know when you've finished, Mr. Munipalla.

Page 248

1      (Witness peruses the exhibit.)
2      THE WITNESS:  Yes.
3  BY MR. MCELROY:
4      Q.  Do you recognize Exhibit 27?
5      A.  I do.
6      Q.  What is it?
7      A.  The bottom of half of this e-mail is a
8  communication that I sent out to the
9  interconnection stations.  Remember earlier I
10 talked to you about how I correspond with the
11 interconnected stations and this is an e-mail that
12 was drafted by NPR communications, with help from
13 us, and this is the memo that we put out to all of
14 interconnection.
15         The response at the top is from KCKO, a
16 station in Alaska, actually a fascinating station
17 with just one employee, who was wondering what
18 exactly this means.  And the person was Paul
19 Walker.
20         And at the very top, this is my team
21 member we talked about, Maryfran, she's part of my
22 staff.  This is her reaching out individually to

Page 249

1  Paul to make sure that we answer any questions he
2  may have.  Because he's so far removed from a lot
3  of the Washington noise, it was hard for him to
4  understand what all of this meant.
5      Q.  Hard to get more further removed
6  than Alaska, huh?
7      A.  Sure.
8      Q.  So the bottom part of this is the
9  message that you sent out to the interconnected
10 entities?
11     A.  That's correct.
12     Q.  And you sent out in June of 2025; right?
13     A.  That's right.
14     Q.  In the second paragraph here, the second
15 half of the first sentence you note that, We are
16 well-positioned to navigate this moment.
17         What does that mean?
18     A.  I think the intention here was to send a
19 calming message to all of the interconnected
20 stations to let them know that their essential
21 service is not going to get turned off tomorrow as
22 a result of this executive action.  That's what

10/20/2025          National Public Radio, Inc., et al. v. Donald J. Trump, et al.          Badri Munipalla

Page 250

1  we're trying to communicate.
2      Q.  And then about three more sentences in,
3  it says, Finally, NPR has built up financial
4  reserves that can be utilized for the management
5  and operation of the PRSS; right?
6      A.  That's correct.
7      Q.  So these are the $25 million in
8  financial reserves we talked about earlier; is
9  that right?
10     A.  That's correct.
11     Q.  Can we go back to Exhibit 26 for just a
12 second?
13     A.  26.  Yes.
14     Q.  And it's the one with NPR 4941 at the
15 bottom?
16     A.  Correct.
17     Q.  All right.  So we talked about the
18 second-to-last bullet point on here, but we
19 didn't -- we talked about the first half of it.
20 We didn't talk about the second half of it.  So I
21 just want to come back to the second half of that
22 bullet quickly.

Page 251

1      You say, So there is a real chance that
2  NPR Distribution becomes more dependent on CPB
3  funding, not less over the next few years.
4      How would that be the case?
5      A.  So the thought here is if there's more
6  convergence, at least in the interim for that
7  convergence to happen, let's assume for a minute
8  that both PBS and NPR comes to a consensus and CPB
9  is willing to fund this notion of convergence.
10     At that point you're getting to be
11 getting more money from CPB than what we were
12 already getting today.  As explained in that
13 discussion before the break, one of the things
14 Michael Levy was saying is, Hey, I mean, in the
15 past we've got a lot of traction from the Hill to
16 support public radio if we can show more progress
17 on convergence.
18     So one could reasonably infer that that
19 would mean more money coming from CPB in terms of
20 federal funding in order to support this new
21 concept.
22     Q.  Because you're doing more work

Page 252

1  effectively, right, on behalf of video and radio?
2      A.  Either more work --
3      Q.  Or am I misunderstanding that?
4      A.  No, no, that's right.  I mean, either
5  more work or busy reinventing and retrofitting the
6  system to meet the requirements of convergence.
7  It essentially creates an activity.  I mean,
8  activity is going to cost money, regardless of
9  what that activity is.
10     Q.  Right.  Okay.
11     A.  So I think that was the point.
12     Q.  Thank you.
13     We're on 28.  So I'm going to hand to
14 the court reporter what I'd like to be marked as
15 Munipalla Exhibit 28.
16     (Munipalla Deposition Exhibit 28 was
17 marked for identification and attached to the
18 transcript.)
19 BY MR. MCELROY:
20     Q.  And take a moment to review Exhibit 28.
21 And let me know when you've finished,
22 Mr. Munipalla.

Page 253

1      MS. TOWNSEND:  Yeah, we might have an
2  issue here.  I think this might include a
3  privileged communication that was inadvertently
4  produced.
5      MR. MCELROY:  Should we go off the
6  record to discuss?
7      MS. TOWNSEND:  Yeah, why don't we do
8  that, just briefly.
9      THE VIDEOGRAPHER:  The time is 4:14 p.m.
10 We are now off the record.
11     (Recess from the record.)
12     THE VIDEOGRAPHER:  The time is 4:16 p.m.
13 We are now on the record.
14     MR. BROOKS:  Yeah, so on the record,
15 after discussion with counsel, Exhibit 27 --
16     MR. MCELROY:  28.
17     MR. BROOKS:  Exhibit 28 will be just the
18 first page, and that's NPR ending in 5094.
19     MR. MCELROY:  Agreed.
20     MS. TOWNSEND:  And we're going to
21 take -- we've agreed on the record that the two
22 subsequent pages, which are Bates stamped 5 --

64 (Pages 250 to 253)

Case 1:25-cv-01674-RDM    Document 59-6    Filed 10/24/25    Page 66 of 79

10/20/2025          National Public Radio, Inc., et al. v. Donald J. Trump, et al.          Badri Munipalla

Page 254

```
1        MR. BROOKS: 95 and 96.
2        MS. TOWNSEND: 595 --
3        MR. MCELROY: 5095.
4        MS. TOWNSEND: Sorry. 5095 and 5096
5   were inadvertently produced and are
6   attorney-client privileged, and we'll be clawing
7   those back.
8        MR. MCELROY: And we will tell our
9   vendor to sequester the other two pages of it.
10       MS. TOWNSEND: Great. Thank you.
11  BY MR. MCELROY:
12       Q. All right. Now that we've had our fun,
13  Mr. Munipalla, have you had a chance to review the
14  document?
15       A. Yes, I have.
16       Q. Okay. And I just want to look at the
17  very first e-mail on this. So can you tell me, do
18  you recognize this exhibit?
19       A. Yes, I do.
20       Q. And what is it?
21       A. If you'll recall, in the e-mail from
22  July, the one that Michael Levy's quotes, he talks
```

Page 255

```
1   about bringing in Deloitte that would allow CPB to
2   look at this convergence idea.
3        And this is after Deloitte was brought
4   on board. They wanted to convene two meetings to
5   talk about -- introduce the idea of what
6   convergence could be. So this is the first time
7   we're talking about what it could be. And there
8   were two sessions planned.
9        So I think this was me suggesting to
10  everybody that I think it is important that we
11  participate in these discussions because it is
12  important to be open, transparent, and engage in
13  dialogue versus just decide not to participate.
14       Q. And in the first sentence here, you say,
15  "In my biweekly one-on-one with Kathy Merritt
16  earlier, I asked if the newco idea is a finalized
17  decision."
18       What is the newco idea?
19       A. So the newco idea is -- at least at that
20  time, it was not fully defined obviously, that's
21  why we were having the meeting, but it was the
22  concept of pulling together TV and radio
```

Page 256

```
1   interconnection under one umbrella, assuming it
2   was even doable, and ideas on how to accomplish
3   that. So that was called the newco.
4        Q. And presumably that would be creating a
5   new company to do that, not doing it under the
6   umbrella of either PBS or NPR?
7        A. That's speculative, right. I mean, I
8   think that's why it says the door is wide open,
9   even Kathy doesn't know what it meant.
10       Q. Okay. But if the convergence happened
11  under either NPR Distribution or under PBS, there
12  would be no need to create a newco; right?
13       MR. BROOKS: Objection; form.
14       THE WITNESS: Sure.
15  BY MR. MCELROY:
16       Q. NPR Distribution and PBS already
17  existed; right?
18       A. That's right.
19       Q. And the term "newco," do you understand
20  it to mean new company?
21       A. That was a short for new company.
22       MR. MCELROY: I'm handing the court
```

Page 257

```
1   reporter what I would like to be marked
2   Exhibit 29.
3        (Munipalla Deposition Exhibit 29 was
4   marked for identification and attached to the
5   transcript.)
6   BY MR. MCELROY:
7        Q. Before we move to 29, actually, just
8   Exhibit 28 quickly, these communications were
9   occurring in October of 2024; right?
10       A. I'm sorry, I'm looking at this one which
11  says --
12       Q. Exhibit 28, sorry.
13       A. Oh. Oh, I'm sorry, my bad.
14       Correct. October of '24 is when there
15  were two plans of this FPMD meeting, and they had
16  assembled a group called the group of champions.
17  And the group of champions were supposed to meet
18  on those two stated dates to talk about the FPMD
19  project, which essentially was about convergence.
20       Q. And then so those two original meetings
21  were on either October 24th or October 25th, 2024;
22  right?
```

Page 258

1    A.  The two meetings were on October 31st or
2  November 5th.
3    Q.  But there's a kickoff meeting first that
4  was either on the 24th or the 25th; right?
5    A.  Yeah, that's right.
6    Q.  So there were overall three potential
7  meetings; right?
8    A.  So in reality, it was just two meetings,
9  it was a kickoff and a discussion, but there was a
10  backup date.  Therefore, four.
11    Q.  Oh, I see.  I understand.
12        Did you attend any of these meetings,
13  Mr. Munipalla?
14    A.  Yes, I did.
15    Q.  Which ones?
16    A.  I attended a kickoff meeting.  I don't
17  know if I attended both of them.  And I also
18  attended both the discussions.  I was part of the
19  group of champions.
20    Q.  Do you recall who else was part of the
21  group of champions?
22    A.  The other champions.  I think it was a

Page 259

1  lot of the TV interconnection folks, and then
2  there were people from NPR leadership.
3    Q.  People from CPB, as well?
4    A.  Oh, yes, and Deloitte.
5    Q.  Do you recall who from CPB was part of
6  the group of champions?
7    A.  Definitely Michael Levy.  He did the
8  introductions.  Kathy Merritt, Stacey Decker,
9  Deborah Carr, and there could have been others.  I
10  don't recall who else from CPB.  I mean, these are
11  Zoom calls.  This was not -- just to be clear,
12  this was over Zoom, and it's very difficult to
13  kind of see all the participants.
14    Q.  I understand.
15        Are you aware of whether or not any of
16  those meetings were recorded?
17    A.  I don't know if those were hosted by CPB
18  or Deloitte, but if it was recorded, Deloitte
19  would have the recording, I think.  It could have
20  been hosted by Deloitte.
21    Q.  Okay.  All right.  Now we're moving to
22  Exhibit 29.  Sorry for the confusion.

Page 260

1        You can take a moment to review
2  Exhibit 29.  Let me know when you're finished.
3        (Witness peruses the exhibit.)
4        THE WITNESS:  Yes.
5  BY MR. MCELROY:
6    Q.  And do you recognize this document?
7    A.  I do.
8    Q.  And what is it?
9    A.  This may be what Chris Nelson and I
10  shared with the NPR board.  I know it looks like
11  an e-mail, but this looks like Chris Nelson sent a
12  backup to Chris Nelson.  This was him, it looks
13  like, working on speaking notes.
14    Q.  It appears to be a presentation; right?
15    A.  These were his speaking notes for the
16  presentation.
17    Q.  And did you speak with Mr. Nelson at
18  this presentation?
19    A.  Yes, I did.  Sorry, the only reason I'm
20  looking at Liz is I don't know if this is
21  confidential because it's board.
22        Okay.  Sorry.

Page 261

1    Q.  We have a protective order in place.
2  Confidentiality provisions can be addressed.
3        If you look at the top of page 2 here,
4  it says, Our negotiations with CPB for
5  interconnection grants have been challenging as of
6  late.
7        It says, CPB has been pushing hard on a
8  number of topics, including why can't we just
9  eliminate satellite and provide interconnection
10  over the public Internet.
11        No. 2, PRSS uses an in-house developed
12  platform called ContentDepot.  And CPB will ask,
13  shouldn't that be outsourced.  Surely there must
14  be a cheaper and better alternative, and why can't
15  you and PBS simply merge your systems.
16        Do you believe that's an accurate
17  characterization of negotiations with CPB for
18  interconnection funds?
19    A.  Those were the general themes that were
20  usually discussed in our negotiations with CPB.
21  So I would agree with that.
22    Q.  And these notes appear to have been

Page 262

1 created on or about February 1st, 2024; right?
2      A.  Correct.
3      Q.  Do you recall is that about when you
4 recall you and Mr. Nelson gave this presentation
5 to the board?
6      A.  I don't remember the specifics.  But if
7 this is Chris mailing this to himself, it would
8 have been shortly afterwards.
9      Q.  Now, we talked about Deloitte earlier in
10 response to one of the exhibits.  What role did
11 Deloitte play in interconnection funding for NPR?
12      A.  So they were brought on July of '24.
13 You know, I think they were brought on even before
14 that because they did review our submitted
15 proposals.  So I think the first thing they did
16 was take a look at the proposals, and then they
17 were tasked with -- it is my understanding they
18 were tasked with looking at broader public media
19 issues as per CPB's request.  I don't know what
20 those specific requests were.  That's between CPB
21 and Deloitte.
22      Q.  Do you know if Deloitte provided any

Page 263

1 recommendations to CPB in the 2024 time period
2 that you were talking about?
3      A.  That's a conversation between Deloitte
4 and CPB.  I don't know what their recommendations
5 were.
6      Q.  So you've never seen any recommendations
7 from Deloitte about interconnection?
8      A.  I have never seen.
9      Q.  Are you aware of any other consultants
10 that have been hired by CPB or NPR in the last
11 five years to study interconnection specifically?
12      A.  Yes, CPB loves hiring consultants, and
13 they've hired multiple consultants over those
14 five years.
15      Q.  Do you recall the names of any of them?
16      A.  There was -- going way back, there was a
17 consultant called Cognizant.  This is from 2015.
18 And then ten years -- so this is before my time as
19 a VP, but there was a Cognizant report that talked
20 about the interconnection.
21          And then came Diversified.  At that
22 point, I was a senior director, and I was only

Page 264

1 brought into specific negotiation -- brought in
2 during specific negotiation points with CPB, and
3 I've interacted with Diversified consultants.
4          After Diversified, CPB asked PRSS to
5 hire consultants, and we hired Kearney.  After
6 Kearney, CPB hired Deloitte to double-check
7 Kearney.  And that was in the 2024 time frame that
8 we were talking about.
9      Q.  Okay.  Did you at any time review any of
10 the reports created by Cognizant?
11      A.  I did not review those reports.  I have
12 only seen them because they're posted on the CPB
13 website.  And I was -- 2015, I was -- I don't know
14 what my title was, but I was far away from the
15 business side.
16      Q.  Okay.  When you say you've only seen
17 them because they're posted on CPB's website, did
18 you go on their website and read them?
19      A.  I think at some point I went in and
20 looked at what the Cognizant recommendations were,
21 and that's where I found it.
22      Q.  Do you recall what the Cognizant

Page 265

1 recommendations were?
2      A.  There were a lot of recommendations.  It
3 was a fairly substantial document.  But some of
4 the bits and pieces, they were talking about
5 satellite being appropriate in 2015 as a
6 distribution pathway.
7          They were talking about making sure --
8 in technology development there's this concept
9 called agile development, which basically means
10 you make incremental progress towards the goal.
11 Because there is a lot of research that has shown
12 that if you take on a big project and say, This is
13 where I want to go, they usually just fail.
14          So Cognizant was trying to tell CPB, You
15 need to fund incremental work because that's
16 guaranteed more success than just saying, you
17 know, Here are the requirements, here's the end
18 stage, just go build it.  That's a recipe for
19 failure.
20          Those are the ones that I distinctly
21 remember.
22      Q.  Okay.  Do you recall whether or not you

Page 266

1  ever reviewed a copy of the Diversified consultant
2  report?
3      A.  I don't think we ever saw the full
4  Diversified report.  Now, this was a consultant
5  CPB hired based on the Cognizant report which
6  said, We need to revisit the interconnection in
7  ten years.
8          So right around that time they hired
9  Diversified.  So it was a relationship between
10  Diversified and CPB.  So I think I've only seen
11  bits and pieces of it.
12         My predecessor might be to have seen or
13  commented on those documents.  I don't remember
14  being overly involved in it except offering some
15  comments.
16     Q.  Do you recall any of the recommendations
17  from the Diversified report?
18     A.  I don't.  I only remember Diversified
19  sharing with PRSS or our leadership at that point
20  saying, this is -- this is what CPB wants you to
21  be doing, and this is what they want me to say in
22  the report.

Page 267

1          So, you know, I'm just giving you a
2  heads-up that this is where they want you to go.
3  Whether it's the right thing or not, that's a
4  different question, but this is sort of -- you
5  know, this is where you should be going.  And if
6  you don't do that, it's going to become tricky.
7      Q.  Were you involved in NPR's work with
8  Kearney?
9      A.  Yes.
10     Q.  How so?
11     A.  One of the things Diversified -- I'm
12  sorry, I should have mentioned this as a part of
13  the previous question, but I will add on to it.
14  One of the things Diversified mentioned was they
15  want you to do more terrestrial.
16         And we proposed to Diversified, to the
17  Diversified consultants in one of our CPB
18  meetings, our terrestrial distribution strategy.
19  And the Diversified consultants thought it was a
20  good idea.
21         But then CPB wanted a second opinion,
22  and they said, Why don't you go off, and we will

Page 268

1  help you hire a consultant.  And we put out an RFP
2  and Kearney responded to it.  I was involved in
3  that process.  And then we hired Kearney, and
4  their job was to look at the future of PRSS.
5      Q.  Are you familiar with the results or the
6  conclusions that Kearney made in that report?
7      A.  I'm familiar with it.  This was probably
8  one of the largest reports that you'll ever see.
9  So I do remember reading it.
10     Q.  Do you recall the general takeaway of
11  Kearney's report, what their recommendations were?
12     A.  There were ten recommendations, I
13  believe, as a top line.  So it's hard to
14  generalize all ten recommendations.  Plus, I don't
15  have a vivid recollection of all of them.
16     Q.  Understood.
17         MR. MCELROY:  I'm going to hand the
18  court reporter what I would like to be marked
19  Exhibit 29.
20         (Munipalla Deposition Exhibit 30 was
21  marked for identification and attached to the
22  transcript.)

Page 269

1          MR. BROOKS:  This is Tab 29?
2          THE COURT REPORTER:  I'm sorry, this is
3  30.
4          MR. MCELROY:  30, sorry.  Exhibit 30.
5  BY MR. MCELROY:
6      Q.  Please take a moment to review
7  Exhibit 30.  And let me know when you've finished,
8  Mr. Munipalla.
9          (Witness peruses the exhibit.)
10         THE WITNESS:  Okay.
11  BY MR. MCELROY:
12     Q.  Do you recognize this document,
13  Mr. Munipalla?
14     A.  Yes.
15     Q.  And did you receive this document?
16     A.  I don't think so, because this was to
17  the CPB working group on content distribution, and
18  I was not on the CPB working group.  Because it
19  doesn't have individual recipients, I'm inclined
20  to believe I did not directly receive this.
21     Q.  How do you recognize it?
22     A.  Because I think it was forwarded to me

Case 1:25-cv-01674-RDM    Document 59-6    Filed 10/24/25    Page 70 of 79

10/20/2025        National Public Radio, Inc., et al. v. Donald J. Trump, et al.        Badri Munipalla

Page 270

1  at some point. So I've seen this before.
2      **Q. And this is the -- an announcement by**
3  **CPB that they're forming a working group regarding**
4  **the 2025 RFP; right?**
5      A. They were forming a working group.
6  There's no reference to the RFP.
7      **Q. Fair enough.**
8          **And it was your testimony earlier today**
9  **that you did not participate in the working group,**
10 **and just a few minutes ago that you did not**
11 **participate in this working group; right?**
12     A. That's correct.
13     **Q. If you look back at Exhibit 30, the**
14 **second-to-last full paragraph, not including the**
15 **single sentence at the end, the second-to-last**
16 **sentence in that paragraph talks about the**
17 **National Federation of Community Broadcasters.**
18         **Do you know -- are you familiar with**
19 **that entity?**
20     A. I've heard of it, and I know of Rima
21 Dael because she was formerly a D/I member, but I
22 don't know about -- I don't know too much about

Page 271

1  them.
2      **Q. Do you know what constituency the**
3  **National Federation of Community Broadcasters**
4  **represents?**
5      A. There are many small sort of groups like
6  this in public media. I think this particular one
7  represents the very small community stations. And
8  I think about 20 of them are probably
9  interconnected. The vast majority of them are
10 not.
11     **Q. That was going to be my follow-up**
12 **question to you, Mr. Munipalla, but you've already**
13 **answered it. You're getting good at this.**
14         **Do you know about how many of those**
15 **community broadcasting stations there are?**
16     A. I can't recall the number right now.
17     **Q. But more of them are not interconnected**
18 **through NPR Distribution than those that are**
19 **connected through NPR Distribution?**
20     A. That's correct.
21         MR. MCELROY: I've probably got about 35
22 or 40 minutes left. Do you want to take a break

Page 272

1  now, or do you want to go through it?
2          THE WITNESS: Can we take a very short
3  break?
4          MR. MCELROY: Yeah, let's take a short
5  break.
6          THE WITNESS: Just five minutes.
7          THE VIDEOGRAPHER: The time is 4:44 p.m.
8  We are now off the record.
9          (Recess from the record.)
10         THE VIDEOGRAPHER: The time is 4:55 p.m.
11 We are now on the record.
12         MR. MCELROY: All right. We're on 31;
13 right?
14         THE COURT REPORTER: Yeah.
15         MR. MCELROY: I'm going to hand to the
16 court reporter three exhibits that I would like to
17 be marked as 31, 32, and 33.
18         (Munipalla Deposition Exhibit 31 was
19 marked for identification and attached to the
20 transcript.)
21         (Munipalla Deposition Exhibit 32 was
22 marked for identification and attached to the

Page 273

1  transcript.)
2          (Munipalla Deposition Exhibit 33 was
3  marked for identification and attached to the
4  transcript.)
5  BY MR. MCELROY:
6      **Q. You can take a moment to review these**
7  **exhibits, Mr. Munipalla. Let me know when you've**
8  **finished.**
9      A. Yes.
10     **Q. Do you recognize Exhibit 31,**
11 **Mr. Munipalla?**
12     A. I do.
13     **Q. And what is it?**
14     A. This was our COO letting Chris and I
15 know that he had received an e-mail -- well, in
16 this case a phone call from Margaret Low from WBUR
17 talking about her station engineer thinking about
18 an interconnection of sorts. I don't think they
19 use that word, but sort of a network to build that
20 would essentially connect their stations together
21 and how he might go about it.
22     **Q. And then Exhibits 32 and 33 appear to be**

Page 274

1  the attachments that Mr. Merkley forwarded to you;
2  right?
3       A.  One is a summary.  The other is the
4  actual doc.
5       Q.  And so Exhibit 32 and 33 are the
6  documents that were prepared by WBUR regarding
7  this network you were just describing?
8       A.  Yes.
9       Q.  And so the network that's being
10 described by WBUR here provides a lot of the same
11 services as PRSS does; right?
12      MR. BROOKS:  Objection; form.
13      THE WITNESS:  I don't think so.
14 BY MR. MCELROY:
15      Q.  You don't think so.  So you said it's an
16 interconnection of sorts.  What did you mean by
17 that?
18      A.  I've read this document exactly once.
19 So my general impression was they were thinking
20 about building what's called as a PRIS in order to
21 move bits around.  The exact set of services is
22 not fully articulated here.  So I don't know what

Page 275

1  services they would be providing.
2       But I think what he's really talking
3  about here is, like, essentially describing the
4  value of having an interconnection and thinking
5  about building one on their own without really
6  spelling out the exact services.
7       So it's hard to know to what degree they
8  want to replicate what we're doing.  Maybe they
9  want to do something completely different to meet
10 their own bespoke requirements.  But like I said,
11 I've read this document once, and that was the
12 impression that I had.
13      Q.  And if you look at Exhibit 32 on the
14 second page of it, that is Bates numbered NPR 16.
15      A.  Yes.
16      Q.  If you look at bullet point D here, the
17 last sentence there says, "If this system became
18 widely spread enough, it could replace all
19 services currently provided by the Public Radio
20 Satellite System"; right?
21      A.  Sorry, what page are you on?
22      Q.  Sorry, I'm on the second page of

Page 276

1  Exhibit 32.  And that is Bates No. 16.
2       A.  Okay.
3       Q.  Bullet D.  The last sentence of bullet D
4  says, "If this system became widely spread enough,
5  it could replace all services currently provided
6  by the Public Radio Satellite System"; right?
7       A.  Yes.
8       Q.  So it seems as if WBUR is at least
9  thinking about a system that might replace the
10 services that PRSS provides?
11      MR. BROOKS:  Objection; form.
12      THE WITNESS:  That's correct.
13 BY MR. MCELROY:
14      Q.  Does -- and when I say "PRSS," is that
15 the same thing as NPR Distribution?
16      A.  PRSS is the system that NPR Distribution
17 operates.
18      Q.  So does NPR Distribution have any
19 competitors on the market?
20      A.  Not for the linear live broadcast
21 distribution that we do.
22      Q.  Explain that to me.

Page 277

1       A.  We've been talking about the
2  distribution of broadcast content and national
3  content.  The exact specific type of distribution
4  is called live linear distribution, which means
5  it's linear one bit after the other.
6       So somebody speaking into a microphone
7  and it's in the exact same order that those bits
8  arrive at the destination, therefore linear.  Live
9  meaning it's realtime.  When you speak into the
10 microphone here, you hear it on the other side
11 with just negligible delay.
12      Q.  So when you say you don't have
13 competitors for the linear live broadcast, is that
14 because no one has -- offers the satellite service
15 that you do?
16      A.  Correct.  Because it is at least for
17 broadcast, since we do it over the satellite,
18 which happens to be extremely efficient, there's
19 no point in reinventing that setup too many times
20 when you have one setup that already works really
21 well.
22      Q.  So by the "live linear feed," you mean

Page 278

1  the satellite feed?
2      A.  The satellite feed could be a live
3  linear feed.  It could be a playback of a file
4  that is not live linear.  That's what you call a
5  nonlinear feed.  It could also be a delayed feed.
6  Those are all the different types of feeds that
7  could still be sent over the satellite.
8      **Q.  But a live linear feed can only be sent**
9  **over the satellite?  Is that how I've understood**
10 **our conversations today?**
11     A.  That's correct.  As of right now, that
12 is the only guaranteed way to ensure that you
13 have -- you don't have the difficulty of delays.
14     MR. MCELROY:  I'm going to hand to the
15 court reporter what I'd like marked as Exhibit 34.
16     (Munipalla Deposition Exhibit 34 was
17 marked for identification and attached to the
18 transcript.)
19 BY MR. MCELROY:
20     **Q.  Take a moment to review Exhibit 34.  And**
21 **let me know when you've finished, Mr. Munipalla.**
22     A.  Yes.

Page 279

1      **Q.  Do you recognize Exhibit 34,**
2  **Mr. Munipalla?**
3      A.  I think I've seen this, but I am missing
4  context.  I don't know where I've seen this.  But
5  I have seen this.
6      **Q.  It's a slide that shows PRSS**
7  **competition; right?**
8      A.  Yes, it is, but I don't know what that
9  slide deck was about, and I don't know if we ever
10 agreed that this was accurate or not.  I don't
11 know if it was a work in progress, or if this was
12 shown in front of anybody.
13     **Q.  Okay.  Well, let's look at PRSS since**
14 **you're in charge of NPR Distribution, the**
15 **organization that runs PRSS.**
16     **Would you say that the information on**
17 **here about PRSS is accurate?**
18     A.  I think that's the problem that I have
19 with this slide.  It's not -- it's not exactly
20 right.
21     **Q.  What's not exactly right about it?**
22     A.  So Audio, LinkUP, Skyview Networks,

Page 280

1  Westwood One, these are commercial linear live
2  distribution networks.  And the services that they
3  provide are completely different from the services
4  that PRSS provides.  The problem I have with this
5  slide is it makes it seem like they're all
6  fungible.
7      **Q.  So you would not view the commercial**
8  **entities as competitors of PRSS?**
9      A.  That is correct.
10     **Q.  What about PRX?  You didn't mention that**
11 **one in the commercial entities.**
12     A.  I was talking about live delivery.  When
13 it comes to file delivery, as you can see, PRX
14 comes up in that conversation.  And I would say
15 PRX is a competition to PRSS when it comes to live
16 delivery -- forgive me, file delivery.
17     **Q.  What is PRX?**
18     A.  I think it stands for Public Radio
19 Exchange.
20     **Q.  What do they do?**
21     A.  Mostly distribute nonlinear file-based
22 content terrestrially.

Page 281

1      **Q.  And do they do it on behalf of public**
2  **radio stations?**
3      A.  Yes, I believe they do.
4      **Q.  Versus Westwood One does it on behalf of**
5  **commercial radio stations?**
6      A.  Westwood One is a satellite-based
7  network, and they do live sports, radio sports.
8  So it's similar to linear live programming, but
9  that is also similar to Skyview.  And LinkUP is a
10 service -- is a company that just does satellite
11 capacity reselling, and they offer some services.
12     I don't know exactly what AUDIO1 does,
13 but what I'm trying to point out here is they're
14 all in the live delivery column.  But PRX does not
15 do anything with live, and that's why that circle
16 is unchecked.
17     **Q.  Okay.  So let's start with rows.  Let's**
18 **look at PRSS and the row for PRSS.**
19     **Would you agree with the information**
20 **that is represented for PRSS regarding each one of**
21 **those columns in that row?**
22     A.  Yes.

Page 282

1    Q.  So where you disagree with this slide is
2  by having PRX listed, for instance, as a
3  competitor in live delivery?
4    A.  It is not listed.
5    Q.  I agree, but I'm trying to understand
6  what your concern is with the slide.
7    A.  My concern with this slide is it says --
8  let me try to explain this better, my apologies.
9  My concern with this slide is your original
10  question is:  Does PRSS have competition in this
11  space?
12        What this assumes is the services that
13  we provide are the same services that Audio 1,
14  Skyview, and Westwood One also provide in the
15  space of live linear distribution.  I disagree
16  with that because what we do is we also take in
17  the content and we introduce what's called as
18  cues, C-U-Es.  And that triggers station
19  automation.
20        Most of the commercial shops do not do
21  that.  They just get a feed in.  It just goes
22  unaltered through the system to all of the

Page 283

1  stations.  And that is a core difference, and that
2  is the service that we offer to public radio.  We
3  take content from producers, and we add things to
4  it based on the producer needs.
5    Q.  And then so Westwood One doesn't serve
6  public radio stations.
7    A.  And that, too.  They are commercial, and
8  we are public radio facing.
9    Q.  Would you consider each one of these
10  columns to be a type of service provided for
11  interconnection?
12        MR. BROOKS:  Objection to form.
13        THE WITNESS:  Program syndicator, for
14  example, is not a service.  It is, are they
15  program syndicators, or are they distributors.  So
16  that is not a service.  But some of the others are
17  not very clearly defined.  Like digital products,
18  I don't know what digital products entails.  So
19  that cannot be a service.  But by and large, this
20  is a mix of services and other concepts.
21  BY MR. MCELROY:
22    Q.  Okay.  Program syndicator is something

Page 284

1  that PRSS does not provide based on this chart;
2  correct?
3    A.  I think it's -- you got to read it as
4  PRSS is not a program syndicator.  But if you look
5  at Skyview, they are a program syndicator.
6    Q.  Okay.  I understand.
7        So in terms of file delivery, would you
8  consider PRX to be in competition with PRSS?
9    A.  Correct.
10    Q.  And in terms of program selection, you
11  would consider PRX to be in competition with PRSS?
12    A.  So this is -- this is why I don't like
13  this slide.  It is confusing so many different
14  concepts.  Program selection here simply means
15  that we offer a bunch of programming to our
16  stations to choose from.  In that sense, we offer
17  a bunch of programming to our stations to choose
18  from, to pick from.  And PRX does the same.
19    Q.  Okay.  So at the end here, there's a
20  column that says, Podcast delivery.  And PRSS is
21  noted as "no service"; right?
22    A.  That's correct.

Page 285

1    Q.  So PRSS has no ability to deliver
2  podcasts to interconnected entities?
3    A.  We do not handle podcasts, that's
4  correct.
5    Q.  But PRX is listed on here that it does?
6    A.  Yes.
7        MR. MCELROY:  I'm going to hand to the
8  court reporter a document that I'm going to ask to
9  be marked Exhibit 35.
10        (Munipalla Deposition Exhibit 35 was
11  marked for identification and attached to the
12  transcript.)
13  BY MR. MCELROY:
14    Q.  Please take a moment to review
15  Exhibit 35, and let me know when you've finished.
16    A.  Yes, sir.
17    Q.  Do you recognize this document,
18  Mr. Munipalla?
19    A.  I do.
20    Q.  And what is it?
21    A.  So this was Maryfran Tyler, who works
22  for me, suggesting the D/I committee agenda for

Page 286

1  our October meeting.
2      Q.  And there appear to be two attachments
3  to this e-mail.  One, D/I agenda exec
4  10/9/25.docx.  And the other is PRSS competition
5  X.pptm; right?
6      A.  That's right.
7      Q.  And that PRSS competition X.pptm, that's
8  a PowerPoint file; correct?
9      A.  That's correct.
10     Q.  Now, is Exhibit 34 that document?
11     A.  I believe that's where I saw it,
12  correct.
13         And just to be clear, we never presented
14  that.  We never -- so this was Maryfran saying,
15  Hey, this is what we could be discussing in
16  October.  And I did not like that competition
17  slide, and we didn't discuss that in October
18  because it was not ready for prime time.
19     Q.  So you never presented it to the D/I
20  board.
21     A.  That's correct.
22     Q.  The D/I committee?

Page 287

1      A.  The D/I committee.
2      Q.  And bullet point No. 1 here says, Status
3  of CPB RFP.  CPB won't be invited because the
4  agreement is no longer in force.  Exactly what
5  we'll report on depends on CPB's and legal's
6  actions.
7         Do you know what that means?
8      MR. BROOKS:  Objection; calls for
9  speculation.
10     THE WITNESS:  As a part of our
11  FY '25 agreement, CPB was invited -- as per the
12  contract, they would be invited to the exec
13  session, and they would participate -- they would
14  be invited to the exec session, and we would have
15  a CPB agenda item as the first item of the exec
16  session.  And then they would leave so that we
17  could continue with our exec session.
18         I think what she's pointing out here is
19  that agenda item does not need to be included
20  starting October because our contract sort of ends
21  on September 30th.
22     MR. MCELROY:  I'm going to hand to the

Page 288

1  court reporter two documents, which I'll ask to be
2  marked as Exhibits 36 and 37.
3         (Munipalla Deposition Exhibit 36 was
4  marked for identification and attached to the
5  transcript.)
6         (Munipalla Deposition Exhibit 37 was
7  marked for identification and attached to the
8  transcript.)
9  BY MR. MCELROY:
10     Q.  Let's start with Exhibit 36.  So you can
11  set 37 aside for a moment.  I just thought maybe
12  we would speed things up with the exhibits here.
13     A.  I'm sorry, I was reading this.  Did you
14  say we start with 37?
15     Q.  36.
16     A.  Sorry about that.  Okay.
17     Q.  Do you recognize Exhibit 36,
18  Mr. Munipalla?
19     A.  Yes, I do.
20     Q.  And this is a conversation about pricing
21  scenarios for, it says, fiscal year '25.  Is that
22  correct?

Page 289

1      A.  I think it should say '26.
2      Q.  So this e-mail is about pricing
3  scenarios for fiscal year '26?
4      A.  That's correct.
5      Q.  Which makes sense, because it's
6  happening in July, the end of July 2025; right?
7      A.  That's correct.
8      Q.  So walk me through the process of how
9  NPR Distribution sets the interconnection fee.
10     A.  So the interconnection fee is the last
11  part of what we discuss in our D/I committee
12  meetings over the course of -- during the summer.
13  The first thing we do is we present the D/I
14  committee the operational plan for the division.
15         And then we present the D/I committee
16  the rates and fees, which shows you how much money
17  we could be collecting from stations.  It's part
18  of the overall budget.  And then, finally, there's
19  a budget piece that pulls everything together.
20         So you have a plan, what are you going
21  to be doing, what can we charge for -- not what
22  can we charge.  As we're thinking about next year,

Case 1:25-cv-01674-RDM    Document 59-6    Filed 10/24/25    Page 75 of 79

10/20/2025          National Public Radio, Inc., et al. v. Donald J. Trump, et al.          Badri Munipalla

Page 290

1 how do we want to handle the rates and fees.
2        Typically, we do a 2.5 percent increase
3 year over year, is that feasible, is this year any
4 different, do we need to make it 0, 2.5, 7.5.  We
5 think about that, and then put all of that
6 together into a budget.  That's the process.
7        Q.  And then once you do that, do you make
8 proposals to the D/I committee about setting the
9 fee?
10       A.  So the first thing we do is we share the
11 operational plan with the committee, make sure
12 that we are in agreement in terms of what we want
13 to accomplish in the coming year.  That's not a
14 proposal.  That's pretty much like this is what we
15 think, and we discuss it.
16       Then we talk about the threshold or the
17 appetite for increase for the interconnection
18 fees.  That is conversation.  And that requires
19 a couple of modeling exercises because we've got
20 stations that fall in multiple tiers based on
21 their total station revenue.
22       And the interconnection rates that we

Page 291

1 charge is based on the total station revenue.  So
2 you could do some scenarios saying, if we
3 increased rates by 2.5 percent, how does it impact
4 the total rates.  So that's scenarios.
5        And then there's a budget that literally
6 is derived from, you know, the station fees.  And
7 the other things that we anticipate in terms of
8 how the business is going to perform, as we've
9 discussed before.
10       Q.  So at the end of July 2025, were you at
11 the point where you were ready to make proposals
12 to the D/I committee about the interconnection fee
13 for fiscal year '26?
14       A.  Correct, usually in the August meeting
15 the D/I committee will approve the operations
16 budget, the rates and fees, and the -- excuse me,
17 the operational plan, the rates and fee, and the
18 budget.  That goes to the NPR board as a seconded
19 resolution.  So -- and the NPR board meeting
20 happens in August.  So we have to get done before
21 the NPR board meeting.
22       Q.  Now let's look at Exhibit 37.  Take a

Page 292

1 moment to review it, and let me know when you're
2 finished.
3        A.  Okay.
4        Q.  Do you recognize this document,
5 Mr. Munipalla?
6        A.  I do.
7        Q.  Okay.  And what is it?
8        A.  I think this is me providing Mike Savage
9 the information that he requested, which is a
10 couple of scenarios.  It talks about what the
11 budget is going to look like with no increase, a
12 2.5 percent increase, and then a massive
13 70 percent increase in order to cover the station
14 satellite lease and satellite insurance and other
15 related data costs.
16       Q.  And then on the top of the second page
17 here, you state, with reference to those changes,
18 "The staff is recommending a 2 and a half percent
19 increase and has attempted to propose a 70 percent
20 increase in rates"; right?
21       A.  That's correct.  So this is the
22 scenarios that we were talking about earlier.  So

Page 293

1 you run the modeling and you kind of make a
2 recommendation and then they deliver it.
3        Q.  And then it looks like Mr. Savage is
4 agreeing with you on the 2 and a half percent
5 increase?
6        A.  I believe so.
7        Q.  And the very next sentence says, "As we
8 discussed, this letter is timely since it lays the
9 ground work for a steep rate increase in fiscal
10 year '27."
11       Why are -- why is NPR Distribution
12 considering a steep rate increase in fiscal year
13 '27?
14       A.  Because we would need to cover the costs
15 of satellite and the satellite lease.  And as per
16 the agreements that we looked at before, the
17 stations sort of are responsible for the PRSS.  So
18 this was -- this was a consequence of not
19 receiving CPB funding or anticipating that we're
20 not going to receive CPB funding next year, as
21 well.
22       Q.  Would it be fair to say that you and

74 (Pages 290 to 293)

Page 294

1  your colleagues at NPR Distribution are frustrated
2  with CPB --
3          MR. BROOKS:  Objection --
4  BY MR. MCELROY:
5      Q.  -- and their funding decisions?
6          MR. BROOKS:  Objection to form.
7          THE WITNESS:  I think that would be a
8  fair characterization.
9          MR. MCELROY:  I'm handing the court
10  reporter what I would like to be marked
11  Exhibit 38.
12          (Munipalla Deposition Exhibit 38 was
13  marked for identification and attached to the
14  transcript.)
15  BY MR. MCELROY:
16      Q.  Take a moment to review this document.
17  And let me know when you've finished,
18  Mr. Munipalla.
19          (Witness peruses the exhibit.)
20          THE WITNESS:  Okay.
21  BY MR. MCELROY:
22      Q.  Do you recognize Exhibit 38,

Page 295

1  Mr. Munipalla?
2      A.  I do.
3      Q.  And this is an e-mail from you to
4  Maryfran Tyler on April 23rd, 2025; isn't it?
5      A.  That's correct.
6      Q.  And Maryfran Tyler is one of your
7  subordinate employees; correct?
8      A.  That's correct.
9      Q.  And you're talking about, among other
10  things, CPB's desire to create an independent
11  PRSS; right?
12      A.  That's correct.
13      Q.  But you don't believe the independent
14  PRSS is the answer; do you?
15      A.  I think what I'm saying is we cannot and
16  should not assume that an independent PRSS is the
17  answer.
18      Q.  Well, let me ask you more directly,
19  Mr. Munipalla.  Do you believe that an independent
20  PRSS is the answer?
21          MR. BROOKS:  Objection; form.
22          THE WITNESS:  Is the answer, sorry, to

Page 296

1  the question?
2  BY MR. MCELROY:
3      Q.  I'm just using your words here, I'm
4  sorry.  If you look at -- one, two, three, four --
5  fifth bullet point up.  The last sentence in bold,
6  you state, "We cannot and should not assume an
7  independent PRSS is the answer"; right?
8      A.  Yeah, and the question -- is the
9  answer -- I was -- my apologies, I was trying to
10  complete the whole statement.  Is the answer to
11  the question that radio governance and operation
12  structures can be improved to reflect the modern
13  media businesses and political realities.
14          And spinning off PRSS, you cannot assume
15  that that is the answer to those questions.
16      Q.  But it's possibly an answer; isn't it?
17          MR. BROOKS:  Objection; form.
18          THE WITNESS:  Sure.
19  BY MR. MCELROY:
20      Q.  But if CPB gets its way or got its way
21  and spun PRSS into a new entity, that would mean
22  your work wouldn't exist at NPR anymore; right?

Page 297

1          MR. BROOKS:  Objection; form.
2          THE WITNESS:  My work as a --
3  BY MR. MCELROY:
4      Q.  Your work as the head of PRSS.
5      A.  I'm not understanding the inference.
6      Q.  So if PRSS moves to an independent
7  entity, would you assume you would move along with
8  it?
9          MR. BROOKS:  Objection; form.
10          THE WITNESS:  I am the vice president of
11  NPR Distribution which manages the PRSS system.
12  There would be a vice president role or a CEO role
13  for the new PRSS entity, I would assume.  Whether
14  that's going to be me or whether that's going to
15  be somebody else, I do not know.
16  BY MR. MCELROY:
17      Q.  But ultimately here, you're so
18  frustrated with CPB that you just wanted them to
19  go away after giving PRSS the money; didn't you?
20          MR. BROOKS:  Objection; form.
21          THE WITNESS:  I think all I'm saying
22  here is there is a scenario where CPB gives the

Page 298

1  money and -- this is in April, and we were
2  speculating that there was going to be an EO.  So
3  there is a scenario where you get the money, and
4  CPB goes away by an act of Congress.
5  BY MR. MCELROY:
6      Q.  Yeah, but you're not saying it's a
7  scenario, Mr. Munipalla.  I'm going to quote your
8  words here.  One, two, three, four -- five bullet
9  points down, you said, "There is a dream
10  scenario"; didn't you, Mr. Munipalla?
11     A.  Based on this document, yes, I did.
12     Q.  And that dream is for CPB to go away
13  for NPR Distribution to get its money?
14         MR. BROOKS:  Objection; form.
15         THE WITNESS:  Sure.
16         MR. MCELROY:  Thank you.  I have no
17  further questions.
18         MR. BROOKS:  All right.
19         MS. TOWNSEND:  We have some redirect.
20     EXAMINATION BY COUNSEL FOR THE PLAINTIFFS
21  BY MR. BROOKS:
22     Q.  Mr. Munipalla, do you recall at the very

Page 299

1  beginning of your testimony discussing your
2  educational background?
3      A.  I do.
4      Q.  And did any of that educational
5  background involve the study of law?
6      A.  No.
7      Q.  And are you a lawyer?
8      A.  No.
9      Q.  Do you also recall discussing today the
10  transition by public radio from satellites to
11  terrestrial?
12     A.  I do.
13     Q.  And what is the current state of that
14  transition?
15     A.  We are piloting with 15 public radio
16  stations to make sure that the technology is
17  viable, and so far we've received really good
18  feedback about it.  And I think we're going to --
19  we're right on track to continue down that path of
20  building a four-port receiver box that would
21  replace the existing satellite receivers.
22     Q.  And about how many years do you estimate

Page 300

1  it will take to complete that transition?
2      A.  Going from one technology to the other
3  has always taken about three years.  I expect it's
4  going to take the same amount of time for this
5  transition, as well.  We are already a year into
6  that transition.  So I would say another two years
7  at most.
8      Q.  Thank you.
9          And do you recall testifying today about
10  an entity called PMI?
11     A.  Yes.
12     Q.  And are you familiar with the current
13  state of PMI's terrestrial capacity?
14     A.  I think I alluded to PMI as a concept.
15  I do not know where they stand because I don't
16  know if it's even an entity.
17     Q.  Okay.  And if an entity did not
18  currently have terrestrial capacity, do you have
19  an estimate of how long it would take to develop
20  it from scratch?
21     A.  I would say it would take a minimum of
22  three to four years just to get the technology out

Page 301

1  and then the rollout.  So it's going to take
2  longer.
3      Q.  Thank you.
4          And do you also recall testifying today
5  about two meetings in October of 2024 with the
6  group of champions that you attended to discuss
7  convergence?
8      A.  I'm sorry, please say that again.
9      Q.  Do you recall testifying today about two
10  meetings you had in October 2024 with the
11  so-called group of champions to discuss
12  convergence?
13     A.  Yes.
14     Q.  And can you describe what occurred at
15  those meetings?
16     A.  It was very contentious, and I think
17  when Deloitte and CPB proposed the idea of a
18  newco, PBS immediately shut the idea down.  And
19  their CTO, Rhonda Holt, she spoke for 45 minutes
20  nonstop saying why it was a terrible idea.  So no
21  progress was made, and the effort was shut down.
22     Q.  Okay.  Thank you.

Page 302

1    MR. BROOKS:  We have nothing further.

2    EXAMINATION BY COUNSEL FOR THE DEFENDANT CPB

3    BY MR. MCELROY:

4    **Q.  Just one or two more here.**

5        **So you said when Deloitte and CPB**

6    **proposed the idea of a newco.  So I just want to**

7    **be clear.  Deloitte and CPB proposed the idea of a**

8    **newco at this meeting in October of 2024?**

9    A.  Right.  That's the document that we

10   looked at.  There were those four dates, the prep

11   and then two discussions.

12   **Q.  And that was a newco that would have an**

13   **independent governance from the current PRSS?**

14   A.  That was a newco that they were talking

15   about convergence -- a convergence of radio and

16   TV, and the governance aspect was not even covered

17   in those meetings.

18   **Q.  Now, you mentioned that you're about**

19   **two years out from having full terrestrial**

20   **distribution capabilities.**

21   **Did I hear that right?**

22   A.  That's correct.

Page 303

1    **Q.  How much would you say -- strike that.**

2        **You said you have $25 million in**

3    **reserves at NPR Distribution; right?  Do you think**

4    **that that would be sufficient to cover any**

5    **shortfalls in NPR Distribution in those next**

6    **two years?**

7    A.  Our proposal was for 27 million.  That's

8    the three-year proposal we put in front of CPB.

9    The money that we have right now, we're already

10   dipping into it.  So I think we would be severely

11   short of being able to deliver on a full-blown

12   terrestrial plan without the money from CPB.

13   **Q.  You said that PBS's CEO spoke for**

14   **45 minutes about a newco being a bad idea.**

15   A.  CTO.

16   **Q.  CTO, sorry.**

17   **Do you recall what PBS's CTO said during**

18   **those 45 minutes?**

19   A.  I do.  The gist of her -- I mean, it's

20   the same sort of frustration that she was

21   expressing about what does this even mean, what

22   problem does it solve, because there's no

Page 304

1    technology problem here to solve.

2        She was speaking from the vantage of a

3    technologist.  And she was saying that there is

4    misconception that just because one business is

5    moving bits and the other business is also moving

6    bits, you can start converging them together.  And

7    that is an absolute -- that is absolutely wrong

8    from a technology standpoint.

9        And I think that was the gist of it.  I

10   think Scott Norris was their VP.  I think he gave

11   the analogy of -- gave the analogy of, like,

12   you're moving some farm animals, we're moving some

13   farm animals, it doesn't mean that -- you know,

14   you might need a truck and somebody else might

15   need a pickup van.  It's very different

16   technologies for the tasks.

17       So just because you're moving animals,

18   you can't say just combine everything together.

19   It doesn't work that way.  That was the gist of

20   it.  In other words, it was a bad idea is what

21   they were saying.

22   **Q.  In PBS's view, it was a bad idea?**

Page 305

1    A.  And in -- I think we were part of the

2    conversation, too.  And I think we pointed out

3    that a lot of the things CPB and Deloitte was

4    pointing out, Oh, but look, we can fix this, we

5    can fix this.  I think we pointed out that those

6    are features, not bugs.  It's working like that

7    for a reason because that's the way the systems

8    wanted.  So...

9        MR. MCELROY:  I have no further

10   questions.

11       THE VIDEOGRAPHER:  Counsel, does this

12   conclude for today's deposition?

13       MR. MCELROY:  Yes.

14       MR. BROOKS:  Yes.

15       THE VIDEOGRAPHER:  This concludes for

16   today's deposition.  The date is October 20th,

17   2025.  The time is 5:41 p.m.

18       We are now off the record.

19       (Off the record at 5:41 p.m.)

20

21

22

77 (Pages 302 to 305)

10/20/2025          National Public Radio, Inc., et al. v. Donald J. Trump, et al.          Badri Munipalla

---

### Page 306

1   DISTRICT OF COLUMBIA )
2
3        I, Matthew Goldstein, RMR, CRR, Notary
4   Public within and for the District of Columbia, do
5   hereby certify:
6
7        That I reported the proceedings in the
8   within entitled matter, and that the within
9   transcript is a true record of said proceedings.
10
11       I further certify that I am not related to
12  any of the parties to the action by blood or
13  marriage, and that I am in no way interested in the
14  outcome of this matter.
15
16       IN WITNESS WHEREOF, I have hereunto set my
17  hand this 20th day of October, 2025.
18
19       _____
20             Matthew Goldstein, RMR, CRR
21
22

---

### Page 307

1   Case: National Public Radio, Inc., et al. v. Donald J. Trump, et al.
2   Witness Name: Badri Munipalla
3   Deposition Date:  10/20/2025
4
5
6   Please be advised that the transcript in the above
7   referenced matter is now complete and ready for signature.
8   The deponent may come to this office to sign the transcript,
9   a copy may be purchased for the witness to review and sign,
10  or the deponent and/or counsel may waive the option of
11  signing. Please advise us of the option selected.
12  Please forward the errata sheet and the original signed
13  signature page to counsel noticing the deposition, noting the
14  applicable time period allowed for such by the governing
15  Rules of Procedure. If you have any questions, please do
16  not hesitate to call our office at (202)-232-0646.
17
18  Sincerely,
19  Digital Evidence Group
20  Copyright 2025 Digital Evidence Group
21  Copying is forbidden, including electronically, absent
22  express written consent.

---

### Page 308

1   Digital Evidence Group, L.L.C.
    1730 M Street, NW, Suite 812
2   Washington, D.C. 20036
    (202) 232-0646
3
4   SIGNATURE PAGE
5   Case: National Public Radio, Inc., et al. v. Donald J. Trump, et al.
6   Witness Name:  Badri Munipalla
7   Deposition Date: 10/20/2025
8   I do hereby acknowledge that I have read
9   and examined the foregoing pages
10  of the transcript of my deposition and that:
11  (Check appropriate box):
12  ( ) The same is a true, correct and
13  complete transcription of the answers given by
14  me to the questions therein recorded.
15  ( ) Except for the changes noted in the
16  attached Errata Sheet, the same is a true,
17  correct and complete transcription of the
18  answers given by me to the questions therein
19  recorded.
20  _____     _____
         DATE              WITNESS SIGNATURE
21
    _____     _____
22       DATE              NOTARY

---

### Page 309

1        Errata Sheet
2   NAME OF CASE: National Public Radio, Inc., et al. v. Donald J. Trump, et al.
3   DATE OF DEPOSITION: 10/20/2025
4   NAME OF WITNESS: Badri Munipalla
5   Reason Codes:  1. To clarify the record.
6        2. To conform to the facts.
7        3. To correct transcription errors.
8   Page _____ Line _____ Reason _____
9   From _____ to _____
10  Page _____ Line _____ Reason _____
11  From _____ to _____
12  Page _____ Line _____ Reason _____
13  From _____ to _____
14  Page _____ Line _____ Reason _____
15  From _____ to _____
16  Page _____ Line _____ Reason _____
17  From _____ to _____
18  Page _____ Line _____ Reason _____
19  From _____ to _____
20
21        _____
22        BADRI MUNIPALLA

78 (Pages 306 to 309)