# EXHIBIT 10



<br>

**GRANT AGREEMENT**

**"Public Radio Satellite System Interconnection Funding FY23-FY24"**

**CPB ID No. 35393-ISS**

THIS GRANT AGREEMENT ("**Agreement**") is made between the **Corporation for Public Broadcasting** ("**CPB**"), whose address is 401 Ninth Street, N.W., Washington, DC 20004, and **National Public Radio, Inc.** ("**Grantee**"), whose address is 1111 North Capitol Street, N.E., Washington, DC 20002 (each a "**Party**" and collectively the "**Parties**").

WHEREAS, the Public Broadcasting Act of 1967 (Pub. L. No. 90-129) (the **"Act"**), as amended, authorizes CPB to assist in the establishment and development of one or more interconnection systems to be used for the distribution of public telecommunications services so that all public telecommunications entities may disseminate such services at times chosen by the entities (47 U.S.C. Sec. 396(g)(1)(B));

WHEREAS, the Grantee was previously awarded a grant to replace, refurbish and upgrade a portion of the public radio satellite system interconnection system (the "**PRSS Interconnection System**" or "**System**") on behalf of the Interconnected PTEs (defined herein);

WHEREAS, the Interconnected PTEs have designated Grantee as their national entity for interconnection purposes;

WHEREAS, Grantee has applied for funding from CPB, and CPB has determined to award a grant to Grantee for the purpose of supporting CPB in satisfying its obligations regarding the Interconnection Appropriation (defined herein), subject to the terms and conditions set forth herein; and

WHEREAS, funds appropriated by Congress and specifically allocated by CPB for the Grant Project (as defined below) are referred to as the "**Project Funds**";

NOW THEREFORE, in consideration of the premises and for other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the Parties agree as follows:

1.    **GRANT PROJECT; TERM**

    **1.1.**    **Grant Project**. The timely replacement, refurbishment, and upgrade of the System is essential to ensure the continuing high quality and diversity of the public telecommunications services disseminated to the public, to permit increases in program offerings and related services,

CPB ID No. 35393-ISS



1

and to encourage innovative uses of the System. Grantee shall plan, design, procure, construct, replace, upgrade and manage the PRSS Interconnection System on behalf of, for the benefit of, and made available to all of those public telecommunications entities participating in the public radio interconnection system (the "**Interconnected PTEs**"), including those public telecommunications entities that in the future may qualify and participate in the System ("**Grant Project**"), as more specifically set forth in <u>Attachment A</u> hereto (the "**Workscope**").

      **1.2.**   <u>**Term**</u>. The term of this Agreement, during which fees and expenses may be incurred, shall be from **October 1, 2022** through **September 30, 2024** (the "**Term**").

**2.**     <u>**BUDGET, PAYMENTS AND BUDGET CHANGES**</u>

      **2.1.**   <u>**Budget**</u>. The total amount of the budget for the Grant Project is **$11,866,755** ("**Budget**" or "**Total Project Cost**"), and is attached hereto as <u>Attachment B</u>. CPB shall reimburse Grantee for its actual fees and expenses ("**Project Costs**") incurred during the Term up to **$11,866,755** ("**Total CPB Commitment**"). Such Project Costs may include expenses related to the Grant Project and Grant Project implementation. Unless otherwise agreed to in a writing signed by the Parties, Grantee agrees that CPB has no obligation to reimburse Grantee for any Project Costs in excess of the Total CPB Commitment.

      **2.2.**   <u>**Schedule of Deliverables and Disbursements**</u>. All payments/disbursements ("**Payment(s)**") hereunder made by CPB to Grantee shall be paid in accordance with the Schedule of Deliverables and Disbursements contained in <u>Attachment C</u>, subject to Grantee's compliance with the terms of this Grant Agreement. Any obligation of CPB to disburse the grant funds shall be conditioned upon Grantee's timely submission of deliverables as specified in <u>Attachment C</u> and CPB's approval thereof. Final financial reports shall be accompanied by an executed Certification of Final Financial Accounting in the form contained in <u>Attachment E</u>.

      **2.3.**   <u>**Indirect Costs**</u>. Grantee is responsible for calculating any indirect costs, if any, listed in the Budget based on an approved methodology contained in the CPB Guidelines for Indirect Costs (FY 2014), a copy of which is available at <u>https://www.cpb.org/sites/default/files/Indirect-Cost-Guidelines-3-20-2014-revisions.pdf</u>. Upon execution of the Agreement, Grantee shall complete and submit the Selection of Indirect Costs Accounting Method in the form contained in <u>Attachment D</u>.

      **2.4.**   <u>**Budget Changes**</u>

         (a)    Grantee may make reallocations among Budget line items without CPB's approval so long as no such reallocation involves an increase or decrease in any single Budget line item in excess of 20% (Twenty Percent) of such line item. Notwithstanding the foregoing, Grantee may not reallocate funds in the Budget to or from the line specifically identified for GEAR costs, or for satellite costs. CPB consent to an increase in Total Project Cost or reallocation of specific budget line items will not signify an increase in the Total CPB Commitment. As used herein, the "Budget categories" are Continuity of Service, Customer Experience, Convergence, Coordination and Management, and Temporary Workers, and the "Budget line items" are the subprojects within Continuity of Service and Customer Experience Budget categories. For the avoidance of doubt, the Budget set forth in <u>Attachment B</u> will be the version of the budget Grantee will report against and will use for any budget reallocations as set forth above.

(b)    Grantee may make no other changes to the Budget, Budget categories or individual Budget line items without CPB's prior written approval other than those described in **Section 2.4(a)**.

(c)    Grantee must specifically identify and report all Budget reallocations in its interim and final financial accountings to CPB, including those that don't require CPB approval, and those that do.

(d)    Any increase in the Budget shall be the responsibility of Grantee and shall not increase the Total CPB Commitment unless the Parties, by written amendment to this Agreement, have authorized an increase in the Total CPB Commitment. If CPB approves any change that decreases the Budget below the Total CPB Commitment, CPB shall consider in good faith Grantee's recommendations for using any savings from the decrease ("**Project Savings**") for a corresponding change in the Workscope, and/or any corresponding adjustment to the disbursement schedule, with all such mutually agreed upon changes to be incorporated by written amendment to the Agreement.

(e)    Generally, reductions to the Total CPB Commitment will be proportional to the amount by which the Total Project Cost has been reduced, but CPB may elect to make other adjustments, or terminate the Agreement in its entirety, if the decrease in the Total Project Cost is caused by significant differences in the Grant Project. If CPB reduces the amount of the Total CPB Commitment because of a decrease in the Total Project Cost for the Grant Project, the Grantee must immediately return to CPB any CPB funds that were paid to the Grantee in excess of a corresponding amount of the Total CPB Commitment; provided, however, that Grantee shall not be required to repay funds that have already been expended or contractually committed during the Term by Grantee, provided that CPB has previously authorized the expenditure or commitment of such funds.

(f)    Grantee shall return to CPB: (i) any CPB funds that exceed the Total CPB Commitment, as the same may have been adjusted, or (ii) amounts equivalent to any expenditures which CPB determines not to have been authorized or made in conformity with this Agreement. Grantee also agrees to return to CPB, no later than thirty (30) days following notice to Grantee of final determination by CPB that funds must be returned, any CPB funds that are not spent, or for which authorized liabilities have not been incurred or contractually committed, by Grantee, by the end date of the Term.

3.    **CPB RESPONSIBILITIES**

**3.1.**    Notwithstanding anything to the contrary, CPB shall have no obligations or liabilities whatsoever with respect to this Agreement or any agreement between Grantee and any consultant except for the payment obligation to Grantee under **Section 2**. Nothing in this Agreement shall be deemed to create any association or other venture between CPB and any other party. Any consultant hired by Grantee shall not constitute a third-party beneficiary of this Agreement or otherwise have recourse against CPB with respect hereto.

**3.2.**    **Reductions in CPB Appropriations**.

(a)    CPB shall not be obligated to distribute to Grantee for this Grant Project any funds other than the Project Funds which CPB has allocated from an Interconnection Appropriation (defined below). The sole source of the Total CPB Commitment is the portion which CPB, in its sole discretion, has allocated for the PRSS Interconnection System from funds appropriated for the costs

associated with replacing and upgrading the public broadcasting interconnection system pursuant to the Consolidated Appropriations Act, 2016 (Public Law 114-113), Consolidated Appropriations Act, 2017 (Public Law 115-31), and from funds appropriated for the costs associated with replacing and upgrading the public broadcasting interconnection system and other technologies and services that create infrastructure and efficiencies with the public media system pursuant to Consolidated Appropriations Act, 2018 (Public Law 115-141), Consolidated Appropriations Act, 2019 (Public Law 115-245) and Consolidated Appropriations, 2020 (Public Law 116-94) and funds which CPB may allocate from any future appropriations by Congress during the Term designated for such interconnection, and other infrastructure technologies and services (each an "**Interconnection Appropriation**") and any interest earned thereon by CPB or Grantee.

(b)    In the event reductions occur in the amount of an Interconnection Appropriation in any year of the Term ("**Reduced Effective Appropriation**"), CPB shall notify Grantee in writing of such reduced funding ("**CPB's Shortfall Notice**"). CPB may, after thirty (30) days following CPB's Shortfall Notice, proportionately reduce the funds it provides hereunder from such Interconnection Appropriation year for the applicable grant year. The reduced amount shall be equal to the amount of CPB funds payable in such grant year under this Agreement multiplied by a fraction, the numerator of which is the amount of any such grant year's Reduced Effective Appropriation, and the denominator of which is the Interconnection Appropriation for such grant year.

(c)    CPB acknowledges the importance of the Interconnection System to the public media system and will in good faith give priority to funding the Interconnection System in the event of a Reduced Effective Appropriation. Upon receipt of CPB's Shortfall Notice, CPB and Grantee shall thereafter promptly enter into good faith negotiations to modify this Agreement with respect to the Total CPB Commitment to be provided hereunder and other terms as may be necessary to accommodate the reduced funding. During the period of such negotiations CPB shall not be required to make any Payments hereunder in excess of the reduced funding as provided in **Section 3.2(b)**. In considering terms for modifying this Agreement, the Parties shall take into account, inter alia, (i) the need to provide for essential and secured broadcast delivery services to public radio stations throughout the United States, its territories and possessions, (ii) the need to provide for a common shared platform for public radio program providers to radio stations, (iii) the needs of the Interconnected PTEs, including the age and condition of their satellite antennae and other ground-system equipment; and (iv) technology developments, cost and availability. If the Parties cannot agree on a new Total CPB Commitment and Budget, then either Party may terminate this Agreement.

**3.3.    Accountability to Congress**. CPB is accountable to Congress for the expenditure of funds pursuant to the Interconnection Appropriation, together with any interest earned thereon, and must assure itself that such funds are expended in a prudent and financially responsible manner exclusively for appropriate purposes as intended by Congress. Grantee's obligations under this Agreement are intended to support CPB in satisfying its obligations regarding the Interconnection Appropriation.

**3.4.    Project Monitoring**. CPB shall monitor Grantee's technical and financial progress in completing the Grant Project, and shall ensure that all funds and interest, if any, distributed to or earned by Grantee under this Agreement are used exclusively for Project Costs. In monitoring this Grant Project, CPB shall rely (a) upon the reports provided by Grantee in accordance with **Section 5,** (b) upon CPB consultants and staff, and (c) upon the observations of CPB's representative, who shall serve as CPB's liaison to the Distribution/Interconnection Committee of Grantee's board of directors

(the "**D/I Committee**") pursuant to **Section 4.4**. However, CPB shall have the right to seek independent verification of financial and technical progress reports and the status of the Grant Project at its own expense, provided that this verification shall not unreasonably delay progress on the Grant Project or CPB's distribution of Project Funds.

**3.5.** __Post-Funding Monitoring__. During the Term, CPB shall have the right to continue monitoring the technical and financial progress of the Grant Project, even if the Project Account has been distributed in its entirety and expended prior to the completion of the Grant Project.

**3.6.** __Post-Term Monitoring.__ After the Term, CPB shall monitor the management and operation of the System in accordance with the interconnection and other obligations under the Act to ensure that the goals of public broadcasting as articulated by Congress are fulfilled.

**3.7.** The Workscope and the Project Funds provided hereunder are intended by CPB to support the provision of facilities and services for the Interconnection System, as defined by 47 U.S.C. §397 (4), and for other infrastructure improvements that will serve public telecommunications entities. Project Funds may not be used for the costs of infrastructure facilities, services, or the portions thereof that do not constitute "interconnection" facilities or services of an "interconnection system" as defined by 47 U.S.C. §397 (3) and (4) unless the Grant Project specifically includes such infrastructure facilities or services and the Budget includes their costs. Nothing herein shall limit CPB's discretion to fund the costs of such other infrastructure improvements with federal appropriations which may be designated or authorized for such purposes. CPB's obligation under 47 U.S.C. §396 (k)(3)(A)(iv) to support annual interconnection operating costs does not apply to the Grant Project and Grantee's annual operating costs of the PRSS Interconnection System.

4.    **GRANTEE RESPONSIBILITIES**

**4.1.** __Project Implementation__. Grantee, as the national entity designated by the Interconnected PTEs for interconnection purposes and acting on their behalf, shall be solely responsible for the planning, design, procurement, construction and maintenance of the System in accordance with its own specifications and to fulfill the needs and enhance the benefits of all of the Interconnected PTEs and the public within existing financial and technological constraints. However, in carrying out its responsibilities under this Agreement and in making significant Project decisions, Grantee shall be guided by the D/I Committee and the Interconnected PTEs, as appropriate.

(a)    __Minimum System Requirements__. Grantee shall take all steps necessary to ensure that the System as refreshed and upgraded pursuant to the Workscope shall provide basic interconnection services for all of the Interconnected PTEs to the satisfaction of the D/I Committee.

(b)    __Acceptance of System by Interconnected PTEs__. Grantee shall provide reasonable assurances to CPB based on reasonable and prudent information and documentation that the System is acceptable to a substantial majority of the Interconnected PTEs.

**4.2.** __Workscope__. If Grantee proposes to make any material change to the Grant Project or to the Workscope, or any change that requires CPB's consent pursuant to this **Section 4.2**, Grantee shall provide a written request to CPB that describes the desired change. At the request of either Party, Grantee and CPB shall meet to discuss in good faith such change and shall continue such discussions and meet as often as the Parties reasonably deem necessary for CPB to reach its decision regarding the proposed change. CPB shall approve or reject Grantee's proposed change(s) in a

written explanation of its decision to Grantee within (i) thirty (30) days of Grantee's written request for any change that would not result in a change to the Total CPB Commitment, or (ii) sixty (60) days of such request for any change that would result in a change to the Total CPB Commitment, or such other time period as mutually agreed by the Parties. If Grantee disagrees with CPB's decision in whole or in part, Grantee may request that the D/I Committee be consulted. The Parties shall collaborate to brief the D/I Committee on the disputed change, and CPB shall consider in good faith any of the D/I Committee's recommendations.

**4.3.    Project Completion.**    In the event that sufficient funds are not available to substantially complete the Grant Project as proposed herein, Grantee shall use commercially reasonable efforts to continue and substantially complete the Grant Project, or in its discretion maintain the System as presently constituted, in each case in a manner that meets the minimum service requirements established by the D/I Committee as described in **Section 4.1(a).**

**4.4.    D/I Committee Meetings.**  Grantee agrees that it shall provide not less than ten (10) business days prior notice to CPB of duly authorized meetings of the D/I Committee, and shall permit up to two (2) representatives of CPB to serve as liaisons to the D/I Committee and to attend meetings of the D/I Committee during the Term, as permitted by and consistent with the fiduciary duties of the members of the D/I Committee. For the avoidance of doubt, the aforementioned liaisons shall participate in CPB inquiry agenda items of each duly authorized meeting of the D/I Committee. CPB, at Grantee's request, will execute a non-disclosure agreement prohibiting the sharing of Grantee-identified sensitive information discussed during D/I Committee meetings.

**4.5.    Public Broadcasting Act Requirements – Grantee.**  Grantee shall comply with all applicable provisions of the Communications Act of 1934, as amended or as may be amended subsequently, including, but not limited to:

(a)    47 U.S.C. Section 396(k)(4), concerning open meetings of its governing body, committees thereof and advisory bodies;

(b)    47 U.S.C. Section 396(k)(5), concerning maintaining financial information for public inspection;

(c)    47 U.S.C. Section 396(k)(9), concerning the annual compensation of, and prohibition of interest-free loans to, officers and employees; and

(d)    47 U.S.C. Section 398(b), concerning equal employment opportunity.

**4.6.    Public Broadcasting Act Requirements – Interconnected PTEs.**  Grantee shall notify each Interconnected PTE that shall receive equipment funded in whole or in part by Project Funds that, as a condition of the receipt of any such Grant Project equipment, such Interconnected PTE is obligated to comply with all applicable provisions of the Communications Act of 1934, as amended or as may be amended subsequently, including, but not limited to:

(a)    open meetings of its governing body, committees thereof, and advisory bodies (47 U.S.C. Section 396(k)(4));

(b)    maintaining financial information for public inspection (47 U.S.C. Section 396(k)(5));

(c)    community advisory boards for community licensees (47 U.S.C. Section 396(k)(8)); and

(d)    equal employment opportunity provisions (47 U.S.C. Section 398(b)).

4.7.    **Management of System**.  During and after the Term, Grantee or its successor shall continue to manage and operate the System on behalf and for the benefit of all of the Interconnected PTEs, provide or arrange for the maintenance of the System, and allow CPB to monitor such management and operation of the System as contemplated by **Section 3.6**, unless and until such time that the Interconnected PTEs decide to dissolve the System.

4.8.    **National Elements of the PRSS**.

(a)    Title to National Elements.  The Parties agree that title to all National Elements of the PRSS shall be transferred to, and held in trust for and on behalf of the interconnected stations that are the beneficial owners of the PRSS, by The Public Radio Satellite Interconnection System Charitable Trust (the **"Trust"**).  **"National Elements"** of the PRSS shall consist of the satellite transponder lease, terrestrial interconnect facilities and services, and all Grant Project equipment, other assets and facilities required for System management and control to be located at Grantee's Network Operations Center (**"NOC"**) at Grantee's headquarters in Washington, D.C. (or at any location where Grantee headquarters may, in the future, be located), and other locations such as the Back-up Network Operations Center (**"BuNOC"**) in St. Paul, Minnesota. (or at any location where BuNOC facilities may, in the future, be located), and any other equipment or other assets that Grantee reasonably determines is necessary for national System management and control.

(b)    Insurance.  Grantee shall acquire and maintain business interruption insurance or other protection against loss or damage, at a commercially reasonable level consistent with avoiding catastrophic loss of operations.  Grantee shall notify each Interconnected PTE that shall receive equipment funded in whole or in part by the Project Funds that, as a condition of the receipt of Grant Project equipment, such Interconnected PTE is obligated to acquire and maintain insurance or other protection of the Grant Project equipment at a commercially reasonable level consistent with its continued ability to be interconnected to the System.

5.    **REPORTING**

5.1.    **Quarterly Reports**.

(a)    Grantee shall provide to CPB quarterly reports on the financial progress of the Grant Project on or about the dates set forth in Attachment C (Schedule of Deliverables and Disbursements).

(b)    The quarterly report shall be a Budget report showing actual versus budget results and may include a listing of any material accomplishments for the reporting period. Grantee shall identify and explain any material variances in the Budget that occurred during the reporting period.

**5.2.** **Congressional Reports**. Grantee shall provide to CPB a copy of any and all reports that it may file with Congress or any committee of Congress on the status of the Grant Project or the Interconnection System at any time during the Term.

**5.3.** **Other Project Information**. In addition to the foregoing and subject to the terms of this Agreement, Grantee shall promptly provide CPB with any and all Grant Project information that CPB may reasonably request at any time during the Term. Grantee shall have a reasonable amount of time, but no fewer than thirty (30) days, to produce the requested Grant Project documentation or information if outside the scope of deliverables set forth in the Schedule of Deliverables and Disbursements; provided, however, that such time may be shortened if requested by the Inspector General or other governmental authority.

## 6.    D/I COMMITTEE, GOVERNANCE AND ACCESS TO PRSS

**6.1.**  The Parties acknowledge that the Interconnected PTEs have designated the D/I Committee responsible for developing and establishing policies and procedures necessary for the governance of the System, which policies and procedures provide for consideration of representative views of independent producers and other public telecommunications entities, and minority groups and women. Grantee represents and warrants that it manages and operates the System pursuant to such policies and procedures and in accordance with all applicable laws, and has provided written documentation of its policies and procedures to CPB. During the Term, Grantee shall continue to manage and operate the System pursuant to such policies and procedures and in accordance with all applicable laws, and shall inform CPB in writing of any changes to such policies and procedures.

**6.2**    Grantee, having received input from the D/I Committee, has established and published procedures governing access to the System in accordance with 47 U.S.C. Section 396(h)(2), including provisions for reasonable access to the System for all public telecommunications service providers and reasonable occasional user rates. Grantee represents and warrants that it administers System access pursuant to such procedures and has provided documentation of these procedures to CPB. During the Term, Grantee will continue to administer System access pursuant to such procedures and in accordance with all applicable laws, including 47 U.S.C. Section 396(h)(2), and shall inform CPB in writing of any changes to such procedures.

**6.3**    Grantee will provide access to the System to any public radio broadcast station licensee or permittee, and any producer or supplier of public telecommunications services, including other public telecommunications entities, independent producers, minority groups, and women, on reasonable terms and conditions, regardless of whether such licensee, permittee, producer, or supplier is an Grantee member station or an employee or agent of Grantee.

**6.4.**    Regarding all issues of procurement related to this Agreement, including but not limited to the procurement of for the design, construction, acquisition and operation of the System, Grantee shall comply with Grantee's procurement policy in effect as of the execution of this Agreement (a copy of which has been provided to CPB).

## 7.    MATERIALS, CONFIDENTIALITY AND COMPLIANCE

**7.1.**    CPB shall have the perpetual non-exclusive right to duplicate, distribute, disclose, and otherwise use solely for its internal purposes all of the information and materials submitted to CPB

("**Materials**") (including but not limited to all narrative reports, but excluding, for example, any inventions, patents, trade secrets, know-how, or other intellectual property such as computer source or object code depicted, described, or otherwise embodied in the Materials), in whole or in part, in any manner, or to have or permit others to do so. For all Materials submitted to CPB that are subject to third-party (e.g., any service provider, subcontractor, or other stakeholder) restrictions ("**Restricted Materials**"), CPB shall have the co-terminus rights to such Restricted Materials that Grantee enjoys, if any, to duplicate, distribute, disclose, and otherwise use solely the Restricted Materials for its internal purposes. Grantee shall mark all Restricted Materials as "Restricted Materials" and provide all limitations; and notwithstanding any other provision in this agreement, Grantee shall have thirty (30) days to respond to any CPB request for Restricted Materials that are not part of a Grantee reporting obligation. Materials and Restricted Materials are subject to **Section 7.2**.

7.2.    To the extent Grantee discloses to CPB proprietary or non-public information ("**Confidential Information**") that it considers confidential or proprietary, including information of any service provider or other Restricted Materials, Grantee shall mark such information "Confidential" if delivered in writing and shall designate such information as being confidential or proprietary if delivered orally. Such Confidential Information includes, but is not limited to, reports; service provider financial or pricing information; service provider intellectual property, including trade secrets, copyrights, source code, design plans, or other proprietary information; and the Workscope and Budget. CPB agrees to keep Confidential Information in strict confidence and shall only disclose it to those who have a need to know or as otherwise required to perform its obligations under this Agreement. CPB shall not disclose to any third parties except as required by statute or law; provided, however, that this provision shall not prohibit disclosure (i) as required pursuant to the Communications Act of 1934, 47 U.S.C. 396 et seq,; (ii) in response to any subpoena or court order; (iii) in response to any request of representatives of the United States government, or (iv) to or by CPB's Office of Inspector General. If such disclosure is required pursuant to (i), (ii), or (iii), CPB shall notify Grantee in advance, and shall seek, and Grantee shall cooperate with CPB to seek, protected or other confidential treatment of the Confidential Information at least as stringent as the requirements of this provision.

7.3.    In performing its obligations under this Agreement, Grantee shall comply with the Federal Communications Commission's regulations and all and with all applicable Federal and state nondiscrimination and equal employment opportunity laws, rules, and regulations. The CPB policy on "Equal Opportunity and CPB Assistance," contained in Attachment G, is specifically made part of this Agreement. In accepting this Agreement, Grantee agrees that the requirements of this provision, as well as the implementation of this CPB policy as a material term and condition of this Agreement. The Parties acknowledge that this policy may be amended for consistency with changes in applicable law.

## 8.    <u>AUDITS</u>

8.1.    <u>General</u>.  Upon receipt by CPB of Grantee's certification of Project completion, if requested by CPB, Grantee shall undergo a final audit of this Project by CPB, which audit shall be conducted in accordance with generally accepted auditing standards. CPB shall have access for the purpose of audit and examination to any books, papers, documents, and records relating to the Grant Project.

**8.2.   Record Keeping.**  Grantee and its subcontractors, if any, must keep books, records, and accounts relating to the Grant and the Grant Project sufficient to:

(a)   enable CPB to verify all direct costs, overhead, and administrative allocations associated with the Grant Project;

(b)   allow CPB, by examination of Grantee's general ledger and other records, to account for the Grant Project level of activities in sufficient detail to enable an audit to verify the investment of the CPB funds in the approved expenses of the Grant Project;

(c)   disclose fully the amount and use of the proceeds of the Grant, the Total Project Cost, and the amount and nature of any portion of the Total Project Cost supplied by sources other than CPB;

(d)   substantiate labor costs with timesheets or other relatively contemporaneous record-keeping documents, consistent with the representation of those costs within the budget of the Grant or the subcontract of the Grant, or in the case of a fixed price line item over $5,000 that was not awarded pursuant to competitive bidding procedure, documentation of the reasonableness of a fixed fee.  Specifically:

(i)   costs represented in a budget as hourly costs must be recorded no less frequently than every two weeks;

(ii)   costs represented in a budget as a percentage of annual time must be recorded no less frequently than every month; and

(e)   records of such costs must permit an effective audit.

**8.3.   Other Audit Conditions.**

(a)   Grantee shall keep, for a period of three (3) years following the delivery of the final reports to CPB, such records as may be reasonably necessary to fully disclose the amounts expended pursuant to the Budget, the final financial report and any undertakings connected with this Agreement, and such other records as will facilitate an effective audit.  CPB and/or the Comptroller General, or their respective duly authorized representatives, shall have access for the purpose of audit and examination to any records that are pertinent to funds received under this Agreement.

(b)   Grantee shall provide copies of the documents specified in **Section 8.2(a)** upon CPB's request.

(c)   In the event that CPB discovers any inaccuracies in reporting of financial information, or any improper use of funds provided by CPB, whether reported by Grantee or discovered during the course of an audit by the Office of the Inspector General or otherwise, CPB may recover any overpayment, in addition to any other rights and remedies CPB may have.  If recovery of overpayment is required, CPB will notify Grantee by letter of the actions CPB intends to take, and Grantee shall have 30 days from the date of the letter to respond to or seek clarification in writing about CPB's intended actions.  If CPB does not receive any written response from the Grantee within such 30-day period, CPB's intended actions shall be deemed to be acceptable as the final determination of the matter, and CPB will implement the actions described in the letter.

CPB ID No. 35393-ISS

(d)    No funds provided by CPB hereunder shall be (i) used for any activity designed to influence legislation or appropriations pending before the United States Congress or any State legislature (26 §U.S.C. 501(c)(3)); or (ii) used to conduct any reception or provide any other entertainment for any officer or employee of the Federal Government or any state or local government (47 §U.S.C. 396, D(k)(2(A)).

**8.4.**    Grantee shall include a provision in all agreements with its consultants or subcontractors relating to this Agreement, requiring such consultant or subcontractor to comply with the requirements of **Section 8.2.**

## 9.    REPRESENTATIONS AND WARRANTIES; INDEMNIFICATION

**9.1.**    **Authority.** Each of CPB and Grantee represents and warrants to the other Party that it has all necessary power and authority to enter into and fully perform this Agreement.    Grantee shall provide CPB with all rights necessary to enable CPB to take all action contemplated by this Agreement.

**9.2.**    **Conduct.**    Grantee represents and warrants to CPB as follows:

(a)    _Designated Representative._    Grantee has been designated by the Interconnected PTEs, by virtue of the execution of a distribution/interconnection agreement with each Interconnected PTE, as the manager and operator of the System and shall continue to serve in this capacity for long as so designated.

(b)    _Professional Standard._    Grantee shall perform its obligations under this Agreement in a professional manner and will take such steps as reasonably necessary to make the System perform as intended and described.

(c)    _Anti-Lobbying._    No funds provided by CPB hereunder shall be:

(i)    used for any activity designed to influence legislation or appropriations pending before Congress or any state legislature (as provided by 26 U.S.C. Section 501(c)(3)); or

(ii)    used to conduct any reception or provide any other entertainment for any officer or employee of the Federal Government or any state or local government (47 U.S.C. Section 396(k)(2)(A)).

**9.3.**    **Indemnification.** Each Party shall indemnify and hold the other Party harmless from and against any and all third-party alleged or actual claims, damages, liabilities, costs and expenses (including reasonable legal fees) arising out of or related to (i) any breach of any representation or warranty in this Agreement, or (ii) any Default (as defined in Section 10.1(a)); provided, however, that neither Party shall be entitled to receive indemnification for any claims, damages, liabilities, costs or expenses that are solely the result of its own acts or omissions.    CPB and Grantee shall promptly notify each other of any claim or legal action relating to the Grant Project.    Grantee shall not name CPB as an additional or alternate defendant or seek indemnity or contribution from CPB for

claims by and liabilities to third parties that may arise out of Grantee's performance under this Agreement.

## 10.    TERMINATION, PERFORMANCE AND REMEDIES

### 10.1.    Termination.

(a)    CPB may terminate this Agreement at any time subject to Grantee's right to cure set forth below and without liability to CPB if Grantee breaches any warranty or representation, or any material condition, term or other provision of this Agreement (each a "**Default**"). Grantee shall have the right to cure any Default within thirty (30) days of CPB giving written notice to Grantee of such Default. If such Default occurs and is not cured within the thirty (30) day period provided above, or if the Default results from a breach of Grantee's obligations pursuant to this Agreement, then CPB may terminate this Agreement pursuant to the terms hereof.

(b)    This Agreement shall terminate immediately in the event that:

(i)    the Interconnected PTEs elect not to complete the Grant Project, or Grantee ceases to be their designated representative for the purposes of the Act and this Agreement; or

(ii)    this Agreement is terminated pursuant to **Section 3.2(c)**; or

(iii)    Grantee faces voluntary or involuntary dissolution, files a petition for bankruptcy, or otherwise becomes incapable of acting as the designated representative of the Interconnected PTEs for the purposes of the Act and this Agreement.

(c)    If this Agreement is terminated, the terms of this Agreement will apply to all information and materials previously provided to CPB pursuant to this Agreement, as if the entire Grant Project had been completed in accordance with the Agreement.  Any termination of this Agreement shall be in addition to any other legal or equitable remedies CPB may have.

(d)    Any decision by CPB not to terminate this Agreement, or any inaction by CPB with respect to any failure by Grantee to keep or perform any covenant or condition of this Agreement shall not be construed as a waiver by CPB of any preceding, succeeding or continuing breach of the same, or of any other covenant or condition; or of CPB's rights or remedies with regard thereto or with regard to any other provision of this Agreement.

(c)    Upon termination of this Agreement for any reason, Grantee shall repay immediately to CPB, without demand, that portion of the Project Funds that CPB has disbursed to Grantee, except for Project Funds that Grantee has properly expended or otherwise contractually committed to expend as of the date of such termination for Project Costs; and in addition, CPB shall have no further financial obligation to Grantee pursuant to the Agreement.

### 10.2.    Suspension of Payments.    CPB may withhold succeeding disbursement(s) to Grantee, until Grantee has provided the required information to CPB or has obtained necessary approvals, in the event that Grantee:

CPB ID No. 35393-ISS

(a)     withholds or otherwise fails to provide any reports required under this Agreement;

(b)     intentionally fails to notify CPB and permit its representative to attend any open meeting of the D/I Committee in accordance with **Section 4.4**;

(c)     effects any material changes to the Project Budget without an amendment to this Agreement in accordance with **Section 2.4**; or

(d)     effects any changes to the Workscope without complying with **Section 4.2**.

**10.3.    Misapplications of Project Funds.** In the event that, upon examination or audit of Grantee's financial reports and records, CPB determines and notifies Grantee that funds distributed under this Agreement were used for purposes other than the Grant Project as described in this Agreement, Grantee shall reimburse CPB for all such misapplied expenditures, including interest calculated at a rate of five percent (5%) per year from the date of each expenditure until its reimbursement. If Grantee fails to do so within 60 days of such notification to Grantee, this Agreement shall terminate, and Grantee shall reimburse CPB for all such wrongful expenditures, including interest, upon written demand by CPB or the Comptroller General of the United States, or their duly authorized representatives.

**10.4.    Not Exclusive Remedies.**    No remedy referred to in this **Section 10** is intended to be exclusive and each remedy shall be cumulative and in addition to other remedies herein or otherwise available to CPB or Grantee at law or in equity.

**10.5.    Force Majeure.**

(a)     Any delay in delivery of any of the required deliverables by Grantee that results from any act of God or natural hazard outside human control or activity, such as an earthquake, tsunami or pandemic; riot or other civil disorder; war or armed insurrection; strike, lockout or other labor action related to the services performed hereunder; governmental enactment, rule, act, order or lack of action; or, major fire or flood; and that does not exceed one hundred twenty (120) days, will not constitute a basis for termination or reduction of the Total CPB Commitment. Notwithstanding the any such delay, the Term shall end as provided in **Section 1.2**.

(b)     However, in the event that any such delay does exceed one hundred twenty (120) days, CPB will have the right to terminate this Agreement following no less than thirty (30) days' notice to Grantee. In the event of termination for such reason, CPB will reimburse Grantee for any contractual commitments or expenditures for which CPB has not yet paid Grantee but which were authorized by this Agreement to be contractually committed or expended as of the date of such termination, provided that such commitments or expenditures were reasonable under the circumstances preceding termination, and provided that in no event will such reimbursement exceed the outstanding amount of the Total CPB Commitment. CPB may delay making any and all Payments otherwise due during the period of delay noted above.

11.    **MISCELLANEOUS**

**11.1.    Modification.** This Agreement constitutes the Parties' complete understanding with respect to its subject matter and supersedes and replaces any previous or contemporaneous

CPB ID No. 35393-ISS

agreements or understandings, whether written or oral, related to the subject matter of the Agreement. No modification or amendment of this Agreement shall be effective unless the same is in writing and signed by the Parties.

**11.2.    Notices; Waiver.** All notices required or permitted under this Agreement shall be in writing. The waiver by either Party of any breach of this Agreement by the other Party shall not be effective unless in writing, and no such waiver shall operate or be construed as a waiver of such breach or another breach on a subsequent occasion.

**11.3.    Governing Law.** This Agreement shall be governed and construed under the laws of the District of Columbia, regardless of the place of execution or performance. Notwithstanding any other court that might have jurisdiction under applicable law and rules, the Superior Court of the District of Columbia and the United States District Court for the District of Columbia will have exclusive jurisdiction to hear and determine any claims or disputes pertaining directly or indirectly to this Agreement. CPB and Grantee hereby expressly submits and consents to such jurisdiction in any action or proceeding and agree that venue will be proper in such courts for all matters. In any action or proceeding commenced in any court in the District of Columbia to enforce this Agreement or any right granted herein or growing out hereof, or any order or decree predicated thereon, any summons, order to show cause, writ, judgment, decree or other process, issued by such court may be delivered to CPB or Grantee personally or by certified or registered mail (return receipt requested), without the District of Columbia; and when so delivered, will constitute valid service of process; and CPB or Grantee, as the case may be, will be subject to the jurisdiction of such court.

**11.4.    Severability.** The illegality or invalidity of any term or provision of this Agreement shall not affect the legality or validity of the remainder of this Agreement.

**11.5.    Independent Status of Parties.** This Agreement shall not be deemed to create any association, partnership or joint venture between CPB and Grantee, nor will anything in this Agreement be deemed to make a Party a surety for or guarantor of the other Party's obligations, or an agent, distributor or representative of the other. Grantee shall act as an independent contractor and not as an agent or representative of CPB, and this Agreement shall not create any employment relationship between CPB and Grantee or any person appearing in or performing services in connection with the Agreement, including any consultant. Neither Party shall act or represent itself, directly or by implication, as an agent of the other or in any manner assume or create any obligation on behalf of, or in the name of, the other. This Agreement does not create any rights enforceable by any person not a party to this Agreement, including any consultant.

**11.6.    Assignment.** This Agreement will inure to the benefit of and be binding upon the successors, and assigns of the Parties. Any assignment, or attempted assignment, of this Agreement, in whole or in part, or rights under this Agreement, without the prior approval of the other Party will be void.

**11.7.    Delegation.** Grantee shall obtain written permission from CPB prior to executing any delegation of its duties under this Agreement, other than any delegations expressly approved herein. Any delegation or attempted delegation by Grantee of its duties under this Agreement, unless pursuant to an amendment to this Agreement, will be void.

**11.8.    No Other Agreement.** This Agreement and the attachments incorporated hereto shall supersede and replace any previous documents, correspondence, conversations, or other

CPB ID No. 35393-ISS

14

written or oral understandings related to this Agreement that are not consistent with or contained in this Agreement. The provisions contained in the main body of this Agreement shall take precedence over any inconsistent information that may appear in the attachments to this Agreement.

**11.9.   Survival**.  The following Sections shall survive termination of this Agreement: **Section 8** (Audit) and **Section 9.3** (Indemnification) for a period of **three (3) years** following expiration or termination of the Agreement.

**11.10.  Headings**.  The captions and headings of this Agreement have been inserted solely for convenience and are not to be considered in matters of its interpretation.

**11.11.  Attachments**.  All attachments hereto are a material part of this Agreement.

**11.12.  Counterparts**.  This Agreement may be executed in counterpart originals, all of which taken together will be deemed one original.

**[The Remainder of Page Intentionally Left Blank]**

IN WITNESS WHEREOF, the parties hereto have duly executed this Grant Agreement to be effective as of the date first set forth above.

**ACCEPTED AND AGREED:**

**National Public Radio, Inc.**

By:  *Deborah A. Cowan*

Print Name:  Deborah A, Cowan
Title:  CFO & Treasurer
Date:  Mar 10, 2023

**Corporation for Public Broadcasting**

By:  *William P. Tayman*

Print Name:  William P. Tayman
Title:  Chief Financial Officer and Treasurer
Date:  Mar 10, 2023

By:  *Patricia Harrison*

Print Name:  Patricia Harrison
Title:  President and Chief Executive Officer
Date:  Mar 10, 2023

CPB ID No. 35393-ISS

16

ATTACHMENT A

WORKSCOPE

**"Public Radio Satellite System Interconnection Funding FY23-FY24"**
**(CPB ID No. 35393-ISS)**

**PROJECT OVERVIEW**

This Workscope describes the activities to be undertaken by NPR during the Term beginning on **October 1, 2022, and continuing through September 30, 2024.** Capitalized terms used but not defined in this Workscope have the meanings ascribed to them in the Agreement.

NPR will continue to refresh and upgrade the Public Radio Satellite System (hereinafter referred to as the "**System**" or "**PRSS**"), including satellite-, internet- and terrestrially-based technologies and operations that NPR manages and operates on behalf of the System to distribute content and associated metadata from content producers and aggregators to public radio stations in the interest of maintaining System continuity and needed upgrades. The System will provide essential and secured broadcast delivery services to public radio stations throughout the United States, including the District of Columbia, the U.S. Virgin Islands, Puerto Rico and Guam, as well as provide a common, shared platform for public radio program providers to public radio stations. The System will provide:

- content aggregation and management
- content distribution and management
- content and operational metadata processing
- descriptive metadata pass-through

NPR will provide system monitoring, management, notification and reporting as required for reliable content distribution. New or renewed service agreements, additional or replacement equipment, as well as system upgrades or new features described in this Attachment A will enable the PRSS to continue to provide efficient, reliable and relevant content aggregation and distribution.

NPR will replace or refurbish certain ground equipment in accordance with the parameters of **Section 3** of this Attachment A, maintain the leases for necessary satellite bandwidth, and create efficiencies and improvements in accordance with the activities outlined herein.

**Workstream #1:**

**PROJECT ACTIVITIES**

NPR will perform and may engage others to collaborate on the following activities ("**Activities**"); however, NPR will be responsible for ensuring that the Activities are completed in accordance with this Agreement. NPR will provide CPB with updates on its progress against each of these Activities in a narrative report ("**Narrative Progress Report**").

1.      **CONTINUITY OF SERVICE – PART A – EQUIPMENT AND SUPPORT**

a.      **Hardware Replacement**: NPR will purchase the new hardware identified in this **Section 1(a)** to support end of lifecycle replacements and necessary upgrades. Purchases may

CPB ID No. 35393-ISS

include spares, which will be put into operation during the Term, as current equipment reaches its end of life at both the Network Operations Center (NOC) and the Backup Network Operations Center (BuNOC).

    (i)    <u>Audio over IP</u>: Purchase of audio over IP replacement equipment

    (ii)    <u>Workstation replacements</u>: Replacement of up to seventy-four (74) end of lifecycle workstations and laptops to support specific project related work in the NOC and BuNOC

    (iii)    <u>Codecs</u>: Replacement of up to seven (7) codecs that are currently approaching their end of life

    (iv)    <u>Servers</u>: Replacement of up to nineteen (19) servers according to NPR's four year replacement cycle

    (v)    <u>Raritan Replacements</u>: Replacement of end-of-life equipment in the NOC and BuNOC that manages electrical power distribution

    (vi)    <u>Routers, Switches, Firewalls</u>: Replacement of end-of-life Cisco routers, switches, and firewalls that allow ContentDepot to run at maximum efficiency

    (vii)    <u>Drivers</u>: Purchase of up to two (2) DataMiner drivers to automate identification of performance issues at the NOC

    b.    **Software Support Agreements**: NPR will maintain and/or renew the software support agreements it has entered into with vendors as needed to maintain service continuity, address security upgrades, and incorporate bug fixes.

    c.    **Continuity of Service Report – Part A**: NPR will provide CPB with an update on the activities identified in **Section 1(a)** and **Section 1(b)** ("**Continuity of Service Report – Part A**") as part of its Narrative Progress Report, as set forth in <u>Attachment D</u>. This report will be broken out into the following subsections:

    (i)    <u>Hardware</u>: NPR will provide confirmation of hardware that has been purchased or replaced during the reporting period.

    (ii)    <u>Software Support</u>: NPR will provide confirmation of the software service agreements it has entered into with vendors, and the time period covered for each agreement.

NPR agrees to provide sufficient information in each subsection of the report to clearly demonstrate to CPB the nature of the work completed and where progress stands against the obligations set forth in this **Section 1**.

## 2.    <u>CONTINUITY OF SERVICE – PART B – IMPROVEMENTS AND UPGRADES</u>

    a.    NPR will perform the activities identified in this **Section 2(a)** to increase security and/or improve system health:

CPB ID No. 35393-ISS

(i) <u>ATX Integration Enhancements</u>: Working in conjunction with ATX, develop a requirements document regarding ways to continue advancing receiver health, including but not limited to remote monitoring of signal strength

(ii) <u>Architectural Improvements</u>: Perform ongoing work required to avoid system degradation

(iii) <u>Automated Functional Testing</u>: Move to AI-powered testing tools

(iv) <u>Security</u>: Implement new tools for increased cyber security and monitoring

(v) <u>Uplink Path Diversity</u>: Implement new pathways to efficiently switch between antennas at NPR headquarters with less manual intervention

(vi) <u>BuNOC Datacenter Improvements</u>: Upgrade monitoring capabilities at the BuNOC to create parity with NOC monitoring capabilities

(vii) <u>Postgres Database Upgrades</u>: Upgrade data storage system to remain current with software releases

(viii) <u>Test Free Linux Distribution Software</u>: Test free Linux distribution software on non-critical servers to test performance and reliability for potential wider adoption

(ix) <u>Remote WebPlayer</u>: Install WebPlayer at the NOC to enable engineers to provide remote operations via laptops and mobile devices.

(x) <u>Moving IT Management Software to the Cloud</u>: Migrate (4) individual software products to the cloud to avoid service interruptions based on vendor changes

b.      **Continuity of Service Report – Part B**: NPR will provide CPB with an update on the activities and how each activity supported the goals of increased security and/or system health identified in **Section 2(a)** ("Continuity of Service Report – Part B"), as part of its Narrative Progress Report, as set forth in <u>Attachment D</u>.

3.      **GROUND SYSTEM REFURBISHMENT (GEAR)**

a.      NPR will replace or refurbish certain elements of the ground systems at local stations based on the following requirements:

(i)     Signal loss of more than or equal to 3dB over a 24-hour period as compared with past performance over a similar 24-hour period. This signifies a signal loss of at least half of the power.

(ii)    Signal level less than or equal to 8dB over a 24-hour period. This signifies signal threshold below the buffer point necessary to protect the site from low-level interference.

CPB ID No. 35393-ISS

(iii)     Significant increase in audio artifacts. This would need to be demonstrated through content recordings directly from the ATX receiver, rather than over-the-air.

Once the above criteria are met, these additional requirements must be met:

(iv)     Station antenna is only used for downlinking

(v)     All qualifying data has been provided to PRSS (including, but not limited to, a completed application, interfacility link (IFL) condition, low noise-block downconverter (LNB), dish surface and mount condition, and current photos)

If a station meets these criteria, it will be placed into one of the following groups:

(i)     <u>Group 1</u>: Station qualifies and needs new or refurbished satellite antenna and/or related downlink equipment

(ii)     <u>Group 2</u>: Station qualifies and needs minor equipment replaced (such as cables)

(iii)     <u>Group 3</u>: Station may or may not qualify, but needs advice

(iv)     <u>Group 4</u>: Station does not meet eligibility requirements

For Group 1 or Group 2 stations, NPR will prioritize eligibility for refurbishment or replacement of equipment, ranking them by level of urgency as follows:

(i)     <u>Urgent</u>: Total signal loss is occurring

(ii)     <u>High</u>: Signal degradation is occurring

(iii)     <u>Medium</u>: Meets minimum criteria and heavy visible rusting, warping, or cracking noted on antenna

(iv)     <u>Low</u>: Meets minimum criteria and some visible rusting, warping, or cracking noted on antenna

Only stations that are classified as Urgent or High will be eligible for funding under this Agreement.

b.     <u>**Financial Reporting**</u>: NPR will submit to CPB a financial report on GEAR spending in the Excel format provided by CPB. This financial report shall be provided, as set forth in <u>Attachment D</u>, and shall include the station recipients, and the breakdown of hardware, professional services, and internal coordination costs. NPR may not reallocate funds in the Budget (<u>Attachment B</u>) to or from the line specifically identified for GEAR costs.

c.     <u>**GEAR Report**</u>: NPR will provide CPB with an update on the activities identified in **Section 3(a)** ("GEAR Report") as part of its Narrative Progress Report, as set forth in <u>Attachment D</u>. This report, a sample form of which is contained in <u>Attachment B-1</u>, shall include updates on completed and upcoming antenna replacements or refurbishments, any changes to the proposed list of replacements or refurbishments, and any unforeseen issues and proposed solutions.

CPB ID No. 35393-ISS

4.     **SATELLITE CAPACITY AND INSURANCE**

a.      The System will continue to use a combination of satellite delivery technologies, the Internet, and leased terrestrial services to distribute content from content producers and aggregators to local stations. NPR will maintain leases for two types of satellite transponder capacity: (1) one C-Band transponder (36 MHz), and (2) a small portion of a Ku-Band transponder (7.2 MHz). Additional Ku-Band space may need to be acquired during the Term to support ContentDepot® content management system or public radio networks as and when necessary.

b.      During the Term, NPR will continue to lease satellite transmission capacity from Intelsat at the current rate. Intelsat has agreed to renew and extend the C-Band lease for the life of the satellite under substantially similar terms as the existing lease agreement (with estimated end of life for the Galaxy 16 satellite being January 2029). NPR will also continue to contract with Intelsat for the lesser amount of Ku-Band capacity. NPR will continue to make lease payments to Intelsat on a monthly basis.

c.      NPR will continue its current satellite insurance that covers business interruption, loss of revenue or expenses that NPR may incur if the satellite becomes inoperable during the Term. NPR will report on any anticipated significant changes to satellite insurance costs.

d.      **Satellite Report**: NPR will report on any changes to satellite capacity, including any increase or decrease in the satellite capacity provided pursuant to the Intelsat agreement, anticipated future increases or decreases in transponder capacity needs, considerations of any changes to the sale of excess bandwidth, or anticipated changes to other material terms of the Intelsat agreement.

5.     **CUSTOMER EXPERIENCE PROJECTS**

a.      **Customer Account Portal**: NPR will continue to improve and expand the capabilities of the customer account portal. The plan to improve and expand these capabilities includes enabling stations and producers to view and pay invoices online as well as editing and signing contracts online. Additionally, NPR will provide increased automated Help Desk support for producers and stations, providing stations with 24-hour submission and tracking of self-help tickets.

b.      **ContentDepot Messaging**: NPR will create more specific, targeted messaging from ContentDepot and streamline user preferences for receiving these messages to ensure users are receiving critical information in the most timely and efficient manner. Targeted messaging includes but is not limited to specific messages for customers located in geographic areas that may be experiencing weather events, users of specific pieces of hardware, or users who have a specific feature enabled that is being affected.

c.      **Improved Station Playback**: NPR will add the ability for stations to prioritize programming and delay playback. This streamlined process will reduce the number of devices required by stations by moving this functionality to satellite or terrestrial receivers.

d.      **ContentDepot Dashboard Improvements**: NPR will upgrade the ContentDepot dashboard to increase customer awareness of new ContentDepot features and documentation. NPR will provide account-specific dashboards for stations and producers to view critical information such as receiver health and program metrics in one place. These improvements will support determining

CPB ID No. 35393-ISS

whether an audio issue is a local or network-wide issue, allowing all parties to troubleshoot more efficiently.

e.    **Improved MetaPub Distribution:** NPR will begin research and development on ways for local schedule metadata to pull through to hybrid radio systems. This research and development work will include further discovery related to the accuracy of data made available through the DTS Autostage platform operated by DTS's parent company Xperi, and the availability and accessibility of such data on the Autostage platform. Contingent upon NPR entering into an agreement with Xperi, NPR will integrate MetaPub with the Autostage platform as an initial step toward the collection of listener data through such platform. CPB acknowledges that NPR's further discovery and negotiation of an agreement with Xperi may not result in an executed agreement between NPR and Xperi relating to MetaPub and the Autostage platform. If NPR does not enter into any such agreement, NPR will continue its research and development to explore alternative means for publishing metadata and collecting listener data.

f.    **Content Workflow and Improved Search:** Provide six (6) key improvements to ContentDepot to improve search, management, identification, and access to content:

(i)     Permission cleanup and simplification
(ii)    Multiple program type fields (making it easier to find various types of content such as specials, promotional, and underwriting spots)
(iii)   Ability for producers to directly manage program clocks
(iv)    Custom time zones
(v)     Use Program audition improvements: using "one-click" to allow producers to make any current episode evergreen
(vi)    Improve program discovery

g.    **Customer Experience Report:** NPR will provide CPB with an update on the activities referenced in this **Section 5(a) ("Customer Experience Report")**, as part of its Narrative Progress Report, as set forth in <u>Attachment D</u>. This report shall explain progress on the development, rollout, and success of each project based on quantitative or qualitative data from users.

6.    **CONVERGENCE**

a.    **Collaboration with PBS Go-Live:**

(i)     NPR shall communicate and endeavor to collaborate with PBS in an ongoing effort to pursue opportunities of coordination, joint operations, and/or other efficiencies regarding the System.

(ii)    As part of its ongoing collaboration project with PBS/sIX involving thirty-eight (38) co-located service sites (**"Co-Located Sites"**), NPR will expand from the initial testing at six (6) "Alpha Sites", the NPR HQ service site and the Edisen service site to all Co-Located Sites and the BuNOC service site with the goal of fully replicating satellite delivery via the PBS sIX MPLS network. This work will follow Use Case 1B described in Grant Agreement 34641 – Amendment 3, which created a staging environment for multicast replication, resulting in a one-to-many transmission. Rollout will now include a Live environment. Success will be measured by the ability of the Co-Located Sites to receive PRSS content over PBS WAN, allowing these stations to choose a

PBS sIX connection seamlessly for their content feed. NPR will monitor these feeds for stability and potential fail-over to satellite as well as ensure security of all network connections.

(iii)     As part of this collaboration project, NPR will build out the NOC and BuNOC environments as needed to support the transmissions, including all necessary software and hardware purchases and installations. NPR will train all relevant NOC and BuNOC staff, and provide necessary upgrades to participating stations' receiver equipment.

(iv)     NPR will supply Co-Located Sites with all of the network hardware and assistance to receive transport stream over IP (TSoIP) via the sIX network. Success will be measured by testing and successful implementation of Use Case 1B for the Co-Located Stations.

(v)     The work described in this **Section 6(a)** will be completed by **January 31, 2024**.

(b)     **Collaboration Report**: NPR will provide CPB with an update on the activities identified in **Section 6(a)** (**"Collaboration Report"**) as part of its Narrative Progress Report, as set forth in <u>Attachment D</u>. The Collaboration Report will include updates on any delays, investigations, discussions, or activities related to possible efficiencies to be obtained through sharing interconnection infrastructure with PBS, consistent with technology developments, costs and availability, and the needs of interconnected public telecommunications entities. The Collaboration Report also will include the following information relating to the collaboration project:

(i)     Narrative update on the actions taken to test the upgrades that build upon Use Case 1B and results during the reporting period, station feedback, and activities expected to be engaged in the next reporting period

(ii)     Terrestrial connectivity metrics of the Co-Located Sites

## 7.    COORDINATION AND MANAGEMENT

a.     NPR will provide ongoing efforts to coordinate and manage the above projects in addition to the day-to-day operations in development, planning, maintenance, and budgeting of the System.

b.     **Stakeholder Engagement**: NPR will seek and gather additional input from internal NPR divisions, and via regular reviews, collaboration, and cooperation from PBS and input from station representatives, including a select group of station representatives that have committed to participate in regularly scheduled meetings or otherwise provide one-on-one feedback (collectively **"Stakeholders"**). If requested by CPB, NPR will invite Stakeholders to engage with CPB and CPB consultants in a manner consistent with CPB's oversight role to ensure transparency and CPB's understanding of the nature of Stakeholder needs and interests. NPR will begin identifying new stakeholder and/or advisory groups as needed to begin informing the forthcoming Roadmap and BRD efforts described in the Workstream #2 section of this Workscope.

       c.     **Coordination and Management Report**: NPR will provide CPB with an update on its coordination and management activities ("**Coordination and Management Report**"), as part of its Narrative Progress Report, as set forth in <u>Attachment D</u>. This report will include the following:

             (i)     An overview of ongoing activities around security updates and user-generated change requests

             (ii)    A written summary of any relevant feedback gleaned from meetings with Stakeholders

## 8.    **FINANCIAL REPORT**

       a.     Grantee will provide a quarterly financial report in Excel, in accordance with Attachment C, outlining budget, actual costs, and variances (if any).

       b.     Each quarterly financial report will be accompanied by the invoices representing the three most expensive grant-funded third-party costs paid by Grantee for that quarter ("**Selected Invoices**"). If the aggregate amount of the Selected Invoices does not equal to or exceed at least thirty percent (30%) of the total amount of third-party costs reported in a financial report, Grantee will submit additional invoices until the thirty percent (30%) threshold is met. Grantee reserves the right to designate any of such documentation as "Confidential", and CPB shall hold and maintain any such documentation in strict confidence pursuant to the non-disclosure provisions of this Agreement.

       c.     As part of the Narrative Progress Report, Grantee shall provide a brief summary of key information regarding the tracking of budget line items against the overall budget, as it relates to any significant anticipated underspending or overages ("**Budget Tracking Summary**").

**Workstream #2:**

**PROJECT ACTIVITIES**

## 1.    **TEMPORARY POSITIONS**

At CPB's request, NPR will undertake a comprehensive process of stakeholder engagement and technical solution due diligence to create a plan for the future of the public radio interconnection system ("**Plan**"). This process will identify future technology solutions and convergence opportunities with PBS, which will inform NPR's FY2025 – FY2027 funding proposal for PRSS. In order to prepare a proposal for and to develop the Plan, NPR will hire five temporary positions, some of which may serve as backfill for current staff to allow them to focus on the Plan.

These positions, which will be funded pursuant to this Agreement for no more than two fiscal years (FY2023 – FY2024), are:

- Technical Solutions Analyst
- Project Manager
- Business Analyst
- Senior Grant Writer and Grant Reports Manager
- Contract Manager

CPB ID No. 35393-ISS

2.    **COMMUNICATIONS**

      a.     NPR will actively engage with CPB during the Term regarding NPR's progress toward submission of a funding proposal to hire a consultant for development of the Plan and toward development of a funding proposal for FY2025 – FY2027 that aligns with the future content delivery technologies that are the most efficient and effective.

      b.     **Communications Deliverables:**

        (i)     Proposal to hire consultant due **March 9, 2023**
        (ii)    Draft proposal for future funding (FY 2025 – FY 2027) due **April 30, 2024**
        (iii)   Final proposal for future funding (FY 2025 – FY2027) due **June 30, 2024**

**ATTACHMENT B**

**BUDGET**

**Public Radio Satellite System Interconnection Funding FY23-FY24**

**(CPB ID No. 35393-ISS)**

National Public Radio, Inc.

Public Radio Satellite System -- Contract Period 10/1/22-9/30/24

| # | Projects | Reporting Period Actuals (10/1/22-xx/xx/xx) | | | Cumulative Actuals (10/1/22-xx/xx/xx) | | | Total Budget | | | Remaining | "Re-allocation Threshold" or |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | Compensation | Other costs | Total Period Actuals | Compensation | Other costs | Total Cumulative Actuals | Compensation | Other costs | Total | Budget | "Permitted Variances" |
| | **A. CONTINUITY OF SERVICE** | | | | | | | | | | | |
| CS.1-2 | Satellite Capacity and Insurance | | | $ - | | | $ - | $ 17,906 | $ 2,886,088 | $ 2,903,994 | $ 2,903,994 | None |
| CS.3-CS.8 | Lifecycle Hardware Replacements | | | - | | | - | 347,362 | 1,168,975 | 1,516,337 | 1,516,337 | See Section 2.4 of Agreement |
| CS.9 | NOC Automation | | | - | | | - | 37,414 | 74,000 | 111,414 | 111,414 | See Section 2.4 of Agreement |
| CS.10 | Software Support Contracts | | | - | | | - | 58,774 | 1,437,785 | 1,496,559 | 1,496,559 | See Section 2.4 of Agreement |
| CS.11 | Station Infrastructure: GEAR* | | | - | | | - | 69,071 | 254,000 | 323,071 | 323,071 | None |
| CS.12-CS.21 | System Improvement and Upgrade Projects | - | | - | | | - | 1,145,217 | 312,832 | 1,458,049 | 1,458,049 | See Section 2.4 of Agreement |
| | **Total "A. Continuity of Service"** | - | - | - | - | - | - | **1,675,744** | **6,133,680** | **7,809,424** | **7,809,424** | |
| | | | | | | | | | | | | |
| | **B. CUSTOMER EXPERIENCE** | | | | | | | | | | | |
| CE.1 | Customer Account Portal | | | - | | | - | 115,065 | 57,000 | 172,065 | 172,065 | See Section 2.4 of Agreement |
| CE.2 | Message Types and Targets | | | - | | | - | 111,718 | - | 111,718 | 111,718 | See Section 2.4 of Agreement |
| CE.3 | Station Playback Improvements | | | - | | | - | 123,547 | 20,000 | 143,547 | 143,547 | See Section 2.4 of Agreement |
| CE.4 | Portal Dashboard and Audit | | | - | | | - | 147,623 | - | 147,623 | 147,623 | See Section 2.4 of Agreement |
| CE.5 | Improved Metadata Distribution/Automated Metadata Management | | | - | | | - | 185,293 | 630 | 185,923 | 185,923 | See Section 2.4 of Agreement |
| CE.6 | Content Workflow and Improved Content Search | | | - | | | - | 387,452 | - | 387,452 | 387,452 | See Section 2.4 of Agreement |
| | **Total "B. Customer Experience"** | - | - | - | - | - | - | **1,070,698** | **77,630** | **1,148,328** | **1,148,328** | |
| | | | | | | | | | | | | |
| | **C. CONVERGENCE** | | | | | | | | | | | |
| C.3 | Collaboration with PBS - demonstration of co-located station project | | | - | | | - | 83,748 | 89,020 | 172,768 | 172,768 | None |
| | | | | | | | | | | | | |
| CM | **D. COORDINATION AND MANAGEMENT** | | | - | | | - | 1,638,860 | 9,720 | 1,648,580 | 1,648,580 | See Section 2.4 of Agreement |
| | | | | | | | | | | | | |
| TW | **E. TEMPORARY WORKERS** | | | - | | | - | 1,087,655 | - | 1,087,655 | 1,087,655 | See Section 2.4 of Agreement |
| | **Grand Total** | $ - | $ - | $ - | $ - | $ - | $ - | $ 5,556,705 | $ 6,310,050 | $ 11,866,755 | $ 11,866,755 | |

*tie to GEAR worksheet

**ATTACHMENT B-1**

**GEAR WORKSHEET**

**Public Radio Satellite System Interconnection Funding FY23-FY24**

**(CPB ID No. 35393-ISS)**

National Public Radio, Inc.
GEAR worksheet – Contract Period
10/1/22-9/30/24

| # | Station name | Priority Group | Urgency | Age of antenna at time of replacement | Vendor Quote Information | | | Reporting Period Actuals (10/1/22-xx/xx/xx) | | | | Cumulative Actuals (10/1/22-xx/xx/xx) | | | | Notes |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | Hardware/ Equipment Cost | Professional Services Cost | Total | Hardware/ Equipment Cost | Professional Services Cost | NPR Compensation | Total Period Actuals | Hardware/ Equipment Cost | Professional Services Cost | NPR Compensation | Total Cumulative Actuals | |
| 1 | NPR GEAR Project Oversight | N/A | N/A | N/A | $ - | $ - | $ - | | | | $ - | | | | $ - | |
| 2 | KCUK | | | | | | - | | | | - | | | | - | |
| 3 | KUYI | | | | | | - | | | | - | | | | - | |
| 4 | | | | | | | - | | | | - | | | | - | |
| 5 | | | | | | | - | | | | - | | | | - | |
| 6 | | | | | | | - | | | | - | | | | - | |
| 7 | | | | | | | - | | | | - | | | | - | |
| 8 | | | | | | | - | | | | - | | | | - | |
| 9 | | | | | | | - | | | | - | | | | - | |
| 10 | | | | | | | - | | | | - | | | | - | |
| 11 | | | | | | | - | | | | - | | | | - | |
| 12 | | | | | | | - | | | | - | | | | - | |
| 13 | | | | | | | - | | | | - | | | | - | |
| 14 | | | | | | | - | | | | - | | | | - | |
| 15 | | | | | | | - | | | | - | | | | - | |
| 16 | | | | | | | - | | | | - | | | | - | |
| 17 | | | | | | | - | | | | - | | | | - | |
| 18 | | | | | | | - | | | | - | | | | - | |
| 19 | | | | | | | - | | | | - | | | | - | |
| 20 | | | | | | | - | | | | - | | | | - | |
| | Grand Total | | | | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | |

v3/7/23

**ATTACHMENT C**

**SCHEDULE OF DELIVERABLES AND DISBURSEMENTS**

**"Public Radio Satellite System Interconnection Funding FY23-FY24"**
**(CPB ID No. 35393-ISS)**

All deliverables must be submitted to CPB electronically unless otherwise specified below. If you do not have access to submit deliverables via the portal, contact your CPB Project Officer.

<u>CPB Project Officer</u>:    Lainie Tompkins, LTOMPKINS@CPB.ORG, 202-879-9687

<u>Disbursements</u>:        All payments are subject to the terms and conditions set forth in the Agreement. CPB funding under this Agreement will be disbursed to Grantee according to the schedule below, upon CPB's receipt and approval of Deliverables, as follows:

| Anticipated Payment Date | Disbursement Amount | Disbursement Number | Deliverable Due Date |
|---|---|---|---|
| Upon Execution | Reimbursement for costs incurred through 12/31/2022 up to $11,866,755 | 8421 | Upon Execution |

| Deliverable Name | Due Date | Deliverable Number | Description |
|---|---|---|---|
| Contract Execution – Execution Documents | Upon Execution | 27919 | If not already on file, Grantee must submit a completed Form W-9, along with a fully executed Agreement, |
| Financial – Interim | Upon Execution | 27920 | A cumulative financial report showing the costs incurred for the period **October 1, 2022 through December 31, 2022**, including any invoices required pursuant to Section 8 of the Agreement and the related GEAR Reporting sheet, |

| Anticipated Payment Date | Disbursement Amount | Disbursement Number | Deliverable Due Date |
|---|---|---|---|
| 4/1/2023 | $0 | 8429 | 3/9/2023 |

| Deliverable Name | Due Date | Deliverable Number | Description |
|---|---|---|---|
| Narrative - Interim | 3/9/2023 | 27936 | NPR Request to Fund a Consultant for the Investigation of the Future of Public Radio Content Distribution |

CPB ID. NO. 35393-ISS

| Anticipated Payment Date | Disbursement Amount | Disbursement Number | Deliverable Due Date |
|---|---|---|---|
| 6/15/2023 | Up to $11,866,755; less amounts previously paid | 8422 | 5/15/2023 |

| Deliverable Name | Due Date | Deliverable Number | Description |
|---|---|---|---|
| Financial - Interim | 5/15/2023 | 27922 | A cumulative financial report for the period October 1, 2022 through March 31, 2023; as well as a quarterly financial report for the period **January 1, 2023 through March 31, 2023**, including any invoices required by Section 8 of the Agreement and the related GEAR Reporting sheet. |
| Narrative - Interim | 5/15/2023 | 27921 | A Narrative Progress Report for activities during the period **October 1, 2022 through March 31, 2023**, comprised of the following sub-reports as described in the Workscope Addendum (Attachment A-1):<br>• Continuity of Service Report (Parts A and B)<br>• GEAR Report<br>• Satellite Report<br>• Customer Experience Report<br>• Collaboration Report<br>• Coordination and Management Report<br>• Budget Tracking Summary |

| Anticipated Payment Date | Disbursement Amount | Disbursement Number | Deliverable Due Date |
|---|---|---|---|
| 9/15/2023 | Up to $11,866,755; less amounts previously paid | 8423 | 8/15/2023 |

| Deliverable Name | Due Date | Deliverable Number | Description |
|---|---|---|---|
| Financial - Interim | 8/15/2023 | 27924 | A cumulative financial report for the period October 1, 2022 through June 39, 2023; as well as a quarterly financial report for the period **April 1, 2023 through June 30, 2023**, including any invoices required by Section 8 of the Agreement and the related GEAR Reporting sheet. |
| Narrative - Interim | 8/15/2023 | 27923 | A Narrative Progress Report for activities during the period **April 1, 2023 through June 30, 2023**, comprised of the following sub-reports as described in the Workscope Addendum (Attachment |

CPB ID. No. 35393-ISS

| | | | A-1): <br>• Continuity of Service Report (Parts A and B) <br>• GEAR Report <br>• Satellite Report <br>• Customer Experience Report <br>• Collaboration Report <br>• Coordination and Management Report <br>•   Budget Tracking Summary |
|---|---|---|---|

| Anticipated Payment Date | Disbursement Amount | Disbursement Number | Deliverable Due Date |
|---|---|---|---|
| 1/15/2024 | Up to $11,866,755; less amounts previously paid | 8424 | 11/30/2023 |

| Deliverable Name | Due Date | Deliverable Number | Description |
|---|---|---|---|
| Financial - Interim | 11/30/2023 | 27925 | A cumulative financial report for the period October 1, 2022 through September 30, 2023, as well as a quarterly report for the period **July 1, 2023 through September 30, 2023**, including any invoices required by Section 8 of the Agreement and the related GEAR Reporting sheet. |
| Financial - Other | 11/30/2023 | 28167 | A financial certification for the first year of the grant (**October 1, 2022 - September 30, 2023**) |
| Narrative - Interim | 11/30/2023 | 27926 | A Narrative Progress Report for activities during the period **July 1, 2023 through September 30, 2023**, comprised of the following sub-reports as described in the Workscope Addendum (Attachment A-1): <br>• Continuity of Service Report (Parts A and B) <br>• GEAR Report <br>• Satellite Report <br>• Customer Experience Report <br>• Collaboration Report <br>• Coordination and Management Report <br>•   Budget Tracking Summary |

| Anticipated Payment Date | Disbursement Amount | Disbursement Number | Deliverable Due Date |
|---|---|---|---|
| 3/15/2024 | Up to $11,866,755; less amounts previously paid | 8425 | 2/15/2024 |
| | | | |
| Deliverable Name | Due Date | Deliverable Number | Description |

CPB ID. No. 35393-ISS

| Financial - Interim | 2/15/2024 | 27927 | A cumulative financial report for the period October 1, 2022 through December 31, 2023, as well as a quarterly report for the period **October 1, 2023 through December 31, 2023**, including any invoices required by Section 8 of the Agreement and the related GEAR Reporting sheet. |
| Narrative - Interim | 2/15/2024 | 27928 | A Narrative Progress Report for activities during the period **October 1, 2023 through December 31, 2023**, comprised of the following sub-reports as described in the Workscope Addendum (Attachment A-1):<br>• Continuity of Service Report (Parts A and B)<br>• GEAR Report<br>• Satellite Report<br>• Customer Experience Report<br>• Collaboration Report<br>• Coordination and Management Report<br>•    Budget Tracking Summary |

| Anticipated Payment Date | Disbursement Amount | Disbursement Number | Deliverable Due Date |
|---|---|---|---|
| 5/15/2024 | $0 | 8430 | 4/30/2024 |

| Deliverable Name | Due Date | Deliverable Number | Description |
|---|---|---|---|
| Narrative - Interim | 4/30/2024 | 27937 | Draft Proposal for next phase of Interconnection funding |

| Anticipated Payment Date | Disbursement Amount | Disbursement Number | Deliverable Due Date |
|---|---|---|---|
| 6/15/2024 | Up to $11,866,755; less amounts previously paid | 8426 | 5/15/2024 |

| Deliverable Name | Due Date | Deliverable Number | Description |
|---|---|---|---|
| Financial - Interim | 5/15/2024 | 27929 | A cumulative financial report as well as for the period **January 1, 2024 through March 31, 2024**, including any invoices required by the Agreement and the related GEAR Reporting sheet. |

CPB ID. No. 35393-ISS

| Narrative - Interim | 5/15/2024 | 27930 | A Narrative Progress Report for activities during the period **January 1, 2024 through March 31, 2024**, comprised of the following sub-reports as described in the Workscope Addendum (Attachment A-1):<br>• Continuity of Service Report (Parts A and B)<br>• GEAR Report<br>• Satellite Report<br>• Customer Experience Report<br>• Collaboration Report<br>• Coordination and Management Report<br>   • Budget Tracking Summary |
| --- | --- | --- | --- |

| Anticipated Payment Date | Disbursement Amount | Disbursement Number | Deliverable Due Date |
| --- | --- | --- | --- |
| 7/15/2024 | $0 | 8431 | 6/30/2024 |

| Deliverable Name | Due Date | Deliverable Number | Description |
| --- | --- | --- | --- |
| Narrative - Final | 6/30/2024 | 27938 | Final Proposal for next phase of Interconnection funding |

| Anticipated Payment Date | Disbursement Amount | Disbursement Number | Deliverable Due Date |
| --- | --- | --- | --- |
| 9/15/2024 | Up to $11,866,755; less amounts previously paid | 8427 | 8/15/2024 |

| Deliverable Name | Due Date | Deliverable Number | Description |
| --- | --- | --- | --- |
| Financial - Interim | 8/15/2024 | 27931 | A cumulative financial report as well as for the period **April 1, 2024 through June 30, 2024**, including any invoices required by the Agreement and the related GEAR Reporting sheet. |
| Narrative - Interim | 8/15/2024 | 27932 | A Narrative Progress Report for activities during the period **April 1, 2024 through June 30, 2024**, comprised of the following sub-reports as described in the Workscope Addendum (Attachment A-1):<br>• Continuity of Service Report (Parts A and B)<br>• GEAR Report<br>• Satellite Report<br>• Customer Experience Report<br>• Collaboration Report<br>• Coordination and Management Report |

CPB ID. No. 35393-ISS

| | | | • Budget Tracking Summary |
|---|---|---|---|

| Anticipated Payment Date | Disbursement Amount | Disbursement Number | Deliverable Due Date |
|---|---|---|---|
| 1/15/2025 | Up to $11,866,755; less amounts previously paid | 8428 | 11/30/2024 |

| Deliverable Name | Due Date | Deliverable Number | Description |
|---|---|---|---|
| Financial - Final Certification | 11/30/2024 | 27933 | A signed Certificate of Final Financial Accounting |
| Financial - Interim | 11/30/2024 | 27934 | A cumulative financial report as well as for the period **July 1, 2024 through September 30, 2024**, including any invoices required by the Agreement and the related GEAR Reporting sheet. |
| Narrative - Interim | 11/30/2024 | 27935 | A Narrative Progress Report for activities during the period **July 1, 2024 through September 30, 2024**, comprised of the following sub-reports as described in the Workscope Addendum (Attachment A-1):<br>• Continuity of Service Report (Parts A and B)<br>• GEAR Report<br>• Satellite Report<br>• Customer Experience Report<br>• Collaboration Report<br>• Coordination and Management Report<br>• Budget Tracking Summary |

**ATTACHMENT D**

**SELECTION OF INDIRECT COSTS ACCOUNTING METHOD**

**GRANTEE:**            **National Public Radio**

**TITLE OF PROJECT:**      **"Public Radio Satellite System Interconnection
                     Funding FY23-FY24"**

                     **(CPB ID NO. 35393-ISS)**

I hereby certify that accounting method for indirect costs for the above Project, as reflected in the Budget in Attachment B of this Grant Agreement, is in conformity with one of the following methods (more fully outlined in the CPB Guidelines for Indirect Costs).

**GRANTEE – PLEASE CHECK ONE BOX BELOW**

◯   1. Method 1 (Variable Federal Rate)

◯   2. Method 2 (Fixed Federal Rate)

◯   3. Method 3 (Grantee-calculated CPB Rate)

◉   4. There are no indirect costs included in the Budget

Signature:   *Deborah A. Cowan*

Name:       DEBORAH COWAN

Title:       CFO & Treasurer

Date:       Mar 10, 2023

**ATTACHMENT E**

**CERTIFICATION OF FINAL FINANCIAL ACCOUNTING AND INDIRECT COSTS**

**GRANTEE:**               **National Public Radio**

**TITLE OF PROJECT:**      **"Public Radio Satellite System Interconnection
                          Funding FY23-FY24"**

                          **(CPB ID NO. 35393-ISS)**

I hereby certify that the attached final financial accounting for the above Project conforms to the Budget reflected in **Attachment B** of this Grant Agreement and has been, or can be, reconciled with the general ledger of our accounting system.

Signature:    _____

Name:         _____

Title:        _____

Date:         _____

# 35393-ISS - Public Radio Satellite System Interconnection Funding FY23-FY24

Final Audit Report                                          2023-03-10

| | |
|---|---|
| Created: | 2023-03-09 |
| By: | Donna Joe (djoe@cpb.org) |
| Status: | Signed |
| Transaction ID: | CBJCHBCAABAA4gEek_yBv8TwuSiL28ynjRvYreRpWaXH |

## "35393-ISS - Public Radio Satellite System Interconnection Funding FY23-FY24" History

🗎 Document created by Donna Joe (djoe@cpb.org)
2023-03-09 - 7:16:52 PM GMT- IP address: 68.66.136.192

📧 Document emailed to contracts@npr.org for signature
2023-03-09 - 7:18:01 PM GMT

🗎 Email viewed by contracts@npr.org
2023-03-09 - 7:40:35 PM GMT- IP address: 173.69.157.66

🗎 Document signing delegated to DEBORAH COWAN (dcowan@npr.org) by contracts@npr.org
2023-03-10 - 0:22:31 AM GMT- IP address: 173.69.157.66

📧 Document emailed to DEBORAH COWAN (dcowan@npr.org) for signature
2023-03-10 - 0:22:32 AM GMT

🗎 Email viewed by DEBORAH COWAN (dcowan@npr.org)
2023-03-10 - 11:40:45 AM GMT- IP address: 73.129.135.58

✍ Document e-signed by DEBORAH COWAN (dcowan@npr.org)
Signature Date: 2023-03-10 - 11:41:38 AM GMT - Time Source: server- IP address: 73.129.135.58

📧 Document emailed to William Tayman (wtayman@cpb.org) for signature
2023-03-10 - 11:41:39 AM GMT

🗎 Email viewed by William Tayman (wtayman@cpb.org)
2023-03-10 - 11:51:36 AM GMT- IP address: 152.39.182.234

✍ Document e-signed by William Tayman (wtayman@cpb.org)
Signature Date: 2023-03-10 - 2:03:23 PM GMT - Time Source: server- IP address: 73.154.191.9



Corporation for Public Broadcasting

Powered by
Adobe
Acrobat Sign

Document emailed to Patricia Harrison (pharrison@cpb.org) for signature
2023-03-10 - 2:03:26 PM GMT

Email viewed by Patricia Harrison (pharrison@cpb.org)
2023-03-10 - 2:04:18 PM GMT- IP address: 104.28.79.175

Document e-signed by Patricia Harrison (pharrison@cpb.org)
Signature Date: 2023-03-10 - 2:04:36 PM GMT - Time Source: server- IP address: 141.156.163.161

Agreement completed.
2023-03-10 - 2:04:36 PM GMT



Corporation for Public Broadcasting

Powered by
**Adobe Acrobat Sign**