# EXHIBIT 11

Page 1

1              IN THE UNITED STATES DISTRICT COURT
                 FOR THE DISTRICT OF COLUMBIA
2

3        _____
                                     :
4    NATIONAL PUBLIC RADIO,          :
     INC., et al.,                   :
5                                    :
              Plaintiffs,            :
6                                    :
         v.                          : Case No.
7                                    :  25-cv-1674 (RDM)
     DONALD J. TRUMP, et al.,        :
8                                    :
              Defendants.            :
9        _____:
10
11              Thursday, October 23, 2025
12
13           Video deposition of KATHLEEN MERRITT,
14   taken at the Law Offices of Gibson Dunn &
15   Crutcher, LLP, 1700 M Street, N.W.
16   Washington, DC, beginning at 9:12 a.m.,
17   EST, before Ryan K. Black, Registered
18   Professional Reporter, Certified Livenote
19   Reporter and Notary Public in and for the
20   District of Columbia.
21
22
23
24
25
26

Page 2

```
1    A P P E A R A N C E S:
2
     GIBSON DUNN & CRUTCHER LLP
3    BY: KATIE TOWNSEND, ESQ.
     333 South Grand Avenue
4    Los Angeles, California 90071
     213.229.7000
5    ktownsend@gibsondunn.com
6    GIBSON DUNN & CRUTCHER LLP
     BY: ERIC BROOKS, ESQ.
7    1700 M Street NW
     Washington, DC 20036
8    202.955.8500
     ebrooks2@gibsondunn.com
9
     Representing - Plaintiffs National Public Radio,
10        Inc.
11   SAUL EWING LLP
     BY: JOSEPH D. LIPCHITZ, ESQ.
12   131 Dartmouth Street - Suite 501
     Boston, Massachusetts 02116
13   617.723.3300
     joseph.lipchitz@saul.com
14
     Representing - Defendant Corporation for Public
15        Broadcasting
16
17
18
19
20
21
22
23
     ALSO PRESENT:
24
     Robert Leonard - Legal Videographer
25   Elizabeth Allen - General Counsel - NPR
```

Page 3

```
1              I N D E X
2    TESTIMONY OF: KATHLEEN MERRITT        PAGE
3    By Mr. Townsend................................7
4    By Mr. Lipchitz..............................241
5
6              E X H I B I T S
7    EXHIBIT        DESCRIPTION        PAGE
8    Merritt 1    a document Bates-stamped
                  CPB_0063000 through 3016........26
9
     Merritt 2    a document titled Grant
10                Agreement......................27
11   Merritt 3    an email Bates-stamped CPB_0307145
                  through 7146, with an attachment
12                Bates-stamped CPB_0307147
                  through 7151...................34
13
     Merritt 4    a document Bates-stamped
14                CPB_0099839 through 9841........39
15   Merritt 5    email Bates-stamped CPB_0304825
                  through 4826 with an attachment
16                Bates-stamped CPB_0304827
                  through 4906...................48
17
     Merritt 6    email Bates-stamped CPB_0136267
18                with attachment Bates-stamped
                  CPB0136269 through 6277........53
19
     Merritt 7    a document Bates-stamped
20                CPB_0148527 through 8535........68
21   Merritt 8    a document Bates-stamped
                  CPB_0106552....................80
22
     Merritt 9    a document Bates-stamped
23                CPB_0106554....................93
24   Merritt 10   a document Bates-stamped
                  CPB_0229885...................106
25
```

Page 4

```
1              I N D E X (Cont'd)
2    EXHIBIT        DESCRIPTION        PAGE
3    Merritt 11   email Bates-stamped CPB_0110333,
                  with an attachment Bates-stamped
4                 CPB_0022946...................109
5    Merritt 12   document Bates-stamped
                  CPB_0110856...................117
6
7    Merritt 13   a document Bates-stamped
                  CPB_0212608 through 2613.......130
8    Merritt 14   a document Bates-stamped
                  CPB_0023245...................142
9
10   Merritt 15   a document Bates-stamped
                  CPB_0023266 through 3268.......145
11   Merritt 16   a document Bates-stamped
                  CPB_0110454 through 0455.......157
12
13   Merritt 17   email Bates-stamped CPB_0305846,
                  with attachment Bates-stamped
14                CPB_0305847 through 5848.......159
15   Merritt 18   email Bates-stamped CPB_0185383
                  through 5384, with attachment
16                Bates-stamped CPB_0185385
                  through 5386..................163
17   Merritt 19   a document Bates-stamped
                  CPB_0015943 through 5944.......169
18
19   Merritt 20   a document Bates-stamped
                  CPB_0001698 through 1700.......178
20   Merritt 21   a document Bates-stamped
                  CPB_0301307 through 1309.......184
21
22   Merritt 22   a document Bates-stamped
                  CPB_0110624 with attachment
23                Bates-stamped CPB_0110625
                  through 0632..................191
24   Merritt 23   a document Bates-stamped
                  CPB_0002562 through 2565.......199
25
```

Page 5

```
1              I N D E X (Cont'd)
2    EXHIBIT        DESCRIPTION        PAGE
3    Merritt 24   a document Bates-stamped
                  CPB_0066136 through 6139.......207
4
     Merritt 25   email Bates-stamped CPB_0066140
5                 through 6141, with attachment
                  Bates-stamped CPB_0066146
6                 through 6153..................217
7    Merritt 26   a document titled Defendant
                  Corporation for Public
8                 Broadcasting's Responses to
                  Plaintiff National Public
9                 Radio, Inc.'s First Set of
                  Interrogatories...............227
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

2 (Pages 2 - 5)

Page 6

1 THE VIDEOGRAPHER: We're going on the
2 record at 9:12 a.m. Eastern time. Today's date
3 is October 23rd, 2025. This is the -- this is
4 Media File Number 1 of the video deposition of
5 Kathy Merritt, taken by the plaintiff in the
6 matter of National Public Radio, Inc., et al.,
7 versus Donald J. Trump, et al., filed in the
8 United States District Court for the District of
9 Columbia, Case Number 25-cv-1674-RDM.
10 This deposition is taking place at
11 Gibson, Dunn & Crutcher, LLP in Washington, D.C.
12 My name is Robert Leonard. I'm the
13 video specialist. I represent Veritext. The
14 court reporter today is Ryan Black. He also
15 represents Veritext.
16 Will counsel please identify themselves
17 verbally and state who they represent, starting
18 with the taking attorney.
19 MS. TOWNSEND: Katie Townsend of Gibson
20 Dunn on behalf of National Public Radio. I'm
21 here with my colleague Eric Brooks of Gibson Dunn
22 and as well as Elizabeth Allen of National Public
23 Radio.
24 MR. LIPCHITZ: Joseph Lipchitz on behalf
25 of the Corporation for Public Broadcasting, from

Page 7

1 Saul Ewing, and also representing the witness
2 here, Kathy Merritt.
3 THE VIDEOGRAPHER: Will the court
4 reporter please swear in the witness?
5 * * *
6 Whereupon --
7 KATHLEEN ANNE MERRITT,
8 called to testify, having been first duly sworn
9 or affirmed, was examined and testified as
10 follows:
11 * * *
12 THE VIDEOGRAPHER: You may begin.
13 MS. TOWNSEND: Thanks.
14 EXAMINATION
15 BY MS. TOWNSEND:
16 Q. Good morning, Mrs. Merritt -- or
17 Ms. Merritt. We met out in the hallway?
18 A. Yes.
19 Q. I'm Katie Townsend, and I'm one of the
20 attorneys representing NPR in this litigation.
21 Can you state your full name for the
22 record, please?
23 A. Sure. Kathleen Anne Merritt.
24 Q. Have you ever been deposed before,
25 Ms. Merritt?

Page 8

1 A. No.
2 Q. Have you ever testified in any other
3 proceeding?
4 A. No.
5 Q. Okay. I'm gonna be asking you some
6 questions under oath. Do you understand what
7 that means?
8 A. Yes.
9 Q. And you're aware that the oath that was
10 just administered by the court reporter here is
11 the same oath that you would take if you were
12 sitting in a court of law?
13 A. Yes.
14 Q. Is there any reason you can think of why
15 you wouldn't be able to give accurate, complete
16 testimony today?
17 A. No.
18 Q. You don't have any medical condition
19 that affects your memory?
20 A. No.
21 Q. Are you taking any medications or any
22 substances that might impact your memory?
23 A. No.
24 Q. I want to start just by going over a few
25 ground rules for -- for the deposition. They're

Page 9

1 pretty straightforward.
2 The court reporter's taking down
3 everything that's said, so it's important that we
4 not talk over each other. So let's just try to
5 not speak at the same time, if we can.
6 It's also important that you give
7 audible answers, so sometimes you nod; you can
8 just say "yes" or "no." I'll try to remind you
9 if I -- if I see that you're not responding
10 audibly.
11 If you don't understand one of my
12 questions, please just ask me to clarify. I'd be
13 happy to do so.
14 There will be times when Mr. Lipchitz,
15 your attorney, objects to questions that I ask.
16 You can still answer that question unless
17 Mr. Lipchitz ad -- instructs you not to answer.
18 And I'm happy to take breaks. If you
19 need a break, just let me know. Otherwise, we'll
20 take breaks every hour/hour-and-a-half or so.
21 The only rule there is no breaks while a question
22 is -- is pending.
23 A. Okay.
24 Q. Do you understand --
25 A. Yes.

3 (Pages 6 - 9)

1  Q. -- all those rules?
2  A.  Yes.
3  Q.  Okay.  Did you meet with anyone to
4  prepare for today's deposition?
5      MR. LIPCHITZ:  So let me interject
6  just quickly on the issue of rules.  I may make
7  objections, so I would just ask you to pause for
8  a few seconds between her Q and your A so I can
9  lodge any objection that needs to be made.
10     THE WITNESS:  Okay.
11     MR. LIPCHITZ:  Thank you.  Sorry.
12 BY MS. TOWNSEND:
13 Q.  Did you meet with anyone to prepare for
14 today's deposition?
15 A.  I met with Joe.
16 Q.  Anyone else other than Joe
17 -- Mr. Lipchitz?
18 A.  No.  I've just been working with Joe on
19 this.
20 Q.  When did you meet with Joe?
21 A.  We've had multiple phone calls.  We
22 met in person last week -- maybe Tuesday.  I'm
23 trying to remember.  One -- one day last week I
24 came to his office and we met.  I -- I don't
25 recall what day it was.

1  Q.  Was anybody else present?
2  A.  Clayton Barsoum was there for part of
3  that meeting.
4  Q.  Okay.  How long did you meet in person
5  with Mr. Lipchitz?
6  A.  We started at about 9:30 and wrapped up
7  at 2.
8  Q.  Okay.  Did you review any documents
9  during that meeting?
10 A.  Yes.  I think we did.
11 Q.  Okay.  Did any of those documents
12 remind you of things that -- that you had -- had
13 previously forgotten?
14 A.  I'm not sure.  I've looked at a lot of
15 documents recently, so I'm not sure how to answer
16 that question.  It -- that may be the case, but I
17 can't recall.
18 Q.  Did you review any documents in
19 preparation for this deposition outside the
20 presence of your attorney?
21 A.  There were some that he e-mailed to me
22 that I reviewed.
23 Q.  What documents did you review in
24 preparation for this deposition?
25 A.  Emails.  Some board -- CPB board minutes

1  and resolutions.  I looked at some consultants'
2  reports.  Things of that nature.
3  Q.  Do you have any -- do you have copies of
4  any of those documents with you today?
5  A.  No.
6  Q.  Did you spe -- did you have any other
7  communications with anyone about your deposition
8  today?
9  A.  There were general conversations with
10 people at CPB as we talked about the course of
11 events of various people being deposed, documents
12 we were trying to provide; so that kind of
13 general conversation about just the lawsuit and
14 everything we had to do to respond to questions
15 and, you know, discovery.
16 Q.  Did you review any of your prior text
17 messages in preparation for this deposition?
18 A.  Yes.
19 Q.  Did you provide your cell phone or
20 copies of text messages to your counsel in
21 connection with this litigation?
22 A.  Yes.
23 Q.  When did you do that?
24 A.  Monday -- I think on Monday.
25 Q.  Okay.  And is that when you were asked

1  to provide those?
2  A.  I think that's right.
3  Q.  Okay.  Ms. Merritt, where did you go to
4  college?
5  A.  I went to the University of North
6  Carolina at Charlotte.
7  Q.  And what degree did you receive?
8  A.  English.
9  Q.  Did you go to graduate school?
10 A.  I did a graduate certificate program at
11 the University of Maryland in multimedia
12 journalism.
13 Q.  Multimedia journalism.
14     Do you have an engineering background?
15 A.  No.
16 Q.  Would you say you have a technical
17 background?
18     MR. LIPCHITZ:  Objection to form.
19 BY MS. TOWNSEND:
20 Q.  You can answer.
21 A.  Okay.  To some degree.
22 Q.  In what way do you have a technical
23 background?
24 A.  I've worked in public radio for more
25 than 40 years.  I've done everything from run a

Page 14

1  control board in a studio, to on-air production,
2  to development of podcasts. I've done field
3  recordings. So I have some technical expertise
4  about audio recording and production.
5      Q. All right. Do you think of yourself as
6  a journalist, primarily?
7      A. I think of myself as someone who has
8  had a well-rounded career in public media that
9  included 20 years of journalism, acting as a news
10 director at a couple of stations, and then as
11 head of content strategy for Public Radio
12 International. So journalism is definitely
13 a -- a big part of what I've done in public
14 radio.
15     Q. What's your current title?
16     A. Executive Vice President and Chief
17 Operating Officer at the Corporation for Public
18 Broadcasting.
19     Q. Okay. When did you become -- if I say
20 CO -- COO, you'll know I mean Chief Operating
21 Officer, right?
22     A. Yes.
23     Q. When did you become COO of the
24 Corporation for Public Broadcasting?
25     A. It was in April of this year, and I

Page 15

1  don't remember the exact date.
2      Q. Does April 11th sound right to you?
3      A. That's about right, I think.
4      Q. If I say "corporation" -- if I say
5  -- strike that.
6          If I say "CPB," you'll know I'm
7  referring to the Corporation for Public
8  Broadcasting, right?
9      A. Yes. Yes.
10     Q. Before becoming CO -- OO of CPB, what
11 was your job title at CPB?
12     A. For about two months, I was Chief of
13 System Strategies.
14     Q. Okay. You said for about two months.
15 Do you recall when you took on that role,
16 roughly?
17     A. It was either in January or February.
18     Q. Okay. Before becoming Chief of Systems
19 Strategies --
20     A. Strategies.
21     Q. -- at CPB, what was your title at CPB?
22     A. I was Senior Vice President of Radio
23 Journalism and System Strategies.
24     Q. How long were you in that role?
25     A. I think for about a year. I had the

Page 16

1  system strategies added, because I -- when I came
2  back to CPB in 2017 --
3      Q. Mm-hmm.
4      A. -- I was Senior Vice President of Radio
5  and Journalism.
6      Q. Okay.
7      A. And maybe a year, 18 months after that,
8  it was Radio Journalism and CSG services. And
9  "CSG" is Community Service Grants.
10         And then, again, I think about a year or
11 so ago, the whole System Strategies piece got
12 added. I kept getting changes in job title and
13 responsibilities along the way.
14     Q. How -- so let's start from -- from about
15 2020, --
16     A. Mm-hmm.
17     Q. -- which I think is when you took on
18 this sort of, initially, Senior Vice President of
19 Journalism, Radio and CSG role, --
20     A. Mm-hmm.
21     Q. -- does that sound right?
22     A. That's about right, I think.
23     Q. Starting in 2020, how would you describe
24 your, sort of, general job responsibilities?
25     A. I was responsible for radio and

Page 17

1  journalism grants and strategies concerning
2  public radio and journalism. On the journalism
3  front, I worked in both public radio and public
4  television grants.
5      Q. Mm-hmm.
6      A. And with CSG services, I was overseeing
7  our distribution of community service grants and
8  policies around CSG.
9      Q. Okay. Did your job responsibilities
10 change when System Strategies was tacked on to
11 your -- to your title?
12     A. Yes. Because it -- it added the System
13 Strategies group, which expanded what I was doing
14 to look more at our different grant programs,
15 like --
16     Q. Mm-hmm.
17     A. -- collaborative operations and
18 services. It then included television
19 interconnection, digital infrastructure,
20 because I had been working since 2017 with
21 radio interconnection and digital infrastructure
22 -- well, interconnection, not so much the digital
23 infrastructure piece.
24     Q. So television in -- infrastructure was
25 added to your portfolio when you be -- when you

5 (Pages 14 - 17)

1    -- when you took on the System Strategies role.
2    Is that fair to say?
3        A.  Yes.
4        Q.  Okay.  How did your responsibilities
5    change when you became Chief of Systems
6    Strategies?
7        A.  They changed in terms of interacting
8    more at the executive team level at CPB.  I was
9    brought into more meetings with our CEO, our COO
10    at that time, our chief financial officer, our
11    general counsel.
12        So, it was an elevation to more company
13    leadership at CPB.
14        Q.  And did your responsibilities change
15    when you transitioned in April of 2025 to this
16    COO role?
17        A.  Yes.  I was then overseeing more of CPB.
18    That then included television programming.  It
19    did give me a seat on the executive team itself,
20    and I think just more of a general responsibility
21    for the management of -- of CPB.
22        Q.  Who do you report to currently?
23        A.  Our CEO, Pat Harrison.
24        Q.  Prior to becoming COO, did you report to
25    Ms. Harrison or someone else?

1        A.  I reported to the then COO -- COO
2    Michael Levy.
3        Q.  Okay.  And when you were chief -- and
4    that's when you were Chief of Systems Strategies,
5    correct?
6        A.  Correct.
7        Q.  Prior to that in your Senior Vice
8    President role -- I won't give you the long
9    title --
10        A.  Yeah.
11        Q.  -- did you report to Mr. Levy?
12        A.  I did.
13        Q.  Okay.  Prior to becoming CO -- well,
14    strike that.
15        As COO, have you attended meetings of
16    CPB's board?
17        A.  Yes.
18        Q.  Do you -- have you attended all meetings
19    of CPB's board since you became COO?
20        A.  I believe so.
21        Q.  Did you attend executive sessions of the
22    CPB board as COO?
23        A.  Yes.
24        Q.  As Chief of System Strategies, did you
25    attend CPB board meetings?

1        A.  Yes.
2        Q.  Did you attend all of them?
3        A.  I believe so.
4        Q.  And that would include executive
5    sessions, correct?
6        A.  There may have been a few executive
7    sessions I was not included in when I held that
8    title.
9        Q.  The title of Chief of System Strategies?
10        A.  Correct.
11        Q.  Okay.  Thank you.
12        You used the term "interconnection."
13    What is "interconnection"?
14        A.  Interconnection is the means by which
15    content from producers gets to stations.
16        Q.  And is it your understanding that
17    Congress appropriates specific funds to CPB to
18    support radio and television interconnection?
19        A.  Yes.  They appropriate funds for
20    interconnection and, now, digital infrastructure.
21        Q.  Can interconnection funds appropriated
22    by Congress be used for content?
23        A.  No.
24        Q.  What is the public television
25    interconnection system called?

1        A.  Well, they call it sIX.  It's the sixth
2    iteration of their interconnection system.
3        Q.  Six as in S-I-X, the number?
4        A.  X -- yeah.  It's s and then I-X.  It's
5    like a small s and then a capital IX.  I'm not
6    sure how it got to be that.
7        Q.  Is that because IX is sometimes used as
8    a shorthand for "interconnection"?
9        A.  Correct.
10        Q.  Who manages and operates sIX, the public
11    television interconnection system?
12        A.  PBS.
13        Q.  What is the public radio interconnection
14    system called?
15        A.  It's the Public Radio Satellite System
16    that provides interconnection currently.
17        Q.  What is the Public Radio Satellite
18    System Trust?
19        A.  It's a -- an organization -- well, I
20    don't know if you call it an organization, but
21    it's -- it's a body that actually holds the
22    satellite leases for public radio interconnection
23    and owns the equipment that provides
24    interconnection for radio.  And they also
25    hold some funds on behalf of the stations for

Page 22

1  interconnection for radio.
2      Q.  It's a trust, right?  That's your
3  understanding?
4      A.  It's a trust.
5      Q.  Who are the beneficiaries of that trust?
6      A.  The public radio stations, and I think,
7  through them, the American people.
8      Q.  Do you know what NPR Distribution is?
9      A.  It's a division of NPR.
10     Q.  Do you know what they do?
11     A.  They -- my understanding is they oversee
12 the distribution needs of NPR.
13     Q.  And that's all they do?  Is that your
14 understanding?
15     A.  They also -- it's where PRSS sits within
16 NPR.
17     Q.  NPR Distribution manages and operates
18 the PRSS currently, isn't that right?
19     A.  I believe that's correct.  I've always
20 had some confusion about where the lines are
21 drawn, honestly, between NPR Distribution and
22 PRSS.  There seems to be overlap.  But I --
23     They -- they manage PRSS, but then
24 there's also the D/I Committee which -- I don't
25 know if they manage; they set policy.  It's

Page 23

1  always felt a little blurred to me.
2      Q.  Well, we'll come back to that.
3      During your time at CPB, to your
4  knowledge, has CPB ever disbursed funds
5  appropriated by Congress for radio
6  interconnection purposes to anyone other
7  than NPR, or NPR Distribution?
8      A.  We've disbursed funds from the
9  interconnection digital infrastructure pool of
10 funds to NPR for the Grove Content Management
11 System and to NPR and PRSS for interconnection.
12     Q.  Well, my question was slightly
13 different.
14     To your knowledge, has -- during
15 -- strike that.
16     During your time at CPB --
17     A.  Mm-hmm.
18     Q.  -- has CPB ever distributed public radio
19 interconnection funds to anyone other than NPR or
20 NPR Distribution?
21     A.  Well, if we're leaving out PBS, because
22 we've certainly distributed, you know, funds out
23 that have pool of money to PBS for television
24 interconnection, but for radio interconnection,
25 just to NPR.

Page 24

1      Q.  What about consultants?  Has CPB used
2  public radio interconnection funds to hire
3  consultants?
4      A.  No.
5      Q.  Has CPB ever used public radio
6  interconnection funds to hire lawyers?
7      A.  I don't believe so.  I don't believe so.
8      Q.  Okay.  In your experience at CPB, prior
9  to disbursing funds to NPR Distribution for
10 public radio interconnection purposes, CPB would
11 enter into a grant agreement with NPR, right?
12     A.  Say that again, please.
13     Q.  Sure.  In your experience at CPB, before
14 disbursing public radio interconnection funds to
15 NPR, --
16     A.  Mm-hmm.
17     Q.  -- CPB would enter into a grant
18 agreement with NPR?
19     A.  Right.  We never discuss any funds
20 unless there is an agreement in place.
21     Q.  Do you typically participate in those
22 negotiations for interconnection grant
23 agreements?
24     A.  I have since 2017.
25     Q.  Can you describe, generally, what your

Page 25

1  role has been since 2017 in those grant agreement
2  negotiations?
3      A.  It's involved a number of things.  I
4  have been the primary -- well, maybe not primary.
5  I've been one of the main communicators with NPR
6  and PRSS as we negotiated grant agreements, and
7  I've also worked with consultants who have been
8  hired to analyze both PBS and NPR interconnection
9  systems.  I've communicated our interconnection
10 efforts to the CPB board.
11     So I've been involved in various ways in
12 working on interconnection.
13     Q.  In September of 2024, CPB signed an
14 agreement with NPR to extend a prior agreement
15 for interconnection funding through September
16 30th of this year.  Do you recall that?
17     A.  Yes.
18     Q.  Okay.  Did you participate in those
19 negotiations?
20     A.  Yes.
21     Q.  What -- what role did you play in the
22 negotiations of that extension agreement?
23     A.  I think pretty much what I just
24 described: you know, working with our team at CPB
25 to interact with people at NPR and PRSS to review

Page 26

1 their proposal, to analyze their proposal,
2 to work with our consultants in evaluating
3 it/reporting out to our board on it.
4     Q.  I'm gonna mark this exhibit as -- hand
5 it to the court reporter to mark as Merritt
6 Exhibit 1.  He will hand that to you.
7     (Merritt Exhibit No. 1, a document
8 Bates-stamped CPB_0063000 through 3016, was
9 introduced.)
10     MR. LIPCHITZ:  Thank you.
11     THE WITNESS:  Thank you.
12 BY MS. TOWNSEND:
13     Q.  Have you seen this document before,
14 Ms. Merritt?
15     A.  Yes, I have.
16     Q.  Is this the extension agreement that we
17 were just discussing?
18     A.  (Reviews document.)
19     Yes, I believe so.  This -- this is it.
20     Q.  Can you look at Page 4 of Exhibit A?  If
21 you look at the bottom there's a -- a Bates stamp
22 series of numbers that begins CPB and then ends
23 in 63003?
24     A.  Mm-hmm.
25     Q.  That's the page I'm on.

Page 27

1     A.  Mm-hmm.  Yes.
2     Q.  And this says "Extension period work
3 scope" at the top.  Do you see that?
4     A.  Yes.
5     Q.  Is this work scope something that
6 you would have discussed with folks at NPR
7 Distribution in connection with the negotiation
8 of this agreement?
9     A.  Yes.
10     Q.  Do you recall having discussions about
11 this work scope with anyone at NPR Distribution?
12     A.  I don't recall specific conversa
13 -- conversations, but I assume I was involved in
14 conversations with PRSS about what was going into
15 the work scope.
16     Q.  Let me show you -- we're going to mark
17 this one as Exhibit 2.
18     (Merritt Exhibit No. 2, a document
19 titled Grant Agreement, was introduced.)
20     THE WITNESS:  Thank you.
21     MR. LIPCHITZ:  Thank you.
22     MS. TOWNSEND:  We need to get less wide
23 tables.
24 BY MS. TOWNSEND:
25     Q.  Have you seen this document before,

Page 28

1 Ms. Merritt?  And take your time.  Let me know
2 when you've had a chance to look at it.
3     A.  (Reviews document.)
4     Yes, I'm familiar with this document.
5     Q.  Was -- Exhibit 1 that we just discussed,
6 is that an extension of this Grant Agreement
7 that's just been marked as Exhibit 2?
8     A.  Yes.
9     Q.  Did you have any role in negotiating the
10 agreement that's been marked as Exhibit 2?
11     A.  Yes.
12     Q.  Okay.  What was your role in negotiating
13 that agreement?
14     A.  Similar to what I said about the
15 extension agreement: interacting with NPR and
16 PRSS staff, working with our consultants on
17 evaluating their proposal, communicating with our
18 board, communicating internally at CPB about the
19 negotiations.
20     Q.  Do you recall a CPB board meeting in
21 February 2025 that was attended by PBS's CEO,
22 Paula Kerger, and NPR's CEO, Katherine Maher?
23     A.  I do.
24     Q.  You were present at that meeting, right?
25     A.  I was.

Page 29

1     Q.  Who invited Ms. Kerger and Ms. Maher to
2 attend that meeting?
3     A.  The board wanted to hear from both
4 organizations.  So I assume the invitation either
5 came from the board chair or from Pat Harrison,
6 our CEO, to have them attend the meeting.
7     Q.  Who is the board chair at CPB?
8     A.  Ruby Calvert.
9     Q.  Was there anyone else in attendance at
10 that February 2025 board meeting who was not with
11 CPB, NPR or PBS?
12     A.  I don't recall.  I don't think so, but
13 I -- I can't be positive.
14     Q.  During that meeting, did Ms. Kerger and
15 Ms. Maher discuss with the board their respective
16 organizations' visions, priorities and plans for
17 interconnection services for public television
18 and public radio?
19     A.  I would say that's what the board asked
20 them to do.  Our board was very interested in
21 hearing what the landscape was in public radio
22 and public television for interconnection and
23 content distribution, and they invited the CEOs
24 as the people they thought would best be able to
25 provide them the information they were looking

Page 30

1    for about the television and radio
2    interconnection systems.
3         Q.   Isn't it true that after hearing from
4    Ms. Maher and Ms. Kerger at that February meeting
5    that the board of CPB expressed a -- a need for
6    urgency in terms of getting out the next round of
7    interconnection funding?
8         A.   The board had been expressing the
9    need to have a pathway for interconnection for,
10   certainly, months and -- and years.  And at that
11   time, we were beginning to be in an environment
12   where public media funding was certainly -- it
13   -- it was becoming clear that there was a threat
14   to public media funding from -- from Congress.
15        And I think the board wanted to act
16   with urgency on how CPB was looking at all of its
17   funding that remained under our control, you
18   know, FY25 funding that we thought could be under
19   threat for being clawed back by the government.
20        Q.   And that "threat" is -- in your -- to
21   your mind what led to that sense of urgency on
22   the part of the board?
23        A.   I think that, plus we knew the radio and
24   television agreements were ending September 30th.
25   And we wanted to go ahead and, you know, again,

Page 31

1    try to have a roadmap for where interconnection
2    was going.  So they urged us to try to resolve
3    that as quickly as we -- we could.
4         Q.   And that's because continuity in terms
5    of interconnection services is really critical
6    for public radio and public television, right?
7         A.   The stations really require that kind of
8    continuity, yes.
9         Q.   Following that meeting in February of
10   2025, did NPR Distribution provide CPB with a
11   PRSS concept note outlining its plan for the next
12   three years of radio interconnection?
13        A.   Yes, I believe so.
14        Q.   Did you ask NPR Distribution to submit
15   that concept note?
16        A.   We had talked about the timing of that
17   for several months, because we -- we had just
18   a -- a one-year extension.
19        Q.   Mm-hmm.
20        A.   And it can take a while to negotiate an
21   agreement around interconnection funding.  So we
22   had been talking, really, since we had executed
23   the extension agreement about the timeline for
24   getting the next proposal into CPB, because we
25   always have to coordinate with our board

Page 32

1    meetings --
2         Q.   Mm-hmm.
3         A.   -- because the board has to approve any
4    funding that's not about content that's over a
5    million dollars.  So we always have to get on the
6    board agenda to make sure that we're getting
7    their approvals in a timely fashion.
8         So we had targeted, you know, spring of
9    2025 as the time to get proposals in for, you
10   know, looking at the next negotiation around
11   funding.
12        Q.   When you said, "We had been
13   talking," are you referring to conversations or
14   discussions that you were having with NPR
15   Distribution?
16        A.   I was having conversations, primarily,
17   with Badri Munipalla.
18        Q.   Who is Badri Munipalla?
19        A.   I'm trying to remember his exact title.
20   He's VP of Distribution, I think, at NPR.  But he
21   oversees PRSS.
22        Q.   How would you describe your working
23   relationship with Mr. Munipalla?
24        A.   I'd like to think it was a positive
25   relationship.

Page 33

1         Q.   Do you think of Mr. Munipalla as a -- a
2    thoughtful person?
3              MR. LIPCHITZ:  Objection to the form.
4              THE WITNESS:  Again, I'd like to think
5    that he's a thoughtful person.
6    BY MS. TOWNSEND:
7         Q.   Would you characterize Mr. Munipalla as
8    a -- a trusted partner?
9              MR. LIPCHITZ:  Objection to form.
10             THE WITNESS:  I think at that time I
11   thought of him as a trusted partner.
12   BY MS. TOWNSEND:
13        Q.   At the -- at what time period are you
14   referring to?
15        A.   When we were in discussions last fall --
16   the fall of 2024.
17        Q.   And you no longer view Mr. Munipalla as
18   someone who could be trusted, or you no longer
19   view him as a partner?
20        A.   I think at this point I just question
21   his priorities in terms of interconnection.
22        Q.   You question Mr. Munipalla's priorities?
23        A.   Yes.
24        Q.   Would you characterize him as someone
25   who brings transparency to his work on

9 (Pages 30 - 33)

Page 34

1    interconnection in the PRSS?
2        A.  I think he was more transparent than his
3    predecessor.  And working with him, we were able
4    to get more answers to the questions we had about
5    PRSS.  So he was transparent in that way, yes.
6        Q.  And that's because Mr. Munipalla has a
7    lot of technical expertise when it comes to
8    interconnection for public radio; is that right?
9        MR. LIPCHITZ:  Objection.
10       THE WITNESS:  I don't think he would be
11   overseeing PRSS if he didn't have a lot of
12   technical expertise.
13       MS. TOWNSEND:  Let's mark these
14   documents collectively as Exhibit 3.
15       (Merritt Exhibit No. 3, an email
16   Bates-stamped CPB_0307145 through 7146, with an
17   attachment Bates-stamped CPB_0307147 through
18   7151, was introduced.)
19       MS. TOWNSEND:  Yeah.  Here you go.
20       MR. LIPCHITZ:  Oh, sorry.
21   BY MS. TOWNSEND:
22       Q.  Let me know when you've had a chance to
23   look at that.
24       I will represent to you that this is an
25   email and attachments to that email.

Page 35

1        A.  Okay.
2        (Reviews document.)
3        Okay.
4        Q.  Is the attachment that I handed you
5    as -- as part of Exhibit 3 the PRSS Concept Note
6    that NPR submitted in March of 2025?
7        A.  Yes.  That's what it's called here in
8    the subject line.
9        Q.  Do you -- do you recall receiving this
10   from NPR Distribution?
11       A.  I -- I did.  I don't recall receiving
12   it, but obviously I did receive it.
13       Q.  Did you review this concept note when
14   -- when it came in?
15       A.  I'm sure I did.
16       Q.  Other than you, would someone else at
17   CPB also have reviewed this concept note when it
18   was received?
19       A.  Yes.
20       Q.  Who would that have been?
21       A.  It would have included Deborah Carr,
22   who is now our SVP of operations; Lainie
23   Tompkins, whose title I don't recall.  I think a
24   senior director, maybe, of System Strategies?
25   Maciej Ochman, another senior director title,

Page 36

1    I believe.
2        And we would have shared it with our
3    consultant that we were working with at the time,
4    which would have been folks from Deloitte.
5        Q.  Would that have been John Footen at
6    Deloitte?
7        A.  John Footen.  Also Nicole Gallagher.
8    And there may have been others at Deloitte who
9    saw it as well.
10       Q.  The cover email that attaches that PRSS
11   concept note is from Maryfran Tyler.
12       A.  Mm-hmm.
13       Q.  Do you know who Maryfran Tyler is?
14       A.  I do.
15       Q.  Who is that?
16       A.  Well, I see her title here.  Executive
17   Director of Strategy.  She works at PRSS.
18       Q.  Okay.  Ms. Tyler says in her cover
19   email, that, "The brief concept document attached
20   is a high-level view of everything we're planning
21   to do for the next three years and the associated
22   budget."
23       Is that a fair description of the
24   attachment?
25       A.  According to what she's saying here,

Page 37

1    yes.  I can't speak to everything they're
2    planning to do.  Just as represented here, yeah.
3        Q.  But that's how you understood this
4    attachment to be, a representation of everything
5    that -- that PRSS was planning to do, right?
6        A.  I took them at their word, that this was
7    what they were planning to do.
8        Q.  The cover email states in the next
9    sentence, the sentence that begins, "Nothing is
10   left out," that the concept note includes "Our
11   best guess of the PBS costs."  Do you see that?
12       A.  Mm-hmm.
13       Q.  Do you understand what "PBS costs"
14   refers to in this context?
15       A.  Yes.
16       Q.  What's that?
17       A.  We had been trying to get NPR and PBS to
18   collaborate, in some ways, for many years.  And
19   included in this proposal, they had agreed -- let
20   me double-check; I believe this is correct.  They
21   had agreed to work together on one satellite
22   agreement so they wouldn't each have separate
23   satellite agreements.
24       Q.  Is this -- is that collaboration between
25   PBS and -- and -- and NPR Distribution on inter

10 (Pages 34 - 37)

1  -- on interconnection what's sometimes called
2  "convergence"?
3      A.  It's one form of convergence, yes.
4      Q.  After you reviewed the PRSS concept note
5  that -- that -- that Ms. Tyler sent to you, did
6  you follow up with her or anyone else at NPR
7  Distribution with any questions?
8      A.  I don't recall specifically.  I imagine
9  we probably did.
10     Q.  But you don't recall any questions
11 -- specific questions that you posed about the
12 concept note to anyone at NPR Distribution, do
13 you?
14     A.  I don't recall specific questions, but
15 we may have had questions.  There might have been
16 questions from Debra or Lainie or Maciej, but I
17 -- I don't recall specific questions.
18     Q.  If anyone at CPB had questions about the
19 concept note, how would those be relayed to folks
20 at NPR Distribution?
21     A.  Through an email, most likely.
22     Q.  Would that email have come from you or
23 someone else?
24     A.  It probably came from Deborah or Lainie.
25 Some may have come from me.  I just -- I don't

1  recall specifically.
2      Q.  Okay.  You don't recall any
3  conversations with Mr. Munipalla or Mr. --
4  Ms. Tyler specifically about the concept note, do
5  you?
6      A.  I don't.
7      Q.  Okay.  After you reviewed this concept
8  note, did you ask Ms. Tyler to submit a full
9  proposal based on that concept note?
10     A.  I may very well have.  I mean, if you
11 have a email you want to share, I'd be happy to
12 look at it.
13     MS. TOWNSEND:  Sure.
14     MR. LIPCHITZ:  Not now, but in the next
15 10 minutes, if we could have a break?
16     MS. TOWNSEND:  Yeah.  Of course.
17     Let me make sure this is the right thing
18 before I give it to you.
19     Yep, mark this as Exhibit 4.
20     (Merritt Exhibit No. 4, a document
21 Bates-stamped CPB_0099839 through 9841, was
22 introduced.)
23     THE WITNESS:  Thank you.
24     THE REPORTER:  You're welcome.
25 BY MS. TOWNSEND:

1      Q.  Okay.  This is an email chain that
2  begins with the email on March 5th from Ms. Tyler
3  that -- that we were just looking at --
4      A.  Mm-hmm.
5      Q.  -- that was marked as Exhibit 3,
6  correct?
7      A.  Correct.
8      Q.  And do you see on Wednesday, March 12th,
9  you responded to Ms. Tyler, "Maryfran, we'd like
10 for you to please proceed with giving us a full
11 proposal based on this concept note."  Do you see
12 that?
13     A.  Yes.
14     Q.  Does this refresh your recollection that
15 you in -- you did, in fact, ask for a full
16 proposal?
17     A.  Yes.
18     Q.  You say in the email, "We'd like to see
19 a full proposal as soon as possible."  Why did
20 you want to see a full proposal as soon as
21 possible?
22     A.  As I said earlier, we were working on
23 a -- excuse me -- a timeline where we knew the
24 current grant would end on September 30th.  We
25 were trying to get a proposal in, be able to

1  review it, get it in front of our board.  And if
2  the board approved, negotiate, you know, a grant
3  award from -- from that point.  And we were in an
4  environment of pressure on the federal funding
5  for public media.
6      Q.  You see that Ms. Tyler responded to
7  you that -- it looks like within five minutes.
8  I was gonna say "that same day," but -- but quite
9  promptly, and told you she -- that they were
10 working on a proposal and a full financial plan
11 for three years and planned to have it to you
12 next week.  Do you see that?
13     A.  I do.
14     Q.  Do you recall receiving a full proposal
15 with a financial plan for three years from NPR
16 Distribution?
17     A.  We did.  I don't recall the exact date
18 that it came in, but we did.
19     MS. TOWNSEND:  Okay.  Your attorney has
20 asked for a break, so let's take a break.
21     THE WITNESS:  Okay.
22     MR. LIPCHITZ:  Thank you.
23     THE VIDEOGRAPHER:  We're going off the
24 record at 10:08 a.m. eastern time.
25     (Recess taken.)

11 (Pages 38 - 41)

Page 42

1      THE VIDEOGRAPHER:  We are back on the
2   record at 10:19 a.m.  This is Video File
3   Number 2.  You may begin.
4   BY MS. TOWNSEND:
5      Q.  Ms. Merritt, you mentioned earlier this
6   morning a D/I Committee.  What is the D/I
7   Committee?
8      A.  That's the Distribution/Interconnection
9   Committee of the NPR board.
10      Q.  Who sits on the D/I Committee?
11      A.  They have five members who are members
12   of the NPR board, and then four nonmembers of the
13   NPR board.
14      Q.  Is it your understanding that everyone
15   on the D/I Committee is affiliated with an NPR
16   member station?
17      A.  I think at this point all but one member
18   is affiliated with an NPR member station.
19      Q.  That's your understanding, that everyone
20   on the D/I Committee except one person is
21   affiliated with an NPR member station?
22      A.  Currently, I believe that's true.
23      Q.  Who is that person who is not affiliated
24   with an NPR member station that sits on the D/I
25   Committee?

Page 43

1      A.  Loretta Rucker -- I think she's still on
2   the committee -- represents a group of African
3   American stations, some of which may be NPR
4   members.  So maybe I'm incorrect in saying that
5   she doesn't have that affiliation.
6      Q.  But Ms. Rucker is who you were thinking
7   of?
8      A.  That's who I was thinking of.
9      Q.  You attended D/I Committee meetings,
10   correct, in your role at CPB?
11      A.  Yes.
12      Q.  How frequently did you attend D/I
13   Committee meetings?
14      A.  You know, it varied.  I was -- I think
15   they began holding them monthly, and I would go
16   to those meetings.  Some were quarterly meetings,
17   but then they would have other meetings.  I
18   -- I'm not totally sure of the -- the cadence of
19   those meetings, but I -- I would attend -- I
20   don't know if I attended every single one.  I
21   would often have schedule conflicts, but I -- I,
22   you know, would attend as needed or, you know, as
23   I was available.
24      Q.  What period of time did you begin
25   attending D/I Committee meetings in your role at

Page 44

1   CPB, roughly?
2      A.  I'm not totally certain.  I think over
3   the past three or four years I have.  I'm not
4   sure if I did prior to that.  I think Deborah
5   Carr attended those meetings for a while.
6      Q.  Would you present at D/I Committee
7   meetings?
8      A.  They have this odd construct that
9   there's a slot on the agenda for CPB questions
10   -- or I can't remember what it says -- where
11   we're allowed to just talk about, you know,
12   whatever sort of current interactions are taking
13   place between CPB and PRSS, and then we are
14   dismissed.  So I would sometimes just give an
15   update, and then it would be, "Okay.  We're going
16   on with our meeting.  You can leave now."
17      So there would be some open meetings,
18   but then you'd get into -- I don't know if it was
19   an executive session, but this weird, like, CPB
20   question time, and then we were dismissed.
21      Q.  Why do you think it's -- it -- it's
22   weird or an odd -- I think you used the phrase
23   "odd construct."  Why would -- why would that be
24   an odd construct to have a time during the D/I
25   Committee meeting for CPB to be present and

Page 45

1   discuss issues?
2      A.  It wasn't odd that the -- that we were
3   present.  What I found odd was the dismissal of
4   CPB from involvement in any other discussions,
5   because that -- it was -- there was a change
6   somewhere along the way with how those meetings
7   were constructed.  And this kind of question time
8   started, I don't know, maybe two years ago.  And
9   it just -- it's very awkward.  You know, we're
10   -- we're there.  We -- I might say a few things,
11   maybe there's a question or two, and then it's,
12   like, "Okay, we're done with you."
13      It's -- it's just odd to me.  Feels odd
14   to me.
15      Q.  I see.  So you -- you think it's odd
16   that CPB wasn't participating in the entirety of
17   the D/I Committee meetings?  Is that fair to say?
18      A.  I think it's odd that given the ongoing
19   kind of interaction that we have, that it didn't
20   feel very, sort of, I don't know, collaborative,
21   I guess.
22      Q.  It didn't feel collaborative vis-à-vis
23   the D/I Committee and CPB?  Is that what you
24   mean?
25      A.  Vis-à-vis the D/I Committee and CPB,

12 (Pages 42 - 45)

1    yes.
2        Q.  Did you attend a D/I Committee meeting
3    on March 20th, 2025?
4        A.  I may have.  I don't recall
5    specifically.
6        Q.  Do you recall attending a D/I Committee
7    meeting in -- sometime in late March of 2025?
8        A.  I may have attended a meeting then.
9        Q.  Do you recall attending a meeting of the
10   D/I Committee sometime in March of 2025 where you
11   informed them that you were expecting a -- a
12   formal proposal from NPR for a three-year
13   extension of the current Public Radio Satellite
14   System funding agreement?
15       A.  I may have.  I -- I don't recall that
16   meeting specifically, but I may have, yes.
17       Q.  Do you recall a meeting where you
18   reported to the D/I Committee that CPB was
19   expecting a formal proposal for three years of
20   interconnection funding from NPR?
21       A.  Again, I don't recall that,
22   specifically, but it may very well have been the
23   case.
24       Q.  So if there are other records showing
25   that that was the discussion you had, you have no

1    reason to doubt that those are accurate?
2        A.  Correct.
3        Q.  Did you tell attendees at that D/I
4    Committee meeting that CPB funds could be
5    affected by a potential executive order?
6        A.  Again, I don't recall the specifics of
7    that meeting, but that could be the case, yes,
8    because we were in an environment where, in late
9    March, there was a lot happening.
10       Q.  So you don't recall it, but it could
11   have -- it could have been the case?
12       A.  Yes.
13       Q.  Did you express at a D/I Committee in
14   March -- strike that.
15           Did you state at a D/I Committee meeting
16   in March of 2025 that CPB management wanted to
17   secure board approval for a proposed PRSS funding
18   extension to April -- to NPR in April of this
19   year?
20       A.  Again, since I don't recall the
21   specifics of the meeting, that could have been
22   the case.  But I don't recall specifically saying
23   that.  I may have.
24       Q.  Okay.  NPR did, in fact, submit a
25   proposal for FY2026 through FY2028 funding to

1    support the Public Radio Interconnection System
2    in late March of 2025, correct?
3        MR. LIPCHITZ:  Objection.  Asked and
4    answered.
5    BY MS. TOWNSEND:
6        Q.  You can answer.
7        A.  Yes.
8        Q.  Do you recall when you received that?
9        A.  I don't know the exact date, but I'm
10   assuming it was after March 12th.
11       Q.  Okay.  Why don't we mark this as
12   Exhibit 5?
13           (Merritt Exhibit No. 5, email
14   Bates-stamped CPB_0304825 through 4826 with an
15   attachment Bates-stamped CPB_0304827 through
16   4906, was introduced.)
17       THE WITNESS:  Thank you.
18       THE REPORTER:  You're welcome.
19   BY MS. TOWNSEND:
20       Q.  This is a -- I'll represent to you, a
21   cover email with an attachment.
22       A.  Okay.
23       Q.  Have you seen this document before?
24       A.  Yes.
25       Q.  Is the attachment the FY2026/FY2028

1    proposal that NPR made for PRSS interconnection
2    funding that we just discussed?
3        A.  It appears to be, yes.
4        Q.  Does this refresh your recollection that
5    you received this on March 21st, 2025?
6        A.  Yes.
7        Q.  The first page of Exhibit 5 is a cover
8    email from Maryfran Tyler to you.  If you look at
9    the last paragraph that begins, "Please note," --
10       A.  Okay.
11       Q.  -- Ms. Tyler refers to PBS satellite
12   insurance.  Do you see that?
13       A.  Yes.
14       Q.  Why would costs for PBS satellite
15   distribution be included in this -- in this
16   proposal?  Is that what we talked about earlier,
17   the step towards convergence?
18       A.  Yes.  This was collaboration on having a
19   single satellite agreement.
20       Q.  If you look at the next paragraph -- I
21   think it's on the next page in Ms. Tyler's email
22   -- she says, "We are aware of your 45-day
23   timeline to commit funds."  Do you see that?
24       A.  I do.
25       Q.  What "45-day timeline" is she referring

1    to?

2        A.   I'm not certain.  We must have given

3    them a deadline or talked about a timeline.  I

4    don't recall exactly what the 45 days would have

5    been, unless we were, again, trying to get it

6    -- looking at that September 30 end date --

7        Q.   Mm-hmm.

8        A.   -- for the agreement, perhaps looking at

9    board meeting schedules.  I don't recall what

10    -- what the 45-day timeline was leading to -- you

11    know, what the -- what the timing was exactly.

12        Q.   So sitting here today, you're not sure

13    what the impetus was for -- for 45 days being the

14    timeline to commit funds.  Is that fair to say?

15        A.   We were trying to move things quickly,

16    but I don't recall the exact 45 days.  You know,

17    again, this was -- this was March 21st.  We were

18    in this environment where DOGE was invading

19    different organizations.  We saw that especially

20    with the U.S. Institute of Peace.  That was very

21    worrisome for CPB because it was a similar

22    organization to CPB -- not a government agency, a

23    private organization, and yet, it was taken over

24    by DOGE.

25           This was shortly before I think

1    the -- the hearing in front of the House DOGE

2    Committee.  So we were, in that environment,

3    looking to -- to work quickly to get our funds,

4    you know, committed to across the board, --

5        Q.   Mm-hmm.

6        A.   -- not just with interconnection, but

7    with all of our -- our funding at that point.

8        Q.   Did you review the proposal for PRSS

9    interconnection funding for fiscal year 2026

10    through fiscal year 2028 when it was received

11    from Ms. Tyler?

12        A.   Yes, I would have reviewed it.

13        Q.   Who else at CPB would have reviewed it?

14        A.   The same people I mentioned previously:

15    Deborah Carr, Lainie Tompkins, Maciej Ochman, our

16    consultants at Deloitte.

17        Q.   After you received this proposal, did

18    you provide anyone at NPR Distribution any

19    feedback on it?

20        A.   I would assume we had at least some

21    preliminary feedback on the proposal that we

22    provided to NPR.  I don't recall specific

23    feedback or, you know, questions we might have

24    had on it.

25        Q.   Would that feedback have been provided

1    via email?

2        A.   Via email or through conversation with

3    Badri.

4        Q.   Sitting here today, do you recall any

5    conversation you had with Badri Munipalla after

6    this proposal was submitted in -- on March 21st,

7    2025, about the proposal?

8        A.   I don't specifically recall any

9    conversations, but there may have been

10    conversations about it.

11        Q.   But sitting here today, you don't recall

12    any specific feedback you gave Mr. Munipalla

13    after March 21st, 2025, on this proposal, do you?

14        A.   I may very well have had questions.  I

15    don't recall specific questions that I asked him.

16        Q.   In late March 2025, you and other

17    members of CPB's management recommended to the

18    board that they vote to authorize CPB to enter

19    into negotiations with both PBS and NPR for

20    three-year extensions to their respective

21    interconnection agreements; is that right?

22        A.   Say it again.  Sorry.

23        Q.   Sure.  In late March of 2025, you and

24    other members of CPB's management recommended

25    to the board that they vote to authorize CPB

1    management to negotiate three-year extensions

2    with both PBS and NPR to their respective

3    interconnection agreements; is that correct?

4        A.   Yes.  There's a memo that we sent to the

5    board that reviewed both the PBS proposal and the

6    NPR proposal, and we said, "This is pretty much

7    what we expected to get from NPR and PBS," and we

8    requested that the board give us the authority to

9    negotiate with them.

10        MS. TOWNSEND:  Okay.  We're going to

11    mark this as Exhibit 6, and I'll hand it to you

12    collectively.

13        THE WITNESS:  Mm-hmm.

14        (Merritt Exhibit No. 6, email

15    Bates-stamped CPB_0136267 with attachment

16    Bates-stamped CPB0136269 through 6277, was

17    introduced.)

18        MR. LIPCHITZ:  Thanks.

19    BY MS. TOWNSEND:

20        Q.   I will represent to you what was

21    just marked as Exhibit 6 is a email with an

22    attachment.

23        A.   Okay.

24        Q.   Let me know when you've had a chance to

25    take a look at that.

14 (Pages 50 - 53)

Page 54

1    A.  (Reviews document.)
2       Okay.
3       Q.  Is the attachment, Ms. Merritt, that I
4  handed you, the memo that you were just referring
5  to in your testimony?
6       A.  Yes.
7       Q.  Can we take a look first at the cover
8  email that's part of Exhibit 6?  That is an email
9  dated March 26th, 2025, from Teresa Safon to
10  Katherine Donohue.  Do you see that?
11      A.  Yes.
12      Q.  It says, "For board book."  Do you know
13  what a board book is?
14      A.  Yes.
15      Q.  What is a board book?
16      A.  That's the material we provide to our
17  board prior to a board meeting.
18      Q.  And the first email in this chain which
19  was sent from Deborah Carr to Ms. Safon and
20  Michael Levy at 11:06 a.m. on March 26th, that
21  copies you, Deborah Carr and Beth Walsh.  Do you
22  see that?
23      A.  Yes.
24      Q.  Who's Beth Walsh?
25      A.  Vice President of System Strategies.

Page 55

1       Q.  Does she report to you?
2       A.  She does now, yes.
3       Q.  At the time of this email, she reported
4  to you?
5       A.  Yes, I guess she must -- she did.
6       Q.  And what was Deborah Carr's position at
7  the time of this email?
8       A.  I'm -- I'm not sure if she had been
9  promoted to Senior Vice President yet.  She may
10  have been Vice President of Operations.
11      Q.  Was Michael Levy COO at this point?
12      A.  Yes.
13      Q.  And who is Ms. Teresa Safon?  What is
14  her role?
15      A.  Teresa Safon is -- was our Chief of
16  Staff.
17      Q.  The memo that's attached to this email,
18  did you draft it?
19      A.  I may have.  As you can see, it's from
20  three of us -- from Michael and Deborah and me.
21  And I don't recall who drafted what elements of
22  it.  Deborah may have done the first draft.  I
23  may have come in after her, and then Michael may
24  have done a final review and edit on it.  But I
25  don't recall specifically, or we -- we may have

Page 56

1  broken it up into -- to parts.
2       Q.  Before this was submitted to the board,
3  had you reviewed the entirety of the memo?
4       A.  Yes.
5       Q.  And -- and you think it's possible you
6  drafted portions of the memo?
7       A.  Yes.
8       Q.  Is it fair to say that you would have
9  edited portions of the memo that you did not
10  draft if you thought there was something
11  incorrect in the memo?
12      A.  I think I would have reviewed the memo
13  before it became final.
14      Q.  Would you have proposed revisions to
15  the memo, or made revisions to the memo, if you
16  thought there was something incorrect or missing?
17      A.  Yes.
18      Q.  Did Pat Harrison review this memo before
19  it was provided to the board?
20         MR. LIPCHITZ:  Objection.
21         THE WITNESS:  I don't know.
22  BY MS. TOWNSEND:
23      Q.  Did you talk to Pat Harrison about any
24  aspect of the recommendation being made to the
25  board before this memo was submitted?

Page 57

1       A.  I'm sure we would have had discussions
2  about what we were presenting to the board.
3       Q.  Did Ms. Harrison provide you with any
4  comments or feedback on the contents of the memo
5  itself?
6       A.  Not that I recall.  She may have
7  provided feedback to -- to Michael Levy, but I
8  don't know.
9       Q.  Not to you directly?
10      A.  I -- I don't recall her doing that.
11      Q.  This memo indicates that you made the
12  recommendation to the board that it authorize
13  CPB to enter into negotiations with PBS and
14  NPR because both organizations had presented
15  proposals that aligned with your expectations; is
16  that right?
17      A.  Yes.  And I -- I do remember writing
18  that sentence, because it's "aligned with our
19  expectations" really meaning that it was kind of
20  business as usual that we had, the previous fall,
21  spent a lot of time talking with PBS and NPR
22  about ways they could collaborate.
23         Michael Levy held a -- a series of
24  meetings between PBS, NPR, I believe some
25  representatives of stations, or maybe it was

Veritext Legal Solutions
215-241-1000 ~ 610-434-8588 ~ 302-571-0510 ~ 202-803-8830

Page 58

1    with representatives of their respective
2    interconnection committees, where we talked about
3    the need for change, as we had been talking about
4    the need for change with NPR, especially, for
5    years.
6        Q.   Are the meetings you're referring to the
7    so-called Group of Champions meetings?  Have you
8    ever heard that phrase, "Group of Champions"?
9        A.   I don't recall that.  But we -- I mean,
10   CPB has had multiple consultants who have
11   analyzed interconnection who have expressed a lot
12   of concern about NPR and their management and
13   execution of interconnection.
14       And we had really hoped, and -- and our
15   board had directed us, to make a concerted effort
16   to talk to PBS and NPR about a future that could
17   involve one interconnection system, a single
18   entity that could really oversee all of the
19   station needs for content distribution for
20   interconnection.  And we got a lot of pushback
21   from PBS, from NPR on doing that; on, you know,
22   trying to advance interconnection into a digital
23   world, to advance to terrestrial distribution, to
24   be more responsive to station needs.
25       And we had been talking about this,

Page 59

1    literally, for years.  And these meetings just
2    proved that both PBS and NPR were just not -- not
3    willing to -- to do anything that would really
4    advance interconnection into a different era.
5        And so when I sat on this, I remember
6    picking the wording on this, "aligned with our
7    expectations," because I didn't feel like I could
8    say in a memo, "Proposals that, you know, are
9    somewhat disappointing because they just couldn't
10   get to the point of really envisioning a
11   different future together."
12       And, so, yeah, "aligned with our
13   expectations."  And their effort to have a single
14   satellite agreement was the only thing they could
15   come up with to actually show that they were
16   willing to change the conversation around
17   interconnection.
18       Q.   And you're -- when you say "come
19   together," you're talking about PBS and NPR
20   coming together, and, again, this goes back to
21   that convergence concept of television and radio
22   interconnection being combined; is that right?
23       A.   That's part of it, because convergence
24   is also the broadcast in digital, which PBS
25   has provided for some time to their stations.

Page 60

1    They've really become a resource for stations for
2    streaming, for meeting station needs in ways that
3    are relevant to content distribution today.
4    Whereas, on the radio side, you have PRSS dealing
5    with broadcast content distribution --
6        Q.   Mm-hmm.
7        A.   -- interconnection, but PRSS doesn't do
8    anything with digital distribution for stations.
9        If you have a podcast, PRSS is not part
10   of the solution to distribution for con -- for
11   podcasts.  And for --
12       Q.   PRSS does terrestrial distribution,
13   doesn't it?
14       A.   Sure.  They do terrestrial
15   distribution, --
16       Q.   Right.
17       A.   -- but that does not mean that they're
18   helping stations with their own --
19       Q.   With podcasts --
20       A.   -- digital distribution of content.
21   They're only focused on broadcast distribution of
22   content.
23       So, convergence, for us at CPB, was also
24   bringing together the digital and the broadcast
25   distribution to meet the needs of public radio

Page 61

1    stations because they -- those needs were not
2    being met.
3        Q.   Did the proposal that you recommended to
4    the board in March 2025 -- strike that.
5        Did the proposal that NPR made that you
6    recommended the board approve in March 2025
7    include a proposal for terrestrial distribution?
8        A.   I'd have to go back and look.  I know
9    they were starting to --
10       Q.   Well, why don't you --
11       A.   -- move in that direction.
12       Q.   Why don't you stick with the exhibit
13   that -- that was in front of you, the memo that
14   you helped prepare?
15       A.   Well, because you asked me a question
16   about the proposal.  So, I'm sorry, I'm trying to
17   keep up with where you are.
18       Q.   Oh, no, keep going.
19       Look at Page 5 if the Bates stamp at the
20   bottom is CPB_ --
21       A.   Yeah.  Okay.
22       Q.   -- 0136273.
23       A.   Okay.
24       Q.   This portion of the memo is describing
25   the NPR/PRSS extension request, right?

16 (Pages 58 - 61)

Page 62

1     A.  Mm-hmm.
2     Q.  And it has a heading entitled
3  Terrestrial Distribution, right?
4     A.  Yes.  Mm-hmm.
5     Q.  So does this refresh your recollection
6  that NPR Distribution's proposal included a
7  proposal for terrestrial distribution as part of
8  their interconnection plan?
9     A.  I -- I see that.  But I also don't want
10  to conflate that with digital distribution.
11     Q.  I understand.  I understand.
12        In March of 2025, it was your view
13  that the proposals submitted by PBS and NPR
14  would ensure continuity of service as well as
15  future-facing strategies that would allow PBS
16  and NPR to respond to the changing needs of
17  producers, stations and audiences amidst an
18  evolving array of technologies; is that right?
19     A.  Could you point me to where it says
20  that?
21     Q.  Sure.  It's at the bottom of Bates
22  stamped CPB_0136275.
23     A.  75.  So, say again.
24     Q.  That last paragraph on Page
25  CPB_0136275 --

Page 63

1     A.  Mm-hmm.
2     Q.  -- that begins, "CPB is assessing each
3  line item in the areas of work above."  Do you
4  see that?
5     A.  Okay.  I do.
6     Q.  Isn't it true that it was your view in
7  March of 2025 that the two proposals that you
8  were recommending the board approve -- one from
9  PBS, one from NPR -- ensure continuity of service
10  as well as future-facing strategies that would allow
11  PBS and NPR to respond to the changing needs of
12  producers, stations and audiences amidst an
13  evolving array of technologies?
14     A.  That's what it states, yes.
15     Q.  And that was your view in March of 2025,
16  was it not?
17     A.  Yes.
18     Q.  In making this recommendation to the
19  board, isn't it true that you and CPB management
20  raised questions with respect to two requests
21  that were included in PBS's proposal?
22     A.  I see that here in the following
23  paragraph -- two paragraphs.
24     Q.  Do you recall these two concerns that
25  you and CPB management had about PBS's proposal?

Page 64

1     A.  Yes.  These were questions we raised.
2     Q.  This memo doesn't include any questions
3  or concerns with respect to NPR's proposal, does
4  it?
5     A.  I'd have to go back and read the whole
6  thing.
7     Q.  Well, do you recall flagging for the
8  board any specific concerns about NPR's proposal
9  when you presented this memo?
10     A.  (Reviews document.)
11        I know we had conversations with the
12  board at one point about -- or it may have been
13  -- we had an interconnection committee of the CPB
14  board, and we may have talked about the -- the
15  Edge device and whether that was really going to
16  be the solution that PRSS thought it might be.
17        We also talked at the -- and I don't
18  recall specific dates, but the board has always
19  expressed concerns about what they've seen in
20  consultant reports about PRSS and NPR; the
21  ongoing questions about it being too expensive
22  for some stations -- well, the cost being high
23  for small stations; just the whole thing
24  being too expensive, too reliant on satellite
25  distribution.  Just a -- a lack of transparency

Page 65

1  in terms of the -- the budgeting, the equipment;
2  just things that kept surfacing over and over in
3  the consultants' reports.
4     Q.  Those concerns --
5     A.  -- that didn't surface --
6     Q.  Excuse me.  Go ahead.
7     A.  Yeah.  All that wasn't surfaced here,
8  but that certainly is the backdrop for any
9  conversation we have about PRSS, because the
10  -- the board is very aware of what the consultant
11  reports have stated over years.
12        And, again, in the fall of 2024, the
13  board had urged us to have these conversations
14  with NPR, PRSS about, you know, going to a -- a
15  single entity for interconnection.
16        So it's not all reflected in this memo,
17  but that was the context that we were operating
18  in.
19     Q.  All of these -- this context certainly
20  predates March of 2025, right?
21     A.  Well, context doesn't stop at a certain
22  date.
23     Q.  Fair enough.
24        None of that is included in this memo
25  where you recommend to the board that it should

17 (Pages 62 - 65)

Page 66

1  authorize CPB management to negotiate a
2  three-year extension with NPR for
3  interconnection, correct?
4      A.  It -- it is not in this memo.
5      Q.  Okay.  Can you turn to the page
6  -- Bates-stamped page on this memo CPB_0136275?
7  It has a number 7 at the top.
8      A.  Mm-hmm.
9      Q.  Under Review of Proposals, it says,
10  "Combined requests of more than 100 million for
11  complex technology projects requires a high level
12  of due diligence."
13      Would you agree that requests for
14  federal funding in the tens of millions for
15  complex technology projects requires a high level
16  of due diligence?
17      A.  Yes.  And that's what CPB's been
18  providing for decades around all of federal
19  funding, whether it's a complex technology
20  project or any kind of grant award that we would
21  make.
22      Q.  Was this March 26th, 2025,
23  recommendation memo provided to the board in
24  advance of its April 2nd, 2025, meeting?
25      A.  Yes, that would have been correct.

Page 67

1      Q.  Did you attend that April 2nd, 2025,
2  meeting of CPB's board?
3      A.  I did.
4      Q.  And didn't the board at that April 2nd,
5  2025, meeting vote to adopt the recommendation
6  that was made by you and CPB management to
7  authorize negotiations with NPR and PBS for a
8  three-year extension of its interconnection
9  funding agreement?
10      A.  The board --
11      Q.  Strike that.  That was not a fair
12  question.
13      Did the board at that April 2nd, 2025,
14  meeting vote to adopt the recommendation made by
15  you and CPB management to authorize negotiations
16  with NPR for a three-year extension of its
17  interconnection funding agreement?
18      A.  The board passed a resolution giving CPB
19  management the authority to negotiate a grant
20  with NPR for interconnection.
21      Q.  And didn't the board at that April 2nd,
22  2025, meeting also vote to authorize CPB
23  management to negotiate with PBS for an extension
24  of its interconnection funding agreement?
25      A.  Yes.

Page 68

1      Q.  That was for a five-year extension, not
2  a three-year extension, right?
3      A.  I believe both NPR and PBS were for
4  five-year extensions.
5      MS. TOWNSEND:  Let's mark this as
6  Exhibit 7.
7      (Merritt Exhibit No. 7, a document
8  Bates-stamped CPB_0148527 through 8535, was
9  introduced.)
10      MR. LIPCHITZ:  Thank you.
11  BY MS. TOWNSEND:
12      Q.  These are a set of resolutions that were
13  produced to us by CPB from the April 1st and
14  April 2nd, 2025, meetings of the CPB board.  So
15  I'll give you a second to take a look at these,
16  because there's a number of them.
17      A.  Mm-hmm.
18      (Reviews document.)
19      Okay.
20      Q.  Does this refresh your recollection that
21  at the April 2nd, 2025, meeting, the board not
22  only voted to extend PBS's agreement by five
23  years, but also voted to increase the funding for
24  public television interconnection up to $91
25  million?

Page 69

1      A.  Yes.  That's what they approved --
2      Q.  And --
3      A.  -- through negotiations.
4      Q.  And CPB management had recommended a
5  three-year extension for PBS; is that right?
6      A.  Yes, for -- for PBS and for NPR.
7      Q.  Why did -- why did the board ultimately
8  approve an even lengthier extension for more
9  money for PBS?
10      A.  This meeting had a real confluence of
11  events happening.  Because we had the first day
12  of the -- the board meeting, and literally that
13  evening at our board dinner, which included the
14  CEOs of PBS, NPR, APTS, of course our own
15  executive team, we began receiving information
16  that indicated that DOGE had targeted CPB and
17  could very well be coming to our offices that
18  night or the next day.
19      Q.  That was the --
20      A.  And this was --
21      Q.  Apologies.
22      A.  -- the evening of April 1st.  And, as
23  I've mentioned before, if you go back to January,
24  we had the President's budget release that showed
25  zero funding for CPB -- for public media --

18 (Pages 66 - 69)

Page 70

1  except for the possibility of close-out funds.
2       We had -- I think in February
3  had FEMA shut down our access to funds for the
4  Next-Generation Warning System Grant program, and
5  we had gone to court over that.
6       There were things like the USIP invasion
7  by DOGE. There was, in late March, the House
8  hearing, you know, that brought in public radio
9  and public television. And then it appeared that
10  something was going to happen immediately, based
11  on what people were -- were hearing that evening
12  of April 1st. People like our government affairs
13  person, Clayton Barsoum, was getting texts saying
14  you guys are -- CPB is being targeted; you know,
15  DOGE is going to be knocking at your door.
16       So you see things the next day in these
17  resolutions that show the board trying to get
18  ahead of that in -- in different ways, including
19  directing management to take any steps necessary
20  to safeguard the security of staff and premises.
21       So this was the environment that the
22  board was facing, and they were concerned about
23  the remaining interconnection funds.
24       So in doing these resolutions for PBS
25  and for PRSS, they increased the amounts for each

Page 71

1  and extended them to five years in order to
2  safeguard those interconnection funds.
3       Q.  That's why the board approved the
4  negotiation with PBS for an agreement of up to
5  five years and up to 9 -- 91 million for public
6  television interconnection; is that right?
7       A.  Yes.
8       Q.  And they did that notwithstanding the
9  preexisting concerns about PBS's willingness to
10  engage in convergence; is that right?
11       A.  They did it in the context I just
12  described: in recognizing that these funds were
13  at risk, that they could have been clawed back,
14  in which case the public media system would lose
15  out on any kind of support from CPB for
16  interconnection. And, regardless, at that
17  moment, they decided let's again safeguard these
18  funds for the system and give CPB the ability to
19  negotiate for an increased term and an increased
20  amount.
21       Q.  Because if these funds were clawed back,
22  if they went back to the Treasury, that would be
23  devastating for the public radio system, right,
24  and public television system?
25       A.  Nobody wanted to see the -- the funds

Page 72

1  -- any of these funds get clawed back. It would
2  have a negative impact across stations.
3       Q.  Was there a final agreement with PBS for
4  interconnection that reflected this five-year
5  extension?
6       A.  Well, not at this time. This was
7  just the board saying, you have the ability to
8  negotiate an amendment.
9       Q.  I understand. Was, eventually, a final
10  agreement with PBS for interconnection entered
11  into?
12       A.  Yes.
13       Q.  Do you know the total amount of
14  television interconnection funding that was
15  provided to PBS pursuant to this authorization by
16  the board?
17       A.  I don't know the exact final amount,
18  because this was an, "Up to 91 million," but I
19  believe it was very close to that amount. It
20  might not been -- have been exactly 91 million.
21       Q.  But -- but close to 91 million?
22       A.  But close to 91 million.
23       Q.  Once that agreement with PBS was
24  negotiated, did CPB management come back to the
25  board to approve that final agreement with PBS?

Page 73

1       A.  We would have informed the board that
2  we had carried out their, you know, mandate to
3  negotiate and to, you know, get an agreement in
4  place.
5       Q.  Were there any further board resolutions
6  related to television interconnection funding to
7  PBS that you're aware of?
8       A.  I don't recall any additional
9  resolutions.
10       Q.  When did CPB provide those around 90
11  million in interconnection funds to PBS?
12       A.  I'm not sure. I would have to find the
13  exact date. It was, you know, some weeks after
14  this, but I don't know the exact timeline.
15       Q.  Was it before May 1st, 2025?
16       A.  Again, I don't know for certain. It may
17  have been. But I would have to find that date.
18       Q.  After the board voted on April 2nd,
19  2025, did you call Mr. Munipalla?
20       A.  I did.
21       Q.  Where were you when you called him?
22       A.  I was in my office at CPB.
23       Q.  Was anyone else with you?
24       A.  Deborah Carr.
25       Q.  Deborah Carr or Debra Sanchez? Sorry.

Page 74

1    A.  Deborah Carr.

2    Q.  Deborah Carr.

3        Were you on speaker phone?

4    A.  I -- I think I was.  I think I used my

5    cell phone to call him.

6    Q.  Did anyone direct you to call

7    Mr. Munipalla, or did you decide to do that on

8    your own?

9    A.  Well, the board had voted to approve

10   negotiations with NPR and with PBS.  And given

11   the environment that we were in, they wanted us

12   to act with some urgency.  So their vote was, you

13   know, my mandate to -- to move forward with their

14   direction.

15   Q.  So in your view, the first step in that

16   process was a conversation with Mr. Munipalla?

17   A.  I wanted to inform PRSS that we were

18   approved by the board to move forward with these

19   negotiations.  So he -- you know, as the person

20   who oversees PRSS, he was the person I thought,

21   you know, I should call.

22   Q.  And you told Mr. Munipalla during that

23   phone call that you were planning to -- strike

24   that.

25       You told Mr. Munipalla during that phone

Page 75

1    call that CPB was planning to distribute more

2    than 30 million in interconnection funding to NPR

3    Distribution, right?

4    A.  I told him that we were going to move

5    forward with negotiations to amend the agreement

6    we had in place, and that we were looking at

7    -- that, you know, our attorneys would be looking

8    at the current agreement that was in place and

9    looking at what we would need to do to amend that

10   to begin the negotiations, and that it could be

11   up to 36 million.

12   Q.  Do you recall telling Mr. Munipalla

13   that you didn't want any, quote, bullshit

14   negotiations?

15   A.  I don't recall saying that, but I may

16   have expressed that sense of urgency that the

17   board conveyed.

18   Q.  Isn't it true that you mentioned to

19   Mr. Munipalla during that phone call the

20   possibility of an executive order targeting

21   public media?

22   A.  Given the -- the context, I may have

23   mentioned that.

24   Q.  Do you recall what you told

25   Mr. Munipalla about the possibility of an

Page 76

1    executive order targeting public media during

2    that call?

3    A.  I -- I don't recall what I said.

4    Q.  Okay.  On April 3rd, the next day, --

5    A.  Mm-hmm.

6    Q.  -- did you attend a meeting of the CPB

7    Board of Directors to get a debrief of a meeting

8    that had occurred earlier that day with an

9    official from OMB, the Office of Mana --

10   Management and Budget?

11   A.  I know there was a board meeting on

12   April 4th.  I can't remember if there was one on

13   April 3rd, but there -- there may have been on

14   April 3rd.

15   Q.  Do you recall being present for a

16   debrief of a meeting that had occurred in early

17   April with official -- an official from OMB?

18   A.  I know there was discussion at a meeting

19   about -- at a board meeting about the meeting

20   that had occurred at OMB.

21   Q.  Do you think that was at the April 4th

22   board meeting?

23   A.  I -- I don't remember which meeting it

24   would have been at.

25   Q.  April 4th was a -- was a Friday; is that

Page 77

1    right?  Friday?  Can't recall?

2    A.  I don't know.

3    Q.  Were you present at the -- at a board

4    meeting on April 4th?

5    A.  Yes, I would have been there.

6    Q.  Is it unusual for CPB's board to meet

7    three times in one week, in your experience?

8    A.  It's the board's prerogative to meet

9    however often they want to meet.  I -- you know,

10   we -- they want to meet, we set up the meetings.

11   And it always depends on what they feel they need

12   to address in the -- the moment.

13   Q.  Of course.

14       My question is was it unusual for the

15   board to want to meet three times in a single

16   week, in your experience?

17   A.  Again, it's up to the -- the board --

18   Q.  Do you re --

19   A.  I'm trying to recall if they had met in

20   that kind of succession before.

21       I mean, nothing comes to mind quite in

22   that kind of short span.  But, you know,

23   certainly given everything that was happening, I

24   think they felt like they had a responsibility to

25   meet to discuss things that were -- were going

Veritext Legal Solutions
215-241-1000 ~ 610-434-8588 ~ 302-571-0510 ~ 202-803-8830

Page 78

1    on.
2        Q.   Was the April 4th meeting publicly
3    noticed?
4        A.   I assume it was.
5        Q.   And if it wasn't, would that be
6    surprising to you?
7        A.   That would be very surprising, because
8    we're very, I think, careful about always giving
9    notice when we need to give notice.
10       Q.   Was the April 4th meeting entirely
11   executive session?
12       A.   I don't think any meeting can be
13   entirely in executive session.  I think we always
14   have to have a public element to the meeting.
15   But I'm not an expert on all the board protocols.
16       Q.   And you don't recall, one way or the
17   other, whether there were -- whether or not there
18   was a public portion of the April 4th board
19   meeting, do you?
20       A.   I don't.
21       Q.   Who called the meeting on April 4th, if
22   you know?
23       A.   I would assume that, you know, the board
24   called the meeting; that either -- you know,
25   that's up to the -- the board chair to call board

Page 79

1    meetings, and, you know, working with the -- the
2    staff.
3        Q.   Do you know who on the board called the
4    April 4th meeting?  Would that have been
5    Ms. Calvert as board chair?
6        A.   I don't know if -- if she called it or
7    called it on behalf of another board member.
8    I just -- I don't know.
9        Q.   Do you know when that meeting was
10   called?
11       A.   I don't.
12       Q.   Do you recall whether it was called on
13   April 4th and then held later on April 4th?
14       A.   I don't know.
15       Q.   At --
16           MR. LIPCHITZ:  Do you -- I don't want to
17   interrupt, but at a certain point if we could
18   take a bio break?
19           MS. TOWNSEND:  Yeah.  Like, a couple
20   minutes?
21           MR. LIPCHITZ:  When -- whenever you want
22   to do it.
23   BY MS. TOWNSEND:
24       Q.   At that April 4th meeting, isn't it
25   true that the board voted to amend its resolution

Page 80

1    of April 2nd regarding interconnection funding
2    for NPR to direct CPB management to proceed
3    with amending the contract with NPR for
4    interconnection, but to include a contingency
5    that NPR provide a plan within 60 days of
6    amendment execution to establish the PRSS as an
7    entity independent of NPR?
8        A.   I assume you're reading the resolution,
9    so, yes.
10       Q.   I could put it in front of you.  And I
11   won't take long since I know your counsel's asked
12   for a break.
13           MS. TOWNSEND:  We'll mark this as
14   Exhibit 8.
15           (Merritt Exhibit No. 8, a document
16   Bates-stamped CPB_0106552, was introduced.)
17           MR. LIPCHITZ:  Thank you.
18   BY MS. TOWNSEND:
19       Q.   Ms. Merritt, is Exhibit 8 the resolution
20   that reflects the board's vote to amend its
21   -- its earlier resolution of April 2nd to require
22   NPR to provide a plan within 60 days of amendment
23   execution to establish PRSS as an entity
24   independent of NPR?
25       A.   Yes.  That's what it says.

Page 81

1        Q.   Who proposed this amended resolution?
2        A.   I don't recall who proposed it.
3        Q.   Do you recall who advanced it to a vote
4    at the April 4th meeting?
5        A.   I don't.
6        Q.   Do you recall who seconded this
7    resolution --
8        A.   I do not.
9        Q.   -- at the April 4th meeting?
10       A.   Yeah.  I do not.
11       Q.   Did you speak at that April 4th board
12   meeting?
13       A.   I may have.  I don't recall
14   specifically.
15       Q.   Did the board take minutes of its April
16   4th meeting?
17       A.   I would assume there were minutes of the
18   meeting.
19       Q.   If there were no minutes of the meeting,
20   would that be surprising to you?
21       A.   I -- as far as I know, we -- we take
22   minutes at all of the board meetings.
23       Q.   So it would be surprising to you if
24   there was a board meeting on April 4th and there
25   were no minutes taken at that meeting?

21 (Pages 78 - 81)

Page 82

1      A.   I think that would be unusual.
2      Q.   Who is usually responsible for taking
3   minutes at CPB board meetings?
4      A.   I think Katherine Donohue takes the
5   minutes.
6      Q.   Was Ms. Donohue present at the April 4th
7   meeting?
8      A.   I -- I'm -- I'm not sure.
9      Q.   Can you recall anything that any member
10   of the board of directors said at this April 4th
11   meeting with respect to NPR?
12      A.   As I recall, at this meeting the board
13   decided to just take a moment to think about what
14   the future would be without any more federal
15   funding for public media, the possibility of not
16   having CPB around anymore.  Because, again, as
17   I've described, there were a lot of things
18   happening at that time that the board had to take
19   into consideration: the possibility of the CPB
20   getting DOGE'd.  You know, just the -- that whole
21   environment of threat to federal funding, threat
22   to public media, that, at this moment, they
23   -- they came back and said, "We want to think
24   more about interconnection for radio, because we
25   do, you know, have this history of all these

Page 83

1   consultant reports looking at PRSS and the kind
2   of issues that have been surfaced over the
3   years," and they wanted to position the public
4   media system as best as possible for success in
5   the future.
6         And they felt that having any --
7      Q.   Could -- I don't want to interrupt you,
8   but I want to get some clarity on this.  Is that
9   a direct quote?  Someone on the board said, "We
10   want to think more about interconnection radio
11   because of the history of consultant reports," or
12   was this -- are you -- are you telling me what
13   someone said, or are you telling me what your
14   impression was?
15      A.   I'm telling you the nature of the
16   conversation --
17      Q.   Okay.
18      A.   -- as I recall in general.  I don't -- I
19   don't think I could provide you a direct quote
20   from anyone in the -- the meeting.
21      Q.   So that was my -- my question was, do
22   you recall anything that any board member said,
23   specifically, about NPR during this April 4th
24   meeting?
25      A.   Well, clearly they talked about NPR.

Page 84

1      Q.   Clearly, they did.  But I'm asking
2   you --
3      A.   Mm-hmm.
4      Q.   -- since you were there, whether you
5   recall anything any individual board member
6   specifically said about NPR?
7      A.   I don't recall specific things that
8   people said -- that board members said --
9      Q.   You don't recall --
10      A.   -- at that meeting.
11      Q.   -- anything Ms. Calvert, for example,
12   said about NPR at that April 4th meeting?
13      A.   Well, she, clearly, would have been part
14   of the conversation about NPR and
15   interconnection.
16      Q.   Clearly.  That's why I'm asking whether
17   you remember anything specific that she said?
18      A.   And I -- I -- I don't remember specific
19   quotes about NPR, but, I mean, interconnection
20   was the -- I think the -- the topic that they
21   were focused on at the meeting, because they
22   realized they wanted to have a -- an independent
23   entity that was not dominated by any one
24   organization but that could better represent the
25   breadth of public radio stations moving forward.

Page 85

1         They felt that was the -- the way
2   forward for success to help stations, you know,
3   be able to better serve their -- their listeners
4   -- their communities.
5      Q.   How do you -- how do you know that
6   that's what the board felt was the best way
7   forward for success?  Did anyone say that?
8      A.   Well, I don't think they would have
9   approved a resolution telling us to do that
10   without speaking about it.
11      Q.   But you don't recall what anybody said
12   at the meeting, right?
13      A.   I don't recall the kind of specific
14   quotes that you're asking me to -- to come up
15   with -- you know, here we are how many months --
16   later in a meeting that happened in April?
17   I -- I don't recall specifically what -- what
18   people said at the meeting.
19      Q.   You don't recall Mr. Rothman -- Tom
20   Rothman saying anything about NPR during this
21   April 4th meeting?
22      A.   You know, again, I -- I -- I can't come
23   up with specific quotes that -- that people said,
24   so I -- no, I don't -- I don't recall something
25   specific Tom said -- Mr. Rothman said.

22 (Pages 82 - 85)

Page 86

1      MS. TOWNSEND: Your counsel has asked
2  for a break, --
3      THE WITNESS: Okay.
4      MS. TOWNSEND: -- so why don't we take a
5  break.
6      THE VIDEOGRAPHER: I'd like to correct a
7  mistake I believe I made earlier with the start
8  time.
9      We had started at 10:19. Now we are
10 going off the record at 11:37 a.m. Eastern time.
11     (Recess taken.)
12     THE VIDEOGRAPHER: This is video file
13 Number 3. Back on the record at 11:51 a.m.
14 Eastern time. You may begin.
15 BY MS. TOWNSEND:
16     Q. Ms. Merritt, could you take a look at
17 Exhibit 6, which I believe is -- the first
18 Bates-stamped page is CPB_0148526? These are the
19 resolutions from April 2nd, 2025. Do you have
20 those?
21     A. That's Exhibit 8.
22     Q. Oh, did I give you the wrong number?
23 I may have given the wrong number.
24     Six? I think it's Exhibit 6.
25     A. Well, 6 is an email and --

Page 87

1      MR. LIPCHITZ: Six is the email in the
2  March --
3      MS. TOWNSEND: Oh, it's 8.
4  My apologies. Exhibit 8.
5      THE WITNESS: Okay.
6  BY MS. TOWNSEND:
7      Q. And those should be the resolutions.
8  The first page, I think, says November 20th,
9  2024, but the rest of them --
10     A. Wait a minute.
11     MR. LIPCHITZ: I think you're looking
12 for --
13     MS. TOWNSEND: 7?
14     MR. LIPCHITZ: -- 7, because you're
15 looking for the April 1st and 2nd.
16     MS. TOWNSEND: Yes. Did I -- all right.
17 This has been very confusing.
18     THE WITNESS: Okay.
19 BY MS. TOWNSEND:
20     Q. Do you have Exhibit 7 in front of you?
21     A. I do.
22     Q. Does the Bates number at the bottom read
23 CPB_0148526?
24     A. 27.
25     Q. Oh, 27. Yes, that's right. You have

Page 88

1  the right document.
2      A. Okay.
3      Q. And at the top it says April 1st --
4      A. Yes.
5      Q. -- 2025?
6      A. Yes.
7      Q. Okay. And it says, "Unanimously,"
8  correct?
9      A. Yes.
10     Q. If you look at the April 2nd, 2025,
11 meeting minutes on the next page, the one that
12 says, "Whereas prudent planning is required to
13 safeguard the interest of public media stations"?
14     A. Yes.
15     Q. At the top it says, "Four in favor. One
16 absent."
17     A. Mm-hmm.
18     Q. Do you recall what CPB board member was
19 absent from this April 2nd meeting?
20     A. It may have been Tom Rothman.
21     Q. You believe it was Tom Rothman, but
22 you're not entirely sure?
23     A. I'm not entirely sure. He sometimes
24 attends virtually, even if we have an in-person
25 meeting. So, it might have been that he couldn't

Page 89

1  attend that day. But I'm -- I'm not certain.
2      Q. Okay. Can you look at the page
3  Bates-stamped CPB_0148531? It's -- it's 30
4  -- there's a 34 at the bottom of the Page 2, I
5  believe. It's one of the April 2nd, 2025,
6  resolutions.
7      A. Mm-hmm.
8      Q. And it -- it reads, "Be it resolved, the
9  CPB Board of Directors directs management to take
10 any steps necessary to safeguard the security of
11 staff and premises."
12     Do you see that?
13     A. Yes.
14     Q. Are you on that page?
15     A. Yes.
16     Q. What steps are -- did CPB management
17 take to safeguard the security of staff and
18 premises following this resolution?
19     A. I believe at that point we decided that
20 employees should no longer come into the office;
21 that that was the -- the primary thing that
22 -- that happened.
23     The data systems, I'm -- I'm not sure
24 what specific steps may have been taken, but
25 I know we -- our director of -- our Chief

23 (Pages 86 - 89)

Page 90

1   Technology Officer was being very careful.
2   Again, given all the things happening with DOGE
3   around DC at that time coming in, taking over
4   computer systems, databases, we were trying to
5   harden those systems. And just, you know, in
6   general, trying to protect our -- our offices.
7        We -- we may even -- I -- I think for a
8   while we had security guards in our actual
9   offices, rather than just -- there's a check-in
10  desk on the first floor of the building that has
11  a security guard, but I believe we added security
12  guards in the CPB office space.
13       Q.  Okay. Can you take a look at Exhibit 8,
14  which I believe is the -- the resolution that was
15  passed by the board on Friday, April 4th, 2025?
16       A.  Mm-hmm.
17       Q.  That -- you see at the top it says,
18  "Four in favor. One absent"?
19       A.  Mm-hmm.
20       Q.  Do you recall what CPB board member was
21  absent from this vote?
22       A.  I -- I don't. Again, I know Tom Rothman
23  tends to be the one hardest to schedule, so it
24  may have been him. But I -- I don't recall.
25       Q.  Okay. You don't recall somebody missing

Page 91

1   from that meeting specifically?
2        A.  I -- clearly, someone was missing.
3   I just don't recall who it was.
4        Q.  Okay. So, this meeting on April 4th
5   that took place on a Friday, the board met again
6   the following Monday on April 7th, right?
7        A.  Yes.
8        Q.  And you attended that meeting?
9        A.  Yes.
10       Q.  Do you recall who called that meeting?
11       A.  Again, it's -- it's up to the board to
12  call the meetings. I don't know which specific
13  board member might have called the meeting.
14       Q.  Do you recall when that meeting was
15  scheduled?
16       A.  I -- I don't.
17       Q.  Was it scheduled over the weekend?
18       A.  It may have been.
19       Q.  But you don't recall one way or the
20  other?
21       A.  I don't recall.
22       Q.  At the April 7th meeting, the board
23  voted to amend its prior resolutions of April 2nd
24  and April 4th regarding interconnection funding
25  to NPR; is that right?

Page 92

1        A.  Do you have a copy of that resolution?
2        Q.  Well, I'm just asking the -- the
3   question. At -- at the April 7th meeting, did
4   the board amend its prior resolutions of April
5   2nd and April 4th regarding interconnection
6   funding to NPR?
7        A.  Yes. And I'm sure you have a copy of it
8   that shows that.
9        Q.  Well, do you recall what that amendment
10  was?
11       A.  I'm sure I could be helped with my
12  recall with a copy of the resolution.
13       Q.  I have no doubt you could.
14            Sitting here today, do you recall what
15  that amendment was, without looking at the copy
16  of the resolution?
17       A.  I, you know, don't know the exact
18  wording. I think it was similar to the one from
19  April 4th, but it talked about NPR providing a
20  plan within 30 days.
21       Q.  And that's the change that you recall
22  from that resolution, from resolution -- April
23  4th resolution to April 7th resolution?
24       A.  Not looking at it in front of me, that's
25  what I recall.

Page 93

1        Q.  Okay. Well, we'll give it to you.
2            MS. TOWNSEND: Okay. We'll mark this as
3   Exhibit 9.
4            (Merritt Exhibit No. 9, a document
5   Bates-stamped CPB_0106554, was introduced.)
6            MR. LIPCHITZ: Thank you.
7            THE WITNESS: (Reviews document.)
8   BY MS. TOWNSEND:
9        Q.  Ms. Merritt, does this refresh your
10  recollection that at the April 7th, 2025,
11  meeting, the CPB board not only resolved that NPR
12  should provide a plan within 30 days of amendment
13  execution but added a second contingency that
14  one-third of the funds will be withheld should
15  NPR not comply with the spin-off obligations,
16  I believe that should read.
17       A.  Yes.
18       Q.  Do you see that?
19       A.  Yes, I see that.
20       Q.  Why did the board reduce the time period
21  from 60 days to 30 days, if you know?
22       A.  During this -- this whole discussion by
23  the board of NPR/radio interconnection/PRSS, the
24  board determined that they wanted to take this
25  moment of the possibility of no additional

24 (Pages 90 - 93)

Veritext Legal Solutions
215-241-1000 ~ 610-434-8588 ~ 302-571-0510 ~ 202-803-8830

Page 94

1    interconnection funds ever again and do something
2    that had been talked about for a long time, which
3    was establish an entity that would be an
4    independent entity for radio interconnection,
5    and that they believed in their discussions --
6    the tenor of their discussions was that they
7    believed they had a responsibility to set the
8    public radio system up for success in the future,
9    because a third of the stations that CPB funded
10   through community service grants are not NPR
11   members.
12          So, having NPR as the, you know,
13   pur -- purveyor of interconnection, we were
14   concerned, moving forward, that with financial
15   pressures that would affect stations, would
16   affect NPR, that we didn't want a third of
17   the radio system to, you know, possibly be
18   deprioritized in some way. So the board believed
19   that moving forward with an independent entity
20   would be the best pathway forward for
21   interconnection for public radio.
22          And you can see in these resolutions,
23   they were trying to figure out the best direction
24   to give to CPB management to work with NPR to
25   help make that happen. And they reduced the

Page 95

1    number of days from 60 to 30, again, given the
2    sense of urgency in safeguarding the -- the
3    funds, and because we knew that the current
4    agreement with NPR ended September 30.
5          Q.  Okay. So, in April -- on April 7th,
6    it's your understanding that because the
7    agreement -- current agreement with NPR for
8    interconnection funding ended at the end of
9    September 30th, that the board needed to reduce
10   the time period in which NPR could provide a plan
11   to spin off the PRSS from 60 days to 30 days?
12          MR. LIPCHITZ:  Objection.
13   Mischaracterizes her answer.
14          You can answer.
15   BY MS. TOWNSEND:
16          Q.  I'm trying to understand -- I believe my
17   initial question was just why -- why -- why 30
18   days and not 60 days to -- to provide a plan to
19   spin off the PRSS?
20          A.  Because of the sense of urgency that the
21   board was feeling because of the threat to CPB
22   funds; and if there are no CPB funds, then CPB
23   would not be around.
24          So, if we were going to execute on
25   their, you know, mandate to us to work with NPR

Page 96

1    to establish PRSS as an independent entity,
2    we -- we needed to -- to do that quickly.
3          Q.  Is it your understanding that the PRSS
4    only provides interconnection services to NPR
5    member stations?
6          A.  No. They provide them to non-NPR
7    stations.
8          Q.  They serve all interconnected stations;
9    is that correct?
10          A.  They serve all interconnection
11   -- connected stations. And, at the same time,
12   the board believed that an independent entity
13   could do a better job in the future of serving
14   all interconnected stations.
15          Q.  How do you know the board believed that?
16          A.  Because of the tenor of the
17   conversation; the general discussion that they
18   had.
19          Q.  Who said that?
20          A.  You know, again, I'm -- I'm not able to
21   give you direct quotes from board members. I
22   just don't have that kind of recall of statements
23   made at the board meetings. But the conversation
24   led to --
25          Q.  I understand, but you're giving me a lot

Page 97

1    of, actually, very specific general tenor
2    comments --
3          A.  Mm-hmm.
4          Q.  -- and what I'm asking you is, you're
5    telling me what the general tenor of the
6    conversation is, --
7          A.  Mm-hmm.
8          Q.  -- who is saying these things? I mean,
9    clearly you must have a recollection of who on
10   the board is talking about this, if you're able
11   to tell me what your understanding of the general
12   tenor was.
13          A.  Well, I mean, there were five board
14   members, and they all participated in the
15   discussion. And I don't recall who specifically
16   said what.
17          Q.  Who came up with the idea that if NPR
18   doesn't comply with CPB's spin-off demand that
19   one-third of the funds for interconnection that
20   Congress has appropriated for public radio
21   interconnection would be withheld?
22          A.  I don't recall specifically who put that
23   idea forward.
24          Q.  Was it Pat Harrison?
25          A.  I don't recall who it was.

25 (Pages 94 - 97)

Page 98

1    Q.  You don't know if it was a member of the
2  board?
3    A.  I don't recall who it was.
4    Q.  What was the purpose of that additional
5  contingency, if you know?
6       Well, strike --
7    A.  I -- I mean, I think it was a -- an
8  approach to, you know, try to compel them to move
9  forward with the spin-off.
10   Q.  So, the goal of that was to push NPR to
11 comply with CPB's demand that it spin off the
12 PRSS; is that right?
13   A.  I think they, you know, probably thought
14 that would be a negotiating point with NPR.
15   Q.  Do you recall at the April 7th meeting
16 Ruby Calvert discussing her April 3rd meeting
17 with Katie Sullivan at OMB, or the Office of
18 Management and Budget?
19   A.  Well, as I said previously, I -- I
20 know Ruby talked about that meeting at a board
21 meeting.  I don't recall specifically which
22 meeting that was.
23   Q.  Do you recall what Ruby said about that
24 meeting with OMB?
25   A.  She said that there seemed to be a lot

Page 99

1  of confusion on Ms. Sullivan's part about CPB's
2  role, you know, about what CPB did.  I think
3  there was confusion about CPB versus PBS versus
4  NPR; that Ms. Sullivan didn't really understand
5  which organization did what.
6       And so, she, you know, tried to correct
7  her misperceptions about public media; about, you
8  know, CPB; about, you know, what organization did
9  what.
10   Q.  Did Ms. Calvert say that Ms. Sullivan
11 was very negative about public media?
12   A.  That was the impression, that she was
13 not a big supporter of public media.
14   Q.  That was Ms. Calvert's impression of
15 Ms. Sullivan?
16   A.  Yes.
17   Q.  So, after the board on April 7th passed
18 the resolution threatening to withhold one-third
19 of interconnection funding if NPR did not spin
20 off the PRSS into an independent entity, the
21 board met again two days later on April 9th; is
22 that right?
23   A.  Well --
24       MR. LIPCHITZ:  Objection to form.
25 Just --

Page 100

1       THE WITNESS:  Yeah.
2       MR. LIPCHITZ:  -- wait a second so I can
3  get an objection in.  I did.  You can answer.
4  BY MS. TOWNSEND:
5    Q.  You can answer.
6    A.  Well, I mean, the way you're framing
7  this is not accurate, because this -- again, this
8  is all about a negotiation that CPB management
9  was to have with NPR for interconnection.  And
10 when you say, you know, "A threat about one-third
11 of the funds," this was to be, you know, part of
12 a conversation with NPR and PRSS.
13       So, you know, whether it became realized
14 would be in NPR's hands.  This was just simply a
15 -- a way of looking at how we would go about our
16 negotiations with NPR.
17   Q.  As of April 7th, had you or anyone else
18 at CPB communicated CPB -- the CPB board's desire
19 that NPR spin off the PRSS to NPR?
20   A.  No, I don't believe that happened until
21 April 11th.
22   Q.  And the board met again on April 9th; is
23 that right?
24   A.  Yes.
25   Q.  Did you attend that meeting?

Page 101

1    A.  Yes.
2    Q.  Do you know who called for that meeting?
3    A.  I do not know who specifically called
4  for that meeting.
5    Q.  Do you know if that meeting was publicly
6  noticed?
7    A.  I assume it was publicly noticed.
8    Q.  Do you know if there are minutes from
9  that meeting?
10   A.  I would assume there were minutes from
11 that meeting.
12   Q.  But you don't -- have you ever seen
13 them?
14   A.  I don't know.
15   Q.  What time of day did that meeting occur,
16 if you remember?  Was it in the morning?
17 Evening?
18   A.  On the 9th?
19   Q.  On the 9th.
20   A.  I don't recall.
21   Q.  Do you recall at that meeting discussing
22 some options with the board for how to avoid
23 distributing directly public radio
24 interconnection funding to NPR?
25   A.  We would have had further discussions

26 (Pages 98 - 101)

1  about NPR establishing PRSS as an independent
2  entity, so that could have been part of the
3  discussion of funding the independent entity
4  versus funding NPR.
5      Q.  Did you recall discussing a few options
6  with the board as to how that could be done?
7      A.  I -- I don't recall that specifically,
8  no.
9      Q.  Well, one option would have been to make
10 NPR create a plan to spin off the PRSS and give
11 NPR two-thirds of the interconnection funding,
12 right?  That was one option that was being
13 considered?
14     A.  Right.  I mean, that was the subject of
15 the resolution at the previous meeting.
16     Q.  In fact, the board had already passed a
17 resolution adopting that, let's call it,
18 "option," right?
19     A.  They gave us that direction for
20 negotiations with NPR, yes.
21     Q.  Was another option you discussed with
22 the board at that April 9th meeting to give radio
23 interconnection funding to PBS?
24     A.  I know we talked at one point about if
25 we needed to safeguard the funds in some way and

1  we didn't have any kind of agreement with NPR or
2  there was not an independent entity yet, could we
3  put the funds at PBS as a way of making sure they
4  wouldn't be clawed back; that they would be
5  safeguarded from any kind of claw-back from the
6  government.
7      Q.  Is it your understanding that it would
8  be permissible under the Public Broadcasting Act
9  to give public radio interconnection funding to
10 PBS?
11     A.  There aren't specific funds that are
12 designated radio or television, so -- to my
13 knowledge, so it's -- it's an interconnection
14 funding pool of -- of money.  It doesn't say, you
15 know, X amount goes to radio; Y amount goes to
16 television, as it does in the Public Broadcasting
17 Act when it comes to television and radio
18 community service grants and -- and program
19 funds.
20     So, I mean, that would have been
21 something our attorneys would have had to -- to
22 look at, but I don't -- I don't know that that
23 would have been an issue.
24     Q.  So, you think -- it's your understanding
25 that CPB could take all of the interconnection

1  funding appropriated by Congress and give it to
2  PBS?  It has no obligation to fund public radio
3  interconnection under the Public Broadcasting
4  Act?
5      A.  We do have an obligation to fund public
6  radio interconnection, but we could have also,
7  you know, given the funds to many other
8  organizations to implement public radio
9  interconnection.
10     Q.  Is another option you discussed at the
11 April 9th board meeting to give public radio
12 interconnection funding to American Public Media?
13     A.  It may have been.  I mean, it sounds
14 like this is a meeting where we -- I mean, if you
15 have -- I don't know if there are board minutes
16 you're looking at or what you're basing the
17 -- the questions on.
18     I know we -- we had discussions about
19 the -- the funds, again, fearing that they might
20 be clawed back at some point; that if we needed
21 to safeguard them in some way, did we have
22 options, you know, as we negotiated with NPR on
23 the independent entity to, you know, place them
24 some -- someplace that they -- they couldn't
25 be clawed back, you know, until we could move

1  forward, or even, you know, with the idea of an
2  independent entity, could -- you know, could
3  someone else create an independent entity.
4      There just -- I think the board was
5  trying to problem-solve.
6      Q.  Mm-hmm.
7      A.  You know, they were in an environment
8  where, again, the threats were very present about
9  clawing back funding; about the loss of CPB
10 funding moving forward; about CPB closing.
11 And our board takes its stewardship very, very
12 seriously, and they work on behalf of the public
13 media system, as does CPB.  So, you know, there
14 were conversations about what -- what could we
15 do, if needed, to make sure those funds didn't
16 get clawed back in some way.
17     Q.  What is American Public Media?
18     Or, wait.  Strike that.
19     If I say APM, you know I'm referring to
20 American Public Media, right?
21     A.  American Public Media Group is the
22 umbrella organization that includes Minnesota
23 Public Radio and American Public Media, which is
24 a distribution arm, really, of the American
25 Public Media Group.

27 (Pages 102 - 105)

1    Q.  American Public Media Group is a content
2  producer, right?
3    A.  They are a producer and distributor and
4  owner of public radio stations.
5    Q.  American Public Media distributes
6  its -- its own content, right?
7    A.  And content from other producers.
8    Q.  Does it have any satellite distribution
9  capacity or capability, to your knowledge?
10    A.  It's the home of the backup network
11  operations center for PRSS.  So, I think in that
12  sense they probably do have, you know, satellite
13  capacity.  But I don't -- since they're the
14  -- the backup, I'm not sure exactly how that
15  works.
16    Q.  So, you don't know whether or not they
17  actually have, currently, the capacity to engage
18  in satellite distribution of radio content?
19    A.  I'm not sure.
20    Q.  What is your understanding -- well,
21  strike that.
22        Let me show you an email.
23        Let's mark this as Exhibit 10.
24        (Merritt Exhibit No. 10, a document
25  Bates-stamped CPB_0229885, was introduced.)

1        MR. LIPCHITZ:  Thank you.
2        THE WITNESS:  Thank you.
3        THE REPORTER:  You're welcome.
4  BY MS. TOWNSEND:
5    Q.  This is an email chain.  The email at
6  the top, which is the last email in the chain, is
7  from Clayton Barsoum to you, and it --
8    A.  Mm-hmm.
9    Q.  -- says, "Argh."
10    A.  Mm-hmm.
11    Q.  I won't ask you about that one.  But the
12  email that I think Mr. Barsoum was responding to
13  is dated Wednesday, April 9th, 2025, at 1:47 p.m.
14  You see that?
15    A.  Mm-hmm.
16    Q.  That's an email from you where you
17  outline the options for public radio inter --
18  interconnection that you're going to talk to the
19  board about; is that right?
20    A.  Yeah.  That's what it -- it says.
21    Q.  And these are the options we just talked
22  about, correct?
23    A.  Yes.
24    Q.  Who came up with these options?  Was it
25  you?

1    A.  There were multiple conversations among
2  CPB staff about, again, trying to problem-solve
3  around the potential of the claw-back of these
4  funds.  So, I contributed to this, yes.
5    Q.  Which of these options was your idea?
6    A.  The APM option.
7    Q.  Who came up with the other two options?
8    A.  Well, the board came up with the first
9  one.
10    Q.  Okay.  Who came up with the Option 2,
11  "Give the money to PBS to hold for radio
12  interconnection"?
13    A.  I think that was Michael Levy.
14    Q.  Was Michael Levy still COO at this
15  point, or were you COO at this point?
16    A.  I wasn't yet COO; I think, not until the
17  11th we talked about earlier, or thereabouts.
18    Q.  Was Michael Levy still employed by CPB,
19  or was he a consultant at this point?
20    A.  This would have been right around the
21  time he made that transition.  I don't -- I guess
22  he was on as a consultant at that point.  Because
23  it -- this was right about the time he, you know,
24  decided to leave as a full-time employee and work
25  as a consultant.

1    Q.  As of April 9th, did Michael Levy have
2  an understanding, in your view, of APM's capacity
3  to provide interconnection services?
4    A.  I don't know what his understanding was.
5    Q.  Was -- is it your under -- strike that.
6        As of April 9th, did Michael Levy, in
7  your view, have a general idea about the size of
8  APM?
9    A.  He may have had some concept of that,
10  but I don't think Michael had ever worked
11  directly with APM.
12        I think I provided information to him
13  and to Pat Harrison about APM to make sure they
14  understood what -- what APM's capacity was; more
15  about their organization.
16        MS. TOWNSEND:  Let's mark this as
17  Exhibit 11.
18        (Merritt Exhibit No. 11, email
19  Bates-stamped CPB_0110333, with an attachment
20  Bates-stamped CPB_0022946, was introduced.)
21        MR. LIPCHITZ:  Thank you.
22        THE WITNESS:  Thank you.
23        THE REPORTER:  You're welcome.
24  BY MS. TOWNSEND:
25    Q.  This is an email chain between you

Page 110

1    -- well, let's just say an email chain with an
2    attachment, and the email chain between you and
3    Michael Levy dated April 9th, 2025.
4        Do you see that?
5        A.  I do.
6        Q.  And this is in advance of the board
7    meeting on April 9th, correct?
8        A.  Uh, --
9        Q.  And this is Mike --
10       A.  Well, let's see.  What time was this?
11          Okay.  The board was meeting at 6:15.
12   Yes, this would have been in advance of the
13   meeting.
14       Q.  So, before that April 9th meeting,
15   Mr. Levy was asking you to tell him whether or
16   not APM had any expertise or capacity to provide
17   interconnection services; is that right?
18       A.  Yes, that's what it says here.
19       Q.  And wouldn't that suggest to you that
20   Mr. Levy didn't know whether or not APM had that
21   expertise or capacity at this point in time?
22       A.  Well, as I said, I think he had some,
23   you know, basic knowledge of APM, but I supplied
24   him with more information that answered the
25   questions that he had.

Page 111

1        Q.  Mr. Levy asked you, in the top email
2    on -- at -- which is the latest email in the
3    chain --
4        A.  Mm-hmm.
5        Q.  -- in Exhibit 11 to have on hand the,
6    quote, language re public radio station's input
7    into who receives the funding to manage the
8    public radio interconnection system.
9        Do you see that?
10       A.  Mm-hmm.  Yes.
11       Q.  What language is he referring to?
12       A.  I know there's specific language in the
13   Public Broadcasting Act around -- well, no, he's
14   asking about statutory language about use of the
15   interconnection funds.
16          Yeah.  I'm not sure if that's referring
17   to the Public Broadcasting Act or, I guess
18   there's also appropriations language around the
19   use of interconnection funds.
20       Q.  Well, he's asking you to have this
21   language at hand --
22       A.  Mm-hmm.
23       Q.  -- presumably for the board meeting,
24   right?
25       A.  Presumably, yes.

Page 112

1        Q.  Did you provide him with any statutory
2    language or other language in response to this
3    request in advance of the board meeting?
4        A.  I probably would have asked Clayton to
5    provide this language, or Evan Slavitt, our
6    general counsel.
7        Q.  So sitting here today, you don't know
8    what Mr. Levy was asking you to have at hand when
9    he referred to the language, "Re Public Radio
10   Station's input into who receives the funding to
11   manage the public radio interconnection system"?
12       A.  Well, it's a little vague, but, I mean,
13   there is -- the -- the Public Broadcasting Act
14   has several places that refer to interconnection
15   and language, so I -- you know, again, I -- I
16   would have assigned this to someone else to
17   pull all the specific references around
18   interconnection funding, including the -- you
19   know, the two instances that he's talking about
20   here.  But who receives the -- the funding,
21   it's -- I think it's kind of up for debate,
22   because there are different uses of -- there are
23   different instances of language in the Act.  One
24   says CPB can, you know, develop interconnection
25   systems -- plural.

Page 113

1        Q.  Mm-hmm.
2        A.  There's other language that I think goes
3    directly to public radio interconnection.  So,
4    you know, I -- again, I would have asked somebody
5    to kind of find all this and have it ready for --
6    for Michael for the board meeting.
7        Q.  You -- you didn't pull this statutory
8    language.  You would have asked someone else to
9    pull this statutory language; is that right?
10       A.  I -- I believe so.  I don't recall doing
11   it.  But, you know, I may have sent it to Michael
12   if somebody else sent it to me, or I may have
13   tried to -- I may have asked Deborah Carr about
14   the language.  She tends to keep more, you know,
15   kind of just documents around this kind of stuff
16   and interconnection; because it would have
17   involved, I think, going through the -- the
18   Act and finding those different references to
19   interconnection.
20       Q.  At the April -- strike that.
21          With respect to the third option that
22   was proposed in your -- in your email --
23       A.  Mm-hmm.
24       Q.  -- the -- that we marked as Exhibit -- I
25   think it would have been Exhibit 10 --

29 (Pages 110 - 113)

Page 114

1    A.  Mm-hmm, yes.
2    Q.  -- did Pat Harrison ever weigh in on any
3  of those options?
4    A.  Yes.  I think she would have had input
5  on -- on all of this.
6    Q.  Do you recall any specific opinion that
7  Ms. Harrison expressed with respect to any of
8  these three options?
9    A.  I know she was never really in favor of
10  working with American Public Media, and, you
11  know, she -- I know there were discussions around
12  the PBS option, the pros and cons of -- of that,
13  which I think Michael was advocating for.
14    But, you know, clearly, we were still
15  working under the board's direction to negotiate
16  with NPR to create a plan and -- to have them
17  create a plan and make PRSS independent.  That
18  was the -- you know, the work at hand at the
19  board's direction.  But we also had to start
20  thinking about what if NPR said, "We're not going
21  to do that," we had to be prepared for finding a
22  way to safeguard the funds and then move forward
23  on creating a -- an independent entity or having,
24  you know, some other avenue to, you know, work
25  -- provide stations with what they needed for

Page 115

1  content distribution.
2    Q.  And providing sat -- providing radio
3  interconnection funding to NPR to continue to
4  manage and operate the PRSS was not an option,
5  correct?
6    A.  That's not what I said.
7    Q.  Well, I'm just asking.
8    A.  It's -- it's --
9    Q.  There are three options here.
10    A.  Right here there are three options.
11  That is the option the board was directing us to
12  pursue at that time.
13    Q.  You mean the option that the board was
14  -- had taken off the table was to provide radio
15  interconnection funding to NPR to continue to
16  operate and manage the PRSS, correct?
17    A.  No, they -- they didn't take it off the
18  table.  Go back to the resolution.  It says we're
19  supposed to work with them to --
20    Q.  Spin off the PRSS to an independent
21  entity?
22    A.  -- spin off PRSS, which NPR would have
23  played -- really could have shaped, could have
24  played a role in.  We -- you know, we were going
25  to ask them to -- to be the ones to -- to do

Page 116

1  that.
2    Q.  At the April 9th meeting, the board
3  rescinded its resolutions of April 2nd, 4th and
4  7th regarding interconnection funding to NPR,
5  correct?
6    MR. LIPCHITZ:  Objection.
7  BY MS. TOWNSEND:
8    Q.  You can answer.
9    A.  Would you repeat the question?
10    Q.  Sure.  At the April 9th board meeting,
11  the board voted to rescind its resolutions of
12  April 2nd, 4th and 7th regarding interconnection
13  funding to NPR, correct?
14    A.  I'm assuming it says those exact words,
15  but, yes, that was the -- the direction at that
16  point.  The board decided to let CPB management
17  move forward in the best way we thought to work
18  with NPR to talk about spinning off PRSS into an
19  independent entity.
20    They felt that they might be
21  constricting the negotiations in -- in some way
22  and wanted to give management more -- they wanted
23  to just take themselves out of any position of
24  kind of micromanaging how we would go about doing
25  that.

Page 117

1    MS. TOWNSEND:  Okay.  We'll mark this as
2  Exhibit 12.
3    (Merritt Exhibit No. 12, a document
4  Bates-stamped CPB_0110856, was introduced.)
5  BY MS. TOWNSEND:
6    Q.  Is this the resolution that reflects --
7    MS. TOWNSEND:  Oh, I'm sorry, I thought
8  I handed that to you.
9    MR. LIPCHITZ:  That's okay.
10  BY MS. TOWNSEND:
11    Q.  Is this the resolution that reflects the
12  vote that we just discussed?
13    A.  Yes.
14    Q.  Who on the board proposed this
15  resolution?
16    A.  This may have been Tom Rothman.
17  There are times when he just, you know, wants the
18  -- wants management to be able to carry out, you
19  know, the direction of the -- the board without a
20  -- a lot of, again, micromanaging.
21    Q.  Did you say anything at this April 9th
22  meeting?
23    A.  I'm sure I probably did.  I don't recall
24  exactly what I would have said, but I know I
25  attended the meeting.

30 (Pages 114 - 117)

1    Q.  Is it your understanding that at this
2  point, after resolutions passed by the board
3  on April 2nd, 4th, 7th and 9th related to
4  interconnection funding to NPR, that no one from
5  CPB had discussed the possibility with NPR of
6  spinning off the PRSS into an independent entity?
7        MR. LIPCHITZ:  Objection.  Asked and
8  answered.
9        You can answer.
10       THE WITNESS:  No, not -- not to my
11  knowledge.  I -- that didn't happen until April
12  11th.
13  BY MS. TOWNSEND:
14    Q.  And two days after that board vote on
15  April 9th, you -- on April 11th you called Ryan
16  Merkley; is that right?
17    A.  Yes.
18    Q.  Who is Ryan Merkley?
19    A.  He's the Chief Operating Officer at NPR.
20    Q.  And that call was to inform Mr. Merkley
21  that CPB had rescinded its approval of NPR's
22  distribution proposal for interconnection, right?
23       MR. LIPCHITZ:  Objection.
24       THE WITNESS:  No.  It was a call to talk
25  with Ryan about our board's direction of wanting

1  to have NPR -- well, first of all, you can't
2  rescind something -- we didn't rescind the award,
3  because there was never any award.  I just want
4  to be clear about that.  But I wanted to let him
5  know that we -- the board wanted to see a plan
6  from NPR to spin off PRSS as an independent
7  entity that would better reflect the breadth of
8  the public radio system with an independent
9  governance and management structure.
10  BY MS. TOWNSEND:
11    Q.  You told Mr. Merkley during that call
12  that CPB had rescinded -- strike that.
13       You told Mr. Merkley during that call
14  that CPB's board had rescinded its approval of
15  NPR's dist -- NPR's proposal for interconnection,
16  right?
17    A.  Well, there wasn't approval.
18    Q.  I'm just asking what you told
19  Mr. Merkley on that call.  Did you tell
20  Mr. Merkley on that call that CPB -- the CPB
21  board had rescinded its approval of NPR's
22  proposal for interconnection?
23    A.  I wouldn't have said that, because there
24  was no approval of the proposal.  There was only,
25  on April 2nd, authority to negotiate with NPR.

1  There was never any grant -- award -- was
2  nothing to rescind.  There was no approval.
3  There was just a negotiation green light.
4    Q.  So you never characterized the
5  resolution that was passed on April 2nd as
6  approval of NPR's distribution proposal by the
7  board; is that right?  Is that your testimony?
8    A.  I -- the board did not approve an award.
9  They approved negotiation, so if I --
10    Q.  That was not my question.
11    A.  -- if I said --
12    Q.  My question is have you ever
13  characterized -- did you ever characterize the
14  board's April 2nd resolution --
15    A.  Mm-hmm.
16    Q.  -- to negotiate an agreement with NPR --
17    A.  Mm-hmm.
18    Q.  -- for interconnection services --
19    A.  Mm-hmm.
20    Q.  -- as the board's approval of NPR's
21  proposal for three years of distribution -- of
22  interconnection funding?
23    A.  If I used the word "approval," it
24  would have been approval to move forward with
25  negotiations.

1       And NPR knows that, you know, there is
2  no agreement until there's a signed contract -- a
3  signed agreement.
4       I mean, you could -- I could say that.
5  It wouldn't be the case.
6    Q.  Mm-hmm.
7    A.  I mean, it has to be -- you -- they're
8  right here.  The grant agreements, that's
9  approval.
10    Q.  So, on April 2nd --
11    A.  When -- when you have a signed agreement
12  that we've negotiated that both parties have, you
13  know, signed off on, that's when you have a grant
14  and when you have approval.  And anything up to
15  that point is, you know, we're gonna work with
16  you to -- to try to get to that point.  But
17  there's not approval until you have a signed
18  agreement.  And that's the way we've worked with
19  NPR for -- and every grantee for decades.
20    Q.  So on April 2nd when you called
21  Mr. Munipalla --
22    A.  Mm-hmm.
23    Q.  -- and told him that the board had
24  approved NPR's proposal --
25    A.  I said the board had approved us to move

31 (Pages 118 - 121)

Page 122

1  forward with their proposal to negotiate it. I
2  didn't say we've awarded you any money.
3      Q. I'm not asking whether you said you
4  awarded any money. I'm -- I'm saying on April
5  2nd when you called Mr. Munipalla, wasn't it your
6  belief at the time that the board had approved
7  moving forward with NPR's funding proposal for
8  three additional years of interconnection
9  funding?
10     A. It was my belief that the board had
11 approved us to negotiate a three-year agreement.
12     Q. Okay.
13     A. And if we could get that done and get it
14 signed, then there would be a grant award for
15 interconnection.
16     Q. During your April 11th call with
17 Mr. Merkley, you told him that CPB would not
18 fund the PRSS unless NPR Distribution agreed to
19 establish it as a separate entity with no ties to
20 NPR; is that right?
21     A. Again, I don't know the exact language,
22 but I told him that our board wanted to see an
23 independent PRSS that had a different governance
24 and management structure that represented the
25 breadth of the public radio system, and, you

Page 123

1  know, that -- I believe I told him NPR could be
2  part of that, but we didn't want to have any one
3  organization in control of interconnection; that
4  we thought something independent would set public
5  radio up better for success in the future if CPB
6  weren't around.
7      Q. To be clear, you told Mr. Merkley on
8  that call that CPB would not fund the public
9  radio satellite system unless NPR spun it off
10 from NPR Distribution into a separate entity,
11 right?
12     A. I told him what I just said; that we
13 wanted them to present a plan to spin off PRSS
14 and that we would fund the independent entity.
15     Q. And you told Mr. Merkley that if they
16 didn't, CPB would not fund PRSS, correct?
17     A. I don't know that I said that, no.
18     Q. So you told --
19     A. Because there was -- I don't think I
20 said, "We will never fund PRSS again under any
21 circumstance."
22     Q. That wasn't my question.
23     A. Well, but the point of the conversation
24 was asking them for a plan to spin off PRSS,
25 to have an independent governance structure.

Page 124

1  And I may even have said to him, you know,
2  that structure could still help fund satellite
3  distribution or PRSS.
4      You know, this is -- it was -- it's
5  about supporting public radio interconnection,
6  but doing it under an independent entity. And
7  if -- just like as we, you know, down the road
8  talked to the PMI Group in their response to the
9  RFP, you know, they included in their proposal
10 funding for PRSS, which we, you know, thought
11 was a great idea. You know, in a subsequent
12 conversation with Ryan when I talked to him about
13 the RFP, I said there is funding for PRSS in
14 their proposal. So, I don't think I said, --
15     Q. Sure.
16     A. -- you know, we are not going to fund
17 PRSS, but we would fund an independent entity for
18 radio interconnection.
19     I mean, NPR had this opportunity to
20 shape this the way they wanted --
21     Q. The way that CPB wanted. I completely
22 understand.
23     A. The way that they wanted. They forget,
24 in all of this, that we didn't, at the very
25 beginning just say, "Well, let's do an RFP right

Page 125

1  now," back in -- in April and May --
2      Q. Ms. Merritt, I appreciate --
3      A. Let me finish, please. May I finish?
4      Q. You may finish, but --
5      A. May I finish?
6      Q. You may finish.
7      A. We didn't say, "Let's go to an RFP."
8  We said to NPR, "Please, you know, take this
9  opportunity to give us a plan for an independent
10 entity that would govern and manage radio
11 interconnection."
12     They had an opportunity to shape it, to
13 have input into it, and they refused to do that.
14 And we ended up with an RFP because NPR did not
15 take that opportunity to do that.
16     Q. To -- okay.
17     NPR, as -- did not -- your testimony
18 is that NPR did not take the opportunity to,
19 at CPB's request, spin off the PRSS into an
20 independent entity, correct?
21     A. Correct.
22     Q. Okay. When you spoke to Mr. Merkley,
23 you told Mr. Merkley that CPB would not fund PRSS
24 unless it was spun off into an independent
25 entity, correct?

Page 126

1    MR. LIPCHITZ: Objection. Asked and
2    answered.
3        MS. TOWNSEND: It was not, but go ahead.
4        THE WITNESS: Could you repeat the
5    question?
6    BY MS. TOWNSEND:
7    Q.  When you spoke to Mr. Merkley on
8    April 11th, you said that CPB would not fund
9    PRSS unless it was spun off into an independent
10    entity, correct?
11    A.  Again --
12    Q.  It's a yes or no question.
13    A.  No, it's not a yes or no question.
14       It's --
15    Q.  Did you not tell him that?
16    A.  This is -- I -- I told him what I've
17    said about three times now.  I told him that we
18    were asking them for a plan to spin off PRSS --
19    Q.  Right.
20    A.  -- into an independent entity, and that
21    entity could involve funding for -- for PRSS.  So
22    I don't think I said there would never be funding
23    for PRSS.  I think that's a very, you know
24    -- well --
25    Q.  I don't think that was my -- my

Page 127

1    question, but let's move on.
2        Why did you call Mr. Merkley instead of
3    Mr. Munipalla?
4    A.  It seemed like a conversation that
5    needed to be had with someone higher up in the
6    NPR organization.
7    Q.  Why is that?
8    A.  Because it came at the direction of our
9    board.  I wanted to be, you know, respectful of
10    lines of authority within NPR.  And I think it
11    was a -- a conversation that needed to be held at
12    that level.
13    Q.  Wasn't it your goal --
14        MR. LIPCHITZ: Sorry.  I'm just
15    interjecting about lunch.
16        MS. TOWNSEND: Okay.  Well -- we can
17    break in about ten minutes.
18    BY MS. TOWNSEND:
19    Q.  Wasn't your goal in calling Mr. Merkley
20    to get ahead of a G4 call that was happening
21    later that morning on April 11th?
22    A.  That's true.  I wanted him to know that
23    this would likely come up at the G4 call, and I
24    didn't want him or Katherine Maher to be
25    blindsided in any way during that call.

Page 128

1    Q.  So you called him the morning of.
2    How much advance notice do you think you gave
3    Mr. Merkley before the G4 call?  Hour?  Two
4    hours?
5    A.  Probably a couple of hours.
6    Q.  What's the G4, by the way?
7    A.  It was a weekly meeting that Pat
8    Harrison started with the heads of PBS, NPR, and
9    APTS -- America's Public Television Stations --
10    which is the legislative lobbying group for
11    public television.
12    Q.  Okay.
13        MS. TOWNSEND: Why don't we break now
14    for lunch?  We could take --
15        THE VIDEOGRAPHER: We're going off the
16    record at 12:51 p.m. Eastern time.
17        (Lunch recess.)
18        THE VIDEOGRAPHER: This is Video File
19    Number 4.  Back on the record at 1:37 p.m.
20    Eastern Time.  You may begin.
21    BY MS. TOWNSEND:
22    Q.  Ms. Merritt, welcome back.  I hope you
23    had a nice lunch, albeit brief.
24        Before we broke for lunch, we were
25    discussing a conversation -- a telephone call you

Page 129

1    had with Ryan Merkley of NPR on April 11th.  Did
2    you prepare a set of talking points to use during
3    your call with Mr. Merkley?
4    A.  I most likely had talking points.
5    I think that was something that we had discussed
6    internally, so I probably did have talking
7    points.
8    Q.  Would you have prepared those talking
9    points for yourself, or did someone prepare them
10    for you?
11    A.  I probably did a draft, and would have
12    run them by other people at CPB to make sure that
13    I was conveying things in the -- the way the
14    board had expressed.  So it probably was not all
15    my -- you know, my set of talking points.  It
16    -- it would have had input from others, probably.
17    Q.  Why did you think it was important that
18    you have talking points for your call with
19    Mr. Merkley?
20    A.  I wanted to be accurate.  I wanted to
21    convey the sense of -- excuse me -- where the
22    -- the board was on radio interconnection.  So
23    that wasn't out of the ordinary to have those
24    lined up and -- as a guide for the conversation.
25    Q.  Would you have anticipated questions

33 (Pages 126 - 129)

Page 130

1  that you might get from Mr. Merkley and tried to
2  have some answers to those questions at the
3  ready?
4      A.  Most likely.
5          MS. TOWNSEND:  Why don't we go to Tab
6  19.
7  BY MS. TOWNSEND:
8      Q.  I'm going to show you what the court
9  reporter will mark as Exhibit 13.
10         (Merritt Exhibit No. 13, a document
11  Bates-stamped CPB_0212608 through 2613, was
12  introduced.)
13         MR. LIPCHITZ:  Thank you.
14  BY MS. TOWNSEND:
15     Q.  This is a series of emails, so you may
16  want to start at the end, which would be the
17  first email in the chain.
18         So let me know when you've had a chance
19  to take a look at that.
20     A.  Okay.
21         (Reviews document.)
22     Q.  Are you familiar with these emails,
23  Ms. Merritt?
24     A.  Yes.  I'm still reading, though.  Hang
25  on one minute.

Page 131

1          (Reviews document.)
2          Okay.
3      Q.  If you look at the first -- temporally
4  first email in this chain, which is actually
5  the last email, it's from you on Thursday,
6  April 10th, 2025, at 8:48 p.m. to a group of
7  folks, including Pat Harrison.  Do you see that?
8      A.  Mm-hmm.  Yes.
9      Q.  And the subject line is N -- "Re:
10  NPR - interconnection - take two"?
11     A.  Yes.
12     Q.  Are these the talking points that you
13  prepared for your April 11th discussion with
14  Mr. Merkley?
15     A.  I believe that is the case.
16     Q.  Was there anyone else on the call with
17  you and Mr. Merkley or just the two of you?
18     A.  It was just the two of us.
19     Q.  Was there ever a plan to have Evan
20  Slavitt on that call?
21     A.  I don't recall that being the case.  We
22  may have discussed that, although normally if we
23  have our general counsel on a call, we would ask
24  the other party to have their general counsel on
25  the call.

Page 132

1      Q.  Mm-hmm.  But, either way, it was just
2  you and Ryan on the call on April 11th.  Is that
3  accurate?
4      A.  Yes.
5      Q.  Okay.  If you take a look at these
6  talking points, I'm going to direct you to Number
7  6 that the -- the first words of that are "CPB
8  would like to see PRSS become independent of
9  NPR."  You see that?
10     A.  Yes.
11     Q.  Is that consistent with your
12  recollection of what you told Mr. Merkley during
13  your April 11th call?
14     A.  Yes.
15     Q.  You see Number 7, just below that, "We
16  want the funds that we have for interconnection
17  to go to the independent PRSS to support it for
18  the long term."  Is that consistent with
19  something you said to Mr. Merkley on your
20  April 11th call?  Excuse me.
21     A.  I told him that we wanted the funds to
22  go to the independent entity for interconnection.
23     Q.  Okay.  The numbering on this I think is
24  a -- is a bit wonky because it goes from Number 9
25  to Number 2.  I don't know if you see that on the

Page 133

1  -- on the email?
2      A.  Mm-hmm.
3      Q.  It looks like where it starts -- and
4  correct me if I'm wrong, but where it starts
5  with Number 2, it's sort of a list of potential
6  questions and -- and answers.  Is that a fair
7  characterization of -- those bullets?
8      A.  Yeah.  I would think so.
9      Q.  Okay.  Take a look at Number 4 at the
10  bottom.  "What if stations don't agree?  They
11  chose NPR to provide interconnection back in the
12  '80s."  Do you see that?
13     A.  Yes.
14     Q.  And then if you turn the page, it looks
15  like there's a -- I'm gonna characterize that as
16  a draft response to that question.  Is that -- is
17  that a fair characterization, the sentence that
18  begins, "You're right"?
19     A.  Yes, I think so.
20     Q.  You wrote, "In talking with system
21  leaders, I've found many are open to the idea."
22         As of April 10th, 2025, which system
23  leaders had you discussed the -- concept of
24  NPR spinning off the PRSS into an independent
25  entity with?

34 (Pages 130 - 133)

Page 134

1    A. I had talked to a number of people,
2 probably half a dozen people. I talked to
3 several NPR board members. I wanted to get a
4 read on what -- what people in the system might
5 think about this idea. And I found that the
6 people I contacted were very positive about it.
7    I was a little surprised that the NPR
8 board members I contacted were so positive about
9 it. But I just wanted to test the waters a
10 little bit on the -- the concept that, you know,
11 we had been talking about for a long time, and
12 was it -- was this the time to move forward with
13 an independent entity for radio interconnection.
14    Q. So between April 9th and April 11th, you
15 contacted individuals, including members of NPR
16 board -- NPR's board, to discuss NPR spinning off
17 the PRSS into an independent entity?
18    A. I don't know what the exact dates were,
19 but it would have been in that time frame of, you
20 know, when we were discussing that at the -- the
21 board level and the time I talked to Ryan.
22    Q. Who on NPR's board did you reach out to
23 during that time period to discuss spinning
24 -- NPR spinning the PRSS off?
25    A. Well, these were confidential

Page 135

1 conversations, but --
2    Q. They're not attorney-client privileged
3 conversations. So who on NPR's board did you
4 discuss spinning off the PRSS with?
5    A. I talked to Erika Pulley-Hayes.
6    Q. Who else?
7    A. Rachel Hubbard.
8    Q. Who else?
9    A. I think they were the only board
10 members.
11    Q. Other than NPR board members during this
12 time frame, who else did you talk to about NPR
13 spinning off the PRSS into an independent entity,
14 outside of CPB?
15    A. I -- I talked to Rima Dael at the
16 National Federation of Community Broadcasters.
17 I think I talked to Bill Davis at the Station
18 Resource Group.
19    There may have been a couple of others.
20 I can't recall off the top of my head, but I know
21 I did, as I said, reach out to a few people.
22    Q. And this was all before you had that
23 conversation on April 11th with Mr. Merkley,
24 right?
25    A. It was in that same time frame, yeah.

Page 136

1    Q. If you take a look at Number 6 on the
2 Bates-stamped page CPB_0212613, "Why did your
3 board change its mind so quickly?" is that a
4 question that you had anticipated Mr. Merkley
5 asking you?
6    A. It's a question I thought could -- could
7 come up from someone outside of CPB who hadn't
8 been involved in the board conversations.
9    Q. Did you think Mr. Merkley would ask you
10 that question?
11    A. It was a possibility.
12    Q. Did he ask you that question?
13    A. I don't think so.
14    Q. If you flip back to the prior page,
15 Number 3, at the bottom, "What if NPR has
16 expenses in developing the plan and making a
17 transition? How are those covered?" Do you see
18 that?
19    A. Yes.
20    Q. Is that a question you anticipated
21 Mr. Merkley might ask you during your April 11th
22 call?
23    A. Yes. It seems like he -- a question he
24 may have asked.
25    Q. And is the, I guess, sub-bullet 1 under

Page 137

1 that kind of a draft response to that question?
2    A. Yes.
3    Q. Do you see that it includes "We might be
4 able to consider some reimbursement through the
5 new entity"? Do you see that?
6    A. Yes.
7    Q. Why wouldn't CPB just pay those funds
8 directly to NPR Distribution? Why would they
9 need to reimburse them through the new entity?
10    A. Because the new entity would be
11 overseeing radio interconnection, and we saw
12 that entity as the entity that would oversee, you
13 know, what might be needed through PRSS as a --
14 a vendor or as a supplier for certain needs for
15 interconnection.
16    Q. Yeah. I guess my question is why
17 wouldn't CPB just provide those funds directly to
18 PRSS?
19    A. Well, because if we were funding the new
20 entity, we wouldn't need to have a separate
21 agreement with PRSS.
22    Q. And you think that if there was
23 reimbursement for NPR's expenses in developing
24 the plan before the expiration of the current
25 grant agreement in September 30th, 2025, that

35 (Pages 134 - 137)

Page 138

1  CPB wouldn't be able to reimburse those expenses
2  directly to NPR?  Or would need a separate
3  agreement to do it?
4       I'm just a little confused.  I'm just
5  trying to understand.
6       A.  Well, we knew we had funding for PRSS
7  through September 30th, and we were asking them
8  in -- this is in April --
9       Q.  Mm-hmm.
10      A.  -- to develop a plan, so they would have
11 some funding through September 30th.  And then we
12 could provide additional funding through the new
13 entity, because the whole point was to have the
14 new entity overseeing radio interconnection.  So
15 there wouldn't be a need for a separate agreement
16 for PRSS.
17      Q.  Okay.  So the whole -- the whole point
18 was to -- for all the radio interconnection
19 funding to go to this new -- new entity.  Am I
20 getting that right?
21      A.  Well, again, like it says, it would go
22 to the new entity, and then some of those funds
23 could flow to PRSS.
24      Q.  But only through that new entity.  No --
25 no funds are coming from CPB directly to NPR

Page 139

1  Distribution for PRSS; is that right?
2       A.  Right.  We were asking them to change
3  the governance and management of PRSS and
4  interconnection so the funds would go to the new
5  entity, but that didn't preclude some of the
6  funding flowing through the new entity to PRSS.
7       Q.  I think you testified before lunch that
8  you -- your call to Mr. Merkley was before a G4
9  meeting; is that right?
10      A.  Yes.
11      Q.  And you -- you referenced APTS as a
12 participant in those G4 meetings.  Who -- who is
13 the president and CEO of APTS?
14      A.  Kate Riley.
15      Q.  Do you know who Jack Williams is?
16      A.  Yes.  He's with Alabama Public
17 Television, I think.
18      Q.  And so he is with APT, not APTS; is that
19 right?
20      A.  I don't -- yeah.  Alabama Public
21 Television.  Yeah.
22      Q.  That's probably my own confusion.
23      Is Jack Williams a -- lobbyist with
24 APT?
25      A.  I don't know if he's a registered

Page 140

1  lobbyist, but I know he's involved in government
2  affairs for Alabama Public Television.
3       Q.  Does he work with folks at APTS, to your
4  knowledge?
5       A.  I would assume so, yes.
6       Q.  From the CPB perspective, would he be
7  working with or liaising with Clayton Barsoum?
8       A.  Yes, I would think so.
9       Q.  More so than you?
10      A.  Yeah.  I don't know that I've ever
11 spoken to him.
12      Q.  Um --
13      A.  Actually, I may have met him once at a
14 conference.  So I -- I may have met him.
15      Q.  Okay.  So you went into that G4 call
16 having spoken with Mr. Merkley about CPB's desire
17 to spin off the PRSS into an independent entity.
18 How did Katherine Maher react to that on the G4
19 call?
20      A.  She -- she seemed upset.
21      Q.  Was she not a happy camper?  Is that the
22 way you would put it?
23      A.  I saw that on here.  Yeah.  She was not
24 "a happy camper."
25      Q.  What makes you say that?

Page 141

1       A.  She seemed angry.  She did not like this
2  idea, and made that known.
3       Q.  Did it seem like she was surprised?
4       A.  I'm not sure.  Because I would assume
5  Ryan would have contacted her and let her know
6  about the conversation he and I had.
7       Q.  And you anticipated in your discussion
8  with Ryan that this news would be both unexpected
9  and challenging for NPR; is that right?
10      A.  I think that's fair.
11      Q.  I believe that's what you said in your
12 talking points.
13      A.  Mm-hmm.
14      Q.  When you had that April 11th
15 conversation with Mr. Merkley, did he express
16 concern about a 30-day time frame?
17      A.  Yes.  He was concerned that that was a
18 short time frame.  And I did say to him, I
19 believe, that, you know, we weren't looking for
20 all this to happen in 30 days.  We were looking
21 for a plan in 30 days.
22      Q.  Did you talk to Mr. Munipalla the day
23 after the G4 meeting?
24      A.  I'm not sure.  I may have, although that
25 would have been a Saturday, because the G4 is on

Page 142

1    Fridays.  But I may have spoken to him that day.
2        Q.  Do you have any rele -- recollection of
3    speaking to him shortly after the G -- within
4    days of the G4 meeting?
5        A.  I don't recall a specific conversation,
6    but I could see where I would have talked to him
7    shortly thereafter.
8        Q.  I'm going to mark this as Exhibit 14.
9            (Merritt Exhibit No. 14, a document
10   Bates-stamped CPB_0023245, was introduced.)
11           THE WITNESS:  Thank you.
12           THE REPORTER:  You're welcome.
13           MR. LIPCHITZ:  Thanks.
14   BY MS. TOWNSEND:
15       Q.  And this is an email from you to Pat
16   Harrison and Debra Sanchez on April 12th, 2025,
17   correct?
18       A.  Correct.
19       Q.  And is this the day after the G4
20   meeting?
21       A.  Yes.
22       Q.  And this is a Saturday?
23       A.  Yes.
24       Q.  And the subject line is "End of day
25   update."  Is this a recounting of a conversation

Page 143

1    you had with Mr. Munipalla?
2        A.  Yes.
3        Q.  And you discussed with Mr. Munipalla
4    CPB's desire that NPR spin off the PRSS to an
5    independent entity during that call?
6        A.  Yes.
7        Q.  Did Mr. Munipalla tell you on that call
8    that any change like that would have to be
9    approved by the interconnected stations?
10       A.  Apparently he did, since it's in my
11   notes.
12       Q.  You don't have an independent
13   recollection of that, but you trust your notes?
14       A.  I do.
15       Q.  It says -- I don't know if this is from
16   him or from you, but "that could be challenging."
17   Do you see that?
18       A.  Yes.
19       Q.  Is that from him or from you -- strike
20   that.  That question probably didn't make sense.
21          The last bullet point that says, "He
22   reiterated that any change would have to be
23   approved by the interconnected stations, which
24   could be challenging."
25       A.  Mm-hmm.

Page 144

1        Q.  Was the phrase, "which could be
2    challenging," his thought or your thought?
3        A.  I'm not certain.
4        Q.  Okay.  Could have been either?
5        A.  Mm-hmm.
6        Q.  Could have been both.
7        A.  Could have been both.
8        Q.  You'll see at the bottom of this email
9    it says, "I also spoke with Ruby."  Do you see
10   that?
11       A.  Yes.
12       Q.  Is that Ruby Calvert?
13       A.  Yes.
14       Q.  Do you recall speaking with Ruby Calvert
15   on April 12th, 2025?
16       A.  I don't recall it, but it appears that I
17   did.
18       Q.  Since you don't recall the conversation,
19   is it fair to say you trust that these -- these
20   notes are accurate?
21       A.  Yes.
22       Q.  So after the G4 meeting on April 11th,
23   you -- you spoke with Mr. Munipalla on Saturday,
24   you spoke with Ms. Calvert on Saturday, and you
25   were working with other members of CPB management

Page 145

1    over that weekend on a plan to implement the
2    board's direction to have NPR spin off the PRSS
3    into an independent entity, right?
4        A.  I'm not sure I understand your question.
5        Q.  Do you recall working a lot that
6    weekend, April 12th and April 13th?
7        A.  I may very well have worked a lot.  It
8    looks like I at least worked on Saturday.
9        Q.  Do you recall coming up with kind of a
10   -- a plan of -- of action for CPB to implement
11   the board's directive that NPR spin off the PRSS
12   into an independent entity over that weekend?
13       A.  I may have worked on this issue.  I'm
14   sure we were thinking about what next steps we
15   would need to take to work with NPR to answer any
16   questions they -- they might have.
17          MS. TOWNSEND:  I'm going to mark this
18   next exhibit, Tab 21, as Exhibit 15,
19          (Merritt Exhibit No. 15, a document
20   Bates-stamped CPB_0023266 through 3268, was
21   introduced.)
22          THE WITNESS:  Thank you.
23   BY MS. TOWNSEND:
24       Q.  Do you recognize these set of emails,
25   Ms. Merritt?  It -- it starts with your

37 (Pages 142 - 145)

Page 146

1    end-of-day update that we marked as Exhibit 14.
2        A.   Hmm.  (Reviews document.)
3            Yes.  It looks like I worked that
4    weekend.
5        Q.   You see on Sunday, April 13th at
6    8:19 a.m. Pat Harrison responded to your
7    end-of-day update that begins, "Can
8    you add D. Carr to this list"?  Do you see that?
9        A.   Yes.
10       Q.   Ms. Harrison mentions in her email -- I
11   think it's sort of the second bullet from the
12   bottom -- "Can you put together a working group
13   of radio leaders, GMs, et cetera to help us
14   create new entity while money is kept whole at
15   PBS?"  Do you see that?
16       A.   Yes.
17       Q.   Is this the -- where the idea for a new
18   working group came from?
19       A.   I don't think so.
20       Q.   Had you been discussing a working group
21   prior to this related to public radio
22   interconnection?
23       A.   Well, as I mentioned, in the fall of
24   2024, we had meetings between NPR and PBS and
25   thought of that as a kind of working group --

Page 147

1        Q.   Oh --
2        A.   -- but this --
3        Q.   And -- and let me -- I don't want to be
4    confusing the --
5        A.   Yeah.
6        Q.   We want to be clear here.
7            When I say, "working group," I'm sure
8    there have been plenty of working groups over
9    time.  When I say, "the idea" of a working group,
10   I mean a working group designed to discuss an
11   independent entity; that is, PRSS spun out of
12   NPR.
13           Was that -- was this the first time
14   anyone had brought up that idea?
15       A.   It -- it may have been the first time
16   that it was brought up.
17       Q.   Okay.  And you see at about 9 a.m. you
18   responded to Pat's email -- or, Ms. Harrison's
19   email, excuse me, and copied some other folks at
20   -- at CPB.  And you set out kind of a list of
21   multiple things we need to do.  You see that?
22       A.   Yes.
23       Q.   The second bullet point -- well, let's
24   start with the first bullet point.  "Reply to
25   Ryan."  You mention you want to "push the D/I

Page 148

1    Committee meeting off as long as possible."  What
2    do you mean by -- by that?  Was there an upcoming
3    D/I Committee meeting?
4        A.   I think there was supposed to be a D/I
5    Committee meeting that -- that next day, the
6    14th.
7            I'm trying to remember, because there
8    was a -- a meeting that they invited me to, I
9    think was on that Monday, the 14th.  And then our
10   board decided to meet that day as well, and it
11   conflicted.  So I think if that's what I was
12   trying to say here, I, you know, didn't think I
13   could do that Monday D/I Committee meeting,
14   but --
15       Q.   And that's because you needed more time
16   to talk to people across the system and to
17   prepare for that meeting?
18       A.   Yeah.  I think that's right.
19       Q.   And then in the second bullet point is
20   you want -- "design what we would like to see,"
21   and you say, "We should have something in mind to
22   float as we talk to system leaders or get a
23   working group together."
24           Is that your view of something that CPB
25   would need to do in order to spin off the PRSS

Page 149

1    from NPR.
2        A.   I think it's indicative of how CPB
3    works.  We like to understand what stakeholders
4    in the system think as we go about our work.
5    So I think we -- we wanted to, just as I was
6    doing in those previous conversations that we
7    discussed, have a sense of where people were with
8    this issue to think with them about what this
9    could look like, because we knew there -- there
10   would be questions from NPR, which did come up in
11   subsequent conversation.  So I think we wanted to
12   be prepared to answer questions from NPR, from
13   people in the -- the system.
14           And this is really how we work in our
15   stewardship, getting input from, you know,
16   stakeholders across the system.
17       Q.   Well, this says, "We should have
18   something in mind to float as we talk to system
19   leaders or get a working group together."  So
20   maybe I'm misinterpreting this, but it sounds to
21   me like CPB is saying, "We should have something
22   in mind as to what we want this independent
23   entity to look like," right?
24       A.   Well, sure.
25       Q.   The line that begins, "They should get

Page 150

1    a" new -- "a seat on the board," do you see that?
2        A.   Yes.
3        Q.   There's an all-caps word "right" that
4    comes after that sentence.  Is that someone
5    else's in-line comment to your email, or did you
6    write that?
7        A.   That's probably Pat's reply.
8        Q.   So Pat re -- replied on April 13th at
9    9:57 a.m., and you think her responses were just
10    in line, in other words, in your initial email?
11        A.   Yes.
12        Q.   Okay.  So your recollection is,
13    "right," that's Pat's word.
14        A.   Yes.
15        Q.   Okay.  You note in this that "I think
16    Badri would become the CEO or a similar position
17    since he will be the one running this.  I don't
18    think there's anyone else who can step in."
19    You're referring to Mr. Munipalla right there?
20        A.   Yes.
21        Q.   Under the next bullet where you say,
22    "hold many conversations," you say, "the D/I
23    Committee is at the center of this."  At the time
24    you sent this email, had you spoken with anyone
25    from the D/I Committee about this plan to spin

Page 151

1    the PRSS off or out of NPR?
2        A.   Yes.
3        Q.   Who had you spoken with?
4        A.   Erika Pulley-Hayes.
5        Q.   Anyone else?
6        A.   No.  I don't think so.
7        Q.   Who's the chair of the D/I Committee?
8        A.   Mike Savage.
9        Q.   And you -- you had not spoken with Mike
10    Savage prior to --
11        A.   No.
12        Q.   -- this?
13        You note that "Mike Savage would
14    probably hate this idea, though he fancies
15    himself as the champion of the little guy."  Why
16    did you think Mr. Savage would "hate this idea"?
17        A.   Because he is very protective of PRSS as
18    it is and has been.
19        Q.   If you look on the next page, you have a
20    bullet that says, "Undertake a system-wide
21    campaign."  Do you see that?
22        A.   Yes.
23        Q.   And the first sentence there is,
24    "Ultimately the stations will have to vote on
25    making a switch for PRSS."  Do you see that?

Page 152

1        A.   Yes.
2        Q.   Do you believe that to be the case, that
3    the stations have to vote to make a switch for
4    PRSS, as you sit here today?
5        A.   If -- well, I'm uncertain, because we're
6    talking about an independent entity that would be
7    created by -- under the supervision of NPR at
8    this point in -- in where we were in the
9    timeline.  So I don't know if they would have had
10    to have some kind of a -- a vote.
11        This is a gray area, I think, that
12    ultimately the stations will decide what -- what
13    systems they want to use, what services they
14    -- they want to sign up for.  So I think in that
15    sense the stations, you know, will ultimately go
16    where they need to go to -- to get the services
17    they need.
18        Q.   Sorry.  You said that an in -- at this
19    point we were talking about an independent entity
20    that would be under the supervision of NPR, but
21    we weren't talking about that.  We're talking
22    about an independent entity, right, spun off from
23    the supervision of NPR Distribution?
24        A.   Right.  But you'd be -- you'd be
25    going from the PRSS, which was under NPR, to an

Page 153

1    independent entity.  So I don't know if NPR felt
2    that there would have to be some kind of vote as
3    that shift was made.
4        Q.   So at this point on Sunday, April 13th,
5    did you believe that CPB needed to undertake a
6    system-wide campaign because ultimately the
7    stations will have to vote on making a switch for
8    PRSS?
9        A.   I think it was important to help
10    stations understand what the "having an
11    independent entity" would mean for them.
12        And in that sense -- because so many
13    stations, honestly -- you know, interconnection
14    for them is -- it's there.  You know, it's
15    meeting some of their needs.  But as I note in
16    here, when it comes to actually getting attention
17    on some of it, it's -- like when NPR says they
18    -- they do these votes, like, you know, a vote
19    for the non-NPR members on the D/I Committee,
20    they can't get enough people to -- to vote.
21        So it really was about helping people
22    understand, you know, the significance of -- of
23    making this kind of change.
24        Q.   Because you recognized that the stations
25    would have to vote on making a switch for PRSS,

Page 154

1 right? That's why you say here, "We would have
2 to gin up interest to get stations to pay
3 attention and vote."
4    A.  Yeah.  If -- if a vote was needed on
5 that kind of a switch from NPR to an independent
6 entity, that would have to happen.
7    Q.  And at this point in Ap -- on April
8 13th, you believed that a vote was necessary,
9 right?  That's why you included it in your to-do
10 list, for lack of a better way to put it?
11    A.  Yeah.  I think at that -- at that point
12 that would have been true.
13    Q.  If you look below, there's an all-caps
14 note that says, "Let's discuss below.  We need
15 Carl to move now."
16       Is that a comment from Pat on your
17 email, or did you write that?
18    A.  That would have been Pat.
19    Q.  Who's Carl?
20    A.  I guess that would be Carl -- it's not
21 Fonte -- Forti? -- Carl Forti, who came in at
22 about this time, I guess, and was helping CPB
23 think through communication strategies.
24    Q.  Is Carl Forti a lobbyist?
25    A.  He may be a lobbyist.  I -- I don't know

Page 155

1 if he's a registered, like, lobbyist.  But he
2 worked on -- worked on the Hill, you know, worked
3 in communications on -- on Capitol Hill for
4 Congress.
5    Q.  So he's a communications consultant that
6 works on Hill communications, specifically.
7    A.  He was working on Hill communications.
8 And I think, just in general, we were running
9 some other things by him having to do with
10 communications.
11    Q.  On the first page of Exhibit 15, just to
12 jump back, in the section at the bottom where you
13 mention the D/I Committee, you say, "Patty Cahill
14 is on the committee, so we need a plan for her."
15       What did you mean by that?
16    A.  Patty Cahill is a former CPB board
17 member.  So we know Patty very well and wanted to
18 make sure that she understood what the board was
19 asking management to do in terms of radio
20 interconnection.  You know, she -- as a former
21 board member, she's someone we thought it was
22 important to, you know, communicate with.
23    Q.  And Ms. Cahill's not a member of the NPR
24 board, correct?
25    A.  She is not.

Page 156

1    Q.  Do you remember having a conversation
2 with Ms. Cahill at or around this time about
3 spinning off the PRSS out of NPR?
4    A.  You know, I can't remember if I talked
5 to her.  I think Michael Levy talked to her.  I
6 -- I may have, but I don't -- I don't recall.
7 But I'm -- I'm pretty sure Michael talked with
8 her.
9    Q.  But you don't recall speaking with her
10 yourself?
11    A.  I'm -- I -- I may have.  I just -- I
12 don't recall, specifically.
13    Q.  Over that same weekend, April 12th,
14 April 13th, in addition to kind of coming up with
15 this to-do list, for lack of a better way to put
16 it, CPB's management was also working on -- on
17 messaging, right?  How to message this change to
18 the system?
19    A.  I -- I could see where we would be doing
20 that at this time, yes.
21    Q.  Because you needed to explain to the
22 system why local stations were gonna be better
23 served by having PRSS as an independent entity,
24 right?
25    A.  We were probably working on that, yes.

Page 157

1    Q.  I'm going to show you Tab 18.
2       MS. TOWNSEND:  We'll mark this as
3 Exhibit 16.
4       (Merritt Exhibit No. 16, a document
5 Bates-stamped CPB_0110454 through 0455, was
6 introduced.)
7       THE WITNESS:  Did I get two copies of
8 this?  I might have got two.
9       Okay.  Yeah.  Would you like one back?
10 BY MS. TOWNSEND:
11    Q.  Sure.  Just to keep it --
12    A.  Neat?
13    Q.  Keep tidy.
14    A.  Yeah.  Organized here.
15    Q.  Okay.  Here is Exhibit 16.
16    A.  Thanks.
17       MR. LIPCHITZ:  Thanks.
18 BY MS. TOWNSEND:
19    Q.  All right.  Does this email chain look
20 familiar to you, Ms. Merritt?
21    A.  (Reviews document.)
22       Okay.
23    Q.  You see this email chain is kicked off
24 on Sunday, April 13th at 2:54 p.m. by an email
25 from Pat Harrison with the subject line "Things

Page 158

1 have changed since last week when our board
2 approved giving interconnection funds to NPR."
3 Do you see that?
4     A.  Mm-hmm.  Yes.
5     Q.  Okay.  And Deb -- Debra Sanchez then
6 responded to that email, looks like less than 10
7 minutes later, with an email where she begins,
8 "Something has been fundamentally missing for
9 me."  Do you see that?
10     A.  Yes.
11     Q.  Are these things that Ms. Sanchez, in
12 your view, thought needed to be addressed by CPB
13 in communicating to the system?
14         And to clarify, I mean communicating to
15 the system about CPB's decision to spin off or
16 compel NPR to spin off the PRSS.
17     A.  Well, it looks like she was throwing
18 some ideas out about messaging.  So she must have
19 thought these were important.
20     Q.  And you responded to -- well, strike
21 that.
22         You sent an email at 3:32 p.m. just to
23 Deborah Carr asking her if she could write "two
24 sentences based on the consultant's reports and
25 the current environment as to why we should spin

Page 159

1 off PRSS, what would you say?"
2         Was this, again, kind of an effort to
3 develop some messaging around the decision of CPB
4 that the PRSS needed to be spun off from NPR?
5     A.  I think we were trying to capture months
6 and years of work on radio interconnection and
7 convey it to the public radio system as to, you
8 know, why, at that moment, our board was
9 directing us to have NPR spin off PRSS.
10     Q.  And you didn't think that was going to
11 be obvious to the system, right?  You thought it
12 needed some explanation.
13     A.  Well, as I said before, I think there
14 are a number of stations who actually don't even
15 know how the government -- governance works for
16 PRSS.  I've had NPR board members tell me that
17 there are board members who don't understand what
18 PRSS does and how it works.
19         So, yes, we felt that we needed to be
20 prepared to explain that.
21     MS. TOWNSEND:  I'll mark this as Exhibit
22 17.
23         (Merritt Exhibit No. 17, email
24 Bates-stamped CPB_0305846, with attachment
25 Bates-stamped CPB_0305847 through 5848, was

Page 160

1 introduced.)
2     MR. LIPCHITZ:  Thank you.
3     THE WITNESS:  Thank you.
4 BY MS. TOWNSEND:
5     Q.  This is -- I will represent to you an
6 email with an attachment.
7         Do you repre -- do you recognize this
8 -- this email and -- and attached letter,
9 Ms. Merritt?
10     A.  (Reviews document.)
11         Yes.
12     Q.  And this is a letter from Mr. Savage
13 who's the chair of the D/I Committee?
14     A.  Yes.
15     Q.  And this letter expresses the belief
16 of the D/I Committee that any changes to PRSS
17 management at this time would be
18 counterproductive and harmful to the public radio
19 system.  Is that a fair summary of this letter
20 from Mr. Savage?
21     A.  I don't know that it says that.
22     Q.  Oh, I was actually looking at
23 Mr. Savage's cover email to you, which is
24 Bates-stamped 305846, where Mr. --
25     A.  Yes, it says that in the email.  But he

Page 161

1 doesn't use that language in the letter.
2     Q.  Is it a fair -- fair enough.
3         Does this email indicate to you that
4 the D/I Committee believes that any change
5 to PRSS management at this time would be
6 counterproductive and harmful to the public radio
7 system?
8     A.  I think the -- the letter just states
9 some facts about, you know, PRSS, about the D/I
10 Committee.  They're asking CPB to provide funding
11 for PRSS.
12     Q.  Can you take a look at the cover email
13 that Mr. Savage sent to you?
14     A.  Yes.
15     Q.  Did you rece -- recall receiving this?
16     A.  Yes.
17     Q.  Do you recall -- strike that.
18         Do you believe that this email reflects
19 the view of the D/I Committee?
20     A.  I think it reflects the view of
21 Mr. Savage.
22     Q.  So you think that Mr. Savage, who is
23 writing on behalf of the D/I Committee here, is
24 just expressing his own personal views and not
25 those of the D/I Committee?

41 (Pages 158 - 161)

1    A.  I think there's some members of the D/I
2  Committee who have a more nuanced view of where
3  public radio interconnection should be going.
4    Q.  Does it matter to you what the D/I
5  Committee thinks?
6    A.  I take input from any station seriously,
7  whether they're on the D/I Committee or not.
8    Q.  Did you call Mr. Savage after you
9  received this letter and -- and email?
10    A.  I -- no, I did not.  I responded with a
11  letter back to Mike and the D/I Committee.
12    Q.  If you take a look at the letter that's
13  attached here, you'll see that Mr. Savage wrote
14  that the -- it's in bolded -- I believe that's
15  his bolding -- "the PRSS exists for the benefit
16  of the interconnected stations.  Its assets
17  belong to those interconnected stations.  CPB
18  interconnection funding supports these stations
19  along with local broadcasting and sharing of
20  content.
21      "On behalf of this group, the full
22  D/I Committee strongly urges CPB to fund PRSS
23  interconnection for three years as was approved
24  by the CPB board and presented to NPR leadership
25  just a few weeks ago."

1      Does this clarify for you that
2  Mr. Savage was writing on behalf of the full D/I
3  Committee?
4    A.  He says he's writing on behalf of the
5  D/I Committee.  But he's also in error when he
6  talks about the funding being approved by the CPB
7  board.
8    Q.  Well -- okay.
9      You believed Mr. Savage was in error
10  when he said that, when you read this letter?
11    A.  Yes.
12    Q.  And you said you responded to Mr. Savage
13  by a letter, right?
14    A.  Yes.
15    Q.  That's how you responded?
16    A.  Mm-hmm.
17      MS. TOWNSEND:  I'm going to mark these
18  two -- no.  Do it on this one. -- Exhibit 18.
19      THE WITNESS:  Thank you.
20      Ms. TOWNSEND:  This is an email with an
21  attachment.
22      MR. LIPCHITZ:  Thank you.
23      (Merritt Exhibit No. 18, email
24  Bates-stamped CPB_0185383 through 5384, with
25  attachment Bates-stamped CPB_0185385 through

1  5386, was introduced.)
2  BY MS. TOWNSEND:
3    Q.  Is this the -- I -- well, strike that.
4      I'll represent to you that this is a
5  email with a letter attachment.  Is this the
6  written response to Mr. Savage's letter that you
7  just referenced?
8    A.  Yes.  Although this one doesn't have the
9  date on it, but it should say, "April 17th."
10    Q.  Okay.  This was in the production that
11  was provided to us by CPB -- I'm not sure why it
12  doesn't have that -- that date.
13      But, in any event, I see that it was
14  sent via email on April 17th based on the cover
15  letter.
16    A.  Correct.
17    Q.  And this -- the attached letter that
18  begins, "I have received your letter dated
19  April 16th, 2025," this is your response to
20  Mr. Savage, correct?
21    A.  Yes.
22    Q.  You respond to something in Mr. Savage's
23  cover email, I believe.  In this letter it
24  states, "Your email states that you believe you
25  would be remiss if you did not share with

1  stations that CPB cannot confirm that public
2  radio stations will have the interconnection
3  support they rely on."  Do you see that?
4    A.  Yes.
5    Q.  Did you think that was a -- an important
6  correction to make in this letter?
7    A.  Yes.
8    Q.  Did you correct what you now say was
9  Mr. Savage's misstatement about the CPB board's
10  approval of PRSS funding to NPR -- in this
11  letter?
12    A.  I did not address that in the letter.
13    Q.  Okay.  Why not?  If you thought it was
14  wrong, why didn't you tell him it was wrong?
15    A.  I think it was an oversight on my part.
16    Q.  Just an oversight?
17      Yes?  Just an oversight?
18    A.  Yes.
19    Q.  But you knew at the time you read his
20  letter it was wrong and you meant to correct it?
21  You just neglected to inadvertently?
22    A.  I don't recall exactly, but I was trying
23  to respond to -- I didn't want a lot of time to
24  go by before responding to Mike.
25    Q.  Right.  Because you wanted to correct

Page 166

1    some misimpressions that you believed he had; is
2    that correct?
3        A.   If nothing else, I wanted him to
4    understand CPB's role in interconnection and
5    reiterate that what we were looking for was a
6    plan to spin off PRSS.
7        Q.   Did you think Mr. Savage as the chair of
8    the D/I Committee would not understand CPB's role
9    with respect to interconnection?
10        A.   I think the D/I Committee has not always
11    understood CPB's role, has developed a somewhat
12    adversarial attitude about CPB, because we have
13    questioned the management of PRSS over the years
14    through the findings of our consultants' reports.
15    And Mike, especially, is very defensive about
16    taking on any input from CPB.
17        So, no, I don't know that the D/I
18    Committee fully understands CPB's role in
19    interconnection.
20        Q.   Did you think it was important to engage
21    with the D/I Committee in connection with CPB's
22    plan to require NPR to spin off the PRSS?
23        A.   Well, they are -- yes, I -- I think it
24    was important.
25        Q.   And what you told Mr. Savage in this

Page 167

1    response to that, "what we have said -- i.e.,
2    what CPB has said -- "to NPR is that we want
3    NPR to deliver a plan to spin off PRSS into an
4    independent entity that would represent the
5    entirety of the public radio system. Federal
6    funding for public radio interconnection would go
7    to this independent entity." Is that accurate?
8        A.   That's what it says.
9        Q.   And is that your -- was that your belief
10    at the time of what CPB's goal was?
11        A.   Yes.
12        MS. TOWNSEND:  We've been going for a
13    little bit. Do you want to -- would you like to
14    take a break?
15        MR. LIPCHITZ:  Yeah. I think that would
16    be good.
17        THE WITNESS:  Sure.
18        MS. TOWNSEND:  Okay. Let's go off the
19    record.
20        THE VIDEOGRAPHER:  We're going off the
21    record at 2:48 p.m. Eastern Time.
22        (Recess taken.)
23        THE VIDEOGRAPHER:  This is Video File
24    Number 5. Back on the record at 3:05 p.m.
25    Eastern Time.

Page 168

1        You may begin.
2    BY MS. TOWNSEND:
3        Q.   Ms. Merritt, do you recall roughly when
4    the 30-day time frame that CPB gave NPR to submit
5    a plan for spinning off the PRSS ran out?
6        A.   May 9th.
7        Q.   I believe you referred earlier to a Rima
8    Dael. I don't want to mispronounce her last
9    name.
10        A.   I think she pronounces it "Dial."
11        Q.   "Dial."  "Rima Dael."
12        Who is Rima Dael again?
13        A.   She is the CEO, I guess, or executive
14    director of the National Federation of Community
15    Broadcasters.
16        Q.   Do you -- did Ms. Dael, in early May,
17    offer to convene a working group on behalf of
18    CPB to address a kind of independent PRSS?
19        A.   She did. She wrote a letter to Pat
20    Harrison and to Katherine Maher offering to
21    convene a working group.
22        Q.   Did you embrace that offer as a way to
23    move this idea of an independent PRSS forward?
24        A.   We thought that it could be a good idea,
25    yes.

Page 169

1        Q.   And that's because it would take the
2    conversation about interconnection away from NPR,
3    right?
4        A.   We thought it would put the conversation
5    about interconnection with the stations, which
6    was an appropriate place for it to be.
7        Q.   And you liked the idea of a working
8    group because it would make it look like NP
9    -- like CPB, excuse me, was collaborating and not
10    acting unilaterally; is that right?
11        A.   No.
12        Q.   Let me show you tab 5.
13        MS. TOWNSEND:  We'll mark this as
14    Exhibit 19.
15        (Merritt Exhibit No. 19, a document
16    Bates-stamped CPB_0015943 through 5944, was
17    introduced.)
18    BY MS. TOWNSEND:
19        Q.   I'll give you a second to take a look at
20    this. This is an email chain -- exchange from
21    May 7th, 2025.
22        Do you recall this email exchange?
23        A.   (Reviews document.)
24        Q.   Ms. Merritt, does this email refresh
25    your recollection that on May 7th, 2025, you told

Page 170

1  Pat Harrison, "I think we could use Rima's offer
2  to convene a working group as a way to move the
3  idea of an independent PRSS forward.  It would
4  take the conversation about interconnection away
5  from NPR and give it to the system"?
6       A.  Yes.  Which is what I was saying: it
7  would give it to the stations and to the system.
8       Q.  And it says -- and do you recall -- or,
9  does this refresh your recollection that on
10  May 7th you told Ms. Harrison, "Another benefit
11  -- I guess of the working group -- "we would look
12  like we are collaborating to address the issue
13  and not acting unilaterally."  Do you see that?
14      A.  I do see that.  And that's -- we would
15  not only look like we were collaborating, but we
16  would be collaborating.
17      Q.  Did you think there was a concern that
18  it would look like CPB was acting unilaterally by
19  forcing NPR to spin off the PRSS?
20      A.  It would be hard to really have it be
21  seen as acting unilaterally because the ball was
22  in NPR's court.  It was up to them whether they
23  were going to respond to our request and how they
24  would respond.
25      Q.  Well, why did you reference "acting

Page 171

1  unilaterally" in your email, then, if you didn't
2  think that was even a possibility that anyone
3  would think that was the case?
4       A.  Well, I think, yes, some people might
5  see it that way.  But that is not the way we were
6  acting.
7       Q.  Your view is that it's possible some
8  people in the system might think you were acting
9  unilaterally, but in your view CPB was not acting
10  unilaterally?
11      A.  Correct.
12      Q.  You convened a working group after this
13  email on May sev -- exchange on May 7th, correct?
14      A.  We did.  I don't remember the dates
15  -- the date of that first working group meeting.
16      Q.  What was your involvement in the working
17  group?
18      A.  I led the conversations in the working
19  group; helped shaped the agendas for the working
20  group; worked to solicit the input, the feedback
21  from the members that we thought would be
22  helpful.
23      Q.  And you selected the members of the
24  working group, correct?
25      A.  I put forward an initial list and had

Page 172

1  other people at CPB respond to that and provide
2  ideas.
3       Q.  So CPB selected all the members of the
4  working group?  Is that fair to say?
5       A.  Rima also had some input into the
6  working group members.
7       Q.  Is that because you asked her for that
8  input?
9       A.  I don't remember if I asked her.  I know
10  she suggested a couple of people.  I -- I may
11  have asked her, or she might have just said,
12  "Why don't you consider, you know, these people."
13      Q.  Who did Rima suggest?
14      A.  She suggested Elva De La Torre and
15  wanted to make sure we included Loris Taylor at
16  Native Public Media, and trying to think if there
17  was anyone else.
18          That -- that may have been it.
19      Q.  Did those two end up on the working
20  group?
21      A.  Yes.
22      Q.  Everyone else was selected by CPB?
23      A.  Yes.
24      Q.  And that's because you at C -- strike
25  that.

Page 173

1          That's because CPB got to decide who was
2  in its working group, right?
3          MR. LIPCHITZ:  Objection.
4          THE WITNESS:  We were looking to have a
5  broadly representative group of people from
6  across the public radio system.  This is
7  something that CPB often does when we do things
8  like community service grant reviews.  We want to
9  make sure we have different size stations,
10  different geographic areas, you know, widely
11  representative groups when we are seeking input.
12  BY MS. TOWNSEND:
13      Q.  But in your view, this working group was
14  CPB's working group, and CPB got to decide who
15  was going to be participating in it, right?
16      A.  Well, I just said that Rima had input
17  into it as well, but -- but, yes, we -- we
18  selected the members.
19      Q.  Did you invite Mr. Munipalla to
20  participate in that working group?  I think it's
21  a yes-or-no question.
22      A.  We asked -- well, it's not, actually.
23          We asked him to come to a meeting where
24  we focused on technology, and he presented to the
25  working group during that meeting.

44 (Pages 170 - 173)

1    Q. Okay. So Mr. Munipalla presented to
2 the working group. But he was not invited to
3 participate in the working group; is that right?
4    A. Strictly speaking, yes.
5    Q. And that's because he's from NPR
6 Distribution, and the thought is that he would
7 disrupt the conversation because he would explain
8 how -- what PRSS already does, and that wouldn't
9 be very -- well, strike that.
10    That's because Mr. Munipalla is from NPR
11 Distribution, and you thought it would disrupt
12 the conversation to have someone from NPR
13 Distribution there to explain what the PRSS
14 already does; is that right?
15    A. No. We had him present to the group to
16 explain what PRSS does. We had two members of
17 the NPR board in the working group, including a
18 member of the D/I Committee.
19    Q. Did you think Mr. Munipalla would be a
20 buzzkill for that meeting?
21    A. For which meeting? For all --
22    Q. For the working group. Yeah.
23    A. For all the meetings.
24    Q. Yeah. Did you think Mr. Munipalla
25 shouldn't be included in the working group

1 because he'd be a buzzkill?
2    A. I think he would have represented a
3 particular point of view that would have been
4 maybe more focused on technology, and that's why
5 we had him come for the session where we talked
6 about technology.
7    But --
8    Q. But separate from --
9    A. When he --
10    Q. Sorry. Go ahead. Did you have
11 something else?
12    A. No.
13    Q. Separate from that -- that presentation
14 that Mr. Munipalla was invited to give with
15 respect to the PRSS technology, did you not think
16 it would be valuable to have the head of NPR
17 Distribution who currently oversees and manages
18 the PRSS in a discussion about radio
19 interconnection, or as part of a working group
20 designed to talk about the future of radio
21 interconnection?
22    A. I think after NPR refused to consider
23 creating a plan for a spin-off of PRSS, I
24 think it -- it was important to focus on some
25 higher-level conversations, which is why we had a

1 member of the D/I Committee on and a member of
2 the board on. And, yes, he -- he may have come
3 in and presented a point of view that -- that
4 may not have been productive to those kind of
5 higher-level conversations.
6    Q. And to -- to the goal that CPB had,
7 which was an entity wholly separate from NPR
8 receiving satellite -- excuse me, interconnection
9 funding -- radio interconnection funding.
10    A. I think we had NPR's interest
11 represented through their two board members.
12 And we had invited Mike Savage as head of the D/I
13 Committee, but NPR then came back and said, no,
14 they didn't want Mike Savage, but they were
15 allowing Debbie Hiott and Rachel Hubbard, as
16 board members, to be on the committee -- the
17 working group.
18    Q. What -- where -- how do you have the
19 impression that NPR did not allow Mr. Savage to
20 participate in the working group?
21    A. Well, he was invited. And I heard from
22 other board members that the board didn't think
23 it was a good idea for him to participate.
24    Q. You heard from other NPR board members
25 that the NPR board did not think it was a good

1 idea for Mr. Savage to participate in the working
2 group?
3    A. That's what I heard.
4    Q. But you don't know for a fact that
5 anyone at NPR told Mr. Savage not to participate
6 in the working group, correct?
7    A. There was a correspondence -- and I
8 don't recall who it was from -- that said that
9 Rachel and Debbie could participate but that Mike
10 was not going to participate, and suggested that
11 Badri participate.
12    So at some point they -- somebody
13 determined -- maybe Mike determined -- that he
14 should not participate. But as head of the D/I
15 Committee, I thought we should invite him; it
16 would be important for him to, you know, be as
17 -- a part of the -- the working group in his role
18 as chair of the D/I Committee.
19    Q. So you don't know if Mr. Savage just
20 believed that Mr. Munipalla would be more
21 valuable to the working group than he would and
22 made that suggestion?
23    A. I don't know who made that suggestion.
24 I just had heard that there were apparently
25 either discussions at the board level or on the

Page 178

1    D/I Committee that Mike would not be a good
2    addition to the -- the working group.
3        Q.  I'm gonna mark this as Exhibit 20.
4    -- well, he's gonna mark this one and give it to
5    you.
6        MR. LIPCHITZ:  Sorry.
7        (Merritt Exhibit No. 20, a document
8    Bates-stamped CPB_0001698 through 1700, was
9    introduced.)
10   BY MS. TOWNSEND:
11       Q.  Some emails between you and Ms. Harrison
12   from June 1st, 2025.  Do you see that?
13       A.  (Reviews document.)
14       Q.  Do you see the email --
15       A.  Wait.  I'm --
16       Q.  Oh, are you still looking?
17       A.  -- still reviewing.  Thank you.
18       Q.  Okay.
19       A.  (Reviews document.)
20       Okay.
21       Q.  You'll see the top email, which is the
22   last one in the chain.  It looks like it's Pat
23   Harrison who thought Badri might be a buzzkill.
24       But Pat was responding to an email that
25   you had sent about Mr. Munipalla's participation

Page 179

1    in the working group.  And it sounds like you
2    were torn about including him because he's a,
3    quote, "thoughtful person"; is that right?
4        A.  That's what I said.
5        Q.  Is that an accurate reflection of how
6    you felt at the time?
7        A.  That's how I felt at the time.
8        Q.  You talked to Rachel Hubbard about it.
9    You -- you reported to Ms. Harrison, and she said
10   that "NPR probably wanted a person in the group
11   who was similar in stature to the heads of PRX
12   and APM, and that was the reason they wanted to
13   include Mr. Munipalla."  Is that an accurate
14   reflection of what you heard from Ms. Hubbard?
15       A.  That's what I stated, so I think so.
16       Q.  If you look at earlier in this email
17   chain, there's an email that you put together or
18   sent to a group, I should say, on May 30th, 2025,
19   at 1:37 p.m.  Do you see that?
20       A.  Yes.
21       Q.  And this is where you're reporting to
22   the group that "NPR wants Mr. Munipalla to be a
23   part of the working group on radio content
24   distribution."  Do you see that?
25       A.  Yes.

Page 180

1        Q.  And you characterized -- characterized
2    this as, quote, "more game play" and say you
3    would have "invited" Mr. Munipalla if you wanted
4    to; is that right?
5        A.  Yes.
6        Q.  And when you add some additional
7    thoughts -- or, initial thoughts, rather, I
8    should say, there's sort of three, it sounds
9    like, options that you're proposing for how to
10   address the request that Mr. Munipalla be able to
11   participate in the working group.
12       And the first one is, say "no, because
13   he wasn't invited," and you, CPB, "get to decide
14   who is in your working group."  And the second
15   is, I take it, the option you took, which is to
16   say, "no," and then "invite Mr. Munipalla to come
17   give a presentation later on."  And then the
18   third option is to include him, which you say
19   "would risk disrupting the conversation with
20   explanations of how PRSS already does what we're
21   planning"; is that right?
22       A.  That's what it says, yes.
23       Q.  Is that an accurate characterization of
24   -- of this email and which option you chose?
25       A.  I think we wanted to have conversations

Page 181

1    on a conceptual level about the new entity, and
2    then look at the technology piece of it.  That's
3    the way we structured the meetings.  So having
4    Badri at the meeting on technology I think made
5    the most sense.
6        Q.  And you didn't think he would bring
7    value to the working group itself and instead he
8    would -- his participation would risk disrupting
9    the conversations about what CPB wanted to
10   accomplish with respect to radio interconnection?
11       A.  I think his job as the head of PRSS
12   would have been to represent the viewpoint that
13   NPR and PRSS had already conveyed, that they
14   didn't want to do any kind of spin-off.
15       So I think it would have been difficult
16   for him to present a -- a viewpoint that wasn't
17   really towing the line to what NPR wanted.
18       Q.  Do you think Mr. Munipalla would have
19   been towing the line with what NPR wanted, or
20   do you believe that he would have just been
21   conveying his views as to what the PRSS can do
22   and what he thinks is best for satellite -- or,
23   strike that -- for radio interconnection?
24       A.  I think in that context he would have
25   felt that he had to represent a particular point

Page 182

1  of view that did adhere to what NPR wanted.
2      Q.   And it's your impression that
3  Mr. Munipalla would have not been transparent in
4  the working group as to what he thought would be
5  best for a radio interconnection moving forward?
6      A.   I don't know that I can represent what
7  his mindset would have been.
8      Q.   Who was part of the working group?
9      A.   I don't have a list in front of me.
10     Q.   Was the goal of the working group to
11  develop a request for proposals?
12     A.   We saw the -- the working group as
13  accomplishing different things.  We thought it
14  could help inform a request for proposals.  We
15  thought it could guide our thinking on the future
16  of content distribution, which is more than
17  interconnection, because it became clear in the
18  conversations that the representatives there in
19  the group got very excited talking about the
20  digital distribution opportunities that could
21  come with a -- a new independent entity.  We
22  thought it was important just to hear from
23  different stakeholders across the -- the system.
24         And, again, as part of our -- our
25  stewardship, it's -- it's something we -- we

Page 183

1  often do, is seek that just kind of input from
2  different kinds of stations.  But we were
3  pointing towards an RFP that, you know, would
4  allow development of a -- of an independent
5  entity for radio content distribution.
6      Q.   The end result of the working group was
7  a request for proposals, correct?
8      A.   We did develop a request for proposals
9  with input from the working group, with input
10  from our consultant, Deloitte.  So they did
11  -- their -- their input played into that, but it
12  wasn't the sole source of what went into the RFP.
13     Q.   Well, let me ask this:  So did CPB draft
14  that RFP, or did someone else do it?
15     A.   We asked Deloitte to draft -- do the
16  first draft of the RFP.
17     Q.   And then what happened with that first
18  draft of the RFP?  Was that shared with the
19  working group?
20     A.   No.
21     Q.   Did you revise that first draft of the
22  RFP?
23     A.   We shared it internally.  There was
24  input from other people at CPB and, you know,
25  we -- we finalized it and posted it in July, I

Page 184

1  think.
2      Q.   So did any member of the working group
3  see any portion of the RFP before it was
4  finalized?
5      A.   I don't -- I don't believe so.  We ended
6  the working group, yeah, before we started on the
7  RFP, if I remember the timeline correctly.
8      Q.   Let me show you -- that's the wrong one.
9         MS. TOWNSEND:  Let's mark this as
10  Exhibit 21.
11         (Merritt Exhibit No. 21, a document
12  Bates-stamped CPB_0301307 through 1309, was
13  introduced.)
14         MR. LIPCHITZ:  Thank you.
15  BY MS. TOWNSEND:
16     Q.   This is an email between you and Bill
17  Davis on July 14th, 2025.  Do you see that -- or,
18  email chain, I should say.
19     A.   Yes.
20     Q.   And is the first email in this chain
21  that you sent on Monday, July 14th, 2025, at 1:32
22  p.m. a -- a -- an update on CPB working group,
23  letting them know that the RFP had been posted?
24     A.   No.  This was a message to the system to
25  all the stations.  And then I think I forwarded

Page 185

1  this system message to people who wouldn't
2  normally be on the system message list, because
3  the system message goes out to all of the
4  stations --
5      Q.   Mm-hmm.
6      A.   -- general managers or, you know,
7  whatever group we select.
8         But then there are people who aren't on
9  that list who I would have forwarded this to.
10  And I think I forwarded it to Bill to make sure
11  that he saw it.
12     Q.   Who is Bill Davis?
13     A.   He is head of the Station Resource
14  Group.
15     Q.   So I understand, so the first email, the
16  1:32 p.m. email on July 14th, 2025, is an email
17  that you sent to the entire system to give them
18  an update on this content distribution working
19  group?
20     A.   Yes.
21     Q.   Does this email include the full list of
22  the participants in the working group?
23     A.   I believe so.
24     Q.   So this list on Bates-stamped page
25  CPB_0301309 is the list of folks who participated

47 (Pages 182 - 185)

Page 186

1  in the working group? To your knowledge, that's
2  complete?
3      A. Yes, I believe so.
4      Q. You see in the first -- the first email
5  in this chain, which is the last one in time, the
6  email Bill Davis sent in response to you, he said
7  he saw "this" -- I think he's referring to your
8  message --
9      A. Mm-hmm.
10     Q. -- "but I've been paying closer
11  attention to the RFP, which is simultaneously
12  daunting and exhilarating. Should be a fun
13  project to work on." You see that?
14     A. Mm-hmm. Yes.
15     Q. Yeah. So it was your understanding even
16  before you issued the RFP that Station Resource
17  Group would be submitting a response to the RFP?
18     A. I didn't know that.
19     Q. You did not know at the time that
20  Mr. Davis was participating in the working group
21  that he intended to submit a proposal alongside
22  other groups in response to the RFP?
23     A. We did not discuss during the working
24  group meetings any -- you know, who -- who might
25  be interested in responding to the RFP. That was

Page 187

1  not discussed.
2      Q. Well, I didn't -- I didn't ask if you
3  discussed it in the working group meetings. I
4  asked whether you knew prior to issuance of
5  the RFP that Mr. Da -- that Station Resource
6  Group was going to be among the entities
7  submitting a response to the RFP.
8      A. I don't know. I mean, we are very
9  careful about RFPs. And, you know, if they
10  were interested or others in the group were
11  interested, we -- I don't know if I -- I don't
12  believe I knew beforehand that they were going to
13  submit something. And they wouldn't have seen
14  the RFP before it got posted.
15     Q. But they were part of the working group
16  that provided input with respect to what was
17  going to go into that RFP, correct?
18     A. They helped develop sort of guiding
19  principles around -- that were used in the RFP.
20     Q. And by "they," I'm speaking about
21  Mr. Davis and the -- and the -- and SRG. Is that
22  who you're talking about?
23     A. The working -- I'm sorry. I lost track
24  of your question.
25     Q. I asked whether you knew prior -- prior

Page 188

1  to the issuance of the RFP that the Station
2  Resource Group was going to be among the entities
3  submitting a response to it. And you -- and then
4  I asked whether, because they were part of the
5  working -- Station Resource Group was part of the
6  working group, whether they provided input on
7  what was going to go into the RFP.
8      And I believe your answer's yes, but
9  correct me if I'm wrong on that.
10     A. The working group provided some guiding
11  principles around the new entity, and helped us
12  shape some of the parameters of what the new
13  entity could look like. But there were
14  many, many aspects of the RFP that were not
15  specifically discussed in the -- the working
16  group.
17     Q. You see in Mr. Davis's email he says,
18  "Kerri's on vacation in the Adirondacks this
19  week, so we've only had a couple of texts."
20  Who's Kerri?
21     A. Kerri Hoffman, who's the head of PRX.
22     Q. Why would he mention where the head of
23  PRX is and the fact that he hasn't had a chance
24  to connect with her about the RFP? Do you know
25  why?

Page 189

1      A. I assume they were talking about what
2  was in the RFP.
3      Q. Do you know why they were -- would be
4  talking about what was in the RFP?
5      A. I assume they were interested in what
6  had ended up in the RFP.
7      Q. Did you know at the time -- strike that.
8      Did you know prior to the issuance of
9  the RFP that PRX would be participating in a
10  response to the request for proposal?
11     A. I thought it was possible that
12  any of the organizations represented in the
13  working group could be interested in responding
14  individually or collectively, you know, in groups
15  to what was in the RFP, including NPR.
16     Q. Well, you didn't just know it was
17  possible. You knew PRX was going to submit a
18  re -- response to the RFP, right, even before
19  Ms. Hoffman was included in the working group.
20     A. I would think that she -- that PRX would
21  submit to the RFP, yes. And they would be the
22  obvious organization to, I think, do that,
23  because they do interconnection-type activities,
24  yes.
25     Q. And you -- you had already been

1  talking with Ms. Hoffman and communicating with
2  Ms. Hoffman in April about PRX serving as an
3  independent entity to receive interconnection
4  funds from CPB; isn't that right?
5      A.  We had talked about that possibility
6  in the same way that we had talked about PBS
7  as an option of being the place to put the
8  interconnection funds; we had talked about APM
9  being the place to put interconnection funds.
10  So we were having conversations about --
11      And then, you know, as time went on,
12  we knew we wanted to do an RFP, put it out for
13  anyone who wanted to apply for the RFP and go
14  through that process.
15      Q.  Ms. Hoffman sent you a proposal -- a
16  rough proposal on April -- in -- on -- in April
17  of 2025 that outlined how PRX would -- could
18  serve as an independent entity to receive
19  interconnection funding from CPB, right?
20      A.  We did get a draft proposal from PRX at
21  the time that we were waiting to hear back from
22  NPR about whether they would spin off PRSS,
23  again, trying to be prepared if we had to make a
24  move quickly to safeguard the interconnection
25  funds.

1      MS. TOWNSEND:  Okay.  So I'm going to
2  mark this as Exhibit 22.
3      (Merritt Exhibit No. 22, a document
4  Bates-stamped CPB_0110624 with attachment
5  Bates-stamped CPB_0110625 through 0632, was
6  introduced.)
7  BY MS. TOWNSEND:
8      Q.  This is an email, I will represent
9  to you, from -- I guess an email chain with an
10  attachment.  The initial email is from Kerri
11  Hoffman to you on April 16th, 2025, and then
12  you -- looks like you forwarded that email to
13  Deborah Carr later that day.  Do you see that?
14      A.  Yes.
15      Q.  Is this the proposal that Ms. Hoffman
16  provided you that we were just speaking about?
17      A.  (Reviews document.)
18      Yes.
19      Q.  You testified a minute ago that this
20  was received during the time period when you were
21  waiting to hear back from NPR as to whether they
22  would spin off the PRSS.  But isn't it true that
23  you had only told NPR about CPB's desire that it
24  spin off the PRSS five days before this email was
25  sent?

1      A.  Yes.  That's the timing.
2      Q.  So is it fair to say you were -- you
3  were waiting on NPR at this point?  They hadn't
4  had much time to react to your discussion with
5  Mr. Merkley on April 11th, right?
6      A.  And CPB didn't have a lot of time if our
7  funds were being under threat of being pulled
8  back.
9      Q.  Did you think it was relevant to
10  Ms. Hoffman's participation in the working group
11  that she had already submitted this proposal to
12  you?
13      A.  I think this was part of CPB's effort to
14  ensure that the interconnection funds would not
15  end up being pulled back; or having an -- an
16  option, in case that NPR determined they didn't
17  want to spin off PRSS, we had to be prepared for
18  that option.  But, ultimately, this is not a real
19  -- this is a, sort of, that -- I don't know that
20  I would call it a "proposal" from PRX.
21      But we determined that we needed to have
22  an open RFP process, and we did that and invited
23  participation by anyone who wanted to respond to
24  the RFP.  And we did not, you know, have to use
25  this option, because we decided we would go in

1  the direction of the -- the RFP and make it a
2  -- a transparent process for all to participate.
3      Q.  But you knew after April 16th, 2025,
4  when Ms. Hoffman provided you this -- I think
5  we called it a "proposal" earlier, but I guess
6  we don't have to call it a "proposal" -- provided
7  to you that PRX was interested in being that
8  independent entity in which the PRSS would be
9  located if it was spun off, right?
10      A.  I'm sorry.  Say that again.
11      Q.  You knew, based on your communications
12  with Ms. Hoffman starting in April of 2025, that
13  PRX was going to submit a response to the RFP
14  that came out of the working group, correct?
15      A.  I thought that was a high likelihood.
16      Q.  And did you think that was relevant to
17  whether you invited Ms. Hoffman to participate in
18  the working group?
19      A.  When we were putting the working group
20  together, I checked with our general counsel --
21      MR. LIPCHITZ:  Whoa.  Whoa.  Whoa.
22      THE WITNESS:  Oh.  Okay.
23  BY MS. TOWNSEND:
24      Q.  I'm not going to ask you about --
25      A.  Sorry.

49 (Pages 190 - 193)

Page 194

1    Q.  I'm not going to ask you about
2    conversations that you had with attorneys.
3       A.  Right.
4       Q.  That could be your folks, your folks at
5    Saul Ewing --
6       A.  Yes.
7       Q.  -- or Mr. Slavitt at CPB.
8       A.  Mm-hmm.
9       Q.  And I don't think my question called for
10   that.
11         I believe my question was, did you
12   think it was relevant to whether you invited
13   Ms. Hoffman to participate in the working group
14   that you anticipated PRX would be submitting a
15   response to the eventual RFP?
16         MR. LIPCHITZ:  Okay.  On that let me
17   just interject.  You can answer that question.
18   But as with all questions, you should not be
19   disclosing conversations between yourself
20   and Mr. Slavitt or any advice that you got in
21   connection with the process.  Do you understand?
22         THE WITNESS:  Yes.
23         MR. LIPCHITZ:  Okay.  That being
24   said ...
25   BY MS. TOWNSEND:

Page 195

1    Q.  Do you have the question in your mind?
2       A.  I believe that the working group
3    represented several organizations that would
4    likely submit a proposal for the RFP.
5       Q.  And you didn't think that there was
6    anything wrong --
7       A.  So the fact that --
8       Q.  -- with the working group being made up
9    of people who not in -- not including anyone from
10   NPR Distribution, but people --
11      A.  Why not in -- why not including anyone
12   from NPR Distribution?  What do you mean?
13      Q.  You did not invite Mr. Munipalla to
14   participate in the working group, right?  That's
15   someone from NPR Distribution.
16      A.  Well, we had representatives of the NPR
17   board in the group, including the D/I Committee.
18      Q.  You had two members of the NPR board --
19      A.  Mm-hmm.
20      Q.  -- participate?
21      A.  Mm-hmm.
22      Q.  You chose not to have, even upon
23   request, Mr. Munipalla, who is the executive at
24   NPR Distribution, participate in the working
25   group.  You had executives from the National

Page 196

1    Federation of Community Broadcasters --
2       A.  Mm-hmm.
3       Q.  -- Station Resource Group, PRX, and
4    American Public Media participate in the working
5    group, correct?
6       A.  Yes.
7       Q.  And all of those four organizations
8    would later be part of the coalition that would
9    be the Public Media Infrastructure, or "PMI,"
10   correct?
11      A.  Yes.
12      Q.  And you knew at the time you invited
13   them to participate in the working group that
14   they would be submitting or were very likely to
15   submit responses to the RFP; is that correct?
16      A.  As I knew that NPR would respond to
17   the RFP, and they were also represented on the
18   working group.
19      Q.  I -- my -- my question is simply did you
20   think there was any problem with having Ms. Dael,
21   Mr. Davis, Ms. Hoffman and Ms. Taylor -- Jean
22   Taylor from American Public Media, participate in
23   the working group when you, at minimum, thought
24   it was very likely that those organizations would
25   submit a response to the RFP?

Page 197

1       A.  I'm sorry.  Say it one more time.
2       Q.  Sure.
3          Did you think there was any problem --
4       A.  Mm-hmm.
5       Q.  -- with having Ms. Dael, Mr. Davis,
6    Ms. Hoffman and Ms. Taylor participate in the
7    working group when you knew or suspected that
8    those organizations, or the organizations that
9    they are executives representing, would be
10   participating or submitting a response to the
11   RFP?
12      A.  In the same way I had no problem with
13   NPR being represented, I had no problem with
14   those organizations being represented.
15      Q.  So you thought it was fine that,
16   even though you knew these individuals would be
17   submitting a proposal, likely jointly, to have
18   them all be part of the working group?
19      A.  I --
20         MR. LIPCHITZ:  Ob -- ob -- objection to
21   form.
22         You can answer.
23         THE WITNESS:  I did not know who
24   or what configuration of organizations would be
25   submitting for the RFP.  I knew of interest from

Page 198

1    PRX. I assumed NPR. And the others I -- you
2    know, I didn't have a crystal ball to know who
3    would submit.
4    BY MS. TOWNSEND:
5        Q.   So it's just a coincidence that there
6    was a lot of members of the working group?
7        A.   I think they participated in the
8    conversation and found common interest.
9        Q.   When did the President send his
10   rescission message to Congress?
11       A.   I don't remember.
12       Q.   Was it --
13       A.   June? May? I'm not sure.
14       Q.   Was it before or after the RFP issued?
15       A.   The RFP went up July 14th, so it would
16   have been before the RFP.
17       Q.   Were you worried that issuance of the
18   RFP would look tone deaf given the discussion
19   about rescission that was taking place in
20   Congress?
21       A.   I wanted us to be careful, yes, about
22   anything we were doing at that point that might
23   draw attention to CPB.
24       Q.   But ultimately, you thought issuing
25   -- issuance of the RFP would help CPB with

Page 199

1    respect to Congress because it would combat the
2    idea that CPB was catering to NPR, right?
3        A.   I think I asked that sort of question to
4    other people in the company to say, "I'm just
5    checking. We're posting the RFP."
6            Because if I remember the timeline,
7    the House had already voted to rescind all of our
8    funds, and the Senate was teed up to rescind $1.1
9    billion in funding for CPB. And anything we were
10   doing at that time, we all wanted to be extremely
11   careful about any kind of messaging that was
12   happening because of any actions that -- that
13   CPB was taking.
14           It was a very -- very challenging,
15   very sensitive time as we were watching Congress,
16   essentially, determine the future of CPB.
17           MS. TOWNSEND: Let's mark this as
18   Exhibit 23.
19           (Merritt Exhibit No. 23, a document
20   Bates-stamped CPB_0002562 through 2565, was
21   introduced.)
22           THE WITNESS: Thank you.
23           MR. LIPCHITZ: When you have an
24   appropriate place, if we can just take a quick
25   break.

Page 200

1            MS. TOWNSEND: Well, not -- I just
2    handed the -- an exhibit to the witness, so --
3            MR. LIPCHITZ: No. No. No. No.
4    Whenever. Whenever.
5    BY MS. TOWNSEND:
6        Q.   Ms. Merritt, this is a set of emails
7    exchanged on July 13th, 2025. Have you had a
8    chance to look at those?
9        A.   No. Give me just another minute here,
10   please.
11       Q.   Sure.
12       A.   (Reviews document.)
13           Okay.
14       Q.   On the first page of this exhibit,
15   there's an email from you dated Sunday, July 13th
16   at 5:12 p.m., where you say, "Also on this, we
17   had planned to post an RFP tomorrow for the new
18   entity for radio interconnection. I don't know
19   if we should move forward with that. Maybe it
20   helps us combat the idea that we are catering to
21   NPR, or maybe it's tone deaf given where we are
22   with the vote. Thoughts."
23       A.   Mm-hmm.
24       Q.   Is that the email that you are recalling
25   you sending to other folks within CPB?

Page 201

1        A.   [Nods head up and down.]
2        Q.   Is that a yes?
3        A.   Yes.
4        Q.   Okay.
5        A.   This was, as I said, at a very
6    challenging time.
7        Q.   Ms. Harrison responded to your email a
8    minute later and said, "Helps us." Do you see
9    that?
10       A.   Mm-hmm. Yes.
11       Q.   Did you understand Ms. Harrison to
12   be saying that issuance of the RFP would help
13   CPB with respect to the vote in Congress on
14   rescission?
15       A.   I think that she -- yes -- was saying
16   it might help us given that, you know, so much
17   of the conversation at that time was just so
18   negative about public media, about PBS, about
19   NPR, about CPB, that if we were showing a
20   emphasis on the stations and their -- serving
21   their needs, that could be positive for us.
22       Q.   And, in fact, you responded to
23   Ms. Harrison about five minutes later and said,
24   "We are not funding NPR. Making changes to
25   comply with Congress directive economically and

Page 202

1  efficient.  How would we communicate to the
2  Hill/key Senators that we are pushing out the
3  RFP"?
4      A.  I don't think that's my response,
5  because I would have -- I mean, this is --
6      Q.  You don't believe --
7      A.  It's confusing.
8      Q.  You don't believe you wrote that?
9      A.  No.  I think that's Pat.  I know it's
10 kind of -- it looks weird on here, but I wouldn't
11 have written the part about "How would we
12 communicate to the Hill/key Senators."
13 I -- I don't believe that's my part of it.
14     Q.  You don't believe you said that?
15     A.  Well, I mean, it looks like that, but
16 it doesn't -- that's -- sometimes Pat responds
17 to emails in kind of unconventional ways.
18     Q.  So you believe Pat wrote that?
19     A.  It may have been Pat, but I don't -- I
20 don't think it was me.  I mean, it -- it
21 obviously looks like it's under my email address,
22 but, yeah.
23     Q.  Do you believe Pat also wrote, "We are
24 not funding NPR," or was that you?
25     A.  I think -- I think all of this was Pat.

Page 203

1      Q.  So you -- just for -- for clarity --
2      A.  Mm-hmm.
3      Q.  -- you believe that Pat wrote, "We are
4  not funding NPR.  Making changes to comply with
5  Congress directive economically and efficient.
6  How would we communicate to the Hill/key Senators
7  that we are pushing out the RFP?"  Is that right?
8      A.  I believe so, yes.
9      Q.  Okay.  Why don't we -- I believe your
10 counsel would like a break, so why don't we take
11 a quick break.
12     A.  Okay.
13     THE VIDEOGRAPHER:  We're going off the
14 record at 4:07 p.m. Eastern Time.
15     (Recess taken.)
16     THE VIDEOGRAPHER:  This is Video File
17 Number 6.  Back on the record at 4:18 p.m.
18 Eastern Time.
19     You may begin.
20 BY MS. TOWNSEND:
21     Q.  Ms. Merritt, how many responses to the
22 RFP that was issued on July 14th did CPB receive?
23     A.  Two.
24     Q.  Was one of those two responses from NPR?
25     A.  Yes.

Page 204

1      Q.  After you received NPR's response to the
2  RFP, did you meet with anyone from NPR or NPR
3  Distribution to discuss it?
4      A.  No.
5      Q.  Did you review NPR Distribution's
6  response to the RFP?
7      A.  Yes.
8      Q.  Did anyone else at CPB review it?
9      A.  Yes.
10     Q.  Did you have any questions about it?
11     A.  I don't recall us having any questions
12 around the proposal.
13     Q.  If you had questions about the proposal
14 made by NPR Distribution, would you have e-mailed
15 those questions to NPR Distribution?
16     A.  We would have e-mailed or asked them for
17 a meeting to go over questions.
18     Q.  Okay.  But you did not email them or ask
19 them for a meeting to go over any questions you
20 might have about NPR Distribution's response to
21 the RFP, right?
22     A.  Yeah.  I don't recall having questions
23 for them, no.
24     Q.  Who else responded to the RFP?
25     A.  A coalition of organizations called

Page 205

1  "Public Media Infrastructure."
2      Q.  Where is Public Media Infrastructure
3  incorporated?
4      A.  I believe in Minnesota.  They are
5  working to get all the paperwork complete on
6  that.
7      Q.  So PMI is not incorporated currently?
8  Is that your understanding?
9      A.  They are working on getting it
10 incorporated.  I believe at this moment it is not
11 yet incorporated.
12     Q.  Who is PMI's executive director?
13     A.  They do not have one at the moment.
14 They have the Station Resource Group as their
15 fiscal agent.
16     Q.  And that's because PMI is not currently
17 a legal entity, right?
18     A.  Yes.
19     Q.  Is there a PMI board currently?
20     A.  There's a board -- a PMI board, no.
21     Q.  Do you know who the chief technology
22 officer is for PMI?
23     A.  I know who they are hoping to bring
24 onboard as their -- I don't know what his title
25 would be, but the person to, I guess, be more of

Page 206

1    a executive director, CTO.
2       Q.   Who is that?
3       A.   His name is Bod -- Bob Kempf.
4       Q.   Where's Bob Kempf currently working?
5       A.   I think he does some consulting work.
6    He had worked at NPR previously; at WGBH.  I
7    don't know his complete work history.
8       Q.   Do you know how the entities that
9    submitted this proposal for a PMI concept came
10   together?
11      A.   I'm not sure I understand your question.
12      Q.   Well, as I understand it, a group of
13   entities submitting a response to the RFP --
14      A.   Mm-hmm.
15      Q.   -- un -- under this PMI concept.
16   How -- do you know how they ended up coming
17   together to submit that response?
18      A.   No.
19      Q.   That wasn't an outgrowth of the working
20   group, was it?
21      A.   I -- I don't know.  Some of them, as
22   you've noted, were in the working group, but I
23   don't know how they came together.
24      Q.   After PMI submitted its response to the
25   RFP, you had some follow-up questions for them,

Page 207

1    didn't you?
2       A.   We did.
3       Q.   And you also met with representatives of
4    the PMI to discuss their proposal, correct?
5       A.   We met with them to ask the questions
6    that we had about their proposal.
7       Q.   And you gave them an opportunity to
8    supplement their response to the RFP; is that
9    right?
10      A.   We asked them to answer the questions we
11   had posed to them.
12      Q.   And you took that into account when
13   evaluating their response to the RFP, right?
14      A.   Their answers gave us a fuller picture
15   of some of their RFP materials, yes.
16           MS. TOWNSEND:  I'll mark this as Exhibit
17   24.
18           (Merritt Exhibit No. 24, a document
19   Bates-stamped CPB_0066136 through 6139, was
20   introduced.)
21           MS. TOWNSEND:  Oh, did I not give you
22   one?
23           I gave that to you for some reason.
24           There you go.
25   BY MS. TOWNSEND:

Page 208

1       Q.   This looks like a --
2       A.   May I review it first?
3       Q.   Yeah.
4       A.   Thanks.
5           (Reviews document.)
6           Okay.
7       Q.   The deadline to submit responses to the
8    RFP was August 15th; is that right?
9       A.   I believe that's correct, yes.
10      Q.   Did the group that submitted a response
11   to the RFP proposing a PMI concept submit their
12   proposal on August 15th, or did they submit it
13   earlier?
14      A.   I think they submitted it August 15th.
15      Q.   So if you look at the first email in
16   this chain temporally, which would be the last
17   email, and it's dated August 28th --
18      A.   Mm-hmm.
19      Q.   -- 2025.  And it's from Bill Davis to
20   you --
21      A.   Mm-hmm.
22      Q.   -- and others at CPB.  Do you see that?
23      A.   Mm-hmm.  Yes.
24      Q.   And he says, "Thank you so much for
25   taking the time to meet with the PMI team

Page 209

1    yesterday."  Did you meet with the PMI team on
2    August 27th, 2025?
3       A.   According to this we did.
4       Q.   And at that point you would have had the
5    PMI team's response to the RFP for about, well,
6    less than -- less than two weeks, right?
7       A.   Yes.
8       Q.   Did you have a lot of questions for the
9    PMI team about that -- that RFP response at this
10   August 27th meeting?
11      A.   Well, we did.  We had -- I -- I don't
12   know how you quantify "a lot," but we had
13   questions for them, yes.
14      Q.   You had a number of questions, let's
15   say.
16      A.   We had more than one.
17      Q.   Okay.
18           You wrote a follow-up email to Mr. Davis
19   and others, including Jean Taylor and Kerri
20   Hoffman; LaFontaine Oliver from New York Public
21   Radio; Rima Dael; and Liz Beebe, who I guess is
22   also at Station Resource Group, on August 29th,
23   2025.  Do you see that email?
24      A.   Yes.
25      Q.   Okay.  In this email you ask for a plan

Page 210

1  of the first 100 days of PMI, providing detail on
2  how you would go about establishing the entity.
3  You see that?
4      A.  Yes.
5      Q.  So as of August 29th, 2025, you were
6  well aware that PMI was act -- was not an
7  existing entity, right?  It needed to be
8  established?
9      A.  Yes.
10     Q.  Okay.  And you note that you were
11  particularly interested in the timeline for
12  establishing your full board.  Do you see that?
13     A.  Yes.
14     Q.  Do you recall whether any of this was
15  included in PMI's initial response to the RFP?
16     A.  I don't recall specifically.  I know
17  they talked about the construct of their board,
18  but they must not have addressed the -- the
19  timeline, or we wouldn't have been asking about
20  that.
21     Q.  And it seems like, based on your
22  email, that at least at that initial meeting on
23  August 27th, 2025, that the PMI team did not
24  expect to be hiring an executive director until
25  mid-2026; is that correct?

Page 211

1      A.  That's what it states.  And that's why
2  we were asking them about their timeline.
3      Q.  You wanted them to speed up.  Is that
4  fair to say?
5      A.  Yeah.  We wanted them to be able to get
6  up and running as soon as possible.
7      Q.  Because you -- and you were looking for
8  answers to these questions because you wanted to
9  recommend to the CPB board on September 15th that
10  they should award this funding to this PMI
11  concept; is that right?
12     A.  I think on -- let's see.  This was
13  August 29th.
14         I mean, we were certainly moving in the
15  direction of making that recommendation.
16     Q.  Well, you say at the bottom of the page
17  Bates-stamped CPB_66138, in --
18     A.  Mm-hmm.
19     Q.  -- in your email to Bill, Jean, Rima
20  LaFontaine and Kerri, "We are looking at giving
21  our board a recommendation on September 15th"?
22     A.  Mm-hmm.  Right.
23     Q.  And that recommendation would be to
24  approve funding to PMI, right?
25     A.  No.  We were going to give a

Page 212

1  recommendation on one, you know, proposal or the
2  other to the board on September 15th.  But I
3  would say we were, at this point, leaning in the
4  direction of recommending PMI, I think, because
5  we were having Deloitte evaluate each of the
6  proposals as well.
7      Q.  Did you recommend to the board on
8  September 15th that it approve at least $58
9  million in funding to -- to PMI?
10     A.  We recommended to the board that we
11  wanted their approval to negotiate with PMI to
12  move forward with, you know, a grant for them.
13     Q.  And you made that recommendation on
14  September 15th?
15     A.  I believe it was September 15th.  I'm
16  trying to remember the board meeting dates, if we
17  had a two-day board meeting, if it would have
18  been on -- I believe it was the 15th.
19     Q.  Did the board approve that -- strike
20  that.
21         Did the board adopt that recommendation
22  on September 15th and authorize CPB management to
23  negotiate an agreement with PMI for approximately
24  $58 million in interconnection funding?
25     A.  Yes.  They approved us negotiating with

Page 213

1  PMI for up to 50 -- yeah.  57.9, I think it was.
2      Q.  In advance of that September 15th
3  -- strike that.
4         You were present at that meeting
5  -- board meeting on September 15th; is that
6  correct?
7      A.  Yes.
8      Q.  In advance of that meeting, did you
9  prepare a memorandum for the board outlining
10  your reasons for that recommendation?
11     A.  Yes.
12     Q.  What would be the date of that
13  memorandum?
14     A.  Prior to September 15th, a few days
15  before.  I -- I don't recall the exact date.
16     Q.  Did that recommendation memo address the
17  fact that at the time you were asking the board
18  to approve management to move forward with
19  negotiations that there was in fact no legal
20  entity known as "PMI"?
21     A.  I can't recall if I put that in the memo
22  or not.
23     Q.  Did you think it was important?
24     A.  I think it's important.  But more
25  important was knowing that there was a timeline

Page 214

1  that we were working with organizations that we
2  felt confident could implement the -- the plans
3  that they had put forward. So it was a -- it was
4  a consideration. I don't think it was a, you
5  know, determining factor.
6     Q. So on August 29th, about 16 days before
7  you made that recommendation to CPB's board, you
8  asked for a more detailed plan and timeline from
9  PMI; is that right?
10    A. Yes.
11    Q. And did they -- I say, "they" -- the PMI
12 group provide you with a response -- a response
13 to that?
14    A. Yes.
15    Q. And before I -- I get to that, if we
16 look at the Exhibit 24, you sent an email on
17 September 3rd, 2025, at 5:30 a.m. to this group
18 outlining some considerations that you, is it
19 safe to say, wanted to see PMI address in its
20 response -- its more detailed response?
21    A. Correct.
22    Q. If you look at this list of
23 considerations for PMI to address in 100-day
24 -- -day planning, some of the questions you
25 include, for example, is "In what state" will the

Page 215

1  -- will "the 501(c)(3) be incorporated?" Do you
2  see that?
3     A. Yes.
4     Q. Did you think that was important to --
5  to know before you gave PMI approximately $58
6  million?
7     A. I think that's why we asked the
8  question, yes.
9     Q. Okay. And then you asked under
10 Governance and Organization, "What is the plan to
11 identify and hire a leader? Until a leader is
12 identified and the organization in a steady
13 state, how will decisions be made?" Do you see
14 that?
15    A. Yes.
16    Q. Do you think that was -- it was
17 important before an organization is given
18 approximately $58 million in federally
19 appropriated funds that it have at least a plan
20 to hire a leader?
21    A. Yes. That's why we're --
22    Q. And that's why you -- you asked that
23 question?
24    A. -- why we were asking the question, yes.
25    Q. But --

Page 216

1     A. We wanted more detail on that.
2     Q. But that question wasn't addressed in
3  PMI's original response to the RFP, was it?
4     A. Well, not having their response in front
5  of me, I can't remember everything that was in
6  their proposal. But clearly we wanted more
7  detail on whatever they had provided.
8     Q. So it's safe to say that they did not
9  provide enough detail with respect to their
10 governance and -- and organization in their
11 original response to the RFP? Is that -- is that
12 fair to say?
13    A. No. No. I don't think that's fair to
14 say.
15    Q. Well, why would you need to ask
16 follow-up questions, then?
17    A. Because we wanted additional information
18 to what they had provided. I think they had
19 provided responses to the questions in the
20 RFP, and we were just looking for additional
21 information.
22    Q. And you wanted to know, for example,
23 what financial controls would be put in place for
24 the organization during transition, right? Which
25 would be important because you're talking about

Page 217

1  giving them $58 million in federal funding, so
2  financial controls are important?
3     A. Correct.
4     Q. And they didn't address that in their
5  original response to the RFP?
6     A. Or they didn't address it at the level
7  of detail that we were looking for.
8     Q. You said that you received a response
9  to -- to your request that P -- the PMI group
10 address these considerations. Do you know when
11 you received that?
12    A. We asked for all of this pretty quickly.
13 I don't recall the exact date. I know they
14 -- this was right before Labor Day weekend that
15 we were asking them, but I think they got
16 everything to us the next week.
17    (Merritt Exhibit No. 25, email
18 Bates-stamped CPB_0066140 through 6141, with
19 attachment Bates-stamped CPB_0066146 through
20 6153, was introduced.)
21    MS. TOWNSEND: All right. This is
22 marked as Exhibit 25.
23    MR. LIPCHITZ: Thank you.
24 BY MS. TOWNSEND:
25    Q. I'll give you a chance to take a look at

Page 218

1  that.
2      A.  (Reviews document.)
3      Okay.
4      Q.  And just to -- to be clear on the
5  timeline here, you provided the considerations
6  for PMI to address in a hundred-day planning to
7  that PMI group on September 3rd, 2025, right?
8      A.  Ask -- I'm sorry.
9      Q.  That's the list in Exhibit 24?
10     A.  Ask me the question again, please.
11     Q.  Sure.
12     The -- we were looking at Exhibit 24
13  earlier, --
14     A.  Right.
15     Q.  -- where you provided the PMI group
16  some considerations for PMI to address in a
17  hundred-day planning --
18     A.  Mm-hmm.
19     Q.  -- including governance and other
20  issues, right, on September 3rd?
21     A.  We provided these considerations after
22  we had asked them on the 29th to provide the
23  100-day plan and the timeline for the first
24  18 months.
25     Q.  Mm-hmm.

Page 219

1      A.  We had told them that we would also
2  provide to them, as they were going about doing
3  that, some questions from Deloitte and from us
4  just to, you know, ensure that these were
5  incorporated into their plan, yes.
6      Q.  And you provided those considerations to
7  them on September 3rd; is that right?
8      A.  Yes.
9      Q.  Okay.  And Exhibit 25 is a response you
10  received from Bill Davis, on behalf of the PMI
11  group, on September 5th, so two days later.  Is
12  that accurate?
13     A.  Yes.
14     Q.  And attached to this email, there was a
15  executive summary and a detailed timeline for
16  the -- I don't know what you want to call
17  it -- launch of PMI.  Is that fair to say?
18     A.  For the launch.  And then as it says,
19  "continuity."  And as they went into different
20  phases, yes.
21     Q.  The subject line of this email is "PMI
22  responses to CPB's considerations."  After you
23  received this material from the PMI group, did
24  you have any other follow-up questions for them?
25     A.  We may very well have had follow-up

Page 220

1  questions.  Deborah Carr was working closely
2  with them on reviewing the responses and asking
3  additional questions.  So there may have been
4  others.
5      Q.  You're not aware of any additional
6  information that was provided by PMI after this
7  September 5th, 2025, submission, are you?
8      A.  I'm not sure.  There may have been.
9  Because I think they didn't -- they said they
10  didn't get us a -- a budget, and I don't know if
11  they provided that afterwards or if there were
12  additional questions.  I'm not sure.
13     Q.  Presumably they would have provided that
14  budget between September 5th and September 15th,
15  which is when you recommended to the board
16  that they approve CPB management to negotiate a
17  approximately $58 million agreement -- grant
18  agreement with PMI, right?
19     A.  I think it's an ongoing process,
20  because, as with any grant, kind of back and
21  forth to gather information.  CPB may have
22  continued asking additional questions, really,
23  you know, in an ongoing way, you know, throughout
24  this whole time period.
25     Q.  But as of September 5th, 2025, the PMI

Page 221

1  group had not provided you or anyone else at CPB
2  with a budget.  Is that accurate?
3      A.  No.  They had a budget that was provided
4  with their proposal, that came in on -- what was
5  the deadline? -- August 15th.
6      Q.  But they didn't -- they had not provided
7  yet an updated budget that addressed concerns
8  that CPB had raised following the submission of
9  that response, right?
10     A.  I'm not sure.  I -- honestly wasn't
11  tracking all of this email by email.  Deborah
12  Carr was really the point person on this and
13  gathering the information that we needed.
14     Q.  You -- so you don't know whether or not
15  CPB had budget questions with respect to PMI that
16  weren't answered as of September 5th, 2025?
17     A.  I -- say that again.
18     Q.  Sure.
19     You don't know whether or not there were
20  outstanding questions about PMI's proposed budget
21  as of September 5th, 2025, do you?
22     A.  There -- there may have been outstanding
23  questions.  Again, we were back and forth with
24  them about, as you can see, different questions
25  we -- we had, including the budget.

56 (Pages 218 - 221)

Page 222

1    Q.  Does CPB have a signed agreement of any
2    kind with PMI?
3    A.  No.
4    Q.  So that means CPB has not awarded the
5    funds to PMI, right?
6    A.  That's correct.  There's a lawsuit
7    that's going on about it, so --
8    Q.  But even if --
9    A.  -- we have not had the opportunity to
10   move forward.
11   Q.  But even if there were no lawsuit,
12   in your view, there would be no award of funds
13   that's been made to PMI because there's no signed
14   agreement, right?
15   A.  There is no signed agreement with PMI at
16   this time.
17   Q.  So there's no obligation on the part of
18   CPB at this time to pay any interconnection funds
19   to PMI, in your view?
20   A.  Well, we do have a concurrence on this.
21   Our internal process at CPB is that we -- on
22   something like this, you know, the board gives
23   us the go-ahead to negotiate, and then we gather
24   information until we're satisfied that we have
25   what we need.  And at that point we can put

Page 223

1    something through our internal approval process.
2    And because the board said, you know,
3    negotiate on September 15th, and we've been
4    working with them on gathering everything that we
5    needed, we did go through the formal concurrence
6    process.
7    There is not a signed agreement, so
8    there is no grant award.  But the concurrence is
9    the point at which we really are working on a
10   grant agreement that both parties can, hopefully,
11   you know, come to agreement on.  But as of right
12   now, no, there is no agreement -- signed
13   agreement with PMI.
14   Q.  So -- and just to get a -- a clear
15   answer on that, so there is no obligation
16   on the part of CPB at this time to pay any
17   interconnection funds whatsoever to PMI; is that
18   right?
19   A.  There is no grant agreement.
20   Q.  And there is no --
21   A.  I don't know how else to say that.
22   There is no grant agreement.
23   Q.  If -- and if CPB -- strike that.
24   If CPB were to distribute
25   interconnection funds to the PMI group,

Page 224

1    where -- where exactly would that money go?
2    A.  It would go to the Station Resource
3    Group, their fiscal agent, until they complete
4    their establishment of the PMI organization.
5    Q.  What kind of financial and governance
6    information did PMI submit with respect to the
7    Station Resource Group in connection with their
8    response to the RFP?
9    A.  Again, I'd have to go back and look at
10   the proposal.  I mean, the Station Resource Group
11   is a known entity to CPB; one that we've awarded
12   funds to in the past.  So I'm not sure if, you
13   know, we had specific -- I'm not sure what
14   specific information we had around SRG.
15   Q.  Prior to 2025, what's the largest grant
16   that CPB has ever made to the Station Resource
17   Group?
18   A.  I don't know.  I'd have to research
19   that.
20   Q.  Less than $25 million?
21   A.  Yes.
22   Q.  Less than $10 million?
23   A.  Yes.
24   Q.  Less than $5 million?
25   A.  Probably.  Again, I'd have to do the

Page 225

1    -- the research.  We haven't -- I'm trying to
2    think.  I -- I don't know.
3    Q.  When you met with the board on September
4    15th to recommend that they authorize CPB
5    management to enter into negotiations with PMI,
6    did anyone on the board raise any concerns about
7    distributing approximately $58 million in
8    federally appropriated funds to an entity that
9    did not exist yet?
10   A.  No.  I think they are familiar with the
11   partners, and they didn't raise a concern about
12   that.
13   Q.  No one raised a concern about that?
14   A.  Not that I recall.
15   Q.  Was there any discussion of a backup
16   plan in the event that PMI's 100- or 200-day plan
17   wasn't carried out?
18   A.  The problem we face is that CPB will not
19   be in existence --
20   Q.  I understand.
21   A.  -- at that point.
22   Q.  Yeah.  I understand that.
23   A.  We are going out of business, because we
24   have no funding.
25   Q.  I understand that.  That's why I'm

57 (Pages 222 - 225)

Page 226

1  asking whether or not there was discussion at the
2  board meeting about a backup plan if CPB gives
3  approximately 58 million in radio interconnection
4  funding to SRG in the hopes that PMI, in a
5  hundred to 200 days will be up and running and
6  it's not, what was the backup plan going to be.
7      A.  The board has confidence in the
8  organizations that make up PMI, and believe
9  that they will be able to execute on the plan.
10      We had an external evaluation
11  from Deloitte that also confirmed that these
12  organizations are capable of implementing the
13  proposal that they put forward.  And the board
14  gave us the green light to negotiate with them.
15  We are moving forward with that.
16      At some point -- and as the clock ticks
17  on all of this, it's very hard to develop backup
18  plans when we are, in fact, going out of
19  business.
20      Q.  So is it safe to say there is no backup
21  plan?
22      A.  I think we are entrusting -- if we get
23  to award them the funds, we're entrusting a group
24  of public radio organizations to act in the best
25  interest of the public radio system and believe

Page 227

1  they would do that.
2      Q.  So there was no discussion on
3  September 15th of what would happen to these
4  federally appropriated funds in the event, for
5  example, PMI just never gets set up?
6      A.  We believe they will get set up and
7  they'll implement the plan.
8      Q.  I'm going to show you a document we'll
9  mark as Exhibit 26.
10      (Merritt Exhibit No. 26, a document
11  titled Defendant Corporation for Public
12  Broadcasting's Responses to Plaintiff National
13  Public Radio, Inc.'s First Set of
14  Interrogatories, was introduced.)
15      MR. LIPCHITZ:  Thanks.
16  BY MS. TOWNSEND:
17      Q.  Have you ever seen this document before,
18  Ms. Merritt?
19      A.  Yes.  I believe -- I'm trying to -- I
20  -- I may not have seen the completed document.
21  I saw some sections of it and contributed to it.
22  I'm not sure I saw the finished final product.
23      Q.  So I will represent to you that these
24  are the Corporation for Public Broadcasting's
25  response to some interrogatories that were

Page 228

1  propounded to it by NPR in this litigation.
2  It sounds like you may have provided some
3  information that went into those responses.
4  Is that accurate?
5      A.  Yes.
6      Q.  Okay.  Can you look at Page 3 of this
7  document?  And you'll see in the middle of the
8  page it says, "Interrogatory Number 2," and it
9  asks by fiscal year for which the funds were
10  appropriated, for CPB to identify the amount
11  of funds appropriated by Congress for
12  interconnection that were in your possession,
13  custody or control as of September 30th, 2025.
14  Do you see that?
15      A.  Yes.
16      Q.  And in the response that was provided by
17  CPB, there's approximately -- and I'm just going
18  to give you approximates -- 16 million in 2024
19  appropriations.  Do you see that?
20      A.  Yes.  Mm-hmm.
21      Q.  And then under that, there's about,
22  approximately, 51 million in fiscal year 2025
23  appropriations.  You see that?
24      A.  Yes.
25      Q.  And then there's interest on

Page 229

1  interconnection funds dating back to fiscal year
2  2016 through 2025 in an amount of about $23
3  million.  Do you see that?
4      A.  Yes.
5      Q.  Setting aside the interest on
6  interconnection funds, for the FY24 appropriation
7  and FY25 appropriation that's listed here, does
8  any of this, to your knowledge, include
9  television interconnection funding?
10      A.  Well, again, the interconnection funding
11  is not appropriated as television or radio.  It's
12  just all interconnection funds.
13      Q.  So is it true -- is your testimony
14  that as of September 30th, 2025, CPB had public
15  television interconnection funds on hand?
16      A.  We had interconnection funds on hand
17  that can be used for television or radio or
18  digital infrastructure.
19      Q.  So your testimony is that all of the
20  interconnection funds that NP -- that CPB had on
21  hand as of September 30th, 2025, could be used
22  for public television interconnection?  None of
23  them need to be used for radio interconnection?
24      A.  No.  I'm just saying that they're not
25  earmarked for one or the other.

Page 230

1    Q. Earmarked by who?
2    A. You tell me. You're -- you're asking me
3    which are television. I don't really understand
4    what you're asking.
5    Q. Well, I'm trying to understand whether
6    some of these funds that CPB had on hand as of
7    September 30th, 2025, are public television
8    interconnection funds?
9    A. Well, they could be if CPB, you know,
10   chose to fund a public television interconnection
11   project.
12   Q. Wouldn't CPB have to tell Congress what
13   it's using those -- these funds for, at some
14   point?
15   A. Well, I think we -- we report on that to
16   Congress.
17   Q. Okay. And when you report on that to
18   Congress, do you tell Congress what specific
19   amounts are going to be utilized for radio
20   interconnection and what specific amounts are
21   going to be used for television interconnection?
22   A. To my knowledge, we -- we have to,
23   I think, provide what -- there's a budget
24   justification --
25   Q. Mm-hmm.

Page 231

1    A. -- that we do annually for our -- or, we
2    used to do for our regular appropriation, and,
3    also for interconnection funds. So we have to,
4    in that budget justification, talk about our
5    intention for those funds.
6        It doesn't always exactly line out the
7    way that we are projecting, but, you know, we do
8    have to present that sort of plan to Congress.
9    Q. And did you submit that -- that plan for
10   fiscal year 2024 to Congress, to your knowledge?
11   A. I assume we did.
12   Q. And did CPB submit that plan for fiscal
13   year 2025 to Congress?
14   A. I assume we did.
15   Q. And would that plan that got submitted
16   to Congress for fiscal year 2025 have told
17   Congress how CPB intends to spend appropriated
18   funds?
19   A. I assume so.
20   Q. Would it have distinguished between
21   television interconnection and radio
22   interconnection?
23   A. It would have outlined what we had
24   expected to fund in television and radio and
25   digital infrastructure projects, yes.

Page 232

1    Q. Is it your testimony that, regardless of
2    what is in that budget justification, that CPB
3    has absolute discretion to utilize any funds that
4    it told Congress it was going to use for radio
5    interconnection for public television
6    interconnection?
7    A. Well, again, I don't really understand
8    your question. I mean, we may present a plan
9    that shows funds for radio and TV, but, you know,
10   it might not exactly work out in that way. And
11   so if we say we're gonna give a hundred dollars
12   to television and a hundred dollars to radio, we
13   might give 99 to television and 101 to -- I mean,
14   it -- it can vary depending on how negotiations
15   go on proposals, so -- I'm -- I'm really not sure
16   what you're asking.
17   Q. If you made a pro -- a budget just -- if
18   you provided Congress -- strike that.
19       If you told Congress in a budget
20   justification that you were giving a hundred
21   dollars to public radio interconnection and a
22   hundred dollars to television interconnection,
23   could you then give zero dollars to public radio
24   interconnection and $200 to public television
25   interconnection, in your view?

Page 233

1    A. In that specific year, if we had met our
2    obligations in some kind of multiyear agreement
3    for public radio, we could take the funds from
4    that year and apply it to public television.
5    But, you know, we have re -- responsibility to
6    both radio and TV, but it's not divided up into
7    X number of dollars per year for each one.
8    Q. So it doesn't matter what you -- what
9    you tell Congress; in other words, CPB has
10   complete discretion to spend interconnection
11   money however it wants? Is that fair to say?
12       MR. LIPCHITZ: Objection to the form.
13       You can answer.
14       THE WITNESS: Well, again, I'm not sure
15   how else I can explain it. We meet the needs of
16   the public radio and television interconnection,
17   and we can look at that in different tranches of
18   funding, because these funds, as you can see, are
19   cumulative, right? We don't have to spend all
20   the funds in a specific year. They're considered
21   no-year funds.
22       So in FY24, we may have given money to
23   radio interconnection, and maybe we didn't give
24   money to television interconnection that year,
25   but the next year we gave funds to television and

59 (Pages 230 - 233)

Page 234

1    not radio.
2        So as long as we're serving the needs of
3    interconnection for radio and television, and,
4    you know, we give a plan to Congress -- and I
5    don't think we radically depart from that plan
6    -- but we do have discretion in terms of what's
7    needed at that moment for interconnection and
8    digital infrastructure.
9    BY MS. TOWNSEND:
10       Q.  Can you take a look at your
11   Interrogatory Number 1?  It starts on the
12   preceding page.  "Describe all distributions or
13   disbursements by you, CPB, since January 20th,
14   2025, of funds appropriated by Congress for
15   interconnection."  Do you see that?
16       A.  Yes.
17       Q.  And then the response to that is on
18   the -- the following page -- starts on Page 2,
19   the following page.  Do you see that?
20       A.  Yes.
21          But let me -- so just let me understand
22   what's in this chart.
23       Q.  Sure.
24       A.  Okay.  So these are all funds --
25       Q.  What do you understand this chart to

Page 235

1    be --
2        A.  -- for -- "describe all distributions
3    ... since January for funds for interconnection."
4        Okay.
5        Q.  If you look at the last entry on the
6    chart, you'll notice it says, "Saul Ewing LLP"?
7        A.  Yes.
8        Q.  Does this refresh your recollection -- I
9    think you testified earlier that CPB couldn't use
10   interconnection funds for attorneys' fees.  But
11   it looks like that's what happened here, right?
12       A.  I think I -- I believe I said I didn't
13   think we were using those funds for attorneys'
14   fees, but it looks like we are using funds for
15   attorneys' fees --
16       Q.  So based on --
17       A.  -- related to interconnection, since we
18   are in a lawsuit.
19       Q.  Okay.  So based on this chart, it
20   -- it's your understanding that CPB is using
21   appropriated funds for interconnection for
22   lawyers?  Is that fair to say?
23       A.  Yes.  Because we have been sued over a
24   decision we made on interconnection, and this is
25   related to interconnection.

Page 236

1        Q.  Okay.
2            MS. TOWNSEND:  I'd like to go off the
3    record for about five minutes just to see if we
4    have any other questions, but, otherwise, I think
5    we will probably be done -- or, we will be.
6            THE VIDEOGRAPHER:  We're going off the
7    record at 5:12 p.m. Eastern Time.
8            (Recess taken.)
9            THE VIDEOGRAPHER:  This is Video File
10   Number 7.  Back on the record at 5:22 p.m.
11   Eastern Time.
12           You may begin.
13   BY MS. TOWNSEND:
14       Q.  Just a couple of additional questions
15   for you, Ms. Merritt.
16           You mentioned earlier in your testimony
17   that CPB had engaged in a concurrence process
18   with respect to an agreement with PMI.  What is
19   that concurrence process?
20       A.  It's an internal process that allows
21   us to move towards a grant agreement.  It's a
22   check-off from different departments within CPB.
23   But it still has to then go to the attorneys to
24   create an actual agreement that then has to be
25   signed by both parties.

Page 237

1        So it's a -- it's a milestone along the
2    way, but it is not an approval of funds or a
3    grant award.
4        Q.  Can you tell me, just specifically
5    what -- I'm just having a hard time kind of
6    envisioning what this concurrence process is.  Is
7    it like a checkbox form that certain people check
8    off on to say, "Go ahead and move forward with
9    this grant agreement internally," or is it
10   something else?  It sounds like I'm
11   misunderstanding.
12       A.  No.  It is, "Do we have all the
13   materials that we think we need?"
14       "Yes."
15       "Do we have funds available?"
16       "Yes."
17       "Is everybody aware that we're, you
18   know, moving forward?"
19       "Yes."
20       And then once you get those checkboxes,
21   then the attorneys start drafting an agreement.
22   But, again, it's a negotiation.  It's -- you put
23   forward a -- a grant agreement.
24       And if, you know, you're ready to do
25   that, then you would send a draft to the grantee;

Page 238

1  you would, you know, negotiate back and forth;
2  but still there's no grant award until you have a
3  signed grant agreement.
4      Q.  Okay.  So the concurrence process is
5  something that's done before attorneys internally
6  at CPB start drafting agreements.  Is that
7  accurate?
8      A.  Yes.
9      Q.  Okay.  With respect to the April 2nd
10 resolution that was entered into -- that was
11 entered by the board directing CPB management to
12 negotiate an agreement with NPR for a three-year
13 extension of its interconnection agreement, was
14 that concurrence process completed?
15     A.  I'm not sure.  I don't -- I'm not -- I
16 don't know if we got to that point.  I would have
17 to check.  I honestly don't -- I don't recall.
18     Q.  If attorneys were drafting an extension
19 agreement, would that suggest to you -- strike
20 that.
21         If CPB attorneys were drafting an
22 extension agreement with NPR following that
23 April 2nd, 2025, resolution, would that suggest
24 to you that the concurrence process had been
25 completed?

Page 239

1      A.  I'm not sure.  Because we were
2  definitely in that sense of urgency.  I just
3  honestly don't know.  I can't remember where we
4  were with that.
5      Q.  Since September 26th, have you reached
6  out to anyone about coordinating a vote among
7  interconnected stations as to who should be the
8  manager and operator of the Public Radio
9  Satellite System?
10     A.  I'm sorry.  Since September 26th?
11     Q.  Yeah.  September 26th.
12     A.  Well, I -- I haven't reached out to
13 anyone about coordinating anything about the -- a
14 vote or otherwise.
15     Q.  Have you ever -- strike that.
16         In the last year, since January 1st,
17 2025, have you ever reached out to anyone about a
18 vote among interconnected stations regarding who
19 should be the manager and operator of the Public
20 Radio Satellite System?
21     A.  Have I reached out to anyone?  I mean,
22 we had a conversation with the Trust, and we
23 talked about -- I think at that point -- I know
24 there were questions following that conversation
25 about really what constitutes a -- a vote.

Page 240

1      I don't recall -- I mean, I -- I don't
2  know.  It may have come up in conversation.  I
3  -- I don't recall making any, like, you know,
4  concerted effort around -- or just, you know,
5  talking about a -- a vote.
6      Q.  When was that conversation with the
7  Trust that you just mentioned?
8      A.  It was in April.  I don't know the
9  exact date.  I want to say it was after the first
10 exchange of letters between Mike Savage and me,
11 and somewhere in that -- you know, like, last two
12 weeks of April time period, I think.
13     Q.  Who from the Trust did you have a
14 conversation with?
15     A.  One of the trustees, Lucille Pavco, I
16 think is her name, and the Trust attorney, whose
17 name I forget.  And there were others on the
18 call.  I believe that NPR's general counsel was
19 on that call.  Our general counsel was on that
20 call.
21         I'm trying to remember if anyone from
22 the D/I Committee was involved in the call.  But
23 I -- I know those folks were -- were all on it.
24     Q.  Apart from that meeting with the Trust,
25 you can't recall any conversations with any

Page 241

1  general managers of any stations or any
2  membership organizations like SRG about
3  coordinating a vote among interconnected stations
4  as to who should be the manager and operator of
5  the PRSS moving forward?
6      A.  Well, that wouldn't be CPB's role.
7  I mean, may have -- it may have come up in
8  conversation with -- with GMs or -- but I don't
9  -- I don't recall anything specific.  It's just
10 not something that we've been, you know, focused
11 on.
12         MS. TOWNSEND:  Okay.  No further
13 questions.
14         Do you have some redirect?
15         MR. LIPCHITZ:  Yeah.  Very briefly.
16              EXAMINATION
17 BY MR. LIPCHITZ:
18     Q.  If you could pull out Exhibit 14?
19         MS. TOWNSEND:  Which Exhibit, Counsel?
20         MR. LIPCHITZ:  14.
21         MS. TOWNSEND:  What's -- can you give me
22 a description of that?
23         MR. LIPCHITZ:  I will in a second.
24         It is the email dated April 12th, 2025,
25 from Kathy Merritt to Pat Harrison.

61 (Pages 238 - 241)

Page 242

1           MS. TOWNSEND:  Oh, okay.
2    BY MR. LIPCHITZ:
3        Q.  Just one question.
4        So you note in this email, Ms. Merritt,
5    that you spoke with Ruby Calvert?
6           MS. TOWNSEND:  Objection, leading.
7    BY MR. LIPCHITZ:
8        Q.  You can answer.
9        A.  I -- yes, that's what it says.
10       Q.  Okay.  And you write here that she's
11   concerned about how all this will play out but is
12   adamant that she doesn't want funding to go to
13   NPR.  You see that?
14       A.  Yes.
15          MS. TOWNSEND:  Objection, leading.
16   BY MR. LIPCHITZ:
17       Q.  What is your best memory of what she
18   conveyed to you about why she didn't want the
19   funding to go to NPR?
20       A.  Well, at this point we were focused
21   on an independent entity.  And the board had
22   directed us to talk to NPR about spinning out
23   PRSS to become independent, and Ruby wanted any
24   funding to go to that entity and not to NPR.
25          MR. LIPCHITZ:  Okay.  No further

Page 243

1    questions.
2           MS. TOWNSEND:  I think we're done.
3           THE VIDEOGRAPHER:  Since there are no
4    more questions, this marks the end of the video
5    deposition of Kathy Merritt.  We are going off
6    the record and ending her deposition at 5:33 p.m.
7    Eastern Time.
8           (Deposition concluded -- 5:33 p.m.)
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 244

1          C E R T I F I C A T E
2
3        I do hereby certify that I am a Notary
4    Public in good standing, that the aforesaid
5    testimony was taken before me, pursuant to
6    notice, at the time and place indicated; that
7    said deponent was by me duly sworn to tell the
8    truth, the whole truth, and nothing but the
9    truth; that the testimony of said deponent was
10   correctly recorded in machine shorthand by me and
11   thereafter transcribed under my supervision with
12   computer-aided transcription; that the deposition
13   is a true and correct record of the testimony
14   given by the witness; and that I am neither of
15   counsel nor kin to any party in said action, nor
16   interested in the outcome thereof.
17       WITN                          eal this
18   24th day o
19
20
21   _____
22          Notary Public
23
24
25

Page 245

1        INSTRUCTIONS TO WITNESS
2
3        Please read your deposition over carefully
4    and make any necessary corrections.
5    You should state the reason in the appropriate
6    space on the errata sheet for any corrections
7    that are made.
8        After doing so, please sign the errata sheet
9    and date it.
10       You are signing same subject to the changes
11   you have noted on the errata sheet, which will be
12   attached to your deposition.
13       It is imperative that you return the
14   original errata sheet to the deposing attorney
15   within thirty (30) days of receipt of the
16   deposition transcript by you.  If you
17   fail to do so, the deposition transcript may be
18   deemed to be accurate and may be used in court.
19
20
21
22
23
24
25

Veritext Legal Solutions
215-241-1000 ~ 610-434-8588 ~ 302-571-0510 ~ 202-803-8830

Page 246

```
 1              _ _ _ _ _
 2            E R R A T A
 3              _ _ _ _ _
 4     PAGE    LINE    CHANGE
 5     ___  ___  _____
 6     Reason for
 7     Change:_____
 8     PAGE    LINE    CHANGE
 9     ___  ___  _____
10     Reason for
11     Change:_____
12     PAGE    LINE    CHANGE
13     ___  ___  _____
14     Reason for
15     Change:_____
16     PAGE    LINE    CHANGE
17     ___  ___  _____
18     Reason for
19     Change:_____
20     PAGE    LINE    CHANGE
21     ___  ___  _____
22     Reason for
23     Change:_____
24
25
```

Page 247

```
 1     PAGE    LINE    CHANGE
 2     ___  ___  _____
 3     Reason for
 4     Change:_____
 5     PAGE    LINE    CHANGE
 6     ___  ___  _____
 7     Reason for
 8     Change:_____
 9     PAGE    LINE    CHANGE
10     ___  ___  _____
11     Reason for
12     Change:_____
13     PAGE    LINE    CHANGE
14     ___  ___  _____
15     Reason for
16     Change:_____
17     PAGE    LINE    CHANGE
18     ___  ___  _____
19     Reason for
20     Change:_____
21     PAGE    LINE    CHANGE
22     ___  ___  _____
23     Reason for
24     Change:_____
25
```

Page 248

```
 1        ACKNOWLEDGMENT OF DEPONENT
 2          I, _____, do
 3     hereby certify that I have read the foregoing
 4     pages __ to ____ and that the same is a
 5     correct transcription of the answers given by
 6     me to the questions therein propounded,
 7     except for the corrections or changes in form
 8     or substance, if any, noted in the attached
 9     Errata Sheet.
10
11     _____    _____
12     DATE           SIGNATURE
13
14          Subscribed and sworn to before
15     me this _____ day of _____, 2025.
16
17          My commission expires:
18          _____
19
20          _____
21          Notary Public
22
23
24
25
```

Page 249

```
 1     Joseph Lipchitz, Esquire
 2     joseph.lipchitz@saul.com
 3               October 24, 2025
 4     RE:   National Public Radio, Inc. Et Al v. Trump, Donald Et Al
 5     10/23/2025, Kathy Merritt (#7665231)
 6       The above-referenced transcript is available for
 7     review.
 8       Within the applicable timeframe, the witness should
 9     read the testimony to verify its accuracy. If there are
10     any changes, the witness should note those with the
11     reason, on the attached Errata Sheet.
12       The witness should sign the Acknowledgment of
13     Deponent and Errata and return to the deposing attorney.
14     Copies should be sent to all counsel, and to Veritext at
15     cs-midatlantic@veritext.com
16       Return completed errata within 30 days from
17     receipt of testimony.
18       If the witness fails to do so within the time
19     allotted, the transcript may be used as if signed.
20
21
22          Yours,
23          Veritext Legal Solutions
24
25
```

**[& - 13th]**                                                      Page 1

| & | | | |
|---|---|---|---|

**&**   1:14 2:2,6
6:11

**0**

**0001698**   4:19
178:8
**0002562**   4:24
199:20
**0015943**   4:17
169:16
**0022946**   4:4
109:20
**0023245**   4:8
142:10
**0023266**   4:10
145:20
**0063000**   3:8
26:8
**0066136**   5:3
207:19
**0066140**   5:4
217:18
**0066146**   5:5
217:19
**0099839**   3:14
39:21
**0106552**   3:21
80:16
**0106554**   3:23
93:5
**0110333**   4:3
109:19

**0110454**   4:11
157:5
**0110624**   4:22
191:4
**0110625**   4:22
191:5
**0110856**   4:5
117:4
**0136267**   3:17
53:15
**0136273**   61:22
**0136275**   62:22
62:25 66:6
**0148526**   86:18
87:23
**0148527**   3:20
68:8
**0148531**   89:3
**0185383**   4:14
163:24
**0185385**   4:15
163:25
**02116**   2:12
**0212608**   4:7
130:11
**0212613**   136:2
**0229885**   3:24
106:25
**0301307**   4:20
184:12
**0301309**   185:25
**0304825**   3:15
48:14

**0304827**   3:16
48:15
**0305846**   4:12
159:24
**0305847**   4:13
159:25
**0307145**   3:11
34:16
**0307147**   3:12
34:17
**0455**   4:11
157:5
**0632**   4:23
191:5

| 1 |
|---|

**1**   3:8 6:4 26:6,7
28:5 136:25
234:11
**1.1**   199:8
**10**   3:24 39:15
106:23,24
113:25 158:6
224:22
**10/23/2025**
249:5
**100**   66:10
210:1 214:23
218:23 225:16
**101**   232:13
**106**   3:24
**109**   4:4
**10:08**   41:24

**10:19**   42:2 86:9
**10th**   131:6
133:22
**11**   4:3 109:17
109:18 111:5
**11516**   244:19
**117**   4:5
**11:06**   54:20
**11:37**   86:10
**11:51**   86:13
**11th**   15:2
100:21 108:17
118:12,15
122:16 126:8
127:21 129:1
131:13 132:2
132:13,20
134:14 135:23
136:21 141:14
144:22 192:5
**12**   4:5 117:2,3
**12:51**   128:16
**12th**   40:8 48:10
142:16 144:15
145:6 156:13
241:24
**13**   4:6 130:9,10
**130**   4:7
**1309**   4:20
184:12
**131**   2:12
**13th**   145:6
146:5 150:8
153:4 154:8

**[13th - 23rd]**                                                         Page 2

156:14 157:24
200:7,15
**14** 4:8 142:8,9
146:1 241:18
241:20
**142** 4:8
**145** 4:10
**14th** 148:6,9
184:17,21
185:16 198:15
203:22
**15** 4:9 145:18
145:19 155:11
**157** 4:11
**159** 4:13
**15th** 208:8,12
208:14 211:9
211:21 212:2,8
212:14,15,18
212:22 213:2,5
213:14 220:14
221:5 223:3
225:4 227:3
**16** 4:11 157:3,4
157:15 214:6
228:18
**163** 4:16
**1674** 1:7 6:9
**169** 4:17
**16th** 164:19
191:11 193:3
**17** 4:12 159:22
159:23

**1700** 1:15 2:7
4:19 178:8
**178** 4:19
**17th** 164:9,14
**18** 4:14 16:7
157:1 163:18
163:23 218:24
**184** 4:20
**19** 4:17 130:6
169:14,15
**191** 4:23
**199** 4:24
**1:37** 128:19
179:19
**1:47** 107:13
**1st** 68:13 69:22
70:12 73:15
87:15 88:3
178:12 239:16

**2**

**2** 3:9 11:7
27:17,18 28:7
28:10 42:3
89:4 108:10
132:25 133:5
228:8 234:18
**20** 4:18 14:9
178:3,7
**200** 225:16
226:5 232:24
**20036** 2:7
**2016** 229:2

**2017** 16:2
17:20 24:24
25:1
**202.955.8500**
2:8
**2020** 16:15,23
**2024** 25:13
33:16 65:12
87:9 146:24
228:18 231:10
**2025** 1:11 6:3
18:15 28:21
29:10 31:10
32:9 35:6 46:3
46:7,10 47:16
48:2 49:5 52:7
52:13,16,23
54:9 61:4,6
62:12 63:7,15
65:20 66:22,24
67:1,5,13,22
68:14,21 73:15
73:19 86:19
88:5,10 89:5
90:15 93:10
107:13 110:3
131:6 133:22
137:25 142:16
144:15 164:19
169:21,25
178:12 179:18
184:17,21
185:16 190:17
191:11 193:3

193:12 200:7
208:19 209:2
209:23 210:5
210:23 214:17
218:7 220:7,25
221:16,21
224:15 228:13
228:22 229:2
229:14,21
230:7 231:13
231:16 234:14
238:23 239:17
241:24 244:18
248:15 249:3
**2026** 51:9
210:25
**2028** 51:10
**207** 5:3
**20th** 46:3 87:8
234:13
**21** 4:20 145:18
184:10,11
**213.229.7000**
2:4
**217** 5:6
**21st** 49:5 50:17
52:6,13
**22** 4:21 191:2,3
**227** 5:9
**23** 1:11 4:24
199:18,19
229:2
**23rd** 6:3

**[24 - 60]**

**24** 5:3 207:17
207:18 214:16
218:9,12 249:3
**241** 3:4
**24th** 244:18
**25** 1:7 5:4 6:9
217:17,22
219:9 224:20
**2565** 4:24
199:20
**26** 3:8 5:7
227:9,10
**2613** 4:7
130:11
**26th** 54:9,20
66:22 239:5,10
239:11
**27** 3:10 87:24
87:25
**27th** 209:2,10
210:23
**28th** 208:17
**29th** 209:22
210:5 211:13
214:6 218:22
**2:48** 167:21
**2:54** 157:24
**2nd** 66:24 67:1
67:4,13,21
68:14,21 73:18
80:1,21 86:19
87:15 88:10,19
89:5 91:23
92:5 116:3,12

118:3 119:25
120:5,14
121:10,20
122:5 238:9,23

---

**3**

**3** 3:11 34:14,15
35:5 40:5
86:13 136:15
215:1 228:6
**30** 50:6 75:2
89:3 92:20
93:12,21 95:1
95:4,11,17
141:16,20,21
168:4 245:15
249:16
**3016** 3:8 26:8
**305846** 160:24
**30th** 25:16
30:24 40:24
95:9 137:25
138:7,11
179:18 228:13
229:14,21
230:7
**3268** 4:10
145:20
**333** 2:3
**34** 3:12 89:4
**36** 75:11
**39** 3:14
**3:05** 167:24

**3:32** 158:22
**3rd** 76:4,13,14
98:16 214:17
218:7,20 219:7

---

**4**

**4** 3:13 26:20
39:19,20
128:19 133:9
**40** 13:25
**45** 49:22,25
50:4,10,13,16
**48** 3:16
**4826** 3:15
48:14
**4906** 3:16
48:16
**4:07** 203:14
**4:18** 203:17
**4th** 76:12,21,25
77:4 78:2,10
78:18,21 79:4
79:13,13,24
81:4,9,11,16,24
82:6,10 83:23
84:12 85:21
90:15 91:4,24
92:5,19,23
116:3,12 118:3

---

**5**

**5** 3:15 48:12,13
49:7 61:19
167:24 169:12
224:24

**50** 213:1
**501** 2:12 215:1
**51** 228:22
**53** 3:18
**5384** 4:15
163:24
**5386** 4:16
164:1
**57.9** 213:1
**58** 212:8,24
215:5,18 217:1
220:17 225:7
226:3
**5848** 4:13
159:25
**5944** 4:17
169:16
**5:12** 200:16
236:7
**5:22** 236:10
**5:30** 214:17
**5:33** 243:6,8
**5th** 40:2 219:11
220:7,14,25
221:16,21

---

**6**

**6** 3:17 53:11,14
53:21 54:8
86:17,24,25
132:7 136:1
203:17
**60** 80:5,22
93:21 95:1,11

[60 - added]                                                Page 4

95:18
**6139**  5:3
 207:19
**6141**  5:5
 217:18
**6153**  5:6
 217:20
**617.723.3300**
 2:13
**6277**  3:18
 53:16
**63003**  26:23
**66138**  211:17
**68**  3:20
**6:15**  110:11

**7**

**7**  3:3,19 66:7
 68:6,7 87:13
 87:14,20
 132:15 236:10
**7146**  3:11
 34:16
**7151**  3:12
 34:18
**75**  62:23
**7665231**  249:5
**7th**  91:6,22
 92:3,23 93:10
 95:5 98:15
 99:17 100:17
 116:4,12 118:3
 169:21,25
 170:10 171:13

**8**

**8**  3:21 80:14,15
 80:19 86:21
 87:3,4 90:13
**80**  3:21
**80s**  133:12
**8535**  3:20 68:8
**8:19**  146:6
**8:48**  131:6

**9**

**9**  3:22 71:5
 93:3,4 132:24
 147:17
**90**  73:10
**90071**  2:4
**91**  68:24 71:5
 72:18,20,21,22
**93**  3:23
**9841**  3:14
 39:21
**99**  232:13
**9:12**  1:16 6:2
**9:30**  11:6
**9:57**  150:9
**9th**  99:21
 100:22 101:18
 101:19 102:22
 104:11 107:13
 109:1,6 110:3
 110:7,14 116:2
 116:10 117:21
 118:3,15
 134:14 168:6

**a**

**a.m.**  1:16 6:2
 41:24 42:2
 54:20 86:10,13
 146:6 147:17
 150:9 214:17
**ability**  71:18
 72:7
**able**  8:15 29:24
 34:3 40:25
 85:3 96:20
 97:10 117:18
 137:4 138:1
 180:10 211:5
 226:9
**above**  63:3
 249:6
**absent**  88:16
 88:19 90:18,21
**absolute**  232:3
**access**  70:3
**accomplish**
 181:10
**accomplishing**
 182:13
**account**  207:12
**accuracy**  249:9
**accurate**  8:15
 47:1 100:7
 129:20 132:3
 144:20 167:7
 179:5,13
 180:23 219:12

221:2 228:4
 238:7 245:18
**acknowledg...**
 248:1 249:12
**act**  30:15 74:12
 103:8,17 104:4
 111:13,17
 112:13,23
 113:18 210:6
 226:24
**acting**  14:9
 169:10 170:13
 170:18,21,25
 171:6,8,9
**action**  145:10
 244:15
**actions**  199:12
**activities**
 189:23
**actual**  90:8
 236:24
**actually**  21:21
 59:15 97:1
 106:17 131:4
 140:13 153:16
 159:14 160:22
 173:22
**ad**  9:17
**adamant**
 242:12
**add**  146:8
 180:6
**added**  16:1,12
 17:12,25 90:11

93:13
**addition**
  156:14 178:2
**additional** 73:8
  93:25 98:4
  122:8 138:12
  180:6 216:17
  216:20 220:3,5
  220:12,22
  236:14
**address** 77:12
  165:12 168:18
  170:12 180:10
  202:21 213:16
  214:19,23
  217:4,6,10
  218:6,16
**addressed**
  158:12 210:18
  216:2 221:7
**adhere** 182:1
**adirondacks**
  188:18
**administered**
  8:10
**adopt** 67:5,14
  212:21
**adopting**
  102:17
**advance** 58:22
  58:23 59:4
  66:24 110:6,12
  112:3 128:2
  213:2,8

**advanced** 81:3
**adversarial**
  166:12
**advice** 194:20
**advocating**
  114:13
**affairs** 70:12
  140:2
**affect** 94:15,16
**affected** 47:5
**affects** 8:19
**affiliated** 42:15
  42:18,21,23
**affiliation** 43:5
**affirmed** 7:9
**aforesaid** 244:4
**african** 43:2
**agency** 50:22
**agenda** 32:6
  44:9
**agendas** 171:19
**agent** 205:15
  224:3
**ago** 16:11 45:8
  162:25 191:19
**agree** 66:13
  133:10
**agreed** 37:19
  37:21 122:18
**agreement** 3:10
  24:11,18,20
  25:1,14,14,22
  26:16 27:8,19
  28:6,10,13,15

31:21,23 37:22
  46:14 49:19
  50:8 59:14
  67:9,17,24
  68:22 71:4
  72:3,10,23,25
  73:3 75:5,8
  95:4,7,7 103:1
  120:16 121:2,3
  121:11,18
  122:11 137:21
  137:25 138:3
  138:15 212:23
  220:17,18
  222:1,14,15
  223:7,10,11,12
  223:13,19,22
  233:2 236:18
  236:21,24
  237:9,21,23
  238:3,12,13,19
  238:22
**agreements**
  24:23 25:6
  30:24 37:23
  52:21 53:3
  121:8 238:6
**ahead** 30:25
  65:6 70:18
  126:3 127:20
  175:10 222:23
  237:8
**aided** 244:12

**air** 14:1
**al** 1:4,7 6:6,7
  249:4,4
**alabama**
  139:16,20
  140:2
**albeit** 128:23
**aligned** 57:15
  57:18 59:6,12
**allen** 2:25 6:22
**allotted** 249:19
**allow** 62:15
  63:10 176:19
  183:4
**allowed** 44:11
**allowing**
  176:15
**allows** 236:20
**alongside**
  186:21
**amend** 75:5,9
  79:25 80:20
  91:23 92:4
**amended** 81:1
**amending** 80:3
**amendment**
  72:8 80:6,22
  92:9,15 93:12
**america's**
  128:9
**american** 22:7
  43:3 104:12
  105:17,20,21
  105:23,24

106:1,5 114:10
196:4,22
**amidst** 62:17
63:12
**amount** 71:20
72:13,17,19
103:15,15
228:10 229:2
**amounts** 70:25
230:19,20
**analyze** 25:8
26:1
**analyzed** 58:11
**angeles** 2:4
**angry** 141:1
**anne** 7:7,23
**annually** 231:1
**answer** 9:16,17
11:15 13:20
48:6 95:13,14
100:3,5 116:8
118:9 145:15
149:12 194:17
197:22 207:10
223:15 233:13
242:8
**answer's** 188:8
**answered** 48:4
110:24 118:8
126:2 221:16
**answers** 9:7
34:4 130:2
133:6 207:14
211:8 248:5

**anticipated**
129:25 136:4
136:20 141:7
194:14
**anybody** 11:1
85:11
**anymore** 82:16
**ap** 154:7
**apart** 240:24
**apm** 105:19
108:6 109:8,11
109:13 110:16
110:20,23
179:12 190:8
**apm's** 109:2,14
**apologies** 69:21
87:4
**apparently**
143:10 177:24
**appeared** 70:9
**appears** 49:3
144:16
**applicable**
249:8
**apply** 190:13
233:4
**appreciate**
125:2
**approach** 98:8
**appropriate**
20:19 169:6
199:24 245:5
**appropriated**
20:21 23:5

97:20 104:1
215:19 225:8
227:4 228:10
228:11 229:11
231:17 234:14
235:21
**appropriates**
20:17
**appropriation**
229:6,7 231:2
**appropriations**
111:18 228:19
228:23
**approval** 47:17
118:21 119:14
119:17,21,24
120:2,6,20,23
120:24 121:9
121:14,17
165:10 212:11
223:1 237:2
**approvals** 32:7
**approve** 32:3
61:6 63:8 69:8
72:25 74:9
120:8 211:24
212:8,19
213:18 220:16
**approved** 41:2
69:1 71:3
74:18 85:9
120:9 121:24
121:25 122:6
122:11 143:9

143:23 158:2
162:23 163:6
212:25
**approximately**
212:23 215:5
215:18 220:17
225:7 226:3
228:17,22
**approximates**
228:18
**april** 14:25
15:2 18:15
47:18,18 66:24
67:1,4,13,21
68:13,14,21
69:22 70:12
73:18 76:4,12
76:13,14,17,21
76:25 77:4
78:2,10,18,21
79:4,13,13,24
80:1,21 81:4,9
81:11,15,24
82:6,10 83:23
84:12 85:16,21
86:19 87:15
88:3,10,19
89:5 90:15
91:4,6,22,23,24
92:3,4,5,19,22
92:23 93:10
95:5,5 98:15
98:16 99:17,21
100:17,21,22

| | | | |
|---|---|---|---|
| 102:22 104:11 | **area** 152:11 | 161:10 210:19 | 36:24 37:4 |
| 107:13 109:1,6 | **areas** 63:3 | 211:2 213:17 | 48:15,21,25 |
| 110:3,7,14 | 173:10 | 215:24 217:15 | 53:15,22 54:3 |
| 113:20 116:2,3 | **argh** 107:9 | 220:2,22 226:1 | 109:19 110:2 |
| 116:10,12 | **arm** 105:24 | 230:2,4 232:16 | 159:24 160:6 |
| 117:21 118:3 | **array** 62:18 | **asks** 228:9 | 163:21,25 |
| 118:11,15,15 | 63:13 | **aspect** 56:24 | 164:5 191:4,10 |
| 119:25 120:5 | **aside** 229:5 | **aspects** 188:14 | 217:19 |
| 120:14 121:10 | **asked** 12:25 | **assessing** 63:2 | **attachments** |
| 121:20 122:4 | 29:19 41:20 | **assets** 162:16 | 34:25 |
| 122:16 125:1 | 48:3 52:15 | **assigned** | **attend** 19:21,25 |
| 126:8 127:21 | 61:15 80:11 | 112:16 | 20:2 29:2,6 |
| 129:1 131:6,13 | 86:1 111:1 | **associated** | 43:12,19,22 |
| 132:2,13,20 | 112:4 113:4,8 | 36:21 | 46:2 67:1 76:6 |
| 133:22 134:14 | 113:13 118:7 | **assume** 27:13 | 89:1 100:25 |
| 134:14 135:23 | 126:1 136:24 | 29:4 51:20 | **attendance** |
| 136:21 138:8 | 172:7,9,11 | 78:4,23 80:8 | 29:9 |
| 141:14 142:16 | 173:22,23 | 81:17 101:7,10 | **attended** 19:15 |
| 144:15,22 | 183:15 187:4 | 140:5 141:4 | 19:18 28:21 |
| 145:6,6 146:5 | 187:25 188:4 | 189:1,5 231:11 | 43:9,20 44:5 |
| 150:8 153:4 | 199:3 204:16 | 231:14,19 | 46:8 91:8 |
| 154:7 156:13 | 207:10 214:8 | **assumed** 198:1 | 117:25 |
| 156:14 157:24 | 215:7,9,22 | **assuming** 48:10 | **attendees** 47:3 |
| 164:9,14,19 | 217:12 218:22 | 116:14 | **attending** |
| 190:2,16,16 | **asking** 8:5 84:1 | **attached** 36:19 | 43:25 46:6,9 |
| 191:11 192:5 | 84:16 85:14 | 55:17 160:8 | **attends** 88:24 |
| 193:3,12 238:9 | 92:2 97:4 | 162:13 164:17 | **attention** |
| 238:23 240:8 | 110:15 111:14 | 219:14 245:12 | 153:16 154:3 |
| 240:12 241:24 | 111:20 112:8 | 248:8 249:11 | 186:11 198:23 |
| **apt** 139:18,24 | 115:7 119:18 | **attaches** 36:10 | **attitude** 166:12 |
| **apts** 69:14 | 122:3 123:24 | **attachment** | **attorney** 6:18 |
| 128:9 139:11 | 126:18 136:5 | 3:11,15,18 4:3 | 9:15 11:20 |
| 139:13,18 | 138:7 139:2 | 4:13,15,22 5:5 | 41:19 135:2 |
| 140:3 | 155:19 158:23 | 34:17 35:4 | 240:16 245:14 |

249:13
**attorneys** 7:20
75:7 103:21
194:2 235:10
235:13,15
236:23 237:21
238:5,18,21
**audible** 9:7
**audibly** 9:10
**audiences**
62:17 63:12
**audio** 14:4
**august** 208:8
208:12,14,17
209:2,10,22
210:5,23
211:13 214:6
221:5
**authority** 53:8
67:19 119:25
127:10
**authorization**
72:15
**authorize**
52:18,25 57:12
66:1 67:7,15
67:22 212:22
225:4
**available** 43:23
237:15 249:6
**avenue** 2:3
114:24
**avoid** 101:22

**award** 41:3
66:20 119:2,3
120:1,8 122:14
211:10 222:12
223:8 226:23
237:3 238:2
**awarded** 122:2
122:4 222:4
224:11
**aware** 8:9
49:22 65:10
73:7 210:6
220:5 237:17
**awkward** 45:9

**b**

**b** 3:6
**back** 16:2 23:2
30:19 42:1
59:20 61:8
64:5 69:23
71:13,21,22
72:1,24 82:23
86:13 103:4,5
104:20,25
105:9,16 108:3
115:18 125:1
128:19,22
133:11 136:14
155:12 157:9
162:11 167:24
176:13 190:21
191:21 192:8
192:15 203:17

220:20 221:23
224:9 229:1
236:10 238:1
**backdrop** 65:8
**background**
13:14,17,23
**backup** 106:10
106:14 225:15
226:2,6,17,20
**badri** 32:17,18
52:3,5 150:16
177:11 178:23
181:4
**ball** 170:21
198:2
**barsoum** 11:2
70:13 107:7,12
140:7
**based** 39:9
40:11 70:10
158:24 164:14
193:11 210:21
235:16,19
**basic** 110:23
**basing** 104:16
**bates** 3:8,11,12
3:13,15,16,17
3:18,19,21,22
3:24 4:3,3,5,6,8
4:9,11,12,13,14
4:15,17,18,20
4:21,22,24 5:3
5:4,5 26:8,21
34:16,17 39:21

48:14,15 53:15
53:16 61:19
62:21 66:6
68:8 80:16
86:18 87:22
89:3 93:5
106:25 109:19
109:20 117:4
130:11 136:2
142:10 145:20
157:5 159:24
159:25 160:24
163:24,25
169:16 178:8
184:12 185:24
191:4,5 199:20
207:19 211:17
217:18,19
**becoming**
15:10,18 18:24
19:13 30:13
**beebe** 209:21
**began** 43:15
69:15
**beginning** 1:16
30:11 124:25
**begins** 26:22
37:9 40:2 49:9
63:2 133:18
146:7 149:25
158:7 164:18
**behalf** 6:20,24
21:25 79:7
105:12 161:23

162:21 163:2,4
168:17 219:10
**belief** 122:6,10
160:15 167:9
**believe** 19:20
20:3 22:19
24:7,7 26:19
31:13 36:1
37:20 42:22
57:24 68:3
72:19 86:7,17
88:21 89:5,19
90:11,14 93:16
95:16 100:20
113:10 123:1
131:15 141:11
141:19 152:2
153:5 161:18
162:14 164:23
164:24 168:7
181:20 184:5
185:23 186:3
187:12 188:8
194:11 195:2
202:6,8,13,14
202:18,23
203:3,8,9
205:4,10 208:9
212:15,18
226:8,25 227:6
227:19 235:12
240:18
**believed** 94:5,7
94:18 96:12,15

154:8 163:9
166:1 177:20
**believes** 161:4
**belong** 162:17
**beneficiaries**
22:5
**benefit** 162:15
170:10
**best** 29:24
37:11 83:4
85:6 94:20,23
116:17 181:22
182:5 226:24
242:17
**beth** 54:21,24
**better** 84:24
85:3 96:13
119:7 123:5
154:10 156:15
156:22
**big** 14:13 99:13
**bill** 135:17
184:16 185:10
185:12 186:6
208:19 211:19
219:10
**billion** 199:9
**bio** 79:18
**bit** 132:24
134:10 167:13
**black** 1:17 6:14
**blindsided**
127:25

**blurred** 23:1
**board** 11:25,25
14:1 19:16,19
19:22,25 25:10
26:3 28:18,20
29:3,5,7,10,15
29:19,20 30:5
30:8,15,22
31:25 32:3,6
41:1,2 42:9,12
42:13 47:17
50:9 51:4
52:18,25 53:5
53:8 54:12,13
54:15,17,17
56:2,19,25
57:2,12 58:15
61:4,6 63:8,19
64:8,12,14,18
65:10,13,25
66:23 67:2,4
67:10,13,18,21
68:14,21 69:7
69:12,13 70:17
70:22 71:3
72:7,16,25
73:1,5,18 74:9
74:18 75:17
76:7,11,19,22
77:3,6,15,17
78:15,18,23,25
78:25 79:3,5,7
79:25 81:11,15
81:22,24 82:3

82:10,12,18
83:9,22 84:5,8
85:6 88:18
89:9 90:15,20
91:5,11,13,22
92:4 93:11,20
93:23,24 94:18
95:9,21 96:12
96:15,21,23
97:10,13 98:2
98:20 99:17,21
100:22 101:22
102:6,16,22
104:11,15
105:4,11
107:19 108:8
110:6,11
111:23 112:3
113:6 115:11
115:13 116:2
116:10,11,16
117:14,19
118:2,14 119:5
119:14,21
120:7,8 121:23
121:25 122:6
122:10,22
127:9 129:14
129:22 134:3,8
134:16,16,21
134:22 135:3,9
135:11 136:3,8
148:10 150:1
155:16,18,21

155:24 158:1
159:8,16,17
162:24 163:7
174:17 176:2
176:11,16,22
176:22,24,25
177:25 195:17
195:18 205:19
205:20,20
210:12,17
211:9,21 212:2
212:7,10,16,17
212:19,21
213:5,9,17
214:7 220:15
222:22 223:2
225:3,6 226:2
226:7,13
238:11 242:21
**board's** 77:8
80:20 100:18
114:15,19
118:25 120:14
120:20 145:2
145:11 165:9
**bob** 206:3,4
**bod** 206:3
**body** 21:21
**bolded** 162:14
**bolding** 162:15
**book** 54:12,13
54:15
**boston** 2:12

**bottom** 26:21
61:20 62:21
87:22 89:4
133:10 136:15
144:8 146:12
155:12 211:16
**breadth** 84:25
119:7 122:25
**break** 9:19
39:15 41:20,20
79:18 80:12
86:2,5 127:17
128:13 167:14
199:25 203:10
203:11
**breaks** 9:18,20
9:21
**brief** 36:19
128:23
**briefly** 241:15
**bring** 181:6
205:23
**bringing** 60:24
**brings** 33:25
**broadcast**
59:24 60:5,21
60:24
**broadcasters**
135:16 168:15
196:1
**broadcasting**
2:15 6:25
14:18,24 15:8
103:8,16 104:3

111:13,17
112:13 162:19
**broadcasting's**
5:8 227:12,24
**broadly** 173:5
**broke** 128:24
**broken** 56:1
**brooks** 2:6 6:21
**brought** 18:9
70:8 147:14,16
**budget** 36:22
69:24 76:10
98:18 220:10
220:14 221:2,3
221:7,15,20,25
230:23 231:4
232:2,17,19
**budgeting** 65:1
**building** 90:10
**bullet** 136:25
143:21 146:11
147:23,24
148:19 150:21
151:20
**bullets** 133:7
**bullshit** 75:13
**business** 57:20
225:23 226:19
**buzzkill** 174:20
175:1 178:23

**c**

**c** 2:1 172:24
215:1 244:1,1

**cadence** 43:18
**cahill** 155:13
155:16 156:2
**cahill's** 155:23
**california** 2:4
**call** 21:1,20
73:19 74:5,6
74:21,23 75:1
75:19 76:2
78:25 91:12
102:17 118:20
118:24 119:11
119:13,19,20
122:16 123:8
127:2,20,23,25
128:3,25 129:3
129:18 131:16
131:20,23,25
132:2,13,20
136:22 139:8
140:15,19
143:5,7 162:8
192:20 193:6
219:16 240:18
240:19,20,22
**called** 7:8 20:25
21:14 35:7
38:1 58:7
73:21 78:21,24
79:3,6,7,10,12
91:10,13 101:2
101:3 118:15
121:20 122:5
128:1 193:5

194:9 204:25
**calling** 127:19
**calls** 10:21
**calvert** 29:8
  79:5 84:11
  98:16 99:10
  144:12,14,24
  242:5
**calvert's** 99:14
**campaign**
  151:21 153:6
**camper** 140:21
  140:24
**capability**
  106:9
**capable** 226:12
**capacity** 106:9
  106:13,17
  109:2,14
  110:16,21
**capital** 21:5
**capitol** 155:3
**caps** 150:3
  154:13
**capture** 159:5
**career** 14:8
**careful** 78:8
  90:1 187:9
  198:21 199:11
**carefully** 245:3
**carl** 154:15,19
  154:20,21,24
**carolina** 13:6

**carr** 35:21 44:5
  51:15 54:19,21
  73:24,25 74:1
  74:2 113:13
  146:8 158:23
  191:13 220:1
  221:12
**carr's** 55:6
**carried** 73:2
  225:17
**carry** 117:18
**case** 1:6 6:9
  11:16 46:23
  47:7,11,22
  71:14 121:5
  131:15,21
  152:2 171:3
  192:16
**catering** 199:2
  200:20
**cell** 12:19 74:5
**center** 106:11
  150:23
**ceo** 18:9,23
  28:21,22 29:6
  139:13 150:16
  168:13
**ceos** 29:23
  69:14
**certain** 44:2
  50:2 65:21
  73:16 79:17
  89:1 137:14
  144:3 237:7

**certainly** 23:22
  30:10,12 65:8
  65:19 77:23
  211:14
**certificate**
  13:10
**certified** 1:18
**certify** 244:3
  248:3
**cetera** 146:13
**chain** 40:1
  54:18 107:5,6
  109:25 110:1,2
  111:3 130:17
  131:4 157:19
  157:23 169:20
  178:22 179:17
  184:18,20
  186:5 191:9
  208:16
**chair** 29:5,7
  78:25 79:5
  151:7 160:13
  166:7 177:18
**challenging**
  141:9 143:16
  143:24 144:2
  199:14 201:6
**champion**
  151:15
**champions**
  58:7,8
**chance** 28:2
  34:22 53:24

130:18 188:23
  200:8 217:25
**change** 17:10
  18:5,14 45:5
  58:3,4 59:16
  92:21 136:3
  139:2 143:8,22
  153:23 156:17
  161:4 246:4,7
  246:8,11,12,15
  246:16,19,20
  246:23 247:1,4
  247:5,8,9,12,13
  247:16,17,20
  247:21,24
**changed** 18:7
  158:1
**changes** 16:12
  160:16 201:24
  203:4 245:10
  248:7 249:10
**changing** 62:16
  63:11
**characterizati...**
  133:7,17
  180:23
**characterize**
  33:7,24 120:13
  133:15
**characterized**
  120:4,13 180:1
  180:1
**charlotte** 13:6

**[chart - communicating]**                                    Page 12

| | | | |
|---|---|---|---|
| **chart**  234:22,25 | 112:4 140:7 | **college**  13:4 | **committee** |
| 235:6,19 | **clear**  30:13 | **columbia**  1:1 | 22:24 42:6,7,9 |
| **check**  37:20 | 119:4 123:7 | 1:20 6:9 | 42:10,15,20,25 |
| 90:9 236:22 | 147:6 182:17 | **combat**  199:1 | 43:2,9,13,25 |
| 237:7 238:17 | 218:4 223:14 | 200:20 | 44:6,25 45:17 |
| **checkbox**  237:7 | **clearly**  83:25 | **combined** | 45:23,25 46:2 |
| **checkboxes** | 84:1,13,16 | 59:22 66:10 | 46:6,10,18 |
| 237:20 | 91:2 97:9 | **come**  23:2 | 47:4,13,15 |
| **checked**  193:20 | 114:14 216:6 | 38:22,25 55:23 | 51:2 64:13 |
| **checking**  199:5 | **client**  135:2 | 59:15,18 72:24 | 148:1,3,5,13 |
| **chief**  14:16,20 | **clock**  226:16 | 85:14,22 89:20 | 150:23,25 |
| 15:12,18 18:5 | **close**  70:1 | 127:23 136:7 | 151:7 153:19 |
| 18:10 19:3,4 | 72:19,21,22 | 149:10 173:23 | 155:13,14 |
| 19:24 20:9 | **closely**  220:1 | 175:5 176:2 | 160:13,16 |
| 55:15 89:25 | **closer**  186:10 | 180:16 182:21 | 161:4,10,19,23 |
| 118:19 205:21 | **closing**  105:10 | 223:11 240:2 | 161:25 162:2,5 |
| **chose**  133:11 | **coalition**  196:8 | 241:7 | 162:7,11,22 |
| 180:24 195:22 | 204:25 | **comes**  34:7 | 163:3,5 166:8 |
| 230:10 | **coincidence** | 77:21 103:17 | 166:10,18,21 |
| **circumstance** | 198:5 | 150:4 153:16 | 174:18 176:1 |
| 123:21 | **collaborate** | **coming**  59:20 | 176:13,16 |
| **clarify**  9:12 | 37:18 57:22 | 69:17 90:3 | 177:15,18 |
| 158:14 163:1 | **collaborating** | 138:25 145:9 | 178:1 195:17 |
| **clarity**  83:8 | 169:9 170:12 | 156:14 206:16 | 240:22 |
| 203:1 | 170:15,16 | **comment**  150:5 | **committees** |
| **claw**  103:5 | **collaboration** | 154:16 | 58:2 |
| 108:3 | 37:24 49:18 | **comments**  57:4 | **common**  198:8 |
| **clawed**  30:19 | **collaborative** | 97:2 | **communicate** |
| 71:13,21 72:1 | 17:17 45:20,22 | **commission** | 155:22 202:1 |
| 103:4 104:20 | **colleague**  6:21 | 248:17 | 202:12 203:6 |
| 104:25 105:16 | **collectively** | **commit**  49:23 | **communicated** |
| **clawing**  105:9 | 34:14 53:12 | 50:14 | 25:9 100:18 |
| **clayton**  11:2 | 189:14 | **committed**  51:4 | **communicating** |
| 70:13 107:7 | | | 28:17,18 |

158:13,14
190:1
**communication**
154:23
**communicati...**
12:7 155:3,5,6
155:7,10
193:11
**communicators**
25:5
**communities**
85:4
**community**
16:9 17:7
94:10 103:18
135:16 168:14
173:8 196:1
**company** 18:12
199:4
**compel** 98:8
158:16
**complete** 8:15
186:2 205:5
206:7 224:3
233:10
**completed**
227:20 238:14
238:25 249:16
**completely**
124:21
**complex** 66:11
66:15,19
**comply** 93:15
97:18 98:11

201:25 203:4
**computer** 90:4
244:12
**con** 60:10
**concept** 31:11
31:15 35:5,13
35:17 36:11,19
37:10 38:4,12
38:19 39:4,7,9
40:11 59:21
109:9 133:23
134:10 206:9
206:15 208:11
211:11
**conceptual**
181:1
**concern** 58:12
141:16 170:17
225:11,13
**concerned**
70:22 94:14
141:17 242:11
**concerning**
17:1
**concerns** 63:24
64:3,8,19 65:4
71:9 221:7
225:6
**concerted**
58:15 240:4
**concluded**
243:8
**concurrence**
222:20 223:5,8

236:17,19
237:6 238:4,14
238:24
**condition** 8:18
**conference**
140:14
**confidence**
226:7
**confident** 214:2
**confidential**
134:25
**configuration**
197:24
**confirm** 165:1
**confirmed**
226:11
**conflate** 62:10
**conflicted**
148:11
**conflicts** 43:21
**confluence**
69:10
**confused** 138:4
**confusing**
87:17 147:4
202:7
**confusion**
22:20 99:1,3
139:22
**congress** 20:17
20:22 23:5
30:14 97:20
104:1 155:4
198:10,20

199:1,15
201:13,25
203:5 228:11
230:12,16,18
230:18 231:8
231:10,13,16
231:17 232:4
232:18,19
233:9 234:4,14
**connect** 188:24
**connected**
96:11
**connection**
12:21 27:7
166:21 194:21
224:7
**cons** 114:12
**consider** 137:4
172:12 175:22
**consideration**
82:19 214:4
**considerations**
214:18,23
217:10 218:5
218:16,21
219:6,22
**considered**
102:13 233:20
**consistent**
132:11,18
**constitutes**
239:25
**constricting**
116:21

[construct - correct]                                                                    Page 14

| | | | |
|---|---|---|---|
| **construct**  44:8 | **contents**  57:4 | **conversation** | **conveyed**  75:17 |
| 44:23,24 | **context**  37:14 | 12:13 52:2,5 | 181:13 242:18 |
| 210:17 | 65:17,19,21 | 59:16 65:9 | **conveying** |
| **constructed** | 71:11 75:22 | 74:16 83:16 | 129:13 181:21 |
| 45:7 | 181:24 | 84:14 96:17,23 | **coo**  14:20,23 |
| **consultant**  36:3 | **contingency** | 97:6 100:12 | 18:9,16,24 |
| 64:20 65:10 | 80:4 93:13 | 123:23 124:12 | 19:1,1,15,19,22 |
| 83:1,11 108:19 | 98:5 | 127:4,11 | 55:11 108:14 |
| 108:22,25 | **continue**  115:3 | 128:25 129:24 | 108:15,16 |
| 155:5 183:10 | 115:15 | 135:23 141:6 | **coordinate** |
| **consultant's** | **continued** | 141:15 142:5 | 31:25 |
| 158:24 | 220:22 | 142:25 144:18 | **coordinating** |
| **consultants** | **continuity**  31:4 | 149:11 156:1 | 239:6,13 241:3 |
| 12:1 24:1,3 | 31:8 62:14 | 169:2,4 170:4 | **copied**  147:19 |
| 25:7 26:2 | 63:9 219:19 | 174:7,12 | **copies**  12:3,20 |
| 28:16 51:16 | **contract**  80:3 | 180:19 198:8 | 54:21 157:7 |
| 58:10 65:3 | 121:2 | 201:17 239:22 | 249:14 |
| 166:14 | **contributed** | 239:24 240:2,6 | **copy**  92:1,7,12 |
| **consulting** | 108:4 227:21 | 240:14 241:8 | 92:15 |
| 206:5 | **control**  14:1 | **conversations** | **corporation** |
| **cont'd**  4:1 5:1 | 30:17 123:3 | 12:9 27:13,14 | 2:14 5:7 6:25 |
| **contacted** | 228:13 | 32:13,16 39:3 | 14:17,24 15:4 |
| 134:6,8,15 | **controls**  216:23 | 52:9,10 64:11 | 15:7 227:11,24 |
| 141:5 | 217:2 | 65:13 105:14 | **correct**  19:5,6 |
| **content**  14:11 | **convene**  168:17 | 108:1 135:1,3 | 20:5,10 21:9 |
| 20:15,22 23:10 | 168:21 170:2 | 136:8 149:6 | 22:19 37:20 |
| 29:23 32:4 | **convened** | 150:22 171:18 | 40:6,7 43:10 |
| 58:19 60:3,5 | 171:12 | 175:25 176:5 | 47:2 48:2 53:3 |
| 60:20,22 106:1 | **convergence** | 180:25 181:9 | 66:3,25 86:6 |
| 106:6,7,18 | 38:2,3 49:17 | 182:18 190:10 | 88:8 96:9 99:6 |
| 115:1 162:20 | 59:21,23 60:23 | 194:2,19 | 107:22 110:7 |
| 179:23 182:16 | 71:10 | 240:25 | 115:5,16 116:5 |
| 183:5 185:18 | **conversa**  27:12 | **convey**  129:21 | 116:13 123:16 |
| | | 159:7 | 125:20,21,25 |

**[correct - cpb]**                                                    Page 15

| | | | |
|---|---|---|---|
| 126:10 133:4 | 244:15 249:14 | 19:25 20:17 | 95:22 99:2,3,8 |
| 142:17,18 | **counsel's** 80:11 | 23:3,4,16,18 | 100:8,18,18,18 |
| 155:24 164:16 | **counterprodu...** | 24:1,5,8,10,13 | 103:25 105:9 |
| 164:20 165:8 | 160:18 161:6 | 24:17 25:10,13 | 105:10,13 |
| 165:20,25 | **couple** 14:10 | 25:24 26:8,22 | 106:25 108:2 |
| 166:2 171:11 | 79:19 128:5 | 28:18,20 29:7 | 108:18 109:19 |
| 171:13,24 | 135:19 172:10 | 29:11 30:5,16 | 109:20 112:24 |
| 177:6 183:7 | 188:19 236:14 | 31:10,24 34:16 | 116:16 117:4 |
| 187:17 188:9 | **course** 12:10 | 34:17 35:17 | 118:5,21 |
| 193:14 196:5 | 39:16 69:14 | 38:18 39:21 | 119:12,20,20 |
| 196:10,15 | 77:13 | 43:10 44:1,9 | 122:17 123:5,8 |
| 207:4 208:9 | **court** 1:1 6:8 | 44:13,19,25 | 123:16 124:21 |
| 210:25 213:6 | 6:14 7:3 8:10 | 45:4,16,23,25 | 125:23 126:8 |
| 214:21 217:3 | 8:12 9:2 26:5 | 46:18 47:4,16 | 129:12 130:11 |
| 222:6 244:13 | 70:5 130:8 | 48:14,15 50:21 | 132:7 135:14 |
| 248:5 | 170:22 245:18 | 50:22 51:13 | 136:2,7 137:7 |
| **correction** | **cover** 36:10,18 | 52:18,25 53:15 | 137:17 138:1 |
| 165:6 | 37:8 48:21 | 57:13 58:10 | 138:25 140:6 |
| **corrections** | 49:7 54:7 | 60:23 61:20 | 142:10 144:25 |
| 245:4,6 248:7 | 160:23 161:12 | 62:22,25 63:2 | 145:10,20 |
| **correctly** 184:7 | 164:14,23 | 63:19,25 64:13 | 147:20 148:24 |
| 244:10 | **covered** 136:17 | 66:1,6 67:6,15 | 149:2,21 153:5 |
| **corresponden...** | **cpb** 3:8,11,12 | 67:18,22 68:8 | 154:22 155:16 |
| 177:7 | 3:14,15,16,17 | 68:13,14 69:4 | 157:5 158:12 |
| **cost** 64:22 | 3:20,21,23,24 | 69:16,25 70:14 | 159:3,24,25 |
| **costs** 37:11,13 | 4:3,4,5,7,8,10 | 71:15,18 72:24 | 161:10 162:17 |
| 49:14 | 4:11,12,13,14 | 73:10,22 75:1 | 162:22,24 |
| **counsel** 2:25 | 4:15,17,19,20 | 76:6 80:2,16 | 163:6,24,25 |
| 6:16 12:20 | 4:22,22,24 5:3 | 82:3,16,19 | 164:11 165:1,9 |
| 18:11 86:1 | 5:4,5 11:25 | 86:18 87:23 | 166:12,16 |
| 112:6 131:23 | 12:10 15:6,10 | 88:18 89:3,9 | 167:2 168:4,18 |
| 131:24 193:20 | 15:11,21,21 | 89:16 90:12,20 | 169:9,16 |
| 203:10 240:18 | 16:2 18:8,13 | 93:5,11 94:9 | 170:18 171:9 |
| 240:19 241:19 | 18:17,21 19:22 | 94:24 95:21,22 | 172:1,3,22 |

173:1,7,14
176:6 178:8
180:13 181:9
183:13,24
184:12,22
185:25 190:4
190:19 191:4,5
192:6 194:7
198:23,25
199:2,9,13,16
199:20 200:25
201:13,19
203:22 204:8
207:19 208:22
211:9,17
212:22 217:18
217:19 220:16
220:21 221:1,8
221:15 222:1,4
222:18,21
223:16,23,24
224:11,16
225:4,18 226:2
228:10,17
229:14,20
230:6,9,12
231:12,17
232:2 233:9
234:13 235:9
235:20 236:17
236:22 238:6
238:11,21
**cpb's** 19:16,19
52:17,24 66:17

67:2 77:6
97:18 98:11
99:1 119:14
125:19 140:16
143:4 156:16
158:15 166:4,8
166:11,18,21
167:10 173:14
191:23 192:13
214:7 219:22
241:6
**cpb0136269**
3:18 53:16
**create** 102:10
105:3 114:16
114:17 146:14
236:24
**created** 152:7
**creating** 114:23
175:23
**critical** 31:5
**crutcher** 1:15
2:2,6 6:11
**crystal** 198:2
**cs** 249:15
**csg** 16:8,9,19
17:6,8
**cto** 206:1
**cumulative**
233:19
**current** 14:15
40:24 44:12
46:13 75:8
95:3,7 137:24

158:25
**currently** 18:22
21:16 22:18
42:22 106:17
175:17 205:7
205:16,19
206:4
**custody** 228:13
**cv** 1:7 6:9

**d**

**d** 2:11 3:1 4:1
5:1 22:24 42:6
42:6,10,15,20
42:24 43:9,12
43:25 44:6,24
45:17,23,25
46:2,6,10,18
47:3,13,15
146:8 147:25
148:3,4,13
150:22,25
151:7 153:19
155:13 160:13
160:16 161:4,9
161:19,23,25
162:1,4,7,11,22
163:2,5 166:8
166:10,17,21
174:18 176:1
176:12 177:14
177:18 178:1
195:17 240:22

**d.c.** 6:11
**da** 187:5
**dael** 135:15
168:8,11,12,16
196:20 197:5
209:21
**dartmouth**
2:12
**data** 89:23
**databases** 90:4
**date** 6:2 15:1
41:17 48:9
50:6 65:22
73:13,17 164:9
164:12 171:15
213:12,15
217:13 240:9
245:9 248:12
**dated** 54:9
107:13 110:3
164:18 200:15
208:17 241:24
**dates** 64:18
134:18 171:14
212:16
**dating** 229:1
**daunting**
186:12
**davis** 135:17
184:17 185:12
186:6,20
187:21 196:21
197:5 208:19
209:18 219:10

**[davis's - determined]**    Page 17

**davis's**  188:17
**day**  10:23,25
    41:8 49:22,25
    50:10 69:11,18
    70:16 76:4,8
    89:1 101:15
    141:16,22
    142:1,19,24
    146:1,7 148:5
    148:10 168:4
    191:13 212:17
    214:23,24
    217:14 218:6
    218:17,23
    225:16 244:18
    248:15
**days**  50:4,13,16
    80:5,22 92:20
    93:12,21,21
    95:1,11,11,18
    95:18 99:21
    118:14 141:20
    141:21 142:4
    191:24 210:1
    213:14 214:6
    219:11 226:5
    245:15 249:16
**dc**  1:16 2:7
    90:3
**de**  172:14
**deadline**  50:3
    208:7 221:5
**deaf**  198:18
    200:21

**dealing**  60:4
**deb**  158:5
**debate**  112:21
**debbie**  176:15
    177:9
**deborah**  35:21
    38:24 44:4
    51:15 54:19,21
    55:6,20,22
    73:24,25 74:1
    74:2 113:13
    158:23 191:13
    220:1 221:11
**debra**  38:16
    73:25 142:16
    158:5
**debrief**  76:7,16
**decades**  66:18
    121:19
**decide**  74:7
    152:12 173:1
    173:14 180:13
**decided**  71:17
    82:13 89:19
    108:24 116:16
    148:10 192:25
**decision**  158:15
    159:3 235:24
**decisions**
    215:13
**deemed**  245:18
**defendant**  2:14
    5:7 227:11

**defendants**  1:8
**defensive**
    166:15
**definitely**  14:12
    239:2
**degree**  13:7,21
**deliver**  167:3
**deloitte**  36:4,6
    36:8 51:16
    183:10,15
    212:5 219:3
    226:11
**demand**  97:18
    98:11
**depart**  234:5
**departments**
    236:22
**depending**
    232:14
**depends**  77:11
**deponent**  244:7
    244:9 248:1
    249:13
**deposed**  7:24
    12:11
**deposing**
    245:14 249:13
**deposition**  1:13
    6:4,10 8:25
    10:4,14 11:19
    11:24 12:7,17
    243:5,6,8
    244:12 245:3
    245:12,16,17

**deprioritized**
    94:18
**describe**  16:23
    24:25 32:22
    234:12 235:2
**described**
    25:24 71:12
    82:17
**describing**
    61:24
**description**  3:7
    4:2 5:2 36:23
    241:22
**design**  148:20
**designated**
    103:12
**designed**
    147:10 175:20
**desire**  100:18
    140:16 143:4
    191:23
**desk**  90:10
**detail**  210:1
    216:1,7,9
    217:7
**detailed**  214:8
    214:20 219:15
**determine**
    199:16
**determined**
    93:24 177:13
    177:13 192:16
    192:21

**[determining - distributing]**                                        Page 18

**determining**
  214:5
**devastating**
  71:23
**develop**  112:24
  138:10 159:3
  182:11 183:8
  187:18 226:17
**developed**
  166:11
**developing**
  136:16 137:23
**development**
  14:2 183:4
**device**  64:15
**dial**  168:10,11
**different**  17:14
  23:13 50:19
  59:4,11 70:18
  112:22,23
  113:18 122:23
  173:9,10
  182:13,23
  183:2 219:19
  221:24 233:17
  236:22
**difficult**  181:15
**digital**  17:19,21
  17:22 20:20
  23:9 58:22
  59:24 60:8,20
  60:24 62:10
  182:20 229:18
  231:25 234:8

**diligence**  66:12
  66:16
**dinner**  69:13
**direct**  74:6 80:2
  83:9,19 96:21
  132:6
**directed**  58:15
  242:22
**directing**  70:19
  115:11 159:9
  238:11
**direction**  61:11
  74:14 94:23
  102:19 114:15
  114:19 116:15
  117:19 118:25
  127:8 145:2
  193:1 211:15
  212:4
**directive**
  145:11 201:25
  203:5
**directly**  57:9
  101:23 109:11
  113:3 137:8,17
  138:2,25
**director**  14:10
  35:24,25 36:17
  89:25 168:14
  205:12 206:1
  210:24
**directors**  76:7
  82:10 89:9

**directs**  89:9
**disappointing**
  59:9
**disbursed**  23:4
  23:8
**disbursements**
  234:13
**disbursing**  24:9
  24:14
**disclosing**
  194:19
**discovery**
  12:15
**discretion**
  232:3 233:10
  234:6
**discuss**  24:19
  29:15 45:1
  77:25 134:16
  134:23 135:4
  147:10 154:14
  186:23 204:3
  207:4
**discussed**  27:6
  28:5 49:2
  102:21 104:10
  117:12 118:5
  129:5 131:22
  133:23 143:3
  149:7 187:1,3
  188:15
**discussing**
  26:17 98:16
  101:21 102:5

**128:25 134:20**
  146:20
**discussion**
  46:25 76:18
  93:22 96:17
  97:15 102:3
  131:13 141:7
  175:18 192:4
  198:18 225:15
  226:1 227:2
**discussions**
  27:10 32:14
  33:15 45:4
  57:1 94:5,6
  101:25 104:18
  114:11 177:25
**dismissal**  45:3
**dismissed**
  44:14,20
**disrupt**  174:7
  174:11
**disrupting**
  180:19 181:8
**dist**  119:15
**distinguished**
  231:20
**distribute**  75:1
  223:24
**distributed**
  23:18,22
**distributes**
  106:5
**distributing**
  101:23 225:7

**[distribution - eastern]**                                                Page 19

**distribution**
17:7 22:8,12
22:17,21 23:7
23:20 24:9
27:7,11 29:23
31:10,14 32:15
32:20 35:10
37:25 38:7,12
38:20 41:16
42:8 49:15
51:18 58:19,23
60:3,5,8,10,12
60:15,20,21,25
61:7 62:3,7,10
64:25 75:3
105:24 106:8
106:18 115:1
118:22 120:6
120:21 122:18
123:10 124:3
137:8 139:1
152:23 174:6
174:11,13
175:17 179:24
182:16,20
183:5 185:18
195:10,12,15
195:24 204:3
204:14,15
**distribution's**
62:6 204:5,20
**distributions**
234:12 235:2

**distributor**
106:3
**district** 1:1,1
1:20 6:8,8
**divided** 233:6
**division** 22:9
**document** 3:8,9
3:13,19,21,22
3:24 4:5,6,8,9
4:11,17,18,20
4:21,24 5:3,7
26:7,13,18
27:18,25 28:3
28:4 35:2
36:19 39:20
48:23 54:1
64:10 68:7,18
80:15 88:1
93:4,7 106:24
117:3 130:10
130:21 131:1
142:9 145:19
146:2 157:4,21
160:10 169:15
169:23 178:7
178:13,19
184:11 191:3
191:17 199:19
200:12 207:18
208:5 218:2
227:8,10,17,20
228:7
**documents**
11:8,11,15,18

11:23 12:4,11
34:14 113:15
**doge** 50:18,24
51:1 69:16
70:7,15 90:2
**doge'd** 82:20
**doing** 17:13
57:10 58:21
70:24 113:10
116:24 124:6
149:6 156:19
198:22 199:10
219:2 245:8
**dollars** 32:5
232:11,12,21
232:22,23
233:7
**dominated**
84:23
**donald** 1:7 6:7
249:4
**donohue** 54:10
82:4,6
**door** 70:15
**double** 37:20
**doubt** 47:1
92:13
**dozen** 134:2
**draft** 55:18,22
56:10 129:11
133:16 137:1
183:13,15,16
183:18,21
190:20 192:19

237:25
**drafted** 55:21
56:6
**drafting** 237:21
238:6,18,21
**draw** 198:23
**drawn** 22:21
**due** 66:12,16
**duly** 7:8 244:7
**dunn** 1:14 2:2,6
6:11,20,21

**e**

**e** 2:1,1 3:1,6 4:1
5:1 11:21
204:14,16
244:1,1 246:2
**earlier** 40:22
42:5 49:16
76:8 80:21
86:7 108:17
168:7 179:16
193:5 208:13
218:13 235:9
236:16
**early** 76:16
168:16
**earmarked**
229:25 230:1
**eastern** 6:2
41:24 86:10,14
128:16,20
167:21,25
203:14,18

[eastern - entity]                                                    Page 20

236:7,11 243:7
**ebrooks2** 2:8
**economically**
  201:25 203:5
**edge** 64:15
**edit** 55:24
**edited** 56:9
**efficient** 202:1
  203:5
**effort** 58:15
  59:13 159:2
  192:13 240:4
**efforts** 25:10
**either** 15:17
  29:4 78:24
  132:1 144:4
  177:25
**element** 78:14
**elements** 55:21
**elevation** 18:12
**elizabeth** 2:25
  6:22
**else's** 150:5
**elva** 172:14
**email** 3:11,15
  3:17 4:3,12,14
  5:4 34:15,25
  34:25 36:10,19
  37:8 38:21,22
  39:11 40:1,2
  40:18 48:13,21
  49:8,21 52:1,2
  53:14,21 54:8
  54:8,18 55:3,7

55:17 86:25
87:1 106:22
107:5,5,6,12,16
109:18,25
110:1,2 111:1
111:2 113:22
130:17 131:4,5
133:1 142:15
144:8 146:7,10
147:18,19
150:5,10,24
154:17 157:19
157:23,24
158:6,7,22
159:23 160:6,8
160:23,25
161:3,12,18
162:9 163:20
163:23 164:5
164:14,23,24
169:20,22,24
171:1,13
178:14,21,24
179:16,17
180:24 184:16
184:18,20
185:15,16,16
185:21 186:4,6
188:17 191:8,9
191:10,12,24
200:15,24
201:7 202:21
204:18 208:15
208:17 209:18

209:23,25
210:22 211:19
214:16 217:17
219:14,21
221:11,11
241:24 242:4
**emails** 11:25
  130:15,22
  145:24 178:11
  200:6 202:17
**embrace**
  168:22
**emphasis**
  201:20
**employed**
  108:18
**employee**
  108:24
**employees**
  89:20
**ended** 95:4,8
  125:14 184:5
  189:6 206:16
**ends** 26:22
**engage** 71:10
  106:17 166:20
**engaged** 236:17
**engineering**
  13:14
**english** 13:8
**ensure** 62:14
  63:9 192:14
  219:4

**enter** 24:11,17
  52:18 57:13
  225:5
**entered** 72:10
  238:10,11
**entire** 185:17
**entirely** 78:10
  78:13 88:22,23
**entirety** 45:16
  56:3 167:5
**entities** 187:6
  188:2 206:8,13
**entitled** 62:2
**entity** 58:18
  65:15 80:7,23
  84:23 94:3,4
  94:19 96:1,12
  99:20 102:2,3
  103:2 104:23
  105:2,3 114:23
  115:21 116:19
  118:6 119:7
  122:19 123:10
  123:14 124:6
  124:17 125:10
  125:20,25
  126:10,20,21
  132:22 133:25
  134:13,17
  135:13 137:5,9
  137:10,12,12
  137:20 138:13
  138:14,19,22
  138:24 139:5,6

140:17 143:5
145:3,12
146:14 147:11
149:23 152:6
152:19,22
153:1,11 154:6
156:23 167:4,7
176:7 181:1
182:21 183:5
188:11,13
190:3,18 193:8
200:18 205:17
210:2,7 213:20
224:11 225:8
242:21,24
**entrusting**
226:22,23
**entry**  235:5
**environment**
30:11 41:4
47:8 50:18
51:2 70:21
74:11 82:21
105:7 158:25
**envisioning**
59:10 237:6
**equipment**
21:23 65:1
**era**  59:4
**eric**  2:6 6:21
**erika**  135:5
151:4
**errata**  245:6,8
245:11,14

248:9 249:11
249:13,16
**error**  163:5,9
**especially**
50:19 58:4
166:15
**esq**  2:3,6,11
**esquire**  249:1
**essentially**
199:16
**est**  1:17
**establish**  80:6
80:23 94:3
96:1 122:19
**established**
210:8
**establishing**
102:1 210:2,12
**establishment**
224:4
**et**  1:4,7 6:6,7
146:13 249:4,4
**evaluate**  212:5
**evaluating**  26:2
28:17 207:13
**evaluation**
226:10
**evan**  112:5
131:19
**evening**  69:13
69:22 70:11
101:17
**event**  164:13
225:16 227:4

**events**  12:11
69:11
**eventual**
194:15
**eventually**  72:9
**everybody**
237:17
**evolving**  62:18
63:13
**ewing**  2:11 7:1
194:5 235:6
**exact**  15:1
32:19 41:17
48:9 50:16
72:17 73:13,14
92:17 116:14
122:21 134:18
213:15 217:13
240:9
**exactly**  50:4,11
72:20 106:14
117:24 165:22
224:1 231:6
232:10
**examination**
7:14 241:16
**examined**  7:9
**example**  84:11
214:25 216:22
227:5
**except**  42:20
70:1 248:7
**exchange**
169:20,22

171:13 240:10
**exchanged**
200:7
**excited**  182:19
**excuse**  40:23
65:6 129:21
132:20 147:19
169:9 176:8
**execute**  95:24
226:9
**executed**  31:22
**execution**
58:13 80:6,23
93:13
**executive**  14:16
18:8,19 19:21
20:4,6 36:16
44:19 47:5
69:15 75:20
76:1 78:11,13
168:13 195:23
205:12 206:1
210:24 219:15
**executives**
195:25 197:9
**exhibit**  3:7 4:2
5:2 26:4,6,7,20
27:17,18 28:5
28:7,10 34:14
34:15 35:5
39:19,20 40:5
48:12,13 49:7
53:11,14,21
54:8 61:12

**[exhibit - february]**                                                    Page 22

68:6,7 80:14
80:15,19 86:17
86:21,24 87:4
87:20 90:13
93:3,4 106:23
106:24 109:17
109:18 111:5
113:24,25
117:2,3 130:9
130:10 142:8,9
145:18,18,19
146:1 155:11
157:3,4,15
159:21,23
163:18,23
169:14,15
178:3,7 184:10
184:11 191:2,3
199:18,19
200:2,14
207:16,18
214:16 217:17
217:22 218:9
218:12 219:9
227:9,10
241:18,19
**exhilarating**
186:12
**exist** 225:9
**existence**
225:19
**existing** 210:7
**exists** 162:15

**expanded**
17:13
**expect** 210:24
**expectations**
57:15,19 59:7
59:13
**expected** 53:7
231:24
**expecting**
46:11,19
**expenses**
136:16 137:23
138:1
**expensive**
64:21,24
**experience** 24:8
24:13 77:7,16
**expert** 78:15
**expertise** 14:3
34:7,12 110:16
110:21
**expiration**
137:24
**expires** 248:17
**explain** 156:21
159:20 174:7
174:13,16
233:15
**explanation**
159:12
**explanations**
180:20
**express** 47:13
141:15

**expressed** 30:5
58:11 64:19
75:16 114:7
129:14
**expresses**
160:15
**expressing** 30:8
161:24
**extend** 25:14
68:22
**extended** 71:1
**extension** 25:22
26:16 27:2
28:6,15 31:18
31:23 46:13
47:18 61:25
66:2 67:8,16
67:23 68:1,2
69:5,8 72:5
238:13,18,22
**extensions**
52:20 53:1
68:4
**external** 226:10
**extremely**
199:10

**f**

**f** 244:1
**face** 225:18
**facing** 62:15
63:10 70:22
**fact** 40:15
47:24 102:16

177:4 188:23
195:7 201:22
213:17,19
226:18
**factor** 214:5
**facts** 161:9
**fail** 245:17
**fails** 249:18
**fair** 18:2 36:23
45:17 50:14
56:8 65:23
67:11 133:6,17
141:10 144:19
160:19 161:2,2
172:4 192:2
211:4 216:12
216:13 219:17
233:11 235:22
**fall** 33:15,16
57:20 65:12
146:23
**familiar** 28:4
130:22 157:20
225:10
**fancies** 151:14
**far** 81:21
**fashion** 32:7
**favor** 88:15
90:18 114:9
**fearing** 104:19
**february** 15:17
28:21 29:10
30:4 31:9 70:2

**federal** 41:4
66:14,18 82:14
82:21 167:5
217:1
**federally**
215:18 225:8
227:4
**federation**
135:16 168:14
196:1
**feedback** 51:19
51:21,23,25
52:12 57:4,7
171:20
**feel** 45:20,22
59:7 77:11
**feeling** 95:21
**feels** 45:13
**fees** 235:10,14
235:15
**felt** 23:1 77:24
83:6 85:1,6
116:20 153:1
159:19 179:6,7
181:25 214:2
**fema** 70:3
**field** 14:2
**figure** 94:23
**file** 6:4 42:2
86:12 128:18
167:23 203:16
236:9
**filed** 6:7

**final** 55:24
56:13 72:3,9
72:17,25
227:22
**finalized**
183:25 184:4
**financial** 18:10
41:10,15 94:14
216:23 217:2
224:5
**find** 73:12,17
113:5
**finding** 113:18
114:21
**findings** 166:14
**fine** 197:15
**finish** 125:3,3,4
125:5,6
**finished** 227:22
**first** 5:9 7:8
49:7 54:7,18
55:22 69:11
74:15 86:17
87:8 90:10
108:8 119:1
130:17 131:3,4
132:7 147:13
147:15,24
151:23 155:11
171:15 180:12
183:16,17,21
184:20 185:15
186:4,4 200:14
208:2,15 210:1

218:23 227:13
240:9
**fiscal** 51:9,10
205:15 224:3
228:9,22 229:1
231:10,12,16
**five** 41:7 42:11
68:1,4,22 71:1
71:5 72:4
97:13 191:24
201:23 236:3
**flagging** 64:7
**flip** 136:14
**float** 148:22
149:18
**floor** 90:10
**flow** 138:23
**flowing** 139:6
**focus** 175:24
**focused** 60:21
84:21 173:24
175:4 241:10
242:20
**folks** 27:6 36:4
38:19 131:7
140:3 147:19
185:25 194:4,4
200:25 240:23
**follow** 38:6
206:25 209:18
216:16 219:24
219:25
**following** 31:9
63:22 89:18

91:6 221:8
234:18,19
238:22 239:24
**follows** 7:10
**fonte** 154:21
**footen** 36:5,7
**forcing** 170:19
**foregoing**
248:3
**forget** 124:23
240:17
**forgotten** 11:13
**form** 13:18
33:3,9 38:3
99:24 197:21
233:12 237:7
248:7
**formal** 46:12
46:19 223:5
**former** 155:16
155:20
**forth** 220:21
221:23 238:1
**forti** 154:21,21
154:24
**forward** 74:13
74:18 75:5
84:25 85:2,7
94:14,19,20
97:23 98:9
105:1,10
114:22 116:17
120:24 122:1,7
134:12 168:23

| | | | |
|---|---|---|---|
| 170:3 171:25 | 41:10,14 | 105:10 111:7 | 103:11,19 |
| 182:5 200:19 | 108:24 162:21 | 112:10,18,20 | 104:7,19 |
| 212:12 213:18 | 163:2 185:21 | 115:3,15 116:4 | 105:15 108:4 |
| 214:3 222:10 | 210:12 | 116:13 118:4 | 111:15,19 |
| 226:13,15 | **fuller** 207:14 | 120:22 122:7,9 | 114:22 132:16 |
| 237:8,18,23 | **fully** 166:18 | 124:10,13 | 132:21 137:7 |
| 241:5 | **fun** 186:12 | 126:21,22 | 137:17 138:22 |
| **forwarded** | **fund** 104:2,5 | 137:19 138:6 | 138:25 139:4 |
| 184:25 185:9 | 122:18 123:8 | 138:11,12,19 | 158:2 190:4,8 |
| 185:10 191:12 | 123:14,16,20 | 139:6 161:10 | 190:9,25 192:7 |
| **found** 45:3 | 124:2,16,17 | 162:18 163:6 | 192:14 199:8 |
| 133:21 134:5 | 125:23 126:8 | 165:10 167:6 | 215:19 222:5 |
| 198:8 | 162:22 230:10 | 176:9,9 190:19 | 222:12,18 |
| **four** 42:12 44:3 | 231:24 | 199:9 201:24 | 223:17,25 |
| 88:15 90:18 | **fundamentally** | 202:24 203:4 | 224:12 225:8 |
| 196:7 | 158:8 | 211:10,24 | 226:23 227:4 |
| **frame** 134:19 | **funded** 94:9 | 212:9,24 217:1 | 228:9,11 229:1 |
| 135:12,25 | **funding** 25:15 | 225:24 226:4 | 229:6,12,15,16 |
| 141:16,18 | 30:7,12,14,17 | 229:9,10 | 229:20 230:6,8 |
| 168:4 | 30:18 31:21 | 233:18 242:12 | 230:13 231:3,5 |
| **framing** 100:6 | 32:4,11 41:4 | 242:19,24 | 231:18 232:3,9 |
| **frequently** | 46:14,20 47:17 | **funds** 20:17,19 | 233:3,18,20,21 |
| 43:12 | 47:25 49:2 | 20:21 21:25 | 233:25 234:14 |
| **friday** 76:25 | 51:7,9 66:14 | 23:4,8,10,19,22 | 234:24 235:3 |
| 77:1 90:15 | 66:19 67:9,17 | 24:2,6,9,14,19 | 235:10,13,14 |
| 91:5 | 67:24 68:23 | 47:4 49:23 | 235:21 237:2 |
| **fridays** 142:1 | 69:25 72:14 | 50:14 51:3 | 237:15 |
| **front** 17:3 41:1 | 73:6 75:2 80:1 | 70:1,3,23 71:2 | **further** 73:5 |
| 51:1 61:13 | 82:15,21 91:24 | 71:12,18,21,25 | 101:25 241:12 |
| 80:10 87:20 | 92:6 95:8 | 72:1 73:11 | 242:25 |
| 92:24 182:9 | 99:19 101:24 | 93:14 94:1 | **future** 58:16 |
| 216:4 | 102:3,4,11,23 | 95:3,22,22 | 59:11 62:15 |
| **full** 7:21 39:8 | 103:9,14 104:1 | 97:19 100:11 | 63:10 82:14 |
| 40:10,15,19,20 | 104:12 105:9 | 102:25 103:3 | 83:5 94:8 |

96:13 123:5
175:20 182:15
199:16
**fy2026** 47:25
48:25
**fy2028** 47:25
48:25
**fy24** 229:6
233:22
**fy25** 30:18
229:7

**g**

**g** 142:3
**g4** 127:20,23
128:3,6 139:8
139:12 140:15
140:18 141:23
141:25 142:4
142:19 144:22
**gallagher** 36:7
**game** 180:2
**gather** 220:21
222:23
**gathering**
221:13 223:4
**general** 2:25
12:9,13 16:24
18:11,20 83:18
90:6 96:17
97:1,5,11
109:7 112:6
131:23,24
155:8 185:6

193:20 240:18
240:19 241:1
**generally** 24:25
**generation**
70:4
**geographic**
173:10
**getting** 16:12
30:6 31:24
32:6 70:13
82:20 138:20
149:15 153:16
205:9
**gibson** 1:14 2:2
2:6 6:11,19,21
**gibsondunn.c...**
2:5,8
**gin** 154:2
**give** 8:15 9:6
18:19 19:8
39:18 44:14
53:8 68:15
71:18 78:9
86:22 93:1
94:24 96:21
102:10,22
103:9 104:1,11
108:11 116:22
125:9 169:19
170:5,7 175:14
178:4 180:17
185:17 200:9
207:21 211:25
217:25 228:18

232:11,13,23
233:23 234:4
241:21
**given** 45:18
50:2 74:10
75:22 77:23
86:23 90:2
95:1 104:7
198:18 200:21
201:16 215:17
233:22 244:14
248:5
**gives** 222:22
226:2
**giving** 40:10
67:18 78:8
96:25 158:2
211:20 217:1
232:20
**gms** 146:13
241:8
**go** 13:3,9 30:25
34:19 43:15
61:8 64:5 65:6
69:23 100:15
115:18 116:24
125:7 126:3
130:5 132:17
132:22 138:19
138:21 139:4
149:4 152:15
152:16 165:24
167:6,18
175:10 187:17

188:7 190:13
192:25 204:17
204:19 207:24
210:2 222:23
223:5 224:1,2
224:9 232:15
236:2,23 237:8
242:12,19,24
**goal** 98:10
127:13,19
167:10 176:6
182:10
**goes** 59:20
103:15,15
113:2 132:24
185:3
**going** 6:1 8:24
27:14,16 31:2
41:23 44:15
53:10 61:18
64:15 65:14
70:10,15 75:4
77:25 86:10
95:24 107:18
113:17 114:20
115:24 124:16
128:15 130:8
132:6 142:8
145:17 152:25
157:1 159:10
162:3 163:17
167:12,20
170:23 173:15
177:10 187:6

187:12,17
188:2,7 189:17
191:1 193:13
193:24 194:1
203:13 211:25
219:2 222:7
225:23 226:6
226:18 227:8
228:17 230:19
230:21 232:4
236:6 243:5
**gonna** 8:5 26:4
41:8 121:15
133:15 156:22
178:3,4 232:11
**good** 7:16
167:16 168:24
176:23,25
178:1 244:4
**govern** 125:10
**governance**
119:9 122:23
123:25 139:3
159:15 215:10
216:10 218:19
224:5
**government**
30:19 50:22
70:12 103:6
140:1 159:15
**graduate** 13:9
13:10
**grand** 2:3

**grant** 3:9 17:14
24:11,17,22
25:1,6 27:19
28:6 40:24
41:2 66:20
67:19 70:4
120:1 121:8,13
122:14 137:25
173:8 212:12
220:17,20
223:8,10,19,22
224:15 236:21
237:3,9,23
238:2,3
**grantee** 121:19
237:25
**grants** 16:9
17:1,4,7 94:10
103:18
**gray** 152:11
**great** 124:11
**green** 120:3
226:14
**ground** 8:25
**group** 17:13
43:2 58:7,8
105:21,25
106:1 124:8
128:10 131:6
135:18 146:12
146:18,20,25
147:7,9,10
148:23 149:19
162:21 168:17

168:21 169:8
170:2,11
171:12,15,17
171:19,20,24
172:4,6,20
173:2,5,13,14
173:20,25
174:2,3,15,17
174:22,25
175:19 176:17
176:20 177:2,6
177:17,21
178:2 179:1,10
179:18,22,23
180:11,14
181:7 182:4,8
182:10,12,19
183:6,9,19
184:2,6,22
185:7,14,19,22
186:1,17,20,24
187:3,6,10,15
188:2,5,6,10,16
189:13,19
192:10 193:14
193:18,19
194:13 195:2,8
195:14,17,25
196:3,5,13,18
196:23 197:7
197:18 198:6
205:14 206:12
206:20,22
208:10 209:22

214:12,17
217:9 218:7,15
219:11,23
221:1 223:25
224:3,7,10,17
226:23
**groups** 147:8
173:11 186:22
189:14
**grove** 23:10
**guard** 90:11
**guards** 90:8,12
**guess** 37:11
45:21 55:5
108:21 111:17
136:25 137:16
154:20,22
168:13 170:11
191:9 193:5
205:25 209:21
**guide** 129:24
182:15
**guiding** 187:18
188:10
**guy** 151:15
**guys** 70:14

**h**

**h** 3:6
**half** 9:20 134:2
**hallway** 7:17
**hand** 26:4,6
53:11 111:5,21
112:8 114:18

229:15,16,21
230:6 244:17
**handed** 35:4
54:4 117:8
200:2
**hands** 100:14
**hang** 130:24
**happen** 70:10
94:25 118:11
141:20 154:6
227:3
**happened**
85:16 89:22
100:20 183:17
235:11
**happening** 47:9
69:11 77:23
82:18 90:2
127:20 199:12
**happy** 9:13,18
39:11 140:21
140:24
**hard** 170:20
226:17 237:5
**harden** 90:5
**hardest** 90:23
**harmful** 160:18
161:6
**harrison** 18:23
18:25 29:5
56:18,23 57:3
97:24 109:13
114:2,7 128:8
131:7 142:16

146:6,10
157:25 168:20
170:1,10
178:11,23
179:9 201:7,11
201:23 241:25
**harrison's**
147:18
**hate** 151:14,16
**hayes** 135:5
151:4
**head** 14:11
135:20 175:16
176:12 177:14
181:11 185:13
188:21,22
201:1
**heading** 62:2
**heads** 128:8
179:11
**hear** 29:3
182:22 190:21
191:21
**heard** 58:8
176:21,24
177:3,24
179:14
**hearing** 29:21
30:3 51:1 70:8
70:11
**held** 20:7 57:23
79:13 127:11
**help** 85:2 94:25
124:2 146:13

153:9 182:14
198:25 201:12
201:16
**helped** 61:14
92:11 171:19
187:18 188:11
**helpful** 171:22
**helping** 60:18
153:21 154:22
**helps** 200:20
201:8
**high** 36:20
64:22 66:11,15
193:15
**higher** 127:5
175:25 176:5
**hill** 155:2,3,6,7
202:2,12 203:6
**hiott** 176:15
**hire** 24:2,6
215:11,20
**hired** 25:8
**hiring** 210:24
**history** 82:25
83:11 206:7
**hmm** 16:3,16
16:20 17:5,16
23:17 24:16
26:24 27:1
31:19 32:2
36:12 37:12
40:4 50:7 51:5
53:13 60:6
62:1,4 63:1

66:8 68:17
76:5 84:3
88:17 89:7
90:16,19 97:3
97:7 105:6
107:8,10,15
111:4,10,22
113:1,23 114:1
120:15,17,19
121:6,22 131:8
132:1 133:2
138:9 141:13
143:25 144:5
146:2 158:4
163:16 185:5
186:9,14 194:8
195:19,21
196:2 197:4
200:23 201:10
203:2 206:14
208:18,21,23
211:18,22
218:18,25
228:20 230:25
**hoffman**
188:21 189:19
190:1,2,15
191:11,15
193:4,12,17
194:13 196:21
197:6 209:20
**hoffman's**
192:10

**hold** 21:25
108:11 150:22
**holding** 43:15
**holds** 21:21
**home** 106:10
**honestly** 22:21
153:13 221:10
238:17 239:3
**hope** 128:22
**hoped** 58:14
**hopefully**
223:10
**hopes** 226:4
**hoping** 205:23
**hour** 9:20,20
128:3
**hours** 128:4,5
**house** 51:1 70:7
199:7
**hubbard** 135:7
176:15 179:8
179:14
**hundred** 218:6
218:17 226:5
232:11,12,20
232:22

**i**

**i.e.** 167:1
**idea** 97:17,23
105:1 108:5
109:7 124:11
133:21 134:5
141:2 146:17

147:9,14
151:14,16
168:23,24
169:7 170:3
176:23 177:1
199:2 200:20
**ideas** 158:18
172:2
**identified**
215:12
**identify** 6:16
215:11 228:10
**imagine** 38:8
**immediately**
70:10
**impact** 8:22
72:2
**imperative**
245:13
**impetus** 50:13
**implement**
104:8 145:1,10
214:2 227:7
**implementing**
226:12
**important** 9:3
9:6 129:17
153:9 155:22
158:19 165:5
166:20,24
175:24 177:16
182:22 213:23
213:24,25
215:4,17

216:25 217:2
**impression**
83:14 99:12,14
176:19 182:2
**inadvertently**
165:21
**inc.'s** 5:9
227:13
**include** 20:4
61:7 64:2 80:4
179:13 180:18
185:21 214:25
229:8
**included** 14:9
17:18 18:18
20:7 35:21
37:19 49:15
62:6 63:21
65:24 69:13
124:9 154:9
172:15 174:25
189:19 210:15
**includes** 37:10
105:22 137:3
**including** 70:18
112:18 131:7
134:15 174:17
179:2 189:15
195:9,11,17
209:19 218:19
221:25
**incorporated**
205:3,7,10,11
215:1 219:5

**incorrect** 43:4
56:11,16
**increase** 68:23
**increased**
70:25 71:19,19
**independent**
80:7,24 84:22
94:4,19 96:1
96:12 99:20
102:1,3 103:2
104:23 105:2,3
114:17,23
115:20 116:19
118:6 119:6,8
122:23 123:4
123:14,25
124:6,17 125:9
125:20,24
126:9,20 132:8
132:17,22
133:24 134:13
134:17 135:13
140:17 143:5
143:12 145:3
145:12 147:11
149:22 152:6
152:19,22
153:1,11 154:5
156:23 167:4,7
168:18,23
170:3 182:21
183:4 190:3,18
193:8 242:21
242:23

| | | | |
|---|---|---|---|
| **indicate** 161:3 | **input** 111:6 | 239:18 241:3 | 97:19,21 99:19 |
| **indicated** 69:16 | 112:10 114:4 | **interconnecti...** | 100:9 101:24 |
| 244:6 | 125:13 129:16 | 17:19,21,22 | 102:11,23 |
| **indicates** 57:11 | 149:15 162:6 | 20:12,13,14,18 | 103:9,13,25 |
| **indicative** | 166:16 171:20 | 20:20,21,25 | 104:3,6,9,12 |
| 149:2 | 172:5,8 173:11 | 21:2,8,11,13,16 | 107:18 108:12 |
| **individual** 84:5 | 173:16 183:1,9 | 21:22,24 22:1 | 109:3 110:17 |
| **individually** | 183:9,11,24 | 23:6,9,11,19,24 | 111:8,15,19 |
| 189:14 | 187:16 188:6 | 23:24 24:2,6 | 112:11,14,18 |
| **individuals** | **instances** | 24:10,14,22 | 112:24 113:3 |
| 134:15 197:16 | 112:19,23 | 25:8,9,12,15 | 113:16,19 |
| **inform** 74:17 | **institute** 50:20 | 29:17,22 30:2 | 115:3,15 116:4 |
| 118:20 182:14 | **instructions** | 30:7,9 31:1,5 | 116:12 118:4 |
| **information** | 245:1 | 31:12,21 33:21 | 118:22 119:15 |
| 29:25 69:15 | **instructs** 9:17 | 34:1,8 38:1 | 119:22 120:18 |
| 109:12 110:24 | **insurance** | 42:8 46:20 | 120:22 122:8 |
| 216:17,21 | 49:12 | 48:1 49:1 51:6 | 122:15 123:3 |
| 220:6,21 | **intended** | 51:9 52:21 | 124:5,18 |
| 221:13 222:24 | 186:21 | 53:3 58:2,11 | 125:11 129:22 |
| 224:6,14 228:3 | **intends** 231:17 | 58:13,17,20,22 | 131:10 132:16 |
| **informed** 46:11 | **intention** 231:5 | 59:4,17,22 | 132:22 133:11 |
| 73:1 | **inter** 37:25 | 60:7 62:8 | 134:13 137:11 |
| **infrastructure** | 107:17 | 64:13 65:15 | 137:15 138:14 |
| 17:19,21,23,24 | **interact** 25:25 | 66:3 67:8,17 | 138:18 139:4 |
| 20:20 23:9 | **interacting** | 67:20,24 68:24 | 146:22 153:13 |
| 196:9 205:1,2 | 18:7 28:15 | 70:23 71:2,6 | 155:20 158:2 |
| 229:18 231:25 | **interaction** | 71:16 72:4,10 | 159:6 162:3,18 |
| 234:8 | 45:19 | 72:14 73:6,11 | 162:23 165:2 |
| **initial** 95:17 | **interactions** | 75:2 80:1,4 | 166:4,9,19 |
| 150:10 171:25 | 44:12 | 82:24 83:10 | 167:6 169:2,5 |
| 180:7 191:10 | **interconnected** | 84:15,19 91:24 | 170:4 175:19 |
| 210:15,22 | 96:8,14 143:9 | 92:5 93:23 | 175:21 176:8,9 |
| **initially** 16:18 | 143:23 162:16 | 94:1,4,13,21 | 181:10,23 |
| | 162:17 239:7 | 95:8 96:4,10 | 182:5,17 |

189:23 190:3,8
190:9,19,24
192:14 200:18
212:24 222:18
223:17,25
226:3 228:12
229:1,6,9,10,12
229:15,16,20
229:22,23
230:8,10,20,21
231:3,21,22
232:5,6,21,22
232:24,25
233:10,16,23
233:24 234:3,7
234:15 235:3
235:10,17,21
235:24,25
238:13
**interest**  88:13
154:2 176:10
197:25 198:8
226:25 228:25
229:5
**interested**
29:20 186:25
187:10,11
189:5,13 193:7
210:11 244:16
**interject**  10:5
194:17
**interjecting**
127:15

**internal**  222:21
223:1 236:20
**internally**
28:18 129:6
183:23 237:9
238:5
**international**
14:12
**interrogatories**
5:9 227:14,25
**interrogatory**
228:8 234:11
**interrupt**  79:17
83:7
**introduced**
26:9 27:19
34:18 39:22
48:16 53:17
68:9 80:16
93:5 106:25
109:20 117:4
130:12 142:10
145:21 157:6
160:1 164:1
169:17 178:9
184:13 191:6
199:21 207:20
217:20 227:14
**invading**  50:18
**invasion**  70:6
**invitation**  29:4
**invite**  173:19
177:15 180:16
195:13

**invited**  29:1,23
148:8 174:2
175:14 176:12
176:21 180:3
180:13 192:22
193:17 194:12
196:12
**involve**  58:17
126:21
**involved**  25:3
25:11 27:13
113:17 136:8
140:1 240:22
**involvement**
45:4 171:16
**issuance**  187:4
188:1 189:8
198:17,25
201:12
**issue**  10:6
103:23 145:13
149:8 170:12
**issued**  186:16
198:14 203:22
**issues**  45:1 83:2
218:20
**issuing**  198:24
**item**  63:3
**iteration**  21:2
**ix**  21:5,7

**j**

**j**  1:7 6:7

**jack**  139:15,23
**january**  15:17
69:23 234:13
235:3 239:16
**jean**  196:21
209:19 211:19
**job**  15:11 16:12
16:24 17:9
96:13 181:11
**joe**  10:15,16,18
10:20
**john**  36:5,7
**jointly**  197:17
**joseph**  2:11
6:24 249:1
**joseph.lipchitz**
2:13 249:2
**journalism**
13:12,13 14:9
14:12 15:23
16:5,8,19 17:1
17:2,2
**journalist**  14:6
**july**  183:25
184:17,21
185:16 198:15
200:7,15
203:22
**jump**  155:12
**june**  178:12
198:13
**justification**
230:24 231:4
232:2,20

| k | | | |
|---|---|---|---|
| **k** 1:17 | 77:20,22 83:1 | 43:14,20,22,22 | 108:23 109:4 |
| **kate** 139:14 | 85:13 96:22 | 44:11,18 45:8 | 110:20,23 |
| **katherine** | 103:1,5 112:21 | 45:9,20 48:9 | 111:12 112:7 |
| 28:22 54:10 | 113:5,15,15 | 50:11,16 51:4 | 112:15,19,24 |
| 82:4 127:24 | 116:24 137:1 | 51:23 53:24 | 113:4,11,14 |
| 140:18 168:20 | 145:9 146:25 | 54:12 56:21 | 114:9,11,11,14 |
| **kathleen** 1:13 | 147:20 152:10 | 57:8 58:21 | 114:18,24,24 |
| 3:2 7:7,23 | 153:2,23 154:5 | 59:8 61:8 | 115:24 117:17 |
| **kathy** 6:5 7:2 | 156:14 159:2 | 64:11 65:14 | 117:19,24 |
| 241:25 243:5 | 168:18 176:4 | 70:8,14 72:13 | 119:5 121:1,13 |
| 249:5 | 181:14 183:1 | 72:17 73:2,3 | 121:15 122:21 |
| **katie** 2:3 6:19 | 199:11 202:10 | 73:13,14,16 | 123:1,17 124:1 |
| 7:19 98:17 | 202:17 220:20 | 74:13,19,21 | 124:4,7,9,10,11 |
| **keep** 61:17,18 | 222:2 224:5 | 75:7 76:11,18 | 124:16 125:8 |
| 113:14 157:11 | 233:2 237:5 | 77:2,9,22 | 126:23 127:9 |
| 157:13 | **kinds** 183:2 | 78:22,23,24 | 127:22 129:15 |
| **kempf** 206:3,4 | **knew** 30:23 | 79:1,3,6,8,9,14 | 130:18 132:25 |
| **kept** 16:12 65:2 | 40:23 95:3 | 80:11 81:21 | 134:10,18,20 |
| 146:14 | 138:6 149:9 | 82:20,25 85:2 | 135:20 137:13 |
| **kerger** 28:22 | 165:19 187:4 | 85:5,15,22 | 139:15,25 |
| 29:1,14 30:4 | 187:12,25 | 89:25 90:5,22 | 140:1,10 141:5 |
| **kerri** 188:20,21 | 189:17 190:12 | 91:12 92:17,17 | 141:19 143:15 |
| 191:10 209:19 | 193:3,11 | 93:21 94:12,17 | 148:12 149:15 |
| 211:20 | 196:12,16 | 95:25 96:15,20 | 152:9,15 153:1 |
| **kerri's** 188:18 | 197:7,16,25 | 98:1,5,8,13,20 | 153:13,14,18 |
| **key** 202:2,12 | **knocking** 70:15 | 99:2,6,8,8 | 153:22 154:25 |
| 203:6 | **know** 9:19 | 100:10,11,13 | 155:2,17,20,22 |
| **kicked** 157:23 | 12:15 14:20 | 101:2,3,5,8,14 | 156:4 159:8,15 |
| **kin** 244:15 | 15:6 21:20 | 102:24 103:15 | 160:21 161:9 |
| **kind** 12:12 31:7 | 22:8,10,25 | 103:22 104:7 | 166:17 172:9 |
| 45:7,19 57:19 | 23:22 25:24 | 104:15,18,22 | 172:12 173:10 |
| 66:20 71:15 | 28:1 30:18,25 | 104:23,25 | 177:4,16,19,23 |
| | 32:8,10 34:22 | 105:1,2,7,13,19 | 182:6 183:3,24 |
| | 36:13 41:2 | 106:12,16 | 184:23 185:6 |

186:18,19,24
187:8,9,11
188:24 189:3,7
189:8,14,16
190:11 192:19
192:24 197:23
198:2,2 200:18
201:16 202:9
205:21,23,24
206:7,8,16,21
206:23 209:12
210:16 212:1
212:12 214:5
215:5 216:22
217:10,13
219:4,16
220:10,23,23
221:14,19
222:22 223:2
223:11,21
224:13,18
225:2 230:9
231:7 232:9
233:5 234:4
237:18,24
238:1,16 239:3
239:23 240:2,3
240:4,8,11,23
241:10
**knowing**
213:25
**knowledge**
23:4,14 103:13
106:9 110:23

118:11 140:4
186:1 229:8
230:22 231:10
**known** 141:2
213:20 224:11
**knows** 121:1
**ktownsend** 2:5

**l**

**la** 172:14
**labor** 217:14
**lack** 64:25
154:10 156:15
**lafontaine**
209:20 211:20
**lainie** 35:22
38:16,24 51:15
**landscape**
29:21
**language** 111:6
111:11,12,14
111:18,21
112:2,2,5,9,15
112:23 113:2,8
113:9,14
122:21 161:1
**largest** 224:15
**late** 46:7 47:8
48:2 52:16,23
70:7
**latest** 111:2
**launch** 219:17
219:18

**law** 1:14 8:12
**lawsuit** 12:13
222:6,11
235:18
**lawyers** 24:6
235:22
**leader** 215:11
215:11,20
**leaders** 133:21
133:23 146:13
148:22 149:19
**leadership**
18:13 162:24
**leading** 50:10
242:6,15
**leaning** 212:3
**leases** 21:22
**leave** 44:16
108:24
**leaving** 23:21
**led** 30:21 96:24
171:18
**left** 37:10
**legal** 2:24
205:17 213:19
249:23
**legislative**
128:10
**lengthier** 69:8
**leonard** 2:24
6:12
**letter** 160:8,12
160:15,19
161:1,8 162:9

162:11,12
163:10,13
164:5,6,15,17
164:18,23
165:6,11,12,20
168:19
**letters** 240:10
**letting** 184:23
**level** 18:8 36:20
66:11,15
127:12 134:21
175:25 176:5
177:25 181:1
217:6
**levy** 19:2,11
54:20 55:11
57:7,23 108:13
108:14,18
109:1,6 110:3
110:15,20
111:1 112:8
156:5
**liaising** 140:7
**light** 120:3
226:14
**liked** 169:7
**likelihood**
193:15
**likely** 38:21
127:23 129:4
130:4 195:4
196:14,24
197:17

**line** 35:8 63:3
131:9 142:24
149:25 150:5
150:10 157:25
181:17,19
219:21 231:6
246:4,8,12,16
246:20 247:1,5
247:9,13,17,21
**lined** 129:24
**lines** 22:20
127:10
**lipchitz** 2:11
3:4 6:24,24
9:14,17 10:5
10:11,17 11:5
13:18 26:10
27:21 33:3,9
34:9,20 39:14
41:22 48:3
53:18 56:20
68:10 79:16,21
80:17 87:1,11
87:14 93:6
95:12 99:24
100:2 107:1
109:21 116:6
117:9 118:7,23
126:1 127:14
130:13 142:13
157:17 160:2
163:22 167:15
173:3 178:6
184:14 193:21

194:16,23
197:20 199:23
200:3 217:23
227:15 233:12
241:15,17,20
241:23 242:2,7
242:16,25
249:1
**list** 133:5 146:8
147:20 154:10
156:15 171:25
182:9 185:2,9
185:21,24,25
214:22 218:9
**listed** 229:7
**listeners** 85:3
**literally** 59:1
69:12
**litigation** 7:20
12:21 228:1
**little** 23:1
112:12 134:7
134:10 138:4
151:15 167:13
**livenote** 1:18
**liz** 209:21
**llp** 1:15 2:2,6
2:11 6:11
235:6
**lobbying**
128:10
**lobbyist** 139:23
140:1 154:24
154:25 155:1

**local** 156:22
162:19
**located** 193:9
**lodge** 10:9
**long** 11:4 15:24
19:8 80:11
94:2 132:18
134:11 148:1
234:2
**longer** 33:17,18
89:20
**look** 17:14
26:20,21 28:2
34:23 39:12
49:8,20 53:25
54:7 61:8,19
68:15 86:16
88:10 89:2
90:13 103:22
130:19 131:3
132:5 133:9
136:1 149:9,23
151:19 154:13
157:19 161:12
162:12 169:8
169:19 170:11
170:15,18
179:16 181:2
188:13 198:18
200:8 208:15
214:16,22
217:25 224:9
228:6 233:17
234:10 235:5

**looked** 11:14
12:1
**looking** 29:25
30:16 32:10
40:3 50:6,8
51:3 75:6,7,9
83:1 87:11,15
92:15,24
100:15 104:16
141:19,20
160:22 166:5
173:4 178:16
211:7,20
216:20 217:7
218:12
**looks** 41:7
133:3,14 145:8
146:3 158:6,17
178:22 191:12
202:10,15,21
208:1 235:11
235:14
**loretta** 43:1
**loris** 172:15
**los** 2:4
**lose** 71:14
**loss** 105:9
**lost** 187:23
**lot** 11:14 34:7
34:11 47:9
57:21 58:11,20
82:17 96:25
98:25 117:20
145:5,7 165:23

192:6 198:6
209:8,12
**lucille**  240:15
**lunch**  127:15
128:14,17,23
128:24 139:7

**m**

**m**  1:15 2:7
**machine**
244:10
**maciej**  35:25
38:16 51:15
**made**  10:9 49:1
56:15,24 57:11
61:5 67:6,14
86:7 96:23
108:21 141:2
153:3 177:22
177:23 181:4
195:8 204:14
212:13 214:7
215:13 222:13
224:16 232:17
235:24 245:7
**maher**  28:22
29:1,15 30:4
127:24 140:18
168:20
**mailed**  11:21
204:14,16
**main**  25:5
**make**  10:6 32:6
39:17 58:15

66:21 94:25
102:9 105:15
109:13 114:17
129:12 143:20
152:3 155:18
165:6 169:8
172:15 173:9
185:10 190:23
193:1 226:8
245:4
**makes**  140:25
**making**  63:18
103:3 136:16
151:25 153:7
153:23,25
201:24 203:4
211:15 240:3
**mana**  76:9
**manage**  22:23
22:25 111:7
112:11 115:4
115:16 125:10
**management**
18:21 23:10
47:16 52:17,24
53:1 58:12
63:19,25 66:1
67:6,15,19,23
69:4 70:19
72:24 76:10
80:2 89:9,16
94:24 98:18
100:8 116:16
116:22 117:18

119:9 122:24
139:3 144:25
155:19 156:16
160:17 161:5
166:13 212:22
213:18 220:16
225:5 238:11
**manager**  239:8
239:19 241:4
**managers**
185:6 241:1
**manages**  21:10
22:17 175:17
**mandate**  73:2
74:13 95:25
**march**  35:6
40:2,8 46:3,7
46:10 47:9,14
47:16 48:2,10
49:5 50:17
52:6,13,16,23
54:9,20 61:4,6
62:12 63:7,15
65:20 66:22
70:7 87:2
**mark**  26:4,5
27:16 34:13
39:19 48:11
53:11 68:5
80:13 93:2
106:23 109:16
117:1 130:9
142:8 145:17
157:2 159:21

163:17 169:13
178:3,4 184:9
191:2 199:17
207:16 227:9
**marked**  28:7
28:10 40:5
53:21 113:24
146:1 217:22
**marks**  243:4
**maryfran**
36:11,13 40:9
49:8
**maryland**
13:11
**massachusetts**
2:12
**material**  54:16
219:23
**materials**
207:15 237:13
**matter**  6:6
162:4 233:8
**mean**  14:20
39:10 45:24
58:9 60:17
77:21 84:19
97:8,13 98:7
100:6 102:14
103:20 104:13
104:14 112:12
115:13 121:4,7
124:19 147:10
148:2 153:11
155:15 158:14

| | | | |
|---|---|---|---|
| 187:8 195:12 | 29:6,10,14 | 117:22,25 | 98:1 155:17,21 |
| 202:5,15,20 | 30:4 31:9 | 128:7 139:9 | 155:23 174:18 |
| 211:14 224:10 | 44:16,25 46:2 | 141:23 142:4 | 176:1,1 184:2 |
| 232:8,13 | 46:7,8,9,16,17 | 142:20 144:22 | **members** 42:11 |
| 239:21 240:1 | 47:4,7,15,21 | 148:1,3,5,8,13 | 42:11 43:4 |
| 241:7 | 50:9 54:17 | 148:17 153:15 | 52:17,24 84:8 |
| **meaning** 57:19 | 60:2 66:24 | 171:15 173:23 | 94:11 96:21 |
| **means** 8:7 | 67:2,5,14,22 | 173:25 174:20 | 97:14 134:3,8 |
| 20:14 222:4 | 68:21 69:10,12 | 174:21 181:4 | 134:15 135:10 |
| **meant** 165:20 | 76:6,7,11,16,18 | 204:17,19 | 135:11 144:25 |
| **media** 6:4 14:8 | 76:19,19,22,23 | 209:10 210:22 | 153:19 159:16 |
| 30:12,14 41:5 | 77:4 78:2,10 | 212:16,17 | 159:17 162:1 |
| 69:25 71:14 | 78:12,14,19,21 | 213:4,5,8 | 171:21,23 |
| 75:21 76:1 | 78:24 79:4,9 | 226:2 240:24 | 172:3,6 173:18 |
| 82:15,22 83:4 | 79:24 81:4,9 | **meetings** 18:9 | 174:16 176:11 |
| 88:13 99:7,11 | 81:12,16,18,19 | 19:15,18,25 | 176:16,22,24 |
| 99:13 104:12 | 81:24,25 82:7 | 32:1 43:9,13 | 195:18 198:6 |
| 105:13,17,20 | 82:11,12 83:20 | 43:16,16,17,19 | **membership** |
| 105:21,23,25 | 83:24 84:10,12 | 43:25 44:5,7 | 241:2 |
| 106:1,5 114:10 | 84:21 85:12,16 | 44:17 45:6,17 | **memo** 53:4 |
| 172:16 196:4,9 | 85:18,21 88:11 | 57:24 58:6,7 | 54:4 55:17 |
| 196:22 201:18 | 88:19,25 91:1 | 59:1 68:14 | 56:3,6,9,11,12 |
| 205:1,2 | 91:4,8,10,13,14 | 77:10 79:1 | 56:15,15,18,25 |
| **medical** 8:18 | 91:22 92:3 | 81:22 82:3 | 57:4,11 59:8 |
| **medications** | 93:11 98:15,16 | 91:12 96:23 | 61:13,24 64:2 |
| 8:21 | 98:20,21,22,24 | 139:12 146:24 | 64:9 65:16,24 |
| **meet** 10:3,13,20 | 100:25 101:2,4 | 174:23 181:3 | 66:4,6,23 |
| 11:4 60:25 | 101:5,9,11,15 | 186:24 187:3 | 213:16,21 |
| 77:6,8,9,10,15 | 101:21 102:15 | **member** 42:16 | **memorandum** |
| 77:25 148:10 | 102:22 104:11 | 42:17,18,21,24 | 213:9,13 |
| 204:2 208:25 | 104:14 110:7 | 79:7 82:9 | **memory** 8:19 |
| 209:1 233:15 | 110:11,13,14 | 83:22 84:5 | 8:22 242:17 |
| **meeting** 11:3,9 | 111:23 112:3 | 88:18 90:20 | **mention** 147:25 |
| 28:20,24 29:2 | 113:6 116:2,10 | 91:13 96:5 | 155:13 188:22 |

**mentioned** 42:5
  51:14 69:23
  75:18,23
  146:23 236:16
  240:7
**mentions**
  146:10
**merkley** 118:16
  118:18,20
  119:11,13,19
  119:20 122:17
  123:7,15
  125:22,23
  126:7 127:2,19
  128:3 129:1,3
  129:19 130:1
  131:14,17
  132:12,19
  135:23 136:4,9
  136:21 139:8
  140:16 141:15
  192:5
**merritt** 1:13
  3:2,8,9,11,13
  3:15,17,19,21
  3:22,24 4:3,5,6
  4:8,9,11,12,14
  4:17,18,20,21
  4:24 5:3,4,7
  6:5 7:2,7,16,17
  7:23,25 13:3
  26:5,7,14
  27:18 28:1
  34:15 39:20

42:5 48:13
53:14 54:3
68:7 80:15,19
86:16 93:4,9
106:24 109:18
117:3 125:2
128:22 130:10
130:23 142:9
145:19,25
157:4,20
159:23 160:9
163:23 168:3
169:15,24
178:7 184:11
191:3 199:19
200:6 203:21
207:18 217:17
227:10,18
236:15 241:25
242:4 243:5
249:5
**message** 156:17
184:24 185:1,2
185:3 186:8
198:10
**messages** 12:17
12:20
**messaging**
156:17 158:18
159:3 199:11
**met** 7:17 10:15
10:22,24 61:2
77:19 91:5
99:21 100:22

140:13,14
207:3,5 225:3
233:1
**michael** 19:2
54:20 55:11,20
55:23 57:7,23
108:13,14,18
109:1,6,10
110:3 113:6,11
114:13 156:5,7
**micromanagi...**
116:24 117:20
**mid** 210:25
**midatlantic**
249:15
**middle** 228:7
**mike** 110:9
151:8,9,13
162:11 165:24
166:15 176:12
176:14 177:9
177:13 178:1
240:10
**milestone**
237:1
**million** 32:5
66:10 68:25
71:5 72:18,20
72:21,22 73:11
75:2,11 212:9
212:24 215:6
215:18 217:1
220:17 224:20
224:22,24

225:7 226:3
228:18,22
229:3
**millions** 66:14
**mind** 30:21
77:21 136:3
148:21 149:18
149:22 195:1
**mindset** 182:7
**minimum**
196:23
**minnesota**
105:22 205:4
**minute** 87:10
130:25 191:19
200:9 201:8
**minutes** 11:25
39:15 41:7
79:20 81:15,17
81:19,22,25
82:3,5 88:11
101:8,10
104:15 127:17
158:7 201:23
236:3
**mischaracteri...**
95:13
**misimpressio...**
166:1
**misinterpreting**
149:20
**misperceptions**
99:7

**mispronounce**
168:8
**missing**  56:16
90:25 91:2
158:8
**misstatement**
165:9
**mistake**  86:7
**misunderstan...**
237:11
**mm**  16:3,16,20
17:5,16 23:17
24:16 26:24
27:1 31:19
32:2 36:12
37:12 40:4
50:7 51:5
53:13 60:6
62:1,4 63:1
66:8 68:17
76:5 84:3
88:17 89:7
90:16,19 97:3
97:7 105:6
107:8,10,15
111:4,10,22
113:1,23 114:1
120:15,17,19
121:6,22 131:8
132:1 133:2
138:9 141:13
143:25 144:5
158:4 163:16
185:5 186:9,14

194:8 195:19
195:21 196:2
197:4 200:23
201:10 203:2
206:14 208:18
208:21,23
211:18,22
218:18,25
228:20 230:25
**moment**  71:17
77:12 82:13,22
93:25 159:8
205:10,13
234:7
**monday**  12:24
12:24 91:6
148:9,13
184:21
**money**  23:23
69:9 103:14
108:11 122:2,4
146:14 224:1
233:11,22,24
**monthly**  43:15
**months**  15:12
15:14 16:7
30:10 31:17
85:15 159:5
218:24
**morning**  7:16
42:6 101:16
127:21 128:1
**move**  50:15
61:11 74:13,18

75:4 98:8
104:25 114:22
116:17 120:24
121:25 127:1
134:12 154:15
168:23 170:2
190:24 200:19
212:12 213:18
222:10 236:21
237:8
**moving**  84:25
94:14,19
105:10 122:7
182:5 211:14
226:15 237:18
241:5
**multimedia**
13:11,13
**multiple**  10:21
58:10 108:1
147:21
**multiyear**
233:2
**munipalla**
32:17,18,23
33:1,7,17 34:6
39:3 52:5,12
73:19 74:7,16
74:22,25 75:12
75:19,25
121:21 122:5
127:3 141:22
143:1,3,7
144:23 150:19

173:19 174:1
174:10,19,24
175:14 177:20
179:13,22
180:3,10,16
181:18 182:3
195:13,23
**munipalla's**
33:22 178:25

**n**

**n**  2:1 3:1 4:1
5:1 131:9
**n.w.**  1:15
**name**  6:12 7:21
168:9 206:3
240:16,17
**national**  1:4
2:9 5:8 6:6,20
6:22 135:16
168:14 195:25
227:12 249:4
**native**  172:16
**nature**  12:2
83:15
**neat**  157:12
**necessary**
70:19 89:10
154:8 245:4
**need**  9:19 27:22
30:5,9 58:3,4
75:9 77:11
78:9 137:9,20
138:2,15

**[need - npr]**                                                      Page 38

145:15 147:21
148:25 152:16
152:17 154:14
155:14 216:15
222:25 229:23
237:13
**needed**  43:22
95:9 96:2
102:25 104:20
105:15 114:25
127:5,11
137:13 148:15
153:5 154:4
156:21 158:12
159:4,12,19
192:21 210:7
221:13 223:5
234:7
**needs**  10:9
22:12 58:19,24
60:2,25 61:1
62:16 63:11
137:14 153:15
201:21 233:15
234:2
**negative**  72:2
99:11 201:18
**neglected**
165:21
**negotiate**  31:20
41:2 53:1,9
66:1 67:19,23
71:19 72:8
73:3 114:15

119:25 120:16
122:1,11
212:11,23
220:16 222:23
223:3 226:14
238:1,12
**negotiated**  25:6
72:24 104:22
121:12
**negotiating**
28:9,12 98:14
212:25
**negotiation**
27:7 32:10
71:4 100:8
120:3,9 237:22
**negotiations**
24:22 25:2,19
25:22 28:19
52:19 57:13
67:7,15 69:3
74:10,19 75:5
75:10,14
100:16 102:20
116:21 120:25
213:19 225:5
232:14
**neither**  244:14
**network**
106:10
**never**  24:19
114:9 119:3
120:1,4 123:20
126:22 227:5

**new**  137:5,9,10
137:19 138:12
138:14,19,19
138:22,24
139:4,6 146:14
146:17 150:1
181:1 182:21
188:11,12
200:17 209:20
**news**  14:9
141:8
**nice**  128:23
**nicole**  36:7
**night**  69:18
**nod**  9:7
**nods**  201:1
**non**  96:6
153:19
**nonmembers**
42:12
**normally**
131:22 185:2
**north**  13:5
**notary**  1:19
244:3,22
248:21
**note**  31:11,15
35:5,13,17
36:11 37:10
38:4,12,19
39:4,8,9 40:11
49:9 150:15
151:13 153:15
154:14 210:10

242:4 249:10
**noted**  206:22
245:11 248:8
**notes**  143:11,13
144:20
**notice**  78:9,9
128:2 235:6
244:6
**noticed**  78:3
101:6,7
**notwithstandi...**
71:8
**november**  87:8
**np**  169:8
229:20
**npr**  2:25 7:20
22:8,9,12,16,17
22:21 23:7,7
23:10,11,19,20
23:25 24:9,11
24:15,18 25:5
25:8,14,25
27:6,11 28:15
29:11 31:10,14
32:14,20 35:6
35:10 37:17,25
38:6,12,20
41:15 42:9,12
42:13,15,18,21
42:24 43:3
46:12,20 47:18
47:24 49:1
51:18,22 52:19
53:2,6,7 57:14

57:21,24 58:4
58:12,16,21
59:2,19 61:5
61:25 62:6,13
62:16 63:9,11
64:20 65:14
66:2 67:7,16
67:20 68:3
69:6,14 74:10
75:2 80:2,3,5,7
80:22,24 82:11
83:23,25 84:6
84:12,14,19
85:20 91:25
92:6,19 93:11
93:15,23 94:10
94:12,16,24
95:4,7,10,25
96:4,6 97:17
98:10,14 99:4
99:19 100:9,12
100:16,19,19
101:24 102:1,4
102:10,11,20
103:1 104:22
114:16,20
115:3,15,22
116:4,13,18
118:4,5,19
119:1,6,25
120:16 121:1
121:19 122:18
122:20 123:1,9
123:10 124:19

125:8,14,17,18
127:6,10 128:8
129:1 131:10
132:9 133:11
133:24 134:3,7
134:15,16,24
135:11,12
136:15 137:8
138:2,25 141:9
143:4 145:2,11
145:15 146:24
147:12 149:1
149:10,12
151:1 152:7,20
152:23,25
153:1,17,19
154:5 155:23
156:3 158:2,16
159:4,9,16
162:24 165:10
166:22 167:2,3
168:4 169:2
170:5,19 174:5
174:10,12,17
175:16,22
176:7,13,19,24
176:25 177:5
179:10,22
181:13,17,19
182:1 189:15
190:22 191:21
191:23 192:3
192:16 195:10
195:12,15,16

195:18,24
196:16 197:13
198:1 199:2
200:21 201:19
201:24 202:24
203:4,24 204:2
204:2,5,14,15
204:20 206:6
228:1 238:12
238:22 242:13
242:19,22,24
**npr's**  28:22
64:3,8 100:14
118:21 119:15
119:15,21
120:6,20
121:24 122:7
134:16,22
135:3 137:23
170:22 176:10
204:1 240:18
**nuanced**  162:2
**number**  6:4,9
21:3 25:3 42:3
66:7 68:16
86:13,22,23
87:22 95:1
128:19 132:6
132:15,24,25
133:5,9 134:1
136:1,15
159:14 167:24
203:17 209:14
228:8 233:7

234:11 236:10
**numbering**
132:23
**numbers**  26:22
**nw**  2:7

**o**

**oath**  8:6,9,11
**ob**  197:20,20
**objection**  10:9
13:18 33:3,9
34:9 48:3
56:20 95:12
99:24 100:3
116:6 118:7,23
126:1 173:3
197:20 233:12
242:6,15
**objections**  10:7
**objects**  9:15
**obligation**
104:2,5 222:17
223:15
**obligations**
93:15 233:2
**obvious**  159:11
189:22
**obviously**
35:12 202:21
**occur**  101:15
**occurred**  76:8
76:16,20
**ochman**  35:25
51:15

| | | | |
|---|---|---|---|
| **october** 1:11 | 28:12 35:1,3 | 210:10 215:9 | **opinion** 114:6 |
| 6:3 244:18 | 36:18 39:2,7 | 218:3 219:9 | **opportunities** |
| 249:3 | 40:1 41:19,21 | 228:6 230:17 | 182:20 |
| **odd** 44:8,22,23 | 44:15 45:12 | 234:24 235:4 | **opportunity** |
| 44:24 45:2,3 | 47:24 48:11,22 | 235:19 236:1 | 124:19 125:9 |
| 45:13,13,15,18 | 49:10 53:10,23 | 238:4,9 241:12 | 125:12,15,18 |
| **offer** 168:17,22 | 54:2 61:21,23 | 242:1,10,25 | 207:7 222:9 |
| 170:1 | 63:5 66:5 | **oliver** 209:20 | **option** 102:9,12 |
| **offering** 168:20 | 68:19 76:4 | **omb** 76:9,17,20 | 102:18,21 |
| **office** 10:24 | 83:17 86:3 | 98:17,24 | 104:10 108:6 |
| 73:22 76:9 | 87:5,18 88:2,7 | **onboard** | 108:10 113:21 |
| 89:20 90:12 | 89:2 90:13,25 | 205:24 | 114:12 115:4 |
| 98:17 | 91:4 93:1,2 | **once** 72:23 | 115:11,13 |
| **officer** 14:17,21 | 95:5 108:10 | 140:13 237:20 | 180:15,18,24 |
| 18:10 90:1 | 110:11 117:1,9 | **ones** 115:25 | 190:7 192:16 |
| 118:19 205:22 | 122:12 125:16 | **ongoing** 45:18 | 192:18,25 |
| **offices** 1:14 | 125:22 127:16 | 64:21 220:19 | **options** 101:22 |
| 69:17 90:6,9 | 128:12 130:20 | 220:23 | 102:5 104:22 |
| **official** 76:9,17 | 131:2 132:5,23 | **oo** 15:10 | 107:17,21,24 |
| 76:17 244:17 | 133:9 138:17 | **open** 44:17 | 108:5,7 114:3 |
| **oh** 34:20 61:18 | 140:15 144:4 | 133:21 192:22 | 114:8 115:9,10 |
| 86:22 87:3,25 | 147:17 150:12 | **operate** 115:4 | 180:9 |
| 117:7 147:1 | 150:15 157:9 | 115:16 | **order** 47:5 71:1 |
| 160:22 178:16 | 157:15,22 | **operates** 21:10 | 75:20 76:1 |
| 193:22 207:21 | 158:5 163:8 | 22:17 | 148:25 |
| 242:1 | 164:10 165:13 | **operating** | **ordinary** |
| **okay** 8:5 9:23 | 167:18 174:1 | 14:17,20 65:17 | 129:23 |
| 10:3,10 11:4,8 | 178:18,20 | 118:19 | **organization** |
| 11:11 12:25 | 191:1 193:22 | **operations** | 21:19,20 50:22 |
| 13:3,21 14:19 | 194:16,23 | 17:17 35:22 | 50:23 84:24 |
| 15:14,18 16:6 | 200:13 201:4 | 55:10 106:11 | 99:5,8 105:22 |
| 17:9 18:4 19:3 | 203:9,12 | **operator** 239:8 | 109:15 123:3 |
| 19:13 20:11 | 204:18 208:6 | 239:19 241:4 | 127:6 189:22 |
| 24:8 25:18 | 209:17,25 | | 215:10,12,17 |

216:10,24
224:4
**organizations**
29:4,16 50:19
57:14 104:8
189:12 195:3
196:7,24 197:8
197:8,14,24
204:25 214:1
226:8,12,24
241:2
**organized**
157:14
**original** 216:3
216:11 217:5
245:14
**outcome**
244:16
**outgrowth**
206:19
**outline** 107:17
**outlined** 190:17
231:23
**outlining** 31:11
213:9 214:18
**outside** 11:19
135:14 136:7
**outstanding**
221:20,22
**overlap** 22:22
**oversee** 22:11
58:18 137:12
**overseeing** 17:6
18:17 34:11

137:11 138:14
**oversees** 32:21
74:20 175:17
**oversight**
165:15,16,17
**own** 60:18
69:14 74:8
106:6 139:22
161:24
**owner** 106:4
**owns** 21:23

**p**

**p** 2:1,1 217:9
**p.m.** 107:13
128:16,19
131:6 157:24
158:22 167:21
167:24 179:19
184:22 185:16
200:16 203:14
203:17 236:7
236:10 243:6,8
**page** 3:2,7 4:2
5:2 26:20,25
49:7,21 61:19
62:24 66:5,6
86:18 87:8
88:11 89:2,4
89:14 133:14
136:2,14
151:19 155:11
185:24 200:14
211:16 228:6,8

234:12,18,18
234:19 246:4,8
246:12,16,20
247:1,5,9,13,17
247:21
**pages** 248:4
**paperwork**
205:5
**paragraph**
49:9,20 62:24
63:23
**paragraphs**
63:23
**parameters**
188:12
**part** 11:2 14:13
30:22 35:5
54:8 59:23
60:9 62:7
84:13 99:1
100:11 102:2
123:2 165:15
175:19 177:17
179:23 182:8
182:24 187:15
188:4,5 192:13
196:8 197:18
202:11,13
222:17 223:16
**participant**
139:12
**participants**
185:22

**participate**
24:21 25:18
173:20 174:3
176:20,23
177:1,5,9,10,11
177:14 180:11
193:2,17
194:13 195:14
195:20,24
196:4,13,22
197:6
**participated**
97:14 185:25
198:7
**participating**
45:16 173:15
186:20 189:9
197:10
**participation**
178:25 181:8
192:10,23
**particular**
175:3 181:25
**particularly**
210:11
**parties** 121:12
223:10 236:25
**partner** 33:8,11
33:19
**partners**
225:11
**parts** 56:1
**party** 131:24
244:15

[passed - plan]                                                    Page 42

| | | | |
|---|---|---|---|
| **passed** 67:18 | 37:17,25 49:11 | 172:1,10,12 | 73:4 75:6,8 |
| 90:15 99:17 | 49:14 52:19 | 173:5 183:24 | 91:5 104:23 |
| 102:16 118:2 | 53:2,5,7 57:13 | 185:1,8 195:9 | 169:6 190:7,9 |
| 120:5 | 57:21,24 58:16 | 195:10 199:4 | 198:19 199:24 |
| **past** 44:3 | 58:21 59:2,19 | 237:7 | 216:23 244:6 |
| 224:12 | 59:24 62:13,15 | **period** 27:2 | **places** 112:14 |
| **pat** 18:23 29:5 | 63:9,11 67:7 | 33:13 43:24 | **plaintiff** 5:8 6:5 |
| 56:18,23 97:24 | 67:23 68:3 | 93:20 95:10 | 227:12 |
| 109:13 114:2 | 69:5,6,9,14 | 134:23 191:20 | **plaintiffs** 1:5 |
| 128:7 131:7 | 70:24 71:4 | 220:24 240:12 | 2:9 |
| 142:15 146:6 | 72:3,10,15,23 | **permissible** | **plan** 31:11 |
| 150:8 154:16 | 72:25 73:7,11 | 103:8 | 41:10,15 62:8 |
| 154:18 157:25 | 74:10 99:3 | **person** 10:22 | 80:5,22 92:20 |
| 168:19 170:1 | 102:23 103:3 | 11:4 33:2,5 | 93:12 95:10,18 |
| 178:22,24 | 103:10 104:2 | 42:20,23 70:13 | 102:10 114:16 |
| 202:9,16,18,19 | 108:11 114:12 | 74:19,20 88:24 | 114:17 119:5 |
| 202:23,25 | 128:8 146:15 | 179:3,10 | 123:13,24 |
| 203:3 241:25 | 146:24 190:6 | 205:25 221:12 | 125:9 126:18 |
| **pat's** 147:18 | 201:18 | **personal** | 131:19 136:16 |
| 150:7,13 | **pbs's** 28:21 | 161:24 | 137:24 138:10 |
| **pathway** 30:9 | 63:21,25 68:22 | **perspective** | 141:21 145:1 |
| 94:20 | 71:9 | 140:6 | 145:10 150:25 |
| **patty** 155:13,16 | **peace** 50:20 | **phases** 219:20 | 155:14 166:6 |
| 155:17 | **pending** 9:22 | **phone** 10:21 | 166:22 167:3 |
| **paula** 28:22 | **people** 12:10,11 | 12:19 74:3,5 | 168:5 175:23 |
| **pause** 10:7 | 22:7 25:25 | 74:23,25 75:19 | 209:25 214:8 |
| **pavco** 240:15 | 29:24 51:14 | **phrase** 44:22 | 215:10,19 |
| **pay** 137:7 | 70:11,12 84:8 | 58:8 144:1 | 218:23 219:5 |
| 154:2 222:18 | 85:18,23 | **picking** 59:6 | 225:16,16 |
| 223:16 | 129:12 134:1,2 | **picture** 207:14 | 226:2,6,9,21 |
| **paying** 186:10 | 134:4,6 135:21 | **piece** 16:11 | 227:7 231:8,9 |
| **pbs** 21:12 | 148:16 149:7 | 17:23 181:2 | 231:12,15 |
| 23:21,23 25:8 | 149:13 153:20 | **place** 6:10 | 232:8 234:4,5 |
| 29:11 37:11,13 | 153:21 171:4,8 | 24:20 44:13 | |

[planned - prepared]                                            Page 43

**planned**  41:11
  200:17
**planning**  36:20
  37:2,5,7 74:23
  75:1 88:12
  180:21 214:24
  218:6,17
**plans**  29:16
  214:2 226:18
**play**  25:21
  180:2 242:11
**played**  115:23
  115:24 183:11
**please**  6:16 7:4
  7:22 9:12
  24:12 40:10
  49:9 125:3,8
  200:10 218:10
  245:3,8
**plenty**  147:8
**plural**  112:25
**plus**  30:23
**pmi**  124:8
  196:9 205:7,16
  205:19,20,22
  206:9,15,24
  207:4 208:11
  208:25 209:1,5
  209:9 210:1,6
  210:23 211:10
  211:24 212:4,9
  212:11,23
  213:1,20 214:9
  214:11,19,23

  215:5 217:9
  218:6,7,15,16
  219:10,17,21
  219:23 220:6
  220:18,25
  221:15 222:2,5
  222:13,15,19
  223:13,17,25
  224:4,6 225:5
  226:4,8 227:5
  236:18
**pmi's**  205:12
  210:15 216:3
  221:20 225:16
**podcast**  60:9
**podcasts**  14:2
  60:11,19
**point**  33:20
  41:3 42:17
  51:7 55:11
  59:10 62:19
  64:12 79:17
  89:19 98:14
  102:24 104:20
  108:15,15,19
  108:22 110:21
  116:16 118:2
  121:15,16
  123:23 138:13
  138:17 143:21
  147:23,24
  148:19 152:8
  152:19 153:4
  154:7,11 175:3

  176:3 177:12
  181:25 192:3
  198:22 209:4
  212:3 221:12
  222:25 223:9
  225:21 226:16
  230:14 238:16
  239:23 242:20
**pointing**  183:3
**points**  129:2,4
  129:7,9,15,18
  131:12 132:6
  141:12
**policies**  17:8
**policy**  22:25
**pool**  23:9,23
  103:14
**portfolio**  17:25
**portion**  61:24
  78:18 184:3
**portions**  56:6,9
**posed**  38:11
  207:11
**position**  55:6
  83:3 116:23
  150:16
**positive**  29:13
  32:24 134:6,8
  201:21
**possession**
  228:12
**possibility**  70:1
  75:20,25 82:15
  82:19 93:25

  118:5 136:11
  171:2 190:5
**possible**  40:19
  40:21 56:5
  83:4 148:1
  171:7 189:11
  189:17 211:6
**possibly**  94:17
**post**  200:17
**posted**  183:25
  184:23 187:14
**posting**  199:5
**potential**  47:5
  108:3 133:5
**preceding**
  234:12
**preclude**  139:5
**predates**  65:20
**predecessor**
  34:3
**preexisting**
  71:9
**preliminary**
  51:21
**premises**  70:20
  89:11,18
**preparation**
  11:19,24 12:17
**prepare**  10:4
  10:13 61:14
  129:2,9 148:17
  213:9
**prepared**
  114:21 129:8

**[prepared - proposal]**                                    Page 44

131:13 149:12
159:20 190:23
192:17
**prerogative**
77:8
**presence** 11:20
**present** 2:23
11:1 28:24
44:6,25 45:3
76:15 77:3
82:6 105:8
123:13 174:15
181:16 213:4
231:8 232:8
**presentation**
175:13 180:17
**presented**
57:14 64:9
162:24 173:24
174:1 176:3
**presenting** 57:2
**president** 14:16
15:22 16:4,18
19:8 54:25
55:9,10 139:13
198:9
**president's**
69:24
**pressure** 41:4
**pressures**
94:15
**presumably**
111:23,25
220:13

**pretty** 9:1
25:23 53:6
156:7 217:12
**previous** 57:20
102:15 149:6
**previously**
11:13 51:14
98:19 206:6
**primarily** 14:6
32:16
**primary** 25:4,4
89:21
**principles**
187:19 188:11
**prior** 12:16
18:24 19:7,13
24:8 25:14
44:4 54:17
91:23 92:4
136:14 146:21
151:10 187:4
187:25,25
189:8 213:14
224:15
**priorities** 29:16
33:21,22
**private** 50:23
**privileged**
135:2
**pro** 232:17
**probably** 38:9
38:24 98:13
106:12 112:4
117:23 128:5

129:6,11,14,16
134:2 139:22
143:20 150:7
151:14 156:25
179:10 224:25
236:5
**problem** 105:5
108:2 196:20
197:3,12,13
225:18
**proceed** 40:10
80:2
**proceeding** 8:3
**process** 74:16
190:14 192:22
193:2 194:21
220:19 222:21
223:1,6 236:17
236:19,20
237:6 238:4,14
238:24
**produced**
68:13
**producer** 106:2
106:3
**producers**
20:15 62:17
63:12 106:7
**product** 227:22
**production**
14:1,4 164:10
**productive**
176:4

**professional**
1:18
**program** 13:10
70:4 103:18
**programming**
18:18
**programs**
17:14
**project** 66:20
186:13 230:11
**projecting**
231:7
**projects** 66:11
66:15 231:25
**promoted** 55:9
**promptly** 41:9
**pronounces**
168:10
**proposal** 26:1,1
28:17 31:24
37:19 39:9
40:11,16,19,20
40:25 41:10,14
46:12,19 47:25
49:1,16 51:8
51:17,21 52:6
52:7,13 53:5,6
61:3,5,7,16
62:6,7 63:21
63:25 64:3,8
118:22 119:15
119:22,24
120:6,21
121:24 122:1,7

124:9,14
186:21 189:10
190:15,16,20
191:15 192:11
192:20 193:5,6
195:4 197:17
204:12,13
206:9 207:4,6
208:12 212:1
216:6 221:4
224:10 226:13
**proposals** 32:9
57:15 59:8
62:13 63:7
66:9 182:11,14
183:7,8 212:6
232:15
**proposed** 47:17
56:14 81:1,2
113:22 117:14
221:20
**proposing**
180:9 208:11
**propounded**
228:1 248:6
**pros** 114:12
**protect** 90:6
**protective**
151:17
**protocols** 78:15
**proved** 59:2
**provide** 12:12
12:19 13:1
29:25 31:10

51:18 54:16
57:3 73:10
80:5,22 83:19
93:12 95:10,18
96:6 109:3
110:16 112:1,5
114:25 115:14
133:11 137:17
138:12 161:10
172:1 214:12
216:9 218:22
219:2 230:23
**provided** 51:22
51:25 56:19
57:7 59:25
66:23 72:15
109:12 164:11
187:16 188:6
188:10 191:16
193:4,6 216:7
216:18,19
218:5,15,21
219:6 220:6,11
220:13 221:1,3
221:6 228:2,16
232:18
**provides** 21:16
21:23 96:4
**providing**
66:18 92:19
115:2,2 210:1
**prss** 22:15,18
22:22,23 23:11
25:6,25 27:14

28:16 31:11
32:21 34:1,5
34:11 35:5
36:10,17 37:5
38:4 44:13
47:17 49:1
51:8 60:4,7,9
60:12 61:25
64:16,20 65:9
65:14 70:25
74:17,20 80:6
80:23 83:1
93:23 95:11,19
96:1,3 98:12
99:20 100:12
100:19 102:1
102:10 106:11
114:17 115:4
115:16,20,22
116:18 118:6
119:6 122:18
122:23 123:13
123:16,20,24
124:3,10,13,17
125:19,23
126:9,18,21,23
132:8,17
133:24 134:17
134:24 135:4
135:13 137:13
137:18,21
138:6,16,23
139:1,3,6
140:17 143:4

145:2,11
147:11 148:25
151:1,17,25
152:4,25 153:8
153:25 156:3
156:23 158:16
159:1,4,9,16,18
160:16 161:5,9
161:11 162:15
162:22 165:10
166:6,13,22
167:3 168:5,18
168:23 170:3
170:19 174:8
174:13,16
175:15,18,23
180:20 181:11
181:13,21
190:22 191:22
191:24 192:17
193:8 241:5
242:23
**prudent** 88:12
**prx** 179:11
188:21,23
189:9,17,20
190:2,17,20
192:20 193:7
193:13 194:14
196:3 198:1
**public** 1:4,19
2:9,14 5:7,8
6:6,20,22,25
13:24 14:8,11

[public - questions]

14:13,17,24
15:7 17:2,3,3
20:24 21:10,13
21:15,17,22
22:6 23:18
24:2,5,10,14
29:17,18,21,22
30:12,14 31:6
31:6 34:8 41:5
46:13 48:1
60:25 68:24
69:25 70:8,9
71:5,14,23,24
75:21 76:1
78:14,18 82:15
82:22 83:3
84:25 88:13
94:8,21 97:20
99:7,11,13
101:23 103:8,9
103:16 104:2,3
104:5,8,11,12
105:12,17,20
105:21,23,23
105:25 106:1,4
106:5 107:17
111:6,8,13,17
112:9,11,13
113:3 114:10
119:8 122:25
123:4,8 124:5
128:9,11
139:16,20
140:2 146:21

159:7 160:18
161:6 162:3
165:1 167:5,6
172:16 173:6
196:4,9,22
201:18 205:1,2
209:20 226:24
226:25 227:11
227:13,24
229:14,22
230:7,10 232:5
232:21,23,24
233:3,4,16
239:8,19 244:4
244:22 248:21
249:4
**publicly**   78:2
101:5,7
**pull**   112:17
113:7,9 241:18
**pulled**   192:7,15
**pulley**   135:5
151:4
**pur**   94:13
**purpose**   98:4
**purposes**   23:6
24:10
**pursuant**   72:15
244:5
**pursue**   115:12
**purveyor**   94:13
**push**   98:10
147:25

**pushback**
58:20
**pushing**   202:2
203:7
**put**   80:10 97:22
103:3 140:22
146:12 154:10
156:15 169:4
171:25 179:17
190:7,9,12
213:21 214:3
216:23 222:25
226:13 237:22
**putting**   193:19

**q**

**quantify**
209:12
**quarterly**
43:16
**question**   9:16
9:21 11:16
23:12 33:20,22
44:20 45:7,11
61:15 67:12
77:14 83:21
92:3 95:17
116:9 120:10
120:12 123:22
126:5,12,13
127:1 133:16
136:4,6,10,12
136:20,23
137:1,16

143:20 145:4
173:21 187:24
194:9,11,17
195:1 196:19
199:3 206:11
215:8,23,24
216:2 218:10
232:8 242:3
**questioned**
166:13
**questions**   8:6
9:12,15 12:14
34:4 38:7,10
38:11,14,15,16
38:17,18 44:9
51:23 52:14,15
63:20 64:1,2
64:21 104:17
110:25 129:25
130:2 133:6
145:16 149:10
149:12 194:18
204:10,11,13
204:15,17,19
204:22 206:25
207:5,10 209:8
209:13,14
211:8 214:24
216:16,19
219:3,24 220:1
220:3,12,22
221:15,20,23
221:24 236:4
236:14 239:24

241:13 243:1,4
248:6
**quick**  199:24
203:11
**quickly**  10:6
31:3 50:15
51:3 96:2
136:3 190:24
217:12
**quite**  41:8
77:21
**quote**  75:13
83:9,19 111:6
179:3 180:2
**quotes**  84:19
85:14,23 96:21

**r**

**r**  2:1 244:1
246:2,2
**rachel**  135:7
176:15 177:9
179:8
**radically**  234:5
**radio**  1:4 2:9
5:9 6:6,20,23
13:24 14:11,14
15:22 16:4,8
16:19,25 17:2
17:3,21 20:18
21:13,15,17,22
21:24 22:1,6
23:5,18,24
24:2,5,10,14

29:18,21 30:1
30:23 31:6,12
34:8 46:13
48:1 59:21
60:4,25 70:8
71:23 82:24
83:10 84:25
93:23 94:4,8
94:17,21 97:20
101:23 102:22
103:9,12,15,17
104:2,6,8,11
105:23 106:4
106:18 107:17
108:11 111:6,8
112:9,11 113:3
115:2,14 119:8
122:25 123:5,9
124:5,18
125:10 129:22
134:13 137:11
138:14,18
146:13,21
155:19 159:6,7
160:18 161:6
162:3 165:2
167:5,6 173:6
175:18,20
176:9 179:23
181:10,23
182:5 183:5
200:18 209:21
226:3,24,25
227:13 229:11

229:17,23
230:19 231:21
231:24 232:4,9
232:12,21,23
233:3,6,16,23
234:1,3 239:8
239:20 249:4
**raise**  225:6,11
**raised**  63:20
64:1 221:8
225:13
**ran**  168:5
**rather**  90:9
180:7
**rdm**  1:7 6:9
**reach**  134:22
135:21
**reached**  239:5
239:12,17,21
**react**  140:18
192:4
**read**  64:5 87:22
93:16 134:4
163:10 165:19
245:3 248:3
249:9
**reading**  80:8
130:24
**reads**  89:8
**ready**  113:5
130:3 237:24
**real**  69:10
192:18

**realized**  84:22
100:13
**really**  31:5,7,22
57:19 58:14,18
59:3,10 60:1
64:15 99:4
105:24 114:9
115:23 149:14
153:21 170:20
181:17 220:22
221:12 223:9
230:3 232:7,15
239:25
**reason**  8:14
47:1 179:12
207:23 245:5
246:6,10,14,18
246:22 247:3,7
247:11,15,19
247:23 249:11
**reasons**  213:10
**recall**  10:25
11:17 15:15
25:16 27:10,12
28:20 29:12
35:9,11,23
38:8,10,14,17
39:1,2 41:14
41:17 46:4,6,9
46:15,17,21
47:6,10,20,22
48:8 50:4,9,16
51:22 52:4,8
52:11,15 55:21

55:25 57:6,10
58:9 63:24
64:7,18 73:8
75:12,15,24
76:3,15 77:1
77:19 78:16
79:12 81:2,3,6
81:13 82:9,12
83:18,22 84:5
84:7,9 85:11
85:13,17,19,24
88:18 90:20,24
90:25 91:3,10
91:14,19,21
92:9,12,14,21
92:25 96:22
97:15,22,25
98:3,15,21,23
101:20,21
102:5,7 113:10
114:6 117:23
131:21 135:20
142:5 144:14
144:16,18
145:5,9 156:6
156:9,12
161:15,17
165:22 168:3
169:22 170:8
177:8 204:11
204:22 210:14
210:16 213:15
213:21 217:13
225:14 238:17

240:1,3,25
241:9
**recalling**
  200:24
**rece** 161:15
**receipt** 245:15
  249:17
**receive** 13:7
  35:12 190:3,18
  203:22
**received** 35:18
  48:8 49:5
  51:10,17 162:9
  164:18 191:20
  204:1 217:8,11
  219:10,23
**receives** 111:7
  112:10,20
**receiving** 35:9
  35:11 41:14
  69:15 161:15
  176:8
**recently** 11:15
**recess** 41:25
  86:11 128:17
  167:22 203:15
  236:8
**recognize**
  145:24 160:7
**recognized**
  153:24
**recognizing**
  71:12

**recollection**
  40:14 49:4
  62:5 68:20
  93:10 97:9
  132:12 142:2
  143:13 150:12
  169:25 170:9
  235:8
**recommend**
  65:25 211:9
  212:7 225:4
**recommendat...**
  56:24 57:12
  63:18 66:23
  67:5,14 211:15
  211:21,23
  212:1,13,21
  213:10,16
  214:7
**recommended**
  52:17,24 61:3
  61:6 69:4
  212:10 220:15
**recommending**
  63:8 212:4
**record** 6:2 7:22
  41:24 42:2
  86:10,13
  128:16,19
  167:19,21,24
  203:14,17
  236:3,7,10
  243:6 244:13

**recorded**
  244:10
**recording** 14:4
**recordings**
  14:3
**records** 46:24
**recounting**
  142:25
**redirect** 241:14
**reduce** 93:20
  95:9
**reduced** 94:25
**refer** 112:14
**reference**
  170:25
**referenced**
  139:11 164:7
  249:6
**references**
  112:17 113:18
**referred** 112:9
  168:7
**referring** 15:7
  32:13 33:14
  49:25 54:4
  58:6 105:19
  111:11,16
  150:19 186:7
**refers** 37:14
  49:11
**reflect** 119:7
**reflected** 65:16
  72:4

[reflection - rescission]                                              Page 49

**reflection**
   179:5,14
**reflects**  80:20
   117:6,11
   161:18,20
**refresh**  40:14
   49:4 62:5
   68:20 93:9
   169:24 170:9
   235:8
**refused**  125:13
   175:22
**regarding**  80:1
   91:24 92:5
   116:4,12
   239:18
**regardless**
   71:16 232:1
**registered**  1:17
   139:25 155:1
**regular**  231:2
**reimburse**
   137:9 138:1
**reimbursement**
   137:4,23
**reiterate**  166:5
**reiterated**
   143:22
**related**  73:6
   118:3 146:21
   235:17,25
**relationship**
   32:23,25

**relayed**  38:19
**rele**  142:2
**release**  69:24
**relevant**  60:3
   192:9 193:16
   194:12
**reliant**  64:24
**rely**  165:3
**remained**  30:17
**remaining**
   70:23
**remember**
   10:23 15:1
   32:19 44:10
   57:17 59:5
   76:12,23 84:17
   84:18 101:16
   148:7 156:1,4
   171:14 172:9
   199:6 212:16
   216:5 239:3
   240:21
**remind**  9:8
   11:12
**remiss**  164:25
**repeat**  116:9
   126:4
**replied**  150:8
**reply**  147:24
   150:7
**report**  18:22,24
   19:11 55:1
   230:15,17

**reported**  19:1
   46:18 55:3
   179:9
**reporter**  1:18
   1:19 6:14 7:4
   8:10 26:5
   39:24 48:18
   107:3 109:23
   130:9 142:12
**reporter's**  9:2
**reporting**  26:3
   179:21
**reports**  12:2
   64:20 65:3,11
   83:1,11 158:24
   166:14
**repre**  160:7
**represent**  6:13
   6:17 34:24
   48:20 53:20
   84:24 160:5
   164:4 167:4
   181:12,25
   182:6 191:8
   227:23
**representation**
   37:4
**representative**
   173:5,11
**representatives**
   57:25 58:1
   182:18 195:16
   207:3

**represented**
   37:2 122:24
   175:2 176:11
   189:12 195:3
   196:17 197:13
   197:14
**representing**
   2:9,14 7:1,20
   197:9
**represents**  6:15
   43:2
**request**  61:25
   112:3 125:19
   170:23 180:10
   182:11,14
   183:7,8 189:10
   195:23 217:9
**requested**  53:8
**requests**  63:20
   66:10,13
**require**  31:7
   80:21 166:22
**required**  88:12
**requires**  66:11
   66:15
**rescind**  116:11
   119:2,2 120:2
   199:7,8
**rescinded**
   116:3 118:21
   119:12,14,21
**rescission**
   198:10,19
   201:14

**research**
224:18 225:1
**resolution**
67:18 79:25
80:8,19,21
81:1,7 85:9
89:18 90:14
92:1,12,16,22
92:22,23,23
99:18 102:15
102:17 115:18
117:6,11,15
120:5,14
238:10,23
**resolutions**
12:1 68:12
70:17,24 73:5
73:9 86:19
87:7 89:6
91:23 92:4
94:22 116:3,11
118:2
**resolve**  31:2
**resolved**  89:8
93:11
**resource**  60:1
135:18 185:13
186:16 187:5
188:2,5 196:3
205:14 209:22
224:2,7,10,16
**respect**  63:20
64:3 82:11
113:21 114:7

166:9 175:15
181:10 187:16
199:1 201:13
216:9 221:15
224:6 236:18
238:9
**respectful**
127:9
**respective**
29:15 52:20
53:2 58:1
**respond**  12:14
62:16 63:11
164:22 165:23
170:23,24
172:1 192:23
196:16
**responded**  40:9
41:6 146:6
147:18 158:6
158:20 162:10
163:12,15
201:7,22
204:24
**responding**  9:9
107:12 165:24
178:24 186:25
189:13
**responds**
202:16
**response**  112:2
124:8 133:16
137:1 164:6,19
167:1 186:6,17

186:22 187:7
188:3 189:10
189:18 193:13
194:15 196:25
197:10 202:4
204:1,6,20
206:13,17,24
207:8,13
208:10 209:5,9
210:15 214:12
214:12,20,20
216:3,4,11
217:5,8 219:9
221:9 224:8
227:25 228:16
234:17
**responses**  5:8
150:9 196:15
203:21,24
208:7 216:19
219:22 220:2
227:12 228:3
**responsibilities**
16:13,24 17:9
18:4,14
**responsibility**
18:20 77:24
94:7 233:5
**responsible**
16:25 82:2
**responsive**
58:24
**rest**  87:9

**result**  183:6
**return**  245:13
249:13,16
**review**  11:8,18
11:23 12:16
25:25 35:13
41:1 51:8
55:24 56:18
66:9 204:5,8
208:2 249:7
**reviewed**  11:22
35:17 38:4
39:7 51:12,13
53:5 56:3,12
**reviewing**
178:17 220:2
**reviews**  26:18
28:3 35:2 54:1
64:10 68:18
93:7 130:21
131:1 146:2
157:21 160:10
169:23 173:8
178:13,19
191:17 200:12
208:5 218:2
**revise**  183:21
**revisions**  56:14
56:15
**rfp**  124:9,13,25
125:7,14 183:3
183:12,14,16
183:18,22
184:3,7,23

| | | | |
|---|---|---|---|
| 186:11,16,17 | 60:16 61:25 | 190:19 192:5 | 166:4,8,11,18 |
| 186:22,25 | 62:3,18 65:20 | 193:9 194:3 | 177:17 241:6 |
| 187:5,7,14,17 | 68:2 69:5 71:6 | 195:14 199:2 | **rothman** 85:19 |
| 187:19 188:1,7 | 71:10,23 75:3 | 203:7 204:21 | 85:20,25 88:20 |
| 188:14,24 | 77:1 85:12 | 205:17 207:9 | 88:21 90:22 |
| 189:2,4,6,9,15 | 87:16,25 88:1 | 207:13 208:8 | 117:16 |
| 189:18,21 | 91:6,25 98:12 | 209:6 210:7 | **rough** 190:16 |
| 190:12,13 | 99:22 100:23 | 211:11,22,24 | **roughly** 15:16 |
| 192:22,24 | 102:12,14,18 | 214:9 216:24 | 44:1 168:3 |
| 193:1,13 | 105:20 106:2,6 | 217:14,21 | **round** 30:6 |
| 194:15 195:4 | 107:19 108:20 | 218:7,14,20 | **rounded** 14:8 |
| 196:15,17,25 | 108:23 110:17 | 219:7 220:18 | **ruby** 29:8 |
| 197:11,25 | 111:24 113:9 | 221:9 222:5,14 | 98:16,20,23 |
| 198:14,15,16 | 115:10 118:16 | 223:11,18 | 144:9,12,14 |
| 198:18,25 | 118:22 119:16 | 233:19 235:11 | 242:5,23 |
| 199:5 200:17 | 120:7 121:8 | **riley** 139:14 | **rucker** 43:1,6 |
| 201:12 202:3 | 122:20 123:11 | **rima** 135:15 | **rule** 9:21 |
| 203:7,22 204:2 | 124:25 126:19 | 168:7,11,12 | **rules** 8:25 10:1 |
| 204:6,21,24 | 133:18 135:24 | 172:5,13 | 10:6 |
| 206:13,25 | 138:20 139:1,2 | 173:16 209:21 | **run** 13:25 |
| 207:8,13,15 | 139:9,19 141:9 | 211:19 | 129:12 |
| 208:8,11 209:5 | 145:3 148:18 | **rima's** 170:1 | **running** 150:17 |
| 209:9 210:15 | 149:23 150:3 | **risk** 71:13 | 155:8 211:6 |
| 216:3,11,20 | 150:13,19 | 180:19 181:8 | 226:5 |
| 217:5 224:8 | 152:22,24 | **road** 124:7 | **ryan** 1:17 6:14 |
| **rfps** 187:9 | 154:1,9 156:17 | **roadmap** 31:1 | 118:15,18,25 |
| **right** 13:2 14:5 | 156:24 157:19 | **robert** 2:24 | 124:12 129:1 |
| 14:21 15:2,3,8 | 159:11 163:13 | 6:12 | 132:2 134:21 |
| 16:21,22 22:2 | 165:25 169:3 | **role** 15:15,24 | 141:5,8 147:25 |
| 22:18 24:11,19 | 169:10 173:2 | 16:19 18:1,16 | **s** |
| 28:24 31:6 | 173:15 174:3 | 19:8 25:1,21 | **s** 2:1 3:6 21:3,4 |
| 34:8 37:5 | 174:14 179:3 | 28:9,12 43:10 | 21:5 |
| 39:17 52:21 | 180:4,21 | 43:25 55:14 | |
| 57:16 59:22 | 189:18 190:4 | 99:2 115:24 | |

**safe** 214:19
216:8 226:20
**safeguard**
70:20 71:2,17
88:13 89:10,17
102:25 104:21
114:22 190:24
**safeguarded**
103:5
**safeguarding**
95:2
**safon** 54:9,19
55:13,15
**sanchez** 73:25
142:16 158:5
158:11
**sat** 59:5 115:2
**satellite** 21:15
21:17,22 37:21
37:23 46:13
49:11,14,19
59:14 64:24
106:8,12,18
123:9 124:2
176:8 181:22
239:9,20
**satisfied** 222:24
**saturday**
141:25 142:22
144:23,24
145:8
**saul** 2:11 7:1
194:5 235:6

**saul.com** 2:13
249:2
**savage** 151:8
151:10,13,16
160:12,20
161:13,21,22
162:8,13 163:2
163:9,12
164:20 166:7
166:25 176:12
176:14,19
177:1,5,19
240:10
**savage's** 160:23
164:6,22 165:9
**saw** 36:9 50:19
137:11 140:23
182:12 185:11
186:7 227:21
227:22
**saying** 36:25
43:4 47:22
70:13 72:7
75:15 85:20
97:8 122:4
149:21 170:6
201:12,15
229:24
**says** 27:2 36:18
44:10 49:22
54:12 62:19
66:9 80:25
87:8 88:3,7,12
88:15 90:17

107:9,20
110:18 112:24
115:18 116:14
138:21 143:15
143:21 144:9
149:17 151:20
153:17 154:14
160:21,25
163:4 167:8
170:8 180:22
188:17 208:24
219:18 228:8
235:6 242:9
**schedule** 43:21
90:23
**scheduled**
91:15,17
**schedules** 50:9
**school** 13:9
**scope** 27:3,5,11
27:15
**seal** 244:17
**seat** 18:19
150:1
**second** 68:15
93:13 100:2
146:11 147:23
148:19 169:19
180:14 241:23
**seconded** 81:6
**seconds** 10:8
**section** 155:12
**sections** 227:21

**secure** 47:17
**security** 70:20
89:10,17 90:8
90:11,11
**see** 9:9 27:3
36:16 37:11
40:8,11,18,20
41:6,12 45:15
49:12,23 54:10
54:22 55:19
62:9 63:4,22
70:16 71:25
89:12 90:17
93:18,19 94:22
107:14 110:4
110:10 111:9
119:5 122:22
131:7 132:8,9
132:15,25
133:12 136:17
137:3,5 142:6
143:17 144:8,9
146:5,8,15
147:17,21
148:20 150:1
151:21,25
156:19 157:23
158:3,9 162:13
164:13 165:3
170:13,14
171:5 178:12
178:14,21
179:19,24
184:3,17 186:4

[see - shorthand]

| | | | |
|---|---|---|---|
| 186:13 188:17 | **sending** 200:25 | 95:4,9 137:25 | 234:2 |
| 191:13 201:8 | **senior** 15:22 | 138:7,11 211:9 | **session** 44:19 |
| 208:22 209:23 | 16:4,18 19:7 | 211:21 212:2,8 | 78:11,13 175:5 |
| 210:3,12 | 35:24,25 55:9 | 212:14,15,22 | **sessions** 19:21 |
| 211:12 214:19 | **sense** 30:21 | 213:2,5,14 | 20:5,7 |
| 215:2,13 | 75:16 95:2,20 | 214:17 218:7 | **set** 5:9 22:25 |
| 221:24 228:7 | 106:12 129:21 | 218:20 219:7 | 68:12 77:10 |
| 228:14,19,23 | 143:20 149:7 | 219:11 220:7 | 94:7 123:4 |
| 229:3 233:18 | 152:15 153:12 | 220:14,14,25 | 129:2,15 |
| 234:15,19 | 181:5 239:2 | 221:16,21 | 145:24 147:20 |
| 236:3 242:13 | **sensitive** | 223:3 225:3 | 200:6 227:5,6 |
| **seek** 183:1 | 199:15 | 227:3 228:13 | 227:13 |
| **seeking** 173:11 | **sent** 38:5 53:4 | 229:14,21 | **setting** 229:5 |
| **seem** 141:3 | 54:19 113:11 | 230:7 239:5,10 | **sev** 171:13 |
| **seemed** 98:25 | 113:12 150:24 | 239:11 | **several** 31:17 |
| 127:4 140:20 | 158:22 161:13 | **series** 26:22 | 112:14 134:3 |
| 141:1 | 164:14 178:25 | 57:23 130:15 | 195:3 |
| **seems** 22:22 | 179:18 184:21 | **seriously** | **shape** 124:20 |
| 136:23 210:21 | 185:17 186:6 | 105:12 162:6 | 125:12 188:12 |
| **seen** 26:13 | 190:15 191:25 | **serve** 85:3 96:8 | **shaped** 115:23 |
| 27:25 48:23 | 214:16 249:14 | 96:10 190:18 | 171:19 |
| 64:19 101:12 | **sentence** 37:9,9 | **served** 156:23 | **share** 39:11 |
| 170:21 187:13 | 57:18 133:17 | **service** 16:9 | 164:25 |
| 227:17,20 | 150:4 151:23 | 17:7 62:14 | **shared** 36:2 |
| **select** 185:7 | **sentences** | 63:9 94:10 | 183:18,23 |
| **selected** 171:23 | 158:24 | 103:18 173:8 | **sharing** 162:19 |
| 172:3,22 | **separate** 37:22 | **services** 16:8 | **sheet** 245:6,8 |
| 173:18 | 122:19 123:10 | 17:6,18 29:17 | 245:11,14 |
| **senate** 199:8 | 137:20 138:2 | 31:5 96:4 | 248:9 249:11 |
| **senators** 202:2 | 138:15 175:8 | 109:3 110:17 | **shift** 153:3 |
| 202:12 203:6 | 175:13 176:7 | 120:18 152:13 | **short** 77:22 |
| **send** 198:9 | **september** | 152:16 | 141:18 |
| 237:25 | 25:13,15 30:24 | **serving** 96:13 | **shorthand** 21:8 |
| | 40:24 50:6 | 190:2 201:20 | 244:10 |

**shortly**  50:25
  142:3,7
**show**  27:16
  59:15 70:17
  106:22 130:8
  157:1 169:12
  184:8 227:8
**showed**  69:24
**showing**  46:24
  201:19
**shows**  92:8
  232:9
**shut**  70:3
**side**  60:4
**sign**  152:14
  245:8 249:12
**signature**
  244:19 248:12
**signed**  25:13
  121:2,3,11,13
  121:17 122:14
  222:1,13,15
  223:7,12
  236:25 238:3
  249:19
**significance**
  153:22
**signing**  245:10
**similar**  28:14
  50:21 92:18
  150:16 179:11
**simply**  100:14
  196:19

**simultaneously**
  186:11
**single**  43:20
  49:19 58:17
  59:13 65:15
  77:15
**sit**  152:4
**sits**  22:15 42:10
  42:24
**sitting**  8:12
  50:12 52:4,11
  92:14 112:7
**six**  21:1,3,10
  86:24 87:1
**sixth**  21:1
**size**  109:7
  173:9
**slavitt**  112:5
  131:20 194:7
  194:20
**slightly**  23:12
**slot**  44:9
**small**  21:5
  64:23
**sole**  183:12
**solicit**  171:20
**solution**  60:10
  64:16
**solutions**
  249:23
**solve**  105:5
  108:2
**somebody**
  90:25 113:4,12

  177:12
**someplace**
  104:24
**somewhat**  59:9
  166:11
**soon**  40:19,20
  211:6
**sorry**  10:11
  34:20 52:22
  61:16 73:25
  117:7 127:14
  152:18 175:10
  178:6 187:23
  193:10,25
  197:1 218:8
  239:10
**sort**  16:18,24
  44:12 45:20
  133:5 146:11
  180:8 187:18
  192:19 199:3
  231:8
**sound**  15:2
  16:21
**sounds**  104:13
  149:20 179:1
  180:8 228:2
  237:10
**source**  183:12
**south**  2:3
**space**  90:12
  245:6
**span**  77:22

**spe**  12:6
**speak**  9:5 37:1
  81:11
**speaker**  74:3
**speaking**  85:10
  142:3 144:14
  156:9 174:4
  187:20 191:16
**specialist**  6:13
**specific**  20:17
  27:12 38:11,14
  38:17 51:22
  52:12,15 64:8
  64:18 84:7,17
  84:18 85:13,23
  85:25 89:24
  91:12 97:1
  103:11 111:12
  112:17 114:6
  142:5 224:13
  224:14 230:18
  230:20 233:1
  233:20 241:9
**specifically**
  38:8 39:1,4
  46:5,16,22
  47:22 52:8
  55:25 81:14
  83:23 84:6
  85:17 91:1
  97:15,22 98:21
  101:3 102:7
  155:6 156:12
  188:15 210:16

237:4
**specifics** 47:6
47:21
**speed** 211:3
**spend** 231:17
233:10,19
**spent** 57:21
**spin** 93:15
95:11,19 97:18
98:9,11 99:19
100:19 102:10
115:20,22
119:6 123:13
123:24 125:19
126:18 140:17
143:4 145:2,11
148:25 150:25
158:15,16,25
159:9 166:6,22
167:3 170:19
175:23 181:14
190:22 191:22
191:24 192:17
**spinning**
116:18 118:6
133:24 134:16
134:23,24
135:4,13 156:3
168:5 242:22
**spoke** 125:22
126:7 144:9,23
144:24 242:5
**spoken** 140:11
140:16 142:1

150:24 151:3,9
**spring** 32:8
**spun** 123:9
125:24 126:9
147:11 152:22
159:4 193:9
**srg** 187:21
224:14 226:4
241:2
**staff** 28:16
55:16 70:20
79:2 89:11,17
108:2
**stakeholders**
149:3,16
182:23
**stamp** 26:21
61:19
**stamped** 3:8,11
3:12,13,15,16
3:17,18,19,21
3:22,24 4:3,3,5
4:6,8,9,11,12
4:13,14,15,17
4:18,20,21,22
4:24 5:3,4,5
26:8 34:16,17
39:21 48:14,15
53:15,16 62:22
66:6 68:8
80:16 86:18
89:3 93:5
106:25 109:19
109:20 117:4

130:11 136:2
142:10 145:20
157:5 159:24
159:25 160:24
163:24,25
169:16 178:8
184:12 185:24
191:4,5 199:20
207:19 211:17
217:18,19
**standing** 244:4
**start** 8:24
16:14 86:7
114:19 130:16
147:24 237:21
238:6
**started** 11:6
45:8 86:9
128:8 184:6
**starting** 6:17
16:23 61:9
193:12
**starts** 133:3,4
145:25 234:11
234:18
**state** 6:17 7:21
47:15 214:25
215:13 245:5
**stated** 65:11
179:15
**statements**
96:22
**states** 1:1 6:8
37:8 63:14

161:8 164:24
164:24 211:1
**station** 42:16
42:18,21,24
58:19,24 60:2
135:17 162:6
185:13 186:16
187:5 188:1,5
196:3 205:14
209:22 224:2,7
224:10,16
**station's** 111:6
112:10
**stations** 14:10
20:15 21:25
22:6 31:7 43:3
57:25 59:25
60:1,8,18 61:1
62:17 63:12
64:22,23 72:2
84:25 85:2
88:13 94:9,15
96:5,7,8,11,14
106:4 114:25
128:9 133:10
143:9,23
151:24 152:3
152:12,15
153:7,10,13,24
154:2 156:22
159:14 162:16
162:17,18
165:1,2 169:5
170:7 173:9

| | | | |
|---|---|---|---|
| 183:2 184:25 | **strictly** 174:4 | 189:21 193:13 | 238:23 |
| 185:4 201:20 | **strike** 15:5 | 195:4 196:15 | **suggested** |
| 239:7,18 241:1 | 19:14 23:15 | 196:25 198:3 | 172:10,14 |
| 241:3 | 47:14 61:4 | 206:17 208:7 | 177:10 |
| **stature** 179:11 | 67:11 74:23 | 208:11,12 | **suggestion** |
| **statutory** | 98:6 105:18 | 224:6 231:9,12 | 177:22,23 |
| 111:14 112:1 | 106:21 109:5 | **submitted** 35:6 | **suite** 2:12 |
| 113:7,9 | 113:20 119:12 | 52:6 56:2,25 | **sullivan** 98:17 |
| **steady** 215:12 | 143:19 158:20 | 62:13 192:11 | 99:4,10,15 |
| **step** 49:17 | 161:17 164:3 | 206:9,24 | **sullivan's** 99:1 |
| 74:15 150:18 | 172:24 174:9 | 208:10,14 | **summary** |
| **steps** 70:19 | 181:23 189:7 | 231:15 | 160:19 219:15 |
| 89:10,16,24 | 212:19 213:3 | **submitting** | **sunday** 146:5 |
| 145:14 | 223:23 232:18 | 186:17 187:7 | 153:4 157:24 |
| **stewardship** | 238:19 239:15 | 188:3 194:14 | 200:15 |
| 105:11 149:15 | **strongly** 162:22 | 196:14 197:10 | **supervision** |
| 182:25 | **structure** 119:9 | 197:17,25 | 152:7,20,23 |
| **stick** 61:12 | 122:24 123:25 | 206:13 | 244:11 |
| **stop** 65:21 | 124:2 | **subscribed** | **supplement** |
| **straightforward** | **structured** | 248:14 | 207:8 |
| 9:1 | 181:3 | **subsequent** | **supplied** |
| **strategies** | **studio** 14:1 | 124:11 149:11 | 110:23 |
| 15:13,19,20,23 | **stuff** 113:15 | **substance** | **supplier** 137:14 |
| 16:1,11 17:1 | **sub** 136:25 | 248:8 | **support** 20:18 |
| 17:10,13 18:1 | **subject** 35:8 | **substances** | 48:1 71:15 |
| 18:6 19:4,24 | 102:14 131:9 | 8:22 | 132:17 165:3 |
| 20:9 35:24 | 142:24 157:25 | **success** 83:4 | **supporter** |
| 54:25 62:15 | 219:21 245:10 | 85:2,7 94:8 | 99:13 |
| 63:10 154:23 | **submission** | 123:5 | **supporting** |
| **strategy** 14:11 | 220:7 221:8 | **succession** | 124:5 |
| 36:17 | **submit** 31:14 | 77:20 | **supports** |
| **streaming** 60:2 | 39:8 47:24 | **sued** 235:23 | 162:18 |
| **street** 1:15 2:7 | 168:4 186:21 | **suggest** 110:19 | **supposed** |
| 2:12 | 187:13 189:17 | 172:13 238:19 | 115:19 148:4 |

**sure** 7:23 11:14
11:15 21:6
24:13 32:6
35:15 39:13,17
43:18 44:4
50:12 52:23
55:8 57:1
60:14 62:21
73:12 82:8
88:22,23 89:23
92:7,11 103:3
105:15 106:14
106:19 109:13
111:16 116:10
117:23 124:15
129:12 141:4
141:24 145:4
145:14 147:7
149:24 155:18
156:7 157:11
164:11 167:17
172:15 173:9
185:10 197:2
198:13 200:11
206:11 218:11
220:8,12
221:10,18
224:12,13
227:22 232:15
233:14 234:23
238:15 239:1
**surface** 65:5
**surfaced** 65:7
83:2

**surfacing** 65:2
**surprised**
134:7 141:3
**surprising** 78:6
78:7 81:20,23
**suspected**
197:7
**svp** 35:22
**swear** 7:4
**switch** 151:25
152:3 153:7,25
154:5
**sworn** 7:8
244:7 248:14
**system** 15:13
15:23 16:1,11
17:10,12 18:1
19:24 20:9,25
21:2,11,14,15
21:18 23:11
35:24 46:14
48:1 54:25
58:17 70:4
71:14,18,23,24
83:4 94:8,17
105:13 111:8
112:11 119:8
122:25 123:9
133:20,22
134:4 148:16
148:22 149:4
149:13,16,18
151:20 153:6
156:18,22

158:13,15
159:7,11
160:19 161:7
167:5 170:5,7
171:8 173:6
182:23 184:24
185:1,2,3,17
226:25 239:9
239:20
**systems** 15:18
18:5 19:4 25:9
30:2 89:23
90:4,5 112:25
152:13

**t**

**t** 3:6 244:1,1
246:2
**tab** 130:5
145:18 157:1
169:12
**table** 115:14,18
**tables** 27:23
**tacked** 17:10
**take** 8:11 9:18
9:20 28:1
31:20 41:20
53:25 54:7
68:15 70:19
79:18 80:11
81:15,21 82:13
82:18 86:4,16
89:9,17 90:13
93:24 103:25

115:17 116:23
125:8,15,18
128:14 130:19
131:10 132:5
133:9 136:1
145:15 161:12
162:6,12
167:14 169:1
169:19 170:4
180:15 199:24
203:10 217:25
233:3 234:10
**taken** 1:14 6:5
41:25 50:23
81:25 86:11
89:24 115:14
167:22 203:15
236:8 244:5
**takes** 82:4
105:11
**talk** 9:4 44:11
56:23 58:16
107:18 116:18
118:24 135:12
141:22 148:16
148:22 149:18
175:20 231:4
242:22
**talked** 12:10
31:16 49:16
50:3 58:2
64:14,17 83:25
92:19 94:2
98:20 102:24

**[talked - thing]**                                                         Page 58

| | | | |
|---|---|---|---|
| 107:21 108:17 | **team's** 209:5 | **tell** 47:3 97:11 | **testify** 7:8 |
| 124:8,12 134:1 | **technical** 13:16 | 110:15 119:19 | **testimony** 3:2 |
| 134:2,21 135:5 | 13:22 14:3 | 126:15 143:7 | 8:16 54:5 |
| 135:15,17 | 34:7,12 | 159:16 165:14 | 120:7 125:17 |
| 142:6 156:4,5 | **technologies** | 230:2,12,18 | 229:13,19 |
| 156:7 175:5 | 62:18 63:13 | 233:9 237:4 | 232:1 236:16 |
| 179:8 190:5,6 | **technology** | 244:7 | 244:5,9,13 |
| 190:8 210:17 | 66:11,15,19 | **telling** 75:12 | 249:9,17 |
| 239:23 | 90:1 173:24 | 83:12,13,15 | **text** 12:16,20 |
| **talking** 31:22 | 175:4,6,15 | 85:9 97:5 | **texts** 70:13 |
| 32:13 57:21 | 181:2,4 205:21 | **temporally** | 188:19 |
| 58:3,25 59:19 | **teed** 199:8 | 131:3 208:16 | **thank** 10:11 |
| 97:10 112:19 | **telephone** | **ten** 127:17 | 20:11 26:10,11 |
| 129:2,4,6,8,15 | 128:25 | **tends** 90:23 | 27:20,21 39:23 |
| 129:18 131:12 | **television** 17:4 | 113:14 | 41:22 48:17 |
| 132:6 133:20 | 17:18,24 18:18 | **tenor** 94:6 | 68:10 80:17 |
| 134:11 141:12 | 20:18,24 21:11 | 96:16 97:1,5 | 93:6 107:1,2 |
| 152:6,19,21,21 | 23:23 29:17,22 | 97:12 | 109:21,22 |
| 182:19 187:22 | 30:1,24 31:6 | **tens** 66:14 | 130:13 142:11 |
| 189:1,4 190:1 | 59:21 68:24 | **teresa** 54:9 | 145:22 160:2,3 |
| 216:25 240:5 | 70:9 71:6,24 | 55:13,15 | 163:19,22 |
| **talks** 163:6 | 72:14 73:6 | **term** 20:12 | 178:17 184:14 |
| **targeted** 32:8 | 103:12,16,17 | 71:19 132:18 | 199:22 208:24 |
| 69:16 70:14 | 128:9,11 | **terms** 18:7 30:6 | 217:23 |
| **targeting** 75:20 | 139:17,21 | 31:4 33:21 | **thanks** 7:13 |
| 76:1 | 140:2 229:9,11 | 65:1 155:19 | 53:18 142:13 |
| **taylor** 172:15 | 229:15,17,22 | 234:6 | 157:16,17 |
| 196:21,22 | 230:3,7,10,21 | **terrestrial** | 208:4 227:15 |
| 197:6 209:19 | 231:21,24 | 58:23 60:12,14 | **thereabouts** |
| **team** 18:8,19 | 232:5,12,13,22 | 61:7 62:3,7 | 108:17 |
| 25:24 69:15 | 232:24 233:4 | **test** 134:9 | **thereof** 244:16 |
| 208:25 209:1,9 | 233:16,24,25 | **testified** 7:9 8:2 | **thing** 39:17 |
| 210:23 | 234:3 | 139:7 191:19 | 59:14 64:6,23 |
| | | 235:9 | 89:21 |

| | | | |
|---|---|---|---|
| **things**  11:12 | 107:12 108:13 | 175:2,15,22,24 | **third**  93:14 |
| 12:2 25:3 | 108:16 109:10 | 176:10,22,25 | 94:9,16 97:19 |
| 45:10 50:15 | 109:12 110:22 | 179:15 180:25 | 99:18 100:10 |
| 65:2 70:6,16 | 112:21 113:2 | 181:4,6,11,15 | 113:21 180:18 |
| 77:25 82:17 | 113:17,25 | 181:18,24 | **thirds**  102:11 |
| 84:7 90:2 97:8 | 114:4,13 | 184:1,25 | **thirty**  245:15 |
| 129:13 147:21 | 123:19 124:14 | 185:10 186:7 | **thought**  29:24 |
| 155:9 157:25 | 126:22,23,25 | 189:20,22 | 30:18 33:11 |
| 158:11 173:7 | 127:10 128:2 | 192:9,13 193:4 | 56:10,16 64:16 |
| 182:13 | 129:5,17 | 193:16 194:9 | 74:20 98:13 |
| **think**  8:14 | 132:23 133:8 | 194:12 195:5 | 116:17 117:7 |
| 11:10 12:24 | 133:19 134:5 | 196:20 197:3 | 123:4 124:10 |
| 13:2 14:5,7 | 135:9,17 136:9 | 198:7 199:3 | 136:6 144:2,2 |
| 15:3,25 16:10 | 136:13 137:22 | 201:15 202:4,9 | 146:25 155:21 |
| 16:17,22 18:20 | 139:7,17 140:8 | 202:20,25,25 | 158:12,19 |
| 22:6 25:23 | 141:10 146:11 | 206:5 208:14 | 159:11 165:13 |
| 29:12 30:15,23 | 146:19 148:4,9 | 211:12 212:4 | 168:24 169:4 |
| 32:20,24 33:1 | 148:11,12,18 | 213:1,23,24 | 171:21 174:6 |
| 33:4,10,20 | 149:2,4,5,8,11 | 214:4 215:4,7 | 174:11 177:15 |
| 34:2,10 35:23 | 150:9,15,18 | 215:16 216:13 | 178:23 182:4 |
| 42:17 43:1,14 | 151:6,16 | 216:18 217:15 | 182:13,15,22 |
| 44:2,4,21,22 | 152:11,14 | 220:9,19 225:2 | 189:11 193:15 |
| 45:15,18 49:21 | 153:9 154:11 | 225:10 226:22 | 196:23 197:15 |
| 50:25 56:5,12 | 154:23 155:8 | 230:15,23 | 198:24 |
| 70:2 74:4,4 | 156:5 159:5,10 | 234:5 235:9,12 | **thoughtful**  33:2 |
| 76:21 77:24 | 159:13 161:8 | 235:13 236:4 | 33:5 179:3 |
| 78:8,12,13 | 161:20,22 | 237:13 239:23 | **thoughts**  180:7 |
| 82:1,4,13,23 | 162:1 165:5,15 | 240:12,16 | 180:7 200:22 |
| 83:10,19 84:20 | 166:7,10,20,23 | 243:2 | **threat**  30:13,19 |
| 85:8 86:24 | 167:15 168:10 | **thinking**  43:6,8 | 30:20 82:21,21 |
| 87:8,11 90:7 | 170:1,17 171:2 | 114:20 145:14 | 95:21 100:10 |
| 92:18 98:7,13 | 171:3,4,8 | 182:15 | 192:7 |
| 99:2 103:24 | 172:16 173:20 | **thinks**  162:5 | **threatening** |
| 105:4 106:11 | 174:19,24 | 181:22 | 99:18 |

**[threats - totally]**                                             Page 60

**threats**  105:8
**three**  31:12
   36:21 41:11,15
   44:3 46:12,19
   52:20 53:1
   55:20 66:2
   67:8,16 68:2
   69:5 77:7,15
   114:8 115:9,10
   120:21 122:8
   122:11 126:17
   162:23 180:8
   238:12
**throwing**
   158:17
**thursday**  1:11
   131:5
**ticks**  226:16
**tidy**  157:13
**ties**  122:19
**time**  6:2 9:5
   18:10 23:3,16
   28:1 30:11
   32:9 33:10,13
   36:3 41:24
   43:24 44:20,24
   45:7 55:3,7
   57:21 59:25
   72:6 82:18
   86:8,10,14
   90:3 93:20
   94:2 95:10
   96:11 101:15
   108:21,23,24

110:10,21
115:12 122:6
128:16,20
134:11,12,19
134:21,23
135:12,25
141:16,18
147:9,13,15
148:15 150:23
154:22 156:2
156:20 160:17
161:5 165:19
165:23 167:10
167:21,25
168:4 179:6,7
186:5,19 189:7
190:11,21
191:20 192:4,6
196:12 197:1
199:10,15
201:6,17
203:14,18
208:25 213:17
220:24 222:16
222:18 223:16
236:7,11 237:5
240:12 243:7
244:6 249:18
**timeframe**
249:8
**timeline**  31:23
   40:23 49:23,25
   50:3,10,14
   73:14 152:9

184:7 199:6
210:11,19
211:2 213:25
214:8 218:5,23
219:15
**timely**  32:7
**times**  9:14 77:7
   77:15 117:17
   126:17
**timing**  31:16
   50:11 192:1
**title**  14:15
   15:11,21 16:12
   17:11 19:9
   20:8,9 32:19
   35:23,25 36:16
   205:24
**titled**  3:9 5:7
   27:19 227:11
**today**  6:14 8:16
   12:4,8 50:12
   52:4,11 60:3
   92:14 112:7
   152:4
**today's**  6:2
   10:4,14
**together**  37:21
   59:11,19,20
   60:24 146:12
   148:23 149:19
   179:17 193:20
   206:10,17,23
**told**  41:9 74:22
   74:25 75:4,24

119:11,13,18
121:23 122:17
122:22 123:1,7
123:12,15,18
125:23 126:16
126:17 132:12
132:21 166:25
169:25 170:10
177:5 191:23
219:1 231:16
232:4,19
**tom**  85:19,25
   88:20,21 90:22
   117:16
**tomorrow**
   200:17
**tompkins**  35:23
   51:15
**tone**  198:18
   200:21
**took**  15:15
   16:17 18:1
   37:6 91:5
   180:15 207:12
**top**  27:3 66:7
   88:3,15 90:17
   107:6 111:1
   135:20 178:21
**topic**  84:20
**torn**  179:2
**torre**  172:14
**total**  72:13
**totally**  43:18
   44:2

**[towards - u.s.]**                                                      Page 61

| | | | |
|---|---|---|---|
| **towards** 49:17 | 169:13,18 | **transparent** | 172:16 190:23 |
| 183:3 236:21 | 173:12 178:10 | 34:2,5 182:3 | 212:16 225:1 |
| **towing** 181:17 | 184:9,15 191:1 | 193:2 | 227:19 230:5 |
| 181:19 | 191:7 193:23 | **treasury** 71:22 | 240:21 |
| **townsend** 2:3 | 194:25 198:4 | **tried** 99:6 | **tuesday** 10:22 |
| 3:3 6:19,19 | 199:17 200:1,5 | 113:13 130:1 | **turn** 66:5 |
| 7:13,15,19 | 203:20 207:16 | **true** 30:3 42:22 | 133:14 |
| 10:12 13:19 | 207:21,25 | 63:6,19 75:18 | **tv** 232:9 233:6 |
| 26:12 27:22,24 | 217:21,24 | 79:25 127:22 | **two** 15:12,14 |
| 33:6,12 34:13 | 227:16 234:9 | 154:12 191:22 | 45:8,11 63:7 |
| 34:19,21 39:13 | 236:2,13 | 229:13 244:13 | 63:20,23,24 |
| 39:16,25 41:19 | 241:12,19,21 | **trump** 1:7 6:7 | 99:21 102:11 |
| 42:4 48:5,19 | 242:1,6,15 | 249:4 | 108:7 112:19 |
| 53:10,19 56:22 | 243:2 | **trust** 21:18 | 118:14 128:3 |
| 68:5,11 79:19 | **track** 187:23 | 22:2,4,5 | 131:10,17,18 |
| 79:23 80:13,18 | **tracking** | 143:13 144:19 | 157:7,8 158:23 |
| 86:1,4,15 87:3 | 221:11 | 239:22 240:7 | 163:18 172:19 |
| 87:6,13,16,19 | **tranches** | 240:13,16,24 | 174:16 176:11 |
| 93:2,8 95:15 | 233:17 | **trusted** 33:8,11 | 195:18 203:23 |
| 100:4 107:4 | **transcribed** | 33:18 | 203:24 209:6 |
| 109:16,24 | 244:11 | **trustees** 240:15 | 212:17 219:11 |
| 116:7 117:1,5 | **transcript** | **truth** 244:8,8,9 | 240:11 |
| 117:7,10 | 245:16,17 | **try** 9:4,8 31:1,2 | **tyler** 36:11,13 |
| 118:13 119:10 | 249:6,19 | 98:8 121:16 | 36:18 38:5 |
| 126:3,6 127:16 | **transcription** | **trying** 10:23 | 39:4,8 40:2,9 |
| 127:18 128:13 | 244:12 248:5 | 12:12 32:19 | 41:6 49:8,11 |
| 128:21 130:5,7 | **transition** | 37:17 40:25 | 51:11 |
| 130:14 142:14 | 108:21 136:17 | 50:5,15 58:22 | **tyler's** 49:21 |
| 145:17,23 | 216:24 | 61:16 70:17 | **type** 189:23 |
| 157:2,10,18 | **transitioned** | 77:19 90:4,6 | **typically** 24:21 |
| 159:21 160:4 | 18:15 | 94:23 95:16 | **u** |
| 163:17,20 | **transparency** | 105:5 108:2 | **u.s.** 50:20 |
| 164:2 167:12 | 33:25 64:25 | 138:5 148:7,12 | |
| 167:18 168:2 | | 159:5 165:22 | |

[uh - videographer]                                                    Page 62

| | | | v |
|---|---|---|---|

**uh**  110:8
**ultimately**  69:7
  151:24 152:12
  152:15 153:6
  192:18 198:24
**um**  140:12
**umbrella**
  105:22
**un**  206:15
**unanimously**
  88:7
**uncertain**
  152:5
**unconventional**
  202:17
**under**  8:6
  30:17,18 66:9
  103:8 104:3
  109:5 114:15
  123:20 124:6
  136:25 150:21
  152:7,20,25
  192:7 202:21
  206:15 215:9
  228:21 244:11
**understand**  8:6
  9:11,24 37:13
  62:11,11 72:9
  95:16 96:25
  99:4 124:22
  138:5 145:4
  149:3 153:10
  153:22 159:17
  166:4,8 185:15

194:21 201:11
  206:11,12
  225:20,22,25
  230:3,5 232:7
  234:21,25
**understanding**
  20:16 22:3,11
  22:14 42:14,19
  95:6 96:3
  97:11 103:7,24
  106:20 109:2,4
  118:1 186:15
  205:8 235:20
**understands**
  166:18
**understood**
  37:3 109:14
  155:18 166:11
**undertake**
  151:20 153:5
**unexpected**
  141:8
**unilaterally**
  169:10 170:13
  170:18,21
  171:1,9,10
**united**  1:1 6:8
**university**  13:5
  13:11
**unusual**  77:6
  77:14 82:1
**upcoming**
  148:2

**update**  44:15
  142:25 146:1,7
  184:22 185:18
**updated**  221:7
**upset**  140:20
**urged**  31:2
  65:13
**urgency**  30:6
  30:16,21 74:12
  75:16 95:2,20
  239:2
**urges**  162:22
**use**  111:14,19
  129:2 152:13
  161:1 170:1
  192:24 232:4
  235:9
**used**  20:12,22
  21:7 24:1,5
  44:22 74:4
  120:23 187:19
  229:17,21,23
  230:21 231:2
  245:18 249:19
**uses**  112:22
**using**  230:13
  235:13,14,20
**usip**  70:6
**usual**  57:20
**usually**  82:2
**utilize**  232:3
**utilized**  230:19

**v**  1:6 249:4
**vacation**
  188:18
**vague**  112:12
**valuable**
  175:16 177:21
**value**  181:7
**varied**  43:14
**various**  12:11
  25:11
**vary**  232:14
**vendor**  137:14
**verbally**  6:17
**verify**  249:9
**veritext**  6:13,15
  249:14,23
**veritext.com**
  249:15
**versus**  6:7 99:3
  99:3 102:4
**vice**  14:16
  15:22 16:4,18
  19:7 54:25
  55:9,10
**video**  1:13 6:4
  6:13 42:2
  86:12 128:18
  167:23 203:16
  236:9 243:4
**videographer**
  2:24 6:1 7:3,12
  41:23 42:1

**[videographer - week]**                                    Page 63

86:6,12 128:15
128:18 167:20
167:23 203:13
203:16 236:6,9
243:3
**view** 33:17,19
36:20 62:12
63:6,15 74:15
109:2,7 148:24
158:12 161:19
161:20 162:2
171:7,9 173:13
175:3 176:3
182:1 222:12
222:19 232:25
**viewpoint**
181:12,16
**views** 161:24
181:21
**virtually** 88:24
**vis** 45:22,22,25
45:25
**visions** 29:16
**vote** 52:18,25
67:5,14,22
74:12 80:20
81:3 90:21
117:12 118:14
151:24 152:3
152:10 153:2,7
153:18,20,25
154:3,4,8
200:22 201:13
239:6,14,18,25

240:5 241:3
**voted** 68:22,23
73:18 74:9
79:25 91:23
116:11 199:7
**votes** 153:18
**vp** 32:20

**w**

**wait** 87:10
100:2 105:18
178:15
**waiting** 190:21
191:21 192:3
**walsh** 54:21,24
**want** 8:24
39:11 40:20
62:9 75:13
77:9,10,15
79:16,21 82:23
83:7,8,10
94:16 119:3
123:2 127:24
130:16 132:16
147:3,6,25
148:20 149:22
152:13,14
165:23 167:2
167:13 168:8
173:8 176:14
181:14 192:17
219:16 240:9
242:12,18

**wanted** 29:3
30:15,25 47:16
71:25 74:11,17
83:3 84:22
93:24 116:22
116:22 119:4,5
122:22 123:13
124:20,21,23
127:9,22
129:20,20
132:21 134:3,9
149:5,11
155:17 165:25
166:3 172:15
179:10,12
180:3,25 181:9
181:17,19
182:1 190:12
190:13 192:23
198:21 199:10
211:3,5,8
212:11 214:19
216:1,6,17,22
242:23
**wanting** 118:25
**wants** 117:17
117:18 179:22
233:11
**warning** 70:4
**washington**
1:16 2:7 6:11
**watching**
199:15

**waters** 134:9
**way** 13:22
16:13 34:5
45:6 78:16
85:1,6 91:19
94:18 100:6,15
102:25 103:3
104:21 105:16
114:22 116:17
116:21 121:18
124:20,21,23
127:25 128:6
129:13 132:1
140:22 154:10
156:15 168:22
170:2 171:5,5
181:3 190:6
197:12 220:23
231:7 232:10
237:2
**ways** 25:11
37:18 57:22
60:2 70:18
202:17
**we've** 10:21
23:8,22 121:12
121:18 122:2
167:12 188:19
223:3 224:11
241:10
**wednesday**
40:8 107:13
**week** 10:22,23
41:12 77:7,16

**[week - works]**                                        Page 64

| | | | |
|---|---|---|---|
| 158:1 188:19 | **willing**  59:3,16 | 233:9 | 168:21 169:7 |
| 217:16 | **willingness** | **work**  26:2 27:2 | 170:2,11 |
| **weekend**  91:17 | 71:9 | 27:5,11,15 | 171:12,15,16 |
| 145:1,6,12 | **withheld**  93:14 | 33:25 37:21 | 171:18,19,24 |
| 146:4 156:13 | 97:21 | 51:3 63:3 | 172:4,6,19 |
| 217:14 | **withhold**  99:18 | 94:24 95:25 | 173:2,13,14,20 |
| **weekly**  128:7 | **witness**  7:1,4 | 105:12 108:24 | 173:25 174:2,3 |
| **weeks**  73:13 | 10:10 26:11 | 114:18,24 | 174:17,22,25 |
| 162:25 209:6 | 27:20 33:4,10 | 115:19 116:17 | 175:19 176:17 |
| 240:12 | 34:10 39:23 | 121:15 140:3 | 176:20 177:1,6 |
| **weigh**  114:2 | 41:21 48:17 | 145:15 149:4 | 177:17,21 |
| **weird**  44:19,22 | 53:13 56:21 | 149:14 159:6 | 178:2 179:1,23 |
| 202:10 | 86:3 87:5,18 | 186:13 206:5,7 | 180:11,14 |
| **welcome**  39:24 | 93:7 100:1 | 232:10 | 181:7 182:4,8 |
| 48:18 107:3 | 107:2 109:22 | **worked**  13:24 | 182:10,12 |
| 109:23 128:22 | 118:10,24 | 17:3 25:7 | 183:6,9,19 |
| 142:12 | 126:4 142:11 | 109:10 121:18 | 184:2,6,22 |
| **went**  13:5 | 145:22 157:7 | 145:7,8,13 | 185:18,22 |
| 71:22 140:15 | 160:3 163:19 | 146:3 155:2,2 | 186:1,20,23 |
| 183:12 190:11 | 167:17 173:4 | 155:2 171:20 | 187:3,15,23 |
| 198:15 219:19 | 193:22 194:22 | 206:6 | 188:5,6,10,15 |
| 228:3 | 197:23 199:22 | **working**  10:18 | 189:13,19 |
| **wgbh**  206:6 | 200:2 233:14 | 17:20 25:12,24 | 192:10 193:14 |
| **whatsoever** | 244:14,17 | 28:16 32:22 | 193:18,19 |
| 223:17 | 245:1 249:8,10 | 34:3 36:3 | 194:13 195:2,8 |
| **whoa**  193:21 | 249:12,18 | 40:22 41:10 | 195:14,24 |
| 193:21,21 | **wonky**  132:24 | 79:1 114:10,15 | 196:4,13,18,23 |
| **wholly**  176:7 | **word**  37:6 | 140:7 144:25 | 197:7,18 198:6 |
| **wide**  27:22 | 120:23 150:3 | 145:5 146:12 | 205:5,9 206:4 |
| 151:20 153:6 | 150:13 | 146:18,20,25 | 206:19,22 |
| **widely**  173:10 | **wording**  59:6 | 147:7,8,9,10 | 214:1 220:1 |
| **williams** | 92:18 | 148:23 149:19 | 223:4,9 |
| 139:15,23 | **words**  116:14 | 155:7 156:16 | **works**  36:17 |
| | 132:7 150:10 | 156:25 168:17 | 106:15 149:3 |

155:6 159:15
159:18
**world** 58:23
**worried** 198:17
**worrisome**
50:21
**wrapped** 11:6
**write** 150:6
154:17 158:23
242:10
**writing** 57:17
161:23 163:2,4
**written** 164:6
202:11
**wrong** 86:22,23
133:4 165:14
165:14,20
184:8 188:9
195:6
**wrote** 133:20
162:13 168:19
202:8,18,23
203:3 209:18

**x**

**x** 3:1,6 4:1 5:1
21:3,4,4
103:15 233:7

**y**

**y** 103:15
**yeah** 19:10
21:4 34:19
37:2 39:16
59:12 61:21

65:7 79:19
81:10 100:1
107:20 111:16
133:8 135:25
137:16 139:20
139:21 140:10
140:23 147:5
148:18 154:4
154:11 157:9
157:14 167:15
174:22,24
184:6 186:15
202:22 204:22
208:3 211:5
213:1 225:22
239:11 241:15
**year** 14:25
15:25 16:7,10
25:16 31:18
46:12 47:19
51:9,10 52:20
53:1 66:2 67:8
67:16 68:1,2,4
69:5 72:4
122:11 228:9
228:22 229:1
231:10,13,16
233:1,4,7,20,21
233:24,25
238:12 239:16
**years** 13:25
14:9 30:10
31:12 36:21
37:18 41:11,15

44:3 45:8
46:19 58:5
59:1 65:11
68:23 71:1,5
83:3 120:21
122:8 159:6
162:23 166:13
**yep** 39:19
**yesterday**
209:1
**york** 209:20

**z**

**zero** 69:25
232:23

**à**

**à** 45:22,25

Federal Rules of Civil Procedure

Rule 30


(e) Review By the Witness; Changes.

(1) Review; Statement of Changes. On request by the
deponent or a party before the deposition is
completed, the deponent must be allowed 30 days
after being notified by the officer that the
transcript or recording is available in which:

(A) to review the transcript or recording; and

(B) if there are changes in form or substance, to
sign a statement listing the changes and the
reasons for making them.

(2) Changes Indicated in the Officer's Certificate.
The officer must note in the certificate prescribed
by Rule 30(f)(1) whether a review was requested
and, if so, must attach any changes the deponent
makes during the 30-day period.



DISCLAIMER:  THE FOREGOING FEDERAL PROCEDURE RULES
ARE PROVIDED FOR INFORMATIONAL PURPOSES ONLY.
THE ABOVE RULES ARE CURRENT AS OF APRIL 1,
2019.  PLEASE REFER TO THE APPLICABLE FEDERAL RULES
OF CIVIL PROCEDURE FOR UP-TO-DATE INFORMATION.

VERITEXT LEGAL SOLUTIONS

COMPANY CERTIFICATE AND DISCLOSURE STATEMENT

Veritext Legal Solutions represents that the
foregoing transcript is a true, correct and complete
transcript of the colloquies, questions and answers
as submitted by the court reporter. Veritext Legal
Solutions further represents that the attached
exhibits, if any, are true, correct and complete
documents as submitted by the court reporter and/or
attorneys in relation to this deposition and that
the documents were processed in accordance with
our litigation support and production standards.

Veritext Legal Solutions is committed to maintaining
the confidentiality of client and witness information,
in accordance with the regulations promulgated under
the Health Insurance Portability and Accountability
Act (HIPAA), as amended with respect to protected
health information and the Gramm-Leach-Bliley Act, as
amended, with respect to Personally Identifiable
Information (PII). Physical transcripts and exhibits
are managed under strict facility and personnel access
controls. Electronic files of documents are stored
in encrypted form and are transmitted in an encrypted

fashion to authenticated parties who are permitted to access the material. Our data is hosted in a Tier 4 SSAE 16 certified facility.

Veritext Legal Solutions complies with all federal and State regulations with respect to the provision of court reporting services, and maintains its neutrality and independence regardless of relationship or the financial outcome of any litigation. Veritext requires adherence to the foregoing professional and ethical standards from all of its subcontractors in their independent contractor agreements.

Inquiries about Veritext Legal Solutions' confidentiality and security policies and practices should be directed to Veritext's Client Services Associates indicated on the cover of this document or at www.veritext.com.