# EXHIBIT 44

Page 1

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

_____
                                :
NATIONAL PUBLIC RADIO,          :
INC., et al.,                   :
                                :
        Plaintiffs,             :
                                :
        v.                      : Case No.
                                :  25-cv-1674 (RDM)
DONALD J. TRUMP, et al.,        :
                                :
        Defendants.             :
_____:


                Wednesday, October 22, 2025


        Video deposition of CLAYTON BARSOUM,
taken at the Law Offices of Gibson Dunn &
Crutcher, LLP, 1700 M Street, N.W.
Washington, DC, beginning at 9:29 a.m.,
EST, before Ryan K. Black, Registered
Professional Reporter, Certified Livenote
Reporter and Notary Public in and for the
District of Columbia.

Page 2

APPEARANCES:

GIBSON DUNN & CRUTCHER LLP
BY: MICHAEL H. DORE, ESQ.
333 South Grand Avenue
Los Angeles, California 90071
213.229.7000
mdore@gibsondunn.com
GIBSON DUNN & CRUTCHER LLP
BY:  ELLIE SCHWIETERING, ESQ.
1700 M Street NW
Washington, DC  20036
202.955.8500
eschwietering@gibsondunn.com

Representing - Plaintiffs National Public Radio, Inc.
SAUL EWING LLP
BY:  JOSEPH D. LIPCHITZ, ESQ.
131 Dartmouth Street - Suite 501
Boston, Massachusetts 02116
617.723.3300
joseph.lipchitz@saul.com

Representing - Defendant Corporation for Public Broadcasting

ALSO PRESENT:
Orson Braithwaite - Legal Videographer

Page 4

I N D E X (Cont'd)

EXHIBIT        DESCRIPTION        PAGE
Barsoum 12    a document bearing Bates stamp
              CPB_0009112 through Bates stamp
              CPB_0009113....................173

Page 3

I N D E X
TESTIMONY OF:  CLAYTON BARSOUM        PAGE

By Mr. Dore....................................6
By Mr. Lipchitz..............................193

E X H I B I T S

EXHIBIT        DESCRIPTION        PAGE
Barsoum 1    a document bearing Bates stamp
             CPB_0194271 through 4273........26

Barsoum 2    a document bearing Bates-stamp
             CPB_0122616....................40
Barsoum 3    a document bearing Bates-stamp
             CPB_0021963....................58

Barsoum 4    a document bearing Bates-stamp
             CPB_0206260 through 261.........64
Barsoum 5    a document bearing Bates stamp
             CPB_0143803 through Bates stamp
             CPB_0143808....................109
Barsoum 6    a document bearing Bates
             stamp CPB_0018106 through
             Bates stamp CPB_0018116........133
Barsoum 7    a New York Post article........138
Barsoum 8    a document bearing Bates stamp
             CPB_0213205 through 0213209....144

Barsoum 9    a document bearing Bates stamp
             CPB_0001385....................152
Barsoum 10   a document bearing Bates number
             CPB_0229996 through Bates number
             CPB_0229998....................155
Barsoum 11   a document bearing Bates
             stamp CPB_0211493 through
             CPB_0211496....................160

Page 5

THE VIDEOGRAPHER:  Good morning.  We are going on the record at 9:29 a.m. on October 22nd, 2025.

Please note that the microphones are sensitive and may pick up whispering and private conversations.  Please mute your phones at this time.  Audio and video recording will continue to take place unless all parties agree to go off the record.

This is Media Unit 1 of the video-recorded deposition of Mr. Clayton Barsoum in the matter of National Public Radio, Inc., et al., versus Donald J. Trump, et al., filed in the United States District Court for the District of Columbia, Case Number 25-cv-1674(RDM).

My name is Orson Braithwaite, representing Veritext Legal Solutions, and I'm the videographer.  The court reporter is Ryan Black from the firm Veritext Legal Solutions.

Counsel will now state their appearances and affiliations for the record, beginning with the noticing attorney.

MR. DORE:  Michael Dore, of Gibson Dunn & Crutcher, on behalf of Plaintiff National Public Radio, Incorporated.

2 (Pages 2 - 5)

Page 6

MS. SCHWIETERING: Ellie Schwietering, Gibson, Dunn & Crutcher, on behalf of National Public Radio.

MR. LIPCHITZ: Joe Lipchitz, from Saul Ewing, on behalf of the Corporation for Public Broadcasting and representing the witness here today.

THE VIDEOGRAPHER: Thank you. Will the court reporter please swear in the witness?

* * *

Whereupon --

CLAYTON BARSOUM, called to testify, having been first duly sworn or affirmed, was examined and testified as follows:

* * *

EXAMINATION

BY MR. DORE:

Q. Good morning, sir.

A. Good morning.

Q. Have you had your deposition taken before?

A. No.

Q. So just a few basics for you so we don't speak over each other. Try to let me ask my

Page 7

question before you start answering, and I'll try not to interrupt you. Okay?

Second point: Please give audible answers -- "yes" or "no," for example -- as opposed to nodding, shaking your head or uh-huh, and that type of thing. Does that make sense?

A. It does.

Q. Okay. Have you had any --

MR. LIPCHITZ: I'll just interject here before --

MR. DORE: Sure.

MR. LIPCHITZ: So just I would instruct you to give me a few seconds between the Q and the A so I can make an objection, to put it on the record. Unless I instruct you not to answer, you're free to answer the question. But just give me that second to object if I need to.

THE WITNESS: Understood.

MR. LIPCHITZ: Okay.

BY MR. DORE:

Q. Have you had any medication or other substance that might affect your memory or ability to testify truthfully today?

A. No.

Q. What did you do to prepare for your

Page 8

deposition?

A. I had communications with my lawyer.

MR. LIPCHITZ: Okay. Let me just interject right there.

You are not to disclose any communications between yourself and myself or any counsel for Corporation for Public Broadcasting.

BY MR. DORE:

Q. So you met with counsel; is that correct?

A. That's right.

Q. When did you meet with counsel? Without telling me the substance of any discussions, just tell me when you met with him, if you did.

A. Friday.

Q. Without telling me the substance of any discussions within the meeting -- from the meeting with counsel last Friday -- was that last Friday?

A. Yes.

Q. Did you review any documents?

A. Yes.

Q. Approximately how many documents did you review in your meeting with counsel last Friday?

A. I can't recall.

Page 9

Q. Can you recall, generally, how many documents you reviewed with your counsel?

A. I couldn't say specifically.

Q. Generally speaking, would you say it was more than 10 documents?

A. No.

Q. Okay. How long was the meeting that you had with counsel last Friday to prepare for your deposition?

A. Three hours.

Q. Have you had any other meetings with counsel to prepare for your deposition, other than the approximately three-hour meeting you had last Friday?

A. Yes.

Q. What other meetings have you had with your counsel other than the meeting last Friday, to prepare for this deposition?

A. I don't recall the date, but I would say last week there was another meeting with counsel lasting approximately three hours.

Q. Were there any other meetings that you had with your counsel to prepare for today's deposition, other than the meeting last Friday and that second meeting that you described from

3 (Pages 6 - 9)

Page 10

last week lasting approximately three hours?

A. No.

Q. Where are you currently employed?

A. The Corporation for Public Broadcasting.

Q. And what is your job title?

A. I'm the Senior Vice President of Government and External Affairs.

Q. For how long have you been the Senior Vice President of Government and External Affairs at the Corporation for Public Broadcasting?

A. Since August 2025.

Q. And if I refer to the CPB or "the Corporation," will you understand that to be a reference to the Corporation for Public Broadcasting?

A. Yes.

Q. And if I refer to NPR, will you understand that to be a reference to National Public Radio?

A. Yes.

Q. Okay. What -- where did you work immediately prior to becoming the Senior Vice President of Government and External Affairs at the Corporation in August of 2025?

A. The Corporation.

Page 11

Q. And what position did you hold at the Corporation prior to becoming the Senior Vice President of Government and External Affairs, immediately prior?

A. Vice President of Government and External Affairs.

Q. And during what period of time were you the Vice President of Government and External Affairs at CPB?

A. February 2025 to August 2025.

Q. Where did you work immediately prior to becoming the Vice President of Government and External Affairs at CPB in February 2025?

A. The Corporation.

Q. And what position did you hold at the Corporation immediately before becoming the VP of Government and External Affairs in February of 2025?

A. Senior Director of Government and External Affairs.

Q. And during what period of time were you the Senior Director of Government and External Affairs at CPB?

A. June of 2024 to February of 2025.

Q. Where did you work immediately prior to

Page 12

becoming Senior Director of Government and External Affairs at the Corporation in June of 2024?

A. The Raben Group.

Q. Could you spell that, please?

A. R-a-b-e-n.

Q. And what position did you hold at the Raben Group?

A. Director.

Q. And during what period of time did you work at the Raben Group as director?

A. June of 2023 to June of 2024.

Q. Where did you work immediately prior to becoming director at the Raben Group in June 2023?

A. The Corporation.

Q. What position did you hold at the Corporation prior to moving to the Raben Group in June of 2023?

A. Director of Government and External Affairs.

Q. During what time period were you the Director of Government and -- and External Affairs at CPB?

A. I'm trying to recall the year. October

Page 13

-- I can't recall the specific year. Sorry.

Q. As Director of Government and External Affairs at CPB -- strike that.

Were you the Director of Government and External Affairs at CPB up until June 2023 when you moved to Raben Group?

A. Yes.

Q. Do you know approximately how long you were Director of Government and External Affairs, whether that would be measured in months or years, for example?

A. I would estimate four-and-a-half years.

Can I clarify that?

Q. Sure.

A. Can I clarify that my tenure at CPB was four-and-a-half years, not that I was the director the entire period.

Q. What other positions did you hold at CPB during that, approximately, four-and-a-half-year period concluding in June of 2023?

A. I started as an associate of Government Affairs, was promoted to a manager of Government Affairs before being elevated to the director of Government and External Affairs.

Q. You mentioned "government affairs" and

4 (Pages 10 - 13)

Page 14

then "government and external affairs." Was "government affairs" a shorthand or is that something different from "government and external affairs"?

A. It's different. We had a reorganization.

Q. Coming back to today in October of 2025, is there something that you consider a group or department that is titled the Government and External Affairs?

MR. LIPCHITZ: Objection to the form. You can answer.

THE WITNESS: There is, broadly, an external affairs department.

BY MR. DORE:

Q. As of January of 2025, how many people were in CPB's External Affairs Department?

A. Seven.

Q. Today on October 22nd, 2025, how many people are in CPB's External Affairs Department?

A. Two.

Q. Who are the two people today, in October of 2025, who are in CPB's External Affairs Department?

A. Myself and Camille Morgan.

Page 15

Q. What position does Ms. Morgan hold at CPB?

A. She is a vice president of external affairs.

Q. Who are the seven people in CPB's External Affairs Department as of January 2025?

A. Anne Brockman, myself, Brendan Daly, Tracey Briggs, Desiree Arriola, and Camille Morgan.

Q. Is there anyone else? I count six.

A. I count six. Okay. It may be six.

Q. Do you recall what Anne Brockman's title was at CPB in January of 2025?

A. I don't recall.

Q. Did you report to Ms. Brockman at that time?

A. I didn't.

Q. Today in October of 2025, as the Senior Vice President of Government and External Affairs, to whom do you report at CPB?

A. Patricia Harrison.

Q. Do you report to anyone else at CPB, other than Ms. Harrison?

A. No.

Page 16

MR. LIPCHITZ: Can I -- I don't want to interrupt, but I heard you say that you didn't report to Ms. Brockman. Is that the case? Because on the -- the realtime transcript it said you did report to Ms. Brockman.

MR. DORE: I heard that you did report to Ms. Brockman in January of 2025?

THE WITNESS: In January of 2025, I did.

MR. LIPCHITZ: Okay. Could you do me a favor? Just keep your voice a little up?

THE WITNESS: Sure. Yeah. Yeah.

MR. LIPCHITZ: Sorry about that.

MR. DORE: Sure.

BY MR. DORE:

Q. From the time when you were Senior Director of Government and External Affairs at CPB in January of 2025 to today, October 22nd, 2025, when you are the Senior Vice President of Government and External Affairs at CPB, how have your job responsibilities changed?

A. On October 1st, CPB was forced to lay off 70 percent of its staff, drastically reducing our workforce, including the External Affairs Department. And so I have had to take on various tasks as required.

Page 17

Q. In January of 2025 when you were the Vice President of Government and External Affairs at CPB, what were your job responsibilities?

A. I just heard you say "January of 2025, Vice President of Government Affairs"; is that correct?

Q. I'll withdraw that.

In January of 2025 when you were the Senior Director of Government and External Affairs at CPB, what were your job responsibilities?

A. I was the liaison with Congress. I drafted various memos that were sent to Congress. I monitored any legislation impacting the public media system.

Q. Are there any other job responsibilities you can think of as the Senior Director of Government and External Affairs as of January '25, or in January '25?

A. Not that I can think of.

Q. Were those generally your job responsibilities during the time period in which you were Senior Director of Government and External Affairs from June 2024 to February 2025 at CPB?

5 (Pages 14 - 17)

Page 18

A.  Yes.

Q.  During the period in which you were Vice President of Government and External Affairs at CPB between February 2025 and August 2025, did your job responsibilities include being a liaison with Congress, drafting various memos to Congress, monitoring legislation impacting the public media?

A.  Yes.

Q.  Did your job responsibilities as Senior -- I'm sorry.  Did your job responsibilities as Vice President of Government and External Affairs at CPB from February 2025 through August 2025 include anything else?

A.  No.

Q.  During the time period in which you were the Vice President of Government and External Affairs at CPB from February 2025 through August 2025, did you act in any way as a liaison with anyone in the executive branch, as opposed to Congress?

MR. LIPCHITZ:  Objection to the form.

You can answer.

BY MR. DORE:

Q.  Do you understand the question?

Page 19

A.  Can you rephrase it?

Q.  As the Vice President of Government and External Affairs, you were a liaison with Congress for CPB; is that correct?

A.  Correct.

Q.  Did you function as a liaison with anyone else in the federal government outside of Congress in your role as the Vice President of Government and External Affairs at CPB?

A.  No, I can't agree that I was a liaison to any other branch other than Congress.

Q.  How would you define being a liaison in the context of your work at CPB with Congress?

A.  I would define it as responding to inquiries, drafting various proactive communications and meeting with members of Cong -- members of Congress and their staff to educate them on the public media system, especially as it pertains to CPB's federal appropriations.

Q.  Is it your testimony that in your role as the -- strike that.

In your role as the Vice President of Government and External Affairs at CPB from February 2025 through August of 2025, did you respond to inquiries from the Office of

Page 20

Management and Budget?

A.  We did respond to an inquiry voluntarily in alignment with past precedent and our goals of transparency.

Q.  How many times have you personally met with anyone in the Office of Management and Budget in your work at CPB, at any time?

A.  I've met once in person with representatives from the Office of Management and Budget.

Q.  In your career outside of working for the Corporation for Public Broadcasting, how many times, if any, have you met in person with someone in the Office of Management and Budget?

A.  Once.

Q.  When, outside of your work with CPB, did you meet with someone at the OMB?

A.  When I was working at the Raben Group.

Q.  With whom did you meet at the OMB in person when you were working at the Raben Group -- Raben Group, at OMB?

MR. LIPCHITZ:  Objection to the form.

You can answer.

THE WITNESS:  Was your question "when"?

BY MR. DORE:

Page 21

Q.  With whom.

A.  With whom.

I can't recall their name, but I remember their title was Associate Director for Justice.

Q.  Do you recall what you were meeting -- strike that.

Do you recall what was discussed in the meeting with OMB in person when you were at the Raben Group?

A.  Yes.

Q.  Generally speaking, what was discussed? What was the subject of the discussion with OMB when you met with them in person in your role at the Raben Group?

A.  Criminal justice reforms, and funding for community safety projects.

THE VIDEOGRAPHER:  Your shirt's rubbing the microphone.

BY MR. DORE:

Q.  Is it accurate to say that the meeting that you had with OMB, related to criminal justice reforms when you were at the Raben Group that you had in person, did not relate to public media?

6 (Pages 18 - 21)

Page 22

A. Correct.

Q. Is it accurate to say that in your entire career, you've had one in-person meeting with anyone at the Office of Management and Budget to discuss any matter related to public media?

A. Correct.

Q. The meeting that you had in person with OMB during the time period in which you were Vice President of Government and External Affairs took place on April 3rd, 2025; is that correct?

A. I don't recall the date.

Q. Do you recall how the meeting that you had in person with OMB, when you were working at the Corporation for Public Broadcasting, came about?

A. I do.

Q. How did the meeting that you had in person with OMB when you were working at the Corporation come about?

A. Olivia Ingrassia, an intern with OMB, emailed CPB's press account, press@cpb.org, requesting a meeting with C -- CPB. That automatic email was forwarded to me from a colleague.

Page 23

Q. Do you recall which colleague at CPB forwarded the meeting request from Olivia Ingrassia?

A. I don't recall.

Q. What happened after the meeting request from Olivia Ingrassia at OMB was forwarded to you -- happened next?

A. I worked to schedule the meeting.

Q. Did you know what the meeting was about with OMB?

A. No.

Q. Did you receive any information whatsoever about what the meeting was intended to cover at OMB?

A. No.

Q. Did you make any effort to determine what the subject of the meeting would be with OMB?

A. I believe I called Peter Hoy, which is CPB's designated budget examiner -- whom is. I asked him if he had any more information about the topics to be discussed, and he said he had no idea.

Q. Mr. Hoy didn't even know that OMB had requested a meeting with CPB, correct?

Page 24

MR. LIPCHITZ: Objection.

THE WITNESS: I can't recall whether he knew or didn't.

BY MR. DORE:

Q. When you say that Mr. Hoy was CPB's designated budget examiner, what do you mean by a "designated budget examiner"?

A. Peter is who CPB voluntarily submits our budget justification.

Q. To your knowledge, has CPB had any interactions with Mr. Hoy related to required submissions, as opposed to voluntary submissions of budget justification?

MR. LIPCHITZ: Objection. To whom? OMB or Congress?

MR. DORE: You can answer the question. Can you reread -- can you reread the question?

COURT REPORTER: Sure.

(Referred-to testimony read back.)

MR. LIPCHITZ: Objection to the form of the question.

THE WITNESS: Anything we submit to OMB is voluntary.

BY MR. DORE:

Q. What about a submission to anyone else

Page 25

that OM -- I'm sorry. Let me withdraw that.

Have you had a interaction -- strike that.

Has CPB had any interactions with Mr. Hoy related to submissions required by anyone, be it OMB, Congress or anyone else, separate and apart from voluntary submissions and budget justification?

MR. LIPCHITZ: Objection to the form.

You can answer.

THE WITNESS: Anything we submit to OMB is voluntary and is expressed as voluntary.

BY MR. DORE:

Q. And I want you to focus on my question, sir. I'm not talking about what's been submitted to OMB. I'm talking about submitted to anyone else, including OMB, or anyone.

Have you had any discussions with Mr. Hoy related to any submission by the Corporation for Public Broadcasting that you understood to be required, as opposed to a voluntary submission?

MR. LIPCHITZ: Objection to the form.

THE WITNESS: I don't quite understand what you're asking.

7 (Pages 22 - 25)

Page 26

MR. DORE: Could we have Tab 3?

(Barsoum Exhibit No. 1, a document bearing Bates stamp CPB_0194271 through 4273, was introduced.)

BY MR. DORE:

Q. So you know, Mr. Barsoum, I'll be focusing on the last page of this document.

A. Okay.

Q. Let me know when you're ready to answer questions.

MR. LIPCHITZ: Read the whole thing for context, please.

THE WITNESS: (Reviews document.)

BY MR. DORE:

Q. Mr. Barsoum, I've placed in front of you what's been marked as Exhibit 1. It's bearing Bates number CPB_0194271 through 4273. The top email in the thread is dated March 31st, 2025.

Focusing on the email from Kathy Merritt dated March 29th, 2025, with the subject "Forward government affairs update 3/28/24," do you recognize that email?

A. Yes.

Q. The first line of Ms. Merritt's March 29th email says, in part, "Clayton prepares a

Page 27

weekly report that he shares with the execs, SVPs and VPs."

It continues, "I asked his permission to share this week's report" and goes on from there.

Did you prepare the report that is included underneath "This week" on the first page of what's been marked as Exhibit 1?

A. This looks like something I would have prepared.

Q. Do you remember definitively if you did prepare it?

A. I don't remember sitting down and typing this, but I have no reason to believe that I did not.

Q. Is it an accurate statement by Ms. Merritt in her March 29th email marked as part of Exhibit 1 that you prepared a weekly report that you typically shared with executives, senior vice presidents and vice presidents at the Corporation?

A. That was a goal.

Q. Did you try to meet that goal of circulating weekly reports?

A. I tried to meet that goal.

Q. And the -- would you characterize what's

Page 28

reflected underneath "This week" in Exhibit 1 as being the format of the weekly reports that you prepared at CPB?

A. It would change given the context of the week. But, broadly, the layout looks familiar.

Q. By "familiar," do you mean familiar as something that you typically would prepare at CPB?

A. For this type of weekly report, yes.

Q. Turning to the last page of Exhibit 1, please, the first sentence states, "Last week Peter Hoy, our budget examiner from the Office of Management and Budget (OMB) called to discuss our compliance with the recent Continuing Resolution, CR, that requires CPB to share its Fiscal Year '25 Operating Plan with appropriations committees. Peter inquired whether we would also share that plan with OMB and offered guidance on how to draft it. I informed him that CPB is currently reviewing the requirement and will ensure compliance with the law."

Do you remember having a call with Peter Hoy to discuss CPB's compliance with the then-recent Continuing Resolution?

A. I -- I don't remember the call

Page 29

specifically, but I remember that this did happen.

Q. And when you say "this did happen," what are you referring to as "this"?

A. I do remember Peter called to ask about the CR. There was new language in the CR that required CPB to submit its FY25 Operating Plan with Congress. That was the requirement.

And I remember on the call, Peter asked if we would also share that with OMB. He said, "I know that you guys do this on a voluntary basis and that you're an independent nonprofit, so you may not be familiar with the format of these types of operating plans," and offered guidance on how to draft it. I declined to seek his guidance on how to draft it and talked to CPB management about the conversation.

Q. What was the substance of your discussions with CPB management about the conversation you had with Peter Hoy in or around late March 2025?

A. I told them exactly what I just told you, that Peter asked whether we would be sharing it with OMB, with the understanding that it was an option.

8 (Pages 26 - 29)

Page 30

Q.  With whom in management did you speak about the call that you had with Peter Hoy in late March 2025 about the compliance with the Continuing Resolution?

A.  I don't recall.

Q.  You don't recall at all who you spoke with in March of 2025 about the outreach from OMB to share the Operating Plan?

A.  I don't recall specifically.

Q.  To your knowledge, had CPB ever been required to share its Operating Plan with appropriations committees?

A.  I do know that CPB has shared its Operating Plan with appropriations committees before March of 2025.

Q.  Do you know that CPB was required to do so in those instances?

A.  I don't recall.

Q.  Did CPB ever share its Operating Plan with OMB per the request of Peter Hoy?

A.  I don't recall.

Q.  So in March of 2025, you receive outreach from the Office of Management and Budget asking you to provide an Operating Plan for the fiscal year 2025 for the Corporation for Public

Page 31

Broadcasting that had been required by Continuing Resolution to be shared with appropriations committees, correct?

A.  Peter Hoy was asking whether we would participate in sharing the document.  He was not asking for the document.

Q.  What do you mean by "participating in sharing the document"?

A.  By that I mean Peter inquired whether we would.

Q.  To your knowledge, did the Corporation ever decide to, in fact, share its Operating Plan with OMB?

A.  We did.

Q.  And to your knowledge, did CPB then provide its Operating Plan for fiscal year 2025 to OMB?

A.  I'm sorry.  How is that different from your previous question?

Q.  It's different in that you said that the Corporation decided to share its Operating Plan.  After having decided to share the Operating Plan, did it, in fact, share the Operating Plan with OMB?

A.  Thank you.

Page 32

Yes.

Q.  When did the Corporation share its Operating Plan for fiscal year 2025 with OMB?

A.  I don't recall the specific date, but I assume it was around the time that we shared it with Congress.

Q.  When did you -- when did CPB share its Operating Plan for fiscal year 2025 with Congress?

A.  Again, I don't recall the specific date, but there was a deadline in the Continuing Resolution to submit the plan by that deadline.

Q.  Do you remember what month that was in 2025?

A.  I don't.

Q.  Do you remember approximately how long after the request came from Peter Hoy in late March 2025 to share it that it was, in fact, shared with OMB?  Whether it was days, weeks or months, for example?

MR. LIPCHITZ:  Objection to the form.

THE WITNESS:  I can't recall.  Sorry.

BY MR. DORE:

Q.  Did you consider the request from the Office of Management and Budget for an Operating

Page 33

Plan that had been required by a Continuing Resolution to be a significant matter?

A.  Not at all.

Q.  Why not?

A.  Because we have a history of transparency.  It helps affirm that transparency.  We were already providing that document to Congress, which is the heart of my work and where I'm mostly focused, so ...

Q.  Were there any discussions at CPB about the potential reasons for OMB's request to provide the Operating Plan?

A.  No.  I think we looked at the requirement from Congress and said, "We're already producing the information."

Q.  To your knowledge, had Congress in the past, prior to the Continuing Resolution, required CPB to share its fiscal year Operating Plan?

A.  I think you already asked that.

MR. LIPCHITZ:  Yeah.

BY MR. DORE:

Q.  What's the answer?

A.  I don't recall if it was required.  I do recall that we voluntarily responded to requests

9 (Pages 30 - 33)

Page 34

and shared our Operating Plan.

Q. Do you remember any discussions about the significance, or lack thereof, of a Continuing Resolution being issued that required the provision of the Operating Plan?

MR. LIPCHITZ: Objection.

THE WITNESS: Can you repeat the question?

BY MR. DORE:

Q. Sure.

Did you think it was a big deal that there was a demand -- a requirement -- that CPB provide its Operating Plan?

A. No.

Q. Why not?

A. Because we are the steward of the federal appropriation, and we seek to be transparent about how we spend those funds.

Q. Did you think it was significant that you got unsolicited outreach from OMB seeking an in-person meeting at their offices in early April 2025?

A. No.

Q. So you've never met in person at OMB regarding public media in your entire career, at

Page 35

that point in April of 2025, correct?

A. No.

Q. It is correct that you had not?

A. Thank you.

It is correct that I had not met in person with OMB regarding public media.

Q. So you get unsolicited outreach from the Office of Management and Budget seeking an in-person meeting about public media for the first time in your career, in the midst of a Continuing Resolution being passed requiring a provision of CPB's fiscal year 2025 Operating Plan, and you didn't think that was significant?

MR. LIPCHITZ: Objection to the form of the question.

THE WITNESS: No.

I'm more concerned with Congress. Congress appropriates our funding. And as you may recall, Congress had their eyes on public media, and the animus towards public media was higher in Congress than before.

BY MR. DORE:

Q. As of April of 2025, did you understand there to be animus towards public media from the White House?

Page 36

A. I understood that, like President Trump's first administration, his second administration would seek to close out the Corporation.

Q. Did you consider that to be animus towards public media, seeking to close out the Corporation?

A. I see it as the President, the Administration's policy position.

Q. Putting aside whether you see it as a policy position, is it your view that seeking to close out the Corporation for Public Broadcasting reflects animus towards public media?

A. I see it as a continuation of many Presidents' suggestions about public media funding.

Q. Sir, I'm just asking you "yes" or "no," and I'm focused on the word "animus," which you used.

Did you consider the White House's expressed intention to close out the Corporation for Public Broadcasting to reflect animus towards public media?

A. I think it underscores a longstanding policy position that republican presidents, and

Page 37

even a democratic president, had suggested, which shows a lack of appreciation for CPB funding.

Q. By closing out the Corporation for Public Broadcasting, do you mean shutting it down?

A. By closing it down, I mean that, like President Trump's first administration, he sought to provide close-out costs for the Corporation. That was a suggestion in his budget in his first administration and his second.

Q. By "closing out" do you mean shutting it down?

A. The President has no power to shut down the Corporation.

Q. Did you ever reach the conclusion -- strike that.

Did you ever have any indication that anyone at the Office of Management and Budget held animus towards National Public Radio?

A. I believe that Russ Vought, for example, strongly dislikes public media, and it has been his career goal to destroy public media.

Q. Did you ever have any indication that anyone at the Office of Management and Budget held animus towards National Public Radio?

10 (Pages 34 - 37)

Page 38

A.  Not specifically.

Q.  So you have -- your -- under oath, under penalty of perjury, your testimony is that you had no specific indication from anyone at the Office of Management and Budget of animus towards National Public Radio, specifically?

A.  I believe -- and what I heard -- was that there was not an appreciation for CPB, PBS, NPR or any government funding for public media.

Q.  When did you hear that there was not an appreciation for CPB, PP -- PBS, NPR or any government funding for public media?

A.  I don't recall the date, but it was in the meeting with Katie Sullivan and Olivia Ingrassia.

Q.  In that meeting, do you recall any specific -- strike that.

In the meeting with Katie Sullivan and Olivia Ingrassia at OMB, do you recall any specific comments by either Ms. Sullivan or Ms. Ingrassia directed towards their feelings about NPR specifically?

A.  I -- I remember Katie Sullivan saying PBS is biased, NPR is biased, and CPB should not receive government funding.

Page 39

Q.  Do you remember any indication from Ms. Sullivan in the meeting at OMB that there was a desire to potentially punish or otherwise adversely impact NPR without harming CPB?

A.  No.

MR. LIPCHITZ:  Objection to the form, a little late, but I would just ask you to give me a couple seconds between his Q and your A.

THE WITNESS:  Can you repeat the question for me, please?

BY MR. DORE:

Q.  Do you remember any indication from Ms. Sullivan in the meeting at OMB that there was a desire on her part to potentially punish or otherwise adversely impact NPR without harming CPB?

A.  No.  She did not believe in government funding for public media.

MR. LIPCHITZ:  At an appropriate time, just want to take a quick bio break.

MR. DORE:  Sure.  Could we go off the record, please?

THE VIDEOGRAPHER:  The time is 10:24 a.m.  This ends Unit 1.  We're off the record.

Page 40

(Recess taken.)

(Barsoum Exhibit No. 2, a document bearing Bates-stamp CPB_0122616, was introduced.)

THE VIDEOGRAPHER:  The time is 10:31 a.m.  This begins Unit Number 2.  We're on the record.

BY MR. DORE:

Q.  Mr. Barsoum, I've placed in front of you a document marked as Exhibit Number 2.  It's a --

MR. LIPCHITZ:  Do I have that?

MR. DORE:  Yeah.  You do.

MR. LIPCHITZ:  This one?

MR. DORE:  Yes.

BY MR. DORE:

Q.  I've placed in front of you a document marked as Exhibit 2 bearing Bates stamp CPB_0122616.  The top email is March 31st, 2025.

Aside from the very top email in the thread from Michael Levy to Deborah Carr, do you recognize the emails beneath it in Exhibit 2?

A.  This looks familiar.

Q.  Is c-b-a-r-s-o-u-m@ c-v -- cpb.org your email address at CPB?

A.  It is.

Q.  And was cbarsoum@cpb.org your email

Page 41

address in the time period from at least January 2025 through today?

A.  It is.

Q.  Who's Teresa Safon?

A.  Teresa Safon is our -- CPB's former chief of staff.

Q.  To your knowledge, is Ms. Safon now a consultant with CPB?

A.  To my knowledge, yes.

Q.  How much time passed between Ms. Safon leaving her chief of staff position at CPB and coming on as a consultant -- had passed, to your knowledge?

A.  I don't know the specific time.  I -- I don't imagine it was long.

Q.  Why don't you imagine it was a long period of time when Ms. Safon left her permanent position and when she came back as a consultant to CPB?

A.  I don't recall her being absent for a long period.

Q.  Do you know why Ms. Safon came back as a consultant at CPB after leaving her permanent position?

A.  She wanted to spend more time with her

11 (Pages 38 - 41)

Page 42

mother, who has severe dementia issues and was deteriorating rapidly. And she wanted to be with her mom.

Q. Do you know how much time Ms. Safon spends as a consultant to CPB?

A. I -- I don't know her schedule.

Q. Who's Michael Levy?

A. Michael Levy is CPB's former COO.

Q. Is Michael Levy also currently a consultant to CPB?

A. He is not.

Q. Has he ever been a consultant to CPB after leaving as COO?

A. He was.

Q. What was the period of time, to your knowledge, between when Mr. Levy left his role at COO and when he came back to CPB as a consultant?

A. Like Teresa, I do not recall a -- an absence. So I -- I don't know if there was or how long there would have been a gap.

Q. Are you familiar with anyone else who left a permanent position at CPB that came back as a consultant in the last year -- 10 months?

A. I'm not familiar.

Q. So Teresa Safon and Michael Levy are the

Page 43

only people you can think of who left permanent positions and came back as consultants?

A. The only ones I'm aware of.

Q. Who's Deborah Carr?

A. I'm struggling to remember her title, but I know that she's been with CPB for a long period.

Q. Do you know, generally speaking, what role she plays -- Deborah Carr that is -- at CPB?

A. Somewhat like a deputy COO role. She's involved in interconnection, assists in technologies.

Q. Who's Daryl Mintz?

A. Daryl Mintz is CPB's current CFO.

Q. And who's Evan Slavitt?

A. Evan Slavitt is CPB's general counsel.

Q. Are you familiar with someone named Deb Sanchez?

A. Yes.

Q. Who's Deb Sanchez?

A. Deb Sanchez is our current chief of staff and corporate secretary.

Q. To whom is Ms. Sanchez chief of staff?

A. The organization.

Q. Okay. Did Ms. Sanchez ever have any

Page 44

role in the Government and External Affairs Group at CPB, to your knowledge?

A. It's hard to say. As we transitioned from our previous structure to the next leaders, we were looking at different ways to organize the structure of our departments.

Q. How would you characterize Ms. Sanchez's roles and responsibilities at CPB in the time frame from January 2025 to October of 2025?

A. Her prime responsibility was the corporate secretary function of her title, so scheduling board meetings, communicating with board members, helping to respond to requests from the board.

Q. When you testified a moment ago as to "a transition from our previous structure to the next leaders," what did you mean?

A. As I mentioned, Michael Levy and Teresa Safon left their official capacities and came on as consultants. Kathy Merritt took over as COO, and Debra Sanchez, largely, took over Teresa Safon's role.

How we were to structure that was -- how do I want to say? We were trying to figure out where people fit.

Page 45

Q. Are you aware of any third-party consultants with whom CPB worked related to its engagement with the federal government?

MR. LIPCHITZ: Objection to the form of the question.

THE WITNESS: Yeah. I'm -- I mean, we utilized federal consultants to inform our interconnection decisions. Many times they helped provide the technical expertise to -- to support our in-house work.

BY MR. DORE:

Q. To your knowledge, has CPB worked with any consultants related to interconnection decisions concerning funding?

A. All interconnection decisions involve funding.

Q. Do you know who the Penn Hill Group is?

A. Yes.

Q. What is the Penn Hill Group?

A. The Penn Hill Group is an education and, I think, workforce development-focused consultant.

Q. Are there any particular people from Penn Hill Group with whom you've worked?

A. Yes.

12 (Pages 42 - 45)

Page 46

Q. Who?

A. Danica Petroshius.

Q. Anyone else?

A. I believe I've been on meetings with someone other than Danica, but I do not recall their name.

Q. To your knowledge, was Penn Hill Group involved in any way in decision-making related to the Public Radio Satellite System?

A. No.

Q. To your knowledge, was anyone from Penn Hill Group involved in any discussions related to the Public Radio Satellite System?

A. No.

Q. And by "no" you mean you're not aware of anyone from Penn Hill Group participating in discussions related to the PRSS; is that right?

A. There's no way that they would ever talk about PRSS. Our work was focused on education issues.

Q. Are you familiar with something called the Black Rock Group?

A. I have heard of it.

Q. What have you heard about the Black Rock Group?

Page 47

A. Is it -- I mean, it's a consultancy, but I don't know much other than that.

Q. Do you know of any people associated with the Black Rock Group?

A. Nothing comes to mind.

Q. No names at all?

A. No.

Q. Is it correct that you don't recall having any communications with anyone from Black Rock Group related to the Public Radio Satellite System?

A. I don't recall any conversations with the Black Rock Group.

Q. What about any written communications with Black Rock Group? Do you recall ever seeing any written communications or participating in any written communications with Black Rock Group?

A. No.

Q. Are there any other consultancies with whom you have -- strike that.

Are there any consultancies which you're aware of that CPB has worked with in the past 10 months related in any way to interconnection?

A. To interconnection?

Q. Let me -- let me rephrase the question.

Page 48

Are there any consultants that you're aware of the Corporation for Public Broadcasting working with in the past year related in any way to the Public Radio Satellite System, including funding that might affect NPR?

MR. LIPCHITZ: Objection to the form.

MR. DORE: What's the basis for the objection?

MR. LIPCHITZ: Form.

MR. DORE: What part of the -- what part of the question?

MR. LIPCHITZ: The whole question.

MR. DORE: Why?

THE WITNESS: I'm just trying to under --

MR. DORE: So I know how to rephrase it if you find it objectionable, I'd like you to tell me what is objectionable about the question.

MR. LIPCHITZ: My objection is noted. He can answer.

MR. DORE: I don't under -- okay. I don't understand what the form objection is.

Can you read the question?

He can answer.

(Referred-to testimony read back.)

Page 49

THE WITNESS: We had Deloitte -- I don't know when their contract began and ended. But we hired them to study the future of public media distribution, broadly -- TV and radio. I believe they also reviewed our proposals when we solicited an RFP for the next round of public radio interconnection and content distribution.

PRSS submitted a proposal, and so did PMI. So if -- if that's the funding you're -- you're talking about, they reviewed proposals and evaluated them.

BY MR. DORE:

Q. Is there anyone other than Deloitte that you can think of as a consultant that CPB has worked with in the past year related to PRSS, including any potential funding that might affect NPR?

A. I don't believe in the past year. I think you may be familiar with Kearney, but that may have been before the past year.

Q. Okay.

A. Okay.

Q. So other than whenever Kearney may have been and working with Deloitte, is it accurate to say that you -- you're not aware of any other

13 (Pages 46 - 49)

Page 50

consultant with whom CPB has worked related in any way to PRSS and any funding that may affect NPR?

A. Correct.

Q. And I just want to make sure that I'm defining -- that we have an understanding of "consultant." So I don't want to limit, like, "Oh, consultant's different from a professional assistance company."

A. Okay.

Q. So, just to be clear, I mean a third party being involved in any way, through communications, consulting, providing advice, other than lawyers, that would be involved.

So with that understanding, because I don't want to limit consulting, right, in a way that excludes something because I don't understand or we don't share an understanding of consulting, is there -- just to confirm, putting aside Kearney and Deloitte, you're not aware of any third party providing any consulting or advising services to the Corporation related to the Public Radio Satellite System or any funding that may affect NPR. Is that accurate?

MR. LIPCHITZ: Objection to the form.

Page 51

THE WITNESS: I -- I don't recall -- I'm not aware of any third party engaged to advise on or consult or -- on funding for PRSS. Is -- are we at the same --

BY MR. DORE:

Q. Funding for -- PRSS broadly --

A. Okay.

Q. -- and funding that may affect NPR. So the rescission, meetings with the government -- the Continuing Resolution, the -- the events that have happened over the past 10 months or so that relate to interconnection, PRSS, funding, PMI, broadly speaking, those issues. Do you understand?

MR. LIPCHITZ: You can answer whether you understand his question.

BY MR. DORE:

Q. Do you understand the question?

A. I feel like this is getting broader than when you first asked it, so I just want to make sure that I'm --

Q. Okay. Well, then I -- let me -- to the extent you see it as an expansion, so --

Would you agree that over the past 10 months there have been discussions at the

Page 52

Corporation for Public Broadcasting, internally and with the government, related to the Public Radio Satellite System and funding that could affect -- even if it might affect others as well -- NPR?

A. Would I agree that we have had discussions internally about future funding for Public Radio's interconnection needs? Yes.

When you say "the government," I want to be clear, we have also shared those discussions that we've had internally with Congress, because our job is to convey the needs of the public media system, be transparent about how we are using those funds, and update Congress on our decision-making and funding decisions.

Q. Okay. To your knowledge, has any third party provided any consulting or advisory services related in any way to the Corporation for Public Broadcasting related in any way to the in-person meeting with the Office of Management and Budget in April of 2025?

A. No.

Q. And to your knowledge, has any third party provided any consulting or advisory-type services to the Corporation for Public

Page 53

Broadcasting related in any way to decisions made by CPB as to -- related to funding associated with the Public Radio Satellite System, other than Deloitte and Kearney?

A. Okay. I just want to repeat back the question, --

Q. Sure.

A. -- if it's okay?

Has any -- has CPB engaged with any consultant to inform on the funding decisions that impact -- that could impact PRSS and --

Q. Consultant or anyone providing consulting or advisory services. So I -- I don't want to be limited as to the definition of consultant, --

A. Okay. Thank you.

Q. -- but, otherwise, correct.

A. Okay. No.

Q. All right. Could you look at Exhibit Number 2 again, please?

A. Yes.

Q. Email from Olivia Ingrassia on March 31st, 2025, at 9:08 a.m. to press@cpb.org at the bottom of the page.

To your knowledge, was this the initial

14 (Pages 50 - 53)

Page 54

outreach from OMB to CPB seeking an in-person meeting?

A. To my knowledge, yes.

Q. And this email from Olivia Ingrassia to the press@cpb.org email address on March 31st was forwarded to you within a reasonably short time after it coming in; is that right?

A. I -- I would think so, yes.

Q. You reviewed the email from Olivia Ingrassia, correct?

A. Yes.

Q. At the time when you saw the first line, it says, "Senior leadership is looking To schedule a meeting," did you have an understanding as to who "senior leadership" was in reference to?

A. No.

Q. Did you have any suspicion or -- or guess as to what that was a reference to?

MR. LIPCHITZ: Objection to the form.

BY MR. DORE:

Q. Not now. I mean at the time you when you read it.

MR. LIPCHITZ: Still objection to form.

THE WITNESS: I -- it could have been

Page 55

anybody.

BY MR. DORE:

Q. Okay. So at the time you see this email on or about March 31st, 2025, from Olivia Ingrassia saying that senior leadership is looking to schedule a meeting, and you had no -- no idea who it even could be?

A. Well, I just -- it's not stated, so, no.

Q. In the email -- email immediately above, on March 31st, 2025, from you to Pat Harrison, among others, you write, "The email below came in through our press@cpb.org account. I would like to reach out to our OMB contact, Peter Hoy, to see if he's aware of this request."

Do you see that?

A. Yes.

Q. And did you reach out to Mr. Hoy about the request that came from Olivia Ingrassia at OMB?

A. I believe so.

Q. And you spoke to Mr. Hoy on the phone, correct?

A. I believe so.

Q. What do you recall about the conversation you had with Mr. Hoy after the email

Page 56

from Ms. Ingrassia came in?

A. I remember relaying this email -- the content of the email; asked if he had any understanding of, you know, the topics that would be discussed or any more information to color this very vague request.

Q. And what did Mr. Hoy say to you in that conversation in March -- on March 31st, 2025?

A. He -- I -- I don't recall, but I'm reading this email, and he may have communicated that OMB is understanding how CPB allocates its funding.

Q. Do you recall having any understanding or interp -- strike that.

Do you recall having any interpretation of what you thought Mr. Hoy was looking for in -- when he relayed what OMB was interested in understanding?

A. No. I mean, "an understanding of how CPB allocates its funding" is very generic and reasonable.

Q. When you spoke with Mr. Hoy on March 31st, 2025, about the incoming meeting request from Olivia Ingrassia at OMB, is it correct that Mr. Hoy said he was unaware of the request?

Page 57

A. I believe so. I -- I -- I don't recall, but I'm reading this email.

Q. Do you believe at the time when you were sending a report to Pat Harrison, among others, that you would have tried to accurately memorialize the call that you had had with Mr. Hoy?

A. Sure.

Q. And do you believe that the call that you had with Mr. Hoy was only a short period of time before you sent this updated email to Ms. Harrison and others?

A. I -- I don't recall the time, but I have no reason to doubt.

Q. And as a general matter, in your work at CPB, you try to be accurate in your communications with your colleagues; is that right?

A. Correct.

Q. And if you see something that you believe to be inaccurate in a document that you review, for example, would you take it upon yourself to try to correct it rather than have incorrect information shared with your colleagues?

15 (Pages 54 - 57)

Page 58

A. Can I reask the question --

Q. Yeah.

A. -- to make sure I understand it?

Would I correct a colleague if I saw incorrect information? Is that what you asked?

Q. No. If you were reviewing a document --

A. Sure.

Q. -- in your work at CPB, and in your review you identified something that you believed to be inaccurate, would you seek to make a correction to what you believed to be an inaccurate statement?

A. Broadly, yes.

Q. Okay. Do you recall -- in the -- in the last sentence of your email on March 31st, 2025, in the exhibit marked as Exhibit 2, you write, "Peter is looking into the details of this inquiry and expects to have more information for us by this afternoon."

Did Mr. Hoy provide any additional information to you or CPB, more generally?

A. I don't recall.

(Barsoum Exhibit No. 3, a document bearing Bates-stamp CPB_0021963, was introduced.)

THE WITNESS: Thank you.

Page 59

THE REPORTER: You're welcome.

MR. LIPCHITZ: This is.

MR. DORE: 3, I think.

MR. LIPCHITZ: 3.

THE WITNESS: (Reviews document.)

BY MR. DORE:

Q. Okay?

Mr. Barsoum, I've placed in front of you what's been marked as Exhibit Number 3 bearing Bates number CPB_0021963, the top email dated April 2nd, 2025.

Looking at the second email down from Debra Sanchez on April 2nd, 2025, at 6:46 a.m., do you recognize that email?

A. I don't.

Q. Do you have any reason to believe that you did not receive the email?

A. I see that my name is included, so I have no reason to believe that I did not receive it.

Q. Ms. Sanchez writes, "Should the" -- excuse me.

Ms. Sanchez writes, "Should the administration follow suit with an EO similar to USIP and IMLS for CPB, what do we believe and

Page 60

defend are our statutory requirements?"

Do you see that?

A. I do.

Q. What does "EO" stand for?

A. Executive order.

Q. And what does "USIP" stand for?

A. United States Institutes of Peace.

Q. What does "IMLS" stand for in this exhibit?

A. Museum of Library Sciences, and I'm not sure about the "I."

Q. Do you remember an executive order issuing in or around March or April of 2025 related to the United States Institute for Peace?

A. Broadly, I recall that there was an executive order. But what is more prevalent in my head is the DOGE physical altercation on USIP's headquarters.

Q. Ms. Sanchez writes in the last sentence of the email -- the second email in Exhibit 3, "I heard from a colleague last night that an EO on CPB may only target" PP -- "PBS and NPR funding."

Do you see that?

A. I do.

Page 61

Q. Were you aware on or about April 2nd, 2025, of a potential executive order on CPB?

A. Can you repeat the question?

Q. Were you aware on or about April 2nd, 2025, of a potential executive order on CPB?

A. I was aware of many rumors from multiple people. I have no idea if an EO was going to come, what the substance of an EO might be. All of the national organizations were speculative. I remember NPR sharing a similar rumor at a time. I remember PBS sharing a similar rumor about it -- about something like this.

Q. What role did Pat Harrison have at CPB on April 2nd, 2025?

A. She was the CEO and president.

Q. And was Michael Levy the COO at this time in April of 2025?

A. I don't recall.

Q. He was either -- Mr. Levy was either the former COO or the current COO --

A. Correct.

Q. -- in April --

Would you believe that an email indicating that Ms. Sanchez hearing from a colleague that an executive order on CPB may

16 (Pages 58 - 61)

Page 62

issue and may target PBS and NPR funding being forwarded to the CEO and President of CPB, as well as the either former or current chief operating officer, suggests that the Corporation was taking that possibility seriously?

MR. LIPCHITZ: Objection.

THE WITNESS: Like I said, we had heard a lot of rumors from NPR, PBS -- I believe -- yeah, I don't know who that is, but we had heard this all over the place. And so we took stock of it, like, "Oh, this is another one." But we were concerned about Congress. I mean, that's how CPB operates, with federal funding. That's how CPB carries out its statutory mission to support the entire system.

BY MR. DORE:

Q. When Deb Sanchez writes in the top email on April 2nd, 2025 in Exhibit 3, "I also heard from Dave that his lobbyist heard an EO might target NPR and PBS through CPB," do you have an understanding as to who "Dave" is in reference to?

A. I -- I don't know.

Q. Do you agree that Ms. Sanchez forwarding her own note about having heard of a possible

Page 63

executive order that would target PBS and NPR funding to the CEO and President of CPB, as well as the either former or then-current chief operating officer, suggests that Ms. Sanchez believed that this particular possibility of an executive order targeting that funding was more than pure conjecture?

MR. LIPCHITZ: Objection. Speculation.

THE WITNESS: Yeah. I -- I -- I --

BY MR. DORE:

Q. Did every rumor get sent to the President and CEO of Corporation for Public Broadcasting regarding an executive order?

A. I -- I don't recall if every one did. But, for example, when Marta shared a rumor, I shared it with Pat.

Q. Do you remember any response from -- strike that.

Do you remember any discussion in early April 2025 regarding a potential executive order that would target, among other things, NPR funding discussed at the executive level?

A. I don't recall. I -- I -- I recall many different rumors of an executive order. So we had no idea what it would end up being, if it

Page 64

ever happened. And our focus, like it always is, is on Congress ensuring we receive the federal appropriation so we can actually do the mission Congress assigned to us.

Q. Was there any focus, from your perspective, on trying to ensure that an executive order would have the least damaging impact on CPB as possible?

A. No.

MR. DORE: Could we have 8, please?

(Barsoum Exhibit No. 4, a document bearing Bates-stamp CPB_0206260 through 261, was introduced.)

THE WITNESS: Thank you.

MR. LIPCHITZ: This is 4?

THE REPORTER: Yes.

THE WITNESS: (Reviews document.)

BY MR. DORE:

Q. Mr. Barsoum, I've placed in front of you what's been marked as Exhibit Number 4, bearing Bates number CPB_0206260 through 261, the top email from you dated April 2nd, 2025.

Did you send and receive the emails reflected in Exhibit 4?

A. I believe so.

Page 65

Q. Looking at the second page, is it accurate to say that on April 1st, 2025, Peter Hoy put you in touch with Olivia Ingrassia at OMB via email?

A. Yes.

Q. And Olivia Ingrassia at that time in April of 2025 was assisting OMB's Associate Director for Justice and Transportation Katie Sullivan?

A. I understood that to be the case.

Q. Prior to April 2025, had you ever met or spoken with Katie Sullivan?

A. No.

Q. So is it accurate to say on April -- strike that.

On April 1st, 2025, Olivia Ingrassia provided you with her phone number so that you and Ms. Ingrassia could speak, correct?

A. That's right.

Q. And you spoke with Ms. Ingrassia shortly after that on April 1st, 2025?

A. That's right.

Q. What did you -- strike that.

Can you please describe for me the discussion that you had with Ms. Ingrassia on

17 (Pages 62 - 65)

Page 66

that April 1st phone call?

A. Sure.

I remember calling Olivia to try to better understand her request, since her original email was so vague. And Olivia said that she and Katie Sullivan would like to meet with our -- one of our board members. And I remember asking, you know, can I help prepare any information that would make this more productive or, like, are there specific topics; and she didn't have any. I remember her being very green. And she was an intern.

Q. Were you aware that she was also a third-year law student at the New York University School of Law?

A. I wasn't aware at the time. But I -- I remember when we were walking into the meeting we, you know, just asked about her background and why she was in DC in her internship and all that stuff, and she may have mentioned it then.

Q. When you asked Ms. Ingrassia on that phone call on April 1st, 2025, for topics that would be discussed in the meeting and she didn't have any, did you strike -- did that strike you as odd?

Page 67

A. Not in the slightest.

Q. Okay. Was there anything else that was discussed in that April 1st phone call between you and Ms. Ingrassia, other than what you've just testified to?

A. No.

Q. After speaking with Ms. Ingrassia on April 1st, 2025, about the meeting that had been requested by OMB, what did you do next related to that potential meeting?

A. I -- I likely communicated with Pat Harrison that Olivia was requesting a board member to meet with them.

Q. Do you remember that conversation with Pat Harrison?

A. I don't. That's why I say I -- "I likely would have." I don't remember that conversation. But I assume that was my next step.

Q. Do you remember how a decision was arrived at for Ruby Calvert to be the board member that met with OMB?

A. I -- I do. Ruby was in town -- was in DC. She lives in Wyoming. And so she was in town. And so we thought if Ruby was here --

Page 68

she's our board chair and was available -- then she should go.

Q. Did you have any communications with Ms. Calvert about the requested meeting and the decision for her to be the person to go?

A. Sure. We wanted to make sure that she was indeed available. We informed Ms. Calvert that there was this request; that I didn't have additional background, but just asked if she was available.

Q. Did Ms. Calvert ask you any questions about what the meeting would cover?

A. She -- I can't remember, but that seems very logical.

Q. How was Ms. Calvert informed of the request for the meeting? Was it via telephone, in person, or some other way?

A. I don't recall.

Q. Have you ever e-mailed with Ms. Calvert directly?

A. I -- I don't -- by "directly," do you mean me to her with no one else on the email?

Q. I mean you to her, even if there are other people as well?

A. Yes.

Page 69

Q. You have?

A. Yes.

Q. What email address do you use and have you used to communicate with Ms. Calvert?

A. cbarsoum@cpb.org.

Q. And what email address have you used for Ms. Calvert in order to send emails to Ms. Calvert?

A. I don't have her email memorized.

Q. To your recollection, is it a personal email address, like a Gmail address or a Yahoo address or something to that effect?

A. I believe so.

Q. Have you ever sent or received text messages with Ms. Calvert?

A. I -- yes.

Q. How frequently have you sent text messages or received text messages involving Ms. Calvert?

A. Infrequently. I do remember that Ruby was scheduled to appear at a Senate democratic caucus meeting, and she had some scheduling delays. So I remember -- remember texting back and forth during those scheduling delays.

Q. Were those scheduling delays related to

18 (Pages 66 - 69)

Page 70

this anticipated April meeting with OMB or something else?

A. Something else entirely.

Q. Have you had other texting communications with Ms. Calvert separate and apart from those scheduling texts?

A. I don't recall, but I can't say that I haven't.

Q. Do you use text messaging in the course of your work to communicate with Kathy Merritt, for example?

A. Not typically. Kathy's not a texter.

Q. Have you done it? Have you, in fact, texted with Ms. Merritt, though, even if not frequently?

A. There has been a time where a text has been sent between Kathy Merritt and I.

Q. Are there any particular executives or board members that you text with more frequently than others?

A. I don't think so. I like to keep my communications in email. It's easier to find.

Q. Have you ever gotten unsolicited text messages from colleagues that you received, putting aside whether you yourself would have

Page 71

sent it via email in the first place?

MR. LIPCHITZ: Objection to the form.

THE WITNESS: Can I understand your question better?

BY MR. DORE:

Q. You like to keep your communications via email. Are there any colleagues who, notwithstanding that, have initiated text conversations with you?

A. I assume that I have received a text from someone that I work with.

Q. You said Ms. Merritt's not a texter. Is there anyone that you work with that you consider to be a texter?

A. Marta.

Q. Is there anyone at CPB that you consider to be a texter?

A. Not as much as Marta.

Q. Focus on the question. Is there anyone at CPB that you consider to be a texter?

MR. LIPCHITZ: Objection to the form.

BY MR. DORE:

Q. I'm not comparing to anyone else. I'm asking if you consider them to be a texter. Kathy Merritt you say is not a texter. Is there

Page 72

someone at CPB that you consider to be a texter?

MR. LIPCHITZ: Objection to the form as to what is "a texter."

THE WITNESS: Exactly.

MR. LIPCHITZ: But you can answer.

THE WITNESS: What is "a texter"?

BY MR. DORE:

Q. Well, you said Kathy Merritt's not one. So what is not a texter?

A. Not a texter is someone that does not text.

Q. Someone who texts -- a texter, then, I'm gonna define it as someone who texts. Who do you consider to be someone who texts with any frequency at OM -- at CPB?

A. Noelle Muha.

Q. If you pulled out your phone right now, would you be able to identify the people at CPB with whom you texted?

A. Noelle Muha would be.

Q. If you pulled out your phone right now, would you be able to identify people at CPB with whom you've texted?

A. I don't know. I mean, I don't think they'd be at the top of my --

Page 73

Q. Does your phone currently have text messages between you and Ruby Calvert?

A. No.

Q. Why not?

A. Because I said I don't remember frequently texting her. I remember the scheduling scenario.

Q. You testified that you have had text messages with Ruby Calvert, correct?

A. Yes.

Q. Are those text messages currently on your phone?

A. I have no way to know if -- I don't have my phone.

Q. Where's your phone?

MR. LIPCHITZ: I have it.

BY MR. DORE:

Q. Have you ever searched your phone to see if there were any text messages that would be responsive to document requests in this case?

A. No.

Q. Well, if you could look at Exhibit Number 4, please.

MR. LIPCHITZ: Hold on.

BY MR. DORE:

19 (Pages 70 - 73)

Page 74

Q. On April 2nd, 2025, Olivia Ingrassia asks you if 10 a.m. for a meeting the next day, April 3rd, would work for you. Do you see that?

A. Yes.

MR. LIPCHITZ: At an appropriate time in the next few minutes, I'm gonna take a break if you don't mind.

MR. DORE: I'm just going to finish this document.

MR. LIPCHITZ: Sure.

BY MR. DORE:

Q. When -- when was the first time you confirmed with Ms. Calvert that she would be the one attending the April 3rd meeting at OMB?

A. I don't recall the time, but given the date that this conversation says it was, --

Q. Mm-hmm.

A. -- I assume that it was within days.

Q. Was there any preparation undertaken in advance of the meeting on April 3rd with the board chair at CPB attending the meeting?

A. I -- I don't recall.

Q. Do you recall any talking points being prepared for Ms. Calvert in advance of the meeting with the Office of Management and Budget?

Page 75

A. I don't recall.

Q. Do you recall any research being done to determine who Olivia Ingrassia was?

A. I do recall Googling.

Q. And what did your research into Olivia Ingrassia reveal to you?

A. I found a Twitter, and not much else.

Q. Did you review Ms. Ingrassia's Twitter account?

A. I did.

Q. Did you draw any conclusions from your review of Ms. Ingrassia's Twitter account as to any strong feelings she may have politically?

A. Not from her Twitter.

Q. Did you use or otherwise rely on anything that you uncovered with respect to Ms. Ingrassia in terms of preparing for the meeting?

A. I -- I don't recall, like, any deep preparation --

Q. Okay.

A. -- of Olivia Ingrassia.

Q. How about for Katie Sullivan? What preparation, if any, did you undertake with respect to Ms. Sullivan?

Page 76

A. I remember doing a simple Google, and there was more information about Katie Sullivan present and posted online.

Q. Did you conclude anything based on your research of Ms. Sullivan about what you thought her approach to the meeting may be at OMB the next day?

A. I don't know that I deciphered any approach about -- that she would have towards the meeting, but I believe I uncovered that she was a former political appointee during the first Trump administration, I believe.

Q. Do you recall uncovering that she filmed multiple videos for the Project 2025 for the Heritage Foundation?

A. I -- did she?

Q. Do you recall whether you uncovered that Ms. Sullivan filmed multiple videos for the Project 2025 -- for Project 2025 by the Heritage Foundation?

A. I don't recall that.

Q. Okay. So other than Google searches of Olivia Ingrassia and Katie Sullivan, you don't recall any other preparation for the in-person meeting at the Office of Management and Budget

Page 77

with the board chair of the Corporation for Public Broadcasting; is that right?

A. Given the fact I didn't know that she was doing Project Veritas videos, I think that shows you I didn't know much or prepare enough for that meeting.

Q. Do you remember any discussions involving Ms. Calvert to address how to approach the in-person meeting at the Office of Management and Budget?

A. I remember talking to Ruby and just trying to explain, you know, the process: "We're going to go to the EEOB. You're gonna check your security -- they're going to check your security. We need your details for that. It's very run of the mill. We go in the EEOB. We sit down. We have a meeting" -- just, like, logistical things to familiarize ourself because I don't know if she's been to the EEOB before.

Q. Were there any substantive discussions about the meeting in advance of it with Ms. Calvert?

A. I don't recall. I -- I assume -- I mean, that's very likely, but I don't recall any meeting to sit down and review.

20 (Pages 74 - 77)

Page 78

Q. Where was -- where did the meeting take place?

A. The EEOB. Eisenhower Executive Office Building.

Q. And is that right next door to the White House?

A. Well, yeah.

Q. I'm from LA, so you tell me. Is -- the EEOB is right next door to the White House. Is it on the White House grounds?

A. It's not on the White House grounds itself. So on one side you have Treasury, and then it's separated. And on the other side it's separated, and you have EEOB, which is where the Office of Management and Budget largely sits. And then you have other federal agencies behind it.

Q. Okay.

How far away would you say OMB is from the White House?

A. The EEOB building is fairly close. Walking distance.

Q. Okay. So you are accompanying -- did anyone else from CPB attend that meeting, other than you and Ms. Calvert at OMB?

Page 79

A. Evan Slavitt.

Q. Anyone else other than you, Ms. Calvert and Evan Slavitt?

A. From CPB, no.

Q. Okay. So in advance of a meeting with the board chair of the Corporation for Public Broadcasting and the general counsel for the Corporation for Public Broadcasting, in the shadow of the White House at OMB, you don't remember any substantive preparation for that meeting?

MR. LIPCHITZ: Objection to the form. You can answer.

BY MR. DORE:

Q. Is that right?

A. You're making me look bad here.

Q. Is it correct?

A. I don't recall any substantive preparation for a meeting with the Associate Director of Transportation and Justice.

Q. The only in-person meeting you've had with OMB regarding public media in your entire career; is that right?

A. That's right.

MR. DORE: Okay. All right. Let's take

Page 80

a break.

MR. LIPCHITZ: Just before we go off the record, as to your question whether he did a review as against the document request to look for text messages, that answer is accurate. However, you should know that I have asked him to review his text messages with -- in light of a emails that Katie Townsend made in a supplemental production of text messages between Mr. Bodre [phonetic] that were previously undisclosed, and Kathy Merritt, I've asked both Kathy and Clayton to go back to look for text messages that relate to NPR, the -- this board -- this meeting, or interconnection in any way, shape or form, even if it's just checking in, "have you heard anything?" messages.

Those were called back and produced to you yesterday, I believe.

So you have those.

MR. DORE: My understanding of the testimony that you said was accurate was that the witness said he did not search his text messages for documents?

MR. LIPCHITZ: Responsive to document requests, is how you formulated it.

Page 81

MR. DORE: I see.

So you have since a unspecified time asked him to search his phone for what?

MR. LIPCHITZ: For text messages with anybody from NPR or with anybody relating to NPR.

MR. DORE: What about with respect to -- so, exclusively, either with NPR or with a non-NPR person about NPR?

MR. LIPCHITZ: About NPR or --

MR. DORE: Nothing else?

MR. LIPCHITZ: -- or interconnection or this meeting or anything having to do with the results of this lawsuit.

MR. DORE: So it would be with respect -- I just -- the -- anything else? So just I want to get the list of okay, like, look through your phone for "blank." I just want to be clear since we're doing this on the record what exactly he was asked and when to search for. I'm not saying he did anything wrong. I just want, since we're talking about it on the record, for you to say exactly what it is.

MR. LIPCHITZ: Any communications with NPR about the issues of this lawsuit, right, interconnection, the meetings, anything like

21 (Pages 78 - 81)

Page 82

that, to communications, text messages about NPR with anybody else, or interconnection, and any text messages that may relate to -- in any way to the OMB meeting.

So anything that he had and that Kathy Merritt had had, those were produced to you.

MR. DORE: And those were produced to us when?

MR. LIPCHITZ: I believe yesterday, and they were all nonsubstantive text messages.

MR. DORE: Okay. We can go off the record.

THE VIDEOGRAPHER: Time is 11:36 a.m. This ends Unit 2. We're off the record.

(Recess taken.)

THE VIDEOGRAPHER: The time is 11:44 a.m. This begins Unit Number 3. We're on the record.

BY MR. DORE:

Q. Mr. Barsoum, did anyone at OMB indicate to you one way or another who they wanted from CPB -- I'm sorry -- yeah, from CPB to attend the meeting?

A. I believe, yes, Olivia indicated that they wanted a board member to attend the meeting.

Page 83

Q. Did Ms. Ingrassia provide any further color as to who they wanted to attend the meeting beyond saying it would be a board member?

A. Not that I recall.

Q. Were there any other reasons other than Ms. Calvert being in Washington, DC, for her being the choice to attend the OMB meeting?

A. The fact that she was our board chair.

Q. What was it about the fact that Ms. Calvert was the board chair that impacted the decision for her to be the one to attend the meeting?

A. The fact that she was our board chair and in DC, combined, made us think that she should go. I don't --

Q. Did you think that providing the board chair as opposed to another -- a different board member that was not the board chair would suggest CPB was taking the meeting more seriously?

MR. LIPCHITZ: Objection.

THE WITNESS: No.

BY MR. DORE:

Q. Then what is it about the fact that Ms. Calvert was the board chair that made it more likely for her to be the attendee at the meeting

Page 84

as opposed to a different board member?

A. I -- I -- I don't know.

Q. Did you, Mr. Slavitt and Ms. Calvert arrive at the April 3rd, 2025, meeting at OMB together?

A. Yes.

Q. Did you attend the full meeting with OMB?

A. Yes.

Q. So you did not miss any part of the meeting between OMB and Ms. Calvert, for example?

A. No. We were all in the meeting.

Q. Were there any discussions that you're aware of between OMB and Ms. Calvert that you were not privy to?

A. Can you repeat the question?

Q. Were there any discussions between OMB and Ms. Calvert that you were not privy to?

MR. LIPCHITZ: At -- at the meeting?

BY MR. DORE:

Q. Let's start with at the meeting on April 3rd?

A. No.

Q. To your knowledge, has Ms. Calvert had any communications with anyone from OMB that you

Page 85

were not privy to?

A. No.

Q. So is it accurate that you, Ms. Calvert and Mr. Slavitt arrive at OMB at the same time on April 3rd, 2025, for the meeting?

A. That's right.

Q. And when you arrive, what happens next?

A. When we arrived, we passed through the security process. There was some difficulty getting through the security process I remember. That took an extra couple minutes.

Once passing through security, we entered the building and Olivia Ingrassia escorted us to the room where Katie Sullivan, I believe, was already there. And we had the meeting.

Q. When there was difficulty passing through security, did -- who had the difficulty? Anyone in particular?

A. I believe it was Ruby and myself, if I remember correctly.

Q. But did all three of the CPB representatives wait until all three were through?

A. Yes.

22 (Pages 82 - 85)

Page 86

Q.   So you, Mr. Slavitt and Ms. Calvert arrive in the room to meet with Ms. Sullivan at OMB.  Who else, other than you, Ms. Calvert, Mr. Slavitt and Ms. Sullivan, if anyone, participated in that meeting?

A.   Olivia Ingrassia.

Q.   Is there anyone other than Olivia Ingrassia, in addition to Ms. Sullivan, you, Ms. Calvert and Mr. Slavitt who took part in that April 3rd meeting at OMB?

A.   No.

Q.   Was Ms. Ingrassia present at the meeting on April 3rd, 2025, for the entire meeting?

A.   Yes.

Q.   Tell me everything that you can remember about that meeting.

A.   I remember it was a very introductory-level conversation.  I remember both Olivia and Katie were not knowledgeable/ignorant of how the public media system operates, and I have had many meetings like that, and carried over the same type of information to discuss to educate on that basic level -- things like CPB's statute that guides our mission, the Public Broadcasting Act, how CPB is guided in

Page 87

distributing its funding, the independence of CPB; in other words, its status as a nonprofit entity completely free from any government interference; the independence of PBS, NPR, American Public Media, PRX, stations, producers, distributors -- outlining the very basics of the system.

Q.   Is there anything else that you can remember from the discussion with Katie Sullivan and Olivia Ingrassia at the OMB meeting on April 3rd, 2025?

A.   Not that I can recall.

Q.   Do you recall anything that Ms. Sullivan said in that meeting with OMB on April 3rd, 2025?

A.   Yes.  I remember very early on thinking that Ms. Sullivan had no clue what public media was -- in other words, who was involved, who did what, what roles each person had.  Very basics.

Q.   What did Ms. Sullivan say that indicated to you that she had no clue what public media was?

A.   I think -- I -- I can't recall.

Q.   Can you recall anything that Ms. Sullivan said in the con -- in that meeting -- strike that.

Page 88

Do you recall anything that Ms. Sullivan said in the April 3rd meeting at OMB?

A.   I remember reviewing our statutory federal funding formula, as I often do in introductory meetings, and Katie saying, "Well, I don't -- I didn't know that's how the funding works."

Like, when I say "70 percent of our funding goes to stations, stations are completely independent," she said something to the effect of, I -- "I did not know that's how your funding was allocated."

Q.   Do you remember Ms. Sullivan saying anything other than that she did not know how the funding worked?

A.   I'm not recalling at this time.

Q.   Do you recall Ms. Ingrassia saying anything during the meeting?

A.   I remember when reviewing the statutory federal funding formula that Olivia Ingrassia asked me to repeat several -- several parts of the federal funding formula.  And then I remember Katie Sullivan asking for us to send it to them -- send the statutory federal funding formula to both Katie and Olivia after the meeting.

Page 89

Q.   Do you remember Ms. Ingrassia saying anything other than asking you to repeat several parts of the funding formula?

A.   I don't.

Q.   How long was the meeting?

A.   Approximately 45 minutes.

Q.   So just to be clear, at the approximately 45-minute meeting at OMB, including you, Mr. Slavitt, Ms. Calvert, Katie Sullivan and Olivia Ingrassia, what you can remember being articulated by Ms. Sullivan and Ms. Ingrassia is limited to an expression by Ms. Sullivan that she did not know the -- she did not know that that was how the funding work, Ms. Ingrassia asking you to repeat several parts of the funding formula, and Ms. Sullivan asking you to send the statutory funding to OMB; is that right?

MR. LIPCHITZ:  Ob -- objection.  Asked and answered.  He also previously testified --

MR. DORE:  You don't -- stop.  Stop. Stop.  Stop.

MR. LIPCHITZ:  You're -- you're --

MR. DORE:  You shouldn't do it.  You know you shouldn't done it.  Don't do it.  You make the objection.  That's it.

23 (Pages 86 - 89)

Page 90

MR. LIPCHITZ: I'm making --

You're con --

MR. DORE: Don't do it. Don't speak. Don't give a whole speech.

MR. LIPCHITZ: I'm making my objection.

MR. DORE: You are do -- you are breaking the rules. This is wholly improper. If -- you should stop. You know you should stop.

MR. LIPCHITZ: I'm making my objection.

MR. DORE: And your objection should be to form, or, if I ask you, tell me what it is, which you wouldn't do. But you're gonna give a speech, and you should not give speeches.

MR. LIPCHITZ: I just literally objected to your question.

MR. DORE: Are you done? Are you done?

MR. LIPCHITZ: Ask your question.

I would like you to be done, but go ahead. Ask --

MR. DORE: Are you done with your objection?

MR. LIPCHITZ: Objection is noted. Ask the question.

MR. DORE: Can you repeat the question?

THE REPORTER: Sure.

Page 91

(Referred-to testimony read back.)

THE WITNESS: I had something coming in my head before the tussle.

I remember there was a question about who -- who are these stations; who are public media stations?

BY MR. DORE:

Q. Was that the extent of the question: "Who are public media stations"?

A. It's very vague, right? And I believe that was the extent of the question.

Q. Who asked the question?

A. Katie Sullivan.

Q. Did you provide an answer -- I withdraw that.

Do you recall anyone from CPB providing an answer to Ms. Sullivan's question about who are public media stations?

A. Yes.

Q. Who provided the answer?

A. I don't recall who provided it, but an answer was provided.

Q. Do you recall what the answer was?

A. The general response was that public media stations are independent nonprofits who

Page 92

hold a noncommercial educational license from the FCC.

Q. Do you remember there being any more information provided in response to Ms. Sullivan's question about who are public media stations other than what you just described?

A. I don't.

Q. Can you recall any other statements or questions by Ms. Sullivan or Ms. Ingrassia and the meet -- at the meeting with OMB on April 3rd, 2025, other than what you've testified to?

A. I remember Katie Sullivan saying that she -- that the administration did not believe in funding for public media.

Q. Did Ms. Sullivan use the words "public media" specifically?

A. Yes.

Q. Was there any response from anyone at CPB to Ms. Sullivan's statement that the administration did not believe in funding, quote, public media, unquote?

A. Yes. I don't recall who gave a response. I know that I added to the response, if someone else responded as well.

Page 93

Q. Do you recall what the response was?

A. Yes. I talked about the market failures that public media works to address; and it receives federal funding to address the market failures in a lack of informational and educational resources provided to all Americans, free of charge and commercial free.

Q. Do you remember any other information being provided in response to Ms. Sullivan's assertion that the administration did not believe in funding public media?

A. No.

Q. Other than Ms. Sullivan saying that she did not know that that was how funding works, Olivia Ingrassia asking you to repeat several parts of the funding formula, Ms. Sullivan asking CPB to send the statutory funding to OMB, Ms. Sullivan's question about who are public media stations, and Ms. Sullivan's assertion that the administration did not believe in funding, quote, public media, unquote, do you recall any other statements, questions, declarations or assertions by OMB at that meeting on April 3rd, 2025?

A. Not that I recall.

24 (Pages 90 - 93)

Page 94

Q. Do you recall Ms. Calvert saying anything at the meeting with OMB on April 3rd, 2025?

A. I don't recall anything specific.

Q. Generally speaking, do you remember anything that Ms. Calvert said at the April 3rd, 2025, meeting?

A. I do remember Ruby Calvert sharing her past experience as a general manager of a local public media station.

Q. Is there anything you remember about what Ms. Calvert said concerning that experience as the general manager of a local public media station?

A. In our introductions, you know, you go around the room and introduce yourself and how long you've been at the organization. Obviously, Ruby shared that she was CPB's board chair but had been involved in public media for a long time and was the former general manager of a local station.

Q. Is there anything else you can remember about what Ms. Calvert said?

A. She expressed how critical CPB funding was for local stations, especially those serving

Page 95

rural communities, like hers in Wyoming. She expressed the independent nature of the system and, from a station perspective, that they uniquely tried to serve their community.

Q. Is there anything else you can remember that Ms. Calvert said during the April 3rd, 2025, meeting at OMB?

A. No.

Q. Can you recall anything that Mr. Slavitt said at the April 3rd, 2025, meeting with OMB?

A. Evan gave an overview of CPB as an organization and related that to the Act, the Public Broadcasting Act; so, Evan spoke to how CPB was a private nonprofit, fully funded by the government but independent of any government control.

Q. Do you recall any response to Mr. Slavitt when he made that statement?

A. I don't recall any response to that.

Q. Do you recall Mr. Slavitt saying anything else at the April 3rd, 2025, meeting at OMB, other than the overview of CPB as an organization that you just described?

A. As it relates to public media?

Q. Period. And just to back up, like, I

Page 96

want --

A. Oh.

Q. -- everything --

A. Yeah.

Q. -- that you remember about this meeting. So if -- if there's something else that someone said, you know, I want to -- I want to get it. So, you know -- so with that clarification, is there anything else you can recall Mr. Slavitt saying at the meeting?

A. I recall Evan asking Katie Sullivan about her work history.

Q. Okay. Do you remember any more about what Mr. Slavitt asked?

A. I don't know if -- I think Evan -- Evan expressed that he served as a judge previously. And I believe he said that in relation to Katie Sullivan's tenure at DOJ. He said, "I know you have a past history and" --

Q. Okay. Is there anything else that you can remember being said by any of the participants in the April 3rd, 2025, meeting at OMB other than what you've already testified to today?

A. I don't recall.

Page 97

Q. It's accurate to say you don't recall anything else?

A. I don't recall anything else.

Q. Okay. How did the meeting conclude?

A. It -- I don't remember the issue that we ended on. But I remember we all stood up, and Olivia escorted us all out of the building. And Katie left in a different direction; like, stayed on the second floor and walked off in a different direction.

Q. Was there any statement to the effect of "We'll talk again," or, "We'll never talk again," some reference to a future event, or lack thereof, coming out of the meeting?

A. No. I believe -- yes, I said, "If you have any questions, or further questions, you have our contact information."

Q. Was there any response to that that you remember?

A. I -- I don't remember.

Q. After Ms. Ingrassia walks you out -- after Ms. Ingrassia walks you out of the OMB meeting -- OMB offices where the meeting took place, what happened then, as between you, Ms. Calvert and Mr. Slavitt?

25 (Pages 94 - 97)

Page 98

A. All three of us walked towards the front gate, a -- a different exit than the one we entered; and walked west, exiting the OMB and EEOB complex, and hailed an Uber -- all three of us together -- back to CPB, I think. Yes.

Q. Did any combination of you, Mr. Slavitt and Ms. Calvert, either together or in pairs, discuss what had just transpired at the meeting at OMB?

A. When we arrived back at CPB, all three of us, together, discussed what had just happened.

Q. Did anyone join that discussion?

A. I don't recall.

Q. What do you recall about the discussion -- well, strike that.

Who participated in that discussion when you got back to CPB after the meeting at OMB?

A. As far as I remember, it was myself, Evan Slavitt and Ruby Calvert.

Q. What do you remember about that discussion upon arriving back at CPB after the OMB meeting on April 3rd?

A. I remember all of us coming to the same conclusion of, "This person has no idea what

Page 99

public media is, who we are, what we do." So for an introductory-level conversation, we thought that we provided a decent amount of information. We also shared, I think, the opinion that Katie was not inquisitive about public media.

Q. Is there anything else you can remember being discussed amongst you, Ms. Calvert and Mr. Slavitt upon returning to CPB after that meeting at OMB on April 3rd, 2025?

A. We discussed a follow-up, as requested by Katie Sullivan.

Q. Was there a takeaway from that discussion of the follow-up?

A. The takeaway is that we would send a -- a PDF that's in existence -- or was already in existence, of our statutory federal funding formula that I share, typically, with every Congressional office I meet with. So I -- I shared with the -- the two others present that that was already available, and so it would be easy to share.

Q. Was there discussion of sharing anything else with CPB other than sending them the statutory federal funding formula?

MR. LIPCHITZ: You mean OMB.

Page 100

MR. DORE: I do.

BY MR. DORE:

Q. Was there any -- was there a discussion at CPB, when you arrived after the meeting at OMB, of providing anything else to OMB, other than the statutory federal funding formula?

A. Yes. We said we would send a thank you and the statutory federal funding formula.

Q. Did the three of you -- Mr. Slavitt, Ms. Calvert and yourself -- resolve to send anything else to OMB, other than the thank you and the federal funding formula?

A. No.

Q. To your knowledge, was information about the meeting that you, Ms. Calvert and Mr. Slavitt had at OMB on April 3rd, 2025, shared with other board members or executives at CPB, to read them into what had happened at the meeting?

MR. LIPCHITZ: Objection to form.

THE WITNESS: I -- I don't recall. I don't recall.

BY MR. DORE:

Q. Do you recall any communications with anyone, outside of Ms. Calvert, Mr. Slavitt and yourself, reporting on what had happened at the

Page 101

meeting with OMB?

A. I -- I don't recall specific conversation.

Q. Do you recall there being any write-up of what had happened at the meeting at OMB?

A. I don't recall a write-up.

Q. So sitting here today in October of 2025, you don't have personal knowledge one way or another of any information describing what had happened at the OMB meeting being shared with anyone who didn't participate in that meeting?

MR. LIPCHITZ: Objection.

THE WITNESS: I don't recall the specific way it was shared.

BY MR. DORE:

Q. Do you know that information about the meeting was, in fact, shared with others at CPB who did not participate in the OMB meeting?

A. Yes.

Q. How was information about the OMB meeting shared with the nonparticipants at CPB?

A. That's what I don't recall.

Q. Okay. So you recall that information about the meeting was, in fact, shared, but you're not sure how; is that right?

26 (Pages 98 - 101)

Page 102

A.  Yes.

Q.  And you recall that information was shared, but you're not sure what information was shared about the OMB meeting.  Is that accurate?

MR. LIPCHITZ:  Objection.

THE WITNESS:  I recall that information was shared, because to this day, you knew about it, you know about it.  I assume folks at CPB know about it.  I don't recall how it was shared, or what specific information was shared.

BY MR. DORE:

Q.  Okay.  Since the meeting took place on April 3rd, from April 3rd through today, have you had any separate conversations with anyone at CPB about the meeting?

MR. LIPCHITZ:  Well, I'll instruct you, to the extent that you had communications with counsel about the meeting and what had occurred, you can't get into those.  But as to anybody else, you can certainly answer the question.

THE WITNESS:  I don't recall.

BY MR. DORE:

Q.  Do you recall ever personally preparing notes of what was discussed at the OMB meeting on April 3rd?

Page 103

A.  I don't recall that.

Q.  Do you recall ever reviewing notes about what had transpired at the April 3rd meeting at OMB?

A.  I don't recall that.

Q.  Do you recall ever reviewing any description of what was discussed at the April 3rd, 2025, meeting at OMB?

A.  No.

Q.  Do you recall -- let's see -- could you take out Exhibit 3, please, in your stack?

Do you agree that on April 2nd, you are sent an email indicating that there are at least rumors of an executive order on CPB?

MR. LIPCHITZ:  Objection.  Asked and answered.

THE WITNESS:  Is your question that on April 2nd was I aware that there were rumors of an EO?

BY MR. DORE:

Q.  That would target the Corporation for Public Broadcasting?

A.  Well, we didn't know who they would target.  There were many different rumors about who or what or when the O -- EO would happen/not

Page 104

happen, target/not target.

Q.  As of April 2nd, 2025, were you aware of concerns at CPB about any potential executive order that could affect CPB?

A.  I don't recall, specifically, if we were concerned about an executive order targeting CPB.  I know that we were concerned about federal funding for CPB, given that it's April and that's near appropriations season.

Q.  So on -- on April 2nd -- and did -- in your experience, did CPB have those concerns about federal funding for CPB as of April 2nd?

A.  Yes.  We have them every year.  We're a hundred percent fully federally funded.

Q.  So on April 2nd, there are emails being exchanged regarding executive orders that would target public media funding in one way or another.  The next day you go to the Office of Management and Budget and meet with someone that you believe has no idea who you are and what you do at CPB.  Did that cause you any concern?

A.  No.  No.

Q.  So you -- you had no concern when you met with Katie Sullivan with your board chair at the Office of Management and Budget, and she is

Page 105

not inquisitive about public media and, in your view, had no idea what you do, in this climate of potential executive orders and public statements related to public media that are critical?

MR. LIPCHITZ:  Objection to the prolix.  You can answer.

THE WITNESS:  I don't know if you know, but there's a special office in the White House that's in charge of writing executive orders that is in no way related to OMB.

We had this request for a meeting with OMB and looked at it as an opportunity to educate.  We were concerned about federal funding for an organization that's a hundred percent funded by the federal government, given that we were nearing appropriations season.

BY MR. DORE:

Q.  So your testimony is that your belief is that the office in the White House that writes executive orders is in no way related to the Office of Management and Budget?

A.  To my knowledge, yes.

Q.  Is it your belief that OMB would not act in a way that would be consistent with the President's policies?

27 (Pages 102 - 105)

Page 106

A. OMB executes on budgetary issues. I don't know to the extent that they would assist any EOs.

Q. Is it accurate to say that your testimony is that you saw no connection at all between the meeting at the Office of Management and Budget and the prospect of a potential executive order related to public media funding?

A. Correct.

Q. Why did you think that OMB was reaching out seeking a meeting with a board member of the Corporation for Public Broadcasting in person?

MR. LIPCHITZ: Objection. Asked and answered.

THE WITNESS: I -- I have no idea. That's why I asked for more information. The only information I received is in the email from Peter Hoy that says "funding."

BY MR. DORE:

Q. And you gave -- you -- are you aware of anyone at CPB who saw any potential connection whatsoever between OMB reaching out seeking an in-person meeting with a board member and the possibility of an executive order targeting public media funding?

Page 107

A. Not to my knowledge.

MR. DORE: Okay. Could we go off the record, please?

THE VIDEOGRAPHER: The time is 12:29 p.m. This ends Unit 3. We're off the record.

(Lunch recess.)

THE VIDEOGRAPHER: The time is 1:26 p.m. This begins Unit Number 4. We're on the record.

BY MR. DORE:

Q. Mr. Barsoum, we just took our lunch break, correct?

A. That is correct.

Q. Was there anything over the lunch break -- yes or no, please.

Was there anything over the lunch break that refreshed your recollection as to anything having to do with the April 3rd, 2025, meeting at OMB?

A. No.

Q. Okay. Are you familiar with an organization who's acronym is "NETA"?

A. Yes.

Q. What is NETA?

A. The National Educational

Page 108

Telecommunications Association.

Q. In the course of your work at CPB, have you had any direct dealings with anyone from the National Educational Telecommunications Association?

A. I don't recall.

Q. Do you know who heads the NETA today?

A. I don't recall his name.

Q. Are you familiar with an organization that goes by "APTS"?

A. Yes.

Q. What is APTS?

A. APTS is America's Public Television Stations.

Q. In the course of your work at CPB, have you had any direct engagement with anyone from America's Public television stations?

A. Yes.

Q. Who have you had direct engagement with in your role at CPB?

A. Jennifer Kylie, Stacey Karp, Colleen -- I'm sorry. I forget the last name. Kate Riley.

Q. Are any of the people that you just identified the CEO of APTS?

Page 109

A. The current CEO is Kate Riley.

Q. Do you know, generally speaking, how long Kate Riley has been the CEO of APTS?

A. Around February of 2025, I believe she transitioned into her new role.

Q. What is APTS?

A. AP -- APTS is a trade association for public television stations. They work with PBS, local public television stations, NPR and CPB, to support the federal appropriation for public media.

Q. Is it accurate to say that NETA is separate and apart from CPB?

A. Correct.

Q. Is it accurate to say that APTS is separate and apart from CPB?

A. That is correct.

Q. Okay.

MR. DORE: Could I have Tab 28, please?

(Barsoum Exhibit No. 5, a document bearing Bates stamp CPB_0143803 through Bates stamp CPB_0143808, was introduced.)

THE REPORTER: That's Exhibit 5.

MR. LIPCHITZ: Oh. Both things?

MR. DORE: One is the cover email and

28 (Pages 106 - 109)

Page 110

one is the attachment, so it should just be one exhibit collectively.

THE WITNESS: (Reviews document.)

BY MR. DORE:

Q. Okay. Mr. Barsoum, I've placed in front of you what's been marked as Exhibit 5. It's an email and attachment bearing Bates Number CPB_0143803 through 3808, with the top email dated April 20, 2025. Do you recognize these emails and attachment marked as Exhibit 5?

A. I don't remember these. These don't look familiar. But I see that I am e-mailed -- or, my email is included.

Q. In the email from Teresa Safon on April 20, 2025, to Pat Harrison, copying Deb Sanchez and yourself with the subject "Remarks for chair and pres." The first sentence says, "Here are some draft remarks for the board meeting for your review. Clayton and Deb have reviewed them." Do you see that?

A. I do.

Q. You reviewed the draft remarks that are attached to Exhibit 5; is that correct?

A. I do not recall reviewing the document attached, but I do see that Teresa has said.

Page 111

"Clayton and Deb have reviewed them."

Q. Do you have any reason to doubt that you, in fact, reviewed the remarks that are attached as part of Exhibit 5?

A. I do. Because -- I do not remember Pat Butler speaking at a board meeting. I do recall Kate Riley speaking at a board meeting.

Q. These are draft remarks in advance of an April 21st meeting, correct?

A. It looks to be presented as such.

Q. And so do you have a reason to believe that you did not review the remarks that are attached to the April 20th, 2025, email from Teresa Safon?

A. I do recall at some point providing a timeline of events, such as, you know, the -- the President was inaugurated on this day, a DOGE hearing on the -- happened on this day, a rescissions bill was transmitted from the executive to the legislative branch.

But some of this language -- this doesn't look familiar, and some of this language I would never say. So, for example, on Page 2 of the attachment, "undeserving of federal support," I don't know if I would have characterized

Page 112

Marjorie Taylor Greene's hearing with that being the most prominent characteristic to describe it.

Q. Well, I want to be clear --

A. It just looks unfamiliar.

Q. I understand. I want to be clear, though, sir. I'm asking if you've reviewed it. If you have any reason to believe you didn't review it, not whether you wrote it. Do you understand?

A. I do.

Q. Okay. So --

A. So when I review something and it has mentions of Congress, I am very particular about what language is used.

Q. Well, you see that you are a recipient on the email from Ms. Safon saying that you had reviewed the attachment, correct?

A. I do see that.

Q. Do you remember ever responding to Ms. Safon saying, "No, I didn't"?

A. I do not, any more than I can recall this email.

Q. And with the subject line of "Remarks for chair and pres," you would have understood that to be remarks for Pat Harrison, the chair

Page 113

and president of the organization you work for, correct?

A. No.

Q. No. Who would "Remarks for chair and pres" been in reference to in your view?

A. Remarks for "pres" would be Patricia Harrison, our CEO and president.

Q. Mm-hmm.

A. Remarks for the "chair" would be Ruby Calvert.

Q. Even better.

So if you got an email saying, hey, these are remarks for the chair of the board of the organization that you work for, as well as the president of the organization you work for, you probably would have responded if you believed that they inaccurately reflect -- reflected something, correct?

A. I often do not get involved with the remarks of the chair, since there's a separate corporate secretary listed here as Debra Sanchez.

Q. What about when the remarks of the chair relate to the meeting at the OMB that you attended in person on April 3rd, 2025?

A. And that is exactly why I am surprised

29 (Pages 110 - 113)

Page 114

to see some of this language.

Q. Did you attend an April 21st, 2025, board meeting?

A. I can't recall.

Q. Do you recall attending any board meeting where the April 3rd, 2025, meeting with OMB was discussed?

A. I can't recall a specific board meeting or discussion or topic that was specifically in regards to that meeting.

Q. Well, let's address it generally, then. Do you have any general recollection of attending a board meeting at CPB where the one and only in-person meeting with OMB regarding public media that you have ever attended in person in your life was discussed?

MR. LIPCHITZ: Objection to the form.

THE WITNESS: I don't recall specifically. The meeting at OMB discussed as a topic, which would be listed here, A, B, C, D, as topic issues, like we normally do.

Further, April 22nd was a busy time. I was the only government affairs representative for the Corporation as we were hearing rumors about a potential executive order: It might be

Page 115

today, it might be tomorrow, it might be this, it might be that.

There were -- there was a disastrous hearing in front of the DOGE subcommittee on house oversight that had not occurred previously. There was the President's request for close-out costs, $30 million for the Corporation that we knew to be coming any time soon, which would also kick-start the appropriations process. And, on top of all of that, I was trying to have proactive meetings with Congress to educate them in the swirl of all of this.

So there were many meetings where I may not have attended, could have attended, or could have attended part of it.

BY MR. DORE:

Q. Could you turn to the second page of the attachment to the email marked as Exhibit 5, and I'm on the page that has a Bates number ending in 806. Let me know when you're there, please.

Are you at the page ending in 806?

A. Yes.

Q. In the penultimate paragraph on that page, it begins by saying, "On March 31st, CPB was contacted by OMB with a request to meet with

Page 116

CPB leadership." Do you see that?

A. Yes.

Q. And that was a true statement, correct?

A. As we discussed, Olivia Ingrassia reached out through our press@cpb.org email.

Q. So that is a correct statement, is it not?

A. Olivia Ingrassia e-mailed press@cpb.org to request a meeting, yes.

Q. Now, on April 1st, CPB began to hear rumors that an executive order would be issued "shuttering CPB imminently." Do you see that?

A. Correct.

Q. Is that a correct statement?

A. As I said, we heard many rumors. Some involved CPB. Some involved PBS. Some involved NPR. Some involved the stations. We heard variations of each of those four. We heard different time that they could be announced: It's happening tomorrow. It's happening the next day. It's happening next week. All over the place.

Q. So as of early April, there were rumors about a potential executive order that could potentially shutter CPB imminently, that could

Page 117

target NPR and PBS funding or that could do something else, correct?

A. I do want to clarify a few things. While we may have heard these rumors, we took them with a grain of salt because there were so many, and so many of them we believed to be illegal.

Q. Do you consider that including a reference to rumors about an EO shuttering CPB imminently and remarks including the chairman of the board -- chairperson of the board and the president of the CPB as taking it with a grain of salt?

A. No. But our job is to communicate with the board, who has no interaction into these matters. I think it would be disclosing information from the board if we didn't share as much and as often as we heard these things.

Q. Why the reference to the rumor of shuttering CPB imminently on April 1st, as opposed to whatever other rumors there may have been?

A. That was the one of the day, I assume. There was a new one every day.

Q. Well, this isn't every day. This is

30 (Pages 114 - 117)

Page 118

April 21st, 2025. The media remarks documented an April 1st rumor, correct?

A. This is describing an April 1st rumor.

I think the board would like to know if there's a rumor targeting CPB maybe a little bit more than they wanted to hear a rumor about PBS, NPR stations. While that is alarming, they are members appointed by the President, confirmed by the Senate, to CPB's board specifically.

Q. And it's your perspective that CPB's board would want to take whatever steps they could in order to avoid an executive order that would shutter CPB imminently, correct?

MR. LIPCHITZ: Objection.

THE WITNESS: No. We believed that the President could not shutter CPB. That has always been our position: That we are a private nonprofit, created by Congress, funded by Congress.

BY MR. DORE:

Q. When you met with OMB on April 3rd, 2025, Katie Sullivan, in fact, stated to you, Ms. Calvert and Mr. Slavitt her intense dislike of NPR, correct?

A. As I said before lunch, Katie Sullivan

Page 119

expressed her disdain for all of public media, including PBS, NPR, CPB, the entire public media system.

Q. But before lunch you said, in quotes, "public media." And this page of these draft remarks, to go to the chairperson of the board and the president of CPB say that "Ms. Sullivan stated her intense dislike for NPR, but noted that it would be a shame to throw the baby out with the bathwater," correct?

A. I see that that's stated here. It's another reason why I am skeptical that I reviewed this.

Q. Did Ms. Sullivan not state her intense dislike for NPR, but also note that it would be a shame to throw the baby out with the bathwater in the April 3rd meeting at OMB?

A. I did not hear that.

Q. So do you believe this is an inaccurate statement in the draft remarks for the chairperson of the board and the president of CPB when it says, "Ms. Sullivan stated her intense dislike for NPR, but noted it would be a shame to throw the baby out with the bathwater"?

A. All I can say is I did not hear that. I

Page 120

heard disdain for all of public media, including PBS, including NPR, including CPB; and, as I said, a belief that public media should not be government-funded.

Q. So do you believe Ms. Sullivan never said that "it would be a shame to throw the baby out with the bathwater"?

A. I cannot speculate. I can tell you what I heard, which is not this -- what is written here, whatever you just said.

Q. You can see it on the page. "Ms. Sullivan stated her intense dislike for NPR, but noted that it would be a shame to throw the baby out with the bathwater."

A. I did not hear those words.

Q. Have you ever heard anyone at CPB use those words in reference to a meeting with OMB?

A. No.

Q. Have you ever heard those words, "throw the baby out with the bathwater," in the context of discussions with any office with any member of Congress?

A. No.

Q. So you don't think that CPB communicated with any office of any senator or congressperson

Page 121

that OMB had told CPB that it didn't want to throw the baby out with the bathwater?

A. Maybe. I -- I don't know. I just --

Q. Why do you say, "maybe"?

A. Specific members of Congress disliked specific things about public media. It's a vast decentralized, deaggregated system. And appealing to 350 million Americans -- and the respective 535 members of Congress -- I'm sure that different people like and dislike different things.

So someone's baby is the other person's bathwater? Too many different people, I could assume.

Q. Do you think it is possible -- well, strike that.

Do you have any reason to believe that anyone from CPB, yourself included, would have, in communications with the office of any senator or congressperson, have referred to OMB's dislike of NPR but OMB's representation that it didn't want to throw the baby out with the bathwater?

A. I -- I can't say yes or no. I don't recall.

Q. Have you ever had any meeting with

31 (Pages 118 - 121)

Page 122

anyone from Senator Collins's office?

A. Yes.

Q. Have you discussed NPR with anyone from Senator Collins's office?

A. I discussed the entire public media system, NPR included.

Q. And you understand that Senator Collins has a dislike for NPR in particular, correct?

A. Yes. She -- she does.

Q. But you don't recall having any discussion with Senator Collins about the possibility of harming NPR without harming CPB?

A. I have only spoken with Senator Collins twice. Once was a quick hello at a reception, and the other one was in a congressional meeting.

Q. Do you recall having any discussion with anyone from Senator Collins's office about the possibility of harming NPR without harming CPB?

A. I recall during the rescission asking if Senator Collins's staff would -- was looking into the possibility of removing CPB from the rescissions package or if they -- excuse me, or if they were looking at a negotiated position; in other words, some form of cut to CPB's funding that left as much available as possible for the

Page 123

entire system.

Q. You also had discussions with the offices of senators and congresspeople about preserving as much funding for CPB as you could while eliminating funding for NPR.

MR. LIPCHITZ: Objection.

THE WITNESS: NPR does not receive any funding from Congress. CPB is the steward and the only recipient of funding from Congress. Funding received by CPB from Congress flows and is guided through a statutory formula, nowhere in which is NPR mentioned.

BY MR. DORE:

Q. When the draft remarks attached to the email that are collectively marked as Exhibit 5 refer to Katie Sullivan's statement of her "intense dislike for NPR" and statement that "it would be a shame to throw the baby out with the bathwater," and then two paragraphs later says, "Concurrently with these events, we have been addressing how to handle the interconnection grant for public radio interconnection in a way that safeguards it for all public radio stations," that is in reference to try to arrive at a arrangement whereby NPR would be separated

Page 124

from receiving any funding related to PRSS in order for CPB to stay open, correct?

A. It's not correct.

Q. In April of 2025, OMB's budget officer for CPB requested information about CPB's fiscal year 2025 expenditures and specifically funding to PBS and NPR, correct?

A. That is correct.

Q. In the paragraph that begins, "I" want to -- "I also want to thank, Clayton, Deb, Kathy, Evan, and Daryl, is "Clayton" a reference to you?

A. It is.

Q. And when it refers to the "political minefield" at the end of that paragraph, do you believe that there was a political minefield in a in relation to these issues concerning funding?

A. As I stated, the President was going to suggest 30 million in close-out costs for CPB. There were more bills in Congress, House and Senate, seeking to defund CPB, defund PBS, defund NPR, a combination of those things. They had more cosponsors than ever before. There were rumors of DOGE invading CPB. There were rumors of an executive order. And we were a month away from appropriations season starting.

Page 125

So, yes, there were a lot of political issues weighing on my mind.

Q. And CPB wanted to do whatever it could to save itself, right?

MR. LIPCHITZ: Objection.

BY MR. DORE:

Q. You're smirking?

A. CPB sought to seek the federal appropriation. It's our number one goal and objective. That's public. To do that is paramount. There is no public media system as we know it today without CPB's appropriation, as we're currently seeing with the rescission of all of its funding, as stations are going off the air.

Q. You wanted to avoid that from happening, right?

A. We wanted to protect the public media system and as much funding for everything that we were doing, and we -- and the statute had guided us to do.

Q. And if that meant throwing NPR overboard, that's what you were going to do, right?

A. No, it doesn't. You should ask Marta.

32 (Pages 122 - 125)

Page 126

Q.  Was Marta in the meeting where Katie Sullivan stated her intense dislike for NPR?  She wasn't, right?

A.  She was informed.

Q.  Who informed her?

A.  Someone.

Q.  Informed her of --

A.  I can't remember who.

Q.  -- Katie Sullivan stating her intense dislike for NPR?

A.  I don't know about that.

Q.  Because you're saying that these draft remarks are false; is that right?

A.  What I am saying is what you are asserting is false.  CPB did not try to save itself while throwing someone under the bus.

NPR, PBS, APTS and CPB worked collaboratively to safeguard CPB's appropriation because we all knew that if there was no CPB appropriation, there is no national public media system.

NPR, PBS, APTS and CPB collaborated on that effort.

Q.  Did you notify NPR of the meeting that you were having at OMB with Katie Sullivan on

Page 127

April 3rd, 2025?

A.  I believe so.

Q.  How did you notify NPR of that meeting?

A.  I'd have to recall the day that the meeting happened -- on what day of the week.

Q.  It happened on a Friday.

A.  Thank you.

So then we, likely, told NPR, PBS, APTS, collectively on a Thursday call that we have had for years, have every week, and continue to have throughout the rescissions process, to update each other on our shared efforts to safeguard CPB's appropriation for the entire system.

Q.  Do you remember that call?

A.  I remember being on many calls.

Q.  Do you remember being on a call where NPR was informed of a meeting at OMB with Katie Sullivan?

A.  I don't remember what specific date or if I expressed it in that call.  I'm saying it is very likely that I brought it up on that call.

Q.  Do you remember any conversation or writing that you had where NPR was informed that you went to the Office of Management and Budget to discuss funding, period?  Not "likely."  Do

Page 128

you remember it?

A.  I remember a discussion with Marta. Because Marta is very collaborative, and she always asks if she can provide any materials to help educate on NPR and its role.  I'm very grateful for her collaborative spirit in that, although I remember that there were no topics, as we previously discussed, set out or shared with us, other than Peter Hoy's email where it says, funding -- "CPB funding."

So I didn't feel the need for any additional information.

Q.  So you remember talking to Marta about the upcoming meeting with CPB -- or, with OMB?

A.  Correct.

Q.  When was that?

A.  It would have been a day or two before the meeting.

Q.  So a day or two before the meeting it would have been, do you remember it?

A.  I know that I communicated it with Marta the same way I communicated it with PBS and APTS.

Q.  So your testimony under oath is that prior to the April 3rd meeting with OMB, you communicated to Marta, as well as PBS and APTS,

Page 129

that you had a meeting with OMB scheduled?

A.  Yes.

Q.  And you did that via telephone with all three of NPR, OMB -- or, I'm sorry.  You did that on telephone with all three of PBS, APTS and NPR?

MR. LIPCHITZ:  Objection.  Misstates his testimony.

You can answer.

THE WITNESS:  I did it over telephone. Yes, I did it over telephone.

BY MR. DORE:

Q.  Three separate calls or one call?

A.  I called Marta separately.  I called Bill separately, and I called Jen separately.

Q.  What do you remember about the phone call with Marta?  What exactly was stated?

A.  The very little information that was in the email, that I would be going; Evan would be going; a board member, Ruby Calvert, would be going.  Didn't really know the topics.  Didn't really know anything ahead of time.

Q.  What did Marta say in the phone call?

A.  Like I said, I remember her expressing to be a resource, if we needed anything ...

Q.  Are you done?

33 (Pages 126 - 129)

Page 130

A.  I am.

Q.  Who did you talk to at PBS to alert them to the fact that OMB had reached out for a meeting at OMB?

A.  Bill Weber.

Q.  When did you talk to Bill Weber?

A.  Because there's, like, two days in between here, I assume it's within those two days.

Q.  Who did you talk to at APTS about the upcoming meeting at OMB?

A.  Jen Kylie.

Q.  Do you remember any -- were you aware of any decision by the board with respect to a new agreement with NPR that was made on or around April 2nd, 2025?

A.  Can you repeat the question, please?

Q.  Were you aware of any decision by the CPB board with respect to a new agreement with NPR that was made on or around April 2nd, 2025?

MR. LIPCHITZ:  Objection to the form.

THE WITNESS:  The board does not make decisions on agreements.  They allow CPB to start the process of negotiating.  So I can't say that I agree with or understand your question.

Page 131

BY MR. DORE:

Q.  Were you aware of any resolution by the board on April 2nd, 2025, related to another agreement with NPR?

A.  I'm aware of a resolution around that time frame to allow CPB management to start the process of negotiations for the next round of interconnection funding.

Q.  Were you involved in any discussions with NPR related to the next round of interconnection funding?

A.  No.

Q.  Were you aware of any decision being made on or about April 4th, 2025, to change CPB's approach to any agreement with CPB regarding additional funding?

MR. LIPCHITZ:  Objection to the form.

THE WITNESS:  Yeah.

Can you repeat the question?

BY MR. DORE:

Q.  Sure.

Was there anything that happened on April 4th, 2025, that you're aware of related to interconnection funding at NPR at CPB?

A.  I don't recall --

Page 132

MR. LIPCHITZ:  Wait.

Objection to the form.

THE WITNESS:  I -- I don't recall specific date April 4th --

BY MR. DORE:

Q.  The day after you went to OMB and met with Katie Sullivan.

A.  I don't recall any discussion or resolution about interconnection on April 4th.

Q.  Did you provide any update to NPR, PBS or APTS regarding the OMB meeting after it happened?

A.  Yes.

Q.  To whom did you provide an update?

A.  The G4 PBS, APTS, NPR.

Q.  Did you tell anyone that Katie Sullivan stated her intense dislike for NPR?

A.  I -- I don't recall saying that.  I, like I said, remember Katie Sullivan was very unknowledgeable about the public media system. She voiced disdain for -- not "voiced disdain," but she was not supportive of PBS, NPR, CPB or the federal government funding of public media.

Q.  Did you tell anyone that Katie Sullivan had singled out NPR in particular?

Page 133

MR. LIPCHITZ:  Objection.

MR. DORE:  What's the objection?

MR. LIPCHITZ:  My objection's noted. I'm not getting into a back-and-forth with you.

BY MR. DORE:

Q.  I -- I will not change the question because I have no idea what the objection is.

So did you tell anyone that Katie Sullivan had singled out NPR in particular in the meeting that you had at OMB on April 3rd, 2025?

A.  I don't recall that.

Q.  All right.

MR. DORE:  Could we have 22, please?

(Barsoum Exhibit No. 6, a document bearing Bates stamp CPB_0018106 through Bates stamp CPB_0018116, was introduced.)

MR. DORE:  Are these two separate attachments?

MS. SCHWIETERING:  Yes.  Two attachments.

THE WITNESS:  Thank you.

THE REPORTER:  Sure.

MR. LIPCHITZ:  Thank you.

Are these -- is this one?

MR. DORE:  Correct.  This is one email

Veritext Legal Solutions
215-241-1000 ~ 610-434-8588 ~ 302-571-0510 ~ 202-803-8830

Page 134

thread with two attachments that are collectively marked as Exhibit 6.

THE WITNESS: (Reviews document.)

BY MR. DORE:

Q. All right.

Mr. Barsoum, I've placed in front of you what's been marked as Exhibit 6, an email thread with two attachments. The Bates numbers range from CPB_0018106 through 116.

The top email in the first page of the thread is dated April 15th, 2025.

You sent and received the emails in Exhibit 6, correct?

A. I believe so.

Q. Looking at the email at the bottom of the thread, first in time, April 15th, 2025, at 7:24 p.m. from Pat Harrison to you, it says, "Please send Michael all omni and Jordan questions. Is "omni" an autocorrect for "OMB"?

A. I would assume so. I don't know what "omni" is.

Q. Okay. Do the emails that follow include questions that had been received from OMB?

A. I understand that to be the case, the OMB section.

Page 135

Q. Right. So there were questions that CPB had received from the Office of Management and Budget, and separately there were questions that CPB had received from Jordan Lawlor, who was a staff on the Senate Appropriations Committee; is that correct?

A. I believe that the questions that are listed under "OMB" were also posed by Congress. But in addition to those questions, there were these questions listed under Congress; in other words, I was trying to avoid duplication of a very long email.

Q. At the bottom of the first page of Exhibit 6 and continuing on to the second, there's an email from Jordan Lawlor to you. Who is Jordan Lawlor?

A. Jordan Lawlor is a Appropriations staffer for Senate majority.

Q. Have you met Jordan Lawlor?

A. Yes.

Q. Is Jordan Lawlor a regular contact on Senate appropriations in the course of your work?

A. I believe she came on earlier this year. Marta met with her, and then alerted me that Jordan was helping on our account for the

Page 136

majority side. And she is still there, as I -- to the best of my knowledge.

Q. Ms. Lawlor's email that spans the first and second pages of Exhibit 6 states in part at the bottom, "I remember on the call that you mentioned that CPB has been turning down investments with entities like NPR." Do you have an understanding as to what that means?

A. Yes. I remember that this was early in Jordan's tenure, or my relationship with her, and she had this understanding that was not correct that, you know, PBS received a blank check and NPR received a blank check. And I was explaining that it is always a -- there's always a proposal to address a specific need, and then there's a negotiation back and forth on the terms and objectives and goals of that; and not every proposal from NPR, from independent producers, from intermediary organizations or distributors gets accepted.

Q. Did Ms. Lawlor say why she was asking for the total amounts of funding that go to PBS and NPR?

A. I don't recall. But I find it to be a normal question. I've received that question

Page 137

through multiple Congresses.

Q. Have you received questions about whether federal funds go to programming involving trans teenagers?

A. Well, the -- the program is around a specific time and specific broadcast, so I don't know how many trans -- or, films that deal with transgender issues have been produced in the past.

I do know that it is a -- this specific film, Real Boy, has been brought up a lot over this past year, and it's one of the reasons why certain members of Congress are not a fan of ITVS, which is the Independent Television Service that helped with the production of that film.

Q. In what con -- has -- strike that.

Has that specific film been brought up with you personally in the past year as a reason why certain members of Congress are not fans of ITVS?

A. By "personally," do you mean in, like, a meeting?

Q. Correct.

A. I don't recall.

Q. Ms. Lawlor's email, pasted into the

35 (Pages 134 - 137)

Page 138

first page of Exhibit 6 that you were sending to Michael Levy, Pat Harrison and others, refers to "reading the NYP article." Do you know what that's in reference to?

A. I don't.

(Barsoum Exhibit No. 7, a New York Post article, was introduced.)

MR. LIPCHITZ: This is 7?

THE REPORTER: Yes. Yes.

THE WITNESS: (Reviews document.)

BY MR. DORE:

Q. Mr. Barsoum, I've marked as Exhibit 7 a New York Post article, dated April 14, 2025, titled "White House readies plan for Congress to ask taxpayer funding for NPR, PBS." Have you seen this article before?

A. May I ask when we get to a good spot to use the restroom? But this is fine.

MR. DORE: Yeah. Let's -- let's go off the record.

THE VIDEOGRAPHER: Time is 2:26 p.m. This ends Unit 4.

(Recess taken.)

THE VIDEOGRAPHER: The time is 2:38 p.m. This begins Unit Number 5. We're on the record.

Page 139

BY MR. DORE:

Q. Mr. Barsoum, I've marked as Exhibit 7 a New York Post article dated April 14th, 2025, titled "White House readies plan for Congress to axe taxpayer funding for NPR, PBS." Have you seen this article before?

A. I don't typically read The Post, but I assume that I would have read this.

Q. And why do you assume you would have read the New York Post article marked as Exhibit -- why do you assume you would have read the article marked as Exhibit 7 from the New York Post?

A. As I mentioned, we were hearing lots of rumors about if an executive order would be placed, who it would impact, when it would happen. So this being put in the press, I -- I would have looked at it for anything I didn't already know.

Q. And the third paragraph of the article marked as Exhibit 7 the New York Post states that "A memo drafted by White House Budget Director Russ Vought and requested by GOP Congressional leaders accuses CPB of a, quote, 'lengthy history of anticonservative bias,' close quote, and

Page 140

states waste fraud and abuse at USAID." Do you know what memo that is referring to?

A. I do not.

Q. Is it your understanding that Russ Vought is Katie Sullivan's boss?

A. I -- I do know that Russ Vought heads OMB. Katie Sullivan works at OMB.

Q. Do you know Katie Sullivan's current position at OMB?

A. I don't know her current position, no.

Q. Do you know if she's the chief of staff to Russ Vought?

A. I do not know that.

Q. Turning back to the exhibit marked 6, there's a reference to "questions received from OMB." And underneath the heading "OMB," the first sentence states in part, "On February 18th, 2025, the President signed the memorandum 'Radical transparency about wasteful spending.'"

Were you aware of that memorandum?

A. Broadly. I remember that memorandum to be DOGE related.

Q. What do you mean by "DOGE related"?

A. Department of Government Efficiency. I remember the executive order broadly stating

Page 141

that there was waste, fraud and abuse in the government, and that the executive order was purportedly trying to end waste, fraud and abuse.

Q. Do you remember OMB ever asking for the amount of funding dispersed directly to NPR in the first two quarters of fiscal year 2025 and planned disbursements for the remainder of the year?

A. I do.

Q. Who made that request?

A. Peter Hoy.

Q. Were you involved in the preparation of a response to that request?

A. I was.

Q. What role did you play in the preparation of the response to Mr. Hoy's questions?

A. I may have drafted some sections. Some of the sections I wouldn't have taken a lead role on, because I do not have access to financial information.

Q. Where do you physically work? Do you go to the office every day?

A. Today? I mean, in this current time or --

36 (Pages 138 - 141)

Page 142

Q. As a general matter in October of 2025, do you work remotely, or do you go to an office?

A. Mostly remote.

Q. Was there a time this year where you mostly worked at CPB offices?

A. No.

Q. How many days a week, typically, in October of 2025 do you work remotely?

A. Most days.

Q. And was that the case in April of 2025 that most days you worked remotely?

A. I believe so.

Q. Turning back to the last page, please, of Exhibit 6, looking at the email from Jordan Lawlor, she writes in the second paragraph, "What are the unobligated balances as well as the obligated unexpended balances for fiscal year '25?" What does that mean?

A. What is the bottom --

MR. LIPCHITZ: No. No. He was talking about the first page of the --

BY MR. DORE:

Q. Exhibit 6, the one that had the OMB and Congress questions in it.

A. Yes.

Page 143

Q. Looking at the second page, the last -- I'm sorry, the second paragraph of Jordan Lawlor's email, which starts with "What are the unobligated balances"? Do you see that? It's just one line.

What does that sentence mean -- or, I'm sorry, what does Ms. Lawlor mean when she asks, "What are the unobligated balances as well as the obligated/unexpended balances for fiscal year 2025?"

A. I remember there being a discussion because Congress -- sometimes these terms don't relate specifically to how CPB defines them.

Q. Did you have an understanding as to what Ms. Lawlor meant by her question?

A. What I understood the question to be is what funding has CPB not assigned a contract to versus what it has or -- [reads document to himself].

Yes.

Or obligated?

"Or if obligated/unexpended is assigned to a project." I'm trying to remember how we defined it. Because I remember there was a difference between -- or, there was a lack of

Page 144

understanding between how they were defining it and how we were defining it.

MR. DORE: Could we have 23, please?

(Barsoum Exhibit No. 8, a document bearing Bates stamp CPB_0213205 through 0213209, was introduced.)

THE WITNESS: Thank you.

THE REPORTER: You're welcome.

MR. LIPCHITZ: Is this 8?

THE REPORTER: Yes.

THE WITNESS: (Reviews document.)

MR. DORE: Could I see the copies?

Great. Thanks.

THE WITNESS: (Reviews document.)

BY MR. DORE:

Q. Mr. Barsoum, you recall testifying under oath that you had no written communications with Black Rock Group, correct?

A. I recall saying I do not know Black Rock Group.

Q. Do you recall being asked if you ever saw any written communications or participating in any written communications with Black Rock Group, and you saying no?

A. I do.

Page 145

Q. That wasn't correct, was it?

A. Well, it would have been helpful to say Carl Forti.

Q. When I asked you if you knew anyone associated with Black Rock Group, you said no, right?

A. I don't. And now I'm assuming that Carl Forti works for Black Rock Group.

Q. So you have had communications with Black Rock Group, correct?

A. I've had communications with Carl Forti. That's who I know him as. I don't know him as Mr. Black Rock Group.

Q. Do you know his email address as cforti@blackrockgroup.com?

A. I don't know that to be the case.

Q. Have you seen the memorandum attached to Exhibit 8 that has Black Rock Group at the top center of the page?

A. I don't remember this specific memo, but some of the -- the content looks familiar to me.

Q. You wrote on April 15th that that specific memo looked good to you, right?

A. It looks like I did.

Q. Do you know when CPB first retained

37 (Pages 142 - 145)

Page 146

Mr. Forti of Black Rock Group?

A. I don't.

Q. When's the first time you recall having any communication with Mr. Forti of Black Rock Group?

A. I don't remember a beginning date or end date, but I do remember that it was pretty brief because he wasn't well-received.

Q. His memo looked good to you on April 15th, didn't it?

A. As I said, he wasn't well-received.

Q. As I said, "His memo looked good to you on April 15th, didn't it?"

A. As I said, he wasn't well-received.

Q. It seems like it was well-received by you, correct?

MR. LIPCHITZ: Objection.

THE WITNESS: You're speaking to a specific --

MR. LIPCHITZ: Hey. I'm going to lodge an objection, and then you can answer.

BY MR. DORE:

Q. Go ahead.

A. We're speaking about two different things. I'm telling you he wasn't well-received,

Page 147

and you're speaking about a specific document.

Q. A specific document that is a memorandum written by Carl Forti to CPB on April 15th, right?

A. That is a specific document. Looks to be written on April 14th --

Q. April 15th.

A. Thank you.

Q. Sure.
By whom?

A. Carl Forti's name is at the top, so I assume that Carl Forti wrote it.

Q. And the memo that you assume Carl Forti wrote looked good to you on April 15th after you reviewed it, correct?

A. That's what my communication says.

Q. Were you lying to the recipients of the email where you said it looked good?

A. No.

Q. So it's not just what it says. It's what you believed, right?

A. As is stated in the email, the memo looked good to me at that date and time.

Q. You didn't say, "at this date and time" in your email, did you?

Page 148

A. You -- you don't say that.

Q. You didn't say it, correct?

A. I don't recall ever saying this looks good "at this date and time," ever.

Q. Do you recall other communications you had with Carl Forti of Black Rock Group?

A. I remember there was a communication -- I remember there was a communication around the idea of, like, what CPB has done, what we're willing to do, and what we won't do. And I remember that Pat hated it, which is at the heart of why he wasn't well-received and his opinion wasn't valued by leadership.

Q. In the memo written by Carl Forti on April 15th, 2025, of Black Rock Group, he states in the first sentence that "the Trump administration is targeting the Corporation for Public Broadcasting in its fight to neuter NPR and PBS which it sees as biased news outlets. To date the administration has made decisions without any input from CPB, and will be submitting a rescission package that zeroes out CPB funding. The focus of CPB leadership and its board should be injected to voice into this funding debate in a manner that can impact the

Page 149

outcome." Do you see that?

A. I do.

Q. And that is part of the Black Rock Group memo that you wrote on April 15th, "Looks good to me," correct?

A. That is --

Q. Yes or no, sir.

A. That is the memo that corresponds with my reply, "This looks good to me. Deb, any edits."

Q. And what I read was from that same memo that you wrote, "Looks good to me," correct?

A. That's what I just said.

Q. Mr. Forti of Black Rock Group also writes on April 15th, 2025, in Key Considerations Number 3, "As mentioned above, one thing that sets CPB apart from these others is the fact that they have already taken steps to address the administration's concerns. These include A, withholding interconnection funds from NPR." That is a statement in the Black Rock Group memo of April 15th that you wrote, "Looks good to me," correct?

A. I'm sorry. Can you point to where on the page you're referencing?

38 (Pages 146 - 149)

Page 150

Q. The bottom. Page ending in 207 under Key Considerations.

A. Thank you.

Q. Number 3.

A. I see that to be written, and I see my response.

Q. Looking at Current Position on the first page of the Black Rock Group memo dated April 15th, the first sentence reads, "Understanding the changing dynamics that came with the Trump administration and unlike some other organizations and entities facing a similar battle, CPB has taken proactive steps to reign in what it sees as bias at NPR and PBS." Do you see that?

A. I do see that.

Q. And that is part of the April 15th, 2025, Black Rock Group memo that you wrote that same day, "Looks good to me," correct?

A. That is correct.

Q. On the second page of the Black Rock Group memo that is marked as part of Exhibit 8, Bates Number ending in 208, the section at the top titled Key Points to Make in Those Conversations," do you see that?

Page 151

A. I do see that.

Q. The Black Rock Group memo of April 15th, 2025, states, "These are the steps CPB has already taken to be responsive to the new administration." Do you see that?

A. I do see that.

Q. And that statement is part of the April 15th Black Rock Group memo that you wrote, "Looks good to me," correct?

A. That is correct.

Q. On the second page of the memo that is attached to the email thread marked as Exhibit 8, the Black Rock Group memo states underneath the heading, "What CPB is saying to Senators" towards the bottom of the page ending in 208, do you see that?

A. I do see that.

Q. As part of that section, the Black Rock Group memo states, "Number one, we want to convey to you our position: A, we understand the new world; B, we are responsive to the new world; C, we are trying to limit funds direct to NPR and PBS for biased content." Do you see that?

A. I do see that.

Q. And those statements were part of the

Page 152

April 15th, 2025, Black Rock Group memo that you wrote, "looks good to me," correct?

A. Correct.

Q. All right.

MR. DORE: Could we have 10, please?

(Barsoum Exhibit No. 9, a document bearing Bates stamp CPB_0001385, was introduced.)

THE WITNESS: Thank you.

THE REPORTER: You're welcome.

THE WITNESS: (Reviews document.)

BY MR. DORE:

Q. Just let me know when you're ready.

A. I'm ready.

Q. Great.

MR. DORE: And just so the record's clear, because I had said 10, that was our own numbering. This is Exhibit Number 9.

MR. LIPCHITZ: Do you have the letter with it, or is it just an email right now?

MR. DORE: There's no attachment to this email.

MR. LIPCHITZ: Okay.

At the bottom it seems like there is. That's why I asked.

MR. DORE: Yeah. That's part of the

Page 153

same thread, so the top email is later in time. So there was no attachment to the email on April 7th at 10:59 a.m.

MR. LIPCHITZ: Okay.

BY MR. DORE:

Q. Exhibit 9, Bates Numbered CPB_0001385. Did you receive the email from Pat Harrison on April 7th, 2025?

A. I don't recall, but I assume so.

Q. Do you know what Ms. Harrison was referring to as "a new development"?

A. I have no idea.

Q. Do you recall calling Michael Levy about any new development?

A. I don't recall, but would have acted on Pat's guidance.

Q. Teresa Safon's email lower down in the thread marked as Exhibit 9 states in the second paragra -- I'm sorry, the second sentence, "Pat and I were wondering if it would be helpful to add a sentence about CPB's politically balanced board and also CPB's CEO as former RNC cochair." Do you see that?

A. I do see that.

Q. Did you have any view about whether it

39 (Pages 150 - 153)

Page 154

would be helpful to add a sentence about CPB's politically balanced board to the letter that was being discussed?

A. Since it is in our statute, I would have not taken issue with that. I don't know if it's what ended up in the final response, but because it's in our statute, I have no concern.

Q. Okay. Did you have any view about whether it would be helpful to add a sentence to the effect that CPB's CEO is a former RNC cochair?

A. I -- I don't recall. Looking at it, I don't have a strong opinion.

Q. Do you have any opinion?

A. It's part of her work history.

Q. What does "RNC" stand for?

A. Republican National Committee.

Q. Is it your view that that sentence would be added merely to identify her work history or because of the connection to the Republican National Committee.

A. Because I didn't write it, I can't speculate on what Teresa and/or Pat may have been thinking.

Q. Well, in the next email up, you cleaned

Page 155

up the latest round and added an additional layer of edits. So you reviewed the email -- I'm sorry -- the letter that was being discussed, right?

A. I assume I did.

Q. And you were a recipient of the email that Teresa had written, correct?

A. Yes. I'm cc'd on the April 7th email.

Q. And so when Pat Harrison and Teresa Safon are wondering if it would be helpful to add a sentence that CPB's CEO is a former RNC cochair to several recipients including yourself, do you recall having any view about what the benefit of adding such a sentence would be?

A. I don't recall having any reaction to it. I would have viewed the entire document together, thought about if it made sense or if it was just a wacky idea. But I don't have any recollection of a reaction.

Q. All right.

MR. DORE: Could we have 16, please?

(Barsoum Exhibit No. 10, a document bearing Bates number CPB_0229996 through Bates Number CPB_0229998, was introduced.)

THE WITNESS: Thank you.

THE REPORTER: You're welcome.

Page 156

MR. LIPCHITZ: Thank you.

THE WITNESS: (Reviews document.)

BY MR. DORE:

Q. Okay. Mr. Barsoum, are you ready?

A. Yes.

Q. Great. Exhibit Number 10 is a email and attachment bearing Bates Number CPB_0229996 through 9998.

The email at the beginning of the thread, or the top of it, rather, is April 11th, 2025.

Did you send and receive the emails and attachment reflected in Exhibit 10?

A. Yes.

Q. At the top of the email -- strike that.

At the top of Exhibit 10 in the list of recipients, there is a "rubydcalvert@gmail.com" address. Do you see that?

A. I do.

Q. Is that Ruby Calvert's email address?

A. Like I said earlier, I know that she uses a personal -- or, that I generally communicate with the personal. I assume that is her personal.

Q. Ms. Calvert doesn't have any CPB email

Page 157

address, does she, to your knowledge?

A. No.

Q. So the only way that you can communicate with the board chair of CPB is through her personal email address or personal text; is that right?

A. Or through a phone call.

Q. So let me amend that.

Is there any way to communicate with Ms. Calvert in her role as the board chair of CPB, in writing, other than, in your experience, email or text? Personal -- email to her personal email?

A. I -- not that I'm aware of, no.

Q. Okay. Is the letter attached to Exhibit 10 the thank you and statutory funding information that you had decided to send to OMB coming out of the April 3rd, 2025, meeting?

A. That's right.

Q. In looking at the letter, did you play a role in the drafting of it before it was sent to OMB?

A. I did.

Q. The second paragraph begins with the sentence -- strike that.

40 (Pages 154 - 157)

.. 

Page 158

This letter from Ruby Calvert to Katie Sullivan at OMB begins at the second paragraph by stating, "As Senator John Barrasso may have told you, I come from a deeply conservative Republican family." Do you know why there's a reference to "Senator John Barrasso" and Ms. Calvert's "deeply conservative republican family"?

A. I know that Senator Barrasso was the Senator to nominate Ruby Calvert.

Q. Do you know why the letter from Ms. Calvert noted in the first sentence of the second paragraph that Ms. Calvert comes from a "deeply conservative republican family"?

A. I don't know why. But I have some broad understanding that somebody in her family was political. I -- I can't remember who, but --

Q. Why would that be -- strike that.

Why was that included in the first substantive paragraph of the letter to OMB coming out of the April 3rd meeting?

A. Oh. "My brother was Speaker of the House."

I do not know -- I don't recall writing that myself. I know Ruby wanted to personalize it.

Page 159

I have no idea if she's conservative fiscally and philosophically. So it might have been something that she added.

Q. From your perspective, what was the value of adding statements in the letter to OMB to the effect that Ms. Calvert was deeply conservative and very conservative fiscally and philosophically?

MR. LIPCHITZ: Objection.

THE WITNESS: Probably to remind the recipient that we have a five-four split on our board, and there's different people with different views.

BY MR. DORE:

Q. CPB was trying to appeal to the political views of Ms. Sullivan by including these references to Ms. Calvert's conservative views, correct?

MR. LIPCHITZ: Objection.

THE WITNESS: I don't think there's any appealing to Ms. Sullivan.

BY MR. DORE:

Q. So your testimony is that Ms. Calvert was writing about her deeply conservative republican family and her very conservative

Page 160

fiscally and her -- the fact that she was very conservative fiscally and philosophically in relation to the five-four board of CPB?

MR. LIPCHITZ: Objection.

THE WITNESS: Yes. She makes up one board member, when we're full, a nine-member board, and so there are differing views. It's a reminder that that five-four split is guaranteed in law.

MR. DORE: All right. Could we have 59?

THE WITNESS: Can I ask to get a drink? I don't need to use the restroom, but --

MR. DORE: Yeah. Just watch your thing.

(Whereupon Mr. Dore and Ms. Schwietering consulted off record.)

(Brief pause in testimony.)

(Barsoum Exhibit No. 11, a document bearing Bates stamp CPB_0211493 through CPB_0211496, was introduced.)

THE WITNESS: Thank you.

THE REPORTER: You're welcome.

MR. LIPCHITZ: Thanks.

THE WITNESS: (Reviews document.)

BY MR. DORE:

Q. All right. Mr. Barsoum, do you consider

Page 161

the discussion in Exhibit 11 to relate to education issues?

A. I do see some mention of civic engagement, educational equity and local storytelling.

Q. Do you think that this discussion relates more to education issues or matters related to funding concerning the Public Radio Satellite System?

A. I -- correct me if I'm wrong, but I don't see anything related to PRSS on here.

Q. Exhibit 11 is a email thread dated -- I'm sorry, dated at the top May 1st, 2025, with Bates numbers ranging from CPB_0211493 through 496.

You sent and received the messages in Exhibit 11, correct?

A. Did I send and receive the messages in Exhibit 11? Is that what you're asking?

Q. Yes. As indicated.

A. I see that I received emails on various portions of this thread.

Q. Okay. I'll rephrase it, because there are -- there's at least one email in the middle that you didn't receive at the time, but it

41 (Pages 158 - 161)

Page 162

appears it was forwarded to you afterwards, right?

You know what, why don't we just do it this way: Can you go to the last page of Exhibit 11, please?

A. Sure.

Q. The first email in this thread is an email from Deb Sanchez to Carl Forti of Black Rock Group dot com, Brendan Daly and yourself, right?

A. Correct.

Q. Mr. Forti's email is the next one in time in that thread with Mr. Forti at Black Rock Group, specifically blackrockgrp.com, writing to Deb Sanchez, Brendan Daly and you on April 30th. Do you see that?

A. Is this the long one?

Q. Yes.

A. Yes.

Q. If you turn to the page ending in Bates Numbered 495 of Exhibit 11, you'll see that there's a number one and a number two in the upper third of the page. Do you see that?

A. I do.

Q. So focusing on the paragraph underneath

Page 163

that, Mr. Forti writes -- strike that.

Carl Forti of Block Rock Group writes on April 30th, 2025, at 5:59 p.m. to Deb Sanchez, Brendan Daly and you, quote, "This comes back to what is CPB's main argument. As the FTC fight over the last two days shows, the admin is not giving up/in easily. What you have that people in this fight and similar fights haven't had is a recent track record of sticking up for the admin's viewpoint." Do you see that?

A. I do see that.

Q. "You" in that sentence is a reference to CPB, correct?

A. I assume so, yes.

Q. And "admin's" is a reference to the administration's viewpoint, correct?

A. I assume so.

Q. The last sentence of that paragraph from Mr. Forti of Black Rock Group to yourself, Deb Sanchez and Brendan Daly on April 30th, 2025, states, "Therefore, you have to, quote, 'give,' unquote, the admin something so that they can claim a win and then be more willing to comprise, give you some money back." Do you understand "comprise" to be a typo, and it should be

Page 164

"compromise"?

A. I understand that to be the case.

Q. Ms. Sanchez responds to Carl Forti of Black Rock Group on April 30th, 2025, copying Brendan Daly, Kathy Merritt and yourself. And in the first sentence she writes, "Thanks for this analysis," and continues, "I don't think we are comfortable with the approach to publicly state we cut funding to NPR, so the bland statement might be where we land."

Do you see that?

A. I do see that.

Q. Do you know why Kathy Merritt, the Chief Operating Officer of CPB, was included in this email thread with this email?

A. I do not.

Q. Do you know why Deb Sanchez wasn't comfortable publicly stating that CPB cut funding to NPR?

A. Because we hadn't.

Q. Do you know why Danica Petroshius of Penn Hill Group writes on May 1st to Deb Sanchez that what Carl Forti of Black Rock Group says below is good?

A. I don't. And I don't know what

Page 165

specifically she's referring to as "good." The way it's framed.

Q. Do you know why Deb Sanchez did not dispute -- well, strike that.

Deb Sanchez does not dispute the accuracy in her email of the fact that CPB cut funding to NPR, does she?

A. All of this is about a communications in relation to the President's budget, so it's about what we are communicating outwards. What she is saying there is I don't believe -- I don't think we are comfortable in communicating outwards in a press release that we cut funding to NPR. So the bland statement might be where we land.

Q. It's because she doesn't want to state it publicly, not because it's inaccurate, correct?

A. I -- I can't speak to what she was communicating.

Q. Do you know why Danica Petroshius was included in this email thread of Penn Hill Group?

A. I believe the press release on the President's budget may have said something about educational service. We often say in press releases related to funding, public media seeks

42 (Pages 162 - 165)

Page 166

to serve the informational and educational needs of everyday Americans.

And so she would have reviewed this to see if we were communicating educational value in the right way, which looks to be what she was doing here.

Q. When Carl Forti writes -- strike that.

When Carl Forti of Black Rock Group writes on April 30th that "CPB has a recent track record of sticking up for the administration's viewpoint," in the emails that follow, neither Kathy Merritt, Deb Sanchez, Brendan Daly, Danica Petroshius of Penn Hill Group or you dispute that characterization, correct?

A. Part of the reason why Carl Forti was not well-received within the building is because he wanted us to be a bit more aggressive and communicating ways -- or, communicating things that we were not comfortable with, which is why his contract ended.

Q. Okay.

MR. DORE: Move to strike as non-responsive --

BY MR. DORE:

Q. -- and ask you the question again:

Page 167

When Carl Forti of Black Rock Group writes on April 30th that CPB has a recent track record of sticking up for the administration's viewpoint, in the emails that follow, neither Kathy Merritt, Deb Sanchez, Brendan Daly, Danica Petroshius of Penn Hill Group or you dispute that characterization, correct?

A. Yes. We ignored it because we were starting to ignore Carl.

Q. Danica Petroshius wrote, "I think what he says below is good" in reference to Carl Forti of Black Rock Group, correct?

A. She did.

Q. When Danica Petroshius wrote on the second page of Exhibit 11, "You can say you'll align and comply, but have to leave room for them to negotiate. So maybe if we are forced, they only trim NPR. If you trim NPR now on your own, then they take the next thing. We have to show pain if we negotiate, even if it's not that big of a pain. I don't think we'll convince them we did it ourselves." Do you see that?

A. Can you refer to the bottom page number?

Q. The one ending in 494.

A. I see that.

Page 168

Q. Who is the "them" that Danica is referring to when she says, "I don't think we'll convince them we did it ourselves"?

MR. LIPCHITZ: Objection.

THE WITNESS: That's hard for me to speculate.

BY MR. DORE:

Q. Did you ask Ms. Petroshius to clarify who she meant --

A. No.

Q. -- in the emails that followed?

A. No.

Q. Did Kathy Merritt ask Ms. Petroshius to clarify what she meant?

A. I couldn't speak for her.

Q. In the emails that follow in the thread that include Kathy Merritt as well as yourself, Brendan Daly and Deb Sanchez, did any of the recipients ask Ms. Petroshius to clarify what she meant when she said, "I don't think we'll convince them we did it ourselves"?

A. I can't speculate. I don't see it here on the page.

Q. When Ms. Sanchez responds on April 30th at 6:36 p.m. on the page ending 494 to Carl Forti

Page 169

of Black Rock Group by saying in the last substantive paragraph of her email, "Your idea on the Pacey report is good," what was she referring to as "the Pacey report"?

A. CPB had Pacey Economics under contract to study the economic impact that public media has across the country. I believe they were on retainer for a different issue that I'm not aware of, but -- and they had hours left over, and so we asked them to do an analysis of the economic impact of public media.

Q. Okay. You can put that aside.

MR. LIPCHITZ: Could we take a restroom break?

MR. DORE: Sure.

Go off the record.

THE VIDEOGRAPHER: Time is 3:42 p.m. This ends Unit 5. We're off the record.

(Recess taken.)

THE VIDEOGRAPHER: The time is 4:14 p.m. This begins Unit Number 6. We're on the record.

BY MR. DORE:

Q. All right. Are you familiar with a Senator Capito?

A. It's Russian. Senator Capito, but --

43 (Pages 166 - 169)

Page 170

Q.  Capito.

A.  -- yes.

Q.  What state is Senator Capito from?

A.  West Virginia.

Q.  And what party is Senator Capito affiliated with?

A.  She's a Republican.

Q.  Have you ever seen talking points for a meeting between Pat Harrison and Senator Capito?

A.  I don't recall, but I may have seen them at one point.

Q.  Do you recall a meeting ever taking place between Pat Harrison and Senator Capito, to your knowledge?

A.  I do remember Pat met with Senator Capito a number of times, maybe early on 2018, and then 20 -- may have been 2024, as well.

Q.  Do you recall any meetings between Ms. Harrison and Senator Capito that you're aware of in 2025?

A.  I do remember Pat Harrison tried to reach out to Senator Capito and Capito was no longer answering her calls, and I believe we tried to schedule a meeting with Senator Capito, in 2025.

Page 171

Q.  And you don't -- strike that.

Sitting here today on October 22nd, 2025, you have no recollection of Katie Sullivan of OMB saying that the administration did not want to "throw the baby out with the bathwater" in reference to NPR?

A.  I -- I don't recall her saying that.

Q.  And do you recall any discussions internally at CPB, in sum or substance, that OMB had said anything to that effect, that -- any reference to "throwing the baby out with the bathwater" as it might relate to NPR and CPB?

A.  I don't recall any specifics about NPR and bathwater and anything like that.

Q.  Do you recall any conversations with Congress members who expressed that they felt their constituents are not reflected in NPR programming?

A.  Yes.

Q.  What senators or Congresspeople are you thinking of?

A.  Senator Capito, Senator -- the "reflected in programming" example makes me think of Capito.

Q.  Why?

Page 172

A.  Because I remember an anecdote.  And I can't remember where it came from or where I heard it, but the story is that it Senator Capito was driving in West Virginia and listening to West Virginia Public Broadcasting, and it had been expressed to me that that is -- she often does that.  And that she was listening to a segment -- and I don't know if it was from, you know, NPR or if it was from another public media distributor, but she heard it on West Virginia Public Broadcasting when she was driving.

And it was a story about, I believe, a mother in Wisconsin and how she would make bento box lunches for her children as, like, a creative nice thing to do for her kids.  And the story is that Senator Capito heard that content on West Virginia Public Broadcasting and thought that that was not reflective of the lived experience of West Virginians, which I -- yeah.  I'll just leave it there.

Q.  Got it.

Let me mark, or ask the court reporter to mark, as our next exhibit I believe Exhibit 12.

///

Page 173

(Barsoum Exhibit No. 12, a document bearing Bates stamp CPB_0009112 through Bates stamp CPB_0009113, was introduced.)

THE WITNESS:  Thank you.

MR. LIPCHITZ:  Thank you.

Is this whole thing --

MR. DORE:  Oh, no.  I think I gave you multiple copies.  It's just one -- one-page document.

THE WITNESS:  (Reviews document.)

BY MR. DORE:

Q.  Okay?

A.  Yes.

Q.  Mr. Barsoum, I've marked as Exhibit Number 12 a email thread bearing Bates Number CPB_0009112 through 9113.  The top email in the thread from you to Pat Harrison is dated July 12th, 2025, at 12:53 p.m.

Did you send and receive the emails reflected in the thread marked as Exhibit 12?

A.  I believe so.

Q.  Did you prepare the talking points for Pat Harrison to Senator Capito reflected at the bottom of the thread marked as Exhibit 12?

A.  I believe so.

44 (Pages 170 - 173)

Page 174

Q. And these talking points that you prepared were for the president of CPB, Pat Harrison, correct?

A. That's right.

Q. On the second page ending in Bates Number 113 of the talking points that you wrote, do you see the bullet for "Acknowledging Concerns About NPR"?

A. I do.

Q. You wrote the quote, "You've been clear and candid about the concerns you see in public broadcasting, particularly with NPR, and you're not alone. We've heard from other members of Congress and from Americans who feel that they aren't reflected, especially in NPR programming." Do you see that?

A. I do.

Q. And the "you" in this sentence and in the talking points is intended to reflect Pat Harrison addressing Senator Capito?

A. That's right.

Q. The next bullet after acknowledging concerns about NPR is "CPB Oversight and Response." The first sentence states, "We take those concerns seriously." Those concerns are in

Page 175

reference to the concerns about NPR in the immediately preceding bullet, correct?

A. It's intended to flow as a conversation, so I -- I assume so, yes.

Q. So in the second bullet on the second page, second full bullet that starts, "CPB Oversight and Response," which follows "acknowledging concerns about NPR," you write, "We take those concerns seriously. CPB has not signed a new grant agreement with NPR since October 2024." Do you see that?

A. I do.

Q. It follows, "We are applying heightened scrutiny and oversight to the one remaining grant, and we are carefully evaluating any future funding in light of these shared concerns." Do you see that?

A. I do.

Q. What is the one remaining grant that is being referred to there?

A. The Editorial Enhancement Grant.

Q. And when you write that "We are carefully evaluating any future funding in light of these shared concerns," the concerns that you were referring to are the concerns as they

Page 176

related to NPR programming, correct?

MR. LIPCHITZ: Objection.

THE WITNESS: To my knowledge, we -- as it's stated here, "CPB has not signed a new agreement with NPR since October 2024." To my knowledge, there was nothing to evaluate after 2024, because we had received no proposal.

BY MR. DORE:

Q. When you write that "We are carefully evaluating any future funding in light of these shared concerns," that is in reference to the concerns about NPR that are described in the bullet point immediately preceding the CPB Oversight and Response bullet point, correct?

MR. LIPCHITZ: Objection.

THE WITNESS: I would say, yes, it's our -- part of our responsibility is to evaluate how public media serves the American public. So if Americans have concerns, don't trust, or their trust is waning, or don't feel that they're reflected, then that is something for CPB to consider.

BY MR. DORE:

Q. Okay.

MR. DORE: I'm going to move to strike

Page 177

after the word "yes."

BY MR. DORE:

Q. When you write, "In the room for legislative solutions" bullet that "There are certainly legislative tools available to address concerns with NPR without undermining the entire system," what "legislative tools" were you referring to?

A. We did not offer any. Our goal was to remind legislators that if you have a problem with PBS, you're the legislator. If you have a problem with NPR, you're the legislator. If you have a problem with CPB and its board members being part of the board more than a presidential term was one, you're the legislator, but we follow the Act.

Q. And by saying, "you're the legislator," CPB meant that the legislators could act with respect to the particular entity or entities with which it had a problem, correct?

A. They could act to change our statute because they are legislators. We were following our statute.

Q. Well, the very next bullet point on the second page of Exhibit 12 is titled "Avoiding

45 (Pages 174 - 177)

Page 178

Unintended Harm," correct?

A. Correct.

Q. And you write, "As the White House said in conversation with CPB, quote, 'we don't want to throw the baby out with the bathwater,'" unquote, right?

A. Yes.

Q. That's what you wrote?

A. That's correct.

Q. And that was in reference to the conversation with Katie Sullivan at the Office of Management and Budget on April 3rd, 2025, correct?

A. I assume that to be.

Q. Does this refresh your recollection as to Ms. Sullivan saying that she didn't want to throw the baby out with the bathwater in the discussion on April 3rd, 2025?

A. Unfortunately, it does not.

Q. This email's from a little over three months ago, correct?

A. Yes.

Q. In the very next email up on July 12th, 2025, looking back at the first page of Exhibit 12, Ms. Sanchez writes to you and to Kathy

Page 179

Merritt, "I'm not sure if referring to Katie's quote, 'months ago'" is relevant. Do you see that?

A. I do see that.

Q. That's in reference to Katie Sullivan, right?

A. I would think so.

Q. And the quote is in reference to the White House saying in a conversation with CPB, "We don't want to throw the baby out with the bathwater," right?

A. Can you repeat the question?

Q. Sure.

When Deb Sanchez refers to "Katie's quote" in her July 12th, 2025, email, she's referring to Katie Sullivan's statement at the meeting between CPB and OMB that "we don't want to throw the baby out with the bathwater." That's the quote, right?

A. That is the quote here, so I speculate that that's what she is referring to.

Q. And focusing, again, on the second page, "the avoiding unintended harm," after the sentence where you write, "As the White House said in conversation with CPB, quote, 'we don't

Page 180

want to throw the baby out with the bathwater,'" you write, "reforms or restrictions can address NPR-specific concerns, but full elimination of CPB of public broadcasting funding would irreparably damage a positive legacy that includes Mr. Rogers Neighborhood, Mountain Stage and local service from West Virginia Public Broadcasting and Allegheny Public Radio." Do you see that?

A. I do.

Q. So you were drawing a distinction between reforms or restrictions that might address NPR-specific concerns as opposed to eliminating CPB altogether?

A. What I was doing is drawing a distinction between specific concerns that a Senator might have and a service that public media entities, separately and together, provide; for example, Mountain Stage, a nationally syndicated program by NPR, funded by CPB at one point. I'm trying to distinguish between a specific concern that a member might have and the broader value that public media provides.

Q. And CPP -- CPB's goal was to have Senator Capito pursue any reforms or restrictions

Page 181

that would address NPR-specific concerns?

A. Our goal was to preserve the federal appropriation that sustains public radio, public television and local public stations.

Q. And if reforms or restrictions that addressed NPR-specific concerns preserved to the maximum extent possible the federal appropriation that sustained public radio, public television and local public stations, that would be consistent with CPB's goals, correct?

A. CPB and NPR and PBS, as in APTS, yes.

Q. You think that reforms and restrictions that targeted NPR would benefit NPR?

A. 100 percent. It's what they agreed to.

Q. Deb Sanchez writes to you on the first page, and Kathy Merritt, "I think they are throwing the baby out with the bathwater." What did she mean?

A. I think that she meant that Congress was -- I'm trying to think who she's referring to. It's hard to speculate.

Q. Well, let's walk through them sequentially.

A. Sure.

46 (Pages 178 - 181)

Page 182

Q. You write -- I'm sorry. Deb Sanchez writes, "I'm not sure if referring to Katie's quote months ago is relevant. I like the 'avoid irreparable harm framing' but maybe just stick to the other points."

You respond to her on July 12th -- so a little over three months before today, October 22nd, 2025 -- "I only brought it up because of Trump's tweet, because we always get the question asking if we've talked to the White House, but I hear you."

When you write to Ms. Sanchez and Kathy Merritt, the chief operating officer of CPB, that you only brought "it" up because of Trump's tweet, "it" is the quote from OMB about "throwing the baby out with the bathwater," right?

A. That makes sense.

Q. What was Trump's tweet that you were referring to that was the basis for the reason for you bringing up Kathy Sullivan's -- Katie Sullivan's quote from the meeting with OMB on April 3rd, 2025?

A. "CPB is a monstrosity."

Q. And so how would -- what is it about

Page 183

that tweet that caused you to refer to and quote what Katie Sullivan had said at the White House -- strike that.

What is it about the Trump tweet that caused you to refer to the quote that you attributed to the White House with respect to "throwing the baby out with the bathwater"?

A. CPB had received questions, you know, when I was in meetings where staffers might ask, "Have you met with the White House?" And I would say, "Yes. It was not a productive meeting, and we haven't met with them since." And so that is pointing to the fact that we had one meeting.

Q. When you invoke the quote that you attribute to the White House in the talking points going to the president of your employer to be delivered to a Senator of the United States that "we don't want to throw the baby out with the bathwater," "the baby" in that quote, in your view, is CPB, and "the bathwater" is NPR, correct?

A. I have no idea what it is. It could be public media's bathwater, public media's baby. I -- I don't know.

Q. So the context of a set of talking

Page 184

points for a United States senator that refers to acknowledging concerns about NPR followed by CPB oversight and response, followed by room for legislative solutions, and then avoiding unintended harm where you write that "reforms or restrictions can address NPR-specific concerns," still leaves you with no idea what you're referring to as "baby in bathwater" in the quote being presented to a senator?

A. No. Because it was -- I don't remember it being expressed. I don't remember anyone saying who's a baby, who's a bathwater.

Q. And you don't remember writing these talking points specifically?

MR. LIPCHITZ: Objection. Asked and answered.

THE WITNESS: Yeah.

I believe that I answered that I would not be surprised that I wrote these talking points. Like I said, I remember trying to schedule a meeting with Capito. I don't remember if it happened or if Pat responded to this.

BY MR. DORE:

Q. I just want to focus on --

A. Sure.

Page 185

Q. -- this particular set of talking points, though, as opposed to anything else around it.

A. Sure.

Q. You don't remember writing the words on the page that are reflected in the talking points, correct?

A. Let me see if I remember.

I remember including Mountain Stage because Senator Capito likes the program.

Q. Okay. Do you remember writing, as the White House said in conversation with CPB, "We don't want to throw the baby out with the bathwater"?

A. I don't.

Q. Do you remember saying you only brought that quote up because of Trump's tweet?

A. I don't.

MR. DORE: Okay. I pass the witness -- oh, wait. I don't pass the witness.

Oh. Could we go off the record for one minute, please?

MR. LIPCHITZ: Sure.

THE VIDEOGRAPHER: Time is 4:41 p.m. We're off the record.

47 (Pages 182 - 185)

Page 186

(Recess taken.)

THE VIDEOGRAPHER: The time is 4:47 p.m. We're on the record.

BY MR. DORE:

Q. Mr. Barsoum, when I asked you whether you thought that reforms and restrictions that targeted NPR would benefit NPR, you responded, "100 percent. It's what they agreed to." Do you remember that?

A. Correct.

Q. What agreement were you referring to?

A. I was referring to an agreement made between PBS, NPR, APTS and CPB. Earlier in the year we recognized that there were numerous threats facing the system and the federal funding that sustains it.

In trying to stay in collaboration with all of our colleagues and believing that if Congress picked one of us off, meaning one of the organizations, we would be weaker as a whole in fighting back the rescission. NPR, including Marta and Katherine; PBS, including Bill Weber and Paula Kerger; APTS, including Jane Kylie and Kate Riley, and myself and Pat, discussed potential options to limit -- to limit the

Page 187

rescission of CPB's entire appropriation.

Marta and I in particular were adamant that we stay in collaboration and that we find common ground and go to Congress with that common ground, right?

NPR agreed to offering the removal of the 23 percent requirement of our statutory federal funding formula, which requires stations to spend a portion of their funding on national programming, not specifically NPR, could be any of the over 30 producers of national content. NPR also agreed to eliminate the radio programming funds bucket of our statutory federal funding formula.

PBS agreed to eliminating the TV programming bucket of our statutory federal funding formula. And the idea was for that funding to remain intact on both sides of the TV-radio split. I know Marta was concerned with any moving of funds to the TV side, for example, from the radio side. So you wanted the overall amount to stay on the TV side and radio side, but just go to stations.

And the idea was that if we kept the funding -- CPB's funding that we received --

Page 188

within the system, able to -- for stations continuing to be able to have a source of funding that they could then send back to PBS and NPR, or any other national producer, it would limit the blow of the rescission.

Q. Was this "agreement," as you describe it, in writing?

A. Yes.

Q. When was the agreement reached?

A. I can't recall a date, but it was before the rescission was filed. We had talked about it at the government affairs level of all the national orgs for multiple weeks. And I remember Marta pressuring us to get agreement at the G4 level. We needed agreement from our bosses.

Q. How did Marta pressure you, in your view?

A. She would text me or we would call and we'd say, "We need to get movement here."

Q. Do you believe those texts have been produced in this litigation?

A. I -- I -- I can't tell you. I'm not looking at them. But I know we talked about it at length for a number of weeks, and our weekly G4 -- or, sorry -- in our weekly national orgs

Page 189

government affairs call that we have on Thursdays, we discussed it a number of times. We kept reaching the same conclusions that these areas were the -- the best way to protect the investment in the system.

Those options were produced in writing. I believe APTS took the lead in putting them to paper after we had said, "Now's the time to take this to our bosses." APTS shared that with all of the government affairs colleagues and said, "Just making sure that these are all the" -- "the options that are on the table that we should put forward to our bosses."

The next day, we met at what we call the "G4 level," which is the heads of PBS, CPB, APTS and NPR, where all of those CEOs were present, and we discussed those fallback options.

Q. And was there a written agreement entered into among those four organizations that was signed by each of them?

A. In the Zoom meeting?

Q. Ever.

A. Yes. As I said, APTS shared that with NPR, asking if they had any concerns, asking if they had any feedback on the options presented as

48 (Pages 186 - 189)

Page 190

we had discussed for weeks.

MR. LIPCHITZ:  So listen to his question, please.

THE WITNESS:  Sorry.

I'm sorry.  Can you repeat?

Was there -- was your question was there a signed agreement?

BY MR. DORE:

Q.  Was there a signed written agreement entered into among the four organizations?

A.  There are no signatures on a document, if that's what you're asking.

Q.  Do you consider it to be an agreement?

A.  Yes.  Absolutely.

Q.  And you consider it to be an agreement because the position was shared among the organizations that -- that what?  How -- how -- how in your view -- at what point in your view --

A.  Yeah.

Q.  -- did the line get crossed into there being an agreement?

A.  When it was affirmed twice by Katherine Maher herself.  And when I spoke up in a subsequent G4 meeting and said -- excuse me --

Page 191

"Katherine, I just want to make clear that I understand your position correctly before we go to Congress."

And I remember -- you know, I had not talked to Katherine much at the time, but I wanted to gain her perspective and her clarity. I did not want to step out of bounds, because I had not talked to her a lot, but I felt that it was important to hear her say that this is okay.

And she said, "I've already said before, NPR can go without federal funding."

Q.  And you took that to reflect an agreement?

A.  I took that to go beyond what we had agreed to, which was an elimination of the radio programming bucket, which NPR is not entitled to, and the 23 percent bucket that, again, NPR is not entitled to.  I have no idea how much money they receive.

Q.  Do you know if the board of directors of any of the four entities had said there was an agreement?

A.  The board of director -- I can't speak for NPR and APTS and PBS, but the board of directors for CPB does not pass resolutions

Page 192

saying what management can do or I -- I can do in my job.  It's more of a guidance and oversight role.  I don't know if NPR works that way.

Q.  So in your experience, is management the one that is, on behalf of CPB, driving whether or not there's an agreement with CPB, and the board functions more in a guidance and oversight role?

MR. LIPCHITZ:  Objection.

THE WITNESS:  As it relates to your last question or what are --

BY MR. DORE:

Q.  Generally.  When you said -- when you said the board follows -- has more of a "guidance and oversight role" at CPB, --

A.  Correct.

Q.  -- that's your experience in working at CPB?

A.  They approve any non-content grants over a million dollars -- I'm sorry.  They approve our ability to negotiate.  They approve our budget plan that's -- that broadly outlines our goals and objectives.  They approve -- what else do they approve?

Q.  And does CPB management then have autonomy in the negotiations?

Page 193

A.  Yes.

MR. DORE:  Okay.  We pass the witness.

THE WITNESS:  Okay.

MR. LIPCHITZ:  Just very briefly.

EXAMINATION

BY MR. LIPCHITZ:

Q.  At the OMB meeting on April 3rd, did Ms. Sullivan ask anyone from the Corporation to take any action as to NPR?

A.  No.

MR. DORE:  Objection, leading.

You can answer.

BY MR. LIPCHITZ:

Q.  At the OMB meeting on April 3rd, did Ms. Sullivan ask anyone at the Corporation to stop funding NPR?

MR. DORE:  Objection, leading.

THE WITNESS:  No.

BY MR. LIPCHITZ:

Q.  Did -- at the OMB meeting on April 3rd, did Ms. Sullivan ask CPB or the Corporation to stop funding PBS?

MR. DORE:  Objection, leading.

THE WITNESS:  No.

BY MR. LIPCHITZ:

49 (Pages 190 - 193)

Page 194

Q.  Okay.  Did she ask anyone at the Corporation to take any action relating to any public media entity at all?

MR. DORE:  Objection, leading.

THE WITNESS:  No.  The only thing that Katie Sullivan requested was that we send the follow-up statutory federal funding form along.

MR. LIPCHITZ:  That's all I have.

MR. DORE:  No further questions.

We can go off the record.

THE VIDEOGRAPHER:  The time is 5 p.m. This concludes today's deposition.  We're off the record.

(Deposition concluded -- 5:00 p.m.)

Page 196

Joseph Lipchitz, Esq.

joseph.lipchitz@saul.com

October 23, 2025

RE: National Public Radio, Inc. Et Al v. Trump, Donald Et Al

10/22/2025, Clayton Barsoum (#7665245)

The above-referenced transcript is available for review.

Within the applicable timeframe, the witness should read the testimony to verify its accuracy. If there are any changes, the witness should note those with the reason, on the attached Errata Sheet.

The witness should sign the Acknowledgment of Deponent and Errata and return to the deposing attorney. Copies should be sent to all counsel, and to Veritext at cs-midatlantic@veritext.com.

Return completed errata within 30 days from receipt of testimony.

If the witness fails to do so within the time allotted, the transcript may be used as if signed.

Yours,

Veritext Legal Solutions

Page 195

CERTIFICATE

I do hereby certify that I am a Notary Public in good standing, that the aforesaid testimony was taken before me, pursuant to notice, at the time and place indicated; that said deponent was by me duly sworn to tell the truth, the whole truth, and nothing but the truth; that the testimony of said deponent was correctly recorded in machine shorthand by me and thereafter transcribed under my supervision with computer-aided transcription; that the deposition is a true and correct record of the testimony given by the witness; and that I am neither of counsel nor kin to any party in said action, nor interested in the outcome thereof.

WITNESS my hand and official seal this 23rd day

Notary Public

Page 197

National Public Radio, Inc. Et Al v. Trump, Donald Et Al

Clayton Barsoum (#7665245)

ERRATA SHEET

PAGE_____ LINE_____ CHANGE_____

_____

REASON_____

PAGE_____ LINE_____ CHANGE_____

_____

REASON_____

PAGE_____ LINE_____ CHANGE_____

_____

REASON_____

PAGE_____ LINE_____ CHANGE_____

_____

REASON_____

PAGE_____ LINE_____ CHANGE_____

_____

REASON_____

PAGE_____ LINE_____ CHANGE_____

_____

REASON_____

_____   _____

Clayton Barsoum                 Date

Veritext Legal Solutions
215-241-1000 ~ 610-434-8588 ~ 302-571-0510 ~ 202-803-8830

Page 198

National Public Radio, Inc. Et Al v. Trump, Donald Et Al

Clayton Barsoum (#7665245)

ACKNOWLEDGEMENT OF DEPONENT

I, Clayton Barsoum, do hereby declare that I have read the foregoing transcript, I have made any corrections, additions, or changes I deemed necessary as noted above to be appended hereto, and that the same is a true, correct and complete transcript of the testimony given by me.

_____  _____

Clayton Barsoum                Date

*If notary is required

SUBSCRIBED AND SWORN TO BEFORE ME THIS _____ DAY OF _____, 20___.


_____

NOTARY PUBLIC

Veritext Legal Solutions
215-241-1000 ~ 610-434-8588 ~ 302-571-0510 ~ 202-803-8830

**[& - 2025]**                                                    Page 1

| **&** | **0213209** 3:19 | **11:36** 82:13 | **193** 3:4 |
|---|---|---|---|
| **&** 1:14 2:2,6 5:24 6:2 | 144:5 | **11:44** 82:17 | **1:26** 107:8 |

**&** 1:14 2:2,6 5:24 6:2

**0**

**0001385** 3:21 152:7 153:6
**0009112** 4:3 173:2,16
**0009113** 4:4 173:3
**0018106** 3:16 133:15 134:9
**0018116** 3:17 133:16
**0021963** 3:11 58:24 59:10
**0122616** 3:10 40:3,17
**0143803** 3:14 109:21 110:8
**0143808** 3:15 109:22
**0194271** 3:8 26:3,17
**0206260** 3:13 64:12,21
**0211493** 3:24 160:18 161:14
**0211496** 3:25 160:19
**02116** 2:12
**0213205** 3:19 144:5

**0213209** 3:19 144:5
**0229996** 3:22 155:22 156:7
**0229998** 3:23 155:23

**1**

**1** 3:8 5:10 26:2 26:16 27:7,17 28:1,10 39:24
**10** 3:22 9:5 42:23 47:22 51:11,24 74:2 152:5,16 155:21 156:6 156:13,16 157:16
**10/22/2025** 196:5
**100** 181:15 186:8
**109** 3:15
**10:24** 39:24
**10:31** 40:5
**10:59** 153:3
**11** 3:24 160:17 161:1,12,17,19 162:5,21 167:15
**113** 174:6
**11516** 195:20
**116** 134:9

**11:36** 82:13
**11:44** 82:17
**11th** 156:10
**12** 4:3 172:24 173:1,15,20,24 177:25 178:25
**12:29** 107:5
**12:53** 173:18
**12th** 173:18 178:23 179:15 182:6
**131** 2:12
**133** 3:17
**138** 3:18
**14** 138:13
**144** 3:19
**14th** 139:3 147:6
**152** 3:21
**155** 3:23
**15th** 134:11,16 145:22 146:10 146:13 147:3,7 147:14 148:15 149:4,15,22 150:9,17 151:2 151:8 152:1
**16** 155:20
**160** 3:25
**1674** 1:7 5:15
**1700** 1:15 2:7
**173** 4:4
**18th** 140:17

**193** 3:4
**1:26** 107:8
**1st** 16:21 65:2 65:16,21 66:1 66:22 67:3,8 116:10 117:20 118:2,3 161:13 164:22

**2**

**2** 3:9 40:2,5,9 40:16,20 53:20 58:16 82:14 111:23
**20** 110:9,15 170:17 198:15
**20036** 2:7
**2018** 170:16
**202.955.8500** 2:8
**2023** 12:12,15 12:19 13:5,20
**2024** 11:24 12:3,12 17:24 170:17 175:11 176:5,7
**2025** 1:11 5:3 10:11,24 11:10 11:10,13,18,24 14:7,16,19,23 15:6,14,19 16:7,8,17,18 17:1,4,8,24 18:4,4,13,13,18

**[2025 - 4273]**

18:19 19:24,24
22:11 26:18,20
29:21 30:3,7
30:15,22,25
31:16 32:3,8
32:14,18 34:22
35:1,12,23
40:17 41:2
44:9,9 52:21
53:23 55:4,10
56:8,23 58:15
59:11,13 60:13
61:2,5,14,17
62:18 63:20
64:22 65:2,7
65:11,16,21
66:22 67:8
74:1 76:14,19
76:19 84:4
85:5 86:13
87:11,14 92:12
93:24 94:3,7
95:6,10,21
96:22 99:9
100:16 101:8
103:8 104:2
107:18 109:4
110:9,15
111:13 113:24
114:2,6 118:1
118:22 124:4,6
127:1 130:16
130:20 131:3
131:14,23

133:10 134:11
134:16 138:13
139:3 140:18
141:6 142:1,8
142:10 143:10
148:15 149:15
150:18 151:3
152:1 153:8
156:11 157:18
161:13 163:3
163:20 164:4
170:20,25
171:3 173:18
178:12,18,24
179:15 182:8
182:23 195:18
196:3

**207** 150:1
**208** 150:23
151:15
**20th** 111:13
**213.229.7000**
2:4
**21st** 111:9
114:2 118:1
**22** 1:11 133:13
**22nd** 5:2 14:19
16:17 114:22
171:2 182:8
**23** 144:3 187:7
191:17 196:3
**23rd** 195:18
**25** 1:7 5:15
17:19,19 28:16

142:18
**26** 3:8
**261** 3:13 64:12
64:21
**28** 109:19
**29th** 26:20,25
27:16
**2:26** 138:21
**2:38** 138:24
**2nd** 59:11,13
61:1,4,14
62:18 64:22
74:1 103:12,18
104:2,10,12,15
130:16,20
131:3

### 3

**3** 3:11 26:1
58:23 59:3,4,9
60:20 62:18
82:17 103:11
107:5 149:16
150:4
**3/28/24** 26:21
**30** 115:7
124:18 187:11
196:16
**30th** 162:15
163:3,20 164:4
166:9 167:2
168:24
**31st** 26:18
40:17 53:23

54:5 55:4,10
56:8,23 58:15
115:24
**333** 2:3
**350** 121:8
**3808** 110:8
**3:42** 169:17
**3rd** 22:11 74:3
74:14,20 84:4
84:22 85:5
86:10,13 87:11
87:14 88:2
92:11 93:23
94:2,6 95:6,10
95:21 96:22
98:23 99:9
100:16 102:13
102:13,25
103:3,8 107:18
113:24 114:6
118:21 119:17
127:1 128:24
133:10 157:18
158:20 178:12
178:18 182:23
193:7,14,20

### 4

**4** 3:12 64:11,15
64:20,24 73:23
107:9 138:22
**40** 3:10
**4273** 3:8 26:3
26:17

**[45 - address]**

| | | | |
|---|---|---|---|
| **45** 89:6,8 | **64** 3:13 | **ability** 7:23 | **acknowledge...** |
| **494** 167:24 | **6:36** 168:25 | 192:20 | 198:3 |
| 168:25 | **6:46** 59:13 | **able** 72:18,22 | **acknowledging** |
| **495** 162:21 | **7** | 188:1,2 | 174:7,22 175:8 |
| **496** 161:15 | | **above** 55:9 | 184:2 |
| **4:14** 169:20 | **7** 3:18 138:6,8 | 149:16 196:6 | **acknowledg...** |
| **4:41** 185:24 | 138:12 139:2 | 198:7 | 196:12 |
| **4:47** 186:2 | 139:12,21 | **absence** 42:19 | **acronym** |
| **4th** 131:14,23 | **70** 16:22 88:8 | **absent** 41:20 | 107:22 |
| 132:4,9 | **7665245** 196:5 | **absolutely** | **act** 18:19 86:25 |
| **5** | 197:2 198:2 | 190:14 | 95:12,13 |
| | **7:24** 134:17 | **abuse** 140:1 | 105:24 177:16 |
| **5** 3:14 109:20 | **7th** 153:3,8 | 141:1,3 | 177:18,21 |
| 109:23 110:6 | 155:7 | **accepted** | **acted** 153:15 |
| 110:10,23 | **8** | 136:20 | **action** 193:9 |
| 111:4 115:18 | | **access** 141:20 | 194:2 195:15 |
| 123:15 138:25 | **8** 3:19 64:10 | **accompanying** | **actually** 64:3 |
| 169:18 194:11 | 144:4,9 145:18 | 78:23 | **adamant** 187:2 |
| **501** 2:12 | 150:22 151:12 | **account** 22:22 | **add** 153:21 |
| **535** 121:9 | **806** 115:20,21 | 55:12 75:9,12 | 154:1,9 155:9 |
| **58** 3:11 | **9** | 135:25 | **added** 92:24 |
| **59** 160:10 | | **accuracy** 165:6 | 154:19 155:1 |
| **5:00** 194:14 | **9** 3:20 152:6,17 | 196:9 | 159:3 |
| **5:59** 163:3 | 153:6,18 | **accurate** 21:21 | **adding** 155:13 |
| **6** | **90071** 2:4 | 22:2 27:15 | 159:5 |
| | **9113** 173:16 | 49:24 50:24 | **addition** 86:8 |
| **6** 3:3,16 133:14 | **9998** 156:8 | 57:16 65:2,14 | 135:9 |
| 134:2,7,13 | **9:08** 53:23 | 80:5,21 85:3 | **additional** |
| 135:14 136:4 | **9:29** 1:16 5:2 | 97:1 102:4 | 58:20 68:9 |
| 138:1 140:14 | **a** | 106:4 109:12 | 128:12 131:16 |
| 142:14,23 | | 109:15 | 155:1 |
| 169:21 | **a.m.** 1:16 5:2 | **accurately** 57:5 | **additions** 198:6 |
| **617.723.3300** | 39:24 40:5 | **accuses** 139:24 | **address** 40:23 |
| 2:13 | 53:23 59:13 | | 41:1 54:5 69:3 |
| | 74:2 82:13,17 | | |
| | 153:3 | | |

69:6,11,11,12 77:8 93:3,4 114:11 136:15 145:14 149:18 156:18,20 157:1,5 177:5 180:2,13 181:1 184:6

**addressed** 181:6

**addressing** 123:21 174:20

**admin** 163:6,22

**admin's** 163:10 163:15

**administration** 36:2,3 37:7,10 59:24 76:12 92:14,21 93:10 93:20 148:17 148:20 150:11 151:5 171:4

**administratio...** 36:9 149:19 163:16 166:10 167:3

**advance** 74:20 74:24 77:21 79:5 111:8

**adversely** 39:4 39:15

**advice** 50:13

**advise** 51:2

**advising** 50:22

**advisory** 52:17 52:24 53:13

**affairs** 10:7,9 10:23 11:3,6,9 11:13,17,20,23 12:2,21,24 13:3,5,9,22,23 13:24,25 14:1 14:2,4,10,14,17 14:20,23 15:4 15:6,21 16:16 16:19,23 17:2 17:5,10,18,24 18:3,12,18 19:3,9,23 22:10 26:21 44:1 114:23 188:12 189:1 189:10

**affect** 7:22 48:5 49:16 50:2,24 51:8 52:4,4 104:4

**affiliated** 170:6

**affiliations** 5:21

**affirm** 33:6

**affirmed** 6:14 190:23

**aforesaid** 195:4

**afternoon** 58:19

**agencies** 78:16

**aggressive** 166:17

**ago** 44:15 178:21 179:2 182:3

**agree** 5:8 19:10 51:24 52:6 62:24 103:12 130:25

**agreed** 181:15 186:8 187:6,12 187:15 191:15

**agreement** 130:15,19 131:4,15 175:10 176:5 186:11,12 188:6,9,14,15 189:18 190:7,9 190:13,15,22 191:13,22 192:6

**agreements** 130:23

**ahead** 90:19 129:21 146:23

**aided** 195:12

**air** 125:15

**al** 1:4,7 5:13,13 196:4,4 197:1 197:1 198:1,1

**alarming** 118:7

**alert** 130:2

**alerted** 135:24

**align** 167:16

**alignment** 20:3

**allegheny** 180:8

**allocated** 88:12

**allocates** 56:11 56:20

**allotted** 196:19

**allow** 130:23 131:6

**altercation** 60:17

**altogether** 180:14

**amend** 157:8

**america's** 108:13,17

**american** 87:5 176:18

**americans** 93:7 121:8 166:2 174:14 176:19

**amount** 99:3 141:5 187:22

**amounts** 136:22

**analysis** 164:7 169:10

**anecdote** 172:1

**angeles** 2:4

**animus** 35:20 35:24 36:5,13

**[animus - apts]**

36:18,22 37:19
37:25 38:5
**anne** 15:7,13
**announced**
116:19
**answer** 7:15,16
14:12 18:23
20:23 24:16
25:10 26:9
33:23 48:20,24
51:15 72:5
79:13 80:5
91:14,17,20,22
91:23 102:20
105:6 129:8
146:21 193:12
**answered**
89:19 103:16
106:14 184:16
184:18
**answering** 7:1
170:23
**answers** 7:4
**anticipated**
70:1
**anticonservat...**
139:25
**anybody** 55:1
81:5,5 82:2
102:19
**ap** 109:7
**apart** 25:7 70:6
109:13,16
149:17

**appeal** 159:15
**appealing**
121:8 159:21
**appear** 69:21
**appearances**
5:20
**appears** 162:1
**appended**
198:7
**applicable**
196:8
**applying**
175:13
**appointed**
118:8
**appointee**
76:11
**appreciation**
37:2 38:8,11
**approach** 76:6
76:9 77:8
131:15 164:8
**appropriate**
39:19 74:5
**appropriates**
35:18
**appropriation**
34:17 64:3
109:10 125:9
125:12 126:18
126:20 127:13
181:3,7 187:1
**appropriations**
19:19 28:16

30:12,14 31:2
104:9 105:16
115:9 124:25
135:5,17,22
**approve** 192:18
192:19,20,22
192:23
**approximately**
8:23 9:13,21
10:1 13:8,19
32:16 89:6,8
**april** 22:11
34:21 35:1,23
52:21 59:11,13
60:13 61:1,4
61:14,17,22
62:18 63:20
64:22 65:2,7
65:11,14,16,21
66:1,22 67:3,8
70:1 74:1,3,14
74:20 84:4,21
85:5 86:10,13
87:10,14 88:2
92:11 93:23
94:2,6 95:6,10
95:21 96:22
98:23 99:9
100:16 102:13
102:13,25
103:3,8,12,18
104:2,8,10,12
104:15 107:18
110:9,15 111:9

111:13 113:24
114:2,6,22
116:10,23
117:20 118:1,2
118:3,21
119:17 124:4
127:1 128:24
130:16,20
131:3,14,23
132:4,9 133:10
134:11,16
138:13 139:3
142:10 145:22
146:9,13 147:3
147:6,7,14
148:15 149:4
149:15,22
150:8,17 151:2
151:7 152:1
153:3,8 155:7
156:10 157:18
158:20 162:15
163:3,20 164:4
166:9 167:2
168:24 178:12
178:18 182:23
193:7,14,20
**apts** 108:10,12
108:13,25
109:3,6,7,15
126:17,22
127:8 128:22
128:25 129:5
130:10 132:11

**[apts - avoid]**                                                          Page 6

132:15 181:12
186:13,23
189:7,9,15,23
191:24
**areas** 189:4
**argument**
163:5
**arrangement**
123:25
**arriola** 15:8
**arrive** 84:4
85:4,7 86:2
123:24
**arrived** 67:21
85:8 98:10
100:4
**arriving** 98:22
**article** 3:18
138:3,7,13,16
139:3,6,10,12
139:20
**articulated**
89:11
**aside** 36:10
40:18 50:20
70:25 169:12
**asked** 23:21
27:3 29:10,23
33:20 51:20
56:3 58:5
66:18,21 68:9
80:6,11 81:3
81:19 88:21
89:18 91:12

96:14 103:15
106:13,16
144:21 145:4
152:24 169:10
184:15 186:5
**asking** 25:25
30:24 31:4,6
36:17 66:7
71:24 88:23
89:2,14,16
93:15,16 96:11
112:6 122:19
136:21 141:4
161:19 182:10
189:24,24
190:12
**asks** 74:2 128:4
143:7
**asserting**
126:15
**assertion** 93:10
93:19
**assertions**
93:23
**assigned** 64:4
143:17,22
**assist** 106:2
**assistance** 50:9
**assisting** 65:7
**assists** 43:11
**associate** 13:21
21:4 65:7
79:19

**associated** 47:3
53:2 145:5
**association**
108:1,5 109:7
**assume** 32:5
67:18 71:10
74:18 77:23
102:8 117:23
121:14 130:8
134:20 139:8,9
139:11 147:12
147:13 153:9
155:4 156:23
163:14,17
175:4 178:14
**assuming** 145:7
**attached**
110:23,25
111:4,13
123:14 145:17
151:12 157:15
196:11
**attachment**
110:1,7,10
111:24 112:17
115:18 152:20
153:2 156:7,13
**attachments**
133:18,20
134:1,8
**attend** 78:24
82:22,25 83:2
83:7,11 84:7
114:2

**attended**
113:24 114:15
115:14,14,15
**attendee** 83:25
**attending**
74:14,21 114:5
114:12
**attorney** 5:22
196:13
**attribute**
183:15
**attributed**
183:6
**audible** 7:3
**audio** 5:7
**august** 10:11
10:24 11:10
18:4,13,18
19:24
**autocorrect**
134:19
**automatic**
22:24
**autonomy**
192:25
**available** 68:1
68:7,10 99:20
122:25 177:5
196:6
**avenue** 2:3
**avoid** 118:12
125:16 135:11
182:3

**[avoiding - begins]**

**avoiding**
177:25 179:23
184:4
**aware** 43:3
45:1 46:15
47:22 48:2
49:25 50:20
51:2 55:14
61:1,4,6 66:13
66:16 84:14
103:18 104:2
106:20 130:13
130:18 131:2,5
131:13,23
140:20 157:14
169:8 170:19
**axe** 139:5

**b**

**b** 3:6 12:6
40:22 114:20
151:21
**baby** 119:9,16
119:24 120:6
120:14,20
121:2,12,22
123:18 171:5
171:11 178:5
178:17 179:10
179:18 180:1
181:18 182:16
183:7,18,19,23
184:8,12
185:13

**back** 14:7
24:19 41:18,22
42:17,22 43:2
48:25 53:5
69:23 80:12,17
91:1 95:25
98:5,10,18,22
133:4 136:16
140:14 142:13
163:4,24
178:24 186:21
188:3
**background**
66:18 68:9
**bad** 79:16
**balanced**
153:21 154:2
**balances**
142:16,17
143:4,8,9
**barrasso** 158:3
158:6,8
**barsoum** 1:13
3:2,8,9,11,12
3:14,16,18,19
3:20,22,24 4:3
5:11 6:12 26:2
26:6,15 40:2,8
58:23 59:8
64:11,19 82:20
107:11 109:20
110:5 133:14
134:6 138:6,12
139:2 144:4,16

152:6 155:21
156:4 160:17
160:25 173:1
173:14 186:5
196:5 197:2,24
198:2,4,12
**based** 76:4
**basic** 86:23
**basics** 6:24
87:6,18
**basis** 29:12
48:7 182:20
**bates** 3:8,9,11
3:12,14,14,16
3:17,19,20,22
3:22,24 4:3,3
26:3,17 40:3
40:16 58:24
59:10 64:12,21
109:21,21
110:7 115:19
133:15,15
134:8 144:5
150:23 152:7
153:6 155:22
155:22 156:7
160:18 161:14
162:20 173:2,2
173:15 174:5
**bathwater**
119:10,16,24
120:7,14,20
121:2,13,22
123:19 171:5

171:12,14
178:5,17
179:11,18
180:1 181:18
182:16 183:7
183:19,20,23
184:8,12
185:14
**battle** 150:13
**bearing** 3:8,9
3:11,12,14,16
3:19,20,22,24
4:3 26:3,16
40:3,16 58:24
59:9 64:12,20
109:21 110:7
133:15 144:5
152:7 155:22
156:7 160:18
173:2,15
**becoming**
10:22 11:2,12
11:16 12:1,14
**began** 49:2
116:10
**beginning** 1:16
5:21 146:6
156:9
**begins** 40:5
82:17 107:9
115:24 124:9
138:25 157:24
158:2 169:21

**behalf** 5:24 6:2 6:5 192:5
**belief** 105:18 105:23 120:3
**believe** 23:19 27:13 37:20 38:7 39:17 46:4 49:4,18 55:20,23 57:1 57:3,9,21 59:16,19,25 61:23 62:8 64:25 69:13 76:10,12 80:18 82:9,24 85:15 85:20 91:10 92:14,21 93:10 93:20 96:17 97:15 104:20 109:4 111:11 112:7 119:19 120:5 121:17 124:15 127:2 134:14 135:7 135:23 142:12 165:11,22 169:7 170:23 172:12,23 173:21,25 184:18 188:20 189:7
**believed** 58:9 58:11 63:5 113:16 117:6

118:15 147:21
**believing** 186:18
**beneath** 40:20
**benefit** 155:12 181:14 186:7
**bento** 172:13
**best** 136:2 189:4
**better** 66:4 71:4 113:11
**beyond** 83:3 191:14
**bias** 139:25 150:14
**biased** 38:24,24 148:19 151:23
**big** 34:11 167:20
**bill** 111:19 129:14 130:5,6 186:22
**bills** 124:19
**bio** 39:20
**bit** 118:5 166:17
**black** 1:17 5:19 46:22,24 47:4 47:9,13,15,17 144:18,19,23 145:5,8,10,13 145:18 146:1,4 148:6,15 149:3 149:14,21

150:8,18,21
151:2,8,13,18
152:1 162:8,13
163:19 164:4
164:23 166:8
167:1,12 169:1
**blackrockgro...**
145:15
**blackrockgrp...**
162:14
**bland** 164:9 165:14
**blank** 81:17 136:12,13
**block** 163:2
**blow** 188:5
**board** 44:12,13 44:14 66:7 67:12,21 68:1 70:19 74:21 77:1 79:6 80:13 82:25 83:3,8,10,13,16 83:17,18,24 84:1 94:18 100:17 104:24 106:11,23 110:18 111:6,7 113:13 114:3,5 114:8,13 117:11,11,15 117:17 118:4,9 118:11 119:6 119:21 129:19

130:14,19,22
131:3 148:24
153:22 154:2
157:4,10
159:12 160:3,6
160:7 177:13
177:14 191:20
191:23,24
192:6,13
**bodre** 80:9
**boss** 140:5
**bosses** 188:15 189:9,13
**boston** 2:12
**bottom** 53:24 134:15 135:13 136:5 142:19 150:1 151:15 152:23 167:23 173:24
**bounds** 191:7
**box** 172:14
**boy** 137:11
**braithwaite** 2:25 5:16
**branch** 18:20 19:11 111:20
**break** 39:20 74:6 80:1 107:12,14,16 169:14
**breaking** 90:7
**brendan** 15:7 162:9,15 163:4

**[brendan - capito]**

| | | | |
|---|---|---|---|
| 163:20 164:5 166:12 167:5 168:18 | **brockman** 15:7 15:16 16:3,5,7 | **bullet** 174:7,22 175:2,5,6 | 69:4,7,8,15,19 70:5 73:2,9 |
| **brief** 146:7 160:16 | **brockman's** 15:13 | 176:13,14 177:4,24 | 74:13,24 77:8 77:22 78:25 |
| **briefly** 193:4 | **brother** 158:21 | **bus** 126:16 | 79:2 83:6,10 |
| **briggs** 15:8 | **brought** 127:21 137:11,17 | **busy** 114:22 | 83:24 84:3,11 |
| **bringing** 182:21 | 182:8,14 185:16 | **butler** 111:6 | 84:14,18,24 85:3 86:1,3,9 |
| **broad** 158:14 | **bucket** 187:13 187:16 191:16 | **c** | 89:9 94:1,6,8 94:12,23 95:6 |
| **broadcast** 137:6 | 191:17 | **c** 2:1 22:23 40:22,22 | 97:25 98:7,20 99:7 100:10,15 |
| **broadcasting** 2:15 6:6 8:7 | **budget** 20:1,7 20:10,14 22:5 | 114:20 151:21 195:1,1 | 100:24 113:10 118:23 129:19 |
| 10:4,10,15 20:12 22:15 | 23:20 24:6,7,9 24:13 25:8 | **california** 2:4 | 156:25 157:10 158:1,9,11,12 |
| 25:20 31:1 36:12,22 37:4 | 28:12,13 30:23 32:25 35:8 | **call** 28:22,25 29:9 30:2 57:6 | 159:6,23 |
| 48:2 52:1,19 53:1 63:13 | 37:9,18,24 38:5 52:21 | 57:9 66:1,22 67:3 127:9,14 | **calvert's** 156:20 158:6 |
| 77:2 79:7,8 86:25 95:13 | 74:25 76:25 77:10 78:15 | 127:16,20,21 129:12,16,22 | 159:17 |
| 103:22 106:12 148:18 172:5 | 104:19,25 105:21 106:7 | 136:5 157:7 188:18 189:1 | **camille** 14:25 15:8 |
| 172:11,17 174:12 180:4,8 | 124:4 127:24 135:3 139:22 | 189:14 | **candid** 174:11 |
| **broader** 51:19 180:23 | 165:9,23 178:12 192:20 | **called** 6:13 23:19 28:13 | **capacities** 44:19 |
| **broadly** 14:13 28:5 49:4 51:6 | **budgetary** 106:1 | 29:5 46:21 80:17 129:13 | **capito** 169:24 169:25 170:1,3 |
| 51:13 58:13 60:15 140:21 | **building** 78:4 78:21 85:13 | 129:13,14 | 170:5,9,13,16 170:19,22,22 |
| 140:25 192:21 | 97:7 166:16 | **calling** 66:3 153:13 | 170:24 171:22 171:24 172:3 |
| | | **calls** 127:15 129:12 170:23 | 172:16 173:23 174:20 180:25 |
| | | **calvert** 67:21 68:4,7,11,15,19 | 184:21 185:10 |

career  20:11 22:3 34:25 35:10 37:22 79:23
carefully 175:15,23 176:9
carl  145:3,7,11 147:3,11,12,13 148:6,14 162:8 163:2 164:3,23 166:7,8,15 167:1,9,11 168:25
carr  40:19 43:4 43:9
carried  86:21
carries  62:14
case  1:6 5:15 16:3 65:10 73:20 134:24 142:10 145:16 164:2
caucus  69:22
cause  104:21
caused  183:1,5
cbarsoum 40:25 69:5
cc'd  155:7
center  145:19
ceo  61:15 62:2 63:2,12 108:25 109:1,3 113:7 153:22 154:10

155:10
ceos  189:16
certain  137:13 137:19
certainly 102:20 177:5
certified  1:18
certify  195:3
cfo  43:14
cforti  145:15
chair  68:1 74:21 77:1 79:6 83:8,10 83:13,17,18,24 94:18 104:24 110:17 112:24 112:25 113:4,9 113:13,20,23 157:4,10
chairman 117:10
chairperson 117:11 119:6 119:21
change  28:4 131:14 133:6 177:21 197:4,7 197:10,13,16 197:19
changed  16:20
changes  196:10 198:6
changing 150:10

characteristic 112:2
characterizati... 166:14 167:7
characterize 27:25 44:7
characterized 111:25
charge  93:7 105:9
check  77:13,14 136:12,13
checking  80:15
chief  41:6,11 43:21,23 62:3 63:3 140:11 164:13 182:13
children 172:14
choice  83:7
circulating 27:23
civic  161:3
claim  163:23
clarification 96:8
clarify  13:13,15 117:3 168:8,14 168:19
clarity  191:6
clayton  1:13 3:2 5:11 6:12 26:25 80:11 110:19 111:1

124:10,11 196:5 197:2,24 198:2,4,12
cleaned  154:25
clear  50:11 52:10 81:17 89:7 112:3,5 152:16 174:10 191:1
climate  105:2
close  36:3,6,12 36:21 37:8 78:21 115:6 124:18 139:25
closing  37:3,6 37:11
clue  87:16,20
cochair  153:22 154:11 155:10
collaborated 126:22
collaboration 186:17 187:3
collaborative 128:3,6
collaboratively 126:18
colleague  22:25 23:1 58:4 60:21 61:25
colleagues 57:17,25 70:24 71:7 186:18 189:10

**[collectively - congress]**

**collectively** 110:2 123:15 127:9 134:1

**colleen** 108:21

**collins** 122:7,11 122:13

**collins's** 122:1 122:4,17,20

**color** 56:5 83:2

**columbia** 1:1 1:20 5:15

**com** 162:9

**combination** 98:6 124:21

**combined** 83:14

**come** 22:20 61:8 158:4

**comes** 47:5 158:12 163:4

**comfortable** 164:8,18 165:12 166:19

**coming** 14:7 41:12 54:7 91:2 97:14 98:24 115:8 157:18 158:19

**comments** 38:20

**commercial** 93:7

**committee** 135:5 154:17

154:21

**committees** 28:17 30:12,14 31:3

**common** 187:4 187:4

**communicate** 69:4 70:10 117:14 156:23 157:3,9

**communicated** 56:10 67:11 120:24 128:21 128:22,25

**communicating** 44:12 165:10 165:12,19 166:4,18,18

**communication** 146:4 147:16 148:7,8

**communicati...** 8:2,6 19:16 47:9,14,16,17 50:13 57:17 68:3 70:5,22 71:6 81:23 82:1 84:25 100:23 102:17 121:19 144:17 144:22,23 145:9,11 148:5 165:8

**communities** 95:1

**community** 21:17 95:4

**company** 50:9

**comparing** 71:23

**complete** 198:8

**completed** 196:16

**completely** 87:3 88:9

**complex** 98:4

**compliance** 28:14,21,23 30:3

**comply** 167:16

**comprise** 163:23,25

**compromise** 164:1

**computer** 195:12

**con** 87:24 90:2 137:16

**concern** 104:21 104:23 154:7 180:22

**concerned** 35:17 62:12 104:6,7 105:13 187:19

**concerning** 45:14 94:12

124:16 161:8

**concerns** 104:3 104:11 149:19 174:7,11,23,25 174:25 175:1,8 175:9,16,24,24 175:25 176:11 176:12,19 177:6 180:3,13 180:16 181:1,6 184:2,6 189:24

**conclude** 76:4 97:4

**concluded** 194:14

**concludes** 194:12

**concluding** 13:20

**conclusion** 37:15 98:25

**conclusions** 75:11 189:3

**concurrently** 123:20

**confirm** 50:19

**confirmed** 74:13 118:8

**cong** 19:16

**congress** 17:12 17:13 18:6,7 18:21 19:4,8 19:11,13,17 24:15 25:6

**[congress - corporation]**

29:8 32:6,9
33:8,14,16
35:17,18,19,21
52:11,14 62:12
64:2,4 112:13
115:11 118:18
118:19 120:22
121:5,9 123:8
123:9,10
124:19 135:8
135:10 137:13
137:19 138:14
139:4 142:24
143:12 171:16
174:14 181:20
186:19 187:4
191:3
**congresses**
137:1
**congressional**
99:18 122:15
139:23
**congresspeople**
123:3 171:20
**congressperson**
120:25 121:20
**conjecture** 63:7
**connection**
106:5,21
154:20
**conservative**
158:4,7,13
159:1,7,7,17,24
159:25 160:2

**consider** 14:8
32:24 36:5,20
71:13,16,20,24
72:1,14 117:8
160:25 176:22
190:13,15
**considerations**
149:15 150:2
**consistent**
105:24 181:10
**constituents**
171:17
**consult** 51:3
**consultancies**
47:19,21
**consultancy**
47:1
**consultant** 41:8
41:12,18,23
42:5,10,12,17
42:23 45:22
49:14 50:1,7
53:10,12,15
**consultant's**
50:8
**consultants**
43:2 44:20
45:2,7,13 48:1
**consulted**
160:15
**consulting**
50:13,16,19,21
52:17,24 53:13

**cont'd** 4:1
**contact** 55:13
97:17 135:21
**contacted**
115:25
**content** 49:7
56:3 145:21
151:23 172:16
187:11 192:18
**context** 19:13
26:12 28:4
120:20 183:25
**continuation**
36:14
**continue** 5:7
127:10
**continues** 27:3
164:7
**continuing**
28:14,24 30:4
31:1 32:11
33:1,17 34:4
35:11 51:10
135:14 188:2
**contract** 49:2
143:17 166:20
169:5
**control** 95:16
**conversation**
29:17,20 55:25
56:8 67:14,18
74:16 86:18
99:2 101:3
127:22 175:3

178:4,11 179:9
179:25 185:12
**conversations**
5:6 47:12 71:9
102:14 150:25
171:15
**convey** 52:12
151:19
**convince**
167:21 168:3
168:21
**coo** 42:8,13,17
43:10 44:20
61:16,20,20
**copies** 144:12
173:8 196:14
**copying** 110:15
164:4
**corporate**
43:22 44:11
113:21
**corporation**
2:14 6:5 8:7
10:4,10,13,14
10:24,25 11:2
11:14,16 12:2
12:16,18 20:12
22:15,20 25:20
27:20 30:25
31:11,21 32:2
36:4,7,12,21
37:3,8,14 48:2
50:22 52:1,18
52:25 62:4

| | | | |
|---|---|---|---|
| 63:12 77:1 | 150:20 151:9 | **count** 15:10,11 | 38:24 39:4,16 |
| 79:6,8 103:21 | 151:10 152:2,3 | **country** 169:7 | 40:3,17,23 |
| 106:12 114:24 | 155:6 159:18 | **couple** 39:8 | 41:8,11,19,23 |
| 115:7 148:17 | 161:10,17 | 85:11 | 42:5,10,12,17 |
| 193:8,15,21 | 162:11 163:13 | **course** 70:9 | 42:22 43:6,9 |
| 194:2 | 163:16 165:17 | 108:2,15 | 44:2,8 45:2,12 |
| **correct** 8:10 | 166:14 167:7 | 135:22 | 47:22 49:14 |
| 17:6 19:4,5 | 167:12 174:3 | **court** 1:1 5:14 | 50:1 53:2,9 |
| 22:1,7,11 | 175:2 176:1,14 | 5:18 6:9 24:18 | 54:1 56:11,20 |
| 23:25 31:3 | 177:20 178:1,2 | 172:22 | 57:16 58:8,21 |
| 35:1,3,5 47:8 | 178:9,13,21 | **cover** 23:14 | 58:24 59:10,25 |
| 50:4 53:17 | 181:10 183:21 | 68:12 109:25 | 60:22 61:2,5 |
| 54:10 55:22 | 185:7 186:10 | **cpb** 3:8,10,11 | 61:13,25 62:2 |
| 56:24 57:19,23 | 192:15 195:13 | 3:13,14,15,16 | 62:13,14,20 |
| 58:4 61:21 | 198:8 | 3:17,19,21,22 | 63:2 64:8,12 |
| 65:18 73:9 | **correction** | 3:23,24,25 4:3 | 64:21 71:16,20 |
| 79:17 106:9 | 58:11 | 4:4 10:12 11:9 | 72:1,15,18,22 |
| 107:12,13 | **corrections** | 11:13,23 12:24 | 74:21 78:24 |
| 109:14,17 | 198:6 | 13:3,5,15,18 | 79:4 82:22,22 |
| 110:23 111:9 | **correctly** 85:21 | 15:2,14,21,23 | 83:19 85:22 |
| 112:17 113:2 | 191:2 195:10 | 16:17,19,21 | 86:25 87:2 |
| 113:18 116:3,6 | **corresponds** | 17:3,10,25 | 91:16 92:20 |
| 116:13,14 | 149:8 | 18:4,13,18 | 93:17 94:24 |
| 117:2 118:2,13 | **cosponsors** | 19:4,9,13,23 | 95:11,14,22 |
| 118:24 119:10 | 124:22 | 20:7,16 22:23 | 98:5,10,18,22 |
| 122:8 124:2,3 | **costs** 37:8 | 23:2,25 24:8 | 99:8,23 100:4 |
| 124:7,8 128:15 | 115:7 124:18 | 24:10 25:4 | 100:17 101:17 |
| 133:25 134:13 | **counsel** 5:20 | 26:3,17 28:3,8 | 101:21 102:8 |
| 135:6 136:11 | 8:7,9,12,18,24 | 28:15,19 29:7 | 102:14 103:14 |
| 137:23 144:18 | 9:2,8,12,17,20 | 29:17,19 30:10 | 104:3,4,6,8,11 |
| 145:1,10 | 9:23 43:16 | 30:13,16,19 | 104:12,21 |
| 146:16 147:15 | 79:7 102:18 | 31:15 32:7 | 106:21 108:2 |
| 148:2 149:5,12 | 195:15 196:14 | 33:10,18 34:12 | 108:15,20 |
| 149:23 150:19 | | 37:2 38:8,11 | 109:9,13,16,21 |

**[cpb - day]**

109:22 110:8
114:13 115:24
116:1,10,12,16
116:25 117:9
117:12,20
118:5,13,16
119:2,7,21
120:2,16,24
121:1,18
122:12,18,21
123:4,8,10
124:2,5,18,20
124:23 125:3,8
126:15,17,19
126:22 128:10
128:14 130:19
130:23 131:6
131:15,24
132:22 133:15
133:16 134:9
135:1,4 136:6
139:24 142:5
143:13,17
144:5 145:25
147:3 148:9,21
148:23,23
149:17 150:13
151:3,14 152:7
153:6 155:22
155:23 156:7
156:25 157:4
157:11 159:15
160:3,18,19
161:14 163:13

164:14,18
165:6 166:9
167:2 169:5
171:9,12 173:2
173:3,16 174:2
174:23 175:6,9
176:4,13,21
177:13,18
178:4 179:9,17
179:25 180:4
180:14,20
181:11 182:14
182:24 183:8
183:20 184:2
185:12 186:13
189:15 191:25
192:5,6,14,17
192:24 193:21
**cpb's** 14:17,20
14:23 15:5
19:19 22:22
23:20 24:5
28:23 35:12
41:5 42:8
43:14,16 86:23
94:18 118:9,10
122:24 124:5
125:12 126:18
127:13 131:14
153:21,22
154:1,10
155:10 163:5
180:24 181:10
187:1,25

**cpb.org** 22:22
40:22,25 53:23
54:5 55:12
116:5,8
**cpb.org.** 69:5
**cpp** 180:24
**cr** 28:15 29:6,6
**created** 118:18
**creative** 172:14
**criminal** 21:16
21:22
**critical** 94:24
105:4
**crossed** 190:21
**crutcher** 1:15
2:2,6 5:24 6:2
**cs** 196:15
**current** 43:14
43:21 61:20
62:3 63:3
109:1 140:8,10
141:24 150:7
**currently** 10:3
28:20 42:9
73:1,11 125:13
**cut** 122:24
164:9,18 165:6
165:13
**cv** 1:7 5:15

| d |
| --- |

**d** 2:11 3:1 4:1
114:20

**daly** 15:7 162:9
162:15 163:4
163:20 164:5
166:12 167:5
168:18
**damage** 180:5
**damaging** 64:7
**danica** 46:2,5
164:21 165:20
166:12 167:5
167:10,14
168:1
**dartmouth**
2:12
**daryl** 43:13,14
124:11
**date** 9:19 22:12
32:4,11 38:13
74:16 127:19
132:4 146:6,7
147:23,24
148:4,20
188:10 197:24
198:12
**dated** 26:18,20
59:10 64:22
110:9 134:11
138:13 139:3
150:8 161:12
161:13 173:17
**dave** 62:19,21
**day** 74:2 76:7
102:7 104:18
111:17,18

**[day - different]**

116:21 117:23
117:24,25
127:4,5 128:17
128:19 132:6
141:23 150:19
189:14 195:18
198:15
**days** 32:19
74:18 130:7,9
142:7,9,11
163:6 196:16
**dc** 1:16 2:7
66:19 67:24
83:6,14
**deadline** 32:11
32:12
**deaggregated**
121:7
**deal** 34:11
137:7
**dealings** 108:3
**deb** 43:17,20
43:21 62:17
110:15,19
111:1 124:10
149:9 162:8,15
163:3,19
164:17,22
165:3,5 166:12
167:5 168:18
179:14 181:16
182:1
**debate** 148:25

**deborah** 40:19
43:4,9
**debra** 44:21
59:13 113:21
**decent** 99:3
**decentralized**
121:7
**decide** 31:12
**decided** 31:21
31:22 157:17
**deciphered**
76:8
**decision** 46:8
52:15 67:20
68:5 83:11
130:14,18
131:13
**decisions** 45:8
45:14,15 52:15
53:1,10 130:23
148:20
**declarations**
93:22
**declare** 198:4
**declined** 29:15
**deemed** 198:6
**deep** 75:19
**deeply** 158:4,6
158:13 159:6
159:24
**defend** 60:1
**defendant** 2:14
**defendants** 1:8

**define** 19:12,14
72:13
**defined** 143:24
**defines** 143:13
**defining** 50:6
144:1,2
**definition**
53:14
**definitively**
27:10
**defund** 124:20
124:20,20
**delays** 69:23,24
69:25
**delivered**
183:17
**deloitte** 49:1,13
49:24 50:20
53:4
**demand** 34:12
**dementia** 42:1
**democratic**
37:1 69:21
**department**
14:9,14,17,20
14:24 15:6
16:24 140:24
**departments**
44:6
**deponent** 195:7
195:9 196:13
198:3
**deposing**
196:13

**deposition** 1:13
5:11 6:21 8:1
9:9,12,18,24
194:12,14
195:12
**deputy** 43:10
**describe** 65:24
112:2 188:6
**described** 9:25
92:7 95:23
176:12
**describing**
101:9 118:3
**description** 3:7
4:2 103:7
**designated**
23:20 24:6,7
**desire** 39:3,14
**desiree** 15:8
**destroy** 37:22
**details** 58:17
77:15
**deteriorating**
42:2
**determine**
23:16 75:3
**development**
45:21 153:11
153:14
**difference**
143:25
**different** 14:3,5
31:18,20 44:5
50:8 63:24

83:17 84:1 97:8,9 98:2 103:24 116:19 121:10,10,13 146:24 159:12 159:13 169:8

**differing** 160:7

**difficulty** 85:9 85:17,18

**direct** 108:3,16 108:19 151:22

**directed** 38:21

**direction** 97:8 97:10

**directly** 68:20 68:21 141:5

**director** 11:19 11:22 12:1,9 12:11,14,20,23 13:2,4,9,17,23 16:16 17:9,17 17:23 21:4 65:8 79:20 139:22 191:23

**directors** 191:20,25

**disastrous** 115:3

**disbursements** 141:7

**disclose** 8:5

**disclosing** 117:16

**discuss** 22:5 28:13,23 86:22 98:8 127:25

**discussed** 21:8 21:12 23:22 56:5 63:22 66:23 67:3 98:11 99:7,10 102:24 103:7 114:7,16,19 116:4 122:3,5 128:8 154:3 155:3 186:24 189:2,17 190:1

**discussion** 21:13 63:19 65:25 87:9 98:13,15,17,22 99:13,22 100:3 114:9 122:11 122:16 128:2 132:8 143:11 161:1,6 178:18

**discussions** 8:13,17 25:18 29:19 33:10 34:2 46:12,17 51:25 52:7,10 77:7,20 84:13 84:17 120:21 123:2 131:9 171:8

**disdain** 119:1 120:1 132:21

132:21

**dislike** 118:23 119:8,15,23 120:12 121:10 121:20 122:8 123:17 126:2 126:10 132:17

**disliked** 121:5

**dislikes** 37:21

**dispersed** 141:5

**dispute** 165:4,5 166:13 167:6

**distance** 78:22

**distinction** 180:11,16

**distinguish** 180:21

**distributing** 87:1

**distribution** 49:4,7

**distributor** 172:10

**distributors** 87:6 136:19

**district** 1:1,1 1:20 5:14,14

**document** 3:8,9 3:11,12,14,16 3:19,20,22,24 4:3 26:2,7,13 31:5,6,8 33:7 40:2,9,15

57:21 58:6,23 59:5 64:11,17 73:20 74:9 80:4,24 109:20 110:3,24 133:14 134:3 138:10 143:18 144:4,11,14 147:1,2,5 152:6,10 155:15,21 156:2 160:17 160:23 173:1,9 173:10 190:11

**documented** 118:1

**documents** 8:21,23 9:2,5 80:23

**doge** 60:17 111:17 115:4 124:23 140:22 140:23

**doing** 76:1 77:4 81:18 125:20 166:6 180:15

**doj** 96:18

**dollars** 192:19

**donald** 1:7 5:13 196:4 197:1 198:1

**door** 78:5,9

**dore** 2:3 3:3 5:23,23 6:18

7:11,20 8:8 14:15 16:6,13 16:14 18:24 20:25 21:20 24:4,16,24 25:13 26:1,5 26:14 32:23 33:22 34:9 35:22 39:11,21 40:7,11,13,14 45:11 48:7,10 48:13,16,21 49:12 51:5,17 54:21 55:2 59:3,6 62:16 63:10 64:10,18 71:5,22 72:7 73:17,25 74:8 74:11 79:14,25 80:20 81:1,6 81:10,14 82:7 82:11,19 83:22 84:20 89:20,23 90:3,6,10,16,20 90:24 91:7 100:1,2,22 101:15 102:11 102:22 103:20 105:17 106:19 107:2,10 109:19,25 110:4 115:16 118:20 123:13 125:6 129:11

131:1,20 132:5 133:2,5,13,17 133:25 134:4 138:11,19 139:1 142:22 144:3,12,15 146:22 152:5 152:11,15,20 152:25 153:5 155:20 156:3 159:14,22 160:10,13,14 160:24 166:22 166:24 168:7 169:15,22 173:7,11 176:8 176:23,25 177:2 184:23 185:19 186:4 190:8 192:11 193:2,11,17,23 194:4,9

**dot** 162:9

**doubt** 57:14 111:2

**draft** 28:19 29:15,16 110:18,22 111:8 119:5,20 123:14 126:12

**drafted** 17:13 139:22 141:18

**drafting** 18:6 19:15 157:21

**drastically** 16:22

**draw** 75:11

**drawing** 180:11,15

**drink** 160:11

**driving** 172:4 172:11 192:5

**duly** 6:13 195:7

**dunn** 1:14 2:2,6 5:23 6:2

**duplication** 135:11

**dynamics** 150:10

**e**

**e** 2:1,1 3:1,6 4:1 12:6 68:19 110:12 116:8 195:1,1 197:3 197:3,3

**earlier** 135:23 156:21 186:13

**early** 34:21 63:19 87:15 116:23 136:9 170:16

**easier** 70:22

**easily** 163:7

**easy** 99:21

**economic** 169:6 169:10

**economics** 169:5

**editorial** 175:21

**edits** 149:10 155:2

**educate** 19:17 86:23 105:13 115:11 128:5

**education** 45:20 46:19 161:2,7

**educational** 92:1 93:6 107:25 108:4 161:4 165:24 166:1,4

**eeob** 77:13,16 77:19 78:3,9 78:14,21 98:4

**effect** 69:12 88:10 97:11 154:10 159:6 171:10

**efficiency** 140:24

**effort** 23:16 126:23

**efforts** 127:12

**eisenhower** 78:3

**either** 38:20 61:19,19 62:3 63:3 81:7 98:7

**[elevated - events]**

| | | | |
|---|---|---|---|
| **elevated** 13:23 | 142:14 143:3 | 138:22 169:18 | **eos** 106:3 |
| **eliminate** | 145:14 147:18 | **engaged** 51:2 | **equity** 161:4 |
| 187:12 | 147:22,25 | 53:9 | **errata** 196:11 |
| **eliminating** | 151:12 152:19 | **engagement** | 196:13,16 |
| 123:5 180:14 | 152:21 153:1,2 | 45:3 108:16,19 | **eschwietering** |
| 187:15 | 153:7,17 | 161:4 | 2:8 |
| **elimination** | 154:25 155:2,5 | **enhancement** | **escorted** 85:14 |
| 180:3 191:15 | 155:7 156:6,9 | 175:21 | 97:7 |
| **ellie** 2:6 6:1 | 156:15,20,25 | **ensure** 28:21 | **especially** |
| **email** 22:24 | 157:5,12,12,13 | 64:6 | 19:18 94:25 |
| 26:18,19,22,25 | 161:12,24 | **ensuring** 64:2 | 174:15 |
| 27:16 40:17,18 | 162:7,8,12 | **entered** 85:13 | **esq** 2:3,6,11 |
| 40:23,25 53:22 | 164:15,15 | 98:3 189:19 | 196:1 |
| 54:4,5,9 55:4,9 | 165:6,21 169:2 | 190:10 | **est** 1:17 |
| 55:9,11,25 | 173:15,16 | **entire** 13:17 | **estimate** 13:12 |
| 56:2,3,10 57:2 | 178:23 179:15 | 22:3 34:25 | **et** 1:4,7 5:13,13 |
| 57:11 58:15 | **email's** 178:20 | 62:15 79:22 | 196:4,4 197:1 |
| 59:10,12,14,17 | **emailed** 22:22 | 86:13 119:2 | 197:1 198:1,1 |
| 60:20,20 61:23 | **emails** 40:20 | 122:5 123:1 | **evaluate** 176:6 |
| 62:17 64:22 | 64:23 69:7 | 127:13 155:15 | 176:17 |
| 65:4 66:5 | 80:8 104:15 | 177:6 187:1 | **evaluated** |
| 68:22 69:3,6,9 | 110:10 134:12 | **entirely** 70:3 | 49:11 |
| 69:11 70:22 | 134:22 156:12 | **entities** 136:7 | **evaluating** |
| 71:1,7 103:13 | 161:21 166:11 | 150:12 177:19 | 175:15,23 |
| 106:17 109:25 | 167:4 168:11 | 180:18 191:21 | 176:10 |
| 110:7,8,13,14 | 168:16 173:19 | **entitled** 191:16 | **evan** 43:15,16 |
| 111:13 112:16 | **employed** 10:3 | 191:18 | 79:1,3 95:11 |
| 112:22 113:12 | **employer** | **entity** 87:3 | 95:13 96:11,15 |
| 115:18 116:5 | 183:16 | 177:19 194:3 | 96:15 98:20 |
| 123:15 128:9 | **ended** 49:2 | **eo** 59:24 60:4 | 124:11 129:18 |
| 129:18 133:25 | 97:6 154:6 | 60:21 61:7,8 | **event** 97:13 |
| 134:7,10,15 | 166:20 | 62:19 103:19 | **events** 51:10 |
| 135:12,15 | **ends** 39:24 | 103:25 117:9 | 111:16 123:20 |
| 136:3 137:25 | 82:14 107:5 | | |

**everyday**  166:2
**ewing**  2:11 6:5
**exactly**  29:22
  72:4 81:18,22
  113:25 129:16
**examination**
  6:17 193:5
**examined**  6:14
**examiner**  23:20
  24:6,7 28:12
**example**  7:4
  13:11 32:20
  37:20 57:22
  63:15 70:11
  84:11 111:23
  171:23 180:19
  187:20
**exchanged**
  104:16
**excludes**  50:17
**exclusively**
  81:7
**excuse**  59:22
  122:22 190:25
**execs**  27:1
**executes**  106:1
**executive**  18:20
  60:5,12,16
  61:2,5,25 63:1
  63:6,13,20,22
  63:24 64:7
  78:3 103:14
  104:3,6,16
  105:3,9,20

106:8,24
111:20 114:25
116:11,24
118:12 124:24
139:15 140:25
141:2
**executives**
  27:18 70:18
  100:17
**exhibit**  3:7 4:2
  26:2,16 27:7
  27:17 28:1,10
  40:2,9,16,20
  53:19 58:16,16
  58:23 59:9
  60:9,20 62:18
  64:11,20,24
  73:22 103:11
  109:20,23
  110:2,6,10,23
  111:4 115:18
  123:15 133:14
  134:2,7,13
  135:14 136:4
  138:1,6,12
  139:2,10,12,21
  140:14 142:14
  142:23 144:4
  145:18 150:22
  151:12 152:6
  152:17 153:6
  153:18 155:21
  156:6,13,16
  157:16 160:17

161:1,12,17,19
162:4,21
167:15 172:23
172:23 173:1
173:14,20,24
177:25 178:24
**existence**  99:15
  99:16
**exit**  98:2
**exiting**  98:3
**expansion**
  51:23
**expects**  58:18
**expenditures**
  124:6
**experience**  94:9
  94:12 104:11
  157:11 172:18
  192:4,16
**expertise**  45:9
**explain**  77:12
**explaining**
  136:13
**expressed**
  25:12 36:21
  94:24 95:2
  96:16 119:1
  127:20 171:16
  172:6 184:11
**expressing**
  129:23
**expression**
  89:12

**extent**  51:23
  91:8,11 102:17
  106:2 181:7
**external**  10:7,9
  10:23 11:3,6,8
  11:13,17,20,22
  12:2,20,23
  13:2,5,9,24
  14:1,3,10,14,17
  14:20,23 15:3
  15:6,20 16:16
  16:19,23 17:2
  17:9,18,24
  18:3,12,17
  19:3,9,23
  22:10 44:1
**extra**  85:11
**eyes**  35:19

### f

**f**  195:1
**facing**  150:12
  186:15
**fact**  31:12,23
  32:18 70:13
  77:3 83:8,9,13
  83:23 101:17
  101:24 111:3
  118:22 130:3
  149:17 160:1
  165:6 183:13
**fails**  196:18
**failures**  93:2,5

| | | | |
|---|---|---|---|
| **fairly** 78:21 | 105:15 109:10 | **fine** 138:18 | **focus** 25:14 |
| **fallback** 189:17 | 111:24 125:8 | **finish** 74:8 | 64:1,5 71:19 |
| **false** 126:13,15 | 132:23 137:3 | **firm** 5:19 | 148:23 184:24 |
| **familiar** 28:5,6 | 181:2,7 186:15 | **first** 6:13 26:24 | **focused** 33:9 |
| 28:6 29:13 | 187:8,14,16 | 27:6 28:11 | 36:18 45:21 |
| 40:21 42:21,24 | 191:11 194:7 | 35:10 36:2 | 46:19 |
| 43:17 46:21 | **federally** | 37:7,9 51:20 | **focusing** 26:7 |
| 49:19 107:21 | 104:14 | 54:12 71:1 | 26:19 162:25 |
| 108:9 110:12 | **feedback** | 74:12 76:11 | 179:22 |
| 111:22 145:21 | 189:25 | 110:17 134:10 | **folks** 102:8 |
| 169:23 | **feel** 51:19 | 134:16 135:13 | **follow** 59:24 |
| **familiarize** | 128:11 174:14 | 136:3 138:1 | 99:10,13 |
| 77:18 | 176:20 | 140:17 141:6 | 134:22 166:11 |
| **family** 158:5,7 | **feelings** 38:21 | 142:21 145:25 | 167:4 168:16 |
| 158:13,15 | 75:13 | 146:3 148:16 | 177:16 194:7 |
| 159:25 | **felt** 171:16 | 150:7,9 158:11 | **followed** |
| **fan** 137:13 | 191:8 | 158:18 162:7 | 168:11 184:2,3 |
| **fans** 137:19 | **fight** 148:18 | 164:6 174:24 | **following** |
| **far** 78:19 98:19 | 163:5,8 | 178:24 181:16 | 177:22 |
| **favor** 16:10 | **fighting** 186:21 | **fiscal** 28:15 | **follows** 6:15 |
| **fcc** 92:2 | **fights** 163:8 | 30:25 31:16 | 175:7,13 |
| **february** 11:10 | **figure** 44:24 | 32:3,8 33:18 | 192:13 |
| 11:13,17,24 | **filed** 5:13 | 35:12 124:5 | **forced** 16:21 |
| 17:24 18:4,13 | 188:11 | 141:6 142:17 | 167:17 |
| 18:18 19:24 | **film** 137:11,15 | 143:9 | **foregoing** |
| 109:4 140:17 | 137:17 | **fiscally** 159:2,7 | 198:5 |
| **federal** 19:7,19 | **filmed** 76:13,18 | 160:1,2 | **forget** 108:22 |
| 34:17 45:3,7 | **films** 137:7 | **fit** 44:25 | **form** 14:11 |
| 62:13 64:2 | **final** 154:6 | **five** 159:11 | 18:22 20:22 |
| 78:16 88:4,20 | **financial** | 160:3,8 | 24:20 25:9,23 |
| 88:22,24 93:4 | 141:20 | **floor** 97:9 | 32:21 35:14 |
| 99:16,24 100:6 | **find** 48:17 | **flow** 175:3 | 39:6 45:4 48:6 |
| 100:8,12 104:7 | 70:22 136:24 | **flows** 123:10 | 48:9,22 50:25 |
| 104:12 105:13 | 187:3 | | 54:20,24 71:2 |

71:21 72:2 79:12 80:14 90:11 100:19 114:17 122:24 130:21 131:17 132:2 194:7

**format** 28:2 29:14

**former** 41:5 42:8 61:20 62:3 63:3 76:11 94:20 153:22 154:10 155:10

**formula** 88:4 88:20,22,24 89:3,16 93:16 99:17,24 100:6 100:8,12 123:11 187:8 187:14,17

**formulated** 80:25

**forth** 69:24 133:4 136:16

**forti** 145:3,8,11 146:1,4 147:3 147:12,13 148:6,14 149:14 162:8 162:13 163:1,2 163:19 164:3 164:23 166:7,8 166:15 167:1

167:11 168:25

**forti's** 147:11 162:12

**forward** 26:20 189:13

**forwarded** 22:24 23:2,6 54:6 62:2 162:1

**forwarding** 62:24

**found** 75:7

**foundation** 76:15,20

**four** 13:12,16 13:19 116:18 159:11 160:3,8 189:19 190:10 191:21

**frame** 44:9 131:6

**framed** 165:2

**framing** 182:4

**fraud** 140:1 141:1,3

**free** 7:16 87:3 93:7,7

**frequency** 72:15

**frequently** 69:17 70:15,19 73:6

**friday** 8:15,18 8:19,24 9:8,14

9:17,24 127:6

**front** 26:15 40:8,15 59:8 64:19 98:2 110:5 115:4 134:6

**ftc** 163:5

**full** 84:7 160:6 175:6 180:3

**fully** 95:14 104:14

**function** 19:6 44:11

**functions** 192:7

**funded** 95:14 104:14 105:15 118:18 120:4 180:20

**funding** 21:16 35:18 36:16 37:2 38:9,12 38:25 39:18 45:14,16 48:5 49:9,16 50:2 50:23 51:3,6,8 51:12 52:3,7 52:15 53:2,10 56:12,20 60:23 62:1,13 63:2,6 63:22 87:1 88:4,6,9,11,15 88:20,22,24 89:3,14,15,17 92:15,21 93:4

93:11,14,16,17 93:20 94:24 99:16,24 100:6 100:8,12 104:8 104:12,17 105:13 106:8 106:18,25 117:1 122:24 123:4,5,8,9,10 124:1,6,16 125:14,19 127:25 128:10 128:10 131:8 131:11,16,24 132:23 136:22 138:15 139:5 141:5 143:17 148:23,25 157:16 161:8 164:9,18 165:7 165:13,25 175:16,23 176:10 180:4 186:15 187:8,9 187:14,17,18 187:25,25 188:2 191:11 193:16,22 194:7

**funds** 34:18 52:14 137:3 149:20 151:22 187:13,20

**[further - group]**                                    Page 22

**further** 83:1 97:16 114:22 194:9

**future** 49:3 52:7 97:13 175:15,23 176:10

**fy25** 29:7

**g**

**g4** 132:15 188:14,25 189:15 190:25

**gain** 191:6

**gap** 42:20

**gate** 98:2

**general** 43:16 57:15 79:7 91:24 94:9,13 94:20 114:12 142:1

**generally** 9:1,4 17:21 21:12 43:8 58:21 94:5 109:2 114:11 156:22 192:12

**generic** 56:20

**getting** 51:19 85:10 133:4

**gibson** 1:14 2:2 2:6 5:23 6:2

**gibsondunn.c...** 2:5,8

**give** 7:3,13,17 39:7 90:4,12 90:13 163:21 163:24

**given** 28:4 74:15 77:3 104:8 105:15 195:14 198:9

**giving** 163:7

**gmail** 69:11

**gmail.com** 156:17

**go** 5:8 39:21 68:2,5 77:13 77:16 80:2,12 82:11 83:15 90:18 94:15 104:18 107:2 119:6 136:22 137:3 138:19 141:22 142:2 146:23 162:4 169:16 185:21 187:4,23 191:2 191:11,14 194:10

**goal** 27:21,22 27:24 37:22 125:9 177:9 180:24 181:2

**goals** 20:3 136:17 181:10 192:21

**goes** 27:4 88:9 108:10

**going** 5:2 61:7 74:8 77:13,14 124:17 125:14 125:23 129:18 129:19,20 146:20 176:25 183:16

**gonna** 72:13 74:6 77:13 90:12

**good** 5:1 6:19 6:20 138:17 145:23 146:9 146:12 147:14 147:18,23 148:4 149:4,9 149:12,22 150:19 151:9 152:2 164:24 165:1 167:11 169:3 195:4

**google** 76:1,22

**googling** 75:4

**gop** 139:23

**gotten** 70:23

**government** 10:7,9,23 11:3 11:5,8,12,17,19 11:22 12:1,20 12:23 13:2,4,9 13:21,22,24,25 14:1,2,3,9

15:20 16:16,19 17:2,5,9,18,23 18:3,12,17 19:2,7,9,23 22:10 26:21 38:9,12,25 39:17 44:1 45:3 51:9 52:2 52:9 87:3 95:15,15 105:15 114:23 120:4 132:23 140:24 141:2 188:12 189:1 189:10

**grain** 117:5,12

**grand** 2:3

**grant** 123:22 175:10,15,19 175:21

**grants** 192:18

**grateful** 128:6

**great** 144:13 152:14 156:6

**green** 66:11

**greene's** 112:1

**ground** 187:4,5

**grounds** 78:10 78:11

**group** 12:4,8 12:11,14,18 13:6 14:8 20:18,20,21 21:10,15,23

44:1 45:17,19
45:20,24 46:7
46:12,16,22,25
47:4,10,13,15
47:17 144:18
144:20,24
145:5,8,10,13
145:18 146:1,5
148:6,15 149:3
149:14,21
150:8,18,22
151:2,8,13,19
152:1 162:9,14
163:2,19 164:4
164:22,23
165:21 166:8
166:13 167:1,6
167:12 169:1
**guaranteed**
  160:8
**guess** 54:19
**guidance** 28:18
  29:15,16
  153:16 192:2,7
  192:13
**guided** 86:25
  123:11 125:20
**guides** 86:24
**guys** 29:11

**h**

**h** 2:3 3:6 197:3
**hailed** 98:4

**half** 13:12,16
  13:19
**hand** 195:17
**handle** 123:21
**happen** 29:2,3
  103:25 104:1
  139:17
**happened** 23:5
  23:7 51:11
  64:1 97:24
  98:12 100:18
  100:25 101:5
  101:10 111:18
  127:5,6 131:22
  132:12 184:22
**happening**
  116:20,20,21
  125:16
**happens** 85:7
**hard** 44:3
  168:5 181:22
**harm** 178:1
  179:23 182:4
  184:5
**harming** 39:4
  39:15 122:12
  122:12,18,18
**harrison** 15:22
  15:24 55:10
  57:4,12 61:13
  67:12,15
  110:15 112:25
  113:7 134:17
  138:2 153:7,10

155:8 170:9,13
  170:19,21
  173:17,23
  174:3,20
**hated** 148:11
**head** 7:5 60:17
  91:3
**heading** 140:16
  151:14
**headquarters**
  60:18
**heads** 108:7
  140:6 189:15
**hear** 38:10
  116:10 118:6
  119:18,25
  120:15 182:11
  191:9
**heard** 16:2,6
  17:4 38:7
  46:23,24 60:21
  62:8,10,18,19
  62:25 80:15
  116:15,17,18
  117:4,18 120:1
  120:9,16,19
  172:3,10,16
  174:13
**hearing** 61:24
  111:18 112:1
  114:24 115:4
  139:14
**heart** 33:8
  148:11

**heightened**
  175:13
**held** 37:19,25
**hello** 122:14
**help** 66:8 128:5
**helped** 45:9
  137:15
**helpful** 145:2
  153:20 154:1,9
  155:9
**helping** 44:13
  135:25
**helps** 33:6
**hereto** 198:7
**heritage** 76:15
  76:19
**hey** 113:12
  146:20
**higher** 35:21
**hill** 45:17,19,20
  45:24 46:7,12
  46:16 164:22
  165:21 166:13
  167:6
**hired** 49:3
**history** 33:5
  96:12,19
  139:24 154:15
  154:19
**hmm** 74:17
  113:8
**hold** 11:1,15
  12:7,17 13:18
  15:1 73:24

92:1
**hour** 9:13
**hours** 9:10,21
  10:1 169:9
**house** 35:25
  45:10 78:6,9
  78:10,11,20
  79:9 105:8,19
  115:5 124:19
  138:14 139:4
  139:22 158:22
  178:3 179:9,24
  182:11 183:2,6
  183:10,15
  185:12
**house's** 36:20
**hoy** 23:19,24
  24:5,11 25:5
  25:19 28:12,23
  29:20 30:2,20
  31:4 32:17
  55:13,17,21,25
  56:7,16,22,25
  57:7,10 58:20
  65:3 106:18
  141:11
**hoy's** 128:9
  141:16
**huh** 7:5
**hundred**
  104:14 105:14

**i**

**idea** 23:23 55:7
  61:7 63:25
  98:25 104:20
  105:2 106:15
  133:7 148:9
  153:12 155:17
  159:1 169:2
  183:22 184:7
  187:17,24
  191:18
**identified** 58:9
  108:25
**identify** 72:18
  72:22 154:19
**ignorant** 86:19
**ignore** 167:9
**ignored** 167:8
**illegal** 117:7
**imagine** 41:15
  41:16
**imls** 59:25 60:8
**immediately**
  10:22 11:4,11
  11:16,25 12:13
  55:9 175:2
  176:13
**imminently**
  116:12,25
  117:10,20
  118:13
**impact** 39:4,15
  53:11,11 64:8

139:16 148:25
  169:6,11
**impacted** 83:10
**impacting**
  17:14 18:7
**important**
  191:9
**improper** 90:7
**inaccurate**
  57:21 58:10,12
  119:20 165:16
**inaccurately**
  113:17
**inaugurated**
  111:17
**include** 18:5,14
  134:22 149:19
  168:17
**included** 27:6
  59:18 110:13
  121:18 122:6
  158:18 164:14
  165:21
**includes** 180:6
**including** 16:23
  25:17 48:4
  49:16 89:8
  117:8,10 119:2
  120:1,2,2
  155:11 159:16
  185:9 186:21
  186:22,23
**incoming** 56:23

**incorporated**
  5:25
**incorrect** 57:24
  58:5
**independence**
  87:1,4
**independent**
  29:12 88:10
  91:25 95:2,15
  136:18 137:14
**indicate** 82:20
**indicated** 82:24
  87:19 161:20
  195:6
**indicating**
  61:24 103:13
**indication**
  37:17,23 38:4
  39:1,12
**inform** 45:7
  53:10
**information**
  23:12,21 33:15
  56:5 57:24
  58:5,18,21
  66:8 76:2
  86:22 92:4
  93:8 97:17
  99:3 100:14
  101:9,16,20,23
  102:2,3,6,10
  106:16,17
  117:17 124:5
  128:12 129:17

141:21 157:17
**informational**
  93:5 166:1
**informed** 28:19
  68:7,15 126:4
  126:5,7 127:17
  127:23
**infrequently**
  69:20
**ingrassia** 22:21
  23:3,6 38:15
  38:19,21 53:22
  54:4,10 55:5
  55:18 56:1,24
  65:3,6,16,18,20
  65:25 66:21
  67:4,7 74:1
  75:3,6,17,22
  76:23 83:1
  85:13 86:6,8
  86:12 87:10
  88:17,20 89:1
  89:10,11,14
  92:10 93:15
  97:21,22 116:4
  116:8
**ingrassia's** 75:8
  75:12
**initial** 53:25
**initiated** 71:8
**injected** 148:24
**input** 148:21
**inquired** 28:17
  31:9

**inquiries** 19:15
  19:25
**inquiry** 20:2
  58:18
**inquisitive** 99:5
  105:1
**instances** 30:17
**institute** 60:14
**institutes** 60:7
**instruct** 7:12
  7:15 102:16
**intact** 187:18
**intended** 23:13
  174:19 175:3
**intense** 118:23
  119:8,14,22
  120:12 123:17
  126:2,9 132:17
**intention** 36:21
**interaction**
  25:2 117:15
**interactions**
  24:11 25:4
**interconnecti...**
  43:11 45:8,13
  45:15 47:23,24
  49:7 51:12
  52:8 80:14
  81:11,25 82:2
  123:21,22
  131:8,11,24
  132:9 149:20
**interested**
  56:17 195:16

**interference**
  87:4
**interject** 7:9
  8:4
**intermediary**
  136:19
**intern** 22:21
  66:12
**internally** 52:1
  52:7,11 171:9
**internship**
  66:19
**interp** 56:14
**interpretation**
  56:15
**interrupt** 7:2
  16:2
**introduce**
  94:16
**introduced**
  26:4 40:3
  58:24 64:13
  109:22 133:16
  138:7 144:6
  152:7 155:23
  160:19 173:3
**introductions**
  94:15
**introductory**
  86:18 88:5
  99:2
**invading**
  124:23

**investment**
  189:5
**investments**
  136:7
**invoke** 183:14
**involve** 45:15
**involved** 43:11
  46:8,12 50:12
  50:14 87:17
  94:19 113:19
  116:16,16,16
  116:17 131:9
  141:12
**involving** 69:18
  77:8 137:3
**irreparable**
  182:4
**irreparably**
  180:5
**issue** 62:1 97:5
  154:5 169:8
**issued** 34:4
  116:11
**issues** 42:1
  46:20 51:13
  81:24 106:1
  114:21 124:16
  125:2 137:8
  161:2,7
**issuing** 60:13
**itvs** 137:14,20

**[j - know]** Page 26

**j**

**j** 1:7 5:13
**jane** 186:23
**january** 14:16
15:6,14 16:7,8
16:17 17:1,4,8
17:18,19 41:1
44:9
**jen** 129:14
130:12
**jennifer** 108:21
**job** 10:5 16:20
17:3,10,16,21
18:5,10,11
52:12 117:14
192:2
**joe** 6:4
**john** 158:3,6
**join** 98:13
**jordan** 134:18
135:4,15,16,17
135:19,21,25
142:14 143:2
**jordan's**
136:10
**joseph** 2:11
196:1
**joseph.lipchitz**
2:13 196:2
**judge** 96:16
**july** 173:18
178:23 179:15
182:6

**june** 11:24 12:2
12:12,12,14,19
13:5,20 17:24
**justice** 21:5,16
21:23 65:8
79:20
**justification**
24:9,13 25:8

**k**

**k** 1:17
**karp** 108:21
**kate** 108:22
109:1,3 111:7
186:24
**katherine**
186:22 190:23
191:1,5
**kathy** 26:19
44:20 70:10,17
71:25 72:8
80:11,11 82:5
124:10 164:5
164:13 166:12
167:4 168:13
168:17 178:25
181:17 182:13
182:21
**kathy's** 70:12
**katie** 38:14,18
38:23 65:8,12
66:6 75:23
76:2,23 80:8
85:14 86:19

87:9 88:5,23
88:25 89:9
91:13 92:13
96:11,17 97:8
99:4,11 104:24
118:22,25
123:16 126:1,9
126:25 127:17
132:7,16,19,24
133:8 140:5,7
140:8 158:1
171:3 178:11
179:5,16
182:21 183:2
194:6
**katie's** 179:1,14
182:2
**kearney** 49:19
49:23 50:20
53:4
**keep** 16:10
70:21 71:6
**kept** 187:24
189:3
**kerger** 186:23
**key** 149:15
150:2,24
**kick** 115:9
**kids** 172:15
**kin** 195:15
**knew** 24:3
102:7 115:8
126:19 145:4

**know** 13:8 23:9
23:24 26:6,9
29:11 30:13,16
41:14,22 42:4
42:6,19 43:6,8
45:17 47:2,3
48:16 49:2
56:4 62:9,23
66:8,18 72:24
73:13 76:8
77:3,5,12,18
80:6 84:2 88:6
88:11,14 89:13
89:13,24 90:8
92:24 93:14
94:15 96:7,8
96:15,18
101:16 102:8,9
103:23 104:7
105:7,7 106:2
108:7 109:2
111:16,25
115:20 118:4
121:3 125:12
126:11 128:21
129:20,21
134:20 136:12
137:7,10 138:3
139:19 140:2,6
140:8,10,11,13
144:19 145:12
145:12,14,16
145:25 152:12
153:10 154:5

156:21 158:5,8
158:10,14,23
158:24 162:3
164:13,17,21
164:25 165:3
165:20 172:8,9
183:8,24
187:19 188:23
191:4,20 192:3

**knowledge**
24:10 30:10
31:11,15 33:16
41:7,9,13
42:16 44:2
45:12 46:7,11
52:16,23 53:25
54:3 84:24
100:14 101:8
105:22 107:1
136:2 157:1
170:14 176:3,6

**knowledgeable**
86:19

**kylie** 108:21
130:12 186:23

**l**

**la** 78:8
**lack** 34:3 37:2
93:5 97:13
143:25
**land** 164:10
165:14

**language** 29:6
111:21,22
112:14 114:1
**largely** 44:21
78:15
**lasting** 9:21
10:1
**late** 29:21 30:3
32:17 39:7
**latest** 155:1
**law** 1:14 28:21
66:14,15 160:9
**lawlor** 135:4,15
135:16,17,19
135:21 136:21
142:15 143:7
143:15
**lawlor's** 136:3
137:25 143:3
**lawsuit** 81:13
81:24
**lawyer** 8:2
**lawyers** 50:14
**lay** 16:21
**layer** 155:1
**layout** 28:5
**lead** 141:19
189:7
**leaders** 44:4,17
139:24
**leadership**
54:13,15 55:5
116:1 148:13
148:23

**leading** 193:11
193:17,23
194:4
**leave** 167:16
172:20
**leaves** 184:7
**leaving** 41:11
41:23 42:13
**left** 41:17 42:16
42:22 43:1
44:19 97:8
122:25 169:9
**legacy** 180:5
**legal** 2:25 5:17
5:19 196:23
**legislation**
17:14 18:7
**legislative**
111:20 177:4,5
177:7 184:4
**legislator**
177:11,12,15
177:17
**legislators**
177:10,18,22
**length** 188:24
**lengthy** 139:24
**letter** 152:18
154:2 155:3
157:15,20
158:1,10,19
159:5
**level** 63:22
86:18,23 99:2

188:12,15
189:15
**levy** 40:19 42:7
42:8,9,16,25
44:18 61:16,19
138:2 153:13
**liaison** 17:12
18:5,19 19:3,6
19:10,12
**library** 60:10
**license** 92:1
**life** 114:16
**light** 80:7
175:16,23
176:10
**likely** 67:11,17
77:24 83:25
127:8,21,25
**likes** 185:10
**limit** 50:7,16
151:22 186:25
186:25 188:4
**limited** 53:14
89:12
**line** 26:24
54:13 112:23
143:5 190:21
197:4,7,10,13
197:16,19
**lipchitz** 2:11
3:4 6:4,4 7:9
7:12,19 8:3
14:11 16:1,9
16:12 18:22

20:22 24:1,14 24:20 25:9,23 26:11 32:21 33:21 34:6 35:14 39:6,19 40:10,12 45:4 48:6,9,12,19 50:25 51:15 54:20,24 59:2 59:4 62:6 63:8 64:15 71:2,21 72:2,5 73:16 73:24 74:5,10 79:12 80:2,24 81:4,9,11,23 82:9 83:20 84:19 89:18,22 90:1,5,9,14,17 90:22 99:25 100:19 101:12 102:5,16 103:15 105:5 106:13 109:24 114:17 118:14 123:6 125:5 129:6 130:21 131:17 132:1 133:1,3,23 138:8 142:20 144:9 146:17 146:20 152:18 152:22 153:4 156:1 159:9,19 160:4,22 168:4

169:13 173:5 176:2,15 184:15 185:23 190:2 192:8 193:4,6,13,19 193:25 194:8 196:1

**list** 81:16 156:16

**listed** 113:21 114:20 135:8 135:10

**listen** 190:2

**listening** 172:4 172:7

**literally** 90:14

**litigation** 188:21

**little** 16:10 39:7 118:5 129:17 178:20 182:7

**lived** 172:18

**livenote** 1:18

**lives** 67:24

**llp** 1:15 2:2,6 2:11

**lobbyist** 62:19

**local** 94:9,13,20 94:25 109:9 161:4 180:7 181:4,9

**lodge** 146:20

**logical** 68:14

**logistical** 77:17

**long** 9:7 10:8 13:8 32:16 41:15,16,21 42:20 43:6 89:5 94:17,19 109:3 135:12 162:17

**longer** 170:23

**longstanding** 36:24

**look** 53:19 73:22 79:16 80:4,12 81:16 110:12 111:22

**looked** 33:13 105:12 139:18 145:23 146:9 146:12 147:14 147:18,23

**looking** 44:5 54:13 55:6 56:16 58:17 59:12 65:1 122:20,23 134:15 142:14 143:1 150:7 154:12 157:20 178:24 188:23

**looks** 27:8 28:5 40:21 111:10 112:4 145:21 145:24 147:5 148:3 149:4,9

149:12,22 150:19 151:8 152:2 166:5

**los** 2:4

**lot** 62:8 125:1 137:11 191:8

**lots** 139:14

**lower** 153:17

**lunch** 107:7,11 107:14,16 118:25 119:4

**lunches** 172:14

**lying** 147:17

**m**

**m** 1:15 2:7 40:22

**machine** 195:10

**made** 53:1 80:8 83:14,24 95:18 130:15,20 131:14 141:10 148:20 155:16 186:12 198:5

**maher** 190:24

**mailed** 68:19 110:12 116:8

**main** 163:5

**majority** 135:18 136:1

**make** 7:6,14 23:16 50:5 51:20 58:3,10

**[make - meeting]**

66:9 68:6 89:25 130:22 150:24 172:13 191:1

**makes** 160:5 171:23 182:18

**making** 46:8 52:15 79:16 90:1,5,9 189:11

**management** 20:1,6,9,14 22:4 28:13 29:17,19 30:1 30:23 32:25 35:8 37:18,24 38:5 52:20 74:25 76:25 77:9 78:15 104:19,25 105:21 106:6 127:24 131:6 135:2 178:12 192:1,4,24

**manager** 13:22 94:9,13,20

**manner** 148:25

**march** 26:18,20 26:24 27:16 29:21 30:3,7 30:15,22 32:18 40:17 53:22 54:5 55:4,10 56:8,8,22

58:15 60:13 115:24

**marjorie** 112:1

**mark** 172:22 172:23

**marked** 26:16 27:7,16 40:9 40:16 58:16 59:9 64:20 110:6,10 115:18 123:15 134:2,7 138:12 139:2,10,12,21 140:14 150:22 151:12 153:18 173:14,20,24

**market** 93:2,4

**marta** 63:15 71:15,18 125:25 126:1 128:2,3,13,21 128:25 129:13 129:16,22 135:24 186:22 187:2,19 188:14,16

**massachusetts** 2:12

**materials** 128:4

**matter** 5:12 22:5 33:2 57:15 142:1

**matters** 117:16 161:7

**maximum** 181:7

**mdore** 2:5

**mean** 24:6 28:6 31:7,9 37:4,6 37:11 44:17 45:6 46:15 47:1 50:11 54:22 56:19 62:12 68:22,23 72:24 77:24 99:25 137:21 140:23 141:24 142:18 143:6,7 181:19

**meaning** 186:19

**means** 136:8

**meant** 125:22 143:15 168:9 168:14,20 177:18 181:20

**measured** 13:10

**media** 5:10 17:15 18:8 19:18 21:25 22:6 34:25 35:6,9,20,20,24 36:6,13,15,23 37:21,22 38:9 38:12 39:18 49:3 52:13 79:22 86:20

87:5,16,20 91:6,9,18,25 92:6,15,17,22 93:3,11,19,21 94:10,13,19 95:24 99:1,5 104:17 105:1,4 106:8,25 109:11 114:14 118:1 119:1,2 119:5 120:1,3 121:6 122:5 125:11,18 126:20 132:20 132:23 165:25 169:6,11 172:9 176:18 180:18 180:23 194:3

**media's** 183:23 183:23

**medication** 7:21

**meet** 8:12 20:17,19 27:22 27:24 66:6 67:13 86:2 92:11 99:18 104:19 115:25

**meeting** 8:17 8:18,24 9:7,13 9:17,20,24,25 19:16 21:6,9 21:21 22:3,8 22:13,18,23

**[meeting - met]**

| | | | |
|---|---|---|---|
| 23:2,5,8,9,13 | 101:24 102:4 | 83:3,18 84:1 | 136:6 139:14 |
| 23:17,25 34:21 | 102:12,15,18 | 106:11,23 | 149:16 |
| 35:9 38:14,16 | 102:24 103:3,8 | 120:21 129:19 | **mentions** |
| 38:18 39:2,13 | 105:11 106:6 | 160:6,6 180:22 | 112:13 |
| 52:20 54:2,14 | 106:11,23 | **members** 19:16 | **merely** 154:19 |
| 55:6 56:23 | 107:18 110:19 | 19:17 44:13 | **merritt** 26:19 |
| 66:17,23 67:8 | 111:6,7,9 | 66:7 70:19 | 27:16 44:20 |
| 67:10 68:4,12 | 113:23 114:3,6 | 100:17 118:8 | 70:10,14,17 |
| 68:16 69:22 | 114:6,8,10,13 | 121:5,9 137:13 | 71:25 80:11 |
| 70:1 74:2,14 | 114:14,19 | 137:19 171:16 | 82:6 164:5,13 |
| 74:20,21,25 | 116:9 119:17 | 174:13 177:13 | 166:12 167:4 |
| 75:18 76:6,10 | 120:17 121:25 | **memo** 139:22 | 168:13,17 |
| 76:25 77:6,9 | 122:15 126:1 | 140:2 145:20 | 179:1 181:17 |
| 77:17,21,25 | 126:24 127:3,5 | 145:23 146:9 | 182:13 |
| 78:1,24 79:5 | 127:17 128:14 | 146:12 147:13 | **merritt's** 26:24 |
| 79:11,19,21 | 128:18,19,24 | 147:22 148:14 | 71:12 72:8 |
| 80:13 81:12 | 129:1 130:4,11 | 149:4,8,11,21 | **messages** 69:15 |
| 82:4,23,25 | 132:11 133:10 | 150:8,18,22 | 69:18,18 70:24 |
| 83:2,7,12,19,25 | 137:22 157:18 | 151:2,8,11,13 | 73:2,9,11,19 |
| 84:4,7,11,12,19 | 158:20 170:9 | 151:19 152:1 | 80:5,7,9,12,16 |
| 84:21 85:5,16 | 170:12,24 | **memorandum** | 80:22 81:4 |
| 86:5,10,12,13 | 179:17 182:22 | 140:18,20,21 | 82:1,3,10 |
| 86:16 87:10,14 | 183:11,13 | 145:17 147:2 | 161:16,18 |
| 87:24 88:2,18 | 184:21 189:21 | **memorialize** | **messaging** 70:9 |
| 88:25 89:5,8 | 190:25 193:7 | 57:6 | **met** 8:9,14 20:5 |
| 92:11 93:23 | 193:14,20 | **memorized** | 20:8,13 21:14 |
| 94:2,7 95:7,10 | **meetings** 9:11 | 69:9 | 34:24 35:5 |
| 95:21 96:5,10 | 9:16,22 44:12 | **memory** 7:22 | 65:11 67:22 |
| 96:22 97:4,14 | 46:4 51:9 | **memos** 17:13 | 104:24 118:21 |
| 97:23,23 98:8 | 81:25 86:21 | 18:6 | 132:6 135:19 |
| 98:18,23 99:9 | 88:5 115:11,13 | **mention** 161:3 | 135:24 170:15 |
| 100:4,15,18 | 170:18 183:9 | **mentioned** | 183:10,12 |
| 101:1,5,10,11 | **member** 67:13 | 13:25 44:18 | 189:14 |
| 101:17,18,21 | 67:22 82:25 | 66:20 123:12 | |

**michael** 2:3 5:23 40:19 42:7,8,9,25 44:18 61:16 134:18 138:2 153:13

**microphone** 21:19

**microphones** 5:4

**midatlantic** 196:15

**middle** 161:24

**midst** 35:10

**mill** 77:16

**million** 115:7 121:8 124:18 192:19

**mind** 47:5 74:7 125:2

**minefield** 124:14,15

**mintz** 43:13,14

**minute** 89:8 185:22

**minutes** 74:6 85:11 89:6

**mission** 62:14 64:3 86:24

**misstates** 129:6

**mm** 74:17 113:8

**mom** 42:3

**moment** 44:15

**money** 163:24 191:18

**monitored** 17:14

**monitoring** 18:7

**monstrosity** 182:24

**month** 32:13 124:24

**months** 13:10 32:20 42:23 47:23 51:11,25 178:21 179:2 182:3,7

**morgan** 14:25 15:1,9

**morning** 5:1 6:19,20

**mother** 42:1 172:13

**mountain** 180:6,19 185:9

**move** 166:22 176:25

**moved** 13:6

**movement** 188:19

**moving** 12:18 187:20

**muha** 72:16,20

**multiple** 61:6 76:14,18 137:1

173:8 188:13

**museum** 60:10

**mute** 5:6

**n**

**n** 2:1 3:1 4:1 12:6

**n.w.** 1:15

**name** 5:16 21:3 46:6 59:18 108:8,22 147:11

**named** 43:17

**names** 47:6

**national** 1:4 2:9 5:12,24 6:2 10:18 37:19,25 38:6 61:9 107:25 108:4 126:20 154:17 154:21 187:9 187:11 188:4 188:13,25 196:4 197:1 198:1

**nationally** 180:19

**nature** 95:2

**near** 104:9

**nearing** 105:16

**necessary** 198:6

**need** 7:17 77:15 128:11 136:15

160:12 188:19

**needed** 129:24 188:15

**needs** 52:8,12 166:1

**negotiate** 167:17,20 192:20

**negotiated** 122:23

**negotiating** 130:24

**negotiation** 136:16

**negotiations** 131:7 192:25

**neighborhood** 180:6

**neither** 166:11 167:4 195:14

**neta** 107:22,24 108:7 109:12

**neuter** 148:18

**never** 34:24 97:12 111:23 120:5

**new** 3:18 29:6 66:14 109:5 117:24 130:14 130:19 138:6 138:13 139:3 139:10,12,21 151:4,20,21 153:11,14

**[new - objection]** Page 32

175:10 176:4
**news**  148:19
**nice**  172:15
**night**  60:21
**nine**  160:6
**nodding**  7:5
**noelle**  72:16,20
**nominate**  158:9
**non**  81:8
  166:23 192:18
**noncommercial**
  92:1
**nonparticipants**
  101:21
**nonprofit**
  29:13 87:2
  95:14 118:18
**nonprofits**
  91:25
**nonsubstantive**
  82:10
**normal**  136:25
**normally**
  114:21
**notary**  1:19
  195:3,22
  198:13,19
**note**  5:4 62:25
  119:15 196:10
**noted**  48:19
  90:22 119:8,23
  120:13 133:3
  158:11 198:7

**notes**  102:24
  103:2
**notice**  195:6
**noticing**  5:22
**notify**  126:24
  127:3
**notwithstandi...**
  71:8
**now's**  189:8
**npr**  10:17 38:9
  38:11,22,24
  39:4,15 48:5
  49:17 50:3,24
  51:8 52:5
  60:22 61:10
  62:1,8,20 63:1
  63:21 80:13
  81:5,5,7,8,8,9
  81:24 82:1
  87:4 109:9
  116:17 117:1
  118:7,24 119:2
  119:8,15,23
  120:2,12
  121:21 122:3,6
  122:8,12,18
  123:5,7,12,17
  123:25 124:7
  124:21 125:22
  126:2,10,17,22
  126:24 127:3,8
  127:17,23
  128:5 129:4,5
  130:15,20

131:4,10,24
132:10,15,17
132:22,25
133:9 136:7,13
136:18,23
138:15 139:5
141:5 148:18
149:20 150:14
151:22 164:9
164:19 165:7
165:13 167:18
167:18 171:6
171:12,13,17
172:9 174:8,12
174:15,23
175:1,8,10
176:1,5,12
177:6,12 180:3
180:13,20
181:1,6,11,14
181:14 183:20
184:2,6 186:7
186:7,13,21
187:6,10,12
188:3 189:16
189:24 191:11
191:16,17,24
192:3 193:9,16
**number**  3:22
  3:22 5:15
  26:17 40:5,9
  53:20 59:9,10
  64:20,21 65:17
  73:23 82:17

107:9 110:7
115:19 125:9
138:25 149:16
150:4,23
151:19 152:17
155:22,23
156:6,7 162:22
162:22 167:23
169:21 170:16
173:15,15
174:6 188:24
189:2
**numbered**
  153:6 162:21
**numbering**
  152:17
**numbers**  134:8
  161:14
**numerous**
  186:14
**nw**  2:7
**nyp**  138:3

**o**

**o**  40:22 103:25
**oath**  38:2
  128:23 144:17
**ob**  89:18
**object**  7:17
**objected**  90:14
**objection**  7:14
  14:11 18:22
  20:22 24:1,14
  24:20 25:9,23

32:21 34:6 35:14 39:6 45:4 48:6,8,19 48:22 50:25 54:20,24 62:6 63:8 71:2,21 72:2 79:12 83:20 89:18,25 90:5,9,10,21,22 100:19 101:12 102:5 103:15 105:5 106:13 114:17 118:14 123:6 125:5 129:6 130:21 131:17 132:2 133:1,2,7 146:17,21 159:9,19 160:4 168:4 176:2,15 184:15 192:8 193:11,17,23 194:4

**objection's** 133:3

**objectionable** 48:17,18

**objective** 125:10

**objectives** 136:17 192:22

**obligated** 142:17 143:9 143:21,22

**obviously** 94:17

**occurred** 102:18 115:5

**october** 1:11 5:2 12:25 14:7 14:19,22 15:19 16:17,21 44:9 101:7 142:1,8 171:2 175:11 176:5 182:8 195:18 196:3

**odd** 66:25

**offer** 177:9

**offered** 28:18 29:15

**offering** 187:6

**office** 19:25 20:6,9,14 22:4 28:12 30:23 32:25 35:8 37:18,24 38:5 52:20 74:25 76:25 77:9 78:3,15 99:18 104:18,25 105:8,19,21 106:6 120:21 120:25 121:19 122:1,4,17 127:24 135:2 141:23 142:2 178:11

**officer** 62:4 63:4 124:4 164:14 182:13

**offices** 1:14 34:21 97:23 123:3 142:5

**official** 44:19 195:17

**oh** 50:8 62:11 96:2 109:24 158:21 173:7 185:20,21

**okay** 7:2,8,19 8:3 9:7 10:21 15:11 16:9 26:8 43:25 48:21 49:21,22 50:10 51:7,22 52:16 53:5,8 53:16,18 55:3 58:14 59:7 67:2 75:21 76:22 78:18,23 79:5,25 81:16 82:11 96:13,20 97:4 101:23 102:12 107:2 107:21 109:18 110:5 112:11 134:22 152:22 153:4 154:8 156:4 157:15 161:23 166:21 169:12 173:12

176:24 185:11 185:19 191:9 193:2,3 194:1

**olivia** 22:21 23:2,6 38:14 38:19 53:22 54:4,9 55:4,18 56:24 65:3,6 65:16 66:3,5 67:12 74:1 75:3,5,22 76:23 82:24 85:13 86:6,7 86:19 87:10 88:20,25 89:10 93:15 97:7 116:4,8

**om** 25:1 72:15

**omb** 20:17,19 20:21 21:9,13 21:22 22:9,14 22:19,21 23:6 23:10,14,18,24 24:14,22 25:6 25:11,16,17 28:13,18 29:10 29:24 30:7,20 31:13,17,24 32:3,19 34:20 34:24 35:6 38:19 39:2,13 54:1 55:13,19 56:11,17,24 65:3 67:9,22

**[omb - p.m.]**

70:1 74:14 76:6 78:19,25 79:9,22 82:4 82:20 83:7 84:4,8,11,14,17 84:25 85:4 86:3,10 87:10 87:14 88:2 89:8,17 92:11 93:17,23 94:2 95:7,10,22 96:23 97:22,23 98:3,9,18,23 99:9,25 100:5 100:5,11,16 101:1,5,10,18 101:20 102:4 102:24 103:4,8 105:10,12,23 106:1,10,22 107:19 113:23 114:7,14,19 115:25 118:21 119:17 120:17 121:1 126:25 127:17 128:14 128:24 129:1,4 130:3,4,11 132:6,11 133:10 134:19 134:23,25 135:8 140:7,7 140:9,16,16 141:4 142:23

157:17,22 158:2,19 159:6 171:4,9 179:17 182:15,22 193:7,14,20
**omb's** 33:11 65:7 121:20,21 124:4
**omni** 134:18,19 134:21
**once** 20:8,15 85:12 122:14
**ones** 43:3
**online** 76:3
**open** 124:2
**operates** 62:13 86:20
**operating** 28:16 29:7,14 30:8,11,14,19 30:24 31:12,16 31:21,22,23 32:3,8,25 33:12,18 34:1 34:5,13 35:12 62:4 63:4 164:14 182:13
**opinion** 99:4 148:12 154:13 154:14
**opportunity** 105:12
**opposed** 7:5 18:20 24:12

25:21 83:17 84:1 117:21 180:13 185:2
**option** 29:25
**options** 186:25 189:6,12,17,25
**order** 60:5,12 60:16 61:2,5 61:25 63:1,6 63:13,20,24 64:7 69:7 103:14 104:4,6 106:8,24 114:25 116:11 116:24 118:12 118:12 124:2 124:24 139:15 140:25 141:2
**orders** 104:16 105:3,9,20
**organization** 43:24 94:17 95:12,23 105:14 107:22 108:9 113:1,14 113:15
**organizations** 61:9 136:19 150:12 186:20 189:19 190:10 190:17
**organize** 44:5
**orgs** 188:13,25

**original** 66:4
**orson** 2:25 5:16
**ourself** 77:18
**outcome** 149:1 195:16
**outlets** 148:19
**outlines** 192:21
**outlining** 87:6
**outreach** 30:7 30:23 34:20 35:7 54:1
**outside** 19:7 20:11,16 100:24
**outwards** 165:10,12
**overall** 187:21
**overboard** 125:23
**oversight** 115:5 174:23 175:7 175:14 176:14 184:3 192:2,7 192:14
**overview** 95:11 95:22
**own** 62:25 152:16 167:18

| p |
|---|

**p** 2:1,1
**p.m.** 107:5,8 134:17 138:21 138:24 163:3

**[p.m. - pdf]**                                                                          Page 35

168:25 169:17
169:20 173:18
185:24 186:2
194:11,14
**pacey** 169:3,4,5
**package** 122:22
148:22
**page** 3:2,7 4:2
26:7 27:6
28:10 53:24
65:1 111:23
115:17,19,21
115:24 119:5
120:11 134:10
135:13 138:1
142:13,21
143:1 145:19
149:25 150:1,8
150:21 151:11
151:15 162:4
162:20,23
167:15,23
168:23,25
173:8 174:5
175:6 177:25
178:24 179:23
181:17 185:6
197:4,7,10,13
197:16,19
**pages** 136:4
**pain** 167:20,21
**pairs** 98:7
**paper** 189:8

**paragra** 153:19
**paragraph**
115:23 124:9
124:14 139:20
142:15 143:2
157:24 158:2
158:12,19
162:25 163:18
169:2
**paragraphs**
123:19
**paramount**
125:11
**part** 26:25
27:17 39:14
48:10,10 84:10
86:9 111:4
115:15 136:4
140:17 149:3
150:17,22
151:7,18,25
152:25 154:15
166:15 176:17
177:14
**participants**
96:22
**participate**
31:5 101:11,18
**participated**
86:5 98:17
**participating**
31:7 46:16
47:16 144:22

**particular**
45:23 63:5
70:18 85:19
112:13 122:8
132:25 133:9
177:19 185:1
187:2
**particularly**
174:12
**parties** 5:8
**parts** 88:21
89:3,15 93:16
**party** 45:1
50:12,21 51:2
52:17,24 170:5
195:15
**pass** 185:19,20
191:25 193:2
**passed** 35:11
41:10,12 85:8
**passing** 85:12
85:17
**past** 20:3 33:17
47:22 48:3
49:15,18,20
51:11,24 94:9
96:19 137:9,12
137:18
**pasted** 137:25
**pat** 55:10 57:4
61:13 63:16
67:11,15
110:15 111:5
112:25 134:17

138:2 148:11
153:7,19
154:23 155:8
170:9,13,15,21
173:17,23
174:2,19
184:22 186:24
**pat's** 153:16
**patricia** 15:22
113:6
**paula** 186:23
**pause** 160:16
**pbs** 38:8,11,24
60:22 61:11
62:1,8,20 63:1
87:4 109:8
116:16 117:1
118:6 119:2
120:2 124:7,20
126:17,22
127:8 128:22
128:25 129:5
130:2 132:10
132:15,22
136:12,22
138:15 139:5
148:19 150:14
151:23 177:11
181:11 186:13
186:22 187:15
188:3 189:15
191:24 193:22
**pdf** 99:15

peace  60:7,14
penalty  38:3
penn  45:17,19
  45:20,24 46:7
  46:11,16
  164:22 165:21
  166:13 167:6
penultimate
  115:23
people  14:16,20
  14:22 15:5
  43:1 44:25
  45:23 47:3
  61:7 68:24
  72:18,22
  108:24 121:10
  121:13 159:12
  163:7
percent  16:22
  88:8 104:14
  105:14 181:15
  186:8 187:7
  191:17
period  11:7,21
  12:10,22 13:17
  13:20 17:22
  18:2,16 22:9
  41:1,17,21
  42:15 43:7
  57:10 95:25
  127:25
perjury  38:3
permanent
  41:17,23 42:22

43:1
permission
  27:3
person  20:8,13
  20:20 21:9,14
  21:24 22:3,8
  22:14,19 34:21
  34:24 35:6,9
  52:20 54:1
  68:5,17 76:24
  77:9 79:21
  81:8 87:18
  98:25 106:12
  106:23 113:24
  114:14,15
person's
  121:12
personal  69:10
  101:8 156:22
  156:23,24
  157:5,5,12,12
personalize
  158:24
personally  20:5
  102:23 137:18
  137:21
perspective
  64:6 95:3
  118:10 159:4
  191:6
pertains  19:19
peter  23:19
  24:8 28:12,17
  28:23 29:5,9

29:20,23 30:2
  30:20 31:4,9
  32:17 55:13
  58:17 65:2
  106:18 128:9
  141:11
petroshius  46:2
  164:21 165:20
  166:13 167:5
  167:10,14
  168:8,13,19
philosophically
  159:2,8 160:2
phone  55:21
  65:17 66:1,22
  67:3 72:17,21
  73:1,12,14,15
  73:18 81:3,17
  129:15,22
  157:7
phones  5:6
phonetic  80:10
physical  60:17
physically
  141:22
pick  5:5
picked  186:19
place  5:8 22:11
  62:10 71:1
  78:2 97:24
  102:12 116:22
  170:13 195:6
placed  26:15
  40:8,15 59:8

64:19 110:5
  134:6 139:16
plaintiff  5:24
plaintiffs  1:5
  2:9
plan  28:16,18
  29:7 30:8,11
  30:14,19,24
  31:12,16,21,22
  31:23 32:3,8
  32:12 33:1,12
  33:19 34:1,5
  34:13 35:13
  138:14 139:4
  192:21
planned  141:7
plans  29:14
play  141:15
  157:20
plays  43:9
please  5:4,6 6:9
  7:3 12:5 26:12
  28:11 39:10,22
  53:20 64:10
  65:24 73:23
  103:11 107:3
  107:15 109:19
  115:20 130:17
  133:13 134:18
  142:13 144:3
  152:5 155:20
  162:5 185:22
  190:3

**[pmi - previously]**

**pmi** 49:9 51:13
**point** 7:3 35:1
  111:15 149:24
  170:11 176:13
  176:14 177:24
  180:21 190:18
**pointing**
  183:13
**points** 74:23
  150:24 170:8
  173:22 174:1,6
  174:19 182:5
  183:16 184:1
  184:14,20
  185:2,7
**policies** 105:25
**policy** 36:9,11
  36:25
**political** 76:11
  124:13,15
  125:1 158:16
  159:16
**politically**
  75:13 153:21
  154:2
**portion** 187:9
**portions**
  161:22
**posed** 135:8
**position** 11:1
  11:15 12:7,17
  15:1 36:9,11
  36:25 41:11,18
  41:24 42:22

118:17 122:23
  140:9,10 150:7
  151:20 190:16
  191:2
**positions** 13:18
  43:2
**positive** 180:5
**possibility** 62:5
  63:5 106:24
  122:12,18,21
**possible** 62:25
  64:8 121:15
  122:25 181:7
**post** 3:18 138:6
  138:13 139:3,7
  139:10,13,21
**posted** 76:3
**potential** 33:11
  49:16 61:2,5
  63:20 67:10
  104:3 105:3
  106:7,21
  114:25 116:24
  186:25
**potentially**
  39:3,14 116:25
**power** 37:13
**pp** 38:11 60:22
**precedent** 20:3
**preceding**
  175:2 176:13
**preparation**
  74:19 75:20,24
  76:24 79:10,19

141:12,16
**prepare** 7:25
  9:8,12,18,23
  27:5,11 28:7
  66:8 77:5
  173:22
**prepared** 27:9
  27:17 28:3
  74:24 174:2
**prepares** 26:25
**preparing**
  75:17 102:23
**pres** 110:17
  112:24 113:5,6
**present** 2:24
  76:3 86:12
  99:19 189:16
**presented**
  111:10 184:9
  189:25
**preserve** 181:2
**preserved**
  181:6
**preserving**
  123:4
**president** 10:6
  10:9,23 11:3,5
  11:8,12 15:3
  15:20 16:18
  17:2,5 18:3,12
  18:17 19:2,8
  19:22 22:10
  36:1,8 37:1,7
  37:13 61:15

62:2 63:2,12
  111:17 113:1,7
  113:15 117:12
  118:8,16 119:7
  119:21 124:17
  140:18 174:2
  183:16
**president's**
  105:25 115:6
  165:9,23
**presidential**
  177:14
**presidents**
  27:19,19 36:15
  36:25
**press** 22:22,22
  53:23 54:5
  55:12 116:5,8
  139:17 165:13
  165:22,24
**pressure**
  188:16
**pressuring**
  188:14
**pretty** 146:7
**prevalent**
  60:16
**previous** 31:19
  44:4,16
**previously**
  80:10 89:19
  96:16 115:5
  128:8

**[prime - public]**

| | | | |
|---|---|---|---|
| **prime** 44:10 | **professional** | **provided** 52:17 | 47:10 48:2,4 |
| **prior** 10:22 | 1:18 50:8 | 52:24 65:17 | 49:3,6 50:23 |
| 11:2,4,11,25 | **program** 137:5 | 91:20,21,22 | 52:1,2,8,12,19 |
| 12:13,18 33:17 | 180:20 185:10 | 92:4 93:6,9 | 52:25 53:3 |
| 65:11 128:24 | **programming** | 99:3 | 63:12 77:2 |
| **private** 5:5 | 137:3 171:18 | **provides** | 79:6,8,22 |
| 95:14 118:17 | 171:23 174:15 | 180:23 | 86:20,24 87:5 |
| **privy** 84:15,18 | 176:1 187:10 | **providing** 33:7 | 87:16,20 91:5 |
| 85:1 | 187:13,16 | 50:13,21 53:12 | 91:9,18,24 |
| **proactive** 19:15 | 191:16 | 83:16 91:16 | 92:5,15,16,22 |
| 115:11 150:13 | **project** 76:14 | 100:5 111:15 | 93:3,11,18,21 |
| **probably** | 76:19,19 77:4 | **provision** 34:5 | 94:10,13,19 |
| 113:16 159:10 | 143:23 | 35:12 | 95:13,24 99:1 |
| **problem** | **projects** 21:17 | **prss** 46:17,19 | 99:5 103:22 |
| 177:10,12,13 | **prolix** 105:5 | 49:8,15 50:2 | 104:17 105:1,3 |
| 177:20 | **prominent** | 51:3,6,12 | 105:4 106:8,12 |
| **process** 77:12 | 112:2 | 53:11 124:1 | 106:25 108:13 |
| 85:9,10 115:9 | **promoted** | 161:11 | 108:17 109:8,9 |
| 127:11 130:24 | 13:22 | **prx** 87:5 | 109:10 114:14 |
| 131:7 | **proposal** 49:8 | **public** 1:4,19 | 119:1,2,5 |
| **produced** | 136:14,18 | 2:9,14 5:12,25 | 120:1,3 121:6 |
| 80:17 82:6,7 | 176:7 | 6:3,5 8:7 10:4 | 122:5 123:22 |
| 137:8 188:21 | **proposals** 49:5 | 10:10,14,19 | 123:23 125:10 |
| 189:6 | 49:10 | 17:14 18:8 | 125:11,18 |
| **producer** 188:4 | **prospect** 106:7 | 19:18 20:12 | 126:20 132:20 |
| **producers** 87:5 | **protect** 125:18 | 21:24 22:5,15 | 132:23 148:18 |
| 136:18 187:11 | 189:4 | 25:20 30:25 | 161:8 165:25 |
| **producing** | **provide** 30:24 | 34:25 35:6,9 | 169:6,11 172:5 |
| 33:15 | 31:16 33:12 | 35:19,20,24 | 172:9,11,17 |
| **production** | 34:13 37:8 | 36:6,12,13,15 | 174:11 176:18 |
| 80:9 137:15 | 45:9 58:20 | 36:22,23 37:4 | 176:18 180:4,7 |
| **productive** | 83:1 91:14 | 37:19,21,22,25 | 180:8,17,23 |
| 66:9 183:11 | 128:4 132:10 | 38:6,9,12 | 181:3,3,4,8,8,9 |
| | 132:14 180:18 | 39:18 46:9,13 | 183:23,23 |

194:3 195:4,22 196:4 197:1 198:1,19

**publicly** 164:8 164:18 165:16

**pulled** 72:17,21

**punish** 39:3,14

**pure** 63:7

**purportedly** 141:3

**pursuant** 195:5

**pursue** 180:25

**put** 7:14 65:3 139:17 169:12 189:12

**putting** 36:10 50:19 70:25 189:7

**q**

**quarters** 141:6

**question** 7:1,16 18:25 20:24 24:16,17,21 25:14 31:19 34:8 35:15 39:10 45:5 47:25 48:11,12 48:18,23 51:16 51:18 53:6 58:1 61:3 71:4 71:19 80:3 84:16 90:15,17 90:23,24 91:4

91:9,11,12,17 92:5 93:18 102:20 103:17 130:17,25 131:19 133:6 136:25,25 143:15,16 166:25 179:12 182:10 190:3,6 192:10

**questions** 26:10 68:11 92:10 93:22 97:16,16 134:19,23 135:1,3,7,9,10 137:2 140:15 141:17 142:24 183:8 194:9

**quick** 39:20 122:14

**quite** 25:24

**quote** 92:21 93:21 139:24 139:25 163:4 163:21 174:10 178:4 179:2,8 179:15,19,20 179:25 182:3 182:15,22 183:1,5,14,19 184:8 185:17

**quotes** 119:4

**r**

**r** 2:1 12:6 40:22 195:1 197:3,3

**raben** 12:4,8,11 12:14,18 13:6 20:18,20,21 21:10,15,23

**radical** 140:19

**radio** 1:4 2:9 5:12,25 6:3 10:19 37:19,25 38:6 46:9,13 47:10 48:4 49:4,7 50:23 52:3 53:3 123:22,23 161:8 180:8 181:3,8 187:12 187:19,21,22 191:15 196:4 197:1 198:1

**radio's** 52:8

**range** 134:8

**ranging** 161:14

**rapidly** 42:2

**rather** 57:23 156:10

**rdm** 1:7 5:15

**reach** 37:15 55:13,17 170:22

**reached** 116:5 130:3 188:9

**reaching** 106:10,22 189:3

**reaction** 155:14 155:18

**read** 24:19 26:11 48:23,25 54:23 91:1 100:17 139:7,8 139:10,11 149:11 196:9 198:5

**readies** 138:14 139:4

**reading** 56:10 57:2 138:3

**reads** 143:18 150:9

**ready** 26:9 152:12,13 156:4

**real** 137:11

**really** 129:20 129:21

**realtime** 16:4

**reask** 58:1

**reason** 27:13 57:14 59:16,19 111:2,11 112:7 119:12 121:17 137:18 166:15 182:20 196:11 197:6,9,12,15 197:18,21

**reasonable**
56:21
**reasonably**
54:6
**reasons** 33:11
83:5 137:12
**recall** 8:25 9:1
9:19 12:25
13:1 15:13,15
21:3,6,8 22:12
22:13 23:1,4
24:2 30:5,6,9
30:18,21 32:4
32:10,22 33:24
33:25 35:19
38:13,16,19
41:20 42:18
46:5 47:8,12
47:15 51:1
55:24 56:9,13
56:15 57:1,13
58:14,22 60:15
61:18 63:14,23
63:23 68:18
70:7 74:15,22
74:23 75:1,2,4
75:19 76:13,17
76:21,24 77:23
77:24 79:18
83:4 87:12,13
87:22,23 88:1
88:17 91:16,21
91:23 92:9,23
93:1,21,25

94:1,4 95:9,17
95:19,20 96:9
96:11,25 97:1
97:3 98:14,15
100:20,21,23
101:2,4,6,13,22
101:23 102:2,6
102:9,21,23
103:1,2,5,6,10
104:5 108:6,8
110:24 111:6
111:15 112:21
114:4,5,8,18
121:24 122:10
122:16,19
127:4 131:25
132:3,8,18
133:11 136:24
137:24 144:16
144:19,21
146:3 148:3,5
153:9,13,15
154:12 155:12
155:14 158:23
170:10,12,18
171:7,8,13,15
188:10
**recalling** 88:16
**receipt** 196:17
**receive** 23:12
30:22 38:25
59:17,19 64:2
64:23 123:7
153:7 156:12

161:18,25
173:19 191:19
**received** 69:14
69:18 70:24
71:10 106:17
123:10 134:12
134:23 135:2,4
136:12,13,25
137:2 140:15
146:8,11,14,15
146:25 148:12
161:16,21
166:16 176:7
183:8 187:25
**receives** 93:4
**receiving** 124:1
**recent** 28:14,24
163:9 166:9
167:2
**reception**
122:14
**recess** 40:1
82:15 107:7
138:23 169:19
186:1
**recipient**
112:15 123:9
155:5 159:11
**recipients**
147:17 155:11
156:17 168:19
**recognize**
26:22 40:20
59:14 110:9

**recognized**
186:14
**recollection**
69:10 107:17
114:12 155:18
171:3 178:15
**record** 5:2,9,21
7:15 39:22,25
40:6 80:3
81:18,21 82:12
82:14,18 107:3
107:6,9 138:20
138:25 160:15
163:9 166:10
167:2 169:16
169:18,21
185:21,25
186:3 194:10
194:13 195:13
**record's** 152:15
**recorded** 5:11
195:10
**recording** 5:7
**reducing** 16:22
**refer** 10:12,17
123:16 167:23
183:1,5
**reference** 10:14
10:18 54:16,19
62:21 97:13
113:5 117:9,19
120:17 123:24
124:11 138:4
140:15 158:5

**[reference - remember]**

| | | | |
|---|---|---|---|
| 163:12,15 167:11 171:6 171:11 175:1 176:11 178:10 179:5,8 | **reflective** 172:18 | 67:9 69:25 95:12 105:4,10 105:20 106:8 124:1 131:3,10 131:23 140:22 | 113:4,6,9,13,20 113:22 117:10 118:1 119:6,20 123:14 126:13 |
| **referenced** 196:6 | **reflects** 36:13 | 140:23 161:8 161:11 165:25 | **remember** 21:4 27:10,12 28:22 |
| **references** 159:17 | **reforms** 21:16 21:23 180:2,12 180:25 181:5 181:13 184:5 186:6 | 176:1 | 28:25 29:1,5,9 32:13,16 34:2 |
| **referencing** 149:25 | **refresh** 178:15 | **relates** 95:24 161:7 192:9 | 38:23 39:1,12 43:5 56:2 |
| **referred** 24:19 48:25 91:1 121:20 175:20 | **refreshed** 107:17 | **relating** 81:5 194:2 | 60:12 61:10,11 63:17,19 66:3 |
| **referring** 29:4 140:2 153:11 165:1 168:2 169:3 175:25 177:8 179:1,16 179:21 181:21 182:2,20 184:8 186:11,12 | **regarding** 34:25 35:6 63:13,20 79:22 104:16 114:14 131:15 132:11 | **relation** 96:17 124:16 160:3 165:9 | 66:7,11,17 67:14,17,20 68:13 69:20,23 69:23 73:5,6 76:1 77:7,11 79:10 85:10,21 86:15,17,18 87:9,15 88:3 88:13,19,22 89:1,10 91:4 92:3,13 93:8 94:5,8,11,22 |
| | **regards** 114:10 | **relationship** 136:10 | |
| | **registered** 1:17 | **relayed** 56:17 | |
| | **regular** 135:21 | **relaying** 56:2 | |
| | **reign** 150:13 | **release** 165:13 165:22 | |
| **refers** 124:13 138:2 179:14 184:1 | **relate** 21:24 51:12 80:13 82:3 113:23 143:13 161:1 171:12 | **releases** 165:25 | 95:5 96:5,13 96:21 97:5,6 |
| | | **relevant** 179:2 182:3 | 97:19,20 98:19 98:21,24 99:6 |
| **reflect** 36:22 113:17 174:19 191:12 | **related** 21:22 22:5 24:11 25:5,19 45:2 45:13 46:8,12 46:17 47:10,23 48:3 49:15 50:1,22 52:2 52:18,19 53:1 53:2 60:14 | **rely** 75:15 | 110:11 111:5 |
| | | **remain** 187:18 | 112:19 126:8 |
| **reflected** 28:1 64:24 113:17 156:13 171:17 171:23 173:20 173:23 174:15 176:21 185:6 | | **remainder** 141:7 | 127:14,15,16 127:19,22 |
| | | **remaining** 175:14,19 | 128:1,2,7,13,20 |
| | | **remarks** 110:16,18,22 111:3,8,12 112:23,25 | 129:15,23 |

130:13 132:19
136:5,9 140:21
140:25 141:4
143:11,23,24
145:20 146:6,7
148:7,8,11
158:16 170:15
170:21 172:1,2
184:10,11,13
184:20,21
185:5,8,9,11,16
186:9 188:13
191:4
**remind** 159:10
177:10
**reminder** 160:8
**remote** 142:3
**remotely** 142:2
142:8,11
**removal** 187:6
**removing**
122:21
**reorganization**
14:6
**repeat** 34:7
39:9 53:5 61:3
84:16 88:21
89:2,15 90:24
93:15 130:17
131:19 179:12
190:5
**rephrase** 19:1
47:25 48:16
161:23

**reply** 149:9
**report** 15:16,21
15:23 16:3,5,6
27:1,4,5,18
28:9 57:4
169:3,4
**reporter** 1:18
1:19 5:18 6:9
24:18 59:1
64:16 90:25
109:23 133:22
138:9 144:8,10
152:9 155:25
160:21 172:22
**reporting**
100:25
**reports** 27:23
28:2
**representation**
121:21
**representative**
114:23
**representatives**
20:9 85:23
**representing**
2:9,14 5:17 6:6
**republican**
36:25 154:17
154:20 158:4,7
158:13 159:25
170:7
**request** 23:2,5
30:20 32:17,24
33:11 55:14,18

56:6,23,25
66:4 68:8,16
80:4 105:11
115:6,25 116:9
141:10,13
**requested**
23:25 67:9
68:4 99:10
124:5 139:23
194:6
**requesting**
22:23 67:12
**requests** 33:25
44:13 73:20
80:25
**required** 16:25
24:11 25:5,21
29:7 30:11,16
31:1 33:1,18
33:24 34:4
198:13
**requirement**
28:20 29:8
33:14 34:12
187:7
**requirements**
60:1
**requires** 28:15
187:8
**requiring**
35:11
**reread** 24:17
24:17

**rescission** 51:9
122:19 125:13
148:22 186:21
187:1 188:5,11
**rescissions**
111:19 122:22
127:11
**research** 75:2,5
76:5
**resolution**
28:14,24 30:4
31:2 32:12
33:2,17 34:4
35:11 51:10
131:2,5 132:9
**resolutions**
191:25
**resolve** 100:10
**resource**
129:24
**resources** 93:6
**respect** 75:16
75:25 81:6,14
130:14,19
177:19 183:6
**respective**
121:9
**respond** 19:25
20:2 44:13
182:6
**responded**
33:25 92:25
113:16 184:22
186:7

**responding**
19:14 112:19
**responds** 164:3
168:24
**response** 63:17
91:24 92:4,19
92:24,24 93:1
93:9 95:17,19
97:18 141:13
141:16 150:6
154:6 174:24
175:7 176:14
184:3
**responsibilities**
16:20 17:3,11
17:16,22 18:5
18:10,11 44:8
**responsibility**
44:10 176:17
**responsive**
73:20 80:24
151:4,21
166:23
**restrictions**
180:2,12,25
181:5,13 184:6
186:6
**restroom**
138:18 160:12
169:13
**results** 81:13
**retained**
145:25

**retainer** 169:8
**return** 196:13
196:16
**returning** 99:8
**reveal** 75:6
**review** 8:21,24
57:22 58:9
75:8,12 77:25
80:4,7 110:19
111:12 112:8
112:12 196:7
**reviewed** 9:2
49:5,10 54:9
110:20,22
111:1,3 112:6
112:17 119:12
147:15 155:2
166:3
**reviewing**
28:20 58:6
88:3,19 103:2
103:6 110:24
**reviews** 26:13
59:5 64:17
110:3 134:3
138:10 144:11
144:14 152:10
156:2 160:23
173:10
**rfp** 49:6
**right** 8:4,11
46:17 50:16
53:19 54:7
57:18 65:19,22

72:17,21 77:2
78:5,9 79:15
79:23,24,25
81:24 85:6
89:17 91:10
101:25 125:4
125:17,24
126:3,13
133:12 134:5
135:1 145:6,23
147:4,21 152:4
152:19 155:3
155:19 157:6
157:19 160:10
160:25 162:2
162:10 166:5
169:23 174:4
174:21 178:6
179:6,11,19
182:17 187:5
**riley** 108:23
109:1,3 111:7
186:24
**rnc** 153:22
154:10,16
155:10
**rock** 46:22,24
47:4,10,13,15
47:17 144:18
144:19,23
145:5,8,10,13
145:18 146:1,4
148:6,15 149:3
149:14,21

150:8,18,21
151:2,8,13,18
152:1 162:9,13
163:2,19 164:4
164:23 166:8
167:1,12 169:1
**rogers** 180:6
**role** 19:8,20,22
21:14 42:16
43:9,10 44:1
44:22 61:13
108:20 109:5
128:5 141:15
141:19 157:10
157:21 192:3,7
192:14
**roles** 44:8
87:18
**room** 85:14
86:2 94:16
167:16 177:3
184:3
**round** 49:6
131:7,10 155:1
**rubbing** 21:18
**ruby** 67:21,23
67:25 69:20
73:2,9 77:11
85:20 94:8,18
98:20 113:9
129:19 156:20
158:1,9,24
**rubydcalvert**
156:17

**rules** 90:7
**rumor** 61:10,11
  63:11,15
  117:19 118:2,3
  118:5,6
**rumors** 61:6
  62:8 63:24
  103:14,18,24
  114:24 116:11
  116:15,23
  117:4,9,21
  124:23,23
  139:15
**run** 77:15
**rural** 95:1
**russ** 37:20
  139:23 140:4,6
  140:12
**russian** 169:25
**ryan** 1:17 5:18

**s**

**s** 2:1 3:6 40:22
  197:3
**safeguard**
  126:18 127:12
**safeguards**
  123:23
**safety** 21:17
**safon** 41:4,5,7
  41:10,17,22
  42:4,25 44:19
  110:14 111:14
  112:16,20

155:9
**safon's** 44:22
  153:17
**salt** 117:5,13
**sanchez** 43:18
  43:20,21,23,25
  44:21 59:13,21
  59:23 60:19
  61:24 62:17,24
  63:4 110:16
  113:21 162:8
  162:15 163:3
  163:20 164:3
  164:17,22
  165:3,5 166:12
  167:5 168:18
  168:24 178:25
  179:14 181:16
  182:1,12
**sanchez's** 44:7
**satellite** 46:9,13
  47:10 48:4
  50:23 52:3
  53:3 161:9
**saul** 2:11 6:4
**saul.com** 2:13
  196:2
**save** 125:4
  126:15
**saw** 54:12 58:4
  106:5,21
  144:22
**saying** 38:23
  55:5 81:20

83:3 88:5,13
88:17 89:1
92:13 93:13
94:1 95:20
96:10 112:16
112:20 113:12
115:24 126:12
126:14 127:20
132:18 144:19
144:24 148:3
151:14 165:11
169:1 171:4,7
177:17 178:16
179:9 184:12
185:16 192:1
**says** 26:25
  54:13 74:16
  106:18 110:17
  119:22 123:19
  128:9 134:17
  147:16,20
  164:23 167:11
  168:2
**scenario** 73:7
**schedule** 23:8
  42:6 54:14
  55:6 170:24
  184:21
**scheduled**
  69:21 129:1
**scheduling**
  44:12 69:22,24
  69:25 70:6
  73:7

**school** 66:15
**schwietering**
  2:6 6:1,1
  133:19 160:14
**sciences** 60:10
**scrutiny** 175:14
**seal** 195:17
**search** 80:22
  81:3,19
**searched** 73:18
**searches** 76:22
**season** 104:9
  105:16 124:25
**second** 7:3,17
  9:25 36:2
  37:10 59:12
  60:20 65:1
  97:9 115:17
  135:14 136:4
  142:15 143:1,2
  150:21 151:11
  153:18,19
  157:24 158:2
  158:12 167:15
  174:5 175:5,5
  175:6 177:25
  179:22
**seconds** 7:13
  39:8
**secretary** 43:22
  44:11 113:21
**section** 134:25
  150:23 151:18

| | | | |
|---|---|---|---|
| **sections**  141:18 141:19 | **seek**  29:16 34:17 36:3 58:10 125:8 | **senators**  123:3 151:14 171:20 | 154:18 155:10 155:13 157:25 158:11 163:12 |
| **security**  77:14 77:14 85:9,10 85:12,18 | **seeking**  34:20 35:8 36:6,11 54:1 106:11,22 124:20 | **send**  64:23 69:7 88:23,24 89:16 93:17 99:14 100:7,10 134:18 156:12 157:17 161:18 173:19 188:3 194:6 | 163:18 164:6 174:18,24 179:24 |
| **see**  36:8,10,14 51:23 55:3,14 55:15 57:20 59:18 60:2,24 73:18 74:3 81:1 103:10 110:12,20,25 112:15,18 114:1 116:1,12 119:11 120:11 143:4 144:12 149:1 150:5,5 150:14,16,25 151:1,5,6,15,17 151:23,24 153:23,24 156:18 161:3 161:11,21 162:16,21,23 163:10,11 164:11,12 166:4 167:22 167:25 168:22 174:7,11,16 175:11,17 179:2,4 180:9 185:8 | **seeks**  165:25 **seems**  68:13 146:15 152:23 **seen**  138:16 139:6 145:17 170:8,10 **sees**  148:19 150:14 **segment**  172:8 **senate**  69:21 118:9 124:20 135:5,18,22 **senator**  120:25 121:19 122:1,4 122:7,11,13,17 122:20 158:3,6 158:8,9 169:24 169:25 170:3,5 170:9,13,15,19 170:22,24 171:22,22 172:3,16 173:23 174:20 180:17,25 183:17 184:1,9 185:10 | **sending**  57:4 99:23 138:1 **senior**  10:6,8 10:22 11:2,19 11:22 12:1 15:20 16:15,18 17:9,17,23 18:10 27:19 54:13,15 55:5 **sense**  7:6 155:16 182:18 **sensitive**  5:5 **sent**  17:13 57:11 63:11 69:14,17 70:17 71:1 103:13 134:12 157:21 161:16 196:14 **sentence**  28:11 58:15 60:19 110:17 140:17 143:6 148:16 150:9 153:19 153:21 154:1,9 | **separate**  25:7 70:5 102:14 109:13,16 113:20 129:12 133:17 **separated** 78:13,14 123:25 **separately** 129:13,14,14 135:3 180:18 **sequentially** 181:24 **seriously**  62:5 83:19 174:25 175:9 **serve**  95:4 166:1 **served**  96:16 **serves**  176:18 **service**  137:14 165:24 180:7 180:17 **services**  50:22 52:18,25 53:13 **serving**  94:25 **set**  128:8 183:25 185:1 |
| **seeing**  47:15 125:13 | | | |

**[sets - speaking]**

| | | | |
|---|---|---|---|
| **sets**  149:17 | **shares**  27:1 | 189:20 190:7,9 | **solutions**  5:17 |
| **seven**  14:18 | **sharing**  29:23 | 196:19 | 5:19 177:4 |
| 15:5 | 31:5,8 61:10 | **significance** | 184:4 196:23 |
| **several**  88:21 | 61:11 94:8 | 34:3 | **somebody** |
| 88:21 89:2,15 | 99:22 | **significant**  33:2 | 158:15 |
| 93:15 155:11 | **sheet**  196:11 | 34:19 35:13 | **someone's** |
| **severe**  42:1 | **shirt's**  21:18 | **similar**  59:24 | 121:12 |
| **shadow**  79:9 | **short**  54:6 | 61:10,11 | **somewhat** |
| **shaking**  7:5 | 57:10 | 150:12 163:8 | 43:10 |
| **shame**  119:9,16 | **shorthand**  14:2 | **simple**  76:1 | **soon**  115:8 |
| 119:23 120:6 | 195:10 | **singled**  132:25 | **sorry**  13:1 |
| 120:13 123:18 | **shortly**  65:20 | 133:9 | 16:12 18:11 |
| **shape**  80:14 | **show**  167:19 | **sir**  6:19 25:15 | 25:1 31:18 |
| **share**  27:4 | **shows**  37:2 | 36:17 112:6 | 32:22 82:22 |
| 28:15,18 29:10 | 77:5 163:6 | 149:7 | 108:22 129:4 |
| 30:8,11,19 | **shut**  37:13 | **sit**  77:16,25 | 143:2,7 149:24 |
| 31:12,21,22,23 | **shutter**  116:25 | **sits**  78:15 | 153:19 155:2 |
| 32:2,7,18 | 118:13,16 | **sitting**  27:12 | 161:13 182:1 |
| 33:18 50:18 | **shuttering** | 101:7 171:2 | 188:25 190:4,5 |
| 99:17,21 | 116:12 117:9 | **six**  15:10,11,12 | 192:19 |
| 117:17 | 117:20 | **skeptical** | **sought**  37:7 |
| **shared**  27:18 | **shutting**  37:4 | 119:12 | 125:8 |
| 30:13 31:2 | 37:11 | **slavitt**  43:15,16 | **source**  188:2 |
| 32:5,19 34:1 | **side**  78:12,13 | 79:1,3 84:3 | **south**  2:3 |
| 52:10 57:24 | 136:1 187:20 | 85:4 86:1,4,9 | **spans**  136:3 |
| 63:15,16 94:18 | 187:21,22,22 | 89:9 95:9,18 | **speak**  6:25 30:1 |
| 99:4,19 100:16 | **sides**  187:18 | 95:20 96:9,14 | 65:18 90:3 |
| 101:10,14,17 | **sign**  196:12 | 97:25 98:6,20 | 165:18 168:15 |
| 101:21,24 | **signature** | 99:8 100:9,15 | 191:23 |
| 102:3,4,7,9,10 | 195:20 | 100:24 118:23 | **speaker**  158:21 |
| 127:12 128:8 | **signatures** | **slightest**  67:1 | **speaking**  9:4 |
| 175:16,24 | 190:11 | **smirking**  125:7 | 21:12 43:8 |
| 176:11 189:9 | **signed**  140:18 | **solicited**  49:6 | 51:13 67:7 |
| 189:23 190:16 | 175:10 176:4 | | 94:5 109:2 |

**[speaking - statute]**

111:6,7 146:18
146:24 147:1
**special** 105:8
**specific** 13:1
32:4,10 38:4
38:17,20 41:14
66:10 94:4
101:2,14
102:10 114:8
121:5,6 127:19
132:4 136:15
137:6,6,10,17
145:20,23
146:19 147:1,2
147:5 180:3,13
180:16,22
181:1,6 184:6
**specifically** 9:3
29:1 30:9 38:1
38:6,22 92:17
104:5 114:9,19
118:9 124:6
143:13 162:14
165:1 184:14
187:10
**specifics**
171:13
**speculate** 120:8
154:23 168:6
168:22 179:20
181:22
**speculation**
63:8

**speculative**
61:9
**speech** 90:4,13
**speeches** 90:13
**spell** 12:5
**spend** 34:18
41:25 187:9
**spending**
140:19
**spends** 42:5
**spirit** 128:6
**split** 159:11
160:8 187:19
**spoke** 30:6
55:21 56:22
65:20 95:13
190:24
**spoken** 65:12
122:13
**spot** 138:17
**stacey** 108:21
**stack** 103:11
**staff** 16:22
19:17 41:6,11
43:22,23
122:20 135:5
140:11
**staffer** 135:18
**staffers** 183:9
**stage** 180:6,19
185:9
**stamp** 3:8,9,11
3:12,14,14,16
3:17,19,20,24

4:3,3 26:3 40:3
40:16 58:24
64:12 109:21
109:22 133:15
133:16 144:5
152:7 160:18
173:2,3
**stand** 60:4,6,8
154:16
**standing** 195:4
**start** 7:1 84:21
115:9 130:23
131:6
**started** 13:21
**starting** 124:25
167:9
**starts** 143:3
175:6
**state** 5:20
119:14 164:8
165:15 170:3
**stated** 55:8
118:22 119:8
119:11,22
120:12 124:17
126:2 129:16
132:17 147:22
176:4
**statement**
27:15 58:12
92:20 95:18
97:11 116:3,6
116:14 119:20
123:16,17

149:21 151:7
164:9 165:14
179:16
**statements**
92:9 93:22
105:3 151:25
159:5
**states** 1:1 5:14
28:11 60:7,14
136:4 139:21
140:1,17
148:16 151:3
151:13,19
153:18 163:21
174:24 183:17
184:1
**stating** 126:9
140:25 158:3
164:18
**station** 94:10
94:14,21 95:3
**stations** 87:5
88:9,9 91:5,6,9
91:18,25 92:6
93:19 94:25
108:14,17
109:8,9 116:17
118:7 123:24
125:14 181:4,9
187:8,23 188:1
**status** 87:2
**statute** 86:24
125:20 154:4,7
177:21,23

**statutory** 60:1 62:14 88:3,19 88:24 89:17 93:17 99:16,24 100:6,8 123:11 157:16 187:7 187:13,16 194:7

**stay** 124:2 186:17 187:3 187:22

**stayed** 97:8

**step** 67:19 191:7

**steps** 118:11 149:18 150:13 151:3

**steward** 34:16 123:8

**stick** 182:4

**sticking** 163:9 166:10 167:3

**stock** 62:11

**stood** 97:6

**stop** 89:20,20 89:21,21 90:8 90:8 193:16,22

**story** 172:3,12 172:15

**storytelling** 161:5

**street** 1:15 2:7 2:12

**strike** 13:3 19:21 21:7 25:2 37:16 38:17 47:20 56:14 63:18 65:15,23 66:24 66:24 87:25 98:16 121:16 137:16 156:15 157:25 158:17 163:1 165:4 166:7,22 171:1 176:25 183:3

**strong** 75:13 154:13

**strongly** 37:21

**structure** 44:4 44:6,16,23

**struggling** 43:5

**student** 66:14

**study** 49:3 169:6

**stuff** 66:20

**subcommittee** 115:4

**subject** 21:13 23:17 26:20 110:16 112:23

**submission** 24:25 25:19,22

**submissions** 24:12,12 25:5 25:7

**submit** 24:22 25:11 29:7 32:12

**submits** 24:8

**submitted** 25:15,16 49:8

**submitting** 148:22

**subscribed** 198:14

**subsequent** 190:25

**substance** 7:22 8:13,16 29:18 61:8 171:9

**substantive** 77:20 79:10,18 158:19 169:2

**suggest** 83:18 124:18

**suggested** 37:1

**suggestion** 37:9

**suggestions** 36:15

**suggests** 62:4 63:4

**suit** 59:24

**suite** 2:12

**sullivan** 38:14 38:18,20,23 39:2,13 65:9 65:12 66:6 75:23,25 76:2 76:5,18,23

85:14 86:2,4,8 87:9,13,16,19 87:24 88:1,13 88:23 89:9,11 89:12,16 91:13 92:10,13,16 93:13,16 96:11 99:11 104:24 118:22,25 119:7,14,22 120:5,12 126:2 126:9,25 127:18 132:7 132:16,19,24 133:9 140:7 158:2 159:16 159:21 171:3 178:11,16 179:5 183:2 193:8,15,21 194:6

**sullivan's** 91:17 92:5,20 93:9 93:18,19 96:18 123:16 140:5,8 179:16 182:21 182:22

**sum** 171:9

**supervision** 195:11

**supplemental** 80:8

**support** 45:10 62:15 109:10

**[support - testified]**

111:24
**supportive**
  132:22
**sure**  7:11 13:14
  16:11,13 24:18
  34:10 39:21
  50:5 51:21
  53:7 57:8 58:3
  58:7 60:11
  66:2 68:6,6
  74:10 90:25
  101:25 102:3
  121:9 131:21
  133:22 147:9
  162:6 169:15
  179:1,13
  181:25 182:2
  184:25 185:4
  185:23 189:11
**surprised**
  113:25 184:19
**suspicion**  54:18
**sustained**  181:8
**sustains**  181:3
  186:16
**svps**  27:1
**swear**  6:9
**swirl**  115:12
**sworn**  6:13
  195:7 198:14
**syndicated**
  180:20
**system**  17:15
  19:18 46:9,13

47:11 48:4
50:23 52:3,13
53:3 62:15
86:20 87:7
95:2 119:3
121:7 122:6
123:1 125:11
125:19 126:21
127:13 132:20
161:9 177:7
186:15 188:1
189:5

**t**

**t**  3:6 195:1,1
  197:3,3
**tab**  26:1 109:19
**table**  189:12
**take**  5:8 16:24
  39:20 57:22
  74:6 78:1
  79:25 103:11
  118:11 167:19
  169:13 174:24
  175:9 189:8
  193:9 194:2
**takeaway**
  99:12,14
**taken**  1:14 6:21
  40:1 82:15
  138:23 141:19
  149:18 150:13
  151:4 154:5
  169:19 186:1

195:5
**talk**  46:18
  97:12,12 130:2
  130:6,10
**talked**  29:17
  93:2 182:10
  188:11,23
  191:5,8
**talking**  25:15
  25:16 49:10
  74:23 77:11
  81:21 128:13
  142:20 170:8
  173:22 174:1,6
  174:19 183:15
  183:25 184:14
  184:19 185:1,6
**target**  60:22
  62:1,20 63:1
  63:21 103:21
  103:24 104:1,1
  104:17 117:1
**targeted**
  181:14 186:7
**targeting**  63:6
  104:6 106:24
  118:5 148:17
**tasks**  16:25
**taxpayer**
  138:15 139:5
**taylor**  112:1
**technical**  45:9
**technologies**
  43:12

**teenagers**
  137:4
**telecommuni...**
  108:1,4
**telephone**
  68:16 129:3,5
  129:9,10
**television**
  108:13,17
  109:8,9 137:14
  181:4,8
**tell**  8:14 48:18
  78:8 86:15
  90:11 120:8
  132:16,24
  133:8 188:22
  195:7
**telling**  8:13,16
  146:25
**tenure**  13:15
  96:18 136:10
**teresa**  41:4,5
  42:18,25 44:18
  44:21 110:14
  110:25 111:14
  153:17 154:23
  155:6,8
**term**  177:15
**terms**  75:17
  136:16 143:12
**testified**  6:14
  44:15 67:5
  73:8 89:19
  92:12 96:23

testify   6:13 7:23

testifying 144:16

testimony   3:2 19:20 24:19 38:3 48:25 80:21 91:1 105:18 106:5 128:23 129:7 159:23 160:16 195:5,9,13 196:9,17 198:8

text   69:14,17 69:18 70:9,16 70:19,23 71:8 71:10 72:11 73:1,8,11,19 80:5,7,9,12,22 81:4 82:1,3,10 157:5,12 188:18

texted   70:14 72:19,23

texter   70:12 71:12,14,17,20 71:24,25 72:1 72:3,6,9,10,12

texting   69:23 70:4 73:6

texts   70:6 72:12,13,14 188:20

thank   6:8 31:25 35:4 53:16 58:25 64:14 100:7,11 124:10 127:7 133:21,23 144:7 147:8 150:3 152:8 155:24 156:1 157:16 160:20 173:4,5

thanks   144:13 160:22 164:6

thereof   34:3 97:14 195:16

thing   7:6 26:11 149:16 160:13 167:19 172:15 173:6 194:5

things   63:21 77:17 86:23 109:24 117:3 117:18 121:6 121:11 124:21 146:25 166:18

think   17:17,20 33:13,20 34:11 34:19 35:13 36:24 43:1 45:21 49:14,19 54:8 59:3 70:21 72:24 77:4 83:14,16 87:22 96:15

98:5 99:4 106:10 117:16 118:4 120:24 121:15 159:20 161:6 164:7 165:11 167:10 167:21 168:2 168:20 171:23 173:7 179:7 181:13,17,20 181:21

thinking   87:15 154:24 171:21

third   45:1 50:11,21 51:2 52:17,23 66:14 139:20 162:23

thought   56:16 67:25 76:5 99:2 155:16 172:17 186:6

thread   26:18 40:19 134:1,7 134:11,16 151:12 153:1 153:18 156:10 161:12,22 162:7,13 164:15 165:21 168:16 173:15 173:17,20,24

threats   186:15

three   9:10,13 9:21 10:1

85:22,23 98:1 98:4,11 100:9 129:4,5,12 178:20 182:7

throw   119:9,16 119:24 120:6 120:13,19 121:2,22 123:18 171:5 178:5,17 179:10,18 180:1 183:18 185:13

throwing 125:22 126:16 171:11 181:18 182:16 183:7

thursday   127:9

thursdays 189:2

time   5:7 11:7 11:21 12:10,22 15:17 16:15 17:22 18:16 20:7 22:9 32:5 35:10 39:19,23 40:4 41:1,10 41:14,17,25 42:4,15 44:8 54:6,12,22 55:3 57:3,11 57:13 61:10,17 65:6 66:16 70:16 74:5,12

74:15 81:2
82:13,16 85:4
88:16 94:19
107:4,8 114:22
115:8 116:19
129:21 131:6
134:16 137:6
138:21,24
141:24 142:4
146:3 147:23
147:24 148:4
153:1 161:25
162:13 169:17
169:20 185:24
186:2 189:8
191:5 194:11
195:6 196:18

**timeframe**
196:8

**timeline** 111:16

**times** 20:5,13
45:8 170:16
189:2

**title** 10:5 15:13
21:4 43:5
44:11

**titled** 14:9
138:14 139:4
150:24 177:25

**today** 6:7 7:23
14:7,19,22
15:19 16:17
41:2 96:24
101:7 102:13

108:7 115:1
125:12 141:24
171:2 182:7

**today's** 9:23
194:12

**together** 84:5
98:5,7,11
155:16 180:18

**told** 29:22,22
121:1 127:8
158:3

**tomorrow**
115:1 116:20

**took** 22:10
44:20,21 62:10
85:11 86:9
97:23 102:12
107:11 117:4
189:7 191:12
191:14

**tools** 177:5,7

**top** 26:17 40:17
40:18 59:10
62:17 64:21
72:25 110:8
115:10 134:10
145:18 147:11
150:24 153:1
156:10,15,16
161:13 173:16

**topic** 114:9,20
114:21

**topics** 23:22
56:4 66:10,22

128:7 129:20

**total** 136:22

**touch** 65:3

**towards** 35:20
35:24 36:6,13
36:22 37:19,25
38:5,21 76:9
98:1 151:14

**town** 67:23,25

**townsend** 80:8

**tracey** 15:8

**track** 163:9
166:9 167:2

**trade** 109:7

**trans** 137:4,7

**transcribed**
195:11

**transcript** 16:4
196:6,19 198:5
198:8

**transcription**
195:12

**transgender**
137:8

**transition**
44:16

**transitioned**
44:3 109:5

**transmitted**
111:19

**transparency**
20:4 33:6,6
140:19

**transparent**
34:18 52:13

**transpired** 98:8
103:3

**transportation**
65:8 79:20

**treasury** 78:12

**tried** 27:24
57:5 95:4
170:21,24

**trim** 167:18,18

**true** 116:3
195:13 198:8

**trump** 1:7 5:13
76:11 148:16
150:11 183:4
196:4 197:1
198:1

**trump's** 36:2
37:7 182:9,15
182:19 185:17

**trust** 176:19,20

**truth** 195:8,8,9

**truthfully** 7:23

**try** 6:25 7:1
27:22 57:16,23
66:3 123:24
126:15

**trying** 12:25
44:24 48:14
64:6 77:12
115:10 135:11
141:3 143:23
151:22 159:15

180:21 181:21
184:20 186:17
**turn** 115:17
162:20
**turning** 28:10
136:6 140:14
142:13
**tussle** 91:3
**tv** 49:4 187:15
187:19,20,22
**tweet** 182:9,15
182:19 183:1,4
185:17
**twice** 122:14
190:23
**twitter** 75:7,8
75:12,14
**two** 14:21,22
99:19 123:19
128:17,19
130:7,8 133:17
133:19 134:1,8
141:6 146:24
162:22 163:6
**type** 7:6 28:9
52:24 86:22
**types** 29:14
**typically** 27:18
28:7 70:12
99:17 139:7
142:7
**typing** 27:12
**typo** 163:25

**u**

**u** 40:22
**uber** 98:4
**uh** 7:5
**unaware** 56:25
**uncovered**
75:16 76:10,17
**uncovering**
76:13
**under** 38:2,2
48:15,21
126:16 128:23
135:8,10
144:16 150:1
169:5 195:11
**undermining**
177:6
**underneath**
27:6 28:1
140:16 151:13
162:25
**underscores**
36:24
**understand**
10:13,18 18:25
25:24 35:23
48:22 50:18
51:14,16,18
58:3 66:4 71:3
112:5,9 122:7
130:25 134:24
151:20 163:24
164:2 191:2

**understanding**
29:24 50:6,15
50:18 54:15
56:4,11,13,18
56:19 62:21
80:20 136:8,11
140:4 143:14
144:1 150:9
158:15
**understood**
7:18 25:21
36:1 65:10
112:24 143:16
**undertake**
75:24
**undertaken**
74:19
**undeserving**
111:24
**undisclosed**
80:10
**unexpended**
142:17 143:9
143:22
**unfamiliar**
112:4
**unfortunately**
178:19
**unintended**
178:1 179:23
184:5
**uniquely** 95:4
**unit** 5:10 39:24
40:5 82:14,17

107:5,9 138:22
138:25 169:18
169:21
**united** 1:1 5:14
60:7,14 183:17
184:1
**university**
66:14
**unknowledge...**
132:20
**unobligated**
142:16 143:4,8
**unquote** 92:22
93:21 163:22
178:6
**unsolicited**
34:20 35:7
70:23
**unspecified**
81:2
**upcoming**
128:14 130:11
**update** 26:21
52:14 127:11
132:10,14
**updated** 57:11
**upper** 162:23
**usaid** 140:1
**use** 69:3 70:9
75:15 92:16
120:16 138:18
160:12
**used** 36:19 69:4
69:6 112:14

**[used - way]** Page 53

196:19

**uses** 156:22

**using** 52:14

**usip** 59:25 60:6

**usip's** 60:18

**utilized** 45:7

**v**

**v** 1:6 40:22 196:4 197:1 198:1

**vague** 56:6 66:5 91:10

**value** 159:5 166:4 180:23

**valued** 148:13

**variations** 116:18

**various** 16:24 17:13 18:6 19:15 161:21

**vast** 121:7

**verify** 196:9

**veritas** 77:4

**veritext** 5:17,19 196:14,23

**veritext.com.** 196:15

**versus** 5:13 143:18

**vice** 10:6,9,22 11:2,5,8,12 15:3,20 16:18 17:2,5 18:2,12

18:17 19:2,8 19:22 22:9 27:19,19

**video** 1:13 5:7 5:11

**videographer** 2:25 5:1,18 6:8 21:18 39:23 40:4 82:13,16 107:4,8 138:21 138:24 169:17 169:20 185:24 186:2 194:11

**videos** 76:14,18 77:4

**view** 36:11 105:2 113:5 153:25 154:8 154:18 155:12 183:20 188:17 190:18,19

**viewed** 155:15

**viewpoint** 163:10,16 166:11 167:3

**views** 159:13 159:16,18 160:7

**virginia** 170:4 172:4,5,10,17 180:7

**virginians** 172:19

**voice** 16:10 148:24

**voiced** 132:21 132:21

**voluntarily** 20:2 24:8 33:25

**voluntary** 24:12,23 25:7 25:12,12,22 29:12

**vought** 37:20 139:23 140:5,6 140:12

**vp** 11:16

**vps** 27:2

**w**

**wacky** 155:17

**wait** 85:23 132:1 185:20

**walk** 181:23

**walked** 97:9 98:1,3

**walking** 66:17 78:22

**walks** 97:21,22

**waning** 176:20

**want** 16:1 25:14 39:20 44:24 50:5,7 50:16 51:20 52:9 53:5,14 81:16,17,20

96:1,7,7 112:3 112:5 117:3 118:11 121:1 121:22 124:9 124:10 151:19 165:15 171:5 178:4,16 179:10,17 180:1 183:18 184:24 185:13 191:1,7

**wanted** 41:25 42:2 68:6 82:21,25 83:2 118:6 125:3,16 125:18 158:24 166:17 187:21 191:6

**washington** 1:16 2:7 83:6

**waste** 140:1 141:1,3

**wasteful** 140:19

**watch** 160:13

**way** 18:19 46:8 46:18 47:23 48:3 50:2,12 50:16 52:18,19 53:1 68:17 73:13 80:14 82:3,21 101:8 101:14 104:17 105:10,20,24

**[way - world]** Page 54

123:22 128:22 157:3,9 162:4 165:2 166:5 189:4 192:3

**ways** 44:5 166:18

**we've** 52:11 174:13 182:10

**weaker** 186:20

**weber** 130:5,6 186:22

**wednesday** 1:11

**week** 9:20 10:1 27:6 28:1,5,11 116:21 127:5 127:10 142:7

**week's** 27:4

**weekly** 27:1,17 27:23 28:2,9 188:24,25

**weeks** 32:19 188:13,24 190:1

**weighing** 125:2

**welcome** 59:1 144:8 152:9 155:25 160:21

**went** 127:24 132:6

**west** 98:3 170:4 172:4,5,10,16 172:19 180:7

**whatsoever** 23:13 106:22

**when's** 146:3

**whispering** 5:5

**white** 35:25 36:20 78:5,9 78:10,11,20 79:9 105:8,19 138:14 139:4 139:22 178:3 179:9,24 182:10 183:2,6 183:10,15 185:12

**wholly** 90:7

**willing** 148:10 163:23

**win** 163:23

**wisconsin** 172:13

**withdraw** 17:7 25:1 91:14

**withholding** 149:20

**witness** 6:6,9 7:18 14:13 16:8,11 20:24 24:2,22 25:11 25:24 26:13 32:22 34:7 35:16 39:9 45:6 48:14 49:1 51:1 54:25 58:25

59:5 62:7 63:9 64:14,17 71:3 72:4,6 80:22 83:21 91:2 100:20 101:13 102:6,21 103:17 105:7 106:15 110:3 114:18 118:15 123:7 129:9 130:22 131:18 132:3 133:21 134:3 138:10 144:7,11,14 146:18 152:8 152:10 155:24 156:2 159:10 159:20 160:5 160:11,20,23 168:5 173:4,10 176:3,16 184:17 185:19 185:20 190:4 192:9 193:2,3 193:18,24 194:5 195:14 195:17 196:8 196:10,12,18

**wondering** 153:20 155:9

**word** 36:18 177:1

**words** 87:2,17 92:16 120:15

120:17,19 122:24 135:11 185:5

**work** 10:21 11:11,25 12:11 12:13 19:13 20:7,16 33:8 45:10 46:19 57:16 58:8 70:10 71:11,13 74:3 89:14 96:12 108:2,15 109:8 113:1,14 113:15 135:22 141:22 142:2,8 154:15,19

**worked** 23:8 45:2,12,24 47:22 49:15 50:1 88:15 126:17 142:5 142:11

**workforce** 16:23 45:21

**working** 20:11 20:18,20 22:14 22:19 48:3 49:24 192:16

**works** 88:7 93:3,14 140:7 145:8 192:3

**world** 151:21 151:21

**[write - zoom]** Page 55

**write** 55:11 58:16 101:4,6 154:22 175:8 175:22 176:9 177:3 178:3 179:24 180:2 182:1,12 184:5

**writes** 59:21,23 60:19 62:17 105:19 142:15 149:15 163:1,2 164:6,22 166:7 166:9 167:1 178:25 181:16 182:2

**writing** 105:9 127:23 157:11 158:23 159:24 162:14 184:13 185:5,11 188:7 189:6

**written** 47:14 47:16,17 120:9 144:17,22,23 147:3,6 148:14 150:5 155:6 189:18 190:9

**wrong** 81:20 161:10

**wrote** 112:8 145:22 147:12 147:14 149:4 149:12,22 150:18 151:8

152:2 167:10 167:14 174:6 174:10 178:8 184:19

**wyoming** 67:24 95:1

**x**

**x** 3:1,6 4:1

**y**

**yahoo** 69:11

**yeah** 16:11,11 33:21 40:11 45:6 58:2 62:9 63:9 78:7 82:22 96:4 131:18 138:19 152:25 160:13 172:19 184:17 190:20

**year** 12:25 13:1 13:19 28:16 30:25 31:16 32:3,8 33:18 35:12 42:23 48:3 49:15,18 49:20 66:14 104:13 124:6 135:23 137:12 137:18 141:6,8 142:4,17 143:9 186:14

**years** 13:11,12 13:16 127:10

**yesterday** 80:18 82:9

**york** 3:18 66:14 138:6,13 139:3 139:10,12,21

**z**

**zeroes** 148:22

**zoom** 189:21

Federal Rules of Civil Procedure

Rule 30

(e) Review By the Witness; Changes.

(1) Review; Statement of Changes. On request by the deponent or a party before the deposition is completed, the deponent must be allowed 30 days after being notified by the officer that the transcript or recording is available in which:

(A) to review the transcript or recording; and

(B) if there are changes in form or substance, to sign a statement listing the changes and the reasons for making them.

(2) Changes Indicated in the Officer's Certificate. The officer must note in the certificate prescribed by Rule 30(f)(1) whether a review was requested and, if so, must attach any changes the deponent makes during the 30-day period.

DISCLAIMER:  THE FOREGOING FEDERAL PROCEDURE RULES ARE PROVIDED FOR INFORMATIONAL PURPOSES ONLY. THE ABOVE RULES ARE CURRENT AS OF APRIL 1, 2019.  PLEASE REFER TO THE APPLICABLE FEDERAL RULES OF CIVIL PROCEDURE FOR UP-TO-DATE INFORMATION.

VERITEXT LEGAL SOLUTIONS

COMPANY CERTIFICATE AND DISCLOSURE STATEMENT

Veritext Legal Solutions represents that the foregoing transcript is a true, correct and complete transcript of the colloquies, questions and answers as submitted by the court reporter. Veritext Legal Solutions further represents that the attached exhibits, if any, are true, correct and complete documents as submitted by the court reporter and/or attorneys in relation to this deposition and that the documents were processed in accordance with our litigation support and production standards.

Veritext Legal Solutions is committed to maintaining the confidentiality of client and witness information, in accordance with the regulations promulgated under the Health Insurance Portability and Accountability Act (HIPAA), as amended with respect to protected health information and the Gramm-Leach-Bliley Act, as amended, with respect to Personally Identifiable Information (PII). Physical transcripts and exhibits are managed under strict facility and personnel access controls. Electronic files of documents are stored in encrypted form and are transmitted in an encrypted

fashion to authenticated parties who are permitted to access the material. Our data is hosted in a Tier 4 SSAE 16 certified facility.

Veritext Legal Solutions complies with all federal and State regulations with respect to the provision of court reporting services, and maintains its neutrality and independence regardless of relationship or the financial outcome of any litigation. Veritext requires adherence to the foregoing professional and ethical standards from all of its subcontractors in their independent contractor agreements.

Inquiries about Veritext Legal Solutions' confidentiality and security policies and practices should be directed to Veritext's Client Services Associates indicated on the cover of this document or at www.veritext.com.