Page 1

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF COLUMBIA

--------------------------------X

NATIONAL PUBLIC RADIO, INC.,          :

ET AL.,                               :

                    Plaintiffs,       :

                                         Case No.:

        v.                            :

                                         1:25-cv-1674-RDM

DONALD J. TRUMP, ET AL.,              :

                    Defendants.       :

--------------------------------X

Deposition of BADRI MUNIPALLA

Washington, D.C.

Monday, October 20, 2025

9:01 a.m.

Job No.: 172445

Reported by: Matthew Goldstein, RMR, CRR

Page 2

1          Deposition of BADRI MUNIPALLA, held at:

2

3

4              Saul Ewing LLP

5              1919 Pennsylvania Avenue, NW

6              Suite 550

7              Washington, D.C. 20006

8              202.333.8800

9

10

11

12

13          Pursuant to Notice, before Matthew Goldstein,

14     RMR, CRR, Notary Public in and for the District of

15     Columbia.

16

17

18

19

20

21

22

Page 3

1                     A P P E A R A N C E S

2           ON BEHALF OF THE PLAINTIFFS, NATIONAL PUBLIC

3           RADIO, INC., ET AL.:

4           ERIC BROOKS, ESQUIRE

5           GIBSON DUNN & CRUTCHER, LLP

6           1700 M Street, NW

7           Washington, D.C. 20036

8           202.777.9302

9

10          and

11

12          KATIE TOWNSEND, ESQUIRE

13          GIBSON DUNN & CRUTCHER, LLP

14          333 South Grand Avenue

15          Los Angeles, California 90071

16          213.229.7000

17

18

19

20

21

22

Page 4

1      A P P E A R A N C E S    C O N T I N U E D

2           ON BEHALF OF THE DEFENDANTS, DONALD J. TRUMP,

3           ET AL.:

4           JASON W. MCELROY, ESQUIRE

5           PETER C. NANOV, ESQUIRE

6           SAUL EWING LLP

7           1919 Pennsylvania Avenue, NW

8           Suite 550

9           Washington, D.C. 20006

10          202.295.6605

11

12          ALSO PRESENT:

13          ELIZABETH A. ALLEN, ESQ. - NPR

14          DESHAWN WHITE - VIDEOGRAPHER

15

16

17

18

19

20

21

22

Page 5

1                   C O N T E N T S

2   EXAMINATION OF BADRI MUNIPALLA                PAGE

3

4   By MR. MCELROY                                12

5   By MR. BROOKS                                 298

6   By MR. MCELROY                                302

7                   E X H I B I T S

8                   (Attached)

9   MUNIPALLA       DEPOSITION EXHIBIT            PAGE

10

    Exhibit 1      NPR0004959 through NPR0004960,   43
11                 June 10, 2024, E-mail
                   Correspondence

12
    Exhibit 2      47 U.S.C.A. 397, Definitions     53

13
    Exhibit 3      NPR0000256 through NPR0000257,   63
14                 ContentDepot Overview of the
                   Public Radio Satellite System
15                 (PRSS)

16  Exhibit 4      NPR0000254 through NPR0000255,   63
                   August 29, 2025, E-mail
17                 Correspondence

18  Exhibit 5      NPR0000294, September 5, 2025,   69
                   E-mail Correspondence

19

20

21

22

Page 6

1    (Continued)
2                       E X H I B I T S
3    Exhibit 6      CPB_0063000 through              85
                    CPB_0063016, Amendment #1 to
4                   Agreement "Public Radio
                    Satellite System
5                   Interconnection Funding
                    FY23-FY24"
6
     Exhibit 7      NPR0000314 through NPR0000325,   122
7                   NPR Distribution & PRSS Slide
                    Deck
8
     Exhibit 8      CPB_0198626 through              126
9                   CPB_0198642, Request for
                    Proposals for Entity to Manage
10                  and Govern Public Radio Content
                    Distribution Proposal Date:
11                  August 15, 2025, at 3 pm ET
12   Exhibit 9      CPB_0078348 through              149
                    CPB_0078396, RFP Response
13
     Exhibit 10     CPB_0078397 through              168
14                  CPB_0078435, Entity to Manage
                    and Govern Public Radio Content
15                  Distribution CPB Requests for
                    Proposals Response
16
     Exhibit 11     Q&A on NPR's September 26,       180
17                  2025, Filing
18   Exhibit 12     NPR0000164 through NPR0000165,   194
                    Letter Re: Distribution and
19                  Interconnection Committee
20   Exhibit 13     NPR0000007 through NPR0000008,   199
                    August 22, 2025, E-mail
21                  Correspondence
22

Page 7

```
 1   (Continued)
 2                  E X H I B I T S
 3   Exhibit 14   NPR0000201 through NPR0000202,    202
                  August 20, 2025, E-mail
 4                Correspondence
 5   Exhibit 15   NPR0000225, August 21, 2025,      209
                  E-mail Correspondence
 6
     Exhibit 16   NPR0000238 through NPR0000239,    209
 7                August 25, 2025, E-mail
                  Correspondence
 8
     Exhibit 17   NPR0000299 through NPR0000300,    209
 9                September 5, 2025, E-mail
                  Correspondence
10
     Exhibit 18   Exhibit A, Public Radio           212
11                Satellite Interconnection
                  Agreement
12
     Exhibit 19   NPR0000410 through NPR0000412,    215
13                September 19, 2025, E-mail
                  Correspondence
14
     Exhibit 20   NPR0000432 through NPR0000433,    215
15                September 19, 2025, E-mail
                  Correspondence
16
     Exhibit 21   NPR0000451 through NPR0000452,    215
17                September 19, 2025, E-mail
                  Correspondence
18
     Exhibit 22   NPR0000460 September 19, 2025,    215
19                E-mail Correspondence
20   Exhibit 23   NPR0000241 through NPR0000244,    215
                  August 28, 2025, E-mail
21                Correspondence
22
```

Case 1:25-cv-01674-RDM    Document 60-3    Filed 10/24/25    Page 8 of 102

10/20/2025    National Public Radio, Inc., et al. v. Donald J. Trump, et al.    Badri Munipalla

Page 8

```
 1    (Continued)
 2                     E X H I B I T S
 3    Exhibit 24    NPR0000471 through NPR0000472,    221
                    September 23, 2025, E-mail
 4                  Correspondence
 5    Exhibit 25    NPR0004993 through NPR0004996,    231
                    July 1, 2024, E-mail
 6                  Correspondence
 7    Exhibit 26    NPR0004941 through NPR0004942,    243
                    June 3, 2024, E-mail
 8                  Correspondence
 9    Exhibit 27    NPR0018114 through NPR0018115,    247
                    June 3, 2025, E-mail
10                  Correspondence
11    Exhibit 28    NPR0005094, October 23, 2024,     252
                    E-mail Correspondence
12
      Exhibit 29    NPR0006421 through NPR0006423,    257
13                  February 1, 2024, E-mail
                    Correspondence
14
      Exhibit 30    CPB_0304041 through             268
15                  CPB_0304042, May 9, 2025,
                    E-mail Correspondence
16
      Exhibit 31    NPR0000013 through NPR0000014,    272
17                  September 25, 2025, E-mail
                    Correspondence
18
      Exhibit 32    NPR0000015 through NPR0000027,    272
19                  Memo Subject: Next-Generation
                    Public Radio Infrastructure,
20                  Sponsorship, and Support
                    (PRISS) Network - Informal
21                  Introduction
22
```

Page 9

1    (Continued)

2                      E X H I B I T S

3    Exhibit 33    NPR0000028, Public Radio                273
                   Infrastructure, Sponsorship, &
4                  Support Network

5    Exhibit 34    NPR0000401, PRSS Competition            278
                   Slide
6

     Exhibit 35    NPR0000400, September 18, 2025,         285
7                  E-mail Correspondence

8    Exhibit 36    NPR0000036, July 31, 2025,              288
                   E-mail Correspondence
9

     Exhibit 37    NPR0000045 through NPR0000046,          288
10                 August 1, 2025, E-mail
                   Correspondence
11

     Exhibit 38    NPR0002804, April 23, 2025,             294
12                 E-mail Correspondence

13

14

15

16

17

18

19

20

21

22

Page 10

1          THE VIDEOGRAPHER:  This is Video No. 1

2    of the video-recorded deposition of Badri

3    Munipalla, taken in the matter of National Public

4    Radio, Inc., et al., versus Donald J. Trump,

5    et al., in the United States District Court for

6    the District of Columbia, Case No. 1:25-cv-1674.

7          This deposition is being held at

8    Saul Ewing, LLP, 1919 Pennsylvania Avenue

9    Northwest, Washington, D.C., on October 20th,

10   2025.

11         The time on the video screen is

12   9:01 a.m.

13         My name is DeShawn White.  I am the

14   legal videographer from Digital Evidence Group.

15         The court reporter is Matthew Goldstein,

16   in association with Digital Evidence Group.

17         Will counsel please introduce themselves

18   for the record, followed by the court reporter

19   administering the oath.

20         MR. MCELROY:  Jason McElroy on behalf of

21   defendant, Corporation for Public Broadcasting.

22         MR. BROOKS:  Eric Brooks on behalf of

Page 11

1    National Public Radio.

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

Page 12

1                    P R O C E E D I N G S

2    Whereupon,

3                    BADRI MUNIPALLA,

4    being first duly sworn or affirmed to testify to the

5    truth, the whole truth, and nothing but the truth,

6    was examined and testified as follows:

7         EXAMINATION BY COUNSEL FOR THE DEFENDANT

8    BY MR. MCELROY:

9         Q.    Thank you.

10               Good morning, Mr. Munipalla.

11        A.    Good morning.

12        Q.    Am I pronouncing that correctly?

13        A.    (No verbal response.)

14        Q.    Great.

15               So before we get started, I just want to

16   go over general ground rules of depositions.

17   Obviously, we're taking a stenographic transcript

18   of what's being said.

19               So to the extent that we can try to

20   allow me to finish a question before you answer,

21   and I will do the same thing for you, let you

22   finish your answer before I start a question.

Page 14

1    employment?

2        A.    I work for National Public Radio.  I am

3    the vice president of NPR Distribution.

4        Q.    What is NPR Distribution?

5        A.    NPR Distribution is responsible for

6    distributing national content to all stations.

7        Q.    What does that mean, distributing

8    national content to all stations?

9        A.    We operate the public radio satellite

10   infrastructure.  That is the conduit to distribute

11   content to all stations.

12       Q.    Okay.  I want to follow up on a few of

13   those things.

14            When you say it's a conduit to

15   distribute content, does that mean that the public

16   radio satellite infrastructure doesn't engage with

17   content or doesn't create content, I should say?

18       A.    That is correct.

19       Q.    Okay.  And you said distributing

20   national content to all stations.  What is

21   national content?

22       A.    Sorry, if I may, the previous question

Page 15

 1   was NPR does not engage in creating content.  I

 2   just want to clarify.  NPR creates content.

 3   NPR Distribution does not create content, just for

 4   clarification.

 5        Q.    Thank you for that clarification.

 6              So what is the difference between NPR

 7   and NPR Distribution?

 8        A.    NPR is a producer of content.  NPR is

 9   also a membership organization that has NPR

10   members.

11              NPR Distribution is an interconnection

12   system.  It is the backbone to distribute national

13   broadcast content.

14        Q.    So when you say "national broadcast

15   content," what does that mean?

16        A.    It is the main content that most people

17   listen to when they turn on their radio, for

18   example, NPR's morning edition are, all things

19   considered, in the evenings.  That's what I call

20   national content.

21              Regional content, for example, if you're

22   listening to WAMU, which is our local public radio

Page 16

1    station, on Saturdays you would hear a program

2    called Big Broadcast.  That is a very local

3    production that WAMU airs to its listeners.  It's

4    not the same content that is aired across all

5    stations at the same time.

6         Q.   So when you say the NPR national

7    content, you mean the programming that NPR creates

8    for a national audience?

9         A.   That is correct.  It is programming that

10   goes to all stations.  And when that gets aired,

11   it's the same content, by and large, that gets

12   aired by all of the stations.

13        Q.   And to be clear, NPR Distribution has

14   nothing to do with that content; is that correct?

15        A.   That is correct.

16        Q.   So you mentioned that you are the vice

17   president of distribution; is that right?

18        A.   That's correct.

19        Q.   How long have you been in that role,

20   Mr. Munipalla?

21        A.   Two and a half years.

22        Q.   How long have you been an employee at

Page 20

1          Q.   And when I say "a separate entity," you

2     understand that I mean a separate legal entity,

3     they're not the same company?

4               MR. BROOKS:  Objection; form.

5               THE WITNESS:  I'll explain it the best I

6     understand it.  The -- NPR is a separate profit

7     and loss -- NPR Distribution is a separate P & L

8     than NPR, but my paycheck says NPR.  We do share

9     resources with NPR, like legal, HR, some software

10    that we use, like Salesforce, to manage customers.

11              So we get the benefit of some shared

12    resources, but otherwise we are sort of an

13    independent organization that takes care of all of

14    the interconnected stations, which is separate

15    from the NPR membership.

16    BY MR. MCELROY:

17         Q.   But you're not aware of whether or not

18    NPR Distribution is a separate legal entity from

19    NPR?

20         A.   I believe it is, but I cannot say that

21    for sure.

22         Q.   Okay.  Are you familiar with the acronym

Page 21

1    PRSS?

2         A.    Yes.

3         Q.    What does that mean?

4         A.    The Public Radio Satellite System.

5         Q.    Is that different from NPR Distribution?

6         A.    NPR Distribution is the team that

7    operates the PRSS.

8         Q.    I'm afraid I may not understand the

9    finer points of this distinction.  So can you

10   explain to me, are NPR Distribution and PRSS

11   separate entities?

12        A.    You should think of the PRSS as the

13   primary product -- I'm simplifying here, as the

14   primary product that the employees of NPR

15   Distribution support.  And the primary product

16   here is the system, which is called the Public

17   Radio Satellite System.  And that serves the

18   interconnected stations.

19        Q.    Does NPR Distribution own the Public

20   Radio Satellite System?

21        A.    It does not own it.

22        Q.    Who does?

Page 22

1        A.    The trust does, the PRS -- the Public

2    Radio Satellite Trust.

3        Q.    And is the Public Radio Satellite Trust

4    a separate entity from NPR?

5        A.    Yes, it is.

6        Q.    Are they related at all?

7        A.    No, they're not.

8        Q.    Now, you used a term in there that I

9    want to talk about for a second, "interconnected

10   stations."

11            What does that mean, Mr. Munipalla?

12       A.    So I think it is a term that has been

13   used to define all of the stations that

14   participate in this network that I described

15   earlier, the network that sends national content.

16            So it is the set of stations that are

17   intertwined and are capable of receiving all of

18   the content that is pushed out by the Public Radio

19   Satellite System.

20            If you are an interconnected station,

21   you will receive the content.  If you're not an

22   interconnected station, you don't have the pipe

Page 23

1    that delivers the content.

2        Q.    And the pipe that delivers the content

3    is interconnection?  Is that the term that we use

4    or that you use?

5        A.    The pipe that delivers the content is --

6    it could be called interconnection.

7        Q.    Okay.  But when you said "the pipe,"

8    you're specifically referring to the Public Radio

9    Satellite System?

10       A.    Correct, which is the interconnection

11   for radio.

12       Q.    Okay.  What -- do you understand what

13   the term "interconnection" means?

14       A.    I don't understand the question.

15       Q.    Can you describe to me what

16   "interconnection" means?  Is there a difference

17   between the term "interconnection" and "PRSS"?

18       A.    Interconnection, in general in this

19   context, just means it is the infrastructure that

20   is -- it is the name for the infrastructure that

21   is distributing content.  Specifically, the system

22   that is making it happen is the PRSS.

Page 24

1      Q.   The PRSS is a specific type of

2   interconnection; right?  It's not interconnection,

3   more broadly?

4           MR. BROOKS:  Objection to form.

5           THE WITNESS:  I think PRSS is the system

6   that delivers interconnected content.  So these

7   terms are used interchangeably and sometimes

8   confusingly.

9   BY MR. MCELROY:

10      Q.   Okay.  But there could be other types of

11   interconnection other than PRSS; correct?

12           MR. BROOKS:  Objection; form.

13           THE WITNESS:  Sure.

14   BY MR. MCELROY:

15      Q.   So PRSS is a satellite system; correct?

16      A.   That's correct.

17      Q.   And so would it be fair to refer to PRSS

18   as satellite interconnection?

19      A.   Yes.

20      Q.   All right.  I got a little off topic

21   there.  I'm going to come back to interconnection

22   in a minute, I promise, but let's get back to your

Page 27

1    same thing as PRSS?

2         A.   It is the software that powers the PRSS.

3    PRSS is a very old name.  Back in the '70s it was

4    purely hardware, and there were people who were

5    operating the hardware.

6              And then in 2000 -- mid-2000, they

7    decided that it's time to evolve the system, we

8    need to have more software controls.  So then it

9    became a much more software oriented system.

10             So, you know, without the software,

11   there is no PRSS.

12        Q.   Are you familiar with a term called

13   "terrestrial interconnection"?

14        A.   Yes, I am.

15        Q.   What does that mean?

16        A.   So satellite, essentially, has three

17   points.  You have the uplink, which is right now

18   located in our D.C. office that pushes the signal

19   to a satellite.  And the satellite pushes it to

20   all of the downlinks that are located at stations.

21   So it is the satellite.

22             Terrestrial, in general, refers to

Page 28

1    anything that doesn't have to go up to the

2    satellite.  It is -- it uses a network of either

3    fiber, broadband, 5G, a combination of any of

4    those connections in order to deliver content,

5    with the exception of Starlink, which is also a

6    satellite-based terrestrial distribution system.

7           It can get confusing, but I wanted to

8    add that for thoroughness.

9        Q.   So I want to come back to some of this,

10   but, first, what is Starlink?

11       A.   Starlink is a network of satellites that

12   essentially work like a satellite, for all intents

13   and purposes, but the difference is when the

14   signal is received back at all of the

15   destinations, instead of giving you like a radio

16   frequency signal, they'll just give you a cable, a

17   CAT5 cable, which is your general Ethernet cable.

18          So even though it is using satellite

19   technologies in the back end, the end point to all

20   of the users is just a terrestrial Ethernet jack.

21   So because of that, it is considered much more of

22   a terrestrial technology rather than a satellite

Page 29

1  technology.

2      Q.    Starlink is a private company; correct?

3      A.    That's correct.

4      Q.    Is that an Elon Musk company?

5      A.    That's correct.

6      Q.    So Starlink and NPR are separate

7  entities?

8      A.    Yes.

9      Q.    So for the layman, like myself,

10  terrestrial interconnection is any type of

11  interconnection that doesn't require a satellite,

12  or is it specific to Internet connections?

13      A.    I think it is safe to go with that

14  definition, anything that doesn't --

15      Q.    Which one, the first or second, sorry?

16      A.    Anything that doesn't require satellite.

17      Q.    All right.  So when we were talking

18  about interconnected stations earlier, you said

19  that not all stations are interconnected through

20  NPR Distribution; is that correct?

21      A.    That is correct.

22      Q.    Explain to me why or how a station comes

Page 30

1    to be interconnected with NPR Distribution.

2              MR. BROOKS:  Objection; form.

3              THE WITNESS:  NPR interconnection --

4    excuse me, NPR Distribution has a legal contract

5    with all of the interconnected stations.  Stations

6    are expected to sign that contract.  They are

7    expected to pay an interconnection fee that is set

8    up by the D/I committee.  And that's how they

9    become an interconnected station.

10   BY MR. MCELROY:

11       Q.   What is the D/I committee?

12       A.   Yeah, forgive me, it's a

13   distribution/interconnection committee.  We

14   haven't talked about it, but D/I stands for

15   distribution/interconnection committee.

16       Q.   Where is the D/I committee?

17              MR. BROOKS:  Objection; form.

18              THE WITNESS:  The D/I committee is part

19   of the NPR board that governs the PRSS.  So they

20   are like my boss.

21   BY MR. MCELROY:

22       Q.   Do you sit on the D/I committee?

Page 31

1    A.    I do not sit on the D/I committee.    I

2    report to the D/I committee.

3    Q.    Do you -- does the D/I committee conduct

4    regular meetings?

5    A.    Correct, we do.

6    Q.    Do you attend those meetings of the D/I

7    committee?

8    A.    Yes, I do.

9    Q.    Do you attend those meetings as the head

10    of NPR Distribution?  Is that why you go?

11    A.    That is correct.

12    Q.    Now, when we talk about an

13    interconnected station, specifically with respect

14    to NPR Distribution, what type of stations are we

15    talking about?

16    A.    They are public radio entities.  So any

17    public radio station can become an interconnected

18    station.

19    Q.    You said specifically public radio

20    entity, what does that mean?  What is a public

21    radio entity?

22    A.    I don't know what exactly makes a public

Page 32

1    radio entity.  I don't know what the definition

2    that needs to be satisfied, but I just know that

3    as you got to be a public radio station.

4         Q.   Do they have to be nonprofit

5    corporations?

6              MR. BROOKS:  Objection; form.

7              THE WITNESS:  I do believe they're

8    mostly nonprofit.

9    BY MR. MCELROY:

10        Q.   Okay.  Is the distinction you're making

11   between commercial radio entities and public radio

12   entities?  Is that a distinction that exists?

13        A.   That is absolutely a distinction that

14   exists, and we serve public radio stations as part

15   of the interconnection.

16        Q.   You don't serve commercial radio

17   entities then?

18        A.   We -- this is a little nuanced.  NPR

19   Distribution has always had the ability to resell

20   excess satellite capacity, and the revenue

21   generated from that is used to keep our rates and

22   fees low as part of our mission.  So in that

Page 33

1    capacity, we do serve some commercial entities.

2       Q.    Okay.  Explain that to me.  Explain to

3    me how you resell excess satellite capacity.

4       A.    So this is part of the foundation of the

5    PRSS.  It goes back before my time.  The idea was

6    when satellite was the primary distribution pipe

7    back in the '70s and '80s, we were allowed to sell

8    satellite capacity that is not used by public

9    radio, excess satellite capacity to, let's say, a

10   broadcasting video network.

11          So you would sell them a segment, and

12   they would buy that segment from us instead of

13   going to, let's say, Intelsat.  And they would pay

14   us a fee for that, for the usage of that segment.

15      Q.    And are you still doing that today; that

16   is, is NPR Distribution still selling excess

17   satellite capacity today in 2025?

18      A.    Yes.

19      Q.    And the revenue that is generated based

20   upon selling excess satellite capacity, that goes

21   directly to NPR Distribution?

22      A.    That is correct.

Page 34

1      Q.   Do you know how much annually NPR

2    Distribution -- how much revenue annually NPR

3    Distribution generates based upon the sale of

4    excess satellite capacity?

5      A.   That number has been changing over the

6    years.  As of right now, that portion of the

7    business generates about 1.5 million per year.

8      Q.   You said it's been changing over the

9    years, how has it been changing?

10     A.   It is a technology shift.  More and more

11   people are choosing terrestrial distribution over

12   satellite.  Over the last couple of years, we've

13   had the FCC go after the C-band spectrum, which is

14   also precipitated as a quicker transition.

15     Q.   What does that mean, the FCC has gone

16   after the C-band spectrum?

17     A.   I don't mean to say going after with any

18   negative connotation.  I just mean they have been

19   reselling -- excuse me, they have been selling off

20   C-band bandwidth, which is where the Public Radio

21   Satellite System operates.  It's that frequency.

22              So remember I was telling you the

Page 35

1   satellite distribution is made up of an uplink and

2   then goes to the satellite and then there's a

3   downlink.  All of those transmissions happen over

4   a certain frequency, and when that frequency is

5   not available, satellite is not an option anymore.

6           And what the FCC is doing is the

7   frequency spectrum, which is known as the C-band

8   spectrum, they've been auctioning that away in

9   chunks.  I hope that makes sense.

10      Q.   I think so.

11           How does that affect NPR Distribution's

12  business model?

13      A.   It is a pretty significant impact.

14  Because if we don't have an alternative

15  distribution methodology, you wouldn't be able to

16  serve the interconnected stations, and that would

17  be problematic.

18      Q.   Is that because NPR Distribution's

19  satellite capacity is being diminished by the

20  FCC's actions?

21      A.   That is a good way to put it.

22      Q.   And you said if you don't have an

Page 36

1    alternative distribution methodology, you wouldn't

2    be able to serve the interconnected stations.

3          Has NPR Distribution been working on

4    alternative distribution methodologies?

5          A.    Yes.

6          Q.    How so?

7          A.    We have been building our own

8    terrestrial receiver.  The stations right now are

9    equipped with a satellite receiver in order to

10   receive the content.  Our ambition is to replace

11   all of those satellite receivers with a

12   terrestrial receiver so that there's no longer a

13   dependency on satellite.

14         Q.    Do you have a timeline on which you're

15   trying to accomplish that objective?

16         A.    Yes, it is June of 2028.

17         Q.    How realistic is that timeline?

18         A.    It is -- it's aggressive.

19         Q.    Why is it aggressive?

20         A.    Because it requires funding to meet

21   those goals and make sure that every station

22   smoothly transitions from satellite to

Page 38

1    achieve parity with our existing satellite

2    receivers.

3         Q.   And that's what you are hoping to

4    accomplish by 2028, to achieve parity with your

5    current receivers?

6         A.   That's correct.

7         Q.   Does NPR Distribution currently offer a

8    terrestrial distribution methodology for public

9    radio stations?

10             MR. BROOKS:  Objection to form.

11             THE WITNESS:  The satellite receivers

12   have what's called a terrestrial backup option.

13   In that sense, we do offer terrestrial.  The

14   challenge with that backup option is delay.

15             It uses a technology called HLS, and

16   there's an inherent 30-second delay between the

17   live transmission which happens over satellite and

18   what arrives over the terrestrial conduit.  So

19   it's not optimum, but there is an option for

20   stations.

21   BY MR. MCELROY:

22        Q.   Do you have any stations that currently

Page 39

1    utilize only the terrestrial distribution

2    methodology?

3        A.    Yes.

4        Q.    Do you know how many?

5        A.    I would like to say around 40.

6        Q.    And those 40 stations are not using

7    satellite interconnection; right?

8        A.    That's correct.  They're terrestrial

9    only.

10       Q.    Are there -- you mentioned earlier,

11   Mr. Munipalla, that -- or at least it sounded like

12   there may be stations, public radio stations, that

13   are not interconnected through NPR Distribution;

14   is that correct?

15       A.    That is correct.

16       Q.    Do you know how many public radio

17   entities or stations there are that are not

18   interconnected through NPR?

19       A.    I do not.

20       Q.    Do you have an approximation of how many

21   public radio stations exist that are not

22   interconnected through NPR?

Page 44

1    Mr. Munipalla, and let me know when you're

2    finished.

3              (Witness peruses the exhibit.)

4              THE WITNESS:  Okay.

5    BY MR. MCELROY:

6         Q.   Do you recognize Exhibit 1,

7    Mr. Munipalla?

8         A.   I do.

9         Q.   It's an e-mail from you to Marta

10   McClellan Ross; correct?

11        A.   That's what it says, yes.

12        Q.   And it's dated June 10th, 2024?

13        A.   Correct.

14        Q.   Now, if you look, it's -- I'm not sure

15   whether you call these actually paragraphs or not,

16   but they're kind of separated here.  So it's the

17   third sentence there starting, "Because teasing

18   out the answers."

19              Do you see that sentence?

20        A.   Yes, I do.

21        Q.   And at the end of it, you say, Since --

22              MR. BROOKS:  Hold on one minute.  Where

Page 49

1          Q.   Just to be clear, the driver of whether

2     or not you wanted to move -- or not the driver,

3     but a consideration was how much the satellite

4     cost; correct?

5          A.   It was a consideration.  And if you look

6     at specifically the first portion of this, that is

7     the key consideration because we are a

8     mission-driven organization first, and it's

9     through the funding that we get from CPB that

10    we're allowed to carry our mission.

11               So it says that, do we compromise on

12    that commitment?  And then that's why we have

13    Question 3, saying if there is no other choice,

14    what other options exist?  So it has to be taken

15    in context.

16          Q.   If you look on page 2, the top bullet

17    point there, it says, "Given CPB's advocacy for

18    changes in governance, and the definition of

19    interconnection, could NPR Distribution become

20    more dependent on CPB funding in the coming

21    years?"

22               Did I read that correctly?

Page 50

1      A.    Yes.

2      Q.    What was CPB's advocacy for changes in

3    governance?

4      A.    At that specific point, I don't think

5    there was clarity.  I think there was just this

6    talk about, Hey, we need to look at the governance

7    structure.  But it was never properly explained.

8    So I can't answer that question because I don't

9    know what exactly it entailed.

10      Q.    But at this point in time in June of

11    2024, CPB was advocating for changes in the

12    governance of the satellite interconnection,

13    weren't they?

14            MR. BROOKS:  Objection; form.

15            THE WITNESS:  I think there was some

16    conversation about it.  I don't know how strong.

17    I don't know if I would say they were advocating

18    vigorously.  There was chatter about it.

19    BY MR. MCELROY:

20      Q.    Sure.  I didn't say "vigorously," but

21    they were advocating.

22            I mean, these are your words here,

Page 58

1        Q.    Fair enough.

2              My technical expertise is nowhere near

3    yours, Mr. Munipalla.  So forgive me for using

4    layman's terms.

5              Is it fair to say terrestrial

6    distribution is any type of distribution that does

7    not leave the earth's atmosphere?

8              MR. BROOKS:  Objection; form.

9              THE WITNESS:  Sure.

10   BY MR. MCELROY:

11       Q.    Are you aware of whether using microwave

12   equipment, boosters, translators, or repeaters

13   would require leaving the earth's atmosphere to a

14   space satellite?

15       A.    No.

16       Q.    You're not aware, or it would not

17   require it?

18       A.    It would not require it.

19       Q.    Thank you.

20             You can give that to the court reporter

21   if you want.  You can keep it if you want, not

22   long term.

Page 62

1    concept, yes.

2    BY MR. MCELROY:

3        Q.   And so when I say "PMI," you know that

4    I'm referring to Public Media Infrastructure

5    coalition?

6        A.   That's correct.

7        Q.   So as part of this lawsuit, one of the

8    things NPR is seeking is to stop CPB from awarding

9    funds, interconnection funds to PMI; is that

10   correct?

11            MR. BROOKS:  Objection; form.

12            THE WITNESS:  It may be one of the

13   goals, sure.

14   BY MR. MCELROY:

15       Q.   And if NPR were to get this funding

16   instead of PMI, would NPR use it to advance this

17   alternative methodology we talked about with

18   terrestrial interconnection?

19            MR. BROOKS:  Objection; form.

20            THE WITNESS:  Yes.

21   BY MR. MCELROY:

22       Q.   All right.  I want to talk a little bit

Page 75

1    higher cost of satellite interconnection?

2         A.   It is the upfront purchase of the

3    satellite capacity.  That's what drives the cost,

4    because you're buying for the -- you're paying for

5    the bandwidth no matter what.  I mean, that's sort

6    of the PRSS model, right.

7              The CPB pays for satellite capacity, and

8    that gives us the capability of going to all of

9    the public radio stations, if necessary, assuming

10   that they choose to be interconnected.

11             So there is that upfront cost that is

12   associated with satellite, which is also called

13   the CapEx expenditure.  And that's what makes it

14   expensive.  But with terrestrial, that barrier is

15   gone because it's almost a pay-as-you-go.

16        Q.   So to be clear, satellite

17   interconnection is more expensive than Internet

18   interconnection?

19             MR. BROOKS:  Objection; form.

20             THE WITNESS:  The satellite

21   interconnection rates are set up by the D/I

22   committee, as I've shared with you before.  And

Page 76

1   those are, in general, more expensive than what

2   you could do with terrestrial.

3          And that is what we are discussing here,

4   that for this particular -- for this particular

5   deal, it would be better that they use the

6   terrestrial distribution technology, given their

7   size, given what they're trying to accomplish.

8   BY MR. MCELROY:

9      Q.   So two sentences later, still first

10  paragraph, you say, "Plus this producer is already

11  set up with terrestrial distribution.  They are

12  not going to switch to satellite."

13         Did I read that correctly?

14     A.   That is correct.

15     Q.   Does that mean that this producer, WXPN,

16  is already set up with terrestrial distribution

17  with NPR Distribution?

18     A.   No.  What this means is this producer is

19  already set up with terrestrial distribution.

20  They're not going to switch, meaning they already

21  have their own technology set up.  They use --

22  just for -- I mean, you see the word "Barix"

Page 86

1          A.    Yeah.

2          Q.    Do you recognize Exhibit 6,

3    Mr. Munipalla?

4          A.    I do.

5          Q.    What is it?

6          A.    This is the slide deck that we typically

7    use to orient new D/I committee members or NPR

8    board members.

9          Q.    To orient them about NPR Distribution?

10         A.    That's correct.

11         Q.    And this appears to be an orientation

12   that occurred on September 10th, 2025; right?

13         A.    That's right.

14         Q.    Would you have participated in this

15   orientation, Mr. Munipalla?

16         A.    Yes.

17         Q.    I should ask that better.  Did you

18   participate in this September 10th, 2025,

19   orientation?

20         A.    Yes.

21         Q.    Did you create this presentation that

22   we're looking at?

Page 88

1      Q.    So how is it relayed to the red dot from

2    the blue dot?

3      A.    It could vary.  I don't know if there's

4    a uniform way of doing it.  A lot of it could be

5    just the station infrastructure.  I don't know.

6    That's the station business.

7      Q.    Would it be another satellite that

8    they're using?

9      A.    In some cases, it could.

10     Q.    In some cases it could be a terrestrial

11   technology that they're using to relay that

12   information?

13     A.    That's correct.  I'm speculating, but

14   yes.

15     Q.    If you look at the next page with the

16   Bates No. 317 on the bottom.

17         The middle box here is discussing PRSS

18   interconnected stations; right?

19     A.    That's correct.

20     Q.    And PRSS interconnected stations are

21   those public radio stations that use

22   NPR Distribution for their interconnection; is

Page 89

1    that correct?

2         A.    That's correct.

3         Q.    All right.  And there it says there are

4    379 total; is that right?

5         A.    Yes.

6         Q.    Now, underneath the -- there's like a --

7    almost sort of a Venn diagram -- not really a Venn

8    diagram.  It's a circle chart; right?

9         A.    It is a Venn diagram.  Yeah, sure.

10        Q.    Underneath that there's a chart where it

11   says, PRSS interconnected stations 379.  And under

12   that it says, Additional license stations; right?

13        A.    Yes.

14        Q.    And there it says 859.

15              Do you know what that 859 -- what those

16   859 licensed stations are?

17        A.    I think that refers to the affiliates

18   and the red dots in addition to the blue dots in

19   the previous map.

20        Q.    So would all of these be public radio

21   stations, Mr. Munipalla?

22        A.    Yes, I believe so.

Page 90

1        Q.   But these would not be -- these 859,

2    would they be considered interconnected through

3    NPR Distribution?

4        A.   Indirectly.

5        Q.   Because they're receiving content from

6    an interconnected station?

7        A.   That's -- so, I mean, I don't know

8    specifically what content they're receiving, but

9    the fact that they are served in some capacity

10   directly or indirectly is what this reflects.

11       Q.   These 859 additional licensed stations,

12   NPR doesn't -- or NPR Distribution doesn't

13   consider them as interconnected stations for their

14   numbers; right?

15       A.   That is correct, which is why when you

16   asked the question earlier, how many

17   interconnected stations we serve, I said it's

18   about 350, which here it's 379.

19       Q.   So these 859 other stations, are those

20   public radio stations?

21            MR. BROOKS:  Objection; form.

22            THE WITNESS:  I believe they are.

Page 91

1    BY MR. MCELROY:

2        Q.    And those 859 additional licensed

3    stations do not have a contract with

4    NPR Distribution; correct?

5            MR. BROOKS:   Objection; form.

6            THE WITNESS:   That's correct.

7    BY MR. MCELROY:

8        Q.    And before we go off this page, I think

9    we may have addressed this before, but just

10   following up on this, that total number of

11   stations, 1,238 there, are you aware of -- is

12   that -- are there more public radio stations than

13   those 1,238 that are referenced on this slide?

14       A.    I honestly don't know.  As you pointed

15   out earlier, just to be very clear, I mean, we do

16   business with the 379, and what they do afterwards

17   is -- I'm less familiar with that.

18       Q.    Okay.  Fair enough.

19            So you don't do business with the other

20   859.  So you just are unfamiliar with what they

21   do?

22       A.    That's right.

Page 92

1        Q.   All right.  If you go to Slide No. 321,

2   Mr. Munipalla.

3             This is a slide discussing the different

4   funding sources for NPR Distribution; correct?

5        A.   That's correct.

6        Q.   And so there are --

7             MR. BROOKS:  Sorry, one second.  What

8   number are we on now?

9             MR. MCELROY:  321.

10            MR. BROOKS:  Thank you.

11  BY MR. MCELROY:

12       Q.   And so here there are five separate

13  sources of revenue that you've identified on this

14  slide; correct?

15       A.   That's correct.

16       Q.   And the stations, that is the fees that

17  the individual stations who are signed up for

18  interconnection through NPR Distribution pay to

19  NPR; correct?

20       A.   That is correct.

21       Q.   And then the producers, distributors, do

22  those individuals pay NPR interconnection a

Page 93

1    separate fee to provide their content on the

2    interconnection network?

3        A.    Correct.

4        Q.    And then public radio networks and

5    commercial customers, what does that refer to?

6        A.    That's the 1.5 million business I was

7    talking about earlier.

8        Q.    So that's the sale of the excess

9    satellite capacity that we discussed earlier?

10       A.    That's correct.  Just to be clear,

11   there's a little bit more to it, but it's a good

12   general way to think about it.

13       Q.    And then this other box here, it says,

14   charitable trust.  What does that mean?

15       A.    This is what we discussed earlier.  This

16   is the separate entity, the trust, the Public

17   Radio Satellite Trust that owns the equipment, the

18   satellite, and the satellite lease and all of the

19   equipment.

20            And as per our arrangement with them,

21   the trust represents all of the stations.  And

22   since the stations elected NPR to be the operator

Page 94

1    of the PRSS, there is an equipment lease agreement

2    that allows us to get up to $400,000 in

3    reimbursement for very specific types of expenses.

4    So that's the charitable trust.

5        Q.   You said that the stations elected NPR

6    to be the operator of the PRSS.  How did that

7    occur?

8            MR. BROOKS:  Objection; form.

9            THE WITNESS:  That was before my time.

10   It was in the 1980s.

11   BY MR. MCELROY:

12       Q.   Are you aware of whether a vote or

13   election occurred amongst the public radio

14   stations?

15           MR. BROOKS:  Objection; form.

16           THE WITNESS:  You would have to check

17   with legal.

18   BY MR. MCELROY:

19       Q.   Since you have been the VP of

20   distribution, are you aware of an election in

21   which public radio stations have elected NPR to be

22   the entity that runs PRSS?

Page 95

1      A.   No.

2      Q.   Since you've -- since 2008 is when you

3  started at NPR; right?

4      A.   (No verbal response.)

5      Q.   Are you aware of any election that has

6  been held of the public radio stations to elect

7  NPR as that entity that runs PRSS?

8      A.   No.

9      Q.   And back on 317, we talked about those

10  859 stations.  Those stations, just to be clear,

11  do not have contracts currently with NPR

12  Distribution; is that right?

13          MR. BROOKS:  Objection; form.

14          THE WITNESS:  I'm sorry, can you say

15  that again?

16  BY MR. MCELROY:

17      Q.   Yeah, sorry.

18          So back on page 317, we were talking

19  about those 859 additional licensed stations.  Do

20  you recall that?

21      A.   Yes.

22      Q.   Those 859 additional licensed stations

Page 101

1  finance people, but the number looks really high.

2  I don't believe this number is that.

3  BY MR. MCELROY:

4      Q.   Do you know sitting here today how much

5  NPR Distribution has in financial reserves?

6      A.   I believe -- I believe it is around

7  25 million, yeah.

8      Q.   And so looking at the other pieces of

9  this pie chart, CPB's project funding is

10  29 percent of fiscal year '25 revenue; correct?

11      A.   Correct.

12      Q.   So the other two-thirds, approximately,

13  a little more than two-thirds, of

14  NPR Distribution's revenue for fiscal year

15  '25 came from non-CPB sources; right?

16      A.   That's correct.

17      Q.   Now, let's talk for a few minutes about

18  the funds that NPR Distribution receives from CPB.

19          NPR Distribution cannot use any

20  interconnection funds received from CPB to create

21  content; right?

22          MR. BROOKS:  Objection; form.

Page 102

1              THE WITNESS:  We do not create content.

2    NPR Distribution does not create content.

3    BY MR. MCELROY:

4         Q.   But the question I asked is slightly

5    different.

6              NPR Distribution cannot use the

7    interconnection funds received from CPB to create

8    content; is that right?

9              MR. BROOKS:  Objection; form.

10              THE WITNESS:  I don't know if we can,

11    but we don't create content is what I'm trying to

12    communicate.  We're not in the business of

13    creating content.

14    BY MR. MCELROY:

15         Q.   Fair enough.  So let me restate the

16    question slightly.

17              NPR Distribution does not use CPB

18    interconnection funds to create content --

19              MR. BROOKS:  Objection; form.

20    BY MR. MCELROY:

21         Q.   -- is that right?

22         A.   That is accurate.

Page 103

1          Q.   So NPR's actual content that it creates

2     is unaffected by the amount of interconnection

3     funds NPR Distribution receives from CPB; right?

4               MR. BROOKS:   Objection; form.

5               THE WITNESS:   NPR's content creation

6     budget is completely separate from our budget, as

7     you can see from this pie chart.  So the answer is

8     yes.

9     BY MR. MCELROY:

10         Q.   And in your experience at NPR, does the

11    Corporation for Public Broadcasting take a role in

12    reviewing or approving programming content at NPR?

13              MR. BROOKS:   Objection; form.

14              THE WITNESS:   That is a question you

15    would have to ask -- you'll have to ask an NPR

16    person, not an NPR Distribution person.  I don't

17    know what happens there.

18    BY MR. MCELROY:

19         Q.   You're not aware of any time that CPB

20    has attempted to review or approve or alter NPR

21    programming content?

22         A.   Again, that is generally a question that

Page 105

1   affect NPR's actual programming content?

2            MR. BROOKS:  Objection; form.

3            THE WITNESS:  I have no personal

4   connections with that team and I have -- I really

5   don't know.  I just have no knowledge of it if

6   that's what you're asking.

7   BY MR. MCELROY:

8        Q.   So you have no knowledge of it; right?

9        A.   That's right.

10           MR. BROOKS:  Objection.  I think he's

11  answered the question numerous times.

12           MR. MCELROY:  I disagree, but he now

13  has.

14  BY MR. MCELROY:

15       Q.   Are you aware of any time that CPB has

16  ever conditioned NPR's receipt of interconnection

17  funding based upon any content that NPR has

18  created?

19           MR. BROOKS:  Objection; form.

20           THE WITNESS:  I have nothing to do with

21  content creation.  These are not conversations I

22  engage with with anybody at NPR.  I just do the

Page 106

1    distribution side.

2    BY MR. MCELROY:

3        Q.   Sure.  But your communications with CPB

4    about -- you do have communications with CPB about

5    interconnection funding; correct?

6        A.   That's correct.

7        Q.   Has CPB ever told you that

8    interconnection funding is dependent upon the

9    content of NPR's programming?

10       A.   We are the bottle, not the wine, which

11   is really, I mean, we're the conduit, we maintain

12   the infrastructure, we don't have conversations

13   about the content.  It doesn't even come up in

14   discussions with me, in my communications with

15   CPB.

16       Q.   So to be clear, NPR's programming

17   content has never come up in your communications

18   with CPB about interconnection funding?

19           MR. BROOKS:  Objection; form.

20           THE WITNESS:  It has not come up in my

21   communications with CPB.

22

Page 108

1              MR. BROOKS:  Objection; form.

2              THE WITNESS:  I don't know what CPB

3     requires from NPR.  That's where the lawyers come

4     in.  This is something that they handle with the

5     CPB lawyers.

6     BY MR. MCELROY:

7         Q.   Do you think that NPR would receive the

8     funding if it didn't sign an agreement with CPB?

9              MR. BROOKS:  Objection; form.

10             THE WITNESS:  I don't think -- I don't

11    know for sure, but I've never seen that happen.  I

12    mean, there's always a final paperwork for me to

13    sign which ratifies the contract and the

14    arrangement.

15    BY MR. MCELROY:

16        Q.   So to be clear, in your time as VP of

17    distribution at NPR, there has never been a time

18    where NPR received interconnection funds from CPB

19    where it didn't sign an agreement?

20        A.   That is correct.

21             MR. MCELROY:  We've been going for about

22    another hour.  Do you need to take a break, or we

Page 119

1    Kathy Merritt -- was to make sure that these

2    negotiations go as quickly and as smoothly as

3    possible.

4            There was a consultant -- I'm sure we'll

5    get to this later, but as it pertains to this

6    question, there was a consultant report that said

7    it takes 2 million to negotiate a contract with

8    CPB in terms of time and people tax.

9            So it was my objective to reduce that

10   and keep it as expeditious as possible, just to

11   save everybody a lot of time and keep it moving

12   along.

13       Q.   Are you aware of any time that CPB

14   provided NPR with interconnection funding without

15   a written agreement?

16           MR. BROOKS:  Objection; form.

17           THE WITNESS:  No.  NPR Distribution,

18   just to be specific.  You said NPR, just

19   clarifying.

20   BY MR. MCELROY:

21       Q.   So are you aware of any time that CPB

22   provided NPR Distribution with interconnection

Case 1:25-cv-01674-RDM    Document 60-3    Filed 10/24/25    Page 56 of 102

10/20/2025          National Public Radio, Inc., et al. v. Donald J. Trump, et al.          Badri Munipalla

Page 120

1    funding without a written agreement?

2         A.   No.

3              MR. BROOKS:  Objection; form.

4              THE WITNESS:  Sorry.

5    BY MR. MCELROY:

6         Q.   So it's your experience that before NPR

7    receives -- before NPR Distribution receives

8    interconnection funding from CPB, that there are

9    negotiations of a written agreement; right?

10             MR. BROOKS:  Objection; form.

11             THE WITNESS:  Can you clarify what do

12   you mean by there are negotiations of the written

13   agreement?

14   BY MR. MCELROY:

15        Q.   Let me rephrase.

16        A.   Thank you.

17        Q.   In your experience, before NPR

18   Distribution receives interconnection funding from

19   CPB, there is a written agreement in place between

20   the two parties; right?

21             MR. BROOKS:  Objection; form.

22             THE WITNESS:  Yes.

Page 126

1        A.    That's correct.

2        Q.    And that RFP actually came out of a

3    working group that CPB put together; didn't it?

4        A.    That's my understanding, correct.

5              MR. BROOKS:   Objection.

6    BY MR. MCELROY:

7        Q.    Did you sit on that working group?

8        A.    I did not sit on the working group.

9              MR. MCELROY:   I'm handing the court

10   reporter what I would like to be marked Exhibit 8.

11             (Munipalla Deposition Exhibit 8 was

12   marked for identification and attached to the

13   transcript.)

14   BY MR. MCELROY:

15       Q.    Take a moment to review Exhibit 8.   Let

16   me know when you finished, Mr. Munipalla.

17             (Witness peruses the exhibit.)

18             THE WITNESS:   I'm good.

19   BY MR. MCELROY:

20       Q.    Do you recognize Exhibit 8?

21       A.    Yes, I do.

22       Q.    What is it?

Page 130

1   BY MR. MCELROY:

2       Q.   And do you believe NPR, including NPR

3   Distribution, was entitled to receive funds to

4   maintain the satellite, the satellite insurance,

5   the associated hardware, et cetera, that you just

6   referenced?

7           MR. BROOKS:  Objection; form.

8           THE WITNESS:  I think I have difficulty

9   with the word "entitled."  I think it's more

10  contractual, in my opinion, or that's my

11  understanding.  So I think when you say

12  "entitled," I don't exactly know what that

13  encompasses, but I would like to -- but I believe

14  that based on our existing contract with CPB,

15  going back to the 1980s, they're responsible for

16  paying for satellite, satellite insurance, and

17  upgrades of the system, which has come to mean the

18  ContentDepot upgrades, as well.

19  BY MR. MCELROY:

20      Q.   So in your opinion, it's based upon the

21  contracts between NPR -- or NPR Distribution and

22  CPB?

Page 131

1              MR. BROOKS:  Objection; form.

2              THE WITNESS:  That's my understanding,

3    it's contractual.

4    BY MR. MCELROY:

5         Q.   Did you ever ask anyone at CPB to see an

6    advanced copy of the RFP?

7         A.   An advanced copy of the RFP.  I don't

8    think I did.

9         Q.   So we talked a minute ago about the

10   working committee that CPB set up to formulate

11   this RFP.

12             Do you remember that?

13        A.   The working group, yes.

14        Q.   You said you weren't on the working

15   group; right?

16        A.   That's correct.

17        Q.   Was anyone from NPR on this working

18   group?

19        A.   Yes.

20        Q.   Who?

21        A.   I think I remember -- I think there were

22   at least two people, Debbie Hiott and Rachel

Page 132

1   Hubbard.

2        Q.   And who are they?

3        A.   They are public radio station general

4   managers.

5        Q.   What is their affiliation with NPR then?

6        A.   Oh, I see what you mean.  They are on

7   the NPR board.

8        Q.   Was there ever a point in time where you

9   were going to be a member of the working group for

10  the RFP that is Exhibit 8?

11           MR. BROOKS:  Objection; form.

12           THE WITNESS:  There was another member

13  who was going to sit on the working group.  His

14  name is Mike Savage, who is the chair of the D/I

15  committee.  And I don't know the exact reasons,

16  but Mike Savage suggested that I sit instead of

17  him on the working group.

18           I believe we sent an e-mail -- I don't

19  know if it was an e-mail or a letter, I cannot

20  remember, but we discussed putting me on the

21  working group instead of Mr. Savage.  And I

22  believe the response to that was, This is not a

Page 140

1    interconnection.  And, therefore, the D/I

2    committee, which is a committee of the NPR board,

3    is set up the way it is set up.

4           So asking us to change that without

5    needing stations or just changing that in response

6    to the RFP, I don't think NPR could have done

7    that, which is why we did the best that we could,

8    which is add another member to the D/I committee,

9    to even it out and bring in some expertise that

10   this RFP was asking for, which was around digital

11   distribution.

12   BY MR. MCELROY:

13      Q.   Did you reach out to the interconnected

14   stations to ask their opinion on this?

15      A.   No.

16      Q.   So you stated that NPR is limited with

17   respect to what it could do in governance.  Why?

18           MR. BROOKS:  Objection; form.

19           THE WITNESS:  I think I just explained

20   that.  NPR is the designated operator of the

21   interconnection, and the structure falls out of

22   that.  So NPR cannot just change things out of its

Page 141

1    own volition is the point here.

2    BY MR. MCELROY:

3        Q.   But NPR never asked any of the stations

4    whether they wanted to make any changes.

5            MR. BROOKS:   Objection; form.

6            THE WITNESS:   NPR consulted the trust

7    and the trustees, and the trustees said they have

8    no problem with NPR as the operator.   And NPR does

9    not reach out to the interconnected stations

10   directly almost ever.   NPR Distribution maintains

11   that relationship, and we take counsel from the

12   trustees and their attorney.

13   BY MR. MCELROY:

14       Q.   Okay.   So NPR Distribution never reached

15   out to the interconnected stations and asked them

16   whether they would --

17       A.   That's correct.

18       Q.   -- whether they would agree to a change

19   in governance?

20       A.   But we did talk to the trustees, which

21   the beneficiaries of this trust are the stations.

22   So they speak for the stations.

Page 146

1    reflect changing business and audience needs.

2            This is where they're talking about the

3    audience needs.  But it's both what's needed for

4    the station in terms of capability, and then it's

5    also alluding to the fact that audiences, the way

6    they consume that, is changing.

7    BY MR. MCELROY:

8        Q.    I understand.

9            So forget the paragraph for a second.

10   Let's talk about the RFP at large.  Because you're

11   familiar with the RFP; right?

12       A.    Yes.

13       Q.    You engineered NPR's response to it;

14   right?

15           MR. BROOKS:  Objection; form.

16           THE WITNESS:  I --

17   BY MR. MCELROY:

18       Q.    You led NPR's response to it.

19       A.    That's correct.

20       Q.    So CPB was seeking in this RFP to

21   include more terrestrial technologies in

22   interconnection for the public radio system;

Page 147

1    right?

2              MR. BROOKS:  Objection; form.

3              THE WITNESS:  I think we can agree that

4    in terms of expanding the terrestrial -- I mean,

5    the interconnection, we already have satellite,

6    the next natural extension is terrestrial, which

7    is what PRSS has also been doing and which is what

8    CPB is also seeking.

9              But the terrestrial, all I'm trying to

10   say is there is a B2B component, which is what we

11   do.  We deliver content from our data center to

12   our stations.  And then there's also a B2C

13   component, which happens separately from the PRSS.

14             So in this particular RFP, I think

15   they're trying to tackle multiple things.  That's

16   sort of the confusion here.  So I'm not trying to

17   be difficult.  All I'm trying to say is in certain

18   paragraphs, they're talking about expanding the

19   technology capability.  In certain paragraphs,

20   they're talking about the end user consumer

21   behavior changing.

22

Page 154

1    BY MR. MCELROY:

2        Q.   So looking at page 1 of this, or Bates

3    No. 78348, of Exhibit 9.  The first sentence --

4        A.   Sorry, could you please say the page

5    number again?

6        Q.   It's just first page.

7        A.   Oh, the very first page.  Got it.

8        Q.   The very first page.

9        A.   Yes, got it.

10        Q.   Sorry, Bates No. 78348.

11            The very first sentence of this, you

12    state that NPR is pleased to submit this proposal

13    and response; don't you?

14        A.   Yes.

15        Q.   Not that NPR believes that CPB is

16    retaliating against it for its exercise of

17    First Amendment rights by issuing this RFP?

18        A.   Based on what's written here, I was just

19    expressing -- I was just expressing my pleasure at

20    having this opportunity to respond to this RFP.

21        Q.   And as part of this RFP response that

22    NPR submitted to CPB, you include terrestrial

Page 155

1   distribution as part of the response; correct?

2          MR. BROOKS:  Objection; form.

3          THE WITNESS:  Correct.

4   BY MR. MCELROY:

5       Q.   If you can go to page 32, it's -- the

6   actual page 32 of the document.  I'll give you the

7   Bates number in just a second.  The Bates number

8   is 78384.

9       A.   Yes.

10      Q.   And this is a chart that shows the

11  terrestrial capabilities that you're proposing to

12  implement; correct?

13      A.   That's correct.

14      Q.   And including the service expansion that

15  would result as a result of the terrestrial

16  platform?

17      A.   That's correct.

18      Q.   So NPR intended to use these grant funds

19  if it had been -- if it had won the bid, at least

20  in part, to expand terrestrial interconnection;

21  correct?

22      A.   That's correct.

Page 156

1          Q.   Now, at this point in time -- or as part

2     of this proposal, did NPR plan for a phasing out

3     or diminishment of settling interconnection?

4               MS. TOWNSEND:  Objection to form.

5               THE WITNESS:  No, I think what we've

6     always attempted -- what we've always proposed is

7     adding distribution capabilities as long as we can

8     provide them.  Our mission is to provide

9     distribution capabilities to leave no station

10    behind.

11              Unless, of course -- we discussed the

12    whole FCC issue -- if that were to happen, we

13    wouldn't be able to use satellite, but it is

14    generally our intention to leave no station

15    behind.

16    BY MR. MCELROY:

17         Q.   But the -- excuse me, the FCC issue was

18    with respect to FCC's regulation of satellite

19    bandwidth; right?

20         A.   That's correct.

21         Q.   And that has nothing to do with CPB;

22    correct?

Page 158

1    remains in use"?

2        A.    I think this is our commitment to the

3    whole leave-no-station-behind idea.  As long as

4    stations need satellite connectivity, it is our

5    goal to provide it to them.  And I think -- I

6    think the risks to satellite were constantly

7    increasing.  So I think we were trying to just be

8    careful and candid that as long as it's needed, we

9    will provide it.

10        Q.    So by this you're recognizing that

11    there's a realistic possibility that satellite

12    connectivity may end at some point in the future?

13            MR. BROOKS:  Objection; form.

14            THE WITNESS:  Yes.

15    BY MR. MCELROY:

16        Q.    If you'd go to the page immediately

17    prior to that.  It's page 34 and Bates No. 78386.

18            In Section 2.3.6, you see there are two

19    paragraphs there.  If you look down about nine

20    lines down, there's a sentence that begins in the

21    middle.  And it says, "The terrestrial system."

22            Do you see where I'm starting?

Page 159

1       A.    Yes.

2       Q.    I'm going to read that.

3             The terrestrial system will become the

4    primary system once an overwhelming majority of

5    systems -- or stations, excuse me, have

6    transitioned to the new system; is that right?

7       A.    That's correct.

8       Q.    So was it NPR's goal that the

9    terrestrial system will become the primary system?

10      A.    NPR Distribution's goal, yes.

11      Q.    So prior to the issuance of the 2025

12   RFP, was there a point in time where CPB and NPR

13   were discussing a possible extension of the fiscal

14   year '25 interconnection funding agreement?

15            MR. BROOKS:  Objection; form.

16            THE WITNESS:  When you say "extension,"

17   I don't think we discussed if it was going to be

18   an extension or if it was going to be a new

19   agreement.  And I'd like to make that distinction

20   because this has happened in the past where we've

21   discussed entering a new agreement, but it ended

22   up being an extension.

Page 163

1    start, you know, as soon as the new year comes

2    around.

3    BY MR. MCELROY:

4        Q.   So you're trying to have the

5    conversations to prime the CPB board for that

6    April meeting?

7        A.   Well put.

8        Q.   All right.  So did similar conversations

9    occur this year, that is in the year 2025?

10       A.   Yes.

11       Q.   And did -- are you aware of whether or

12   not NPR ever received an actual written agreement,

13   a proposed written agreement from CPB for funding

14   in the year 2025?

15           MR. BROOKS:  Objection; form.

16           THE WITNESS:  No written agreement for

17   '25.

18   BY MR. MCELROY:

19       Q.   And just to be clear, because I think

20   that my question may have been slightly unclear on

21   this, when you say no agreement, no written

22   agreement for 2025, you mean that NPR didn't

Page 164

1    receive a written agreement for 2025?

2         A.   We did not receive a written -- in the

3    spirit of clarifying it, we did not receive any

4    written agreement for FY '26 and beyond.

5         Q.   Which occurs in the year, the calendar

6    year 2025?

7         A.   April of 2025.

8         Q.   Thank you for that.  The difference

9    between fiscal years and calendar years can get

10   confusing in here.  So I want to make sure that we

11   get that clear.  I appreciate that.

12             After the -- switching back to the RFP

13   quickly, are you aware of who won the RFP?

14        A.   It was this concept called a PMI.

15        Q.   And that's the Public Media

16   Infrastructure coalition we discussed earlier;

17   right?

18        A.   That's correct.

19        Q.   Are you aware of whether or not the PMI

20   winning bid contained any money going to PRSS?

21             MR. BROOKS:  Objection; form.

22             THE WITNESS:  I have no idea.

Page 165

1    BY MR. MCELROY:

2        Q.    Would it surprise you to learn that the

3    PMI bid included funding for PRSS in it?

4            MR. BROOKS:  Objection; form.

5            THE WITNESS:  It would not surprise me

6    because the RFP explicitly says whatever entity

7    responds to this RFP should have the ability to

8    work with the PRSS Trust.

9    BY MR. MCELROY:

10       Q.    Now, in advance of CPB's determination

11   on the RFP that it issued in July of '25, did NPR

12   make any contingency plans for if it did not

13   prevail on the bid?

14       A.    So coinciding with that April time frame

15   is also when NPR Distribution starts talking about

16   the FY '26 budget.  And for FY '25 funding, I

17   think we were able to accomplish, in principle,

18   what that amount was going to be so there was a

19   little bit of less guesswork.

20            But in this particular budget cycle, we

21   had no idea how much money we would ever get, if

22   any.  So we just assumed zero dollars.  And your

Page 166

1    question was about contingency.  And I was just

2    saying all of this to say the contingency was

3    using our reserves.

4         Q.   So when you say you assumed that you

5    would get zero dollars, you mean you assume you

6    would get zero dollars from CPB?

7         A.   That's correct.

8         Q.   And the contingency was to use

9    NPR Distribution's reserves to cover the shortfall

10   or any shortfall that may exist?

11            MR. BROOKS:  Objection; form.

12            THE WITNESS:  That is correct.

13   BY MR. MCELROY:

14        Q.   And you testified earlier that there's

15   approximately $25 million in NPR Distribution's

16   reserves right now; correct?

17        A.   That's correct.  I mean, just to be

18   clear, we view the reserves as a rainy day fund,

19   and we've also used it in the past when CPB and

20   NPR Distribution haven't been able to come to a

21   contract agreement.  So we've used the reserves

22   funds to tie us over and pay our bills until the

Page 167

1    money arrives.

2        Q.    Would you consider CPB losing federal

3    funding from Congress to be a rainy day?

4            MR. BROOKS:  Objection; form.

5            THE WITNESS:  I don't think I'm

6    qualified to answer that question.

7    BY MR. MCELROY:

8        Q.    Okay.  What is your definition of "rainy

9    day fund"?

10       A.    In the context of our reserves, I think

11   I already gave you one example.  Like if we don't

12   receive money, it's a stopgap.  If we also have to

13   pay for severances because of layoffs, again,

14   because of CPB underfunding, we dip into the

15   reserves.  That's how we pay for it.

16           Sometimes, just as a natural process of

17   during the course of business, because CPB uses a

18   reimbursement model to reimburse us for the work

19   that we do, the risk is really on us because what

20   happens is we have to get the work done, but let's

21   say somebody goes on maternity or maternity leave,

22   it's going to take us a while to find a backfill

Page 173

1          Q.    So I want to go back to something that

2    you testified to a few minutes ago.  I want to

3    make sure I understand it.

4              You stated that there have been other

5    instances in the past where NPR Distribution has

6    used its reserves as a stopgap to cover CPB

7    funding shortfalls; is that correct?

8          A.    That is correct.

9          Q.    Can you describe to me what instances

10   you can recall where that was -- where that

11   happened?

12         A.    There was the FY '22 negotiations that

13   dragged on until calendar year -- until February

14   of the calendar year.  That means --

15         Q.    So the negotiations were happening in

16   calendar year '21, and they dragged on to calendar

17   of '22?

18         A.    Yeah, until the Feb of '22.

19         Q.    When normally you would have had an

20   agreement for fiscal year 2022 during calendar

21   year 2021?

22         A.    That is correct.

Page 174

1          Q.    Can you recall any other instances?

2          A.    I believe there were -- the previous

3     year, which I was not a part of, the exact same

4     thing happened.

5          Q.    So you were a part of the fiscal year

6     '22 negotiations, though?

7          A.    Yes.

8          Q.    Can you describe to me your recollection

9     of why those negotiations went wrong or were

10    delayed?

11              MR. BROOKS:  Objection; form.

12              THE WITNESS:  I can only explain it from

13    a technical perspective because I was not in every

14    one of those conversations.  I think the

15    fundamental argument was about NPR Distribution

16    not using sufficient terrestrial technologies to

17    distribute content, and there was this general

18    perception that we were not forwarding that notion

19    of adopting terrestrial distribution.

20              And I think the NPR Distribution

21    counterpoint was we already are doing to a certain

22    degree terrestrial distribution but what you are

Page 175

1  asking for is a lot more complicated and we need

2  to sit down and talk about it, but we don't have

3  that technology ready yet.

4  BY MR. MCELROY:

5      Q.   And why didn't you have that technology

6  ready?

7      A.   So bear with me.  It's a little

8  complicated because I think what was happening is

9  we were coming off a long funding cycle, and we

10  simply did not have the cadence to engage with CPB

11  on a regular basis, the flow just wasn't there.

12  So genuinely, I think there was just not enough

13  communication to understand each other.

14      Q.   Okay.  But it wasn't a technological

15  shortcoming.  The technology existed to do it at

16  that time?

17      A.   Yes.  Yeah, yes.  It's complicated when

18  you ask a technology question, but if you want, I

19  can elaborate.

20      Q.   No, I just want to make sure that the

21  technology -- the availability of the technology

22  was not the barrier; is that correct?

Page 177

1          Q.    So NPR Distribution today, as we sit

2     here today on, what, October 20th, 2025, is no

3     longer receiving interconnection funds from CPB;

4     correct?

5          A.    I would say as where we are today, we

6     haven't received any funding from CPB, and I don't

7     know if we're going to be receiving, I don't know,

8     but as of right now we haven't received anything.

9          Q.    And NPR Distribution is still able to

10    provide interconnection services to public radio

11    stations today, though; isn't it?

12         A.    We are making sure that there's

13    continuity of service and, yes, as of right now

14    we're able to provide that.

15         Q.    Assuming you receive no further funding

16    from CPB for interconnection, do you have a

17    timetable for how long NPR Distribution can

18    continue providing interconnection services for

19    public radio stations?

20         A.    I think I need to ask a clarifying

21    question.  Are you saying without improving

22    services or maintaining the current state?

Page 178

1        Q.    Let's say maintaining the current state

2    as it exists right now.

3        A.    If we were to just maintain the current

4    state and do nothing else, the limiter would not

5    be money as much as it would be the satellite

6    system going away, at which point you wouldn't

7    have anything else and the system would stop

8    operating.

9        Q.    Why would the satellite system go away?

10       A.    Because my understanding is part of the

11   big, beautiful bill, there was explicit stuff

12   about the FCC claiming the C-band available

13   spectrum, and that chatter has really picked up.

14            We are learning that they're planning on

15   issuing whatever is the initial procedural stuff

16   to begin the auction, and they want to auction off

17   the entire 200 megahertz of C-band.  And that

18   could happen as early as FY '20 -- calendar year

19   '27, perhaps.

20            So by '28 you're either looking at a

21   situation where there's no C-band, or it's very

22   clear when it's going to not be available.

Page 179

1        Q.    So that includes the satellite capacity

2    that PRSS currently uses?

3        A.    That is correct.

4        Q.    How would CPB funding affect that?

5            MR. BROOKS:  Objection; form.

6            THE WITNESS:  Our grand proposal to CPB

7    exactly lays out that case, because what we're

8    telling them is by 2028.  And as you saw also in

9    our RFP proposal, we were talking about how can we

10    transition away from satellite because these risks

11    have been known, and we've tried to actively

12    mitigate them.

13            So our 27 million, which was our

14    three-year -- I know we haven't talked about it,

15    but the three-year grand proposal that we put in

16    front of CPB on March 25th-ish exactly speaks to

17    that.

18    BY MR. MCELROY:

19        Q.    It speaks to the NPR Distribution's

20    ability to transition away from satellite.

21        A.    And a plan.

22        Q.    And a plan.  So the CPB funding wouldn't

Page 180

1    affect the C-band satellite capacity going away?

2        A.    I'm sorry, I don't understand that.

3        Q.    The CPB funding -- strike that.

4              CPB has no authority over the C-band

5    satellite capacity; right?

6              MR. BROOKS:  Objection; form.

7              THE WITNESS:  CPB, as an organization,

8    has absolutely no control over when C-band will go

9    away.

10             MR. MCELROY:  I'm handing the court

11   reporter what I would like to be marked as

12   Munipalla Exhibit 11.

13             (Munipalla Deposition Exhibit 11 was

14   marked for identification and attached to the

15   transcript.)

16   BY MR. MCELROY:

17       Q.    Take a moment to review Exhibit 11.  Let

18   me know when you've finished, Mr. Munipalla.

19       A.    Yes, sir.

20       Q.    Do you recognize Exhibit 11,

21   Mr. Munipalla?

22       A.    Yes, I do.  I believe this is a Q&A on

Page 181

1    this -- I might use the wrong term, but on this

2    court case.

3          Q.    And were you involved in creating this

4    document?

5          A.    Not at all.

6          Q.    Have you seen this document before

7    today?

8          A.    Yeah.

9                MR. BROOKS:   Objection; form.

10               THE WITNESS:   I'm sorry, yes.

11   BY MR. MCELROY:

12         Q.    And how did you see this?

13         A.    Because we have a practice where NPR,

14   excuse me, they send their communications to the

15   NPR member stations.  And when anything needs to

16   be -- excuse me, when anything needs to be sent to

17   the broader system, and by "broader system" I mean

18   the interconnected stations, it goes through me or

19   my staff.  So I saw this document, and I asked my

20   staff to send it to the interconnection stations,

21   as well.

22         Q.    So this document was sent to the

Page 182

1    interconnected stations by your department?

2          A.    Yes.

3          Q.    Do you know the date when it was sent to

4    the interconnected stations?

5          A.    No, I don't.

6          Q.    We can probably say a date after which

7    is probably after September 26th, 2025; is that

8    fair?

9          A.    Oh, yeah, it was definitely in October.

10         Q.    Okay.  Yeah.

11               Do you know who at NPR was responsible

12   for drafting this document?

13         A.    I don't.

14         Q.    Do you recall who sent it to you to send

15   out to the interconnected stations?

16         A.    So we do have -- I mean, it's weird.

17   There is a shared Google doc where when

18   communications are going out through the system,

19   it's got a couple of -- I mean, send it to the

20   staff, send it to member stations, send it to

21   interconnected stations.  And I think typically

22   they just go down that order.

Page 193

```
 1   BY MR. MCELROY:

 2        Q.   And stations do disconnect every year;

 3   right?

 4        A.   Yeah, they do.  A small portion of them.

 5        Q.   And some of them disconnect because they

 6   think the fees are too high; right?

 7        A.   Yes, that's correct.

 8             MS. TOWNSEND:  Do you need a break or

 9   are you --

10             THE WITNESS:  Sure.

11             MS. TOWNSEND:  Do you want a break?  You

12   don't have to take one.

13             THE WITNESS:  I can go a little longer.

14             MS. TOWNSEND:  Okay.

15             THE WITNESS:  Actually, I'm sorry, let's

16   take a break.  I'll just quickly use the restroom.

17             MR. MCELROY:  All right.

18             THE WITNESS:  I apologize.

19             MR. MCELROY:  I'm happy to take a break.

20             THE VIDEOGRAPHER:  The time is 2:24 p.m.

21   We are now off the record.

22             (Recess from the record.)
```

Page 212

1    what is the process by which a public radio

2    station signs up with NPR Distribution for

3    interconnection services?

4         A.    I think they would have to sign a legal

5    agreement and there is -- I think that's all there

6    is to it.

7         Q.    I'm going to hand the court reporter

8    what I would like to be marked as Exhibit 18.

9              (Munipalla Deposition Exhibit 18 was

10   marked for identification and attached to the

11   transcript.)

12   BY MR. MCELROY:

13        Q.    Take a moment to review Exhibit 18 and

14   let me know when you've finished.

15        A.    Yes.

16        Q.    And this -- do you recognize this

17   document, Mr. Munipalla?

18        A.    Yes, I do.

19        Q.    What is it?

20        A.    I believe this is a sample of public

21   radio satellite interconnection agreement.

22        Q.    So is this the template agreement that a

Page 213

1    radio would sign when signing up for

2    interconnection services with NPR Distribution?

3         A.    That's correct.

4         Q.    And is it these agreements,

5    Mr. Munipalla, that NPR contends are the mechanism

6    by which public radio stations have designated NPR

7    as the entity to receive interconnection funds on

8    their behalf?

9              MR. BROOKS:  Objection; form.

10             THE WITNESS:  That was a lot.  I don't

11   know if this is -- can you say that again, there

12   were at least two questions in there.

13   BY MR. MCELROY:

14        Q.    Sure.  Are these agreements the

15   documents that NPR contends designate NPR as the

16   entity to receive interconnection funds?

17             MR. BROOKS:  Objection; form.

18             THE WITNESS:  I would say no.  This is

19   very specific to the service that the PRSS or NPR

20   Distribution provides to each station.

21   BY MR. MCELROY:

22        Q.    Let's just look quickly at Section 8 of

Page 216

1    of paper, Mr. Munipalla, let's start with

2    Exhibit 19.

3              Have you had a chance to review

4    Exhibit 19 yet?

5              MR. BROOKS:  Take your time if you need.

6              THE WITNESS:  Yeah, thank you.

7              Yes.

8    BY MR. MCELROY:

9        Q.    And do you recognize Exhibit 19?

10       A.    I do.

11       Q.    What is it?

12       A.    I think this is a conversation or an

13   e-mail initiated by WORT about disconnecting from

14   the PRSS.

15       Q.    And this was in September of 2025;

16   right?

17       A.    That's correct.

18       Q.    And then if you can look at Exhibit 20.

19       A.    Uh-huh.  Yes.

20       Q.    And this is a disconnection notice from

21   a radio with a call signal WBJB; is that correct?

22       A.    That's correct.

Page 217

1        Q.   Or is that WBIB, instead of BJB?

2        A.   It's BJB.

3        Q.   And then Exhibit 21 is a disconnection

4    notice from a radio station with the call signal

5    WMSB; correct?

6        A.   Correct.

7        Q.   And then Exhibit 22 is a disconnection

8    notice from a radio station with the call signal

9    KWMR; right?

10       A.   Almost the same with the exception that

11   in this case that particular station decided to

12   stay interconnected but switch to terrestrial

13   only.

14       Q.   Okay.  Is -- does that come with a

15   decrease in cost or an increase in cost?

16       A.   A decrease by 50 percent.

17       Q.   Now, for KWMR, Exhibit 22, I just want

18   to make sure we're talking about the right one.

19            How do you know that KWMR stayed on with

20   the 50 percent discount in terrestrial connection?

21       A.   It -- I think if you look at the e-mail

22   that Renee exchanged with Dennis, she says, "This

Page 218

1   is good news.  Basically what will happen is we

2   will terminate the satellite agreement and

3   reconnect you as an Internet station."

4        Q.   I see what's going on.  You're on

5   Exhibit 23.

6        A.   Oh, I'm so sorry.  22?

7        Q.   Exhibit 22, yes.

8        A.   I was talking about --

9        Q.   No worries.

10        A.   I'm sorry.

11        Q.   So Exhibit 22 is a disconnect form for

12   the station with a call signal KWMR; right?

13        A.   Correct.

14        Q.   And then Exhibit 23 is the station you

15   were discussing that switched to Internet?

16        A.   Correct.  Sorry for the confusion.

17        Q.   No worries.  I'm glad we could clear it

18   up.

19             And that station is -- can you -- oh,

20   KCCK; correct?  It looks like it's on Bates

21   No. 243 of Exhibit 23.

22        A.   243, correct.

Page 219

1      Q.   And all of these were in August or

2   September of 2025; right?

3      A.   Correct.  I remember this, and

4   previously I said I don't remember any recent

5   stuff.  So thank you for putting this in front of

6   me.  All of this was put in front of me by Sophya

7   all on the same day.  So that's why they're all

8   dated 9/19.

9           I think it came in on a Friday fast and

10  furious.  She was just summarizing a whole bunch

11  of requests that came in recently.

12     Q.   Was there some sort of timing

13  requirement that sort of precipitated all these

14  coming in on the same day?

15     A.   No, I think the general workflow is a

16  station will reach out with their intention to

17  disconnect.  And then we usually talk to them and,

18  you know, tell them what the options are, if they

19  want to stay on.  Usually, the primary alternative

20  being, do you want to stay on as an Internet-only

21  station, and explain to them what that means.  As

22  we've talked about it, the Internet-only service

Page 244

1    transcript.)

2    BY MR. MCELROY:

3         Q.    Take a moment to review this document,

4    Mr. Munipalla.  Let me know when you're finished.

5         A.    Yes.

6         Q.    Do you recognize Exhibit 26,

7    Mr. Munipalla?

8         A.    Yes, I do.

9         Q.    What is it?

10        A.    This was similar -- this is related to

11   the e-mail that we saw earlier where -- the one

12   that I flagged Marta asking about, Can you give us

13   some parameters so that we could actually do some

14   sensible analysis on the doomsday scenario?  The

15   doomsday scenario here being losing federal

16   funding.

17             And this is -- this is an e-mail

18   starting off with my staff kind of taking what was

19   done previously, not when I was a VP, and just

20   updating it and saying this is what it could look

21   like.

22             And then this is me responding to Chris

Page 250

1    we're trying to communicate.

2        Q.    And then about three more sentences in,

3    it says, Finally, NPR has built up financial

4    reserves that can be utilized for the management

5    and operation of the PRSS; right?

6        A.    That's correct.

7        Q.    So these are the $25 million in

8    financial reserves we talked about earlier; is

9    that right?

10       A.    That's correct.

11       Q.    Can we go back to Exhibit 26 for just a

12   second?

13       A.    26.  Yes.

14       Q.    And it's the one with NPR 4941 at the

15   bottom?

16       A.    Correct.

17       Q.    All right.  So we talked about the

18   second-to-last bullet point on here, but we

19   didn't -- we talked about the first half of it.

20   We didn't talk about the second half of it.  So I

21   just want to come back to the second half of that

22   bullet quickly.

Page 255

1   about bringing in Deloitte that would allow CPB to

2   look at this convergence idea.

3             And this is after Deloitte was brought

4   on board.  They wanted to convene two meetings to

5   talk about -- introduce the idea of what

6   convergence could be.  So this is the first time

7   we're talking about what it could be.  And there

8   were two sessions planned.

9             So I think this was me suggesting to

10  everybody that I think it is important that we

11  participate in these discussions because it is

12  important to be open, transparent, and engage in

13  dialogue versus just decide not to participate.

14       Q.   And in the first sentence here, you say,

15  "In my biweekly one-on-one with Kathy Merritt

16  earlier, I asked if the newco idea is a finalized

17  decision."

18             What is the newco idea?

19       A.   So the newco idea is -- at least at that

20  time, it was not fully defined obviously, that's

21  why we were having the meeting, but it was the

22  concept of pulling together TV and radio

Page 256

1    interconnection under one umbrella, assuming it

2    was even doable, and ideas on how to accomplish

3    that.  So that was called the newco.

4         Q.   And presumably that would be creating a

5    new company to do that, not doing it under the

6    umbrella of either PBS or NPR?

7         A.   That's speculative, right.  I mean, I

8    think that's why it says the door is wide open,

9    even Kathy doesn't know what it meant.

10        Q.   Okay.  But if the convergence happened

11   under either NPR Distribution or under PBS, there

12   would be no need to create a newco; right?

13             MR. BROOKS:  Objection; form.

14             THE WITNESS:  Sure.

15   BY MR. MCELROY:

16        Q.   NPR Distribution and PBS already

17   existed; right?

18        A.   That's right.

19        Q.   And the term "newco," do you understand

20   it to mean new company?

21        A.   That was a short for new company.

22             MR. MCELROY:  I'm handing the court

Page 263

1    recommendations to CPB in the 2024 time period

2    that you were talking about?

3         A.    That's a conversation between Deloitte

4    and CPB.  I don't know what their recommendations

5    were.

6         Q.    So you've never seen any recommendations

7    from Deloitte about interconnection?

8         A.    I have never seen.

9         Q.    Are you aware of any other consultants

10    that have been hired by CPB or NPR in the last

11    five years to study interconnection specifically?

12        A.    Yes, CPB loves hiring consultants, and

13    they've hired multiple consultants over those

14    five years.

15        Q.    Do you recall the names of any of them?

16        A.    There was -- going way back, there was a

17    consultant called Cognizant.  This is from 2015.

18    And then ten years -- so this is before my time as

19    a VP, but there was a Cognizant report that talked

20    about the interconnection.

21              And then came Diversified.  At that

22    point, I was a senior director, and I was only

Page 264

1    brought into specific negotiation -- brought in

2    during specific negotiation points with CPB, and

3    I've interacted with Diversified consultants.

4              After Diversified, CPB asked PRSS to

5    hire consultants, and we hired Kearney.  After

6    Kearney, CPB hired Deloitte to double-check

7    Kearney.  And that was in the 2024 time frame that

8    we were talking about.

9         Q.   Okay.  Did you at any time review any of

10   the reports created by Cognizant?

11        A.   I did not review those reports.  I have

12   only seen them because they're posted on the CPB

13   website.  And I was -- 2015, I was -- I don't know

14   what my title was, but I was far away from the

15   business side.

16        Q.   Okay.  When you say you've only seen

17   them because they're posted on CPB's website, did

18   you go on their website and read them?

19        A.   I think at some point I went in and

20   looked at what the Cognizant recommendations were,

21   and that's where I found it.

22        Q.   Do you recall what the Cognizant

Page 293

1    you run the modeling and you kind of make a

2    recommendation and then they deliver it.

3        Q.    And then it looks like Mr. Savage is

4    agreeing with you on the 2 and a half percent

5    increase?

6        A.    I believe so.

7        Q.    And the very next sentence says, "As we

8    discussed, this letter is timely since it lays the

9    ground work for a steep rate increase in fiscal

10   year '27."

11           Why are -- why is NPR Distribution

12   considering a steep rate increase in fiscal year

13   '27?

14       A.    Because we would need to cover the costs

15   of satellite and the satellite lease.  And as per

16   the agreements that we looked at before, the

17   stations sort of are responsible for the PRSS.  So

18   this was -- this was a consequence of not

19   receiving CPB funding or anticipating that we're

20   not going to receive CPB funding next year, as

21   well.

22       Q.    Would it be fair to say that you and

Page 294

1    your colleagues at NPR Distribution are frustrated

2    with CPB --

3              MR. BROOKS:  Objection --

4    BY MR. MCELROY:

5         Q.   -- and their funding decisions?

6              MR. BROOKS:  Objection to form.

7              THE WITNESS:  I think that would be a

8    fair characterization.

9              MR. MCELROY:  I'm handing the court

10   reporter what I would like to be marked

11   Exhibit 38.

12              (Munipalla Deposition Exhibit 38 was

13   marked for identification and attached to the

14   transcript.)

15   BY MR. MCELROY:

16        Q.   Take a moment to review this document.

17   And let me know when you've finished,

18   Mr. Munipalla.

19              (Witness peruses the exhibit.)

20              THE WITNESS:  Okay.

21   BY MR. MCELROY:

22        Q.   Do you recognize Exhibit 38,

Page 297

1              MR. BROOKS:  Objection; form.

2              THE WITNESS:  My work as a --

3     BY MR. MCELROY:

4         Q.   Your work as the head of PRSS.

5         A.   I'm not understanding the inference.

6         Q.   So if PRSS moves to an independent

7     entity, would you assume you would move along with

8     it?

9              MR. BROOKS:  Objection; form.

10             THE WITNESS:  I am the vice president of

11    NPR Distribution which manages the PRSS system.

12    There would be a vice president role or a CEO role

13    for the new PRSS entity, I would assume.  Whether

14    that's going to be me or whether that's going to

15    be somebody else, I do not know.

16    BY MR. MCELROY:

17        Q.   But ultimately here, you're so

18    frustrated with CPB that you just wanted them to

19    go away after giving PRSS the money; didn't you?

20             MR. BROOKS:  Objection; form.

21             THE WITNESS:  I think all I'm saying

22    here is there is a scenario where CPB gives the

Page 298

1    money and -- this is in April, and we were

2    speculating that there was going to be an EO.  So

3    there is a scenario where you get the money, and

4    CPB goes away by an act of Congress.

5    BY MR. MCELROY:

6        Q.   Yeah, but you're not saying it's a

7    scenario, Mr. Munipalla.  I'm going to quote your

8    words here.  One, two, three, four -- five bullet

9    points down, you said, "There is a dream

10   scenario"; didn't you, Mr. Munipalla?

11       A.   Based on this document, yes, I did.

12       Q.   And that dream is for CPB to go away and

13   for NPR Distribution to get its money?

14            MR. BROOKS:  Objection; form.

15            THE WITNESS:  Sure.

16            MR. MCELROY:  Thank you.  I have no

17   further questions.

18            MR. BROOKS:  All right.

19            MS. TOWNSEND:  We have some redirect.

20       EXAMINATION BY COUNSEL FOR THE PLAINTIFFS

21   BY MR. BROOKS:

22       Q.   Mr. Munipalla, do you recall at the very

Page 301

1    and then the rollout.  So it's going to take

2    longer.

3              Q.    Thank you.

4                    And do you also recall testifying today

5    about two meetings in October of 2024 with the

6    group of champions that you attended to discuss

7    convergence?

8              A.    I'm sorry, please say that again.

9              Q.    Do you recall testifying today about two

10   meetings you had in October 2024 with the

11   so-called group of champions to discuss

12   convergence?

13             A.    Yes.

14             Q.    And can you describe what occurred at

15   those meetings?

16             A.    It was very contentious, and I think

17   when Deloitte and CPB proposed the idea of a

18   newco, PBS immediately shut the idea down.  And

19   their CTO, Rhonda Holt, she spoke for 45 minutes

20   nonstop saying why it was a terrible idea.  So no

21   progress was made, and the effort was shut down.

22             Q.    Okay.  Thank you.

Page 306

1    DISTRICT OF COLUMBIA )

2

3            I, Matthew Goldstein, RMR, CRR, Notary

4    Public within and for the District of Columbia, do

5    hereby certify:

6

7            That I reported the proceedings in the

8    within entitled matter, and that the within

9    transcript is a true record of said proceedings.

10

11            I further certify that I am not related to

12   any of the parties to the action by blood or

13   marriage, and that I am in no way interested in the

14   outcome of this matter.

15

16            IN WITNESS WHEREOF, I have hereunto set my

17   hand this 20th day of October, 2025.

18

19

20            Matthew Goldstein, RMR, CRR

21

22