Case 1:25-cv-01674-RDM    Document 60-6    Filed 10/24/25    Page 1 of 58

10/22/2025          National Public Radio, Inc., et al. v. Donald J. Trump, et al.    Marta McLellan Ross

1

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF COLUMBIA

-------------------------------X

NATIONAL PUBLIC RADIO, INC.,      :

ET AL.,                           :

                Plaintiffs,       :

                                       Case No.:

    v.                            :

                                       1:25-cv-1674-RDM

DONALD J. TRUMP, ET AL.,          :

                Defendants.       :

-------------------------------X


            Deposition of MARTA MCLELLAN ROSS

                 Washington, D.C.

            Wednesday, October 22, 2025

                  9:07 a.m.








Reported by: Matthew Goldstein, RMR, CRR

2

1        Deposition of MARTA MCLELLAN ROSS, held at:

2

3

4            Gibson Dunn & Crutcher

5            1700 M Street

6            Washington, D.C. 20036

7            202.955.8500

8

9

10

11

12       Pursuant to Notice, before Matthew Goldstein,

13   RMR, CRR, Notary Public in and for the District of

14   Columbia.

15

16

17

18

19

20

21

22

3

```
 1      A P P E A R A N C E S

 2   ON BEHALF OF THE PLAINTIFFS, NATIONAL PUBLIC

 3   RADIO, INC., ET AL.:

 4   SOPHIA BRILL, ESQUIRE

 5   ERIC BROOKS, ESQUIRE

 6   GIBSON DUNN & CRUTCHER, LLP

 7   1700 M Street, NW

 8   Washington, D.C. 20036

 9   202.777.9302

10

11   ON BEHALF OF THE DEFENDANT CORPORATION OF

12   PUBLIC BROADCASTING:

13   JEFFREY S. ROBBINS, ESQUIRE

14   JACOB WEINSTEIN, ESQUIRE

15   SAUL EWING LLP

16   131 Dartmouth Street

17   Suite 501

18   Boston, Massachusetts 02116

19   617.912.0941

20

21

22
```

4

```
1   A P P E A R A N C E S   C O N T I N U E D

2

3        ALSO PRESENT:

4        ELIZABETH A. ALLEN, ESQ. - NPR

5        DESHAWN WHITE - VIDEOGRAPHER

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22
```

10/22/2025      National Public Radio, Inc., et al. v. Donald J. Trump, et al.    Marta McLellan Ross

5

```
 1                  C O N T E N T S
 2    EXAMINATION OF MARTA MCLELLAN ROSS              PAGE
 3
 4    By MR. ROBBINS                                    11
 5    By MS. BRILL                                     390
 6    By MR. ROBBINS                                   401
 7                  E X H I B I T S
 8                    (Attached)
 9    ROSS            DEPOSITION EXHIBIT              PAGE
10
      Exhibit 1    Katherine Maher Transcript of       32
11                 Congressional Hearing
12    Exhibit 2    CPB_0311378 through CPB_031181,     48
                   March 26, 2025, E-mail
13                 Correspondence
14    Exhibit 3    March 20, 2025, E-mail              56
                   Correspondence
15
      Exhibit 4    I've Been at NPR for 25 Years.      95
16                 Here's How We Lost America's
                   Trust, Uri Berliner Article
17
      Exhibit 5    NPR Suspends Editor Who            118
18                 Criticized His Employer For
                   What He Calls An Unquestioned
19                 Liberal Worldview, AP Article
20    Exhibit 6    Inside the Crisis at NPR, New      121
                   York Times Article
21
22
```

```
                                                              6
  1    (Continued)
  2                       E X H I B I T S
  3    Exhibit 7     A Proposal to the Corporation      149
                     for Public Broadcasting For
  4                  NPR's Editorial Enhancement
                     Initiative May 2024
  5
       Exhibit 8     CPB_0064645 through                174
  6                  CPB_0064679, Grant Agreement
                     "NPR Editorial Enhancements"
  7
       Exhibit 9     Corporation for Public             194
  8                  Broadcasting and National
                     Public Radio Agreement on the
  9                  Management of the Public Radio
                     Satellite Interconnection
 10                  System
 11    Exhibit 10    CPB_0159311 through                218
                     CPB_0159312, Deloitte CPB
 12                  Future of Public Media
                     Distribution Interconnection
 13                  Committee and CPB Board Update
                     October 1 and 7-8, 2024, Slide
 14                  Deck
 15    Exhibit 11    NPR0005094, October 23, 2024,      224
                     E-mail Correspondence
 16
       Exhibit 12    CPB_0389662 through                249
 17                  CPB_0389666, Minutes Executive
                     Session Board of Directors
 18                  Corporation for Public
                     Broadcasting Monday, October 7,
 19                  - Tuesday, October 8, 2024
 20
 21
 22
```

10/22/2025        National Public Radio, Inc., et al. v. Donald J. Trump, et al.    Marta McLellan Ross

```
                                                                    7
  1   (Continued)
  2                       E X H I B I T S
  3   Exhibit 13      CPB_0389643 through              264
                      CPB_0389648, Minutes Executive
  4                   Session Board of Directors
                      Corporation for Public
  5                   Broadcasting Tuesday, November
                      19 - Wednesday, November 20,
  6                   2024
  7   Exhibit 14      CPB_0096603 through              268
                      CPB_0096606, April 22, 2025,
  8                   E-mail Correspondence
  9   Exhibit 15      CPB_0110941, April 30, 2025,     286
                      Letter
 10
      Exhibit 16      Corporation for Public           292
 11                   Broadcasting Statement
                      Regarding Executive Order on
 12                   Public Media May 2, 2025,
                      Statement
 13
      Exhibit 17      Spreadsheet                      298
 14
      Exhibit 18      CPB_0015776 through              302
 15                   CPB_0015777, May 6, 2025,
                      Letter
 16
      Exhibit 19      NPR0011741 through NPR0011743,   307
 17                   May 23, 2025, E-mail
                      Correspondence
 18
      Exhibit 20      CPB_0304041 through              312
 19                   CPB_0304042, May 9, 2025,
                      E-mail Correspondence
 20
      Exhibit 21      CPB_0301876, May 30, 2025,       318
 21                   Letter
 22
```

```
                                                              8
  1    (Continued)
  2                      E X H I B I T S
  3    Exhibit 22    CPB_0111938, July 11, 2025,        322
                     E-mail Correspondence
  4
       Exhibit 23    NPR0001613 through NPR0001614,     335
  5                  April 23, 2025, E-mail
                     Correspondence
  6
       Exhibit 24    NPR0015348, May 2, 2025, E-mail    342
  7                  Correspondence
  8    Exhibit 25    NPR0001536 through NPR0001539,     353
                     March 26, 2025, E-mail
  9                  Correspondence
 10    Exhibit 26    NPR0000125 through NPR0000126,     366
                     August 15, 2025, E-mail
 11                  Correspondence
 12    Exhibit 27    NPR0012683 through NPR0012684,     372
                     September 7, 2025, E-mail
 13                  Correspondence
 14    Exhibit 28    NPR0000401, PRSS Competition       387
                     Slide
 15
       Exhibit 29    CPB_0313532 through                398
 16                  CPB_0313535, May 9, 2025,
                     E-mail Correspondence
 17
 18
 19
 20
 21
 22
```

9

1              THE VIDEOGRAPHER:  This is video No. 1

2    of the video-recorded deposition of Marta McLellan

3    Ross, in the matter of National Public Radio,

4    Inc., et al., versus Donald J. Trump, et al., in

5    the United States District Court for the District

6    of Columbia, Case No. 1:25-cv-1674.

7              This deposition is being held at Gibson

8    Dunn, 1700 M Street Northwest, Washington, D.C.,

9    on October 22nd, 2025.

10              The time on the video screen is

11    9:07 a.m.

12              My name is DeShawn White.  I am the

13    legal videographer from Digital Evidence Group.

14              The court reporter is Matthew Goldstein,

15    in association with Digital Evidence Group.

16              Will counsel please introduce themselves

17    for the record, followed by the court reporter

18    administering the oath.

19              MR. ROBBINS:  Well, you're the

20    plaintiff.  So...

21              MS. BRILL:  Sure.  I'm Sophya Brill with

22    Gibson Dunn, representing National Public Radio.

10

1              MR. BROOKS:  And Eric Brooks,

2      representing National Public Radio.

3              MS. ALLEN:  I'm Elizabeth Allen.

4              MR. ROBBINS:  Jeff Robbins and Jacob

5      Weinstein, representing the Corporation for Public

6      Broadcasting.

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

11

1                    P R O C E E D I N G S

2    Whereupon,

3                    MARTA MCLELLAN ROSS,

4    being first duly sworn or affirmed to testify to the

5    truth, the whole truth, and nothing but the truth,

6    was examined and testified as follows:

7        EXAMINATION BY COUNSEL FOR THE DEFENDANT

8            CORPORATION OF PUBLIC BROADCASTING

9    BY MR. ROBBINS:

10        Q.   Thank you.

11             Ms. Ross, good morning.  Thank you for

12    being here.  Would you state your full name for

13    the record, please?

14        A.   Marta Lynn McLellan Ross.

15        Q.   And you understand this is a proceeding

16    that is pending in the United States District

17    Court?

18        A.   I do.

19        Q.   You're, in fact, an attorney; are you

20    not?

21        A.   I am not an attorney.

22        Q.   Okay.  Do you have a license to practice

12

1    law?

2        A.    No.

3        Q.    Did you go to law school?

4        A.    No.

5        Q.    Okay.  Have you ever testified in any

6    proceeding at all?

7        A.    No.

8        Q.    Do you understand what it means to

9    testify under oath?

10       A.    I do.

11       Q.    What's your understanding of what it

12   means.

13       A.    I understand that I affirmed to provide

14   the truth and answer the questions.

15       Q.    Okay.  You are the chief of staff at

16   NPR.

17       A.    Currently.  And the SVP for government

18   and external affairs.

19       Q.    The senior vice president?

20       A.    Correct.

21       Q.    How long have you been the chief of

22   staff?

10/22/2025        National Public Radio, Inc., et al. v. Donald J. Trump, et al.    Marta McLellan Ross

13

1        A.    Since the middle of September.

2        Q.    Of 2024?

3        A.    '5.

4        Q.    2025?

5        A.    Yes, the bottom of.

6        Q.    Okay.  How long have you been at NPR?

7        A.    Since April 2021.

8        Q.    Okay.  And when you began at -- in April

9    of 2021, what was your job?

10       A.    I was the vice president for government

11   and external affairs.

12       Q.    And what were your duties?

13       A.    My duties were to lead the policy and

14   representation office.  It was a small -- or it is

15   a small office within NPR that represents NPR and

16   member stations to Congress and any other

17   authorities.

18       Q.    Okay.  And what were your duties as --

19   in that capacity?  What did you do?

20       A.    I advocated for public radio.  I am the

21   primary public radio advocate.

22       Q.    Okay.  So you were the interface between

14

1    NPR and the Hill?

2        A.    In most cases, yes.

3        Q.    Okay.  And did your duties change at any

4    point?

5        A.    No.

6        Q.    Okay.  You have been that senior vice

7    president with those roles -- with those duties

8    ever since April 2021?

9        A.    I was a vice president until I believe

10   it was January 2025.  I was promoted to senior

11   vice president, but the duties were similar and

12   expanded in scope given the threats that we were

13   facing to public radio and the funding.

14       Q.    Okay.  That was in January, did you say,

15   of 2025?

16       A.    Correct.

17       Q.    Okay.  And as chief of staff, first of

18   all, who did you report to -- who have -- who were

19   your direct reports starting in April of 2021?

20       A.    Who I reported to?

21       Q.    Who you reported to?

22       A.    I have consistently reported to the CEO.

15

1        Q.    Okay.  So you have reported to the CEO

2    of NPR for the last four and a half years?

3        A.    Yes.

4        Q.    Okay.  And how often would you meet with

5    the CEO?

6        A.    One-on-one, under the previous CEO, it

7    was less frequent.  He was more often than not

8    working remotely.  This was still during COVID.

9    We had a long return back to the office.

10            But we would meet weekly as an executive

11    team, and I was a part of the senior executive

12    team.  And then when the new CEO came in, I met

13    very frequently with the CEO.

14        Q.    But I take it, therefore, you have been

15    part of the senior executive team at NPR for the

16    last four and a half years?

17        A.    I've been a part of the executive

18    committee for the last four years, yes.

19        Q.    How many people on the executive

20    committee?

21        A.    About 15.

22        Q.    Okay.  Can you and I agree that it's

10/22/2025     National Public Radio, Inc., et al. v. Donald J. Trump, et al.     Marta McLellan Ross

17

1           MS. BRILL:  Objection as to the form.

2    BY MR. ROBBINS:

3           Q.    You may answer.

4           A.    I guess representative -- there's always

5    been a question as representative in what way.

6           Q.    Okay.

7           A.    And I think, you know, our mission, our

8    public service commitment is to serve all America.

9           Q.    That's great.  And I take it you'd also

10   agree that it's important for NPR, as a recipient

11   of taxpayer funds, to engage in fact-based

12   journalism.

13          Can we agree on that much?

14          A.    That's a part of our editorial

15   standards.

16          Q.    Okay.  It's important for NPR to

17   maintain the confidence and trust of the public.

18          A.    Yes.

19          Q.    It's important for NPR to adhere to a

20   standard of unbiased reporting?

21          A.    Can you repeat that, please?

22          Q.    Sure.  It's important for NPR as a

18

1    recipient of taxpayer dollars to engage in

2    unbiased fact-based reporting?

3         A.    We engage in fact-based objective

4    reporting.

5         Q.    Okay.  Can you agree with me that the

6    Corporation for Public Broadcasting, which I'll

7    refer to as CPB, has had an obligation, in your

8    view, to ensure that NPR engages in fact-based

9    journalism?

10        A.    I -- CPB does not have an obligation

11   to -- in my understanding, does not have an

12   obligation to make an evaluation on the content of

13   NPR.

14        Q.    Okay.  You agree that CPB has been a

15   steward -- a congressionally mandated steward of

16   taxpayer dollars directed to public media?

17        A.    Yes.

18        Q.    And what's its -- what have its

19   obligations been, in your view, CPB?

20        A.    To implement the Public Broadcasting

21   Act.

22        Q.    Okay.  And is it legitimate, in your

21

1              MS. BRILL:  Objection as to form.

2       BY MR. ROBBINS:

3              Q.    You may answer.

4              A.    I think it would depend on what the

5       funding from CPB to NPR is for and what the terms

6       of the grant agreement are for.

7              Q.    Okay.  As a general matter, is it

8       legitimate for CPB to engage in any oversight of

9       NPR?

10             A.    With respect to the grant funding that

11      it provides to NPR?

12             Q.    Yes.

13             A.    Yes.

14             Q.    Okay.  And is it legitimate for CPB to

15      ask whether or not NPR is being open and

16      transparent with the public?

17             A.    I don't know that that has been a -- I

18      mean, that's a confusing question.

19             Q.    What confuses you, so I can eliminate

20      the confusion?

21             A.    I guess I'm -- NPR is open and

22      transparent to the public.  So that's not, to my

22

1    understanding, been a question.

2        Q.    Okay.  And I understand your position.

3    I'm just asking whether or not, in your view, it's

4    legitimate for CPB to ask questions about whether

5    or not NPR is, in fact, open and transparent with

6    the public?

7        A.    I think it would depend for what

8    purpose.

9        Q.    To ensure that it's carrying out its

10   role as the steward of public financing for public

11   media?

12       A.    Again, but the steward for the financing

13   that it's providing to NPR --

14       Q.    Yes.

15       A.    -- or -- well, and that would be, I

16   think, reflective of whatever the terms of the

17   grants were pertaining to.

18       Q.    Okay.  Can you agree with me that CPB

19   has any legitimate role in inquiring whether or

20   not NPR, to which it distributes funds, is being

21   open and transparent with the public?

22       A.    With respect to the funds that are

10/22/2025        National Public Radio, Inc., et al. v. Donald J. Trump, et al.    Marta McLellan Ross

23

1   provided to NPR, on the use and implementation of

2   those funds, yes.

3        Q.   Okay.  And is it legitimate as a general

4   matter for CPB to ask questions about whether or

5   not NPR is engaged in biased journalism?

6        A.   NPR is an independent editorial

7   organization.  So, you know, I don't think it is

8   appropriate for CPB to be an arbiter as to what is

9   or isn't biased.

10       Q.   Is it legitimate for anybody to inquire

11   whether or not NPR is engaged in biased reporting?

12            MS. BRILL:  Objection as to form.  You

13   can answer.

14            THE WITNESS:  I can answer.

15   BY MR. ROBBINS:

16       Q.   Let me ask this.  Is it your view that

17   nobody can legitimately ask whether or not NPR is

18   engaged in biased reporting?

19       A.   People can always ask the question.

20       Q.   Can Congress do so legitimately?

21       A.   I think Congress can express its views

22   in any particular way.  The question is whether

10/22/2025        National Public Radio, Inc., et al. v. Donald J. Trump, et al.    Marta McLellan Ross

27

1         Q.   Okay.  All right.  Are there any

2    questions that Congress can legitimately, validly

3    ask, in your view, about the use of taxpayer --

4    federal taxpayers' dollars, taxpayers' dollars to

5    go to NPR?

6              Are there any questions that it can

7    legitimately ask?

8         A.   Yes.

9         Q.   What kinds of questions can they

10   legitimately ask, in your view?

11        A.   How the funding was used, what -- where

12   it -- how it served the audience.

13        Q.   Great.  Okay.

14        A.   Yeah.

15        Q.   And you said earlier that -- you

16   explained to me the process by which Congress

17   appropriates money to CPB, and CPB in turn has

18   provided funding for NPR.

19             You were careful to educate me on that

20   distinction; right?

21        A.   Yes.

22        Q.   Okay.  So I take it that you'll agree

10/22/2025         National Public Radio, Inc., et al. v. Donald J. Trump, et al.    Marta McLellan Ross

28

1    that CPB has some valid role in making assessments

2    about NPR before it decides to grant NPR money?

3         A.   NPR -- CPB will request a grant

4    proposal, NPR will provide a grant proposal, and

5    CPB, to my understanding, bases their decisions on

6    what is contained in the proposal.

7         Q.   Let me just ask a hypothetical question,

8    and I'm not saying this is the case.

9              Supposing that there was evidence that

10   NPR was corrupt, was misusing funds, would you

11   agree in that case that CPB had a legitimate

12   interest in ensuring that that corruption was

13   eliminated before granting money to NPR?

14        A.   I think CPB, in weighing whether or not

15   it would fund, continued grant funding for NPR,

16   could base its decision on any number of factors,

17   including how the finances were managed at NPR.

18        Q.   Okay.  Great.

19             Now, it is the case over the last

20   several years that NPR has received some criticism

21   from certain quarters about perceptions of bias in

22   reporting; correct?

10/22/2025        National Public Radio, Inc., et al. v. Donald J. Trump, et al.    Marta McLellan Ross

41

1    speaking.

2              (Record read.)

3    BY MR. ROBBINS:

4        Q.   Can we agree that CPB has some

5    legitimate interest before granting money to NPR

6    in ensuring that NPR does, in fact, operate with

7    the highest journalistic standards?

8              MS. BRILL:  Objection.  This has been

9    asked and answered seven or eight times by now.

10              MR. ROBBINS:  Thank you.

11   BY MR. ROBBINS:

12       Q.   Please answer the question.

13       A.   Again, as the steward of the federal

14   appropriation and with NPR as an independent

15   editorial operation, there is a line at which

16   CPB's oversight does not cross.

17       Q.   That's -- I appreciate that, but I'm not

18   sure you've answered my question.

19              But can we agree that CPB has some

20   legitimate interest in inquiring whether or not

21   NPR is adhering to the highest journalistic

22   standards before CPB hands NPR federal money?

10/22/2025      National Public Radio, Inc., et al. v. Donald J. Trump, et al.    Marta McLellan Ross

47

1   BY MR. ROBBINS:

2        Q.   Tens of millions of dollars?

3            MS. BRILL:  Objection as to form.

4            THE WITNESS:  It depends on the time

5   frame, but yes.

6   BY MR. ROBBINS:

7        Q.   Is CPB entitled to do any due diligence

8   before it gives money to NPR into the standard of

9   NPR's operations?

10       A.   I would hope that CPB would always do

11   due diligence before it gives a grant.

12       Q.   Great.  Terrific.

13           Now, you recall at the hearing before

14   Congress earlier this year, Congressman Jordan

15   inquired whether or not NPR was issuing a --

16   requesting donations in conjunction with

17   Ms. Maher's appearance before Congress.

18           Do you recall that?

19       A.   I do.

20       Q.   And, indeed, NPR was fundraising off of

21   that appearance; correct?

22       A.   I believe it was.

10/22/2025        National Public Radio, Inc., et al. v. Donald J. Trump, et al.    Marta McLellan Ross

79

1    his opinion; right?

2         A.   Yes, it was his opinion, I guess.  Yeah.

3         Q.   Protected by the First Amendment; right?

4         A.   Everyone is entitled to their opinion.

5         Q.   Important to protect people's rights

6    that give their opinions; right?

7         A.   As a -- yeah.

8         Q.   I mean, that's what NPR stands for;

9    doesn't it?

10        A.   Yes, free speech.

11        Q.   Yeah, NPR is a champion of the right of

12   people to express their opinion freely; right?

13        A.   Yes.

14        Q.   It's a very important value for NPR;

15   correct?

16        A.   Yes.

17        Q.   It's one that means a great deal to you

18   and your colleagues at NPR to protect people's

19   rights to express their opinions; correct?

20        A.   Free speech.  It's a fundamental right.

21        Q.   Fundamental right.

22             You wouldn't want to punish free speech;

10/22/2025        National Public Radio, Inc., et al. v. Donald J. Trump, et al.    Marta McLellan Ross

92

1        Q.    Yeah, I don't want you to answer

2    incorrectly, but I'm not asking about a specific

3    question.  You'll note that my question didn't

4    include a question about a specific question.

5            My question more generally is:  I

6    thought you testified that you were involved in

7    discussions about how to respond to press

8    inquiries about the matter?

9        A.    The article.

10        Q.    Okay.  Fine.

11            So you remember that there were press

12    inquiries after Mr. Berliner's opinion column was

13    written; correct?

14        A.    Yes.

15        Q.    Okay.  And do you recall any of the

16    media outlets that inquired about Mr. Berliner's

17    column?

18        A.    Not really.  I mean, not specifically.

19        Q.    Okay.  Do you also recall there were

20    inquiries after it emerged, whether or not you put

21    it out, whether or not NPR put it out, that

22    Mr. Berliner had been suspended; correct?

10/22/2025        National Public Radio, Inc., et al. v. Donald J. Trump, et al.    Marta McLellan Ross

93

1        A.    So what I would say is, in general, we

2    were getting a lot of media inquiries around that

3    time.  I don't recall any inquiries regarding the

4    suspension, or specific inquiries.  So I don't

5    want to answer incorrectly.

6        Q.    That's fine.

7              But you were getting a lot of -- NPR was

8    getting a lot of media inquiries, to use your

9    words, about Mr. Berliner's opinion column;

10   correct?

11             MS. BRILL:  Objection; asked and

12   answered.

13   BY MR. ROBBINS:

14       Q.    You just said "a lot"?

15       A.    Yes.

16       Q.    Okay.  All right.

17             And, obviously, it was an issue, a

18   public issue after he wrote the column; correct?

19             MS. BRILL:  Objection as to form.

20             THE WITNESS:  In what way?  Can you --

21   BY MR. ROBBINS:

22       Q.    Well, if you were receive- -- I take it

110

1            MS. BRILL:  Can we be given copies

2    and --

3            MR. ROBBINS:  You will when I'm marking

4    it.  I'm not -- hold on a second, please.

5            MR. WEINSTEIN:  Sorry.

6            MR. ROBBINS:  I just want to ask about

7    her recollection before I mark the exhibit.

8    BY MR. ROBBINS:

9        Q.   You recall that Mr. Berliner was

10   suspended by NPR after he wrote this opinion

11   column?

12       A.   In general, I recall that.

13       Q.   Okay.  And he was suspended without pay?

14       A.   I don't know the specifics.

15       Q.   Do you know that he was suspended

16   without pay?

17       A.   In general, I recall.  I think in

18   general a suspension is usually without pay, but,

19   again, I don't recall the specifics.

20       Q.   Okay.  So NPR, which stands for the

21   protection of the right of free speech and free

22   press, sees a column by one of its editors

113

1   management about responding to press inquiries,

2   you're not prepared to agree that NPR management

3   wasn't very happy about the fact that he had

4   written this column?

5        A.   I think in general no organization would

6   be happy with a critical article written about it.

7   So I would say generally I could agree with that.

8        Q.   Well, it's not just what no

9   organization.  I'm asking specifically about NPR.

10            Will you agree with me that NPR's

11   management was not happy about Mr. Berliner's

12   column?

13        A.   Again, I don't speak for NPR management.

14   But in general, there was concern about the

15   article.

16        Q.   And what basis for the concern?

17        A.   Well, with the CEO two weeks into their

18   tenure, you know, the article --

19        Q.   Was critical of NPR?

20        A.   -- was critical of NPR, yeah.

21        Q.   Okay.  Thank you.

22        A.   May I also just state, though, there was

10/22/2025       National Public Radio, Inc., et al. v. Donald J. Trump, et al.    Marta McLellan Ross

118

1          Q.   Okay.  Do you know who was involved in

2     those discussions?

3          A.   No.

4          Q.   But it is the case that after

5     Mr. Berliner was suspended without pay, after he

6     wrote this opinion column critical of NPR, that

7     fact itself got media coverage; correct?

8          A.   I believe it did.

9          Q.   Like the New York Times covered it?

10         A.   I don't know.

11         Q.   Okay.  Let me just ask you --

12              MR. ROBBINS:  Well, there's the piece

13    that -- where's the previous piece that we were

14    almost going to mark, but we didn't?

15              Let's have that marked.

16              (Ross Deposition Exhibit 5 was marked

17    for identification and attached to the

18    transcript.)

19    BY MR. ROBBINS:

20         Q.   This is Exhibit 5.

21         A.   Right.  What's the -- oh, AP.

22         Q.   Yeah, this is an Associated Press story

10/22/2025         National Public Radio, Inc., et al. v. Donald J. Trump, et al.    Marta McLellan Ross

119

1    entitled, NPR suspends editor who criticized his

2    employer for what he calls an unquestioned liberal

3    worldview.

4              Do you see that?

5              MS. BRILL:  Can I ask that Ms. McLellan

6    Ross be given a moment to read the document?

7              MR. ROBBINS:  Yes, of course,

8    absolutely.

9              (Witness peruses the exhibit.)

10   BY MR. ROBBINS:

11        Q.   Do you recall this piece?

12        A.   I don't recall it, but I'm seeing it

13   now.

14        Q.   Okay.  It's an Associated Press story

15   headlined, NPR suspends editor who criticized his

16   employer for what he calls an unquestioned liberal

17   worldview.

18              Do you see that?

19        A.   That's the headline.

20        Q.   And actually -- and it begins, National

21   Public Radio has suspended a veteran editor who

22   wrote an outside essay criticizing his employer

10/22/2025        National Public Radio, Inc., et al. v. Donald J. Trump, et al.    Marta McLellan Ross

121

1         A.   Oh, I see you have the article.  Could I

2    refer to it?

3         Q.   Yes, you can.

4              (Ross Deposition Exhibit 6 was marked

5    for identification and attached to the

6    transcript.)

7              MS. BRILL:  And I'll ask, again, that

8    Ms. McLellan Ross be given a moment to read the

9    article.

10             MR. ROBBINS:  Of course.

11             (Witness peruses the exhibit.)

12             THE WITNESS:  Sorry, it's a long

13   article.

14   BY MR. ROBBINS:

15        Q.   It's okay.

16             (Witness peruses the exhibit.)

17   BY MR. ROBBINS:

18        Q.   All set?

19        A.   Yeah.

20        Q.   Okay.  This article --

21             MR. ROBBINS:  Which is Exhibit 6; is it?

22             THE COURT REPORTER:  Yes.

122

1   BY MR. ROBBINS:

2        Q.    -- 6 is an article that appeared in The

3   New York Times on April 24th, 2024, entitled,

4   Inside the crisis at NPR.

5            Do you see that?

6        A.    I see.

7        Q.    With the subhead, Listeners are tuning

8   out, sponsorship revenue has dipped, a diversity

9   push has generated internal turmoil.  Can

10  America's public radio network turn things around?

11           Do you see that?

12       A.    Yes.

13       Q.    And on the second page of this long

14  article, The New York Times writes -- it covers

15  the Uri Berliner situation; correct?

16       A.    Yes, it referenced it.

17       Q.    It says, For the past two weeks, turmoil

18  has engulfed NPR after a senior editor assailed

19  what he described as an extreme liberal bias

20  inside the organization that has bled into its

21  news coverage.  The editor, Uri Berliner, said

22  NPR's leaders had placed race and identity as

10/22/2025       National Public Radio, Inc., et al. v. Donald J. Trump, et al.     Marta McLellan Ross

127

1    experienced that peak in growth.  So --

2         Q.    But that was 2020; right?

3         A.    In the COVID period, yes.

4         Q.    But I think, unless I'm missing

5    something, it is correct that between 2020 and

6    2024 --

7         A.    Broadcast radio audience has declined.

8    I'm sorry.

9         Q.    Between 2020 and 2024, NPR's

10   listenership had declined; correct?

11            MS. BRILL:  Objection; asked and

12   answered.

13            THE WITNESS:  Yes, I believe that's

14   true.

15   BY MR. ROBBINS:

16        Q.    Okay.  Was that a subject of concern

17   within NPR?

18        A.    Yes.

19        Q.    And why is that?

20        A.    Our objective is to grow audience and

21   serve all America with that in partnership with

22   our member stations.

128

1        Q.    Now, if you turn to what would be the --

2    I think the fifth page from the end of this

3    exhibit.  At the top, it's after a picture of --

4    it's after the picture, and the top of it says,

5    NPR is grappling with declining audiences and

6    falling revenue and internal conflict about how to

7    fix it.

8            Do you see that?

9        A.    Yes.

10        Q.    All right.  So the first sentence is, In

11    May 2022, the board met to discuss taking a big

12    step in ambitious membership effort that it hoped

13    would be a big part of NPR's future.

14            Do you see that?

15        A.    Yes.

16        Q.    And then it goes on to describe -- it

17    says as follows, For years NPR's rules restricted

18    the ways it could ask listeners for money

19    directly.  Those solicitations were supposed to be

20    done with participation from local member

21    stations.  Now the board, which is referring to

22    the NPR board, planned to suspend that rule so

129

1    that NPR could ask avid public radio listeners to

2    donate directly to the NPR network.

3              Is that true?

4    A.    Yes.

5    Q.    Are those two paragraphs true?

6    A.    To my knowledge, yes.

7    Q.    Okay.  And then the next paragraph says,

8    There was some initial disagreement on the board

9    over the NPR network, according to people familiar

10   with the meeting.  Some of the directors said NPR

11   needed to do a better job of reaching listeners

12   directly.  Others urged caution, warning that the

13   proposal could interfere with fund-raising efforts

14   at local stations.

15             Do you see that?

16   A.    Yes.

17   Q.    It says, Then after much back-and-forth,

18   the board held a special session in June for a

19   formal vote on whether to remove the rule.

20   Ultimately, the board voted to suspend the rule,

21   but agreed to revisit the decision in the coming

22   years, setting up yet another debate.

130

1               Is that true, to your knowledge?

2          A.    To my knowledge, in June 2022.

3          Q.    Okay.  So, as I understand it, there

4     were some criticisms raised that the changing of

5     the rule could interfere with fund-raising efforts

6     at local stations; correct?

7          A.    Yes, but that's primarily based on what

8     the prior audience models were like and the way

9     that local stations leveraged broadcast radio to

10    support with local listener donations.  That was

11    changing with the growth of digital audiences.

12         Q.    And I'm not asking whether or not you

13    think the criticisms are valid or invalid.

14         A.    No, but I'm trying to explain why there

15    were criticisms.

16         Q.    Again, I'm just asking whether or not

17    there were, in fact, criticisms by local stations

18    that the suspension of the rule would adversely

19    affect fund-raising at local stations.

20               Is that the case?

21         A.    I would say there were questions.  I'm

22    not aware of specific criticisms, but definitely

136

1      Q.   Part of this fund-raising initiative was

2   to generate additional funding for NPR; am I

3   right?

4      A.   A portion --

5           MS. BRILL:  Objection; asked and

6   answered.

7           THE WITNESS:  A small portion of that.

8   BY MR. ROBBINS:

9      Q.   Thank you.

10          At a time when revenue had been

11   declining since 2020; correct?

12     A.   Well, as broadcast audience was also

13   declining and revenue would be declining

14   potentially for member stations, as well, if they

15   weren't able to generate the audiences on the

16   radio platforms.

17     Q.   I'm just asking whether or not it is the

18   case that revenue had declined at NPR, as The New

19   York Times report?

20     A.   And, again, I don't have the specific

21   revenue numbers in mind, but I think in general

22   that's true.

10/22/2025        National Public Radio, Inc., et al. v. Donald J. Trump, et al.    Marta McLellan Ross

149

1              (Ross Deposition Exhibit 7 was marked

2       for identification and attached to the

3       transcript.)

4              MR. ROBBINS:  This will be Exhibit --

5              THE COURT REPORTER:  7.

6              MR. ROBBINS:  -- 7.

7    BY MR. ROBBINS:

8       Q.   Exhibit 7 is on NPR stationary, and it's

9    titled, A proposal to the Corporation for Public

10   Broadcasting for NPR's editorial enhancement

11   initiative May 2024.

12             Do you see that?

13      A.   I see that.

14             MS. BRILL:  Could Ms. McLellan Ross be

15   given a moment to look at the document?

16             MR. ROBBINS:  Yes, absolutely.

17             (Witness peruses the exhibit.)

18   BY MR. ROBBINS:

19      Q.   You've read Exhibit 7?

20      A.   Yes.

21      Q.   Okay.  This is, in fact, a proposal to

22   the Corporation for Public Broadcasting that NPR

10/22/2025        National Public Radio, Inc., et al. v. Donald J. Trump, et al.    Marta McLellan Ross

150

1    submitted to CPB for NPR's editorial enhancement

2    initiative dated May 2024?

3        A.    Yes, that's what the title says.

4        Q.    You're familiar with proposals like this

5    to CPB?

6        A.    So, in general, I don't review proposals

7    that go to CPB.  And I don't see them.  This is

8    the first time I've seen this.

9        Q.    Okay.  Do you know who likely would have

10   been involved in preparing this?

11       A.    Likely the -- in general, I think the

12   proposals are developed by the development team,

13   written by the development team, and then in

14   partnership with whichever function within the

15   company that would be the user of those funds.  So

16   in this case, I believe it would have been

17   developed with the content division.

18       Q.    Okay.  I want to ask for some -- you've

19   said a lot there.  So I want to see if I

20   understand it.

21            This proposal would have been put

22   together by the development team?

156

1    statements, one in April and I believe one in May.

2    The first one was a commitment to establishing

3    closer editorial planning relationships with our

4    member stations.  And then the second one, the May

5    statement, which coincided with, I believe,

6    Katherine's conversation with Ms. Harrison, was a

7    rundown of the editorial enhancements that NPR

8    would be committing to.

9            And, you know, as the proposal notes,

10   this is a series of enhancements that many, you

11   know, leaders in the content division had been

12   wanting to -- you now, and thinking through, you

13   know, implementing and the funds coming out of

14   2022, 2023, you know, this would enable -- some

15   CPB support would enable them to hire the

16   individuals to implement these initiatives.

17       Q.   Okay.  Let me just take it bit by bit.

18       A.   Okay.

19       Q.   In April/May of 2024, NPR makes two

20   public statements about improving its editorial

21   processes; correct?

22       A.   About enhancing them, yes.

10/22/2025       National Public Radio, Inc., et al. v. Donald J. Trump, et al.    Marta McLellan Ross

157

1       Q.   Okay.  And it makes them within weeks of

2   Mr. Berliner's publication of his opinion column;

3   correct?

4       A.   Yes.

5       Q.   And it makes them just a couple of weeks

6   after NPR suspends Mr. Berliner without pay after

7   he has published his opinion column; correct?

8       A.   That's accurate in the timeline.

9       Q.   Okay.  And there was a discussion within

10  NPR's management about making those public

11  statements at that very time frame; correct?

12          MS. BRILL:  Objection as to form.

13          THE WITNESS:  Can you repeat that?

14  BY MR. ROBBINS:

15      Q.   Sure.

16          There were discussions within NPR's

17  management team -- executive team about the

18  importance of making those public statements; am I

19  right?

20      A.   I think there was discussion about

21  communicating -- communicating to the public,

22  yeah.

10/22/2025        National Public Radio, Inc., et al. v. Donald J. Trump, et al.    Marta McLellan Ross

158

1        Q.   And, as a matter of fact, there were

2    discussions within NPR's executive team about the

3    urgency of implementing editorial reforms;

4    correct?

5             MS. BRILL:  Objection as to form.

6             THE WITNESS:  Well, what I would suggest

7    is in the --

8    BY MR. ROBBINS:

9        Q.   I'm just trying to ask if that's

10   correct.  If you don't know, that's fine.

11       A.   Yeah, I don't know.

12       Q.   Okay.  Page 2 of this proposal to the

13   Corporation for Public Broadcasting for NPR's

14   editorial enhancement initiative dated May 2024

15   starts as follows:  Many of these changes have

16   been under discussion as part of NPR's long-term

17   strategy for some time, though recent increased

18   public scrutiny has added urgency to the moment.

19             Do you see that?

20       A.   I do.  And I was going to refer to that

21   sentence to your previous question.

22       Q.   Well, okay.  I'm simply saying that

159

1    NPR's proposal to CPB states that there are

2    editorial changes, changes in the review of

3    content, that have been under discussion within

4    NPR for some time; correct?

5        A.    That's what the statement says?

6        Q.    Yes.   That's what the NPR proposal says;

7    correct?

8        A.    Yes.

9        Q.    And the NPR proposal also says that

10   recent increased public scrutiny has added urgency

11   to the moment; correct?

12       A.    Yes, I already answered that.

13       Q.    Yes.

14            And the NP -- so what NPR is saying is

15   that as of May of 2024, there was recent increased

16   public scrutiny, let's stop on that; right?

17            MS. BRILL:   Objection; asked and

18   answered.

19            THE WITNESS:   Yes, I've answered that.

20   BY MR. ROBBINS:

21       Q.    Scrutiny of NPR; correct?

22       A.    Public scrutiny.

169

1    scope of NPR's editorial standards and practices

2    team?

3        A.    Yes.

4        Q.    And it was to provide, among other

5    things, a level of transparency to the public

6    about the decisions that guide NPR's journalism;

7    correct?

8        A.    Yes.

9        Q.    And the purpose of these funds,

10   according to this NPR proposal, was to bolster

11   editorial support to further strengthen our

12   quality control processes before publication and

13   to step back to evaluate our content mix

14   holistically to ensure we are serving all of our

15   audiences.

16            Do you see that?  At the bottom.

17       A.    Yes.

18       Q.    And for this purpose, NPR was seeking

19   just about $2 million of taxpayer's funds;

20   correct?

21       A.    Congressionally appropriated funds, yes.

22       Q.    Paid for by the American taxpayer;

170

1   correct?

2         A.   Yes.

3         Q.   So NPR wanted the American taxpayers to

4   pay $2 million so that NPR could provide a

5   backstop and enhance its editorial standards

6   implementation; correct?

7         A.   Well, NPR was making these commitments,

8   and CPB felt that it was a value to the taxpayer

9   that these enhancements be funded.  So they made

10  the decision to fund this proposal.

11        Q.   Yes.  But the proposal that NPR makes is

12  for the American taxpayer to fund, to the tune of

13  about $2 million, NPR so it could enhance its

14  editorial review; correct?

15        A.   Yes.

16        Q.   Okay.  And to go back to what we were

17  looking at before, apparently, according to NPR,

18  the changes that NPR wanted to make to enhance its

19  editorial review had been under discussion within

20  NPR for, quote-unquote, some time; correct?

21             MS. BRILL:  Objection; asked and

22  answered.

10/22/2025        National Public Radio, Inc., et al. v. Donald J. Trump, et al.    Marta McLellan Ross

173

1            Now, to your knowledge, the CPB did

2    approve this editorial enhancement grant?

3        A.    To my knowledge, yes.

4        Q.    Okay.  And does it refresh your --

5    strike that.

6            Do you recall that it was granted around

7    October 1st, 2024?

8        A.    That's my understanding.

9        Q.    Okay.  Now, the proposal calls for the

10   processes within NPR to strengthen their reviews

11   to take place over a period of 15 months.

12           Do you see that?

13       A.    I see that.

14       Q.    So that would come out roughly to, by

15   coincidence, January of -- roughly of 2026;

16   correct?

17       A.    I guess.

18       Q.    Okay.  And the grant, I can show it to

19   you if you need to, stated the core objective was,

20   quote, to assure editorial standards for fairness,

21   balance, and a variety of perspectives are

22   maintained and strengthened.

10/22/2025      National Public Radio, Inc., et al. v. Donald J. Trump, et al.    Marta McLellan Ross

177

 1    BY MR. ROBBINS:

 2         Q.   Can we agree that CPB was entitled to

 3    inquire with NPR about its compliance with the

 4    terms of the grant agreement?

 5         A.   Again --

 6         Q.   Is that a "yes"?

 7         A.   Again, yes --

 8         Q.   Okay.

 9         A.   -- CPB can inquire for information in

10    line with the terms of the grant agreement.

11         Q.   Sure.

12              And at any time are you aware that NPR

13    said to CPB, Oh, you can't ask us if we've -- if

14    we're complying with the terms of the grant

15    agreement?

16              You're not aware of that happening?

17         A.   I'm not aware.

18         Q.   Right.  You'd be surprised if that

19    happened; right?

20         A.   Well, I guess there would be a question,

21    is CPB asking for information that NPR can't

22    provide it.  I mean, I don't know.

184

1        Q.   Yeah, that's what I'm saying, in fact.

2             You don't claim that just because NPR

3    made a proposal for PRSS funding, that CPB had to

4    agree to that proposal; correct?

5        A.   Well, so typically the -- my

6    understanding is the back-and-forth would happen

7    prior to presentation to the board, the board

8    would vote on that, and then the proposal would be

9    carried forward.

10       Q.   I'm simply saying that, you're -- maybe

11   you are, you're claiming that if NPR makes a

12   proposal to CPB for PRSS funding, that CPB is

13   obligated to agree to that proposal?

14            MS. BRILL:  Objection as to form.

15            THE WITNESS:  I do believe that CPB is

16   obligated to fund the satellite interconnection

17   system.  The specifics of a proposal, I think, are

18   to be --

19   BY MR. ROBBINS:

20       Q.   Negotiated?

21       A.   -- worked through with the parties.

22       Q.   To be negotiated between the parties?

185

1        A.    I would imagine.

2        Q.    Okay.  And are you aware of any document

3    which obligates CPB to fund NPR for PRSS after

4    September 30th, 2025?

5        A.    I'm not aware.

6        Q.    Are you aware of anything which

7    obligates CPB to fund NPR for PRSS after

8    September 30th, 2025?

9            MS. BRILL:  Objection as to form.

10           THE WITNESS:  My understanding of the

11    statute is that CPB is obligated to fund the

12    national entity that is selected by the stations

13    to manage interconnection.

14    BY MR. ROBBINS:

15        Q.    Okay.  And are you aware of any document

16    reflecting NPR's selection as that entity?

17        A.    My understanding from this process is

18    that there are hundreds of contracts between NPR

19    and the interconnected stations that would

20    solidify that.

21        Q.    Are you aware of any document that

22    obligates CPB to fund NPR for PRSS after

186

1   September 30th, 2025?

2           MS. BRILL:  Objection; asked and

3   answered.

4           THE WITNESS:  As I said, I'm aware that

5   there is an obligation for CPB to fund the

6   national entity selected to run the satellite

7   interconnection service for public radio.  I am

8   not aware that there is a current grant agreement

9   between CPB and NPR for PRSS.

10  BY MR. ROBBINS:

11      Q.   I agree.  Okay.  That's fine.  That's

12  part of what I want to ask you about.

13          Are you aware of any document which

14  reflects that NPR has been selected to be the

15  designated entity subsequent to September 30th,

16  2025?

17          MS. BRILL:  Objection; asked and

18  answered.

19          THE WITNESS:  Again, I --

20  BY MR. ROBBINS:

21      Q.   The answer is just -- are you aware of

22  such a document or not?

10/22/2025        National Public Radio, Inc., et al. v. Donald J. Trump, et al.    Marta McLellan Ross

188

1    the stations have selected NPR as the entity and

2    continue to select NPR as the entity through the

3    contractual arrangements they have as

4    interconnected stations with PRSS.

5    BY MR. ROBBINS:

6        Q.    Can you identify any document which

7    reflects that the stations have voted and selected

8    NPR to be the designated entity subsequent to

9    September 30th, 2025?

10            MS. BRILL:  Objection; asked and

11    answered.

12    BY MR. ROBBINS:

13        Q.    You may answer.

14        A.    Are -- can I ask a clarifying question?

15            Are you asking if now, in the current

16    fiscal year, that stations have voted?

17        Q.    Well, for starters, let's do that.

18        A.    I'm not aware of a vote.

19        Q.    Are you aware of any --

20        A.    A vote to change.

21        Q.    Are you aware of any vote that has ever

22    been taken by the stations to designate NPR?

189

1        A.    My understanding is in the past, yes,

2    there was a vote.

3        Q.    When?

4        A.    I think -- I don't want to misstate, but

5    I think it was in the late '80s, early '90s.

6        Q.    Okay.  So you think that there was a

7    vote that was taken in the early -- strike that,

8    in the 1980s or the early 1990s that makes NPR the

9    designated recipient of PRSS funds?

10        A.    I don't want to misstate.

11        Q.    I don't want you to either.  I'm just

12    asking if that's what your testimony is?

13            Let me just do it again.

14            Is it your testimony that there was a

15    vote taken in the 1980s or the 1990s by radio

16    stations that NPR be the designated entity to

17    receive interconnection funding?

18            MS. BRILL:  Objection; asked and

19    answered.

20            THE WITNESS:  Again, that's my general

21    understanding, but I don't have specifics.

22

202

1    developing and recommending policy necessary for

2    the governance of the interconnection system;

3    correct?

4         A.    I guess.

5         Q.    Okay.  Now, let's go to page 6.

6              Right under Section 4, term, annual

7    review, and termination.  Do you see that?

8         A.    I see it.

9         Q.    It says, The term of this agreement

10   shall be from date of execution hereof through

11   September 30th, 1988, unless sooner terminated by

12   CPB pursuant to the provisions hereof or extended

13   by CPB, et cetera.

14             Do you see that?

15        A.    I do.

16        Q.    Do you know of any agreement that was

17   entered into between CPB and NPR to replace this

18   one?

19        A.    I don't have detailed knowledge of the

20   PRSS grant agreements and whether or not they

21   refer to this as an extension.  I don't know.

22        Q.    Okay.  But in any event, we can see that

210

1    CPB had a relationship with Deloitte.

2        Q.    Okay.  And that it had engaged Deloitte

3    to do something to evaluate interconnection;

4    right?

5        A.    In general, yes.

6        Q.    I mean, isn't that the --

7        A.    Yes, that's my understanding.

8        Q.    Okay.

9        A.    I don't have specific knowledge of what

10    Deloitte was doing.

11        Q.    That's fine.

12            Did you learn at some point that

13    Deloitte had provided CPB with reports setting

14    forth its recommendations for how interconnection

15    should be managed going forward?

16            MS. BRILL:  Objection as to form.

17            THE WITNESS:  What I would say is in

18    general, I'm aware that there was -- oh, and you

19    know, jogging my mind, there was a Cognizant

20    report.  I don't know the timing of it.  But I

21    think one of the frustration -- the reason that

22    I'm aware of that is one of the frustrations is I

211

1    don't think the team had seen the full report or

2    that we had.  So there was a question about, like,

3    what actually were the reports saying.

4    BY MR. ROBBINS:

5        Q.   Let me see if I can break this down.

6        A.   So I didn't really see them.

7        Q.   Okay.  Let me just ask you questions to

8    see if we can break it down into usable exchanges.

9             You knew that CPB had engaged Deloitte

10   to conduct certain evaluations of interconnection

11   for CPB; correct?

12       A.   That's -- yes, in general.

13       Q.   You knew that CPB -- strike that.

14            You knew that Deloitte had provided CPB

15   with certain reports setting forth its

16   recommendations, whatever they were?

17       A.   So I know that Cognizant provided a

18   report.  Kearney, which is the NPR -- the

19   CPB-funded NPR consultant, provided a report.  I

20   think Deloitte was the most recent consultant that

21   CPB had engaged on this, and I don't know what

22   their work product resulted in.

10/22/2025      National Public Radio, Inc., et al. v. Donald J. Trump, et al.    Marta McLellan Ross

312

1    said that it is not subject to those.

2         Q.   With all due respect, ma'am, I just need

3    to ask this question again.

4              Can you identify something that CPB did,

5    some action that it took, that indicated that it

6    believed that it was subject to the President's

7    executive order?  Yes, you can do so; or no, you

8    cannot?

9         A.   No.

10        Q.   Okay.

11             MR. ROBBINS:  Let's have Tab 42, please.

12             (Ross Deposition Exhibit 20 was marked

13   for identification and attached to the

14   transcript.)

15   BY MR. ROBBINS:

16        Q.   Ms. Ross, I'm showing you CPB_304041 and

17   2.  And it's an e-mail from Kathy Merritt to the

18   CPB working group on content distribution.  And

19   tell me when you've read it.

20        A.   Who are the other addresses to this?

21        Q.   I don't know.

22        A.   Okay.

423

1    DISTRICT OF COLUMBIA )

2

3            I, Matthew Goldstein, RMR, CRR, Notary

4    Public within and for the District of Columbia, do

5    hereby certify:

6

7            That I reported the proceedings in the

8    within entitled matter, and that the within

9    transcript is a true record of said proceedings.

10

11           I further certify that I am not related to

12   any of the parties to the action by blood or

13   marriage, and that I am in no way interested in the

14   outcome of this matter.

15

16           IN WITNESS WHEREOF, I have hereunto set my

17   hand this 22nd day of October, 2025.

18

19

20           Matthew Goldstein, RMR, CRR

21

22