UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| NATIONAL PUBLIC RADIO, INC., *Plaintiff*, v. DONALD J. TRUMP, *in his official capacity as President of the United States of America*, et al., *Defendants*. | Civil Action No. 25-cv-1674-RDM |

**SUPPLEMENTAL DECLARATION OF EVAN SLAVITT**

I, Evan Slavitt, do hereby state under oath as follows:

1. I am Executive Vice-President and General Counsel of the Corporation for Public Broadcasting ("CPB"). As the Public Broadcasting Act of 1967, 47 U.S.C. § 396 (the "Act"), provides and authorizes, CPB is a private nonprofit corporation. As General Counsel, I am responsible for all legal affairs concerning CPB.

**President Trump's May 1, 2025 Executive Order**

2. On May 1, 2025, President Trump issued an Executive Order entitled *Ending Taxpayer Subsidization Of Biased Media* in which he purported to "instruct the CPB Board of Directors and all executive departments and agencies to cease Federal funding for NPR and PBS" (the "May 1st EO"). Specifically, the May 1st EO stated that CPB "fails to abide by these principles [of the Public Broadcasting Act] to the extent it subsidizes NPR and PBS." It then purported to "instruct" CPB as follows:

> (a) The CPB Board shall <u>cease direct funding to NPR and PBS</u>, consistent with my Administration's policy to ensure that Federal funding does not support biased and partisan news coverage. The CPB Board shall cancel existing direct funding to the maximum extent allowed by law and shall decline to provide future funding.

1

(b)  The CPB Board shall <u>cease indirect funding to NPR and PBS</u>, including by ensuring that licensees and permittees of public radio and television stations, as well as any other recipients of CPB funds, do not use Federal funds for NPR and PBS.  To effectuate this directive, the <u>CPB Board shall, before June 30, 2025, revise the 2025 Television Community Service Grants General Provisions and Eligibility Criteria and the 2025 Radio Community Service Grants General Provisions and Eligibility Criteria to prohibit direct or indirect funding of NPR and PBS</u>.

(emphasis added).

3. By way of context, Television and Radio Community Service Grants are grants to local public radio and televisions stations for the purposes, among other things, to purchase national programming.  Many public media stations use these funds to purchase content from PBS, NPR, and other content providers.

4. Of course, this is precisely the type of governmental interference designed to impact media programming or program judgments that Congress by its plain terms sought to prevent in creating CPB as it did.  As the Senate Report accompanying the Act carefully pointed out:

> There is general agreement that for the time being, Federal financial assistance is required to provide the resources necessary for quality programs. It is also recognized that this assistance **should in no way involve the Government in programming or program judgments**. An **independent** entity supported by Federal funds is required to provide programs **free of political pressures**. The Corporation for Public Broadcasting, a nonprofit private corporation, authorized by title II of S. 1160 <u>provides such an entity</u>.

S.Rep.No.222, 90th Cong., 1st Sess. 4, 11 (1967) (emphasis added).

5. Second, since the May 1st EO, CPB has continued to pay NPR Congressional funds under existing grants and contracts, totaling over $2.15 million. Since January of 2025, CPB has paid NPR over $6.8 million.  CPB has also continued to pay PBS funds of approximately $90 million.

6. Third, CPB did not alter the terms of its Community Service Grants to prohibit them from being used by local radio or television stations to purchase PBS or NPR content or programing if they sought fit to do so. Moreover, CPB continues to distribute funds to local radio and television stations after May 1, 2025, so that they could procure programing as they saw fit which could include payments to NPR or PBS.

7. Fourth, CPB has continued to make payments to PBS with regard to existing grants and for television interconnection. These payments collectively are in the tens of millions of dollars.

8. Fifth, CPB has taken the position in this very litigation that the Executive Order does not apply to CPB.

9. Sixth, in the proposal submitted by PMI, NPR will receive about $7,500,000 in payments related to the satellite lease and associated costs which is also directly in contradiction to the Executive Order.

10. In addition, although not directly related to the Executive Order but directly contradicting any allegation that CPB is currying favor with the administration, CPB filed litigation against the President relating to the purported firing of certain of its Board members. Based on my observations of the President and his administration, lawsuits against the President are not generally considered to be a significant way to curry favor.

11. Having previously contended in NPR's motion for a temporary restraining order that CPB's decision to request NPR to spin off PRSS and create an independent entity with broad based governance – that NPR could participate in, but could not dominate and that no one single media entity could control was somehow the result of CPB "complying" with the May 1st EO despite CPB Board making this decision on April 4, 2025 close to a month before to the May 1st

EO ever being issued, NPR now appears to contend that CPB's decision was somehow the result of an April 3, 2025 meeting between myself, Ruby Calvert, and Clayton Barsoum and Katie Sullivan from the Office of Management and Budget. NPR's contention is incorrect.

**The April 3, 2025, Meeting With Office of Management and Budget**

12. On March 31, Olivia Ingrassia, allegedly an Intern at the Office of Management and Budget, reached out to CPB to request a meeting with one of CPB's board members. At the time, CPB's Board Chair Ruby Calvert was in town and available for such a meeting, which took place on April 3, 2025. No information regarding the specific topic to discuss was shared with CPB before the meeting.

13. I, along with Ruby Calvert and Clayton Barsoum attended the meeting with Olivia Ingrassia and Katie Sullivan, OMB's Associate Director for Justice and Transportation. Much of the discussion focused on the fundamental basics of the role of CPB, its funding, and statutory mission. Ms. Sullivan was not familiar with much of this information and time was spent correcting assumptions about the operations of public media and the statutory funding parameters that govern CPB. While interconnection was raised as an example of the many grants that CPB makes as part of its steward of federal funds, Ms. Sullivan asked no questions about interconnection. Further, at no time did Ms. Sullivan dictate, demand, or request that CPB take, or not take, any action as to NPR or PBS. To the best of my knowledge and belief, no one at CPB has heard from Ms. Sullivan since then and, other than a thank-you note relating to the meeting, no one at CPB has affirmatively communicated with her.

**Miscellaneous**

14. Based on the books and records of CPB, there are no funds currently set aside for the Satellite Interconnection Fund as referred to in the PBA.

15. I have never seen any documentation concerning the designation of NPR as the national entity as described in the section of the PBS that refers specifically to the Satellite Interconnection Fund. I have made a diligent search of existing CPB files and can find no record that confirms such designation. In any event, since CPB does not have – and has not had for years – monies designated for the Satellite Interconnection Fund as referred to in the PBA, such designation would not have any effect on the allocation of other interconnection funding to PMI.

Signed under the pain and penalties of perjury this 24th day of October, 2025.

*Evan Slavitt*
Evan Slavitt, General Counsel