# EXHIBIT C

# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

NATIONAL PUBLIC RADIO, INC.,
*Plaintiff*,

v.

DONALD J. TRUMP,
*in his official capacity as President of the United States of America*, *et al.*,

*Defendants*.

Civil Action No. 25-cv-1674-RDM

## DECLARATION OF KATHY MERRITT

I, Kathy Merritt, do hereby state under oath as follows:

1.     I am Executive Vice President and Chief Operating Officer of the Corporation for Public Broadcasting ("CPB"). In my role, I am a member of the executive management team and oversee CPB's general operations, including strategies and grantmaking for radio, journalism, television, system strategies, and Community Service Grants. I attend board meetings and execute on the strategy and direction of the Board of CPB.

2.     As the Public Broadcasting Act of 1967, 47 U.S.C. § 396 (the "Act"), provides and authorizes, CPB is a private nonprofit corporation.

**Background On Public Radio Satellite System**

3.     The Public Radio Satellite System ("PRSS") is the national interconnection and distribution network for public radio in the United States. PRSS delivers news, music, emergency alerts, and other programming to more than 1,200 public radio stations via satellite and terrestrial technologies. PRSS supports various forms of distribution. Satellite interconnection relies entirely on space-based satellites. Terrestrial interconnection relies on ground-based fixed and mobile

communications networks. These technologies are simply transmission conduits for providing telecommunications, they have nothing to do with creating, influencing, or selecting the content of the programming that passes through them. The delivery of public media content through satellite and terrestrial technologies is generally referred to as "interconnection."

4.    The public radio stations served by the PRSS include both NPR member stations and non-NPR member stations. Approximately one-third of radio stations that are served by PRSS are unaffiliated with NPR.

5.    CPB is statutorily required to support Interconnection services for public media. Specifically, the Act authorizes CPB to "assist in the establishment and development of one or more interconnection systems to be used for the distribution of public telecommunications services so that all public telecommunications entities may disseminate such services at times chosen by the entities." See 47 U.S.C.. § 396(g)(1)(B). Further, Congress provided CPB the power to:

> arrange, by grant or contract with appropriate public or private agencies, organizations, or institutions, for interconnection facilities suitable for distribution and transmission of public telecommunications services to public telecommunications entities.

47 U.S.C. § 396(g)(2).

6.    In administering federal funds, CPB strictly requires that no funds may be disbursed without a signed written grant agreement between CPB and the grantee. When CPB considers awarding any interconnection grant, it will not award a grant unless and until there is a fully executed written grant agreement that sets forth, among other standard terms:

- a detailed scope of work;

- a project budget and schedule of payments;

- performance metrics and reporting requirements;

- audit and compliance provisions; and

- termination and enforcement clauses to ensure accountability for federal funds.

During my 16-year tenure at CPB, it has never issued federally appropriated funds for an interconnection or production grant to anyone without a written, signed agreement.

**CPB's Longstanding View That An Independent Entity With A Broad-Based, Pluralistic Governance Should Manage PRSS**

7. Long before President Trump took office to commence his second term, CPB expressed its desire to NPR and PBS for an independent entity with broad-based governance, representative of **all** interconnected stations, to manage public media interconnection. Indeed, since at least 2021, CPB has periodically engaged independent consultants – including Diversified (2021), Deloitte (2024), and others to review the efficiency of the Public Radio Satellite System. Those engagements, all initiated before the 2025 Executive Order, informed CPB's desire for an independent entity with a broad-based governance model from across the public media system. For example, CPB engaged an independent consultant, Deloitte, in April 2024 to provide recommendations to improve public media interconnection for the future.

8. In September of 2024, Deloitte submitted its detailed report to the CPB Board. Deloitte then presented an executive summary of its findings to the CPB Board, in which it recommended that CPB:

> **Create a new distribution entity** (referred to as 'NewCo') that operates shared services for distribution **independently from existing public media organizations** as a non-profit. Establishing a new entity governed by a Board, **with representation from across public media (e.g., CPB, NPR, PBS, station groups)**, helps serve the needs of the entire system, while consolidating capabilities, governance, and spend over time. **The transition of existing distribution services into the new entity introduces risk, but enables public media to realize the greatest technical, operational, and financial upside** of a model that unifies services.

*See* Exhibit A at 2 (emphasis added, in part).

9.      On October 8, 2024, I attended a CPB Board meeting during which the board discussed governance, costs, and timelines for transforming public media interconnection, including PRSS distribution.  The Deloitte consultant, Mr. Footen, also attended the meeting and "reported on discussions with public media leaders, noting that there is widespread agreement on the need for change."  The Board minutes also noted:

> Mr. Footen reported that the design envisions an independent entity to run the distribution services with a mission and governance structure that meets the needs of all parties …. Discussion ensued about the design option, the independent governance entity, and ensuring commitment to project by all involved parties. Mr. Footen reported that the immediate next steps include continuing to brief stakeholders and obtain feedback.

*See* Exhibit B at 2.

10.     On November 19, 2024, I attended another CPB Board meeting in which the members of the Board discussed pushback from NPR and PBS regarding an independent entity. As a result, Michael Levy, CPB's then-COO, proposed that "CPB post a Request for Proposals for new content distribution to increase competition."  *See* Exhibit C at 4.

11.     Continuing from December 2024 through February 2025, CPB continued to have both internal discussions and communications about the future of interconnection, the need for a unified distribution plan, and a new governance model for interconnection that would best serve the entire public radio system.

**CPB's Long-standing Concerns With NPR's Management Of PRSS And Its Performance Under Interconnection Grants**

12.     In addition to CPB's desire for an independent entity with a pluralistic governance to manage the PRSS, CPB was also struggling with NPR's year-over-year submission of grant proposals, including proposals regarding their management of the interconnection system, which lacked sufficient detail, rigorous oversight requirements, and transparency.  Indeed, since at least

2021, CPB has been told from its independent consultants who review and analyze PRSS grant proposals, that NPR is not transparent in presenting critical information, over-projects budgets by as much as 54%, and does not spend taxpayer funds in the most efficient manner.

13.    For example, on May 27, 2021, NPR submitted its request for PRSS funding, requesting $18.5 million in funding.  CPB's independent consultant, Diversified, reviewed NPR's proposal and reported to CPB on June 14, 2021:

> **This request exceeds the $12.07 million projection in the 2017 PRSS 10-year Project Plan by $6.469 million (54%)** with the overages confined to two (2) primary areas of the budget. NPR is requesting an additional $5.12 million in new capital spending and an additional **$1.38 million for salaries and benefits beyond what was anticipated in the 2017 budget projections**….

> **NPR has also changed the format of the budget proposal which includes significantly less information than was provided for Phase I. This reduction of shared information has had some degree of impact on our ability to analyze the proposed plan. In contrast, the PBS budget submissions reviewed by Diversified contained significantly more detail than NPR has provided even for Phase I**…

> Diversified has also reviewed the internal projects NPR has listed as priorities for the in house development team. **With the exception of extending the current contract for satellite bandwidth, Diversified does not believe any of the projects listed are critical to PRSS operations**….

> [Discussion of file distribution system]. **This recommendation was included in the original NPR Interconnection Assessment and is again repeated here in response to NPR's proposed plan to study this in Phase II instead of moving forward with outsourcing the service as recommended by Diversified …. There is no need to study file based delivery over the internet as NPR suggests. This is the preferred method of file distribution in the media industry and has been so for a number of years….**

> **NPR has responded to our recommendations in the NPR Interconnection Assessment by including examples of the work they are doing to support this project. However, they have not shared any evidence that this work is actually necessary….**

5

**NPR Phase II budget request has significantly less detail compared to the Phase I budget provided in 2017.** NPR is also recommending that this new format should become the format used for budget requests and reporting going forward....

[Diversified recommends] … **The current PBS budget be used as a template for this new budget format.**

*See* Exhibit D at 3-5 (emphasis added).

14.    As a result of NPR's strikingly insufficient proposal, Mr. Levy and I sent a letter to the CPB Board on June 21, 2021, recommending that the Board reduce the proposed agreement from three years to one year:

**Over the course of eight months, CPB and Diversified probed the staffing, systems, operations, practices, equipment, and finances of PRSS, at times receiving insufficient responses to our requests for information from a less than fully transparent NPR....**

Diversified has advanced ideas that are commonplace in commercial radio, such as a rapid and full transition to using the internet to deliver non-real time content. **NPR, however, continues to staunchly defend its use of satellite bandwidth as the most effective, affordable way to deliver radio content and did not address the idea of making a full transition to internet-based delivery in their proposal.**

NPR delivered its proposal to CPB on May 27, 2021. Based on our review, **it was clear that NPR ignored the guidance from CPB as well as the recommendations from Diversified** that would have PRSS move to a primarily IP delivery system. **CPB was disappointed with NPR's continued commitment to the status quo use of existing systems and approaches, as well as the absence of explanation or context for many of its proposed project activities and expenses....**

Given the gap between information needed by CPB and information provided by NPR/PRSS, including a lack of budget detail, CPB management firmly believes that reaching a new agreement with NPR by September 30th is not realistic. Instead, CPB management proposes to offer NPR a one-year amendment to the current agreement to provide NPR with the funding it needs to continue critical interconnection services to all public radio stations while these aforementioned issues are resolved.

*See* Exhibit E at 1-2 (emphasis added).

15.     On February 9, 2022, Diversified delivered to CPB's Board a new report based on NPR's proposal to manage the PRSS system from 2022 to 2024.  Diversified warned that they "[did] not support NPR's proposals to continue [NPR's satellite receive antenna maintenance strategy] beyond the 2022 budget year.  Diversified does not believe that the cost for coordination is reasonable…. We have expressed concerns as to whether NPR will be able to test this amount of network hardware in a single year…. It should be noted that if NPR follows Diversified's recommendation to outsource file-based program distribution, some of this hardware may not be needed going forward."  *See* Exhibit F at 31, 48.  Yet again CPB's independent consultant was expressing concerns about the cost projections set forth by NPR in its proposal.

16.     After CPB forced reductions in cost, CPB's Board eventually executed a grant agreement with NPR to expire on September 30, 2024.

17.     Another example of NPR's inability to implement CPB's request for improvements that benefit all public radio stations relates to the Grove content management system (CMS), funded by CPB, which allows local stations to manage their websites and mobile content.  While separate from PRSS, it was intended to serve the same group of public radio stations. CPB and NPR agreed in 2023 that the Grove system would be implemented in two phases – the first phase included rolling out the Grove system to NPR member stations while Phase II, which NPR committed to implementing, included rolling out the Grove system to non-NPR member stations.

18.     NPR delivered the Grove system to NPR member stations but failed to submit a proposal to CPB for the second phase, which would deliver the technology to non-NPR member radio stations.

19.     On May 28, 2024, Beth Jacobs from CPB emailed Nik Khilnani and Malik Abdullah from NPR about implementing Phase II of the Grove system:

> Mike has been working with your team for *9 months* now – since last September. At this point, the draft proposal should be in a well-defined place. It should include all the underlying assumptions to justify your forecasted budget and cost estimates for each area. We need NPR to be at a point where we can review the proposal and start to assess how the overall project scope and cost estimates align; are realistic; and create efficiencies. Please let me know if you/the team will be ready to review the budget with Mike this week and if not, what is preventing this.

*See* Exhibit G.

20.     On June 10, 2024, Ms. Jacobs again emailed NPR staff to identify the gaps that CPB identified in NPR's Phase two proposal, noting that:

> **The scope includes the user requirements for the Grove product dev, operations, training, support, etc. for each of the various station segments in Phase 2 such that it will <u>meet the majority of each segment's needs</u> (without over-scoping)**. Using your station/user research, NPR should determine the **realistic needs over the project timeframe** of existing Grove stations to drive retention AND future, prospective needs of the majority of prospective non-Grove stations…. The Phase 2 project needs to have clear, justifiable explanations of the proposed and forecasted fixed vs. variable costs for each of the project areas – product dev, operations, support, etc.).

*See* Exhibit H.

21.     On November 13, 2024, Flaka Spahiu from CPB emailed Monica Ostolaza from NPR, reminding her that they had a Grove Phase II meeting the following day.  However, Monica abruptly canceled the meeting and suggested "restart[ing] the meetings in 2025."  *See* Exhibit I.

22.     Frustrated by NPR's delay in providing equal access to non-NPR member stations, Ms. Jacobs emailed her colleagues to explain the issues with NPR:

> I am attaching an email I sent to NPR last year as an example of how we have repeatedly clarified our expectations for Phase 2. This was one of many emails and repeated monthly meetings during 2023-2024 where I clearly articulated CPB's expectations…. In all of our communications we have emphasized the need to right-

size Phase 2 **so that it is commensurate with a justifiable and defensible budget that we can be comfortable proposing to the CPB Board**. We told NPR it must meet the overall goals of providing a valuable CMS to existing and prospective stations **without overbuilding it**; with a high retention rate of Phase 1 users/stations and a solid adoption rate of new Phase 2 cohorts. We reminded NPR that they are **NOT building a NEW GROVE CMS in Phase 2 so the product development costs should not be as high**.

*See* Exhibit J.

23.     In my discussions with CPB management and staff, it became clear that NPR was dragging its feet on a rollout that was heavily emphasized by CPB as critical to the public radio system representing both NPR members and non-NPR members.

24.     This non-performance only underscored CPB's desire for an independent entity for radio interconnection that represented ***all*** public radio stations across the country and which would meet their needs by allowing digital and broadcast content distribution to be integrated.

### CPB's Legitimate Concern About A Physical DOGE Takeover And The 2025 Interconnection Proposal Process

25.     On March 17, 2025, CPB was made aware that officials from the Department of Government Efficiency ("DOGE") had breached the security at the offices of the United States Institute for Peace (USIP), expelled the duly appointed USIP President and other staff, destroyed USIP property, and shredded financial documents. USIP is similar to CPB in that it is a private, non-governmental organization that receives federal funding.

26.     As a result, CPB had legitimate concerns that DOGE might attempt to do the same to CPB's offices. In the event of a DOGE takeover, CPB would be unable to distribute funds, including those for interconnection, leaving the public media system entirely without support after the expiration of the current grant agreements.

27.     To expedite the interconnection grant process and safeguard the federally-appropriated funds through their issuance after the execution of a written grant agreement as well

as meet the timing for a scheduled board meeting, CPB asked NPR to submit a proposal for an interconnection grant on March 21, 2025.

**The CPB Board Meetings & Board Resolutions From April 1 to 9, 2025**

28.    On April 1, 2025, I attended a dinner with CPB Board members and staff as well as various public media leaders, including staff from NPR.  During the course of the dinner, CPB was informed by members of NPR and other individuals that a DOGE takeover of CPB was imminent on April 2, 2025.  CPB Board members became concerned that DOGE would carry out the same acts of destruction it committed against USIP.

29.    April 2, 2025, I had discussions with CPB Board members and staff regarding the impact of recent executive orders on longstanding institutions such as the United States Institute for Peace and we identified measures to ensure that CPB could meet its obligations to employees, grantees, and creditors, and the public media system should an executive order be issued to close CPB or other challenges to CPB operations.

30.    Out of urgency and consideration of the rumors of an imminent DOGE takeover, the Board passed a resolution authorizing negotiations with NPR for an amendment to the existing grant agreement.  As the CPB Board Resolution from the April 2, 2025 Board Meeting makes clear:

> The Board authorizes CPB Management to negotiate an amendment to the existing agreement with NPR for the design and implementation of the updated public radio interconnection system to extend the term by five years and increase the funding by up to $36 million, as appropriated in FY 2024 and prior.

*See* Exhibit K.  I understood then and understand today that an authorization of negotiations is not an authorization of funding which can only take place once the terms of the proposed grant are agreed to and a written grant agreement is then executed between CPB and the grantee.  To the best of my knowledge and belief, NPR has always understood the CPB process.

31.     By the end of the day on April 2, 2025, CPB learned that the rumored DOGE takeover was not going to happen.

32.     On April 3, 2025, I discussed with members of the CPB Board that while DOGE did not carry out a physical takeover of CPB, it was likely that the government would target CPB in some manner over the coming weeks or months.

33.     My discussions with CPB Board members and staff reflected a growing sentiment that if CPB's future was uncertain and we were making the last Interconnection grant that CPB would ever issue, we wanted to improve the interconnection system for all stations and position it for future success.  Part of that endeavor would require us to implement changes that we had been considering, and that we had raised with NPR, namely having PRSS managed by an independent entity with governance that was representative of the broad spectrum of public radio stations and that was not dominated by any single media entity.

34.     As a result, on April 4, 2025, I attended a CPB Board meeting in which the Board amended its April 2, 2025, resolution authorizing negotiations with NPR to include "a contingency that NPR <u>provide a plan</u> within 60 days of amendment execution to establish PRSS as an entity independent of NPR."  *See* Exhibit L.  The Board's direction to CPB management was to negotiate with NPR and seek a plan from NPR within 60 days as to how it would create and spin-out PRSS as an independent entity in the future.

35.     Over the next few days, concerns about executive interference with CPB grew again as rumors of an executive order persisted and word began to leak of a potential rescission package to Congress that would eliminate CPB funding.   In response, on April 7, 2025, I attended a Board meeting in which the Board amended its April 4 resolution to "include a contingency that NPR provide a plan within **30 days** of amendment execution to establish PRSS as an entity independent

of NPR and a second contingency that one third of the funds will be withheld should NPR not comply with the spin off obligations." *See* Exhibit M. The Board's direction to CPB management was to negotiate with NPR and seek a plan from NPR within 30 days as to how it would create and spin-out PRSS as an independent entity in the future. The Board saw the second contingency as a means of encouraging NPR to actually provide its plan.

36. Two days later, on April 9, 2025, the Board convened another Board Meeting, which I attended. The Board determined that continuing to pass resolutions regarding contingent requirements for any agreement was inefficient and could be carried out more easily through direct negotiations with NPR. In addition, some Board members expressed that there was no need to micromanage the negotiations between NPR and CPB's management, who could simply relay this requirement to NPR during those negotiations. As a result, it passed a resolution rescinding its prior resolutions of April 2, 4, and 7 regarding interconnection funding for NPR. *See* Exhibit N. The Board's direction to CPB management was to negotiate with NPR and seek a plan from NPR as to how it would create and spin-out PRSS as an independent entity with broad-based governance.

37. Based on my knowledge and discussions with the Board in April, no one from the government told CPB to have NPR spin out PRSS as a separate independent entity. Similarly, based on my knowledge and discussions with the Board in April, the decision to negotiate with NPR to spin out PRSS had nothing to do with NPR's news reporting or content generation or CPB trying to curry favor with the Trump Administration.

**CPB Begins Negotiating With NPR Concerning A Potential Interconnection Grant**

38. On April 11, 2025, I spoke on the phone with Ryan Merkley, NPR's Chief Operating Officer, about the CPB's Board decision to require NPR to provide a plan for spinning off PRSS

into an independent entity with governance that would better reflect the breadth of the public radio system. I specifically called him before the weekly G4 meeting – a group that consists of the presidents of NPR, CPB, PBS and APTS. Mr. Merkley responded calmly and told me that NPR was happy to continue doing interconnection and was committed to it. He also said that it would be hard to come up with a plan in 30 days and that there was risk that CPB could go out of business by then based on what NPR was hearing about a potential executive order. However, he expressed that NPR was willing to explore the idea of spinning off NPR. I told him that the CPB Board was taking the time to consider the long-term future of interconnection and how best to support all stations across the public radio landscape.

39.    On April 12, 2025, I had a phone conversation with Badri Munipalla, the vice-president of distribution at NPR who runs PRSS. Badri told me that NPR leadership viewed the PRSS spinoff as a "non-starter" and that he saw Ms. Maher as someone who always puts NPR first. Ms. Maher was not willing to consider the spinoff and Mr. Munipalla thought she might use it as a springboard to reject federal funding.

40.    Importantly, Mr. Munipalla told me that he was under the impression that a "spinoff" meant that PRSS would have to move out of the NPR building, which he said would be an expensive and timely project. I told him that moving out of the NPR building immediately was not necessary, and that our goal was to have an independent governance and management structure that gave more control to the broad range of radio stations.

41.    Mr. Munipalla suggested that I reach out to NPR's CFO, Daphne Kwon, who could have a more productive conversation with me about how NPR might be able to structure a new independent entity. Mr. Munipalla even recommended that a PRSS spinoff might copy the

structure of National Public Media, a corporate sponsorship organization jointly owned by NPR, PBS, and GBH.

42.     On April 21, 2025, CPB's General Counsel, Evan Slavitt, sent a letter to NPR's General Counsel, under the re line of: "*New Structure of Radio Interconnection*," in which Mr. Slavitt summarized CPB's expectations on an independent entity that NPR could participate in and requested that NPR deliver a plan by May 9, 2025.  Specifically, Mr. Slavitt informed NPR:

> CPB has requested that NPR, as the grantee of interconnection funds and manager and operator of PRSS, submit to CPB by May 9, a plan to make PRSS an entity that is separate from NPR. Specifically, goal is as follows:
>
> The entity that manages and operates radio interconnection must be legally independent of NPR and must not be controlled or managed by NPR. **The entity must be managed and operated on behalf of all public radio stations. Its board must be, and be perceived to be, representative of all stakeholders in interconnection and content distribution for public radio**. This should include representation from a variety of interconnected stations, both NPR and non-NPR members, **and may include representation from NPR**, other content producers and distributors, CPB, and persons outside of public media who can provide technical or other expertise. **No one public media organization should have majority control over the board and how its representatives are selected**.

*See* Exhibit O at CPB_0096605 (emphasis added).

43.     On April 30, 2025, I sent a letter to the Chairwoman of NPR's Board of Directors, Jennifer Ferro, and the entire NPR Board summarizing CPB's position, making it clear that if NPR did not create an independent entity, then CPB will consider "alternatives to the current public radio interconnection framework."  As I wrote:

> For more than 40 years, CPB has met its statutory obligation, stewarding taxpayer dollars to support radio and television interconnection. In the process, we have worked to ensure both the radio and television interconnection systems will benefit local stations now and in the future, but also meet the high standards of efficiency and effectiveness that are required when using taxpayer dollars.
>
> This is especially important in this challenging moment. **Currently, NPR controls the governance, management, fee structure, and strategic direction of PRSS.**

> **We anticipate increasing financial pressures in the next few years that will force many public media organizations, including NPR, to re-examine their priorities. In a changing media and content distribution environment, we believe PRSS would better serve the public radio system as an independent entity with a governance structure that more broadly represents the needs and interests of the entire public radio system.**
>
> Three weeks ago, CPB asked NPR, as the current grantee of public radio interconnection funds, and manager and operator of PRSS, to submit to CPB by May 9, a plan to make PRSS an independent entity. We believe the NPR board has a responsibility to recognize that the interconnection structures that have been in place for more than 40 years need to be reshaped for the future. **The NPR board's leadership, we have learned through numerous conversations, would be welcome throughout the system at this critical moment**. **Without it, CPB will consider other alternatives to the current public radio interconnection framework**.

*See* Exhibit P (emphasis added).

44.     NPR declined to negotiate with CPB around creating a separate independent entity, as requested by CPB.

45.     CPB's request that NPR negotiate around a plan to spin out PRSS into a separate independent entity that NPR could participate in, but that neither it nor any one public media entity would be allowed to dominate, had nothing to do with NPR's editorial content or political views. At no time did I, or to my knowledge, any CPB Board member or employee, receive any direction, suggestion, or pressure from the Executive Office of the President, the Department of Government Efficiency, or any other governmental entity to have CPB request that NPR spin out PRSS as a separate independent entity with broad-based governance across the public radio spectrum. This was CPB's decision, as the steward of federally appropriated funds, to improve the interconnection system for all stations and position it for future success.

**The May 1, 2025 Executive Order Issued By President Trump**

46.     On May 1, 2025, President Trump issued an Executive Order entitled *Ending Taxpayer Subsidization Of Biased Media* in which he purported to "instruct the CPB Board of Directors and all executive departments and agencies to cease Federal funding for NPR and PBS" (the "May 1st EO"), a copy of which is attached as Exhibit Q.

47.     In the May 1st EO, President Trump purported to instruct the CPB Board of Directors and all executive departments and agencies to cease all direct and indirect Federal funding for NPR and PBS because he objects to the content of their speech.

48.     Of course, this is precisely the type of governmental interference designed to impact media programming or program judgments that Congress by its plain terms sought to prevent in creating CPB as it did.  As the Senate Report accompanying the Act carefully pointed out:

> There is general agreement that for the time being, Federal financial assistance is required to provide the resources necessary for quality programs. It is also recognized that this assistance **should in no way involve the Government in programming or program judgments**. An **independent** entity supported by Federal funds is required to provide programs **free of political pressures**. The Corporation for Public Broadcasting, a nonprofit private corporation, authorized by title II of S. 1160 provides such an entity.

S.Rep.No.222, 90th Cong., 1st Sess. 4, 11 (1967) (emphasis added).

49.     The day after the May 1st EO was issued, CPB issued a public statement regarding it, making it clear that "CPB is not a federal executive agency subject to the President's authority. Congress directly authorized and funded CPB to be a private nonprofit corporation wholly independent of the federal government."  *See* Exhibit R.

50.     The May 1st EO purported to "instruct" CPB to as follows: "cease direct funding to NPR and PBS…."   The EO also purported to instruct CPB to "cease indirect funding to NPR and PBS, including by ensuring that licensees and permittees of public radio and television stations, as

well as any other recipients of CPB funds, do not use Federal funds for NPR and PBS. To effectuate this directive, the <u>CPB Board shall, before June 30, 2025, revise the 2025 Television Community Service Grants General Provisions and Eligibility Criteria and the 2025 Radio Community Service Grants General Provisions and Eligibility Criteria to prohibit direct or indirect funding of NPR and PBS</u>." *See* Exhibit Q (emphasis added).

51.     By way of context, Television and Radio Community Service Grants (CSGs) are grants to local public radio and televisions stations to support their operations, including the purchase of national programming from PBS, NPR, and other content providers. In fact, public radio CSGs include a restricted amount of funds that grantees MUST use for the production or purchase of national programming.   CPB has not followed the May 1st EO and continued paying both PBS and NPR directly under their grants and further has not changed the terms of the Radio and Television Community Service Grants.

### After NPR Declined To Negotiate, CPB Informs The Public Radio System Of Its Intent To Create A Working Committee To Solicit Views As To An Independent Entity

52.     On May 9, 2025, CPB issued a letter to NPR and stakeholders across the public media system (including radio stations that were members and non-members of NPR) about its desire to shift the management of the interconnection system to an independent entity and inviting NPR's board members and public media stations to participate in a working group, stating, in relevant part:

> Public radio interconnection is currently governed and managed by NPR through the Public Radio Satellite System (PRSS), which sets its fee structure and strategic direction. NPR has managed PRSS for decades, but the changing financial and media environment requires us to think differently about its future.
>
> CPB has asked NPR to develop a plan to transition PRSS into an independent entity. This new entity would have a governance structure that better reflects the full

spectrum of public radio, including rural, tribal, and community stations that rely heavily on interconnection but do not currently have a direct role in its oversight.

To support this transition, **CPB is forming a working group to establish shared goals and create a vision for forming a new content distribution entity, funded by CPB. We are asking members of the NPR Board's Distribution/Interconnection Committee to join the group along with stakeholders from other public radio organizations and stations.** I would like to express my appreciation to Rima Dael, CEO of the National Federation of Community Broadcasters, for bringing forward her ideas, and spurring the formation of the working group. We look forward to having the input of the group as well as the public radio system.

*See* Exhibit S (emphasis added).

53.     The Working Committee was made up of a diverse group of radio stations, entities which represented a wide array of public radio stations, and content creators and distributors. This included representatives from the National Federation of Community Broadcasters, which represents approximately 200 public radio stations, Station Resource Group, Nebraska Public Media, KXCI-Tucson, PRX**,** WRTI-Philadelphia, Minnesota Public Radio, GBH-Boston, American Public Media, , Alaska Public Media, and Native Public Media. The group also included two directors from NPR's own board, including one who sits on the committee that oversees PRSS.

54.     On July 9, 2025, CPB met with NPR's Chief Operating Officer, Ryan Merkley, to inform him that CPB was moving forward with its open competitive bid process for the Interconnection system. In stark contrast to contending that CPB was somehow not authorized to engage in this process, Mr. Merkley asked to see an advance copy of the Request for Proposals that CPB would be posting that Monday. CPB declined this request.

55.     The culmination of the work of the committee was to determine the needs of all the stakeholders for the new entity in order to formulate an RFP that would meet the needs of the system. As I explained to the committee members in an email dated July 11, 2025:

Thank you for taking time to be part of CPB's Public Radio Content Distribution Working Group. We appreciate you bringing your experience and brain power to the discussions, which informed CPB's thinking on the creation of a new entity to deliver content distribution services.

Our goal in convening the group was to hear your thoughts on what stations need to successfully deliver content on multiple platforms to multiple audiences, now and in the future. **You helped establish a set of guiding principles, define the parameters of the new entity, and further our understanding of the technology needed for content distribution and services. On that last item, please find attached the slides from our last meeting. Many thanks to Badri and Andrew for presenting**.

The culmination of the work is development of an RFP that CPB will post on Monday, July 14th on this page: https://cpb.org/grants. The deadline for proposals will be mid-August, with a final contract anticipated by September 30th. Please see the full RFP for further details.

*See* Exhibit T (emphasis added).

### The Two Competing Proposals From The PMI Coalition and NPR

56.    On August 15, 2025, NPR submitted its response to the RFP, a copy of which is attached as Exhibit T. ("NPR Submission"). Nowhere in the NPR Submission did it claim that it was somehow automatically entitled to an award from CPB, or that it was providing its submission "under a reservation of rights," or contending in any way that CPB's competitive bid process was somehow "retaliatory." In stark contrast to what NPR now contends, NPR's cover letter to its submission stated that it was "***pleased to submit our proposal in response to CPB's Request for Proposals*** to manage and govern public radio content distribution services." *See* Exhibit U at CPB_0078348 (emphasis added).

57.    In addition to NPR, Public Media Infrastructure ("PMI") Coalition also submitted a bid in response to CPB's RFP. The PMI Coalition is a group of five (5) established public radio entities: American Public Media Group (APMG), the National Federation of Community

19

Broadcasters (NFCB), New York Public Radio (NYPR), the Public Radio Exchange (PRX), and the Station Resource Group (SRG). At least forty-nine (49) NPR member stations are part of PMI.

58.    PMI's proposal included $6.5 in funds to go directly to NPR to cover the cost of providing satellite distribution to stations. *See* Exhibit W at CPB_0078436-3.

59.    In evaluating the competing bid submissions, NPR's submission was non-responsive to the RFP in numerous ways. Without limitation, but only by way of example, consistent with what CPB had been communicating for months prior to the issuance of the RFP, CPB's RFP required the independent entity to have a corporate governance structure that was more representative of the entire public media system and not dominated by one organization that would have undue influence over the direction or control of the entity. NPR's Submission did not meaningfully address the RFP requirement for an independent entity whose governance would be free from a single public media organization's dominance or outsized influence on the content delivery infrastructure. In contrast, PMI's proposal did address that requirement. Deloitte was clear:

> PMI's approach to the RFP response was found to better match CPB's vision for a selected entity to continue and evolve public radio services for the entire system.

*See* Exhibit X at 1.

Signed under the pain and penalties of perjury this 24th day of October, 2025.

*Kathy Merritt*
Kathy Merritt