# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

NATIONAL PUBLIC RADIO, INC., *et al.*    )
    )
        Plaintiffs,    )
    )
        v.    )        Case No. 1:25-cv-1674
    )
DONALD J. TRUMP, *et al.*    )
    )
        Defendants.    )

## DEFENDANT CORPORATION FOR PUBLIC BROADCASTING'S MEMORANDUM IN OPPOSITION TO NATIONAL PUBLIC RADIO, INC.'S MOTION FOR PRELIMINARY INJUNCTION AND FOR SUMMARY JUDGMENT

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................................................. iii

INTRODUCTION ............................................................................................................... 1

FACTUAL BACKGROUND ............................................................................................... 7

ARGUMENT ..................................................................................................................... 10

  I.   The Remedies NPR Seeks Have No Basis in Law or Equity ........................... 10

     A.   NPR's Requested Remedies Sound in Contract and the Equitable Remedy of
          Specific Performance ................................................................................. 11

     B.   Courts Cannot Order Specific Performance for a Contract That Does Not Exist ...... 12

     C.   Courts Cannot Order Parties to Negotiate or Enter Contracts ................................ 13

     D.   This Court Cannot Second Guess Congress by Ordering the Appropriation of Funds
          to NPR ...................................................................................................... 14

     E.   If CPB is a Government Entity, the Court Cannot Intrude on its Decision to Award
          Funds to NPR's Competitor ..................................................................... 16

     F.   This Court Cannot Order CPB to Pay Tort Damages from Funds Appropriated for
          Interconnection ....................................................................................... 18

  II.   NPR's Statutory *Ultra Vires* Claim for a Violation of the PBA is   Meritless .................. 19

     A.   The Statutory Provision Under the PBA Upon Which NPR Bases its Claims Does
          Not Apply to the Generally Appropriated Funds at Issue ......................... 19

       1.   No Private Right of Action Exists Under the PBA ..................................... 19

       2.   The Appropriations at Issue Were Broad and Not Limited to Satellite
          Interconnection ..................................................................................... 20

       3.   The Specific Section of the PBA That NPR Claims Was Violated Does Not Apply to
          the Appropriations at Issue Because They Were Not Appropriated to the Statutorily
          Defined Satellite Interconnection Fund ................................................... 21

       4.   NPR's Asks this Court to Disregard the Plain Text of the PBA ................ 23

       5.   NPR's Argument Makes Little Sense in Practical Context ....................... 24

  III.   NPR's First Amendment Claim is Not Viable ................................................ 26

     A.   NPR has Failed to Demonstrate the Second Element of a Retaliation Claim .......... 26

i

B.    NPR has Not Proved, and Cannot Prove, that CPB was Compelled by, or Acting Jointly with the Trump Administration or that Any Pressure from the Administration was the But-For Cause of CPB's Decision to Award Interconnection Funding to NPR's Competitor .................................................................................................26

C.    NPR has Failed to Show Viewpoint Discrimination....................................................32

D.    CPB was Authorized by Congress to Ensure Objectivity and Balance ...................33

IV.  NPR's Tortious Interference Claim Fails .............................................................................33

V.   NPR has Failed to Demonstrate the Necessary Factors to Justify an Injunction...............35

A.    NPR has Failed to Show that it is Likely to Prevail on the Merits ...........................36

B.    NPR has Failed to Show that it Will Suffer Any Harm, Much Less Irreparable, Without Injunctive Relief or that Legal Remedies are Inadequate ...........................36

C.    The Balance of Harms Favors CPB and Mandates Denial of Injunctive Relief........41

D.    The Public Interest Weighs Heavily Against the Issuance of Injunctive Relief ........42

VI.  NPR's Motion for a Preliminary Injunction Should be Denied Because it Seeks to Improperly Deprive CPB of Appropriated Funds Necessary to     Conduct its Congressionally Mandated Duties Without Posting a Bond Required by Rule 56...........44

**CONCLUSION** ........................................................................................................................**45**

# TABLE OF AUTHORITIES

*U.S. Dep't of Navy v. Fed. Lab. Rels. Auth.*,
    665 F.3d 1339 (D.C. Cir. 2012)..................................................................................18

*Accuracy in Media, Inc. v. F.C.C.*,
    521 F.2d 288 (D.C. Cir. 1975)........................................................................15, 16, 19

*Air Transp. Ass'n of Am., Inc. v. Exp.-Imp. Bank of the United States*,
    840 F.Supp.2d 327 (D. D.C. 2012) ...........................................................................41

*Alpine Sec. Corp. v. FINRA*,
    121 F.4th 1314 (D.C. Cir. 2024).................................................................................35

*American Sci. and Eng'g, Inc. v. Kelly*,
    69 F. Supp.2d 227 (D. Mass. 1999) ............................................................................44

*Anthoine v. N. Cent. Ctys. Consortium*, 3
    605 F.3d 740 (9th Cir. 2010) ......................................................................................27

*Aref v. Lynch*,
    833 F.3d 242 (D.C. Cir. 2016).....................................................................................26

*Ark. Dairy Co-op Ass'n, Inc. v. U.S. Dep't of Agric.*,
    573 F.3d 815 (D.C. Cir. 2009) ....................................................................................35

*Ashland Oil, Inc. v. F.T.C.*,
    409 F. Supp. 297 (D.D.C. 1976), aff'd, 548 F.2d 977 (D.C. Cir. 1976)...................35

*Bennett Enters., Inc. v. Domino's Pizza, Inc.*,
    45 F.3d 493 (D.C. Cir. 1995).......................................................................................34

*Cal. Ass'n of Private Postsecondary Schs. v. DeVos*,
    344 F. Supp. 3d 158 (D.D.C. 2018) ...........................................................................35

*Cincinnati Soap Co. v. United States*,
    301 U.S. 308, 57 S.Ct. 764 (1937).................................................................14, 15, 16

*Climate United Fund v. Citibank, N.A.*,
    No. 25-5122, 2025 WL 2502881 (D.C. Cir. Sept. 2, 2025)..................................37, 38

*Consumer Fin. Prot. Bureau v. Cmty. Fin. Servs. Ass'n of Am., Ltd.*,
    601 U.S. 416, 144 S. Ct. 1474 (2024).................................................................14, 16

*Corporation for Public Broadcasting v. Federal Emergency Management Agency, et al.*
    No. 1:25-cv-00740 (D.D.C. Mar. 13, 2025) ...............................................................7

*Crowley v. Crowley*,
13 F.2d 311 (D.C. Cir. 1926) ........................................................................12, 13

*Ellipso, Inc. v. Mann*,
480 F.3d 1153 (D.C. Cir. 2007) ...............................................................................38

*Chaplaincy of Full Gospel Churches v. England*,
454 F.3d 290 (D.C. Cir. 2006) ...............................................................................37

*Fund for Animals v. Frizzell*,
530 F.2d 982 (D.C. Cir.1975) ..................................................................................41

*Gordon v. Holder*,
632 F.3d 722 (D.C. Cir. 2011) .................................................................................41

*Grupo Mexicano de Desarrollo, S.A. v. Alliance Bond Fund, Inc.*,
527 U.S. 308 (1999) ................................................................................................38

*Hall v. Ford*,
856 F.2d 255 (D.C. Cir. 1988) .................................................................................27

*Haverda v. Hays Cnty.*,
723 F.3d 586 (5th Cir. 2013) ...................................................................................27

*Heckler v. Chaney*,
470 U.S. 821, 105 S.Ct. 1649 (1985) .......................................................................17

*Hunt v. Rhodes*,
26 U.S. 1 (1828) ..................................................................................................13, 14

*Int'l Union, U.A.A.A.I.W. of Am. v. Donovan*,
746 F.2d 855 (D.C. Cir. 1984) .................................................................................17

*Johnson v. D.C.*,
726 F. Supp. 3d 8 (D.D.C. 2024), *reconsideration denied*,
No. CV 20-2944 (RC), 2024 WL 3858547 (D.D.C. Aug. 19, 2024) ......................27

*Jones v. Brown*,
518 F. App'x 643 (11th Cir. 2013) ..........................................................................45

*Kim v. Fin. Indus. Regul. Auth., Inc.*, 698 F. Supp. 3d 147 (D.D.C. 2023), *appeal dismissed*,
No. 23-7136, 2025 WL 313965 (D.C. Cir. Jan. 27, 2025) .....................................41

*Lebron v. Nat'l R.R. Passenger Corp.*,
513 U.S. 374, 115 S. Ct. 961 (1995) ..................................................................16, 27

*Lincoln v. Vigil,*
 508 U.S. 182, 113 S.Ct. 2024 (1993) ......................................................................17, 18

*Magwood v. Patterson,*
 561 U.S. 320, 130 S.Ct. 2788 (2010) ...........................................................................24

*Media Matters for Am. v. Paxton,*
 732 F. Supp. 3d 1 (D.D.C. 2024), aff'd, 138 F.4th 563 (D.C. Cir. 2025) ......................25

*Memphis Cmty. Sch. Dist. v. Stachura,*
 477 U.S. 299, 106 S. Ct. 2537 (1986) ...........................................................................19

*Milk Train, Inc. v. Veneman,*
 310 F.3d 747 (D.C. Cir. 2002) ......................................................................................17

*Monsanto Co. v. Geertson Seed Farms,*
 561 U.S. 139, 130 S. Ct. 2743 (2010) ...............................................................35, 36, 39

*Mova Pharm. Corp. v. Shalala,*
 140 F.3d 1060 (D.C. Cir. 1998) .....................................................................................25

*Mylan Pharm., Inc. v. Shalala,*
 81 F.Supp.2d 30 (D. D.C. 2000) ....................................................................................41

*Network Project v. Corp. for Pub. Broad.,*
 398 F. Supp. 1332 (D.D.C. 1975), *aff'd in relevant part,*
 561 F.2d 963 (D.C. Cir. 1977) .......................................................................................19

*Newdow v. Bush,*
 355 F.Supp.2d 265 (D.D.C.2005) ..................................................................................41

*Nieves v. Bartlett,*
 587 U.S. 391 (2019) .......................................................................................................26

*O Centro Espirita Beneficente Uniao Do Vegetal v. Ashcroft,*
 389 F.3d 973 (10th Cir. 2004) .......................................................................................36

*Oceana, Inc. v. Ross,*
 275 F. Supp. 3d 270 (D.D.C. 2017), *aff'd*, 920 F.3d 855 (D.C. Cir. 2019) ..............16, 17, 18

*Office of Personnel Management v. Richmond,*
 496 U.S. 414 110 S.Ct. 2465 (1990) ........................................................................14, 16

*Oklahoma v. Castro-Huerta,*
 597 U.S. 629, 142 S. Ct. 2486 (2022) ......................................................................23, 24

*Parker Drilling Mgmt. Servs., Ltd. v. Newton*,
   587 U.S. 601 (2019)............................................................................................23

*Perkins v. Lukens Steel Co.*,
   310 U.S. 113 (1940)............................................................................................16

*Ramey v. U.S. Marshals Serv.*,
   755 F. Supp. 2d 88 (D.D.C. 2010) ....................................................................27

*Redondo-Borges v. U.S. Dep't of Hous. & Urb. Dev.*,
   421 F.3d 1 (1st Cir. 2005)..................................................................................39

*Reeside v. Walker*,
   11 How. 272, 13 L.Ed. 693 (1851) ...................................................................14

*Rochester Pure Waters Dist. v. E.P.A.*,
   960 F.2d 180 (D.C. Cir. 1992)..............................................................14, 15, 16

*Rosenberger v. Rector & Visitors of Univ. of Virginia*,
   515 U.S. 819, 115 S. Ct. 2510 (1995)...............................................................33

*Sanders v. D.C.*,
   85 F. Supp. 3d 523 (D.D.C. 2015) ....................................................................27

*Santilli v. Van Erp*,
   2018 WL 2172554 (M.D. Fla. Apr. 20, 2018) ), *report and recommendation*
   *adopted*, 2018 WL 2152095 (M.D. Fla. May 10, 2018)........................................45

*Schnapper v. Foley*,
   667 F.2d 102 (D.C. Cir. 1981) ..........................................................................19

*Schrier v. Univ. Of Co.*,
   427 F.3d 1253 (10th Cir. 2005) .........................................................................36

*Sherley v. Sebelius*,
   644 F.3d 388 (D.C. Cir. 2011) ..........................................................................41

*Sierra Club v. Env't Prot. Agency*,
   No. CV 25-1112 (RC), 2025 WL 1895609 (D. D.C. July 9, 2025)....................41

*Spectrum Leasing Corp. v. United States*,
   764 F.2d 891 (D.C. Cir. 1985) ..........................................................................12

*Strobos v. RxBio, Inc.*,
   221 F. Supp. 3d 21 (D.D.C. 2016) ....................................................................38

*Tao v. Freeh*,
    27 F.3d 635 (D.C. Cir. 1994) ................................................................................27, 32

*The Corporation for Public Broadcasting, et al. v. Donald J. Trump, et al*,
    No. 1:25-cv-01305-RDM (D.D.C.) ..............................................................................5

*The Corporation for Public Broadcasting v. Federal Emergency Management Agency, et al.*,
    No. 1:25-cv-00740-TJK (D.D.C.) ......................................................................... 5, 31

*Trilogy Fed., LLC v. CivitasDX LLC*,
    No. CV 24-2713, 2025 WL 2651240 (D.D.C. Sept. 16, 2025) ...............................34

*United States v. United Continental Tuna Corp.*,
    425 U.S. 164 (1976) ...................................................................................................23

*Univ. of Tex. v. Camenisch*,
    451 U.S. 390, 101 S.Ct. 1830 (1981) .......................................................................36

*Williams v. Johnson*,
    701 F. Supp. 2d 1 (D.D.C. 2010) ..............................................................................27

*Winter v. Natural Res. Def. Council, Inc.*,
    555 U.S. 7 (2008) ..........................................................................................36, 42, 43

*Wurtzel v. Richmond*, 717 F. Supp. 1 (D.D.C. 1989) ............................................................12, 13

*Zehner v. Jordan-Elbridge Bd. of Educ.*,
    666 F. App'x 29 (2d Cir. 2016) .................................................................................27

**FEDERAL STATUTES**

31 U.S.C. § 1301(a) ..............................................................................................................18, 19

47 U.S.C. § 396 ........................................................................................................... *passim*

47 U.S.C. § 397 ................................................................................................................20

Pub. L No. 100–626, November 7, 1988, 102 Stat .......................................................22

Pub. L. No.110–161, December 26, 2007, 121 Stat 1844 .............................................22

Pub. L. No. 111-8, March 11, 2009, 123 Stat 524, 797 ................................................22

Pub. L. No. 111-117, December 16, 2009, 123 Stat 3034, 3275 ..................................22

Pub. L. No. 118-47, March 23, 2024, 138 Stat 460, 696 ...................................... *passim*

Pub. L. No. 119-4, March 15, 2005, 139 Stat 9 ....................................................... *passim*

### STATE STATUTES

Fed. R. Civ. P. 12(b)(6)...........................................................................................34

Fed. R. Civ. P.  56 .............................................................................................34, 44

Fed. R. Civ. P.  65.............................................................................................34, 44

### OTHER AUTHORITIES

Restatement (Second) of Contracts § 357 (1981) ..................................................12, 13

## INTRODUCTION

Placing its hopes on an over-caffeinated conspiracy theory at sharp odds with the record, NPR takes liberties with the facts, hoping that this Court will gloss over the indisputable chronology of events – including those showing NPR's knowledge, NPR's conduct, what CPB actually did, and what NPR itself has represented along the way. NPR's claims here are not merely factually, but also legally, meritless. NPR's overblown rhetoric and assertions are demonstrably false and its legally baseless claims contradict the express will of Congress.

For starters, NPR's assertion that CPB "retaliated" against NPR because of the "content" of its speech, or that it has been "doing the bidding of Donald Trump" is based on "incontrovertible evidence" is ridiculous. Even in the light most favorable to NPR, the evidence shows that NPR's assertion is patently untrue. There is no evidence that CPB held any view on the "content" of NPR's speech because it is not involved in the reviewing or approval of the content of public media entities' broadcasts. Indeed, on August 1, 2025 – *after* the critical events at issue – NPR's own CEO proclaimed in a press release that: "The Corporation for Public Broadcasting (CPB) has been a cornerstone of public broadcasting in the United States for more than half a century. It has served as …a *bulwark for independent journalism* — enabling organizations like ours to deliver essential news and culture across the nation."

There is no evidence that, at the OMB meeting on April 3, 2025, or any other time, any other government official ever directed, suggested, or encouraged CPB to take any action as to NPR. NPR points to President Trump's May 1st Executive Order ("May 1st EO") that instructed CPB to cease all funding to NPR and PBS. CPB *publicly* rejected and then disregarded the May 1st EO by continuing to pay millions of dollars to both NPR and PBS, as well as local media stations that purchase NPR and PBS content.

Similarly, NPR accuses CPB of "severing" NPR from federally appropriated

interconnection funds, when it has no entitlement to any appropriated funds under the Public Broadcasting Act ("PBA") or the Appropriations Act at issue. NPR doesn't even have a contract with CPB that would entitle it to interconnection funds.

NPR has known for years that independent experts in broadcast and digital distribution strategies and technology have long been urging that CPB, as the Congressionally-mandated steward of public funds for public media, take steps to reform governance of the Public Radio Satellite System ("PRSS"). Among other things, those experts have repeatedly expressed concern about: interconnection grant agreements with NPR that provide NPR with sole and exclusive control over PRSS; the need to improve diversity, representation and innovation in that governance; and that maintaining NPR's *de facto* monopoly over interconnection funds was contrary to the public interest.  For years NPR had worked to delay implementation of the recommended reforms.  By the second half of 2024 – before Donald Trump was elected to a second term, and long before the May 1st EO that NPR claims CPB was "implementing"  – NPR had expressed concern that CPB was on the verge of adopting those experts' recommendations in planning for the period after its current grant agreement with NPR for interconnection funding expired on September 30, 2025.

In early October 2024, Deloitte issued a written recommendation to CPB's Board that CPB implement independent governance of the public radio interconnection system to be more representative and diverse.  NPR had a significant financial self-interest in maintaining such sole and exclusive control, including maintenance of a "commercially successful business" allowing it to charge third parties for access to the system and depositing the revenues in NPR's coffers.

CPB discussed the recommendation with NPR in October 2024 and again in November 2024, and continued thereafter.  Meanwhile, NPR strategized internally about how to

dissuade CPB from insisting upon a reformed PRSS governance structure, and lobbied CPB against it.

In early April 2025, CPB held a series of Board meetings. In stark contrast to NPR's assertions to this Court, CPB's Board did not "approve" any agreement with NPR; as NPR's own documents concede, negotiations between CPB and NPR for a potential new interconnection grant agreement, for funding post-September 30th, *had not yet begun.*  As conceded by NPR in an email on March 25, 2025, CPB Board approval was required to begin the negotiating process, stating NPR's "immediate goal is to get board approval to begin negotiations." There had been no draft agreement.  There was no agreement.  There could not have been, and was not, Board *approval* for any "agreement."  As made clear by the CPB Board resolution on April 2, 2025, the Board "authorizes CPB Management *to negotiate* an amendment" with NPR for a potential new grant agreement, and thereafter voted to include as part of those negotiations a proviso that NPR would have to submit a plan that would eventually transition to a new management-entity for PRSS, one that NPR *and others* would manage, that is, that would include stakeholders other than NPR *as well* as NPR. Notably, this was a month before the May 1st EO.

Accordingly, CPB informed NPR, repeatedly, that it wanted to enter into exclusive negotiations with NPR for a new grant agreement funding NPR, one that would envision such a transition.  It did so orally, in communications with NPR's General Counsel and NPR management.  It did so by letter from CPB's General Counsel to NPR's General Counsel on April 21, 2025.  And it did so again by letter from CPB's COO to NPR's Chairman of the Board and Board members on April 30, 2025. Each time CPB asked NPR to begin negotiations for a funding agreement for NPR that would envision such a transition.  Each CPB request for the beginning of negotiations with NPR was rebuffed by NPR, which expressed no interest in having such negotiations.

3

After a month of waiting in vain for NPR to begin these negotiations, or even to respond, CPB convened a broad-based working group made up of diverse radio stations and public media entities to consider how best to address the needs of the public radio system. CPB invited NPR to participate actively in that working group, and NPR did, appointing two of its Board members to do so. After multiple meetings in June 2025, on July 11, 2025 the working group (in which NPR participated) finalized and formalized the parameters and principles for issuing a Request for Proposal from those wishing to receive CPB grants for radio interconnection funding. NPR did not object, or claim that it was "entitled" to receive such a grant, or that the competitive bidding process was "engineered," or that in holding a competitive bidding process CPB was acting "in compliance" with Trump's May 1st EO purporting to prevent CPB from funding NPR (and PBS). Not only did NPR not object to the competitive bidding process, it submitted a proposal on August 15, 2025 stating that it was "pleased" to do so. There was a competing proposal from a coalition of radio stations and others ("PMI"), as NPR knew.

CPB engaged Deloitte to independently evaluate the competing proposals. Deloitte concluded that the PMI proposal was superior to that of NPR in numerous respects. In September 2025, CPB's Board met to discuss Deloitte's evaluations and voted to direct CPB Management to begin negotiations with PMI to attempt to reach an agreement to fund PMI to manage radio interconnection, *including a subset of funding going to NPR* for PRSS.[1]

Suddenly, NPR, an unsuccessful bidder, decided that this was all part of a "conspiracy" between CPB and the Trump Administration to punish NPR for the content of its journalism, and that CPB was acting in furtherance of the May 1st EO, and that CPB was, in fact, Donald Trump's

_____

[1] The Proposal approved for negotiation by the CPB Board would have had PMI pay $6.5 million to NPR for PRSS for, among other things, payment of the satellite lease fees, as part of the transition.

4

instrument of "vengeance" against NPR.

The facts summarized above, which are beyond genuine dispute, dispose of NPR's "by-selecting-PMI-over-us-CPB-violated-our-First-Amendment-rights" theory, and there are numerous reasons at law why NPR's theory is untenable. But NPR's theory is all the more unfounded given CPB's interactions directly with the Trump Administration and its continued discussions with, *and funding of*, NPR.

Far from "complying" with Donald Trump's May 1st EO purporting to prohibit CPB from funding NPR, CPB openly defied it. First, within hours of its issuance, CPB issued a public statement expressly stating that it was disregarding the May 1st EO, and that CPB was not subject to it. Second, even after knowing the May 1st EO was imminent and then after it was issued, CPB repeatedly offered to negotiate *exclusively* with NPR to reach an agreement providing CPB funds to NPR for interconnection. Third, knowing the Order was imminent and then even after it was issued, CPB transferred more than $3 million in federal funds to NPR, and transferred millions more to PBS, both in blatant disregard of the May 1st EO.

Far from "currying favor" with the Trump Administration, CPB has filed two lawsuits since March *against the Administration* asserting that the Administration had acted illegally. The Court can take judicial notice of them. CPB filed the first against the Federal Emergency Management Agency for the shut-off of federal funds. *See The Corporation for Public Broadcasting v. Federal Emergency Management Agency, et al.*, No. 1:25-cv-00740-TJK. CPB filed the second against Donald Trump and various federal offices, asserting that Trump had acted illegally in purporting to fire CPB's Board Members and wrongfully try take control over CPB. *See The Corporation for Public Broadcasting, et al. v. Donald J. Trump, et al,* No. 1:25-cv-01305-RDM.

Notably, in April, May, June, July, August and the first three weeks of September, while

CPB was asking NPR for a plan to transition management of PRSS to a new entity, while CPB was issuing an RFP and while CPB was accepting and evaluating competing proposals, NPR never claimed that CPB was "doing Trump's bidding," "violating the First Amendment" or depriving it of funds to which it was statutorily entitled.  On the contrary, NPR was repeatedly praising CPB for standing up to Trump, standing up to the May 1st EO, standing up for the First Amendment and, indeed, for conducting "business as usual."

When a competitor won the bid, of course, everything changed. NPR suddenly decided that CPB was "complying" with the May 1st EO.  Perhaps the best illustration of the preposterousness of NPR's theory is the timing of CPB's selection of PMI over NPR – which occurred on September 15, 2025,  almost two (2) months *after Congress had rescinded all of CPB's funding*, putting CPB *out of business*. CPB had absolutely nothing to gain by that point from "currying favor" with Trump.  It would have absolutely no reason to do so.

At the end of the day, this case about NPR's desire for cash – without any strings or even a representation by NPR that it will use those funds for interconnection – not vindication of First Amendment rights.  Invoking the Constitution is a transparent ploy by NPR to obscure its true goal, stated in an internal e-mail dated April 23, 2025: *"There is a dream scenario – we get the money and CPB goes away by this action of Congress."* It is a measure of just how untethered NPR's lawsuit is from the evidence and from the law that it pins its hopes here on simply blocking CPB from carrying out its Congressional mandate to steward public funds for public media by preventing CPB from entering into an agreement with a competitor.  And if NPR cannot block CPB from carrying out that mandate, it hopes that it can at least delay CPB from doing so until "CPB goes away."

## FACTUAL BACKGROUND

CPB incorporates herein both: (1) its Statement of Material Facts Not Subject to Genuine Dispute ("SOF") filed in support of its Motion for Summary Judgment (Dkt. No. 58-2); and (2) its Response to NPR's Supplemental Statement of Undisputed Facts in support of its Motion for Summary Judgment, filed herewith. NPR has claimed that CPB buckled under the pressure of the Trump Administration or was somehow in cahoots with the Administration. The following background information and timeline of events demonstrates the absurdity of its claim:

- Throughout 2021, CPB had long-standing issues with NPR's submission of grant proposals for its management of the interconnection system, which lacked sufficient detail, rigorous oversight requirements, and transparency. Merritt Decl. at ¶ 12-15 (Dkt. No. 61 corrected at Dkt. No. 64.

- CPB has heard complaints for years from small stations, many of which are not NPR members, about the fees NPR charges for PRSS interconnection; and stations disconnect from the PRSS every year. Supplemental Declaration of K. Merritt, attached hereto as Exhibit 1, at ¶ 4; SOF at ¶ 95.

- In September of 2024, Deloitte recommended that CPB: "***Create a new distribution* entity** (referred to as 'NewCo') that operates shared services for distribution ***independently from existing public media organizations*** … with representation from across public media ***(e.g., CPB, NPR, PBS, station groups)***. SOF at ¶ 145.

- On March 13, 2025, CPB defied the Trump Administration by obstructing its DOGE efforts and suing the Administration, specifically, FEMA, over access to grant funds. *Corporation for Public Broadcasting v. Federal Emergency Management Agency, et al.* No. 1:25-cv-00740 (D.D.C. Mar. 13, 2025);

- On April 2, 2025, CPB Board Resolution "authorizes CPB Management **to negotiate an amendment** to the existing agreement with NPR for the design and implementation of the updated public radio interconnection system …" SOF ¶ 153.

- On April 3, 2025, CPB voluntarily met with Katharine Sullivan at OMB where Ms. Sullivan expressed her belief that there should be no public funding of public media, including PBS, NPR, and CPB; but she knew little of how the public media system worked and did not ask about interconnection or suggest CPB take any action relating to any public media entity, including NPR. Supp. Slavitt Decl. at ¶12-13 (Dkt. No. 60-26 corrected at Dkt. No. 63-27); Townsend Decl. at Ex. 44 at 38-39, 86-89, 193-194 (Dkt. No. 59-44); Townsend Decl. at Ex. 101 (CPB Int. Answer No.3) (Dkt. No. 59-101)

7

- On April 4, 2025, CPB's Board voted to amend its April 2, 2025, resolution authorizing negotiations with NPR to include "a contingency that NPR provide a plan within 60 days of amendment execution to establish PRSS as an entity independent of NPR." SOF ¶ 154.

- On April 11, 2025, CPB's Board Chair sent a letter to Ms. Sullivan stating: "CPB, Congress made clear that [CPB] was "a private corporation [to] be created to facilitate the development of public telecommunications and ***to afford maximum protection from extraneous interference and control*** … ***I believe deeply in the mission of public media, and I believe we are delivering on the legislative intent of the Public Broadcasting Act and our mission every hour of every day***." Declaration of J. Lipchitz, attached hereto as Exhibit 2, at Ex. C.

- On April 11, 2025, CPB informed NPR about its decision to require NPR to provide a plan for spinning off PRSS into an independent entity. NPR expressed that it ***was willing to explore the idea*** of spinning off PRSS. Merritt Decl. at ¶ 38.

- On April 14, 2025, CPB executed a television interconnection grant agreement with PBS for approximately $90 million. SOF at ¶ 209.

- On April 25, 2025, CPB disbursed $995,012 of interconnection funds to NPR. Exhibit Z at 27 (Dkt. No. 60-25; corrected at Dkt. No. 63-26)

- On April 21, 2025, CPB's General Counsel, sent a letter to NPR's General Counsel which summarized CPB's expectations on an independent entity that NPR could participate in and requested that ***NPR deliver a plan*** by May 9, 2025. SOF at ¶ 157.

- On April 28, 2025, CPB sued President Trump for engaging in the unlawful act of purporting to remove its Board Members. SOF at ¶ 200.

- On April 30, 2025, CPB sent a letter to NPR making it clear that if NPR did not create an independent entity, then CPB will consider "alternatives to the current public radio interconnection framework." SOF at ¶ 160.

- NPR declined to negotiate with CPB. SOF at ¶ 161

- On May 1, 2025, President Trump issued the May 1st EO purporting to "instruct the CPB Board of Directors and all executive departments and agencies to cease Federal funding for NPR and PBS."

- On May 1, 2025, the very day of the May 1st EO, CPB disbursed $600,000 in funds to NPR under a grant relating to Election 2024 reporting. CPB's Motion for Summary Judgment ("CPB's MSJ"), Exhibit Z at 27.

- On May 2, 2025, CPB issued a public statement stating: "CPB is not a federal executive

8

agency subject to the President's authority ... [it is] a private nonprofit corporation wholly independent of the federal government." SOF at ¶ 207.

- On May 9, 2025, CPB invited NPR to participate in a Working Group about shifting management of the interconnection system to an independent entity. SOF at ¶ 164.

- On May 23, 2025, NPR sent an email to a public radio station informing him that: "CPB ... *is not a federal agency, such that it is not subject to the purported instruction* in the May 1st Executive order . . . . *CPB has also advised the system that it is conducting business as usual. NPR has not changed its operating procedures as a result of the instructions directed to CPB in the EO*. Lipchitz Decl. Ex. I.

- On July 9, 2025, CPB informed NPR that CPB would have an open competitive bid process for the interconnection system. NPR did not argue that CPB could not do so. SOF at ¶ 171.

- On July 11, 2025, the Working Group completed its work.

- On July 24, 2025, Congress rescinded CPB's funding. SOF at ¶ 13.

- On July 24, 2025, CPB disbursed $959,100 of interconnection funds to NPR under its existing grant agreement. Second Supplemental Declaration of E. Slavitt, attached hereto as Exhibit 3, at ¶8; CPB's MSJ at Exhibit Z.

- On August 1, 2025: NPR's CEO issued a press release stating: "CPB has been a cornerstone of public broadcasting in the United States for more than half a century ... and *a bulwark for independent journalism* . . . . *CPB upheld the core values of the Public Broadcasting Act, including support for diverse voices, promotion of excellence and creative risk, and advancing service for the unserved and underserved*. Lipchitz Decl. Ex. H.

- On August 7, 2025, CPB disbursed $300,000 of funds to NPR under its existing grant agreement for Editorial Enhancements. CPB's MSJ at Exhibit Z at 27.

- On August 15, 2025, NPR submitted its response to the RFP. SOF at ¶ 179.

- PMI's proposal included $6.5 million in funds to go directly to NPR to cover the cost of providing satellite distribution to stations. SOF at ¶ 196.

- On August 28, 2025, CPB disbursed $190,417 of funds to NPR under its existing grant agreement for its Ukraine War Crisis Coverage. CPB's MSJ at Exhibit Z at 27.

- From August to September 2025, CPB evaluated the competing bid submissions along with its consultant Deloitte.

- On September 23, 2025, CPB informed NPR that it had selected PMI's bid. SOF at ¶ 195.

ARGUMENT[2]

I.    **The Remedies NPR Seeks Have No Basis in Law or Equity**

NPR has not requested monetary damages as a remedy in its Complaint. Am. Compl. at 49-50. Beyond declaratory relief, NPR seeks (a) injunctive relief barring CPB from awarding the interconnection funds to its competitor, PMI, and (b) an order instructing CPB to award the interconnection funds to NPR. *Id.*

In its Motion for Preliminary Injunction and Summary Judgment, beyond declaratory relief, NPR seeks the following remedies:

- OPTION 1: (A) "preliminarily and permanently enjoin CPB from implementing the Order and from disbursing said funds to any entity or entities other than NPR or "those public telecommunications entities participating in the public radio satellite interconnection system" (the Interconnected Stations)" *and* (B) "order CPB to disburse no less than $35,962,000 in interconnection funds to NPR or the Interconnected Stations; *or*

- OPTION 2: "order CPB to *disburse no less than $35,962,000 in interconnection funds to NPR* or the Interconnected Stations in accordance with the Act"; *or* "at minimum"

- OPTION 3: (A) "order CPB to negotiate in good faith an extension of NPR's grant agreement for interconnection"; *and* (B) "order CPB to place [interconnection] funds into an escrow account pending its disbursement to NPR or the Interconnected Stations [at] the conclusion of this litigation and exhaustion of all appeals."

NPR's Motion for Preliminary Injunction and Summary Judgment ("NPR's PI-SJ Motion") at 1-2 (Dkt. No. 57) (emphasis added). Even if the Court finds all of NPR's facts to be true, and all of its theories of liability to be sound, the Court still cannot grant the above relief to NPR.

---

[2] CPB hereby incorporates all arguments that it made in support of its Motion for Summary Judgment herein as opposition to NPR's motions for preliminary and permanent injunction, as well as its motion for summary judgment. CPB also incorporates all arguments it has made in this Memorandum in support of its Motion for Summary Judgment.

**A. NPR's Requested Remedies Sound in Contract and the Equitable Remedy of Specific Performance**

It is undisputed that the PBA does not directly entitle NPR to general interconnection funding. 47 U.S.C. §§ 396, *et seq.*; SOF at ¶ 73; *see* Am. Compl. at *passim* (making no claim of direct funding entitlement); NPR's Memorandum in Support of its Motion for Preliminary Injunction and Summary Judgment ("NPR's PI-SJ Memo") at *passim* (Dkt. No. 57-1) (same). It is undisputed that NPR does not receive appropriations directly from Congress, for interconnection or otherwise. SOF at ¶ 20. Rather, "Congress appropriates funding for interconnection to CPB." NPR's PI-SJ Memo at 3. The PBA "***authorize[s]***" CPB to "arrange, ***by grant to or contract*** with appropriate public or private agencies, organizations, or institutions, for interconnection facilities suitable for distribution and transmission of public telecommunications services to public telecommunications entities." 47 U.S.C. § 396(g)(2)(E). The PBA does not require or compel CPB to do so. 47 U.S.C. §§ 396, *et seq.*

CPB has never issued federally appropriated funds for an interconnection grant to anyone without a written, signed agreement. SOF at ¶ 75. NPR knows that it must have a written and signed agreement from CPB to be entitled to interconnection funds; it has never received interconnection grant funds without first entering into a written signed grant agreement. SOF at ¶ 74. NPR also knows that the "process" of negotiating such an agreement and "obtaining funding from CPB is time-consuming and inefficient" – a process that NPR is seeking to sidestep through this lawsuit. NPR's PI-SJ Memo at 5 (citing SSUMF ¶¶ 33).

NPR's previous grant agreement that awarded NPR approximately $4.5 million expired on September 30, 2025. NPR's PI-SJ Memo at 4 (citing SSUMF at ¶ 29). NPR had no agreement entitling it to any additional funds or for any period beyond that. SOF at ¶ 172; (Am. Compl. at *passim* (identifying further agreement); NPR's PI-SJ Memo at *passim* (same). CPB never provided

11

a draft agreement, statement of work, or a schedule of deliverables to NPR for additional funds or any period beyond that. SOF at ¶ 168. CPB, therefore, never entered an agreement with NPR for the funds that it seeks in this lawsuit, and no such contract exists. NPR's request that this Court "order CPB to negotiate in good faith an extension of NPR's grant agreement for interconnection" admits this fact. Given that the PBA does not directly entitle NPR to funds and that Congress has not directly appropriated funds to NPR, even if NPR's application of 47 U.S.C. § 396(k)(10)(D)(i) is valid – which it is not, fundamentally, the basis of NPR's claim is contractual.

NPR's request for an order requiring CPB to turn over millions of Congressionally appropriated funds to NPR or the Interconnected Stations is a request for the remedy of specific performance. NPR's request for an order requiring CPB to place the interconnection funds in escrow pending distribution to NPR is the same. Specific performance is a "classic contractual remedy." *Spectrum Leasing Corp. v. United States*, 764 F.2d 891, 894 (D.C. Cir. 1985).

### B. Courts Cannot Order Specific Performance for a Contract That Does Not Exist

"***It is elementary*** that the right to enforce specific performance depends upon mutuality of obligation." *Crowley v. Crowley*, 13 F.2d 311, 312 (D.C. Cir. 1926). "A contract to be specifically enforced by the court must be mutual- that is to say, such that it might, at the time it was entered into, have been enforced by either of the parties against the other of them." *Id.* (quoting Fry on Specific Performance (3d Ed.) Sec. 440). Consequently, "to prevail on a specific performance theory, [a] plaintiff must show … the existence of a valid contract … and breach of the contract by a defendant able to perform his or her obligations. . . ." *Wurtzel v. Richmond*, 717 F. Supp. 1, 2 (D.D.C. 1989) (citing Restatement (Second) of Contracts § 357 (1981)).

NPR can show neither. *See id.* NPR admits that it had no contract with CPB for the funds it seeks. Absent a contract, there is no mutuality, because there is nothing that can be enforced

12

against either party. *See Crowley*, 13 F.2d at 312. NPR has not asserted that any of the Interconnected Stations had a contract with CPB – NPR's entire theory is that ***it*** is entitled to those funds by virtue of its contracts with those Interconnected Stations. NPR has not even asserted a breach of contract claim, thus conceding a lack of mutuality and that no breach occurred. Am. Compl. at *passim*; *see Crowley*, 13 F.2d at 312. NPR, therefore, seeks specific performance of a contract that does not exist, as relief for a claim that it has not, and could not have, pled. Such a request fails as a matter of law and, consequently, this Court cannot grant such relief. *See Wurtzel*, 717 F. Supp. at 2; *Crowley*, 13 F.2d at 312; Restatement (Second) of Contracts at § 357.

## C. Courts Cannot Order Parties to Negotiate or Enter Contracts

Recognizing that it has no contract to enforce, NPR asks this Court to order CPB to "negotiate in good faith" a grant extension, *i.e.* a ***new*** contract. NPR's PI-SJ Motion at 2. NPR's request is either (1) a veiled attempt to ask the Court to force CPB into a contract – which it cannot do as a matter of law; or (2) transparent delay tactic to frustrate CPB's ability to finalize the grant award with PMI prior to CPB's dissolution after rescission. Either way, NPR's request is meritless on its face.

The Supreme Court made clear long ago:

> Courts of Equity may compel parties to execute their agreements, but it ***has no power to make agreements for them***.
>
> \*      \*      \*
>
> The former is a legitimate branch of its jurisdiction, and in its exercise, is highly beneficial to society. The latter ***is without its authority, and the exercise of it would be not only an usurpation of power, but would be highly mischievous in its consequences***.

*Hunt v. Rhodes*, 26 U.S. 1, 14 (1828) (emphasis added).

Such mischief is exactly what NPR seeks through this lawsuit. Notably, NPR phrased its

request for an order to negotiate in the conjunctive with its request to place the interconnection funds in escrow "pending its disbursement to NPR." NPR's PI-SJ Motion at 2. By phrasing those requests in the conjunctive rather than the disjunctive, NPR demonstrates that it views the negotiations as a mere formality to the foregone conclusion that those funds will eventually be disbursed to NPR. NPR's intent is clear: it wants this Court to force CPB to enter a grant agreement with NPR. This Court cannot do so; it has no authority to force CPB – or NPR for that matter – to negotiate or enter into a contract. *See Hunt*, 26 U.S. at 14. Therefore, the Court has no authority to grant NPR's request to order CPB to enter or negotiate a new contract. *Id.*

### D. This Court Cannot Second Guess Congress by Ordering the Appropriation of Funds to NPR

The Appropriations Clause of the Constitution requires that "No Money shall be drawn from the Treasury, but in Consequence of Appropriations made by Law." U.S. Const. Art. I § 9, cl. 7. "Textually, the command is unmistakable—'no money can be paid out of the Treasury unless it has been appropriated by an act of Congress.'" *Consumer Fin. Prot. Bureau v. Cmty. Fin. Servs. Ass'n of Am., Ltd.*, 601 U.S. 416, 425, 144 S. Ct. 1474 (2024) (citing *Cincinnati Soap Co. v. United States*, 301 U.S. 308, 321, 57 S.Ct. 764 (1937); *Office of Personnel Management v. Richmond*, 496 U.S. 414, 424 110 S.Ct. 2465 (1990) ("Money may be paid out only through an appropriation made by law; in other words, the payment of money from the Treasury must be authorized by a statute.").

"Any exercise of a power granted by the Constitution to one of the other branches of Government is limited by a valid reservation of congressional control over funds in the Treasury." *Office of Personnel Management*, 496 U.S. at 425. "It is beyond dispute that ***a federal court cannot order the obligation of funds for which there is no appropriation***." *Rochester Pure Waters Dist. v. E.P.A.*, 960 F.2d 180, 184 (D.C. Cir. 1992) (citing *Reeside v. Walker*, 11 How. 272, 291, 13 L.Ed.

693 (1851) and *Office of Personnel Management*, 110 S.Ct. at 2471-72) (emphasis added). "Nor

can it be contended that a court may appropriate funds from which an obligation may be made."

*Id.*(citing U.S. Const., art. I, § 9, cl. 7; *Cincinnati Soap*, 301 U.S. at 321.

> [CPB] was established [by Congress] as nonprofit and non-political in nature and is prohibited from owning or operating "any television or radio broadcast station, system or network, community antenna system, or interconnection, or production facility." Numerous statutory safeguards were created to insure against partisan abuses. Ultimately, Congress may show its disapproval of any activity of the Corporation through the appropriation process. This supervision of CPB through its funding is buttressed by an annual reporting requirement. Through [the PBA's] statutory requirements and control over the 'purse-strings,' ***Congress reserved for itself*** the oversight responsibility for the Corporation [for Public Broadcasting].

*Accuracy in Media, Inc. v. F.C.C.*, 521 F.2d 288, 294 (D.C. Cir. 1975) (internal citations omitted)

(emphasis added).

      Here, there is no dispute that Congress has not directly appropriated the interconnection

funds to NPR. There is also no dispute that Congress *has* delegated interconnection funds to CPB.

That appropriation was made:

> for the costs associated with replacing and upgrading the public broadcasting interconnection system and other technologies and services that create infrastructure and efficiencies within the public media system, $60,000,000.

Pub. L. 118-47, March 23, 2024, 138 Stat 460, 696; Pub. L. No. 119-4, Div. A, tit. I, § 1101(a)(8).

Congress did so pursuant to its previous authorization of CPB to: "assist in the establishment and

development of one or more interconnection systems to be used for the distribution of public

telecommunications services so that all public telecommunications entities may disseminate such

services at times chosen by the entities"; and "arrange, by grant to or contract with appropriate

public or private agencies, organizations, or institutions, for interconnection facilities suitable for

distribution and transmission of public telecommunications services to public telecommunications

entities." 47 U.S.C. §§ 396(g)(1)(B), 396(g)(2)(E).

NPR's relief would require this Court to violate the separation of powers enshrined in the Constitution by second-guessing Congress's appropriation decision in direct violation of the Constitution. *See* U.S. Const. Art. I § 9, cl. 7; *Consumer Fin. Prot. Bureau*, 601 U.S. at 425; *Office of Personnel Management*, 496 U.S. at 425; *Cincinnati Soap*, 301 U.S. at 321. NPR's requested orders are precisely the type of action that "[i]t is beyond dispute" that this Court cannot do. *See Rochester Pure*, 960 F.2d at 184; *Accuracy in Media*, 521 F.2d at 294. Congress appropriated the interconnection funds to CPB. Congress entrusted and authorized CPB with the management of those funds. Congress did not so appropriate the interconnection funds to NPR. Nor did Congress entrust NPR with the management of those funds. The Court, therefore, has no authority or basis to order millions of congressionally appropriated taxpayer dollars be paid to NPR, or otherwise alienated from CPB and placed in escrow. *See* U.S. Const. Art. I § 9, cl. 7; *Consumer Fin. Prot. Bureau*, 601 U.S. at 425; *Office of Personnel Management*, 496 U.S. at 425; *Cincinnati Soap*, 301 U.S. at 321; *Rochester Pure*, 960 F.2d at 184; *Accuracy in Media*, 521 F.2d at 294.

### E. If CPB is a Government Entity, the Court Cannot Intrude on its Decision to Award Funds to NPR's Competitor

NPR has argued that, under *Lebron v. Nat'l R.R. Passenger Corp.*, 513 U.S. 374, 115 S. Ct. 961 (1995), CPB is a federal agency or instrumentality for purposes of the First Amendment. NPR's PI-SJ Memo at 23. But even if that were true, NPR is not entitled to the relief it seeks because Congress appropriated a lump-sum to CPB to spend at its discretion, which is not reviewable by the Court under the separation of powers doctrine.

"The interference of the courts with the performance of the ordinary duties of the executive departments of the government, would be productive of nothing but mischief; and we are quite satisfied, that such a power was never intended to be given to them." *Perkins v. Lukens Steel Co*., 310 U.S. 113, 131–32 (1940). "An agency's allocation of funds is unreviewable, unless Congress

has restricted the use of the funds by statute." *Oceana, Inc. v. Ross*, 275 F. Supp. 3d 270, 282 (D.D.C. 2017), *aff'd*, 920 F.3d 855 (D.C. Cir. 2019) (citing *Lincoln v. Vigil*, 508 U.S. 182, 192–94, 113 S.Ct. 2024 (1993). "'The allocation of funds from a lump-sum appropriation is [an] administrative decision traditionally regarded as committed to agency discretion' by law and therefore not subject to judicial review." *Id.* (quoting *Lincoln*, 508 U.S. at 192-93). "Decisions about how to distribute resources among programs require 'complicated balancing of a number of factors which are peculiarly within [the agency's] expertise.'" *Id.* (citing *Lincoln*, 508 U.S. at 193 and *Heckler v. Chaney*, 470 U.S. 821, 831, 105 S.Ct. 1649 (1985)). "Therefore, 'as long as the agency allocates funds from a lump-sum appropriation to meet permissible statutory objectives,' ***courts have 'no leave to intrude***.'" *Id.* (quoting *Lincoln*, 508 U.S. at 193).

> Congress may circumscribe agency discretion by putting restrictions on funding in the appropriations act or establishing statutory entitlements in the substantive statute for which the appropriation is usable. But if it chooses not to do so, ***it is not a court's*** "***responsibility to decree what 'reasonable' amounts should be expended on various programs***."

*Id.* (quoting *Int'l Union, U.A.A.A.I.W. of Am. v. Donovan*, 746 F.2d 855, 861 n.5 (D.C. Cir. 1984) and citing *Milk Train, Inc. v. Veneman*, 310 F.3d 747, 751–52 (D.C. Cir. 2002)).

Here, Congress appropriated a lump sum with broad language to "replac[e] and upgrad[e] the public broadcasting interconnection system and other technologies and services that create infrastructure and efficiencies within the public media system." Pub. L. 118-47, March 23, 2024, 138 Stat 460, 696; Pub. L. No. 119-4, Div. A, tit. I, § 1101(a)(8). The appropriation was so broad that Congress included the "***other*** technologies and services…" language, meaning that the funding was not even limited solely to specific interconnection technologies. *Id.* (emphasis added). Congress left it to CPB's expertise and authority to determine how to do so. 47 U.S.C. §§ 396(g)(1)(B), 396(g)(2)(E).

NPR has not alleged that CPB's award of interconnection funding to PMI violates the terms of the appropriation; it has alleged only that the PBA requires NPR to get the funds rather than its competitor. Nor could NPR do so. CPB selected PMI's bid which sets up an additional entity to provide interconnection capabilities, and it does so by relying on existing PRSS capability for satellite interconnection specifically, as well as introducing new methods of interconnection that are just as reliable and more easily accessible to a majority of public broadcasting entities. SOF at ¶ 191-196.

CPB, therefore, exercised the discretion that it is authorized to exercise under both the PBA and the terms of the specific appropriation. It engaged in a "complicated balancing of a number of factors which are peculiarly within [its] expertise." *See Oceana*, 275 F. Supp. 3d at 282; *Lincoln*, 508 U.S. at 193. CPB "allocate[d] funds from a lump-sum appropriation to meet permissible statutory objectives." *See id.* This Court, therefore, has "no leave to intrude" and CPB's funding choice is "not subject to judicial review." *See id.*; *Lincoln*, 508 U.S. at 192-93. Consequently, the Court cannot: enjoin CPB from distributing the interconnection funds to PMI; force CPB to distribute the interconnection funds to NPR or place those funds in escrow; or declare any action by CPB unlawful. *Id.*

### F. This Court Cannot Order CPB to Pay Tort Damages from Funds Appropriated for Interconnection

Even if one treats NPR's requested relief as a request for compensatory damages rather than specific performance, its claim still fails because CPB cannot use Congressionally appropriated interconnection funds to pay tort damages. "Congress's control over federal expenditures is absolute*." U.S. Dep't of Navy v. Fed. Lab. Rels. Auth.*, 665 F.3d 1339, 1348 (D.C. Cir. 2012) (citations omitted). "A core tenet of appropriations law is enshrined in 31 U.S.C. § 1301(a), the 'Purpose Statute,' which commands: 'Appropriations shall be applied

only to the objects for which the appropriations were made except as otherwise provided by law.'" *Id.*

Here, NPR asks for the money appropriated for interconnection as, essentially, tort damages for its non-viable First Amendment claim. If awarded, NPR would be under no contract with CPB governing its use of the funds. It could use those funds however it pleases. That result is not allowed by 31 U.S.C. § 1301(a). The Court cannot, therefore, award the interconnection funds that NPR seeks as tort damages for its First Amendment or Tortious Interference claim. *See Memphis Cmty. Sch. Dist. v. Stachura,* 477 U.S. 299, 305, 106 S. Ct. 2537, 2542 (1986) (describing liability for deprivation of constitutional rights under color of state law as *"a species of tort liability").*

## II.    NPR's Statutory *Ultra Vires* Claim for a Violation of the PBA is Meritless

### A. The Statutory Provision Under the PBA Upon Which NPR Bases its Claims Does Not Apply to the Generally Appropriated Funds at Issue

#### 1.    No Private Right of Action Exists Under the PBA

"[P]rivate rights of action are ***not part of the machinery devised by Congress for control of CPB's activities.*"* *Network Project v. Corp. for Pub. Broad.*, 398 F. Supp. 1332, 1339 (D.D.C. 1975), *aff'd in relevant part*, 561 F.2d 963, 976 (D.C. Cir. 1977) (emphasis added); *see also Schnapper v. Foley*, 667 F.2d 102, 116 (D.C. Cir. 1981) ("Appellants' request for relief under the Public Broadcasting Act fails because ***that statute provides no private right of action*** that is available to appellants.") (emphasis added).

NPR has not bothered to even address this reality. *See* NPR's PI-SJ Memo at 30-35. In addition to asking the Court to step into the shoes of Congress, NPR apparently believes that it can do so as well. It cannot. *See Accuracy in Media*, 521 F.2d at 294. Because NPR has no private right of action under the PBA, its claim to enforce the statutory terms of the PBA fails.

### 2. The Appropriations at Issue Were Broad and Not Limited to Satellite Interconnection

NPR has argued that "CPB's [a]ttempt to [d]istribute [s]atellite [i]nterconnection [f]unds to an [e]ntity [o]ther than NPR or the Interconnected Stations [v]iolates the [PBA]." NPR's PI-SJ Memo at 34. NPR's argument is inherently deceptive because it starts from the false premise that the funds at issue were appropriated to the statutorily defined Satellite Interconnection Fund, or, at least, for satellite interconnection. They were not. Second Supp. Slavitt Decl. at ¶ 8.

Rather than appropriating funds for "satellite interconnection," the appropriation was made broadly:

> for the costs associated with replacing and upgrading the public broadcasting interconnection system and other technologies and services that create infrastructure and efficiencies within the public media system, $60,000,000.

Pub. L. 118-47, March 23, 2024, 138 Stat 460, 696; Pub. L. No. 119-4, Div. A, tit. I, § 1101(a)(8). The word "satellite" *does not appear* in the appropriations language. *Id.*

The appropriation used the statutorily defined term "interconnection system," which the PBA defines as "*any system* of interconnection facilities used for the distribution of programs to public telecommunications entities." 47 U.S.C. § 397(4) (emphasis added). "Interconnection" is also a defined term; it means "the use of microwave equipment, boosters, translators, repeaters, communication space satellites, or other apparatus or equipment for the transmission and distribution of television or radio programs to public telecommunications entities." 47 U.S.C. § 397(3).

Interconnection is a very broad concept. It involves both terrestrial interconnection systems and satellite interconnection systems. "Terrestrial interconnection" is an interconnection system that does not rely on satellite relays to transmit and instead uses a network of fiber, broadband, or 5G connections to deliver the signal; it does not involve a signal leaving the earth's atmosphere.

20

SOF at ¶ 27; CPB's MSJ at Exhibit D at 58:5-9 (Dkt. No. 60-3 corrected at Dkt. Not. 63-4). Satellite interconnection is an interconnection system that relies on satellites to transmit; signals. SOF at ¶ 26. According to NPR's Vice President of Distribution, who was previously its "Senior Director of Technology, where [he] was responsible for the overall operation and development of the technical functions of the Public Radio Satellite System (PRSS)," the technology described in the PBA's definition of "interconnection" other than "communication space satellites" does not involve the use of a satellite or a signal leaving the earth's atmosphere. SOF at ¶ 24. The PBA, therefore, contemplates interconnection technology other than satellite.

NPR is aware that not all appropriated "interconnection" funds must be used for satellite interconnection because it has received grants from CPB using interconnection funds for non-satellite interconnection purposes. Second Supp. Slavitt Decl. at ¶ 9. By way of limited example, in approximately 2018, CPB issued a grant to NPR using appropriated interconnection funds to assist public radio stations in acquiring technology to share content on their websites and on mobile devices. *Id.*

### 3. The Specific Section of the PBA That NPR Claims Was Violated Does Not Apply to the Appropriations at Issue Because They Were Not Appropriated to the Statutorily Defined Satellite Interconnection Fund

NPR's PBA violation claim is based on 47 U.S.C. § 396(k)(10)(D)(i). Am. Compl. ¶¶ 34, 54, 143; NPR's PI-SJ Memo at 30. This subsection states, in its entirety:

Notwithstanding any other provision of this subsection except paragraphs (4), (5), (8), and (9), all funds ***appropriated*** to the ***Satellite Interconnection Fund*** and interest thereon —

(i)shall be distributed by the Corporation to the licensees and permittees of noncommercial educational television broadcast stations providing public telecommunications services or the national entity they designate for satellite interconnection purposes and to those public telecommunications entities participating in the public radio satellite interconnection system or the national entity they designate for satellite interconnection purposes, exclusively for the

21

capital costs of the replacement, refurbishment, or upgrading of their national satellite interconnection systems and associated maintenance of such systems. . . .

47 U.S.C. § 396(k)(10)(D)(i) (emphasis added). By the plain text of the statute, this section applies *only* to "funds appropriated to the ***Satellite Interconnection Fund*** and interest thereon . . . ." *Id.* The term "Satellite Interconnection Fund" is also a defined term in the PBA: "There is hereby established in the Treasury a fund which shall be known as the Public Broadcasting Satellite Interconnection Fund (hereinafter in this subsection referred to as the 'Satellite Interconnection Fund'), to be administered by the Secretary of the Treasury." 47 U.S.C. § 396(k)(10)(A). Subsection 396(k)(10) deals exclusively with the Satellite Interconnection Fund and no other portion of the PBA mentions it. *See* 47 U.S.C. § 396, *et seq.*

As discussed above, the appropriations at issue were broad – appropriated for the "interconnection system and other technologies and services that create infrastructure and efficiencies within the public media system . . . ." Pub. L. 118-47, March 23, 2024, 138 Stat 460, 696; Pub. L. No. 119-4, Div. A, tit. I, § 1101(a)(8). When Congress has intended to appropriate funds specifically to the Satellite Interconnection Fund, it has done so explicitly, either by reference to the fund itself, or to Subsection 396(k)(10).[3] Congress, however, did not do so here, has not done so since 2009, and CPB has no such funds. SOF at ¶ 113.

The subsection of the PBA that NPR relies on, 47 U.S.C. § 396(k)(10)(D)(i), therefore, has no application to the funds at issue. NPR's theory can best be summarized as a claim to funds that

---

[3] *See* Pub. L 100–626, Nov. 7, 1988, 102 Stat 3207 ("There is authorized to be ***appropriated*** to the ***Satellite Interconnection Fund***, for fiscal year 1991, the amount of $200,000,000."); Pub. L. 111-117, December 16, 2009, 123 Stat 3034, 3275 (Congress appropriated $25 million "***pursuant to section 396(k)(10)*** of the Communications Act of 1934 . . . .") (emphasis added); Pub. L. 111-8, March 11, 2009, 123 Stat 524, 797 (Congress appropriated $26.642 million "***pursuant to section 396(k)(10)*** of the Communications Act of 1934 . . . .") (emphasis added); Pub. L. 110–161, December 26, 2007, 121 Stat 1844 (Congress appropriated $26.750 million "***pursuant to section 396(k)(10)*** of the Communications Act of 1934.") (emphasis added).

do not exist, based on a statute that does not apply, which NPR has no right to enforce. NPR cannot prevail on such a claim.

### 4. NPR's Asks this Court to Disregard the Plain Text of the PBA

NPR's argument in response to the clear divergence between the appropriations language and the subsection of the PBA on which it relies is, essentially, that it knows what Congress intended to do better than Congress. Bafflingly, NPR has specifically argued that:

> [I]t is a "cardinal principal of statutory construction that repeals by implication are not favored," *United States v. United Continental Tuna Corp.*, 425 U.S. 164, 168 (1976), and "courts must give effect, if possible, to every clause and word of a statute," *Parker Drilling Mgmt. Servs., Ltd. v. Newton*, 587 U.S. 601, 611 (2019) (quotation marks omitted).

NPR's PI-SJ Memo at 34. There is no "repeal" here, though; nor does CPB argue there is. Congress knows how to appropriate funds to the Satellite Interconnection Fund; it chose not to do so. NPR's "repeal" or "erasure" argument is a strawman.

Moreover, giving effect to every clause and word of a statute is exactly what CPB is arguing for the Court to do. It is not a matter of saying the "magic words" as NPR flippantly retorts, NPR's PI-SJ Memo at 33, but rather reading the **plain text** and **defined terms** of the statute for what it **actually** says, rather than what NPR wishes it said. NPR's argument asks the Court to **disregard and depart from** not just the **plain text**, but the **defined terms** of the statute. The Court should not do so.

"Congress expresses its intentions through statutory text passed by both Houses and signed by the President (or passed over a Presidential veto)." *Oklahoma v. Castro-Huerta*, 597 U.S. 629, 642, 142 S. Ct. 2486 (2022).

> As [the Supreme Court] has repeatedly stated, the **text of a law controls over purported legislative intentions unmoored from any statutory text**. The Court **may not "replace the actual text with speculation** as to Congress' intent." Rather, the Court "will presume more modestly" that "the **legislature says what it means and**

*means what it says*."

*Id.* (citing *Magwood v. Patterson*, 561 U.S. 320, 334, 130 S.Ct. 2788 (2010)) (emphasis added).

The plain text of the statute relied upon by NPR is clear – it applies only to funds appropriated to the Satellite Interconnection Fund. 47 U.S.C. § 396(k)(10). The appropriations bill is clear – it did not provide funds to the Satellite Interconnection Fund.

Additionally, under NPR's argument, any appropriation to the "public broadcasting interconnection system" can only be an appropriation to its Public Radio Satellite System. NPR's PI-SJ Memo at 30-35. This argument ignores another section of the plain text of the PBA, which authorizes CPB to "assist in the establishment and development of *one or more* interconnection systems . . . ," and therefore allows for multiple interconnections not just to exist, but for CPB to support them. 47 U.S.C. § 396(g)(1)(B).

NPR's argument, therefore, requires the Court to ignore three defined terms of the PBA and the plain text of both the PBA and the appropriation in at least four separate instances. The Supreme Court's rule of interpretation could not be more clear; the Court cannot ignore the plain text and the defined terms that Congress used. *See Castro-Huerta*, 597 U.S. at 642. Applying that rule here leads to only one conclusion: the appropriation and the funds at issue were not appropriated to the Satellite Interconnection Fund, 47 U.S.C. § 396(k)(10)(D)(i) does not apply, and NPR's claim fails.

**5. NPR's Argument Makes Little Sense in Practical Context**

Recalling that NPR's argument is based on the (false) premise that that the funds at issue were appropriated for satellite interconnection, *see* NPR's PI-SJ Memo at 34, NPR's argument makes little sense given the language of the appropriation and the practical state of the technology. If NPR is correct that any appropriation to the "public broadcasting interconnection system" can

only be an appropriation to its Public Radio Satellite System, the appropriation cannot be accomplished on its face. The appropriation provides funds for "the costs associated with **replacing** . . . the public broadcasting interconnection system." Pub. L. 118-47, March 23, 2024, 138 Stat 460, 696; Pub. L. No. 119-4, Div. A, tit. I, § 1101(a)(8). Following NPR's argument to its conclusion, the appropriation provides funds to replace the only interconnection system for which those funds can be used. But that cannot be; funds restricted to use *for* the PRSS cannot be used to *replace* the PRSS. This absurd result, demanded by NPR's argument, must be avoided. *See Media Matters for Am. v. Paxton*, 732 F. Supp. 3d 1, 16 (D.D.C. 2024), aff'd, 138 F.4th 563 (D.C. Cir. 2025) ("When construing a statute, the court must read it to 'avoid absurd results.'") (quoting *Mova Pharm. Corp. v. Shalala*, 140 F.3d 1060, 1068 (D.C. Cir. 1998)).

NPR's argument also makes little sense given the current state of technology. According to NPR's technology expert, NPR is currently building a terrestrial receiver to **replace** its satellite receivers. SOF at ¶ 47. It hopes to complete this project by 2028 and NPR's goal is that its terrestrial system will become the primary interconnection system. SOF at ¶¶ 47-48. If NPR obtains the funds it seeks in this lawsuit, it would not use them solely for satellite interconnection, but would also use them for terrestrial interconnection. SOF at ¶ 185. NPR, therefore, does not subscribe to its own interpretation of the appropriation.

In fact, the actions of both CPB and NPR throughout the relevant timeframe demonstrate that neither party understood the appropriation as being for satellite interconnection funds only. CPB's RFP specifically included expansion of terrestrial interconnection capabilities. SOF at ¶ 178. NPR's Proposal in response to that RFP included aspects of terrestrial interconnection and, in fact, included a transition away from satellite interconnection. SOF at ¶ 182. Had NPR won the bid for CPB's RFP it would have used those funds, at least in part, to expand terrestrial

interconnection. SOF at ¶ 184. Not only does NPR's construction of the PBA and the appropriation have no basis in *law*, it has no basis in *fact*.

## III.    NPR's First Amendment Claim is Not Viable

### A.  NPR has Failed to Demonstrate the Second Element of a Retaliation Claim

To state a claim for First Amendment retaliation, a plaintiff must allege that: "the defendant took some retaliatory action sufficient to deter a person of ordinary firmness in plaintiff's position from speaking again." *Aref v. Lynch*, 833 F.3d 242, 258 (D.C. Cir. 2016). As argued in support of CPB's Motion for Summary Judgment, NPR has not, to date, alleged any facts to suggest any such "chill." Dkt. No. 62 at 32-36. NPR still has not done so. It has not produced any evidence of chill, and it has not offered an affidavit claiming chill. Nothing. Nor could it given NPR's CEO's public admission that CPB "served as …a bulwark for independent journalism." NPR has not even attempted to prove this element, and therefore its claim fails. *See Aref*, 833 F.3d at 258.

### B.  NPR has Not Proved, and Cannot Prove, that CPB was Compelled by, or Acting Jointly with the Trump Administration or that Any Pressure from the Administration was the But-For Cause of CPB's Decision to Award Interconnection Funding to NPR's Competitor

To prove its claim for First Amendment retaliation, the third element that NPR must show is "a causal link between the exercise of a constitutional right and the adverse action taken against him or her." *Aref*, 833 F.3d at 258. To prove causation, it "is not enough to show that an official acted with a retaliatory motive and that the plaintiff was injured—***the motive must cause the injury***. Specifically, it must be a '***but-for***' cause, meaning that the adverse action against the plaintiff would not have been taken absent the retaliatory motive." *Nieves v. Bartlett*, 587 U.S. 391, 398–99 (2019).

Motive and causation are subjective. Consequently, "whether [a plaintiff's] assertion of discrimination was a substantial or motivating factor in [a defendant's] treatment of her, and

whether [a defendant] [has] shown that [it] would have [taken the alleged action] even absent the protected speech—are factual questions ordinarily left to the jury." *Tao v. Freeh*, 27 F.3d 635, 641 (D.C. Cir. 1994) (citing *Hall v. Ford*, 856 F.2d 255, 258 (D.C. Cir. 1988)).

> Once a plaintiff has met his initial burden of showing that he engaged in constitutionally protected speech, and that this speech was a 'substantial' or 'motivating' factor, the burden shifts to the defendants to show, by a preponderance of the evidence, that they would have taken the same actions 'even in the absence of the protected conduct.' This factor is a 'question of fact ordinarily for the jury.'

*Sanders v. D.C.*, 85 F. Supp. 3d 523, 537 (D.D.C. 2015) (internal citations omitted).[4] It is proper to deny summary judgment where the Court finds genuine disputes of material fact as to the element of causation on plaintiff's First Amendment retaliation claim. *Johnson v. D.C.*, 726 F. Supp. 3d 8, 39 (D.D.C. 2024), *reconsideration denied*, No. CV 20-2944 (RC), 2024 WL 3858547 (D.D.C. Aug. 19, 2024). Courts across the country agree.[5]

Here, NPR has argued that, either as a government agency or instrumentality under *Lebron*, or as a "state actor" that the Trump Administration "compelled or significantly encouraged," CPB acted to achieve the Trump Administration's goals of retaliating against NPR for its speech. NPR's PI-SJ Motion at 2, NPR's PI-SJ Memo at 22-29. The same evidence that demonstrates that CPB was not compelled by, or working with, the Trump Administration also demonstrates that no retaliatory motive was the but-for cause of CPB's decision to select PMI's proposal for the

---

[4] *See also Ramey v. U.S. Marshals Serv.*, 755 F. Supp. 2d 88, 94–95 (D.D.C. 2010) ("[C]ausation is normally a question of fact for the jury."); *Williams v. Johnson*, 701 F. Supp. 2d 1, 17 (D.D.C. 2010) ("[T]he question [of causation] is ordinarily one of fact for the jury").

[5] *Zehner v. Jordan-Elbridge Bd. of Educ.*, 666 F. App'x 29, 32 (2d Cir. 2016) (holding that "summary judgment on the element of causation [was] inappropriate" where a reasonable jury could infer that plaintiff was retaliated against due to engaging in protected activities under the First Amendment); *Haverda v. Hays Cnty.*, 723 F.3d 586, 595 (5th Cir. 2013) ("[S]ummary disposition of the causation issue in First Amendment retaliation claims is generally inappropriate."); *Anthoine v. N. Cent. Ctys. Consortium*, 605 F.3d 740, 752 (9th Cir. 2010) (reversing summary judgment on plaintiff's First Amendment retaliation claim because "[t]he 'but-for causation inquiry' is 'purely a question of fact.'") (citation omitted).

interconnection funding. CPB will, therefore, address the issues together.

NPR's theory is that, after CPB's April 3, 2025 meeting with Ms. Sullivan from the Office of Management and Budget ("OMB"), CPB suddenly changed course, from wanting to shower NPR with its requested cash, to pursuing an invented new objective and "sham" process to achieve that objective, all to disguise its fear of, or attempts to placate, the Trump Administration ("OMB Theory"). NPR's PI-SJ Memo at 22-29.

This theory has no basis in fact. The undisputed evidence shows that, contrary to NPR's speculation, little happened at the OMB meeting on April 3, 2025. Ms. Sullivan never asked, directed, or suggested that CPB take any action as to NPR, PBS, or the PRSS, much less take any action because of the content of NPR's speech. Though Ms. Sullivan expressed her belief that there should be no public funding of public media, including PBS, NPR, and CPB, she did not know how the public media system worked or the laws governing it. Supp. Slavitt Decl. at ¶12-13; Townsend Decl. at Ex. 44 at 38-39, 86-89, 193-194 (Dkt. No. 59-44); Townsend Decl. at Ex. 101 (CPB Int. Answer No.3) (Dkt. No. 59-101).

NPR engages in overblown rhetoric to describe the "***voluminous*** evidence" and "***overwhelming uncontroverted*** evidence" for which "no other explanation is ***plausible***." NPR's PI-SJ Memo at 24. NPR doth protest too much. This rhetoric is, at times, demonstrably false, but always exposes, rather than conceals, NPR's desperation to skew the evidence to cover the cognitive dissonance required to accept its theories and legally deficient claims.

For example, NPR argues that "CPB has sought to acquiesce to the Administration's demands and ***punish NPR*** for the content of its journalism by redirecting federal interconnection funds away from NPR by ***any means necessary***" and that "CPBs [*sic*] intention all along was to stop direct federal funding to NPR for the PRSS ***under any circumstances***." These statements are

28

inconsistent with the undisputed facts. On April 25, 2025, *after* the OMB meeting that supposedly sparked CPB's purported conversion to Team Trump, CPB gave NPR approximately $1 million ***for interconnection*** funding. CPB's MSJ at Exhibit Z at 27 (Dkt. No. 60-25 corrected at 63-26). Then, after the President's May 1st EO, which supposedly cemented CPB's conversion, CPB gave NPR another approximately $2.1 million, nearly $1 million of which was for ***interconnection*** funding, and the remaining $1.1 million was for ***content*** programming. *Id.* Giving NPR $3.1 million is a curious way to retaliate against it, particularly on the basis of the content of NPR's speech, when $1.1 million of those funds were ***for NPR to produce its content***. Then, CPB selected PMI's bid for interconnection funding, including $6.5 million of which would be paid to NPR for ***interconnection*** funding. SOF at ¶ 196. Since CPB's supposed heel-turn, therefore, it has given, or intended to give, NPR approximately $10 million for both interconnection and content. "By any means necessary" and "under any circumstances," indeed.

NPR's theory also requires the Court to ignore the fact that CPB has been defunded. CPB chose to award the interconnection funds grant to PMI on September 15, 2025, almost two months after CPB was defunded on July 24, 2025. SSUMF at ¶ 208; SOF at ¶ 13. NPR's argument requires the Court to believe that CPB was somehow still trying to curry favor with the Trump Administration *after* CPB's defunding. This argument makes little sense and requires the belief that CPB delusionally believed it could somehow win back the Administration's favor and get a Congressional do-over. NPR tries to evade that logical flaw by pointing to the discussion at the CPB Board meeting where it chose to select the PMI bid, where CPB's President made remarks about "options for survival." NPR's PI-SJ Memo at 20. CPB was not delusional, as NPR makes it out to be. That meeting occurred after CPB had, on August 1, 2025, released a press release stating "that it will begin an orderly wind-down of its operations following the passage of a federal

rescissions package" and that it had "informed its employees today that the majority of staff positions will conclude with the close of the fiscal year on September 30, 2025" but that "[a] small transition team will remain through January 2026 to ensure a responsible and orderly closeout of operations." Second Supp. Slavitt Decl. at ¶ 12. CPB was done and it knew it. It made its decision for the benefit of all public radio.

As another example, NPR's OMB Theory asks the Court to ignore its own evidence. NPR identifies that President Trump posted on social media prior to that OMB meeting stating: "NPR and PBS, two horrible and completely biased platforms (Networks!), should be DEFUNDED by Congress, IMMEDIATELY" and "REPUBLICANS MUST DEFUND AND TOTALLY DISASSOCIATE THEMSELVES FROM NPR & PBS, THE RADICAL LEFT "MONSTERS" THAT SO BADLY HURT OUR COUNTRY!" NPR's PI-SJ Memo at 11. These posts supposedly contributed to the "pressure campaign" on CPB, yet, even under NPR's telling, after those two social media posts, CPB's Board still voted to "authorize CPB management to negotiate an amendment to the existing agreement *with NPR* for the design and implementation of the updated public radio interconnection system." SOF at ¶ 153. If CPB had been concerned about the Administration, its actions show otherwise.

Even CPB's actions after the OMB meeting belie NPR's theory. On April 4, 2025 CPB's Board *again* voted to "direct CPB Management to proceed with amending the contract *with NPR* for interconnection to include a contingency *that NPR* provide a *plan* within 60 days of amendment execution to establish PRSS as an entity independent of NPR." SOF at ¶ 154 (emphasis added). CPB was supposedly so eager to disassociate with NPR that the very next day after the OMB meeting they authorized contract negotiations *with* NPR asking NPR to provide nothing more than a *plan* to spin-off its pre-existing entity, giving NPR, essentially, a right of first refusal.

SOF at ¶¶ 154, 162.

NPR also points to the political messaging consultant, whom CPB hired for advice on how to approach Congress in dealing with the anticipated rescission package, as evidence of CPB's motive. But that consultant was hired *after* CPB's Board had already decided to negotiate with NPR about a plan to spin out PRSS into an independent entity that NPR could participate in. Supp. Merritt Decl. at ¶ 7. In other words, neither the hiring of that consultant nor anything he said caused CPB to decide to pursue independent management of public radio interconnection; it had already done so. Further, the consultant recommended how CPB should **spin** actions it had **already taken**, in its discussions with **Congress**, not with the Trump Administration. Supp. Merritt Decl. at ¶ 8. NPR's theory is that CPB was acting in concert with the Administration, not Congress. The consultant, therefore, is irrelevant under NPR's own construction of the facts.

NPR's state actor theory also asks the Court to ignore CPB's continued funding of NPR, discussed above, as well as CPB's direct interactions with the Trump Administration, which it defied at every turn. CPB sued the Trump Administration twice in the span of as many months. *The Corporation for Public Broadcasting v. Federal Emergency Management Agency, et al.*, No. 1:25-cv-00740-TJK; SOF at ¶ 200. After the April 3 OMB meeting, CPB sent it a letter reminding the Trump Administration that CPB was a private corporation not subject to the Executive's control. When the Administration issued the May 1st EO, CPB issued a public statement saying that the EO did not apply to it. SOF at ¶ 207. The suggestion that CPB was, in light of these actions, compelled or working with the Trump Administration is absurd.

NPR's theories make little sense and its evidence, at best, presents a *prima facie* case based primarily on speculation, innuendo, and logical fallacy. But the undisputed facts also show that, in response to various complaints from public broadcast stations, *Supp. Merritt Decl.* at ¶ 4, and

widespread agreement on the need for change, SOF at ¶ 146, CPB, with good reason, Supp. Merritt Decl. at ¶ 4; SOF at ¶¶ 137-139, had been exploring and developing a change in the governance of public radio interconnection since, at least, April 2024, SOF at ¶¶ 82, 133-139, 141. Since at least June 2024, NPR has been aware of those efforts. SOF at ¶¶ 142-144. In October 2024, Deloitte specifically recommended the creation of an independent entity to run interconnection, referred to at the time as "NewCo," – new company – "with representation from across public media (e.g., CPB, NPR, PBS, station groups), helps serve the needs of the entire system, while consolidating capabilities, governance, and spend over time." SOF at ¶¶ 145-148. CPB's actions months later in April 2025 were aimed at achieving that goal, particularly in light of the political winds that may make this the last interconnection grant CPB awarded. This evidence, as well as that discussed above, at the very least, presents the court with a genuine dispute as to material facts that are best left to a jury on the issues of motive, causation, and whether CPB was compelled by or acting with the Trump Administration. Consequently, summary judgment in favor of NPR is inappropriate and should be denied. *See, e.g., Tao*, 27 F.3d at 641.

### C. NPR has Failed to Show Viewpoint Discrimination

While NPR has argued that it was retaliated against because of the viewpoint expressed in its speech, NPR has not alleged or argued any past or current actions of viewpoint discrimination or suppression. It is not clear whether NPR intended to allege such a claim in the first place. Nor could it given (a) the undisputed evidence that management of PRSS is content neutral, interconnection is content neutral, and interconnection funds cannot be used for content generation, and (b) NPR's CEO's proclamation of CPB as "***a bulwark for independent journalism.***" Lipchitz Decl. Ex.H. In any event, NPR has failed to allege any action that has burdened its speech or affected the content thereof, and for that reason, its viewpoint discrimination

claim must fail. *See Rosenberger v. Rector & Visitors of Univ. of Virginia,* 515 U.S. 819, 829, 115 S. Ct. 2510 (1995).

### D.  CPB was Authorized by Congress to Ensure Objectivity and Balance

*Even if* CPB did choose not to award interconnection funding to NPR on the basis of the content of its speech, which it absolutely did not, it would have been Congressionally entitled to do so. Under the PBA, CPB is:

> authorized to— … facilitate the full development of public telecommunications in which programs of high quality, diversity, creativity, excellence, and innovation, which are obtained from diverse sources, will be made available to public telecommunications entities, with *strict adherence to objectivity and balance* in all programs or series of programs of a controversial nature.

47 U.S.C. § 396(g)(1)(A) (emphasis added). CPB, therefore, is authorized to make the determination as to whether the funds it distributes are going to entities that are strictly adhering to standards of objectivity and balance. *Id.* If CPB chooses not to award a grant on that basis, that is well within its right. *Id.* It is not a retaliation, it is exercising its authority granted by Congress. Entities have a right to report the news however they choose, but they do not have a right to federal funding in doing so. For NPR's First Amendment claim to prevail, this authorization to CPB must, itself, be an unconstitutional violation of the First Amendment. NPR, however, has not alleged that this authorization is unconstitutional.

### IV.    NPR's Tortious Interference Claim Fails

NPR appears to argue that it is entitled to summary judgment on its claim of tortious interference with business relations. But, in addition to the reasons this claim fails as argued in CPB's Motion for Summary Judgment (Dkt. No. 37-43). NPR makes little effort to support its claim with any evidence. Their claim boils down to the argument that CPB's attempt to set up a new interconnection system is detrimental to NPR—but this is simply not enough. NPR fails to

allege that any of its contractual relations were actually altered or affected by CPB's actions. Similarly, NPR concedes in its motion that it has not suffered any injury, arguing that "*if CPB's interference with NPR's business relationships succeeds*, it will cause" injury. NPR Motion at 38 (emphasis added). And last, but not least, NPR's contracts with the interconnected stations give both parties unfettered discretion to terminate the contracts (*see* Second Munipalla Decl. at Ex. A, Section 8 (Dkt. No 38-4))—and the only stations that have terminated did so due to the cost of NPR's interconnection services, not any action by CPB.

NPR has failed to submit any evidence of a single station breaking its agreement with NPR as a result of CPB's RFP. The only "evidence" supporting NPR's claims in its motion is a conclusory statement by an NPR employee that CPB's decision is "hurtful and damaging . . . ." NPR Motion at 37. This is not enough to survive a motion under Rule 12(b)(6), let alone serve as the basis for summary judgment under Rule 56 or a preliminary injunction under Rule 65. *See, e.g., Trilogy Fed., LLC v. CivitasDX LLC,* No. CV 24-2713, 2025 WL 2651240, at *16 (D.D.C. Sept. 16, 2025) ("Nowhere do defendants allege that they were unable to meet their contractual obligations, that Trilogy's lack of documentation impaired their ability to meet those obligations, or that defendants' obligations became more costly or time-consuming."). Indeed, the only evidence related to stations terminating their contracts demonstrates that it was because of cost, not any action by CPB. Munipalla Depo. At 215-221, Exs. 19 through 23. "Nothing in the evidence supports more than the rankest speculation" that CPB's actions have harmed NPR's business relations, and NPR's motion fails as a result. *Bennett Enters., Inc. v. Domino's Pizza, Inc.*, 45 F.3d 493, 499 (D.C. Cir. 1995).

Because NPR's arguments in support of its claim for tortious interference fail to meet the strict standard of either Rule 56 or Rule 65, the Court should deny NPR's motion.

**V.      NPR has Failed to Demonstrate the Necessary Factors to Justify an Injunction**

NPR's requests for preliminary and permanent injunctive relief seek both (1) the prohibitory injunction of barring CPB from proceeding with its selection of PMI to receive the interconnection funding grant; and (2) the mandatory injunction of requiring CPB to award the interconnection funds to NPR. NPR's PI-SJ Motion at 1-2. NPR has sought both preliminary and permanent injunctions. *Id.* These are substantial requests.

"An injunction is a ***drastic and extraordinary remedy***, which should not be granted as a matter of course." *Monsanto Co. v. Geertson Seed Farms*, 561 U.S. 139, 165, 130 S. Ct. 2743 (2010). "[I]t 'does not follow from success on the merits.'" *Id.* To obtain a preliminary injunction, a movant "must show that (1) it is likely to succeed on the merits; (2) it is likely to suffer irreparable harm in the absence of preliminary relief; (3) the balance of equities tips in its favor; and (4) the issuance of a preliminary injunction is in the public interest." *Alpine Sec. Corp. v. FINRA*, 121 F.4th 1314, 1324 (D.C. Cir. 2024) (internal quotations and alterations omitted).

Where a movant fails to show any "likelihood of success on the merits," courts are without authority to grant a preliminary injunction, and, accordingly, the court "need not proceed to review the other three preliminary injunction factors." *Ark. Dairy Co-op Ass'n, Inc. v. U.S. Dep't of Agric.*, 573 F.3d 815, 832 (D.C. Cir. 2009). "[A] showing that irreparable injury is 'likely' is the sine qua non for obtaining a preliminary injunction—it is what justifies the extraordinary remedy of granting relief before the parties have had the opportunity fully to develop the evidence and fully to present their respective cases." *Cal. Ass'n of Private Postsecondary Schs. v. DeVos*, 344 F. Supp. 3d 158, 167 (D.D.C. 2018). *Ashland Oil, Inc. v. F.T.C.*, 409 F. Supp. 297, 309 (D.D.C. 1976), aff'd, 548 F.2d 977 (D.C. Cir. 1976) ("If irreparable injury cannot be established, . . . injunctive relief is not warranted.").

> [A] plaintiff seeking a *permanent* injunction must satisfy a four-factor test before a court may grant such relief. A plaintiff must demonstrate: (1) that it has suffered an irreparable injury; (2) that remedies available at law, such as monetary damages, are inadequate to compensate for that injury; 3) that, considering the balance of hardships between the plaintiff and defendant, a remedy in equity is warranted; and (4) that the public interest would not be disserved by a permanent injunction."

*Monsanto*, 561 U.S. at 156–57.

The types of injunctive relief sought by NPR are disfavored by courts. "Because the limited purpose of a preliminary injunction 'is merely to preserve the relative positions of the parties until a trial on the merits can be held,' courts "'have identified ... types of specifically disfavored preliminary injunctions ... :(1) preliminary injunctions that alter the status quo; [and] (2) mandatory preliminary injunctions.'" *Schrier v. Univ. Of Co.*, 427 F.3d 1253, 1259 (10th Cir. 2005) (*quoting Univ. of Tex. v. Camenisch*, 451 U.S. 390, 395, 101 S.Ct. 1830 (1981), and *O Centro Espirita Beneficiente Uniao Do Vegetal v. Ashcroft*, 389 F.3d 973, 977 (10th Cir. 2004)). "Such disfavored injunctions 'must be more closely scrutinized to assure that the exigencies of the case support the granting of a remedy that is extraordinary even in the normal course.'" *Id.* (quoting *O Centro*, 389 F.3d at 975).

### A.  NPR has Failed to Show that it is Likely to Prevail on the Merits

For the reasons set forth above, and those argued in CPB's Motion for Summary Judgment, which are incorporated herein, NPR is unlikely to prevail on the merits of its claims.

### B.  NPR has Failed to Show that it Will Suffer Any Harm, Much Less Irreparable, Without Injunctive Relief or that Legal Remedies are Inadequate

As the Supreme Court has made clear, a movant seeking injunctive relief must make a "clear showing" that **substantial** and ***immediate*** irreparable harm is "likely," not just a possibility, in the absence of an injunction. *Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 22 (2008) (reversing court preliminary injunction). Here, NPR has failed to make the required "clear

showing" of substantial and immediate irreparable harm.

First, NPR's request is nothing more than a brazen request for money by an $800 million organization that it contends it deserves. Indeed, their motion nakedly concedes as much: "This Court should issue a preliminary injunction restraining CPB from distributing appropriated interconnection funding for public radio to any entity or entities other than NPR . . . ." NPR's PI-SJ Memo at 42. But "[t]he loss of grant funds during this litigation is not irreparable because the harm is compensable through money damages." *Climate United Fund v. Citibank, N.A.*, No. 25-5122, 2025 WL 2502881, at *12 (D.C. Cir. Sept. 2, 2025). *See also Chaplaincy of Full Gospel Churches v. England,* 454 F.3d 290, 98  (D.C. Cir. 2006) ("Mere injuries, however substantial, in terms of money, time and energy necessarily expended in the absence of a stay are not enough. The possibility that adequate compensatory or other corrective relief will be available at a later date, in the ordinary course of litigation weighs heavily against a claim of irreparable harm.") (citations omitted). The D.C. Circuit has recognized only one exception to this rule: "for pecuniary loss that 'threatens the very existence of the movant's business.'" *Climate United Fund*, No. 25-5122, 2025 WL 2502881, at *12.

Initially, NPR does not even allege that the loss of the PRSS funding threatens its very existence, nor could it. Compl. at ¶ 53 ("NPR is funded primarily through sponsorships, donations from individuals and private entities, membership and licensing fees from local public radio stations, direct funding from the Corporation, and direct funding from other governmental grants . . . ."). NPR is an organization with $800 million in assets, $325 million in revenue, and a $368 million endowment, which receives less than 1% of its funding through grants of federal appropriations provided by CPB. *See* SOF at ¶¶ 15-18.

NPR claims that it is the only entity capable of implementing the PBA's requirements

related to interconnection, but that is not NPR's call to make. Congress made it clear that it is CPB's role to determine how best to determine the development and advancement of interconnection technologies for the public media system. But in that case, it is just like the entities in *Climate United Fund*, created "solely for the purpose of applying for and spending these federal grants." *Id*. at *12. And because NPR's legal theory relies on CPB being a governmental entity for these purposes,[6] NPR sits in the exact same shoes as the losing petitioners in *Climate Fund*:

> So while their "existence relies on grant money" as the district court held, that is because these entities were established to benefit from government largesse. ***Creating such an entity cannot establish an irrevocable claim to government funds or an entitlement to injunctive relief*** preventing the Executive Branch from supervising and managing those funds. In short, the existential threat alleged by the grantees does not amount to irreparable harm.

*Climate United Fund* , No. 25-5122, 2025 WL 2502881, at *12 (emphasis added).

Moreover, to the extent that NPR claims it is entitled to injunctive relief here because CPB is winding down its business affairs (Motion at 20), this cannot form the basis of an irreparable harm either. "The law of this Circuit, however, is clear that '[a]n injunction freezing assets is only permissible when a party has demonstrated an equitable claim to the assets.'" *Strobos v. RxBio, Inc*., 221 F. Supp. 3d 21, 23 (D.D.C. 2016) (quoting *Ellipso, Inc. v. Mann*, 480 F.3d 1153, 1160 (D.C. Cir. 2007)). As the court in *Strobos* noted, "federal 'courts cannot issue preliminary injunctions based solely on the solvency of debtors where the plaintiffs' underlying claims primarily seek monetary damages,' rather than equitable relief." *Id*. (citing *Grupo Mexicano de Desarrollo, S.A. v. Alliance Bond Fund, Inc*., 527 U.S. 308 (1999)). It is no different here—NPR seeks a preliminary injunction to seize money because it fears CPB is going out of business—but this does not make the harm irreparable. NPR still only seeks money damages, and it asserts no

---

[6] CPB does not concede it is a governmental entity.

equitable claim to the money it seeks—indeed, it seeks no valid claim to it at all. A "plaintiff['s] dashed hopes of receiving future government work, without more, cannot yield a constitutionally protected property interest." *Redondo-Borges v. U.S. Dep't of Hous. & Urb. Dev.*, 421 F.3d 1, 9 (1st Cir. 2005). Because NPR is, in effect, seeking money damages, it has not, and cannot demonstrate that remedies available at law are inadequate. *See Monsanto*, 561 U.S. at 156–57.

Second, both before *and* after NPR pursued its action against CPB, NPR admitted time and time again that it has suffered no harm. By way of limited example, in April of 2025 when NPR was conducting its budgeting and planning for PRSS, it drafted its budget assuming "zero dollars" from CPB because it did not know "how much, if any money [NPR] would get." SOF at ¶ 163.

Then, on July 18, 2025, just days after CPB posted the RFP, Mr. Munipalla informed his colleagues that:

> "NPR leadership assured GMs that PRSS services will continue - - *no matter what CPB does with the RFP, and with or without CPB funding.*"

Lipchitz Decl. Ex. A;Merkley Dep. Ex. 3. Then in August, NPR boasted internally about its "healthy reserves" for the PRSS system of between $23 million to $25 million, generated in part from NPR's "very successful commercial business selling excess satellite capacity." SOF at ¶ 186.

Indeed, Mr. Munipalla has admitted: "If NPR were to just maintain the current state and do nothing else, the ***limiter would not be money*** as much as it would be the satellite system going away, at which point you wouldn't have anything else and the system would stop operating." SOF at ¶ 189.[7] CPB has no control over whether that satellite system stops operating. SOF at ¶ 104.

---

[7] As NPR concedes, its real harm comes from the FCC auctioning off portions of the satellite frequency spectrum, specifically the "C-band," and plans to continue doing so. The FCC selling off portions of the C-band will diminish NPR Distribution's satellite capacity and if the FCC sells off the C-band, the PRSS will cease to operate. Townsend Decl. at Ex. 6 (Munipalla Tr. at 34-35:18-21 (Dkt. No. 59-6). NPR concedes that CPB has no control over when satellite C-band will go away. *Id.* (Munipalla Tr. at 180:4-9).

Similarly, even *after* moving for a temporary restraining order, NPR issued a public press release in the form of a Q&A where it conceded there was no harm, by asserting:

- "If NPR doesn't get the money they want, will they stop supporting PRSS?

  No. NPR plans to support PRSS at the same level of quality, reliability and service as it has for the past 40 years."

- "NPR's board has passed a stable FY26 budget that will fund PRSS and not increase PRSS station fees, despite the loss of federal funding."

- "No matter what happens in the suit, the money in question will be put toward supporting the public radio system."

- "Even if NPR succeeds in this motion, some RFP grant money would go to PMI and some would go to PRSS. If NPR does not succeed, the money will go to PMI. No money goes away."

CPB's MSJ at Exhibit E (Dkt No. 60-4 corrected at 63-5). As NPR concedes, regardless of whether it obtains any relief, it will continue to operate the PRSS as it sees fit, using its considerable assets to do so. This concession, that it will continue to operate regardless, further demonstrates that NPR's claim, despite being dressed up in injunctive requests, is really just a claim for money damages for which legal remedies are adequate.

Third, NPR's conduct, including its own five-month delay in seeking any injunctive relief, is fundamentally inconsistent with any assertion of irreparable harm. NPR has known that CPB desired to make changes to the future management of the interconnection system since at least April 2025. Indeed, on April 30, 2025, CPB sent a letter to NPR's Board of Directors making it clear that if NPR did not create an independent entity, then CPB will consider an "alternative to the current public radio interconnection framework."[8] As discussed above, NPR planned in April "zero dollars" for its upcoming budget based on CPB's request. NPR then sat

---

[8] NPR's Motion calls the RFP process a "sham." NPR's PI-SJ Memo at 15. Yet, they nonetheless waited until five months later, on September 26, 2025, to seek relief from the Court.

back and took no action until it lost the bid to be selected as part of the RFP process. This five-month delay in taking any action underscores the fact that NPR has not suffered any irreparable harm. *See Gordon v. Holder*, 632 F.3d 722, 725 (D.C. Cir. 2011); *Fund for Animals v. Frizzell*, 530 F.2d 982, 987 (D.C. Cir.1975) ("appellants knew on August 15th that what they allege to be their right to a more extensive comment period was to be denied them. Yet they delayed bringing any action until 44 days later, when the final regulations were issued. We find this delay to be inexcusable"); *Sierra Club v. Env't Prot. Agency*, No. CV 25-1112 (RC), 2025 WL 1895609, at *4 (D. D.C. July 9, 2025); *Air Transp. Ass'n of Am., Inc. v. Exp.-Imp. Bank of the United States*, 840 F.Supp.2d 327, 340 (D. D.C. 2012) (finding preliminary injunctive relief inappropriate where there was a measure of "inaction" and where the alleged harm was "economic and speculative [in] nature"); *Newdow v. Bush*, 355 F.Supp.2d 265, 292 (D.D.C.2005) ("[U]nexcused delay in seeking extraordinary injunctive relief may be grounds for denial because such delay implies a lack of urgency and irreparable harm[.]"); *Mylan Pharm., Inc. v. Shalala*, 81 F.Supp.2d 30, 44 (D. D.C. 2000) (finding delay of two months "militates against a finding of irreparable harm").

### C.  The Balance of Harms Favors CPB and Mandates Denial of Injunctive Relief

Balancing harms requires the Court to weigh the hardship to the nonmovant if enjoined as contrasted with the hardship to the movant if no injunction issues.  "[A] court can deny preliminary injunctive relief solely on the balance of equities and public interest factors even in cases, like this, involving constitutional claims." *Kim v. Fin. Indus. Regul. Auth., Inc*., 698 F. Supp. 3d 147, 170 (D.D.C. 2023), *appeal dismissed*, No. 23-7136, 2025 WL 313965 (D.C. Cir. Jan. 27, 2025). Such denial is appropriate if injunctive relief would interfere with, for example, an entity's regulatory mission or deny other properly qualified grantees from receiving funds. *Id.*; *Sherley v. Sebelius*,

644 F.3d 388, 398–99 (D.C. Cir. 2011).

Here, if CPB is ordered to disburse restricted federal funds to NPR – an entity that has no grant agreement with CPB and no obligations governing the use of those funds – it would frustrate CPB's Congressionally-mandated mission to serve as the steward of federal funds in the way that it deems to be in the best interest of public media. *See* 47 U.S.C. §396 (a) (10) ("a private corporation should be created to facilitate the development of public telecommunications and *to afford maximum protection from extraneous interference and control*.") (emphasis added). Indeed, CPB is required by law to safeguard federal funds through oversight and accountability measures, including strict grant requirements for recipients, which NPR seeks to avoid. *See* 47 U.S.C. §396 (L)(Financial Management and Records). Similarly, any order having the effect of delaying CPB's ability to finalize and document the award to PMI before it winds down would frustrate CPB's statutory mission and result in the appropriated funds being returned to the Treasury, as opposed to being put to work for the benefit of the public media system, as intended and determined by CPB and its consultants.

In contrast, NPR has no harm if it does not receive injunctive relief. The interconnection funds at issue have no bearing on NPR's news reporting or content creation. *See* CPB SOF 22, 32, 33, 37, 49-55. Moreover, as NPR has conceded, "NPR plans to support PRSS at the same level of quality, reliability and service as it has for the past 40 years," regardless of any funding from CPB. *See* supra and CPB's MSJ at Exhibit E (Dkt No. 60-4 corrected at 63-5); Townsend Decl. at Ex. 6 (Munipalla Tr. at 178).

**D.  The Public Interest Weighs Heavily Against the Issuance of Injunctive Relief**

As the U.S. Supreme Court has made clear, federal courts, in determining whether an injunction should issue, "***should pay particular regard to the public consequences in employing***

*the extraordinary remedy of an injunction*." *Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008) (emphasis added) (***reversing*** preliminary injunction that was detrimental to public interest in the Navy's use of sonar). That admonition is particularly applicable here because there are numerous and substantial public interests at stake. Indeed, before this Court is the future of the last public media interconnection grant that CPB is attempting to finalize before it winds down and ceases operations due to the Congressional rescission of its funds. As Congress recognized in enacting the Broadcasting Act:

(1) it is in the public interest to encourage the growth and development of public radio and television broadcasting

(2) it is in the public interest to encourage the growth and development of non-broadcast telecommunications technologies for the delivery of public telecommunications services;

(4) the encouragement and support of public telecommunications, while matters of importance for private and local development, are also of appropriate and important concern to the Federal Government;

47 U.S.C. §396 (a) (1), (2) and (4) (Congressional declaration of policy). In achieving these public interests, Congress also found it in the public interest that "a private corporation should be created to facilitate the development of public telecommunications and *to afford maximum protection from extraneous interference and control*. *Id.* at (10) (emphasis added).

Here, NPR's broad injunction would either (1) direct $36 million in Congressionally appropriated funds to be disbursed directly into its pockets ***knowing that it has no written grant agreement setting forth the limitations or obligations or use of those restricted federal funds*** or (2) force the further delay of CPB's finalization and approval of the written grant agreement with PMI by forcing CPB to "negotiate" with NPR, knowing that it can chew the clock as CPB is in the process of winding down its operations. This would effectively end CPB's ability to put $36 million in appropriated interconnection funds to use in the public media system in the way that it

determined is in the best interest for the system. Courts do not permit such results. *See, e.g., Winter*, 555 U.S. at 24; *American Sci. and Eng'g, Inc. v. Kelly*, 69 F. Supp.2d 227, 237-8 (D. Mass. 1999) (denying injunction; "the public interest militates against injunctive relief. An injunction will delay the production of an x-ray system that may assist Custom officers to detect illegal narcotics and weapons"). For this reason as well, NPR's motion must be denied.

**VI.    NPR's Motion for a Preliminary Injunction Should be Denied Because it Seeks to Improperly Deprive CPB of Appropriated Funds Necessary to Conduct its Congressionally Mandated Duties Without Posting a Bond Required by Rule 56**

In addition to failing to meet the high standard for a preliminary injunction because NPR cannot establish that it has a substantial likelihood of success on the merits and will suffer any harm much less irreparable harm, NPR's motion further violates Rule 65. Specifically, NPR brazenly seeks both preliminary and permanent injunctive relief that would improperly deprive CPB of $36 million in taxpayer funds appropriated by Congress to fulfill its obligations under the Broadcasting Act to "develop[] of one or more interconnection systems to be used for the distribution of public telecommunications services" and issue grants and contracts for interconnection facilities suitable for distribution and transmission of public telecommunications *without posting any kind of bond or security*. *See* 47 U.S.C. § 396(g)(1)(B) and § 396(g)(2). Indeed, the word "bond" is notably absent from NPR's filing.

Rule 65(c) of the Federal Rules of Civil Procedure mandates that:

> SECURITY. The Court may issue a preliminary injunction … ***only if*** the movant gives security in an amount that the Court considers proper to pay costs and damages sustained by a party found to have been wrongfully enjoined or restrained.

Fed.R.Civ.P. 65(c) (emphasis added). As a result, NPR's motion seeks to not only harm CPB and PMI by seeking an improper injunction, but also, in so doing, seeking to limit CPB's and PMI's

44

recourse in the unlikely event that an injunction should wrongfully be issued. For that separate reason, NPR's motion must be denied. *See* Jones v. Brown, 518 F. App'x 643, 644 (11th Cir. 2013) (affirming denial of preliminary injunction, in part, because movant failed to offer a bond); *Santilli v. Van Erp*, 2018 WL 2172554, at *7 (M.D. Fla. Apr. 20, 2018), *report and recommendation adopted*, 2018 WL 2152095 (M.D. Fla. May 10, 2018) (denying PI – "In addition to the above reasons Plaintiffs' motion is deficient, Plaintiffs also do not mention a bond amount.").

## CONCLUSION

For the foregoing reasons, Defendant the Corporation for Public Broadcasting respectfully requests that this Court DENY Plaintiff National Public Radio, Inc.'s Motion for Preliminary Injunction and Motion for Summary Judgment and Permanent Injunction.


Dated: October 27, 2025              By: */s/ Peter C. Nanov*
                                     Jason W. McElroy (D.C. Bar No. 502733)
                                     Peter C. Nanov (D.C. Bar No. 230021)
                                     SAUL EWING LLP
                                     1919 Pennsylvania Avenue NW, Suite 550
                                     Washington, D.C. 20006
                                     Tel: (202) 295-6605
                                     Email: jason.mcelroy@saul.com
                                                    peter.nanov@saul.com

                                     Jeffrey S. Robbins (*Admitted Pro Hac Vice*)
                                     Joseph D. Lipchitz (*Admitted Pro Hac Vice*)
                                     SAUL EWING LLP
                                     131 Dartmouth St., Suite 501
                                     Boston, MA 02116
                                     Tel: (617) 912-0941
                                     Email: jeffrey.robbins@saul.com
                                                    joseph.lipchitz@saul.com

                                     ***Counsel for Defendant Corporation for Public Broadcasting***

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on Oct. 27, 2025, I caused a copy of the foregoing **DEFENDANT CORPORATION FOR PUBLIC BROADCASTING'S MEMORANDUM IN OPPOSITION TO NATIONAL PUBLIC RADIO, INC.'S MOTION FOR PRELIMINARY INJUNCTION AND FOR SUMMARY JUDGMENT** and all attachments to be served on all parties and counsel of record via the Court's CM/ECF system.

*/s/ Peter C. Nanov*
Peter C. Nanov

46