# **EXHIBIT A**

Updated February 2024



# Board of Directors Reference Book

Corporation for Public Broadcasting
401 Ninth Street, NW
Washington, D.C. 20004

# Table of Contents

Updated February 2024

# CPB Board of Directors Reference Book
## Table of Contents

Board of Directors                                                                                      Tab
- Board Biographies                                                                          1
- 2022 Board Meeting Dates                                                           2

Governance Documents
- Articles of Incorporation                                                                 3
- By-Laws                                                                                          4
- Board Roles and Responsibilities                                                    5
- Open Meeting Practices (and Counsel's guidance)                          6
- Comments Policy                                                                             7
- Whistleblower/Investigation-Related Records Policies                   8
- Public Broadcasting Act                                                                   9

Ethics and Disclosure Documents
- Code of Ethics for Directors                                                           10
- Conflicts of Interest Policy                                                             11
- Conflict of Interest Questionnaire                                                   12

Board Expense Guidelines                                                                    13

Committee Charters
- Audit and Finance Committee                                                         14
- Corporative Governance Committee                                                15
- Executive Compensation Committee                                               16

1

**Board of Directors**
**Corporation for Public Broadcasting**

A Board of Directors governs CPB, sets policy, and establishes funding priorities. CPB is the only public media organization whose board members are nominated by the President of the United States and confirmed by the U.S. Senate. A full board term runs for six years, with the President nominating members for vacancies. The Board, in turn, appoints the president and the chief executive officer of CPB, who then names the other corporate officers.



**Laura G. Ross**
*Chair, Board of Directors*

Laura Gore Ross was reappointed to the CPB Board of Directors by President Joseph Biden and confirmed by the Senate in February 2022. Ms. Ross was appointed for her first term to the CPB Board of Directors by President Donald Trump and confirmed by the Senate in May 2018. She was elected as chair of the Board in October 2022 after serving as vice chair from October 2020-2022.

Ms. Ross is a retired attorney with a career in public service.

Ms. Ross' past professional experience includes the Corporation Counsel of the City of New York, MFY Legal Services, eight years as Chief of Staff to the Attorney General of the State of New York, and subsequently Legislative Counsel to a New York State Senator. She began government service at the Civil Rights Division of the U.S. Department of Justice, was a former Legislative Assistant to a U.S. Congressman from Flint, Michigan, and was appointed by President Obama to represent the United States at the 64th United Nations General Assembly.

She is currently a member of the Screening Panel for New York's Federal Judiciary. She was a Trustee of New York Public Media (WNET, WLIW, and NJTV); a Director of the Mayor's Fund to Advance New York City; a Trustee of WNYC Public Radio, President of NYANA, a refugee resettlement agency, a member of the Board of the Horace Mann School, a Trustee of the Citizens Budget Committee, and a Trustee for Turnaround for Children, an educational not-for-profit.

Ms. Ross resides in New York City with her husband who is a retired attorney and venture capitalist. They have two adult children.

Her term expires in 2028.

**Ruby Calvert**
*Vice Chair, Board of Directors*

Rubydee Calvert was reappointed to the CPB Board of Directors by President Joseph Biden and confirmed by the Senate in December 2022. Ms. Calvert was first appointed to the CPB Board of Directors by President Donald Trump and confirmed by the Senate in May 2018.

Ms. Calvert retired from Wyoming PBS in August 2015, where she served as the General Manager of the station and the President of the Wyoming PBS Foundation (2006-2016). Prior to becoming General Manager, she was the Director of Programming for 24 years, and supervised the departments of production, promotion, and education services, leading the production team to produce the station's signature series Main Street, Wyoming in 1990. This series continues today – and has archived 225 programs on the history and culture of Wyoming. Ms. Calvert was the executive producer for several documentaries that were distributed nationally and produced and hosted many local public affairs programs and election debates. She also supervised the education initiatives Teacherline and Ready To Learn, serving on their national advisory boards.

While working as the general manager, Ms. Calvert handled all governmental affairs efforts for the station and was successful in working with Wyoming governors and the State Legislature to acquire three additional staff positions (2007), a $1.5 million endowment grant for station production (2008), $1 million grant to upgrade the station production truck to high definition (2009-10), and a grant to produce online Native American education modules for Wyoming schools (2014). She received the National Advocacy Award from APTS in 2013 for her work with the Wyoming Congressional delegation.

Ms. Calvert served two terms on the national PBS Board (2008-2014), where she also served on PBS' Station Services, Interconnection, National Policy Advisory and Station Diversity committees. Governor Geringer appointed Calvert to the Wyoming State Board of Education (2000-2006), which she chaired for two years. Prior to that she served and chaired the Riverton Memorial Hospital Board (1996-2000) and was a Riverton Rotary officer for six years.

Ms. Calvert is a member of the Board of Trustees of the Buffalo Bill Center of the West in Cody, Wyoming and chairs the Education and Interpretation Advisory Committee. She was elected to the Board of Directors of America's Public Television Stations in January 2017 and serves on U.S. Senator Mike Enzi's committee for military academy appointments.

Ms. Calvert has a BA in English, Secondary Education from the University of Wyoming; she has completed post graduate work in the Master of Public Administration program from the University of Wyoming and completed two years of broadcasting classes at Central Wyoming College, where she also taught production classes. She has three children, Chad, an attorney who works in Denver, Kara who works in governmental affairs in Washington, D.C., and Chris, a petroleum engineer who works in Dallas.

Her term expires in 2028.



**Miriam Hellreich**

Miriam Hellreich was appointed to the CPB Board of Directors by President Donald Trump and confirmed by the Senate in March 2019.

Ms. Hellreich, originally from Alabama, began her career as a speech and language pathologist when she founded the first speech and language therapy program at Taipei American School in Taiwan. She later moved to Hawaii and established a private practice, delivering speech, language and voice therapy services to a culturally diverse group of adults and children.

Ms. Hellreich was President of the Hawaii Speech Language & Hearing Association (HSHA); she developed the first professional continuing education program for its members and later became the Chairman of the HSHA Legislative Affairs Committee. She authored the first professional licensure bill for Hawaii's Speech and Language Pathologists.

Ms. Hellreich has been active in her community, serving as the president of the Hawaii Medical Association Auxiliary and on the boards of the American Cancer Society and the Hawaii Association of Children and Adults with Learning Disabilities. Seeking to help train parents to work with their communicatively handicapped children, she developed a home therapy program for Hawaii's rural preschool children through the California-Hawaii Elks Major Project. She is also a long-serving member of the RNC Executive Committee.

Ms. Hellreich was appointed by the governor of Hawaii to serve on the Board of Governors of the East West Center (EWC) from 2002-2009. The EWC is an educational, training and research institution that focuses on promoting better relations and understanding among the people and nations of the United States, Asia and the Pacific through cooperative study, research and dialogue. During her EWC tenure, Ms. Hellreich was Vice-Chairman of the Board of Governors and later served as the Chairman of the Strategic Planning Committee.

Ms. Hellreich earned her B.A. and M.A. Degrees in Speech & Language Pathology at the University of Alabama. She is married to Dr. Philip Hellreich and has an adult daughter.

Her term expires in 2024.



**Kathy Im**

Kathy Im was appointed to the CPB Board of Directors by President Joseph Biden and confirmed by the Senate in December 2022.

Ms. Im is the Director of Journalism and Media at the John D. and Catherine T. MacArthur Foundation. She manages one of the nation's largest and longest running philanthropic portfolios focused on public interest journalism and media. During her tenure, the program has deepened and expanded its investments in the creation, dissemination, and amplification of accurate, just, and inclusive news and narratives across three areas of media – Professional Nonprofit Reporting, Nonfiction Multimedia Storytelling, and Participatory Civic Media.

Ms. Im is a recognized leader in philanthropy and media and the author of several editorials and essays about press freedom, media diversity, and the connection between media and democracy. She is a member of the Board of Jurors for the George Foster Peabody Awards, a member of the Academy of Motion Picture Arts and Sciences, and she serves on the advisory boards of the Berkeley School of Journalism and the University of Chicago's Harris School of Public Policy. She is a former board member of Media Impact Funders, the Center for Asian American Media, and Asian Americans/Pacific Islanders in Philanthropy. Ms. Im earned her Master's in Public Policy from the Harris School at the University of Chicago, and her Bachelor's in Government Studies from Smith College.

Her term expires in 2024.

January 9, 2022

**Diane Kaplan**

Diane Kaplan was appointed to the CPB Board of Directors by President Joseph Biden and confirmed by the Senate in December 2022.

Ms. Kaplan grew up in Brooklyn, New York. Her path to Alaska wound through public radio management positions in Pennsylvania and California.

Ms. Kaplan came to the 49th state in 1983 to run the four-year old Alaska Public Radio Network (APRN), stewarding the system through the building of stations in rural areas throughout the state, expansion of news and public affairs programming from one daily broadcast to a full schedule, and creation of a national Native American news network.

After 11 years with APRN, Ms. Kaplan opened a consulting practice which handled federal and state government relations and management advising for media, tribal, government and corporate clients. In 1995, she was tapped to lead the Anchorage-based Rasmuson Foundation as its first employee. During her 27-year tenure as President, the Foundation grew from $5M to $800M in assets, and developed a national reputation for excellence in grantmaking and public policy work.

Ms. Kaplan is a founder and continues as a board member of United States Artists, the nation's largest funder of fellowships for artists in all disciplines, and guides the grantmaking of two donor-advised funds at the Alaska Community Foundation. She has received numerous honors from industry, tribal and civic organizations, both nationally and in Alaska.

Her term expires in 2026.



**Bruce Ramer**

Bruce M. Ramer was reappointed to the CPB Board of Directors by President Donald Trump and confirmed by the Senate in March 2019. Mr. Ramer was previously appointed by Presidents Barack Obama and George W. Bush. He was vice chair of the CPB Board from 2016 to 2018 and in October 2018 was elected as chair, a position he also held from 2010 to 2012.

He is an attorney and partner at Gang, Tyre, Ramer, Brown and Passman, a firm specializing in entertainment and media matters.

Mr. Ramer has been active in public television since joining the board of KCET in Los Angeles in 1992. He served as chair from 2001 to 2003.

He is a member of the Board of Trustees of the University of Southern California (USC). He is chair of the USC Institute on Entertainment Law and Business and a member of the Board of Councilors of the USC Annenberg School for Communication and Journalism, Board of Governors of the Center for the Digital Future at USC Annenberg; member of the Board of Councilors of the USC Gould School of Law and the USC Shoah Foundation Institute for Visual History and Education.

Mr. Ramer is founding chairman and member of the Board of Trustees of the Geffen Playhouse, a board member of the Southern California Committee for the Olympic Games, the Los Angeles Sports Council, the National Archives Foundation; and Chair, Peabody Awards Board of Directors – West Coast and a member of the Board of Directors of the Ellis Island Honors Society. He is also a member of the Council on Foreign Relations and the Pacific Council on International Policy. He serves on the Executive Advisory Council of the American Archive of Public Broadcasting. He is a former member of the Herrhausen Institute for International Dialogue of Deutsche Bank.

Mr. Ramer received the American Jewish Committee Community Service Award in 1987 and the Learned Hand Award in 2005. He has also received the Beverly Hills Bar Association Entertainment Lawyer of the Year Award in 1996; the Commanders Cross of the Order of Merit of the Federal Republic of Germany in 2000; the Medal of Honor of the Konrad Adenauer Foundation in 2001 and the Survivors of the Shoah Visual History Foundation Ambassador for Humanity Award in 2002; and the Ellis Island Medal of Honor in 2013.

He was named one of the 100 most powerful lawyers in California by California Business Lawyer and one of the top 100 lawyers in California by the Daily Journal.

Mr. Ramer is a graduate of Princeton University and Harvard Law School. He lives in Los Angeles with his wife, Madeline. They have four children and seven grandchildren.

His term expires in 2024.

7



**Tom Rothman**

Tom Rothman was appointed to the CPB Board of Directors by President Joseph Biden and confirmed by the Senate in February 2022.

Mr. Rothman is Chairman and CEO of Sony Pictures Entertainment's Motion Picture Group. In that role, Mr. Rothman oversees the studio's motion picture businesses worldwide including that of Columbia Pictures, TriStar Pictures, Screen Gems, Sony Pictures Animation, Sony Pictures Imageworks and Sony Pictures Classics. The company has offices and operations in over forty countries across the globe.

Mr. Rothman joined Sony Pictures in 2013 as Chairman of TriStar Pictures before being promoted to Chairman, Sony Pictures Motion Picture Group in February 2015, and then to Chairman and CEO in 2021. He has led a full turnaround of the motion picture business since he assumed oversight of the film studio, achieving record profitability.

Prior to Sony Pictures, Mr. Rothman served as Chairman and CEO of Fox Filmed Entertainment (FFE) from 2000 – 2012. In this capacity he oversaw Twentieth Century Fox Film Corp., Fox Searchlight (which Rothman founded in 1994) and Twentieth Century Fox Television. During his years there, Fox released two of the highest-grossing films in cinematic history, *Titanic* and *Avatar,* and garnered over 150 Academy Award® nominations, three Best Picture Oscars, and in excess of $40 billion at the worldwide box office.

Prior to Fox, Mr. Rothman was President of Worldwide Production for the Samuel Goldwyn Company. Mr. Rothman came to Goldwyn in 1989 from Columbia Pictures where he was Executive Vice President. Before joining Columbia, Mr. Rothman was a partner at the New York entertainment law firm Frankfurt, Kurnit, Klein and Selz. Mr. Rothman began his work life as an English teacher and was later a law clerk on the Second Circuit Court of Appeals in New York.

Mr. Rothman graduated from Brown University in 1976, with Honors in English Literature, Magna Cum Laude, Phi Beta Kappa, and was an All New England selection in Division I Lacrosse. In 1980 he graduated from Columbia Law School as a two-time James Kent Scholar -- the school's highest academic honor.

Among Mr. Rothman's many awards and distinctions are lifetime achievement recognitions from the Producers Guild of America, the IFP East, and the Academy of Science Fiction Films. He was presented with the Corwin Award for Human Relations from the American Jewish Committee.

Mr. Rothman is a longstanding member of the Academy of Motion Picture Arts and Sciences and has long been active in the non-profit arts and education areas. He is on the board of the California Institute for the Arts and is an emeritus member of the Sundance Institute and Brown University Boards and has worked as a teacher and fundraiser for Mentor L.A. Partner Schools. He is involved in numerous other civic and philanthropic activities including fundraising for the Fulfillment Fund, The Jewish Home for the Aging, the National Multiple Sclerosis Society, PXE International, and Harlem Lacrosse.

In 2015 Mr. Rothman was appointed to the National Council of the Arts and he serves on the Board of Directors of Booking Holdings Inc. the world's largest online travel agency.

His term expires in 2026.

8



### Elizabeth Sembler

Elizabeth Sembler was reappointed to the CPB Board of Directors by President Joseph Biden and confirmed by the Senate in February 2022. She was previously appointed by Presidents Barack Obama and George W. Bush. She served as board chair from 2014 to 2016 and vice chair from 2012 to 2014.

Ms. Sembler is a retired educator, school administrator, and Jewish communal professional.  She previously served as the director of engagement at Congregation B'nai Israel in St. Petersburg, Florida.

She has served on the board of WEDU-TV since 1993 and was the chair of its board from 2001-2003. From 2006-2008, she served on the board of the Association of Public Television Stations (APTS), a nonprofit group that supports the continued growth and development of a strong and financially sound noncommercial television service. She also served on the foundation board of the Poynter Institute for Media Studies in St. Petersburg, Florida.

Ms. Sembler is active in leadership and board service in the Jewish community – locally, regionally and nationally – serving on the advisory board of the Davidson Graduate School of Education at the Jewish Theological Seminary in New York, New York, the board of trustees of Jewish Theological Seminary in New York, New York, and the board of trustees for the TOP Jewish Foundation in Tampa, Florida. She also serves on the and board of trustees of Congregation B'nai Israel. Ms. Sembler is on the board of directors for the Institute for Strategic Policy Solutions (ISPS) at St. Petersburg College, the board of directors of the Academy Prep Center of St. Petersburg in Florida, a privately funded middle school for students qualifying for needs-based scholarships, and the board of directors of the Florida Orchestra. She was a member of the United Jewish Communities National Young Leadership Cabinet in the 1990s.

She began her career as a staff writer for the St. Petersburg Times (now the Tampa Bay Times) after earning her bachelor's degree in newspaper journalism and political science from Syracuse University. She later earned a master's degree in English from the University of South Florida.

Ms. Sembler lives in Seminole, Florida, with her husband, Greg. They are the parents of four adult children.

Her term expires in 2026.

2

**RESOLUTION**
**PUBLIC SESSION**
**BOARD OF DIRECTORS**
**CORPORATION FOR PUBLIC BROADCASTING**
**WASHINGTON, D.C.**
**Tuesday, February 13, 2024**

*unanimously*

RESOLVED,

That the Board of Directors adopts the following revised board meeting dates and locations for the remainder of calendar year **2024**:

| Date: | Location: |
|---|---|
| Wednesday, April 10 – Thursday, April 11 | Washington, D.C. |
| **Thursday, June 6 (1:00 – 4:00 pm ET)** | **Virtual** |
| Thursday, September 26 | Washington, D.C. |
| Tuesday, November 19 – Wednesday, November 20 | Washington, D.C. |

3

APR 1 68  109119 F5227    0  —Crp— S H   12.00

**OFFICE OF RECORDER OF DEEDS**
Washington, D. C.
Recorder *Peter S. Ridley*

OF

# CERTIFICATE

*THIS IS TO CERTIFY* that all provisions of the District of Columbia

Non-profit Corporation Act have been complied with and ACCORD-

INGLY this Certificate of _____ **Incorporation** _____

_____

is hereby issued to the __ **CORPORATION FOR PUBLIC BROADCASTING** __

_____

as of the date hereinafter mentioned.

Date — **March 27, 1968**

PETER S. RIDLEY,

*Recorder of Deeds, D. C.*

*Alfred Goldstein*

**Alfred Goldstein**
*Superintendent of Corporations*

Government of the District of Columbia
Form RD-C 55
Oct. 1962

2642

ARTICLES OF INCORPORATION

OF

CORPORATION FOR PUBLIC BROADCASTING

We, the undersigned natural persons of the age of
twenty-one (21) years or more, and citizens of the United
States, acting as incorporators appointed by the President
of the United States under Title II of the Public Broadcast-
ing Act of 1967, Public Law 90-129, approved November 7, 1967,
81 Stat. 365, and desiring to organize a corporation under
said Act and under the District of Columbia Non-Profit Cor-
poration Act (29 D. C. Code Chapter 10), adopt, by direction
of all the Incorporators so appointed, the following Articles
of Incorporation for such Corporation.

ARTICLE I.

Section 1.01.  The name of the Corporation is:
Corporation for Public Broadcasting.

ARTICLE II.

Section 2.01.  The period of duration of the
Corporation is perpetual.

FILED
MAR 27 1968

BY: _____

- 2 -

## ARTICLE III.

Section 3.01.  The purposes for which the Corporation is organized are -

(a)  to further and carry out the purposes and achieve the objectives of the Public Broadcasting Act of 1967 and any amendments thereto; and

(b)  to do everything necessary, desirable, advisable, or convenient for the furtherance and accomplishment of such purposes and the achievement of such objectives, and to do all other things incidental thereto or connected therewith which are not forbidden by applicable law or these Articles.

Section 3.02.  In order to further and carry out the purposes and achieve the objectives of the Public Broadcasting Act of 1967, the Corporation -

(a)  shall have the powers set forth in the Public Broadcasting Act of 1967, and any amendments thereto, as the powers of the Corporation authorized to be created by said Act, and

(b)  shall have the further power, subject to the provisions of the Public Broadcasting Act of 1967, and any amendments thereto, to -

- 3 -

1. have perpetual succession by its corporate name;

2. sue and be sued, complain and defend, in **its corporate name;**

3. have a corporate seal which may be altered at pleasure and to use the **same by causing it,** or a facsimile thereof, to be impressed or affixed or in any other manner reproduced;

4. purchase, take, receive, lease, take by **gift, devise** or bequest, or otherwise acquire, own, hold, improve, use, and otherwise deal in and with, real or personal property, or any interest therein, wherever situated;

5. **sell,** convey, mortgage, pledge, lease, exchange, transfer, and otherwise dispose of all or any part of its property and assets;

6. purchase, take, receive, subscribe for, or otherwise acquire, own, hold, vote, use, employ, sell, mortgage, loan, pledge, or otherwise dispose of, and otherwise use and deal in and with, shares or other interests **in,** or obligations of, other domestic or foreign corporations,

- 4 -

whether for profit or not for profit, associations, partner-
ships, or individuals, or direct or indirect obligations of
the United States, or of any other government, State, terri-
tory, governmental district, or municipality or of any in-
strumentality thereof;

7. make contracts and incur liabilities,
borrow money at such rates of interest as the Corporation
may determine, issue its notes, bonds, and other obligations,
and secure any of its obligations by mortgage or pledge of
all or any of its property, franchises and income;

8. lend money for its corporate purposes, in-
vest and reinvest its funds, and take and hold real and per-
sonal property as security for the payment of funds so loan-
ed or invested;

9. conduct its affairs, carry on its opera-
tions, hold property, and have offices and exercise its
powers in any part of the world;

10. elect or appoint officers and agents of
the Corporation, and define their duties and fix their com-
pensation;

- 5 -

      11.  make and alter By-Laws, not inconsistent with its Articles of Incorporation, or with applicable law, for the administration and regulation of the affairs of the Corporation;

      12.  make donations for the public welfare or for charitable, scientific, literary, or educational purposes, or for other purposes for which the Corporation is organized;

      13.  indemnify any director or officer or former director or officer of the Corporation, or any person who may have served at its request as a director or officer of another corporation, whether for profit or not for profit, against expenses actually and necessarily incurred by him in connection with the defense of any action, suit, or proceeding in which he is made a party by reason of being or having been such director or officer, except in relation to matters as to which he shall be adjudged in such action, suit, or proceeding to be liable for negligence or misconduct in the performance of a duty.  Such indemnification shall not be deemed exclusive of any other rights to which such director or officer may be entitled, under any by-law,

- 6 -

agreement, vote of board of directors or members, or otherwise;

14.  cease its corporate activities and surrender its corporate franchise; and

15.  have and exercise all powers necessary or convenient to effect any or all of the purposes for which the Corporation is organized.

### ARTICLE IV.

Section 4.01.  The Corporation will have no members.

### ARTICLE V.

Section 5.01.  The directors of the Corporation shall be appointed or elected in the manner provided for by the Public Broadcasting Act of 1967 and any amendments thereto.

### ARTICLE VI.

Section 6.01.  The affairs of the Corporation shall be conducted as provided for in the By-Laws of the Corporation to be adopted by the Board of Directors.

Section 6.02.  The Corporation is organized exclusively for charitable, scientific, literary and educational purposes, including, for such purposes, the making

- 7 -

of distributions to organizations that qualify as exempt organizations under section 501(c)(3) of the Internal Revenue Code of 1954 (or the corresponding provisions of any future United States Internal Revenue Law).

Section 6.03. Notwithstanding any other provision of these Articles, the Corporation shall not carry on any other activities not permitted to be carried on (a) by a corporation exempt from Federal income tax under section 501(c)(3) of the Internal Revenue Code of 1954 (or the corresponding provision of any future United States Internal Revenue Law) or (b) by a corporation, contributions to which are deductible under section 170(c)(2) of the Internal Revenue Code of 1954 (or the corresponding provision of any future United States Internal Revenue Law).

Section 6.04. In the event of dissolution or final liquidation of the Corporation, the Board of Directors shall, after paying or making provision for the payment of all of the liabilities of the Corporation, dispose of all of the assets of the Corporation in such manner, or to such organization or organizations organized and operated

- 8 -

exclusively for charitable, educational, literary, or scienti-
fic purposes as shall at the time qualify as an exempt organi-
zation or organizations under section 501(c)(3) of the
Internal Revenue Code of 1954 (or the corresponding provi-
sion of any future United States Internal Revenue Law), as
the Board of Directors shall determine.

ARTICLE VII.

Section 7.01.  The address of the Corporation's
initial registered office is:

1250 Connecticut Avenue
Washington, D. C. 20036

Section 7.02.  The name of the Corporation's
initial registered agent at such address is:

William E. Miller

ARTICLE VIII.

Section 8.01.  The number of directors constitut-
ing the Initial Board of Directors is fifteen (15) and the
names and address, including street and number, of the

- 9 -

persons who are to serve as the Initial Directors until their
successors are elected and qualified are:

| Name | Address |
|------|---------|
| Joseph A. Beirne | 1925 K Street, N. W.<br>Washington, D. C. 20006 |
| Robert S. Benjamin | 729 Seventh Avenue<br>New York, New York 10019 |
| Roscoe C. Carroll | 1999 W. Adams Blvd.<br>Los Angeles, California 90018 |
| Milton S. Eisenhower | 12 E. Bishops Road<br>Baltimore, Maryland 21218 |
| Michael A. Gammino | 33 Weybosset Street<br>Providence, Rhode Island 02903 |
| Saul Haas | 1530 Queen Anne Avenue N.<br>Seattle, Washington 98109 |
| Oveta Culp Hobby | 2410 Polk Avenue<br>Houston, Texas 77003 |
| Joseph D. Hughes | 525 William Penn Place<br>Pittsburgh, Pennsylvania 15219 |
| James R. Killian, Jr. | 77 Massachusetts Avenue<br>Cambridge, Massachusetts 02139 |
| Erich Leinsdorf | 251 Huntington Avenue<br>Boston, Massachusetts 02115 |

- 10 -

| Name | Address |
|------|---------|
| Frank Pace, Jr. | 545 Madison Avenue<br>New York, New York 10022 |
| John D. Rockefeller 3rd | 30 Rockefeller Plaza<br>New York, New York 10020 |
| Carl E. Sanders | 34 Broad Street<br>Atlanta, Georgia 30303 |
| Frank E. Schooley | 504 West Springfield Avenue<br>Champaign, Illinois 61820 |
| Jack Valenti | 918 Sixteenth Street, N. W.<br>Washington, D. C. 20006 |

### ARTICLE IX.

Section 9.01.  The name and address, including street and number, of each Incorporator is:

| Name | Address |
|------|---------|
| Joseph A. Beirne | 1925 K Street, N. W.<br>Washington, D. C. 20006 |
| Robert S. Benjamin | 729 Seventh Avenue<br>New York, New York 10019 |
| Roscoe C. Carroll | 1999 W. Adams Blvd.<br>Los Angeles, California 90018 |
| Milton S. Eisenhower | 12 E. Bishops Road<br>Baltimore, Maryland 21218 |
| Michael A. Gammino | 33 Weybosset Street<br>Providence, Rhode Island 02903 |
| Saul Haas | 1530 Queen Anne Avenue N.<br>Seattle, Washington 98109 |

- 11 -

| Name | Address |
|------|---------|
| Oveta Culp Hobby | 2410 Polk Avenue<br>Houston, Texas 77003 |
| Joseph D. Hughes | 525 William Penn Place<br>Pittsburgh, Pennsylvania 15219 |
| James R. Killian, Jr. | 77 Massachusetts Avenue<br>Cambridge, Massachusetts 02139 |
| Erich Leinsdorf | 251 Huntington Avenue<br>Boston, Massachusetts 02115 |
| Frank Pace, Jr. | 545 Madison Avenue<br>New York, New York 10022 |
| John D. Rockefeller 3rd | 30 Rockefeller Plaza<br>New York, New York 10020 |
| Carl E. Sanders | 34 Broad Street<br>Atlanta, Georgia 30303 |
| Frank E. Schooley | 504 West Springfield Avenue<br>Champaign, Illinois 61820 |
| Jack Valenti | 918 Sixteenth Street, N. W.<br>Washington, D. C. 20006 |

Whereas, we, the undersigned Incorporators,
hereunto affix, on separate pages, with acknowledgments,
our signatures:

- 12 -

*Joseph A. Beirne*
Joseph A. Beirne

WASHINGTON, D. C.

DISTRICT OF COLUMBIA

On this the 18th day of March , 1968,
before me Ebba H. Muller , the undersigned officer,
personally appeared Joseph A. Beirne, who signed the foregoing
document as an incorporator and who acknowledged that the state-
ments therein contained are true.

*Ebba H. Muller*
Notary Public

My Commission Expires May 14, 1970

- 13 -

_Robert S. Benjamin_

Robert S. Benjamin

**CITY OF**   NEW YORK

**STATE OF**   NEW YORK

On this the   25th   day of   March   , 1968, before me   Florence Abramson   , the undersigned officer, personally appeared Robert S. Benjamin, who signed the fore-going document as an incorporator and who acknowledged that the statements therein contained are true.

_Florence Abramson_

FLORENCE ABRAMSON
Notary Public, State of New York
No. 31 5600100
Qualified in New York County
Commission Expires March 30, 1968

- 14 -

_Roscoe C. Carroll_
Roscoe C. Carroll

CITY OF <u>Los Angeles</u>

STATE OF <u>California</u>

COUNTY OF <u>Los Angeles</u>

     On this the <u>18th</u> day of <u>March</u>, 1968,
before me <u>NOLAN PAYTON</u>, the undersigned officer,
personally appeared Roscoe C. Carroll, who signed the foregoing
document as an incorporator and who acknowledged that the state-
ments therein contained are true.



OFFICIAL SEAL
**NOLAN PAYTON**
NOTARY PUBLIC · CALIFORNIA
PRINCIPAL OFFICE IN
LOS ANGELES COUNTY

- 15 -

*Milton S. Eisenhower*

Milton S. Eisenhower

**CITY OF**     Baltimore

**STATE OF**    Maryland

On this the  25  day of   March  , 1968,
before me a Notary Public   , the undersigned officer,
personally appeared Milton S. Eisenhower, who signed the fore-
going document as an incorporator and who acknowledged that the
statements therein contained are true.

*Gertrude K. Holland*

- 16 -

Michael A. Gammino

CITY OF Providence

STATE OF Rhode Island and Providence Plantations


On this the 18th day of March , 1968,
before me _a notary public_ ~~Michael A. Gammino~~ , the undersigned officer,

personally appeared Michael A. Gammino, who signed the foregoing

document as an incorporator and who acknowledged that the state-

ments therein contained are true.

My Commission Expires
June 30, 1971

- 17 -

_____
SAUL HAAS

WASHINGTON, D. C.

DISTRICT OF COLUMBIA

On this the _13_ day of _March_, 1968, before me _Hugh W. Smith_, the undersigned officer, personally appeared Saul Haas, who signed the foregoing document as an incorporator and who acknowledged that the statements therein contained are true.

_____
My Commission Expires April 14, 1972

- 18 -

_Oveta Culp Hobby_

**CITY OF** Houston

**STATE OF** Texas

On this the 18th day of March , 1968, before me Peggy C. Buchanan , the undersigned officer, personally appeared Oveta Culp Hobby, who signed the foregoing document as an incorporator and who acknowledged that the statements therein contained are true.

_Peggy C. Buchanan_
Peggy C. Buchanan, Notary Public in and for Harris County, T e x a s

- 19 -

_Joseph W. Hughes_
Joseph D. Hughes

CITY OF PITTSBURGH

COMMONWEALTH OF PENNSYLVANIA

On this the __19th__ day of ____March____, 1968, before me __Dorothy J. Deist_____, the undersigned officer, personally appeared Joseph D. Hughes, who signed the foregoing document as an incorporator and who acknowledged that the statements therein contained are true.

_Dorothy J. Deist_
Notary Public

DOROTHY J. DEIST, Notary Public
Pittsburgh, Allegheny Co., Pa.
My Commission Expires
January 15, 1971

- 20 -

_James R. Killian, Jr._
James R. Killian, Jr.

CITY OF _Cambridge_

STATE OF _Mass._

     On this the _19th_ day of _March_, 1968, before me _Mary Louise Morrissey_ the undersigned officer, personally appeared James R. Killian, Jr., who signed the fore-going document as an incorporator and who acknowledged that the statements therein **contained are** true.

_Mary Louise Morrissey_
_James R. Killian_

x *Erich Leinsdorf*
Erich Leinsdorf

**CITY OF** Boston

**STATE OF** Massachusetts


On this the 18th day of March , 1968,
before me  James J. Brosnahan , the undersigned officer, per-
sonally appeared Erich Leinsdorf, who signed the foregoing docu-
ment as an incorporator and who acknowledged that the statements
therein contained are true.

*James J Brosnahan*

- 22 -

*Frank Pace Jr.*
_____
Frank Pace, Jr.

CITY OF    New York
_____

STATE OF   New York
_____


     On this the 18th day of       March       , 1968,
before me    Diana Houghtelling     , the undersigned officer, per-
sonally appeared Frank Pace, Jr., who signed the foregoing docu-
ment as an incorporator and who acknowledged that the statements
therein contained are true.


*Diana Houghtelling*
_____

DIANA HOUGHTELLING
Notary Public, State of New York
No. 31-1867800
Qualified in New York County
Commission Expires    3/22/69

- 23 -

_John D. Rockefeller 21_
John D. Rockefeller 3rd

CITY OF _NEW YORK_

STATE OF _NEW YORK_


On this the _22nd_ day of _MARCH_, 1968,

before me _JOHN D. ROCKEFELLER 3rd_, the undersigned officer,

personally appeared John D. Rockefeller 3rd, who signed the

foregoing document as an incorporator and who acknowledged that

the statements therein contained are true.

_Ruth Avidon_

**RUTH AVIDON**
Notary Public, State of New York
No. 31-0118550 - New York County
Commission Expires March 30, 19 _69_

- 24 -

_Carl E. Sanders_

**CITY OF** _Atlanta_

**STATE OF** _Georgia_

On this the 18th day of March , 1968, before me Kathryn W. Frierson , **the undersigned officer, personally appeared Carl E. Sanders, who signed the foregoing document as an incorporator and who acknowledged that the statements therein contained are true.**

_Kathryn W. Frierson_
Notary Public, Fulton County, Georgia
My Commission expires: March 14, 1971

- 25 -

_Frank E. Schooley_
Frank E. Schooley

CITY OF _CHAMPAIGN_

STATE OF _ILLINOIS_


On this the _18_ day of _MARCH_, 1968, before me _John UPP_, the undersigned officer, personally appeared Frank E. Schooley, who signed the foregoing document as an incorporator and who acknowledged that the statements therein contained are true.

_John Upp_
Notary Public

- 26 -

_Jack Valenti_
Jack Valenti

WASHINGTON, D. C.

DISTRICT OF COLUMBIA


On this the 18th day of _March_ , 1968, before
me _Mary J. Tyler_ , the undersigned officer, personally
appeared Jack Valenti, who signed the foregoing document as an
incorporator and who acknowledged that the statements therein
contained are true.

_Mary J. Tyler_

My Commission Expires Sept. 30, 1972

4

# BY-LAWS

## OF THE

## CORPORATION FOR PUBLIC BROADCASTING

*As amended September 13, 2021*

-2-

# ARTICLE I

## Offices

Section 1.01.  **Registered Office**.  The Corporation shall maintain a registered office in the City of Washington, District of Columbia.

Section 1.02.  **Other Offices**.  The Corporation may also have offices at such other places, either within or without the District of Columbia, as the business of the Corporation may require.

# ARTICLE  II

## Board of Directors

Section 2.01.  **General Powers**.  The property, affairs and business of the Corporation shall be managed by the Board of Directors.

Section 2.02.  **Number, Terms of Office and Qualifications**.  The Board of Directors (the "Board") shall consist of the number of Directors required by the Public Broadcasting Act of 1967 and any amendments thereto.  The method of appointment of Directors and their terms of office shall be as set forth in the Public Broadcasting Act of 1967 and any amendments thereto.

Section 2.03.  **The Chair of the Board**.  At each annual meeting of the Board, or at such other time as there may be a vacancy in this office, and, if, as a result of the vacancy, the Board by majority vote calls for an election, the Board shall elect, by majority vote, from among its members who are not employees of the Corporation who have completed a minimum of one full year of service as of the date of such election, a Chair of the Board.  The Chair shall not serve in such a capacity for more than three consecutive full one-year terms during a single term of office.  The Chair shall serve at the pleasure of the Board, or until his or her successor has been duly elected and qualified, or until the Chair shall resign or otherwise vacate his or her office or Board membership.  The Chair shall preside at all meetings of the Board, shall carry out all functions required by these By-Laws, and shall perform such other duties as from time to time may be assigned by the Board.

-3-

Section 2.04.  **The Vice Chair of the Board**.  At each Annual Meeting of the Board, or at such other time as there may be a vacancy in this office, the Board shall elect, by majority vote, from among its members who are not employees of the Corporation, a Vice Chair of the Board.  The Vice Chair shall not serve in such capacity for more than three consecutive full one-year terms during a single term of office.  The Vice Chair shall serve at the pleasure of the Board, or until his or her successor has been duly elected and qualified, or until the Vice Chair shall resign or otherwise vacate his or her office or Board membership.  In the absence of the Chair of the Board, the Vice Chair of the Board shall act in all respects in the stead of the Chair during such absence.  In the case of a vacancy in the office of the Chair of the Board, the Vice Chair of the Board shall act in all respects in the stead of the Chair, for the remainder of the unexpired term of the Chair, or until the Board, by majority vote, elects a successor to the Chair.  In addition, the Vice Chair shall carry out all functions required by these By-Laws and shall perform such other duties as from time to time may be assigned by the Board.

Section 2.05.  **Organization of Directors' Meetings**.  At all meetings of the Board of Directors, the Chair of the Board, or, in his or her absence, the Vice Chair of the Board, or in the absence of the Chair of the Board and the Vice Chair of the Board, a temporary Chair chosen by a majority of the Directors present, shall act as Chair of such meeting and preside threat.  The Secretary shall act as Secretary at all meetings of the Board of Directors.  In the absence from any such meeting of the Secretary, the Chair may appoint any person to act as Secretary of the meeting.  A copy of the minutes of all meetings shall be supplied to each member of the Board.

Section 2.06.  **Place and Manner of Meetings**.  Meetings of the Board of Directors, including the Annual Meeting, will be held at Washington, D.C., or at such other place or places as may be determined by the Board. Meetings of the Board and its committees may be actual or telephonic.  The Annual Meeting and at least two Regular Meetings each year shall be actual meetings of the Board unless the Board otherwise determines. Directors who are unable to attend actual meetings in person may participate by telephonic means. Telephonic meetings and telephonic participation in actual meetings may use any form of electronic communications which permits all persons attending or participating in the meeting to speak to and be heard by all others attending or participating.

-4-

Section 2.07.  **Annual Meeting of the Board**.  The Annual Meeting of the Board of Directors for the purpose of organization, the election of Chair and Vice Chair for the ensuing year, and the transaction of other business shall be held during September of each year on such date and at such hour and at such place as shall be fixed by the Chair of the Board.  However, the Board may vote, by a two-thirds majority, to hold the Annual Meeting during a month other than September, so long as the Annual Meeting occurs before the end of the calendar year.  Unless the Board has voted to schedule it otherwise, if no Annual Meeting has been scheduled and called by the Chair of the Board by a date one year from the date of the previous Annual Meeting, then the Vice Chair of the Board shall call such a meeting.  If the Annual Meeting is not called by either the Chair of the Board or the Vice Chair of the Board, the Annual Meeting shall be called by the Secretary.  Notice of such Annual Meeting shall be given or waived as in the case of special meetings of the Board.

Section 2.08.  **Regular Meetings**.  Regular meetings of the Board of Directors shall be held at such intervals as may be fixed by resolution adopted by the Board.   Notice of such meetings shall be given or waived as in the case of special meetings of the Board.

Section 2.09.  **Special Meetings**.  Special meetings of the Board of Directors shall be held whenever called by the Chair of the Board ( or in the case of the Chair's absence or a vacancy in the office of the Chair, by the Vice Chair of the Board), or by a number of Directors representing not less than one-third of the current Directors serving on the Board, but in no event fewer than two (2) Directors.  Notice of each such meeting shall be mailed or sent by electronic mail to each Director at the mailing or electronic mail address appearing on the books of the Corporation for the purpose of notice to Directors, at least five (5) days before the day on which the meeting is to be held, or shall be sent to such mailing address by overnight express service, charges prepaid, or delivered personally not later than the third (3rd) day before the day on which the meeting is to be held.  Every such notice shall specify the time of the meeting, place, day, and hour of the meeting and the general nature of the business to be transacted.  A waiver of notice of any meeting in writing signed by the Director entitled to such notice, whether before or after the time stated therein, shall be deemed equivalent to the giving of such notice.  Participation of a Director in any meeting shall constitute a waiver of notice of such meeting, except where a Director participates for the express purpose of objecting to the

-5-

transaction of any business because the meeting was not lawfully called or convened. Whenever a meeting of the Board shall be adjourned, it shall not be necessary to give any notice of the adjourned meeting or of the business to be transacted thereat, otherwise than by announcement at the meeting at which such adjournment is taken.

Section 2.10.  **Quorum, Manner of Acting and Adjournment**.  At each regular meeting or special meeting of the Board, the presence or participation of a simple majority of the Directors then serving pursuant to law shall be necessary to constitute a quorum for the transaction of business.  Except as otherwise specifically provided by statute, the Articles of Incorporation, or these By-Laws, the acts of a majority of the Directors present at or participating in a regular meeting or special meeting, at which a quorum is present, shall be the acts of the Board.  A Director who is present at or participating in a regular or special meeting of the Board, but who abstains from participation in the vote upon any matter whether he or she remains in the meeting or withdraws therefrom during the vote, may be counted for purposes of determining whether or not a quorum is present or participating, and if a quorum is present or participating, the acts with respect to any such matter of a majority of the Directors present or participating who do not abstain shall be the acts of the Board.  A majority of the Directors present at or participating in any regular or special meeting, whether or not they shall comprise a quorum, may adjourn the meeting from time to time.  Each Director shall be entitled to one vote, and voting rights of Directors may not be exercised by proxy. Notwithstanding the foregoing, during an emergency period following a national, regional or local catastrophe, a majority of the surviving members of the Board of Directors who have not been rendered incapable of attending or participating shall constitute a quorum.  Any action which can be taken at a meeting of the Directors may be taken without a meeting if a consent in writing, in the form of a resolution setting forth the action so taken, shall be signed by all of the Directors.  Each such resolution shall be reported at the next meeting of the Board and set forth in the minutes of that meeting.  The Board may assign and delegate to the Chair, Vice Chair, President and other officers of the Corporation additional duties and authority not conferred pursuant to these By-Laws only by resolution of the Board, which resolution shall be set forth in the minutes of the meeting at which it was adopted.

-6-

## ARTICLE III

### Standing Committees

Section 3.01. **Audit Committee.** After each Annual Meeting of the Board, the Chair shall appoint, subject to the approval of the Board, no more than five (5) Directors to serve on the Audit Committee, including one to serve as chair. The Audit Committee shall be responsible for meeting with and receiving the reports of the outside auditors of the Corporation, shall review internal audits of the Corporation and shall assume such additional duties as may be assigned to it by the Board. The Committee shall report annually to the Board and at such other times as it deems appropriate or when requested to do so by the Board.

Section 3.02. **Other Committees.** The Board of Directors may establish such other standing or temporary committees as it may deem appropriate to perform such functions as it may designate. The Chair of the Board shall appoint, with the approval of the Board, an appropriate number of Directors to serve on such committees, including one to serve as chair.

Section 3.03. **Committee Procedure**. Each member of any regular or standing committee shall continue to serve as a member of that committee at the pleasure of the Board . The Chair of the Board shall serve as an *ex officio*, non-voting member of all Committees of the Board to which he or she is not specifically appointed, with the same rights and obligations as all duly appointed members except that the Chair shall not be counted to establish a quorum. Except as otherwise provided in these By-Laws, a majority of a committee shall constitute a quorum thereof, and the act of a majority of those present at or participating in a meeting at which a quorum is present shall be the act of the committee. Meetings of each committee shall be called by the chair of the committee or any two members of the committee. Each committee shall render such reports at such time as the Board shall require.

## ARTICLE IV

### Appointed Officers

Section 4.01. **Officers**. In addition to the elected officers of the Board (the Chair and Vice Chair) the Corporation shall have appointed officers employed by the Corporation. The

appointed officers shall be the President and Chief Executive Officer, the Executive Vice Presidents, the Secretary, the General Counsel, and the Treasurer. Officers in the areas of government relations, corporate communications, education, programming and system and station development, and such other officers as the Board or President and Chief Executive Officer deem necessary may be appointed pursuant to Section 4.03 of these By-Laws. A complete list of current officers of the Corporation shall be kept on file in the Office of the Corporate Secretary and posted on the CPB website.

Section 4.02. **Appointment, Term of Office, and Qualifications.** At such time as there may be a vacancy in the office of the President and Chief Executive Officer, the Board shall appoint an individual to serve in that position under such terms of employment as the Board shall determine. The President and Chief Executive Officer shall serve at the pleasure of the Board, and the Board shall conduct an annual review of the President's performance and his or her compensation at or before the last meeting of the Board in each calendar year. In addition, at such meeting in any year in which the employment agreement of the President and Chief Executive Officer is subject to renewal, the Chairman shall so inform the Board, and the Board shall decide whether to conduct an additional review of the performance and compensation of the President and Chief Executive Officer in connection with such renewal. All other corporate officers shall serve at the pleasure of the Board, but the Board may expressly delegate to the President and Chief Executive Officer the authority to review, hire, and dismiss officers and establish the level of their compensation. No individual other than a citizen of the United States may serve as an officer of the Corporation. Any two or more offices may be held by the same person, except the offices of Treasurer and President.

Section 4.03. **Additional Officers.** The Board may appoint such officers as it may deem necessary or may expressly delegate to the President and Chief Executive Officer the authority to appoint such other officers as the President shall deem necessary. Each such officer shall have such authority and shall perform such duties as may be determined, from time to time, by the Board, or by the President, acting under the expressed delegated authority of the Board.

Section 4.04. **Removal**. Any officer appointed by the Board may be removed by the Board, and any officer appointed by the President and Chief Executive Officer under

-8-

expressed delegated authority from the Board may be removed by the President, whenever, in the judgment of the Board or the President, the best interests of the Corporation will be served thereby.  Such removal shall be without prejudice to the contract rights, if any, of the person so removed.

Section 4.05.  **Resignation**.  Any officer of the Corporation may resign at any time by giving written notice of his resignation to the Board, or to the Chair of the Board, or to the President, or to the Secretary.  Any such resignation shall take effect at the time specified therein, and, unless otherwise specified therein, the acceptance thereof shall not be necessary to make it effective.

Section 4.06.  **Vacancies.**  Any vacancy in any office because of death, resignation, removal, disqualification, or any other cause may be filled by the Board at any regular or special meeting thereof, or may be filled by the President and Chief Executive Officer, under expressed authority delegated by the Board.

Section 4.07.  **The President**.  The President of the Corporation shall be its Chief Executive Officer and shall have the responsibility and authority for the day-to-day administration of the affairs of the Corporation under the general supervision of the Board and shall have such other powers and perform such other duties as the Board may from time to time prescribe.  If the President is not a member of the Board he or she may attend and participate in meetings of the Board *ex officio* but may not vote.

Section 4.08.  **The Vice Presidents.**  Each Vice President shall have such powers and perform such duties as the Board or the President and Chief Executive Officer, under expressed authority delegated by the Board, may from time to time prescribe.

Section 4.09.  **The Secretary**.  The Secretary shall (a) see that all notices are duly given in accordance with law and these By-Laws; (b) be custodian of the seal of the Corporation and affix such seal to all documents the execution of which, on behalf of the Corporation under its seal, is authorized by the Board or by any officer or agent of the Corporation to whom power to authorize the affixing of such seal shall have been delegated; (c) keep, or cause to be kept, in books provided for the purpose, minutes of the meetings of the Board, and of each committee of the Board; (d) see that the books, reports, statements and all other documents and records

-9-

required by law are properly kept and filed; (e) sign such instruments as require the signature of the Secretary; and (f) in general, perform all the duties incident to the office of the Secretary and such other duties as from time to time may be assigned.

Section 4.10. **The Treasurer**. The Treasurer shall (a) have charge and custody of, and be responsible for, all funds and securities of the Corporation and deposit all such funds in such banks, trust companies or other depositories as shall be selected in accordance with the provisions of these By-Laws; (b) receive, and give receipts for, monies due and payable to the Corporation from any source whatsoever; (c) sign such documents as shall require the signature of the Treasurer; (d) be responsible for the accounting functions of the Corporation including full and accurate accounts of all assets, liabilities, commitments, receipts, disbursements and other financial transactions; (e) see that all expenditures are made in accordance with procedures established from time to time by the Corporation; and (f) in general, perform all duties incident to the office of Treasurer and such other duties as from time to time may be assigned. The Treasurer shall give a bond for the faithful discharge of his or her duties in such sum and with such sureties as the Board shall determine.

Section 4.11. **General Counsel**. The General Counsel is the chief legal officer of the Corporation and provides advice and counsel to the Board of Directors and the Management of the Corporation on legal, public policy, legislative, and regulatory matters affecting public broadcasting and the operation of the Corporation. The General Counsel is responsible for, and generally oversees, the conduct of the Corporation's legal affairs, including the retention of outside counsel where appropriate and necessary, and provides representation and legal support services required for day-to-day corporate operations. The General Counsel is authorized to appoint and make changes in the Corporation's registered agent in accordance with the laws of the District of Columbia.

Section 4.12. **Compensation.** The compensation of the officers, the duration for which it will be applicable, and such other terms of employment, shall be fixed from time to time by the Board, or by the President and Chief Executive Officer, under expressed authority delegated by the Board. No officer of the Corporation may receive any salary or other compensation (except for compensation for services on boards of directors of other organizations that do not receive funds from the Corporation, on committees of such boards, and in similar activities for

-10-

such organizations) from any sources other than the Corporation for services rendered during the period of his or her employment by the Corporation. Service by any officer on such boards of directors of other organizations, on committees of such boards, and in similar activities for such organizations, shall be subject to annual advance approval by the Board, or by the President under expressed authority delegated by the Board, and shall be subject to the provisions of the Corporation's Statement of Ethical Conduct.

Section 4.13. **Outside Interests of Officers and Employees**. The Board from time to time may adopt rules and regulations governing the conduct of officers or key employees with respect to matters in which they have any interest adverse to the interests of the Corporation. Such rules and regulations may forbid officers or key employees from participating personally and substantially in corporate action with respect to any contract, grant, transaction or other matter in which, to the knowledge of any such officers or employee, he or she or any member of his or her immediate family has any interest, financial or otherwise, unless (a) such officer or employee makes full disclosure of the circumstances to the Board or its delegate and the Board or its delegate determines that the interest is not so substantial as to affect the integrity of the services of such officer or employee, or (b) on the basis of standards to be established in such rules or regulations, the interest is too remote or too inconsequential to affect the integrity of such services. Such rules and regulations may also prohibit, or establish appropriate limits upon, the ownership by such officer or employee, or member of his or her immediate family, of securities of any firm or corporation doing business with the Corporation.


## ARTICLE V

### Designated Body

Section 5.01. **Application.** This Article shall apply only in the instance that the Corporation's Board fails to meet the statutory minimum number of directors required under the D.C. Nonprofit Corporation Act. All references to rights and responsibilities of the Board, in these By-Laws, the Articles of Incorporation, or applicable statutes, shall apply to a Designated Body which shall be authorized to perform the functions of the Board in that

instance, with the exception of the authority to remove Directors under the D.C. Nonprofit Corporation Act.

Section 5.02.  **Responsibilities and Membership.**  If less than the statutory minimum number of presidentially appointed Directors of the Corporation remain in office, a Designated Body, consisting of three (3) members, shall exercise the rights and responsibilities of the Board until such time as there are three (3) presidentially appointed Directors. Members of the Designated Body shall include the remaining presidentially appointed Directors plus the number of former Directors, appointed as provided in Section 5.03, as are required for a total of three (3) members. The Designated Body shall be authorized to perform the functions of the Board for the period of time only until at least the statutory minimum number of Directors are in office.

Section 5.03.  **Appointed Members.**  The President and Chief Executive Officer of the Corporation shall select and appoint to the Designated Body the required number of individuals who most recently served as Directors of the Corporation who were nominated by the President and confirmed by the Senate, whose service on the Board ended by operation of law and not by earlier vacating office, and who agree to serve. Such former Directors shall be selected in the order in which they most recently served as Directors, and shall be removed in the order in which they were most recently appointed to serve on the Designated Body. The President and Chief executive Officer shall ensure the continued presence of three (3) members by appointing former Directors to fill any vacancies that occur, and by removing them from service when new presidentially appointed Directors take office. The Designated Body shall cease to function as soon as three (3) presidentially appointed Directors are in office.

## ARTICLE VI

### Contracts, Checks, Drafts, Bank Accounts, Etc.

Section 6.01.  **Contracts and Appointments of Agents in Connection Therewith**.  To the extent the Board may specifically authorize, the President or any other officer may, in the name of the Corporation and on its behalf, execute and deliver, or appoint agents with power to execute and deliver, in full compliance with the Corporation's procurement and contracting policies, bids and proposals for contracts with any person or entity, corporate or otherwise,

-12-

contracts between the Corporation and any such person or entity, bonds and undertakings required for the faithful performance of such contracts, and vouchers and receipts in connection therewith.

Section 6.02.  **Loans**.  To the extent the Board may specifically authorize, any two of the following, to wit, the President or any other officer, acting together, may effect loans and advances at any time for the Corporation from any bank, trust company or other institution or from any firm or individual and for such loans and advances may make, execute and deliver promissory notes or other evidences of indebtedness of the Corporation, but no officer or officers shall, for purposes of giving security for any such loan or advance, mortgage, pledge, hypothecate or transfer any property whatsoever owned or held by the Corporation, except when specifically authorized by resolution of the Board.

.

Section 6.03.  **Checks, Drafts, Etc**.  All checks, drafts, orders for the payment of money, bills of lading, warehouse receipts, obligations, bills of exchange and insurance certificates shall be signed or endorsed by such officer or officers, agent or agents of the Corporation and in such manner as shall from time to time be determined by resolution of the Board.

## ARTICLE  VII

### Seal

Section 7.01.  The Corporation shall have a corporate seal, which shall be in the form adopted by the Board.

## ARTICLE VIII

### Fiscal Year

Section 8.01.  The fiscal year of the Corporation shall be fixed by resolution of the Board.

-13-

## ARTICLE  IX

### Indemnification

Section 9.01.  The Corporation shall indemnify an employee, officer, Director or other volunteer, to the fullest extent mandated or permitted by District of Columbia law, against any and all expenses and liabilities incurred by or imposed on him or her in connection with any claim, action, suit or proceeding (whether actual or threatened, brought by or in the right of the Corporation or otherwise, civil, criminal, administrative, or investigative, including appeals) to which he or she may be or is made a party by reason of being or having been an employee, officer, Director, or other volunteer of the Corporation.

Amounts paid in indemnification of expenses and liabilities may include, but shall not be limited to, counsel fees and other fees, cost and disbursements, and judgments, fines and penalties against and amounts paid in settlement by such employee, officer, Director, or other volunteer.  The Corporation may advance expenses to, or where appropriate may itself, at its expense, undertake the defense of, any employee, officer,  Director, or other volunteer; provided, however, that such employee, officer, Director or other volunteer shall undertake to repay or to reimburse such expense, if it should be ultimately determined that he or she is not entitled to indemnification.

The provisions of this Article shall be applicable to claims, actions, suits or proceedings made or commenced after the adoption hereof, whether arising from acts or omissions to act occurring before or after adoption thereof.  Indemnification as provided for in this Section shall inure to the benefit of the heirs, executors, administrators, or other legal representatives of an employee, officer, director, or other volunteer.

If any part of this Section shall be found, in any action, suit or proceeding, to be invalid or ineffective, the validity and the effectiveness of the remaining parts shall not be affected.

## ARTICLE  X

### Amendments

-14-

Section 10.01.  Any of these By-Laws may be altered, amended, or repealed, and new By-Laws may be adopted, by an affirmative two-thirds majority vote of the Board; provided that (a) such action may be taken only at a meeting of the Board where such action has been identified, in advance, as one of the purposes of the meeting; (b) the notice of such an action at a meeting shall state the substance of the By-Law to be made or repealed, or of the alteration or amendment; and (c) the notice of such an action at a meeting shall be mailed, sent by electronic mail, sent by overnight express service, or delivered personally to each Director at least five (5) days before the date on which the meeting is to be held.

*Amended September 13, 2021*

5

**Roles and Responsibilities of the**
**Board of Directors, Chair of the Board, and President**
**in Directing the Affairs of the**
**Corporation for Public Broadcasting**

The Board of Directors (the "Board"), the Chair of the Board (the "Chair") and the President and Chief Executive Officer (the "President") each have distinct responsibilities in overseeing the affairs of the Corporation for Public Broadcasting ("Corporation"). This memorandum sets forth the Board's understanding of those distinct responsibilities. It does so by first describing, as a matter of general principles, the respective responsibilities of the Board, the Chair and the President. It then describes how those general principles would be applied in certain specific situations that regularly recur at the Corporation.

<u>General Principles</u>

***Board of Directors***

The By-Laws of the Corporation provide that the "property, affairs and business of the Corporation shall be managed by the Board of Directors." This is consistent with the District of Columbia Nonprofit Corporation Act, which provides that the "affairs of a corporation shall be managed by a board of directors." As such, the Board has general oversight responsibility for the management of all of the Corporation's affairs. Board Committees have specific roles in the fulfillment of general oversight responsibilities: the Audit and Finance committee provides oversight of the Corporation's finances; the Governance committee supervises development of and compliance with governance practices and guidelines; the Compensation committee has responsibilities relating to compensation and evaluation of the Corporation's officers and other employees.

The Board satisfies this responsibility by providing active leadership regarding important issues facing the Corporation. In particular, the Board is expected to provide leadership in:
  (i)     defining the Corporation's mission and strategy designed to achieve that mission;
  (ii)    appointing and planning for succession of the President; and
  (iii)   ensuring the Corporation's compliance with the law.

In addition, the Board is responsible for approving all "Matters Requiring Board Approval" as set forth in the Guidelines Regarding Board Approvals and Notification attached hereto as Exhibit A (the "Approvals/Notifications Guidelines").

The Board's responsibility is to provide clear direction on the course it wishes management to pursue regarding these and other critical matters. It is the responsibility of management to determine the manner in which such directives are achieved and implemented.

The Board, and its individual directors, each owe certain fiduciary duties to the Corporation. These duties (i.e., the duties of care, loyalty and candor), are described in the memorandum that is attached hereto as Exhibit B.

### *Chair of the Board*

The Chair is responsible for leading the Board in its activities and for serving as the principal liaison between management and the Board.

With respect to leading the Board in its activities, the Chair is primarily responsible, with the input of committee chairs and other directors, for setting the agenda for regularly-scheduled Board meetings and for determining whether and when special meetings should be held. The Chair presides at all meetings of the Board. The Chair will coordinate Board representation at events and functions. The Chair is expected to keep the Board apprised of his or her activities.

In the absence of the Chair of the Board, the Vice Chair of the Board shall act in all respects in the stead of the Chair during such absence.

With respect to serving as the principal liaison between management and the Board, the Chair is expected to stay in regular contact with the President in the periods between meetings. The Chair is also expected to keep the Board apprised on important issues he or she discusses with management.

The Chair operates in a capacity as a member of the Board and not as a member of the Corporation's management and is expected to respect and reinforce the appropriate roles of the Board and management.

### *President*

The President leads management's efforts in implementing and achieving the priorities that are adopted by the Board. He or she has discretion in determining the most appropriate means to achieve those priorities.

The President is also responsible for keeping the Board appropriately informed regarding the Corporation's significant activities and undertakings. The President is responsible for providing the Board with information regarding the Corporation that is relevant both to specific decisions that the Board is required to make and to the Board's effective fulfillment of its general responsibility for oversight of the Corporation's affairs. In particular, the President is responsible for ensuring that the Board is notified of the items identified under the caption "Matters About Which the Board Must be Notified" in the Approvals/Notifications Guidelines.

2

**Specific Situations**

The language above defines the general roles and responsibilities of the Board, the Chair, and the President and will guide the parties in their respective roles.  What follows is a description of how these roles and responsibilities are to be applied in regularly occurring matters affecting the Corporation.

### Budget-Setting

Each year the President, working with his or her senior staff and in consultation with the Chair, will develop a proposed annual budget.  The proposed budget represents the Corporation's plans for fulfilling the Board's annual priorities and will be presented to the Board (or if the Board so chooses, a committee of the Board) for consideration and approval.  Additionally, as part of the President's long-term budget planning, each year the President, in consultation with the Board, the public broadcasting system, and CPB senior staff, will develop a proposed appropriations request.  The proposed request will be presented to the Board for approval prior to submitting the request to the Federal government.  Any request for appropriations outside of the annual cycle (i.e., emergency requests) will be conducted in a similar fashion.

### Personnel Decisions Regarding the President and CEO; Executive Vice President and COO; Treasurer/CFO; and General Counsel

In accordance with Corporation's governance documents and human resources policies, the Board of Directors as a body will evaluate and make decisions regarding the hiring and termination of the Corporation's President.

The Board will also be responsible for approving the hiring and termination of the Corporation's Executive Vice President and Chief Operating Officer, Treasurer/Chief Financial Officer and General Counsel. It will make these decisions, however, only after the President has presented his or her recommendations regarding the same.

The Board delegates to the President the authority to hire, fire, promote, and set compensation and bonuses for all staff other than the Corporation's Executive Vice President and Chief Operating Officer, Treasurer/Chief Financial Officer and General Counsel, in accordance with CPB policies, procedures, and board committee charters.

### Programming Grants

The Board will set programming priorities through the annual budget process.  CPB management will make programming and content decisions, including delivery, strategies, program strands, and individual programs, in accordance with CPB policies and procedures.

### Station Grants

As required by CPB's authorizing legislation, CPB management will conduct consultations with the public broadcasting system regarding operational grants to public broadcasting stations. Management will then summarize the results of these consultations, and having considered them, present them along with its recommendations to the Board for consideration and approval.

### Communications/Press

The President acts as the chief spokesman for the Corporation to the public, press, legislative bodies and other related organizations.

### Annual Schedule of Standing Agenda Items

Each year the Board and its committees will be presented with a list of standing agenda items that reflect the matters referenced above and other recurring matters that require the consideration and approval of the Board.

*Adopted by the Board of Directors
on May 1, 2006*

**Exhibit A**

## CORPORATION FOR PUBLIC BROADCASTING

### GUIDELINES REGARDING REQUIRED
### BOARD APPROVALS AND NOTIFICATIONS

Matters Requiring Board Approval

1. Contracts and grants of and over $1 million in total contemplated payments for non-"program funding or program related" activities unless

    a. The contracts and grants are specifically included in corporate budget approved by the Board; or

    b. The grant is to a public radio or television station and is calculated in accordance with eligibility criteria or awarded according to priorities that were established after consultation with representatives of the public broadcasting system and approved by the Board.

2. Hiring and employment separation decisions regarding any of the Corporation's Senior Officers, provided that in extraordinary circumstances the Corporation's President and Chief Executive Officer (the "President") may, after consultation with the Chairman, if practicable, fire any such officer without prior Board approval. For purposes of these Guidelines, the Senior Officers of the Corporation shall be deemed to be the Corporation's President, Executive Vice President and Chief Operating Officer, Treasurer/Chief Financial Officer, and General Counsel.

3. Engagement of consultants to review or analyze the content of public broadcasting programming for the purpose of monitoring compliance with the Corporation's responsibilities under 47 U.S.C. Section 396(g)(1)(A) to "facilitate the full development of public telecommunications in which programs of high quality, diversity, creativity, excellence, and innovation, which are obtained from diverse sources, will be made available to public telecommunications entities, with strict adherence to objectivity and balance in all programs or series of programs of a controversial nature."

4. Any reduction-in-force or layoff involving more than 15% of the Corporation's employees.


Matters About Which the Board Must be Notified

1. Contracts over $250,000 in total contemplated payments.

2. Any event of defalcation (i) by any employee involving amounts in excess of $10,000 or (ii) by any officer of the Corporation, regardless of amount.

3. Any determination of a valid claim of harassment or discrimination lodged against a director, officer or vice president of the Corporation.

4. Any waiver of a requirement under the Corporation's Code of Ethics for Directors or Code of Ethics and Business Conduct for Employees.

5. Resignation by any officer or director of the Corporation.

6. Any issue characterized as material by outside auditors with respect to the Corporation's financial statements.

7. Any issue characterized as material by outside auditors with respect to the Corporation's internal controls.

8. Any findings of an internal investigation conducted by the management of the Corporation relating to possible material misconduct on the part of any employee or director.

9. The commencement of litigation by the Corporation involving (i) estimated legal fees in excess of $100,000 in any year or $300,000 over the course thereof or (ii) a potential counterclaim in excess of $100,000

10. The commencement of litigation against the Corporation seeking amounts in excess of $100,000.

*As adopted by the Board of Directors on January 9, 2006*

**Exhibit B**

**Fiduciary Duties of Directors**

Members of the Board of Directors of the Corporation for Public Broadcasting owe fiduciary duties to the Corporation. The principal duties are the duty of care, the duty of loyalty and the duty of candor.

*Duty of Care*

Directors owe to the Corporation a duty to exercise reasonable care when making corporate decisions and when performing their corporate responsibilities. Directors are obligated to perform their duties in good faith, in a manner reasonably believed to be in the best interests of the Corporation, and with the care that an ordinarily prudent person would reasonably be expected to exercise under similar circumstances. When making decisions, the duty of care requires directors to put forth a good faith effort to inform themselves of all material information reasonably available and to exercise appropriate judgment. The duty of care also requires directors to take adequate steps to see that the senior officers of the Corporation are properly managing the Corporation's business and affairs. This includes instituting (i) information and reporting systems reasonably designed to provide them and senior management with timely, accurate information sufficient to allow them to reach informed judgments concerning the Corporation's performance and (ii) compliance policies reasonably designed to ensure that the Corporation and its officers comply with laws applicable to the Corporation.

*Duty of Loyalty*

The duty of loyalty is a director's duty not to benefit personally at the expense of the Corporation. In order for a director to satisfy this obligation, the director must not allow personal or partisan political interests to prevail over the interests of the Corporation. Furthermore, directors may not use assets of the Corporation (including information) for personal gain or to the detriment of the Corporation.

*Duty of Candor*

The duty of candor requires that a director disclose to the other directors all facts of which the director is aware that could be material to the Board's consideration of the matters before it. The duty of candor is of particular relevance in those instances in which the director has a conflict of interest or a potential conflict of interest regarding a matter before the Board. Where there is such a conflict or potential conflict, the duty of candor requires that the director disclose the director's self-interest so that the disinterested directors can make an informed decision.

6

**RESOLUTION**
**THE BOARD OF DIRECTORS**
**CORPORATION FOR PUBLIC BROADCASTING**
**WASHINGTON, DC**
**Monday, May 1, 2006**

*unanimously*

WHEREAS,

The Corporation for Public Broadcasting is governed by the open meeting requirements of the Public Broadcasting Act as set forth in 47 U.S.C. Section 396 (g)(4) and (k)(4); and

WHEREAS,

The Board is committed to conducting its deliberations in open session in accordance with the Public Broadcasting Act; and

WHEREAS,

The Corporate Governance Committee has reviewed and recommended to the Board specific practices and procedures to ensure transparency in deliberations and that directors and corporate officers are mindful of their responsibilities in this regard.

NOW, THEREFORE, BE IT RESOLVED,

That the CPB Board of Directors hereby adopts the attached summary of practices and procedures for ensuring open board and committee meetings as its standard meeting policy.

# SUMMARY

### Subject:  Practices and Procedures for
### Ensuring Open Board and Committee Meetings

Transparency is a central goal of the improvements that CPB has been implementing.  The Board supports these goals and has already implemented practices that ensure that the Board's deliberations are as open as possible and that board members and corporate officers are mindful of their responsibilities in this regard.  These practices include:

- Both the General Counsel and the Corporate Secretary will review agendas for board and committee meetings and provide a written statement to the Board delineating which matters, if any, fall within the exceptions to the open meeting requirements under the Public Broadcasting Act.

- The Chair of the Board (or Committee) will call for a vote before closing any portion of the meeting.

- Advance public notice of closed meetings, and of closed sessions within open meetings, will be given in the same manner as for open meetings.

- CPB will continue its practice of:

  - Posting the Board's annual schedule of regular meetings on the CPB website
  - Posting notice and agendas for the Board's regular, special and committee meetings, approximately one week in advance, on the CPB website and in a local newspaper of general circulation
  - Issuing an e-mail advisory to the press for the Board's regular, special and committee meetings approximately one week in advance.

- CPB will continue to make available on the CPB website an archive of the resolutions of the Board.

- Audio files of all open meetings of the full Board will be posted on the CPB website.

*Adopted by the Board of Directors*
*on May 1, 2006*

PUBLIC SESSION
Board of Directors
Corporation for Public Broadcasting
Washington, DC
Monday, May 1, 2006

7

PUBLIC COMMENTS SESSION
OF
BOARD OF DIRECTORS MEETINGS

POLICY:    The Public Comments Session was first established
to provide the public with a certain portion during
each Board meeting to address the Board.  The Board
adopted guidelines to administer these Public
Comments Sessions.  The guidelines call for
requests to be submitted in writing to the Office
of the Secretary stating the subject of the
comments, who will be addressing the Board, their
titles, and affiliation, and whether any written
documents will be distributed to the Board.  The
written requests are encouraged to be submitted
before Board materials are mailed, usually two
weeks in advance of the meeting in question.  The
Corporate Secretary clears such requests with the
President, Chairman and Vice Chairman, taking into
account such considerations as whether the Board's
agenda and schedule permit a Public Comments
Session, whether the Board has received a
presentation on this issue recently, or whether the
group making the request has addressed the Board in
the recent past.  The national public broadcasting
organizations do not have to request slots on the
Public Comments Session; they may speak on issues
as they arise on the agenda at the discretion and
invitation of the Board and Management.

(SEE ATTACHED PUBLIC COMMENTS SESSION GUIDELINES)

GUIDELINES FOR PUBLIC COMMENTS SESSION
DURING CPB BOARD MEETINGS

1. Within the time available, the Board of Directors of the
   Corporation for Public Broadcasting will permit persons
   interested in public telecommunications issues to address
   the Board in the course of its regular meetings.

2. The Public Comments Session will appear as the last sub-
   stantive item on each Regular Session agenda of the Board.
   This portion of the meeting is intended to accommodate two
   separate speakers for no more than ten minutes each, with an
   additional ten minutes allocated to each for questions from
   the Board.

3. Those who wish to speak will file their requests in writing
   with the Office of the Secretary, Corporation for Public
   Broadcasting, which request will include name of speaker,
   organization or affiliation, and the subject of the comments.

4. A person requesting an opportunity to appear before the Board
   is encouraged have his request on file with the Office of the
   Secretary before meeting materials are mailed to the Board two
   weeks in advance of the Board meeting.  The Chairman has dis-
   cretion over requests made after the deadline has passed,
   taking into account the amount of work to be conducted by the
   Board during that meeting.

5. The Office of the Secretary will notify each applicant of
   time and place of the appearance.  If more than two requests
   for a given meeting are received, applicants may be re-
   quested to appear before Board Committees rather than before
   the full Board.  Otherwise, the Office of the Secretary will
   make arrangements for those speakers to address the Board
   during a subsequent Board meeting.

June, 1985

8

## Whistleblower Policy

**Purpose**

To establish a "Whistleblower Policy" that encourages CPB directors, officers and employees to report suspected waste, fraud, abuse, mismanagement, violations of law, and violations of the CPB Code of Ethics and Business Conduct or the Code of Ethics for Directors of the Corporation for Public Broadcasting (the "Codes"), and to prevent retaliation against those who report such occurrences in good faith. This Whistleblower Policy is further intended to encourage the reporting and resolution of such issues within CPB prior to seeking resolution outside CPB.

**Policy**

Directors, officers and employees expected to report any reasonable suspicion of waste, fraud, abuse, material mismanagement, or violations of law or the Codes at CPB, and to cooperate in the investigation of the same by the CPB Inspector General or other authorized entities. It is further CPB's policy that there shall be no retaliation of any kind against those who, in good faith, appropriately report such occurrences.

**Implementation**

Under this Whistleblower Policy, CPB directors, officers, supervisors, and employees are required to report any good faith reasonable belief or suspicion of waste, fraud, abuse, or mismanagement with respect to CPB resources or violations of law or the Codes. At the same time, CPB will endeavor to maintain the confidentiality of those who report and witness such occurrences and to protect them from retaliation. Reports of any wrongdoing contemplated by this policy shall be deemed made in good faith if the person reporting the same had reasonable grounds to believe or suspect that the wrongdoing occurred, even if that belief or suspicion should later prove unsubstantiated.

**Reporting Procedure**

Directors, officers and employees may report occurrences under this policy on a confidential basis or they may submit them anonymously. Ordinarily, officers and employees should report occurrences to their supervisors, and members of the Board should submit them to the Board Chair. If these reporting relationships are impractical or inappropriate under the circumstances, then reports shall be made directly to the General Counsel, and if that is impractical or inappropriate, then to the Inspector General. All reports by whomever received shall be forwarded to the General Counsel for an initial evaluation, or if inappropriate under the circumstances then directly to the Inspector General. The General Counsel shall submit the report with his or her evaluation and recommendations to the Inspector General for further evaluation or investigation as the Inspector General deems appropriate, with a copy of the same to the President and CEO unless inappropriate under the circumstances.

Upon completion of his or her consideration of the matter, the Inspector General shall submit a Report of Investigation to the General Counsel, or the Chairman of the Board if the General

Counsel or the President and CEO is the subject of the Report. The General Counsel shall submit a copy of the Report of Investigation, with any recommendations about the Report, to the President and CEO for determination of appropriate corrective action. Once corrective action has been taken, the Chair of the Board shall be so notified.

All reports shall be kept confidential to the fullest extent possible by CPB and its directors, officers and employees, consistent with the need to conduct an adequate investigation, prosecute any criminal charges that may arise, and to inform the Board and management of weaknesses in internal controls and the need for corrective measures.

**Retaliation**

No director, officer or employee who, in good faith, reports waste, fraud, abuse, mismanagement or a violation of law or the Codes shall be subjected to any harassment, adverse employment consequences or other form of retaliation by CPB. Retaliation includes, but is not limited to, adverse job actions such as termination; denial of any bonus, benefit or training; reduction of salary or decrease in hours; or change in or transfer to a lesser position. An officer or employee who retaliates against someone who has reported such an occurrence in good faith shall be subject to disciplinary action, up to and including termination of employment. Likewise, anyone who is found by the General Counsel to have intentionally submitted a report knowing the same to be false and not in good faith shall be subject to appropriate disciplinary action.

*Adopted by the Board of Directors*
*on May 1, 2006*

9

**Subpart D --Corporation for Public Broadcasting**

**Sec. 396. [47 U.S.C. 396] Corporation for Public Broadcasting**

(a) Congressional declaration of policy

The Congress hereby finds and declares that--

(1) it is in the public interest to encourage the growth and development of public radio and television broadcasting, including the use of such media for instructional, educational, and cultural purposes;

(2) it is in the public interest to encourage the growth and development of nonbroadcast telecommunications technologies for the delivery of public telecommunications services;

(3) expansion and development of public telecommunications and of diversity of its programming depend on freedom, imagination, and initiative on both local and national levels;

(4) the encouragement and support of public telecommunications, while matters of importance for private and local development, are also of appropriate and important concern to the Federal Government;

(5) it furthers the general welfare to encourage public telecommunications services which will be responsive to the interests of people both in particular localities and throughout the United States, which will constitute an expression of diversity and excellence, and which will constitute a source of alternative telecommunications services for all the citizens of the Nation;

(6) it is in the public interest to encourage the development of programming that involves creative risks and that addresses the needs of unserved and underserved audiences, particularly children and minorities;

(7) it is necessary and appropriate for the Federal Government to complement, assist, and support a national policy that will most effectively make public telecommunications services available to all citizens of the United States;

(8) public television and radio stations and public telecommunications services constitute valuable local community resources for utilizing electronic media to address national concerns and solve local problems through community programs and outreach programs;

(9) it is in the public interest for the Federal Government to ensure that all citizens of the United States have access to public telecommunications services through all appropriate available telecommunications distribution technologies; and

(10) a private corporation should be created to facilitate the development of public telecommunications and to afford maximum protection from extraneous interference and control.

(b) Establishment of Corporation; application of District of Columbia Nonprofit Corporation Act

There is authorized to be established a nonprofit corporation, to be known as the "Corporation for Public Broadcasting", which will not be an agency or establishment of

the United States Government. The Corporation shall be subject to the provisions of this section, and, to the extent consistent with this section, to the District of Columbia Nonprofit Corporation Act [D.C. Code, Sec. 29-501 et seq.].

(c) Board of Directors; functions, duties, etc.

(1) The Corporation for Public Broadcasting shall have a Board of Directors (hereinafter in this section referred to as the "Board"), consisting of 9 members appointed by the President, by and with the advice and consent of the Senate. No more than 5 members of the Board appointed by the President may be members of the same political party.

(2) The 9 members of the Board appointed by the President (A) shall be selected from among citizens of the United States (not regular full-time employees of the United States) who are eminent in such fields as education, cultural and civic affairs, or the arts, including radio and television; and (B) shall be selected so as to provide as nearly as practicable a broad representation of various regions of the Nation, various professions and occupations, and various kinds of talent and experience appropriate to the functions and responsibilities of the Corporation.

(3) Of the members of the Board appointed by the President under paragraph (1), one member shall be selected from among individuals who represent the licensees and permittees of public television stations, and one member shall be selected from among individuals who represent the licensees and permittees of public radio stations.

(4) The members of the initial Board of Directors shall serve as incorporators and shall take whatever actions are necessary to establish the Corporation under the District of Columbia Nonprofit Corporation Act [D.C. Code, Sec. 29-501 et seq.].

(5) The term of office of each member of the Board appointed by the President shall be 6 years, except as provided in section 5(c) of the Public Telecommunications Act of 1992. Any member whose term has expired may serve until such member's successor has taken office, or until the end of the calendar year in which such member's term has expired, whichever is earlier. Any member appointed to fill a vacancy occurring prior to the expiration of the term for which such member's predecessor was appointed shall be appointed for the remainder of such term. No member of the Board shall be eligible to serve in excess of 2 consecutive full terms.

(6) Any vacancy in the Board shall not affect its power, but shall be filled in the manner consistent with this chapter.

(7) Members of the Board shall attend not less than 50 percent of all duly convened meetings of the Board in any calendar year. A member who fails to meet the requirement of the preceding sentence shall forfeit membership and the President shall appoint a new member to fill such vacancy not later than 30 days after such vacancy is determined by the Chairman of the Board.

(d) Election of Chairman and Vice Chairman; compensation of Board members

(1) Members of the Board shall annually elect one of their members to be Chairman and elect one or more of their members as a Vice Chairman or Vice Chairmen.

(2) The members of the Board shall not, by reason of such membership, be deemed to be officers or employees of the United States. They shall, while attending meetings of the Board or while engaged in duties related to such meetings or other activities of the Board pursuant to this subpart, be entitled to receive compensation at the rate of $150 per day, including traveltime. No Board member shall receive compensation of more than $10,000 in any fiscal year. While away from their homes or regular places of business, Board members shall be allowed travel and actual, reasonable, and necessary expenses.

(e) Officers and employees; term of office, compensation, qualifications, and removal; political party affiliation, political test or qualification when taking personnel actions

(1) The Corporation shall have a President, and such other officers as may be named and appointed by the Board for terms and at rates of compensation fixed by the Board. No officer or employee of the Corporation may be compensated by the Corporation at an annual rate of pay which exceeds the rate of basic pay in effect from time to time for level I of the Executive Schedule under section 5312 of title 5. No individual other than a citizen of the United States may be an officer of the Corporation. No officer of the Corporation, other than the Chairman or a Vice Chairman, may receive any salary or other compensation (except for compensation for services on boards of directors of other organizations that do not receive funds from the Corporation, on committees of such boards, and in similar activities for such organizations) from any sources other than the Corporation for services rendered during the period of his or her employment by the Corporation. Service by any officer on boards of directors of other organizations, on committees of such boards, and in similar activities for such organizations shall be subject to annual advance approval by the Board and subject to the provisions of the Corporation's Statement of Ethical Conduct. All officers shall serve at the pleasure of the Board.

(2) Except as provided in the second sentence of subsection (c)(1) of this section, no political test or qualification shall be used in selecting, appointing, promoting, or taking other personnel actions with respect to officers, agents, and employees of the Corporation.

(f) Nonprofit and nonpolitical nature of Corporation

(1) The Corporation shall have no power to issue any shares of stock, or to declare or pay any dividends.

(2) No part of the income or assets of the Corporation shall inure to the benefit of any director, officer, employee, or any other individual except as salary or reasonable compensation for services.

(3) The Corporation may not contribute to or otherwise support any political party or candidate for elective public office.

(g) Purposes and activities of Corporation; powers under District of Columbia Nonprofit Corporation Act

(1) In order to achieve the objectives and to carry out the purposes of this subpart, as set out in subsection (a) of this section, the Corporation is authorized to--

(A) facilitate the full development of public telecommunications in which programs of high quality, diversity, creativity, excellence, and innovation, which are obtained from diverse sources, will be made available to public telecommunications entities, with strict adherence to objectivity and balance in all programs or series of programs of a controversial nature;

(B) assist in the establishment and development of one or more interconnection systems to be used for the distribution of public telecommunications services so that all public telecommunications entities may disseminate such services at times chosen by the entities;

(C) assist in the establishment and development of one or more systems of public telecommunications entities throughout the United States; and

(D) carry out its purposes and functions and engage in its activities in ways that will most effectively assure the maximum freedom of the public telecommunications entities and systems from interference with, or control of, program content or other activities.

(2) In order to carry out the purposes set forth in subsection (a) of this section, the Corporation is authorized to--

(A) obtain grants from and make contracts with individuals and with private, State, and Federal agencies, organizations, and institutions;

(B) contract with or make grants to public telecommunications entities, national, regional, and other systems of public telecommunications entities, and independent producers and production entities, for the production or acquisition of public telecommunications services to be made available for use by public telecommunications entities, except that--

(i) to the extent practicable, proposals for the provision of assistance by the Corporation in the production or acquisition of programs or series of programs shall be evaluated on the basis of comparative merit by panels of outside experts, representing diverse interests and perspectives, appointed by the Corporation; and

(ii) nothing in this subparagraph shall be construed to prohibit the exercise by the Corporation of its prudent business judgment with respect to any grant to assist in the production or acquisition of any program or series of programs recommended by any such panel;

(C) make payments to existing and new public telecommunications entities to aid in financing the production or acquisition of public telecommunications services by such entities, particularly innovative approaches to such services, and other costs of operation of such entities;

(D) establish and maintain, or contribute to, a library and archives of noncommercial educational and cultural radio and television programs and related materials and develop public awareness of, and disseminate information about, public telecommunications services by various means, including the publication of a journal;

(E) arrange, by grant to or contract with appropriate public or private agencies, organizations, or institutions, for interconnection facilities suitable for distribution and transmission of public telecommunications services to public telecommunications entities;

(F) hire or accept the voluntary services of consultants, experts, advisory boards, and panels to aid the Corporation in carrying out the purposes of this subpart;

(G) conduct (directly or through grants or contracts) research, demonstrations, or training in matters related to public television or radio broadcasting and the use of nonbroadcast communications technologies for the dissemination of noncommercial educational and cultural television or radio programs;

(H) make grants or contracts for the use of nonbroadcast telecommunications technologies for the dissemination to the public of public telecommunications services; and

(I) take such other actions as may be necessary to accomplish the purposes set forth in subsection (a) of this section.

Nothing contained in this paragraph shall be construed to commit the Federal Government to provide any sums for the payment of any obligation of the Corporation which exceeds amounts provided in advance in appropriation Acts.

(3) To carry out the foregoing purposes and engage in the foregoing activities, the Corporation shall have the usual powers conferred upon a nonprofit corporation by the District of Columbia Nonprofit Corporation Act [D.C. Code, Sec. 29-501 et seq.], except that the Corporation is prohibited from--

(A) owning or operating any television or radio broadcast station, system, or network, community antenna television system, interconnection system or facility, program production facility, or any public telecommunications entity, system, or network; and

(B) producing programs, scheduling programs for dissemination, or disseminating programs to the public.

(4) All meetings of the Board of Directors of the Corporation, including any committee of the Board, shall be open to the public under such terms, conditions, and exceptions as are set forth in subsection (k)(4) of this section.

(5) The Corporation, in consultation with interested parties, shall create a 5-year plan for the development of public telecommunications services. Such plan shall be updated annually by the Corporation.


(h) Free or reduced rate interconnection service; access to facilities


(1) Nothing in this chapter, or in any other provision of law, shall be construed to prevent United States communications common carriers from rendering free or reduced rate communications interconnection services for public television or radio services, subject to such rules and regulations as the Commission may prescribe.

(2) Subject to such terms and conditions as may be established by public telecommunications entities receiving space satellite interconnection facilities or services purchased or arranged for, in whole or in part, with funds authorized under this part, other public telecommunications entities shall have reasonable access to such facilities or services for the distribution of educational and cultural programs to public telecommunications entities. Any remaining capacity shall be made available to other persons for the transmission of noncommercial educational and cultural programs and program information relating to such programs, to public telecommunications entities, at a charge or charges comparable to the charge or charges, if any, imposed upon a public

telecommunications entity for the distribution of noncommercial educational and cultural programs to public telecommunications entities. No such person shall be denied such access whenever sufficient capacity is available.

(i) Report to Congress

   (1) The Corporation shall submit an annual report for the preceding fiscal year ending September 30 to the President for transmittal to the Congress on or before the 15th day of May of each year. The report shall include--
     (A) a comprehensive and detailed report of the Corporation's operations, activities, financial condition, and accomplishments under this subpart and such recommendations as the Corporation deems appropriate;
     (B) a comprehensive and detailed inventory of funds distributed by Federal agencies to public telecommunications entities during the preceding fiscal year;
     (C) a listing of each organization that receives a grant from the Corporation to produce programming, the name of the producer of any programming produced under each such grant, the title or description of any program so produced, and the amount of each such grant;
     (D) the summary of the annual report provided to the Secretary pursuant to section 398(b)(4) of this title.
   (2) The officers and directors of the Corporation shall be available to testify before appropriate committees of the Congress with respect to such report, the report of any audit made by the Comptroller General pursuant to subsection (l) of this section, or any other matter which such committees may determine.

(j) Repeal, alteration, or amendment

   The right to repeal, alter, or amend this section at any time is expressly reserved.

(k) Financing restrictions

   (1)(A) There is hereby established in the Treasury a fund which shall be known as the Public Broadcasting Fund (hereinafter in this subsection referred to as the "Fund"), to be administered by the Secretary of the Treasury.
   (B) There is authorized to be appropriated to the Fund for each of the fiscal years 1978, 1979, and 1980, an amount equal to 40 percent of the total amount of non-Federal financial support received by public broadcasting entities during the fiscal year second preceding each such fiscal year, except that the amount so appropriated shall not exceed $121,000,000 for fiscal year 1978, $140,000,000 for fiscal year 1979, and $160,000,000 for fiscal year 1980.
   (C) There is authorized to be appropriated to the Fund, for each of the fiscal years 1981, 1982, 1983, 1984, 1985, 1986, 1987, 1988, 1989, 1990, 1991, 1992, and 1993, an amount equal to 40 percent of the total amount of non-Federal financial support received by public broadcasting entities during the fiscal year second preceding each such fiscal year, except that the amount so appropriated shall not exceed $265,000,000 for fiscal year

1992, $285,000,000 for fiscal year 1993, $310,000,000 for fiscal year 1994, $375,000,000 for fiscal year 1995, and $425,000,000 for fiscal year 1996.

(D) In addition to any amounts authorized under any other provision of this or any other Act to be appropriated to the Fund, $20,000,000 are hereby authorized to be appropriated to the Fund (notwithstanding any other provision of this subsection) specifically for the transition from the use of analog to digital technology for the provision of public broadcasting services for fiscal year 2001.

(E) Funds appropriated under this subsection shall remain available until expended.

(F) In recognition of the importance of educational programs and services, and the expansion of public radio services, to unserved and underserved audiences, the Corporation, after consultation with the system of public telecommunications entities, shall prepare and submit to the Congress an annual report for each of the fiscal years 1994, 1995, and 1996 on the Corporation's activities and expenditures relating to those programs and services.

(2)(A) The funds authorized to be appropriated by this subsection shall be used by the Corporation, in a prudent and financially responsible manner, solely for its grants, contracts, and administrative costs, except that the Corporation may not use any funds appropriated under this subpart for purposes of conducting any reception, or providing any other entertainment, for any officer or employee of the Federal Government or any State or local government. The Corporation shall determine the amount of non-Federal financial support received by public broadcasting entities during each of the fiscal years referred to in paragraph (1) for the purpose of determining the amount of each authorization, and shall certify such amount to the Secretary of the Treasury, except that the Corporation may include in its certification non-Federal financial support received by a public broadcasting entity during its most recent fiscal year ending before September 30 of the year for which certification is made. Upon receipt of such certification, the Secretary of the Treasury shall make available to the Corporation, from such funds as may be appropriated to the Fund, the amount authorized for each of the fiscal years pursuant to the provisions of this subsection.

(B) Funds appropriated and made available under this subsection shall be disbursed by the Secretary of the Treasury on a fiscal year basis.

(3)(A)(i) The Corporation shall establish an annual budget for use in allocating amounts from the Fund. Of the amounts appropriated into the Fund available for allocation for any fiscal year--

(I) $10,200,000 shall be available for the administrative expenses of the Corporation for fiscal year 1989, and for each succeeding fiscal year the amount which shall be available for such administrative expenses shall be the sum of the amount made available to the Corporation under this subclause for such expenses in the preceding fiscal year plus the greater of 4 percent of such amount or a percentage of such amount equal to the percentage change in the Consumer Price Index, except that none of the amounts allocated under subclauses (II), (III), and (IV) and clause (v) shall be used for any administrative expenses of the Corporation and not more than 5 percent of all the amounts appropriated into the Fund available for allocation for any fiscal year shall be available for such administrative expenses;

(II) 6 percent of such amounts shall be available for expenses incurred by the Corporation for capital costs relating to telecommunications satellites, the payment of

programming royalties and other fees, the costs of interconnection facilities and operations (as provided in clause (iv)(I)), and grants which the Corporation may make for assistance to stations that broadcast programs in languages other than English or for assistance in the provision of affordable training programs for employees at public broadcast stations, and if the available funding level permits, for projects and activities that will enhance public broadcasting;

(III) 75 percent of the remainder (after allocations are made under subclause (I) and subclause (II)) shall be allocated in accordance with clause (ii); and

(IV) 25 percent of such remainder shall be allocated in accordance with clause (iii).

(ii) Of the amounts allocated under clause (i)(III) for any fiscal year--

(I) 75 percent of such amounts shall be available for distribution among the licensees and permittees of public television stations pursuant to paragraph (6)(B); and

(II) 25 percent of such amounts shall be available for distribution under subparagraph (B)(i), and in accordance with any plan implemented under paragraph (6)(A), for national public television programming.

(iii) Of the amounts allocated under clause (i)(IV) for any fiscal year--

(I) 70 percent of such amounts shall be available for distribution among the licensees and permittees of public radio stations pursuant to paragraph (6)(B);

(II) 7 percent of such amounts shall be available for distribution under subparagraph (B)(i) for public radio programming; and

(III) 23 percent of such amounts shall be available for distribution among the licensees and permittees of public radio stations pursuant to paragraph (6)(B), solely to be used for acquiring or producing programming that is to be distributed nationally and is designed to serve the needs of a national audience.

(iv)(I) From the amount provided pursuant to clause (i)(II), the Corporation shall defray an amount equal to 50 percent of the total costs of interconnection facilities and operations to facilitate the availability of public television and radio programs among public broadcast stations.

(II) Of the amounts received as the result of any contract, lease agreement, or any other arrangement under which the Corporation directly or indirectly makes available interconnection facilities, 50 percent of such amounts shall be distributed to the licensees and permittees of public television stations and public radio stations. The Corporation shall not have any authority to establish any requirements, guidelines, or limitations with respect to the use of such amounts by such licensees and permittees.

(v) Of the interest on the amounts appropriated into the Fund which is available for allocation for any fiscal year--

(I) 75 percent shall be available for distribution for the purposes referred to in clause (ii)(II); and

(II) 25 percent shall be available for distribution for the purposes referred to in clause (iii)(II) and (III).

(B)(i) The Corporation shall utilize the funds allocated pursuant to subparagraph (A)(ii)(II) and subparagraph (A)(iii)(II) to make grants for production of public television or radio programs by independent producers and production entities and public telecommunications entities, producers of national children's educational programming, and producers of programs addressing the needs and interests of minorities, and for acquisition of such programs by public telecommunications entities. The Corporation

8

may make grants to public telecommunications entities and producers for the production of programs in languages other than English. Of the funds utilized pursuant to this clause, a substantial amount shall be distributed to independent producers and production entities, producers of national children's educational programming, and producers of programming addressing the needs and interests of minorities for the production of programs.

(ii) All funds available for distribution under clause (i) shall be distributed to entities outside the Corporation and shall not be used for the general administrative costs of the Corporation, the salaries or related expenses of Corporation personnel and members of the Board, or for expenses of consultants and advisers to the Corporation.

(iii)(I) For fiscal year 1990 and succeeding fiscal years, the Corporation shall, in carrying out its obligations under clause (i) with respect to public television programming, provide adequate funds for an independent production service.

(II) Such independent production service shall be separate from the Corporation and shall be incorporated under the laws of the District of Columbia for the purpose of contracting with the Corporation for the expenditure of funds for the production of public television programs by independent producers and independent production entities.

(III) The Corporation shall work with organizations or associations of independent producers or independent production entities to develop a plan and budget for the operation of such service that is acceptable to the Corporation.

(IV) The Corporation shall ensure that the funds provided to such independent production service shall be used exclusively in pursuit of the Corporation's obligation to expand the diversity and innovativeness of programming available to public broadcasting.

(V) The Corporation shall report annually to Congress regarding the activities and expenditures of the independent production service, including carriage and viewing information for programs produced or acquired with funds provided pursuant to subclause (I). At the end of fiscal years 1992, 1993, 1994, and 1995, the Corporation shall submit a report to Congress evaluating the performance of the independent production service in light of its mission to expand the diversity and innovativeness of programming available to public broadcasting.

(VI) The Corporation shall not contract to provide funds to any such independent production service, unless that service agrees to comply with public inspection requirements established by the Corporation within 3 months after August 26, 1992. Under such requirements the service shall maintain at its offices a public file, updated regularly, containing information relating to the service's award of funds for the production of programming. The information shall be available for public inspection and copying for at least 3 years and shall be of the same kind as the information required to be maintained by the Corporation under subsection (l)(4)(B) of this section.

(4) Funds may not be distributed pursuant to this subsection to the Public Broadcasting Service or National Public Radio (or any successor organization), or to the licensee or permittee of any public broadcast station, unless the governing body of any such organization, any committee of such governing body, or any advisory body of any such organization, holds open meetings preceded by reasonable notice to the public. All persons shall be permitted to attend any meeting of the board, or of any such committee or body, and no person shall be required, as a condition to attendance at any such

meeting, to register such person's name or to provide any other information. Nothing contained in this paragraph shall be construed to prevent any such board, committee, or body from holding closed sessions to consider matters relating to individual employees, proprietary information, litigation and other matters requiring the confidential advice of counsel, commercial or financial information obtained from a person on a privileged or confidential basis, or the purchase of property or services whenever the premature exposure of such purchase would compromise the business interests of any such organization. If any such meeting is closed pursuant to the provisions of this paragraph, the organization involved shall thereafter (within a reasonable period of time) make available to the public a written statement containing an explanation of the reasons for closing the meeting.

(5) Funds may not be distributed pursuant to this subsection to any public telecommunications entity that does not maintain for public examination copies of the annual financial and audit reports, or other information regarding finances, submitted to the Corporation pursuant to subsection (l)(3)(B) of this section.

(6)(A) The Corporation shall conduct a study and prepare a plan, in consultation with public television licensees (or designated representatives of those licensees) and the Public Broadcasting Service, on how funds available to the Corporation under paragraph (3)(A)(ii)(II) can be best allocated to meet the objectives of this chapter with regard to national public television programming. The plan, which shall be based on the conclusions resulting from the study, shall be submitted by the Corporation to the Congress not later than January 31, 1990. Unless directed otherwise by an Act of Congress, the Corporation shall implement the plan during the first fiscal year beginning after the fiscal year in which the plan is submitted to Congress.

(B) The Corporation shall make a basic grant from the portion reserved for television stations under paragraph (3)(A)(ii)(I) to each licensee and permittee of a public television station that is on the air. The Corporation shall assist radio stations to maintain and improve their service where public radio is the only broadcast service available. The balance of the portion reserved for television stations and the total portion reserved for radio stations under paragraph (3)(A)(iii)(I) shall be distributed to licensees and permittees of such stations in accordance with eligibility criteria (which the Corporation shall review periodically in consultation with public radio and television licensees or permittees, or their designated representatives) that promote the public interest in public broadcasting, and on the basis of a formula designed to--

(i) provide for the financial needs and requirements of stations in relation to the communities and audiences such stations undertake to serve;

(ii) maintain existing, and stimulate new, sources of non-Federal financial support for stations by providing incentives for increases in such support; and

(iii) assure that each eligible licensee and permittee of a public radio station receives a basic grant.

(7) The funds distributed pursuant to paragraph (3)(A)(ii)(I) and (iii)(I) may be used at the discretion of the recipient for purposes related primarily to the production or acquisition of programming.

(8)(A) Funds may not be distributed pursuant to this subpart to any public broadcast station (other than any station which is owned and operated by a State, a political or special purpose subdivision of a State, or a public agency) unless such station establishes

a community advisory board. Any such station shall undertake good faith efforts to assure that (i) its advisory board meets at regular intervals; (ii) the members of its advisory board regularly attend the meetings of the advisory board; and (iii) the composition of its advisory board are reasonably representative of the diverse needs and interests of the communities served by such station.

(B) The board shall be permitted to review the programming goals established by the station, the service provided by the station, and the significant policy decisions rendered by the station. The board may also be delegated any other responsibilities, as determined by the governing body of the station. The board shall advise the governing body of the station with respect to whether the programming and other policies of such station are meeting the specialized educational and cultural needs of the communities served by the station, and may make such recommendations as it considers appropriate to meet such needs.

(C) The role of the board shall be solely advisory in nature, except to the extent other responsibilities are delegated to the board by the governing body of the station. In no case shall the board have any authority to exercise any control over the daily management or operation of the station.

(D) In the case of any public broadcast station (other than any station which is owned and operated by a State, a political or special purpose subdivision of a State, or a public agency) in existence on November 2, 1978, such station shall comply with the requirements of this paragraph with respect to the establishment of a community advisory board not later than 180 days after November 2, 1978.

(E) The provision of subparagraph (A) prohibiting the distribution of funds to any public broadcast station (other than any station which is owned and operated by a State, a political or special purpose subdivision of a State, or a public agency) unless such station establishes a community advisory board shall be the exclusive remedy for the enforcement of the provisions of this paragraph.

(9) Funds may not be distributed pursuant to this subsection to the Public Broadcasting Service or National Public Radio (or any successor organization) unless assurances are provided to the Corporation that no officer or employee of the Public Broadcasting Service or National Public Radio (or any successor organization), as the case may be, will be compensated in excess of reasonable compensation as determined pursuant to Section 4958 of title 26 for services that the officer or employee renders to organization, and unless further assurances are provided to the Corporation that no officer or employee of such an entity will be loaned money by that entity on an interest-free basis.

(10)(A) There is hereby established in the Treasury a fund which shall be known as the Public Broadcasting Satellite Interconnection Fund (hereinafter in this subsection referred to as the "Satellite Interconnection Fund"), to be administered by the Secretary of the Treasury.

(B) There is authorized to be appropriated to the Satellite Interconnection Fund, for fiscal year 1991, the amount of $200,000,000. If such amount is not appropriated in full for fiscal year 1991, the portion of such amount not yet appropriated is authorized to be appropriated for fiscal years 1992 and 1993. Funds appropriated to the Satellite Interconnection Fund shall remain available until expended.

(C) The Secretary of the Treasury shall make available and disburse to the Corporation, at the beginning of fiscal year 1991 and of each succeeding fiscal year

11

thereafter, such funds as have been appropriated to the Satellite Interconnection Fund for the fiscal year in which such disbursement is to be made.

(D) Notwithstanding any other provision of this subsection except paragraphs (4), (5), (8), and (9), all funds appropriated to the Satellite Interconnection Fund and interest thereon--

(i) shall be distributed by the Corporation to the licensees and permittees of noncommercial educational television broadcast stations providing public telecommunications services or the national entity they designate for satellite interconnection purposes and to those public telecommunications entities participating in the public radio satellite interconnection system or the national entity they designate for satellite interconnection purposes, exclusively for the capital costs of the replacement, refurbishment, or upgrading of their national satellite interconnection systems and associated maintenance of such systems; and

(ii) shall not be used for the administrative costs of the Corporation, the salaries or related expenses of Corporation personnel and members of the Board, or for expenses of consultants and advisers to the Corporation.

(11)(A) Funds may not be distributed pursuant to this subsection for any fiscal year to the licensee or permittee of any public broadcast station if such licensee or permittee--

(i) fails to certify to the Corporation that such licensee or permittee complies with the Commission's regulations concerning equal employment opportunity as published under section 73.2080 of title 47, Code of Federal Regulations, or any successor regulations thereto; or

(ii) fails to submit to the Corporation the report required by subparagraph (B) for the preceding calendar year.

(B) A licensee or permittee of any public broadcast station with more than five full-time employees to file annually with the Corporation a statistical report, consistent with reports required by Commission regulation, identifying by race and sex the number of employees in each of the following full-time and part-time job categories:

(i) Officials and managers.
(ii) Professionals.
(iii) Technicians.
(iv) Semiskilled operatives.
(v) Skilled craft persons.
(vi) Clerical and office personnel.
(vii) Unskilled operatives.
(viii) Service workers.

(C) In addition, such report shall state the number of job openings occurring during the course of the year. Where the job openings were filled in accordance with the regulations described in subparagraph (A)(i), the report shall so certify, and where the job openings were not filled in accordance with such regulations, the report shall contain a statement providing reasons therefor. The statistical report shall be available to the public at the central office and at every location where more than five full-time employees are regularly assigned to work.

(12) Funds may not be distributed under this subsection to any public broadcasting entity that directly or indirectly--

12

(A) rents contributor or donor names (or other personally identifiable information) to or from, or exchanges such names or information with, any Federal, State, or local candidate, political party, or political committee; or

(B) discloses contributor or donor names, or other personally identifiable information, to any nonaffiliated third party unless--

(i) such entity clearly and conspicuously discloses to the contributor or donor that such information may be disclosed to such third party;

(ii) the contributor or donor is given the opportunity, before the time that such information is initially disclosed, to direct that such information not be disclosed to such third party; and

(iii) the contributor or donor is given an explanation of how the contributor or donor may exercise that nondisclosure option.

(l) Financial management and records

(1)(A) The accounts of the Corporation shall be audited annually in accordance with generally accepted auditing standards by independent certified public accountants or independent licensed public accountants certified or licensed by a regulatory authority of a State or other political subdivision of the United States, except that such requirement shall not preclude shared auditing arrangements between any public telecommunications entity and its licensee where such licensee is a public or private institution. The audits shall be conducted at the place or places where the accounts of the Corporation are normally kept. All books, accounts, financial records, reports, files, and all other papers, things, or property belonging to or in use by the Corporation and necessary to facilitate the audits shall be made available to the person or persons conducting the audits; and full facilities for verifying transactions with the balances or securities held by depositories, fiscal agents and custodians shall be afforded to such person or persons.

(B) The report of each such independent audit shall be included in the annual report required by subsection (i) of this section. The audit report shall set forth the scope of the audit and include such statements as are necessary to present fairly the Corporation's assets and liabilities, surplus or deficit, with an analysis of the changes therein during the year, supplemented in reasonable detail by a statement of the Corporation's income and expenses during the year, and a statement of the sources and application of funds, together with the independent auditor's opinion of those statements.

(2)(A) The financial transactions of the Corporation for any fiscal year during which Federal funds are available to finance any portion of its operations may be audited by the General Accounting Office in accordance with the principles and procedures applicable to commercial corporate transactions and under such rules and regulations as may be prescribed by the Comptroller General of the United States. Any such audit shall be conducted at the place or places where accounts of the Corporation are normally kept. The representative of the General Accounting Office shall have access to all books, accounts, records, reports, files, and all other papers, things, or property belonging to or in use by the Corporation pertaining to its financial transactions and necessary to facilitate the audit, and they shall be afforded full facilities for verifying transactions with the balances or securities held by depositories, fiscal agents, and custodians. All such

books, accounts, records, reports, files, papers and property of the corporation shall remain in possession and custody of the Corporation.

(B) A report of each such audit shall be made by the Comptroller General to the Congress. The report to the Congress shall contain such comments and information as the Comptroller General may deem necessary to inform Congress of the financial operations and condition of the Corporation, together with such recommendations with respect thereto as he may deem advisable. The report shall also show specifically any program, expenditure, or other financial transaction or undertaking observed in the course of the audit, which, in the opinion of the Comptroller General, has been carried on or made without authority of law. A copy of each report shall be furnished to the President, to the Secretary, and to the Corporation at the time submitted to the Congress.

(3)(A) Not later than 1 year after November 2, 1978, the Corporation, in consultation with the Comptroller General, and as appropriate with others, shall develop accounting principles which shall be used uniformly by all public telecommunications entities receiving funds under this subpart, taking into account organizational differences among various categories of such entities. Such principles shall be designed to account fully for all funds received and expended for public telecommunications purposes by such entities.

(B) Each public telecommunications entity receiving funds under this subpart shall be required--

(i) to keep its books, records, and accounts in such form as may be required by the Corporation;

(ii)(I) to undergo a biennial audit by independent certified public accountants or independent licensed public accountants certified or licensed by a regulatory authority of a State, which audit shall be in accordance with auditing standards developed by the Corporation, in consultation with the Comptroller General; or

(II) to submit a financial statement in lieu of the audit required by subclause (I) if the Corporation determines that the cost burden of such audit on such entity is excessive in light of the financial condition of such entity; and

(iii) to furnish biennially to the Corporation a copy of the audit report required pursuant to clause (ii), as well as such other information regarding finances (including an annual financial report) as the Corporation may require.

(C) Any recipient of assistance by grant or contract under this section, other than a fixed price contract awarded pursuant to competitive bidding procedures, shall keep such records as may be reasonably necessary to disclose fully the amount and the disposition by such recipient of such assistance, the total cost of the project or undertaking in connection with which such assistance is given or used, and the amount and nature of that portion of the cost of the project or undertaking supplied by other sources, and such other records as will facilitate an effective audit.

(D) The Corporation or any of its duly authorized representatives shall have access to any books, documents, papers, and records of any recipient of assistance for the purpose of auditing and examining all funds received or expended for public telecommunications purposes by the recipient. The Comptroller General of the United States or any of his duly authorized representatives also shall have access to such books, documents, papers, and records for the purpose of auditing and examining all funds received or expended for public telecommunications purposes during any fiscal year for which Federal funds are available to the Corporation.

(4)(A) The Corporation shall maintain the information described in subparagraphs (B), (C), and (D) at its offices for public inspection and copying for at least 3 years, according to such reasonable guidelines as the Corporation may issue. This public file shall be updated regularly. This paragraph shall be effective August 26, 1992, and shall apply to all grants awarded after January 1, 1993.

(B) Subsequent to any award of funds by the Corporation for the production or acquisition of national broadcasting programming pursuant to subsection (k)(3)(A)(ii)(II) or (iii)(II) of this section, the Corporation shall make available for public inspection the following:

(i) Grant and solicitation guidelines for proposals for such programming.

(ii) The reasons for selecting the proposal for which the award was made.

(iii) Information on each program for which the award was made, including the names of the awardee and producer (and if the awardee or producer is a corporation or partnership, the principals of such corporation or partnership), the monetary amount of the award, and the title and description of the program (and of each program in a series of programs).

(iv) A report based on the final audit findings resulting from any audit of the award by the Corporation or the Comptroller General.

(v) Reports which the Corporation shall require to be provided by the awardee relating to national public broadcasting programming funded, produced, or acquired by the awardee with such funds. Such reports shall include, where applicable, the information described in clauses (i), (ii), and (iii), but shall exclude proprietary, confidential, or privileged information.

(C) The Corporation shall make available for public inspection the final report required by the Corporation on an annual basis from each recipient of funds under subsection (k)(3)(A)(iii)(III) of this section, excluding proprietary, confidential, or privileged information.

(D) The Corporation shall make available for public inspection an annual list of national programs distributed by public broadcasting entities that receive funds under subsection (k)(3)(A)(ii)(III) or (iii)(II) of this section and are engaged primarily in the national distribution of public television or radio programs. Such list shall include the names of the programs (or program series), producers, and providers of funding.

(m) Needs of minorities and other groups

(1) Prior to July 1, 1989, and every three years thereafter, the Corporation shall compile an assessment of the needs of minority and diverse audiences, the plans of public broadcasting entities and public telecommunications entities to address such needs, the ways radio and television can be used to help these underrepresented groups, and projections concerning minority employment by public broadcasting entities and public telecommunications entities. Such assessment shall address the needs of racial and ethnic minorities, new immigrant populations, people for whom English is a second language, and adults who lack basic reading skills.

(2) Commencing July 1, 1989, the Corporation shall prepare an annual report on the provision by public broadcasting entities and public telecommunications entities of service to the audiences described in paragraph (1). Such report shall address

programming (including that which is produced by minority producers), training, minority employment, and efforts by the Corporation to increase the number of minority public radio and television stations eligible for financial support from the Corporation. Such report shall include a summary of the statistical reports received by the Corporation pursuant to subsection (k)(11) of this section, and a comparison of the information contained in those reports with the information submitted by the Corporation in the previous year's annual report.

(3) As soon as they have been prepared, each assessment and annual report required under paragraphs (1) and (2) shall be submitted to Congress.

## Subpart E--General Provisions

### Sec. 397. [47 U.S.C. 397] Definitions

For the purposes of this part--

(1) The term "construction" (as applied to public telecommunications facilities) means acquisition (including acquisition by lease), installation, and modernization of public telecommunications facilities and planning and preparatory steps incidental to any such acquisition, installation, or modernization.

(2) The term "Corporation" means the Corporation for Public Broadcasting authorized to be established in subpart D.

(3) The term "interconnection" means the use of microwave equipment, boosters, translators, repeaters, communication space satellites, or other apparatus or equipment for the transmission and distribution of television or radio programs to public telecommunications entities.

(4) The term "interconnection system" means any system of interconnection facilities used for the distribution of programs to public telecommunications entities.

(5) The term "meeting" means the deliberations of at least the number of members of a governing or advisory body, or any committee thereof, required to take action on behalf of such body or committee where such deliberations determine or result in the joint conduct or disposition of the governing or advisory body's business, or the committee's business, as the case may be, but only to the extent that such deliberations relate to public broadcasting.

(6) The terms "noncommercial educational broadcast station" and "public broadcast station" mean a television or radio broadcast station which--

(A) under the rules and regulations of the Commission in effect on November 2, 1978, is eligible to be licensed by the Commission as a noncommercial educational radio or television broadcast station and which is owned and operated by a public agency or nonprofit private foundation, corporation, or association; or

(B) is owned and operated by a municipality and which transmits only noncommercial programs for education purposes.

(7) The term "noncommercial telecommunications entity" means any enterprise which-

(A) is owned and operated by a State, a political or special purpose subdivision of a State, a public agency, or a nonprofit private foundation, corporation, or association; and

(B) has been organized primarily for the purpose of disseminating audio or video noncommercial educational and cultural programs to the public by means other than a

primary television or radio broadcast station, including, but not limited to, coaxial cable, optical fiber, broadcast translators, cassettes, discs, microwave, or laser transmission through the atmosphere.

(8) The term "nonprofit" (as applied to any foundation, corporation, or association) means a foundation, corporation, or association, no part of the net earnings of which inures, or may lawfully inure, to the benefit of any private shareholder or individual.

(9) The term "non-Federal financial support" means the total value of cash and the fair market value of property and services (including, to the extent provided in the second sentence of this paragraph, the personal services of volunteers) received--

(A) as gifts, grants, bequests, donations, or other contributions for the construction or operation of noncommercial educational broadcast stations, or for the production, acquisition, distribution, or dissemination of educational television or radio programs, and related activities, from any source other than (i) the United States or any agency or instrumentality of the United States; or (ii) any public broadcasting entity; or

(B) as gifts, grants, donations, contributions, or payments from any State, or any educational institution, for the construction or operation of noncommercial educational broadcast stations or for the production, acquisition, distribution, or dissemination of educational television or radio programs, or payments in exchange for services or materials with respect to the provision of educational or instructional television or radio programs.

Such term includes the fair market value of personal services of volunteers, as computed using the valuation standards established by the Corporation, but only, with respect to such an entity in a fiscal year, to the extent that the value of the services does not exceed 5 percent of the total non-Federal financial support of the entity in such fiscal year.

(10) The term "preoperational expenses" means all nonconstruction costs incurred by new telecommunications entities before the date on which they begin providing service to the public, and all nonconstruction costs associated with expansion of existing entities before the date on which such expanded capacity is activated, except that such expenses shall not include any portion of the salaries of any personnel employed by an operating public telecommunications entity.

(11) The term "public broadcasting entity" means the Corporation, any licensee or permittee of a public broadcast station, or any nonprofit institution engaged primarily in the production, acquisition, distribution, or dissemination of educational and cultural television or radio programs.

(12) The term "public telecommunications entity" means any enterprise which--

(A) is a public broadcast station or a noncommercial telecommunications entity; and

(B) disseminates public telecommunications services to the public.

(13) The term "public telecommunications facilities" means apparatus necessary for production, interconnection, captioning, broadcast, or other distribution of programming, including, but not limited to, studio equipment, cameras, microphones, audio and video storage or reproduction equipment, or both, signal processors and switchers, towers, antennas, transmitters, translators, microwave equipment, mobile equipment, satellite communications equipment, instructional television fixed service equipment, subsidiary communications authorization transmitting and receiving equipment, cable television equipment, video and audio cassettes and discs, optical fiber communications equipment, and other means of transmitting, emitting, storing, and receiving images and sounds, or

intelligence, except that such term does not include the buildings to house such apparatus (other than small equipment shelters which are part of satellite earth stations, translators, microwave interconnection facilities, and similar facilities).

(14) The term "public telecommunications services" means noncommercial educational and cultural radio and television programs, and related noncommercial instructional or informational material that may be transmitted by means of electronic communications.

(15) The term "Secretary" means the Secretary of Commerce when such term is used in subpart A and subpart B, and the Secretary of Health and Human Services when such term is used in subpart C, subpart D, and this subpart.

(16) The term "State" includes the District of Columbia, the Commonwealth of Puerto Rico, the Virgin Islands, Guam, American Samoa, the Northern Mariana Islands, and the Trust Territory of the Pacific Islands.

(17) The term "system of public telecommunications entities" means any combination of public telecommunications entities acting cooperatively to produce, acquire, or distribute programs, or to undertake related activities.

## Sec. 398. [47 U.S.C. 398] Federal interference or control

(a) Prohibition

Nothing contained in this part shall be deemed (1) to amend any other provision of, or requirement under, this chapter; or (2) except to the extent authorized in subsection (b) of this section, to authorize any department, agency, officer, or employee of the United States to exercise any direction, supervision, or control over public telecommunications, or over the Corporation or any of its grantees or contractors, or over the charter or bylaws of the Corporation, or over the curriculum, program of instruction, or personnel of any educational institution, school system, or public telecommunications entity.

(b) Equal opportunity employment

(1) Equal opportunity in employment shall be afforded to all persons by the Public Broadcasting Service and National Public Radio (or any successor organization) and by all public telecommunications entities receiving funds pursuant to subpart C (hereinafter in this subsection referred to as "recipients"), in accordance with the equal employment opportunity regulations of the Commission, and no person shall be subjected to discrimination in employment by any recipient on the grounds of race, color, religion, national origin, or sex.

(2)(A) The Secretary is authorized and directed to enforce this subsection and to prescribe such rules and regulations as may be necessary to carry out the functions of the Secretary under this subsection.

(B) The Secretary shall provide for close coordination with the Commission in the administration of the responsibilities of the Secretary under this subsection which are of interest to or affect the functions of the Commission so that, to the maximum extent possible consistent with the enforcement responsibilities of each, the reporting

requirements of public telecommunications entities shall be uniformly based upon consistent definitions and categories of information.

(3)(A) The Corporation shall incorporate into each grant agreement or contract with any recipient entered into on or after the effective date of the rules and regulations prescribed by the Secretary pursuant to paragraph (2)(A), a statement indicating that, as a material part of the terms and conditions of the grant agreement or contract, the recipient will comply with the provisions of paragraph (1) and the rules and regulations prescribed pursuant to paragraph (2)(A). Any person which desires to be a recipient (within the meaning of paragraph (1)) of funds under subpart C shall, before receiving any such funds, provide to the Corporation any information which the Corporation may require to satisfy itself that such person is affording equal opportunity in employment in accordance with the requirements of this subsection. Determinations made by the Corporation in accordance with the preceding sentence shall be based upon guidelines relating to equal opportunity in employment which shall be established by rule by the Secretary.

(B) If the Corporation is not satisfied that any such person is affording equal opportunity in employment in accordance with the requirements of this subsection, the Corporation shall notify the Secretary, and the Secretary shall review the matter and make a final determination regarding whether such person is affording equal opportunity in employment. In any case in which the Secretary conducts a review under the preceding sentence, the Corporation shall make funds available to the person involved pursuant to the grant application of such person (if the Corporation would have approved such application but for the finding of the Corporation under this paragraph) pending a final determination of the Secretary upon completion of such review. The Corporation shall monitor the equal employment opportunity practices of each recipient throughout the duration of the grant or contract.

(C) The provisions of subparagraph (A) and subparagraph (B) shall take effect on the effective date of the rules and regulations prescribed by the Secretary pursuant to paragraph (2)(A).

(4) Based upon its responsibilities under paragraph (3), the Corporation shall provide an annual report for the preceding fiscal year ending September 30 to the Secretary on or before the 15th day of February of each year. The report shall contain information in the form required by the Secretary. The Corporation shall submit a summary of such report to the President and the Congress as part of the report required in section 396(i) of this title. The Corporation shall provide other information in the form which the Secretary may require in order to carry out the functions of the Secretary under this subsection.

(5) Whenever the Secretary makes a final determination, pursuant to the rules and regulations which the Secretary shall prescribe, that a recipient is not in compliance with paragraph (1), the Secretary shall, within 10 days after such determination, notify the recipient in writing of such determination and request the recipient to secure compliance. Unless the recipient within 120 days after receipt of such written notice--

(A) demonstrates to the Secretary that the violation has been corrected; or

(B) enters into a compliance agreement approved by the Secretary;

the Secretary shall direct the Corporation to reduce or suspend any further payments of funds under this part to the recipient and the Corporation shall comply with such directive. Resumption of payments shall take place only when the Secretary certifies to the Corporation that the recipient has entered into a compliance agreement approved by

the Secretary. A recipient whose funds have been reduced or suspended under this paragraph may apply at any time to the Secretary for such certification.

(c) Control over content or distribution of programs

Nothing in this section shall be construed to authorize any department, agency, officer, or employee of the United States to exercise any direction, supervision, or control over the content or distribution of public telecommunications programs and services, or over the curriculum or program of instruction of any educational institution or school system.

## Sec. 399. [47 U.S.C. 399] Support of political candidates prohibited

No noncommercial educational broadcasting station may support or oppose any candidate for political office.

## Sec. 399a. [47 U.S.C 399a] Use of business or institutional logograms

(a) "Business or institutional logogram" defined

For purposes of this section, the term "business or institutional logogram" means any aural or visual letters or words, or any symbol or sign, which is used for the exclusive purpose of identifying any corporation, company, or other organization, and which is not used for the purpose of promoting the products, services, or facilities of such corporation, company, or other organization.

(b) Permitted uses

Each public television station and each public radio station shall be authorized to broadcast announcements which include the use of any business or institutional logogram and which include a reference to the location of the corporation, company, or other organization involved, except that such announcements may not interrupt regular programming.

(c) Authority of Commission not limited

The provisions of this section shall not be construed to limit the authority of the Commission to prescribe regulations relating to the manner in which logograms may be used to identify corporations, companies, or other organizations.

## Sec. 399b. [47 U.S.C. 399b] Offering of certain services, facilities, or products by public broadcast station

(a) "Advertisement" defined

For purposes of this section, the term "advertisement" means any message or other programming material which is broadcast or otherwise transmitted in exchange for any remuneration, and which is intended--

(1) to promote any service, facility, or product offered by any person who is engaged in such offering for profit;

(2) to express the views of any person with respect to any matter of public importance or interest; or

(3) to support or oppose any candidate for political office.

(b) Offering of services, facilities, or products permitted; advertisements prohibited

(1) Except as provided in paragraph (2), each public broadcast station shall be authorized to engage in the offering of services, facilities, or products in exchange for remuneration.

(2) No public broadcast station may make its facilities available to any person for the broadcasting of any advertisement.

(c) Use of funds from offering services, etc.

Any public broadcast station which engages in any offering specified in subsection (b)(1) of this section may not use any funds distributed by the Corporation under section 396(k) of this title to defray any costs associated with such offering. Any such offering by a public broadcast station shall not interfere with the provision of public telecommunications services by such station.

(d) Development of accounting system

Each public broadcast station which engages in the activity specified in subsection (b)(1) of this section shall, in consultation with the Corporation, develop an accounting system which is designed to identify any amounts received as remuneration for, or costs related to, such activities under this section, and to account for such amounts separately from any other amounts received by such station from any source.

# Selected Provisions from the Public Telecommunications Act of 1992 (Pub. L. 102-356)

### Transition Rules Relating to Term of Office of Board of Directors of Corporation for Public Broadcasting

 Section 5(c).  (1) With respect to the three offices whose terms are prescribed by law to expire on March 26, 1992, the term for each such office immediately after that date shall expire on January 31, 1998.

   (2) With respect to the two offices whose terms are prescribed by law to expire on March 1, 1994, the term for each of such offices immediately after that date shall expire on January 31, 2000.

   (3) With respect to the five offices whose terms are prescribed by law to expire on March 26, 1996--

      (A) one such office, as selected by the President, shall be abolished on January 31, 1996;

      (B) the term immediately after March 26, 1996, for another such office, as designated by the President, shall expire on January 31, 2000; and

      (C) the term for each of the remaining three such offices immediately after March 26, 1996, shall expire on January 31, 2002.

(4) As used in this subsection, the term `office' means an office as a member of the Board of Directors of the Corporation for Public Broadcasting.

### Objectivity and Balance Policy, Procedures, and Report

   Section 19.  Pursuant to the existing responsibility of the Corporation for Public Broadcasting under section 396(g)(1)(A) of the Communications Act of 1934 (47 U.S.C. 396(g)(1)(A)) to facilitate the full development of public telecommunications in which programs of high quality, diversity, creativity, excellence, and innovation, which are obtained from diverse sources, will be made available to public telecommunications entities, with strict adherence to objectivity and balance in all programs or series of programs of a controversial nature, the Board of Directors of the Corporation shall--

      (1) review the Corporation's existing efforts to meet its responsibility under section 396(g)(1)(A);

      (2) after soliciting the views of the public, establish a comprehensive policy and set of procedures to--

         (A) provide reasonable opportunity for members of the public to present comments to the Board regarding the quality, diversity, creativity, excellence, innovation, objectivity, and balance of public broadcasting services, including all public broadcasting programming of a controversial nature, as well as any needs not met by those services;

         (B) review, on a regular basis, national public broadcasting programming for quality, diversity, creativity, excellence, innovation, objectivity, and balance, as well as for any needs not met by such programming;

         (C) on the basis of information received through such comment and review, take such steps in awarding programming grants pursuant to clauses (ii)(II), (iii)(II), and (iii)(III) of section 396(k)(3)(A) of the Communications Act of 1934 (47 U.S.C. 396(k)(3)(A)) that it finds necessary to meet the Corporation's responsibility under

section 396(g)(1)(A), including facilitating objectivity and balance in programming of a controversial nature; and

(D) disseminate among public broadcasting entities information about its efforts to address concerns about objectivity and balance relating to programming of a controversial nature so that such entities can utilize the Corporation's experience in addressing such concerns within their own operations; and

(3) starting in 1993, by January 31 of each year, prepare and submit to the President for transmittal to the Congress a report summarizing its efforts pursuant to paragraphs (1) and (2).

## Consumer Information; Disclosure of Funding

Section 20.  Prior to the expiration of the 90-day period following the date of the enactment of this Act [Aug. 26, 1992], the Corporation for Public Broadcasting, in consultation with representatives of public broadcasting entities, shall develop guidelines to assure that program credits for public television programs that receive production funding directly from the Corporation for Public Broadcasting adequately disclose that all or a portion of the cost of producing such program was paid for by funding from the Corporation for Public Broadcasting, and that indicates in some manner that the Corporation for Public Broadcasting is partially funded from Federal tax revenues.

## Independent Production Service Funding

Section 21.  In making available funding pursuant to authorizations under this Act [see Short Title of 1992 Amendment note set out under section 609 of this title], any independent production service established under section 396(k) of the Communications Act of 1934 (47 U.S.C. 396(k)) shall, to the maximum extent practicable and consistent with the provisions of the Communications Act of 1934 [47 U.S.C. 151 et seq.], provide such funding to eligible recipients and projects representing the widest possible geographic distribution, with the objective of providing funding to eligible recipients and projects in each State from which qualified proposals are received over the course of such authorizations.

**RESOLUTION**
**THE BOARD OF DIRECTORS**
**CORPORATION FOR PUBLIC BROADCASTING**
**WASHINGTON, D.C.**
**Monday, May 1, 2006**

*unanimously*

WHEREAS,

The Board of Directors of the Corporation for Public Broadcasting established a Corporate Governance Committee and charged it with reviewing the Board's governance documents and recommending improvements to the Board;

WHEREAS,

The Corporate Governance Committee has reviewed, with the assistance of CPB counsel and outside counsel, the Code of Ethics for Directors and recommends amendments to the Code as well as the adoption of a Conflicts of Interest Policy;

WHEREAS,

The Board has reviewed the recommended amendments to the Code of Ethics for Directors and the proposed Conflicts of Interest Policy;

NOW, THEREFORE, BE IT RESOLVED THAT:

The Board of Directors of the Corporation for Public Broadcasting wishes to reinforce its commitment to conduct the Corporation's business according to the highest standards of ethical conduct and adopts the revised Code of Ethics for Directors and accompanying Conflicts of Interest Policy attached hereto.

10

**CODE OF ETHICS**

**FOR DIRECTORS**

**OF THE**

**CORPORATION FOR PUBLIC BROADCASTING**

*As amended by the Board of Directors on May 1, 2006*

## INTRODUCTION

The purpose of this Code of Ethics is to assure that directors of CPB act in the best interest of public broadcasting, without being partial to any particular organization or their own personal interests; devote to CPB their loyalty and uncompromised integrity; and give the appearance as well as the fact of such impartiality, devotion and integrity.

Directors are responsible for reflecting on this code with respect to their individual situations and current duties, adhering to this code while conducting their official duties, and taking any questions about compliance to the General Counsel.

## BACKGROUND

CPB makes grants to and contracts with stations, producers and others to advance the cause of public broadcasting. It is essential that those in a position to influence the allocation of CPB funds consider only what is best for public broadcasting, without being partial to any particular organization within public broadcasting or influenced by their own personal interest. Because CPB uses taxpayer dollars and is a highly visible organization, the appearance as well as the fact of impartiality is important.

Accordingly, this code seeks to provide clear and conservative guidance for those serving CPB. By acceptance of service with CPB, each director acknowledges these responsibilities and agrees to regulate his or her conduct in a manner that assures CPB of loyalty and uncompromised integrity.

## THE CODE

1. **Directors' Fiduciary Duties.** Members of the Board of Directors owe fiduciary duties to the Corporation. The principal duties are the duty of care, the duty of loyalty and the duty of candor.

   *Duty of Care*

   Directors owe to the Corporation a duty to exercise reasonable care when making corporate decisions and when performing their corporate responsibilities. Directors are obligated to perform their duties in good faith, in a manner reasonably believed to be in the best interests of the Corporation and with the care that an ordinarily prudent person would reasonably be expected to exercise under similar circumstances. When making decisions, the duty of care requires directors to put forth a good faith effort to inform themselves of all material information reasonably available and to exercise appropriate judgment. The duty of care also requires directors to take adequate steps to see that the senior officers of the Corporation are properly managing the Corporation's business and affairs. This includes instituting (i) information and reporting systems reasonably designed to provide them and senior management with timely, accurate

information sufficient to allow them to reach informed judgments concerning the Corporation's performance and (ii) compliance policies reasonably designed to ensure that the Corporation and its officers comply with laws applicable to the Corporation.

*Duty of Loyalty*

The duty of loyalty is a director's duty not to benefit personally at the expense of the Corporation. In order for a director to satisfy this obligation, the director must not allow personal or partisan political interest to prevail over the interests of the Corporation. Furthermore, directors may not use assets of the Corporation (including information) for personal gain or to the detriment of the Corporation.

*Duty of Candor*

The duty of candor requires that a director disclose to the other directors all facts of which the director is aware that could be material to the Board's consideration of the matters before it. The duty of candor is of particular relevance in those instances in which the director has a conflict of interest or a potential conflict of interest regarding a matter before the Board. Where there is such a conflict or potential conflict, the duty of candor requires that the director disclose the director's self-interest so that the disinterested directors can make an informed decision.

2. **Avoidance of Conflict of Interests.** While it is recognized that directors appointed to the Board of CPB are to be representative of many fields, including education, cultural and civic affairs, business, the arts, and radio and television, directors will perform their CPB duties in an objective manner so their performance will not cause or create the appearance of a conflict of interests. To that end, directors shall comply with CPB's Conflict of Interests Policy for the Board of Directors. Directors may not engage, directly or indirectly, in financial, business, trade or professional transactions as a result of, or in primary reliance upon, information obtained through the discharge of the corporate responsibilities.

3. **Invitation to Disclose Possible Conflicts of Interest.** The agenda for every meeting of the Board of Directors of CPB will include, immediately after the approval of the agenda, an item entitled "Invitation to Disclose Possible Conflicts of Interest." This agenda item will consist of the Chairman's oral invitation to Board members to disclose any conflicts of interest they believe they or other Board members may have concerning any items on the agenda. Upon the disclosure by any Board member of any such potential conflict of interest, the Board shall satisfy itself that no Board member will take any action during the deliberations of the meeting that would give the appearance of a conflict of interest, and, if necessary, will recuse himself or herself from the discussion and vote on the item in question.

4. **Prohibition Against Use of Confidential and Nonpublic Information**. No director shall disclose to others, make personal use of, or permit others to make use of, any information obtained as a result of his or her relationship with CPB, which information is not generally available to the public or is otherwise confidential, whether for direct personal gain or for advice to others with whom he or she has family, business, financial, or professional ties.

5. **Stewardship of CPB Resources.** In carrying out his or her duties as a member of the Board, each director has an obligation to protect and conserve corporate money, property and other resources by adhering to policies adopted by the Board and procedures established by CPB.

6. **Campaign Contributions**. No director may, through any means whatsoever, make or be reimbursed for any contributions to political parties or candidates for public office on behalf of CPB. This requirement does not preclude lawful individual contributions not reimbursed by CPB.

7. **Loss of Public Confidence**. Beyond the specific policies above, each director shall avoid any conduct that might result in the loss of public confidence in CPB's programs and activities, the impairment of corporate efficiency or economy, or might reasonably give the appearance of: (a) the extension of preferential treatment to any person, group, organization, or other entity; or (b) the compromise or loss of complete impartiality of judgment and action; or (c) the making or implementation of a corporate decision outside of standard corporate policies and procedures.

8. **Violations.** Apparent or alleged violations of this Code by any director shall be referred to the Corporate Governance Committee of the Board of Directors which shall, after appropriate inquiry and investigation of the relevant facts, communicate its findings and recommendations to the Board. If the Board concludes that a director has knowingly violated the Code, it may impose such disciplinary measures as are appropriate and permissible under the circumstances, including but not limited to a resolution of censure.

By Resolution adopted May 1, 2006, the Board of Directors of Corporation for Public Broadcasting has adopted this Code of Ethics and Business Conduct for Directors.

*CORPORATION FOR PUBLIC BROADCASTING*

**CODE OF ETHICS
SIGNATURE FORM**

I have received, read, understood, and promise to support the Code of Ethics for Directors of the Corporation for Public Broadcasting.


_____
Print Name

_____          _____
Signature                                                                    Date


_____          _____
General Counsel                                                           Date



File in the Office of the General Counsel

11

**CORPORATION FOR PUBLIC BROADCASTING**

**<u>Conflict of Interests Policy for the Board of Directors</u>**

The Corporation for Public Broadcasting (CPB) is a private nonprofit corporation created by Congress to facilitate the development of, and ensure universal access to, high-quality noncommercial programming and telecommunications services. CPB makes grants to and enters into contracts with stations, producers and others to advance the cause of public broadcasting. It is the duty of each member of CPB's Board of Directors to serve the Corporation's mission, and not to advance his or her personal interests or those of other private parties. This conflict of interests policy is intended to permit CPB and its Board members to identify, evaluate, and address any real, potential, or apparent conflicts of interests that might, in fact or in appearance, call into question their duty of undivided loyalty to CPB.

1.    <u>Covered Persons</u>

This policy applies to all members of CPB's Board of Directors ("Covered Persons"). Each Covered Person shall be required to acknowledge, not less than annually, that he or she has read and is in compliance with this policy.

2.    <u>Covered Transactions</u>

This policy applies to all transactions between CPB and a Covered Person, or between CPB and another party with which a Covered Person has a significant relationship ("Covered Transactions"). A Covered Person is considered to have a significant relationship with another party if:

      (a)    the other party is a member of the Covered Person's family or household, including a spouse, parent, sibling, child, stepchild, grandparent, grandchild, great-grandchild, in-law, or domestic partner;

      (b)    the other party is an entity in which the Covered Person and/or a family member has, directly or indirectly, more than a 10% ownership interest; or

      (c)    the Covered Person and/or a family member is an officer, director, trustee, fiduciary, partner or employee of the other party.

A Covered Transaction also includes any other transaction in which there may be an actual or perceived conflict of interests, including any transaction in which the interests of a Covered Person may be seen as competing with the interests of CPB.

3.    Disclosure, Refrain from Influence, and Recusal

When a Covered Person becomes aware of a proposed Covered Transaction, he or she has a duty to take the following actions:

(a)    immediately disclose the existence and circumstances of such Covered Transaction to the Corporate Governance Committee of the Board of Directors in writing;

(b)    refrain from using his or her personal influence to encourage CPB to enter into the Covered Transaction;

(c)    remove himself or herself from participation in any discussions regarding the Covered Transaction with Directors, officers and employees of CPB, whether formal or informal, or at meetings of the Board or its committees, except to respond to requests for information about the Covered Transaction; and

(d)    recuse himself or herself from voting on the Covered Transaction or on any matter relating to or affected by it.

In order to assist CPB in identifying potential Covered Transactions, each Covered Person annually shall complete a Conflict of Interests Questionnaire provided by CPB, and shall update such Questionnaire as necessary to reflect changes during the course of the year.  Completed Questionnaires shall be available for inspection by any Board member, and may be reviewed by CPB's General Counsel.

4.    Standard for Approval of Covered Transactions

CPB may enter into a Covered Transaction where the Board determines, acting without the participation or influence of the Covered Person and, if applicable, based on comparable market data, that such transaction is fair, reasonable and in the best interest of CPB.  The Board shall document the basis for this determination in the minutes of the meeting at which the Covered Transaction is considered.

5.    Administration of Policy

This policy shall be administered by the Corporate Governance Committee of the Board of Directors, which shall be responsible for the following:

(a)    reviewing    reports    regarding    the    Conflict    of    Interests Questionnaires;

(b)    receiving disclosures of proposed Covered Transactions;

(c)     reviewing proposed Covered Transactions to determine whether they meet the above-described standard;

(d)     maintaining minutes and such other documentation as may be necessary and appropriate to document its review of Covered Transactions;

(e)     reviewing the operation of this policy and recommending changes to the Board of Directors from time to time as it may deem appropriate; and

(f)     addressing and making recommendations to the Board of Directors concerning the failure of any Covered Person to complete a Conflict of Interests Questionnaire, disclose any conflict of interests, or otherwise fail to comply with this policy.

This Conflict of Interests Policy was adopted by the Board of Directors on May 1, 2006.

12

Name: _____          Date: _____

## CORPORATION FOR PUBLIC BROADCASTING
### Conflict of Interests Questionnaire

The Corporation for Public Broadcasting (CPB) requires each Board member annually (1) to review CPB's Conflict of Interests Policy (the "Policy"); (2) to disclose any possible personal, familial, household, business or fiduciary relationship that reasonably could give rise to a conflict of interests or the appearance of a conflict of interests; and (3) to acknowledge by his or her signature that he or she is acting in accordance with the letter and spirit of such Policy.

This form shall be filed with the office of CPB's General Counsel. The information provided herein shall be available for inspection by members of the Board and by CPB's General Counsel, but shall otherwise be held in confidence except when, after consultation with the applicable Board member, the Corporate Governance Committee of the Board of Directors recommends, and the Board of Directors determines, that CPB's best interests would be served by disclosure.

Please respond to the following questions to the best of your knowledge:

1.  List all entities which are reasonably likely to become parties to transactions with CPB and in which you and/or a family member, as defined in Section 2(a) of the Conflict of Interests Policy, are an officer, director, trustee, fiduciary, partner or employee, and describe the affiliation with each such entity. Entities which are likely to become parties to transactions with CPB include noncommercial public television and radio stations, television and radio production companies, public broadcasting-related organizations, and other entities that have previously been parties to transactions with CPB.

2.  List all entities of the kinds described in Question 1 above in which you and/or a family member, as defined in Section 2(a) of the Conflict of Interests Policy, have, directly or indirectly, more than a 10% ownership interest.

2537278.1

Name: _____    Date: _____

3.    List any Covered Transactions, as defined in Section 2 of the Conflict of Interests Policy, that you, your family members and/or entities listed in paragraphs 1 and 2 above have had with CPB in the past year.

4.    List any proposed Covered Transactions, as defined in Section 2 of the Conflict of Interests Policy, between CPB and you, your family members and/or entities listed in paragraphs 1 and 2 above. Describe each such proposed transaction and its actual and potential financial benefits as you can best estimate them.

5.    Are you aware of any other relationships, arrangements, transactions or matters which could create a conflict of interests or the appearance of such a conflict? If so, please describe.

I have received and read the CPB Conflict of Interests Policy. I am currently, and agree to remain, in compliance with the Policy.

_____
Signature

2537278.1

13

-1-

EXPENSE GUIDELINES

CPB BOARD OF DIRECTORS AND OFFICERS

I.  <u>PURPOSE</u>

The purpose of this document is to establish guidelines for travel and miscellaneous expenses incurred by members of the CPB Board of Directors and CPB Officers in the course of their duties.  To the extent that applicable law permits, and consistent with these Guidelines, individual Board members and Officers are responsible for using their good judgment and discretion in incurring expenses while traveling and conducting business related to CPB.

II.  <u>THE LAW</u>

The applicable 1981 amendment to the Public Broadcasting Act of 1967 states that:

> *. . . the members of the Board shall not, by reason of such membership, be deemed to be officers or employees of the United States.  They shall, while attending meetings of the Board or while engaged in duties related to such meetings or other activities of the Board pursuant to this subpart, be entitled to receive compensation at the rate of $150 per day, including travel time.  No Board member shall receive compensation of more than $10,000 in any fiscal year.  Board members shall be allowed travel and actual, reasonable and necessary expenses.*

III.  <u>COMPENSATION AND EXPENSES</u>

A.  <u>Compensation</u>

The rate of Board compensation is $l50.00 per day, not to exceed $10,000 for any director in any fiscal year.  In general, a Board member is entitled to claim the entire per day rate of $l50.00 for any day in which the member is engaged in matters related to Board duties, including travel to and from events.  This includes attendance at CPB Board and Committee meetings, attendance at CPB-sponsored or CPB-related events, and study and preparation for such events.

B.  <u>Out-of-pocket Expenses</u>

Board members and Officers may submit requests for reimbursement for reasonable and necessary actual expenses incurred while engaged in matters related to CPB duties.  Board members and Officers are accountable for CPB funds and must avoid expenses that appear unnecessary or extravagant.

-2-

C.  Expense Reports

Board Expense Reports are submitted to the Office of the Corporate Secretary for payment authorization.  Officer Expense Reports are submitted to the Office of the President for payment authorization.  Authorized Reports are then forwarded to the Office of Budget and Finance for processing and payment.

Expense Reports must include a statement explaining expenditures for activities (other than CPB Board and Committee meetings).  If there is a questionable Board member expense submission, the Corporate Secretary will contact the particular Board member to discuss the submission.  If the issue cannot be resolved, the Secretary will refer the matter to the Chair of the Audit and Finance Committee for resolution.

Any expense in excess of $25 requires a supporting receipt.

IV.  TRAVEL - APPROVAL

Board members must obtain prior approval from the CPB Board Chairman for travel, other than to CPB Board or Committee meetings.  Officers must obtain prior approval for all travel from the Office of the President.

Board members will be informed of CPB-sponsored and relevant events and may contact the Chair (or in the Chair's absence, the Vice Chair) to indicate a desire to attend.  The Chair will use best efforts to accommodate the requests of Board members wishing to attend such events.

V.  TRAVEL -MODE

A.  Long-Distance Transportation

CPB Board members and Officers may travel using business or first-class fares, when business class fares are not available, for domestic travel and international travel where the flight time exceeds three hours.  If alternate transportation methods are chosen, reimbursement will be made at the lesser of either actual cost or the equivalent cost for travel using common means of transportation, including airfare and ground transportation.  CPB's travel agency will assist with documentation of the equivalent cost when necessary.

B.  Local Transportation

Members of the Board and Officers may choose to rent cars or use taxis, shuttle or car services, or public transportation in the locality where they are conducting CPB business.  Costs for transportation to and from members' homes and airports or stations are also reimbursable.  Generally, automobiles should be rented when the cost of cabs would exceed the per-day rental rate or no other convenient and less expensive form of transportation is available.

-3-

1. Taxi costs should be detailed by trip and receipted when the cost exceeds $25.00.

2. If renting a car, Board members may purchase the leasing company's insurance. For Officers, CPB-issued American Express card must be used when renting a car because American Express provides rental insurance. Additionally, CPB's liability insurance provides employee coverage. CPB will not be liable in the event of an accident or injury if an unauthorized person (i.e., friend, relative, etc.) has been permitted to operate the vehicle. CPB will reimburse actual expenses for tolls and parking charges while the member is using rental car.

3. There are occasions in which the use of a personal auto is the most practical and/or economical method of travel. For use of a personal automobile, members of the Board will be reimbursed at the standard mileage reimbursement rate set by the Internal Revenue Service plus tolls and parking expenses incurred.

VI.    HOTEL ACCOMMODATIONS

For regular Board meetings, hotel accommodations are made through the Office of the Corporate Secretary, which will arrange for direct billing to CPB. For other travel, hotel bills must be provided to support charges claimed on the Expense Report. When direct billing to CBP is provided, upon checking out of a hotel, Board members and Officers are responsible for paying any non-reimbursable items on the hotel bill.

VII.   OTHER EXPENSES

CPB will reimburse Board members and Officers for reasonable costs incurred during their CPB-related travel. Reimbursable items include:
- Meals, snacks and refreshments
- Laundry and dry cleaning
- Business telephone calls, faxes, copy expense and computer usage charges
- Gratuities
- Newspapers, business center costs and health club fees

CPB will also reimburse Board members and Officers for memberships in two airline executive clubs.

Any expense not covered in the preceding paragraphs or contrary to any of the above policies should be detailed and fully explained on the Expense Report. A determination will be made, as described in Section III, as to whether a particular expense qualifies for reimbursement.

-4-

VIII. <u>BUSINESS AND PROFESSIONAL RELATIONS</u>

    A.   <u>Limitations</u>

        The Public Broadcasting Act of 1967 states that the Corporation may not contribute to or otherwise support any political party or candidate for elective public office. The Corporation is also prohibited from using appropriations to fund receptions or other entertainment events for any officer or employee of the Federal Government or any state or local government.

    B.   Board members and Officers may incur business and professional relations expenses under the guidelines set forth below:

        1.   There should be reasonable expectation of deriving Corporation benefits from any such expenses.

        2.   These types of expenses should be limited to those incurred during professional dealings with other members of the public broadcasting industry or related organizations or entities, and not during purely social occasions or for the entertainment of persons not related to the public broadcasting industry.

        3.   All such expenses must list the date, name of restaurant, individuals and company affiliation.

*Adopted by the Board of Directors*
*on December 4, 2006*

14



**CHARTER OF THE
AUDIT AND FINANCE COMMITTEE OF
THE BOARD OF DIRECTORS OF
THE CORPORATION FOR PUBLIC BROADCASTING**

<u>**Purpose**</u>

The purpose of the Audit and Finance Committee (the "Committee") of the Board of Directors (the "Board") of the Corporation for Public Broadcasting (the "Corporation") is to assist the Board in discharging its responsibilities relating to financial reporting, budget, corporate controls and related matters.

<u>**Composition of Committee**</u>

After each Annual Meeting of the Board of Directors, the Chair shall appoint, subject to the approval of the Board, three or more directors to serve on the Committee, including one to serve as chair. Members of the Committee shall serve for such terms as the Board may determine, or until their earlier resignation or removal by the Board.

The Committee may form, and delegate authority to, subcommittees when it deems appropriate.

<u>**Meetings**</u>

The Committee is governed by the same rules regarding meetings (including meetings by conference telephone or similar commujnications equipment), action without meetings, notice, waiver of notice, and quorum and voting requirements as are applicable to the Board. The Committee is authorized and empowered to adopt its own rules of procedure not inconsistent with (i) any provision of this Charter, (ii) any provision of the By-Laws of the Corporation or (iii) the laws of the United States of America or the District of Columbia applicable to the Corporation. The Committee will maintain copies of the minutes of each meeting of the Committee, and each written consent to action taken without a meeting, reflecting the actions so authorized or taken by the Committee. A copy of the minutes of each meeting and all consents will be placed in the Corporation's minute books.

<u>**Authority**</u>

The Corporation will provide the Committee with the resources necessary to discharge its duties and responsibilities, including retaining, at the Corporation's expense and in accordance with appropriate CPB policies, outside counsel or other experts or consultants, as it deems appropriate.

The Committee shall report annually to the Board and at such other times as it deems appropriate or when requested to do so by the Board.

The Committee shall remain active, informed, and knowledgeable of the laws, regulations, business environment and business activities that affect its responsibilities. In order to remain knowledgeable and informed, the Committee shall require regularly scheduled reporting by Management, the Corporation's external auditors, and Office of Inspector General (OIG), and shall maintain open communication between Board members, senior management, and the internal and external auditors.

**Office of Inspector General**

The Committee shall work with the OIG to establish a program for review of the adequacy of systems of financial management and internal controls to ensure accurate and complete reporting, compliance with applicable rules and regulations and safeguards over CPB resources.  It shall regularly receive updates on the progress, findings, and results of the OIG's efforts.  The Committee shall serve as the primary contact between the OIG and the Board of Directors and the Memorandum of Understanding between the CPB Board of Directors and the CPB Office of the Inspector General will provide overall guidelines for interface.

**Internal Oversight**

Committee oversight of internal operations shall include oversight of the Corporation's financial reporting and corporate controls, and review of the Corporation's annual fiscal year operating budgets, investment policy and director expense reimbursement policy.

**Budget and Internal Financial Reporting:**  The Committee shall be responsible for reviewing and recommending to the Board of Directors an annual budget proposed by Management for the Corporation, and for receiving assurance that financial disclosures made by Management reasonably portray CPB's financial condition, results of operations, plans and long term commitments.  The Committee shall review Management's policies and procedures regarding these objectives and shall monitor execution.  Committee members should have a basic understanding of CPB's financial operations and reporting requirements.

The Committee's specific duties shall include:

- Review of proposed annual operating budget presented by Management and by the Office of Inspector General for recommendation to the Board of Directors.

- Review of interim financial reports, including variances in relation to the Corporation's approved budget.

- Review of any internal financial audit results.

- Review of the Corporation's investment policy and performance.

- Review the establishment and administration of general policies and procedures governing financial planning, execution and reporting.

- Review and approve the Annual Audit Plan of the outside auditor for CPB's financial statement audit .
.

- Review policies and procedures for the selection and retention of the external auditors, evaluate their performance periodically and recommend to the Board of Directors either their retention or the selection of new auditors.

- Review the annual financial statements, changes in accounting principles and auditing standards and Management Letters.  Recommend financial statements to the Board of Directors for approval.

- Review the Management Representation Letter and Committee Chairman's Letter as applicable.

- Conduct private, post-audit review with the external auditors.

- Review corporate policies and procedures relating to compliance with laws and regulations, ethics, conflict of interest, internal controls and the investigation of misconduct.

- Annually review the Board Member Expense Guidelines.


**<u>Corporate Controls</u>**

The Committee shall review reports from management regarding the Corporation's key program, administrative, and accounting controls and obtain reasonable assurances that controls are adequate and carried out consistent with Management direction.  The Committee shall rely on Management to establish controls that effectively govern operations and upon the Corporation's external auditors for compliance review and assessment.  The Committee shall review Management policies and procedures for these objectives and monitor execution.  The Committee shall be responsible for the following actions with respect to its corporate control oversight function:

- Review general policies and procedures for administrative and accounting controls.

- Review, with Management and the Inspector General, any significant findings made by the Inspector General and Management's response thereto and any difficulties encountered in the course of the Inspector General's audits.

**Relationship with External Auditors**

The Committee shall be responsible for the Corporation's relationship with its external auditors, including their selection, compensation and evaluation. The Committee shall be further responsible for assessing the independence of the external auditors, establishing the scope of the Corporation's audits, communicating with the external auditors about the results of their audits, and seeking second opinions when the Committee deems it appropriate.

**Other**

The Committee shall also have the following additional responsibilities:

- Review and reassess the adequacy of this Charter periodically and recommend any proposed changes to the Board for approval.

- Periodically conduct a performance evaluation of the Committee and identify opportunities for improved effectiveness.

- Report to the Board on a regular basis and make sure recommendations with respect to any of the above and other matters as the Committee deems necessary or appropriate.

- Perform such other duties and responsibilities, consistent with this Charter, delegated to the Committee by the Board.

- Review reports of CPB's 403(b) tax deferred annuity defined contribution investment policy committee.

*As adopted by the Board of Directors on February 15, 2022*

15

# CHARTER OF THE
## CORPORATE GOVERNANCE COMMITTEE OF
## THE BOARD OF DIRECTORS OF
## THE CORPORATION FOR PUBLIC BROADCASTING

**Purpose**

The purpose of the Corporate Governance Committee (the "Committee") of the Board of Directors (the "Board") of the Corporation for Public Broadcasting (the "Corporation") is to assist the Board in developing corporate governance practices and guidelines, including guidelines regarding the proper role of management, the Board and individual directors, for the Corporation.

**Composition of Committee**

After each Annual Meeting of the Board of Directors, the Chair shall appoint, subject to the approval of the Board, three or more directors to serve on the Committee, including one to serve as chair. Members of the Committee shall serve for such terms as the Board may determine, or until their earlier resignation or removal by the Board.

**Meetings**

The Committee is governed by the same rules regarding meetings (including meetings by conference telephone or similar communications equipment), action without meetings, notice, waiver of notice, and quorum and voting requirements as are applicable to the Board. The Committee is authorized and empowered to adopt its own rules of procedure not inconsistent with (i) any provision of this Charter, (ii) any provision of the By-Laws of the Corporation or (iii) the laws of the United States of America or the District of Columbia applicable to the Corporation. The Committee will maintain copies of minutes of each meeting of the Committee, and each written consent to action taken without a meeting, reflecting the actions so authorized or taken by the Committee. A copy of the minutes of each meeting and all consents will be placed in the Corporation's minute books.

**Authority**

The Corporation will provide the Committee with the resources necessary to discharge its duties and responsibilities, including retaining, at the Corporation's expense, outside counsel or other experts or consultants, as it deems appropriate. The Committee may form, and delegate authority to, subcommittees when it deems appropriate.

The Committee shall report annually to the Board and at such other times as it deems appropriate or when requested to do so by the Board.

## Duties and Responsibilities

The principal responsibilities and functions of the Committee are as follows:

1. The Chair of the Corporate Governance Committee will participate in the Executive Compensation Committee's leading of the Board's annual review of the performance of the President and Chief Executive Officer (the "President").

2. Review periodically the Corporation's By-Laws, Code of Ethics for Directors, Code of Ethics and Business Conduct for Employees, Mission Statement, and Guidelines Regarding Required Board Approvals and Notifications (collectively, the Corporation's "Governance Documents"), as well as its corporate governance practices more generally, and recommend any proposed changes to the Board for approval.

3. Investigate, in conjunction with the Office of the Inspector General and the Audit Committee, as appropriate, and report to the Board on any credible allegation that the Corporation, the Board, or any individual officer of the Corporation or director, has violated, or taken action inconsistent with, the Corporation's Governance Documents, the Public Broadcasting Act of 1967 (the "Act"), or any other law applicable to the Corporation.

4. Oversee the compliance by the Corporation with the public meeting requirements of the Act and consider, periodically, transparency concerns more generally.

5. Oversee the Board's program for the orientation of new directors and recommend any proposed changes to the Board for approval.

6. Oversee the Board's program for the continuing education of directors and recommend any proposed changes to the Board for approval.

7. Review size and composition of the committees of the Board and recommend any proposed changes to the Board for approval.

8. Review and reassess the adequacy of this Charter periodically and recommend any proposed changes to the Board for approval.

9. Conduct an annual performance evaluation of the Committee and identify opportunities for improved effectiveness.

10. Lead an annual review of the Board's performance and effectiveness.

11. On a regular basis, discuss with the President and other members of senior management their views regarding corporate governance at the Corporation.  This discussion should include a review of the Corporation's compliance with the various statutory mandates applicable to it.

12. Report to the Board on a regular basis and make such recommendations with respect to any of the above and other matters as the Committee deems necessary or appropriate.

13. Perform such other duties and responsibilities, consistent with this Charter, delegated to the Committee by the Board.

*As adopted by the Board of Directors on January 9, 2006*

16

**CHARTER OF THE**
**EXECUTIVE COMPENSATION COMMITTEE OF**
**THE BOARD OF DIRECTORS OF**
**THE CORPORATION FOR PUBLIC BROADCASTING**

## Purpose

The purpose of the Executive Compensation Committee (the "Committee") of the Board of Directors (the "Board") of the Corporation for Public Broadcasting (the "Corporation") is to assist the Board in discharging its responsibilities relating to compensation of the Corporation's officers and other employees.

## Composition of Committee

After each Annual Meeting of the Board of Directors, the Chair shall appoint, subject to the approval of the Board, three or more directors to serve on the Committee, including one to serve as chair.  Members of the Committee shall serve for such terms as the Board may determine, or until their earlier resignation or removal by the Board.

The Committee may form, and delegate authority to, subcommittees when it deems appropriate.

## Meetings

The Committee is governed by the same rules regarding meetings (including meetings by conference telephone or similar communications equipment), action without meetings, notice, waiver of notice, and quorum and voting requirements as are applicable to the Board. The Committee is authorized and empowered to adopt its own rules of procedure not inconsistent with (i) any provision of this Charter, (ii) any provision of the By-Laws of the Corporation or (iii) the laws of the United States of America or the District of Columbia applicable to the Corporation.  The Committee will maintain copies of the minutes of each meeting of the Committee, and each written consent to action taken without a meeting, reflecting the actions so authorized or taken by the Committee.  A copy of the minutes of each meeting and all consents will be placed in the Corporation's minute books.

## Authority

The Corporation will provide the Committee with the resources necessary to discharge its duties and responsibilities, including retaining, at the Corporation's expense, outside counsel or other experts or consultants, as it deems appropriate.

The Chair of the Committee shall, with the consent of a majority of the Committee, have the authority to retain and terminate executive search firms and compensation consultants to be used by the Corporation in connection with the hiring and compensation of the Corporation's President and Chief Executive Officer (the "President"), including authority to approve the fees and other retention terms of such firms and consultants, in accordance with appropriate CPB policies.

2

With respect to the hiring and compensation of the Corporation's Senior Officers other than the President, the Committee shall have the authority, in consultation with the President, to direct management to retain and terminate executive search firms and compensation consultants to be used by the Corporation, including authority to approve the fees and other retention terms of such firms and consultants.  For purposes of this Charter, the Senior Officers of the Corporation shall be deemed to be the Corporation's President, Executive Vice President and Chief Operating Officer, Treasurer/Chief Financial Officer, and General Counsel.

The Committee shall report annually to the Board and at such other times as it deems appropriate or when requested to do so by the Board.

## Duties and Responsibilities

The principal responsibilities and functions of the Committee are as follows:

1.  In conjunction with the Chair of the Corporate Governance Committee, lead the Board's annual review of the performance of the President.

2.  Review and recommend to the Board on an annual basis the compensation of the President.  The Committee's recommendation will be considered by the Board when setting the President's compensation.

3.  In consultation with the President, review and recommend to the Board on an annual basis the compensation of the Corporation's Senior Officers other than the President.

4.  In consultation with the President, make recommendations to the Board concerning any compensation packages for new Senior Officers and termination and/or severance packages for departing Senior Officers.

5.  In consultation with the President, develop and make recommendations to the Board concerning policies and procedures designed to prevent the use of political tests or qualifications in connection with personnel decisions at the Corporation, as required by the Public Broadcasting Act of 1967 (the "Act").

6.  Provide oversight regarding the Corporation's compliance with any limits imposed by applicable law on the compensation to be paid to the Corporation's employees, including any such limits imposed by the Act or the Internal Revenue Code.

7.  Review management's decisions regarding the compensation of senior staff (all employees at the vice president and officer level and above).

8.  Provide oversight of management's decisions concerning the compensation programs for all officers and employees.

9.  Oversee the Corporation's compliance with its policies and procedures applicable to the retention of consultants and other independent contractors who are engaged by the Corporation.

3

10.    Review and reassess the adequacy of this Charter periodically and recommend any proposed changes to the Board for approval.

11.    Report to the Board on a regular basis and make such recommendations with respect to any of the above and other matters as the Committee deems necessary or appropriate.

12.    Perform such other duties and responsibilities, consistent with this Charter, delegated to the Committee by the Board or required under the provisions of any compensation or benefit plan maintained by the Corporation.

*As adopted by the Board of Directors on January 9, 2006*

17

**CHARTER OF THE
INTERCONNECTION COMMITTEE OF
THE BOARD OF DIRECTORS OF
THE CORPORATION FOR PUBLIC BROADCASTING**

## Purpose

The purpose of the Interconnection Committee (the "Committee") of the Board of Directors (the "Board") of the Corporation for Public Broadcasting (the "Corporation") is to advise and assist the Board with respect to issues, challenges and opportunities relating to the Corporation's role in the establishment, development and funding of interconnection systems for the distribution of public telecommunications services.

## Composition of Committee

The Board Chair shall appoint, subject to the approval of the Board, three or more directors to serve on the Committee, including one to serve as chair. The Members of the Committee shall serve for such terms as the Board may determine, or until their earlier resignation or removal by the Board. The Committee is established for a period of one year and the Committee may be renewed annually by the Board.

## Meetings

The Committee is governed by the same rules regarding meetings (including meetings by conference telephone or similar communications equipment), action without meetings, notice, waiver of notice, and quorum and voting requirements as are applicable to the Board. The Committee is authorized and empowered to adopt its own rules of procedure not inconsistent with (i) any provision of this Charter, (ii) any provision of the By-Laws of the Corporation or (iii) the laws of the United States of America or the District of Columbia applicable to the Corporation. The Committee will maintain copies of minutes of each meeting of the Committee, and each written consent to action taken without a meeting, reflecting the actions so authorized or taken by the Committee. The Committee will ensure that a copy of the minutes of each meeting and all consents is provided by the Secretary of the Corporation and included in the Corporation's minute books.

## Authority

The Corporation will provide the Committee with the resources necessary to discharge its duties and responsibilities, including retaining, at the Corporation's expense, outside counsel or other experts or consultants, as it deems appropriate. The Committee may form, and delegate authority to, subcommittees when it deems appropriate.

## Duties and Responsibilities

The principal responsibilities and functions of the Committee are as follows:

1.  Serve in an advisory capacity to the Board on all matters concerning the Corporation's role in the (strategic) development and funding of interconnection systems for distribution of noncommercial educational programming and related content by public telecommunications entities.

2.  Develop guiding principles for CPB's funding of interconnection that will help shape the timeline, activities, and funding of interconnection proposals.

3.  Engage with CPB staff, who will ensure the Committee has access to and opportunities to engage with consultants, representatives of public media interconnection organizations, station representatives, and others, as appropriate, to discuss and assess station and system interconnection needs.

4.  Review and provide feedback on proposals to expand the capabilities of interconnection systems to improve the distribution of content to and among public telecommunications entities in ways that are cost effective and compatible with new and emerging technologies.

5.  Review prior and future interconnection system assessments and recommendations, as provided by CPB, conducted by outside experts, including studies sponsored by CPB and the entities responsible for radio and television interconnection services.

6.  Review historical background on CPB's interconnection funding history and become familiar with statutory definitions and requirements for interconnection, as provided by CPB.

7.  Periodically conduct a performance evaluation of the Committee and identify opportunities for improved effectiveness.

8.  Review and reassess the adequacy of this Charter periodically and recommend any proposed changes to the Board for approval.

9.  Report to the Board on a regular basis and make such recommendations with respect to any of the above and other matters as the Committee deems necessary or appropriate.

10. Perform such other duties and responsibilities, consistent with this Charter, delegated to the Committee by the Board.

*As adopted by the Board of Directors February 13, 2024*