# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| NATIONAL PUBLIC RADIO, INC., *et al.*<br><br>*Plaintiffs*,<br><br>*v.*<br><br>DONALD J. TRUMP, *et al.*,<br><br>*Defendants*. | Case No. 25-cv-1674-RDM |

**COMBINED OPPOSITION TO DEFENDANT THE CORPORATION FOR PUBLIC BROADCASTING'S MOTION FOR SUMMARY JUDGMENT AND REPLY IN SUPPORT OF NATIONAL PUBLIC RADIO, INC.'S MOTION FOR PRELIMINARY INJUNCTION AND FOR PARTIAL SUMMARY JUDGMENT**

Miguel A. Estrada (D.D.C. Bar No. 456289)
GIBSON, DUNN & CRUTCHER LLP
1700 M Street, N.W.
Washington, D.C. 20036-4504

Theodore J. Boutrous, Jr. (D.D.C. Bar No. 420440)
Katie Townsend (D.C. Bar No. 1026115)
GIBSON, DUNN & CRUTCHER LLP
333 South Grand Avenue
Los Angeles, CA 90071-3197

Elizabeth A. Allen (*Admitted Pro Hac Vice*)
NATIONAL PUBLIC RADIO, INC.
1111 North Capitol Street, NE
Washington, D.C. 20002

*Counsel for Plaintiff*
*National Public Radio, Inc.*

## TABLE OF CONTENTS

INTRODUCTION ........................................................................................................ 1

ARGUMENT ............................................................................................................... 2

    I.      CPB Is Violating the First Amendment. ................................................. 4

         A.      The First Amendment Applies to CPB. ..................................... 4

         B.      There Is No Genuine Factual Dispute that CPB's Primary Motives Were Political Pressure and Retaliation. ..................................... 6

         C.      CPB's Unlawful Refusal to Disburse PRSS Funding to NPR Constituted Retaliation. .................................................................... 18

         D.      CPB Engaged in Viewpoint Discrimination. ............................. 21

         E.      The Court Should Draw Adverse Inferences from CPB's Discovery Failures. ................................................................... 22

    II.     CPB's Actions Violate the Public Broadcasting Act. ............................ 24

         A.      CPB Is Required to Distribute Interconnection Funds to NPR or to Public Radio Stations Participating in the PRSS on an Equal Basis. ....... 24

         B.      NPR Can Maintain an *Ultra Vires* Claim Against CPB. .......................... 28

          C.      NPR Has Standing to Raise its Statutory Claim. ...................................... 29

    III.    CPB Has Tortiously Interfered with NPR's Business Relations. ........................ 30

    IV.    NPR Is Entitled to Summary Judgment, or, at a Minimum, a Preliminary Injunction. .............................................................................. 33

CONCLUSION ............................................................................................................. 34

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Agency for Int'l Dev. v. All. For Open Soc'y Int'l, Inc.*,
    570 U.S. 205 (2013) ......................................................................................19, 21

*Aref v. Lynch*,
    833 F.3d 242 (D.C. Cir. 2016) ......................................................................19, 20

*Arizona Free Enter. Club's Freedom PAC v. Bennett*,
    564 U.S. 721 (2011) ..............................................................................................11

*Bell v. Hood*,
    327 U.S. 678 (1946) ..............................................................................................31

*Board of County Commissioners v. Umbehr*,
    518 U.S. 668 (1996) ..............................................................................................21

*Estate of Boyland v. U.S. Dep't of Agric.*,
    913 F.3d 117 (D.C. Cir. 2019) ............................................................................30

*Campbell v. Clinton*,
    203 F.3d 19 (D.C. Cir. 2000) ..............................................................................30

*Corp. for Pub. Broad. v. Trump*,
    No. 25-cv-1305 (D.D.C.) ......................................................................................20

*Free Enterprise Fund v. Public Company Accounting Oversight Board*,
    561 U.S. 477 (2010) ..............................................................................................28

*Gleklen v. Democratic Cong. Campaign Comm., Inc.*,
    199 F.3d 1365 (D.C. Cir. 2000) ..........................................................................17

*Greene v. Dalton*,
    164 F.3d 671 (D.C. Cir. 1999) ......................................................................17, 18

*Hartman v. Moore*,
    547 U.S. 250 (2006) ..............................................................................................19

*Herero People's Reparations Corp. v. Deutsche Bank, A.G.*,
    370 F.3d 1192 (D.C. Cir. 2004) ..........................................................................31

*Int'l Union, United Auto., Aerospace & Agr. Implement Workers of Am. (UAW) v.
    N.L.R.B.*,
    459 F.2d 1329 (D.C. Cir. 1972) ..........................................................................23

*Laningham v. U.S. Navy*,
    813 F.2d 1236 (D.C. Cir. 1987) ............................................................................3

*Lebron v. Nat'l R.R. Passenger Corp.*,
    12 F.3d 388 (2d Cir. 1993), *rev'd*, 513 U.S. 374 (1995) ......................................28

*Lebron v. Nat'l R.R. Passenger Corp.*,
    513 U.S. 374 (1995) ........................................................................4, 5, 28, 29

*Lugar v. Edmondson Oil Co.*,
    457 U.S. 922 (1982) ........................................................................6

*Meyer v. Washington Times Co.*,
    76 F.2d 988 (D.C. Cir. 1935) ........................................................31

*Nat'l Rifle Ass'n v. Vullo*,
    602 U.S. 175 (2024) ........................................................................6, 21

*NCRIC, Inc. v. Columbia Hosp. for Women Med. Ctr., Inc.*,
    957 A.2d 890 (D.C. 2008) ..............................................................32

*N.Y. Times Co. v. Sullivan*,
    376 U.S. 265 (1964) ........................................................................19

*Roberts v. U.S. Dep't of Justice*,
    366 F.3d 13 (D.D.C. 2005) ............................................................20

*Rosenberger v. Rectors & Visitors of Univ. of Va.*,
    515 U.S. 819 (1995) ........................................................................18, 21

*Royal Canin U.S.A., Inc. v. Wullschleger*,
    604 U.S. 22 (2025) ..........................................................................31

*Rutan v. Republican Party of Ill.*,
    497 U.S. 67 (1994) ..........................................................................19

*Savignac v. Jones Day*,
    754 F. Supp. 3d 135 (D.D.C. 2024) ..............................................3

*Scott v. Harris*,
    550 U.S. 372 (2007) ........................................................................3, 17, 23

*Spokeo v. Robbins*,
    578 U.S. 330 (2016) ........................................................................29

*Tao v. Freeh*,
    27 F.3d 635 (D.C. Cir. 1994) ........................................................19, 20

## Statutes

15 U.S.C. § 7211 ...................................................................................28

45 U.S.C. § 581(d) (1985) ...................................................................5

47 U.S.C. § 396 .....................................................................................4

47 U.S.C. § 396(k)(1)(A) .....................................................................24

47 U.S.C. § 396(k)(10)(D)(i) ...............................................................24, 25, 30

47 U.S.C. § 396(k)(10)(D)(k) ................................................................................24

47 U.S.C. § 398(b)(4) ...........................................................................................5

84 Stat. 1330 .........................................................................................................4

89 Stat. 92 (May 26, 1975) ...................................................................................5

## Rules

Fed. R. Civ. P. 56(a) .............................................................................................3

Fed. R. Evid. 602 ................................................................................................15

Fed. R. Evid. 801(a)............................................................................................17

## Treatises

Restatement (Second) of Torts § 767 (A.L.I. 1979) ..........................................32

## INTRODUCTION

As the Court has recognized, NPR's First Amendment claims against CPB "turn on motivation."  Dkt. 42 (9/30/2025 Tr. 14:21).  When CPB abruptly issued NPR an ultimatum in April to "spin off" the Public Radio Satellite System (PRSS) into a separate legal entity as a condition for the receipt of federal funds appropriated specifically for the PRSS—and then doubled down on its demand and rushed to identify a new, yet-to-exist recipient for those funds when NPR would not accede—did CPB do so because it thought this was the best way to responsibly "steward" federal funds and manage public radio interconnection?  Or was CPB trying, amid overwhelming political pressure and threats to its own funding, to comply with the demands of the Trump Administration and save itself?

The evidence amassed in just a few short weeks overwhelmingly proves the answer:  CPB was desperate to give the Administration a "win" by taking "AGGRESSIVE ACTION RE NPR—NO FUNDING ANYTHING."  CPB's executive responsible for interconnection, Kathy Merritt, told the story in her own draft talking points for the conversation she planned to have with NPR's chief operating officer, Ryan Merkley, to explain CPB's rapid reversal from its vote to fully fund the PRSS just days before: "[W]e're in an environment where NPR is the target of the Administration and Congress.  It's challenging for CPB to disperse millions of dollars to an organization that's under fire and heavily scrutinized."  Therefore, as Ms. Merritt wrote, CPB's Board had decided to "decoupl[e] interconnection from NPR's editorial efforts" by requiring that NPR turn the PRSS into a separate legal entity.

None of CPB's proffered alternative explanations makes any sense.  CPB relies almost exclusively on a 2024 study in which the consulting firm Deloitte recommended that a new, independent entity be formed to manage distribution for both public radio *and public television* to achieve "convergence."  Both NPR and the Public Broadcasting Service (PBS) objected to this

plan because it was impractical and not cost effective; indeed, PBS opposed it even more strongly than NPR.  CPB thus agreed to shelve the plan in late 2024, and in March 2025 it asked NPR and PBS to move forward with funding proposals for their respective interconnection systems.  CPB then provided more than $100 million to PBS for television interconnection funding while at the same time insisting NPR "spin off" the PRSS.  It strains credulity to suggest that CPB was merely following Deloitte's recommendation; CPB's demand was not what Deloitte had recommended— and even if it were, CPB has offered no explanation as to why it initially decided to fund the PRSS as-is and then abruptly reversed course.  The only plausible explanation for CPB's actions is the one that CPB's executives, Board members, and political consultants provided in their own communications at the time:  the Trump Administration "intense[ly] dislike[d]" NPR, and CPB was desperate to show that it had "taken steps to address the administration's concerns" by cutting off NPR's interconnection funding—which constituted the "vast majority of CPB's direct funding to NPR."

Because these facts are not subject to genuine dispute, NPR is entitled to summary judgment on its First Amendment claims.  At a minimum, if the Court determines that further factfinding is necessary, NPR is entitled to a preliminary injunction because it is likely to succeed on the merits and the other relevant factors overwhelmingly favor injunctive relief.  NPR is also entitled to summary judgment—or, at minimum, a preliminary injunction—as to its claim that CPB's actions impermissibly flout the requirements of the Public Broadcasting Act, and to its claim that CPB has tortiously interfered with NPR's business relations with the public radio stations that have designated NPR to manage and operate the PRSS for their benefit.

## ARGUMENT

The overwhelming evidence submitted by NPR—and the lack of any genuine contrary evidence from CPB—entitles NPR to summary judgment on each of its claims.  Summary

judgment is warranted if "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "A fact is 'material' if it could affect the outcome of the litigation under governing law, and a dispute is 'genuine' if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Savignac v. Jones Day*, 754 F. Supp. 3d 135, 163 (D.D.C. 2024) (citations omitted). If the moving party carries its initial burden, the non-moving (or cross-moving) party must submit an opposition that "consist[s] of more than unsupported allegations or denials, and must be supported by affidavits, declarations, or other competent evidence setting forth specific facts showing that there is a genuine issue for trial. That is, . . . the nonmoving party must provide evidence that would permit a reasonable jury to find in its favor." *Id.* (citations omitted); *see also Laningham v. U.S. Navy*, 813 F.2d 1236, 1241 (D.C. Cir. 1987). And "[w]hen opposing parties tell two different stories, *one of which is blatantly contradicted by the record, so that no reasonable jury could believe it*, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment." *Scott v. Harris*, 550 U.S. 372, 380 (2007) (emphasis added).

NPR is entitled to summary judgment on its First Amendment claims because it has presented a mountain of evidence, much of it admissions from CPB itself, establishing that CPB cut off NPR's funding for the PRSS based on a torrent of political pressure from the Trump Administration and a desire to save itself from retribution, including by appealing to the President's allies in Congress. CPB's unsupported denials and nonsensical alternative explanations are insufficient to create a genuine material factual dispute because they are "blatantly contradicted by the record" and "no reasonable jury could believe" them. *Scott*, 550 U.S. at 380. NPR is also entitled to summary judgment on its statutory claims because the only relevant factual issue—NPR's status as the national entity designated by public radio stations to manage and

operate the public radio interconnection system—is not in genuine dispute. Further, NPR is entitled to summary judgment on its claim of tortious interference with business relations.

At a minimum, the evidence and the law clearly establish that NPR is likely to succeed on the merits of each of its claims. NPR is likely to succeed on its First Amendment claims because the available evidence abundantly demonstrates that CPB's actions were driven by political pressure to retaliate against NPR and punish it for its perceived viewpoints. NPR is also likely to succeed on its statutory and tortious interference claims. Absent injunctive relief, in addition to the *per se* irreparable harm caused by CPB's violation of its constitutional rights, NPR will suffer unrecoverable economic losses as well as irremediable damage to its non-profit mission.

I.     **CPB Is Violating the First Amendment.**

    A.     **The First Amendment Applies to CPB.**

Because "the Government create[d] [CPB] by special law, for the furtherance of governmental objectives, and retains for itself permanent authority to appoint a majority of the directors of that corporation, the corporation is part of the Government for purposes of the First Amendment." *Lebron v. Nat'l R.R. Passenger Corp.*, 513 U.S. 374, 399 (1995); *see* Dkt. 38-1 at 18–20. The only part of the *Lebron* test that CPB disputes is whether CPB was created by the government; CPB argues that the Public Broadcasting Act merely "authorized" CPB to be created, rather than directly "creating" it. Dkt. 62 at 26; *see* 47 U.S.C. § 396 ("There is authorized to be established a nonprofit corporation, to be known as the 'Corporation for Public Broadcasting.'"). But this is not even a superficial distinction: Amtrak's organic statute nearly identically provides that "[t]here is authorized to be created a National Railroad Passenger Corporation." 84 Stat. 1330; *see Lebron*, 513 U.S. at 384 (discussing how "sections of the statute authorize Amtrak's incorporation"). The similarity between CPB's and Amtrak's authorizing statutes is one of the

many reasons why the Supreme Court in *Lebron* expressly stated that CPB and Amtrak are "variation[s] upon the [same] theme," *id.* at 391, and why CPB satisfies *Lebron*'s test.

The other ways in which CPB tries to portray itself as less governmental than Amtrak are mostly incorrect and all irrelevant. CPB argues that it differs from Amtrak because Amtrak's Board of Directors includes the Secretary of Transportation, while CPB's has only non-governmental personnel. Dkt. 62 at 27. But that provision regarding Amtrak's Board had been repealed by the time of *Lebron*. *See* 513 U.S. at 385, 386 n.4 (explaining how the statute was amended to allow the Transportation Secretary to appoint a "designee" in his place). Regardless, *Lebron* holds that a corporation can be a constitutional actor simply when it is overseen by government-*appointed* directors, whether or not those directors are government employees. *Id.* at 399. Two of CPB's other attempts to distinguish itself from Amtrak also rely on provisions in the Amtrak statute—one creating a presidential advisory panel for Amtrak, and the other requiring the President to approve the actions of Amtrak's incorporators—which had been repealed by the time of *Lebron* and so were not a basis for the Court's decision. Dkt. 62 at 27; *see* 89 Stat. 92 (May 26, 1975); 45 U.S.C. § 581(d) (1985). CPB next notes that Amtrak must submit annual reports to the President and Congress, Dkt. 62 at 27, a point which (even if had been relevant to *Lebron*'s reasoning) equally implicates CPB, which also must submit "an annual report." 47 U.S.C. § 398(b)(4). CPB then cites several ways in which the legislative and executive branches have referred to Amtrak as quasi-governmental—but those points were irrelevant to *Lebron*, which understood Congress to have "dispositive[ly]" designated Amtrak as *non*-governmental but found it to be a state actor anyway for constitutional purposes. 513 U.S. at 392.[1] In short, none of these

---

[1] CPB also cites a provision allowing the Interstate Commerce Commission to compel private railroads to open their routes to Amtrak, Dkt. 62 at 27, but this is not even an example of government control over Amtrak.

purported distinctions holds up. CPB is a government actor for First Amendment purposes. Accordingly, if CPB retaliated against NPR based on NPR's speech or denied NPR funding based on its perceived viewpoints—even if it did *not* do so under pressure from the Administration—it violated the Constitution.

But even setting aside *Lebron*, CPB must be considered a state actor for purposes of the First Amendment here. *See Lugar v. Edmondson Oil Co.*, 457 U.S. 922, 941–942 (1982); Dkt. 38-1 at 20–21; *cf. Nat'l Rifle Ass'n v. Vullo*, 602 U.S. 175, 191 (2024) ("To state a claim that the government violated the First Amendment through coercion of a third party, a plaintiff must plausibly allege conduct that, viewed in context, could be reasonably understood to convey a threat of adverse government action in order to punish or suppress the plaintiff's speech."). CPB does not (and cannot) dispute that *if* it discontinued NPR's funding at the Administration's behest, its actions would rise to the level of state action under *Lugar*. Dkt. 62 at 28–32. The *Lugar* question therefore merges with the merits of NPR's First Amendment claims—to which NPR now turns.

### B. There Is No Genuine Factual Dispute that CPB's Primary Motives Were Political Pressure and Retaliation.

On April 2, CPB's Board of Directors authorized, consistent with CPB management's recommendation following an orderly proposal process, the distribution of more than $30 million in interconnection funding to NPR. Dkt. 57-1 at 9–12. Although CPB tries to paint that April 2 decision as merely an authorization to commence negotiations, Dkt. 62 at 11, CPB's established practice and its own communications to NPR prove otherwise. The Board's resolution used the same language that the CPB Board always uses to approve such awards. For example, the Board passed a materially identical resolution that day with respect to PBS, and CPB management later executed an agreement with PBS with no further Board approvals or resolutions needed. Dkt. 58-2 at 8 (¶ 55). Indeed, when CPB's President and CEO announced on September 26, 2025 that

CPB was "awarding [a] grant to PMI" for $58 million, the Board had only just the day before passed precisely the same type of resolution "authoriz[ing] CPB management to negotiate an agreement" with PMI." *Id.* at 35 (¶ 214).[2]  Moreover, the Board's April 2 resolution was evidently sufficient for Merritt to, in her words, "call [NPR] and offer all the funding." *Id.* at 9 (¶ 62); *see also* Dkt. 38-3 at 3 (¶ 10) (2nd Munipalla Decl.) ("Ms. Merritt informed me that CPB's Board of Directors had approved NPR's proposal.").  And it was sufficient for CPB's in-house attorneys to draft the written contractual agreement—which, as Ms. Merritt explained, typically occurs only after an internal "concurrence" process in which departments within CPB affirm they are prepared to move forward with a grant award.  Townsend Supp. Decl., Ex. 1 at 4–9 (CPB_0080191) (draft contract prepared by CPB); Dkt. 59-11 (Merritt Tr. 236:16–238:8).

But on April 4, at a hastily organized, unnoticed meeting,[3] the Board reversed course and decreed that no interconnection funds could go to NPR; the funds would have to go to a new, independent entity.  Dkt. 58-2 at 11 (¶¶ 83–84).

The explanation for the Board's reversal over the course of just two days is clear from the record.  NPR's opening brief details powerful, objective, documentary evidence from CPB's own communications that CPB caved to Executive Branch pressure not to fund NPR, beginning most significantly at an April 3 meeting with a senior official from the Office of Management and Budget (OMB) that sent CPB into "crisis mode."  Dkt. 58-2 at 10 (¶ 77).  At that meeting, the

---

[2] In further acknowledgement of the true meaning of a Board resolution authorizing "negotiation" of a contract, CPB admits in its Statement of Facts that in September, "CPB's Board had approved awarding the interconnection funding to PMI."  Dkt. 58-2 at 31 (¶ 194).  Just so.  The Board did the same for NPR (only to revoke that decision) on April 2.

[3] The Public Broadcasting Act in fact requires the CPB Board meetings must generally be open to the public and that reasonable notice must be provided; to the extent the Board holds closed meetings, it must make a publicly available statement containing its reasons for closing the meeting.  47 U.S.C. §§ 396(g)(4), (k)(4).

OMB official expressed "her intense dislike for NPR" but said "it would be a shame to throw the baby out with the bath water." Dkt. 57-1 at 6, 13, 30.[4]

In CPB's telling, over these two days—in a truly remarkable coincidence of timing—it merely unearthed a "governance" concern unrelated to political pressure that was simultaneously longstanding but also suddenly required immediate and drastic action. Dkt. 62 at 9, 35. Far less than deserving summary judgment, CPB's story is based on no evidence at all. CPB does not even attempt to offer any account of what changed between April 2 and April 4, and the evidence it points to is irrelevant, inadmissible and implausible.

1. *CPB's April 2025 demand that the PRSS be spun off bears little relationship to Deloitte's 2024 recommendation*. CPB's lead response—that it was actually considering forcing NPR to spin off the PRSS for months before April 2025—relies on an obvious mischaracterization of a report it had commissioned from Deloitte the year before. In 2024, CPB briefly considered a proposal for "convergence": the idea that the "television and radio [interconnection systems] should become one." Dkt. 59-6 (Munipalla Tr. 236:10–22). CPB's consultant Deloitte had proposed, as an "efficiency" measure, "establish[ing] a platform to unify services for audio and video distribution." Dkt. 61-2 at 2. And Deloitte floated the idea of doing so by forming a "new distribution entity" or a "NewCo." for short. *Id.*; *see also* Dkt. 59-6 (Munipalla Tr. 255:14–256:3) ("the newco idea … was the concept of pulling together TV and radio").

---

[4] CPB suggests that the "allegations in this case focus on the May 1 EO," Dkt. 62 at 32, but NPR's claims are not so limited. *See* Dkt. 46-1 at 51 (¶ 200) (Amended Compl.) ("Even if CPB's actions were not undertaken specifically to implement the Order, its actions would still violate the First Amendment because CPB acted to comply with the Administration's demands to defund NPR in retaliation for NPR's protected speech."). Regardless, President Trump's Executive Order is part and parcel of the pressure he put on CPB before and after May 1. The Order, the OMB meeting, public statements and threats from the President, and President Trump's purported firing of CPB Board members are all part of the escalating pressure to which CPB capitulated. And CPB knew in early April that an Executive Order was impending. Dkt. 57-1 at 12; Dkt. 57-2 at 10 (¶ 60).

As CPB itself notes, to pitch this idea, "in November 2024, CPB's Board discussed 'a joint meeting of CPB, NPR, and PBS's Interconnection teams' and a 'proposal that CPB post a Request for Proposals for new content distribution to increase competition.'" Dkt. 62 at 34. CPB's narrative conspicuously stops there (jumping immediately to April 2025), *id.* at 34–35, neglecting to mention what actually transpired at this meeting or its subsequent abandonment of the NewCo concept. When "Deloitte and CPB proposed the idea of a newco, PBS immediately shut the idea down." Dkt. 59-6 at 77 (Munipalla Tr. 301:17–18). Indeed, PBS's chief technology officer "spoke for 45 minutes nonstop saying why it was a terrible idea. So no progress was made, and the effort was shut down." *Id.* (Munipalla Tr. 301:19–21). Although NPR shared PBS's concerns, CPB executives understood that *PBS* was the proposal's most adamant opponent. On December 1, 2024, for example, Merritt wrote to other executives, "If we thought PBS was upset with NewCo, they would go ballistic with an RFP." *See* Townsend Supp. Decl., Ex. 2 at 2 (CPB_0112005).

By March 2025, when NPR and PBS submitted their proposals to extend interconnection funding, the idea of a radio-television NewCo was long dead. *See* Dkt. 59-103 at 221, 262–62 (McLellan Ross Tr. 221:11–15, 261:17–18, 262:15–21) (CPB executive Anne Brachman informed NPR in November or December of 2024 that "we've gotten the CPB board off the idea of convergence," and "the technical teams were instead asked to develop proposals that would demonstrate further collaboration between PBS and NPR"). Although the proposals included a new area of collaboration between PBS and NPR (with respect to satellite leases), neither proposal suggested forming a "NewCo," and CPB management, including Merritt, concluded that the proposals "aligned with our expectations" and would "ensure continuity of service as well as future

facing strategies."  Dkt. 57-2 at 8 (¶ 50).[5]  Consistent with management's recommendation, on April 2 the CPB Board approved separate interconnection proposals by NPR and PBS.  *Id.* at 9 (¶¶ 54–55).

The Board's abrupt reversal two days later had nothing whatsoever to do with Deloitte's "NewCo" concept.  To the contrary, CPB awarded—and unlike with NPR, never revoked—$100 million in television interconnection funding to PBS, which it understood to be the main *opponent* of the concept.  *Id.* at 18 (¶ 115).  Indeed, CPB does not now claim that its April 4 demand to spin off the PRSS was related to its push to converge television and radio interconnection.  CPB instead misleadingly marshals Deloitte's recommendation as somehow supporting vague "concerns" about NPR's—and only NPR's—governance of the public radio interconnection system and insinuates that NPR would operate the PRSS in a way that favors NPR member stations over non-NPR stations.  Dkt. 62 at 33.  The first time this supposed concern ever surfaced internally at CPB was on April 4, and the first time CPB mentioned it to NPR was April 11; CPB cites no evidence that it considered this alleged issue before then.  Dkt. 62 at 33–35; Dkt. 57-2 at 18 (¶ 112).

Even today, CPB offers no factual basis to support its supposed concern that NPR Distribution, the separate division within NPR that operates the PRSS, *see* Dkt. 59-6 at 6 (Munipalla Tr. 14:4–15:13), somehow favors NPR members over other interconnected stations.  Nor could it.  NPR Distribution undisputedly "charge[s] the exact same amount" to all interconnected stations, "whether or not they use NPR content."  *Id.* at 8 (Tr. 24:5–11).  Nor does CPB cite any evidence that any non-NPR station has ever complained of favoritism.  In fact, the two paragraphs in CPB's statement of facts purporting to justify its concerns cite only a made-for-

---

[5] Whereas the memorandum argued that two aspects of PBS's proposal "require[d] further evaluation," it raised no concerns at all about NPR's proposal.  Dkt. 57-2 at 9 (¶ 52).

litigation affidavit by CPB's general counsel, which in turn just asserts without support and in passive voice that PRSS's governance structure "creates the concern that the needs of tribal and non-NPR stations from the interconnection system will not be met." Dkt. 62 at 33; Dkt. 58-2 at 11 ¶ 82, 21 ¶ 138; Dkt. 40-9. There is not a single piece of evidence from any fact witness that this governance concern is real.

*2. CPB's actions to implement its April 4 decision confirm its unconstitutional motive.* CPB argues that it could not have had an illicit motive because it "offered NPR a right of first refusal and included NPR in the process of revising the management of the interconnection system." Dkt. 62 at 35 (capitalization altered). Specifically, CPB wants credit because it let NPR take the first crack at divorcing itself from the PRSS (*i.e.*, draft "a plan to make PRSS an entity that is separate from NPR"). *Id.* (emphasis omitted). CPB also permitted two NPR Board members to join its "Working Group to establish shared goals and create a vision for forming a new content distribution entity." *Id.* at 36. And CPB allowed NPR to respond to its RFP—the terms of which required that any proposal name "an independent entity to manage the interconnection system[,]" and therefore excluded NPR. *Id.* at 37.[6]

"Some people might call that *chutzpah*." *Arizona Free Enter. Club's Freedom PAC v. Bennett*, 564 U.S. 721, 766 (2011) (Kagan, J., dissenting). In essence, CPB asks the Court to believe that it could not have been retaliating against and punishing NPR for the content of its speech and its viewpoints because it gave NPR an opportunity to inflict the First Amendment

---

[6] Contrary to CPB's suggestions, NPR made clear during all these stages its view that CPB's efforts to sever the PRSS from NPR violated the Public Broadcasting Act and the First Amendment. On July 25—eleven days after CPB issued the RFP—NPR wrote in a filing in this litigation that "CPB is seeking to replace NPR as the manager and operator of the PRSS," which NPR said was a "nod to the [Executive] Order" that "can hardly be coincidental." Dkt. 34 at 20. And even before then—as early as May 31, 2025—CPB's Chief Operating Officer remarked that NPR had advanced a "narrative of CPB not funding PRSS because of the EO." Dkt. 57-2 at 27 (¶ 163).

injury on itself.  CPB decided, at the Administration's behest, that interconnection funding could never be allowed to go directly *to NPR*.  So CPB's first resort was to enlist NPR's help in finding a way *to not give interconnection funds to NPR* by spinning off the PRSS.  Offering NPR an opportunity to participate in that process does not cure the First Amendment violation any more than the police could remedy a Fourth Amendment violation by letting a homeowner pick whether his house will be forcibly invaded without a warrant from the front door or the back door.  Nor does CPB's purported willingness to receive such input from NPR disprove "subjective animus or retaliatory motive" against NPR.  Dkt. 62 at 37.  The subjective animus here was the Trump Administration's.  And what the Trump Administration specifically wanted was for federal money to stop flowing to NPR.  Dkt. 21-2 at 19–23 (¶¶ 155–72).  CPB's motive, in turn, was to try to survive by complying with that demand.

3. *Other funds that CPB has allowed to be transferred to NPR and PBS since April 2025 confirm CPB's political motives*.  CPB argues that it must not have decided to comply with the Administration's demands because the PMI proposal it selected "would give NPR an additional $6.5 million for interconnection" as a subcontractor; CPB did disburse interconnection funding to PBS; and since the May 1 Executive Order, CPB has transferred about $2.1 million to NPR based on older awards and other sums to local NPR member stations.  Dkt. 62 at 31.  But the details of these transfers, and CPB's decisionmaking behind them, only underline the precise political calculations that CPB was engaged in.

First, the $6.5 million figure in PMI's proposal just proves that CPB's motive for cobbling together PMI and attempting to award it all public radio interconnection funding was not to act in the public radio system's best interests.  PMI *had* to propose giving at least some funding to NPR because someone actually needs to provide satellite interconnection services for public radio

moving forward; PMI does not have any satellite interconnection capacity.  Indeed, PMI *does not even exist*.  *See* Dkt. 61-24 at 13 (PMI's proposal admitting that "current satellite delivery through PRSS must be supported and maintained, particularly for its critical role connecting rural and Native communities"); Dkt. 59-11 at 52 (Merritt Tr. 205:2–24) (acknowledging that PMI is not incorporated and has no executive director, no board, and no chief technology officer).  Nor does PMI have "terrestrial" (*i.e.*, non-satellite) distribution capacity, which will "take a minimum of three to four years" to roll out.  Dkt. 59-6 at 77 (Munipalla Tr. 300:17–301:2).  If CPB were acting in the public radio system's best interests, it would have simply awarded the public radio interconnection funding directly to NPR for the PRSS.  But because of political pressure from the Trump Administration, CPB decided to stop directly transferring any further federal dollars to NPR and instead funnel it through PMI; that way, it could tell OMB that it was "exploring . . . directing funding to an entity separate from NPR, to manage public radio's interconnection service," Dkt. 57-1 at 20; Dkt. 57-2 at 22–23 (¶ 139).  CPB's convoluted plan to then channel a (inadequate) portion of public radio interconnection funds to NPR is just proof that CPB was reacting to OMB's directives.

CPB's award of funding to PBS was likewise the result of an explicit political judgment that PBS was less politically toxic than NPR.  *See* Dkt. 57-1 at 18 (former CPB COO remarking that PBS "presents a vastly different degree of threat to funding than NPR"; CPB Chief of Staff explaining that "We are moving ahead with almost $100 million to PBS for their distribution (interconnection) and not to NPR, why?  There are obvious political challenges."); *id.* at 23 (CPB's Vice President, Government and External Affairs arguing for "[r]eforms or restrictions [to] address NPR-specific concerns" while keeping PBS program "Mister Rogers' Neighborhood").

Finally, CPB's grants to local radio stations and the $2.1 million it transferred to NPR since the May 1 Executive Order tell a similar story. CPB continued to fund local radio stations (even if they were NPR member stations) because that was not the Trump Administration's primary focus. Dkt. 59-63 at 2 (OMB demanding that CPB report how much "funding [was] disbursed *directly* to NPR"). And the $2.1 million exclusively comprised payments required by previously awarded contracts (or donations intended for NPR), payments the Executive Order arguably did not forbid. Dkt. 60-25 at 27. None of the transfers cited by CPB resulted from a new decision to award NPR money. *Id.* After the Administration's pressure campaign, CPB never made that decision again. *Id.*

CPB's entire argument is premised on the idea that its compliance with the Administration's demands must be all-or-nothing. But even partial compliance is a First Amendment violation. And while the Administration no doubt has a distaste for public media across the board, the evidence is crystal clear that CPB has believed since April that the Administration's prime target by far was the direct disbursement of government funds to NPR. For that reason, CPB immediately acted to discontinue the largest direct source of government money to NPR by far: interconnection funding. The numerous CPB communications showing the political logic behind this decision only confirm that CPB was endeavoring to comply with the Administration's retaliatory and punitive demands based on the content and viewpoint of NPR's speech and journalistic activities.

4. *In private, CPB did not live up to its public protests of independence.* To argue that it did not bend to the Administration, CPB also cites all the ways in which it publicly asserted that it "would not permit President Trump to dictate how it conducts its affairs." Dkt. 62 at 30. CPB cites the lawsuit it filed contesting the President's purported removal of CPB directors; press

releases; and communications and journalism by NPR (all from before discovery in this case) reporting on CPB's public pronouncements. *Id.* at 30–31.

But evidence obtained through discovery has undisputedly revealed that behind the scenes, CPB was desperate to appease the Administration and its allies in Congress. CPB's meeting with OMB put it into "crisis mode." Dkt. 57-1 at 30. Its executives soon recognized that "we're in an environment where NPR is the target of the Administration and Congress. It's challenging for CPB to disperse millions of dollars to an organization that's under fire and heavily scrutinized." *Id.* at 15. And once CPB decided to pull the plug on interconnection funding to NPR, it quickly worked that decision into its government-communications strategy. *Id.* at 32.

This desperation to appease the President continued even after CPB's funding was rescinded on July 24. *Contra* Dkt. 62 at 29. On August 29, CPB's President and CEO was still stressing that CPB needed to consider "ANY STEPS WE COULD TAKE TO KEEP CPB ALIVE. SUCH AS … AGGRESSIVE ACTION RE NPR—NO FUNDING ANYTHING." Dkt. 57-1 at 24. As late as September 15, Ms. Harrison was "explor[ing] options for survival." Dkt. 57-2 at 33 (¶ 204). As it turns out, those options included doubling down on the decision to defund NPR, in the hope of restoring CPB's political fortunes.[7]

5. *CPB's sham declaration from Kathy Merritt does not create a disputed fact question about CPB's motives*. The common thread behind all of CPB's evidence and arguments described above is that none purports to say anything about the crux of this case—what happened between April 2 and April 4. Apparently recognizing this failing, the day after Ms. Merritt was deposed for a full day, CPB included with its summary-judgment papers a new twenty-page declaration

---

[7] And despite CPB's public representations that it is shuttering its doors, Ms. Harrison admitted in her deposition that CPB may continue as a "shell" organization in the hopes of receiving future appropriations. Dkt. 59-35 (Harrison Tr. 253:15–254:9).

from her, which asserts that "[a]t no time did I, or to my knowledge, any CPB Board member of employee, receive any direction, suggestion, or pressure from the Executive Office of the President, the Department of Government Efficiency, or any other governmental entity to have CPB request that NPR spin out PRSS as a separate entity. … This was CPB's decision, as the steward of federally appropriated funds, to improve the interconnection system for all stations and position it for future success." Dkt. 61 at 15; *see* Dkt. 62 at 29, 36; Dkt. 58-2 at 26 ¶ 162.  But Ms. Merritt's generic denial, set against the copiously documented contemporaneous evidence that CPB was indeed responding to Executive Branch pressure, does not create a genuine material factual dispute that can defeat summary judgment.  And for purposes of NPR's entitlement to a preliminary injunction, Ms. Merritt's statements should be afforded little if any weight.

As an initial matter, the declaration is rife with inadmissible testimony.  *See* Objections to Merritt Declaration at 3, 5, 6, 8, 10–13, 15–17, 23–24.  CPB agrees that "CPB's *board*" made the decision "[o]n April 4" to demand an independent PRSS.  Dkt. 62 at 35 (emphasis added); Dkt. 59-33 at 2.  What matters in this case is therefore the *Board*'s motives.  But Ms. Merritt lacks any personal knowledge about those individuals' intent or whether they "received any direction, suggestion, or pressure" from any "government entity."  She is not competent to testify as to that issue.  Fed. R. Evid. 602.  And Ms. Merritt of course cannot testify to what pressure government officials may have put on Board members in her absence, or to those members' subjective motives for the April 4 decision and subsequent decisions.  Nor can she even competently testify about any of the Board's conversations that occurred in her presence in April of 2025.  In her deposition, Ms. Merritt repeatedly disclaimed remembering any specifics about who said what at Board meetings.  *See* Objections to Merritt Declaration at 4 & n.3 (citing many examples).  And even if her memory

were not so faulty, any testimony about the Board's decisionmaking drawn from what Ms. Merrit heard Board members say would be hearsay.  Fed. R. Evid. 801(a).

Nor are Ms. Merritt's statements a preview of admissible evidence to come.  "While a nonmovant is not required to produce evidence in a *form* that would be admissible at trial, the evidence still must be capable of being converted into admissible evidence."  *Gleklen v. Democratic Cong. Campaign Comm., Inc.*, 199 F.3d 1365, 1369 (D.C. Cir. 2000).  Here, the admissible form of evidence about the Board would be Board members' own testimony.  But as the Court well knows, CPB has not only declined to affirmatively offer testimony about their motives, it has refused to make its Board members available to testify or even produce their documents.  Dkt. 56 (10/21/25 Tr. 26:3–35:2).  Having labored to keep the Board members out of this case, CPB cannot rely on inadmissible hearsay and speculative evidence about their motives to avoid summary judgment.

But even if Ms. Merritt's self-serving statements were admissible, they are too conclusory to defeat summary judgment.  "Although, as a rule, statements made by the party opposing a motion for summary judgment must be accepted as true for the purpose of ruling on that motion, some statements are so conclusory as to come within an exception to that rule."  *Greene v. Dalton*, 164 F.3d 671, 675 (D.C. Cir. 1999).  "When opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment." *Scott v. Harris*, 550 U.S. 372, 380 (2007).  NPR has unearthed reams of evidence *from CPB's own records* showing that CPB met with OMB officials, that an official told CPB about her "intense dislike of NPR," that CPB immediately went into "crisis mode," that within about 24 hours its Board changed course and revoked $30 million of funding for NPR, and that in the

following months it cited this fact in talking points to the Administration and Congress as a reason why it should not be defunded.  If against all this evidence, CPB could force a trial because it found a witness (who was not even the relevant decisionmaker) to incant "not so," then "the summary judgment device" would lose its power "to weed out those cases insufficiently meritorious to warrant the expense of a … trial"—the procedure's "central purpose." *Greene*, 164 F.3d at 675.

Ms. Merritt's carefully lawyered, post-deposition declaration, moreover, reveals little. NPR has never suggested that a government official specifically and expressly "request[ed] that NPR spin out PRSS as a separate entity"; indeed, it would not be surprising if the OMB official who met with CPB on April 3 had never heard of the PRSS.  Denying that the government specifically brought up the PRSS therefore does not count for much.  What the Administration wanted, according to CPB's own records, was for CPB to stop funding NPR.  CPB swiftly did so.

C.    **CPB's Unlawful Refusal to Disburse PRSS Funding to NPR Constituted Retaliation.**

CPB implausibly claims that refusing to distribute tens of millions of dollars that NPR needs to manage and operate the PRSS is not a sufficiently adverse action to support a claim for First Amendment retaliation.  That argument ignores both the facts and the law.

To begin, even if CPB were correct that its actions were not sufficiently chilling to support a retaliation claim, that argument would be irrelevant to NPR's independent First Amendment claim that CPB engaged in impermissible viewpoint discrimination by withholding funds because of NPR's perceived viewpoints.  *See* Dkt. 46-1 at 41–44, 50–51 (Counts 3 and 7 of the Amended Complaint alleging viewpoint-based discrimination).  The viewpoint-based withholding of a benefit is per se unconstitutional regardless of the degree to which that deprivation chills the victim's speech. *See, e.g.*, *Rosenberger v. Rectors & Visitors of Univ. of Va.*, 515 U.S. 819, 834

(1995) ("reaffirm[ing] the requirement of viewpoint neutrality in the Government's provision of financial benefits"); *Agency for Int'l Dev. v. All. For Open Soc'y Int'l, Inc.*, 570 U.S. 205, 214–17 (2013) (government cannot "leverage funding" to "regulate speech outside the contours of the federal program itself").  Because CPB, which is a government actor for First Amendment purposes, withheld funds based on NPR's perceived viewpoints, it engaged in unconstitutional viewpoint discrimination, full stop.

In any event, it is self-evident that the deprivation of tens of millions of dollars that an organization needs to operate a mission-critical system and fulfill a core mission is sufficiently adverse to support a First Amendment retaliation claim.  The "law is settled" that the First Amendment prohibits government actors "from subjecting an individual to retaliatory actions . . . for speaking out," including the denial "of a benefit."  *Hartman v. Moore*, 547 U.S. 250, 256 (2006).  While the retaliatory action must be "sufficient to deter a person of ordinary firmness in plaintiff's position from speaking again," *Aref v. Lynch*, 833 F.3d 242, 259 (D.C. Cir. 2016), the Supreme Court and D.C. Circuit have made clear that this is not a high bar:  The First Amendment protects against "an act of retaliation as trivial as failing to hold a birthday party for a public employee . . . when intended to punish her for exercising her free speech rights." *Tao v. Freeh*, 27 F.3d 635, 639 (D.C. Cir. 1994) (quoting *Rutan v. Republican Party of Ill.*, 497 U.S. 67, 76 n.8 (1994)).  The test does not require that the adverse action be so severe that no victim ever would speak again; the action must simply count as a "deter[rent]," *Aref*, 833 F.3d at 259—it need only "*chill* the exercise of constitutionally protected speech," *Tao*, 27 F.3d at 639 (emphasis added; quotations omitted).

The loss of tens of millions of dollars in federal funds for the PRSS clearly would have a chilling effect on any speaker in NPR's position.  *See N.Y. Times Co. v. Sullivan*, 376 U.S. 254,

277–78 (1964) (discussing the chilling effect of the threat of civil damage awards in defamation cases on free speech). Indeed, CPB cites no authority (and NPR is aware of none) holding that the loss of millions of dollars in funding is insufficiently serious to count. Moreover, NPR has explained how providing interconnection for the public radio system to foster an informed public is a core part of its non-profit mission. Doc. 57–1 at 43. NPR also has contractual obligations to continue to run the PRSS. *See* Dkt. 38-5, 38-6, 38-7 (contracts). Managing and operating the PRSS in fulfillment of that mission requires millions of dollars and NPR, despite its resources, cannot continue indefinitely to operate the PRSS at a deficit of more than $10 million per year. *See* Dkt. 38-3 (2d Munipalla Decl.) at 2 ¶ 7 (noting that NPR's 2023 funding for the PRSS was $11,866,755). Indeed, CPB's own General Counsel went so far as to inform this Court that "[i]f the PRSS Interconnection Grant is not extended, the PRSS system will cease operations and the resulting effects will be catastrophic." Dkt. 12-1 at 14 (¶ 36) (Decl. of Evan Slavitt), *Corp. for Pub. Broad. v. Trump*, No. 25-cv-1305 (D.D.C.). Forcing an organization to choose between (a) halting its operation of a program that is core to its mission and its reputation with the hundreds of Interconnected Stations with whom it has partnered for decades, or (b) operating at an eight-figure deficit indefinitely is, at minimum, a "tangible adverse action." *Roberts v. U.S. Dep't of Justice*, 366 F. Supp. 2d 13, 23 (D.D.C. 2005) (citing *Tao*, 27 F.3d at 639). Any organization would think twice about continuing to engage in the speech that caused such retaliation.

CPB's remaining arguments are red herrings. It points to the size of NPR's endowment and annual revenue, Dkt. 62 at 40, but NPR and NPR Distribution have separate budgets and do not share funds, Dkt. 59-6 (Munipalla Tr. 19:20–20:15). CPB also argues that NPR will continue to support and fund the PRSS, and has not altered its speech as a result of the retaliation. Dkt. 62 at 33–35. But the test for an adverse action is *objective*, *Aref*, 833 F.3d at 259, and the possibility

that NPR has greater fortitude than an ordinary speaker does not mean that CPB's actions are not objectively chilling.

Finally, CPB makes the bizarre argument that the deprivation of interconnection funds cannot have an impact on NPR's speech because those funds are not used by NPR for its programming.  Dkt. 62 at 34.  But the deprivation of substantial funding for one of the organization's core activities in retaliation for its speech can chill the organization's speech regardless of whether that funding directly supports the speech.  *Cf. Agency for Intern. Development*, 570 U.S. at 214–15 (holding unconstitutional government spending conditions that sought to control speech outside the scope of the federally funded program).

### D.    CPB Engaged in Viewpoint Discrimination.

CPB's carrying out the Administration's demands is especially offensive to the Constitution because the stripping of NPR's funding is based on the Administration's explicit objections to NPR's perceived viewpoints as "biased" and "woke propaganda."  Dkt. 57-2  at 11 ¶¶ 63, 64); Dkt. 21-2 at 23 (¶ 171).  "At the heart of the First Amendment's Free Speech Clause is the recognition that viewpoint discrimination is uniquely harmful to a free and democratic society."  *Vullo*, 602 U.S. at 187.  The Administration disdains NPR and demanded its defunding because of the content of NPR's journalism and the views it expresses on issues of the day.  This viewpoint discrimination is an especially "egregious form of content discrimination" and is "presumptively unconstitutional."  *Rosenberger v. Rector & Visitors of Univ. of Virginia*, 515 U.S. 819, 829–30 (1995).

CPB argues that the government commits viewpoint discrimination only if its regulation directly acts on speech, Dkt. 62 at 43, but the Supreme Court has held precisely the opposite:  In *Board of County Commissioners v. Umbehr*, for example, the Court recognized a claim of "discrimination based on the viewpoint of one's speech" when a county Board fired a contractor

who had criticized the Board.  518 U.S. 668 (1996).  The fact that the services the contractor provided—hauling trash for cities in the county, *see id.* at 671—were unrelated to speech had no bearing on the his First Amendment claim.  The gravamen of the claim was that the county took away a valuable benefit (the contract) because of disagreement with the contractor's speech.

> **E.  The Court Should Draw Adverse Inferences from CPB's Discovery Failures.**

In NPR's Motion to Compel or, in the Alternative, for Evidentiary Sanctions, Dkt. 55, NPR explained how the Chair of CPB's Board of Directors, Ruby Calvert, was very likely to possess in her personal email account highly relevant documents, including communications with OMB, members of Congress, and other government officials related to NPR and CPB's decision to cease funding NPR as a result of government pressure.  Ms. Calvert was one of only three CPB leaders to attend the April 3 meeting with OMB.  Dkt. 57-2 at 12 (¶ 74).  And it is clear that Ms. Calvert was communicating with members of the Administration via a personal email account.  Dkt. 55 at 6.  NPR moved to compel production of relevant documents in Ms. Calvert's possession.  *Id.* at 12.

At the status conference held before this Court on October 21, the Court indicated that if Ms. Calvert, as Chair of CPB's Board, "has responsive documents in her possession, they ought to be produced one way or the other."  Dkt. 56 (10/21 Tr. 31:16–18).  The Court explained that those documents could be produced pursuant to a subpoena, or Ms. Calvert could provide an "attestation" that she has provided all responsive documents.  *Id.* at 32:1–16.  To date, however, CPB has produced only two additional documents from Ms. Calvert, without a sworn declaration from Ms. Calvert attesting that these are exhaustive.  CPB's lawyers instead have simply asserted in an unsworn email that all of Ms. Calvert's "communications with the Administration regarding NPR sent from her personal gmail have already been provided" and that "[s]he has only located two emails with members of Congress that reference NPR."  Townsend Supp. Decl., Ex. 3.  This

Court should not accept that implausible, self-serving statement—which does not even explain what steps (if any) counsel took to ascertain whether this statement is true. Nor was NPR's request for responsive documents limited only to those explicitly referencing NPR. *See* Dkt. 56 (10/21 Tr. 30:19–21) (NPR sought Ms. Calvert's communications with the Administration and Congress "relating to NPR [and] relating to her work at CPB as CPB's board chair"). Rather, CPB's continued failure to produce responsive documents in Ms. Calvert's possession or to produce a sworn declaration *from Ms. Calvert* that no such documents exist warrants evidentiary sanctions.

At a minimum, CPB's failure should prevent this Court from crediting any affirmative representations that CPB and its declarants have made about the conduct of its Board or its motives. In particular, CPB has asserted through the post-deposition declaration by Ms. Merritt that based on Ms. Merritt's "knowledge and discussions with the Board in April, no one from the government told CPB to have NPR spin out PRSS as a separate entity," and the Board's decision "had nothing to do with NPR's news reporting or content generation or CPB trying to curry favor with the Trump Administration." Dkt. 61 at 12 (¶ 37). Even putting aside the implausibility of Ms. Merritt's assertions in light of the significant documentary evidence to the contrary, this Court should not allow CPB to hide behind such statements while refusing to produce the Board documents and communications that would prove or disprove them (or, at least, a sworn declaration that no such documents exist). The Court should give Ms. Merritt's statements no weight in light of CPB's discovery failures.

Moreover, an adverse inference from CPB's discovery failures is warranted. It is blackletter law that "when a party has relevant evidence within his control which he fails to produce, that failure gives rise to an inference that the evidence is unfavorable to him." *Int'l Union, United Auto., Aerospace & Agr. Implement Workers of Am. (UAW) v. N.L.R.B.*, 459 F.2d 1329,

1336 (D.C. Cir. 1972). CPB's refusal to provide a sworn declaration that Ms. Calvert possesses no additional responsive documents supports an inference that Ms. Calvert in fact possesses such documents. And CPB's refusal to produce those documents supports an inference that they are damaging to CPB. This Court should conclude that the unproduced documents would show that CPB decided not to extend NPR's PRSS funding because of pressure from the government related to the content and viewpoints of NPR's speech.

## II.    CPB's Actions Violate the Public Broadcasting Act.

### A.    CPB Is Required to Distribute Interconnection Funds to NPR or to Public Radio Stations Participating in the PRSS on an Equal Basis.

The Public Broadcasting Act unambiguously requires CPB to distribute interconnection funds for public radio to "those public telecommunications entities participating in the public radio satellite interconnection system or the national entity they designate for satellite interconnection purposes"—*i.e.*, NPR. 47 U.S.C. § 396(k)(10)(D)(i); *see* Dkt. 57-1 at 35; Dkt. 41 at 7–10. CPB offers two arguments in response, both of which misread the Act and relevant appropriations statutes.

First, CPB asserts that it is free to ignore § 396(k)(10) because Congress did not specifically assign funds to "the Satellite Interconnection Fund" when it appropriated tens of millions of dollars for interconnection purposes in recent years. Dkt. 62 at 18–20. But as NPR has explained, this reading of the statute is untenable: it would obliterate *all* of the spending rules for CPB's grants and programs set out in § 396(k)(1)-(9), because those requirements relate to the use of funds appropriated to "the Public Broadcasting Fund," *id.* § 396(k)(1)(A); Dkt. 57-1 at 38–39. Because Congress has not specifically appropriated funding to "the Public Broadcasting Fund" in recent years, CPB's position would have allowed it to spend hundreds of millions of dollars however it saw fit—free from the Act's requirements regarding spending for television versus radio

programming, direct spending on local stations, and restrictions on administrative costs.  The more sensible reading of the Act, together with Congress's recent appropriations statutes, is that those appropriations fall into two categories—one that supports CPB's general programming and is subject to the requirements in § 396(k)(1)-(9), and another that supports interconnection and is subject to § 396(k)(10).

CPB's position would also render the detailed budget justifications that it has submitted to Congress year after year no more than empty gestures.  When CPB made its $60 million request to Congress for interconnection funding for Fiscal Year 2025, it specified that it would work with PBS and NPR to extend interconnection contracts and provide detailed information about the PRSS's budget.  Dkt. 57-1 at 39.  And CPB has represented *to this Court* that $35,962,000 of its congressional appropriation was designated "*for th[e] specific purpose*" of extending its "current PRSS Interconnection Grant with NPR."  *Id.* at 40 (emphasis added).

Second—displaying a consistent misunderstanding of § 396(k)(10)(D)(i) as well as a misreading of the transcript from this Court's September 30, 2025 hearing—CPB asserts that NPR is not the "designated national entity" for purposes of that provision because "NPR cannot show that all licensees and permittees have designated them as such."  Dkt. 62 at 23.  As counsel for NPR already has explained, § 396(k)(10)(D)(i)'s reference to "licensees and permittees" refers to public *television* stations.  Dkt. 42 (9/30/2025 Tr. 12:20–13:7) (Court noting that CPB appeared to focus on this language incorrectly).  That is, public *television* interconnection funds must be distributed by CPB "to the licensees and permittees of noncommercial educational television broadcast stations . . . or the national entity they designate for satellite interconnection purposes." 47 U.S.C. § 396(k)(10)(D)(i).  Public *radio* interconnection funds must be distributed to "those public telecommunications entities participating in the public radio satellite interconnection

system or the national entity they designate for satellite interconnection purposes." *Id.* To the extent CPB appears to suggest that NPR is not the designated national entity because not *every* public radio station has designated it to serve as that entity, that argument has no basis in the text or reality. NPR is the designated national entity because "public telecommunications entities *participating in the public radio satellite interconnection system*" designated it as such through a vote. The choices of other stations that do *not* participate in the PRSS are irrelevant.

Finally, CPB offers a hodgepodge of other insinuations intended to cast doubt on NPR's status as the designated national entity—none of which withstands scrutiny. The uncontroverted evidence put forth by NPR demonstrates that the Interconnected Stations voted in 1985 for the management and governance of the PRSS to remain within NPR, Dkt. 57-2 at 3 (¶ 11); that NPR has fulfilled that role ever since, *id.* (¶ 13); that each Interconnected Station has entered into a contractual agreement with NPR to provide these services, nearly all of which renew automatically, *id.* (¶¶ 14–15); and that CPB has itself repeatedly recognized NPR's status as the designated "national entity for interconnection purposes," *id.* at 5 (¶ 26). Indeed, when CPB began planning to require that NPR spin off the PRSS, Kathy Merritt indicated that "the stations will have to vote on making a switch for PRSS." *Id.* at 20 (¶ 127). And CPB's General Counsel has referred to NPR as the "manager and operator of PRSS." Dkt. 59-64 at 2.

The fact that NPR's contracts with Interconnected Stations do not include an explicit "guarantee" that NPR has "the right to interconnection funds," Dkt. 62 at 22, is unsurprising and irrelevant: obviously, the Interconnected Stations cannot make binding agreements with NPR entitling NPR to interconnection funds from Congress. Rather, the Public Broadcasting Act requires that these funds be provided by CPB so long as NPR remains the designated national entity. Nor does it matter that the contracts contemplate a possibility that NPR might cease

managing or operating the PRSS, or that the contracts give stations the right to terminate these agreements. *See* Dkt. 62 at 23. The stations have *not* chosen to terminate their agreements with NPR and have *not* decided to replace NPR as the manager and operator of the system. And the fact that NPR has not affirmatively sought to hold a vote regarding the management of the PRSS should come as no surprise: NPR is under no obligation to orchestrate such a referendum—and thereby drag local stations into the middle a dispute with CPB—when those stations have voiced no complaints with NPR's operation and management of the system. Dkt. 59-6 at 37, 79 (Munipalla Tr. 141:3–12, 187:21–189:2) ("NPR consulted the trust and the trustees, and the trustees said they have no problem with NPR as the operator. And NPR does not reach out to the interconnected stations almost ever. NPR Distribution maintains that relationship, and we take counsel from the trustees and their attorney.")

Last, CPB's assertions that "NPR's Chief of Staff cannot identify any vote that was ever taken by any radio stations to designate NPR" as their national entity and that she is not aware of specific evidence of such votes, Dkt. 58-2 at 12 ¶ 85, are brazenly misleading. CPB bases these assertions on a series of wholly misdirected questions posed by its counsel in a deposition of NPR's Senior Vice President for Government and External Affairs, Marta McLellan Ross, who became NPR's Chief of Staff less than a month ago. Dkt. 59-103 at 13–14 (McLellan Ross. Tr. 12:15–13:5). Counsel for CPB—who began the deposition under the mistaken impression that Ms. McLellan Ross is a lawyer, *see id.* at 12 (Tr. 11:19–12:4), and spent the first three hours asking her questions about NPR's journalistic standards, the political makeup of its staff, and whether NPR is biased, *id.* at 18–181 (Tr. 17:9–180:18)—pressed Ms. McLellan Ross repeatedly to identify specific documents reflecting NPR's status as the Interconnected Stations' designated national entity. *Id.* at 187–94 (Tr. 185:15–16, 186:13–16, 186:21–22, 187:6–10, 188:6–9, 189:14–190:8,

191:9–15, 192:9–11, 192:21–193:17).  Ms. McLellan Ross made clear, repeatedly, that she is not responsible for managing the PRSS and is "not involved in the process" of negotiating PRSS grants or contracts.  *Id.* at 183–84, 190, 391–92 (Tr. 182:3–4, 182:11, 183:12, 189:20–21, 390:18–391:14).  Counsel for CPB then asked Ms. McLellan Ross to read and interpret a document that counsel represented to be a contract from 1986 between NPR and CPB.  *Id.* 195 (Tr. 194:13–194:22).  Ms. McLellan Ross made clear that she had never seen the document before, had no detailed knowledge of events that occurred in the 1980s, and was in no position to engage in a back-and-forth with counsel about the meaning of the contract.  *Id.* at 196–97, 200, 202–03, 392–93 (Tr. 195:21–196:1, 199:17–18, 201:13, 202:19–21, 391:19–392:12).  The fact that an NPR executive who is not a lawyer—and whose primary responsibilities relate to external affairs—was not aware of specific documents supporting NPR's legal and contractual claims is self-evidently irrelevant.

### B.    NPR Can Maintain an *Ultra Vires* Claim Against CPB.

CPB asserts that NPR cannot maintain a statutory *ultra vires* claim against it because CPB is not a federal agency, Dkt. 62 at 15–16—but it ignores the cases on which NPR primarily relies. As NPR has explained, the Supreme Court confirmed in *Free Enterprise Fund v. Public Company Accounting Oversight Board*, 561 U.S. 477 (2010), that a private party can bring an equitable cause of action against a government-created corporation.  The Oversight Board, like CPB, was created as a private nonprofit corporation organized under D.C. law, and its Board members and employees, like CPB's, "are not considered Government 'officer[s] or employee[s]' for statutory purposes."  *Id.* at 484 (brackets in original) (quoting 15 U.S.C. § 7211).  Nevertheless, the Court affirmed the plaintiffs' right to maintain an action for "equitable relief."  *Id.* at 491 n.2.  The same was true in *Lebron*:  the plaintiff there sued Amtrak seeking "equitable relief."  *Lebron v. Nat'l R.R. Passenger Corp.*, 12 F.3d 388, 390 (2d Cir. 1993), *rev'd*, 513 U.S. 374 (1995), and the

Supreme Court never questioned his ability to do so.  *See* Dkt. 38-1 at 22–23 & n.2 (further explaining why the availability of equitable relief against government-created entities is consistent with courts' inherent equitable powers).

To the extent CPB suggests that courts should allow equitable claims against it pertaining only to constitutional rights, *see* Dkt. 62 at 16, that distinction has no basis in case law or common sense.  As the Court explained in *Lebron*, Congress's designation of a government-created corporation as a private entity is dispositive with respect to the application of other *statutes*, such as the Administrative Procedure Act.  513 U.S. at 392.  And that designation can deprive an entity of other "inherent powers and immunities of Government agencies."  *Id.*  But there is no reason to believe Congress chose or could choose to provide a government-created entity with a *greater* level of immunity from suit than government entities themselves.  Indeed, the Court in *Lebron* had "no doubt . . . that the statutory disavowal of Amtrak's agency status *deprives* Amtrak of sovereign immunity from suit."  *Id.* (emphasis added).  Yet CPB's proposed rule would completely insulate itself from any equitable claims premised on statutory violations.  That result is incompatible with common sense and with the inherent equitable power of courts.

## C.    NPR Has Standing to Raise its Statutory Claim.

NPR plainly has standing to assert its statutory claim against CPB.  NPR alleges that CPB chose to redirect tens of millions of dollars in federal interconnection funds away from NPR in violation of the Public Broadcasting Act.  The loss of those funds obviously constitutes a "concrete and particularized" injury, *see, e.g.*, *Spokeo v. Robbins*, 578 U.S. 330, 339 (2016), and CPB's contrary arguments border on frivolous.  CPB points to NPR's public statements regarding its intent to continue supporting the PRSS and its commitment not to raise station fees in its Fiscal Year 2026 budget.  Dkt. 62 at 24.  But those facts merely underscore that NPR is prepared to attempt to absorb the loss of funding rather than cease providing critical infrastructure services.

Next, CPB misleadingly suggests that absent federal funding, NPR could simply continue operating the PRSS until "the satellite system go[es] away."  Dkt. 62 at 25 (quoting Dkt. 59-6 at 22 (Munipalla Tr. 78:3–8)).  But NPR would need to drain the PRSS's reserves to do so.  Moreover, Mr. Munipalla was clear that absent funding from CPB, the PRSS would "be severely short of being able to deliver on a full-blown terrestrial plan"—*i.e.*, to shift toward terrestrial or internet-based distribution—as both the PRSS and CPB have long intended.   Dkt. 59-6 at 78 (Munipalla Tr. 303:1–12).

As to CPB's claim that NPR cannot identify a "legally protected interest" because it "has no right to the funds it seeks," Dkt. 62 at 24, CPB mistakenly "conflates standing with the merits." *Campbell v. Clinton*, 203 F.3d 19, 23 (D.C. Cir. 2000); *see also, e.g.*, *Estate of Boyland v. U.S. Dep't of Agric.*, 913 F.3d 117, 123 (D.C. Cir. 2019) ("Whether a plaintiff has a legally protected interest that supports standing does not require that he show he will succeed on the merits.").  And, finally, CPB is simply wrong that "the beneficiaries of the funding at issue . . . are the various public broadcasting licensees and permittees."  Dkt. 62 at 24.  As NPR has repeatedly explained, 47 U.S.C. § 396(k)(10)(D)(i) directs that public radio interconnection funds must be distributed either to "those public telecommunications entities participating in the public radio satellite interconnection system or the national entity they designate for satellite interconnection purposes." Where, as here, public radio stations have designated a national entity for satellite interconnection purposes, the funds at issue must be distributed to that national entity.  Alternatively, CPB could distribute this funding equally to all Interconnected Stations—which it has never suggested it would do.

## III.    CPB Has Tortiously Interfered with NPR's Business Relations.

NPR has demonstrated that CPB tortiously interfered with its business relationships by unlawfully refusing to provide interconnection funds for the PRSS and leveraging that refusal to

attempt to force stations to select a new manager and operator of the PRSS. Dkt. 57-1 at 40–44. In response, CPB raises a spurious jurisdictional objection while ignoring the undisputed facts supporting NPR's position. This Court should grant NPR summary judgment on this claim for the reasons NPR has explained.

To begin, the Court has supplemental jurisdiction over NPR's tortious interference claim because it "derives from the same nucleus of operative fact" as NPR's federal claims—namely, CPB's decision to cut off PRSS funding to NPR and attempt to provide that funding instead to PMI. *Royal Canin U.S.A., Inc. v. Wullschleger*, 604 U.S. 22, 27 (2025) (quotation marks omitted). CPB does not deny that the tortious interference claim stems from the same nucleus of operative fact as NPR's federal claims but instead argues that federal question jurisdiction "does not exist" because NPR's federal claims "fail as a matter of law." Dkt. 62 at 45. CPB is, of course, wrong that NPR's federal claims fail as a matter of law. And in any event, CPB improperly (again) conflates jurisdiction with the merits: "If a plaintiff purports to assert a federal claim, the district court has federal question jurisdiction unless the claim is 'immaterial and made solely for the purpose of obtaining jurisdiction or wholly insubstantial and frivolous.'" *Herero People's Reparations Corp. v. Deutsche Bank, A.G.*, 370 F.3d 1192, 1194 (D.C. Cir. 2004) (quoting *Bell v. Hood*, 327 U.S. 678, 682–83 (1946)). There is plainly federal question jurisdiction over NPR's First Amendment and Public Broadcasting Act claims, so there is supplemental jurisdiction over NPR's tortious interference claim.

CPB next claims that NPR has not sought damages and therefore has no standing to pursue a tortious interference claim. But CPB cites no authority for the proposition that a tortious interference claim must seek damages. In fact, an "injunction will lie" to stop an "interfer[ence] with existing contract relations." *Meyer v. Washington Times Co.*, 76 F.2d 988, 993 (D.C. Cir.

31

1935).  NPR seeks an injunction to stop CPB's unlawful refusal to disburse interconnection funding for the PRSS and attempt to provide that funding to another entity—actions that interfere with NPR's existing business relationships with the Interconnected Stations.  NPR therefore has standing to pursue its tortious interference claim.

Turning to the merits, CPB claims that NPR has no contractual right to the satellite interconnection funds that Congress appropriated.  Dkt. 62 at 46.  But the existence of a contractual right to those funds is irrelevant to the question whether NPR has "valid contractual or other business relationship[s]" with the Interconnected Stations, *NCRIC, Inc. v. Columbia Hosp. for Women Med. Ctr., Inc.*, 957 A.2d 890, 900 (D.C. 2008).  CPB's actions in denying NPR the PRSS funding (for which it has a *statutory* entitlement) and attempting to induce the Interconnected Stations to abandon NPR interfere with NPR's valid contractual and business relationships— regardless of whether NPR has a *contractual* right to funding for the PRSS.  And despite CPB's suggestion to the contrary, Dkt. 62 at 46–47, NPR undoubtedly has "valid contractual or other business relationship[s]" with the Interconnected Stations.  *See* Dkt. 57-2 at 3–4 (¶¶ 14–20) (explaining that NPR has an active interconnection agreement with every Interconnected Station and these agreements renew annually or a renewal agreement is signed each year).

Next, CPB asserts that its interference with NPR's business relationships was not wrongful and was instead legally justified.  Dkt. 62 at 47–50.  But despite CPB's claims that it ran a an open and competitive RFP process, NPR has produced voluminous evidence that the working group and the RFP were a sham, designed from the beginning to give interconnection funding to anyone but NPR—as CPB's internal communications and the RFP criteria demonstrate.  *See* Dkt. 57-1 at 20–27, 41–43.  Moreover, CPB's actions were wrongful and not legally justified because they violated the First Amendment as well as the Public Broadcasting Act; and the "violation of statutory

32

provisions or . . . established public policy . . . make an interference improper."  Restatement

(Second) of Torts § 767 (A.L.I. 1979).

Finally, CPB claims NPR has not suffered damages.  But CPB's interference with NPR's

business relationships with the Interconnected Stations is causing substantial irreparable injury,

including the loss of unrecoverable funding as well as the harm to NPR's mission and goodwill

and reputation with the Interconnected Stations.  *See* Dkt. 57-1 at 38.

## IV.    NPR Is Entitled to Summary Judgment, or, at a Minimum, a Preliminary Injunction.

Because the evidence overwhelmingly establishes that CPB cut off NPR's funding for the

PRSS due to political pressure targeting the content of NPR's speech, NPR is entitled to summary

judgment on its First Amendment claims.  None of the evidence offered by CPB gives rise to a

genuine dispute of fact:  The 2024 plan by Deloitte to create a single radio and television

interconnection entity bears little relation to the actions CPB took in April 2025 with respect to

NPR (and NPR alone).  And Ms. Merritt's self-serving declaration, offered the day after she was

deposed and two hours after CPB's filing deadline, "is blatantly contradicted by the record, so that

no reasonable jury could believe it."  *Scott*, 550 U.S. at 380.  More importantly, because Ms.

Merritt is in no position to attest to the intent or motives of CPB's Board members—who were

ultimately the decisionmakers here—her subjective beliefs about the Board's motivations do not

give rise to a genuine factual dispute.

The Court should therefore enjoin CPB from distributing any funds that would have been

awarded to NPR but for CPB's unconstitutional actions; restore the CPB Board's approval of up

to $36 million for a grant agreement with NPR for the operation of the PRSS; and, at a minimum,

require CPB to negotiate such a contract in good faith—free from any impermissible consideration

of the Administration's desire to retaliate against NPR or discriminate against NPR based on its

viewpoint.[8]

At a minimum, should the Court believe further factfinding is necessary—potentially including testimony by CPB's Board members—then NPR is entitled to a preliminary injunction on its First Amendment claims while that factfinding proceeds. The evidence at this stage firmly establishes that NPR is likely to succeed on the merits, and CPB should be enjoined from disbursing the $58 million that it has "awarded" to PMI and that would likely become unrecoverable once released. In addition, to preserve the status quo, the Court should enjoin CPB from returning these funds to the Treasury and should require CPB to place the funds in escrow.

NPR is also independently entitled to summary judgment (or, at a minimum, a preliminary injunction) as to its statutory and tortious interference claims. The facts and the law establish that NPR is the national entity designated by public radio stations to operate their interconnection system. CPB's attempt to ignore the Public Broadcasting Act and oust NPR from this decades-long role has no basis in law and constitutes tortious interference with NPR's business relations.

## CONCLUSION

This Court should enter summary judgment for NPR, direct CPB to restore NPR to the position it would be in had CPB not violated NPR's First Amendment rights, and permanently enjoin CPB from disbursing funds appropriated for public radio interconnection to any entity that is not statutorily authorized to receive it. The Court should further require CPB to disburse those funds (a minimum of $35,962,000) to NPR, or directly to all Interconnected Stations.

---

[8] CPB's assertion that the relief sought by NPR "has no basis in law," Dkt. 62 at 12, 50–51, misunderstands both the law and the remedy NPR seeks. NPR does not purport to be party to an existing contract with CPB and does not seek "specific performance" of any contract. Rather, NPR seeks to be restored to the position it would have been in had CPB not engaged in unconstitutional retaliation and viewpoint discrimination—a remedy that is well within the Court's broad equitable discretion. *See* Dkt. 57-1 at 46–47.

     In the alternative, at a minimum, the Court should issue a preliminary injunction restraining CPB from distributing appropriated interconnection funding for public radio to any entity or entities other than NPR or all the Interconnected Stations, including by returning those funds to the Treasury, or from taking any other steps to implement the unlawful Order pending a resolution of this case on the merits.

October 27, 2025

Respectfully submitted,

*/s/ Miguel A. Estrada*

Miguel A. Estrada (D.D.C. Bar No. 456289)
GIBSON, DUNN & CRUTCHER LLP
1700 M Street, N.W.
Washington, D.C. 20036-4504
(202) 955-8500
MEstrada@gibsondunn.com

Theodore J. Boutrous, Jr. (D.D.C. Bar No. 420440)
Katie Townsend (D.C. Bar No. 1026115)
GIBSON, DUNN & CRUTCHER LLP
333 South Grand Avenue
Los Angeles, CA 90071-3197
(213) 229-7000
TBoutrous@gibsondunn.com
KTownsend@gibsondunn.com

Elizabeth A. Allen (*Admitted Pro Hac Vice*)
NATIONAL PUBLIC RADIO, INC.
1111 North Capitol Street, NE
Washington, D.C. 20002
(202) 513-2000
EAAllen@npr.org

*Counsel for Plaintiff*
*National Public Radio, Inc.*