**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

NATIONAL PUBLIC RADIO, INC., *et al.*,

*Plaintiffs*,

v.

DONALD J. TRUMP, *et al.*,

*Defendants*.

Civil Case No. 25-cv-1674

**PLAINTIFF NATIONAL PUBLIC RADIO, INC.'S RESPONSE TO DEFENDANT
CORPORATION FOR PUBLIC BROADCASTING'S STATEMENT OF UNDISPUTED
MATERIAL FACTS**

Pursuant to Federal Rule of Civil Procedure 56 and Local Civil Rule 7(h), Plaintiff National

Public Radio, Inc. (NPR) submits this response to the Statement of Facts Not In Genuine Dispute

filed by Defendant Corporation for Public Broadcasting (CPB) in support of its Motion for

Summary Judgment.

**CPB is a Private and Independent Nonprofit Corporation**

1.     CPB is a private and independent nonprofit corporation. *See* 47 U.S.C. § 396(b);

Declaration of E. Slavitt at ¶ 1 (Dkt. No. 40-1).

Plaintiff's Response: Undisputed.

2.     CPB is expressly not a government agency. *See* 47 U.S.C. § 396(b) ("[T]here is

authorized to be established a nonprofit corporation … which will not be an agency or

establishment of the United States Government . . . . ").

Plaintiff's Response: This paragraph asserts a legal conclusion and is not a "material fact"

within the meaning of Rule 56.   Subject to that objection, disputed in part.   CPB is not a

1

government agency for statutory purposes.  It is, however, for constitutional purposes.  *See Lebron v. Nat'l R.R. Passenger Corp.*, 513 U.S. 374, 391–92, 397 (1995).

3.      The Public Broadcasting Act of 1967 ("PBA") does not dictate that any member of the executive branch sit on its Board of Directors.  Declaration of E. Slavitt at ¶ 9 (Dkt. No. 40-1).

<u>Plaintiff's Response:</u> This paragraph asserts a legal conclusion and is not a "material fact" within the meaning of Rule 56.  Subject to that objection, undisputed.

4.      At no time in its 58-year existence has a member of the executive branch ever sat on its Board.  *See* 47 U.S.C. § 396(c)(5); Slavitt Decl. at ¶ 9.

<u>Plaintiff's Response:</u> Undisputed but immaterial.

5.      CPB has never taken direction from the President or any executive agency. Slavitt Decl. at ¶¶ 8–15.

<u>Plaintiff's Response:</u> Disputed.  The cited evidence does not support this assertion, nor does the record.  CPB took direction from the Executive Branch by refusing to disburse interconnection funding to NPR for the PRSS.  *See, e.g.*, Dkt. 59-94 at 2 (CPB's President and CEO, Patricia Harrison, telling the CPB Board of Directors that "[w]e currently have an EO prohibiting us from funding PBS and NPR"); Dkt. 59-39 at 2 (Kathy Merritt writing that "we're in an environment where NPR is the target of the Administration and Congress. It's challenging for CPB to disperse millions of dollars to an organization that's under fire and heavily scrutinized."); Dkt. 59-25 at 4 (Harrison reporting to the CPB Board that, at a meeting on April 3, 2025 an OMB official "stated her intense dislike for NPR but noted that it would be a shame to throw the baby out with the bathwater").

6.      Congress authorized the creation of CPB.  *See* 47 U.S.C. § 396(b).

Plaintiff's Response: This paragraph asserts a legal conclusion and is not a "material fact" within the meaning of Rule 56.  Subject to that objection, to the extent that this paragraph intends to draw a distinction between "authorizing the creation of" and "creating" CPB, it is disputed. *Compare Lebron*, 513 U.S. at 384 ("[T]he statute authorize[d] Amtrak's incorporation."), *with id.* at 397 ("Amtrak was created by a special statute . . . .").

7.      In authorizing the creation of CPB, Congress made clear that it was "a private corporation [to] be created to facilitate the development of public telecommunications and to afford maximum protection from extraneous interference and control." 47 U.S.C. § 396(a)(10).

Plaintiff's Response: Disputed in part.  Undisputed that this is the statutory text.  To the extent that this paragraph intends to draw a distinction between "authorizing the creation of" and "creating" CPB, it is disputed.  *Compare Lebron*, 513 U.S. at 384 ("[T]he statute authorize[d] Amtrak's incorporation."), *with id.* at 397 ("Amtrak was created by a special statute . . . .").

8.      Since its creation, CPB has been the steward of Congressionally appropriated funds for public broadcasting and the largest single source of funding for public radio, television, and related online and mobile services.  Slavitt Decl. at ¶ 10.

Plaintiff's Response: Undisputed.

9.      Congress forbid "any department, agency, officer, or employee of the United States to exercise any direction, supervision, or control over educational television or radio broadcasting, or over [CPB] or any of its grantees or contractors…."  47 U.S.C. at § 398(c).

Plaintiff's Response: Undisputed that this is the statutory text.

10.    The Senate Report accompanying the Act carefully pointed out:

> There is general agreement that for the time being, Federal financial assistance is required to provide the resources necessary for quality programs.  It is also recognized that this assistance should ***in no way involve the Government in programming or program judgments***.  An ***independent*** entity supported by Federal funds is required to provide programs ***free of political pressures***. The Corporation for Public Broadcasting, a nonprofit private corporation, authorized by title II of S. 1160 provides such an entity.

S. Rep. No. 222, 90th Cong., 1st Sess. 4, 11 (1967) (emphasis added).

Plaintiff's Response: Undisputed.

11.    Congress conceived of CPB as an entirely private corporation that also acts as a vehicle to infuse federal funds into public broadcasting without the introduction of government direction or control, particularly from the executive branch, which Congress accomplished by withholding from CPB any form, pure or quasi, of legislative, judicial, or regulatory power. *See* Slavitt Decl. at ¶¶10-14.

Plaintiff's Response: This paragraph asserts a legal conclusion and is not a "material fact" within the meaning of Rule 56.  Subject to that objection, undisputed.

12.    NPR publicly admitted in August 2025 that CPB has helped protect the core values of the Public Broadcasting Act, which is the ability of public media to publish whatever content it wishes, free of government interference.  Declaration of E. Slavitt at ¶ 24 (Dkt. No. 40-1); Transcript of Deposition of R. Merkley, attached hereto as Exhibit A ("Merkley Tr.") at 39:15-40:7.

Plaintiff's Response: Disputed in part.  It is undisputed that Mr. Merkley made this statement in his deposition regarding the perception of CPB in August 2025.  CPB's cited evidence does not show that NPR made this statement in August 2025.

13.    The federal government rescinded CPB's funding on July 24, 2025.  P. L. 119-28, 139 Stat. 467;  https://www.whitehouse.gov/briefings-statements/2025/07/h-r-4-and-h-r-517-signed-into-law-s-1582/.

Plaintiff's Response: Undisputed.

**National Public Radio, Inc. ("NPR") is National Media Company With Over $800 Million in Assets**

14.    NPR is a national media company that produces news and cultural programming. Am. Compl. at ¶ 6.

Plaintiff's Response: Undisputed.

15.    As of its fiscal year ending September 30, 2025, NPR had approximately $818.6 million in total assets. National Public Radio, Inc. and Subsidiaries Consolidated Financial Statements, Supplemental Schedules, and Independent Auditor's Report As of and for the years ended    September    30,    2024    and    2024    at    6,    available    at https://media.npr.org/documents/about/statements/fy2024/National%20Public%20Radio,%20Inc.%202024%20Audited%20Consolidated%20Financial%20Statements.pdf    ("NPR    2024 Consolidated Financials"), attached hereto as Exhibit B; Merkley Tr. at 15:22–16:7.

Plaintiff's Response: Undisputed but immaterial.

16.    As of its fiscal year ending September 30, 2025, NPR had approximately $336.6 million in revenue.  NPR 2024 Consolidated Financials at 7; Merkley Tr. at 16:12–17:21

Plaintiff's Response: Undisputed but immaterial.

17.    As of its fiscal year ending September 30, 2025, NPR had an endowment of $368.7 million.  NPR 2024 Consolidated Financials at 46; Merkley Tr. at 18:2–21.

<u>Plaintiff's Response:</u> Undisputed but immaterial.

18.    Only about one percent of NPR's annual budget comes from CPB.  Merkley Tr. at 26:1–4.

<u>Plaintiff's Response:</u> Undisputed but immaterial.

19.    The money the NPR receives from CPB are taxpayer dollars that it receives through written grants.  Merkley Tr. at 26:10–17.

<u>Plaintiff's Response:</u> Undisputed.

20.    NPR does not receive appropriations directly from Congress. Merkley Tr. at 29:4–13.

<u>Plaintiff's Response:</u> Undisputed.

21.    NPR's audience is approximately 43 million people. Am. Compl. at ¶ 6.

<u>Plaintiff's Response:</u> Undisputed but immaterial.

## **Interconnection is A Conduit for Public Media Entities To Transmit Content**

22.    The Public Radio Satellite System ("PRSS") is the national interconnection and distribution network for public radio in the United States.  Satellite interconnection relies entirely on space-based satellites.  Terrestrial interconnection relies on ground-based fixed and mobile communications networks.  These technologies provide are simply transmission conduits for providing telecommunications, they have nothing to do with creating, influencing, or selecting the content of programming that passes through them.  The delivery of public media content through satellite and terrestrial technologies is generally referred to as "interconnection."  Declaration of K. Merritt, attached hereto as Exhibit C, at ¶ 3.

<u>Plaintiff's Response:</u> Disputed in part.  Disputed to the extent this statement implies that satellite and terrestrial interconnection are mutually exclusive interconnection systems or that the PRSS does not provide both satellite and terrestrial interconnection.  Dkt. 59-6 at 21–22 (Munipalla Tr. 77:21–79:3) (explaining that satellite and terrestrial distribution "go[] to the same satellite receiver").

23.     "Interconnection" is statutorily defined under the Public Broadcasting Act to mean the use of microwave equipment, boosters, translators, repeaters, communication space satellites, or other apparatus or equipment for the transmission and distribution of television or radio programs to public telecommunications entities; put differently, it is an infrastructure that distributes content.  47 U.S.C. § 397(3); Deposition of B. Munipalla, attached hereto as Exhibit D ("Munipalla Tr.") at 23:15-22.

<u>Plaintiff's Response:</u> Undisputed that the above language appears in the statutory text.

24.     The use of microwave equipment, boosters, translators, and repeaters does not require the use of a satellite or involve a signal leaving earth's atmosphere.  Munipalla Tr. at 58:11–18.

<u>Plaintiff's Response:</u> Undisputed but immaterial.

25.     "Interconnection system" is statutorily defined under the Public Broadcasting Act to mean any system of interconnection facilities used for the distribution of programs to public telecommunications entities.  47 U.S.C. § 397(4).

<u>Plaintiff's Response:</u> Undisputed that the above language appears in the statutory text.

26.     Satellite interconnection is an interconnection system that relies on satellites to transmit; signals. It involves pushing a signal to a satellite from an "uplink" and the satellite pushing the signal to the "downlinks" located at broadcast stations.  Munipalla Tr. at 27:16-21.

Plaintiff's Response: Disputed in part.  Disputed to the extent this statement implies that satellite and terrestrial interconnection are mutually exclusive interconnection systems or that the PRSS does not provide both satellite and terrestrial interconnection.  Dkt. 59-6 at 21–22 (Munipalla Tr. 77:21–79:3).

27.     "Terrestrial interconnection" is an interconnection system that does not rely on satellite relays to transmit and instead uses a network of fiber, broadband, or 5G connections to deliver the signal.  Munipalla Tr. at 27:12–28:6, 29:9-16.

Plaintiff's Response: Disputed in part.  Disputed to the extent this statement implies that satellite and terrestrial interconnection are mutually exclusive interconnection systems or that the PRSS does not provide both satellite and terrestrial interconnection.  Dkt. 59-6 at 21–22 (Munipalla Tr. 77:21–79:3).

28.     CPB's mission is to ensure universal access to non-commercial, high-quality content and telecommunications services and it is statutorily required to support Interconnection services for public media.  Slavitt Decl. at ¶ 26.

Plaintiff's Response: Undisputed.

29.     CPB is the steward of the federal government's investment in public media. Merkley Tr. at 27:3–6.

Plaintiff's Response: Undisputed.

8

30. CPB does not own or operate any of the equipment or infrastructure essential for the noncommercial, telecommunications services that Congress mandates that CPB provide and maintain. Slavitt Decl. at ¶ 27.

Plaintiff's Response: Undisputed.

31. Rather, the system of transmitters, relay stations, and satellite networks that make up "interconnection" is owned and operated by other non-profit corporations and trusts, such as the Public Radio Satellite Interconnection System Charitable Trust, but funded through CPB based on Congressional appropriations. *Id.*

Plaintiff's Response: Disputed in part. Disputed that "interconnection" is "ma[d]e up" solely by a "system of transmitters, relay stations, and satellite networks." The cited evidence does not support that assertion, nor does the record. Dkt. 59-6 at 21–22 (Munipalla Tr. 77:21–79:3) (discussing terrestrial distribution). Otherwise undisputed.

32. The interconnection system is a conduit for providing telecommunications, it has nothing to do with the creation of content. Slavitt Decl. at ¶ 28; Exhibit E – NPR's Q&A.

Plaintiff's Response: Undisputed.

33. Interconnection funds cannot be used to create content. Merkley Tr. 44–45.

Plaintiff's Response: Undisputed.

34. Congress authorized CPB to "assist in the establishment and development of one or more interconnection systems to be used for the distribution of public telecommunications services so that all public telecommunications entities may disseminate such services at times chosen by the entities." 47 U.S.C. § 396(g)(1)(B).

<u>Plaintiff's Response:</u> Undisputed that the quoted language appears in the statutory text.

35.    Congress authorized CPB to "arrange, by grant to or contract with appropriate public or private agencies, organizations, or institutions, for interconnection facilities suitable for distribution and transmission of public telecommunications services to public telecommunications entities."  47 U.S.C. § 396(g)(2)(E).

<u>Plaintiff's Response:</u> Undisputed that the quoted language appears in the statutory text.

36.    Congress never specified that any particular interconnection system created or how many such systems should exist.  Slavitt Decl. at ¶ 30.

<u>Plaintiff's Response:</u> This paragraph asserts a legal conclusion and is not a "material fact" within the meaning of Rule 56.  Subject to that objection, disputed.  Congress specified that a specific interconnection system, the "public radio satellite interconnection system," be created and funded.  47 U.S.C. § 396(k)(10).

## NPR Operates a Public Radio Satellite Interconnection System

37.    NPR Distribution is a division of NPR that currently operates NPR's public radio satellite interconnection infrastructure, the Public Radio Satellite System ("PRSS"), which is the conduit to distribute content to public radio stations, and manages interconnection services for public radio stations.    Munipalla    Tr.    at    14:4–11,    20:22–21:18,    24:10–19; https://www.nprdistribution.org/about.

<u>Plaintiff's Response:</u> Undisputed.

38.    Stations that are interconnected via the PRSS are a set of public radio stations that are intertwined and are capable of receiving all of the content that is pushed out by the Public

Radio Satellite System.  If you are an interconnected station, you will receive the content.  If you're not an interconnected station, you don't have the pipe that delivers the content.  Munipalla Tr. at 22:8- 23:1, 31:12–18.

Plaintiff's Response: Undisputed.

39.     To become interconnected, stations must sign a contract and pay NPR Distribution a fee for the right to access the system.  Munipalla Tr. at 29:22–30:9.

Plaintiff's Response: Undisputed.

40.     A subcommittee of the NPR Board, called the Interconnection Committee determines the fees that NPR charges to radio stations to use the satellite interconnection system. (Merkley Tr. at 45-46).

Plaintiff's Response: Disputed in part.  The Distribution/Interconnection Committee (D/I Committee), which includes non-NPR Board Member representatives from the interconnected stations, sets the interconnection fee.  Dkt. 59-6 at 10 (Munipalla Tr. at 30:3–30:9).

41.     The fees charged by NPR Distribution for satellite interconnectivity are more than what it could charge for terrestrial internet connectivity.  Munipalla Tr. at 75:16–76:7.

Plaintiff's Response: Disputed in part.  The satellite interconnection rates are set up by the D/I Committee, and, though the Committee has the authority to charge the same fees, in general terrestrial fees are lower.  Dkt. 59-6 at 21 (Munipalla Tr. at 75:16–76:7).

42.     PRSS is owned by the Public Radio Satellite Trust.  Munipalla Tr. at 21:19–22:2.

Plaintiff's Response: Disputed in part.  Undisputed that the Public Radio Satellite Trust owns the PRSS satellite lease and equipment.  Dkt. 59-6 at (Munipalla Tr. 93:13–19).  Disputed

that the PRST owns every component of the PRSS; for example, NPR Distribution owns certain PRSS-related intellectual property, Dkt. 40-3 at 10, and interconnected stations own their own uplink and downlink equipment.

43.     Through the PRSS, NPR Distribution serves approximately 379 public broadcast stations.   Munipalla Tr. at 86:2–10, 88:20–89:13, Ex. 6, attached hereto as Exhibit F, at NPR0000317.

Plaintiff's Response: Undisputed.

44.     Of those 379 stations, 246 are NPR member stations.  Am. Compl. at ¶ 51; Exhibit F at NPR0000317.

Plaintiff's Response: Undisputed.

45.     There are 859 public broadcast stations that are not a part of the PRSS and with whom NPR Distribution does not have a contract.  Munipalla Tr. at 89:11–91:6; Exhibit F at NPR0000317.

Plaintiff's Response: Disputed in part.  The 859 figure corresponds to the number of signals that receive data from the PRSS.  Undisputed that NPR does not have a separate contract for each signal.  Munipalla Tr. at 89:11–91:6; Dkt. 60-5 at 4; Dkt. 21-4 at 5.

46.     The PRSS also provides a terrestrial interconnection backup to approximately 40 public broadcast stations.  Munipalla Tr. at 38:22–39:9.

Plaintiff's Response: Undisputed.

47.     NPR Distribution is currently in the process of building its own terrestrial receiver to replace its satellite receivers that it hopes will be complete by 2028.  Munipalla Tr. at 36:3-16.

Plaintiff's Response: Undisputed.

48.     NPR Distribution's goal is that terrestrial interconnection become the primary interconnection system.  Munipalla Tr. at 159:3-10.

Plaintiff's Response: Disputed in part.  Undisputed that NPR Distribution is adopting terrestrial technology.  But NPR Distribution intends to "leave no station behind" and therefore provide satellite capacity for as long as any station needs it and doing so is possible.  Dkt. 59–6 at 41 (Munipalla Tr. 156:1–15).

49.     The public radio satellite infrastructure does not create content.  Munipalla Tr. at 14:14- 18.

Plaintiff's Response: Undisputed.

50.     While NPR generates content, NPR Distribution does not create content.  Munipalla Tr. at 15:2–4.

Plaintiff's Response: Undisputed.

51.     NPR charges fees for content that it sells.  Merkley Tr. at 22:12–20.

Plaintiff's Response: Undisputed but immaterial.

52.     "NPR Distribution has nothing to do with the content [created by NPR]." Munipalla Tr. at 16:13–15; Slavitt Decl. at ¶ 28.

Plaintiff's Response: Undisputed.

53.     NPR Distribution does not use interconnection funding from CPB to create content. Munipalla Tr. at 102:17–22; Merkley Tr. at 44:5–13.

13

<u>Plaintiff's Response:</u> Undisputed.

54.    NPR's content creation budget is completely separate from NPR Distribution's budget.  Munipalla Tr. at 103:1–8.

<u>Plaintiff's Response:</u> Undisputed.

55.    NPR's content is unaffected by the amount of interconnection funds that NPR Distribution receives from CPB.  Munipalla Tr. at 103:1–8

<u>Plaintiff's Response:</u> Undisputed.

56.    NPR's content does not come up in NPR Distribution's communications with CPB.  Munipalla Tr. at 105:15–106.

<u>Plaintiff's Response:</u> Undisputed.

57.    CPB plays no role in reviewing or approving the programming content that NPR creates and provides to radio stations.  CPB also plays no role in telling local public radio stations whether they should purchase or not purchase NPR-related content.  Merkley Tr. at 33–35.

<u>Plaintiff's Response:</u> Disputed in part.  Undisputed that CPB plays no role in reviewing or approving NPR's content.  Disputed that CPB plays no role in dictating the purchasing decisions of local radio stations.  *See* Townsend Supp. Decl., Ex. 4 at 6 (CPB_0028848) (CPB Board Chair publicly saying: "I just hope that local stations, if they're perceiving a large amount of bias with NPR, they need to be talking with NPR … [a]nd, I would say, threatening them to say 'we're not going to continue to support you if this continues.'").

**CPB Administers the Interconnection Grant Process**

58.    Historically, CPB has contracted with and provided grants to NPR Distribution to manage the public radio interconnection system.  Merkley Tr. at 30; Merritt Decl. at ¶6.

Plaintiff's Response: Undisputed.

59.    In each instance, CPB has done so after NPR Distribution has submitted a comprehensive proposal detailing what the funding would be used for, such satellite services, evolution of technical infrastructure, and technical upgrades.  Slavitt Decl. at ¶ 31; Merkley Tr. at 32:14–33:3.

Plaintiff's Response: Undisputed.

60.    CPB would evaluate those proposals, request clarifications, changes and then negotiate final agreements based on the original proposal and any subsequent revisions made in the negotiating process. Slavitt Decl. at ¶ 31.

Plaintiff's Response: Undisputed.

61.    CPB's Board of Directors must authorize negotiations before CPB could even begin to negotiate a contract with NPR. Merkley Tr. at 110:13–18.

Plaintiff's Response: Disputed. The cited evidence does not support this assertion, nor does the record.  NPR Distribution and CPB negotiate the terms of grant agreements, including the scope of work, prior to CPB Board review.  For instance, NPR staff will send CPB staff a "concept paper" outlining NPR's plans. Dkt. 59-6 at 42 (Munipalla Tr. 160:8–161:6).  CPB staff review the concept paper, ask NPR questions if they have any, and then may ask NPR to submit a full proposal for CPB Board review.  Id. Ex. 11 at 38:18–40:17 (Merritt Tr.).

62.    CPB retained the right to determine whether to issue a grant, and for what those funds would be used.  Slavitt Decl. at ¶ 33.

Plaintiff's Response: This paragraph asserts a legal conclusion and is not a "material fact" within the meaning of Rule 56.  Subject to that objection, disputed in part. Under the Public Broadcasting Act, CPB is required to provide interconnection funding to the national entity designated by the interconnected stations for interconnection purposes, NPR, or all the interconnected stations themselves.  47 U.S.C. § 396(k)(10)(D)(i); *see* Dkt. 57-1 at 35 Dkt. 41 at 7–10.

63.    Marta McLellan Ross is NPR's Chief of Staff, Senior Vice President for Government and External Affairs and has been a member of NPR's Executive Committee since 2021.  Deposition of M. McLellan Ross, attached hereto as Exhibit G ("McClellan Ross Tr.") at 12:15–15:18.

Plaintiff's Response: Undisputed.

64.    NPR admits that CPB is the Congressionally mandated steward of taxpayer dollars directed to public media.  McClellan Ross Tr. at 18:14–17.

Plaintiff's Response: Disputed in part.  It is undisputed that the referenced testimony is from the deposition of Ms. McLellan Ross.  It is disputed that this constitutes an admission by NPR.  Ms. McLellan Ross was deposed in her individual capacity and not as a Rule 30(b)(6) witness.

65.    NPR admits that it is legitimate for CPB to engage in oversight of NPR to the extent it provides grant funding to NPR, including whether or not NPR is being open and transparent with

the public, and with respect to the use and implementation of the funds to be provided, or actually provided, by CPB to NPR.  McClellan Ross Tr. at 21:7–23:2.

Plaintiff's Response:  Disputed in part.  It is undisputed that the referenced testimony is from the deposition of Ms. McLellan Ross.  It is disputed that this constitutes an admission by NPR.  Ms. McLellan Ross was deposed in her individual capacity and not as a Rule 30(b)(6) witness.  To the extent this assertion is intended to describe CPB's statutory authority under the Public Broadcasting Act it asserts a legal conclusion and is not a "material fact" within the meaning of Rule 56.

66.    NPR admits that it is valid for Congress to ask questions about how the funding that it provides to CPB that ultimately flows to NPR is used.  McClellan Ross Tr.at 27:1–12.

Plaintiff's Response:  Disputed in part.  It is undisputed that the referenced testimony is from the deposition of Ms. McLellan Ross.  It is disputed that this constitutes an admission by NPR.  Ms. McLellan Ross was deposed in her individual capacity and not as a Rule 30(b)(6) witness.

67.    NPR admits that CPB, in weighing whether or not it would fund or continue funding grant money for NPR, can validly "base its decision on any number of factors, including how the finances were managed at NPR."  McClellan Ross Tr. at 27:22–28:17.

Plaintiff's Response:  Disputed in part.  It is undisputed that the quoted testimony is from the deposition of Ms. McLellan Ross.  It is disputed that this constitutes an admission by NPR. Ms. McLellan Ross was deposed in her individual capacity and not as a Rule 30(b)(6) witness.  To the extent this assertion is intended to describe CPB's statutory authority under the Public

Broadcasting Act it asserts a legal conclusion and is not a "material fact" within the meaning of Rule 56.

68.     NPR admits that as the Congressionally-mandated steward of public funds used for public media, CPB has a legitimate interest in ensuring that public funds designated for public media are "appropriately implemented." McClellan Ross Tr. at 41:1–9.

Plaintiff's Response: Disputed in part. It is undisputed that the referenced testimony is from the deposition of Ms. McLellan Ross. It is disputed that this constitutes an admission by NPR. Ms. McLellan Ross was deposed in her individual capacity and not as a Rule 30(b)(6) witness. To the extent this assertion is intended to describe CPB's statutory authority under the Public Broadcasting Act it asserts a legal conclusion and is not a "material fact" within the meaning of Rule 56.

69.     NPR admits that CPB should do its due diligence before it gives NPR federal funding. McClellan Ross Tr.at 47:7–11.

Plaintiff's Response: Disputed in part. It is undisputed that the referenced testimony is from the deposition of Ms. McLellan Ross. It is disputed that this constitutes an admission by NPR. Ms. McLellan Ross was deposed in her individual capacity and not as a Rule 30(b)(6) witness. To the extent this assertion is intended to describe CPB's statutory authority under the Public Broadcasting Act it asserts a legal conclusion and is not a "material fact" within the meaning of Rule 56.

70.     NPR admits that CPB was entitled to inquire with NPR about its compliance with grant funding agreements. McClellan Ross Tr. at 177:2–11.

<u>Plaintiff's Response:</u> Disputed in part.  It is undisputed that the referenced testimony is from the deposition of Ms. McLellan Ross.  It is disputed that this constitutes an admission by NPR.  Ms. McLellan Ross was deposed in her individual capacity and not as a Rule 30(b)(6) witness.  To the extent this assertion is intended to describe CPB's statutory authority under the Public Broadcasting Act it asserts a legal conclusion and is not a "material fact" within the meaning of Rule 56.

71.    NPR admits that with respect to funding requests by NPR for PRSS in the past, typically it was "a back and forth", in which the specifics of a proposal are "to be negotiated between the parties."  McClellan Ross Tr. at 184:2–185:1.

<u>Plaintiff's Response:</u> Disputed in part.  It is undisputed that the quoted testimony is from the deposition of Ms. McLellan Ross.  It is disputed that this constitutes an admission by NPR.  Ms. McLellan Ross was deposed in her individual capacity and not as a Rule 30(b)(6) witness.

72.    NPR's Chief of Staff admits that she is unaware of any current grant agreement which obligates CPB to fund NPR for PRSS after September 30, 2025.  McClellan Ross Tr. at 185:21–186:9.

<u>Plaintiff's Response:</u> Undisputed.

73.    NPR is not entitled to federal funds under the Public Broadcasting Act.  Merkley Tr. at 28:12–17; Munipalla Tr. at 130:2–131:3 (stating his understanding that NPR's claim to interconnection funds is contractual).

<u>Plaintiff's Response:</u>  Disputed.  This paragraph asserts a legal conclusion and is not a "material fact" within the meaning of Rule 56.  Nor does the cited evidence support this assertion.  NPR is the national entity designated by the Interconnected Stations under the Public Broadcasting

Act to receive interconnection funds. Dkt. 38-3 at 2 (¶ 6) (2d Munipalla Decl.). Mr. Merkley and

Mr. Munipalla are not lawyers, and both testified they did not understand what "entitled to" meant

in this context. Merkley Tr. 28:8–9 ("'Automatically entitled,' can you explain what you mean by

that?"); Munipala Tr. 130:9–10 ("I think I have difficulty with the word 'entitled.'").

74.    NPR has never received interconnection funds from CPB without signing a written

agreement. Munipalla Tr. at 108:16–20, 119:21–120:2, 120:17–22; Merkley Tr. at 32:8–13;

107:10–21.

Plaintiff's Response: Undisputed.

75.    CPB, it has never issued federally appropriated funds for an interconnection or

production grant to anyone without a written, signed agreement. Merritt Decl. at ¶ 6.

Plaintiff's Response: Undisputed.

76.    As has always been the case for interconnection grant awards, there are numerous

administrative and logistical tasks that must be accomplished before any Congressionally

appropriated funds can be provided, including negotiating and executing a written agreement.

Slavitt Decl. at ¶ 59.

Plaintiff's Response: Disputed in part. The cited evidence does not support a finding as to

what "has always been the case.' Undisputed that historically CPB has engaged in "numerous

administrative and logistical tasks." Disputed that this burden is necessary. *See, e.g.*, Dkt. 59-6 at

33 (Munipalla Tr. 118:19-119:12) (noting a "consultant report" concluded that "it takes 2 million

to negotiate a contract with CPB" but that "tax" this should be "reduc[ed]").

77.    CPB was never bound to automatically and exclusively contract with NPR.  Slavitt Decl. at ¶ 32.

Plaintiff's Response:  This paragraph asserts a legal conclusion and is not a "material fact" within the meaning of Rule 56.  Subject to that objection, disputed in part.  Undisputed that CPB is not bound to exclusively contract with NPR for interconnection purposes; CPB enters into agreements with PBS for television interconnection, for example.  But CPB is legally required to provide funds for the national interconnection system, and the Public Broadcasting Act specifies that this money should go to the "national entity" that interconnected stations have designated to manage the system, NPR, or to the interconnected stations themselves.

78.    Negotiations of the written agreement for FY2022 lasted into the 2022 calendar year.  Munipalla Tr. at 173:9–22.

Plaintiff's Response: Undisputed.

79.    The issue during that negotiation was about NPR Distribution not using sufficient terrestrial technologies to distribute content.  Munipalla Tr. at 173:9-175:3.

Plaintiff's Response:  Disputed in part.  Undisputed but immaterial that terrestrial distribution was discussed during the negotiation.  Disputed that NPR Distribution in fact was not using sufficient terrestrial technologies.    Munipalla Tr. at 174:8–176:19 (NPR Distribution's position in the negotiations was that they were "already ... doing to a certain degree terrestrial distribution" and that what CPB was asking for would have been "extremely expensive").

80.    On March 10, 2023, CPB entered into a Grant Agreement for Public Radio Satellite System Interconnection Funding FY2023 and FY2024 with NPR (the "Interconnection Contract").  *Id.* at ¶ 32.

Plaintiff's Response: Undisputed.

81.    The term of that Interconnection Contract was extended, by way of amendment, until September 30, 2025. *Id.*

Plaintiff's Response: Undisputed.

82.    Under the current Interconnection Contract, and previous contracts, with NPR Distribution, NPR controls the governance, management, fee structure, and strategic direction of PRSS, which creates the concern that the needs of tribal and non-NPR stations from the interconnection system will not be met. *Id.* at ¶ 37, Ex. H (Dkt. No. 40-9)

Plaintiff's Response: Disputed.  The cited evidence does not support this assertion, nor does the record.  PRSS is overseen by the D/I Committee, which has representatives from the Interconnected Stations as well as NPR.  Dkt. 59-102 at 16 (Merkley Tr. 56:6–9).  The D/I Committee treats member and non-member stations equally, including by charging all stations "the exact same" interconnection fee.  Dkt. 59-6 at 13 (Munipalla Tr. 42:5–11).  CPB has cited no evidence that any Interconnected Station has ever raised favoritism concerns; to the contrary, under the D/I Committee's operation and management, the PRSS has a 90 percent satisfaction rate from, and has been consistently praised by, the Interconnected Stations. Dkt. 38-3 at 4 (¶ 14) (2d Munipalla Decl.); Dkt. 59-6 at 49 (Munipalla Tr. 187:21–188:8); Dkt. 59-5 at 2.

83.    CPB's grants to NPR Distribution were only ever for a defined period of time and a term of each was there were no other agreements or understandings other than the terms contained in the contract and that the contract supersedes all prior understandings, conversations or agreements. *See id.* at Ex. H at §§ 11.1 ("This Agreement constitutes the Parties' complete understanding with respect to its subject matter and supersedes and replaces any previous or

contemporaneous agreements or understandings, whether written or oral, related to the subject matter of the Agreement"); at 11.8 ("No Other Agreement. This Agreement and the attachments incorporated hereto shall supersede and replace any previous documents, correspondence, conversations, or other written or oral understandings related to this Agreement that are not consistent with or contained in this Agreement").

_Plaintiff's Response:_  Undisputed that this paragraph quotes language from the cited grant agreement, but immaterial.

84.    Public broadcast stations have not voted to designate NPR for any interconnection purpose since at least 2008.  Munipalla Tr. at 94:19-95:8.  Indeed, NPR has did not request a vote from the interconnected radio stations in April, May, or even when the RFP decision was made. Merkley Tr. at 204-05; Exhibit E – NPR's Q&A.

_Plaintiff's Response:_ Undisputed but immaterial.

85.    NPR's Chief of Staff cannot identify any vote that was ever taken by any radio stations to designate NPR as the entity to receive interconnection funding from CPB, has never seen any evidence of such a vote being taken, has never asked anyone to provide her with such evidence, has never heard of any evidence of such a vote, does not know of the existence of such a document and does not know what any such document said.  McClellan Ross Tr. at 188:6-189:21.

_Plaintiff's Response:_ Disputed. Ms. McLellan Ross testified it was her understanding that the Interconnected Stations did vote "in the late '80s, early '90s" to designate NPR as the national entity, and that "each of the interconnected stations have contracts with NPR that reflect this designation." Dkt. 59-103 at 189–90, 194 (McLellan Ross Tr. 188:21–189:5, 193:7–14).

86.     NPR Distribution's Vice President denies that its PRSS contracts designate NPR (Distribution) as the entity to receive interconnection funds.  Munipalla Tr. at 212:13-213:20.

Plaintiff's Response: Undisputed that Mr. Munipalla so testified.  Mr. Munipalla's testimony is not material because he is not an attorney and does not deal with contracting issues for the PRSS.  Dkt. 59-6 at 77 (Munipalla Tr. 299:4–8).

87.     There exists a document entitled "Corporation for Public Broadcasting and National Public Radio Agreement On the Management of the Public Radio Satellite Interconnection System", dated June 17, 1986, executed by officials of CPB and NPR respectively. McClellan Ross Tr. at Ex. 9, attached hereto as Exhibit H.

Plaintiff's Response: Undisputed that such document exists.

88.     That agreement expressly states that it expires, at the latest, on September 30, 1988. Exhibit H at IV-1.

Plaintiff's Response: Undisputed but immaterial.

89.     The agreement obliges NPR to "establish a process for developing and recommending policy necessary for the governance of the public radio satellite interconnection system," or PRSS.  Exhibit H at I-7.

Plaintiff's Response: Undisputed but immaterial.

90.     The agreement provides that that process shall include "a consideration of (a) independent producers and public telecommunications entities, not members or otherwise affiliated with NPR which may use satellite interconnection services, and (b) minority groups and

women, and shall be conducted in the fashion agreed to by CPB and NPR and currently in place at the time of the execution of this agreement."  Exhibit H at I-7.

> Plaintiff's Response: Undisputed but immaterial.

91.    It further provides that NPR "will consult CPB in advance as part of the process of developing and recommending policy necessary for the governance of the interconnection system."  Exhibit H at I-7.

> Plaintiff's Response: Undisputed  but immaterial.

92.    It provides, under Section 4, "Term, Annual Review and Termination" :"the term of this agreement shall be from date of execution hereof through September 30, 1988, unless sooner terminated by CPB pursuant to the provisions hereof or extended by CPB." Exhibit H at IV-1.

> Plaintiff's Response: Undisputed but immaterial.

93.    The agreement expressly contemplates entities other than NPR being the entity providing primary interconnection and distribution service to public radio stations in the United States. It provides in Section IV-2: "This Agreement shall terminate automatically in the event that: for any reason NPR ceases to be the entity providing primary interconnection and distribution service to public radio stations in the United States; NPR commits an act of bankruptcy or assigns assets to its creditors; if NPR is found to be in default of that certain lease with the Transponder Trust causing the lease to be terminated at any time; or if federal appropriations to CPB are suspended, terminated, or reduced to a level that makes impossible CPB's ability to make payments to stations and satisfy all of its statutory obligations which would be necessary to perform under the Agreement and those conditions exist for a period of more than 30 days. In

addition, if the current financing agreement between CPB, NPR and the participating licensees, which is anticipated by this Agreement, shall have changed substantially during the term hereof, then the parties agree that this Agreement shall be terminated and the parties agree to enter into good-faith negotiations of a new agreement, if appropriate." Exhibit H at IV-2.

    Plaintiff's Response: Disputed in part.  Disputed that the quoted text "expressly contemplates entities other than NPR being the entity providing primary interconnection and distribution service to public radio stations in the United States."  Undisputed that the quoted text appears in the document.

94.    NPR's Chief of Staff is unaware of any agreement which succeeded that Agreement. McClellan Ross Tr. at 202:16-21.

    Plaintiff's Response: Undisputed but immaterial.

95.    Stations disconnect from the PRSS every year because they think the fees are too high.  Munipalla Tr. at 193:2-7, 216:9-219:3, Exs. 19, 20, 21, 22, 23, attached hereto as Exhibits I, J, K, L, M.

    Plaintiff's Response: Disputed. This assertion is not supported by the cited evidence.  Mr. Munipalla testified that "[a] small portion of" stations disconnect every year, but only some of them do so because of fees. Dkt. 59-6 at 50 (Munipalla Tr. 193:2–7).

**NPR Sells Excess Satellite Capacity but the FCC is Decreasing its Ability to do so**

96.    NPR Distribution sells excess satellite capacity in the PRSS to commercial entities. Munipalla Tr. at 32:16-33:22.

Plaintiff's Response: Disputed as to the meaning of "excess satellite capacity in the PRSS." Otherwise undisputed.

97.    The revenue that is generated based upon selling excess satellite capacity goes directly to NPR Distribution.  Munipalla Tr. at 33:19-22.

Plaintiff's Response: Disputed in part. The "revenue generated from" selling excess capacity "is used to keep [NPR Distribution's] rates and fees low as part of [its] mission" to support the Interconnected Stations. Dkt. 59-6 at 10 (Munipalla Tr. 32:16–33:1).

98.    NPR Distribution believes that it is a realistic possibility that satellite interconnection will end in the future.  Munipalla Tr. at 158:10-14.

Plaintiff's Response: Undisputed.

99.    The FCC is has been auctioning off portions of the satellite frequency spectrum, specifically the "C-band," and plans to continue doing so.  Munipalla Tr. at 34:15-35:9.

Plaintiff's Response: Undisputed that this reflects Mr. Munipalla's testimony.

100.    The PRSS uses the C-band of the satellite spectrum.  Munipalla Tr. at 34:15-35:5.

Plaintiff's Response: Undisputed.

101.    The FCC selling off portions of the C-band will diminish NPR Distribution's satellite capacity.  Munipalla Tr. at 35:18-21.

Plaintiff's Response: Undisputed.

102.    If the FCC sells off the C-band, the PRSS will cease to operate.  Munipalla Tr. at 34:22-35:17 ("[W]hen that frequency is not available, satellite is not an option anymore").

Plaintiff's Response: Disputed.  The PRSS currently provides terrestrial distribution and, in preparation for this potential eventuality, has been developing and is currently executing a transition to terrestrial distribution.  Dkt. 59-6 at 11 (Munipalla Tr. 36:3–16).

103.    If the FCC sells off the C-band, NPR Distribution will not be able to sell excess satellite capacity. Munipalla Tr. at 178:9-179:3.

Plaintiff's Response: Undisputed.

104.    CPB has no control over when satellite C-band will go away. Munipalla Tr. at 180:4-9.

Plaintiff's Response: Undisputed.

105.    NPR Distribution has five sources of revenue: station fees from payments for interconnectivity; producers and distributors of content; selling excess satellite capacity; the Public Radio Satellite Trust; and federal funding from Congress through CPB.  Munipalla Tr. at 92:1-94:4; Exhibit F - NPR0000321.

Plaintiff's Response: Undisputed.

**The Appropriations at Issue are for Broad Interconnection Support Rather than the Satellite Interconnection Fund**

106.    In 1988 Congress established the Satellite Interconnection Fund. P.L. 100–626, November 7, 1988, 102 Stat 3207.

Plaintiff's Response: This paragraph asserts a legal conclusion and is not a "material fact" within the meaning of Rule 56.  Subject to that objection, undisputed.

107.    Congress's establishment of the Satellite Interconnection Fund was codified at 47 U.S.C. § 396(k)(10(D). 47 U.S.C. § 396(k)(10(D).

<u>Plaintiff's Response:</u> This paragraph asserts a legal conclusion and is not a "material fact" within the meaning of Rule 56.  Subject to that objection, undisputed.

108.    Since then, Congress has appropriated funding to the Satellite Interconnection Fund on various occasions, using the language "[t]here is authorized to be ***appropriated*** to the ***Satellite Interconnection Fund***" or "***pursuant to section 396(k)(10)*** of the Communications Act of 1934…"  P. L. 100–626, Nov. 7, 1988, 102 Stat 3207 ("There is authorized to be ***appropriated*** to the ***Satellite Interconnection Fund***, for fiscal year 1991, the amount of $200,000,000."); P. L. 111-117, December 16, 2009, 123 Stat 3034, 3275 (Congress appropriated $25 million "***pursuant to section 396(k)(10)*** of the Communications Act of 1934 . . . .") (emphasis added); P. L. 111-8, March 11, 2009, 123 Stat 524, 797 (Congress appropriated $26.642 million "***pursuant to section 396(k)(10)*** of the Communications Act of 1934   ") (emphasis added); P. L. 110–161, December 26, 2007, 121 Stat 1844 (Congress appropriated $26.750 million "***pursuant to section 396(k)(10)*** of the Communications Act of 1934.") (emphasis added).

<u>Plaintiff's Response:</u> This paragraph asserts a legal conclusion and is not a "material fact" within the meaning of Rule 56.  Subject to that objection, undisputed.

109.    Since 2009, however, Congress has not made a single appropriation to the Satellite Interconnection Fund, whether by reference to the defined term or the statutory citation. Defendant Corporation for Public Broadcasting's Responses to Plaintiff National Public Radio, Inc.'s First Set of Interrogatories, at Answer to Interrogatory No. 2 (attached hereto as Exhibit N)

<u>Plaintiff's Response:</u> This paragraph asserts a legal conclusion and is not a "material fact" within the meaning of Rule 56.  Subject to that objection, disputed.  Congress's interconnection

appropriations since 2009 have also been, in part, to the satellite interconnection fund. *See* Dkt. 57-1 at 35–40 (NPR's Supplemental Memorandum of Law).

110.    Instead, for the fiscal years 2024 and 2025, Congress's appropriations bills used the following language:

> In addition, for the costs associated with replacing and upgrading the public broadcasting interconnection system and other technologies and services that create infrastructure and efficiencies within the public media system, $60,000,000.

P.L. 118-47, March 23, 2024, 138 Stat 460, 696.

Plaintiff's Response: This paragraph asserts a legal conclusion and is not a "material fact" within the meaning of Rule 56. Subject to that objection, undisputed.

111.    This same language was used in 2023. P.L. 117-328, December 29, 2022, 136 Stat 4459, 4901-02; P.L. 117-103, March 15, 2022, 136 Stat 49, 489.

Plaintiff's Response:  This paragraph asserts a legal conclusion and is not a "material fact" within the meaning of Rule 56. Subject to that objection, undisputed.

112.    Congress used nearly identical language, with differing dollar amounts, for the fiscal years dating back to 2016. P.L. 116-260, December 27, 2020, 134 Stat 1182, 1615; P.L. 116-94, December 20, 2019, 133 Stat 2534, 2600; P.L. 115-245, September 28, 2018, 132 Stat 2981. 3111; P.L. 115-141, March 23, 2018 , 132 Stat 348, 757; P.L. 115-31, May 5, 2017, 131 Stat 135, 556; PL 114-113, December 18, 2015 , 129 Stat 2242, 2643.

Plaintiff's Response: This paragraph asserts a legal conclusion and is not a "material fact" within the meaning of Rule 56. Subject to that objection, undisputed.

113.    CPB currently holds no funds appropriated to, or received from, the "Satellite Interconnection Fund" as that term is defined in the Public Broadcasting Act (47 U.S.C. § 396(k)(10)(A)).  Defendant Corporation for Public Broadcasting's Responses to Plaintiff National Public Radio, Inc.'s First Set of Interrogatories, at Answer to Interrogatory No. 2 (attached hereto as Exhibit N).

Plaintiff's Response: This paragraph asserts a legal conclusion and is not a "material fact" within the meaning of Rule 56.  Subject to that objection, disputed.  Congress's interconnection appropriations since 2009 have also been, in part, to the satellite interconnection fund. *See* Dkt. 57-1 at 35–40 (NPR's Supplemental Memorandum of Law).

## NPR Admits that in 2024 Public Scrutiny of NPR Made it "Urgent" That NPR Address Questions About its Declining Public Trust

114.    Under the Public Broadcasting Act, Congress expressly authorizes CPB to "facilitate the full development of public telecommunications in which programs of high quality, diversity, creativity, excellence, and innovation, which are obtained from diverse sources, will be made available to public telecommunications entities, with strict adherence to objectivity and balance in all programs or series of programs of a controversial nature." 47 U.S.C. 396(g)(1)(A).

Plaintiff's Response: Undisputed that the quoted language appears in the statutory text.

115.    By May of 2024, in part as a result of a series of public disclosures about NPR, NPR sought financial assistance from CPB in addressing issues with its quality control and editorial oversight which it stated it had acknowledged existed in NPR for "some time" but had never been addressed, and which, as a result of "increased public scrutiny," made it "urgent" for NPR to address. McClellan Ross Tr. at 149, Ex 7, attached hereto as Exhibit O.

<u>Plaintiff's Response:</u> Disputed in part but immaterial.  Undisputed that NPR applied for a grant from CPB, and that it used the quoted phrases.  Disputed that NPR had quality control or editorial oversight issues.  NPR's grant proposal stated that "[m]any of these changes have been under discussion as part of NPR's long-term strategy for some time," not that NPR had experienced quality control or editorial oversight issues.  Dkt. 60-14 at 2 (CPB Ex. O).

116.    Indeed, the public furor about issues with NPR led the New York Time to publish a piece entitled "Inside the Crisis at NPR: Listeners Are Tuning Out, Sponsorship Revenue Has Dipped, a Diversity Push Has Generated Turmoil. Can America's Public Radio Network Turn Things Around?" McClellan Ross Tr. at 121:20-122:16, Ex. 6, attached hereto as Exhibit P.

<u>Plaintiff's Response:</u> Disputed in part but immaterial.  Undisputed that the New York Times published an article with that title.  Disputed as to there being a "public furor about issues with NPR," or that it "led the New York Time [sic] to publish."  *See* Dkt. 59-103 at 122-23 (McLellan Ross Tr. 121:2-122:16)

117.    In order to help quell the "urgent" issues about the public trust of NPR that NPR had itself identified, in April and May of 2024, NPR itself issued two public statements assuring the public that it would take steps to improve its credibility and trust issues with the public. McClellan Ross Tr. at 156-58.

<u>Plaintiff's Response:</u> Disputed in part but immaterial. Undisputed that NPR issued two public statements in April and May of 2024.  Disputed that the statements were issued to quell "urgent" issues about public trust; as CPB asserts.  Ms. McLellan Ross's testimony was that they were issued to discuss enhancements to NPR's editorial process.  *See* Dkt. 59-103 at 157-59 (McLellan Ross Tr.).

118.    To that end, NPR applied for a grant from CPB of approximately $2 million in taxpayer funds to help it address those credibility and trust issues. The grant was entitled "NPR Editorial Enhancements." CPB approved that grant. McClellan Ross Tr. at 169-70, 173.

Plaintiff's Response: Disputed in part but immaterial.  Undisputed that NPR applied for an Editorial Enhancements grant from CPB of approximately $2 million.  Disputed that NPR applied for this grant because it had "credibility and trust issues"; as CPB asserts.  Ms. McLellan Ross's testimony was that NPR applied for the grant to enhance NPR's editorial standards.  *See* Dkt. 59-103 at 170-71, 174 (McLellan Ross Tr.).  Undisputed that CPB approved that grant.

119.    Some of the public trust issues to which NPR was alluding when it informed CPB that it was "urgent" that it address quality control and editorial review problems related to an opinion column authored by an award-winning NPR editor who had been at NPR for 25 years, Uri Berliner, whose opinion piece entitled "I've Been at NPR for 25 years. Here's How We Lost America's Trust," the publication of which generated much attention by commentators and others. https://www.thefp.com/p/npr-editor-how-npr-lost-americas-trust; McClellan Ross Tr. at 172.

Plaintiff's Response:  Disputed in part but immaterial.  The cited evidence does not support CPB's assertions in this paragraph.  Undisputed that Mr. Berliner published the referenced column and that Ms. McLellan Ross testified that the column was related to NPR's grant application. Otherwise disputed, including as to the assertion that NPR had "quality control and editorial review problems."  *See* Dkt. 59-103 at 173 (McLellan Ross Tr.).

120.    Shortly after Mr. Berliner published his opinion column, NPR, which represents itself as an advocate for the First Amendment, suspended him without pay for having published the column. There followed a great deal of criticism of NPR both because of the substance of Mr.

Berliner's column and because NPR had disciplined of its journalists for having written it. McClellan Ross Tr. at 79, 92-93, 110.

    <u>Plaintiff's Response:</u> Disputed in part but immaterial. The cited evidence does not support CPB's assertions in this paragraph.  Undisputed that Mr. Berliner was suspended and that NPR is an advocate for the First Amendment.  Disputed that there was "a great deal of criticism of NPR"; the cited testimony by Ms. McLellan Ross was that there were "media inquiries."  *See* Dkt. 59-103 at 93-94 (McLellan Ross Tr.).  Moreover, NPR did not suspend Mr. Berliner for having written the article; NPR suspended him for violating NPR's "policy that required supervisor approval for outside publication." *Id.* at 112-113 (McLellan Ross Tr. 111:13–112:4).

    121.    NPR admits that it is that from 2020 to 2024 NPR's audience was declining, and that decline was the subject of concern at NPR.  McClellan Ross Tr. at 127:4-14.

    <u>Plaintiff's Response:</u> Disputed in part but immaterial.  It is undisputed that the referenced testimony is from the deposition of Ms. McLellan Ross.  It is disputed that this constitutes an admission by NPR.  Ms. McLellan Ross was deposed in her individual capacity and not as a Rule 30(b)(6) witness.

    122.    In addition, as the New York Times had reported, revenue had declined at NPR. McClellan Ross Tr. at 136:10-22.

    <u>Plaintiff's Response:</u> Undisputed but immaterial.

    123.    NPR admits that in May of 2022, the NPR board met to discuss taking a big step in its membership effort that it hoped would be a big part of NPR's future.  McClellan Ross Tr. at 128-29.

<u>Plaintiff's Response:</u> Disputed in part but immaterial.  It is undisputed that the referenced testimony is from the deposition of Ms. McLellan Ross.  It is disputed that this constitutes an admission by NPR.  Ms. McLellan Ross is not a member of NPR's Board and was deposed in her individual capacity and not as a Rule 30(b)(6) witness.

124.    In light of NPR's declining audience and revenue, the NY Times publicly reported on NPR's decision to change its longstanding rules restricting the ways it could ask listeners for money directly and that solicitations were supposed to be done with participation from local member stations.  McClellan Ross Tr. at 128-29.

<u>Plaintiff's Response:</u> Disputed but immaterial. Disputed that this accurately reflects what the New York Times "publicly reported" and further disputed to the extent this paragraph suggests NPR's audience generally declined, as opposed to NPR's audience specifically for broadcast radio.

125.    NPR admits that the NPR board planned to suspend that rule so that NPR could ask public radio listeners to donate directly to NPR Network. The NPR board held a special session in June of 2022 for a formal vote on whether to remove the rule and ultimately voted to suspend the rule.  McClellan Ross Tr. at 129-130.

<u>Plaintiff's Response:</u> Disputed in part but immaterial.  It is undisputed that the referenced testimony is from the deposition of Ms. McLellan Ross.  It is disputed that this constitutes an admission by NPR.  Ms. McLellan Ross was deposed in her individual capacity, is not a member of NPR's board, and not as a Rule 30(b)(6) witness.

126.    NPR admits that there were criticisms raised that the changing of the rule could interfere with fund-raising efforts at local radio stations.  McClellan Ross Tr. at 130.

Plaintiff's Response: Disputed but immaterial. The above paragraph mischaracterizes Ms. McLellan Ross's testimony. *See* Dkt. 59-103 at 131 (130:16–22 ("Q. Again, I'm just asking whether or not there were, in fact, criticisms by local stations that the suspension of the rule would adversely affect fund-raising at local stations. Is that the case? A. I would say there were questions. Im not aware of specific criticisms.")). It is also disputed that Ms. McLellan Ross's testimony constitutes an admission by NPR. Ms. McLellan Ross was deposed in her individual capacity and not as a Rule 30(b)(6) witness.

127.    The New York Times reported that some directors at NPR also urged caution, warning that the proposal could interfere with fund-raising efforts at local radio stations. McClellan Ross Tr. at Exhibit 6.

Plaintiff's Response: Undisputed but immaterial.

128.    NPR admits that part of this fund-raising initiative was to generate additional funding for NPR. McClellan Ross Tr. at 136.

Plaintiff's Response: Disputed in part but immaterial. It is undisputed that Ms. McLellan Ross stated that "a small portion" of the fund-raising initiative was to generate funding for NPR. Dkt. 59-103 at 137 (McLellan Ross Tr. 136:1-7). It is disputed that this constitutes an admission by NPR. Ms. McLellan Ross was deposed in her individual capacity and not as a Rule 30(b)(6) witness.

129.    Within weeks of the publication of Berliner's column, NPR's suspension of Berliner for writing the column and media coverage of both and of the "crisis" within NPR as reported by the New York Times, in May 2024, NPR asked CPB to provide it with almost $2 million of taxpayer funds for it to improve its quality control and its editorial oversight through its

submission, on NPR stationery, entitled "A Proposal to the Corporation for Public Broadcasting for NPR's Editorial Enhancement Initiative", it identified a number of changes and improvements to quality control and editorial review that had been "under discussion as part of NPR's long-term strategy for some time", but that "recent increased public scrutiny has added urgency to the moment." McClellan Ross Tr. at 149:8-150:3, Ex. 7, attached hereto as Exhibit O.

<u>Plaintiff's Response:</u> Disputed in part but immaterial.  The cited evidence does not support CPB's assertions in this paragraph.  Disputed that there was a "crisis" within NPR.  Additionally, NPR did not suspend Mr. Berliner for having written the article; NPR suspended him for violating NPR's "policy that required supervisor approval for outside publication."  59-103 at 112–13 (McLellan Ross Tr. 111:13–112:4).

130.    NPR admits that its May 2024 request for $2 million in taxpayer funding to improve its quality control and editorial review which, it stated, had been under discussion within NPR for "some time" but because of "recent increased public scrutiny" now involved "added urgency to the moment" followed at least two public statements made by NPR after Mr. Berliner's column, his suspension and the media reaction to both in which NPR "commit[ed] to these series of editorial enhancements."  McClellan Ross Tr. at 158:12–159:8.

<u>Plaintiff's Response:</u> Disputed in part but immaterial.  It is undisputed that opposing counsel read the quoted language to Ms. McLellan Ross and she agreed that the document she was being shown did indeed contain said language.  It is disputed that this constitutes an admission by NPR.  Ms. McLellan Ross was deposed in her individual capacity and not as a Rule 30(b)(6) witness.

**<u>NPR Knew Full Well Long Before President Trump took office in 2025, and even longer Before he Issued the May 1, 2025 Executive Order on which NPR Relies, CPB was Actively</u>**

**Considering, Based in Part on Independent Expert Recommendations, that CPB Require Reform in the Governance of Interconnection.**

131.    Since the early stages of interconnection for public television, CPB has been involved in reviewing and evaluating the best methods of maintaining the interconnection system and employing consultants to help evaluate to best keep pace with technological changes and the needs of all the public media stations.  Slavitt Decl. at ¶ 35; Merritt Decl. at ¶7.

Plaintiff's Response:  Undisputed.

132.    Since that time, CPB has spent funds on detailed investigations of interconnection by outside consultants. *Id.* at ¶¶ 35–36.

Plaintiff's Response: Undisputed.

133.    In June 2015, CPB engaged Cognizant Business Consulting to evaluate interconnection plans for public media.  Munipalla Tr. at 263:9–20; McClellan Ross Tr. at 210–11.

Plaintiff's Response: Undisputed.

134.    In September 2019, CPB engaged the company Diversified to conduct a financial, structural, and functional assessment of the existing public television and public radio interconnection systems operated by PBS and NPR, respectively.  Munipalla Tr. at 263:9–264:3.

Plaintiff's Response: Undisputed.

135.    In May 2021, Diversified recommended that CPB: "reevaluate the existing management structure of public media interconnection and consider having NPR's and PBS's interconnection management functions roll up to a common senior manager or organizational lead."  *See* Ex. Q (emphasis added).

<u>Plaintiff's Response:</u> Undisputed.

136.    In June 2021, Diversified submits its PRSS Interconnection Systems Phase II Budget Proposal–Report, in which it noted that NPR's budget request sough approximately $6 million more than the 2017 PRSS 10-year Project Plan and that:

> NPR has also changed the format of the budget proposal which includes significantly less information than was provided for Phase I. This reduction of shared information has had some degree of impact on our ability to analyze the proposed plan. In contrast, the PBS budget submissions reviewed by Diversified contained significantly more detail than NPR has provided even for Phase I….

> Diversified has also reviewed the internal projects NPR has listed as priorities for the in house development team. With the exception of extending the current contract for satellite bandwidth, Diversified does not believe any of the projects listed are critical to PRSS operations….

> NPR has responded to our recommendations in the NPR Interconnection Assessment by including examples the work they are doing to support this project. However, they have not shared any evidence that this work is actually necessary.

Merritt Decl. at Ex. C at 3–5.

<u>Plaintiff's Response:</u> Undisputed that the cited report contains the quoted language.

137.    Approximately one-third of the PRSS stations are non-NPR member radio stations. Slavitt Decl. at ¶ 37; Exhibit F at NPR0000317; Merritt Decl. at ¶4.

<u>Plaintiff's Response:</u> Undisputed.

138.    With NPR running the PRSS, however, NPR controls the governance, management, fee structure, and strategic direction of PRSS, which creates the concern that the needs of tribal and non-NPR stations from the interconnection system will not be met.  Slavitt Decl. at ¶ 37

<u>Plaintiff's Response:</u> Disputed. The cited evidence does not support CPB's assertions in this paragraph, nor does the record. PRSS is overseen by the D/I Committee, whose members include non-NPR Board members. Dkt. 59-102 at 16 (Merkley Tr. 56:6–9). The D/I Committee treats member and non-member stations equally, Dkt. 59-6 at 13 (Munipalla Tr. 42:5–11), and CPB has cited no evidence that any Interconnected Station has ever raised favoritism concerns. To the contrary, under the D/I Committee's NPR Distribution's operation and management, the PRSS has a 90 percent satisfaction rate from, and has been consistently praised by, the Interconnected Stations. Dkt. 38-3 at 4 (¶ 14) (2d Munipalla Decl.); Dkt. 59-6 at 49 (Munipalla Tr. 187:21–188:8); Dkt. 59-5 at 2.

139.    As a result of those concerns, CPB began discussing and evaluating the governance of the interconnection system. ¶¶ 133–137, supra; Munipalla Tr. at 50:2–18.

<u>Plaintiff's Response:</u> Disputed. The cited evidence does not support CPB's assertions in this paragraph. CPB did not voice the above-referenced "concerns" until April 2025. The discussions referenced by CPB are about the unrelated issue of television/radio convergence. Dkt. 59-6 at 64 (Munipalla Tr. 246:14–247:1).

140.    In June 2024, NPR Distribution noted, in an internal email: "Given CPB's advocacy for changes in governance and the definition of Interconnection, could NPR Distribution become more dependent on CPB funding in the coming years?" Munipalla Tr. at 44:6–13, 49:16–50:9; *Id.* at Ex. 1, attached hereto as Exhibit R.

<u>Plaintiff's Response:</u>  Undisputed that the cited email contains the quoted language.

141.    In April 2024, CPB engaged Deloitte Consulting LLP ("Deloitte") to provide technical advice on the future of interconnection. Merritt Decl. at ¶ 7.

<u>Plaintiff's Response:</u> Undisputed.

142.    In June 2024, NPR Distribution noted, in an internal email: "Given CPB's advocacy for changes in governance and the definition of Interconnection, could NPR Distribution become more dependent on CPB funding in the coming years?"  Munipalla Tr. at 44:6–13, 49:16–50:9, Ex. 1 attached hereto as Exhibit R.

<u>Plaintiff's Response:</u>  Undisputed that the cited email contains the quoted language.

143.    In June 2024, NPR Distribution noted, in an internal email: "As we speak CPB is advocating for a change in governance and the definition of interconnection. So there is a real chance that NPR Distribution becomes more dependent on CPB funding not less of the next few years. The landscape could be totally different if this happens." Munipalla Tr. at 244:6–22, Ex. 26 attached hereto as Exhibit S.

<u>Plaintiff's Response:</u>  Undisputed that the cited email contains the quoted language.

144.    On September 17, 2024, Chris Nelson, NPR's Senior Vice President, Technology Operations, emailed Katherine Maher, NPR's Chief Executive Officer, stating:

> Deloitte is currently under contract with CPB to develop a strategy and a recommendation for the future of interconnection. Based on recent conversations, it is becoming clear Deloitte is planning to recommend the creation of a "shared services entity," that would potentially handle all broadcast infrastructure, all digital infrastructure, and potentially back-office infrastructure for NPR and other national organizations.

Exhibit T.

<u>Plaintiff's Response:</u> Undisputed that the cited email contains the quoted language.

145.    On October 1, 2024, CPB held a meeting to discuss interconnection during which Deloitte conducted a presentation in which it shared its recommendation to CPB for interconnection that it:

> Create a new distribution entity (referred to as 'NewCo') that operates shared services for distribution independently from existing public media organizations as a non-profit. Establishing a new entity governed by a Board, with representation from across public media (e.g., CPB, NPR, PBS, station groups), helps serve the needs of the entire system, while consolidating capabilities, governance, and spend over time. The transition of existing distribution services into the new entity introduces risk, but enables public media to realize the greatest technical, operational, and financial upside of a model that unifies services.

Merritt Decl. at Ex. A at 2.

Plaintiff's Response: Undisputed that the above language appears in the cited presentation but immaterial.

146.    On October 7–8, 2024, CPB's Board of Directors held an Executive Session where:

> [Michael Levy, CPB Executive Vice President and Chief Operating Officer] reported on CPB's work with Deloitte since the June meeting. [John Footen, Managing Director, Media & Entertainment, Deloitte Consulting] reported on discussions with public media leaders, noting that there is widespread agreement on the need for change. . . . Deloitte developed seven options and chose the two most feasible to present to the board. The first is to create a common shared services platform that provides distribution services to the system from one core technology platform. The second option uses PRSS as the starting point. Deloitte believes the first of the two options to be the better one. . . . Mr. Footen reported that the design envisions an independent entity to run the distribution services with a mission and governance structure that meets the needs of all parties.
>
> *       *       *
>
> The proposed design would be transformational, require time, and the governance structure would be the main challenge    CPB has been in communication with NPR staff, PRSS staff, and NPR board members and Mr. Footen is scheduled to meet with NPR's President and CEO on October 28. Discussion ensued about the design option, the independent governance entity, and ensuring commitment to project by all involved parties.

Merritt Decl. at Ex. B at 2.

Plaintiff's Response: Undisputed that the cited minutes of a CPB Board meeting include this quoted language but immaterial.

147.    In October 2024, CPB and Deloitte presented plan for a change in the structure and governance of the interconnection system. Munipalla Tr. at 301:9–21.

Plaintiff's Response: Disputed in part and immaterial.   The plan was principally about the convergence of television and radio interconnection, and only partially touched on related governance concerns.  Dkt. 59-6 at 64 (Munipalla Tr. 246:14–247:1).

148.    That presentation included the plan for a "newco," i.e. new company, to manage the interconnection system.  *See* Munipalla Tr. 256:19–21.

Plaintiff's Response: Undisputed but immaterial.

149.    On October 23, 2024, NPR Distribution's Vice President emailed NPR's CEO advising that he had asked CPB "if the newco idea is a finalized decision."  Munipalla Tr. 255:14–256:9, Ex. 28, attached hereto as Exhibit U.

Plaintiff's Response: Undisputed but immaterial.

150.    In November 2024, CPB's Board discussed "a joint meeting of CPB, NPR, and PBS's Interconnection teams" and a "propos[al] that CPB post a Request for Proposals for new content distribution to increase competition."  Merritt Decl. at Ex. C at 4.

Plaintiff's Response: Undisputed.

151.    In early 2025, CPB determined with the aid of independent consultants that it would be in the best interest of the public to have the Interconnection system managed by an independent

entity with a corporate governance structure that is independent, representative of all the radio stakeholders, and not controlled by a single public media stakeholder.  Slavitt Decl. at ¶ 39.

Plaintiff's Response: Disputed.  The cited evidence does not support the assertions in this paragraph, not does the record.  CPB's conclusion in 2025 to require spinning off the PRSS was a capitulation to political pressure and not based on what would serve the "best interest of the public.".  Dkt. 59-94 at 2 (CPB's President and CEO, Patricia Harrison, telling the CPB Board of Directors that "[w]e currently have an EO prohibiting us from funding PBS and NPR."); Dkt. 59-39 at 2 (Kathy Merritt writing that "we're in an environment where NPR is the target of the Administration and Congress. It's challenging for CPB to disperse millions of dollars to an organization that's under fire and heavily scrutinized."); Dkt. 59-25 at 4 (Harrison reporting to the CPB Board that, at a meeting on April 3, an OMB official "stated her intense dislike for NPR but noted that it would be a shame to throw the baby out with the bathwater").

## CPB Invites NPR to Negotiate an Agreement for Interconnection Funding that Would Require a Plan for Reform of Governance of PRSS

152.    In April 2025, CPB informed NPR that after decades of studies by outside consultants, it was pursuing a strategy of having an independent entity that was more inclusive of the broad range of public media entities across the country, including rural, tribal, and community stations that rely heavily on interconnection, manage the system.  Slavitt Decl. at ¶ 40.

Plaintiff's Response: Disputed in part.  The cited evidence does not support the assertions in this paragraph.  Undisputed that in April 2025, CPB informed NPR that it was demanding NPR spin off the PRSS.  Otherwise disputed.  *See* Dkt. 59-94 at 2; Dkt. 59-39 at 2; Dkt. 59-25 at 4.

153.    On April 2, 2025, CPB's Board voted to "authorize CPB management to negotiate an amendment to the existing agreement with NPR for the design and implementation of the updated public radio interconnection system. . . ." Merritt Decl. at ¶¶ 29–30 and Ex. K.

Plaintiff's Response: Undisputed.

154.    On April 4, 2025, CPB's Board voted to "direct CPB Management to proceed with amending the contract with NPR for interconnection to include a contingency that NPR provide a plan within 60 days of amendment execution to establish PRSS as an entity independent of NPR." Merritt Decl. at Ex. L.

Plaintiff's Response: Undisputed.

155.    Throughout April 2025, CPB had conversations with NPR about its desire to have public radio interconnection managed by an independent entity and how NPR could be part of that new vision. *Id.* at ¶¶ 40–42.

Plaintiff's Response: Disputed in part.  Undisputed that CPB "had conversations with NPR" about its demand for an independent entity to manage and operate the PRSS.  But CPB demanded NPR spin off the PRSS into an independent entity, therefore excising NPR from its supposed "new vision."  Dkt. 59-102 at 43 (Merkley Tr. 162:3–7, 163:20–164:3).

156.    CPB never provided to NPR a draft agreement, statement of work, or schedule of deliverables for the specific grant of funds at issue.  Merkley Tr. at 115:22–117:10.

Plaintiff's Response: Undisputed.

157.    On April 21, 2025, CPB's General Counsel sent a letter to NPR's General Counsel, Elizabeth Allen, under the re line of: "*New Structure of Radio Interconnection,*" in which CPB's

45

Counsel summarized CPB's expectations on an independent entity and requested that NPR deliver

a plan by May 9, 2025:

> CPB has requested that NPR, as the grantee of interconnection funds and manager and operator of PRSS, submit to CPB by May 9, a plan to make PRSS an entity that is separate from NPR. Specifically, goal is as follows: The entity that manages and operates radio interconnection must be legally independent of NPR and must not be controlled or managed by NPR. The entity must be managed and operated on behalf of all public radio stations. ***Its board must be, and be perceived to be, representative of all stakeholders in interconnection and content distribution for public radio***. **This should include representation from a variety of interconnected stations, both NPR and non-NPR members**, and may include representation from NPR, other content producers and distributors, CPB, and persons outside of public media who can provide technical or other expertise. ***No one public media organization should have majority control over the board and how its representatives are selected***.

Slavitt Decl. at ¶¶40–41, Ex. J (Dkt. No. 40-11) (emphasis added).

> Plaintiff's Response: Undisputed.

158.    In April 2025, NPR was frustrated with CPB and its funding decisions.  Munipalla

Tr. 2293:22–294:8.

> Plaintiff's Response: Undisputed.

159.    On April 23, 2025, in an internal email, NPR Distribution's Vice President

identified a "dream scenario–we get the money and CPB goes away by the action of Congress."

Munipalla Tr. 297:17–298:15, Ex. 38, attached hereto as Exhibit V.

> Plaintiff's Response:  Undisputed that the cited email includes the quoted language.

160.    On April 30, 2025, CPB sent a letter to NPR's Board of Directors summarizing

CPB's position and the request for NPR's plan to create an independent entity, making it clear that

if NPR did not create an independent entity, then CPB will consider "alternatives to the current

public radio interconnection framework":

CPB has a statutory obligation to fund interconnection, the essential service that provides all Americans with access to news and other content. For more than 40 years, CPB has met its statutory obligation, stewarding taxpayer dollars to support radio and television interconnection. In the process, we have worked to ensure both the radio and television interconnection systems will benefit local stations now and in the future, but also meet the high standards of efficiency and effectiveness that are required when using taxpayer dollars.

This is especially important in this challenging moment. Currently, NPR controls the governance, management, fee structure, and strategic direction of PRSS. We anticipate increasing financial pressures in the next few years that will force many public media organizations, including NPR, to re-examine their priorities. In a changing media and content distribution environment, we believe PRSS would better serve the public radio system as an independent entity with a governance structure that more broadly represents the needs and interests of the entire public radio system.

Three weeks ago, CPB asked NPR, as the current grantee of public radio interconnection funds, and manager and operator of PRSS, to submit to CPB by May 9, a plan to make PRSS an independent entity. We believe the NPR board has a responsibility to recognize that the interconnection structures that have been in place for more than 40 years need to be reshaped for the future. The NPR board's leadership, we have learned through numerous conversations, would be welcome throughout the system at this critical moment. ***Without it, CPB will consider other alternatives to the current public radio interconnection framework.***

Slavitt Decl. at ¶ 42, Ex. K (Dkt. No. 40-12) (emphasis added).

Plaintiff's Response:  Undisputed.

161.    NPR declined to provide CPB with a plan to transform PRSS into an independent entity.  Merrit Decl. at ¶44.

Plaintiff's Response: Disputed in part.  Disputed to the extent this paragraph implies that NPR had the authority to unilaterally change PRSS's governance, management or operation.  Dkt. 59-6 at 37 (Munipalla Tr. 138:4–22) (explaining CPB's request "would essentially mean that we would have to completely redo the entire D/I committee structure, and that is ... not something that we could do, as per the arrangements with the trust and as per our role as the operator of the interconnection").

162.    CPB's request that NPR negotiate around a plan to spin off PRSS into a separate independent entity that NPR could participate in, but that neither it nor any one public media entity would be allowed to dominate, had nothing to do with NPR's editorial content or political views. At no time did I, or to my knowledge, any CPB Board member or employee, receive any direction, suggestion, or pressure from the Executive Office of the President, the Department of Government Efficiency, or any other governmental entity to have CPB request that NPR spin out PRSS as a separate independent entity with broad-based governance across the public radio spectrum.  This was CPB's decision, as the steward of federally appropriated funds, to improve the interconnection system for all stations and position it for future success.  Merritt Decl. at ¶ 45, *passim*.

Plaintiff's Response:  Disputed. The cited evidence is inadmissible and does not support the assertions in this paragraph, which are contradicted by the record evidence.  There is overwhelming evidence that CPB discontinued PRSS funding to NPR because of political pressure from the Trump Administration based on a dislike of NPR's perceived viewpoints. *See, e.g.*, Dkt. 59-94 at 2 (CPB's President and CEO, Patricia Harrison, telling the CPB Board of Directors that "[w]e currently have an EO prohibiting us from funding PBS and NPR."); Dkt. 59-39 at 2 (Kathy Merritt writing that "we're in an environment where NPR is the target of the Administration and Congress. It's challenging for CPB to disperse millions of dollars to an organization that's under fire and heavily scrutinized."); Dkt. 59-25 at 4 (Harrison reporting to the CPB Board that, at a meeting on April 3, an OMB official "stated her intense dislike for NPR but noted that it would be a shame to throw the baby out with the bathwater").

163.    In April 2025 NPR Distribution had no idea how much interconnection funding it would receive, if any, so it assumed it would receive zero dollars, and made a contingency plan to use its reserves.  Munipalla Tr. at 165:10–167:1, 250:2–10.

Plaintiff's Response: Disputed in part.  On April 2, 2025, Kathy Merritt informed NPR that CPB's Board had approved more than $30 million in interconnection funding to NPR.  Dkt. 38-3 at 3 (¶ 10) (2d Munipalla Decl.).  From then until April 11, NPR assumed that it would receive the interconnection funds that CPB's Board had approved.  Dkt. 59-32 at 2–3.

164.    On May 9, 2025, on May 9, 2025, CPB issued a letter to NPR and stakeholders across the public media system stating:

> Public radio interconnection is currently governed and managed by NPR through the Public Radio Satellite System (PRSS), which sets its fee structure and strategic direction. NPR has managed PRSS for decades, but the changing financial and media environment requires us to think differently about its future.
>
> CPB has asked NPR to develop a plan to transition PRSS into an independent entity. This new entity would have a governance structure that better reflects the full spectrum of public radio, including rural, tribal, and community stations that rely heavily on interconnection but do not currently have a direct role in its oversight.
>
> To support this transition, CPB is forming a working group to establish shared goals and create a vision for forming a new content distribution entity, funded by CPB. We are asking members of the NPR Board's Distribution/Interconnection Committee to join the group along with stakeholders from other public radio organizations and stations. I would like to express my appreciation to Rima Dael, CEO of the National Federation of Community Broadcasters, for bringing forward her ideas, and spurring the formation of the working group. We look forward to having the input of the group as well as the public radio system.

Slavitt Decl. at ¶ 43, Ex. L (Dkt. No. 40-13).

Plaintiff's Response: Undisputed.

165.    On May 30, 2025, NPR sent CPB a letter designating two of NPR's board members to participate in the Working Group.  Slavitt Decl. at ¶ 44; Munipalla Tr. At 131:17–132:7.

Plaintiff's Response: Disputed in part.  NPR designated three individuals to participate in CPB's Working Group.  CPB refused to include Mr. Munipalla.  Dkt. 59-6 at 35 (Munipalla Tr. 131:17–133:6); NPR ¶ SSUMF 161.

166.    During June 2025, the Working Group created a set of guiding principles, parameters, and needs by the stakeholders for the new independent entity.  Slavitt Decl. at ¶ 44, Exs. M, N, O (Dkt. Nos. 40–14, 40–15, 40–16).

Plaintiff's Response: Undisputed that the Working Group created a document purporting to address those issues.  Dkt. 38-3 at 4 (¶ 14) (2d Munipalla Decl.); Dkt. 59-6 at 49 (Munipalla Tr. 187:21–188:8); Dkt. 59-5 at 2.

167.    The culmination of the Working Group's efforts was the formulation of an RFP that would meet the needs of the system.  Slavitt Decl. at ¶ 45; Munipalla Tr. at 126:22–8.

Plaintiff's Response:  Disputed in part.  Undisputed that the Working Group culminated in the formulation of an RFP, as CPB intended.  Disputed that the RFP "would meet the needs of the system."  Dkt. 38-3 at 4 (¶ 14) (2d Munipalla Decl.); Dkt. 59-6 at 49 (Munipalla Tr. 187:21–188:8); Dkt. 59-5 at 2.

168.    CPB explained to the public media stakeholders:

> Our goal in convening the group was to hear your thoughts on what stations need to successfully deliver content on multiple platforms to multiple audiences, now and in the future.  You helped establish a set of guiding principles, define the parameters of the new entity, and further our understanding of the technology needed for content distribution and services….  The culmination of the work is development of an RFP that CPB will post on Monday, July 14th on this page: https://cpb.org/grants.  The deadline for proposals will be mid-August, with a final contract anticipated by September 30th. Please see the full RFP for further details.

Slavitt Decl. at ¶¶ 44–45, Ex. P (Dkt. No. 40-17).

Plaintiff's Response: Undisputed that the cited exhibit includes this quoted language.

169.    On July 9, 2025, CPB informed NPR's Chief Operating Officer that CPB was moving forward with its competitive bid process for the interconnection system.  *Id.* at ¶ 46.

<u>Plaintiff's Response:</u> Disputed in part. It is undisputed that CPB met with NPR's Chief Operating Officer, Ryan Merkley, on July 9, 2025 and informed him about the RFP.  It is disputed that this was a "competitive bid process for the interconnection system."

170.    On July 9, 2025, CPB met with NPR's Chief Operating Officer, Ryan Merkley, to inform him that CPB was moving forward with its competitive bid process for the interconnection system. *Id.*

<u>Plaintiff's Response:</u> Disputed in part. It is undisputed that CPB met with NPR's Chief Operating Officer, Ryan Merkley, on July 9, 2025 and informed him about the RFP.  It is disputed that this was a "competitive bid process for the interconnection system."

171.    In stark contrast to contending that CPB was somehow not authorized to engage in this process, Mr. Merkley inappropriately asked to see an advance copy of the Request for Proposal that CPB would be posting that Monday. CPB declined this request. *Id.*

<u>Plaintiff's Response:</u> Disputed in part but immaterial.  Undisputed that Mr. Merkley asked whether CPB "would be willing to share the terms or what they were asking for in the RFP with" NPR and that CPB "said no."  Dkt. 59-102 at 60 (Merkley Tr. 231:9–16).  Disputed that Mr. Merkley acted inappropriately.

172.    NPR Distribution did not receive or enter any written agreement for funding for FY2026 and beyond.  Munipalla Tr. at 163:4–164:7; Merkley Tr. at 124:17–19.

<u>Plaintiff's Response:</u> Undisputed.

173.    At no point throughout the process did NPR Distribution contact the public broadcast entities regarding a possible independent entity managing the interconnection system. Munipalla Tr. at 140:13–141:22.

Plaintiff's Response: Undisputed but immaterial.

174.    At no point since April 2025 has NPR asked for a vote from the public broadcast entities regarding designation to receive funds, nor has it sought feedback from those entities. Merkley Tr. at 204:17–206:2.

Plaintiff's Response: Undisputed but immaterial.

175.    In May 2025, NPR received an offer from the National Federation of Community Broadcaster, whose membership includes various public broadcast entities, to work with the Public Radio Satellite Interconnection System Charitable Trust, who technically owns the PRSS, to stabilize PRSS operations and insulate PRSS from political pressure. Exhibit W - NPR0014036.

Plaintiff's Response: Undisputed but immaterial.

**CPB's Selected NPR's Competitor to Manage Interconnection**

176.    On July 14, 2025, CPB publicly issued its Request for Proposals for Entity to Manage and Govern Public Radio Content Distribution, with proposals due by August 15, 2025 (CPB's "RFP").  Slavitt Decl. at ¶ 47, Ex. Q (Dkt. No. 40-18).

Plaintiff's Response: Undisputed.

177.    The RFP was for a grant to manage public radio content distribution, including, but not exclusively through, an interconnection system. *Id.*

Plaintiff's Response: Undisputed.

178.    Aspects of CPB's RFP include expansion of terrestrial interconnection capabilities. Munipalla Tr. at 146:20–147:8.

Plaintiff's Response: Undisputed.

179.    On August 15, 2025, NPR submitted its response to the RFP ("NPR's Proposal"), but nowhere in the NPR Submission did it claim that it was somehow automatically entitled to an award from CPB, or that it was providing its submission "under a reservation of rights," or contending in any way that CPB's competitive bid process was somehow "retaliatory."  Slavitt Decl. at ¶ 48.

Plaintiff's Response: Undisputed that NPR submitted a response to the RFP on August 15, 2025.  The remainder of the paragraph is undisputed but immaterial.

180.    Instead, NPR's cover letter to its submission stated that it was "***pleased to submit our proposal in response to CPB's Request for Proposals*** to manage and govern public radio content distribution services." *Id.* at ¶¶ 47–48, Ex. R (Dkt. No. 40–19) (emphasis added).

Plaintiff's Response: Undisputed but immaterial.

181.    NPR's Proposal was non-responsive to CPB's RFP in numerous ways.  Without limitation, but only by way of example, consistent with what CPB had been communicating for months prior to the issuance of the RFP, CPB's RFP required the independent entity to have a corporate governance structure that was more representative of the entire public media system and not dominated by one organization that would have undue influence over the direction or control of the entity.  NPR's Proposal did not meaningfully address the RFP requirement for an independent entity whose governance would be free from a single public media organization's dominance or outsized influence on the content delivery infrastructure. *Id.* at ¶¶ 50–51

53

<u>Plaintiff's Response:</u> Disputed.  The cited evidence does not support the assertions in this paragraph.  NPR's proposal was responsive to each element of the RFP.  It is undisputed that NPR's proposal did not and could not have satisfied the RFP's criteria intended to exclude NPR. *See* Dkt. No. 40–19 (addressing every required section of the RFP).

182.    NPR's Proposal in response to CPB's RFP included terrestrial interconnection. Munipalla Tr. 154:21–155:3.

<u>Plaintiff's Response:</u> Undisputed.

183.    NPR's Proposal includes a transition away from satellite interconnection because of the risks of the FCC selling off the C-band.  Munipalla Tr. 156:1–20.

<u>Plaintiff's Response:</u> Undisputed.

184.    Had NPR won the bid for CPB's RFP it would have used those funds, at least in part, to expand terrestrial interconnection.  Munipalla Tr. 62:7–20, 155:18–22.

<u>Plaintiff's Response:</u> Undisputed.

185.    Funding that NPR seeks in this lawsuit would be used for NPR Distribution's terrestrial interconnection project.  Munipalla Tr. 62:7–20.

<u>Plaintiff's Response:</u> Disputed in part.  Undisputed that some funding would be used for terrestrial interconnection; the PRSS currently provides both satellite and terrestrial interconnection.  Dkt. 40-19 at 17.

186.    NPR Distribution has between $23 million and $25 million in "healthy reserves" that has arisen, in part, from NPR's "very successful commercial business selling excess satellite capacity."  Munipalla Tr. 101:4–7, 250:2–10; Exhibit X - NPR0012683; Merkey Tr. 47.

<u>Plaintiff's Response:</u> Disputed in part.  Disputed to the extent this paragraph implies that NPR Distribution is a for-profit entity.  Revenue obtained by NPR from selling excess satellite capacity is held for the exclusive benefit of the Interconnected Stations.  Dkt. 59-6 at 10 (Munipalla Tr. 32:16–33:1) (explaining that "revenue generated from" selling excess capacity "is used to keep our rates and fees low as part of our mission").

187.    NPR as a whole possesses an additional $33.4 million in reserves, not exclusively for interconnection or NPR Distribution.  Exhibit Y - NPR0007942.

<u>Plaintiff's Response:</u> Disputed but immaterial.  The cited email indicates that "$33.4 million" is an NPR employee's snap answer to the question of how much is available in NPR's "cash stack" to "offset drop in revenue," but that the employee needed "more information to answer well."  Dkt. 60-24 at 1.  Disputed that this amount reflects NPR Distribution reserves for the PRSS.

188.    If NPR does not receive the funding it seeks in this suit, it would be able to maintain the PRSS. Munipalla Tr. at 177:1–14, 180:20–182:9, Ex. K, attached hereto as Exhibit E.

<u>Plaintiff's Response:</u> Disputed in part.  Without interconnection funding, NPR Distribution's reserves will be unable to cover NPR's shortfalls over the next two years and it will be unable to advance terrestrial interconnection.  Dkt. 59-6 at 77 (Munipalla Tr. 303:1–12).

189.    "If NPR were to just maintain the current state and do nothing else, the limiter would not be money as much as it would be the satellite system going away, at which point you wouldn't have anything else and the system would stop operating."  Munipalla Tr. at 178:1–8.

<u>Plaintiff's Response:</u>  Undisputed.

190.    Public Media Infrastructure ("PMI") also submitted a proposal in response to CPB's RFP ("PMI's Proposal"). Slavitt Decl. at ¶ 51.

Plaintiff's Response: Disputed in part.   As CPB has admitted, "Public Media Infrastructure" did not exist at the time the referenced proposal was submitted (nor did it exist as of October 23, 2025), and therefore could not have submitted the above referenced proposal.  Dkt. 59-11 at 53 (Merritt Tr. 205:16– 18 ("Q. And that's because PMI is not currently a legal entity, right? A. Yes.")).  A group purporting to act on behalf of a to-be-formed entity known as "Public Media Infrastructure" or "PMI," however, did submit a proposal in response to the RFP.

191.    Unlike NPR's Proposal, PMI's Proposal did address the RFP requirement for an independent entity whose governance would be free from a single public media organization's dominance or outsized influence on the content delivery infrastructure. *Id.*

Plaintiff's Response: Disputed in part.  Undisputed that the "PMI" entities are a coalition of multiple organizations.   Disputed that NPR's proposal did not address "governance" or proposed a structure where "a single public media organization" would have "dominance or outsized influence on the content delivery infrastructure."  *See* Dkt. 38-3 at 4 (¶ 14) (2d Munipalla Decl.); Dkt. 59-6 at 49 (Munipalla Tr. 187:21–188:8); Dkt. 59-5 at 2.

192.    PMI's Proposal also addressed issues that CPB's RFP requested, but that NPR's did not address, such as how PMI would address digital distribution and assist public media stations using the system to collect and analyze data about content distribution to help stations monetize that content. *Id.*

Plaintiff's Response: Disputed.  The cited evidence does not support the assertion in this paragraph.  NPR's proposal addressed these topics.  *E.g.,* Dkt. 40-19 at 14, 19, 36.

193. Deloitte reviewed both NPR's Proposal and PMI's Proposal and found, and advised CPB, that PMI's was superior. *Id.* at ¶ 52.

Plaintiff's Response: Disputed. The cited evidence does not support this assertion. The cited Deloitte report states only that PMI's Proposal better fit CPB's hand-picked criteria designed to make it impossible for NPR to win the contract.

194. As a result of that recommendation, CPB elected to award the interconnection funding to PMI. *Id.* at ¶ 52.

Plaintiff's Response: Disputed. The cited evidence does not support this assertion, which is contradicted by the record. CPB did not "elect[] to award the interconnection funding to PMI" as a "result of that recommendation" but rather in response to political pressure. Dkt. 59-94 at 2; Dkt. 59-39 at 2; Dkt. 59-25 at 4.

195. On September 23, 2025, CPB informed NPR during a phone call, that CPB's Board had approved awarding the interconnection funding to PMI, effective after September 30, 2025. *Id.* at ¶ 53.

Plaintiff's Response: Undisputed.

196. PMI's Proposal included $6.5 million in funding to NPR for satellite interconnection services. Supp. Slavitt Dec. at ¶ 10; Merritt Decl. at Ex. W at CPB_0078436-3.

Plaintiff's Response: Undisputed.

197. Only after CPB advised NPR that it had lost the bid, did NPR allege, for the first time, that it was somehow entitled to a perpetual award of Congressional funds appropriated for interconnection. Slavitt Decl. at ¶ 56, Ex. A.

<u>Plaintiff's Response:</u> Disputed.  The cited evidence does not support the assertions in this paragraph, which are contradicted by the record.  NPR has never alleged that it is "entitled to a perpetual award of Congressional funds appropriated for interconnection."  CPB is statutorily required to provide funds for the PRSS, the national public radio interconnection system, and the Public Broadcasting Act specifies that this money should go to the "national entity" that public radio stations have designated to manage the system, NPR, or the interconnected stations themselves.  47 U.S.C. s 396(k)(10).  Moreover, CPB was aware of NPR's position at least as early as April 2025, when the D/I Committee sent CPB a letter expressing that view.  *See* Dkt. 59-61 at 2, 3.  Further disputed that NPR "lost the bid" in an open, competitive bidding process.

## CPB Disputed President Trump's Attempt to Remove Members of CPB's Board of Directors

198.    When the Government recently sought to affect the independence of public media, CPB commenced litigation in this Court to protect its autonomy.  *See id.* at ¶¶ 16-23.

<u>Plaintiff's Response:</u> Undisputed.

199.    On April 28, 2025, three members of the Board of Directors for CPB—Laura G. Ross, Diane Kaplan, and Thomas E. Rothman—received an email purportedly from Trent Morse, the Deputy Director of Presidential Personnel for the Executive Office of the President, purporting to notify those Board members that their positions on CPB's Board of Directors were terminated. Slavitt Decl. at ¶¶ 16-18.

<u>Plaintiff's Response:</u> Undisputed.

200.    CPB also sued President Trump in *The Corporation for Public Broadcasting, et al. v. Donald J. Trump*, et al., Case No. 1:25-cv-01305-RDM  and recently moved for summary

judgment on its claims that President Trump has acted unlawfully and in excess of any purported authority in his attempt to control CPB. Slavitt Decl. at ¶ 23; *see* Am. Compl. at ¶ 82.

 Plaintiff's Response: Undisputed.

 201. On April 29, 2025, just one day after the President's purported termination of three members of CPB's board, DOGE officials sent an email to the two remaining CPB Board members requesting a meeting to learn more about CPB and discuss having a DOGE team assigned to the organization. Slavitt Decl. at ¶¶ 16-18.

 Plaintiff's Response: Undisputed.

 202. CPB counsel responded the same day, explaining that CPB is a private entity, not part of the government and certainly not part of the executive branch. Consistent with this response, at no time has CPB allowed DOGE access to CPB or to be involved in its operations in any way. *Id.*

 Plaintiff's Response: Undisputed.

**CPB Defied President Trump's May 1, 2025 Executive Order**

 203. On May 1, 2025, President Trump issued an Executive Order entitled Ending Taxpayer Subsidization Of Biased Media ("May 1st EO") which purported to "instruct the CPB Board of Directors and all executive departments and agencies to cease Federal funding for NPR and PBS." Slavitt Decl. at ¶ 19; K. Merritt Decl. at Ex. Q; Am. Compl. at ¶¶ 87-92.

 Plaintiff's Response: Undisputed.

 204. The May 1st EO purported to instruct the CPB Board of Directors and all executive departments and agencies to cease all direct and indirect federal funding for NPR and PBS because

he objects to the content of their speech.    Slavitt Decl. at ¶ 20; https://www.whitehouse.gov/presidential-actions/2025/05/ending-taxpayer-subsidization-of-biased-media/; Am. Compl. at ¶ 90.

Plaintiff's Response: Undisputed.

205.    The May 1st EO also specifically instructed CPB to revise 2025 Television and Radio Community Service Grants, which are grants to local public radio and televisions stations for the purposes, among other things, to purchase national programming.  Many public media stations uses these funds to purchase content from PBS, NPR, and other content providers.  Supp. Slavitt Decl. at ¶¶ 2–3.

Plaintiff's Response: Undisputed.

206.    In doing so, the May 1st EO is precisely the type of governmental interference designed to impact media programming or program judgments that Congress by its plain terms sought to prevent in creating CPB as it did.  As the Senate Report accompanying the Act carefully pointed out:

> There is general agreement that for the time being, Federal financial assistance is required to provide the resources necessary for quality programs.  It is also recognized that this assistance **should in no way involve the Government in programming or program judgments**.  An **independent** entity supported by Federal funds is required to provide programs **free of political pressures**.  The Corporation for Public Broadcasting, a nonprofit private corporation, authorized by title II of S. 1160 provides such an entity.

S.Rep.No.222, 90th Cong., 1st Sess. 4, 11 (1967) (emphasis added).  Supp. Slavitt Decl. at ¶ 4.

Plaintiff's Response: This paragraph asserts a legal conclusion and is not a "material fact" within the meaning of Rule 56.  Subject to that objection, undisputed.

207.    The day after the May 1st EO was issued, CPB issued a public statement making it clear that "CPB is not a federal executive agency subject to the President's authority. Congress directly authorized and funded CPB to be a private nonprofit corporation wholly independent of the federal government."  Slavitt Decl. at ¶ 22; Am. Compl. at ¶ 110.

Plaintiff's Response: Undisputed.

208.    CPB did not otherwise follow the purported instructions of the May 1st EO.  Supp. Slavitt Decl. at ¶ 5.

Plaintiff's Response: Disputed.  CPB has followed "the purported instructions" of the Executive Order by withholding the interconnection funding at issue in this case from NPR. See, e.g., Dkt. 59-94 at 2 (CPB's President and CEO, Patricia Harrison, telling the CPB Board of Directors that "[w]e currently have an EO prohibiting us from funding PBS and NPR."); Dkt. 59-39 at 2 (Kathy Merritt writing that "we're in an environment where NPR is the target of the Administration and Congress. It's challenging for CPB to disperse millions of dollars to an organization that's under fire and heavily scrutinized."); Dkt. 59-25 at 4 (Ms. Harrison reporting to the CPB Board that, at a meeting on April 3, an OMB official "stated her intense dislike for NPR but noted that it would be a shame to throw the baby out with the bathwater").

209.    Second, since the May 1st EO, CPB has continued to pay NPR Congressional funds under existing grants and contracts, totaling over $2.15 million.  Since January of 2025, CPB has paid NPR over $6.8 million, as well as paying PBS funds of approximately $90 million. Supp. Slavitt Decl. at ¶ 6; Merritt Decl. at ¶ 49-50.

Plaintiff's Response: Undisputed.

210.    CPB did not alter the terms of its Community Service Grants to prohibit them from being used by local radio or television stations to purchase PBS or NPR content or programing if they sought fit to do so.  Moreover, CPB continues to distribute funds to local radio and television stations after May 1, 2025, so that they could procure programing as they saw fit which could include payments to NPR or PBS. Supp.  Slavitt Decl. at ¶ 7.

Plaintiff's Response: Undisputed.

211.    CPB has continued to make payments to PBS with regard to existing grants and for television interconnection.  These payments collectively are in the tens of millions of dollars. Supp. Slavitt Decl. at ¶ 8.

Plaintiff's Response: Undisputed.

212.    CPB has taken the position in this very litigation that the Executive Order does not apply to CPB.  Slavitt Decl. at ¶ 9.

Plaintiff's Response: Undisputed that CPB has taken this position in litigation.

213.    On May 2, 2025, NPR published an article entitled "Trump says he's ending federal funding for NPR and PBS.  They say he can't," in which NPR publicly states: "CPB is already suing the Trump administration over his executive order seeking to fire three of its five board members; on Friday, it dismissed the validity of the president's new order." https://www.npr.org/2025/05/02/nx-s1-5384790/trump-orders-end-to-federal-funding-for-npr-and-pbs.

Plaintiff's Response: Undisputed.

214.    On May 2, 2025, NPR published an article entitled, "President Trump has issued an executive order to pull federal funds from NPR and PBS," stating: "The Corporation for Public Broadcasting itself seems to have essentially ignored this [May 1st EO]. It doesn't seem to be granting it the standing as being legitimate, and it's already suing the president and the White House over his efforts to remove three of their board members." https://www.npr.org/2025/05/02/nx-s1-5384981/president-trump-has-issued-an-executive-order-to-pull-federal-funds-from-npr-and-pbs

Plaintiff's Response: Undisputed.

215.    NPR's Chief of Staff cannot "identify something that CPB did, some action that it took, that indicated that it believed that it was subject to the President's executive order." McClellan Ross Tr. at 312:4–9.

Plaintiff's Response: Disputed.  The cited testimony contradicts this assertion.  Dkt. 59-103 at 307 (McLellan Ross Tr. 306:4–10 ("Q. Did you at NPR have any basis to believe that CPB was acting in a way that suggested that it felt that it was subject to the executive order? A. Yes.")).

216.    On May 23, 2025, NPR's Senior Vice President of Member Partnership, Gemma Hooley, sent an email to Bill Marrazzo, President and CEO of a local public radio station, stating:

> As CPB highlighted in its May 2, 2025 statement, it is not a federal agency, such that it is not subject to the purported instructions in the May 1 Executive Order to take actions to stop directly and indirectly funding PBS and NPR.  CPB has also advised the system that it is conducting business as usual.  NPR has not changed its operating procedures as a result of the instructions directed to CPB in the EO.

McClellan Ross Tr. at Dep. Ex. 19.

Plaintiff's Response: Undisputed.

**NPR has Sued the Trump Administration and Continued to Speak Freely**

217.    The day after President Trump issued the May 1st EO, NPR's CEO published a formal Statement stating:

> Last night the President released an Executive Order seeking to cease all federal funding to NPR and PBS. ***We will vigorously defend our right*** to provide essential news, information and life-saving services to the American public. We will challenge this Executive Order ***using all means available***.
>
> \*        \*        \*
>
> The President's order is an affront to the First Amendment rights of NPR . . . .
>
> \*        \*        \*
>
> We will strongly defend our work and our editorial independence and will continue to tell the stories of our country and the world with accuracy, objectivity, and fairness.

Available    at    https://www.npr.org/2025/05/02/g-s1-64016/npr-statement-on-white-house-executive-order (emphasis added).

Plaintiff's Response: Undisputed.

218.    On May 27, 2025, NPR filed suit against the Trump Administration, giving rise to this action. *National Public Radio, et al. v. Trump*, No. 1:25-cv-01674 (D.D.C. May, 27, 2025).

Plaintiff's Response: Undisputed.

219.    NPR has been clear that it will never be a party to limitations on the reporting of its journalists. (Merkley Tr. at 35).

Plaintiff's Response: Undisputed.

220.    To that end, NPR has continued to report critically on President Trump and his actions. By way of limited example, on May 27, 2025, NPR published a press release statement from NPR's CEO, explaining the lawsuit, in which it stated:

The [May 1st EO] is a clear violation of the Constitution and the First Amendment's protections for freedom of speech and association, and freedom of the press. It is an affront to the rights of NPR . . . .

\*       \*       \*

The President's [May 1st EO] is directly counter to Congress's long standing intent, as expressed in the Public Broadcasting Act   The Order threatens the existence of the public broadcasting system, upon which tens of millions of Americans rely for vital news, information, and emergency alerts."

\*       \*       \*

The intent [of the May 1st EO] could not be more clear — the Executive Order aims to punish NPR for the content of news and other programming the President dislikes.

\*       \*       \*

This is retaliatory, viewpoint-based discrimination in violation of the First Amendment. The Supreme Court has ruled numerous times over the past 80 years that the government does not have the right to determine what counts as "biased." ***NPR will never agree to this infringement of our constitutional rights, or the constitutional rights of our Member stations, and NPR will not compromise our commitment to an independent free press and journalistic integrity***.

NPR has a First Amendment right to be free from government attempts to control private speech as well as from retaliation aimed at punishing and chilling protected speech. By basing its directives on the substance of NPR's programming, the Executive Order seeks to force NPR to adapt its journalistic standards and editorial choices to the preferences of the government if it is to continue to receive federal funding.

\*       \*       \*

NPR looks forward to continuing to explore, explain, and attempt to elucidate the great American experience.

Available   at   https://www.npr.org/2025/05/27/g-s1-69017/npr-and-katherine-maher-ceo-of-npr-statement (emphasis added).

Plaintiff's Response:  Disputed in part.  Disputed that NPR has "report[ed] critically on President Trump."  NPR's newsroom conforms to editorial standards that prize neutrality and objectivity.  Dkt. 59-103 at 31 (McLellan Ross Tr. 30:14–19).  Moreover, the cited press release is not an example of NPR's reporting at all—it is a statement from NPR's management, which is separated from NPR's journalistic activities by an editorial firewall.  *See, e.g.*, *id.* at 71 (McLellan

Ross Tr. 70:6–10.  It is undisputed that NPR's management released the cited statement with the quoted language.

221.    On May 27, 2025, NPR published an article entitled, "NPR and Colorado public radio stations sue Trump White House," stating that "CPB [has] effectively ignored Trump's orders—retaining, for now, its board members, as the case works through the federal courts — and taking no actions to withhold money from NPR and PBS or the hundreds of stations that send funds to the two national broadcasters."   Available at   https://www.npr.org/2025/05/27/nx-s1-5413094/npr-public-radio-lawsuit-trump-funding-ban.

Plaintiff's Response: Undisputed.

222.    On July 2, 2205, NPR published an article entitled "CBS is the latest news giant to bend to Trump's power."   Available at   https://www.npr.org/2025/07/02/nx-s1-5454790/cbs-settlement-trump-60-minutes-harris-interview-analysis.

Plaintiff's Response: Undisputed.

223.    On August 2, 2025, NPR published a recorded conversation between two of its reporters in which the following was stated:

> [Y]ou have an administration that is openly, directly pressuring news organizations through lawsuits, through the pressure of merger approvals, through defunding, through many other forms.
>
> *    *    *
>
> We are seeing the exercise of political pressure and presidential power to seek to control the flow of independent information from the press but also from - in other ways. From the press - well, look, you're stripping all money out of public broadcasting. You can argue whether or not you feel that public media captures - you know, is fully reflecting things fairly and properly exactly in the right balance and the right way. But to strip it of all funds immediately is not to seek a new balance. It is to try to crash the system in some way.
>
> *    *    *

[Trump's] chief regulator has gone after every single major broadcast network for formal review or investigation, except for Fox, which, of course, is owned by Murdoch. You've seen a number of media and social media companies settle defamation suits or other lawsuits filed as a private citizen by President Trump against them on what are considered legally pretty flimsy grounds to utterly specious grounds.

Available at   https://www.npr.org/2025/08/02/nx-s1-5483925/whats-it-like-to-cover-your-own-network-when-its-in-the-headlines.

  Plaintiff's Response: Undisputed.

224.    On September 19, 2025, NPR published a recorded conversation between two of its reporter in which the following was stated:

Prominent members of the administration are using their official roles to threaten investigations, court cases and other forms of retribution for comments that people make in public and online.

*        *        *

[T]he Trump administration [is] using its power to crack down on or otherwise punish organizations, institutions that it disagrees with. So you see this with universities, you see this with law firms that did work for democratic causes, and you see it a lot with President Trump using the courts to go after journalists and journalism organizations.

Available at   https://www.npr.org/2025/09/19/nx-s1-5544346/where-does-free-speech-go-from-here.

  Plaintiff's Response: Undisputed.

225.    On September 27, 2025, NPR published a recorded conversation between two of its reporters, in which the following was stated:

[The Trump Administration] used the power of the government to go after language about diversity in corporate suites, for example, equity and inclusion.  It's been seeking to unleash speech that has been seen as offensive or off-limits and using the power of government to do so.  But let's be clear.  That's the kind of speech the president likes. ***The administration, at his direction, is also going after major institutions where you find critics or people challenging the administration and its policies***.  So think of universities.  Think of law firms.  Think of corporations - and, yes, especially the media.

Available at https://www.npr.org/2025/09/20/nx-s1-5546602/what-does-free-speech-mean (emphasis added).

Plaintiff's Response: Undisputed.

226. On September 27, 2025, NPR published an article entitled, "NPR and the Corporation for Public Broadcasting clash as federal funding declines." Available at https://www.npr.org/2025/09/27/nx-s1-5554882/npr-federal-funds-decline-clashes-cpb.

Plaintiff's Response: Undisputed.

227. At no time since Trump became President, including throughout 2025, has NPR deviated from its standard journalistic practices and policies. Merkley Tr. at 39:4-14.

Plaintiff's Response: Undisputed.

October 24, 2025                                  Respectfully submitted,

                                                 /s/ Miguel A. Estrada

Miguel A. Estrada (D.D.C. Bar No. 456289)
GIBSON, DUNN & CRUTCHER LLP
1700 M Street, N.W.
Washington, D.C. 20036-4504
(202) 955-8500
MEstrada@gibsondunn.com

Theodore J. Boutrous, Jr. (D.D.C. Bar No. 420440)
Katie Townsend (D.C. Bar No. 1026115)
GIBSON, DUNN & CRUTCHER LLP
333 South Grand Avenue
Los Angeles, CA 90071-3197
(213) 229-7000
T Boutrous@gibsondunn.com
KTownsend@gibsondunn.com

Elizabeth A. Allen (*Admitted Pro Hac Vice*)
NATIONAL PUBLIC RADIO, INC.
1111 North Capitol Street, NE
Washington, D.C. 20002
(202) 513-2000
EAAllen@npr.org

*Counsel for Plaintiff*
*National Public Radio, Inc.*